FILED

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF VIRGINIA
# ALEXANDRIA DIVISION

2016 APR -5 P 12: 18

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| ANAS ELHADY;<br>OSAMA HUSSEIN AHMED;<br>AHMAD IBRAHIM AL HALABI;<br>MICHAEL EDMUND COLEMAN;<br>WAEL HAKMEH;<br>MURAT FRLJUCKIC;<br>ADNAN KHALIL SHAOUT;<br>SALEEM ALI;<br>SHAHIR ANWAR;<br>SAMIR ANWAR;<br>JOHN DOE NO. 1;<br>JOHN DOE NO. 2; and,<br>JOHN DOE NO. 3;<br><br>      Plaintiffs,<br><br>v.<br><br>CHRISTOPHER M. PIEHOTA, Director of the<br>Terrorist Screening Center; in his official<br>capacity;<br><br>STEVEN MABEUS, Principal Deputy<br>Director of the Terrorist Screening Center;<br>in his official capacity;<br><br>G. CLAYTON GRIGG, Deputy Director of<br>Operations of the Terrorist Screening<br>Center; in his official capacity;<br><br>JAMES G. KENNEDY, Director, Transportation<br>Security Redress (OTSR), Transportation<br>Security Administration (TSA), United States<br>Department of Homeland Security (DHS), and<br>Director of the DHS Traveler Redress Inquiry<br>Program (DHS TRIP); in his official capacity;<br><br>MATTHEW G. OLSEN, Director of the<br>National Counterterrorism Center, in<br>his official capacity;<br><br>      Defendants. | Case No.<br>Hon.<br><br>**COMPLAINT FOR INJUNCTIVE<br>AND DECLARATORY RELIEF** |

1

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

Plaintiffs, **Anas Elhady, Osama Hussein Ahmed, Ahmad Ibrahim Al Halabi, Michael Edmund Coleman, Wael Hakmeh, Murat Frljuckic, Adnan Khalil Shaout, Saleem Ali, Shahir Anwar, Samir Anwar, John Doe No. 1, John Doe No. 2,** and **John Doe No. 3** for themselves and on behalf of all others similarly situated, through their attorneys, Council on American-Islamic Relations, Michigan ("CAIR-MI"), The Law Office of Gadeir Abbas, and Akeel and Valentine, PLC, state as follows:

### Introduction

1.      Our federal government is imposing an injustice of historic proportions upon the Americans who have filed this action, as well as thousands of other Americans.  Through extra-judicial and secret means, the federal government is ensnaring individuals into an invisible web of consequences that are imposed indefinitely and without recourse as a result of the shockingly large federal watch list that now include hundreds of thousands of individuals.

2.      Indeed, many Americans, including children, end up on these secret federal watch list – which the Defendants have named the Terrorist Screening Database ("TSDB") – based on mere guesses, hunches, and conjecture and even simply based on matters of race, ethnicity, national origin, religion or the exercise of their constitutional rights.

3.      These consequences include the inability to fly on airplanes, to go through security without having all screeners receive a message for the remainder of a listee's life that she is a "known or suspected terrorist," to obtain licenses, to exercise their Second Amendment right to own a firearm, and to be free from the unimaginable indignity and real-life danger of having their own government communicate to hundreds of thousands of

federal agents, private contractors, businesses, state and local police, the captains of sea-faring vessels, and foreign governments all across the world that they are a violent menace.

4.      And unfortunately, the federal government has designed its federal watch list to be accountability-free.  Persons placed on the federal watch list have no means of removing themselves or challenging the basis for their inclusion.  Indeed, people on the federal watch lists only learn of their placement when they feel the web of consequences burdening their lives and aspirations, and they never learn why.

5.      Media accounts have made clear that the secret federal watch list is the product of bigotry and misguided, counterproductive zeal.  Americans are dumped onto the watch list without being charged, convicted, or in some stomach-churning cases, even subject to an ongoing investigation.

6.      Instead, two recently leaked government documents and a governmental report, which include the March 2013 Watchlisting Guidance (Exhibit 2), the Directorate of Terrorist Identities (DTI): Strategic Accomplishments 2013 (Exhibit 3), and the Department of Justice's March 2014 Audit of the Federal Bureau of Investigation's Management of Terrorist Watchlist (Exhibit 4) reveal that the care the federal government takes in creating its federal watch list is void of proper processing, which in turn results in life-altering consequences that flow from these illegal actions.

7.      In fact, upon information and belief, Dearborn, a city of less than 100,000 and a place Arab Americans and Muslim Americans have called home for generations, contains the second highest concentration of Americans on the federal government's watch list. Moreover, there have been more than 1.5 million nominations to the federal watch list since

2009 and that, in 2013 for example, the Terrorist Screening Center converted 98.96 percent of those nominations into watch list placements.

8.      Upon information and belief, evidence also shows that the federal government uses guilt-by-association presumptions to place family members and friends of listed persons on the watch list.

9.      Moreover, travel to Muslim majority countries—travel that American Muslims are very likely to engage in—is also a basis for watch list placement.

10.     In 2009, the federal government made 227,932 nominations to its federal watch list. In 2013, that number more than doubled at an alarming and dangerous rate to 468,749.

11.     Recently, a federal court judge observed in *Gulet Mohamed v. Eric R. Holder, Jr., et al.* (United States District Court, Eastern District of Virginia, Case No. 11-cv-00050 (2011)), that "[a] showing of past or ongoing unlawful conduct does not seem to be required,... But the Court has little, if any, ability to articulate what information is viewed by TSC as sufficiently 'derogatory' beyond the labels it has provided the Court. In sum, the No Fly List assumes that there are some American citizens who are simply too dangerous to be permitted to fly, no matter the level of pre-flight screening or on-flight surveillance and restraint, even though those citizens cannot be legally arrested, detained, or otherwise restricted in their movements or conduct." *See* United States District Court, Eastern District of Virginia, Case No. 11-cv-00050 (2011); Dkt. 70 at 19; attached as Memorandum Opinion (Exhibit 1).

12.     Moreover, the Court went on to find that "[i]nclusion on the No Fly List also labels an American citizen a disloyal American who is capable of, and disposed toward

4

committing, war crimes, and one can easily imagine the broad range of consequences that might be visited upon such a person if that stigmatizing designation were known by the general public... The process of nomination to the No Fly List is based on a suspected level of future dangerousness that is not necessarily related to any unlawful conduct." *See* United States District Court, Eastern District of Virginia, Case No. 11-cv-00050 (2011); Dkt. 70 at 14, 17; attached as Memorandum Opinion (Exhibit 1).

### Parties

13.     Plaintiff Yaseen Kadura is a 26 year old United States Citizen and a Muslim residing in Cook County, Illinois. Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district which is where the federal watch list is compiled.

14.     Plaintiff Osama Hussein Ahmed is a 24 year old United States Citizen and a Muslim residing in Wayne County, Michigan. Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district which is where the federal watch list is compiled.

15.     Plaintiff Anas Elhady is a 22 year old United States Citizen and a Muslim residing in Wayne County, Michigan. Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district which is where the federal watch list is compiled.

16.     Plaintiff Gulet Mohamed is a United States Citizen and a Muslim residing in Fairfax County, Virginia. Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district which is where the federal watch list is compiled.

5

17.     Plaintiff Ahmad Ibrahim Al Halabi is a 37 year old United States Citizen and a Muslim residing in Wayne County, Michigan. Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district which is where the federal watch list is compiled.

18.     Plaintiff Michael Edmund Coleman is a 44 year old United States Citizen and a Muslim residing in Wayne County, Michigan. Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district which is where the federal watch list is compiled.

19.     Plaintiff Wael Hakmeh is a 37 year old United States Citizen and a Muslim residing in Oakland County, Michigan. Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district which is where the federal watch list is compiled.

20.     Plaintiff Adnan Khalil Shaout is a 55 year old United States Citizen and a Muslim residing in Jordan. Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district which is where the federal watch list is compiled.

21.     Plaintiff Saleem Ali is a 43 year old United States Citizen and a Muslim residing in Wayne County, Michigan. Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district which is where the federal watch list is compiled.

22.     Plaintiff Shahir Anwar is a 36 year old United States Citizen and a Muslim residing in Macomb County, Michigan. Venue is proper because a substantial part of the

events or omissions giving rise to his claims occurred within this district which is where the federal watch list is compiled.

23.     Plaintiff Samir Anwar is a 29 year old United States Citizen and a Muslim residing in Macomb County, Michigan. Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district which is where the federal watch list is compiled.

24.     Plaintiff Mariam Jukaku is a 32 year old United States Citizen and a Muslim residing in Alameda County, California. Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district which is where the federal watch list is compiled.

25.     Plaintiff Mohammad Haydar is a 34 year old United States Citizen and a Muslim residing in Alameda County, California. Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district which is where the federal watch list is compiled.

26.     Plaintiff John Doe No. 1 is a 51 year old United States Citizen and a Muslim residing in Washtenaw County, Michigan. Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district which is where the federal watch list is compiled.

27.     Plaintiff John Doe No. 2 is a 38 year old United States Citizen and a Muslim residing in Oakland County, Michigan. Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district which is where the federal watch list is compiled.

28.     Plaintiff John Doe No. 3 is a 55 year old United States Citizen and a Muslim residing in Washtenaw County, Michigan.  Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district which is where the federal watch list is compiled.

29.     Defendant Christopher M. Piehota is the current Director of the Terrorist Screening Center ("TSC").  Defendant Piehota was appointed in April, 2013.  Defendant Piehota develops and maintains the federal government's consolidated Terrorism Screening Database (the "watch list"), and accepts nominations of Plaintiffs and other similarly situated American citizens made to the federal watch list.  Defendant Piehota also oversees the dissemination of the stigmatizing label attached to Plaintiffs and other similarly situated American citizens of "known or suspected terrorists" to state and local authorities, foreign governments, corporations, private contractors, gun sellers, the captains of sea-faring vessels, among other official and private entities and individuals.  Defendant Piehota is being sued in his official capacity, only.

30.     Defendant Steven Mabeus is the current Principal Deputy Director of the Terrorist Screening Center ("TSC").  Defendant Mabeus was appointed in October, 2013.  Defendant Mabeus develops and maintains the federal government's consolidated Terrorism Screening Database (the "watch list"), and accepts nominations of Plaintiffs and other similarly situated American citizens made to the federal watch list.  Defendant Mabeus also oversees the dissemination of the stigmatizing label attached to Plaintiffs and other similarly situated American citizens of "known or suspected terrorists" to state and local authorities, foreign governments, corporations, private contractors, gun sellers, the captains

of sea-faring vessels, among other official and private entities and individuals. Defendant Mabeus is being sued in his official capacity, only.

31.     Defendant G. Clayton Grigg is the current Deputy Director of Operations of the Terrorist Screening Center ("TSC"). Defendant Grigg began serving in September, 2013. Defendant Grigg developed and maintained the federal government's consolidated Terrorism Screening Database (the "watch list"), and accepted nominations of Plaintiffs and other similarly situated American citizens made to the federal watch list. Defendant Grigg also oversaw the dissemination of the stigmatizing label attached to Plaintiffs and other similarly situated American citizens of "known or suspected terrorists" to state and local authorities, foreign governments, corporations, private contractors, gun sellers, the captains of sea-faring vessels, among other official and private entities and individuals. Defendant Grigg is being sued in his official capacity, only.

32.     Defendant James Kennedy is the Director of the Office of Transportation Security Redress (OTSR), Transportation Security Administration (TSA), United States Department of Homeland Security (DHS). Defendant Kennedy also serves as the Director of the DHS Traveler Inquiry Program (DHS TRIP). Defendant Kennedy is responsible for overseeing DHS TRIP, the administrative complaint process to challenge nominations of Plaintiffs and other similarly situated American citizens made to the federal watch list, and coordinating with other government agencies, including the Terrorism Screening Center, to resolve the complaint. Defendant Kennedy is being sued in his official capacity, only.

33.     Defendant Matthew G. Olsen is Director of the National Counterterrorism Center ("NCTC"). Defendant Olsen is responsible for Defendant the nominations that

resulted in the placement of Plaintiffs and other similarly situated American citizens on the federal watch list. Olsen is being sued in his official capacity, only.

### Jurisdiction and Venue

34.     Under U.S. Const. Art. III §2, this Court has jurisdiction because the rights sought to be protected herein are secured by the United States Constitution. Jurisdiction is proper pursuant to 28 U.S.C. § 1331, *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), *et seq.*, 5 U.S.C. § 702, 5 U.S.C. § 706, the United States Constitution, and federal common law.

35.     This action seeks declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § § 2201-02, Rules 57 and 65 of the Federal Rules of Civil Procedure, and pursuant to the general, legal, and equitable powers of this Court.

36.     This action also seeks damages pursuant to 28 U.S.C. § 1343(a)(4) and 28 U.S.C. § 1357.

37.     A substantial part of the unlawful acts alleged herein were committed within the jurisdiction of the United States District Court for the Eastern District of Virginia.

38.     Venue is proper under 42 U.S.C. § 1391(e) as to all Defendants because Defendants are officers or employees of agencies of the United States sued in their individual capacities and because this judicial district is where a substantial part of the events or omissions giving rise to the claims occurred.

## Factual Background

### The Federal Government's Terrorist Watch List

39.     In September, 2003, Attorney General John Ashcroft established the Terrorist Screening Center ("TSC") to consolidate the government's approach to terrorism screening. The TSC, which is administered by the FBI, develops and maintains the federal government's consolidated Terrorism Screening Database (the "watch list"). TSC's consolidated watch list is the federal government's master repository for suspected international and domestic terrorist records used for watch list related screening.

40.     The watch list has two primary components: the Selectee List and the No-Fly List. Persons on the Selectee List, including many of Plaintiffs, are systematically subject to extra screening at airports and land border crossings, and often find "SSSS" on their boarding passes printed by airline employees which is marked to indicate a passenger's watch list status to airline employees and screeners. Persons on the No-Fly List, including the remainder of Plaintiffs, are prevented from boarding flights that fly into, out of, or even through United States airspace.

41.     TSC disseminates records from its terrorist watch list to other government agencies that in turn use those records to identify suspected terrorists. For example, applicable TSC records are provided to TSA for use by airlines in pre-screening passengers and to CBP for use in screening travelers entering the United States by land.

42.     Upon information and belief, TSC disseminated the records of Plaintiffs from its terrorist watch list to other government agencies, including the TSA for use by airlines in pre-screening Plaintiffs, and CBP for use in screening Plaintiffs upon entering the United States.

43.     Upon information and belief, Defendants disseminated the records pertaining to Plaintiffs from its terrorist watch list to foreign governments with the purpose and hope that those foreign governments will constrain the movement of the Plaintiffs in some manner.

44.     Upon information and belief, Defendants' intention in disseminating watch list records, including those of Plaintiffs and similarly situated American citizens, as widely as possible is to constrain Plaintiffs' movements, not only within the United States, but abroad as well.  For example, some countries detain individuals listed on the federal watch list who enter their borders, question those individuals at the behest of United States officials, or altogether prevent those individuals from even entering those countries.

45.     Thus, while the TSC maintains and controls the database of suspected terrorists, it is the front-line agencies like the TSA that carry out the screening function.  In the context of air travel, when individuals make airline reservations and check in at airports, the front-line screening agency, like TSA and CBP, conducts a name-based search of the individual, including each of the Plaintiffs, to determine whether he or she is on a watch list.

46.     While agencies throughout the federal government utilize the federal watch list to conduct screening, listed persons are subject to a comprehensive portfolio of consequences that cover large aspects of their lives.

47.     Indeed, the federal government disseminates its federal watch list to both government authorities and private corporations and individuals with the purpose and hope that these entities and/or individuals will impose consequences on those individuals Defendants have listed.

12

48.     Upon information and belief, the status of Plaintiffs and similarly situated American citizens as known or suspected terrorists on the federal watch list diminishes and even imperils their ability to access the financial system.

49.     Banks have closed the bank accounts of individuals listed on the federal watch list and financial companies have declined to allow some listed individuals to make wire transfers.

50.     Moreover, upon information and belief, the citizenship and green card applications of Plaintiffs and similarly situated American citizens are delayed indefinitely due to an "FBI name check" and not adjudicated, thereby denying Plaintiffs and similarly situated American citizens of the rights the flow from citizenship, including the ability to travel freely as a United States citizen and to sponsor for lawful permanent residency immediate relatives living abroad.

51.     Among the entities and individuals that the federal government disseminates its federal watch list are state and local authorities, foreign governments, corporations, private contractors, gun sellers, the captains of sea-faring vessels, among others.

52.     Upon information and belief, because the names of Plaintiffs and similarly situated American citizens are included on the federal watch list, their names were disseminated to state and local authorities, foreign governments, corporations, private contractors, the captains of sea-faring vessels, among other official and private entities and individuals.

53.     Because the federal government disseminates its federal watch list to foreign governments, listed persons, including Plaintiffs and similarly situated American citizens, are often not allowed to enter other nations.  This is because the United States is telling other

nations, without any modicum of due process, that thousands of its own citizens are "known or suspected terrorists."

54. The federal government disseminates its federal watch list to state and local police officers, including Plaintiffs, which allows those officers to query the names of persons, if for example, the listed individual is pulled over for routine traffic violations.

55. Disseminating the federal watch list to state and local police officers creates a dangerous situation insofar as the federal watch list effectively directs state and local officers to treat thousands of Americans, including Plaintiffs, charged or convicted with no crime yet listed as a "known or suspected terrorist" and as extremely dangerous.

56. With the advent and deployment of automatic license plate readers by police departments across the country, local and state authorities have relied heavily upon a driver's watch list status as the basis of a traffic stop, including Plaintiffs and similarly situated American citizens.

57. Being on the federal watch list can prevent listed persons, including Plaintiffs and similarly situated American citizens, from purchasing a gun. For example, New Jersey passed a law in 2013 that banned persons on the federal watch list from owning guns. Additionally, Connecticut is in the process of setting up an institutional mechanism to prevent individuals whose names are included on the federal watch list, such as Plaintiffs, from being able to buy a gun in the state of Connecticut.

58. Accordingly, Plaintiffs and similarly situated American citizens are unable to purchase guns in states that ban persons on the federal watch list from owning guns.

59. Because the federal government conducts a security risk assessment that includes querying the federal watch list prior to issuing a license to commercial drivers to

transport hazardous materials, being on the federal watch list can prevent listed persons, including Plaintiffs and similarly situated American citizens, from obtaining or renewing their Hazmat license.

60.     Being on the federal watch list can also prevent listed persons, including Plaintiffs and similarly situated American citizens, from accompanying minors or passengers with disabilities to their gate, from working at an airport, or working for an airline insofar as listed persons are not allowed to enter so-called "sterile areas" of airports.

61.     Being on the federal watch list can also result in the denial or revocation of a Federal Aviation Administration (FAA) license of Plaintiffs and similarly situated American citizens.

62.     Although TSA, CBP, and other agencies may use the records provided by the TSC, it is the TSC that maintains and controls the database of suspected terrorists.

63.     Two government entities, including the Unidentified FBI Agents and Unidentified TSC Agents employed by those government entities, are primarily responsible for "nominating" individuals for inclusion in the terrorist watch list—the NCTC and the FBI. The NCTC, which is managed by the Office of the Director of National Intelligence, relies on information from other federal departments and agencies when including alleged known or suspected international terrorists in its Terrorist Identities Datamart Environment ("TIDE") database. The NCTC reviews TIDE entries and recommends specific entries to the TSC for inclusion in the watch list. TIDE is the main source of all international terrorist information included in the watch list.

64.     The FBI, including the Unidentified FBI Agents, in turn, nominates to the watch list individuals with what it characterizes as suspected ties to domestic terrorism. TSC,

including Defendant Healy and Unidentified TSC Agents, makes the final decision on whether a nominated individual meets the minimum requirements for inclusion into the watch list as a known or suspected terrorist. TSC also decides which screening systems will receive the information about that individual.

65.     Defendant Healy has testified that in evaluating whether an individual meets the criteria for inclusion on the consolidated watch list, the TSC determines whether the nominated individual is "reasonably suspected" of having possible links to terrorism. According to the TSC, "reasonable suspicion requires articulable facts which, taken together with rational inferences, reasonably warrant the determination that an individual is known or suspected to be or has been engaged in conduct constituting, in preparation for, in and of or related to terrorism and terrorist activities."

66.     Defendants have not stated publicly what standards or criteria are applied to determine whether an American citizen on the consolidated watch list will be placed on the No-Fly List, Selectee List ("SSSS") or other list that is distributed to the TSA, CBP or other screening agencies.

67.     The standards for watch list inclusion do not evince even internal logic. Defendants define a "suspected terrorist" as an "individual who is reasonably suspected to be, or have been, engaged in conduct constituting, in preparation for, in aid of, or related to terrorism and terrorist activities based on articulable and reasonable suspicion." In other words, Defendants place American citizens on the federal watch list based upon a "reasonable suspicion" that they are "reasonably suspected" of nefarious activities. This "reasonable suspicion" based on a "reasonable suspicion" standard does not even contain internal logic.

68.     The federal government utilizes guilt-by-association as a basis for watch list inclusion. For example, the immediate relative of listed persons can be listed without any derogatory information—other than the bonds of family. Nonetheless, such designation suggests that the immediate relative is him or herself engaged in nefarious activities.

69.     Being a known associate—a friend, colleague, fellow community member, etc.—of a listed individual can also provide a basis for watch list inclusion.

70.     Even if an American citizen is acquitted of terrorism charges or those charges are otherwise dismissed, the federal government retains for itself the authority to continue to include them in the watch list.

71.     For reasons unknown, Defendants also place what they call "non-investigatory subjects" on the federal watch list, American citizens that they have chosen not to investigate.

72.     Under these practices and standards, the number of records in the consolidated watch list has swelled. Over 1.5 million nominations to the watch list have been submitted by federal agencies since fiscal 2009.

73.     In 2013, Defendant TSC accepted 98.96 percent of all nominations made.

74.     Because of these loose standards and practices, the federal watch list's rate of growth has increased. In fiscal 2009, there were 227,932 nominations to the watch list. In fiscal 2013, there were 468,749 nominations.

75.     Upon information and belief, in 2001, there were 16 people who the federal government systematically prevented from flying. In 2013, that number increased to 47,000.

76.     Once an American citizen has been placed on the watch list, the individual remains on the list until the agency that supplied the initial information in support of the nomination determines the individual should be removed.

77.     A 2007 GAO report found that TSC rejects only approximately one percent of all nominations to the watch list.[1] As such, the watch list is growing at a rate of approximately 20,000 entries per year.

78.     At a March 10, 2010 Senate Homeland Security Committee hearing, Russel E. Travers, Deputy Director of the National Counterterrorism Center, stated that "[t]he entire federal government is leaning very far forward on putting people on list," and that the watch list is "getting bigger, and it will get even bigger."

79.     The federal watch list also disproportionately targets American Muslims.

80.     Defendants have utilized the watch list, not as a tool to enhance aviation and border security, but as a bludgeon to coerce American Muslims into becoming informants or forgoing the exercise of their rights, such as the right to have an attorney present during law enforcement questioning.

81.     Public examples of this phenomenon abound. *See Latif v. Holder,* 2014 U.S. Dist. LEXIS 85450, *19 (D. Or. June 24, 2014) (an FBI agent told Steven Washburn that he "would help remove Washburn's name from the No-Fly List if he agreed to speak to the FBI"); *Id.* at *21-22 (FBI agents told Ibraheim Mashal that "his name would be removed from the No-Fly List and he would receive compensation if he helped the FBI by serving as an informant."): *Id* at *22-23 (FBI agents offered Amir Meshal "the opportunity to serve as a government informant in exchange for assistance in removing his name from the No-Fly List."). *See also Fikre v. FBI,* 2014 U.S. Dist. LEXIS 73174 (D. Or. May 29, 2014) (Emirati officials told Yonas Fikre that he "could not travel to the United States by air because he is on

---

[1] *See* United States Government Accountability Office Report to Congressional Requesters entitled *Terrorist Watch List Screening:  Opportunities Exist to Enhance Management Oversight, Reduce Vulnerabilities in Agency Screening Processes, and Expand Use of the List,* GAO-08-110, October 2007, at 22.

the No-Fly List" and an FBI agent told Fikre that "the FBI could take steps to remove [him] from the No-Fly List if he agreed to be an informant."); *Tanveer v. Holder, et. al.,* No. 13-cv-6951, Dkt. 15 (April 22, 2014) (Naveed Shinwari "declined to act as an informant for the Federal Bureau of Investigation and to spy on [his] own American Muslim communities and other innocent people.").

82.     Almost all publicly known instances of Americans being placed on the watch list regard Muslims or persons who could be mistaken for Muslims.

83.     Additionally, government records show that Dearborn, Michigan—which is 40 percent Arab—is disproportionately represented on the federal watch list. In fact, Dearborn is among the top five cities in the country, alongside Chicago, Houston, New York, and San Diego, represented on the federal watch list.

84.     Defendants' 2013 Watchlisting Guidance also indicates that "[t]ravel for no known lawful or legitimate purpose to a locus of terrorist activity" can be a basis for being listed. While a "locus of Terrorist Activity" is not defined by the document, upon information and belief, it likely includes any place where many Muslims reside.

85.     The federal watch list's inclusion standards are so permissive and pliable and the selectee list's efficacy is at best fleetingly marginal that the inclusion standards themselves violate Plaintiffs procedural and substantive due process.

86.     The federal watch list diminishes, rather than enhances, our national security because the number of innocent Americans on the list is becoming so voluminous that the purpose of having a list is significantly undermined as all are being treated as the same.

87.     The consequences of being on the federal watch list are meted out publically. Members of the public can witness the extra screening to which individuals on the federal

watch list are subject, including being pulled out of their car at gunpoint, being ordered to leave one's vehicle with one's hands held above his/her head, among other stigmatizing measures.

88.     In practice, frontline screeners disclose the status of individuals on the federal watch list to state and local authorities, as well as airline employees.

89.     The operation of the federal watch list enlists air carriers to assist the federal government in tracking the passenger on the federal watch list.

90.     Defendants apply the federal watch list against Muslim Americans in a manner that is different from how it uses its list against people of other faith backgrounds.

91.     Defendants use impermissible and inaccurate religious profiles in compiling the federal watch list.

92.     Defendants who contributed to the placement of Plaintiffs and similarly situated American citizens on the federal watch list knew that their actions violated clearly established federal law.

93.     Defendants knew at the time they acted unlawfully that Supreme Court precedent required that, whenever a citizen is deprived of a liberty interest, the federal government must at least provide the deprived with some form of notice that a deprivation occurred.

**Inadequacy of the DHS Traveler Redress Inquiry Program Process**

94.     The government entities and individuals involved in the creation, maintenance, support, modification and enforcement of the federal watch list, including Defendants, have not provided travelers, including Plaintiffs and similarly situated American

citizens, with a fair and effective mechanism through which they can challenge the TSC's decision to place them on the terrorist watch list.

95.     An individual, including Plaintiffs and similarly situated American citizens, who has been prevented or hindered from travel by being placed on the federal watch list has no clear avenue for redress, because no single government entity is responsible for removing an individual from the list. The TSC, which is administered by the FBI, does not accept redress inquiries from the public, nor does it directly provide final disposition letters to individuals on the selectee list, including Plaintiffs on the selectee list and similarly situated American citizens, who have submitted redress inquiries. The NCTC which manages the TIDE list does not accept redress inquiries from the general public.

96.     Individuals who seek redress after having been included in the terrorist watch list must submit an inquiry through the DHS Traveler Redress Inquiry Program ("DHS TRIP"). DHS TRIP provides individuals with a "Redress Control Number."

97.     DHS TRIP is the only redress "process" available to individuals included on the terrorist watch list.

98.     DHS TRIP submits traveler complaints to the TSC, which determines whether any action should be taken. The TSC has not provided any publicly available information about how it makes that decision. The TSC is the final arbiter of whether an individual's name is retained on or removed from the watch list, including those of Plaintiffs and similarly situated American citizens.

99.     The TSC makes a determination regarding a particular individual's status on the watch list, including Plaintiffs and similarly situated American citizens, and DHS in turn responds to the individual with a standard form letter that neither confirms nor denies the

existence of any terrorist watch list records relating to the individual.  The letters do not set forth any basis for inclusion in a terrorist watch list, do not state whether the government has resolved the complaint at issue.

100.   The government does not provide an American citizen with any opportunity to confront, or to rebut, the grounds for his or her possible inclusion on the watch list.  As such, DHS TRIP offers no meaningful review of the watch list designation and in effect shields the TSC's actions with respect to the individual nominations or classes of nominations from meaningful review by any independent authority.

101.   Moreover, the government's own internal audits of the system point to serious flaws.  For example, a March 2008 DOJ Office of the Inspector General report entitled *Audit of the U.S. Department of Justice Terrorism Watchlist Nomination Processes* found significant problems with the nomination and removal process.

102.   Thus, the only "process" available to such individuals is to submit their names and other identifying information to a government entity that has no authority to provide redress and to hope that an unspecified government agency corrects an error or changes its mind.

103.   As alleged below, each of the Plaintiffs and similarly situated American citizens are designated on the watch list.

**Plaintiff Anas Elhady**

104.   Mr. Anas Elhady is routinely referred to secondary inspection, handcuffed and detained by CBP at land border crossings when he attempts to re-enter the United States from Canada.

105.    CBP officers routinely subject him to a prolonged detention and questioning for approximately four to twelve hours each time.

106.    Moreover, he is routinely asked questions about his religious beliefs and practices, what sect of Islam he belongs to, what mosque he prays in, among other things.

107.    Moreover, every time Mr. Elhady travels by air, his boarding pass is stamped with the "SSSS" designation, indicating that he has been designated as a "known or suspected terrorist."

108.    Mr. Elhady filed a redress request through DHS TRIP.

109.    On May 11, 2015, Mr. Elhady received a letter as described in paragraph 99 above and was assigned a Redress Control Number.

110.    Shortly afterwards, Mr. Elhady was again referred to secondary inspection, handcuffed and detained by CBP at the border stop at the Ambassador Bridge Port of Entry in Detroit, Michigan, for approximately six hours when he attempted to re-enter the United States after a brief vacation in Canada.

111.    After the CBP officers confiscated Mr. Elhady's jacket and shoes, they detained him in a small, freezing cold holding cell with bright lights.

112.    After several hours, Mr. Elhady knocked on the door repeatedly and begged for someone to help him.  His pleas for help were ignored.

113.    Afterwards, his body began shaking uncontrollably and he fell unconscious.

114.    CBP officers finally opened the door and woke him up.

115.    Mr. Elhady repeatedly begged for an ambulance to take him to the hospital, but his pleas were ignored.

116.    Finally, Mr. Elhady was taken to an ambulance, only to be handcuffed to the bed inside the ambulance.

117.    Mr. Elhady was taken to a local hospital, where he was handcuffed to a chair in the waiting room of the hospital.

118.    After being attended to by nurses and physicians, and prescribed the medication that he needed, Mr. Elhady was again handcuffed to a chair inside a vehicle and transported back to the Ambassador Bridge.

119.    On December 2, 2015, FBI Special Agent Josh Allen contacted Mr. Elhady and informed him that his phone was being tapped and that all his calls were being listened to by the FBI.

120.    Mr. Elhady's boarding pass continues to be stamped with the "SSSS" designation when travels by air, indicating that he has been designated as a "known or suspected terrorist."

121.    Additionally, every time Mr. Elhady travels by air, he is referred to secondary inspection and subjected to prolonged searches and questioning.

122.    At no time was Mr. Elhady given notice of the factual basis for his placement on the federal watch list, and at no time was he offered a meaningful opportunity to contest his designation.

123.    Moreover, at no time was Mr. Elhady given notice of the deprivation of his liberty interests or violation of his constitutional rights.

124.    Upon information and belief, Mr. Elhady remains on the federal watch list.

125.    Upon information and belief, Mr. Elhady's nomination to the federal watch list was made based solely upon a hunch (based upon his race, ethnicity, national origin, religious affiliation, or First Amendment protected activities).

### Plaintiff Osama Hussein Ahmed

126.    On or about February or March, 2011, Mr. Osama Ahmed appeared at the Detroit Metropolitan Airport, upon returning home on a commercial flight from Yemen.

127.    Mr. Ahmed was escorted from the gate to an interrogation room and interrogated by FBI agents for approximately six to seven hours.

128.    The FBI agents confiscated his USB drive that he had with him, and upon information and belief, downloaded the information from his USB drive.

129.    Several days later, FBI agents, including Special Agent Joel Kelso, appeared at Mr. Ahmed's home.

130.    The FBI agents took him to a nearby bd's Mongolian Grill, and attempted to recruit Mr. Ahmed into becoming an informant in Yemen.

131.    The FBI agents tried to entice Mr. Ahmed, who was only 18 years old at the time, into becoming an informant by offering to teach him how to sky dive, among other things.

132.    Special Agent Kelso informed Mr. Ahmed that his name was on the No-Fly List, and that if he cooperated, his name would be removed from the list.

133.    On April 29, 2011, Mr. Ahmed filed a complaint through DHS TRIP.

134.    On May 2, 2011, Mr. Ahmed's attorney spoke with Special Agent Kelso who informed her at that time that there was no basis to include Mr. Ahmed on the No-Fly List, and that he would make arrangements to remove his name from the federal watch list.

135.   On May 10, 2011, Special Agent Kelso informed his attorney that Mr. Ahmed's name was removed from the No-Fly List.

136.   As a result of being added to the No-Fly List, Mr. Ahmed was unable to apply for employment at the airport where his brother was employed at the time until his name was removed from the No-Fly List.

137.   Upon information and belief, Mr. Ahmed's name was added to the No-Fly List in order to leverage his status on the federal watch list to put pressure on Mr. Ahmed to act as an informant in Yemen.

138.   On or about 2015, Mr. Ahmed's boarding passes are now stamped with the "SSSS" designation, indicating that he has been once again designated as a "known or suspected terrorist."

139.   At no time was Mr. Ahmed given notice of the factual basis for his placement on the federal watch list, and at no time was he offered a meaningful opportunity to contest his designation.

140.   Moreover, at no time was Mr. Ahmed given notice of the deprivation of his liberty interests or violation of his constitutional rights.

141.   Upon information and belief, Mr. Ahmed remains on the federal watch list.

142.   Upon information and belief, Mr. Ahmed's nomination to the federal watch list was made based solely upon a hunch (based upon his race, ethnicity, national origin, religious affiliation, or First Amendment protected activities).

**Plaintiff Ahmad Ibrahim Al Halabi**

143.    Every time Mr. Ahmad Al Halabi travels by air, since 2004, his boarding pass is stamped with the "SSSS" designation, indicating that he has been designated as a "known or suspected terrorist."

144.    Moreover, Mr. Al Halabi is frequently unable to board his flights until he is "cleared" by DHS to board the flight, a process that oftentimes takes hours.

145.    Moreover, Mr. Al Halabi has missed his flights and incurred additional expenses on multiple occasions after having been subjected to prolonged searches and interrogations.

146.    On June 25, 2014, Mr. Al Halabi was surrounded by armed CBP officers, handcuffed in front of his children and detained in a freezing cold holding cell for approximately two to three hours and in the waiting area for another three to four hours at the Ambassador Bridge port of entry in Detroit, Michigan, when he attempted to re-enter the United States after a brief vacation in Canada.

147.    CBP officers confiscated his phone, and upon information and belief, the CBP officers downloaded the data from his phone.

148.    Mr. Al Halabi no longer travels by air nor does he travel to Canada by land unless absolutely necessary for business purposes in order to avoid being subjected to the above treatment.

149.    Mr. Al Halabi filed multiple redress requests through DHS TRIP.

150.    Mr. Al Halabi received multiple letters as described in paragraph 99 above and was assigned multiple Redress Control Numbers.

151.    At no time was Mr. Al Halabi given notice of the factual basis for his placement on the federal watch list, and at no time was he offered a meaningful opportunity to contest his designation.

152.    Moreover, at no time was Mr. Al Halabi given notice of the deprivation of his liberty interests or violation of his constitutional rights.

153.    Mr. Al Halabi's boarding passes continue to be stamped with the "SSSS" designation every time he travels by air.

154.    Additionally, every time Mr. Al Halabi travels by air, he is referred to secondary inspection and subjected to prolonged searches and questioning.

155.    Upon information and belief, Mr. Al Halabi remains on the federal watch list.

156.    Upon information and belief, Mr. Al Halabi's nomination to the federal watch list was made based solely upon a hunch (based upon his race, ethnicity, national origin, religious affiliation, or First Amendment protected activities).

### Plaintiff Michael Edmund Coleman

157.    On or about May 2, 2015, Mr. Michael Edmund Coleman appeared at the Detroit Metropolitan Airport, in order to board a commercial flight for his trip to Doha International Airport.

158.    Mr. Coleman was unable to check in online or at a kiosk stationed at the airport.

159.    He approached an airline representative to be checked in manually, and after speaking on the phone with a DHS representative to obtain clearance before he could fly, his boarding pass was stamped with the "SSSS" designation, indicating that he has been designated as a "known or suspected terrorist."

160.     During Mr. Coleman's flight connection at the Philadelphia International Airport, Mr. Coleman was unable to board his next flight until he was once again "cleared" by DHS to board the flight.

161.     Mr. Coleman filed a redress request through DHS TRIP.

162.     As of the date of this filing, Mr. Coleman has not received a response from DHS, nor has he been assigned a Redress Control Number.

163.     Mr. Coleman's boarding passes continue to be stamped with the "SSSS" designation every time he travels by air.

164.     Additionally, every time Mr. Coleman travels by air, he is referred to secondary inspection and subjected to prolonged searches, questioning and chemical testing.

165.     Mr. Coleman is frequently interrogated about his religious activities.

166.     At no time was Mr. Coleman given notice of the factual basis for his placement on the federal watch list, and at no time was he offered a meaningful opportunity to contest his designation.

167.     Moreover, at no time was Mr. Coleman given notice of the deprivation of his liberty interests or violation of his constitutional rights.

168.     Upon information and belief, Mr. Coleman remains on the federal watch list.

169.     Mr. Coleman limits travels by air and by land to Canada when necessary for business purposes in order to avoid being subjected to the above treatment.

170.     Upon information and belief, Mr. Coleman's nomination to the federal watch list was made based solely upon a hunch (based upon his race, ethnicity, national origin, religious affiliation, or First Amendment protected activities).

**Plaintiff Wael Hakmeh**

171.    On or about April, 2014, Mr. Wael Hakmeh appeared at Chicago O'Hare International Airport upon returning on a flight from a business trip in Turkey.

172.    He was referred to secondary screening and subjected to a prolonged interrogation.

173.    Additionally, to the best of his recollection, in June, 2014, his boarding pass was stamped with the "SSSS" designation for the first time, indicating that he was designated as a "known or suspected terrorist."

174.    On or about October, 2014, Mr. Hakmeh appeared to have been removed from the watch list, as his boarding pass for his flight was not stamped with the "SSSS" designation.

175.    However, since approximately January, 2016, Mr. Hakmeh's boarding passes are stamped with the "SSSS" designation every time he travels by air.

176.    Additionally, every time Mr. Hakmeh travels by air, he is referred to secondary inspection and subjected to prolonged searches and questioning.

177.    At no time was Mr. Hakmeh given notice of the factual basis for his placement on the federal watch list, and at no time was he offered a meaningful opportunity to contest his designation.

178.    Moreover, at no time was Mr. Hakmeh given notice of the deprivation of his liberty interests or violation of his constitutional rights.

179.    Upon information and belief, Mr. Hakmeh remains on the federal watch list.

180.    Mr. Hakmeh no longer connects through Chicago O'Hare International Airport to Detroit Metropolitan Airport when returning home to Michigan from overseas travel. Rather, Mr. Hakmeh drives from Chicago O'Hare International Airport for approximately five

hours to his home in Wayne County, Michigan each time in order to avoid being subjected to the above treatment at multiple airports and risk arriving late to his place of employment.

181.     Upon information and belief, Mr. Hakmeh's nomination to the federal watch list was made based solely upon a hunch (based upon his race, ethnicity, national origin, religious affiliation, or First Amendment protected activities).

### Plaintiff Murat Frljuckic

182.     On or about October, 2012, Mr. Murat Frljuckic was referred to secondary inspection, handcuffed and detained by CBP at the border stop at the Blue Water Bridge Port of Entry in Port Huron, Michigan, when he attempted to re-enter the United States after a brief vacation in Canada.

183.     CBP officers subjected him to a prolonged detention and questioning for approximately three to four hours.

184.     Similarly, on or about August, 2014, Mr. Frljuckic was referred to secondary inspection, handcuffed and detained by CBP at the border stop at the Blue Water Bridge Port of Entry in Port Huron, Michigan, when he attempted to re-enter the United States after a brief vacation in Montenegro.

185.     Moreover, every time Mr. Frljuckic travels by air, since approximately March or April, 2012, his boarding pass is stamped with the "SSSS" designation, indicating that he has been designated as a "known or suspected terrorist."

186.     Mr. Frljuckic filed a redress request through DHS TRIP.

187.     As of the date of this filing, Mr. Frljuckic has not received a response from DHS, nor has he been assigned a Redress Control Number.

188.   Mr. Frljuckic's boarding passes continue to be stamped with the "SSSS" designation every time he travels by air.

189.   Additionally, every time Mr. Frljuckic travels by air, he is referred to secondary inspection and subjected to prolonged searches and questioning.

190.   At no time was Mr. Frljuckic given notice of the factual basis for his placement on the federal watch list, and at no time was he offered a meaningful opportunity to contest his designation.

191.   Moreover, at no time was Mr. Frljuckic given notice of the deprivation of his liberty interests or violation of his constitutional rights.

192.   Upon information and belief, Mr. Frljuckic remains on the federal watch list.

193.   Mr. Frljuckic no longer travels by air nor does he travel to Canada by land in order to avoid being subjected to the above treatment.

194.   Upon information and belief, Mr. Frljuckic's nomination to the federal watch list was made based solely upon a hunch (based upon his race, ethnicity, national origin, religious affiliation, or First Amendment protected activities).

### Plaintiff Adnan Khalil Shaout

195.   Every time Mr. Adnan Shaout travels by air, since 2004, his boarding pass is stamped with the "SSSS" designation, indicating that he has been designated as a "known or suspected terrorist."

196.   Mr. Shaout is frequently interrogated about his religious beliefs and affiliation with religious groups during secondary inspections.

197.   Moreover, Mr. Shaout is frequently unable to board his flights until he is "cleared" by DHS to board the flight, a process that oftentimes takes hours.

198.   Moreover, TSA agents often confiscate his laptop, and upon information and belief, download information from his laptop.

199.   On or about, June 23, 2011, while Mr. Shaout was sitting in the plane waiting for take-off, despite having been thoroughly screened by TSA, TSA agents removed Mr. Shaout from the plane and conducted another extensive pat down and search of his personal belongings.

200.   The entire flight was delayed until the TSA agents completed this search.

201.   Mr. Shaout no longer travels by air in the United States in order to avoid being subjected to the above treatment.

202.   Mr. Shaout filed a redress request through DHS TRIP.

203.   On November 5, 2015, Mr. Shaout received a letter as described in paragraph 99 above and was assigned a Redress Control Number.

204.   Mr. Shaout's boarding pass continues to be stamped with the "SSSS" designation when travels by air, indicating that he has been designated as a "known or suspected terrorist."

205.   Additionally, every time Mr. Shaout travels by air, he is referred to secondary inspection and subjected to prolonged searches and questioning.

206.   At no time was Mr. Shaout given notice of the factual basis for his placement on the federal watch list, and at no time was he offered a meaningful opportunity to contest his designation.

207.   Moreover, at no time was Mr. Shaout given notice of the deprivation of his liberty interests or violation of his constitutional rights.

208.   Upon information and belief, Mr. Shaout remains on the federal watch list.

209.   Upon information and belief, Mr. Shaout's nomination to the federal watch list was made based solely upon a hunch (based upon his race, ethnicity, national origin, religious affiliation, or First Amendment protected activities).

210.   Mr. Shaout no longer travels by air in order to avoid being subjected to the above treatment.

### Plaintiff Saleem Ali

211.   On or about October, 2012, Mr. Saleem Ali was referred to secondary inspection and detained by CBP at the border stop at the Ambassador Bridge, Detroit, Michigan, when he attempted to re-enter the United States after a brief vacation in Canada.

212.   CBP officers confiscated his two phones, asked him for his passwords to access the two phones, and upon information and belief, the CBP officers downloaded the data from his phones.

213.   CBP officers kept his phones and did not return them until the following day.

214.   Moreover, every time Mr. Ali travels by air, his boarding pass is stamped with the "SSSS" designation, indicating that he has been designated as a "known or suspected terrorist."

215.   Additionally, every time Mr. Ali travels by air, he is referred to secondary inspection and subjected to prolonged searches and questioning.

216.   Mr. Ali filed a redress request through DHS TRIP.

217.   Mr. Ali received a letter as described in paragraph 99 above and was assigned a Redress Control Number.

218.    At no time was Mr. Ali given notice of the factual basis for his placement on the federal watch list, and at no time was he offered a meaningful opportunity to contest his designation.

219.    Moreover, at no time was Mr. Ali given notice of the deprivation of his liberty interests or violation of his constitutional rights.

220.    Upon information and belief, Mr. Ali remains on the federal watch list.

221.    Upon information and belief, Mr. Ali's nomination to the federal watch list was made based solely upon a hunch (based upon his race, ethnicity, national origin, religious affiliation, familial status or First Amendment protected activities).

**Plaintiff Shahir Anwar**

222.    Mr. Shahir Anwar is the brother of Plaintiff Mr. Samir Anwar.

223.    Every time Mr. Anwar travels by air, since 2014, his boarding pass is stamped with the "SSSS" designation, indicating that he has been designated as a "known or suspected terrorist."

224.    Additionally, every time Mr. Anwar travels by air, he is referred to secondary inspection and subjected to prolonged searches and questioning.

225.    Mr. Anwar filed a redress request through DHS TRIP.

226.    On March 23, 2015, Mr. Anwar received a letter as described in paragraph 99 above and was assigned a Redress Control Number.

227.    Mr. Anwar's boarding passes continue to be stamped with the "SSSS" designation every time he travels by air.

228.    At no time was Mr. Anwar given notice of the factual basis for his placement on the federal watch list, and at no time was he offered a meaningful opportunity to contest his designation.

229.    Moreover, at no time was Mr. Anwar given notice of the deprivation of his liberty interests or violation of his constitutional rights.

230.    Upon information and belief, Mr. Anwar remains on the federal watch list.

231.    Mr. Anwar no longer travels by air nor does he travel to Canada by land in order to avoid being subjected to the above treatment or the treatment experienced by his brother, Plaintiff Samir Anwar, described below.

232.    Upon information and belief, Mr. Anwar's nomination to the federal watch list was made based solely upon a hunch (based upon his race, ethnicity, national origin, religious affiliation, familial or First Amendment protected activities).

**Plaintiff Samir Anwar**

233.    Mr. Samir Anwar is the brother of Plaintiff Mr. Shahir Anwar.

234.    Every time Mr. Anwar travels by air, his boarding pass is stamped with the "SSSS" designation, indicating that he has been designated as a "known or suspected terrorist."

235.    Mr. Anwar filed a redress request through DHS TRIP.

236.    On August 7, 2014, Mr. Anwar received a letter as described in paragraph 99 above and was assigned a Redress Control Number.

237.    On or about February 22, 2015, Mr. Anwar was referred to secondary inspection and detained by CBP at the border stop at the Blue Water Bridge Port of Entry in

Port Huron, Michigan, when he attempted to re-enter the United States after a brief trip to Canada.

238.    Mr. Anwar handed a CBP officer the letter from DHS, however the CBP officer responded that the letter does not mean anything and does not have any impact on the situation.

239.    CBP officers confiscated his phone, asked him for his password to access the phone, and upon information and belief, the CBP officers downloaded the data from his phone.

240.    Moreover, Mr. Anwar was interrogated about his religious beliefs and religious affiliations.

241.    Mr. Anwar's boarding pass continues to be stamped with the "SSSS" designation when travels by air, indicating that he has been designated as a "known or suspected terrorist."

242.    Additionally, every time Mr. Anwar travels by air, he is referred to secondary inspection and subjected to prolonged searches and questioning.

243.    At no time was Mr. Anwar given notice of the factual basis for his placement on the federal watch list, and at no time was he offered a meaningful opportunity to contest his designation.

244.    Moreover, at no time was Mr. Anwar given notice of the deprivation of his liberty interests or violation of his constitutional rights.

245.    Upon information and belief, Mr. Anwar remains on the federal watch list.

246.    Upon information and belief, Mr. Anwar's nomination to the federal watch list was made based solely upon a hunch (based upon his race, ethnicity, national origin, religious affiliation, or First Amendment protected activities).

### Plaintiff John Doe No. 1

247.    On or about January, 2015, Mr. John Doe No. 1's boarding pass is stamped with the "SSSS" designation, indicating that he has been designated as a "known or suspected terrorist."

248.    Additionally, every time Mr. Doe No. 1 returns to the United States from international travel, Mr. Doe is subjected to prolonged detention and questioning.

249.    Suddenly, shortly after Mr. Doe No. 1 was designated on the federal watch list, many of his individual and business bank accounts were closed without notice or an explanation of the reasons why they were being closed, including bank accounts at JPMorgan Chase Bank, TCF Bank and PNC Bank.

250.    Upon information and belief, Unidentified TSC Agents disseminated the stigmatizing label of "known or suspected terrorist" attached to Mr. Doe No. 1 to JPMorgan Chase Bank, TCF Bank and PNC Bank, and as a result, his bank accounts were closed without notice.

251.    Mr. Doe No. 1 filed a redress request through DHS TRIP.

252.    As of the date of this filing, Mr. Doe No. 1 has not received a response from DHS, nor has he been assigned a Redress Control Number.

253.    At no time was Mr. Doe No. 1 given notice of the factual basis for his placement on the federal watch list, and at no time was he offered a meaningful opportunity to contest his designation.

254.    Moreover, at no time was Mr. Doe No. 1 given notice of the deprivation of his liberty interests or violation of his constitutional rights.

255.    Upon information and belief, Mr. Doe No. 1 remains on the federal watch list.

256.    Upon information and belief, Mr. Doe's No. 1 nomination to the federal watch list was made based solely upon a hunch (based upon his race, ethnicity, national origin, religious affiliation, or First Amendment protected activities).

### Plaintiff John Doe No. 2

257.    On or about May, 2010, Mr. John Doe No. 2 appeared at the Detroit Metropolitan Airport upon returning on a flight from a trip to Turkey.

258.    He was referred to secondary screening and subjected to a prolonged interrogation.

259.    During his interrogation, CBP officers began looking through pictures on Mr. Doe No. 2's laptop and asked him questions about his place of worship, the religious leader at his mosque, whether Mr. Doe No. 2 knew anyone who was involved in terrorist activities, and whether he had information about other congregants at his place of worship.

260.    Every time Mr. Doe No. 2 travels by air, since his May, 2010 trip, his boarding pass is stamped with the "SSSS" designation, indicating that he has been designated as a "known or suspected terrorist."

261.    Additionally, every time Mr. Doe No. 2 travels by air, he is referred to secondary inspection and subjected to prolonged searches and questioning.

262.    Mr. Doe No. 2 filed a redress request through DHS TRIP.

263.    On January 19, 2016, Mr. Doe No. 2 received a letter as described in paragraph 99 above and was assigned a Redress Control Number.

264. At no time was Mr. Doe No. 2 given notice of the factual basis for his placement on the federal watch list, and at no time was he offered a meaningful opportunity to contest his designation.

265. Moreover, at no time was Mr. Doe No. 2 given notice of the deprivation of his liberty interests or violation of his constitutional rights.

266. As of the date of this filing, it is unclear whether Mr. Doe No. 2 remains on the federal watch list.

267. Upon information and belief, Mr. Doe No. 2's nomination to the federal watch list was made based solely upon a hunch (based upon his race, ethnicity, national origin, religious affiliation, or First Amendment protected activities).

### Plaintiff John Doe No. 3

268. Every time Mr. John Doe No. 3 travels by air, since 2002, his boarding pass is stamped with the "SSSS" designation, indicating that he has been designated as a "known or suspected terrorist."

269. In fact, in 2002, upon returning from an international flight, Mr. Doe No. 3 was escorted off of the plane by FBI agents, before he was interrogated and threatened by agents from different government agencies.

270. Mr. Doe No. 3 is frequently unable to board his flights until he is "cleared" by DHS to board the flight, a process that can take hours.

271. Moreover, Mr. Doe No. 3 is frequently called over the loud speakers at the airport after he has already reached the gate prior to take off to go back to security, only to be detained and subjected to further prolonged interrogations and searches.

272.   Additionally, TSA agents confiscated his phones, requested his passwords, and upon information and belief, downloaded information from them.

273.   On or about 2006, Mr. Doe No. 3's JPMorgan Chase Bank was suddenly closed a few days after he opened it without notice or an explanation of the reasons why it was being closed.

274.   Upon information and belief, Unidentified TSC Agents disseminated the stigmatizing label of "known or suspected terrorist" attached to Mr. Doe No. 3 to JPMorgan Chase Bank, and as a result, his bank account was closed without notice.

275.   Mr. Doe No. 3 lost lucrative employment opportunities as a result of being designated as a "known or suspected terrorist."

276.   Mr. Doe No. 3 filed a redress request through DHS TRIP.

277.   As of the date of this filing, Mr. Doe No. 3 has not received a response from DHS, nor has he been assigned a Redress Control Number.

278.   At no time was Mr. Doe No. 3 given notice of the factual basis for his placement on the federal watch list, and at no time was he offered a meaningful opportunity to contest his designation.

279.   Moreover, at no time was Mr. Doe No. 3 given notice of the deprivation of his liberty interests or violation of his constitutional rights.

280.   Upon information and belief, Mr. Doe No. 3 remains on the federal watch list.

281.   Upon information and belief, Mr. Doe No. 3's nomination to the federal watch list was made based solely upon a hunch (based upon his race, ethnicity, national origin, religious affiliation, or First Amendment protected activities).

282.    Mr. Doe No. 3 limits travels by air when necessary in order to avoid being subjected to the above treatment.

## COUNT I
## FAILURE TO PROVIDE POST-DEPRIVATION NOTICE AND HEARING IN VIOLATION OF THE FIFTH AMENDMENT RIGHT TO PROCEDURAL DUE PROCESS (Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702)

283.    The foregoing allegations are realleged and incorporated herein.

284.    Each of the Plaintiffs and other similarly situated American citizens learned that he or she was placed on the federal watch list subsequent to being added on the federal watch list and sought to challenge such placement.

285.    Defendants' actions as described above in refusing to provide Plaintiffs and other similarly situated American citizens with any notice at all of their placement which deprived Plaintiffs and other similarly situated American citizens of constitutionally protected liberty interests.

286.    Defendants' actions in nominating Plaintiffs and other similarly situated American citizens to the federal watch list blatantly violate the requirement that "'nominations' must not be solely based on race, ethnicity, national origin, religious affiliation, or First Amendment protected activities." 49 U.S.C. § 114(h)(3).

287.    Plaintiffs and other similarly situated American citizens have a liberty interest in traveling free from unreasonable burdens that are not reasonably tailored within, to, and from the United States, through land border crossings and over U.S. air space.

288.    Plaintiffs and other similarly situated American citizens have a right to be free from false government stigmatization as individuals who are "known or suspected to be" terrorists, or who are otherwise associated with terrorist activity, when such harm arises in

conjunction with the additional consequences that follow from being listed as well as the deprivation of their right to travel on the same terms as other travelers and/or the deprivation of their liberty interest under the Fifth Amendment in travel free from unreasonable burdens.

289.   Plaintiffs and other similarly situated American citizens have a liberty interest in nonattainder (ie:  the interest against being singled out for punishment without trial). Defendants' actions have singled out Plaintiffs and others similarly situated for punishments that include, but are not limited to, inability to travel by air and unreasonable burdens placed upon traveling by air to and from the United States, over U.S. air space and at land border crossings, and false association with a list of individuals suspected of terrorism.

290.   Plaintiffs and other similarly situated American citizens, having been burdened or prevented from boarding on commercial flights or entering the United States at land border crossings, having had their bank accounts closed, having been prevented from making wire transfers at financial institutions, having had their citizenship applications delayed indefinitely due to an "FBI name check," having lost lucrative economic opportunities and suffering from other forms of financial harm, and having sought to challenge their placement on the federal watch list, are entitled to a constitutionally adequate legal mechanism that affords them notice of the reasons and bases for their placement on the federal watch list and a meaningful opportunity to contest their continued inclusion on the federal watch list.  Defendants have even failed to provide the most basic ingredient of due process, which is notice that the government has deprived a person of their protected rights.

291.    Moreover, Defendants have officially imposed on Plaintiffs and other similarly situated American citizens the stigmatizing label of "known or suspected terrorists" without a constitutionally adequate legal mechanism.

292.    Further, Defendants disseminated the stigmatizing label attached to Plaintiffs and other similarly situated American citizens of "known or suspected terrorists" to state and local authorities, foreign governments, corporations, private contractors, gun sellers, the captains of sea-faring vessels, among other official and private entities and individuals.

293.    By imposing on Plaintiffs and other similarly situated American citizens the stigmatizing label of "known or suspected terrorists" and by failing to provide Plaintiffs and others similarly situated with a constitutionally adequate legal mechanism, Defendants have deprived Plaintiffs and other similarly situated American citizens of their protected liberty interests, including but not limited to their liberty interests in traveling, freedom from false stigmatization, and nonattainder, and thus violated the constitutional rights of Plaintiffs and other similarly situated American citizens without affording them due process of law and will continue to do so into the future if Plaintiffs and other similarly situated American citizens are not afforded the relief demanded below.

WHEREFORE, Plaintiffs request this Honorable Court grant declaratory and injunctive relief in the form described in the Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

## COUNT II
## DEPRIVATION OF PROTECTED LIBERTIES IN VIOLATION OF FIFTH AMENDMENT RIGHT TO SUBSTANTIVE DUE PROCESS
### (Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702)

294.    The foregoing allegations are realleged and incorporated herein.

295.   Because Plaintiffs and other similarly situated American citizens were listed by Defendants in a manner not narrowly tailored to a compelling interest, Defendants' actions as described above in including Plaintiffs and other similarly situated American citizens on a watch list that unreasonably burdens or prevents them from boarding commercial flights or entering the United States at land border crossings, are arbitrary and capricious, lack even a rational relationship to any legitimate government interest, and have unduly deprived Plaintiffs of constitutionally protected rights, including their liberty interests in travel, freedom from false stigmatization, and nonattainder.

296.   Defendants' actions in nominating Plaintiffs and other similarly situated American citizens to the federal watch list blatantly violate the requirement that "'nominations' must not be solely based on race, ethnicity, national origin, religious affiliation, or First Amendment protected activities."  49 U.S.C. § 114(h)(3).

297.   By placing Plaintiffs and other similarly situated American citizens on the federal watch list, Defendants have placed an undue burden on their fundamental right of movement.

298.   By placing Plaintiffs and other similarly situated American citizens on the federal watch list, Defendants have treated Plaintiffs like second-class citizens.

299.   Defendants' watch list lacks a compelling interest insofar as their true purpose is to provide law enforcement with a tool to coerce American Muslims into becoming informants.

300.   Defendants' watch list are also not narrowly tailored insofar as the federal watch list are entirely and demonstrably ineffectual and obvious alternatives exist.

301.    Defendants' actions in placing Plaintiffs and other similarly situated American citizens on the federal watch list, officially imposing on Plaintiffs and other similarly situated American citizens the stigmatizing label of "known or suspected terrorists," and disseminating the stigmatizing label to state and local authorities, foreign governments, corporations, private contractors, gun sellers, the captains of sea-faring vessels, among other official and private entities and individuals, without a constitutionally adequate legal mechanism, are arbitrary and capricious, shock the conscience, violate the decencies of civilized conduct and are so brutal and offensive that they do not comport with the traditional ideas of fair play and decency.

302.    Because Plaintiffs and other similarly situated American citizens have not been charged with any crimes and are United States Citizens, Plaintiffs challenge their placement and the placement of others similarly situated American citizens on the federal watch list on a broad, as-applied basis.

303.    Plaintiffs' substantive due process challenge is also facial, as there are no circumstances where their placement or the placement of others similarly situated on the federal watch list is narrowly tailored to achieve any compelling government interest.

304.    Defendants have thus violated Plaintiffs' constitutional rights and the constitutional rights of other similarly situated American citizens without affording them due process of law and will continue to do so into the future if Plaintiffs and other similarly situated American citizens are not afforded the relief demanded below.

WHEREFORE, Plaintiffs request this Honorable Court grant declaratory and injunctive relief in the form described in the Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

## COUNT III
### UNLAWFUL AGENCY ACTION IN VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. §§ 702, 706
### (Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702)

305.    The foregoing allegations are realleged and incorporated herein.

306.    Defendants' actions in placing Plaintiffs and other similarly situated American citizens on the federal watch list, officially imposing on Plaintiffs and other similarly situated American citizens the stigmatizing label of "known or suspected terrorists," and disseminating the stigmatizing label to state and local authorities, foreign governments, corporations, private contractors, gun sellers, the captains of sea-faring vessels, among other official and private entities and individuals, without a constitutionally adequate legal mechanism, were and are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and contrary to constitutional rights, power, privilege, or immunity, and should be set aside as unlawful pursuant to 5 U.S.C. § 706.

307.    Defendants' actions in nominating Plaintiffs and other similarly situated American citizens to the federal watch list blatantly violate the requirement that "'nominations' must not be solely based on race, ethnicity, national origin, religious affiliation, or First Amendment protected activities." 49 U.S.C. § 114(h)(3).

308.    Defendants' failure to provide Plaintiffs and other similarly situated American citizens, who had been unreasonably burdened or denied boarding on commercial flights or entering the United States across the border and sought to challenge their placement on the federal watch list, with a constitutionally adequate mechanism that affords them notice of the reasons and bases for their placement on the federal watch list and a meaningful opportunity to contest their continued inclusion on the federal watch list is arbitrary,

capricious, an abuse of discretion, otherwise not in accordance with law, and contrary to constitutional rights, power, privilege, or immunity, and should be set aside as unlawful pursuant to 5 U.S.C. § 706.

309. Because Plaintiffs and other similarly situated American citizens do not present a security threat to commercial aviation, Defendants' actions as described above in including Plaintiffs and other similarly situated American citizens on the federal watch list that unreasonably burdens or prevents them from boarding commercial flights or entering the United States across the border, are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and contrary to constitutional rights, power, privilege, or immunity, and should be set aside as unlawful pursuant to 5 U.S.C. § 706.

310. Plaintiffs and other similarly situated American citizens are not required to exhaust the DHS TRIP process, under the holding in *Darby v. Cisneros*, 509 U.S. 137 (1993). *See* United States District Court, Eastern District of Virginia, Case No. 11-cv-00050 (2011); Dkt. 70 at 22; attached as Memorandum Opinion (Exhibit 4).

WHEREFORE, Plaintiffs request this Honorable Court grant declaratory and injunctive relief in the form described in the Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

**COUNT IV**
**VIOLATION OF THE FIFTH AMENDMENT**
**TO THE UNITED STATES CONSTITUTION**
**(Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702)**
**(Equal Protection)**

311. The foregoing allegations are realleged and incorporated herein.

312.   Defendants' actions in placing Plaintiffs and other similarly situated American citizens on the federal watch list, officially imposing on Plaintiffs and other similarly situated American citizens the stigmatizing label of "known or suspected terrorists," and disseminating the stigmatizing label to state and local authorities, foreign governments, corporations, private contractors, gun sellers, the captains of sea-faring vessels, among other official and private entities and individuals, without a constitutionally adequate legal mechanism are discriminatory and constitute an action that targets religious conduct for distinctive treatment.

313.   Defendants' actions in nominating Plaintiffs and other similarly situated American citizens to the federal watch list blatantly violate the requirement that "'nominations' must not be solely based on race, ethnicity, national origin, religious affiliation, or First Amendment protected activities." 49 U.S.C. § 114(h)(3).

314.   By placing Plaintiffs and other similarly situated American citizens on the federal watch list, Defendants have treated Plaintiffs and other similarly situated American citizens like second-class citizens.

315.   Defendants' above-described actions were motivated by the religious status of Plaintiffs and other similarly situated American citizens and on the basis of the constitutionally-protected free exercise of religion of Plaintiffs and other similarly situated American citizens.

316.   Defendants' above-described actions have had a discriminatory effect upon and have disparately impacted Plaintiffs and other similarly situated American citizens who are Muslim American travelers, and not travelers of other faiths.

317.    Defendants' above-described actions, policies, course of conduct, or pattern of practice that mandate or permit the above-described treatment of Plaintiffs and other similarly situated American citizens does not serve a compelling state interest or a legitimate or public purpose, nor are they the least restrictive means or narrowly tailored to achieve any such interest.

WHEREFORE, Plaintiffs request this Honorable Court grant declaratory and injunctive relief in the form described in the Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

### COUNT V
### VIOLATION OF THE UNITED STATES CONSTITUTION
### (Non-Delegation)

318.    The foregoing allegations are realleged and incorporated herein.

319.    Congress has not provided the Executive Branch with intelligible principles from which the Executive can implement its watch list schemes regarding civil aviation and national security.

320.    The Executive branch's assignment of the watch listing function to TSC violates Congress' directive that TSA determine who belongs on federal watch lists and the consequences that flow from being on those lists.

321.    Congress has not delegated to TSA the authority to create a process that can culminate in the removal of individuals from the TSDB.

322.    In the alternative, Congress's delegation to TSA to create a redress process is defective because the Executive Branch has allocated watch list authority in a manner that prevents TSA from creating a redress process.

323.   As a result, Defendants have illegally acted beyond their authority.

WHEREFORE, Plaintiffs request this Honorable Court grant declaratory and injunctive relief in the form described in the Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

## Prayer for Relief

WHEREFORE, Plaintiffs respectfully request:

1.   A declaratory judgment that Defendants' policies, practices, and customs violate the Fifth Amendment to the United States Constitution and the Administrative Procedure Act;

2.   An injunction that:

   a.   requires Defendants to remedy the constitutional and statutory violations identified above, including the removal of Plaintiffs from any watch list or database that burdens or prevents them from flying or entering the United States across the border; and,

   b.   requires Defendants to provide individuals designated on the federal watch list with a legal mechanism that affords them notice of the reasons and bases for their placement on the federal watch list and a meaningful opportunity to contest their continued inclusion on the federal watch list;

3.   A trial by jury;

4.   An award of attorneys' fees, costs, and expenses of all litigation, pursuant to 28 U.S.C. § 2412; and,

5.   Such other and further relief as the Court may deem just and proper.

### JURY DEMAND

NOW COME Plaintiffs, by and through their undersigned counsel, and hereby demand

trial by jury of the above-referenced causes of action.

Respectfully submitted,

THE LAW OFFICE OF GADEIR ABBAS

BY: /s/ Gadeir Abbas
GADEIR I. ABBAS
Attorney for Plaintiffs
1155 F Street NW, Suite 1050
Washington, D.C. 20004
Telephone: (720) 251-0425
Fax: (720) 251-0425
Email: gadeir.abbas@gmail.com

*Licensed in Virginia, not in D.C.*
*Practice limited to federal matters*

Dated: April 5, 2016

## CERTIFICATE OF SERVICE

A copy of the foregoing document was filed with the United States District Court for the

Eastern District of Virginia on April 5, 2016

LAW OFFICE OF GADEIR
ABBAS

BY: /s/ Gadeir Abbas

1155 F Street NW - Suite 1050
Washington, DC 20004
Phone: (720) 251-0425
Fax: (202) 204-0253
gadeir@abbaslawfirm.com
*licensed in Virginia, not in D.C.*
*practice limited to federal matters*