**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| **ANAS ELHADY;** ) | |
| **BABY DOE 2**, by his next friend, Father Doe 2; ) | **Case No.  16-cv-00375** |
| **YASEEN KADURA;** ) | **Hon. Anthony J. Trenga** |
| **OSAMA HUSSEIN AHMED;** ) | |
| **AHMAD IBRAHIM AL HALABI;** ) | **FIRST COMPLAINT FOR** |
| **MICHAEL EDMUND COLEMAN;** ) | **INJUNCTIVE AND DECLARATORY** |
| **WAEL HAKMEH;** ) | **RELIEF AND JURY DEMAND** |
| **HASSAN SHIBLY;** ) | |
| **AUSAMA ELHUZAYEL;** ) | |
| **DONALD THOMAS;** ) | |
| **MURAT FRLJUCKIC;** ) | |
| **IBRAHIM AWAD;** ) | |
| **MARK AMRI;** ) | |
| **ADNAN KHALIL SHAOUT;** ) | |
| **SALEEM ALI;** ) | |
| **SHAHIR ANWAR;** ) | |
| **SAMIR ANWAR;** ) | |
| **MUHAMMAD YAHYA KHAN;** ) | |
| **HASSAN FARES;** ) | |
| **ZUHAIR EL-SHWEHDI;** ) | |
| **MAHMOUD ERAQI;** ) | |
| **JOHN DOE NO. 1;** ) | |
| **JOHN DOE NO. 2;** ) | |
| **JOHN DOE NO. 3;** and, ) | |
| **JOHN DOE NO. 4;** ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| **CHRISTOPHER M. PIEHOTA**, Director of the ) | |
| Terrorist Screening Center; in his official ) | |
| capacity; ) | |
| ) | |
| **STEVEN MABEUS**, Principal Deputy ) | |
| Director of the Terrorist Screening Center; ) | |
| in his official capacity; ) | |
| ) | |
| **G. CLAYTON GRIGG**, Deputy Director of ) | |
| Operations of the Terrorist Screening ) | |
| Center; in his official capacity; ) | |
| ) | |

**JAMES G. KENNEDY**, Director, Transportation      )
Security Redress (OTSR), Transportation             )
Security Administration (TSA), United States        )
Department of Homeland Security (DHS), and          )
Director of the DHS Traveler Redress Inquiry        )
Program (DHS TRIP); in his official capacity;       )
                                                    )
**MATTHEW G. OLSEN**, Director of the               )
National Counterterrorism Center, in                )
his official capacity;                              )
                                                    )
**PETER NEFFENGER**, Administrator,                 )
Transportation Security Administration              )
(TSA), United States Department of                  )
Homeland Security (DHS); in his official            )
capacity;                                           )
                                                    )
**JAMES COMEY**, Director, Federal Bureau           )
of Investigation (FBI); in his official capacity;   )
                                                    )
**R. GIL KERLIKOWSKE**, Director, United            )
States Customs and Border Protection; in            )
his official capacity;                              )
                                                    )
          Defendants.                               )
_____/

### FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

Plaintiffs, **Anas Elhady; Baby Doe 2,** by his Next Friend, Father Doe 2; **Yaseen Kadura; Osama Hussein Ahmed; Ahmad Ibrahim Al Halabi; Michael Edmund Coleman; Wael Hakmeh; Hassan Shibly; Ausama Elhuzayel; Donald Thomas; Murat Frljuckic; Ibrahim Awad; Mark Amri; Adnan Khalil Shaout; Saleem Ali; Shahir Anwar; Samir Anwar; Muhammad Yahya Khan; Hassan Fares; Zuhair El-Shwehdi; Mahmoud Eraqi; John Doe No. 1; John Doe No. 2; John Doe No. 3** and **John Doe No. 4** for themselves and on behalf of all others similarly situated, through their attorneys, Council on American-Islamic Relations, Michigan ("CAIR-MI"), The Law Office of Gadeir Abbas, and Akeel and Valentine, PLC, state as follows:

2

## **Introduction**

1.      Our federal government is imposing an injustice of historic proportions upon the Americans who have filed this action, as well as thousands of other Americans.  Through extra-judicial and secret means, the federal government is ensnaring individuals into an invisible web of consequences that are imposed indefinitely and without recourse as a result of the shockingly large federal terror watch list that now include hundreds of thousands of individuals.

2.      Indeed, many Americans, including children, end up on these secret federal terror watch list – which the Defendants have named the Terrorist Screening Database ("TSDB") – based on mere guesses, hunches, and conjecture and even simply based on matters of race, ethnicity, national origin, religion or the exercise of their constitutional rights.

3.      These consequences include the inability to fly on airplanes, to go through security without having all screeners receive a message for the remainder of a listee's life that she is a "known or suspected terrorist," to obtain licenses, to exercise their Second Amendment right to own a firearm, and to be free from the unimaginable indignity and real-life danger of having their own government communicate to hundreds of thousands of federal agents, private contractors, businesses, state and local police, the captains of sea-faring vessels, and foreign governments all across the world that they are a violent menace.

4.      And unfortunately, the federal government has designed its federal terror watch list to be accountability-free.  Persons placed on the federal terror watch list have no means of removing themselves or challenging the basis for their inclusion.  Indeed, people

on the federal terror watch lists only learn of their placement when they feel the web of consequences burdening their lives and aspirations, and they never learn why.

5.      Media accounts have made clear that the secret federal terror watch list is the product of bigotry and misguided, counterproductive zeal.  Americans are dumped onto the watch list without being charged, convicted, or in some stomach-churning cases, even subject to an ongoing investigation.

6.      Instead, two recently leaked government documents and a governmental report, which include the March 2013 Watchlisting Guidance (Exhibit 2), the Directorate of Terrorist Identities (DTI): Strategic Accomplishments 2013 (Exhibit 3), and the Department of Justice's March 2014 Audit of the Federal Bureau of Investigation's Management of Terrorist Watchlist (Exhibit 4) reveal that the care the federal government takes in creating its federal terror watch list is void of proper processing, which in turn results in life-altering consequences that flow from these illegal actions.

7.      In fact, upon information and belief, Dearborn, a city of less than 100,000 and a place Arab Americans and Muslim Americans have called home for generations, contains the second highest concentration of Americans on the federal government's watch list. Moreover, there have been more than 1.5 million nominations to the federal terror watch list since 2009 and that, in 2013 for example, the Terrorist Screening Center converted 98.96 percent of those nominations into watch list placements.

8.      Upon information and belief, evidence also shows that the federal government uses guilt-by-association presumptions to place family members and friends of listed persons on the watch list.

9.     Moreover, travel to Muslim majority countries—travel that American Muslims are very likely to engage in—is also a basis for watch list placement.

10.     In 2009, the federal government made 227,932 nominations to its federal terror watch list.  In 2013, that number more than doubled at an alarming and dangerous rate to 468,749.

11.     Recently, a federal court judge observed in *Gulet Mohamed v. Eric R. Holder, Jr.*, et al. (United States District Court, Eastern District of Virginia, Case No. 11-cv-00050 (2011)), that "[a] showing of past or ongoing unlawful conduct does not seem to be required,… But the Court has little, if any, ability to articulate what information is viewed by TSC as sufficiently 'derogatory' beyond the labels it has provided the Court.  In sum, the No Fly List assumes that there are some American citizens who are simply too dangerous to be permitted to fly, no matter the level of pre-flight screening or on-flight surveillance and restraint, even though those citizens cannot be legally arrested, detained, or otherwise restricted in their movements or conduct."  *See* United States District Court, Eastern District of Virginia, Case No. 11-cv-00050 (2011); Dkt. 70 at 19; attached as Memorandum Opinion (Exhibit 1).

12.     Moreover, the Court went on to find that "[i]nclusion on the No Fly List also labels an American citizen a disloyal American who is capable of, and disposed toward committing, war crimes, and one can easily imagine the broad range of consequences that might be visited upon such a person if that stigmatizing designation were known by the general public… The process of nomination to the No Fly List is based on a suspected level of future dangerousness that is not necessarily related to any unlawful conduct."  *See* United

States District Court, Eastern District of Virginia, Case No. 11-cv-00050 (2011); Dkt. 70 at 14, 17; attached as Memorandum Opinion (Exhibit 1).

## Parties

13.     Plaintiff Anas Elhady is a 22 year old United States Citizen and a Muslim residing in Wayne County, Michigan.  Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district which is where the federal terror watch list is compiled.

14.     Plaintiff Baby Doe 2 is a 1-year-old United States Citizen toddler born to an American Muslim family, residing in Wayne County, Michigan.  Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district which is where the federal terror watch list is compiled.  Plaintiff Baby Doe 2 brings this action by and through his next friend, Father Doe 2.

15.     Plaintiff Yaseen Kadura is a 26 year old United States Citizen and a Muslim residing in Cook County, Illinois.  Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district which is where the federal terror watch list is compiled.

16.     Plaintiff Osama Hussein Ahmed is a 24 year old United States Citizen and a Muslim residing in Wayne County, Michigan.  Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district which is where the federal terror watch list is compiled.

17.     Plaintiff Ahmad Ibrahim Al Halabi is a 37 year old United States Citizen and a Muslim residing in Wayne County, Michigan.  Venue is proper because a substantial part of

the events or omissions giving rise to his claims occurred within this district which is where the federal terror watch list is compiled.

18.     Plaintiff Michael Edmund Coleman is a 44 year old United States Citizen and a Muslim residing in Wayne County, Michigan.  Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district which is where the federal terror watch list is compiled.

19.     Plaintiff Wael Hakmeh is a 37 year old United States Citizen and a Muslim residing in Oakland County, Michigan.  Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district which is where the federal terror watch list is compiled.

20.     Plaintiff Hassan Shibly is a 29-year-old United States Citizen and a Muslim residing in Hillsborough County, Florida.  Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district which is where the federal terror watch list is compiled.

21.     Plaintiff Ausama Elhuzayel is a 40-year-old United States Citizen and a Muslim residing in Orange County, California.  Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district which is where the federal terror watch list is compiled.

22.     Plaintiff Donald Thomas is a 29-year-old United States Citizen and a Muslim residing in Sacramento County, California.  Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district which is where the federal terror watch list is compiled.

23.     Plaintiff Murat Frljuckic is a 37-year-old United States Citizen and a Muslim residing in Oakland County, Michigan.  Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district which is where the federal terror watch list is compiled.

24.     Plaintiff Ibrahim Awad is a 23-year-old United States Citizen and a Muslim residing in Oakland County, Michigan.  Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district which is where the federal terror watch list is compiled.

25.     Plaintiff Mark Amri is a 36-year-old United States Citizen and a Muslim residing in San Bernardino County, California.  Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district which is where the federal terror watch list is compiled.

26.     Plaintiff Adnan Khalil Shaout is a 55 year old United States Citizen and a Muslim residing in Jordan.  Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district which is where the federal terror watch list is compiled.

27.     Plaintiff Saleem Ali is a 43 year old United States Citizen and a Muslim residing in Wayne County, Michigan.  Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district which is where the federal terror watch list is compiled.

28.     Plaintiff Shahir Anwar is a 36 year old United States Citizen and a Muslim residing in Macomb County, Michigan.  Venue is proper because a substantial part of the

events or omissions giving rise to his claims occurred within this district which is where the federal terror watch list is compiled.

29.     Plaintiff Samir Anwar is a 29 year old United States Citizen and a Muslim residing in Macomb County, Michigan.  Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district which is where the federal terror watch list is compiled.

30.     Plaintiff Muhammad Yahya Khan is a 46-year-old United States Citizen and a Muslim residing in Oakland County, Michigan.  Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district which is where the federal terror watch list is compiled.

31.     Plaintiff Hassan Fares is a 33-year-old United States Citizen and a Muslim residing in Jefferson Parish, Louisiana.  Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district which is where the federal terror watch list is compiled.

32.     Plaintiff Zuhair El-Shwehdi is a 58-year-old United States Citizen and a Muslim residing in Montgomery County, Ohio.  Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district which is where the federal terror watch list is compiled.

33.     Plaintiff Mahmoud Eraqi is a 22-year-old United States Citizen and a Muslim residing in Macomb County, Michigan.  Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district which is where the federal terror watch list is compiled.

34.     Plaintiff John Doe No. 1 is a 51 year old United States Citizen and a Muslim residing in Washtenaw County, Michigan.  Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district which is where the federal terror watch list is compiled.

35.     Plaintiff John Doe No. 2 is a 38 year old United States Citizen and a Muslim residing in Oakland County, Michigan.  Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district which is where the federal terror watch list is compiled.

36.     Plaintiff John Doe No. 3 is a 55 year old United States Citizen and a Muslim residing in Washtenaw County, Michigan.  Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district which is where the federal terror watch list is compiled.

37.     Plaintiff John Doe No. 4 is a 23-year-old United States Citizen and a Muslim residing in Macomb County, Michigan.  Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district which is where the federal terror watch list is compiled.

38.     Defendant Christopher M. Piehota is the current Director of the Terrorist Screening Center ("TSC").  Defendant Piehota was appointed in April, 2013.  Defendant Piehota develops and maintains the federal government's consolidated Terrorism Screening Database (the "watch list"), and accepts nominations of Plaintiffs and other similarly situated American citizens made to the federal terror watch list.  Defendant Piehota also oversees the dissemination of the stigmatizing label attached to Plaintiffs and other similarly situated American citizens of "known or suspected terrorists" to state and local authorities, foreign

governments, private corporations, private contractors, airlines, gun sellers, car dealerships, financial institutions, the captains of sea-faring vessels, among other official and private entities and individuals.  Defendant Piehota is being sued in his official capacity, only.

39.    Defendant Steven Mabeus is the current Principal Deputy Director of the Terrorist Screening Center ("TSC").  Defendant Mabeus was appointed in October, 2013.  Defendant Mabeus develops and maintains the federal government's consolidated Terrorism Screening Database (the "watch list"), and accepts nominations of Plaintiffs and other similarly situated American citizens made to the federal terror watch list.  Defendant Mabeus also oversees the dissemination of the stigmatizing label attached to Plaintiffs and other similarly situated American citizens of "known or suspected terrorists" to state and local authorities, foreign governments, private corporations, private contractors, airlines, gun sellers, car dealerships, financial institutions, the captains of sea-faring vessels, among other official and private entities and individuals.  Defendant Mabeus is being sued in his official capacity, only.

40.    Defendant G. Clayton Grigg is the current Deputy Director of Operations of the Terrorist Screening Center ("TSC").  Defendant Grigg began serving in September, 2013.  Defendant Grigg developed and maintained the federal government's consolidated Terrorism Screening Database (the "watch list"), and accepted nominations of Plaintiffs and other similarly situated American citizens made to the federal terror watch list.  Defendant Grigg also oversaw the dissemination of the stigmatizing label attached to Plaintiffs and other similarly situated American citizens of "known or suspected terrorists" to state and local authorities, foreign governments, private corporations, private contractors, airlines, gun sellers, car dealerships, financial institutions, the captains of sea-faring vessels, among

other official and private entities and individuals.  Defendant Grigg is being sued in his official capacity, only.

41.     Defendant James Kennedy is the Director of the Office of Transportation Security Redress (OTSR), Transportation Security Administration (TSA), United States Department of Homeland Security (DHS).  Defendant Kennedy also serves as the Director of the DHS Traveler Inquiry Program (DHS TRIP).  Defendant Kennedy is responsible for overseeing DHS TRIP, the administrative complaint process to challenge nominations of Plaintiffs and other similarly situated American citizens made to the federal terror watch list, and coordinating with other government agencies, including the Terrorism Screening Center, to resolve the complaint.  Defendant Kennedy is being sued in his official capacity, only.

42.     Defendant Matthew G. Olsen is Director of the National Counterterrorism Center ("NCTC").  Defendant Olsen is responsible for the nominations that resulted in the placement of Plaintiffs and other similarly situated American citizens on the federal terror watch list.  Olsen is being sued in his official capacity, only.

43.     Defendant Peter Neffenger is Administrator of the Transportation Security Administration ("TSA"). Defendant Neffenger oversaw the dissemination of the stigmatizing label attached to Plaintiffs and other similarly situated American citizens of "known or suspected terrorists" to state and local authorities, foreign governments, private corporations, private contractors, airlines, gun sellers, car dealerships, financial institutions, the captains of sea-faring vessels, among other official and private entities and individuals. Neffenger is being sued in his official capacity, only.

44.    Defendant James Comey is Director of the Federal Bureau of Investigation ("FBI").  Defendant Comey is responsible for nominations of Plaintiffs and other similarly situated American citizens made to the federal terror watch list.  Comey is being sued in his official capacity, only.

45.    Defendant R. Gil Kerlikowski is Director of the United States Customs and Border Protection ("CBP").  Defendant Kerlikowski is responsible for receiving and implementing the federal terror watch list.  Kerlikowski is being sued in his official capacity, only.

## Jurisdiction and Venue

46.    Under U.S. Const. Art. III §2, this Court has jurisdiction because the rights sought to be protected herein are secured by the United States Constitution.  Jurisdiction is proper pursuant to 28 U.S.C. § 1331, *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), *et seq.*, 5 U.S.C. § 702, 5 U.S.C. § 706, the United States Constitution, and federal common law.

47.    This action seeks declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § § 2201-02, Rules 57 and 65 of the Federal Rules of Civil Procedure, and pursuant to the general, legal, and equitable powers of this Court.

48.    This action also seeks damages pursuant to 28 U.S.C. § 1343(a)(4) and 28 U.S.C. § 1357.

49.    A substantial part of the unlawful acts alleged herein were committed within the jurisdiction of the United States District Court for the Eastern District of Virginia.

50.    Venue is proper under 42 U.S.C. § 1391(e) as to all Defendants because Defendants are officers or employees of agencies of the United States sued in their individual

capacities and because this judicial district is where a substantial part of the events or omissions giving rise to the claims occurred.

## Factual Background

### The Federal Government's Terrorist Watch List

51.     In September, 2003, Attorney General John Ashcroft established the Terrorist Screening Center ("TSC") to consolidate the government's approach to terrorism screening. The TSC, which is administered by the FBI, develops and maintains the federal government's consolidated Terrorism Screening Database (the "watch list").  TSC's consolidated watch list is the federal government's master repository for suspected international and domestic terrorist records used for watch list related screening.

52.     The watch list has two primary components: the Selectee List and the No-Fly List.  Persons on the Selectee List, including many of Plaintiffs, are systematically subject to extra screening at airports and land border crossings, and often find "SSSS" on their boarding passes printed by airline employees which is marked to indicate a passenger's watch list status to airline employees and screeners.   Persons on the No-Fly List, including the remainder of Plaintiffs, are prevented from boarding flights that fly into, out of, or even through United States airspace.

53.     TSC disseminates records from its terrorist watch list to other government agencies that in turn use those records to identify listed persons.  For example, applicable TSC records are provided to TSA for use by airlines in pre-screening passengers and to CBP for use in screening travelers entering the United States by land.

54.     Upon information and belief, Defendants disseminated the records of each of the Plaintiffs from its terrorist watch list to other government agencies, including the TSA

for use by airlines in pre-screening Plaintiffs, and CBP for use in screening Plaintiffs upon entering the United States.

55.    Upon information and belief, Defendants disseminated the records pertaining to each of the Plaintiffs from its terrorist watch list to foreign governments with the purpose and hope that those foreign governments will constrain the movement of the Plaintiffs in some manner.

56.    Upon information and belief, Defendants' intention in disseminating watch list records, including those of Plaintiffs and similarly situated American citizens, as widely as possible is to constrain Plaintiffs' movements, not only within the United States, but abroad as well.  For example, some countries detain individuals listed on the federal terror watch list who enter their borders, question those individuals at the behest of United States officials, or altogether prevent those individuals from even entering those countries.

57.    Thus, while the TSC maintains and controls the database of suspected terrorists, it is the front-line agencies like the TSA that carry out the screening function.  In the context of air travel, when individuals make airline reservations and check in at airports, the front-line screening agency, like TSA and CBP, conducts a name-based search of the individual, including each of the Plaintiffs, to determine whether he or she is on a watch list.

58.    While agencies throughout the federal government utilize the federal terror watch list to conduct screening, listed persons are subject to a comprehensive portfolio of consequences that cover large aspects of their lives.

59.    Indeed, Defendants disseminated the federal terror watch list to both government authorities and private corporations and individuals with the purpose and hope

that these entities and/or individuals will impose consequences on those individuals Defendants have listed, including each of the Plaintiffs.

60.     Upon information and belief, the status of Plaintiffs and similarly situated American citizens as known or suspected terrorists on the federal terror watch list diminishes and even imperils their ability to access the financial system.

61.     Defendants have provided access to the federal terror watch list, and banks have closed the bank accounts of individuals listed on the federal terror watch list and financial companies have declined to allow some listed individuals to make wire transfers.

62.     Moreover, upon information and belief, the citizenship and green card applications of Plaintiffs and similarly situated American citizens are delayed indefinitely due to an "FBI name check" and not adjudicated, thereby denying Plaintiffs and similarly situated American citizens of the rights the flow from citizenship, including the ability to travel freely as a United States citizen and to sponsor for lawful permanent residency immediate relatives living abroad.

63.     Among the entities and individuals that the federal government disseminates its federal terror watch list are state and local authorities, foreign governments, private corporations, private contractors, airlines, gun sellers, car dealerships, financial institutions, the captains of sea-faring vessels, among others.

64.     In fact, two days after this action was filed, Defendant Piehota, Director of the Terrorist Screening Center, gave an exclusive interview to CNN and stated the following, in relevant part:

> It's concerning that our partners don't use all of our data. We provide them with tools. We provide them with support, and I would find it concerning that they don't use these tools to help

screen for their own aviation security, maritime security, border
screening, visas, things like that for travel.[1]

65.     Defendant Piehota went on to state that the United States shares its federal terror watch list with the European Union, but that European Union countries don't systematically utilize it to identify suspected terrorists or screen migrants coming.

66.     Upon information and belief, because the names of Plaintiffs and similarly situated American citizens are included on the federal terror watch list, their names were disseminated to state and local authorities, foreign governments, private corporations, private contractors, airlines, gun sellers, car dealerships, financial institutions, the captains of sea-faring vessels, among other official and private entities and individuals.

67.     Because the federal government disseminates its federal terror watch list to foreign governments, listed persons, including Plaintiffs and similarly situated American citizens, are often not allowed to enter other nations.  This is because the United States is telling other nations, without any modicum of due process, that thousands of its own citizens are "known or suspected terrorists."

68.     The federal government, through Defendants, disseminates its federal terror watch list to state and local police officers, including Plaintiffs, which allows those officers to query the names of persons, if for example, the listed individual is pulled over for routine traffic violations.

69.     Disseminating the federal terror watch list to state and local police officers creates a dangerous situation insofar as the federal terror watch list effectively directs state

---

[1] First on CNN: Top U.S. intel official: Europe not taking advantage of terror tracking tools, CNN, *available at*: http://www.cnn.com/2016/04/07/politics/christopher-piehota-us-intel-europe-terror-tracking/

and local officers to treat thousands of Americans, including Plaintiffs, charged or convicted with no crime yet listed as a "known or suspected terrorist" and as extremely dangerous.

70.     With the advent and deployment of automatic license plate readers by police departments across the country, local and state authorities have relied heavily upon a driver's watch list status as the basis of a traffic stop, including Plaintiffs and similarly situated American citizens.

71.     Being on the federal terror watch list can prevent listed persons, including Plaintiffs and similarly situated American citizens, from purchasing a gun. For example, New Jersey passed a law in 2013 that banned persons on the federal terror watch list from owning guns. Additionally, Connecticut is in the process of setting up an institutional mechanism to prevent individuals whose names are included on the federal terror watch list, such as Plaintiffs, from being able to buy a gun in the state of Connecticut.

72.     Accordingly, Plaintiffs and similarly situated American citizens are unable to purchase guns in states that ban persons on the federal terror watch list from owning guns.

73.     Because the federal government conducts a security risk assessment that includes querying the federal terror watch list prior to issuing a license to commercial drivers to transport hazardous materials, being on the federal terror watch list can prevent listed persons, including Plaintiffs and similarly situated American citizens, from obtaining or renewing their Hazmat license.

74.     Being on the federal terror watch list can also prevent listed persons, including Plaintiffs and similarly situated American citizens, from accompanying minors or passengers with disabilities to their gate, from working at an airport, or working for an airline insofar as listed persons are not allowed to enter so-called "sterile areas" of airports.

75.     Being on the federal terror watch list can also result in the listing of the false stigmatizing label of "known or suspected" terrorist on the criminal records of Plaintiffs and similarly situated American citizens, information that is publicly accessible to the general public.

76.     Defendants make the federal terror watch list available to municipal courts, which then make bail determinations based on an individual's status on the watch list.

77.     Being on the federal terror watch list can also result in the denial or revocation of a Federal Aviation Administration (FAA) license of Plaintiffs and similarly situated American citizens.

78.     Although TSA, CBP, and other agencies may use the records provided by the TSC, it is the TSC that maintains and controls the database of suspected terrorists.

79.     Two government entities are primarily responsible for "nominating" individuals for inclusion in the terrorist watch list—Defendants NCTC and FBI.  The NCTC, which is managed by the Office of the Director of National Intelligence, relies on information from other federal departments and agencies when including alleged known or suspected international terrorists in its Terrorist Identities Datamart Environment ("TIDE") database. The NCTC reviews TIDE entries and recommends specific entries to the TSC for inclusion in the watch list.  TIDE is the main source of all international terrorist information included in the watch list.

80.     Defendant FBI, in turn, nominates to the watch list individuals with what it characterizes as suspected ties to domestic terrorism.

81.     Defendant TSC makes the final decision on whether a nominated individual meets the minimum requirements for inclusion into the watch list as a known or suspected

terrorist.  TSC also decides which screening systems will receive the information about that individual.

82.     Former Director of the Terrorism Screening Center Healy has testified that in evaluating whether an individual meets the criteria for inclusion on the consolidated watch list, the TSC determines whether the nominated individual is "reasonably suspected" of having possible links to terrorism.  According to the TSC, "reasonable suspicion requires articulable facts which, taken together with rational inferences, reasonably warrant the determination that an individual is known or suspected to be or has been engaged in conduct constituting, in preparation for, in and of or related to terrorism and terrorist activities."

83.     Defendants have not stated publicly the entirety of what standards or criteria are applied to determine whether an American citizen on the consolidated watch list will be placed on the No-Fly List, Selectee List ("SSSS") or other list that is distributed to the TSA, CBP or other screening agencies.

84.     The standards for watch list inclusion do not evince even internal logic. Defendants define a "suspected terrorist" as an "individual who is reasonably suspected to be, or have been, engaged in conduct constituting, in preparation for, in aid of, or related to terrorism and terrorist activities based on articulable and reasonable suspicion."  In other words, Defendants place American citizens on the federal terror watch list based upon a "reasonable suspicion" that they are "reasonably suspected" of nefarious activities.  This "reasonable suspicion" based on a "reasonable suspicion" standard does not even contain internal logic.

85.     The federal government utilizes guilt-by-association as a basis for watch list inclusion.  For example, the immediate relative of listed persons can be listed without any

derogatory information—other than the bonds of family.  Nonetheless, such designation suggests that the immediate relative is him or herself engaged in nefarious activities.

86.     Being a known associate—a friend, colleague, fellow community member, etc.—of a listed individual can also provide a basis for watch list inclusion.

87.     Even if an American citizen is acquitted of terrorism charges or those charges are otherwise dismissed, the federal government retains for itself the authority to continue to include them in the watch list.

88.     For reasons unknown, Defendants also place what they call "non-investigatory subjects" on the federal terror watch list, American citizens that they have chosen not to investigate.

89.     Defendants place individuals on the federal terror watch list without any information regarding an individual's intended target.

90.     Defendants place individuals on the Selectee List without any information that they pose a threat to aviation.

91.     Defendants place individuals on the No Fly List without any information that they pose a threat to aviation.

92.     Under these practices and standards, the number of records in the consolidated watch list has swelled.  Over 1.5 million nominations to the watch list have been submitted by federal agencies since fiscal 2009.

93.     In 2013, Defendant TSC accepted 98.96 percent of all nominations made.

94.     Because of these loose standards and practices, the federal terror watch list's rate of growth has increased.  In fiscal 2009, there were 227,932 nominations to the watch list.  In fiscal 2013, there were 468,749 nominations.

95.     Upon information and belief, in 2001, there were 16 people who the federal government systematically prevented from flying.  In 2013, that number increased to 47,000.

96.     Once an American citizen has been placed on the watch list, the individual remains on the list until the agency that supplied the initial information in support of the nomination determines the individual should be removed.

97.     A 2007 GAO report found that TSC rejects only approximately one percent of all nominations to the watch list.[2]  As such, the watch list is growing at a rate of approximately 20,000 entries per year.

98.     At a March 10, 2010 Senate Homeland Security Committee hearing, Russel E. Travers, Deputy Director of the National Counterterrorism Center, stated that "[t]he entire federal government is leaning very far forward on putting people on list," and that the watch list is "getting bigger, and it will get even bigger."

99.     The federal terror watch list also disproportionately targets American Muslims.

100.    Defendants have utilized the watch list, not as a tool to enhance aviation and border security, but as a bludgeon to coerce American Muslims into becoming informants or forgoing the exercise of their rights, such as the right to have an attorney present during law enforcement questioning.

101.    Public examples of this phenomenon abound.  *See Latif v. Holder,* 2014 U.S. Dist. LEXIS 85450, *19 (D. Or. June 24, 2014) (an FBI agent told Steven Washburn that he "would help remove Washburn's name from the No-Fly List if he agreed to speak to the FBI");

---

[2] *See* United States Government Accountability Office Report to Congressional Requesters entitled *Terrorist Watch List Screening:  Opportunities Exist to Enhance Management Oversight, Reduce Vulnerabilities in Agency Screening Processes, and Expand Use of the List*, GAO-08-110, October 2007, at 22.

*Id.* at *21-22 (FBI agents told Ibraheim Mashal that "his name would be removed from the No-Fly List and he would receive compensation if he helped the FBI by serving as an informant."): *Id* at *22-23 (FBI agents offered Amir Meshal "the opportunity to serve as a government informant in exchange for assistance in removing his name from the No-Fly List."). *See also Fikre v. FBI,* 2014 U.S. Dist. LEXIS 73174 (D. Or. May 29, 2014) (Emirati officials told Yonas Fikre that he "could not travel to the United States by air because he is on the No-Fly List" and an FBI agent told Fikre that "the FBI could take steps to remove [him] from the No-Fly List if he agreed to be an informant."); *Tanveer v. Holder, et. al.,* No. 13-cv-6951, Dkt. 15 (April 22, 2014) (Naveed Shinwari "declined to act as an informant for the Federal Bureau of Investigation and to spy on [his] own American Muslim communities and other innocent people.").

102.    Almost all publicly known instances of Americans being placed on the watch list regard Muslims or persons who could be mistaken for Muslims.

103.    Additionally, government records show that Dearborn, Michigan—which is 40 percent Arab—is disproportionately represented on the federal terror watch list.  In fact, Dearborn is among the top five cities in the country, alongside Chicago, Houston, New York, and San Diego, represented on the federal terror watch list.

104.    Due to Dearborn's significant population of Muslims, it has earned a reputation as the "Muslim Capital of America."  In fact, almost all publicly known instances of Americans being placed on the watch list regard Muslims or persons who could be mistaken for Muslims.

105.    Defendants' 2013 Watchlisting Guidance also indicates that "[t]ravel for no known lawful or legitimate purpose to a locus of terrorist activity" can be a basis for being

listed.  While a "locus of Terrorist Activity" is not defined by the document, upon information and belief, it likely includes any place where many Muslims reside.

106.    The federal terror watch list's inclusion standards are so permissive and pliable and the selectee list's efficacy is at best fleetingly marginal that the inclusion standards themselves violate Plaintiffs procedural and substantive due process.

107.    The federal terror watch list diminishes, rather than enhances, our national security because the number of innocent Americans on the list is becoming so voluminous that the purpose of having a list is significantly undermined as all are being treated as the same.

108.    The consequences of being on the federal terror watch list are meted out publically. Members of the public can witness the extra screening to which individuals on the federal terror watch list are subject, including being pulled out of their car at gunpoint, being ordered to leave one's vehicle with one's hands held above his/her head, among other stigmatizing measures.

109.    Because travel is regularly done with family, friends, and community and professional contacts, a person's watch list status is revealed to travel companions.  Travel companions come to learn of a person's watch list status based on how screeners treat a listee.

110.    In practice, frontline screeners disclose the status of individuals on the federal terror watch list to state and local authorities, as well as airline employees, and they do so in a manner that other members of the traveling public can hear.

111.    The operation of the federal terror watch list enlists air carriers to assist the federal government in tracking the passenger on the federal terror watch list.

112.    Defendants apply the federal terror watch list against Muslim Americans in a manner that is different from how it uses its list against people of other faith backgrounds.

113.    Defendants use impermissible and inaccurate religious profiles in compiling the federal terror watch list.

114.    Defendants who contributed to the placement of Plaintiffs and similarly situated American citizens on the federal terror watch list knew that their actions violated clearly established federal law.

115.    Defendants knew at the time they acted unlawfully that Supreme Court precedent required that, whenever a citizen is deprived of a liberty interest, the federal government must at least provide the deprived with some form of notice that a deprivation occurred.

**The Federal Government's Terrorist Watch List
Is No More Effective Than a List of Randomly Selected Individuals**

116.    Defendants' ability to watch list persons, including Plaintiffs, who pose a threat of terrorism can be measured and described using a quantitative analysis based on factual allegations made in this Complaint as well as publicly available information describing the current operation of the federal terror watch list.

117.    Upon information and belief, the federal government has placed approximately one million persons on the federal terror watch list over the last ten years.

118.    Moreover, based on the University of Maryland's Global Terrorism Database, a project funded in part by the Department of Homeland Security, there have been less than 250 terrorist acts inside the United States over the last decade.  These terrorist acts were perpetrated by less than 250 persons.

119.    Only one of these perpetrators was designated on the federal terror watch list by the federal government prior to their criminal conduct.  This single person designated on the federal terror watch list, however, was removed from the federal terror watch list prior to perpetrating the terrorist attack.

120.    Upon information and belief, in order to designate a person on the federal terror watch list, the federal government must first have information about that person. Because the federal government does not possess information on every person in the world, existing law enforcement and intelligence practices produce a subset of persons who the federal government can then screen against the federal terror watch list's inclusion standards.

121.    The precise size of this subset is unknown, however a survey of law enforcement and intelligence practices indicates that the size of this subset is greater than 50 million people.

122.    Upon information and belief, the practices that produce this subset exclude some persons who do pose a threat of terrorism and include some persons who do not pose a threat of terrorism.

123.    Upon further information and belief, the federal government does not screen the entire subset of people known to it.   Moreover, Defendants do not make individual determinations as to whether each person about whom they know should be placed on the federal terror watch list.

124.    In order to designate a person on the federal terror watch list, a federal government official must make a nomination and a TSC official must accept the nomination.

125.    Upon information and belief, TSC officials accept nominations at a rate above 95 percent.

126.    Based on the facts alleged in this Complaint and the publicly known processes of the federal terror watch list, a quantitative analysis can be constructed to measure and describe the performance of the federal terror watch list.

127.    A quantitative analysis demonstrates that, in order to accomplish the federal terror watch list's stated objectives, Defendants must have at least some greater-than-random ability to identify future terrorists.  This is due to the nature of the processes Defendants utilize to place persons on the federal terror watch list and the size of the population Defendants can—if they so choose—screen against the federal terror watch list's inclusion standards.

128.    A quantitative analysis also demonstrates that Defendants' watch listing system would perform similarly if inclusion on the watch list was done via random selection instead of the existing inclusion standards Defendants utilize.

129.    A quantitative analysis therefore indicates that Defendants have no ability to watch list persons whose placement on the watch list would further Defendants' stated objectives.

**Inadequacy of the DHS Traveler Redress Inquiry Program Process**

130.    The government entities and individuals involved in the creation, maintenance, support, modification and enforcement of the federal terror watch list, including Defendants, have not provided travelers, including Plaintiffs and similarly situated American citizens, with a fair and effective mechanism through which they can challenge the TSC's decision to place them on the terrorist watch list.

131.    An individual, including Plaintiffs and similarly situated American citizens, who has been prevented or hindered from travel by being placed on the federal terror watch list has no clear avenue for redress, because no single government entity is responsible for removing an individual from the list.  The TSC, which is administered by the FBI, does not accept redress inquiries from the public, nor does it directly provide final disposition letters to individuals on the selectee list, including Plaintiffs on the selectee list and similarly situated American citizens, who have submitted redress inquiries.  The NCTC which manages the TIDE list does not accept redress inquiries from the general public.

132.    Individuals who seek redress after having been included in the terrorist watch list must submit an inquiry through the DHS Traveler Redress Inquiry Program ("DHS TRIP").  DHS TRIP provides individuals with a "Redress Control Number."

133.    DHS TRIP is the only redress "process" available to individuals included on the terrorist watch list.

134.    DHS TRIP submits traveler complaints to the TSC, which determines whether any action should be taken.  The TSC has not provided any publicly available information about how it makes that decision.  The TSC is the final arbiter of whether an individual's name is retained on or removed from the watch list, including those of Plaintiffs and similarly situated American citizens.

135.    The TSC makes a determination regarding a particular individual's status on the watch list, including Plaintiffs and similarly situated American citizens, and DHS in turn responds to the individual with a standard form letter that neither confirms nor denies the existence of any terrorist watch list records relating to the individual.  The letters do not set

forth any basis for inclusion in a terrorist watch list, do not state whether the government has resolved the complaint at issue.

136.    The government does not provide an American citizen with any opportunity to confront, or to rebut, the grounds for his or her possible inclusion on the watch list.  As such, DHS TRIP offers no meaningful review of the watch list designation and in effect shields the TSC's actions with respect to the individual nominations or classes of nominations from meaningful review by any independent authority.

137.    Moreover, the government's own internal audits of the system point to serious flaws.  For example, a March 2008 DOJ Office of the Inspector General report entitled *Audit of the U.S. Department of Justice Terrorism Watchlist Nomination Processes* found significant problems with the nomination and removal process.

138.    Thus, the only "process" available to such individuals is to submit their names and other identifying information to a government entity that has no authority to provide redress and to hope that an unspecified government agency corrects an error or changes its mind.

139.    All Plaintiffs are United States Citizens.

140.    None have been charged, arrested or convicted of a terrorism-related offense.

141.    As alleged below, each of the Plaintiffs and similarly situated American citizens are designated on the watch list.

**Plaintiff Anas Elhady**

142.    Mr. Anas Elhady is routinely referred to secondary inspection, handcuffed and detained by CBP at land border crossings when he attempts to re-enter the United States from Canada.

143.    CBP officers routinely subject him to a prolonged detention and questioning for approximately four to twelve hours each time.

144.    Moreover, he is routinely asked questions about his religious beliefs and practices, what sect of Islam he belongs to, what mosque he prays in, among other things.

145.    Moreover, every time Mr. Elhady travels by air, his boarding pass is stamped with the "SSSS" designation, indicating that he has been designated as a "known or suspected terrorist."

146.    Mr. Elhady filed a redress request through DHS TRIP.

147.    On May 11, 2015, Mr. Elhady received a letter as described in paragraph 135 above and was assigned a Redress Control Number.

148.    Shortly afterwards, Mr. Elhady was again referred to secondary inspection, handcuffed and detained by CBP at the border stop at the Ambassador Bridge Port of Entry in Detroit, Michigan, for approximately six hours when he attempted to re-enter the United States after a brief vacation in Canada.

149.    After the CBP officers confiscated Mr. Elhady's jacket and shoes, they detained him in a small, freezing cold holding cell with bright lights.

150.    After several hours, Mr. Elhady knocked on the door repeatedly and begged for someone to help him.  His pleas for help were ignored.

151.    Afterwards, his body began shaking uncontrollably and he fell unconscious.

152.    CBP officers finally opened the door and woke him up.

153.    Mr. Elhady repeatedly begged for an ambulance to take him to the hospital, but his pleas were ignored.

154.    Finally, Mr. Elhady was taken to an ambulance, only to be handcuffed to the bed inside the ambulance.

155.    Mr. Elhady was taken to a local hospital, where he was handcuffed to a chair in the waiting room of the hospital.

156.    After being attended to by nurses and physicians, and prescribed the medication that he needed, Mr. Elhady was again handcuffed to a chair inside a vehicle and transported back to the Ambassador Bridge.

157.    On December 2, 2015, FBI Special Agent Josh Allen contacted Mr. Elhady and informed him that his phone was being tapped and that all his calls were being listened to by the FBI.

158.    Mr. Elhady's boarding pass continues to be stamped with the "SSSS" designation when travels by air, indicating that he has been designated as a "known or suspected terrorist."

159.    Additionally, every time Mr. Elhady travels by air, he is referred to secondary inspection and subjected to prolonged searches and questioning.

160.    At no time was Mr. Elhady given notice of the factual basis for his placement on the federal terror watch list, and at no time was he offered a meaningful opportunity to contest his designation.

161.    Moreover, at no time was Mr. Elhady given notice of the deprivation of his liberty interests or violation of his constitutional rights.

162.    Upon information and belief, Mr. Elhady remains on the federal terror watch list.

163.    Upon information and belief, Mr. Elhady's nomination to and designation on the federal terror watch list was made based solely upon a hunch (based upon his race, ethnicity, national origin, religious affiliation, guilt-by-association, or First Amendment protected activities).

164.    Upon information and belief, because Mr. Elhady is included on the federal terror watch list, Defendants disseminated and are continuing to disseminate his designation as a "known or suspected terrorist" to state and local authorities, foreign governments, private corporations, private contractors, airlines, gun sellers, car dealerships, financial institutions, among other official and private entities and individuals.

### Plaintiff Baby Doe 2

165.    Baby Doe 2 is a 1-year-old toddler.

166.    He was eleven-months-old when his boarding pass was first stamped with the "SSSS" designation, indicating that he had been designated as a "known or suspected terrorist."

167.    While passing through airport security, he was subjected to extensive searches and pat downs.

168.    Baby Doe 2 and his father, whose boarding pass was also stamped with the "SSSS" designation, were detained for hours and questioned regarding the existence of any affiliations with terror groups.

169.    At no time was Baby Doe 2, or his parents, given notice of the factual basis for his placement on the federal terror watch list, and at no time was he or his parents offered a meaningful opportunity to contest his designation.

170.   Moreover, at no time was Baby Doe 2, or his parents, given notice of the deprivation of his liberty interests or violation of his constitutional rights.

171.   Upon information and belief, Baby Doe 2's nomination to and designation on the federal terror watch list was made based solely upon a hunch (based upon his race, ethnicity, national origin, religious affiliation, guilt-by-association, familial status—based upon his father's or other family member's designation—or First Amendment protected activities).

172.   Upon information and belief, because Baby Doe 2 is included on the federal terror watch list, Defendants disseminated and are continuing to disseminate his designation as a "known or suspected terrorist" to state and local authorities, foreign governments, private corporations, private contractors, airlines, gun sellers, car dealerships, financial institutions, among other official and private entities and individuals.

### Plaintiff Yaseen Kadura

173.   On September 22, 2012, Mr. Yaseen Kadura was surrounded by eight armed CBP officers, handcuffed and detained in a holding cell for nearly eight hours at the Peace Bridge Port of Entry in Port Huron, Michigan, when he attempted to re-enter the United States after a brief trip to Canada.

174.   CBP officers confiscated his phone and informed Mr. Kadura that his phone was being forwarded to ICE and would be returned to him in 24 to 48 hours.

175.   Upon information and belief, the CBP officers downloaded the data from his phone.

176.   On October 22, 2012, Mr. Kadura appeared at Chicago O'Hare International Airport, in order to travel to Libya.

177.    Mr. Kadura had previously purchased a plane ticket for a Turkish Airlines flight to Istanbul, and he was to then fly to Libya from Istanbul on Turkish Airlines.  Mr. Kadura presented himself at the Turkish Airlines ticket counter hours before his flight.

178.    Turkish Airlines personnel were unable to check Mr. Kadura in for his flight and did not issue him a boarding pass.

179.    The Turkish Airlines personnel informed Mr. Kadura that he was on the No-Fly List and that he could not board his flight.

180.    Before Mr. Kadura was denied the ability to board his flight on October 22, 2012, he did not receive any notice, from a government agency or anyone else, that he would be unable to board his flight or that his name was placed on the No Fly List.  Mr. Kadura had been able previously to board flights in the United States without difficulty.

181.    On or about November 14, 2012, Special Agent Arkin Fout, Homeland Security Investigations ("HSI"), Immigration and Customs Enforcement, directly contacted Mr. Kadura and harassed and intimidated him in an attempt to coerce him into arranging an "informal meeting" at an undisclosed location without the presence of his attorney.

182.    Special Agent Fout proceeded to pressure Mr. Kadura into becoming an informant in Libya.

183.    Special Agent Fout indicated that if Mr. Kadura wanted to remove his name from the No-Fly List, it would be nearly impossible for him to do so unless he agreed to work as an informant in Libya.

184.    Upon information and belief, Mr. Kadura's name was added to the No-Fly List in order to leverage his status on the federal terror watch list to put pressure on Mr. Kadura to act as an informant in Libya.

34

185.     On multiple occasions, some of the same of Mr. Kadura's family members were traveling with him; and upon witnessing the above incidents, upon information and belief, they learned of his status on the federal terror watch list.

186.     On November 30, 2012, Mr. Kadura filed a complaint through DHS TRIP.

187.     On May 8, 2013, Mr. Kadura received a letter as described in paragraph 135 above and was assigned a Redress Control Number.

188.     Mr. Kadura filed a timely DHS TRIP appeal on June 5, 2013.

189.     Because Mr. Kadura did not received a response to his DHS TRIP appeal, Mr. Kadura filed a federal lawsuit, along with four other Muslim Americans, on August 14, 2014 seeking his removal from the federal terror watch list or any other database that burdens or prevents him from flying or entering the United States across the border.  (United States District Court, Eastern District of Michigan, Case No. 14-cv-13128 (2014)).

190.     On September 4, 2015, Mr. Kadura's attorney received a response to the DHS TRIP appeal that stated "As you requested in connection with Mr. Kadura's redress inquiry challenging the redress process, DHS TRIP reevaluated Mr. Kadura's redress inquiry and is now providing a new determination in accordance with the newly enhanced procedures.  At this time the U.S. Government knows of no reason Mr. Kadura should be unable to fly."

191.     On January 15, 2016, Mr. Kadura attempted to check in online for his commercial flight to New York, however he was unable to check in.

192.     Mr. Kadura appeared later that day at Chicago O'Hare International Airport in order to board his commercial flight to New York.

193.     Mr. Kadura was unable to check in at the kiosk stationed at the airport.  He approached an airline representative to be checked in manually, and after speaking on the

phone with a Department of Homeland Security ("DHS") representative for nearly an hour, his boarding pass was stamped with the "SSSS" designation, indicating that he has been designated as a "known or suspected terrorist."

194.    He was then taken into a special security room by a number of TSA agents for a private security check before he was allowed to board his flight.

195.    Upon information and belief, Defendant TSC disseminated the stigmatizing label of "known or suspected terrorist" attached to Mr. Kadura to Western Union or other private entities or individuals, and as a result, he is unable to conduct wire transfers at any Western Union branch.

196.    At no time was Mr. Kadura given notice of the factual basis for his placement on the federal terror watch list, and at no time was he offered a meaningful opportunity to contest his designation.

197.    Moreover, at no time prior to April, 2015 was Mr. Kadura given notice of the deprivation of his liberty interests or violation of his constitutional rights.

198.    Upon information and belief, Mr. Kadura remains on the federal terror watch list.

199.    Upon information and belief, Mr. Kadura's nomination to and designation on the federal terror watch list was made based solely upon a hunch (based upon his race, ethnicity, national origin, religious affiliation, guilt-by-association, or First Amendment protected activities).

200.    Upon information and belief, because Mr. Kadura is included on the federal terror watch list, Defendants disseminated and are continuing to disseminate his designation as a "known or suspected terrorist" to state and local authorities, foreign governments,

private corporations, private contractors, airlines, gun sellers, car dealerships, financial institutions, among other official and private entities and individuals.

### Plaintiff Osama Hussein Ahmed

201.    On or about February or March, 2011, Mr. Osama Ahmed appeared at the Detroit Metropolitan Airport, upon returning home on a commercial flight from Yemen.

202.    Mr. Ahmed was escorted from the gate to an interrogation room and interrogated by FBI agents for approximately six to seven hours.

203.    The FBI agents confiscated his USB drive that he had with him, and upon information and belief, downloaded the information from his USB drive.

204.    Several days later, FBI agents, including Special Agent Joel Kelso, appeared at Mr. Ahmed's home.

205.    The FBI agents took him to a nearby bd's Mongolian Grill, and attempted to recruit Mr. Ahmed into becoming an informant in Yemen.

206.    The FBI agents tried to entice Mr. Ahmed, who was only 18 years old at the time, into becoming an informant by offering to teach him how to sky dive, among other things.

207.    Special Agent Kelso informed Mr. Ahmed that his name was on the No-Fly List, and that if he cooperated, his name would be removed from the list.

208.    On April 29, 2011, Mr. Ahmed filed a complaint through DHS TRIP.

209.    On May 2, 2011, Mr. Ahmed's attorney spoke with Special Agent Kelso who informed her at that time that there was no basis to include Mr. Ahmed on the No-Fly List, and that he would make arrangements to remove his name from the federal terror watch list.

210.    On May 10, 2011, Special Agent Kelso informed his attorney that Mr. Ahmed's name was removed from the No-Fly List.

211.    As a result of being added to the No-Fly List, Mr. Ahmed was unable to apply for employment at the airport where his brother was employed at the time until his name was removed from the No-Fly List.

212.    Upon information and belief, Mr. Ahmed's name was added to the No-Fly List in order to leverage his status on the federal terror watch list to put pressure on Mr. Ahmed to act as an informant in Yemen.

213.    On or about 2015, Mr. Ahmed's boarding passes are now stamped with the "SSSS" designation, indicating that he has been once again designated as a "known or suspected terrorist."

214.    At no time was Mr. Ahmed given notice of the factual basis for his placement on the federal terror watch list, and at no time was he offered a meaningful opportunity to contest his designation.

215.    Moreover, at no time was Mr. Ahmed given notice of the deprivation of his liberty interests or violation of his constitutional rights.

216.    Upon information and belief, Mr. Ahmed remains on the federal terror watch list.

217.    Upon information and belief, Mr. Ahmed's nomination to and designation on the federal terror watch list was made based solely upon a hunch (based upon his race, ethnicity, national origin, religious affiliation, guilt-by-association, or First Amendment protected activities).

218.     Upon information and belief, because Mr. Ahmed is included on the federal terror watch list, Defendants disseminated and are continuing to disseminate his designation as a "known or suspected terrorist" to state and local authorities, foreign governments, private corporations, private contractors, airlines, gun sellers, car dealerships, financial institutions, among other official and private entities and individuals.

### Plaintiff Ahmad Ibrahim Al Halabi

219.     Every time Mr. Ahmad Al Halabi travels by air, since 2004, his boarding pass is stamped with the "SSSS" designation, indicating that he has been designated as a "known or suspected terrorist."

220.     Moreover, Mr. Al Halabi is frequently unable to board his flights until he is "cleared" by DHS to board the flight, a process that oftentimes takes hours.

221.     Moreover, Mr. Al Halabi has missed his flights and incurred additional expenses on multiple occasions after having been subjected to prolonged searches and interrogations.

222.     On June 25, 2014, Mr. Al Halabi was surrounded by armed CBP officers, handcuffed in front of his children and detained in a freezing cold holding cell for approximately two to three hours and in the waiting area for another three to four hours at the Ambassador Bridge port of entry in Detroit, Michigan, when he attempted to re-enter the United States after a brief vacation in Canada.

223.     CBP officers confiscated his phone, and upon information and belief, the CBP officers downloaded the data from his phone.

224.    On multiple occasions, some of the same of Mr. Halabi's family members were traveling with him, and upon witnessing the above incidents, upon information and belief, they learned of his status on the federal terror watch list.

225.    Mr. Al Halabi no longer travels by air nor does he travel to Canada by land unless absolutely necessary for business purposes in order to avoid being subjected to the above treatment.

226.    Mr. Al Halabi filed multiple redress requests through DHS TRIP.

227.    Mr. Al Halabi received multiple letters as described in paragraph 135 above and was assigned multiple Redress Control Numbers.

228.    At no time was Mr. Al Halabi given notice of the factual basis for his placement on the federal terror watch list, and at no time was he offered a meaningful opportunity to contest his designation.

229.    Moreover, at no time was Mr. Al Halabi given notice of the deprivation of his liberty interests or violation of his constitutional rights.

230.    Mr. Al Halabi's boarding passes continue to be stamped with the "SSSS" designation every time he travels by air.

231.    Additionally, every time Mr. Al Halabi travels by air, he is referred to secondary inspection and subjected to prolonged searches and questioning.

232.    Upon information and belief, Mr. Al Halabi remains on the federal terror watch list.

233.    Upon information and belief, Mr. Al Halabi's nomination to and designation on the federal terror watch list was made based solely upon a hunch (based upon his race,

ethnicity, national origin, religious affiliation, guilt-by-association, or First Amendment protected activities).

234.    Upon information and belief, because Mr. Al Halabi is included on the federal terror watch list, Defendants disseminated and are continuing to disseminate his designation as a "known or suspected terrorist" to state and local authorities, foreign governments, private corporations, private contractors, airlines, gun sellers, car dealerships, financial institutions, among other official and private entities and individuals.

### Plaintiff Michael Edmund Coleman

235.    On or about May 2, 2015, Mr. Michael Edmund Coleman appeared at the Detroit Metropolitan Airport, in order to board a commercial flight for his trip to Doha International Airport.

236.    Mr. Coleman was unable to check in online or at a kiosk stationed at the airport.

237.    He approached an airline representative to be checked in manually, and after speaking on the phone with a DHS representative to obtain clearance before he could fly, his boarding pass was stamped with the "SSSS" designation, indicating that he has been designated as a "known or suspected terrorist."

238.    During Mr. Coleman's flight connection at the Philadelphia International Airport, Mr. Coleman was unable to board his next flight until he was once again "cleared" by DHS to board the flight.

239.    Mr. Coleman filed a redress request through DHS TRIP.

240.    As of the date of this filing, Mr. Coleman has not received a response from DHS, nor has he been assigned a Redress Control Number.

241.   Mr. Coleman's boarding passes continue to be stamped with the "SSSS" designation every time he travels by air.

242.   Additionally, every time Mr. Coleman travels by air, he is referred to secondary inspection and subjected to prolonged searches, questioning and chemical testing.

243.   Mr. Coleman is frequently interrogated about his religious activities.

244.   At no time was Mr. Coleman given notice of the factual basis for his placement on the federal terror watch list, and at no time was he offered a meaningful opportunity to contest his designation.

245.   Moreover, at no time was Mr. Coleman given notice of the deprivation of his liberty interests or violation of his constitutional rights.

246.   Upon information and belief, Mr. Coleman remains on the federal terror watch list.

247.   Mr. Coleman limits travels by air and by land to Canada when necessary for business purposes in order to avoid being subjected to the above treatment.

248.   Upon information and belief, Mr. Coleman's nomination to and designation on the federal terror watch list was made based solely upon a hunch (based upon his race, ethnicity, national origin, religious affiliation, guilt-by-association, or First Amendment protected activities).

249.   Upon information and belief, because Mr. Coleman is included on the federal terror watch list, Defendants disseminated and are continuing to disseminate his designation as a "known or suspected terrorist" to state and local authorities, foreign governments, private corporations, private contractors, airlines, gun sellers, car dealerships, financial institutions, among other official and private entities and individuals.

**Plaintiff Dr. Wael Hakmeh**

250.    On or about April, 2014, Dr. Wael Hakmeh appeared at Chicago O'Hare International Airport upon returning on a flight from a business trip in Turkey.

251.    He was referred to secondary screening and subjected to a prolonged interrogation.

252.    Additionally, to the best of his recollection, in June, 2014, his boarding pass was stamped with the "SSSS" designation for the first time, indicating that he was designated as a "known or suspected terrorist."

253.    On or about October, 2014, Dr. Hakmeh appeared to have been removed from the watch list, as his boarding pass for his flight was not stamped with the "SSSS" designation.

254.    However, in January, 2016, Dr. Hakmeh's boarding pass was again stamped with the "SSSS" designation.

255.    On or about June, 2016, Dr. Wael Hakmeh appeared at San Diego International Airport to return home after taking a medical course in San Diego.

256.    Before passing through the TSA security checkpoint, Dr. Hakmeh expressed medical and privacy concerns regarding the full-body millimeter wave scanner and requested to be screened by a metal detector instead.

257.    TSA agents informed Dr. Hakmeh that he was required to be screened by both the full-body millimeter scanner and metal detector in accordance with security protocol.  As a result, he complied.

258.    Nonetheless, despite having already been screened by both the full-body millimeter scanner and metal detector, a San Diego police officer approached Dr. Hakmeh after he passed through security, and in the midst of an inspection of each of the items he

was carrying, and threatened to charge Dr. Hakmeh with a misdemeanor and arrest him for refusing to pass through the full-body millimeter scanner.

259.    On multiple occasions, Dr. Hakmeh's family members were traveling with him, and upon witnessing the above incidents, upon information and belief, they learned of his status on the federal terror watch list.

260.    At no time was Dr. Hakmeh given notice of the factual basis for his placement on the federal terror watch list, and at no time was he offered a meaningful opportunity to contest his designation.

261.    Moreover, at no time was Dr. Hakmeh given notice of the deprivation of his liberty interests or violation of his constitutional rights.

262.    Upon information and belief, Dr. Hakmeh remains on the federal terror watch list.

263.    Dr. Hakmeh no longer connects through Chicago O'Hare International Airport to Detroit Metropolitan Airport when returning home to Michigan from overseas travel. Rather, Dr. Hakmeh drives from Chicago O'Hare International Airport for approximately five hours to his home in Wayne County, Michigan each time in order to avoid being subjected to the above treatment at multiple airports and risk arriving late to his place of employment.

264.    Upon information and belief, Dr. Hakmeh's nomination to and designation on the federal terror watch list was made based solely upon a hunch (based upon his race, ethnicity, national origin, religious affiliation, guilt-by-association, or First Amendment protected activities).

265.    Upon information and belief, because Dr. Hakmeh is included on the federal terror watch list, Defendants disseminated and are continuing to disseminate his designation

as a "known or suspected terrorist" to state and local authorities, foreign governments, private corporations, private contractors, airlines, gun sellers, car dealerships, financial institutions, among other official and private entities and individuals.

### Plaintiff Hassan Shibly

266.    Mr. Hassan Shibly is the Chief Executive Director of the Council on American-Islamic Relations, Florida (CAIR-FL), a chapter of the nation's largest Muslim civil rights and civil liberties advocacy organization, and a prominent civil rights activist.

267.    Mr. Shibly often serves as a consultant on Islam for, among other private entities, law enforcement and other government agencies.

268.    Upon information and belief, since at least 2010 until 2015, oftentimes when Mr. Shibly traveled by air, his boarding pass was stamped with the "SSSS" designation.

269.    However, FBI documents, obtained through a Freedom of Information Act Request ("FOIA") request in 2011, revealed the FBI made a determination that Mr. Shibly does not have any nexus to terrorism whatsoever.

270.    Nonetheless, Mr. Shibly routinely is unable to check in online or at a kiosk stationed at the airport, or print his boarding pass.

271.    As a matter of practice, airline representatives routinely contact DHS representatives in order to obtain clearance before allowing Mr. Shibly to board his flights.

272.    When traveling through land border crossings to re-enter the United States from Canada and air ports of entry, Mr. Shibly is also routinely referred to secondary inspection and detained by CBP.

273.    On November 25, 2009, Mr. Shibly was handcuffed, detained, fingerprinted and photographed at the Peace Bridge Port of Entry in Port Huron, Michigan.

274.     That day, a CBP officer confirmed that Mr. Shibly was not randomly selected. Rather, the officer advised Mr. Shibly that he was on a "list" and that he would receive the same treatment each time he crossed the border into the United States.

275.     The following day, Mr. Shibly again attempted to cross into the United States, however, this time at the Lewiston-Queens Bridge in Lewiston, New York.

276.     However, when the CBP officer swiped Mr. Shibly's passport, he radioed "I have a 1022 at booth number one."

277.     Mr. Shibly was immediately surrounded by armed CBP officers who escorted him for a secondary inspection and prolonged questioning.

278.     Mr. Shibly's grandmother, who was with him at the time, fainted at the sight of what had transpired, and was carried to a hospital by an ambulance.

279.     CBP officers searched through all his electronics on his possession and in his car, including, upon information and belief, his cell phone.

280.     On at least one occasion, on August 6, 2013, at the Ambassador Bridge port of entry in Detroit, Michigan, Mr. Shibly was questioned by CBP regarding the mosque he attends.

281.     On another occasion, on August 18, 2010, CBP officers at the John F. Kennedy International Airport asked Mr. Shibly about the holy sites he visited, whether he is part of "any Islamic tribes," whether he has been to a "madrassah [Islamic school] or studied Islam full-time," whether he attends a particular mosque, the Qur'an, and how many "gods" and "prophets" he believes in.  After this line of questioning, a CBP officer told Mr. Shibly that they were asking these questions "to protect against bombs and terrorism."

282.    Approximately two years prior, Mr. Shibly was questioned by a different CBP officer, also at the John F. Kennedy International Airport, about whether he recruits people to join his faith.

283.    Whenever Mr. Shibly was detained and subjected to prolonged questioning at land border crossings, he observed that at least 50% to 75% of the other individuals similarly detained were visibly Muslim.

284.    During the time that Mr. Shibly was receiving the "SSSS" designation on his boarding pass, he became employed by Regional Elite, a wholly owned subsidiary of Delta Airlines, specifically during 2011.

285.    In order to obtain his employment with Regional Elite, which required him to obtain access to sterile areas of the airport, Mr. Shibly was required to go extensive background checks, including an FBI background check.

286.    During the period of his employment with Regional Elite, Mr. Shibly had unrestricted access to the sterile area of the airport in addition to planes to clean them.

287.    Additionally, during the period of his employment with Regional Elite, Mr. Shibly was allowed to gain unrestricted access to planes to clean them in connection with his employment without having to undergo any additional security measures, detentions, or interrogations.

288.    On the other hand, whenever Mr. Shibly traveled for personal reasons during the same time period, Mr. Shibly's boarding passes continued to be marked with "SSSS," and he continued to have to obtain clearance from a DHS representative to board his flights.

289.    Moreover, during the time that Mr. Shibly's boarding passes were marked with "SSSS" or that Mr. Shibly was required to obtain clearance from a DHS representative to

board his flights, he met with President Barack Obama and several high-ranking government officials (including Ms. Valerie Jarett, Senior Advisor to the President; Mr. Benjamin Rhodes, Deputy National Security Advisor for Strategic Communications for the President; Ms. Melissa Rogers, Special Assistant to the President and Executive Director of the White House Office of Faith-based and Neighborhood Partnerships; Ms. Cecilia Muñoz, Former Director of Intergovernmental Affairs; Mr. Richard Chávez, Senior Executive of the Department of Homeland Security; Mr. Gil Kerlikowske, Commissioner of the U.S. Customs and Border Protection; Mr. Kareem Shora, DHS Senior Policy Advisor; and Mr. David Gersten, DHS Office for Community Partnerships), numerous United States Congress members, and state and local representatives regarding Islam and civil rights issues facing Muslims.

290.    In fact, on or about March, 2016, Mr. Shibly appeared at the Tampa International Airport in order to board his flight to Washington, D.C., where he was scheduled to meet with senior advisors to the President.

291.    However, Mr. Shibly was delayed as a result of not being able to obtain DHS clearance to board his flight in time, and missed his flight as a result.

292.    Neither in connection with his meeting with President Barack Obama nor in connection with his meetings with high level government officials was Mr. Shibly ever subjected to additional security measures, whether searches, questioning or prolonged detentions.

293.    On multiple occasions, some of the same of Mr. Shibly's friends and/or family members were traveling with him; and upon witnessing the above incidents, upon information and belief, they learned of his status on the federal terror watch list.

294.    Mr. Shibly filed a redress request through DHS TRIP.

295.     On January 26, 2011, Mr. Shibly received a letter as described in paragraph 135 above and was assigned a Redress Control Number.

296.     At no time was Mr. Shibly given notice of the factual basis for his placement on the federal terror watch list, and at no time was he offered a meaningful opportunity to contest his designation.

297.     Moreover, at no time was Mr. Shibly given notice of the deprivation of his liberty interests or violation of his constitutional rights.

298.     Upon information and belief, Mr. Shibly remains on the federal terror watch list.

299.     Upon information and belief, Mr. Shibly's nomination to and designation on the watch list was made based solely upon a hunch (based upon his race, ethnicity, national origin, religious affiliation, guilt-by-association, or First Amendment protected activities).

300.     Upon information and belief, because Mr. Shibly is included on the federal terror watch list, Defendants disseminated and are continuing to disseminate his designation to state and local authorities, foreign governments, private corporations, private contractors, airlines, gun sellers, car dealerships, financial institutions, among other official and private entities and individuals.

**Plaintiff Ausama Elhuzayel**

301.     On or about April, 2016, Mr. Ausama Elhuzayel appeared at the Los Angeles International Airport in order to board his flight to Dominica.

302.     Mr. Elhuzayel presented himself to check in for his flight when an agent in common clothes (the agency to which he belongs is unknown, however the agent

represented himself as a TSA agent) approached him and informed him that he had "bad news" for him and that he "was not going anywhere."

303.    A second armed agent (the agency to which the second agent belongs is also unknown) provided backup as Mr. Elhuzayel was escorted out of the airport to a shuttle to ensure that he left the airport.

304.    One of the agents advised Mr. Elhuzayel to file a redress request through DHS TRIP.

305.    Mr. Elhuzayel immediately filed a redress request through DHS TRIP.

306.    As of the date of this filing, Mr. Elhuzayel has not received a response from DHS, nor has he been assigned a Redress Control Number.

307.    At no time was Mr. Elhuzayel given notice of the factual basis for his placement on the federal terror watch list, and at no time was he offered a meaningful opportunity to contest his designation.

308.    Moreover, at no time was Mr. Elhuzayel given notice of the deprivation of his liberty interests or violation of his constitutional rights.

309.    Upon information and belief, Mr. Elhuzayel remains on the federal terror watch list.

310.    Upon information and belief, Mr. Elhuzayel's nomination to and designation on the federal terror watch list was made based solely upon a hunch (based upon his race, ethnicity, national origin, religious affiliation, guilt-by-association—based upon his association with Plaintiff Donald Thomas or other individuals—or First Amendment protected activities).

311.     Upon information and belief, because Mr. Elhuzayel is included on the federal terror watch list, Defendants disseminated and are continuing to disseminate his designation as a "known or suspected terrorist" to state and local authorities, foreign governments, private corporations, private contractors, airlines, gun sellers, car dealerships, financial institutions, among other official and private entities and individuals.

### Plaintiff Donald Thomas

312.     On April 26, 2016, two FBI agents, including FBI Agent Pat, met with Mr. Thomas at a Starbucks.

313.     They questioned him about his religious beliefs – specifically, FBI Agent Pat asked Mr. Thomas "[w]hen does Islam promote violence?" and "[w]hat does jihad mean?"

314.     The following day, on April 27, 2016, Mr. Donald Thomas appeared at the Sacramento International Airport in order to board his flight to Malaysia.

315.     Prior to his flight, Mr. Thomas presented himself at the Delta Airlines ticket counter before his flight.

316.     Delta Airlines personnel were unable to check Mr. Thomas in for his flight.

317.     The personnel spoke on the phone with a DHS representative to obtain clearance to allow Mr. Thomas to board his flight.

318.     Suddenly, at least two TSA Agents, one of which was armed and had his hand on his gun ready to shoot, and one Canine Enforcement Officer who was handling a canine, surrounded Mr. Thomas.

319.     The Delta Airlines representative informed Mr. Thomas that he was on the No Fly List and would not be permitted to board his flight.

320.    Mr. Thomas immediately left the airport, and as he was loading his suitcases, two FBI agents approached him, one of which was Agent Pat who had questioned him at Starbucks the day before.

321.    Agent Pat advised Mr. Thomas to contact the Council on American-Islamic Relations (CAIR), as the organization may be able to help him in connection with his status on the No Fly List.

322.    Prior to being added to the No Fly List, on at least two flights, Mr. Thomas' boarding passes were stamped with the "SSSS" designation, indicating that he had been designated as a "known or suspected terrorist."

323.    Moreover, on or about February 1, 2016, Mr. Thomas was surrounded by at least four to five armed CBP officers and detained for eight to ten hours at the border stop at the Peace Bridge Port of Entry in Port Huron, New York, when he attempted to re-enter the United States after a brief trip to Canada.

324.    CBP officers confiscated his phone, asked him for his password to access the phone, and upon information and belief, the CBP officers downloaded the data from his phone.

325.    Mr. Thomas filed a redress request through DHS TRIP.

326.    As of this date, Mr. Thomas has not received a final response from DHS.

327.    At no time was Mr. Thomas given notice of the factual basis for his placement on the federal terror watch list, and at no time was he offered a meaningful opportunity to contest his designation.

328.    Moreover, at no time was Mr. Thomas given notice of the deprivation of his liberty interests or violation of his constitutional rights.

329.    Upon information and belief, Mr. Thomas' nomination to and designation on the federal terror watch list was made based solely upon a hunch (based upon his race, ethnicity, national origin, religious affiliation, guilt-by-association—based upon his association with Plaintiff Ausama Elhuzayel or other individuals—or First Amendment protected activities).

330.    Upon information and belief, because Mr. Thomas is included on the federal terror watch list, Defendants disseminated and are continuing to disseminate his designation as a "known or suspected terrorist" to state and local authorities, foreign governments, private corporations, private contractors, airlines, gun sellers, car dealerships, financial institutions, among other official and private entities and individuals.

### Plaintiff Murat Frljuckic

331.    On or about October, 2012, Mr. Murat Frljuckic was referred to secondary inspection, handcuffed and detained by CBP at the border stop at the Blue Water Bridge Port of Entry in Port Huron, Michigan, when he attempted to re-enter the United States after a brief vacation in Canada.

332.    CBP officers subjected him to a prolonged detention and questioning for approximately three to four hours.

333.    Similarly, on or about August, 2014, Mr. Frljuckic was referred to secondary inspection, handcuffed and detained by CBP at the border stop at the Blue Water Bridge Port of Entry in Port Huron, Michigan, when he attempted to re-enter the United States after a brief vacation in Montenegro.

334.    Moreover, every time Mr. Frljuckic travels by air, since approximately March or April, 2012, his boarding pass is stamped with the "SSSS" designation, indicating that he has been designated as a "known or suspected terrorist."

335.    On multiple occasions, Mr. Frljuckic's friends and/or family were traveling with him and were required to provide their contact information to U.S Customs Officers; and upon witnessing the above incidents, upon information and belief, they learned of his status on the federal terror watch list.

336.    Mr. Frljuckic filed a redress request through DHS TRIP.

337.    As of the date of this filing, Mr. Frljuckic has not received a response from DHS, nor has he been assigned a Redress Control Number.

338.    Mr. Frljuckic's boarding passes continue to be stamped with the "SSSS" designation every time he travels by air.

339.    Additionally, every time Mr. Frljuckic travels by air, he is referred to secondary inspection and subjected to prolonged searches and questioning.

340.    At no time was Mr. Frljuckic given notice of the factual basis for his placement on the federal terror watch list, and at no time was he offered a meaningful opportunity to contest his designation.

341.    Moreover, at no time was Mr. Frljuckic given notice of the deprivation of his liberty interests or violation of his constitutional rights.

342.    Upon information and belief, Mr. Frljuckic remains on the federal terror watch list.

343.    Mr. Frljuckic no longer travels by air nor does he travel to Canada by land in order to avoid being subjected to the above treatment.

344.    Upon information and belief, Mr. Frljuckic's nomination to and designation on the federal terror watch list was made based solely upon a hunch (based upon his race, ethnicity, national origin, religious affiliation, guilt-by-association, or First Amendment protected activities).

345.    Upon information and belief, because Mr. Frljuckic is included on the federal terror watch list, Defendants disseminated and are continuing to disseminate his designation as a "known or suspected terrorist" to state and local authorities, foreign governments, private corporations, private contractors, airlines, gun sellers, car dealerships, financial institutions, among other official and private entities and individuals.

### Plaintiff Ibrahim Awad

346.    On June 30, 2016, Mr. Ibrahim Awad appeared at a Chevrolet car dealership located in Sterling Heights, Michigan to test drive and purchase a pickup truck.

347.    However, when he requested to test drive the vehicle, a Chevrolet sales representative informed Mr. Awad that, although he was "not supposed to tell" Mr. Awad, upon inputting his information in the company's system, Mr. Awad's name showed up as being designated on the federal terror watch list.

348.    The Chevrolet salesperson went on to advise Mr. Awad that because of a "new law," Mr. Awad was not permitted to test drive or purchase any vehicles until the dealership obtain clearance from the FBI allowing him to do so.

349.    The Chevrolet salesperson told Mr. Awad to wait until he was able to obtain clearance from the FBI allowing Mr. Awad to test drive and purchase the pickup truck that Mr. Awad wanted to purchase.

350.    Approximately thirty minutes later, the Chevrolet salesperson informed Mr. Awad that the FBI sent him an email providing Mr. Awad with clearance to test drive and purchase a vehicle.

351.    Upon information and belief, Defendant TSC disseminated the stigmatizing label of "known or suspected terrorist" attached to Mr. Awad to the Chevrolet car dealership and other private entities or individuals, and as a result, he was unable to test drive or purchase a vehicle until the Chevrolet car dealership obtained FBI clearance allowing him to do so.

352.    Upon information and belief, since 2013, Mr. Awad has been unable to check in online or at airport kiosks in order to obtain a boarding pass.

353.    Moreover, since 2013, every time Mr. Awad presents himself at a ticket counter prior to his flight, airlines personnel are unable to check Mr. Awad in for his flight.

354.    Rather, each time, the personnel contact a DHS representative to obtain clearance to allow Mr. Awad to board his flights.

355.    Moreover, since 2013, Mr. Awad is also frequently referred to secondary inspections and subjected to prolonged detention and questioning at both the airport and at land border crossings.

356.    On July 24, 2014, upon returning from a flight to Turkey, Mr. Awad was pulled aside at the John F. Kennedy International Airport by a man wearing a suit and tie, who upon information and belief was an FBI agent, and taken to an interrogation room, where he was detained and subjected to prolonged interrogation by New York Police Department officers.

357.    The NYPD officers, upon information and belief, were part of a joint terrorism taskforce.

358.    On or about May, 2015, Mr. Awad was questioned by FBI Agents Josh Hauxhurst and Hank Impola outside his home about his political opinions regarding the ongoing conflict in Syria, his position on the Assad regime, the Free Syria Army and ISIS, and his recent trip to Turkey.

359.    The FBI Agents proceeded to pressure Mr. Awad into becoming an informant.

360.    Upon information and belief, Mr. Awad's name was added to the federal terror watch list in order to leverage his status and put pressure on Mr. Awad to act as an informant.

361.    At no time was Mr. Awad given notice of the factual basis for his placement on the federal terror watch list, and at no time was he offered a meaningful opportunity to contest his designation.

362.    Moreover, at no time was Mr. Awad given notice of the deprivation of his liberty interests or violation of his constitutional rights.

363.    Upon information and belief, Mr. Awad remains on the federal terror watch list.

364.    Upon information and belief, Mr. Awad's nomination to and designation on the federal terror watch list was made based solely upon a hunch (based upon his race, ethnicity, national origin, religious affiliation, guilt-by-association, or First Amendment protected activities).

365.    Upon information and belief, because Mr. Awad is included on the federal terror watch list, Defendants disseminated and are continuing to disseminate his designation as a "known or suspected terrorist" to state and local authorities, foreign governments, private corporations, private contractors, airlines, gun sellers, car dealerships, financial institutions, among other official and private entities and individuals.

**Plaintiff Mark Amri**

366.    On January 21, 2016, Mr. Mark Amri appeared at the Ontario International Airport in Ontario, California in order to board his flight to Las Vegas, Nevada.

367.    Prior to his flight, Mr. Amri presented himself at the Southwest Airlines ticket counter before his flight.

368.    Southwest Airlines personnel were unable to check Mr. Amri in for his flight.

369.    The personnel spoke on the phone with a DHS representative to obtain clearance to allow Mr. Amri to board his flight.

370.    Mr. Amri overhead the personnel describe him on the phone, stating that "he looks ok."

371.    The Southwest Airlines representative informed Mr. Amri that he was on the No Fly List and would not be permitted to board his flight.

372.    Mr. Amri filed a redress request through DHS TRIP.

373.    On July 19, 2016, Mr. Amri received a letter as described in paragraph 135 above and was assigned a Redress Control Number.

374.    On August 4, 2016, Mr. Amri again appeared at the Ontario International Airport in Ontario, California in order to board his flight to San Francisco, California.

375.    He approached an airline representative to be checked in manually, and after the airline personnel spoke on the phone multiple times with DHS representatives to obtain clearance before he could fly, his boarding pass was stamped with the "SSSS" designation, indicating that he was still designated as a "known or suspected terrorist."

376.     On September 1, 2016, Mr. Amri received a second letter from DHS stating that "the U.S. Government knows of no reason, related to your inquiry, that you should be unable to fly."

377.     At no time was Mr. Amri given notice of the factual basis for his placement on the federal terror watch list, and at no time was he offered a meaningful opportunity to contest his designation.

378.     Moreover, at no time was Mr. Amri given notice of the deprivation of his liberty interests or violation of his constitutional rights.

379.     Upon information and belief, Mr. Amri's nomination to and designation on the federal terror watch list was made based solely upon a hunch (based upon his race, ethnicity, national origin, religious affiliation, guilt-by-association, or First Amendment protected activities).

380.     Upon information and belief, because Mr. Amri is included on the federal terror watch list, Defendants disseminated and are continuing to disseminate his designation as a "known or suspected terrorist" to state and local authorities, foreign governments, private corporations, private contractors, airlines, gun sellers, car dealerships, financial institutions, among other official and private entities and individuals.

### Plaintiff Adnan Khalil Shaout

381.     Every time Mr. Adnan Shaout travels by air, since 2004, his boarding pass is stamped with the "SSSS" designation, indicating that he has been designated as a "known or suspected terrorist."

382.     Mr. Shaout is frequently interrogated about his religious beliefs and affiliation with religious groups during secondary inspections.

383.    Moreover, Mr. Shaout is frequently unable to board his flights until he is "cleared" by DHS to board the flight, a process that oftentimes takes hours.

384.    Moreover, TSA agents often confiscate his laptop, and upon information and belief, download information from his laptop.

385.    On or about, June 23, 2011, while Mr. Shaout was sitting in the plane waiting for take-off, despite having been thoroughly screened by TSA, TSA agents removed Mr. Shaout from the plane and conducted another extensive pat down and search of his personal belongings.

386.    The entire flight was delayed until the TSA agents completed this search.

387.    Mr. Shaout no longer travels by air in the United States in order to avoid being subjected to the above treatment.

388.    On multiple occasions, some of the same of Mr. Shaout's family and/or friends were traveling with him; and upon witnessing the above incidents, upon information and belief, they learned of his status on the federal terror watch list.

389.    Mr. Shaout filed a redress request through DHS TRIP.

390.    On November 5, 2015, Mr. Shaout received a letter as described in paragraph 135 above and was assigned a Redress Control Number.

391.    Mr. Shaout's boarding pass continues to be stamped with the "SSSS" designation when travels by air, indicating that he has been designated as a "known or suspected terrorist."

392.    Additionally, every time Mr. Shaout travels by air, he is referred to secondary inspection and subjected to prolonged searches and questioning.

393.    At no time was Mr. Shaout given notice of the factual basis for his placement on the federal terror watch list, and at no time was he offered a meaningful opportunity to contest his designation.

394.    Moreover, at no time was Mr. Shaout given notice of the deprivation of his liberty interests or violation of his constitutional rights.

395.    Upon information and belief, Mr. Shaout remains on the federal terror watch list.

396.    Upon information and belief, Mr. Shaout's nomination to and designation on the federal terror watch list was made based solely upon a hunch (based upon his race, ethnicity, national origin, religious affiliation, guilt-by-association, or First Amendment protected activities).

397.    Upon information and belief, because Mr. Shaout is included on the federal terror watch list, Defendants disseminated and are continuing to disseminate his designation as a "known or suspected terrorist" to state and local authorities, foreign governments, private corporations, private contractors, airlines, gun sellers, car dealerships, financial institutions, among other official and private entities and individuals.

**Plaintiff Saleem Ali**

398.    On or about October, 2012, Mr. Saleem Ali was referred to secondary inspection and detained by CBP at the border stop at the Ambassador Bridge, Detroit, Michigan, when he attempted to re-enter the United States after a brief vacation in Canada.

399.    CBP officers confiscated his two phones, asked him for his passwords to access the two phones, and upon information and belief, the CBP officers downloaded the data from his phones.

400.    CBP officers kept his phones and did not return them until the following day.

401.    Moreover, every time Mr. Ali travels by air, his boarding pass is stamped with the "SSSS" designation, indicating that he has been designated as a "known or suspected terrorist."

402.    Additionally, every time Mr. Ali travels by air, he is referred to secondary inspection and subjected to prolonged searches and questioning.

403.    Mr. Ali filed a redress request through DHS TRIP.

404.    Mr. Ali received a letter as described in paragraph 135 above and was assigned a Redress Control Number.

405.    At no time was Mr. Ali given notice of the factual basis for his placement on the federal terror watch list, and at no time was he offered a meaningful opportunity to contest his designation.

406.    Moreover, at no time was Mr. Ali given notice of the deprivation of his liberty interests or violation of his constitutional rights.

407.    Upon information and belief, Mr. Ali remains on the federal terror watch list.

408.    Upon information and belief, Mr. Ali's nomination to and designation on the federal terror watch list was made based solely upon a hunch (based upon his race, ethnicity, national origin, religious affiliation, guilt-by-association, or First Amendment protected activities).

409.    Upon information and belief, because Mr. Ali is included on the federal terror watch list, Defendants disseminated and are continuing to disseminate his designation as a "known or suspected terrorist" to state and local authorities, foreign governments, private

corporations, private contractors, airlines, gun sellers, car dealerships, financial institutions, among other official and private entities and individuals.

### Plaintiff Shahir Anwar

410.    Mr. Shahir Anwar is the brother of Plaintiff Mr. Samir Anwar.

411.    Every time Mr. Anwar travels by air, since 2014, his boarding pass is stamped with the "SSSS" designation, indicating that he has been designated as a "known or suspected terrorist."

412.    Additionally, every time Mr. Anwar travels by air, he is referred to secondary inspection and subjected to prolonged searches and questioning.

413.    Mr. Anwar filed a redress request through DHS TRIP.

414.    On March 23, 2015, Mr. Anwar received a letter as described in paragraph 135 above and was assigned a Redress Control Number.

415.    Mr. Anwar's boarding passes continue to be stamped with the "SSSS" designation every time he travels by air.

416.    At no time was Mr. Anwar given notice of the factual basis for his placement on the federal terror watch list, and at no time was he offered a meaningful opportunity to contest his designation.

417.    Moreover, at no time was Mr. Anwar given notice of the deprivation of his liberty interests or violation of his constitutional rights.

418.    Upon information and belief, Mr. Anwar remains on the federal terror watch list.

419.  Mr. Anwar no longer travels by air nor does he travel to Canada by land in order to avoid being subjected to the above treatment or the treatment experienced by his brother, Plaintiff Samir Anwar, described below.

420.  Upon information and belief, Mr. Anwar's nomination to and designation on the federal terror watch list was made based solely upon a hunch (based upon his race, ethnicity, national origin, religious affiliation, guilt-by-association, familial status—based upon his brother's or other family member's designation—or First Amendment protected activities).

421.  Upon information and belief, because Mr. Anwar is included on the federal terror watch list, Defendants disseminated and are continuing to disseminate his designation as a "known or suspected terrorist" to state and local authorities, foreign governments, private corporations, private contractors, airlines, gun sellers, car dealerships, financial institutions, among other official and private entities and individuals.

### Plaintiff Samir Anwar

422.  Mr. Samir Anwar is the brother of Plaintiff Mr. Shahir Anwar.

423.  Every time Mr. Anwar travels by air, his boarding pass is stamped with the "SSSS" designation, indicating that he has been designated as a "known or suspected terrorist."

424.  Mr. Anwar filed a redress request through DHS TRIP.

425.  On August 7, 2014, Mr. Anwar received a letter as described in paragraph 135 above and was assigned a Redress Control Number.

426.  On or about February 22, 2015, Mr. Anwar was referred to secondary inspection and detained by CBP at the border stop at the Blue Water Bridge Port of Entry in

Port Huron, Michigan, when he attempted to re-enter the United States after a brief trip to Canada.

427.    Mr. Anwar handed a CBP officer the letter from DHS, however the CBP officer responded that the letter does not mean anything and does not have any impact on the situation.

428.    CBP officers confiscated his phone, asked him for his password to access the phone, and upon information and belief, the CBP officers downloaded the data from his phone.

429.    Moreover, Mr. Anwar was interrogated about his religious beliefs and religious affiliations.

430.    Mr. Anwar's boarding pass continues to be stamped with the "SSSS" designation when travels by air, indicating that he has been designated as a "known or suspected terrorist."

431.    Additionally, every time Mr. Anwar travels by air, he is referred to secondary inspection and subjected to prolonged searches and questioning.

432.    At no time was Mr. Anwar given notice of the factual basis for his placement on the federal terror watch list, and at no time was he offered a meaningful opportunity to contest his designation.

433.    Moreover, at no time was Mr. Anwar given notice of the deprivation of his liberty interests or violation of his constitutional rights.

434.    Upon information and belief, Mr. Anwar remains on the federal terror watch list.

435.    Upon information and belief, Mr. Anwar's nomination to and designation on the federal terror watch list was made based solely upon a hunch (based upon his race, ethnicity, national origin, religious affiliation, guilt-by-association, familial status—based upon his brother's or other family member's designation—or First Amendment protected activities).

436.    Upon information and belief, because Mr. Anwar is included on the federal terror watch list, Defendants disseminated and are continuing to disseminate his designation as a "known or suspected terrorist" to state and local authorities, foreign governments, private corporations, private contractors, airlines, gun sellers, car dealerships, financial institutions, among other official and private entities and individuals.

### Plaintiff Muhammad Yahya Khan

437.    Every time Mr. Muhammad Yahya Khan travels by air, since approximately 2012, his boarding pass is stamped with the "SSSS" designation, indicating that he has been designated as a "known or suspected terrorist."

438.    Additionally, every time Mr. Khan travels by air, he is referred to secondary inspection and subjected to prolonged searches and questioning.

439.    Moreover, every time Mr. Khan returns to the United States on an international flight, CBP officers escort Mr. Khan from the gate, detain him, search his belongings and interrogate him.

440.    As a result, Mr. Khan has missed at least two connecting flights.

441.    On or about December, 2013, Mr. Khan was interrogated in his home by FBI agents about his religious practices and beliefs, including the mosque he attends, whether he

is a regular attendee at his mosque, whether his mosque preaches extremism, and whether he knows anyone affiliated with the Taliban.

442.    Upon requesting their business cards, the FBI agents refused to provide Mr. Khan their business cards.

443.    In 2012, Mr. Khan was referred to secondary inspection and detained by CBP at the border stop at the Blue Water Bridge, Port Huron, Michigan, when he attempted to re-enter the United States after a brief vacation in Canada.

444.    Mr. Khan no longer travels by land into the United States in order to avoid being subjected to the above treatment.

445.    Mr. Khan filed a redress request through DHS TRIP.

446.    On July 14, 2015, Mr. Khan received a letter as described in paragraph 135 above and was assigned a Redress Control Number.

447.    Mr. Khan's boarding pass continues to be stamped with the "SSSS" designation when travels by air, indicating that he has been designated as a "known or suspected terrorist."

448.    Additionally, every time Mr. Khan travels by air, he is referred to secondary inspection and subjected to prolonged searches and questioning.

449.    At no time was Mr. Khan given notice of the factual basis for his placement on the federal terror watch list, and at no time was he offered a meaningful opportunity to contest his designation.

450.    Moreover, at no time was Mr. Khan given notice of the deprivation of his liberty interests or violation of his constitutional rights.

451.    Upon information and belief, Mr. Khan remains on the federal terror watch list.

452.    Upon information and belief, Mr. Khan's nomination to and designation on the federal terror watch list was made based solely upon a hunch (based upon his race, ethnicity, national origin, religious affiliation, guilt-by-association, or First Amendment protected activities).

453.    Upon information and belief, because Mr. Khan is included on the federal terror watch list, Defendants disseminated and are continuing to disseminate his designation as a "known or suspected terrorist" to state and local authorities, foreign governments, private corporations, private contractors, airlines, gun sellers, car dealerships, financial institutions, among other official and private entities and individuals.

**Plaintiff Hassan Fares**

454.    On August 2, 2016, Mr. Fares' boarding pass was stamped with the "SSSS" designation for the first time, indicating that he was still designated as a "known or suspected terrorist."

455.    After boarding his flight, a TSA agent removed Mr. Fares from the plane and required him to pass through airport security once again, although he had already underwent screening to get to his gate.

456.    He was subjected to extensive searches and pat downs.

457.    By the time Mr. Fares returned to the gate, he missed his flight.

458.    Upon witnessing the above incidents, upon information and belief, his family learned of his status on the federal terror watch list.

459.    At no time was Mr. Fares given notice of the factual basis for his placement on the federal terror watch list, and at no time was he offered a meaningful opportunity to contest his designation.

460.    Moreover, at no time was Mr. Fares given notice of the deprivation of his liberty interests or violation of his constitutional rights.

461.    Upon information and belief, Mr. Fares remains on the federal terror watch list.

462.    Upon information and belief, Mr. Fares' nomination to and designation on the federal terror watch list was made based solely upon a hunch (based upon his race, ethnicity, national origin, religious affiliation, guilt-by-association, or First Amendment protected activities).

463.    Upon information and belief, because Mr. Fares is included on the federal terror watch list, Defendants disseminated and are continuing to disseminate his designation as a "known or suspected terrorist" to state and local authorities, foreign governments, private corporations, private contractors, airlines, gun sellers, car dealerships, financial institutions, among other official and private entities and individuals.

### Plaintiff Zuhair El-Shwehdi

464.    Every time Mr. Zuhair El-Shwehdi travels by air, since at least 2011, his boarding pass is stamped with the "SSSS" designation, indicating that he has been designated as a "known or suspected terrorist."

465.    Mr. Shwehdi is frequently unable to board his flights until he is "cleared" by DHS to board the flight, a process that can take hours.

466.    Frequently, upon returning from a flight, Mr. El-Shwehdi is escorted from the gate or, on at least two occasions off of the plane from his seat, by FBI and/or TSA agents, before he is detained and subjected to prolonged questioning and searches of his person and belongings.

467.    On November 22, 2013, upon landing at John F. Kennedy International Airport, the pilot announced over the loud speaker that all passengers should have their passports and boarding passes ready for inspection.

468.    FBI and/or TSA agents boarded the plane and inspected the passengers' passports and boarding passes until they located Mr. El-Shwehdi, escorted him off of the plane, detained him and subjected him to prolonged questioning and searches of his person and belongings.

469.    As a result, Mr. El-Shwehdi has missed flight connections and was forced to stay overnight at the airport on at least two separate occasions.

470.    Moreover, El-Shwehdi was unable to attend two funerals of immediate relatives as a result of the above treatment.

471.    TSA agents frequently confiscate his electronics, request his passwords, and upon information and belief, download information from them.

472.    As a result, Mr. El-Shwehdi stopped carrying electronics with him during flights.

473.    On multiple occasions, some of the same of Mr. El-Shwehdi's family members were traveling with him; and upon witnessing the above incidents, upon information and belief, they learned of his status on the federal terror watch list.

474.    Mr. El-Shwehdi filed a redress request through DHS TRIP.

475.    As of the date of this filing, Mr. El-Shwehdi has not received a response from DHS, nor has he been assigned a Redress Control Number.

476.    At no time was Mr. El-Shwehdi given notice of the factual basis for his placement on the federal terror watch list, and at no time was he offered a meaningful opportunity to contest his designation.

477.    Moreover, at no time was Mr. El-Shwehdi given notice of the deprivation of his liberty interests or violation of his constitutional rights.

478.    Upon information and belief, Mr. El-Shwehdi remains on the federal terror watch list.

479.    Mr. El-Shwehdi no longer travels by air since 2013 in order to avoid being subjected to the above treatment.

480.    Upon information and belief, Mr. El-Shwehdi's nomination to and designation on the federal terror watch list was made based solely upon a hunch (based upon his race, ethnicity, national origin, religious affiliation, guilt-by-association, or First Amendment protected activities).

481.    Upon information and belief, because Mr. El-Shwehdi is included on the federal terror watch list, Defendants disseminated and are continuing to disseminate his designation as a "known or suspected terrorist" to state and local authorities, foreign governments, private corporations, private contractors, airlines, gun sellers, car dealerships, financial institutions, among other official and private entities and individuals.

### Plaintiff Mahmoud Eraqi

482.    On or about May 4, 2016, Mr. Mahmoud Eraqi's boarding pass was stamped with the "SSSS" designation, indicating that he has been designated as a "known or suspected terrorist."

483.     That day, upon arriving at the Toronto Pearson International Airport, Mr. Eraqi was pulled aside by U.S. Customs officers, detained and subjected to questioning and searches of his person and belongings.

484.     The U.S. Customs officers confiscated his phone and, upon information and belief, downloaded information from it.

485.     Moreover, on or about one or two months prior to this filing, Mr. Eraqi was surrounded by 4-5 armed CBP officers, handcuffed and detained in a holding cell for nearly 5 hours at the Peace Bridge Port of Entry in Port Huron, Michigan, when he attempted to re-enter the United States after a brief trip to Canada.

486.     One of the CBP officers advised Mr. Eraqi that he was flagged in their system as "armed and dangerous."

487.     During the above instances, Mr. Eraqi's friends were traveling with him, and upon witnessing the above incidents, upon information and belief, they learned of his status on the federal terror watch list.

488.     Upon information and belief, Mr. Eraqi remains on the federal terror watch list.

489.     Upon information and belief, Mr. Eraqi's nomination to and designation on the federal terror watch list was made based solely upon a hunch (based upon his race, ethnicity, national origin, religious affiliation, guilt-by-association, or First Amendment protected activities).

490.     Upon information and belief, because Mr. Eraqi is included on the federal terror watch list, Defendants disseminated and are continuing to disseminate his designation as a "known or suspected terrorist" to state and local authorities, foreign governments,

private corporations, private contractors, airlines, gun sellers, car dealerships, financial institutions, among other official and private entities and individuals.

### Plaintiff John Doe No. 1

491.    On or about January, 2015, Mr. John Doe No. 1's boarding pass was stamped with the "SSSS" designation, indicating that he had been designated as a "known or suspected terrorist."

492.    Additionally, every time Mr. Doe No. 1 returns to the United States from international travel, Mr. Doe is subjected to prolonged detention and questioning.

493.    Suddenly, shortly after Mr. Doe No. 1 was designated on the federal terror watch list, many of his individual and business bank accounts were closed without notice or an explanation of the reasons why they were being closed, including bank accounts at JPMorgan Chase Bank, TCF Bank and PNC Bank.

494.    Upon information and belief, Defendant TSC disseminated the stigmatizing label of "known or suspected terrorist" attached to Mr. Doe No. 1 to JPMorgan Chase Bank, TCF Bank and PNC Bank, and as a result, his bank accounts were closed without notice.

495.    Mr. Doe No. 1 filed a redress request through DHS TRIP.

496.    As of the date of this filing, Mr. Doe No. 1 has not received a response from DHS, nor has he been assigned a Redress Control Number.

497.    At no time was Mr. Doe No. 1 given notice of the factual basis for his placement on the federal terror watch list, and at no time was he offered a meaningful opportunity to contest his designation.

498.    Moreover, at no time was Mr. Doe No. 1 given notice of the deprivation of his liberty interests or violation of his constitutional rights.

499.     Upon information and belief, Mr. Doe No. 1 remains on the federal terror watch list.

500.     Upon information and belief, Mr. Doe No. 1's nomination to and designation on the federal terror watch list was made based solely upon a hunch (based upon his race, ethnicity, national origin, religious affiliation, guilt-by-association, or First Amendment protected activities).

501.     Upon information and belief, because Mr. Doe No. 1 is included on the federal terror watch list, Defendants disseminated and are continuing to disseminate his designation as a "known or suspected terrorist" to state and local authorities, foreign governments, private corporations, private contractors, airlines, gun sellers, car dealerships, financial institutions, among other official and private entities and individuals.

**Plaintiff John Doe No. 2**

502.     On or about May, 2010, Mr. John Doe No. 2 appeared at the Detroit Metropolitan Airport upon returning on a flight from a trip to Turkey.

503.     He was referred to secondary screening and subjected to a prolonged interrogation.

504.     During his interrogation, CBP officers began looking through pictures on Mr. Doe No. 2's laptop and asked him questions about his place of worship, the religious leader at his mosque, whether Mr. Doe No. 2 knew anyone who was involved in terrorist activities, and whether he had information about other congregants at his place of worship.

505.     Every time Mr. Doe No. 2 travels by air, since his May, 2010 trip, his boarding pass is stamped with the "SSSS" designation, indicating that he has been designated as a "known or suspected terrorist."

506.    Additionally, every time Mr. Doe No. 2 travels by air, he is referred to secondary inspection and subjected to prolonged searches and questioning.

507.    Mr. Doe No. 2 filed a redress request through DHS TRIP.

508.    On January 19, 2016, Mr. Doe No. 2 received a letter as described in paragraph 135 above and was assigned a Redress Control Number.

509.    At no time was Mr. Doe No. 2 given notice of the factual basis for his placement on the federal terror watch list, and at no time was he offered a meaningful opportunity to contest his designation.

510.    Moreover, at no time was Mr. Doe No. 2 given notice of the deprivation of his liberty interests or violation of his constitutional rights.

511.    As of the date of this filing, it is unclear whether Mr. Doe No. 2 remains on the federal terror watch list.

512.    Upon information and belief, Mr. Doe No. 2's nomination to and designation on the federal terror watch list was made based solely upon a hunch (based upon his race, ethnicity, national origin, religious affiliation, guilt-by-association, or First Amendment protected activities).

513.    Upon information and belief, because Mr. Doe No. 2 is included on the federal terror watch list, Defendants disseminated and are continuing to disseminate his designation as a "known or suspected terrorist" to state and local authorities, foreign governments, private corporations, private contractors, airlines, gun sellers, car dealerships, financial institutions, among other official and private entities and individuals.

**Plaintiff John Doe No. 3**

514.    Every time Mr. John Doe No. 3 travels by air, since 2002, his boarding pass is stamped with the "SSSS" designation, indicating that he has been designated as a "known or suspected terrorist."

515.    In fact, in 2002, upon returning from an international flight, Mr. Doe No. 3 was escorted off of the plane by FBI agents, before he was interrogated and threatened by agents from different government agencies.

516.    Mr. Doe No. 3 is frequently unable to board his flights until he is "cleared" by DHS to board the flight, a process that can take hours.

517.    Moreover, Mr. Doe No. 3 is frequently called over the loud speakers at the airport after he has already reached the gate prior to take off to go back to security, only to be detained and subjected to further prolonged interrogations and searches.

518.    Additionally, TSA agents confiscated his phones, requested his passwords, and upon information and belief, downloaded information from them.

519.    On July 14, 2016, Mr. Doe No. 3 was surrounded by several armed CBP officers, handcuffed and detained for several hours at the border stop at the Sault Ste. Marie International Bridge, Michigan, when he attempted to re-enter the United States after a brief trip to Canada.

520.    He was informed during that detention that he was surrounded by several armed CBP officers because he was flagged in their system as "armed and dangerous."

521.    On or about 2006, Mr. Doe No. 3's JPMorgan Chase Bank was suddenly closed a few days after he opened it without notice or an explanation of the reasons why it was being closed.

522.    Upon information and belief, Defendant TSC disseminated the stigmatizing label of "known or suspected terrorist" attached to Mr. Doe No. 3 to JPMorgan Chase Bank, and as a result, his bank account was closed without notice.

523.    Mr. Doe No. 3 lost lucrative employment opportunities as a result of being designated as a "known or suspected terrorist."

524.    On multiple occasions, some of the same of Mr. Doe No. 3's family members and/or friends were traveling with him, and upon witnessing the above incidents, upon information and belief, they learned of his status on the federal terror watch list.

525.    Mr. Doe No. 3 filed a redress request through DHS TRIP.

526.    As of the date of this filing, Mr. Doe No. 3 has not received a response from DHS, nor has he been assigned a Redress Control Number.

527.    At no time was Mr. Doe No. 3 given notice of the factual basis for his placement on the federal terror watch list, and at no time was he offered a meaningful opportunity to contest his designation.

528.    Moreover, at no time was Mr. Doe No. 3 given notice of the deprivation of his liberty interests or violation of his constitutional rights.

529.    Upon information and belief, Mr. Doe No. 3 remains on the federal terror watch list.

530.    Mr. Doe No. 3 limits travels by air when necessary in order to avoid being subjected to the above treatment.

531.    Upon information and belief, Mr. Doe No. 3's nomination to and designation on the federal terror watch list was made based solely upon a hunch (based upon his race,

ethnicity, national origin, religious affiliation, guilt-by-association, or First Amendment protected activities).

532.    Upon information and belief, because Mr. Doe No. 3 is included on the federal terror watch list, Defendants disseminated and are continuing to disseminate his designation as a "known or suspected terrorist" to state and local authorities, foreign governments, private corporations, private contractors, airlines, gun sellers, car dealerships, financial institutions, among other official and private entities and individuals.

### Plaintiff John Doe No. 4

533.    On August 1, 2016, Mr. Doe No. 4 arrived at the Detroit Metropolitan Airport in order to board his flight to Morocco.

534.    Prior to his flight, Mr. Doe No. 4 presented himself at the Delta Airlines ticket counter before his flight.

535.    Delta Airlines personnel were unable to check Mr. Doe No. 4 in for his flight.

536.    The personnel spoke on the phone with a DHS representative to obtain clearance to allow Mr. Doe No. 4 to board his flight.

537.    The personnel, along with a Delta Airlines supervisor spoke with two men dressed in suits, who upon information and belief were FBI agents.

538.    The Delta Airlines supervisor returned to the counter and informed Mr. Doe No. 4 that he was on the No Fly List and would not be permitted to board his flight.

539.    Before Mr. Doe No. 4 was denied the ability to board his flight, he did not receive any notice, from a government agency or anyone else, that he would be unable to board his flight or that his name was placed on the No Fly List.  Mr. Doe No. 4 had been able previously to board flights in the United States without difficulty.

540.    On or about August 24, 2015, Mr. Doe No. 4 was involved in a minor car accident in Clinton Township, Michigan.

541.    As he was providing his witness statement to the local police officer, the officer pulled up Mr. Doe No. 4's profile on his computer screen.

542.    Mr. Doe No. 4 saw next to his name at the top of the officer's computer screen a warning in large, red block letters "Possible Terrorist," and a note to exercise caution.

543.    On at least two separate occasions, while being pulled over for traffic stops, the police officers approached Mr. Doe No. 4 vehicle with their hand on their gun ready to shoot, as though they had information that Mr. Doe No. 4 was armed and extremely dangerous.

544.    Upon information belief, Defendants, including Defendant TSC, disseminated the stigmatizing label of "known or suspected terrorist" attached to Mr. Doe No. 4 to the local police officers, and as a result, after running his license plate on an automatic license plate reader, they treated Mr. Doe No. 4 as armed and extremely dangerous.

545.    On or about December 12, 2014, after having been pulled over while driving for a minor traffic violation by a local police officer in Warren, Michigan, the police officer conducted a search of Mr. Doe No. 4's vehicle.

546.    Upon finding a broken Airsoft gun with an orange tip, the police officer immediately handcuffed Mr. Doe No. 4 and transported him to the local jail, where he was detained in a holding cell overnight.

547.    While he was in his holding cell, he overheard police officers discussing his arrest, when one of the officers said that if he were the officer that had pulled him over, he would have shot and killed him.

548.    Later that night, while Mr. Doe No. 4 was being fingerprinted, he saw paperwork in connection with his case next to him on the counter that contained the text "FBI Hold" and "no phone."

549.    The officer taking Mr. Doe No. 4's fingerprints told Mr. Doe No. 4 that he must have "done something really bad to get the FBI involved," and that he "thinks something is going down."

550.    Mr. Doe No. 4 filed a redress request through DHS TRIP.

551.    As of this date, Mr. Doe No. 4 has not received a response from DHS.

552.    Nonetheless, Mr. Doe No. 4 remains on the No Fly List.

553.    Mr. Doe No. 4 is planning on traveling to Morocco for his engagement party as he is planning on becoming engaged to his fiancée.

554.    However, Mr. Doe No. 4 is unable to travel to Morocco as a result of his placement on the No Fly List.

555.    At no time was Mr. Doe No. 4 given notice of the factual basis for his placement on the federal terror watch list, and at no time was he offered a meaningful opportunity to contest his designation.

556.    Moreover, at no time was Mr. Doe No. 4 given notice of the deprivation of his liberty interests or violation of his constitutional rights.

557.    Upon information and belief, Mr. Doe No. 4's nomination to and designation on the federal terror watch list was made based solely upon a hunch (based upon his race, ethnicity, national origin, religious affiliation, guilt-by-association, or First Amendment protected activities).

558.    Upon information and belief, because Mr. Doe No. 4 is included on the federal terror watch list, Defendants disseminated and are continuing to disseminate his designation as a "known or suspected terrorist" to state and local authorities (including the local police officers above), foreign governments, corporations, private contractors, airlines, gun sellers, car dealerships, financial institutions, among other official and private entities and individuals.

## COUNT I
## FAILURE TO PROVIDE POST-DEPRIVATION NOTICE AND HEARING IN VIOLATION OF THE FIFTH AMENDMENT RIGHT TO PROCEDURAL DUE PROCESS
### (Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702)

559.    The foregoing allegations are realleged and incorporated herein.

560.    Each of the Plaintiffs and other similarly situated American citizens learned that he or she was placed on the federal terror watch list subsequent to being added on the federal terror watch list and sought to challenge such placement.

561.    Defendants' actions as described above in refusing to provide Plaintiffs and other similarly situated American citizens with any notice at all of their placement which deprived Plaintiffs and other similarly situated American citizens of constitutionally protected liberty interests.

562.    Defendants' actions in nominating Plaintiffs and other similarly situated American citizens to the federal terror watch list blatantly violate the requirement that "'nominations' must not be solely based on race, ethnicity, national origin, religious affiliation, or First Amendment protected activities."  49 U.S.C. § 114(h)(3).

563.    Plaintiffs and other similarly situated American citizens have a liberty interest in traveling free from unreasonable burdens that are not reasonably tailored within, to, and from the United States, through land border crossings and over U.S. air space.

564.    Plaintiffs and other similarly situated American citizens have a right to be free from false government stigmatization as individuals who are "known or suspected to be" terrorists, or who are otherwise associated with terrorist activity, when such harm arises in conjunction with the additional consequences that follow from being listed as well as the deprivation of their right to travel on the same terms as other travelers and/or the deprivation of their liberty interest under the Fifth Amendment in travel free from unreasonable burdens.

565.    Plaintiffs and other similarly situated American citizens have a liberty interest in nonattainder (ie:  the interest against being singled out for punishment without trial). Defendants' actions have singled out Plaintiffs and others similarly situated for punishments that include, but are not limited to, inability to travel by air and unreasonable burdens placed upon traveling by air to and from the United States, over U.S. air space and at land border crossings, and false association with a list of individuals suspected of terrorism.

566.    Plaintiffs and other similarly situated American citizens, having been burdened or prevented from boarding on commercial flights or entering the United States at land border crossings, having had their bank accounts closed, having been prevented from making wire transfers at financial institutions, having had their citizenship applications delayed indefinitely due to an "FBI name check," having lost lucrative economic opportunities and suffering from other forms of financial harm, having been prevented from test driving or purchasing vehicles at a car dealership, and having sought to challenge their

placement on the federal terror watch list, are entitled to a constitutionally adequate legal mechanism that affords them notice of the reasons and bases for their placement on the federal terror watch list and a meaningful opportunity to contest their continued inclusion on the federal terror watch list.  Defendants have even failed to provide the most basic ingredient of due process, which is notice that the government has deprived a person of their protected rights.

567.    Moreover, Defendants have officially imposed on Plaintiffs and other similarly situated American citizens the stigmatizing label of "known or suspected terrorists" without a constitutionally adequate legal mechanism.

568.    Further, Defendants disseminated the stigmatizing label attached to Plaintiffs and other similarly situated American citizens of "known or suspected terrorists" to state and local authorities, foreign governments, private corporations, private contractors, airlines, gun sellers, car dealerships, financial institutions, the captains of sea-faring vessels, among other official and private entities and individuals.

569.    By imposing on Plaintiffs and other similarly situated American citizens the stigmatizing label of "known or suspected terrorists" and by failing to provide Plaintiffs and others similarly situated with a constitutionally adequate legal mechanism, Defendants have deprived Plaintiffs and other similarly situated American citizens of their protected liberty interests, including but not limited to their liberty interests in traveling, freedom from false stigmatization, and nonattainder, and thus violated the constitutional rights of Plaintiffs and other similarly situated American citizens without affording them due process of law and will continue to do so into the future if Plaintiffs and other similarly situated American citizens are not afforded the relief demanded below.

WHEREFORE, Plaintiffs request this Honorable Court grant declaratory and injunctive relief in the form described in the Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

## COUNT II
### DEPRIVATION OF PROTECTED LIBERTIES IN VIOLATION OF FIFTH AMENDMENT RIGHT TO SUBSTANTIVE DUE PROCESS
### (Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702)

570.   The foregoing allegations are realleged and incorporated herein.

571.   Because Plaintiffs and other similarly situated American citizens were listed by Defendants in a manner not narrowly tailored to a compelling interest, Defendants' actions as described above in including Plaintiffs and other similarly situated American citizens on a watch list that unreasonably burdens or prevents them from boarding commercial flights or entering the United States at land border crossings, are arbitrary and capricious, lack even a rational relationship to any legitimate government interest, and have unduly deprived Plaintiffs of constitutionally protected rights, including their liberty interests in travel, freedom from false stigmatization, and nonattainder.

572.   Defendants' actions in nominating Plaintiffs and other similarly situated American citizens to the federal terror watch list blatantly violate the requirement that "'nominations' must not be solely based on race, ethnicity, national origin, religious affiliation, or First Amendment protected activities."  49 U.S.C. § 114(h)(3).

573.   By placing Plaintiffs and other similarly situated American citizens on the federal terror watch list, Defendants have placed an undue burden on their fundamental right of movement.

574.   By placing Plaintiffs and other similarly situated American citizens on the federal terror watch list, Defendants have treated Plaintiffs like second-class citizens.

575.   Defendants' watch list lacks a compelling interest insofar as their true purpose is to provide law enforcement with a tool to coerce American Muslims into becoming informants.

576.   Defendants' watch list are also not narrowly tailored insofar as the federal terror watch list are entirely and demonstrably ineffectual and obvious alternatives exist.

577.   Defendants' actions in placing Plaintiffs and other similarly situated American citizens on the federal terror watch list, officially imposing on Plaintiffs and other similarly situated American citizens the stigmatizing label of "known or suspected terrorists," and disseminating the stigmatizing label to state and local authorities, foreign governments, private corporations, private contractors, airlines, gun sellers, car dealerships, financial institutions, the captains of sea-faring vessels, among other official and private entities and individuals, without a constitutionally adequate legal mechanism, are arbitrary and capricious, shock the conscience, violate the decencies of civilized conduct and are so brutal and offensive that they do not comport with the traditional ideas of fair play and decency.

578.   Plaintiffs and other similarly situated American citizens, having been burdened or prevented from boarding on commercial flights or entering the United States at land border crossings, having had their bank accounts closed, having been prevented from making wire transfers at financial institutions, having had their citizenship applications delayed indefinitely due to an "FBI name check," having lost lucrative economic opportunities and suffering from other forms of financial harm, having been prevented from test driving or purchasing vehicles at a car dealership, and having sought to challenge their

85

placement on the federal terror watch list, are entitled to a constitutionally adequate legal mechanism that affords them notice of the reasons and bases for their placement on the federal terror watch list and a meaningful opportunity to contest their continued inclusion on the federal terror watch list.  Defendants have even failed to provide the most basic ingredient of due process, which is notice that the government has deprived a person of their protected rights.

579.   Because Plaintiffs and other similarly situated American citizens have not been charged with any crimes and are United States Citizens, Plaintiffs challenge their placement and the placement of others similarly situated American citizens on the federal terror watch list on a broad, as-applied basis.

580.   Plaintiffs' substantive due process challenge is also facial, as there are no circumstances where their placement or the placement of others similarly situated on the federal terror watch list is narrowly tailored to achieve any compelling government interest.

581.   Defendants have thus violated Plaintiffs' constitutional rights and the constitutional rights of other similarly situated American citizens without affording them due process of law and will continue to do so into the future if Plaintiffs and other similarly situated American citizens are not afforded the relief demanded below.

WHEREFORE, Plaintiffs request this Honorable Court grant declaratory and injunctive relief in the form described in the Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

## COUNT III
## UNLAWFUL AGENCY ACTION IN VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. §§ 702, 706
## (Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702)

582.   The foregoing allegations are realleged and incorporated herein.

583.   Defendants' actions in placing Plaintiffs and other similarly situated American citizens on the federal terror watch list, officially imposing on Plaintiffs and other similarly situated American citizens the stigmatizing label of "known or suspected terrorists," and disseminating the stigmatizing label to state and local authorities, foreign governments, private corporations, private contractors, airlines, gun sellers, car dealerships, financial institutions, the captains of sea-faring vessels, among other official and private entities and individuals, without a constitutionally adequate legal mechanism, were and are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and contrary to constitutional rights, power, privilege, or immunity, and should be set aside as unlawful pursuant to 5 U.S.C. § 706.

584.   Defendants' actions in nominating Plaintiffs and other similarly situated American citizens to the federal terror watch list blatantly violate the requirement that "'nominations' must not be solely based on race, ethnicity, national origin, religious affiliation, or First Amendment protected activities." 49 U.S.C. § 114(h)(3).

585.   Defendants' failure to provide Plaintiffs and other similarly situated American citizens, who had been unreasonably burdened or denied boarding on commercial flights or entering the United States across the border and sought to challenge their placement on the federal terror watch list, with a constitutionally adequate mechanism that affords them notice of the reasons and bases for their placement on the federal terror watch list and a

meaningful opportunity to contest their continued inclusion on the federal terror watch list is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and contrary to constitutional rights, power, privilege, or immunity, and should be set aside as unlawful pursuant to 5 U.S.C. § 706.

586.   Because Plaintiffs and other similarly situated American citizens do not present a security threat to commercial aviation, Defendants' actions as described above in including Plaintiffs and other similarly situated American citizens on the federal terror watch list that unreasonably burdens or prevents them from boarding commercial flights or entering the United States across the border, are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and contrary to constitutional rights, power, privilege, or immunity, and should be set aside as unlawful pursuant to 5 U.S.C. § 706.

587.   Because Defendants' watch list is based on always-wrong, or in the alternative almost-always wrong, predictions of who among the innocent will engage in criminal conduct in the future, Defendants' federal terror watch list violates 5 U.S.C. § 706's prohibition on arbitrary government action.

588.   Plaintiffs and other similarly situated American citizens are not required to exhaust the DHS TRIP process, under the holding in *Darby v. Cisneros*, 509 U.S. 137 (1993). *See* United States District Court, Eastern District of Virginia, Case No. 11-cv-00050 (2011); Dkt. 70 at 22; attached as Memorandum Opinion (Exhibit 4).

WHEREFORE, Plaintiffs request this Honorable Court grant declaratory and injunctive relief in the form described in the Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

## COUNT IV
### VIOLATION OF THE FIFTH AMENDMENT
### TO THE UNITED STATES CONSTITUTION
### (Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702)
### (Equal Protection)

589.    The foregoing allegations are realleged and incorporated herein.

590.    Defendants' actions in placing Plaintiffs and other similarly situated American citizens on the federal terror watch list, officially imposing on Plaintiffs and other similarly situated American citizens the stigmatizing label of "known or suspected terrorists," and disseminating the stigmatizing label to state and local authorities, foreign governments, private corporations, private contractors, airlines, gun sellers, car dealerships, financial institutions, the captains of sea-faring vessels, among other official and private entities and individuals, without a constitutionally adequate legal mechanism are discriminatory and constitute an action that targets religious conduct for distinctive treatment.

591.    Defendants' actions in nominating Plaintiffs and other similarly situated American citizens to the federal terror watch list blatantly violate the requirement that "'nominations' must not be solely based on race, ethnicity, national origin, religious affiliation, or First Amendment protected activities."  49 U.S.C. § 114(h)(3).

592.    By placing Plaintiffs and other similarly situated American citizens on the federal terror watch list, Defendants have treated Plaintiffs and other similarly situated American citizens like second-class citizens.

593.    Defendants' above-described actions were motivated by the religious status of Plaintiffs and other similarly situated American citizens and on the basis of the constitutionally-protected free exercise of religion of Plaintiffs and other similarly situated American citizens.

594.    Defendants' above-described actions have had a discriminatory effect upon and have disparately impacted Plaintiffs and other similarly situated American citizens who are Muslim American travelers, and not travelers of other faiths.

595.    Defendants' above-described actions, policies, course of conduct, or pattern of practice that mandate or permit the above-described treatment of Plaintiffs and other similarly situated American citizens does not serve a compelling state interest or a legitimate or public purpose, nor are they the least restrictive means or narrowly tailored to achieve any such interest.

WHEREFORE, Plaintiffs request this Honorable Court grant declaratory and injunctive relief in the form described in the Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

## COUNT V
## VIOLATION OF THE UNITED STATES CONSTITUTION
## (Non-Delegation)

596.    The foregoing allegations are realleged and incorporated herein.

597.    Congress has not provided the Executive Branch with intelligible principles from which the Executive can implement its watch list schemes regarding civil aviation and national security.

598.    Congress has not directed the Executive Branch to create either a No Fly List or a Selectee List.

599.    Congress has not authorized the Executive Branch to utilize the federal terror watch list to encourage financial institutions to close bank accounts or ban wire transfers, to encourage car dealerships to restrict test drives or purchases of vehicles, or state and local

law enforcement to detain individuals based on their watch list status.

600.    Congress has not authorized the Executive Branch to disseminate the terror watch list to local and state authorities, foreign countries, private corporations, private contractors, airlines, gun sellers, car dealerships, financial institutions, the captains of sea-faring vessels, among other official and private entities and individuals.

601.    The Executive Branch's assignment of the watch listing function to TSC violates Congress' directive that TSA determine who belongs on federal terror watch lists and the consequences that flow from being on those lists.

602.    Congress has not delegated to TSA the authority to create a process that can culminate in the removal of individuals from the TSDB.

603.    In the alternative, Congress's delegation to TSA to create a redress process is defective because the Executive Branch has allocated watch list authority in a manner that prevents TSA from creating a redress process.

604.    As a result, Defendants have illegally acted beyond their authority.

WHEREFORE, Plaintiffs request this Honorable Court grant declaratory and injunctive relief in the form described in the Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

### Prayer for Relief

WHEREFORE, Plaintiffs respectfully request:

1.      A declaratory judgment that Defendants' policies, practices, and customs violate the Fifth Amendment to the United States Constitution and the Administrative Procedure Act;

2.      A declaratory judgment that Defendants' policies, practices, and customs violate

the non-delegation doctrine of the United States Constitution;

3.      An injunction that:

a.      requires Defendants to remedy the constitutional and statutory violations

identified above, including the removal of Plaintiffs from any watch list or

database that burdens or prevents them from flying or entering the United

States across the border; and,

b.      requires Defendants to provide individuals designated on the federal

terror watch list with a legal mechanism that affords them notice of the

reasons and bases for their placement on the federal terror watch list and

a meaningful opportunity to contest their continued inclusion on the

federal terror watch list;

4.      A trial by jury;

5.      An award of attorneys' fees, costs, and expenses of all litigation, pursuant to 28

U.S.C. § 2412; and,

6.      Such other and further relief as the Court may deem just and proper.

### **JURY DEMAND**

NOW COME Plaintiffs, by and through their undersigned counsel, and hereby demand

trial by jury of the above-referenced causes of action.

Respectfully submitted,

THE LAW OFFICE OF GADEIR ABBAS

BY:  /s/ Gadeir Abbas
GADEIR I. ABBAS
Attorney for Plaintiffs
1155 F Street NW, Suite 1050
Washington, D.C. 20004
Telephone: (720) 251-0425
Fax: (720) 251-0425
Email: gadeir.abbas@gmail.com

*Licensed in Virginia, not in D.C.*
*Practice limited to federal matters*

COUNCIL ON AMERICAN-ISLAMIC
RELATIONS, MICHIGAN

BY:     /s/ Lena Masri
LENA F. MASRI (P73461)
Attorney for Plaintiffs
Legal Director
30201 Orchard Lake Rd., Suite 260
Farmington Hills, MI 48334
Phone:  (248) 559-2247

AKEEL & VALENTINE, PLLC

BY:     /s/ Shereef Akeel
SHEREEF H. AKEEL (P54345)
Attorney for Plaintiffs
888 W. Big Beaver Rd., Ste. 910
Troy, MI 48084
Phone: (248) 269-9595
shereef@akeelvalentine.com

Dated: September 23, 2016

**CERTIFICATE OF SERVICE**

I hereby certify that on September 23, 2016, I electronically filed the foregoing document with the Clerk of the Court for the Eastern District of Virginia using the ECF System, which will send notification to the registered participants of the ECF System as listed on the Court's Notice of Electronic Filing.

*/s/ Gadeir Abbas*