**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

**Anas ELHADY, et al.,**

**Plaintiffs,**

**v.**

**CHARLES H. KABLE, et al.,**

**Defendants.**

**Case No. 1:16-cv-375 (AJT/JFA)**

# DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL


TRACY DOHERTY-MCCORMICK
Acting United States Attorney

CHAD A. READLER
Acting Assistant Attorney General
Civil Division

ANTHONY J. COPPOLINO
Deputy Director, Federal Programs Branch

AMY POWELL
DENA ROTH
ANTONIA KONKOLY
CHRISTOPHER HEALY
Trial Attorneys, Federal Programs Branch
United States Department of Justice
Civil Division, Federal Programs Branch

LAUREN A. WETZLER
Chief, Civil Division
Assistant United States Attorney
2100 Jamieson Ave.,
Alexandria, VA. 22314
Tel: (703) 299-3752
Fax: (703) 299-3983
Lauren.Wetzler@usdoj.gov

*Attorneys for Defendants*

# TABLE OF CONTENTS

INTRODUCTION ..... 1

RELEVANT PROCEDURAL BACKGROUND ..... 3

ARGUMENT ..... 7

I. The Motion to Compel Should Be Dismissed As Untimely and/or For Failure to Satisfy Conferral Obligations. ..... 7

A. The Motion is Untimely With Respect to the TSC and FBI document productions and the TSC RFA Responses. ..... 8

B. Plaintiffs Have Failed to Make Any Effort to Confer with Defendants Regarding the Remainder of This Motion. ..... 11

II. The Law Enforcement Privilege Protects All of the Information Sought by Plaintiffs. ..... 12

A. The Standard for Invoking the Law Enforcement Privilege. ..... 13

B. Plaintiffs Fail to Identify with Any Specificity the Information Needed to Pursue Their Claims. ..... 14

C. Defendants Have Properly Withheld Detailed Information Related to Nominations to and Placements on the TSDB. ..... 15

D. Defendants Have Properly Withheld Information Related to Information-Sharing with Other Agencies and Governments. ..... 21

E. Defendants Have Properly Withheld Information Related to Screening and Encounters. ..... 25

F. Defendants Have Properly Withheld Information Related to Redress Policies and Procedures. ..... 26

G. Defendants Properly Withheld Information Redacted from Audit Reports. ..... 27

H. Defendants Have Properly Withheld Certain TSDB Statistics. ..... 27

I. The Law Enforcement Information Should Not Be Disclosed Even Under a Protective Order. ..... 30

III. The State Secrets Privilege Protects 204 Documents Sought by Plaintiffs. ..... 31

A. The United States Has Satisfied the Procedural Requirements for Invoking the State Secrets Privilege. ..... 32

B. The Information at Issue is Subject to the State Secrets Privilege. ..... 34

C. The Case Should be Able to Proceed Without Reliance on the Information Protected by the State Secrets Privilege. ..... 39

IV. Sensitive Security Information Protects Additional Information Sought by Plaintiffs ..... 40

A. This Court Does Not Have Jurisdiction to Review Plaintiffs' Challenge to the Designation of Sensitive Security Information. ....................42

B. Information Is Reasonably Designated as SSI. ................................................43

CONCLUSION..........................................................................................................................45

**INTRODUCTION**

Many weeks after the close of discovery, Plaintiffs have filed an untimely motion to compel hundreds of documents that Defendants disclosed in discovery responses between October and December 22, 2018. *See* Plaintiffs' Motion to Compel ("MTC"), Dkt. No. 139. As discussed in greater detail below, Plaintiffs have been in a position to move to compel the vast majority of information at issue in this motion—including *almost all* of the hundreds of documents at issue—since, at the very least, early January; indeed, on January 10, 2018, Plaintiffs expressly represented to the Court that they planned to file such a motion a mere two days later, *i.e.*, by January 12, 2018. Dkt. No. 78 at 1. However, instead of pursuing their interests in the challenged documents with even minimal diligence, Plaintiffs inexcusably elected to wait more than two additional months—and until three weeks past the discovery cut-off date—to file the instant motion. Further, Plaintiffs made absolutely no effort to meet and confer with Defendants with respect to significant portions of the discovery responses at issue in this motion—including the parameters of the document searches that Defendants agreed to and did conduct, or any aspect of *any* of Defendants' interrogatory responses. Accordingly, as an initial but dispositive matter, this motion should be denied outright as untimely and/or for failure to comply with the conferral obligations imposed by Federal Rule 37(a)(1) and Local Rule 37(E).

To the extent the Court considers anything beyond these threshold grounds for denial, adjudication of Plaintiffs' sole remaining claim does not require this Court to order the disclosure of information that is properly classified, privileged or otherwise protected from disclosure. To evaluate Plaintiffs' procedural due process claim, the Court will need to determine whether Plaintiffs have been deprived of a liberty interest, and if so, whether the existing redress process satisfies due process, balancing the parties' respective interests. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976); *Mohamed v. Holder*, 2015 WL 4394958, at *5 (E.D. Va. July 16, 2015). This is largely a question of law

that, at best, implicates a limited set of facts about watchlisting determinations and redress, why that process is needed to protect governmental interests, and why it adequately protects the interests of persons given the limited deprivations at issue. Indeed, in *Mohamed*, this Court ultimately adjudicated all process-oriented questions about the No Fly List on the basis of declarations submitted by the agencies about the process available to the plaintiff, and without consideration of information over which the Defendants asserted privilege. *Id.* at 2. The Court should take a similar approach here.

Further, Plaintiffs have failed to make any real attempt to narrow the motion to items or information relevant to their claims. Rather, they have sought almost all of the documents on the privilege logs. Each and every one of the referenced documents is protected by one or more privileges, and none of them is necessary to resolve the sole remaining procedural due process claim. First, all of the withheld documents and other responses contain law enforcement sensitive information. Disclosure of this highly sensitive information, even under a protective order, risks harm to ongoing investigations and law enforcement interests.

Second, the requested documents contain certain information protected by the state secrets privilege. As set forth below, the Attorney General has properly asserted the privilege, and the declarations of the Attorney General and Federal Bureau of Investigation ("FBI") Assistant Director for the Counterterrorism Division Michael C. McGarrity establish that disclosure of this information risks harm to national security.

Finally, 47 of the withheld documents (and other challenged responses) contain Sensitive Security Information ("SSI"), protected from disclosure by statute. This Court lacks jurisdiction to review the Transportation Security Agency ("TSA") final order that these documents contain SSI. Plaintiffs are too late to seek disclosure under a protective order, and in any event have not made the necessary showing.

## RELEVANT PROCEDURAL BACKGROUND

**RFPs to TSC and FBI**. On September 26, 2017, Plaintiffs served one set of nine Requests for Production of Documents ("RFPs") on the Terrorist Screening Center ("TSC"); on October 6, 2017, Plaintiffs served another set of 49 RFPs on TSC and the Federal Bureau of Investigation ("FBI"). Defendants timely objected to both sets of requests, and served their written responses to the same on October 26 and November 6, 2017, respectively. Defendants' Exhibit ("DEX) 1, 2. In response to these 58 broad, overlapping requests, Defendants agreed to search for and process specifically defined categories of documents, primarily related to TSC watchlisting policy and procedures.

On November 15, 2017, consistent with the written discovery responses, Defendants TSC and FBI produced over 1300 pages of responsive material, as well as a 20-page privilege log covering those documents fully reviewed and withheld to date. In order to facilitate the prompt resolution of anticipated privilege disputes, the log produced on that date deliberately included many of the documents that Defendants thought were most likely to be disputed, such as the 2015 Watchlisting Guidance ("2015 WLG"). Defendants produced additional documents and privilege logs on November 30, December 18, and December 22, 2017, and by the latter date the document production and privilege logs were essentially complete.[1] All told, TSC and FBI produced over 1900 pages of responsive documents and privilege logs encompassing approximately 120 entries (some of which include more than one document). Importantly for various aspects of this motion,

[1] In accordance with their continuing obligation to supplement, Defendants produced a single—though important—additional document on January 8, 2018, namely, a newly-created, comprehensive, and nonprivileged overview of current watchlisting policies, entitled Overview of the U.S. Government Watchlisting Process and Procedures (the "Overview Document"). MTC Ex. O. On February16, 2018, Defendants further produced a small supplemental privilege log encompassing four documents. *See* MTC Exs. F-J (Collected Privilege Logs).

in responding to Plaintiffs' RFPs, Defendants clearly articulated the parameters of the searches they conducted. And at no point during the discovery period did Plaintiffs state any objection whatsoever to this aspect of Defendants' discovery responses.

Plaintiffs informed Defendants during the first week of January 2018 that they planned to file a motion to compel regarding all withheld documents. DEX 3. (January 8, 2018 email from Plaintiffs' counsel, commemorating that he had stated to defense counsel, during the prior week, his intention to file a motion to compel "all responsive documents," *i.e.*, the entirety of Defendants' combined privilege logs). On January 3, 2018, Plaintiffs further informed Defendants that, in light of this "forthcoming motion" to compel documents, and their anticipation that Defendants would likely deem it necessary to prepare a states secret assertion in response, they intended to seek a blanket 60-day extension of all discovery. DEX 4. On January 5, 2018, Plaintiffs filed this extension motion, expressly representing to the Court that they would "be filing a motion to compel regarding outstanding discovery requests," and asserting that the extension was warranted in order to "give the parties and this Court the time needed to resolve several imminent privilege disputes." Dkt. No. 76 at 1-2. Defendants took no position on the extension motion at the time of filing.

On January 8, 2018, Plaintiffs again reiterated to Defendants that they would be filing a motion to compel "the production … of all responsive documents," and sought immediate conferral with Defendants due to their stated intention to file the motion to compel prior to the hearing (then scheduled for January 12, 2018) on their pending extension motion. DEX 3. As requested, Defendants conferred with Plaintiffs regarding the anticipated motion to compel documents later that same day. DEX 3, 5. Anticipating that Plaintiffs would—as they had repeatedly represented—imminently file the motion to compel documents, Defendants then joined Plaintiffs in moving the Court to push back consideration of the pending extension motion by one week, in order to allow Plaintiffs to file—and Defendants to assess how much time they would reasonably need to respond

to—their promised motion to compel documents. DEX 6 (January 10, 2018 email from Plaintiffs' counsel, stating that he "commit[ted] to filing [Plaintiffs'] MTC this Friday [January 12, 2018]"); Dkt. No. 78 at 1 (making similar representation to the Court); Dkt. No. 116 at 3 (Plaintiff again representing, in a filing made on February 15, 2018, that they "anticipate[d] filing a motion to compel production of documents"). However, notwithstanding Plaintiffs' repeated representations to both Defendants and the Court on this subject, Plaintiffs took no further action to pursue their motion to compel documents until filing the instant motion more than two months later, on March 15, 2018.

The instant MTC now seeks to compel 105 of the 119 entries from Defendants' combined privilege logs. *See* MTC Ex. K. Because some entries consist of numerous documents, the motion comprises over 300 distinct documents in total. For the Court's aid in resolution of this motion, Defendants have created an updated version of Plaintiffs' Exhibit K, reflecting that certain privilege assertions have been withdrawn and SSI assertions have been formalized in a final order of TSA. *See* DEX 7.

**RFAs to TSC.** The MTC also challenges three of TSC's responses to Plaintiffs' requests for admission ("RFAs")—namely, numbers 20, 21, and 24. *See* MTC at 6. Plaintiffs served the RFAs in question on September 11, 2017; after interposing timely objections, Defendants served their initial responses on October 11, 2017. *See* MTC Ex. E. In accordance with the Court's order from the bench on December 1, 2017, Defendants then served slightly revised responses on December 22, 2017. DEX. 8.[2] Counsel for the parties met and conferred about these RFA responses on multiple occasions in late December 2017 and January 2018, and as part of this conferral process,

[2] Confusingly, instead of filing Defendants' final, operative RFA responses, Plaintiffs have instead attached, as Exhibit E to the MTC, the original RFA responses served on October 11, 2018. As these initial responses have been superseded, the Court should refer to the final versions, attached hereto as DEX 8-10, in resolving this motion.

Defendants made supplemental responses on January 4 and 8, 2018. *See* DEX 9, 10. The conferral process narrowed but did not fully resolve the issues raised by Plaintiffs, and in early January 2018 Plaintiffs repeatedly represented to Defendants that they would imminently file a motion to compel with respect to the final RFA responses. DEX 11, 12. However, as with the RFPs discussed *supra*, Plaintiffs failed to take any further action with respect to the challenged RFAs until filing the instant motion.

**Interrogatories to FBI and TSC**. Plaintiffs also challenge various interrogatory responses provided by TSC and FBI. *See* MTC at 6 (seeking TSC Interrogatory Responses 10, 11, 21, 22); at 14 (seeking FBI Interrogatory Responses 1, 2, 11, 14 and TSC Interrogatory Responses 7, 20). Plaintiffs served interrogatories on TSC and FBI, for the first time, on January 22 and 24, 2018, respectively—*i.e.*, in the very last days of the available discovery window in which to timely do so. Defendants timely objected to these requests, then provided responses on February 21 and 22, 2018, respectively. *See* MTC Exs. B, C. Notwithstanding their contrary certification to the Court, Plaintiffs never sought to meet and confer about any aspect of any of Defendants' interrogatory responses prior to filing the instant motion.[3]

**Discovery Deadlines and Summary Judgment.** Discovery was originally scheduled to close on January 12, 2018. *See* Dkt. Nos. 48, 53. On December 1, 2017, the Court granted

---

[3] Plaintiffs' motion makes a passing reference to some portion of the document production provided by the Department of Homeland Security Traveler Redress Inquiry Program ("DHS TRIP"). *See* MTC at 15 (citing these RFPs but not specifically moving to compel). As relevant to this motion, on January 24, 2018 (*i.e.*, exactly 30 days before the close of discovery), Plaintiffs served on DHS TRIP an RFP seeking, *inter alia*, (1) all "monthly reports" received by the Director of DHS TRIP, and (2) all "documents regarding any statistical reports DHS TRIP has produced, received, or possesses [sic] since 2013." MTC Ex D. The "monthly reports" request was vague but appeared to refer to certain monthly reports referenced in the December 20, 2017 deposition of DHS TRIP Director Dr. Deborah Moore. Defendants timely processed and produced redacted versions of monthly error reports and website surveys—about 900 pages of statistical reporting material—while reserving various applicable objections. With respect to the latter request for statistical reports, Defendants referred Plaintiffs to the approximately 900 pages of documents they had produced with respect to the former request, but otherwise objected on grounds of vagueness, burden, relevance and privilege, and stood on those objections. As with the TSC and FBI interrogatory responses, Plaintiffs have never attempted to meet and confer about any aspect of these DHS TRIP document productions.

Plaintiffs' request (which Defendants did not oppose) to extend the discovery deadline by six weeks, to February 23, 2018. Dkt. No. 68. On February 15, 2018, the parties jointly moved the court to extend discovery through March 23, 2018 for the sole purpose of completing four previously-noticed depositions. Dkt. No. 116. The Court granted that motion, but was pellucidly clear that the extension was for the sole and exclusive purpose of completing those depositions—and not for any additional other discovery. DEX 13 (Feb. 16, 2018 Hearing Tr. at 24:19–25:5); Dkt. No. 123 (Order commemorating that the Court had granted the joint extension motion "for the limited purpose of conducting additional deposition which have already been noticed as of the date of this order"). Two additional extensions were later granted; these were likewise for the limited purpose of completing certain specified depositions. *See* Dkt. Nos. 131, 159. Thus, when Plaintiffs filed their motion to compel on March 15, 2018, they did so approximately three weeks after the close of documentary discovery, and well past their deadline to seek the requested relief.

The same day this motion was filed, the Court held a final pretrial conference. Dkt. No. 140. The Court set a summary judgment briefing schedule whereby motions are to be filed by May 14, 2018; oppositions by June 13, 2018; and replies to be filed by June 13, 2018. The motions hearing is set for July 10, 2018, and trial is set for August 6, 2018.

## ARGUMENT

### I. The Motion to Compel Should Be Dismissed As Untimely and/or For Failure to Satisfy Conferral Obligations.

As an initial but dispositive matter, this motion should be denied outright as untimely (with respect to the TSC and FBI document productions, and TSC RFA responses), and/or for failure to satisfy conferral obligations (with respect to all remaining aspects of this motion).

#### A. The Motion is Untimely With Respect to the TSC and FBI Document Productions and the TSC RFA Responses

District courts have substantial discretion in the handling of a motion to compel. *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.*, 43 F.3d 922, 929 (4th Cir. 1995). Courts generally consider motions to compel untimely when they are filed after the discovery deadline. *See Powell v. Kamireddy,* No. 7:13-CV-00267-F, 2015 WL 333015, at *4 (E.D.N.C. Jan. 26, 2015); *Wootten v. Virginia*, No. 6:14-CV-13, 2015 WL 13658068, at *2 (W.D. Va. June 9, 2015); *PCS Phosphate Co. v. Norfolk S. Corp*., 238 F.R.D. 555, 558 (E.D.N.C. 2006); *Greene v. Swain Cty. P'ship for Health*, 342 F. Supp. 2d 442, 449 (W.D.N.C. 2004). Courts occasionally review motions to compel filed after the discovery cutoff when the parties are continuing to negotiate supplemental responses and dispositive motions deadlines have not been fixed. *See, e.g., Ayers v. Continental Cas. Co*., 240 F.R.D. 216, 223-25 (N.D.W. Va. 2007); *U.S. ex rel. Purcell v. MWI Corp*., 232 F.R.D. 14, 16-17 (D.D.C. 2005). But courts seldom review untimely motions to compel when the requesting party easily could have filed a timely motion to compel, but simply failed to do so. *See, e.g., Wootten*, 2015 WL 13658068, at *2; *In re Sulfuric Acid Antitrust Litig*., 231 F.R.D. 331, 339 (N.D. Ill. 2005) (finding a motion to compel as untimely and rejecting the moving party's argument of prejudice because "whatever prejudice they suffered was the result of their own inaction"). Untimely motions to compel are less likely to be considered when the parties have "had adequate opportunity to perform all the discovery it needed" or treated discovery with "unwarranted delay." *Gulfstream Inc. v. PalmYacht Sales, Inc.*, 176 F.3d 475, at *4 (4th Cir. 1999); *Lone Star Steakhouse & Saloon, Inc*., 43 F.3d at 929.

This motion was filed three weeks after the close of discovery and is plainly untimely with respect to TSC and FBI's document productions, and TSC's RFA responses. As demonstrated by the relevant procedural history set forth in detail above, Plaintiffs have had ample time to pursue these aspects of the instant motion, but simply failed to do so in a timely manner. Any issues presented by the TSC and FBI's document productions, as well as TSC's RFA responses, have indisputably been ripe for presentment to the Court since—at the latest—early January 2018.

Indeed, the record clearly reflects that Plaintiffs themselves correctly viewed these issues as ripe, and "intended" to file a motion to compel these discovery responses, at that point in time. *See supra* at 4-5; DEX 3, 4, 6; Dkt. No. 78 at 1 (representing Plaintiffs' "intent to file—*no later than January 12, 2018*—a Motion to Compel regarding Defendants' responses to Plaintiffs' Requests for the Production of Documents.") (emphasis added); Dkt. No. 116 at 3 (Plaintiffs again stating, in a filing made on February 15, 2018, their intent to move "to compel production of documents"). But instead of pursuing their interests in the challenged documents and RFA responses with even minimal diligence, Plaintiffs elected to wait more than two additional months—and until three weeks past the relevant discovery cut-off date of February 23, 2018—to file the instant motion. Defendants have been significantly prejudiced by Plaintiffs' delay insofar as they have had to redirect their efforts from preparing for summary judgment to undertaking the enormous efforts required to respond to this motion. Simply put, there is no good reason for the Court to countenance this dilatory conduct, and the Court should deny these aspects of Plaintiffs' MTC as plainly untimely.[4]

Plaintiffs may attempt to argue that the limited discovery extension granted by the Court on February 16, 2018—which was expressly cabined to the taking of previously noticed depositions—somehow also afforded them an extension of time in which to file the instant motion. Any such contention would be both disingenuous and incorrect. In discussing the terms of the relevant joint extension motion prior to filing, Defendants were abundantly clear to Plaintiffs that they would only join an extension motion made for the "sole[] purpose of completing depositions noticed or scheduled to date." DEX 14. Plaintiffs agreed to these terms, *id.*, and the motion in question was, on its face, expressly "limited" to the "purpose of completing noticed depositions." Dkt. No. 116.

---

[4] It bears noting that Plaintiffs—none of whom reside anywhere close to the Eastern District of Virginia—affirmatively elected to bring their suit in this district, which is well-known for its standards for expediency and timeliness. While Plaintiffs were free to elect this forum from among several that were available to them, Plaintiffs can present no reason why they should be entitled to special exemption or leniency from the norms of the jurisdiction they affirmatively chose to invoke for their suit.

And in granting the limited-purpose motion, the Court likewise made clear that it was extending discovery *only* for the purpose of taking depositions that had already been noticed:

> THE COURT: So this is only for the depositions? All the written discovery issues are not being extended for any period of time? Okay.
> MR. [sic] POWELL: That's correct.
> THE COURT: We are under that -- so this is only, and only for depositions that have currently been noticed?
> MR. [sic] POWELL: Yes.
> THE COURT: So we're not opening up discovery for -- other than the one interrogatory that I have mentioned here today. Written discovery ends on the current timetable that we have talked about?
> MR. [sic] POWELL: That's correct.

DEX 13 at 24:19–25:5. The Court likewise made this limitation crystal clear in its written order granting the extension, which expressly provided that the extension granted was "for the limited purpose of conducting additional deposition which have already been noticed as of the date of this order." Dkt. No. 123.[5]

On March 15, this Court adopted Defendants' proposed summary judgment briefing schedule and set a trial date. *See* Dkt. No. 140. An order to compel documents now would require, at a minimum, additional review and processing—and thus, additional time built into the summary judgment and trial schedule. And there is absolutely no excuse for Plaintiffs to have failed to bring a

---

[5] At the February 16 hearing, there was further discussion of the potential for a forthcoming Motion to Compel, but—especially in light of the written Order that followed—it does not support any argument that the Court somehow granted Plaintiffs leave to file additional motions outside the discovery period:

> MS. POWELL: . . . Plaintiffs still anticipate filing their motion to compel. To the extent that comes and necessitates additional briefing or production of documents thereafter, I suppose that could change dates as well.
>
> THE COURT: Well, hopefully not. I mean, if they file it, they file it. We decide it. If I order documents produced, I order documents produced. If I don't, then, you know, I don't. But … [o]bviously, when I say written discovery, I mean, you know, there are no new interrogatories being served. There are no new document requests being served. There are, you know, no -- that we're now -- we can fight over what has been served, but we can't start serving new document requests and things like that. Okay?

DEX 13 at 27:15– 28:4. This colloquy occurred on February 16, 2018—a week before the discovery cut-off; moreover. Yet Plaintiffs *still* failed to timely file their motion.

timely motion with respect to issues that have been concededly ripe for many months. The motion to compel documents and RFA responses should be denied as untimely.

**B. Plaintiffs Have Failed to Make Any Effort to Confer with Defendants Regarding the Remainder of This Motion.**

Both Federal Rule 37(a)(1) and Local Civil Rule 37(E) expressly require that prior to raising any discovery-related disputes with the Court, the dissatisfied party confer with its opponent in order to attempt to narrow or resolve the relevant issues. Although Plaintiffs have certified to the Court that they have complied with these requirements, this certification is simply inaccurate with respect to the remainder of their motion—*i.e.*, that portion related to the FBI and TSC interrogatory responses, and certain DHS TRIP document productions. As explained above, Plaintiffs served all of these requests at or very close to their deadline to do so, and Defendants accordingly served the relevant responses at or near the relevant discovery deadline of February 23, 2018. At no point in the approximately three weeks between receiving these responses and serving the instant motion did Plaintiffs attempt to confer with Defendants regarding any aspect of these discovery responses.

Simply put, Plaintiffs have no excuse for their failure to abide by their conferral obligation. The Court should not countenance this failure, and should deny the relevant aspects of the MTC on this ground alone. *See*, *e.g.*, *Kolon Indus., Inc. v. E.I. Dupont De Nemours & Co.*, No. 3:11-CV-622, 2012 WL 12894840, at *3-4 (E.D. Va. Feb. 23, 2012) (denying motion to compel on grounds of noncompliance with conferral obligation); *Motley v. Host Hotels & Resorts, Inc.*, No. fPX 15-2062, 2017 WL 1406297, at *5-6 (D. Md. Apr. 20, 2017), *aff'd*, 707 F. App'x 139 (4th Cir. 2017) (similar); *Crofts v. Issaquah Sch. Dist.*, No. C17-1365RAJ, 2018 WL 1577544, at *1 (W.D. Wash. Mar. 30, 2018) (similar). Further, because the renewal of any such motion following Plaintiffs' (theoretical) satisfaction of their conferral obligation would be untimely, such dismissal should be with prejudice.

## II. The Law Enforcement Privilege Protects All of the Information Sought by Plaintiffs

Plaintiffs seek information subject to the law enforcement privilege, including all 105 entries on Exhibit K to their motion;[6] answers to three requests for admission (Nos. 20, 21, and 24) directed to TSC and answers to ten interrogatories to FBI and TSC. *See* MTC at 6 (seeking TSC Interrogatory Responses 10, 11, 21, 22); at 14 (seeking FBI Interrogatory Responses 1, 2, 11, 14 and TSC Interrogatory Responses 7, 20). Given the breadth of the instant motion, covering well over 200 individual documents, Defendants will address the documents and other responses by category. The types of information sought by Plaintiff that are subject to the law enforcement privilege include, broadly speaking, (1) information related to nominations to and placement on the Terrorist Screening Database ("TSDB"); (2) information regarding information-sharing agreements between the TSC and other U.S. agencies as well as foreign governments; (3) information related to screening and encounters; (4) redress policy documents; (5) information related to the identities of government officials with law enforcement functions;[7] (6) audit documents; (7) certain TSDB statistics; and (8) information that would permit identification of watchlist status.[8]

[6] Because the law enforcement privilege applies to all of the information sought by Plaintiffs, information that (1) is protected by the state secrets privilege and/or (2) contains SSI, necessarily constitute two subgroups of information within the larger whole to which the law enforcement privilege applies. Accordingly, to the extent that the Court were to determine that the law enforcement privilege protects the information sought in the instant motion from disclosure to Plaintiffs, it need not reach the other privileges asserted in Defendants' Opposition.

[7] The Groh Declaration establishes that many of the withheld documents identify the TSC and FBI personnel working on sensitive law enforcement and counterterrorism matters. The withholding of identifying information is necessary to protect the safety and security of law enforcement personnel. Groh Decl. ¶¶ 63-64. Withholding of contact information for certain screening personnel or units prevents information collection and deception by adversaries. *Id.* None of this information has any arguable relevance to Plaintiffs' claims.

[8] These categories do not align with those used by Plaintiffs, and most withheld documents fall into multiple categories.

### A. The Standard for Invoking the Law Enforcement Privilege

The law enforcement investigatory privilege is "designed to prevent disclosure of information that would be contrary to the public interest in the effective functioning of law enforcement," and to "preserve the integrity of law enforcement techniques." *Tuite v. Henry,* 181 F.R.D. 175, 176 (D.D.C. 1998), *aff'd,* 203 F.3d 53 (D.C. Cir. 1999). "The purpose of th[e] [law enforcement] privilege is to prevent disclosure of law enforcement techniques and procedures, to preserve the confidentiality of sources, to protect witness and law enforcement personnel, to safeguard the privacy of individuals involved in an investigation, and otherwise to prevent interference with an investigation." *In re Dep't of Investigation of the City of N.Y.*, 856 F.2d 481, 484 (2d Cir. 1988). "[T]he reasons for recognizing the law enforcement privilege are even more compelling" when "the compelled production of government documents could impact highly sensitive matters relating to national security." *In re U.S. Dep't of Homeland Sec.*, 459 F.3d 565, 569 (5th Cir. 2006).

A proper review of an assertion of the law enforcement privilege involves three steps.[9] "First, the party asserting the law enforcement privilege bears the burden of showing that the privilege indeed applies to the documents at issue" by showing that the documents contain information pertaining to law enforcement techniques and procedures, information that would undermine the confidentiality of sources, information that would endanger witness and law enforcement personnel, information that would undermine the privacy of individuals involved in the investigation, or information that would seriously impair the ability of a law enforcement agency to conduct future investigations. *In re New York City*, 607 F.3d 923, 948 (2d Cir. 2010). Second, once

[9] Because the Fourth Circuit has not directly addressed the standard that a district court should apply to evaluate the Government's assertion of the law enforcement privilege, district courts in this Circuit have looked to relevant decisions from sister circuits for guidance. *See, e.g., United States v. Matish,* 193 F. Supp. 3d 585, 597 (E.D. Va. 2016) (citing *In re City of New York*, 607 F.3d 923, 944 (2d Cir. 2010) in evaluating the privilege in a criminal matter); *Hugler v. Bat Masonry Co., Inc.*, No. 6:15-CV-28, 2017 WL 1207847, at *4 (W.D. Va. Mar. 31, 2017) (citing, *inter alia, In re City of New York*, in ERISA matter).

the privilege is determined to apply, "the district court must balance the public interest in nondisclosure against 'the need of a particular litigant for access to the privileged information.'" *Id.* (quoting *In re Sealed Case*, 856 F.2d 268, 272 (D.C. Cir. 1988)). There is a strong presumption against lifting the privilege that may be rebutted only by a showing that the lawsuit is non-frivolous and brought in good faith, that the information sought is not available through other discovery or from other sources, and that the party has a compelling need for the privileged information. *Id.* Third, "[i]f the presumption against disclosure is successfully rebutted [], the district court must then weigh the public interest in nondisclosure against the need of the litigant for access to the privileged information before ultimately deciding whether disclosure is required." *Id.* As set forth below and in the declaration by Timothy P. Groh, TSC Deputy Director for Operations ("Groh Decl."), submitted *ex parte* and *in camera* because it contains information that is itself subject to the law enforcement privilege and/or constitutes SSI, the information in question is protected from disclosure by the law enforcement privilege.[10]

**B. Plaintiffs Fail to Identify with Any Specificity the Information Needed to Pursue Their Claims.**

In the course of discovery, Defendants have produced a significant volume of material about the TSDB, including generally the standards for inclusion as well as the relevant procedures for nominations to and placement on the TSDB, and extensive description of the redress process. *See*, *e.g.*, MTC Ex. O. Moreover, Plaintiffs have had the opportunity to depose witnesses from TSC, TSA, FBI, and U.S. Customs and Border Protection ("CBP") about these policies and procedures. Nonetheless, as set forth below, Defendants have withheld detailed and comprehensive information on these topics that, if disclosed, would permit circumvention of crucial law enforcement and counterterrorism measures.

[10] A redacted version of the Groh Declaration is filed on the public record, at DEX 17.

In assessing the documents at issue under the three-step process outlined above, it bears emphasizing that Plaintiffs have made no serious effort to either identify the specific information they are missing at this late stage of discovery, or pinpoint what is necessary to litigate their claims. Instead, they have indiscriminately moved to compel 105 of the 119 entries on the TSC/FBI privilege logs. Plaintiffs cannot possibly identify utility, for example, in having nine different Power Point presentations providing an overview of the TSC, or over half a dozen training documents and tests for the Nominations and Data Integrity Unit ("NDIU"). *See generally* Fed. R. Civ. P. 26(b)(1) (limiting discoverable evidence to what is "relevant . . . and proportional to the needs of the case"). The issues before the Court at summary judgment are: whether Plaintiffs were deprived of a liberty interest, and if so, whether the process received was sufficient. Internal NDIU training documents on the inclusion standards shed no light on Plaintiffs' liberty interest, or on whether the redress process was sufficient. Accordingly, Plaintiffs cannot possibly meet the standard for overcoming the privilege.

**C. Defendants Have Properly Withheld Detailed Information Related to Nominations to and Placements on the TSDB.**

**The 2015 Watchlisting Guidance.** Plaintiffs specifically seek the entirety of the 2015 Watchlisting Guidance ("2015 WLG" or "Guidance"). MTC at 3. The 2015 WLG is the U.S. Government's consolidated approach to terrorist identification, screening, and encounter management. As set forth in detail in ¶¶ 20-38 of the Groh Declaration, the information contained in the Guidance collectively paints a detailed and comprehensive picture of the entire U.S. terrorism watchlisting enterprise, inclusive of the type, quality, and amount of information needed to watchlist an individual, as well as how this information is vetted and disseminated throughout the intelligence community. Thus, disclosure of the Guidance in its entirety would provide adversaries with a comprehensive "roadmap" of the strengths and weaknesses of the watchlisting enterprise, including the specific techniques and procedures by which the U.S. government gathers, evaluates, analyzes,

identifies, and shares information concerning known and suspected terrorists ("KSTs"). *Id.* ¶¶ 27-35. Further, while disclosure of certain discrete portions of the 2015 WLG might not—in isolation—be *per se* harmful, disclosure of even these minor details could jeopardize important national security interests because, much like a mosaic, each detail may allow adversaries to piece together information that would, taken together, allow them to evade counterterrorism screening activities. *Id.* ¶ 28. Indeed, Plaintiffs do not themselves advance any argument as to why disclosure of the 2015 WLG, in its entirety, is necessary or appropriate here. *See* MTC at 3 (merely noting that Defendants have withheld this document). Additionally, the Overview Document, which Defendants have already produced to Plaintiffs, discloses as much information about watchlisting as the federal agencies involved in this enterprise determined, after a lengthy consultation process, can be made public without compromising national security and law enforcement interests.[11] Groh Decl. ¶ 16.

Accordingly, for these and other detailed reasons set forth in the *ex parte* portions of the Groh Declaration, *id.* ¶¶ 22-37, 84-85, Defendants strongly oppose the production, even under a protective order, of the 2015 WLG. The full extent of U.S. government watchlisting policies and procedures have never been publically revealed. Disclosure of the 2015 WLG as a whole would provide adversaries with a comprehensive roadmap—and thus, a guide to how best to subvert and/or evade—the procedures by which the U.S. Government gathers, evaluates, analyzes, identifies, and shares information concerning KSTs. And protection of the full scope and extent of the watchlisting enterprise (as set forth in the 2015 WLG) is crucial to sustaining the enterprise. Disclosure of the entirety of the 2015 WLG—even under an attorneys' eyes only protective order—

[11] Plaintiffs incorrectly assert that the Overview document was created "for purposes of litigation." MTC at 4. The lengthy interagency process that ultimately yielded this document was undertaken in order to fully and clearly inform the public of watchlisting processes to the extent possible consistent with law enforcement and national security concerns. Groh Decl. ¶ 16.

poses too great a risk to national security and law enforcement concerns. *See id.* ¶¶ 35, 86; *see also infra* § II(I).

For similar reasons, the Court should likewise uphold Defendants' assertion of the law enforcement privilege over the remainder of the documents sought by Plaintiffs that implicate similar information and, thus, similar concerns, including but not necessarily limited to the documents listed at p. 8, n. 1 of the Groh Declaration. Indeed, numerous documents sought by Plaintiffs reproduce portions of the 2015 WLG such that disclosure of such documents would effectively constitute a back-door disclosure of portions of the original document itself. *See* Groh Decl. p. 17 n. 8 (listing such documents). These documents are entitled to the same protections.

**Addendum B.** Plaintiffs also seek TSCD0004, Addendum B to the Memorandum of Understanding on the Integration and Use of Screening Information to Protect against Terrorism ("Addendum B").[12] Addendum B, which is also included as an appendix to the 2015 WLG, is a highly sensitive document that describes in detail how various federal agencies involved in the watchlisting enterprise process and coordinate information. Accordingly, and for the additional reasons set forth in the *ex parte* portions of the Groh Declaration, the disclosure of this document would pose a significant risk to national security, and is properly protected by the law enforcement privilege. *See* Groh Decl. ¶¶ 20-24, 36-37

**Selectee Inclusion Standard.** Plaintiffs also specifically seek the standards for inclusion on the Selectee List, which information is contained in the 2015 WLG as well as other withheld documents. *See* MTC at 3.[13] But as the Groh Declaration establishes, disclosure of this standard

[12] Plaintiffs include Addendum B on p. 4 of Exhibit K to the MTC, and appear to conceive of this document as a "dissemination" document. As with many of Plaintiffs' categorizations in Exhibit K, this conception is mostly inaccurate. Addendum B is protected by the law enforcement privilege for the same reasons discussed above, regardless of Plaintiffs' categories.

[13] Additionally, and puzzlingly, Plaintiffs state that they do not know the standards for inclusion on the No Fly List, MTC at 3, even though these standards are disclosed in the Overview document, among other places, *see* MTC Ex. O. In any event, as "Plaintiffs do not currently contend that any Plaintiff is on the No

would enable terrorists and their associates to deduce which persons will be subjected to enhanced security measures when traveling by airline and/or entering the United States. Groh Decl. ¶¶ 22-23. Thus, such disclosure would allow terrorist groups to tailor their recruiting efforts and assignments so as to focus on members most likely to avoid enhanced security measures; in this way, they would increase their odds of avoiding detection by U.S. law enforcement while preparing terrorist operations. *Id.* In some instances, it may also provide enough information to an individual who believes he is on the List to deduce the nature of the underlying derogatory information and intelligence collection efforts. *Id.*

**Limited Exceptions to the Reasonable Suspicion Standard.** Plaintiffs seek information about exceptions to the reasonable suspicion standard. MTC at 4. This information is contained in the WLG and also other withheld documents. As Plaintiffs note, Defendants have provided deposition testimony to the effect that there exist certain limited circumstances in which individuals may be in the TSDB but not meet the reasonable suspicion standard for inclusion. The depositions, however, establish that these limited exceptions to the reasonable suspicion standards are used only for certain specific screening functions conducted by DHS and the Department of State, including for immigration purposes. *See* Groh Decl. ¶ 11. In other words, individuals who are in the TSDB pursuant to these limited exceptions are not KSTs—and are not screened as such. As a result, any U.S. person in the TSDB pursuant to an exception would not be subject to heightened screening on that basis, *id.*—from which it necessarily follows that further information regarding these limited exceptions has absolutely no relevance to Plaintiffs' claims. But in any event, disclosure of the information Plaintiffs seek would undermine law enforcement interests, and is accordingly protected by the law enforcement privilege. *Id.*

---

Fly List," Dkt. No. 47 at 2 n.2 (Mem. Op. granting in part and denying in part Defendants' Motion to Dismiss), this standard is not relevant to this case.

**Training and Standard Operating Procedure Documents.** Plaintiffs seek documents that they claim would demonstrate "practical application of the inclusion standards." MTC at 4. As the Groh Declaration explains, such documents include discussion of the methods for applying the law enforcement sensitive inclusion criteria, including detailed examples of the types of conduct that are taken into consideration to determine whether a person meets the reasonable suspicion standard, the public disclosure of which could reasonably be expected to, *inter alia*, facilitate operational planning by terrorists and terrorist groups; compromise ongoing counterterrorism investigations; and allow for the deduction of those areas where investigative resources may not be focused. Groh Dec. ¶¶ 22-23.

**Miscellaneous Written Discovery Responses.** On page 6 of the MTC, Plaintiffs also list a handful of specific written discovery responses they include in this motion—namely, four TSC interrogatory responses (Nos. 10, 11, 21, and 22); three TSC RFA responses (Nos. 20, 21, and 24); and four TSC RFP responses (Nos. 19, 22, 23, and 47). As an initial matter, Plaintiffs' challenge to these responses fail for a variety of threshold reasons. First, with respect to the TSC interrogatories, as explained above, Plaintiffs have flatly failed to comply with their obligation to meet and confer with Defendants prior to filing this motion. This is also true with respect to the RFP responses. Defendants stood on their objections with respect to these RFPs in November 2017 and Plaintiffs never complained about these responses or the scope of the search until this motion was filed. Second, with respect to the RFAs, Plaintiffs seek to compel further responses regarding questions that have no actual relevance to Plaintiffs' claims.

To the extent the Court excuses Plaintiffs' failure to confer with Defendants regarding these responses prior to filing this motion—which it should not—it should both uphold Defendants' assertion of the law enforcement privilege over these responses, but also deny this aspect of Plaintiffs' motion on the grounds of relevance and proportionality. Specifically:

- **2013 WLG**. TSC interrogatories Nos. 10 and 11 ask for the differences between the 2013 Watchlisting Guidance ("2013 WLG")[14] and the current 2015 WLG. This information is privileged for the same reasons that apply to the 2015 WLG, see *supra* at 15-17. Further, as the Court already determined in granting Defendants' request to exclude questions regarding the 2013 WLG from deposition testimony, any information specific to this superseded document is not relevant to Plaintiffs' claim; the Court rejected this as a deposition topic. *See* Dkt. Nos. 121, 124.

- **Whether association is sufficient for reasonable suspicion**. Defendants have provided Plaintiffs with the reasonable suspicion standard, and depositions have explored generally its application. *See, e.g.,* Groh Decl. ¶ 10; MTC Ex. O; DEX 9, 10 (RFA supplements). Defendants cannot provide a more detailed answer. First, as explained in the declaration and at multiple depositions, the reasonable suspicion standard is based on the totality of the circumstances, and no single factor is necessarily determinative. Accordingly, the answer to the question of whether associations could prove reasonable suspicion is 'it depends on the totality of the circumstances.' Second, a comprehensive, detailed discussion of hypothetical associations and surrounding circumstances is likely impossibly burdensome and would certainly entail disclosure of information protected by the law enforcement privilege. *See* Groh Decl. ¶¶ 22-24 (explaining that detailed examples regarding applications of the standards provide valuable information to adversaries).

- **"Non-investigatory subjects."** Defendants have provided substantial information and testimony about the inclusion standard for the TSDB. Plaintiffs argue that they are entitled to know more about FBI investigations and the circumstances under which someone in the TSDB would not be under investigation. FBI provided a partial answer to this question at its deposition, explaining that, as one example, a person outside of U.S. jurisdiction might not be actively under investigation but still be in the TSDB. DEX 15 (DeSarno Depo. Tr.) at 263-71; *see also* DEX 9, 10 (RFA supplements). Additional, sensitive information about FBI investigations is wholly unrelated to Plaintiffs' procedural due process claim. Finally, even if Plaintiffs could demonstrate relevance, such information (either in the form of FBI policy, or statistics) is properly protected by privilege; it provides valuable information to adversaries attempting to learn about ongoing counterterrorism investigations. Groh Decl. ¶ 25.

- **Documents containing Islamic words**. In their second set of RFPs, Plaintiffs sought broadly "all written policies . . . and/or other documents containing [certain Islamic words]". The request is overbroad and burdensome and there is no ready way to even search for such documents, and Plaintiffs have never met and conferred

---

[14] Plaintiffs have filed on the docket something that purports to be a leaked or stolen version of the 2013 Guidance. The U.S. Government has not confirmed nor denied the authenticity of the document. Unauthenticated purportedly leaked or stolen information should not be considered in determining whether the Government should be compelled to disclose information. Also, confirmation as to what is or is not authentic information would serve to remove any doubt as to whether information does in fact reflect past or current Government policy. *See, e.g., ACLU v. DOD*, 628 F.3d 612, 621-22 (D.C. Cir. 2011) ("'[I]t is one thing for a reporter or author to speculate or guess that a thing may be so or even, quoting undisclosed sources, to say that it is so; it is quite another thing for one in a position to know of it officially to say that it is so.'") (quoting *Alfred A Knopf, Inc. v. Colby*, 509 F.2d 1362, 1370 (4th Cir. 1975)).

about Defendants' objections. MTC Ex. A. The request is also wholly irrelevant to their procedural due process claim. Plaintiffs now limit their motion to "documents which refer to . . . specified Islamic terms in the context of setting forth whether those terms practically satisfy TSDB inclusion standards." Defendants cannot make sense of this. "Terms" do not satisfy the TSDB inclusion standards. Moreover, to the extent Plaintiffs are seeking detailed examples of how the inclusion standards might be applied, those examples would be privileged for the same reasons discussed above.

D. **Defendants Have Properly Withheld Information Related to Information-Sharing with Other Agencies and Governments**.

Defendants have provided a broad overview of the dissemination and use of information from the TSDB in both documents and deposition testimony. TSA and CBP have described the specific uses or consultation of TSDB information at airport screening and the border. TSC has described generally that subsets of such information are shared with foreign governments and various state, local, and federal agencies who may use it to conduct screening operations. FBI has described that it is available to employees conducting counterterrorism investigations. All of these agencies have testified that TSDB information is not otherwise generally made available, and the same information appears in the Groh declaration and the Overview Document. *See* Groh Decl. 8, 78-83; MTC Exs. B, C, O. Plaintiffs nonetheless maintain that they are entitled to a variety of documents reflecting hypothetical uses of information from the TSDB, including uses that no Plaintiff claims to have ever affected him, such as immigration and visa screening. MTC at 6-9. As set forth in detail in the Groh Declaration, the documents listed on page 3-4 of Plaintiffs' Exhibit K are properly protected by the law enforcement privilege, as follows.

**Documents Containing Details about Information Technology Infrastructure.** Some of the documents sought by Plaintiff— including TSCD0052, TSCC0004, TSCC0005, and TSCD0049—contain sensitive technological details regarding the information technology infrastructure and security of the TSC and partner systems. Groh Decl. ¶ 40. Such information could be valuable to adversaries in efforts to access, alter, or otherwise disrupt terrorist screening systems, *id.*, and is wholly irrelevant to Plaintiffs' remaining claim. *See* Fed. R. Civ. P. 26(b)(1).

**Law enforcement handling codes.** Other documents sought by Plaintiffs contain certain law enforcement handling codes. Groh Decl. ¶ 42. For the reasons set forth in the *ex parte* portions of the Groh declaration, disclosure of these documents would divulge specific law enforcement methods. *Id.* Further, as the Court already determined in granting Defendants' request to exclude questions regarding handling codes from deposition testimony, such information is simply not relevant to Plaintiffs' remaining claim. *See* Dkt. Nos. 121, 124.

**Documents Related to Information Sharing with Domestic Partners.** TSC provides information from the TSDB to certain domestic partners authorized to conduct terrorist screening. *See* MTC Ex. O (describing agencies that receive this information). This information sharing has permitted the tracking of potential terrorist plots. Groh Decl. ¶¶ 44-45. Disclosure of documents related to such information sharing among domestic partners would allow terrorists to tailor their strategies and methods to avoid detection, and would thus both cause irreparable harm to ongoing terrorism-related investigations, and undermine the crucial reforms that were undertaken in the wake of the attacks of September 11, 2001, in order to ensure appropriate collaboration among federal agencies and local law enforcement partners. Groh Decl. ¶ 43.[15] In any event, the specific details of how this information is shared are not necessary to evaluate Plaintiffs' claims. They have ample information that subsets of the TSDB information are in fact shared with these agencies for specific purposes.[16]

---

[15] For example, some documents include details regarding the specific identifying information exported to various partners; such information would inform adversaries as to the specific information used in screening and would facilitate efforts to avoid detection. Groh Decl. ¶ 43.

[16] Puzzlingly, Plaintiffs specifically seek information regarding the sharing of information for the purposes of visa and immigration screening. None of the Plaintiffs have made any allegations regarding visa or immigration screening by the US, they sought no discovery from State Department or USCIS, and as U.S. citizens, they have put forward no reason to think they would be affected by such screening. *Cf. Kerry v. Din*, --- U.S. ---, 135 S. Ct. 2128 (2015) (rejecting claim that a U.S. citizen was deprived of procedural due process when the U.S. Government denied the visa application of her alien spouse).

**Documents Related to Information Sharing with Foreign Partners.**[17] As discussed *supra*, TSC has a mandate to exchange terrorism screening information with select foreign partners; accordingly, the U.S. Government has agreements or understandings in place with over 60 countries with whom it shares subsets of TSDB information, including all 38 of the Visa Waiver Program countries. *See* Groh Decl. ¶ 46-52. Four such agreements are public and have been identified for Plaintiffs; Plaintiffs have moved to compel the remainder. In addition to the state secrets privilege discussed below, Defendants assert the law enforcement privilege over the identities of its undisclosed foreign partners and over the specific contents of agreements. Disclosure of protected information would harm law enforcement liaison relationships, reveal technical information permitting systems and facilitate adversaries' efforts to evade detection. *Id.* Plaintiffs have more than sufficient information to evaluate their procedural due process claims without access to sensitive foreign government information exchanged on condition of confidentiality. Among other public information, the Groh Declaration establishes that these arrangements all "include representations to the effect that the foreign partner will safeguard TSDB information from unauthorized disclosure, and will not without express permission, disclose TSDB information publicly or to any private entity private individual, other government, or international organization." *Id.* ¶ 52. Moreover, the Groh Declartion confirms that the four public agreements contain

[17] Plaintiffs indicate that, as an alternative to the Government producing agreements with foreign partners, they would be willing to accept "a single document or declaration summarizing those terms" and further, that "[w]ith respect to foreign partners, Plaintiffs only request non-classified information." MTC at 8. FBI has proposed to provide plaintiffs with a public, sworn statement that would satisfy plaintiffs' request in exchange for their agreement to withdraw their motion to compel as to the foreign government agreements. *See* Ex. 16 (April 16, 2018 email from Dena Roth to Gadeir Abbas). And the information in the declarations filed with this motion satisfy Plaintiffs' demand. *See* Groh Decl. ¶ 52. However, Plaintiffs have not yet accepted FBI's proposal and the Government must proceed to assert all applicable privileges by the April 23, 2018 deadline to avoid waiver of those privileges. Defendants, however, remain willing to provide a separate declaration that could readily be used as evidence for summary judgment or trial purposes. In these circumstances, the Court need not reach the applicable privileges with respect to any information concerning foreign government arrangements and should deny Plaintiffs' motion to compel such information accordingly.

"representative samples" of such provisions. *Id.* No further information is necessary or useful to litigate these claims.

**Private partners.** Contrary to Plaintiffs' assertion, the Government has not "categorically refuse[d] to disclose whether it provides any access to the TSDB to private partners." TSC does not generally work with "private partners" (other than contractors working directly for TSC). In interrogatory responses, TSC appropriately refused to answer on behalf of other agencies, but TSC has disclosed the agency entities to which it exports subsets of TSDB information, MTC Exs. B, O, and accurately testified that they are unaware of other private entities that would get that information. TSC has repeatedly confirmed that watchlist status is considered law enforcement sensitive and not shared with members of the public. *See* Groh Decl. ¶¶ 78-83. TSC also specifically, and repeatedly, denied Plaintiffs' speculations about financial institutions. *See* MTC Ex. B at 51-52 (Response to Interrogatory No. 29); *id.* Ex. E at 9-10 (Response to RFA No. 8). Other agencies who were served deposition notices specifically testified that they also treat this information as highly sensitive and do not disclose it other than as necessary to conduct specific law enforcement and screening functions.

**Contractors Working on behalf of TSC and DHSTRIP**. Plaintiffs also purport to seek the production of TSC's and DHS TRIP's agreements with contractors who provide certain services to each of these entities. MTC at 9. As an initial matter, Plaintiffs never served an RFP to DHS TRIP that would encompass such documents, even after the December 2017 deposition. With respect to TSC, such documents might have fallen within the vague and poorly worded RFP 7 (in 2d set of RFPs), but Defendants stood on their objections and declined to conduct such a search in November 2017; Plaintiffs never challenged that objection or met and conferred about the response. Moreover, the content of these agreements is irrelevant. Contractors at TSC are working on behalf of TSC. Like anyone else at TSC, all such contractors are required to sign non-disclosure

agreements that prohibit the unauthorized disclosure of any TSDB information. Groh Decl. ¶ 55. The "disclosure" to individuals who work at TSC as private contractors rather than with full employee benefits is not a disclosure that even arguably affects Plaintiffs' claims. Finally, these documents contain sensitive information, including information that might make these contractors into targets for exploitation, and confidential business information of the companies involved. *Id.*[18]

**E. Defendants Have Properly Withheld Information Related to Screening and Encounters.**

Plaintiffs never propounded any written discovery to the frontline screening agencies (*e.g.*, TSA and CBP) regarding their "screening policies." Indeed, Plaintiffs never propounded any document requests to TSA or CBP (other than a November 2017 request about Plaintiff-specific travel records). Nonetheless, Defendants have described in documents and testimony how TSDB status affects screening at airports and at the border. They have further described that encounters with persons in the TSDB are reported back to TSC. Plaintiffs nonetheless seek additional documents about specific security procedures at the border and at airports and internal security steps taken in response to encounters with known or suspected terrorists. *See* MTC at 9-10. As described in the Groh Declaration, the documents which contain information about specific screening measures would permit U.S. adversaries to develop and employ countermeasures at the point of screening. Groh Decl. ¶¶ 56-60.

[18] It is unclear whether the MTC seeks any relief with respect to Defendants' response to RFP 14, which requested the production of documents related to "the dissemination of any information contained in the TSDB to federal, state, municipal, local, or any other court[s]." *See* MTC at 7 (noting that Defendants stood on their objections with respect to this request, but failing to list this response in the "following additional information from the Government" sought by Section II of the motion). Plaintiffs never met and conferred about this response, which was made on November 6, 2017. Accordingly, insofar as the MTC is construed to encompass Defendants' response to RFP 14, it is both untimely and in breach of Plaintiffs' conferral obligations. Moreover, as discussed above, TSC has provided information about the entities to which it routinely exports subsets of TSDB information.

As explained in the Groh Declaration, several of the "screening policy" documents sought by Plaintiffs do not have any relevance to their remaining claim. For example, documents regarding TSC's internal procedures for tracking encounters, such as TSCA0017, TSCA0018, and TSCD0029), do not have any effect that would be noticeable to a listed individual. Groh Decl. ¶ 57. But disclosure of the details contained in these documents could inform counter measures by terrorists and their associates that would compromise screening, watchlisting, and counterterrorism efforts. *Id.*

Although other screening-related documents may be arguably relevant to Plaintiffs' claim, they are properly protected by the law enforcement privilege; because they describe screening procedures employed by TSC's domestic partners, they would, if disclosed publically, allow adversaries to develop and employ countermeasures at the point of screening. *See* Groh Decl. ¶ 58 (identifying examples of such documents). And TSCD0065, in particular—An Updated Strategy for Comprehensive Terrorist-Related Screening Procedures—provides a highly detailed and comprehensive description of the U.S. terrorist screening enterprise, and should be protected for the same reasons given with respect to the 2015 WLG, above. *Id.* ¶ 60.

### F. Defendants Have Properly Withheld Information Related to Redress Policies and Procedures.

Defendants have provided detailed descriptions of the redress process, to the extent possible consistent with national security and law enforcement interests, including providing seven hours of testimony from DHS TRIP, as well as additional testimony from agencies involved in the redress process. But the "Redress Policy" documents sought by Plaintiffs contain additional, law enforcement sensitive information pertaining to law enforcement methods, to coordination with members of the intelligence community, sensitive internal procedures, and information that would allow individual to deduce their TSDB status (when they would not otherwise be entitled to disclosure of status). Groh Decl. ¶¶ 61-62. One of these documents relates solely to the revised

redress process available to U.S. persons on the No Fly List (TSCD0051) and is not remotely relevant to Plaintiffs' claims here. The other (TSC Redress Standard Operating Procedure), although relevant, includes sensitive internal processing and law enforcement information not necessary or useful for the resolution of Plaintiffs' claims.

### G. Defendants Properly Withheld Information Redacted from Audit Reports.

Plaintiffs additionally seek two audit reports for which public versions already exist: TSCC0010, an October 2007 Government Accountability Office ("GAO Report"), and TSCC0011, a March 2014 audit prepared by DOJ's Office of the Inspector General ("OIG Report"). The Groh Declaration confirms that redacted information in both reports is protected by the law enforcement privilege. Groh Decl. ¶¶ 65-69. The public version of the GAO Report omits, *inter alia*, certain information associated with vulnerabilities that the GAO identified in the then-extant screening processes and certain details regarding the development and use of the TSDB. *Id.* ¶ 66.[19] For the detailed reasons set forth in the *ex parte* portions of the Groh Declaration, *id.* ¶¶ 67, 69, the redacted information in the both the 2014 OIG report is still protected by the law enforcement privilege.

### H. Defendants Have Properly Withheld Certain TSDB Statistics.

Finally, Defendants have provided some general statistics regarding, for each calendar year from 2008 through 2017, the aggregate, approximate numbers of (1) nominations to the TSDB,[20] (2) "add" nominations (*i.e.*, nominations for the inclusion of a new individual into the TSDB) that were accepted into the TSDB (only a very small percentage of which were U.S. persons), and (3) rejected

[19] The description of the 2014 OIG Report contained in the Groh Declaration itself contains information subject to the law enforcement privilege, and thus cannot be reproduced in this public filing. Groh Decl. ¶ 69. With respect to this document, Defendants further note that Plaintiffs expressly disclaim seeking any information contained therein that is still classified. MTC at 13. Accordingly, it is being referred to an OCA for confirmation on whether or not it remains currently and properly classified. *See* Groh Decl. ¶ 68.

[20] As TSC has explained in its interrogatory responses and elsewhere, it uses the term "nomination" to refer to any proposed change to TSDB information—*i.e.*, not just additions to the TSDB, but also, *inter alia*, downgrades or removals, and the addition or correction of identifiers.

nominations. MTC Ex. B at 20-21. In conjunction with its deposition, DHS TRIP also provided general statistics regarding DHS TRIP processing. Generally, however, statistical information regarding the TSDB, as well as other types of information that reveals sensitive information about the evolving threat environment for law enforcement and intelligence agencies, is protected by the law enforcement privilege. Further, some of the information sought by Plaintiffs is not readily available and would be burdensome or even impossible to compile. And, in any event, none of the information sought by Plaintiffs in Section V of the MTC is relevant, much less necessary to resolve their claims.

On page 14 of the MTC, Plaintiff list a series of discrete statistical inquiries, interposed either through the RFPs they served on FBI and TSC at the beginning of the discovery period, or through the interrogatories they served on the same agencies at the very last possible opportunity during this period. It bears repeating, however, that *not a single one* of these discovery requests is properly before the Court in this motion. As explained above with respect to Plaintiffs' reference other RFPs, *see supra* at 19, Plaintiffs have been on notice since November 6, 2017 that Defendants stood on their objections as to each of the aspects of RFP No. 24 that Plaintiffs include in this list—and, accordingly, would not conduct any search with respect to the listed categories. DEX 2. As with RFP No. 14 above, at no point prior to filing the instant motion did Plaintiffs raise any objection regarding this response. Accordingly, Plaintiffs' challenge to those aspects of RFP No. 24 included on the list on p. 14 of the MTC are both untimely and in breach of the conferral obligation imposed by Federal Rule 37(a)(1) and Local Rule 37(E). Likewise, as also explained above, at no point prior to filing this motion did Plaintiffs ever seek to confer with Defendants regarding *any* of the interrogatory responses—including each of those included in the list on p. 14 of the MTC—that Defendants served on Plaintiffs at the close of the discovery period. The Court should, accordingly, dismiss the motion as to every item on this list on these grounds alone.

However, even if the Court were to reach the merits of this aspect of the motion, it should still deny Plaintiffs' attempt to compel the production of the listed statistics. As explained in the Groh Declaration, the TSC does not track much of the requested information, including, *inter alia*, whether particular individuals listed in the TSDB have been charged with or convicted of any terrorism-related offense. Groh Decl. ¶ 72.[21] Further, while some of the requested statistics, such as the numbers of nominations or encounters received by the TSC during a particular period, may seem harmless, their disclosure could be valuable to adversaries. *Id.* ¶ 73. Additionally, information regarding the number of people meeting specific criteria in any given category (*e.g.*, U.S. citizens or children) who are included in the TSDB or any of its subsets could be valuable to terrorists in selecting operatives who are more likely to avoid detection because they are less likely to be identified during screening. *Id.* ¶ 76. For these and other detailed reasons set forth in the *ex parte* portions of the Groh Declaration, *id.* ¶¶ 70-77, the statistical data sought by Plaintiffs is properly protected by the law enforcement privilege.

---

21 With respect to the requested statistics regarding terrorist attacks, FBI is, of course, aware of successful terrorist attacks in the United States, as is the general public, but the "number of attacks" is not a document request (*see* MTC Ex A), and the interrogatory language on this point is quite different. *Compare* MTC at 14 *with* MTC Ex. C ("Identify every incident in the last 15 years that the FBI considers an act of terrorism or an attempt to commit an act of terrorism. Limit your response to acts of terrorism and attempted acts of terrorism occurring within the United States. Provide a prose description of each incident."). Terrorism has several different legal definitions, depending on context. The interrogatory also fails to define "acts . . . occurring with the United States;" the locations of an act could be based solely on where the harm occurred, or could it be based on where harm was intended to occur, where one or more of the conspirators or accomplices were located during the course of the act, where instrumentalities of the crime were located, or where necessary actions or processes forming part of the act or offense took place. FBI does not compile any of these specific categories of data and attempting to compile them would be unduly burdensome, likely impossible, and certainly disproportionate to the needs of the case. *See generally* Groh Decl. ¶¶ 71-72 & n. 18. Given the failure to confer, the public availability and total irrelevance of the information sought, there is no reason to compel disclosure.

## I. The Law Enforcement Information Should Not Be Disclosed Even Under a Protective Order.

Because Defendants have established the applicability of the law enforcement privilege, disclosure of these materials under a protective order raises unwarranted risks. *See In Re the City of New York*, 607 F.3d 923, 936-37 (2d Cir. 2010) (describing protective orders associated with law enforcement sensitive information as a "deeply flawed procedure that cannot fully protect the secrecy of information in this case; it merely mitigates—to some degree—the possibility of unauthorized disclosure.").[22] The Second Circuit explained that attorneys' eyes only orders were developed for use in commercial and sometimes criminal litigation, but were inappropriate for civil matters involving the law enforcement privilege. The potential injuries are "more severe" and "far more difficult to remedy;" moreover the source of unauthorized disclosures are difficult or impossible to pin down. *Id.* (also collecting instances where sealed or protected documents were leaked). The Groh Declaration confirms that disclosure, even under an attorneys' eyes only protective order, poses too great a risk to national security and law enforcement concerns. Groh Decl. ¶ 86. In the event the Court disagrees, any disclosure should be limited to an attorneys' eyes only order and to discrete, necessary pieces of information, rather than the indiscriminate hundreds of documents sought here that would provide adversaries with a roadmap to U.S. counterterrorism activity. Plaintiffs seek a comprehensive picture of U.S. counterterrorism measures; this detailed roadmap is not pertinent to resolution of their sole remaining procedural due process claim, but its disclosure would provide a broad picture of highly sensitive processes and procedures. *Id.* ¶¶ 27-35.

---

[22] And to the extent the particular information at issue is also subject to the state secrets privilege, a protective order is per se barred as a matter of law. *See, e.g., Sterling v. Tenet*, 416 F.3d 338, 348 (4th Cir. 2005) (rejecting plaintiff's request for access to information protected by the privilege). To the extent the particular information at issue is also SSI, there are separate statutory and regulatory requirements for SSI protective orders. *See* Part IV, *infra*.

## III. The State Secrets Privilege Protects Information in Documents Sought by Plaintiffs.

Plaintiffs' Motion seeks the production of information that is also subject to the state secrets privilege. Specifically, as described further below, Plaintiffs seek classified and other sensitive national security information that appear in (1) documents concerning the sharing of watchlisting information between and among the U.S. and foreign governments and the methods and procedures through which this national security information is shared; (2) documents and information that describe policies and procedures for how foreign partner information sharing occurs, and (3) documents containing the Government's watchlisting procedures, policies, and practices.

The Supreme Court has long recognized the Government's ability to protect state secrets from disclosure in litigation. *See United States v. Reynolds,* 345 U.S. 1, 7–8 (1953) (discussing *Totten v. United States,* 92 U.S. 105 (1875)); *Gen. Dynamics Corp. v. United States,* 131 S. Ct. 1900 (2011) ("We have recognized the sometimes-compelling necessity of governmental secrecy by acknowledging a Government privilege against court-ordered disclosure of state and military secrets."); *El-Masri v. United States,* 479 F.3d 296, 304 (4th Cir. 2007). The privilege to protect state secrets derives from the President's Article II authority over foreign affairs and national defense matters. *See United States v. Nixon*, 418 U.S. 683, 710 (1974); *see also El-Masri*, 479 F.2d at 303–304 (noting "constitutional dimension" of privilege). The state secrets privilege is an absolute privilege and "even the most compelling necessity cannot overcome the claim of [the state secrets] privilege." *Reynolds*, 345 U.S. at 11; *Sterling v. Tenet*, 416 F.3d 338, 343 (4th Cir. 2005). "[N]o attempt is made to balance the need for secrecy of the privileged information against a party's need for the information's disclosure; a court's determination that a piece of evidence is a privileged state secret removes it from the proceedings entirely." *El-Masri*, 479 F.3d at 306.

The resolution of a claim of state secrets privilege requires a three-step analysis. *Abilt v. Cent. Intelligence Agency*, 848 F.3d 305, 311 (4th Cir. 2017). "First, 'the court must ascertain that the

procedural requirements for invoking the state secrets privilege have been satisfied.'" *Id.* (quoting *El-Masri*, 479 F.3d at 304). "Second, the court must decide whether the information sought to be protected qualifies as privileged under the state secrets doctrine." *Id.* "Third, if the information is determined to be privileged, the ultimate question to be resolved is how the matter should proceed in light of the successful privilege claim." *Id.*

**A. The United States Has Satisfied the Procedural Requirements for Invoking the State Secrets Privilege.**

To ensure that the privilege is asserted only when necessary, the United States must satisfy three procedural requirements to invoke the state secrets privilege: (1) there must be a "formal claim of privilege;" (2) the claim must be "lodged by the head of the department which has control over the matter;" and (3) the claim must be made "after actual personal consideration by that officer." *Reynolds*, 345 U.S. at 7-8; *El-Masri*, 479 F.3d at 304.

The state secrets privilege has been properly asserted in this case. The Attorney General has formally asserted the privilege over information of the FBI and TSC, after personal consideration of the matter. *See* DEX 18, Declaration of Jefferson Sessions, Attorney General ("Sessions Decl.").[23]

---

[23] In addition to the foregoing requirements in established case law, on September 23, 2009, the Attorney General announced a new Executive branch policy governing the assertion and defense of the state secrets privilege in litigation. Under this policy, the U.S. Department of Justice will defend an assertion of the state secrets privilege, and seek dismissal of a claim on that basis, "only when doing so is necessary to protect against the risk of significant harm to national security." *See* Exhibit 1 to Sessions Declaration (State Secrets Policy); *see also Jeppesen*, 614 F.3d at 1077 (discussing Policy). Moreover, "[t]he Department will not defend an invocation of the privilege in order to: (i) conceal violations of the law, inefficiency, or administrative error; (ii) prevent embarrassment to a person, organization, or agency of the United States government; (iii) restrain competition; or (iv) prevent or delay the release of information the release of which would not reasonably be expected to cause significant harm to national security." State Secrets Policy at 2. The Attorney General also established detailed procedures — followed in this case — for review of a proposed assertion of the state secrets privilege in a particular case. Those procedures require submissions by the relevant Government departments or agencies specifying "(i) the nature of the information that must be protected from unauthorized disclosure; (ii) the significant harm to national security that disclosure can reasonably be expected to cause; (iii) the reason why unauthorized disclosure is reasonably likely to cause such harm; and (iv) any other information relevant to the decision whether the privilege should be invoked in litigation." *Id.* In addition, the Department will only defend an assertion of the privilege in court with the personal approval of the Attorney General following review and recommendations from senior Department officials. *Id.* at 3. The Attorney General has expressly determined that the requirements for an assertion and defense of the

As part of his personal consideration of the matter, the Attorney General reviewed the *ex parte, in camera* declaration of Michael McGarrity, Assistant Director of the Counterterrorism Division of the FBI, which attests that the disclosure of the information over which the Attorney General asserts the privilege could reasonably be expected to cause significant harm to the national security of the United States. *See* Sessions Decl. ¶ 4; *In Camera, Ex Parte* Classified Declaration of Michael McGarrity ("Classified McGarrity Decl.").[24] The Attorney General's assertion of privilege is thus properly raised as a procedural matter.

Plaintiffs argue that the Government has not properly raised the state secrets privilege in its privilege logs. *See* MTC at 20-21. But it is well established that the Government need not submit a formal assertion of the state secrets privilege (or, for that matter, any governmental privilege) until after a motion to compel is filed with respect to specific documents or categories of documents. *See In re Sealed Case*, 121 F.3d at 741 (D.C. Cir. 1997) (White House was not obliged to "formally invoke its [executive] privileges in advance of the motion to compel"; it was sufficient that it said, in response to a subpoena, that it "believed the withheld documents were privileged."); *Huntleigh USA Corp. v. United States*, 71 Fed. Cl. 726, 727 (2006) (procedural requirements for privilege assertion are satisfied through the production of a declaration or affidavit by the agency head in response to a motion to compel); *Tri-State Hosp. Supply Corp. v. United States*, 226 F.R.D. 118, 134 n.13 (D.D.C. 2005); *see also Scott v. PPG Indus., Ind.*, 142 F.R.D. 291, 293-94 (N.D.W. Va. 1992) ("[I]t is ludicrous to suggest that the agency head rather than the litigation attorney should be required to invoke the deliberative process privilege in a deposition."). To hold otherwise would force an unnecessary—

state secrets privilege have been met in this case in accord with the September 2009 State Secrets Policy. Sessions Decl. ¶ 9.

[24] Defendants have also filed on the public docket, at DEX 19, a second declaration by Michael McGarrity, which provides a more limited explanation in unclassified terms of why the disclosure of the information over which the Attorney General asserts the privilege could reasonably be expected to cause significant harm to the national security of the United States ("Public McGarrity Decl.").

and unnecessarily broad—showdown on the state secrets privilege, which is generally invoked as a matter of last resort. *Reynolds*, 345 U.S. at 11 (1953) (chastising the parties for "forcing a showdown on the claim of privilege" unnecessarily).

**B. The Information at Issue is Subject to the State Secrets Privilege.**

After the state secrets privilege has been properly invoked, the Court "must determine whether the information that the United States seeks to shield is a state secret, and thus privileged from disclosure." *El-Masri*, 479 F.3d at 304. The privilege must be sustained if the Court is satisfied, "from all the circumstances of the case, that there is a reasonable danger that compulsion of the evidence will expose . . . matters which, in the interest of national security, should not be divulged." *Reynolds*, 345 U.S. at 10. "After information has been determined to be privileged under the state secrets doctrine, it is absolutely protected from disclosure. . . ." *El-Masri*, 479 F.3d at 306. "[E]ven the most compelling necessity cannot overcome the claim of privilege if the court is ultimately satisfied that [state] secrets are at stake." *Reynolds*, 345 U.S. at 11.

"[T]he executive's determination that disclosure of information might pose a threat to national security is entitled to utmost deference." *Abilt*, 848 F.3d at 312. As the Supreme Court has stressed, "what may seem trivial to the uninformed, may [be] of great moment to one who has a broad view of the scene and may put the questioned item of information in its proper context." *CIA v. Sims*, 471 U.S. 159, 178 (1985) (quoting *Halkin v. Helms*, 598 F.2d 1, 9 (D.C. Cir. 1978)). *Accord Halperin v. CIA*, 629 F.2d 144, 150 (D.C. Cir. 1980) ("[E]ach individual piece of intelligence information, much like a piece of [a] jigsaw puzzle, may aid in piecing together other bits of information even when the individual piece is not of obvious importance in itself."). "Frequently, the explanation of the department head who has lodged the formal privilege claim, provided in an affidavit or personal declaration, is sufficient to carry the Executive's burden" of satisfying the court that the information is privileged. *El-Masri*, 479 F.3d at 305.

The United States has demonstrated, in the accompanying declarations, that disclosure of the information over which the Attorney General has asserted privilege reasonably could be expected to cause significant harm to national security and the foreign relations of the United States. *See Ellsberg v. Mitchell*, 709 F.2d 51, 57 (D.C. Cir. 1983) (the state secrets privilege protects a broad range of information, including disclosures that could reasonably be expected to cause ". . . disruption of diplomatic relations with foreign governments.") While "the Government need not demonstrate that injury to the national interest will inevitably result from disclosure," *id.* at 58, the showing it has made here is more than sufficient to demonstrate that the information at issue should be protected from disclosure. The Government's descriptions of the information at issue and the harms to national security at stake are fully set forth in the Classified McGarrity Declaration and are also explained in the unclassified, Public McGarrity Declaration, as well as the public declaration of Attorney General Jefferson Sessions.

In sum, the Attorney General has asserted the state secrets privilege over the following categories of information, as described in unclassified terms:

1. **Foreign Government Information.** Information contained in documents that could be used to identify certain countries with which the U.S. has information-sharing agreements concerning the terrorist watchlist and the terms of agreements associated with particular countries.

2. **Other Sensitive National Security Information Pertaining to Information Sharing with Foreign Partners.** Information that would reveal classified and sensitive details concerning the information sharing between the United States and foreign partners.

3. **Other Sensitive National Security Watchlisting Information**. Other classified information associated with watchlisting, including classified documents and classified portions of documents concerning watchlisting policies and procedures.

Sessions. Decl. ¶ 3.

The Attorney General and Mr. McGarrity have explained in unclassified terms on the public record why the disclosure of the above information subject to Plaintiffs' Motion to Compel reasonably could be expected to cause significant harm to national security.

*Foreign Government Information*: First, the Attorney General has determined that the disclosure of foreign government information, including information identifying foreign partners, reasonably could be expected to cause significant harm to the national security by having a chilling effect on foreign government cooperation and assistance, jeopardize collaborative efforts with foreign governments, and lead to gaps in vital intelligence. *Id.* at ¶ 5. Mr. McGarrity also explains that the foreign partner identities at issue in the present motion to compel have not previously been disclosed in the specific context of the agreements that Defendants seeks to protect in this case. And even though some of the particular agreements at issue are not marked and treated as classified, he attests that the protection of the identity of the foreign governments in these arrangements is based on express promises of confidentiality and any breach of that promise would not only harm foreign relations, but also would risk potential harm to ongoing national security operations. Public McGarrity Decl. ¶ 20. Further, Mr. McGarrity explains why the identifying information across all agreements requires the utmost protection: if TSC were to disclose this information without specific authorization from the foreign partner, doing so could undermine the trust of other foreign partners that rely on the TSC's assurances of nondisclosure or confidentiality. *Id.* ¶ 24. A failure by the United States to honor the expectation of these foreign partners could reasonably be expected to affect the trust these countries have in the United States and their willingness to share sensitive information, which is critical to the United States' global effort to combat terrorism. *Id.* ¶ *25*.

The Attorney General concurs with the FBI and has determined that the need to protect foreign government identifying information exists regardless of whether that resides in documents not marked or treated as classified. Sessions Decl. ¶ 5. While the protections afforded by the state

secrets privilege and by the system for the classification of documents are both directed at preventing the disclosures of information that would harm national security, they differ in important respects, and an assertion of the state secrets privilege is not limited by whether information resides in a document the information that is treated as classified.[25] The state secrets privilege constitutes a policy judgment made at the highest levels of government that the disclosure of information at issue reasonably could be expected to harm national security and foreign relations. *See Halkin v. Helms*, 690 F.2d 977, 996 (D.C. Cir. 1982) (distinguishing policy judgment reflected in a state secrets privilege assertion from a classification determination needed to protect information in response to a Freedom of Information Act request).[26] Here, disclosure of the identities of undisclosed foreign partners in the context of the arrangements that Plaintiffs seek through their motion would, for the reasons explained in the accompanying declarations, risk significant harm to national security and foreign relations and thus fall properly within the scope of the state secrets privilege, as well as the law enforcement privilege addressed above.

*Other Foreign Partner Information*: Second, the Attorney General has determined that the disclosure of information, policies and procedures for how foreign partner information sharing occurs could be expected to cause significant harm to the national security by suggesting possible points of infiltration for terrorist networks or adversaries to exploit and otherwise negatively impact foreign relations and have a chilling effect on the free flow of vital information to the United States intelligence and law enforcement agencies. Sessions Decl. ¶ 6. Mr. McGarrity describes in further

---

[25] The classification system required by Executive Order imposes requirements on Executive Branch officials for the granting of access to, and establishes procedures for the safeguarding of, information where disclosure would harm national security. *See Dep't of the Navy v. Egan*, 484 U.S. 518, 527 (1988).

[26] To be clear, the Attorney General's privilege assertion does *not* extend to portions of the unclassified watchlisting sharing arrangements at issue that do not identify the foreign governments. Those terms of the unclassified arrangements are subject to the law enforcement privilege, as discussed above. And, as also indicated, the Government has proposed to provide Plaintiffs with a public, sworn statement that would satisfy plaintiffs' request for unclassified information regarding "whether, and on what terms, downstream agencies and foreign governments can further disseminate TSDB information to other entities." MTC at 8.

detail the documents that describe information, policies and procedures for how foreign partner information sharing occurs and why its disclosure would reasonably be expected to cause significant harm to national security. For example, one such document is a classified document provided by a foreign country that shares classified information. Disclosure of the document would reveal to potential terrorists what type of behaviors are being detected by foreign partners and the types of information being shared with the U.S. Disclosure would also allow potential terrorists to avoid detection in the future and undercut this particular foreign country's confidence in the United States and its willingness to share sensitive information in the future. Public McGarrity Decl. ¶ 30. Another document in this category is a classified FBI policy guide for the foreign dissemination of classified information. The document itself contains classified information about sensitive processes and coordination with other government agencies. Mr. McGarrity explains that disclosure of this classified information would enable foreign adversaries to identify gaps in the sharing of information and allow them to exploit those gaps in order to accomplish their goals, and thereby cause significant harm to national security. *Id.* ¶ 32.[27]

*Other Classified Watchlisting Documents and Information:* Third, the Attorney General has determined that the disclosure of classified information about highly sensitive operational documents relating to watchlisting reasonably could be expected to cause significant harm to the national security. The disclosure of these materials would enable individuals and/or groups to employ countermeasures, evade detection and/or take steps to harm U.S. interests, and revealing classified investigative information obtained and created by the FBI, as well as sources and methods of investigation. Sessions Decl. at ¶ 7. For example, one such document, which Mr. McGarrity describes in his unclassified declaration, is the Terrorist Screening Operations Unit (TSOU)

[27] The Attorney General's state secrets privilege applies to the portions of these classified documents that are specifically marked as classified, with the remainder covered by the law enforcement privilege discussed *supra*.

Operational Encounter Management Standard Operating Procedures. This is a classified document that describes in intricate detail the sensitive procedures by which TSOU handles encounters with individuals identified as a positive match to identities in the TSDB. Public McGarrity Decl. ¶ 37. The document also reveals extensive information about interagency coordination through multiple security efforts or programs, as well as detailed information about the coordination within TSC and the rest of the U.S. terrorism watchlisting enterprise in the event of positive encounters in a variety of contexts. *Id.* ¶¶ 37-38. Disclosure of this information can reasonably be expected to cause significant harm to national security by revealing sources and methods the U.S. Government uses to conduct its terrorist watchlisting and counterterrorism mission, and allow terrorists to avoid, exploit or otherwise circumvent the different procedures and undermine U.S. counterterrorism efforts. *Id.*

Defendants have fully and sufficiently demonstrated the grounds for the state secrets privilege assertion as applied to the information described by the Attorney General, and set forth in more detail in the supporting Classified and Public McGarrity Declarations, and accordingly this information should be protected from disclosure in response to Plaintiffs' motion to compel and excluded from the case.

**C. The Case Should be Able to Proceed Without Reliance on the Information Protected by the State Secrets Privilege.**

After a court sustains a claim of privilege, it must then resolve "how the matter should proceed in light of the successful privilege claim." *El-Masri*, 479 F.3d at 304. "If a proceeding involving state secrets can be fairly litigated without resort to the privileged information, it may continue." *Id.* at 306.

Given the ample information on the public record, Defendants currently believe this case can and should be resolved without reliance on the excluded information. Indeed, the only remaining claim in this case concerns the adequacy of the post-deprivation redress process available to plaintiffs who have alleged that they were placed on a watchlist. In evaluating a procedural due

process claim, the Court considers three factors: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest," including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

In *Mohamed*, the Court reasoned that the "procedural due process claim does not require reliance on any protected fact specific analysis that may have resulted in any placement on the No Fly List; rather, it requires an analysis of the procedures afforded to any U.S. citizen who is denied boarding on an aircraft, procedures that the defendants describe in detail in their public filings." *Mohamed v. Holder*, No. 1:11-CV-50 AJT/MSN, 2015 WL 4394958, at *12 (E.D. Va. July 16, 2015). These process-oriented questions should be subject to adjudication without reliance on the excluded information.[28]

**IV. Sensitive Security Information Protects Additional Information Sought by Plaintiffs.**

Plaintiffs seek information that is subject to protection by statute as Sensitive Security Information, or "SSI." In addition to being protected by the law enforcement privilege, the following log entries contain information that is SSI: TSCA0001-13, 15, 17-19, TSCB0004-7, 9, 10, 12, 16, 17-37, TSCC0001, 2, 4-6, 10, 11, TSCD0022-24, 26-27, 43, 49, 51, 59, 66, 71, and TSCE0001-3. DEX 20 (TSA Final Order on Sensitive Security Information) ("Final Order"), Part III at n.1. TSA has also determined that certain other information Plaintiffs have moved to compel,

[28] If this action proceeds to trial on disputed issues of fact involving information protected by the state secrets privilege, Defendants of course reserve the possibility of moving to dismiss on state secrets grounds if that becomes necessary. *See generally Abilt*, 848 F.3d at 314 (describing three circumstances where dismissal may be necessary – where a claim relies on state secrets, where defenses would rely on state secrets, and where further litigation presents an unjustifiable risk of disclosure).

which is responsive to discovery requests and deposition questions, also falls within the definition of SSI. *See id.* Part III-IV.

Plaintiffs premise their objection to the withholding of SSI upon Defendant's privilege logs, but those logs notified them explicitly that such information would be "referred to TSA for review, as appropriate." During discovery, identified documents that potentially contained SSI were referred to TSA, as required by 49 C.F.R. § 1520.9(a)(3). *See* Final Order at (describing referral); Groh Decl. ¶ 87 (describing referral); *see also* Dkt. No. 65, at 11 (Defs.' Opp'n to Motion to Compel, describing SSI process); Dkt. No. 56, at 9-10 (Defs' Mot. for Protective Order, describing SSI process). Once Plaintiffs identified specific documents of concern by filing the instant motion—without first meeting and conferring on this specific issue, which could have avoided or narrowed the scope of the dispute over the SSI privilege—TSA reviewed those documents and issued a Final Order determining that certain information contained within 47 documents, as well as information sought in other discovery requests, contain SSI. *See* Final Order, Part III, n.1 (listing the documents at issue in this motion TSA has determined contain SSI); Part IV. This Court lacks jurisdiction to review TSA SSI Final Orders and, in any event, Plaintiffs' objections are without merit.[29]

---

[29] Plaintiffs' motion only challenges the *designation* of SSI, it does not request *access* to SSI under Section 525(d) of the Department of Homeland Security Appropriations Act, Pub. L. No. 109-295, § 525(d), 120 Stat. 1355, 1381-82 (Oct. 4, 2006). Plaintiffs are not authorized, at this juncture, to receive and review the SSI at issue, because they have not requested access under Section 525(d), despite repeated reminders to do so. Under that section, persons may seek access to SSI in the context of civil litigation in federal district court where they show "substantial need of relevant SSI in the preparation of the party's case" and "that the party is unable without undue hardship to obtain the substantial equivalent of the information by other means." *Id.* Once the party has made such a showing, that party may be designated as a "covered person" to access SSI under the TSA regulations only if the presiding "judge enters an order that protects the SSI from unauthorized or unnecessary disclosure and specifies the terms and conditions of access," unless TSA determines after a background check or due to the sensitivity of the information that "such access to the information for the proceeding presents a risk of harm to the nation." *Id.*

Despite repeated reminders over the course of months about how to request SSI access in accordance with Section 525(d), Plaintiffs have failed to even identify which of Plaintiffs' attorneys would like access, let alone make the required showings of substantial need and undue hardship. *See* DEX 21 (Dec. 29, 2017 email from A. Powell to G. Abbas, describing the process to request SSI under § 525(d)); DEX 22 (Jan. 8, 2018 email exchange between A. Powell and G. Abbas, in which government counsel again described the steps necessary to initiate the clearance process); DEX 23 (Jan. 24-25, 2018 email exchange in which government counsel

## A. This Court Does Not Have Jurisdiction to Review Plaintiffs' Challenge to the Designation of Sensitive Security Information.

Plaintiffs primarily challenge TSA's SSI determinations, but this Court lacks jurisdiction to review TSA Final Orders concerning SSI. TSA's SSI determinations constitute final agency actions subject to exclusive review in the United States Courts of Appeals. 49 U.S.C. § 46110(a); *Blitz v. Napolitano*, 700 F.3d 733, 738-39 (4th Cir. 2012); *Robinson v. Napolitano*, 689 F.3d 888, 891 (8th Cir. 2012); *MacLean v. Dep't of Homeland Sec.*, 543 F.3d 1145, 1149 (9th Cir. 2008); *Lacson v. U.S. Dept't of Homeland Sec.*, 726 F.3d 170, 173 & n.2 (D.C. Cir. 2013); *Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 928 F. Supp. 2d 139, 146-47 (D.D.C. 2013); *Chowdhury v. Northwest Airlines Corp.*, 226 F.R.D. 608, 614 (N.D. Cal. 2004).[30]

The Fourth Circuit has conclusively determined that with respect to challenging a TSA Order, that "Congress has spoken — plainly and clearly — that a court of appeals is to hear, in the first instance, a challenge to an order of the TSA Administrator. Indeed, we have no authority or power to decide otherwise." *Blitz*, 700 F.3d at 741. District Courts faced with motions to compel the disclosure of SSI routinely find that they may not entertain such motions on jurisdictional grounds. *See*, *e.g., Elec. Privacy Info. Ctr.*, 928 F. Supp. 2d at 146 ("Judicial review of TSA's determination that certain material is nondisclosable 'security sensitive information' is available exclusively in federal circuit courts. . . . Accordingly, district courts may not review TSA orders that designate material as security sensitive information."); *Chowdhury*, 226 F.R.D. at 614 ("Congress has expressly provided that an appeal from an order of the TSA pursuant to [49 U.S.C. § 114(r)] (non-

noted Defendants had not received a response; Plaintiffs' counsel responded without providing any of the necessary information; and government counsel again reiterated the instructions to request access); DEX 24 (Apr. 2, 2018 email from C. Healy to G. Abbas, offering to send individual instructions if Plaintiffs could simply identify which of Plaintiffs' counsel were seeking access—which inquiry went unanswered).

[30] Section 46110 refers to TSA final orders issued pursuant to "subsection (*l*) or (s) of section 114;" subsection (s) of section 114 was later redesignated as subsection (r). *See* Consolidated Appropriations Act, 2008, Pub. L. No. 110-161, Div. E, § 568(a), 121 Stat. 1844, 2092 (Dec. 26, 2007). And courts have continued to recognize that § 46110 continues to apply to orders designating material as SSI.

disclosure of certain information) lies exclusively with the Court of Appeals"); *Shquierat v. U.S. Airways Group, Inc.*, No. 07-cv-1513-ADM-AJB, 2008 WL 4232018, at *2 (D. Minn. Sept. 9, 2008) (unreported decision) ("District Courts are without jurisdiction to entertain challenges to the TSA's decisions regarding disclosure of SSI."); *In re Sept. 11 Litig.*, 236 F.R. D. 164, 172 (S.D.N.Y. 2006) ("I am ever mindful of the important security concerns that have loomed over this litigation from its inception. . . . I have no jurisdiction to review TSA's final orders [regarding SSI]").

Plaintiffs also request that TSA "assert their SSI privilege with more particularity," MTC at 18-19. TSA has now done so by issuing its Final Order. To the extent this request still stands it amounts to a request to "amend, modify, or set aside" TSA's Order, which is beyond the jurisdiction of this Court to provide. *See* 49 U.S.C. § 46110(c).

**B. Information Is Reasonably Designated as SSI.**

TSA has now determined that 47 of the documents contain SSI. This determination is reasonable and within TSA's authority. *See* Final Order Part II (describing authority); Part IV.A-E (designating five categories of information at SSI). The final order designates five categories of information as SSI: 1) the Status of Individuals on the Expanded Selectee List, Selectee List, and No Fly List; 2) Watchlist Matching Information and Technical IT Details; 3) TSA Screening Procedures and Security Measures taken to Counteract Threats; 4) Criteria for TSDB, and the Expanded Selectee, Selectee, and No Fly Lists; and 5) TSDB and Enhanced Security Screening Statistics. TSA reasonably determined that disclosing these five categories of information would be detrimental to the security of transportation. TSA reasoned that the information thus constitutes SSI under § 114(r), because, among other reasons, disclosure would enable terrorists to change their behavior and circumvent transportation security. *See* Final Order Part IV.

Even if Plaintiffs were correct that this Court had jurisdiction to review TSA's SSI determinations, Plaintiffs incorrectly argue that the information at issue could not contain SSI

because it was not "obtained or developed" by TSA. *See* MTC at 16-17. The plain language of the statute demonstrates that Plaintiffs' reading is wrong. Congress directed that TSA must "prescribe regulations prohibiting the disclosure of information *obtained or developed* in carrying out security under authority of the Aviation and Transportation Security Act (Public Law 107-71) or under chapter 449 of this title if the Under Secretary [of Transportation for Security] decides that disclosing the information would . . . (C) be detrimental to the security of transportation." 49 U.S.C. § 114(r)(1) (emphasis added). Plaintiffs argue that because TSDB information is "owned and developed" by TSC, it cannot be SSI. MTC at 16. The statute includes no such limitation—it only requires that SSI be obtained or developed in "carrying out security" authorized by TSA statutes, not that such information be *exclusively* obtained or developed by TSA. In fact, certain critical SSI is routinely owned and developed by private sector stakeholders in the transportation security system, *e.g.,* security programs or security contingency plans including those developed by aircraft operators, airport operators, air cargo operators, vessels, and maritime facilities, 49 C.F.R. § 1520.5(b)(1) and critical aviation, maritime, or rail infrastructure asset information, § 1520.5(b)(12). Information developed by other agencies of the Federal Government may also constitute SSI, *e.g.*, information held by the Federal Government concerning threats against transportation security, § 1520.5(b)(7), and information and sources of information used by, *inter alia*, an automated screening system, § 1520.5(b)(9). To adopt Plaintiffs' reading of the statute would leave sensitive information held by private entities or other Government agencies unprotected.[31]

Indeed, plaintiffs appear to read the word "obtain[]" out of the statute entirely—Plaintiffs confusingly declare that the fact that TSDB information is "used by" TSA means that such information cannot be "obtained or developed" by TSA. *See* MTC at 18 ("the Selectee and No Fly

[31] Furthermore, to the extent that Plaintiffs' challenge can be construed as a challenge to these regulations, such challenges may only be heard in the Court of Appeals. *See* 49 U.S.C. § 46110.

lists 'are used by' TSA, not obtained or developed by the agency") (quoting the TSA Privacy Impact Assessment for Secure Flight). How Plaintiffs believe the agency could use the information without obtaining it first is puzzling at best. Plaintiffs would eliminate from potential SSI designation any information that TSA obtained from another agency, or that TSA obtained along with another agency. This cannot be right: Congress knows how to make a privilege contingent on exclusivity when it wants to. *See, e.g.*, Fed. R. Evid. 502 (discussing waiver of the attorney-client privilege). When it drafted the SSI statute, it did no such thing.

Finally, any TSC-related information TSA has designated as SSI has been obtained by TSA or developed pursuant to the Aviation and Transportation Security Act and Chapter 449 of Title 49. ATSA explicitly directs TSA to "share and . . . cross-check . . . data on individuals [in] federal databases who may pose a risk to transportation or national security" 49 U.S.C. § 114(h)(1) and to "receive, assess, and distribute intelligence information related to transportation security," *id.* § 114(f)(1). Section 44903(j)(2)(C)(ii) of Title 49 directs TSA to "assume the performance of the passenger prescreening function of comparing passenger information to the automatic selectee and no fly lists, utilizing all appropriate records in the consolidated and integrated terrorist watchlist maintained by the Federal Government "in performing the function." Any TSC-related information TSA has designated as SSI was obtained or developed to carry out security under the authority of those statutes.[32] *See generally* Final Order, Part IV.

**CONCLUSION**

For the foregoing reasons, Plaintiffs' motion to compel should be denied.

Dated: April 23, 2018 Respectfully submitted,

---

[32] Plaintiffs appear to argue that an SSI designation can apply only where no other agency uses the same information for some other purpose, or pursuant to some other authority. *See* MTC at 18. But the statute does not say "obtained or developed only pursuant to," it says "obtained or developed in carrying out." *See* 49 U.S.C. § 114(r). And Plaintiffs themselves recognize that TSA "does utilize TSDB information for transportation purposes . . . ." *See* MTC at 18. TSDB information falls within the statute's potential ambit.

TRACY DOHERTY-MCCORMICK
Acting United States Attorney

CHAD A. READLER
Acting Assistant Attorney General
Civil Division

ANTHONY J. COPPOLINO
Deputy Director, Federal Programs Branch

AMY POWELL
DENA ROTH
ANTONIA KONKOLY
CHRISTOPHER HEALY
Trial Attorneys, Federal Programs Branch
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue NW, Room 7324
Washington, DC 20530
Tel: (202) 514-2395
amy.powell@usdoj.gov
dena.m.roth@usdoj.gov
antonia.konkoly@usdoj.gov
christopher.healy@usdoj.gov

*/s/ Lauren A. Wetzler*
LAUREN A. WETZLER
Chief, Civil Division
Assistant United States Attorney
2100 Jamieson Ave.,
Alexandria, VA. 22314
Tel: (703) 299-3752
Fax: (703) 299-3983
Lauren.Wetzler@usdoj.gov

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 23, 2018, I filed the foregoing via the CM/ECF system, which will send a Notification of Electronic Filing to all counsel of record.

*/s/ Lauren A. Wetzler*

LAUREN A. WETZLER
Chief, Civil Division
Assistant United States Attorney
2100 Jamieson Ave.,
Alexandria, VA. 22314
Tel: (703) 299-3752
Fax: (703) 299-3983
Lauren.Wetzler@usdoj.gov