# Exhibit 19

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Civil Action No. 16-cv-00375

ANAS ELHADY, et al.,

    Plaintiffs,

v.

CHARLES H. KABLE, Director of the Terrorist Screening Center, in his official capacity, *et al.*,

    Defendants.

---

## DECLARATION OF MICHAEL C. MCGARRITY
## FEDERAL BUREAU OF INVESTIGATION

---

I, Michael C. McGarrity, hereby state and declare as follows, pursuant to 28 U.S.C. § 1746:

1. I am the Assistant Director, Counterterrorism Division, Federal Bureau of Investigation ("FBI"), United States Department of Justice ("DOJ"). The mission of the FBI's Counterterrorism Division is to lead law enforcement and domestic intelligence efforts to defeat terrorism, and thereby protect the United States. To this end, the Counterterrorism Division works to eliminate the risk of terrorism, both international and domestic, to the homeland and US interests abroad. As the Assistant Director, I am responsible for, among other things, directing the conduct of FBI counterterrorism investigations.

2. In my capacity as Assistant Director of the FBI's Counterterrorism Division, I have been delegated original classification authority by the Attorney General of the United States. See Executive Order 13526, Section 1.3(c). As a result, and pursuant to all applicable Executive Orders, I am responsible for the protection of classified information, including the sources, methods, and techniques used by the FBI in the collection of such information. Thus, I have been authorized, pursuant to the responsibilities and obligations as defined in Executive Orders and through the delegation from the Attorney General, to execute declarations and other affidavits in order to protect such classified information.

## I. PURPOSE OF THIS DECLARATION

3. I submit this declaration in support of the Attorney General's assertion of the state secrets privilege in response to Plaintiffs' motion to compel the production of documents dated March 15, 2018. As set forth further below, it is my judgment that disclosure of the information subject to the Attorney General's privilege assertion described herein reasonably could be expected to cause significant harm to national security.

4. A more detailed explanation in support of the Attorney General's assertion of the state secrets privilege is set forth in the separate classified declaration that will be submitted to the court *ex parte, in camera*. This declaration sets forth as much of the information contained in the classified *ex parte, in camera* declaration as can be stated on the public record.

5. Through the exercise of my official duties, I have been advised of this civil action, in which Plaintiffs allege that they have experienced travel delays, travel difficulties, and other types of harm described in the Complaint that they believe to be associated with their alleged placement in the Terrorist Screening Database ("TSDB"). I am further aware that the Court ordered discovery to proceed in this matter, pursuant to which the Terrorist Screening Center ("TSC")

and FBI produced documents responsive to several Requests for Production of Documents put forward by Plaintiffs. I am also aware that TSC and FBI have withheld certain information responsive to Plaintiffs' discovery requests on the basis that disclosure would harm national security and law enforcement interests, and logged such documents on sequential privilege logs. Finally, I am aware that on March 15, 2018, Plaintiffs moved to compel certain information that they believe is responsive and was withheld from the production

6. As the official charged with overseeing counterterrorism investigative activities of the FBI, I have concluded that unauthorized disclosure of the information subject to the Attorney General's state secrets privilege assertion described herein would reveal, among other things, highly sensitive intelligence, sources, methods, techniques, and procedures—including foreign government arrangements described below—and reasonably could be expected to cause significant harm the national security of the United States.

7. The matters stated herein are based on my personal knowledge, my background, training and experience related to national security matters, my review and consideration of documents and information available to me in my official capacity, my judgment as the Assistant Director of the FBI's Counterterrorism Division, and on information furnished to me by employees of the FBI and DOJ, as well as other U.S. Government agency employees detailed to the TSC. I have reached my conclusions in accordance therewith.

8. Specifically, this declaration addresses the significant harm to the national security interests that would result from the disclosure of documents and information from FBI and TSC national security programs. This would also include arrangements regarding international information sharing with foreign country partners, as well as policies and procedures associated with national security programs and the collection and use of information from foreign partners.

9. In particular, the Attorney General's assertion of the state secrets privilege encompasses the following categories of information that Plaintiffs have challenged in their motion to compel: (A) foreign government information; (B) other sensitive national security information pertaining to information sharing with foreign partners and (C) other sensitive national security watchlisting information.

10. This declaration is intended to be read in conjunction with the Declaration in Support of the Law Enforcement Privilege that is also being submitted by Defendants in response to the Plaintiffs' motion to compel, as the statements and conclusions set forth in these declarations are mutually supportive.

## II. BACKGROUND ON THE TSC AND THE TSDB

11. The TSC, established in 2003 pursuant to an Executive Order, is a federal multi-agency center created to consolidate the U.S. Government's approach to terrorism screening and provide for appropriate and lawful use of terrorist information in screening processes. Administered by the FBI, the TSC is the primary U.S. Government component for the watchlisting, encounter management, and information sharing of known or suspected terrorist ("KST") information, and serves as a bridge between homeland security, law enforcement, the intelligence community, and select foreign partners for the purpose of sharing terrorism-related information as appropriate.

12. The TSC manages the TSDB, a consolidated database containing identifying information of persons known or reasonably suspected to be terrorists. The FBI and other federal agencies use the TSDB and its subsets, the No Fly and Selectee Lists, as preventative measures to protect against terrorist threats. The overarching goal of the TSDB is to protect the United States from harm by identifying and sharing information about individuals who pose a national security

threat. Through the TSDB, the TSC ensures timely dissemination of terrorist identity information to screening partners such as the Department of State, the Department of Homeland Security, and federal, state, and local law enforcement to provide for the appropriate and lawful use of terrorism-related information. The TSC serves as a bridge between homeland security, law enforcement, the intelligence community, and select foreign partners, discussed further below, for the purpose of sharing terrorism-related information as appropriate. Each document logged by the TSC contains non-public, and in many instances classified national security information that describes various practices, arrangements, policies, procedures, and processes for terrorism watchlisting.

13. As one of numerous members of the U.S. Government's watchlisting community, the FBI nominates known or suspected terrorists for inclusion in the TSDB; the FBI nominations of international terrorists are also submitted for inclusion in the Terrorist Identities Datamart Environment ("TIDE"), and are processed through the National Counterterrorism Center ("NCTC").

14. In cases where the FBI is the nominator, the underlying derogatory information supporting its nomination is typically derived from classified national security investigative case material, which often consists of sensitive sources and methods. The dynamic nature of investigations and the continuously developing information that supports nominations often affect placement determinations; therefore, new or updated information must be continuously submitted for consideration.

15. The TSC exports TSDB data to various databases used by screening agencies for screening-related purposes. For example, the Department of Homeland Security uses the TECS system (not an acronym) to screen travelers entering the United States.

16. I understand that the Plaintiffs challenge the process by which persons who are allegedly placed in the TSDB may seek redress for such placement and that this lawsuit thus seeks to put at issue the U.S. Government's watchlisting processes, procedures, policies, and practices. These processes, procedures, policies, and practices all relate to the protection of the national security of the United States, which is the very purpose behind the creation of a consolidated approach to the United States' terrorism watchlisting after the terrorist attacks of September 11, 2001. Integral to this approach is the reliance on the TSDB by the United States Intelligence Community. Because of existing interagency coordination and information sharing, any impact on the TSDB's ability to collect, maintain, update, and disseminate information related to terrorists can be reasonably imputed to all members of the Intelligence Community.

### III. INFORMATION SUBJECT TO THE STATE SECRETS PRIVILEGE AND THE HARM TO NATIONAL SECURITY FROM DISCLOSURE

17. The Attorney General's assertion of the state secrets privilege covers certain information within the following three general categories:

   A. **Foreign Government Information.** The Attorney General's privilege assertion encompasses information contained in documents that could be used to identify certain countries with which the United States has terrorism information-sharing arrangements, and the terms of arrangements associated with particular countries.

   B. **Other Sensitive National Security Information Pertaining to Information Sharing with Foreign Partners.** The Attorney General's privilege assertion encompasses documents and information that would reveal classified and sensitive details concerning the information sharing between the United States and foreign partners.

   C. **Other Sensitive National Security Watchlisting Information.** The Attorney General's privilege assertion also encompasses other classified information associated with

watchlisting, including classified documents and classified portions of documents concerning watchlisting policies and procedures.

18. I describe the information contained in each of the categories more fully below, together with the significant harm to national security that is reasonably expected to occur upon disclosure of the national security information in those categories.

### A. FOREIGN GOVERNMENT INFORMATION

19. The first category of information encompassed by the Attorney General's assertion of state secrets privilege are documents concerning the sharing of watchlisting information between and among the U.S. and foreign governments and the methods and procedures through which this national security information is shared (collectively, "foreign partner arrangements"). Within this category are two subsets of information: (1) foreign partner arrangement documents that are classified, and (2) names of foreign partners and any other potentially identifying information within foreign partner arrangement documents, regardless of whether that information resides in a document that is specifically classified.

20. Some foreign partner arrangement documents responsive to Plaintiffs' discovery requests contain classified information about information sharing and assistance between the FBI and foreign government counterparts. Even where such documents are not specifically marked as classified, however, TSC communicates to these counterparts that it is the practice of the United States to maintain confidentiality over these arrangements in order to protect the bilateral partnership, and there is a commensurate expectation by the United States' foreign partners that this information will be kept confidential and protected against disclosure. Wherever it resides, the name of the foreign partner and any other potentially identifying information within those documents must be protected in order to preserve this promise of confidentiality and to protect

the national security, law enforcement, and foreign relations interests of the United States.[1]

21. Based on my role as the Assistant Director of the FBI's Counterterrorism Division as well as experience negotiating an information sharing arrangement between the TSC and a foreign partner, it is my judgment that international information sharing arrangements are critical to the safety and security of the United States.

22. I am aware that the TSC, at times in coordination with the Department of State (DOS), has negotiated more than sixty distinct arrangements with foreign partners, and many foreign partner arrangements have multiple foreign partner arrangement documents associated with the underlying arrangement. Some of these arrangements have been maintained and have remained classified and confidential for more than a decade. These arrangements, which center on the need to share information related to individuals who may pose national security threats, are entered into between the TSC and our foreign partners pursuant to Homeland Security Presidential Directive-6 (HSPD-6). The arrangements frequently include details that are appropriately classified SECRET (such as particular criteria for sharing), CONFIDENTIAL (such as the existence of a particular arrangement), law enforcement sensitive (LES) (such as the types of events requiring screening and the mechanism for provided screening identifiers) or sensitive but unclassified (such as the terms of the legal and dissemination restrictions attached to the information and the dispute resolution process). The purpose of these arrangements is to provide the United States and its foreign partner (which may be a foreign government or a military, intelligence, or law enforcement component of the foreign government) a mechanism

---

[1] While the Attorney General's state secrets privilege assertion applies to identifying country information in the foreign partner arrangements sought in discovery, other unclassified information in these arrangements is protected under the law enforcement privilege that is being asserted in conjunction with the state secrets privilege.

to collaborate and coordinate on national security threats through the provision of identifiers associated with known or suspected terrorists held within the TSDB. Incorporated within these distinct arrangements are law enforcement-privileged subjects such as managing encounters,[2] and sharing intelligence with domestic and foreign partners.

23. I describe below the foreign partner arrangements in the privilege log and why disclosure will reasonably be expected to cause significant damage to national security and negatively impact our relationships with our foreign partners. I then discuss generally sensitivities associated with these information-sharing arrangements, and also the type of harm failure to protect this information may cause.

24. Documents logged as TSCA0030-0225 evidence arrangements between the United States and specific foreign partners identified in the arrangements regarding the information they agree to share and how they share that information as well as points of contact who coordinate the information sharing. While four of these foreign partner arrangements exist in the form of binding international agreements, which are public,[3] the vast majority of such foreign partner arrangements are embodied in non-public documents meant to be protected against disclosure. In fact, some of the documents evidencing foreign partner arrangements subject to the Attorney

---

[2] An "encounter" is generally defined as any instance where a federal, state, local, tribal, territorial, or international partner comes in contact with a KST, such as through a traffic stop or a border crossing.

[3] The binding international agreements between the United States and Albania, Bulgaria, Hungary, and Slovenia are publicly available on the Department of State Treaty Office website. While these agreements were inadvertently included amongst the foreign partner documents listed on the privilege log, the United States is not seeking to protect these documents under the state secrets privilege or as law enforcement sensitive and has already provided them to plaintiffs via interrogatory response. Any reference in this section to "foreign partner arrangements" herein is not meant to include these four binding international agreements.

9

General privilege assertion are specifically classified in whole or in part.[4] Even when not specifically classified, however, foreign partner arrangements exist pursuant to an understanding that their terms (and often their existence) will be protected against disclosure. Consequently, in many cases, TSC neither confirms nor denies the existence of foreign partner arrangements with specific foreign partners. Moreover, because the contents of foreign partner arrangements include terms that would disclose law enforcement sensitive information in the context of combating terrorism outside the United States, the TSC protects foreign partner arrangements against unauthorized disclosure. This factor highlights in particular why the identifying information across all arrangements, regardless of the specific classification, requires the utmost protection. If TSC were to disclose this information without specific authorization from the foreign partner, doing so could undermine the trust of other foreign partners that rely on the TSC's assurances of nondisclosure or confidentiality. Additionally, revealing the information about the points of contact could create significant security concerns for officials in other countries.

---

[4] Whether a particular arrangement is marked classified or not can be the result of different variables. For example, the foreign partner may specifically request a classification designation based on its own concerns regarding disclosure of the arrangement on watchlisting matters – a concern that the United States would grant particular deference. Similarly, a foreign partner may have a relationship with the United States Intelligence Community that itself is protected as classified. In addition, as explained below, the United States may determine that classification of the arrangement is appropriate because it may have partner arrangements with one country that might impact the willingness of another country to share information. As also noted above, a particular arrangement may include sensitive terms for information sharing for which classification is judged to be appropriate. Finally, as a practical matter, classification of documents relating to the arrangement may depend on whether the foreign partner nation has the necessary mechanisms, such as secured information systems analogous to the United States' classified information systems, in place to protect their versions of the documents. Regardless of whether the arrangement is specifically classified, however, disclosure of the confidential relationship with any foreign partner must be protected for the reasons described in this declaration.

10

25. Thus, based upon representations made during negotiations, foreign partners expect the United States to protect the specifics (and, in many cases, even the existence) of their arrangements with the United States.[5] A failure by the United States to honor the expectation of these foreign partners could reasonably be expected to affect the trust these countries have in the United States and their willingness to share sensitive information, which is critical to the United States' global effort to combat terrorism. For example, if the United States were to disclose the existence of a foreign partner arrangement with Country X, contrary to U.S. assertions that such information would be kept confidential, Country X would be less likely to share sensitive information with the U.S. Similarly, if Country X and Country Y are openly hostile toward one another, the disclosure of an agreement between the United States and Country X might affect Country Y's willingness to cooperate or share information with the United States. Either scenario would adversely affect the United States' ability to gather information about known and suspected terrorists, thereby weakening international terrorism efforts and threatening national security.

26. In addition to the chilling effect described above, a national security operational risk would result from disclosure of the foreign partner arrangements. Disclosure of a country's identity and identifying information, or any terms specific to that country, could reasonably be expected to cause significant harm to national security, because it would enable terrorists to avoid or employ countermeasures in countries that share information with the United States. For example, if terrorists and their associates know the names of countries with which the U.S. Government exchanges terrorism information and the details of those arrangements, they

---

[5] While the United States has generally acknowledged the existence of foreign partner arrangements with all Visa Waiver Program (VWP) countries, it has not disclosed the actual arrangements with each of these countries sought in this case.

11

reasonably could alter their behavior or strategies overseas, including shifting their activities away from countries with which the U.S. Government has information sharing arrangements to those countries with which the U.S. Government does not have such arrangements. This would, in turn, result in the U.S. being less likely to detect or disrupt the activities of such terrorist. Thus, disclosing any information that identifies a foreign partner could reasonably be expected to cause a significant harm to the national security.

27. In my judgment, maintaining confidentiality and the confidence of the identities of the United States' foreign partners is critical to fulfilling our national security mission. Foreign governments must feel confident that they can share information with the United States without fear that their information will be compromised. If the United States lost the confidence of foreign governments as a result of the disclosure of classified or sensitive foreign government information, our foreign partners would likely become less cooperative with the United States. The diminishment of valuable foreign cooperation would jeopardize the United States' security and foreign relations interests. Thus, disclosure of the foreign government information at issue here—including classified foreign partner arrangements and information in other arrangements that could be used to identify specific foreign partners—could reasonably be expected to significantly damage the national security of the United States.

### B. OTHER SENSITIVE NATIONAL SECURITY INFORMATION PERTAINING TO INFORMATION SHARING WITH FOREIGN PARTNERS

28. I turn next to a description of additional logged documents and information that describe information, policies and procedures for how foreign partner information sharing occurs.

29. Document TSCD0052, provided by a foreign country, includes detailed information about that country's counterterrorism strategies and capabilities and was shared with the U.S. for purpose of coordination and cooperation. This document provides information about the technical

12

capabilities of another country and may suggest possible points of infiltration for terrorist networks or adversaries to exploit. Moreover, this information was provided with the understanding that the United States would protect it against unauthorized disclosure. Therefore, disclosing this document would be detrimental to the relationship the United States has with this foreign country and would undermine confidence that the United States will keep the foreign country's information confidential. The damage to this relationship would also negatively impact foreign relations and the ability of the United States to obtain valuable intelligence and counterterrorism information in the future, thus posing a significant threat to national security.

30. Document TSCD0054 is a classified document provided by a different foreign country that shares classified information. Disclosing this document would reveal to potential terrorists what type of behaviors are being detected by foreign partners and the types of information being shared with the U.S. As a result, this disclosure would allow potential terrorists to engage in different behaviors to avoid detection in the future, and consequently, both countries would miss opportunities to detect and disrupt terrorist activities. Additionally, this information was shared with the understanding that the United States would protect this information against unauthorized disclosure. Failure to do so could reasonably be expected to undercut this foreign country's confidence in the United States and its willingness to share sensitive information in the future, and could reasonably be expected to cause significant harm to national security.

31. Document TSCA0229 describes the government's strategies for negotiating foreign partner arrangements and sharing terrorism screening information with foreign partners, including information about countries with which information sharing occurs or may occur in the future. It includes multiple classified appendices (along with unclassified or sensitive but unclassified

13

appendices) that contain country-specific information that describes the status of arrangements and negotiations with multiple foreign countries. For the reasons described in Subsection A, above, the classified appendices must be protected under the state secrets privilege. Additionally, the remainder of TSCA0229 qualifies for protection under the law enforcement privilege, as described in the accompanying declaration in support of the law enforcement privilege.

32. Document TSCA0235 is the classified FBI policy guide for the foreign dissemination of classified information, which describes detailed information about the processes used in sharing classified information with foreign governments. This document contains classified information about sensitive processes and coordination with other government agencies. By providing a window into the U.S. Government's methods, processes, and strategies in the sharing of classified information with foreign governments, disclosing this classified information would enable foreign adversaries to identify gaps in the sharing of information and allow them to exploit those gaps in order to accomplish their goals, causing significant harm to national security. The Attorney General's state secrets privilege applies to the portions of this document that are specifically marked as classified. The remainder of this document should be protected under the law enforcement privilege, as more fully described in the accompanying law enforcement privilege declaration.

33. Document TSCD0008 (entitled "Foreign Government Information") is a classified TSC training document that addresses Foreign Government information ("FGI"). This document also contains classified information concerning foreign partners with which the TSC has sharing arrangements pursuant to HSPD-6. It describes some of the TSC's sources and methods and could provide insight to a terrorist about how information is managed and used. It also includes

specific information and, as described above, unless authorized to do so by the foreign partner, TSC neither confirms nor denies the existence of a terrorism information sharing arrangements with specific foreign partners.

34. Document TSCD0017 is a classified document relating to information sharing with foreign partners that provides the identities of many foreign partners. For the reasons described in Subsection A, above, release of this information could reasonably be expected to cause significant damage to national security.

35. In sum, maintaining the confidentiality of foreign government information is critical to the maintenance of ongoing productive cooperation with foreign nations in the field of counterterrorism and counterintelligence. Accordingly, disclosure of the information in the documents described above reasonably could be expected to cause significant harm to national security because it would strain relations between the United States and foreign government(s) and have a chilling effect on the free flow of vital information to United States intelligence and law enforcement agencies.

### C. OTHER SENSITIVE NATIONAL SECURITY WATCHLISTING INFORMATION

36. In addition to the documents and information described above, I understand Plaintiffs' motion to compel seeks the disclosure of other classified information associated with watchlisting and over which the Attorney General has asserted the state secrets privilege, as further described below.

37. Document TSCA0018, the Terrorist Screening Operations Unit (TSOU) Operational Encounter Management Standard Operating Procedures, is a classified document describing, in intricate detail, the sensitive procedures by which TSOU handles encounters with individuals identified as a positive matches to identities in the TSDB, and coordinates such encounters with domestic

and foreign partners. This document reveals extensive information about interagency coordination through multiple security efforts or programs that would provide significant insight to adversaries about how the U.S. Government conducts its terrorism watchlisting and counterterrorism missions. The sources and methods used would be revealed and give significant insight into how to avoid or exploit those processes. The resulting ability to undermine U.S. counterterrorism efforts reasonably could be expected to cause significant harm to national security.

38. In addition, TSCA0018 contains detailed information about the coordination within TSC and the rest of the U.S. terrorism watchlisting enterprise in the event of positive encounters in a variety of contexts, including flights, land border crossings, law enforcement, applications for benefits, and foreign encounters. Disclosure of this information would allow terrorists to identify many of the ways in which they can be encountered by the U.S. Government, and allow them to think of ways in which they can test and circumvent the different procedures. This kind of in-depth understanding of how the U.S. Government manages screening encounters with known and suspected terrorists could reasonably be expected to allow adversaries to undermine U.S. counterterrorism efforts and cause significant damage to national security.

39. Finally, TSCA0018 lists many of the countries with which the U.S. Government has foreign partner arrangements, as well as details regarding arrangements and procedures with respect to particular countries. For all the reasons described in Subsection A, above, release of the country-specific and classified information in this document could reasonably be expected to cause significant damage to national security. Any other portions of this document should be protected under the law enforcement privilege.

40. Document TSCB0009, a TSC Power Point regarding Watchlisting and Information Sharing, is a

classified document that contains classified details about the incorporation of biometric information into terrorism watchlisting and screening, as well as images of classified intelligence reports regarding the U.S. Government's counterterrorism activities. In addition to information that is appropriately classified, this presentation includes some information that, if removed and considered separately from this presentation would likely be unclassified (but still law enforcement sensitive and subject to that privilege), such as an organization chart of the TSC and certain aspects of the screening process. However, the format of this document as a presentation meant to be delivered to an audience, necessitates that it be classified to ensure it is only presented in a classified setting. In all, the contents of this presentation are such that its disclosure could be reasonably expected to cause significant harm to national security.

41. TSCB0009 lists many current foreign partner countries and potential future foreign partners, specifically identifying countries engaged in negotiations with the U.S. Government as well as countries that are scheduled to sign arrangements. For all the reasons described in Subsection A, above, release of this foreign government information could reasonably be expected to cause significant damage to national security. In addition, information regarding use of biometric data in terrorism watchlisting and screening reveals sensitive information regarding the techniques and methods used by the U.S. Government in its counterterrorism efforts and would allow terrorists to exploit that information to the detriment of national security.

42. TSCD0003 is a classified Memorandum of Understanding on the Integration and Use of Screening Information to Protect Against Terrorism. Signed by the Attorney General, the Secretary of State, the Secretary of Homeland Security, and the Director of Central Intelligence at the time, this document describes multiple agencies' roles in implementing the watchlisting enterprise directed by the President. Three paragraphs in this document contain classified

information that could provide adversaries with specific insight on the methods and sources that the agencies identified in the MOU utilize in the terrorism watchlisting process and could thus allow adversaries to circumvent watchlisting and other counterterrorism measures. Knowledge of these nuances in the U.S. terrorism watchlisting and screening procedures would enable adversaries to exploit the processes to their advantage. While the instant assertion of the state secrets privilege is only over the classified portions, the remaining unclassified portions of this document warrant protection from disclosure under the law enforcement privilege, as more fully described in the accompanying law enforcement privilege declaration.

43. Any information in the above-described documents that may not be portion-marked as "classified" and over which the state secrets privilege has not been asserted should nonetheless remain protected from disclosure under the law enforcement privilege, as more fully described in the accompanying law enforcement privilege declaration. This declaration and the law enforcement privilege declaration are designed to be read in tandem and mutually supportive, with the justifications offered in support of the state secrets privilege supporting an assertion of the law enforcement privilege.

## CONCLUSION

44. Accordingly, based upon my personal consideration of the matter, I have concluded that disclosure of the national security information described herein as subject to the Attorney General's assertion of the State Secrets Privilege reasonably could be expected to cause significant harm to the national security.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 23rd day of April 2018.

_____
Michael C. McGarrity
Assistant Director
Federal Bureau of Investigation

19