**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| Anas ELHADY, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )     Case No. 1:16-cv-375 (AJT/JFA) |
| | ) |
| CHARLES H. KABLE, et al., | ) |
| | ) |
| Defendants. | ) |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' SECOND MOTION TO COMPEL

TRACY DOHERTY-MCCORMICK
Acting United States Attorney

CHAD A. READLER
Acting Assistant Attorney General
Civil Division

ANTHONY J. COPPOLINO
Deputy Director, Federal Programs Branch

AMY POWELL
DENA ROTH
ANTONIA KONKOLY
CHRISTOPHER HEALY
Trial Attorneys, Federal Programs Branch
United States Department of Justice
Civil Division, Federal Programs Branch

LAUREN A. WETZLER
Chief, Civil Division
Assistant United States Attorney
2100 Jamieson Ave.,
Alexandria, VA 22314
Tel: (703) 299-3752
Fax: (703) 299-3983
Lauren.Wetzler@usdoj.gov

*Attorneys for Defendants*

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

PROCEDURAL BACKGROUND ........................................................................................2

LEGAL STANDARDS...........................................................................................................8

    I.     Federal Rule of Civil Procedure 37 and 26 ........................................................8

    II.    The Law Enforcement Privilege. .........................................................................9

    III.   The Sensitive Security Information (SSI) Privilege .........................................11

ARGUMENT...........................................................................................................................13

    I.     Some of the Information Which Plaintiffs Move to Compel is Duplicative of
          Their First Motion to Compel, Pending before the District Judge Court. .................14

    II.    Information Which Plaintiffs Move to Compel is Untimely, Irrelevant,
          Duplicative, Burdensome, Outside the Scope of this Court's 30(b)(6)
          Protective Orders, and Privileged. ..................................................................18

         A.    Significant Portions of this Motion Are Untimely or Fail for Other
              Threshold Reasons.........................................................................18

         B.    The Remainder of the Information Plaintiffs Seek is Irrelevant,
               Duplicative, Mooted by Information Provided by Defendants,
               Outside the Scope of Proper 30(b)(6) Questioning Under this Court's
               Protective Order, and/or Privileged. ..................................................21

            i.  Information Regarding the Watchlisting Advisory Council......................21

            ii.  Information Sought From FBI/TSC .................................................25

            iii. Information Sought From CBP ........................................................31

            iv. Information Sought From TSA ........................................................36

    CONCLUSION.............................................................................................................38

## INTRODUCTION

Plaintiffs have moved to compel a long—and largely ill-defined—"laundry list" of information, purportedly in response to refusals to answer questions during four Rule 30(b)(6) depositions. *See* Pls.' 2d Mot. to Compel ("Pls.' 2d Mot."), Dkt. No. 170 (updated memorandum). This characterization is largely inaccurate: most of the information sought by this motion is information that Plaintiffs requested, and had an opportunity to compel, months ago.  Now, many weeks after the close of discovery, Plaintiffs attempt to use this Court's limited-purpose extension of discovery for the Rule 30(b)(6) depositions as a backdoor method through which to conduct further discovery that could have, and should have, been timely pursued during the discovery period.

Plaintiffs admit that much of the information they seek "overlaps with many of the same topics" as their first motion to compel, which will be heard by District Judge Trenga.  *See id.* at 1. There is no justification for seeking to compel the same type of information twice. Much of the information on which Plaintiffs now move is entirely irrelevant to the sole remaining procedural due process claim and is protected by the law enforcement or Sensitive Security Information ("SSI") privileges.

This motion should therefore be denied, because:  several of these issues are currently pending before the district judge; the motion is untimely; the information they seek is in large part irrelevant to their claim and/or burdensome; several requests have now been mooted; several items are outside the scope of the 30(b)(6) protective orders of this Court; and the remaining information sought is protected by the law enforcement privilege and the SSI privilege.  Disclosure of the law enforcement privileged information, even under a protective order, risks harm to ongoing investigations and law enforcement interests. With respect to the SSI, this Court lacks jurisdiction to

review the TSA Final Order that these documents contain SSI, and Plaintiffs have not sought

disclosure under a protective order or made the necessary showing to obtain such information.[1]

## PROCEDURAL BACKGROUND

The procedural due process challenge is the only remaining claim in this case, and it presents

relatively narrow issues: what *process* (notice and an opportunity to respond), if any, is constitutionally

required for a person seeking redress for alleged placement on a terrorist watchlist. That issue can

and should be resolved without the need for the excessive discovery and discovery litigation that

continues to unfold in this case.

The procedural background to this case has been set forth at greater length in other filings,

to which Defendants respectfully refer the Court for a more complete statement. *See, e.g.,* Dkt. Nos.

128, 178. As relevant here, last fall, Plaintiffs served extensive written discovery on Defendants,

including extensive requests for admission and requests for production ("RFPs"). Defendants

timely served both objections and responses to these requests. Importantly for various aspects of

this motion, in responding to Plaintiffs' RFPs, Defendants clearly articulated the parameters of the

searches they conducted, and also clearly stated in their responses where they stood on their

objections and would not conduct any search. *See* Defendants' Exhibits ("DEX") 24, Defs.' Obj. to

Pls.' 1st Request for Prod. Of Docs. to TSC; DEX 25,  Defs.' Resps. to Pls.' 2d Request for Prod.

---

[1] Defendants do not believe that the present motion requires an assertion of the state secrets privilege, either because Plaintiffs specifically exclude classified information protected by the privilege or because Plaintiffs have not identified and requested the specific documents or information they are seeking. Defendants cannot formulate an assertion of the state secrets privilege over vague topic areas or categories without more information about what Plaintiffs are specifically seeking. In any event, the motion was filed on April 13, 2018 and there has not been time to fully explore the applicability of the state secrets privilege to vague topics on which Plaintiffs have moved. Formal assertion of the state secrets privilege requires numerous, lengthy and detailed review procedures, including actual personal consideration by the Attorney General of the United States. *See* Def's Opp. to Pl's. 1st MTC, at 32 n.23. To the extent Plaintiffs identify information with more specificity or the Court orders the search and production of documents, Defendants retain the right to assert that privilege.

Of Docs. to TSC. At no point during the discovery period did Plaintiffs state any objection whatsoever to either of these aspects of Defendants' discovery responses.

At the very end of the discovery period, Plaintiffs served interrogatories on the Federal Bureau of Investigation ("FBI") and the Terrorist Screening Center ("TSC"). Defendants timely objected and responded to these interrogatories. DEXs 21, 22 (Defs.' Obj. to Pls.' First Sets of Interrogatories to TSC and FBI). Plaintiffs never sought a meet and confer about the interrogatory responses at any time before or after the close of discovery.

Three weeks prior to the close of discovery, Plaintiffs noticed a single Rule 30(b)(6) deposition of TSC, and shortly thereafter the Court granted Defendants' motion for a protective order limiting the questioning topics for that deposition. *See* Dkt. No. 121. The Court limited Defendants' topics for the TSC deposition to eight topics.[2] *Id.*; DEX 23 (Feb. 16, 2018 Hrng. Tr.). At the very last possible moment, ten days prior to the close of discovery, Plaintiffs noticed three new Rule 30(b)(6) depositions, of the FBI, the Transportation Security Administration ("TSA"), and U.S. Customs and Border Protection ("CBP"). The Court granted in part and denied in part Defendants' motion for a protective order, permitting most of Plaintiffs' topics to go forward with limitations articulated in a ruling from the bench. Dkt. No. 147; DEX 1 (March 16, 2018 Hrng Tr.).

---

[2] The Court limited the scope of the deposition to the following topics, proposed by Defendants: (1) TSC's role in the TSDB nominations process (including generally TSC's understanding of how and why individuals are placed in the TSDB); (2) TSC's role in the redress process (excluding the revised redress process for US Persons on the No Fly List); (3) TSC's role in terrorism watchlisting in general. (4) Measures TSC undertakes to ensure accuracy and reliability of the TSDB; (5) Categories of information stored in the TSDB; (6) TSC sharing of information from the TSDB with other entities, including TSC's role or responsibility in dissemination and control of such information, the identities of entities that receive exports of TSDB information, and knowledge TSC has about the expected uses of such information; (7) Training provided by TSC to persons who work on TSDB nominations, acceptance, rejections, and removals; and (8) The content of the Overview document (*see* bates numbers Elhady-FBITSC-001947-56), including the standards for inclusion in the TSDB (excluding the No Fly List standards). Dkt. No. 101-1.

The Court also granted an extension of discovery for the sole purpose of taking previously noticed depositions, and not for any other purpose. *See* Dkt. No. 123.

On March 15, 2018, Plaintiffs moved to compel over 100 documents and other pieces of information, as part of an "omnibus" motion to compel. *See* Dkt. No. 139 ("Pls.' 1st Mot."). They now move separately to compel the following information, which, purportedly, the Government "was either unable or unwilling to orally provide during four 30(b)(6) depositions," *see* Pls.' 2d Mot. at 1. Although Plaintiffs' motion is not a model of clarity—and indeed, is frequently confusing to the point of opacity—regarding the discrete information it seeks to compel, in order to assist the Court in its resolution of the motion, Defendants have organized the information that, construed broadly, they understand the motion to place at issue, by agency, below[3]

Information Duplicative with First Motion to Compel, Including Information about the Watchlisting Guidance:

1. A copy of the 2015 Watchlisting Guidance, or answers to "plaintiffs' substantive questions" about the 2015 Watchlisting Guidance. Pls.' 2d Mot at 7.

2. "[C]riteria for the Selectee list and how those standards have changed over time." Pls.' 2d Mot. at 9.

3. Whether relatives or associational relationships could form the basis for nomination to the TSDB. *Id.* at 9–10.

4. "[W]hether U.S. persons can be added to the [TSDB] absent an investigative interest." *Id.* at 10.

5. Whether there are minor children in the TSDB. *Id* at 10-11.

6. Why the "exception to the 'reasonable suspicion' standard exists" and "how it is applied" by different agencies. *Id.* at 11.

---

[3] In particular, Plaintiffs are frequently unclear which pieces of information they are using illustratively, versus which pieces of information they actually wish to compel. For example, at one point Plaintiffs state that the information they are moving to compel from TSA is limited to three discrete items, *see* Pls.' 2d Mot. at 22, but elsewhere they describe other information, in excess of those three, that they are, apparently, additionally seeking to compel from the same agency. *See id.* at 20-21 (requesting statistics on TSA screenings). Nonetheless, for the purpose of compiling this list, and for the aid of the Court, Defendants have attempted to construe Plaintiffs' motion broadly. However, in doing so, Defendants do not waive any applicable objections or arguments regarding the scope and/or imprecision of Plaintiffs' requests.

7. The "DOJ Memo from Deputy Attorney General to Heads of Department Components [r]e: Department of Justice Protocol Regarding Terrorist Watchlist Nominations. TSC D0044; *Id.* at 7-8.

8. Information about how the "Watchlisting Guidance has changed over time." *Id.* at 7.

9. A copy of the "oldest version of the Watchlisting Guidance." *Id.*

10. A revised Watchlisting Guidance from 2010. *Id.*

11. The 2013 Watchlisting Guidance, a purportedly leaked copy of which Plaintiffs believe they already possess. *Id.*

12. A 2009 *Protocol Regarding Terrorist Nominations*. *Id.* at 8.

Information about the Watchlisting Advisory Council:

13. More information on the Watchlisting Advisory Council, including "how the FBI relates to or participates on the Watchlisting Advisory Council" and "how that Council relates to either the National Security Council or its participant agencies." *Id.* at 3.

14. What the Watchlisting Advisory Council is and how it operates. *Id.* at 4.

15. When and how the Watchlisting Advisory Council came into existence. *Id.* at 4-5.

16. The "charter document(s) establishing the Watchlisting Advisory Council." *Id.* at 6.

17. The number of agencies and names of the members of the Watchlisting Advisory Council. *Id.* at 5.

18. FBI's definition of "known or suspected terrorist," and the difference between that definition and the definition of other agencies. *Id.*

19. Copies of the Statements/Summaries of Conclusion (SOC's) of the Watchlisting Advisory Council for the past 5 years. *Id.*

20. A further 30(b)(6) deposition of the National Counter-Terrorism Center (NCTC). *Id.*

Other Information From FBI/TSC:

21. A non-redacted version of the new *Domestic Investigations and Operations Guidelines* (DIOG) manual. *Id.* at 12.

22. "[A]n unclassified summary or a public redacted version of Chapter 11 of the *Counterterrorism Program Guide. Id.*

23. The policy document that governs National Crime Information Center ("NCIC") dissemination to state and local authorities. *Id.* at 13.

24. "[A]ny policy documents governing NCIC dissemination of TSDB information." *Id.*

25. A more exact estimate of the number of authorized individual users of the TSDB. *Id.*

26. The "number of NCIC queries run by [individual] NCIC users in the aggregate." *Id.*

27. Information about FBI "handling codes" including the designation of a TSDB individual as "armed and dangerous." *Id.*

28. The "nature of or details surrounding [FBI] handling codes," including "how many codes exist, any handling instructions that accompany the handling codes, or the contents of any electronic alerts." *Id.* at 15.

29. "[W]hether FBI share[s] NCIC handling codes with CBP." *Id.* at 16.

30. How "handling codes are disseminated, and how those handling codes operate to influence particular responses (i.e. handcuffing, drawing guns, calling in backup, setting off sirens or alarms, etc.) by law enforcement officers." *Id.*

31. Whether FBI receives information from CPB secondary inspections including information from wallets and the content of electronic devices. *Id.* at 17.

32. Whether the FBI is involved in the CBP "secondary inspection process in order to question TSDB listees" *Id.*

33. "[W]hether the TSDB contains informants, or notations that an individual is an informant." *Id.* at 19.

34. How the FBI "use[s] the TSDB to recruit informants." *Id.*

35. The "[n]umber of nominations the FBI makes to the TSDB each year." *Id.* at 21.

36. The "[n]umber of nominations the FBI makes to the TSDB which are accepted." *Id.*

37. The number of nominations the FBI makes to the TSDB "which are rejected for failure to provide sufficient substantive derogatory information." *Id.*

38. The "[n]umber of arrests of TSDB individuals the FBI has made at the border or points of entry." *Id.*

39. The "[n]umber of individuals who committed an act of terrorism in the U.S. while they were on the TSDB." *Id.*

40. The "[n]umber of times the FBI has disclosed in public court filings in terrorism cases that the criminal defendant was listed in the TSDB at the time of the incident." *Id.*

Other Information From CBP:

41. More information on CBP "handling codes," including "armed and dangerous" *Id.* at 14.

42. "[W]hether CBP officers ever draws weapons or handcuff TSDB listees based solely on the fact that they are listees." *Id.* at 16.

43. The procedures applied to TSDB listees during secondary inspection. *Id.*

44. Whether CBP "provides information [] learned from an individual's wallet to [] FBI." *Id.* at 17.

45. Whether CBP shares the information downloaded from electronic devices with FBI. *Id.*

46. "[W]hether CBP involves the FBI in the secondary inspection process in order to question TSDB listees." *Id.*

47. "Additional information" regarding the CBP's initial and secondary inspection procedures that apply to TSDB listees, including the use of weapons and handcuffs, as well as the personal information it collects and shares with the FBI or TSC. *Id.*

48. Whether "automated high-risk designations have ever lead to the CBP nominating individuals to the TSDB." *Id.* at 18.

49. Whether CBP has "ever asked TSDB listees to become informants." *Id.* at 19.

50. "[A]verage number of daily encounters CBP has with individuals on the TSDB." *Id.* at 20.

51. "[N]umber of individuals listed on the TSDB that the CBP arrested in 2017, and how many of those arrests were terrorism related." *Id.*

52. "The number of individuals listed on the TSDB that CBP has arrested in the last 10 years and the number of arrests that were terrorism related." *Id.*

53. "The number of U.S. citizens listed on the TSDB that the CBP has arrested in the last 10 years and the number of arrests that were terrorism related." *Id.*

Other Information From TSA:

54. Additional information about the "rules-based list" system designating passengers as "high-risk," or any examples of what such rules-based lists might entail and "how those criteria relate to TSA's nominations to the watchlist." *Id.* at 17-18.

55. Number of "persons on the Selectee and Expanded Selectee lists." *Id.* at 22.

56. "Average number of enhanced screenings conducted by the TSA each day and each year." *Id.* at 21.

57. The number of U.S. citizens on the Selectee and Expanded Selectee lists. *Id.*

58. The "[n]umber of enhanced screenings that have led to a terrorism-related arrest." *Id.*

59. The number of "potential matches to the TSDB which the TSA determines after evaluation to *not* to be matches to the TSDB." *Id.*

On April 13, 2018, the parties met and conferred on a list of topics that mostly (although not entirely) corresponded with the list of topics on which Plaintiffs have now moved. *See* DEX 2 (Email exchange commemorating this conferral). Defendants indicated during this conferral that there were some topics on which they might be able to provide additional information, and thus narrow or eliminate certain areas of dispute. Where Defendants are now able provide such information, they do so in the instant filing, and note *infra* where they believe the additional information narrows the issues herein presented.

## LEGAL STANDARDS

### I.      Federal Rules of Civil Procedure 37 and 26

Rule 37 of the Federal Rules of Civil Procedure provides that "[a] party seeking discovery

may move for an order compelling an answer, designation, production, or inspection" if a party fails

to produce or make available for inspection requested documents under Rule 34. Fed. R. Civ. P.

37(a)(3)(B)(iv).  District courts have substantial discretion in the handling of a motion to compel.

*Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*, 43 F.3d 922, 929 (4th Cir. 1995).  Courts

generally consider motions to compel untimely when they are filed after the discovery deadline.  *See*

*Powell v. Kamireddy,* No. 7:13-CV-00267-F, 2015 WL 333015, at *4 (E.D.N.C. Jan. 26, 2015); *Wootten*

*v. Virginia*, No. 6:14-CV-13, 2015 WL 13658068, at *2 (W.D. Va. June 9, 2015); *PCS Phosphate Co. v.*

*Norfolk S. Corp.*, 238 F.R.D. 555, 558 (E.D.N.C. 2006); *Greene v. Swain County P'ship for Health*, 342 F.

Supp. 2d 442, 449 (W.D.N.C. 2004).  Courts occasionally review motions to compel filed after the

discovery cutoff when the parties are continuing to negotiate supplemental responses and dispositive

motions deadlines have not been fixed.  *See, e.g., Ayers v. Continental Cas. Co.*, 240 F.R.D. 216, 223-25

(N.D.W. Va. 2007); *U.S. ex rel. Purcell v. MWI Corp.*, 232 F.R.D. 14, 16-17 (D.D.C. 2005).  But courts

seldom review untimely motions to compel when the requesting party easily could have filed a

timely motion to compel, but simply failed to do so.  *See, e.g., Wootten*, 2015 WL 13658068, at *2; *In re*

*Sulfuric Acid Antitrust Litig.*, 231 F.R.D. 331, 339 (N.D. Ill. 2005) (finding a motion to compel as

untimely and rejecting the moving party's argument of prejudice because "whatever prejudice they

suffered was the result of their own inaction").  Untimely motions to compel are less likely to be

considered when the parties have "had adequate opportunity to perform all the discovery it needed"

or treated discovery with "unwarranted delay."  *Gulfstream Inc. v. PalmYacht Sales, Inc.*, 176 F.3d 475, at

4 (4th Cir. 1999); *Lone Star Steakhouse & Saloon, Inc.*, 43 F.3d at 929.\

Unless otherwise limited by the court, Rule 26(b)(1) permits discovery of "any nonprivileged matter that is relevant to any party's claim or defense." Although discoverable information "need not be admissible," Fed. R. Civ. P. 26(b)(1), discovery requests must be "proportional to the needs of the case, considering the importance of the issues at stake in theaction, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(2).  Rule 26(b)(2) further provides that the Court must limit discovery outside that scope and also where "the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive" and where "the party seeking discovery has had ample opportunity to obtain the information."  The Advisory Committee Notes to the 2015 Amendment emphasize that a "party claiming that a request is important to resolve the issues should be able to explain the ways in which the underlying information bears on the issues as that party understands them."

## II.    The Law Enforcement Privilege

The law enforcement investigatory privilege is "designed to prevent disclosure of information that would be contrary to the public interest in the effective functioning of law enforcement," and to "preserve the integrity of law enforcement techniques." *Tuite v. Henry,* 181 F.R.D. 175, 176 (D.D.C. 1998), *aff'd,* 203 F.3d 53 (D.C. Cir. 1999).  "The purpose of th[e] [law enforcement] privilege is to prevent disclosure of law enforcement techniques and procedures, to preserve the confidentiality of sources, to protect witness and law enforcement personnel, to safeguard the privacy of individuals involved in an investigation, and otherwise to prevent interference with an investigation."  *In re Dep't of Investigation of the City of N.Y.,* 856 F.2d 481, 484 (2d Cir. 1988).  "[T]he reasons for recognizing the law enforcement privilege are even more compelling"

when "the compelled production of government documents could impact highly sensitive matters relating to national security." *In re U.S. Dep't of Homeland Sec.*, 459 F.3d 565, 569 (5th Cir. 2006).

A proper review of an assertion of the law enforcement privilege involves three steps.[4] "First, the party asserting the law enforcement privilege bears the burden of showing that the privilege indeed applies to the documents at issue" by showing that the documents contain information pertaining to law enforcement techniques and procedures, information that would undermine the confidentiality of sources, information that would endanger witness and law enforcement personnel, information that would undermine the privacy of individuals involved in the investigation, or information that would seriously impair the ability of a law enforcement agency to conduct future investigations. *In re New York City*, 607 F.3d 923, 948 (2d Cir. 2010). Second, once the privilege is determined to apply, "the district court must balance the public interest in nondisclosure against 'the need of a particular litigant for access to the privileged information.'" *Id.* (quoting *In re Sealed Case*, 856 F.2d at 272). There is a strong presumption against lifting the privilege that may be rebutted only by a showing that the lawsuit is non-frivolous and brought in good faith, that the information sought is not available through other discovery or from other sources, and that the party has a compelling need for the privileged information. *Id.* Third, "[i]f the presumption against disclosure is successfully rebutted [], the district court must then weigh the public interest in nondisclosure against the need of the litigant for access to the privileged information before ultimately deciding whether disclosure is required." *Id.*

---

[4] Because the Fourth Circuit has not directly addressed the standard that a district court should apply to evaluate the Government's assertion of the law enforcement privilege, district courts in this Circuit have looked to relevant decisions from sister circuits for guidance. *See, e.g., United States v. Matish,* 193 F. Supp. 3d 585, 597 (E.D. Va. 2016) (citing *In re City of New York*, 607 F.3d 923, 944 (2d Cir. 2010) in evaluating the privilege in a criminal matter); *Hugler v. Bat Masonry Co., Inc.*, No. 6:15-CV-28, 2017 WL 1207847, at *4 (W.D. Va. Mar. 31, 2017) (citing, *inter alia, In re City of New York*, in ERISA matter).

In response to this second motion to compel, the privilege is supported by the First and Second Declarations TSC Deputy Director Timothy P. Groh, DEX 3 ("1st Groh Decl."), DEX 4 ("2d Groh Decl."); the Second Declaration of Assistant FBI Director Michael C. McGarrity, DEX 5; and the Declaration of CBP Executive Director for Operations Randy Howe, DEX 6.[5]  The Argument Section, *infra*, will address the applicability of the privilege to particular requests.

## III.    Sensitive Security Information (SSI)

District courts may not review challenges to TSA's SSI determinations, because they constitute final agency actions subject to exclusive review in the United States Courts of Appeals. 49 U.S.C. § 46110(a); *Blitz v. Napolitano*, 700 F.3d 733 (4th Cir. 2012); *Robinson v. Napolitano*, 689 F.3d 888 (8th Cir. 2012); *MacLean v. Dep't of Homeland Sec.*, 543 F.3d 1145, 1149 (9th Cir. 2008); *Lacson v. U.S. Dep't of Homeland Sec.*, 726 F.3d 170, 173 & n.2 (D.C. Cir. 2013); *Elec. Privacy Info. Ctr. v. Dep't of*

---

[5] The First Groh Declaration ("1st Groh Decl.") was executed and submitted in support of Defendants' Opposition to Plaintiffs' First Motion to Compel. Dkt. No. 178-18 (public redacted version).  Because the full version of the First Groh Declaration itself contains both information that is protected by the law enforcement privilege as well as SSI, it was submitted *ex parte* and *in camera* to the District Judge, who is deciding Plaintiffs' First Motion to Compel.  *See* Dkt. No. 179 (Notice of Lodging).  Defendants filed a public, redacted version of the First Groh Declaration on the public docket for this case, at Dkt. No. 178-18.  Because, as set forth *infra*, several aspects of Plaintiffs' First Motion to Compel overlap with their Second Motion to Compel, the First Groh Declaration is also relevant to the resolution of the instant motion.  Accordingly, Defendants are again submitting the full version of this declaration *ex parte* and *in camera*, this time to the Magistrate Judge to whom the instant motion has been referred for resolution. Dkt. No. 191 (Notice of *Ex Parte, In Camera* Submission).  The same public, redacted version of this declaration as was previously filed at Dkt. No. 178-18 is also attached hereto as DEX 3.

In addition, Defendants submit a separate, Second Groh Declaration ("2d Groh Decl."), also in support of the instant motion.  Because the Second Groh Declaration itself contains information that is protected by the law enforcement privilege, Defendants have submitted the full version of this declaration to the Magistrate Judge *ex parte* and *in camera*.  Dkt. Not. 191.  Defendants attach a public, redacted version of the Second Groh Declaration hereto as DEX 4.

*Homeland Sec.*, 928 F. Supp. 2d 139, 146-47 (D.D.C. 2013); *Chowdhury v. Northwest Airlines Corp.*, 226 F.R.D. 608, 614 (N.D. Cal. 2004).[6]

The Fourth Circuit has conclusively determined that, with respect to challenging a TSA Order, that "Congress has spoken — plainly and clearly — that a court of appeals is to hear, in the first instance, a challenge to an order of the TSA Administrator.  Indeed, we have no authority or power to decide otherwise." *Blitz*, 700 F.3d at 741.  District courts faced with motions to compel the disclosure of SSI routinely find that they may not entertain such motions on jurisdictional grounds. *See, e.g., Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 928 F. Supp. 2d 139, 146 (D.D.C. 2013) ("Judicial review of TSA's determination that certain material is nondisclosable 'security sensitive information' is available exclusively in federal circuit courts. . . . Accordingly, district courts may not review TSA orders that designate material as security sensitive information."); *Chowdhury v. Northwest Airlines Corp.*, 226 F.R.D. 608, 614 (N.D. Cal. 2004) ("Congress has expressly provided that an appeal from an order of the TSA pursuant to [49 U.S.C. § 114(r)] (non-disclosure of certain information) lies exclusively with the Court of Appeals); *Shquierat v. U.S. Airways Group, Inc.*, No. 07-cv-1513-ADM-AJB, 2008 WL 4232018, at *2 (D. Minn. Sept. 9, 2008) (unreported decision) ("District Courts are without jurisdiction to entertain challenges to the TSA's decisions regarding disclosure of SSI."); *In re Sept. 11 Litig.*, 236 F.R. D. 164, 172 (S.D.N.Y. 2006) ("I am ever mindful of the important security concerns that have loomed over this litigation from its inception. . . .I have no jurisdiction to review TSA's final orders [regarding SSI]").

TSA has issued a Final Order that applies to information sought in this motion.  DEX 7 (TSA Final Order on Sensitive Security Information, Part III–IV).  Plaintiffs object to the

---

[6] Section 46110 refers to TSA final orders issued pursuant to "subsection (l) or (s) of section 114," but subsection (s) of section 114 was later re-designated as subsection (r). See Consolidated Appropriations Act, 2008, Pub. L. No. 110-161, Div. E, § 568(a), 121 Stat. 1844, 2092 (Dec. 26, 2007).

designation of information they seek as SSI, but this Court lacks jurisdiction to entertain that

argument.[7]  Because Congress has provided exclusive jurisdiction in the courts of appeal over

challenges to TSA's final orders on SSI, this court lacks jurisdiction to review the TSA Final Order

of April 23, 2018.  In any event, TSA's Final Order is proper and covers SSI information Plaintiffs

seek in this motion, as described in the argument below.

## ARGUMENT

Plaintiffs' motion should be denied, for numerous reasons.  As a threshold matter, some of

the information is duplicative and overlapping with the information they are seeking in their first

---

[7] Plaintiffs' motion only challenges the *designation* of SSI, it does not request *access* to SSI under Section 525(d) of the Department of Homeland Security Appropriations Act, Pub. L. No. 109-295, § 525(d), 120 Stat. 1355, 1381-82 (Oct. 4, 2006).  Plaintiffs are not authorized, at this juncture, to receive and review the SSI at issue, because they have not requested access under Section 525(d), despite repeated reminders to do so. *See also* Dkt. No. 65, at 11 (Defs.' Opp'n to Motion to Compel, describing SSI process); Dkt. No. 56, at 9-10 (Defs' Mot. for Protective Order, describing SSI process).  Under that section, persons may seek access to SSI in the context of civil litigation in federal district court where they show "substantial need of relevant SSI in the preparation of the party's case" and "that the party is unable without undue hardship to obtain the substantial equivalent of the information by other means." *Id.*  Once the party has made such a showing, that party may be designated as a "covered person" to access SSI under the TSA regulations only if the presiding "judge enters an order that protects the SSI from unauthorized or unnecessary disclosure and specifies the terms and conditions of access," unless TSA determines after a background check or due to the sensitivity of the information that "such access to the information for the proceeding presents a risk of harm to the nation." *Id.*

Despite repeated reminders over the course of months about how to request SSI access in accordance with Section 525(d), Plaintiffs have failed to even identify which of Plaintiffs' attorneys would like access, let alone make the required showings of substantial need and undue hardship. *See* DEX 8 (Dec. 29, 2017 email from A. Powell to G. Abbas, describing the process to request SSI under § 525(d)); DEX 9 (Jan. 8, 2018 email exchange between A. Powell and G. Abbas, in which government counsel again described the steps necessary to initiate the clearance process); DEX 10 (Jan. 24-25, 2018 email exchange in which government counsel noted Defendants had not received a response; Plaintiffs' counsel responded without providing any of the necessary information; and government counsel again reiterated the instructions to request access); DEX 11 (Apr. 2, 2018 email from C. Healy to G. Abbas, offering to send individual instructions if Plaintiffs could simply identify which of Plaintiffs' counsel were seeking access—which inquiry went unanswered).  In a conversation on April 26, 2018, Plaintiffs' counsel confirmed that they had no intention of seeking access to SSI under Section 525(d) for information at issue in this motion to compel.

motion to compel, which is presently pending before the District Judge.  Further, much of the

information sought is protected as Sensitive Security Information, a determination that this Court

lacks jurisdiction to review.   The remaining information sought by this motion is untimely, vague,

irrelevant, duplicative, burdensome, outside the scope of the Rule 30(b)(6) questioning granted by

this Court, and/or validly subject to the law enforcement privilege.  Defendants have withheld

detailed and comprehensive information on topics that, if disclosed, would permit circumvention of

crucial law enforcement and counterterrorism measures.  As described in the declarations of TSC

Deputy Director Timothy P. Groh, DEX 3-4, Assistant FBI Director Michael C. McGarrity, DEX

5, and CBP Executive Director for Operations Randy Howe, DEX 6, information in Plaintiffs'

motion is properly subject to the law enforcement privilege.

## I.        Some of the Information Which Plaintiffs Move to Compel is Duplicative of Their First Motion to Compel, Pending before the District Court.

As Plaintiffs themselves admit, there is significant "overlap[]" between this motion and their

first motion to compel, which is concurrently pending before Judge Trenga.  Pls.' 2d Mot.at 1.  Of

particular note, although the 2015 WLG was prominent among the documents that Plaintiffs sought

to compel in their first motion, Plaintiffs attempt to take a second bite at this same apple—albeit

before a different judge—by moving here to compel answers to certain "substantive [deposition]

questions regarding the 2015 [WLG], or in the alternative," the production of the 2015 WLG itself.

Pls.' 2d Mot. at 7.  Plaintiffs have *already* moved to compel this document—which necessarily

includes all of the information contained within it (including, for example, detailed information

about nomination and placement, application of the inclusion standards, the Selectee List inclusion

standards, the exceptions to the reasonable suspicion standard and other information).  *See* Dkt. No.

139.  And Defendants have already opposed Plaintiffs' First Motion to Compel, explaining, *inter alia*,

that this aspect of that motion is untimely, and the information sought is protected by the law

enforcement privilege and is SSI.  *See* Dkt. No. 178.  All of these issues are pending, in the first

instance, before Judge Trenga, and should not be decided concurrently (and potentially inconsistently) here.

Further, Plaintiffs' attempt to camouflage their double-dipping by purporting to distinguish between the 2015 WLG itself on the one hand, and "[p]laintiffs' substantive questions" about the contents of that document, on the other, is wholly illusory. Pls.' 2d Mot. at 7.  The effect of this request is identical, and involves the same privilege assertion—the 2015 WLG, and its contents, are protected by the law enforcement privilege. *See* 1st Groh Decl.; 2d Groh Decl. ¶¶ 19-23.  Aspects of the current motion that fall within this umbrella—and thus should be left to the district judge's resolution—include the following specific requests, all of which are already briefed in that other motion:

Criteria for the Selectee list and how those standards have changed over time.  Pls.' 2d Mot. at 9.  Aside from being duplicative of the first motion to compel and untimely, the information is protected by the law enforcement privilege.  The Groh Declaration establishes that disclosure of this information would provide valuable information to adversaries and undermine law enforcement interests.  2d Groh Decl. ¶ 17-18.  This information is also SSI, *see* DEX 7 (Final Order) at Part IV, and this court does not have jurisdiction to review TSA's designation of this information as SSI. *See supra.*

"[W]hether relative[s] or associational relationships could form the basis for nomination to the TSDB."  Pl's 2d Mot. at 9-10.  Again duplicative of the first motion to compel to the extent the Court reaches the merits of this request, Defendants have already provided Plaintiffs with the "reasonable suspicion" standard that governs nominations to the TSDB. 2d Groh Decl. ¶ 8; DEX 16 (Overview Document); DeSarno Tr. 239.  As explained in the declaration and at multiple depositions, the reasonable suspicion standard is based on the totality of the circumstances and no single factor is necessarily determinative.  2d Groh Decl. ¶ 8.  Moreover, more granular detail about

how that standard operates is not relevant to the procedural due process claim—it is not necessary or useful to evaluate the adequacy of the redress process available to persons who believe they are in the TSDB due to their alleged screening experiences. *See generally* Fed. R. Civ. P. 26(b)(1) (limiting discoverable evidence to what is "relevant   . . . and proportional to the needs of the case"). Plaintiffs asked about this information during written discovery and did not move to compel any responses from Defendants for months after receiving Defendants' objections. *See* TSC RFA 20, 21; DHS RFA 19, 20.  Furthermore, this information is protected by the law enforcement privilege.  A comprehensive, detailed discussion of hypothetical circumstances is likely impossibly burdensome, speculative, and would certainly entail disclosure of information protected by the privilege.  2d Groh Decl. ¶ 25.

"[W]hether U.S. persons can be added to the [TSDB] absent an investigative interest."  Pls.' 2d Mot. at 10.  Again this request is duplicative of the first motion to compel but to the extent the Court reaches the merits of this request, Defendants have already provided Plaintiffs with the "reasonable suspicion" standard that governs nominations to the TSDB, and FBI provided a partial answer to this question at the deposition, confirming that there are in fact circumstances in which someone might be in the TSDB and not under investigation.  DeSarno Tr. 265-70, 276.  Moreover, this information is not relevant to the adequacy of the redress process available to persons who believe they are in the TSDB.  Plaintiffs already attempted to obtain this information during written discovery, and did not move to compel responses for months after receiving Defendants' objections. *See*, *e.g.*, DEX 12 (TSC RFAs 12, 13, 18, 22, 23, 24); DEX 13 (DHS TRP RFAs 21, 22, 23). Furthermore, this information is protected by the law enforcement privilege.  Additional, sensitive information about FBI investigations is wholly unrelated to Plaintiffs' claims, but would provide valuable information to adversaries attempting to learn more about ongoing counterterrorism investigations.  2d Groh Decl. ¶ 26.

Whether there are minor children in the TSDB.  Pls.' 2d Mot. at 10-11.  Again duplicative of

the first motion to compel and clearly untimely in the face of objections to the first requests for

admission, the information sought is also irrelevant to the redress process available to persons who

believe themselves to be on the TSDB.  DEX 12, 13 (RFA Responses).  Defendants have already

provided Plaintiffs with the reasonable suspicion standard that governs nominations to the TSDB.

Furthermore, TSA determined that releasing this information would be detrimental to the security of

transportation because it could provide terrorists and others with useful demographic information to

determine populations for recruiting purposes.  *See* DEX 7 (Final Order) Part IV.  This Court also

does not have jurisdiction to review TSA's SSI determination. Finally, this information is also

protected by the law enforcement privilege because its disclosure would provide valuable

information to adversaries seeking to circumvent U.S. counterterrorism measures.  2d Groh Decl. ¶

37.

Why the "exception to the 'reasonable suspicion' standard exists" and "how it is applied."

Pls.' 2d Mot at 11.  Again duplicative of the first motion to compel, Defendants have provided

testimony about the exception to the "reasonable suspicion" standard, including that it is used only

for certain, limited screening functions conducted by the Department of Homeland Security

("DHS") and the Department of State.  Individuals placed in the TSDB pursuant to these

exceptions are not considered "known or suspected terrorists" and are not screened as such.  A U.S.

person only in the TSDB pursuant to an exception would not receive additional screening at airports

on this basis.  2d Groh Decl. ¶ 24; DEX 17 (Groh Tr.) 65, 77; DEX 18 (Howe Tr.) 123-29.  This is

consistent with CBP testimony that there was an exception to the reasonable suspicion standard

"with regards to immigration matters," and acknowledged that the exception only applies to "aliens"

in the CBP context.  Howe Tr. at 123-25.  Plaintiffs are all U.S. citizens, and therefore the exception

cannot apply to them in this context.  As set forth in the Howe and Groh declarations, the use of

these records is law enforcement sensitive, and disclosure would jeopardize law enforcement interests.  Howe Decl. ¶ 28; *see also* 2d Groh Decl. ¶ 24.

The "DOJ Memo from Deputy Attorney General to Heads of Department Components Re: Department of Justice Protocol Regarding Terrorist Watchlist Nominations". TSC D0044.  Again, Plaintiffs already moved to compel this document in their first motion to compel before the District Judge and Defendants have argued that is protected by the law enforcement privilege. *See* Dkt. No. 139.[8]  It is moreover unrelated and unnecessary to Plaintiffs' claims.

## II.     Information Which Plaintiffs Move to Compel is Untimely, Irrelevant, Duplicative, Burdensome, Outside the Scope of this Court's Rule 30(b)(6) Protective Orders, and Privileged.

### A.     Significant Portions of this Motion are Untimely, or Fail for Other Threshold Reasons.

Additionally, many other of Plaintiffs' requests—primarily, but not exclusively, to compel the production of certain documents—fail for a variety of threshold grounds, including: (1) Plaintiffs *never served* Defendants with *any RFP* to which the document in question even might have been responsive in the first place—and thus Defendants are under no obligation under the applicable federal discovery rules to run any search, much less produce any document; (2) Plaintiffs never challenged the scope of the searches that Defendants agreed to conduct in response to the RFPs they did serve; (3) Plaintiffs failed to timely move to compel documents that Defendants included on privilege logs produced to Plaintiffs months ago; and/or (4) Plaintiffs failed to discuss the document in question during the meet and confer with Defendants prior to filing this motion.

Specifically, the Court should deny Plaintiffs' motion on one or more of these grounds as to (1) the 2015 Watchlisting Guidance ("2015 WLG"); (2) previous versions of the WLG; (3) Chapter 11 of the Counterterrorism Policy Guide; 4) Documents governing NCIC and its dissemination; and

---

[8] This document is *not* a prior version of the Guidance and relates primarily to nominations.

(4) certain deposition questions that are substantively equivalent to written discovery responses that Plaintiffs could have, but failed to, challenge at an earlier point in time.

First, insofar as the instant motion again seeks to compel the production of the 2015 WLG, this document appeared on Defendants' privilege logs months ago.  *See* DEX 14.  Plaintiffs' request was untimely when they moved for it in their initial Motion to Compel, *see* Dkt. No. 139, and it is untimely now.  In any event, the matter is before the District Judge.

Likewise, Defendants listed the Counterterrorism Policy Guide on the privilege log they produced to Plaintiffs on November 15, 2017, DEX 14 (Document TSCA00234), and Plaintiffs did not attempt to confer with Defendants regarding this document during the written discovery period (except insofar as they threatened to move to compel every single document on Defendants' privilege logs, *en masse*[9]), nor did they move to compel the production of this document until now.

Similarly, Plaintiffs have no basis to move to compel prior iterations of the WLG at this juncture.  Defendants timely objected to searching for previous versions of the WLG during discovery (or any previous policy document), specifically stating their objection to "any document request that seeks the disclosure of policies and procedures not currently in effect," as "the complaint seeks only injunctive relief and past policies and procedures are not relevant to determining whether the process currently available is adequate"—and plainly informing Plaintiff that they stood on this and other objections with respect to RFPs that might have potentially captured earlier policy documents or versions of the WLG.  *See* DEXs 24, 25 (objecting to "Defendants further object to any document request that seeks the disclosure of policies and procedures not currently in effect;").  The Court should not excuse Plaintiffs' failure to raise any objection to these responses until the filing of the instant motion.  Furthermore, Plaintiffs did not move to compel these documents in their first "omnibus" motion to compel, nor did they include

---

[9] Plaintiffs' First Motion to Compel essentially takes that approach.

these documents in their meet and confer with Defendants prior to filing this motion.  *See* DEX 1 (meet and confer exhibit).[10]  The prior iterations of the WLG are also not relevant to Plaintiffs' claims for prospective relief.  Although the Court found that some discussion of the evolution of watchlisting over time could be relevant, the court specifically excluded questions about the 2013 WLG as a topic, reasoning that a deposition was not an "appropriate" way to get such information. DEX 23 (Feb. 16 Hrng. Tr. at 22).

Plaintiffs have also moved to compel documents that govern the NCIC and its dissemination, including unspecified NCIC policy documents.  Although Plaintiffs had ample information about the NCIC and how it functions, *see infra* Part I.B.ii, Plaintiffs *never sought* any documents governing NCIC and its dissemination during the discovery period.  There is no federal rule or legal principle that allows them to "compel" documents they never requested, in the first instance.

Fourth, Plaintiffs have also moved for the updated Domestic Investigations and Operations Guidelines ("DIOG") manual, which governs FBI domestic investigations generally but does not specifically relate to watchlisting.  But the DIOG was never sought in discovery and is not even arguably responsive to any of Plaintiffs' vague and burdensome document requests, and certainly does not fall within the scope of documents Defendants agreed to search for and process.  *See* DEXs 24, 25.  The Court should not permit Plaintiff to use this motion as backdoor method by which to issue a wholly new RFP on Defendants, entirely out of time—and should, accordingly, reject Plaintiffs' motion as to the DIOG on this threshold ground.

---

[10] The Second Groh Declaration establishes that these documents are also subject to the law enforcement privilege, for essentially the same reasons that the 2015 WLG is subject to the privilege. Prior versions of the WLG would provide similar insight into the details of the watchlisting enterprise and would provide adversaries with a clear picture of how the U.S. terrorism watchlisting architecture has progressed, and allow them to deduce the strengths and weaknesses in the process for exploitation.  2d Groh Decl. ¶¶ 19-23.

B.     **The Remainder of the Information Plaintiffs Seek is Irrelevant, Duplicative, Mooted by Information Provided by Defendants, Outside the Scope of Proper 30(b)(6) Questioning Under this Court's Protective Order, and/or Privileged.**

Other information Plaintiffs seek is duplicative of previous requests, has been mooted by information provided to Plaintiffs, is outside the scope of the Rule 30(b)(6) protective orders of this Court, or is protected by law enforcement or constitutes SSI.  Addressing the remaining information Plaintiffs seek (not already addressed above), Defendants oppose Plaintiffs' motion to compel, as follows:

i.     **Information Regarding the Watchlisting Advisory Council:**

General Information about the WLAC.  Plaintiffs seek to compel information, documents, and another 30(b)(6) deposition, related to the Watchlisting Advisory Council ("WLAC"), including:

- More information on the Watchlisting Advisory Council, including "how the FBI relates to or participates on the Watchlisting Advisory Council" and "how that Council relates to either the National Security Council or its participant agencies."  Pls.' 2d Mot. at 3.
- What the Watchlisting Advisory Council is and how it operates.  Pls.' 2d Mot. at 4.

Plaintiffs claim that prior to the 30(b)(6) depositions they did not know that the WLAC existed.  P Pls.' 2d Mot. at 2.[11]  As an initial matter, if Plaintiffs had timely noticed their five Rule 30(b)(6) depositions—instead waiting until literally the very last possible moment in the discovery period to take four of them—they would have elicited the information they now possess about the WLAC at a much earlier point in the discovery process, thus enabling them to timely seek the additional WLAC-discovery that they now request dramatically out of time.  Plaintiffs have no one but themselves to blame for their decision to defer their depositions until the very final hours of

---

[11] It should not be surprising that there is an interagency process for addressing interagency concerns related to the Terrorist Screening Database.   The TSDB is managed by an interagency center (TSC) and used by multiple agencies. *See generally* https://www.fbi.gov/about/leadership-and-structure/national-security-branch/tsc; *see also* DEX 16 (Overview Document).   In any event, Plaintiffs' procedural due process claim does not require an in-depth (or even a surface-level) understanding of the interagency advisory committee, only an understanding of the actual placement, removal and redress policies.

discovery, and their lack of even minimal diligence should not be rewarded with the wholly unwarranted leniency they now seek.

Moreover, Plaintiffs have by now conducted four depositions, each of which went on at length about the WLAC. *See, e.g.*, DEX 17 (Groh Tr.) 15-19, 21-38, 44-51, 68, 72-74, 89, 113-116, 220-230, 326, 329, 353, 386; DEX 19 (DeSarno Tr.) 7-48, 56, 65-66, 75, 241, 243, 384; Howe Tr. 328-31; DEX 20 (Froemling Tr.) 75-76, 125-27, 342-44, 365-66. Plaintiffs claim that deponents could not answer all questions about the WLAC. But 30(b)(6) deponents are not required to have encyclopedic knowledge about irrelevant minutiae like how meeting agendas are written. *Cf. Runnels v. Norcold, Itc.*, No. 1:16-CV-713, 2017 WL 3026915, at *1 (E.D. Va. Mar. 30, 2017). All four deponents testified generally about the WLAC, its functions, and their agency's role. That is all that could be required, and any further information sought is not relevant to the sole remaining claim.

Plaintiffs inaccurately describe the WLAC as the "highest authority of the federal government's watchlisting system." It is not. It is an interagency meeting, an advisory group of interested agencies; it coordinates policy discussions and gives advice. It "does not have the authority to approve changes to the Watchlisting Guidance or take any other action that would create official federal policy in the area of watchlisting." 2d Groh Decl. ¶ 43. Instead, it is a "predecisional body" that "solicits input from member agencies", drafts proposed language through a consensus driven process, and recommends modifications to the WLG. *Id.* It operates entirely by consensus and reports to the National Security Council. *Id.*; *see also, e.g.*, Groh Tr. at 28 (testifying that the WLAC "creates a forum for interagency discussion about how the watch listing and screening enterprise functions amongst the different agencies," and it operates by unanimous consent.).

The wording of these requests cover information Plaintiffs already have, including that the WLAC reports to the NSC, that it is not an agency, that it meets quarterly, that it prepares

statements/summaries of conclusions after such meetings, and what general information is included in those statements of conclusions ("SOCs").  Pls.' Second MTC at 2-4.  Defendants have also provided information responsive to this request in the Groh Declaration. *See* 2d Groh Decl., Part D.

Origins of the WLAC.  Plaintiffs also seek information about the origins of the WLAC, including:

- When and how the Watchlisting Advisory Council came into existence.  Pls.' 2d Mot. at 4-5.
- The charter document establishing the Watchlisting Advisory Council.  *Id.* at 6.

The Second Groh Declaration describes how the WLAC came into existence and information about its history.  *See* 2d Groh Decl. ¶ 42.  Document requests are untimely at this point and in any event, not responsive to any prior request and do not fall within the scope of searches Defendants agreed to conduct.  *See* DEXs 24, 25.  Groh further explains that the charter document Plaintiffs seek (for a predecessor interagency body called the TSC Policy Board) is not operative, because the WLAC never adopted the charter or developed its own.  *Id.*  Thus, aside from being untimely, this document is not relevant.

The number of agencies and names of the members of the Watchlisting Advisory Council. Pls.' 2d Mot. at 5.  On further review, Defendants have provided additional information on this point.  The Groh Declaration explains that WLAC is an "interagency body cochaired by TSC and [NCTC]", comprised of representatives from multiple agencies, including DHS, DOJ, the State Department, DOD and CIA.  *See* 2d Groh Decl. ¶ 41.  No further level of detail has any arguable bearing on Plaintiffs' claims.

FBI's definition of "known or suspected terrorist," and the difference between that definition and the definition of other agencies.  Pls.' 2d Mot. at 5.  Plaintiffs cite to a portion of the transcript from the FBI deposition in which Plaintiffs' counsel asked a series of convoluted questions that necessitated a clarification of testimony provided.  After the portion of the transcript

Plaintiffs cite, FBI deponent DeSarno quickly clarified that, in fact, there is a standard definition of "known or suspected terrorist" that is shared by the member agencies of the Watchlisting Advisory Council for the purposes of watchlisting. *See* DeSarno Tr. at 259.  His description of the reasonable suspicion standard is consistent with that in the overview document, the Groh declaration, and otherwise publicly available. *See* 2d Groh Decl. ¶ 8.  Plaintiffs cannot generate additional discovery by selectively quoting a portion of the transcript that was clarified minutes later.

> Copies of the Statements/ SOCs of the Watchlisting Advisory Council for the past 5 years.
Pls.' 2d Mot. at 5.  As an initial but dispositive matter, Plaintiffs *never sought* the WLAC's SOCS during the discovery period—and there is no federal rule of discovery applicable legal principle that even arguably permits Plaintiffs to "compel" documents *they never sought through discovery in the first place*.  Even setting this insurmountable defect aside, *arguendo*, this request is also vastly overbroad and entirely irrelevant to plaintiffs' procedural due process claim.  SOCs cover a wide variety of topics, and although they have not been collected and processed in full, many SOCs include law enforcement privileged or classified information about watchlisting. 2d Groh Decl. ¶ 44.  They are also properly protected by privilege, because revealing their contents would reflect the internal deliberative decision-making process of the WLAC, and disclosure would undermine the WLAC's ability to carry out its mission as a forum for inter-agency discussion.

> A further Rule 30(b)(6) deposition of the National Counter-Terrorism Center (NCTC).  Pls.' 2d Mot. at 5.  Plaintiffs are not entitled to a new deposition of a Defendant from whom they sought no discovery at all.  The Amended Complaint contains extensive allegations about NCTC, and Plaintiffs are plainly aware that NCTC is a part of the watchlisting process.   There is no excuse for not seeking a deposition sooner, and it is untimely now.  Moreover, Plaintiffs already had an opportunity to ask questions about the Watchlisting Advisory Council at the 30(b)(6) depositions,

and asked extensive questions about the WLAC at each of four depositions, including a deposition

of TSC (which also co-chairs WLAC).

### ii.     Information Sought From FBI/TSC:

Plaintiffs seek a laundry list of additional information from FBI and TSC.

A non-redacted version of the new Domestic Investigations and Operations Guidelines

(DIOG) manual.  Pls.' 2d Mot. at 11.  Plaintiffs move to compel a full, unredacted version of the

DIOG—which is hundreds of pages long and governs all aspects of domestic investigations and

operations, including FBI administrative processes and personnel functions.  As with numerous

other documents at issue in this motion, Plaintiffs never sought this document in the first instance,

and have no basis to "compel" it now.  *See supra* Part II.A.  Moreover, contrary to Plaintiffs'

allegations, the DIOG does not even address watchlisting—and thus, is wholly irrelevant.  The FBI

deponent relied on it for a general description of how the FBI conducts its investigations, DeSarno

Tr. 194-96, 216-17, but this topic is not even remotely relevant to Plaintiffs' claims.  Moreover,

although portions of the current (2016) DIOG are being processed for release to the public, a

redacted version of the 2013 DIOG is currently available publicly and Plaintiffs still have not

identified any aspect of it that is relevant to their sole remaining claim.  In any event, the DIOG

contains information protected by the law enforcement privilege.  For example, disclosure of the

DIOG's factual scenarios regarding the opening of an Assessment would assist criminals, terrorists

and foreign adversaries in gauging whether specific conduct in which they have engaged, or plan to

engage, would cause the FBI to focus its attention on them.  This, in turn, could assist them in

planning operations and compromise ongoing investigations.  McGarrity Decl. ¶ 8.

"[A]n unclassified summary or a public redacted version of Chapter 11 of the *Counterterrorism*

*Program Guide*."  Pls.' 2d Mot. at 12.  Again, this request is untimely and not properly presented, *see*

*supra* Part II.A.  This chapter contains classified information (not at issue in the motion), and

information that is protected by the law enforcement privilege.  It includes information about

watchlisting nomination and inclusion, including examples of the application of the criteria, the

Selectee List inclusion standards, handling codes and an explanation of the relationship between

watchlisting and ongoing investigations.  Disclosure of this type of sensitive information could

reasonably be expected to risk circumvention of the law and to cause harm to law enforcement and

counterterrorism investigations.  McGarrity Decl., Part B.

     Documents and statistics regarding the NCIC.  Plaintiffs seek a number of data points

regarding the NCIC, including:

- The policy document that governs National Crime Information Center ("NCIC") dissemination to state and local authorities. Pls.' 2d Mot. at 13.
- "[A]ny policy documents governing NCIC dissemination of TSDB information." *Id.*
- A more exact estimate of the number of authorized individual users of the NCIC. *Id.*[12]
- The "number of NCIC queries run by [individual] NCIC users in the aggregate." *Id.*

Defendants have provided written discovery about the NCIC and how it functions.  *See*

DEXs 21, 22 (FBI and TSC interrogatory responses, providing a detailed description of

dissemination of subsets of TSDB information through NCIC).  Prior to the FBI deposition, the

Court instructed that "some limited testimony" about NCIC would be appropriate, and that

Plaintiffs should be able to ask questions regarding a "general understanding -- a general statement

as to who generally has access to that database, state police authorities, probation officers, you

know, people like that.  I mean, just something in general as how that goes would be appropriate."

Hearing Tr. at 27.  The Court opined, however, that he did not expect such testimony to include "a

granular level . . . , a general number or anything like that."  *Id.*  And DAD DeSarno in fact provided

---

[12] In the portion of the brief about NCIC, Plaintiffs incorrectly state that 18,000 entities have "access to the TSDB."  That may be a typographical error, but in any event, it is inaccurate.  Defendants have explained (via interrogatory response and at depositions) that there are over 18,000 entities with access to NCIC, not to the TSDB.  *See* DEX 22 (FBI Int. 12); DeSarno Tr. 102.  Defendants have further explained that TSC exports subsets of information from the TSDB to NCIC.  DEX 21 (TSC Int. 2, 3).  But only personnel assigned to TSC have actual direct access to the TSDB.

extensive, detailed testimony on this subject, well beyond what the court held was relevant.  *See, e.g.,*

DeSarno Tr. 87-103, 113-19, 122-23, 128-30, 137-59, 363.  In addition, after meeting and conferring,

Defendants sent Plaintiffs links to publicly available documents that discuss NCIC dissemination for

state and local authorities.  *See* National Crime Information Center, *available at*

https://www.fbi.gov/services/cjis/ncic; National Crime Information Center Audit, *available at*

https://www.fbi.gov/file-repository/ncic-audit.pdf/view.

Given the extensive information available and the court's instructions on the proper scope

of the deposition, further information about NCIC dissemination to state and local authorities is not

relevant and is untimely.  In particular, Plaintiffs have not provided any reason they need an exact

estimate of the number of individual users of NCIC—they claim they need this information to

demonstrate the "scope of dissemination," Pl's. 2d Mot. at 14, but DeSarno testified that there are

approximately 18,000 law enforcement entities with access to NCIC, De Sarno Tr. 95-96, and it is

unclear why this estimate does not satisfy this need.  With over 18,000 individual law enforcement

entities at issue, providing an exact number would be unduly burdensome.  *Id.* 117-18.

Various information about FBI handling codes.  Plaintiffs also seek a number of data points

about FBI handling codes, including:

- Information about FBI "handling codes" including the designation of a TSDB individual as "armed and dangerous." *Id.*
- The "nature of or details surrounding FBI handling codes," including "how many codes exist, any handling instructions that accompany the handling codes, or the contents of any electronic alerts." *Id.* at 15.
- Whether FBI shares NCIC handling codes with CBP.  *Id.* at 16.
- How handling codes are disseminated, and "how those handling codes operate to influence particular responses (i.e. handcuffing, drawing guns, calling in backup, setting off sirens or alarms, etc.) by law enforcement officers."  *Id.*

As an initial matter, these requests substantially overlap with the first motion to compel,

which seeks specific documents about FBI handling codes, is currently pending in front of District

Judge Trenga.  These particular requests at issue in the second motion to compel are vague and

irrelevant to Plaintiffs' claim because this information does not pertain to the redress available to

Plaintiffs or their deprivation of liberty.  Plaintiffs have no need for information about internal law

enforcement handling codes, much less the sort of granular information sought here.  And this

information is outside the scope of the eight limited topics granted in this Court's March protective

order for the TSC deposition. *See* Procedural Background, *supra* at n.2.

Finally, this information is also protected by law enforcement privilege.  Disclosure of

information pertaining to handling codes would work to the disadvantage of law enforcement and

counterterrorism operations and could reasonably be expected to cause significant harm to national

security.  2d Groh Decl. ¶¶ 29-31; *see also, e.g., Miller v. DOJ*, 872 F. Supp. 2d 12, 29 (D.D.C. 2012)

(permitting agency to withhold under FOIA law enforcement numerical database codes used to

identify information and individuals, as well as codes "relate[d] to procedures concerning the use of

law enforcement resources and databases ..., as well as case program and access codes"); *McRae v.

DOJ*, 869 F. Supp. 2d 151, 169 (D.D.C. 2012) (holding that under FOIA, "codes, case numbers, and

other computer information pertaining to the TECS, NCIC, and databases maintained by the North

Carolina authorities are techniques and procedures for law enforcement investigation"); *Strunk v.

DOJ*, 905 F. Supp. 2d 142 (D.D.C. 2012) (specifically permitting under FOIA the withholding of

certain codes in CBP's TECS database).

<u>Various Information About the Relationship between FBI and CBP.</u>  Plaintiffs seek sensitive

information about the relationship between FBI and CBP, including:

- Whether FBI receives information from CPB secondary inspections, including information from wallets and the content of electronic devices. Pls.' 2d Mot. at 17.
- Whether the FBI is involved in the CBP secondary inspection process "in order to question TSDB listees." *Id.*

These requests are wholly untethered from watchlisting or the remaining claim in this case.

As explained in the McGarrity Declaration, FBI may assist CBP with border inspections or

otherwise become involved at the border for a wide variety of reasons, some unrelated to terrorism,

but FBI otherwise does not generally conduct border inspections.  *See* McGarrity Decl. ¶ 16.  For

example, CBP may request assistance or there may be some overlap with an FBI investigation.

Moreover, CBP may share the results of its inspections consistent with general policies, including a

publicly available policy about electronic devices.  *See* Howe Decl. ¶ 17.   Beyond that general

information, the precise nature of FBI's interest in border crossings is protected by the law

enforcement privilege.  McGarrity Decl. ¶ 16, 2d Groh Decl., Part E.

Information About FBI Informants.  Plaintiffs seek information about FBI informants,

including:

- Whether the TSDB contains informants, or notations than an individual is an informant. Pls.' 2d Mot. at 19.
- How the FBI "uses the TSDB to recruit informants." *Id.*

These requests are vague, irrelevant to procedural due process, and seek information

protected by the law enforcement privilege.  2d Groh Decl. ¶ 27-28.  At the FBI 30(b)(6) deposition,

the deponent answered a question about whether "FBI employees place people in the TSDB for the

purposes of assisting their efforts to recruit those prospective listees as informants" by stating that,

"No, the FBI just places people in the TSDB who meet this published reasonable suspicion

standard."  DeSarno Tr. at 365–66.  DAD DeSarno further described, to the extent possible in a

public setting, how TSDB status might evolve.  DeSarno Tr. 369.  The Second Groh Declaration

also provides that an individual who does not meet the reasonable suspicion standard cannot be

included in the TSDB as a KST.  2d Groh Decl. ¶ 8.  Thus, an individual could not be listed as a

KST, No Fly, or Selectee simply because the FBI wishes to recruit or utilize the individual as an

informant.  Also, investigating case agents do not make determinations about placement in the

TSDB (beyond submitting nominations).  In any event, the techniques and methods employed by

the FBI to recruit and utilize informants clearly falls within the scope of sensitive law enforcement

information, the disclosure of which would be extremely valuable to U.S. adversaries and would

cause harm to law enforcement.

FBI Statistics.  Plaintiffs seek a number of statistics specific to the FBI, including:

- The number of nominations the FBI makes to the TSDB each year. *Id.* at 20.
- The number of nominations the FBI makes to the TSDB which are accepted. *Id.*
- The number of nominations the FBI makes to the TSDB "which are rejected for failure to provide sufficient substantive derogatory information." *Id.*
- The number of arrests of TSDB individuals the FBI has made at the border or points of entry. *Id.*
- The number of individuals who committed an act of terrorism in the U.S. while they were on the TSDB. *Id.*

This information is irrelevant to the procedural due process claim, because it does not

pertain to the Plaintiffs' redress process or deprivation of liberty.  The statistical information sought

has no bearing on the extent of their deprivation or the adequacy of the redress process.  Some of

the information is not tracked by the TSDB (including nominations rejected for failure to provide

substantive derogatory information and the number of arrests at the border) and would be

exceedingly burdensome or impossible to generate.  2d Groh Decl. ¶ 32-33.

Finally, this information is protected by the law enforcement privilege.  The Groh

Declaration establishes that detailed statistics related to nominations and encounters can themselves

reveal information that would be valuable to terrorists, permitting insight into counterterrorism

activity.  Groh Decl. ¶ 32-39.  Additionally, information regarding the number of people meeting

specific criteria in any given category (e.g., US citizens or minors) that are included in the TSDB

could be invaluable to terrorists in selecting operatives that are more likely to avoid detection

because they are less likely to be identified during screening. *Id.* ¶ 37.

The number of times the FBI has disclosed in public court filings in terrorism cases that the

criminal defendant was listed in the TSDB at the time of the incident.  Pls' 2d Mot. at 19.  This

information is irrelevant to the procedural due process claim, because it does not pertain to the

redress process available to plaintiffs or their deprivation of liberty.  Moreover, the FBI did not

testify that such filings readily exist,  DeSarno Tr. 103-04, and the Groh declaration establishes that there is no easy way to determine whether such "public court filings" exist at all.  2d Groh Decl. ¶ 39.  Moreover, to the extent this information could be found in public court filings, defendants are in no better position than plaintiffs to search for and find this information.

### iii.    Information Sought From CBP:

Plaintiffs also seek a laundry list of information specifically from CBP, even though, prior to noticing a deposition at the very end of discovery, they had sought almost no discovery from CBP in the preceding six months of discovery (except for Plaintiffs' travel records). Thus, for thi threshold reason, the request is untimely.

More information on CBP "handling codes," including "armed and dangerous." Pls.' 2d Mot. at 14.  Defendants provided information about handling codes during the depositions, in particular that CBP is not responsible for these notations.  While CBP acknowledged that an "armed and dangerous" designation could be recorded in TECS records, *see* Howe Tr. at 132-3, it does not have a policy which dictates that all individuals who are potential or confirmed matches to the TSDB be designated as "armed and dangerous."  Howe Decl. ¶ 12.  It is unclear what more Plaintiffs seek—and to the extent more information would require detailed information about CBP's specific techniques and procedures, Defendants have properly asserted the law enforcement privilege because disclosure of that information would allow known or suspected terrorists to deduce potential vulnerabilities in CBP's inspection efforts and reverse-engineer effective countermeasures to thwart inspection efforts.  Howe Decl. ¶ 14; 2d Groh Decl. ¶ 48.

"[W]hether CBP officers ever draw weapons or handcuff TSDB listees based solely on the fact that they are listees." Pls.' 2d Mot. at 16.  CBP has provided the information plaintiffs appear to seek—when asked "Is an individual's presence on the TSDB alone a reason that the CBP might handcuff them?" the deponent answered "No."  *See* Howe Tr. at 242.  When asked if officers were

instructed that drawing weapons was an appropriate response to a match to the TSDB, the

deponent responded that officers are required to articulate reasons for drawing weapons based on

the totality of circumstances. *Id.* at 250-51. The Howe declaration clarifies that "CBP does not have

any policies that require its officials to draw a weapon or use handcuffs when encountering a traveler

who is a potential or confirmed match to the TSDB." Howe Decl. ¶ 12. It is unclear, what, if any

further information Plaintiffs are seeking to compel, and to the extent providing that information

would require detailed information about CBP's specific techniques and procedures, Defendants

have properly asserted privilege over that information, as discussed above.

The procedures applied to TSDB listees during CBP secondary inspection. Pls.' 2d Mot. at

16. This request is overbroad and vague—plaintiffs do not clarify what kind of information they

seek, and this request could apply to a wide array of protocols or procedures. Specific information

about techniques and procedures that are employed by CBP officials who are potential or confirmed

matches to the TSDB are protected by the law enforcement privilege, because making such

information public would allow adversaries to circumvent those techniques and procedures, as

discussed in the Howe Declaration. Howe Decl. ¶ 14.

Information about the relationship between CBP and FBI. Plaintiffs seek several items in

this category, including:

- Whether CBP "provides information [] learned from an individual's wallet to [] FBI." Pls.' 2d Mot. at 17.
- Whether CBP shares the information downloaded from electronic devices to FBI. Pls.' 2d Mot at 17.
- "[W]hether CBP involves the FBI in the secondary inspection process in order to question TSDB listees." Pls.' 2d Mot. at 17.

As explained above, Defendants have provided information about the presence of the FBI at

the borders, including at depositions and in the instant declarations. *See* Howe Decl. ¶¶ 18-19; 2d

Groh Decl. ¶¶ 46-48, McGarrity Decl. ¶ 16. For example, the CBP deponent answered questions on

this topic at the deposition. When asked "Does the FBI ever participate in the secondary inspection

of an individual listed in the TSDB?", the deponent testified that CBP conducts border inspections and makes the determination of whether to conduct secondary inspection screening, but that FBI may be present, and if so might ask questions during secondary inspection. Howe Tr. at 310-11.  Mr. Howe, the CBP deponent, reiterates in his declaration that a person from an agency providing assistance to CBP could "possibly ask the traveler a question" during secondary inspection.  Howe Decl. ¶ 18; *see also* McGarrity Decl. ¶ 16 (explaining that FBI may assist CBP with border inspections or otherwise become involved at the border for a wide variety of reasons, and providing examples).

CBP further testified to the fact that "if there is a law enforcement need," the agency may create documentation of the wallets of TSDB listees and travel companions.  *See* Howe Tr. at 270; 2d Groh Decl. ¶ 46.  CBP further provided information about the searches of electronic devices. This information was provided to plaintiffs in the Howe Declaration and is available publicly in a public guidance document, CBP Directive No. 3340-049A.  *See* Howe Decl. ¶ 17; 2d Groh Decl. ¶ 47.  That Directive provides guidance and standard operating procedures for searching, reviewing, retaining, and sharing information contained in electronic devices subject to inbound and outbound border searches by CBP; it includes information defining the circumstances in which CBP may share information found in searches of electronic devices with other agencies.  Howe Decl. ¶¶ 16-19.

This CBP information is also also irrelevant to the procedural due process claim, because the internal information sharing between federal agencies for law enforcement purposes does not affect their liberty interests or the redress process.  Finally, additional information about coordination between FBI and CBP is protected by the law enforcement privilege, because disclosure could affect other agencies' law enforcement operations or their ability to effectively carry out their respective missions.  Howe Decl. ¶ 19; 2d Groh Decl. ¶ 46-48; McGarrity Decl. ¶ 16.

"Additional information" regarding the CBP's initial and secondary inspection procedures that apply to TSDB listees, including the use of weapons and handcuffs, as well as the personal

information it collects and shares with the FBI or TSC.  Pls.' 2d Mot. at 17.  This request is vague and coextensive with other requests discussed above.  The CBP Deponent provided information on this topic at the deposition.  *See* Howe Tr. at 242, 250-51.  This information is also protected by the law enforcement privilege, inasmuch as it requests specific techniques and procedures used by CBP.  Howe Decl. ¶¶ 12, 14.

Whether "automated high-risk designations have ever lead [sic] to the CBP nominating individuals to the TSDB."  Pls.' 2d Mot. at 18.  The Plaintiffs did not ask this question at deposition—instead, they asked a confusingly-worded similar question, specifically, "If an individual is listed in TSDB, will they also be given a high risk assessment by ATS?" to which the deponent replied that he did not know.  *See* Howe Tr. at 180–81.  Defendants have provided Plaintiffs with the reasonable suspicion standard which governs the placement of individuals on the TSDB.  The Howe Declaration provides further information about the ATS system—in particular, the declaration notes that "[d]uring inspections resulting from CBP's use of ATS, CBP officials may identify information that may be considered by CBP in assessing whether to nominate an individual for inclusion to the TSDB." *See* Howe Decl. ¶ 23.  However, "the identification by ATS of someone for additional inspection does not in and of itself suffice to constitute an adequate basis for a nomination to the TSDB."  Howe Decl. ¶ 24.

Whether CBP has "ever asked TSDB listees to become informants."  Pls.' 2d Mot. at 19.  This information is entirely irrelevant to the procedural due process claim in this case because it does not pertain to the Plaintiffs deprivation of liberty or the redress procedures available to Plaintiffs.  This information is also properly law enforcement privileged—disclosing when, if ever, CBP potentially recruits informants could compromise ongoing counterterrorism investigations, and could cause terrorists to change their behavior to evade detection.  Howe Decl. ¶ 15.  This information is therefore properly law enforcement privileged.

"[A]verage number of daily encounters CBP has with individuals on the TSDB."  Pls.' 2d

Mot. at 20.  CBP has provided testimony on this subject, stating that there were 2,554 encounters in

2017—or around seven encounters daily.  *See* Howe Tr. at 328 (Q: "Were all of those 2,554

encounters with CBP to your knowledge?" A: "To my knowledge, yes").  This information is also

available publicly, and was reiterated in the Howe Declaration. *See* Howe Decl. ¶ 26; s*ee also, e.g.*, U.S.

DOJ, Office of Public Affairs, (Jan. 16, 2018) Press Release 18-38, *available at*

https://www.justice.gov/opa/pr/doj-dhs-report-three-out-four-individuals-convicted-international-

terrorism-and-terrorism.  Further information implicated by this request may be subject to the law

enforcement privilege.  Howe Decl. ¶ 26-27  In addition, the information is not relevant to Plaintiffs'

procedural due process claim, because it does not pertain to Plaintiffs' alleged deprivation of liberty

or the redress process available to them.

CBP Statistics.  Plaintiffs seek certain statistical information specific to CBP:

- "[N]umber of individuals listed on the TSDB that the CBP arrested in 2017, and how many of those arrests were terrorism related."  Pls.' 2d Mot. at 20.
- "The number of individuals listed on the TSDB that CBP has arrested in the last 10 years and the number of arrests that were terrorism related."  *Id.*
- "The number of U.S. citizens listed on the TSDB that the CBP has arrested in the last 10 years and the number of arrests that were terrorism related."  *Id.*

The Howe Declaration illustrates how collecting this information would be extremely

burdensome for the agency, because CBP does not separately track this information. "To assemble

this information would require a manual record-by-record analysis of each arrest made by CBP over

a ten-year period, and a comparison of whether the individual was listed in the TSDB at that specific

point in time.  Such an endeavor would be enormously burdensome . . ." Howe Decl. ¶ 27.  This

information is also not relevant to Plaintiffs' procedural due process claim, because this aggregate

statistical information does not pertain whatsoever to Plaintiffs' alleged deprivation of liberty or the

redress process available to them.

35

### iv.     Information Sought From TSA:

Plaintiffs now seek an untimely list of information specifically from TSA, even though, prior to noticing a deposition at the very end of discovery, they had never sought any discovery from TSA (other than some limited information from DHSTRIP) in the preceding six months of discovery.

Additional information about the "rules-based list" system designating passengers as "high-risk," or any examples of what such rules-based lists might entail and how those criteria relate to TSA's nominations to the watchlist. Pls.' 2d Mot. at 17-18. The TSA deponent provided general testimony about the existence of the system and how it operates. *See* Froemling Tr. 140-44. She also testified that the rules-based assessments are separate from the TSDB and that "the rules by themselves do not provide the basis for TSA watchlist nominations." *Id.* 205-16. It is thus unclear what further information Plaintiffs want or how it could possibly relate to their claims. But further information is likely protected by the law enforcement privilege, and to constitute SSI.[13] *See* DEX 7 (Final Order), Part IV.C; Groh Decl. ¶ 17. Examples of TSA's risk assessments to identify passengers for enhanced security screening is SSI. *See* DEX 7 (Final Order), Part IV.C. This Court lacks jurisdiction to review that determination. *See* 49 U.S.C. § 46110; Legal Standard discussion, *supra*.

Number of persons on the Selectee and Expanded Selectee lists. Pls.' 2d Mot. at 22. This is duplicative, at least in part, with information sought in the first motion to compel and from TSC. This information is not relevant to the remaining procedural due process claim, because it does not pertain to the redress process available to Plaintiffs, nor to the deprivation of liberty. This information is SSI, and this Court does not have jurisdiction to review TSA's designation. *See* Final Order, Part IV. TSA has determined that revealing the total number of individuals on the Selectee

---

[13] If Plaintiffs were seeking information about the content of TSA rules, that might require an analysis of the application of the state secrets privilege. The rules themselves are generally classified.

and Expanded Selectee lists would give adversaries valuable operational knowledge about the government's receipt of intelligence information related to terrorism. *Id.* In addition, this information is protected by the law enforcement privilege. 2d Groh Decl. Part C.

Average number of enhanced screenings conducted by the TSA each day and each year. Pls.' 2d Mot. at 21. This information is not relevant to the remaining procedural due process claim, or even to watchlisting more generally. TSA may designate an individual for secondary screening for a wide variety of reasons unrelated to watchlisting. The number of times individuals are designated for enhanced security screening on a daily and yearly basis is information that is SSI, and this Court does not have jurisdiction to review such designation. *See* DEX 7 (Final Order) Part IV. TSA determined that releasing such information would give terrorists and others knowledge about the total percentage of passengers who are designated for enhanced scrutiny screening, including by random selection. *Id.*

The number of U.S. citizens on the Selectee List and Expanded Selectee lists. Pls.' 2d Mot. at 21. This information is not relevant to the remaining procedural due process claim, because it does not pertain to the redress process available to Plaintiffs, nor to the deprivation of liberty. This information is protected by the SSI privilege, because TSA determined that it could provide terrorists with demographic information that would be detrimental to the security of transportation. This Court does not have jurisdiction to review such designation. *See* Final Order Part IV. It is also protected by the law enforcement privilege. 2d Groh Decl. Part C.

The number of enhanced screenings that have led to a terrorism related arrest. Pls.' 2d Mot at 21. This information is not relevant to Plaintiffs' claims because it does not pertain to the deprivation of liberty or the redress process available to plaintiffs. That number provides no illumination on either the Government's interest or the Plaintiffs' interest in redress. The request is too vague to answer in any event because Defendants do not know what it means for a screening to

"have led to a terrorism related arrest."  Plaintiffs could be seeking solely the number of times individuals are arrested at airports for terrorism-related contraband or they could be seeking a broader (but vaguer and probably unknowable) analysis of when enhanced screening contributes to an investigation in anyway and eventually "leads to" an arrest.  Furthermore, TSA officers at airport checkpoints do not have the authority to arrest any passenger, regardless of the situation, although TSA does call for law enforcement assistance when deemed necessary.  *See* TSA, Myth Busters: Do TSA Officers Arrest Passengers?, *available at* https://www.tsa.gov/blog/2016/07/03/tsa-myth-busters-do-tsa-officers-arrest-passengers.  In addition, "enhanced screening" is broad and it is unclear whether it refers to the number of passengers that TSA's Secure Flight system designates for enhanced screening or whether it includes additional screening for other reasons, such as an alarm at the checkpoint.

The number of "potential matches to the TSDB which the TSA determines after evaluations *not* to be matches to the TSDB." *Id.*  It is unclear exactly what Plaintiffs mean exactly by "potential matches" and "matches" or in what context the question is asked.  In any event, this information is not relevant to Plaintiffs' claim, because it does not address the redress process or their deprivation of liberty.  If TSA determines that someone is not a match, they are screened accordingly.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion to compel should be denied.

Dated:  April 27, 2018

Respectfully submitted,

TRACY DOHERTY-MCCORMICK
Acting United States Attorney

CHAD A. READLER
Acting Assistant Attorney General
Civil Division

ANTHONY J. COPPOLINO
Deputy Director, Federal Programs Branch

AMY POWELL
Trial Attorney, Federal Programs Branch
Civil Division, Department of Justice
310 New Bern Avenue, Suite 800
Federal Building
Raleigh, NC 27601-1461
Phone: 919-856-4013
Email:  amy.powell@usdoj.gov

ANTONIA KONKOLY
DENA ROTH
CHRISTOPHER R. HEALY
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue NW, Room 7324
Washington, DC 20530
Tel: (202) 514-2395
amy.powell@usdoj.gov
dena.m.roth@usdoj.gov
antonia.konkoly@usdoj.gov
christopher.healy@usdoj.gov

/s/ Lauren A. Wetzler
LAUREN A. WETZLER
Chief, Civil Division
Assistant United States Attorney
2100 Jamieson Ave.,
Alexandria, VA. 22314
Tel: (703) 299-3752
Fax: (703) 299-3983
Lauren.Wetzler@usdoj.gov

Attorneys for Defendants

## CERTIFICATE OF SERVICE

I hereby certify that on April 27, 2018, I filed the foregoing via the CM/ECF system, which

will send a Notification of Electronic Filing to all counsel of record.

/s/ *Lauren A. Wetzler*
LAUREN A. WETZLER
Chief, Civil Division
Assistant United States Attorney
Office of the United States Attorney
2100 Jamieson Ave.,
Alexandria, VA. 22314
Tel: (703) 299-3752
Fax: (703) 299-3983
Lauren.Wetzler@usdoj.gov