**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | | |
|---|---|---|
| **ANAS ELHADY,** *et al.*, | ) | |
| | ) | **Case No. 16-cv-00375** |
| Plaintiffs, | ) | **Hon. Anthony J. Trenga** |
| | ) | |
| v. | ) | |
| | ) | |
| **CHARLES H. KABLE,** Director of the | ) | |
| Terrorist Screening Center; in his official | ) | |
| capacity, *et al.;* | ) | |
| | ) | |
| Defendants. | ) | |

---

**REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS'**
**FIRST MOTION TO COMPEL (DKT. 139)**

## TABLE OF CONTENTS

Table of Contents ....................................................................................................................... ii

Index of Reply Exhibits .............................................................................................................. iii

Introduction ................................................................................................................................. 1

Argument ...................................................................................................................................... 3

    I.   The Government's Assertion Of The State Secrets Privilege Should Not Shield Relevant Watchlisting Information Related To Foreign Dissemination From Disclosure 3

        a.    Plaintiffs Have A Compelling Need For A List Of Foreign Countries Who Receive The TSDB ............................................................................................................. 5

        b.    Plaintiffs Have A Compelling Need For The Government's Policy And Overview Documents Regarding Sharing TSDB Information With Foreign Countries .................. 7

    II.   The Government's Assertion Of The Law Enforcement Privilege Should Not Shield Relevant Watchlisting Information From Disclosure ...................................................... 9

        c.    Plaintiffs Do *Not* Seek Certain Information The Government Contends Is Protected By The Law Enforcement Privilege ........................................................... 10

        d.    Plaintiffs Have A Compelling Need For Information Related To Nomination And Placement On The TSDB ............................................................................... 12

        e.    Plaintiffs Have A Compelling Need For Information Related To TSDB Information Sharing ......................................................................................................... 17

        f.    Plaintiffs Have A Compelling Need For Information Related To TSDB Screening 22

        g.    Plaintiffs Have A Compelling Need For Redress Policy Documents ..................... 24

        h.    Plaintiffs Have A Compelling Need For Aggregate TSDB-Related Statistics ..... 27

    III.   The TSA's Final Order Designating Portions Of Information As SSI Does Not Insulate Non-SSI Portions From Compelled Disclosure ............................................................ 30

    IV.   The Government's Technical Objections On Timing And Conferring Should Be Rejected ...................................................................................................................... 31

Conclusion ................................................................................................................................... 32

# INDEX OF REPLY EXHIBITS

| Exhibit | Description | Date |
|---|---|---|
| A | Plaintiffs' Narrowed List of Government Privilege Log Documents to Compel | May 8, 2018 |
| B | Excerpts of Kadura Deposition Transcript | November 30, 2017 |
| C | Excerpts of Al-Halabi Deposition Transcript | February 23, 2018 |
| D | Excerpts of Father Doe 2 Deposition Transcript | January 17, 2018 |
| E | Excerpts of Shibly Deposition Transcript | February 12, 2018 |
| F | Excerpts of Elhady Deposition Transcript | February 22, 2018 |
| G | Excerpts of Frljuckic Deposition Transcript | December 1, 2017 |
| H | Excerpts of Elhuzayel Deposition Transcript | January 18, 2018 |
| I | Excerpts of Ahmed Deposition Transcript | February 20, 2018 |
| J | Excerpts of El-Shwehdi Deposition Transcript | November 29, 2017 |
| K | Excerpts of Anwar Deposition Transcript | February 15, 2018 |
| L | Excerpts of Ali Deposition Transcript | March 14, 2018 |
| M | Excerpts of Hakmeh Deposition Transcript | March 2, 2018 |
| N | Excerpts of JD4 Deposition Transcript | December 18, 2018 |
| O | Excerpts of Awad Deposition Transcript | January 9, 2018 |
| P | Baltimore Police Department, Policy 802 | September 8, 2016 |
| Q | Review of the Terrorist Screening Center, DOJ Office of the Inspector General | June 2005 |
| R | Excerpts of DHS TRIP Deposition Transcript | December 20, 2017 |

**INTRODUCTION**

Early on in this case, Defendants ("the Government") made the tactical decision to withhold essentially all information the Plaintiffs requested via written discovery.  More than 50 document requests, for instance, produced exactly one document—a blank form— that the Plaintiffs did not already have.  It was a scorched-earth strategy aimed at interfering with Plaintiffs' discovery efforts, bogging down opposing counsel, and denying them basic information that would have produced a substantially different discovery trajectory.  Their strategy worked.

On March 1, 2018, a week after the close of written discovery, the Government finally made an agency representative available for a deposition.  During that deposition, Plaintiffs learned of the Watchlisting Advisory Council—a governmental body that oversees the entirety of the watchlisting system and appears to be its highest authority—for the first time ever.  The existence of this body has never been disclosed by the Government in any way, and its operations would have been a focus of discovery had the Government disclosed it.  In short, the Defendants' discovery obstinance produced a real advantage that substantially diminished the Plaintiffs' capacity to get the documents and information they need to show that the risk of erroneous deprivation is almost absolute, that the Government's interest in its watchlisting system is not what they publicly assert, and the availability of substitute procedures is undeniable.

The Government was reckless in its privilege assertions, abandoning 65 of its original privilege logs' invocations.  *Compare* Dkt. 139-1 at Exhibit K (Plaintiffs' consolidated list of documents sought to be compelled from Government's privilege logs)

*with* Dkt. 178-8 at Exhibit 7 (Government's updated privilege log for documents listed on Plaintiffs' Exhibit K).  Meanwhile the Plaintiffs are laser-focused on getting what they need and moving on to dispositive proceedings. In addition to not seeking classified and SSI information, the U.S. citizens who have sued the Government here have narrowed their discovery aims at every opportunity and do so again here.  Plaintiffs now narrow the relief sought by their motion to compel to 36 documents.  *See* Plaintiffs' Reply Exhibit A (Plaintiffs' list of remaining disputed privilege log documents, filed concurrently herewith).[1]

These 36 documents are important to the resolution of Plaintiffs' procedural due process claims.  Nominations to the Terrorist Screening Database ("TSDB") bear on the pre-deprivation process afforded to Plaintiffs, and the high risks of erroneous deprivation caused by the nominating processes the Government uses.  Law enforcement handling codes in connection with TSDB listees bear on the deprivations Plaintiffs experience. Redress policies bear on the adequacy of the post-deprivation processes available to Plaintiffs to seek removal from the TSDB.  Although the Government contends that no more discovery is necessary (Dkt. 178 at 1-2), Plaintiffs still have significant gaps in their knowledge regarding the watchlist's size and scope, the criteria for and consequences of inclusion on the watchlist, the myriad of ways the Government uses the watchlist to deprive U.S. citizens of their legitimate liberty interests, and Plaintiffs' ability to contest the factual basis for their listings and seek removal.

---

[1] Plaintiffs intend to petition the Court of Appeals for review of the TSA's Final Order (Dkt. 178-21) regarding the SSI designations on eight of these documents, and potentially other documents included in Defendants' Opposition Exhibit 7 (Dkt. 178-8).

Although the Government advances its state secret and law enforcement interests to insulate the watchlist from scrutiny, Plaintiffs have a compelling need to unearth what happens when the Government's watchlisting judgments fail.  Plaintiffs have reason to believe those judgments fail in almost every watchlisting decision the Government makes.  The TSDB lists more than a million names, yet corresponds to zero publicly identified acts of domestic terrorism by watchlistees.  The watchlisting process strips innocent Muslims of freedoms afforded other Americans without adequate redress.  Plaintiffs deserve discovery into these watchlisting facts, no matter how embarrassing to the Government the truth may be.

## ARGUMENT

I.  **The Government's Assertion Of The State Secrets Privilege Should Not Shield Relevant Watchlisting Information Related To Foreign Dissemination From Disclosure**

The Government principally asserts the state secret privilege over the identities of foreign partners and the terms on which is shares TSDB information with foreign partners.  While proper in many respects, the Government's state secrets assertion is overbroad in others.  Plaintiffs agree the Government has satisfied the procedural requirements for invoking the state secrets privilege.  Plaintiffs also agree that, if the Court recognizes the state secrets privilege in whole or in part, this case may nonetheless precede to summary judgment and/or trial.   Plaintiffs also agree for purposes of this motion that classified information is properly subject to the state secrets privilege.  However, not everything the Government seeks to protect is classified.  Nor is it proper for the Government to withhold entire documents or lists on the basis of discrete pieces of classified information.

Plaintiffs have endeavored to narrow their requested information in response to the Government's state secrets privilege invocation.  Plaintiffs have eliminated their requests for foreign-government-generated documents and additional foreign-TSDB-sharing agreements.  *Compare* Reply Exhibit A *with* Dkt. 139-1, Ex. K (original list).  Plaintiffs also agree the Government may redact any still-classified information.[2]  Plaintiffs also consent to the redaction of any "methods and procedures through which…national security information is shared," akin to the technical details of domestic sharing the Government separately seeks to protect under the law enforcement privilege.  *See* Dkt. 178 at 29.  What Plaintiffs are most focused on is which countries receive TSDB information, as well as broad descriptions of the Government's policies and expectations behind sharing TSDB information with foreign countries.  Accordingly, Plaintiffs now seek the following allegedly state secrets privileged information:

- A list of all countries who receive exports of the TSDB

- TSCA0235, Foreign Dissemination of Classified Information Policy Guide

- TSCD0008, TSC Training Powerpoint re: Foreign Government Information

- TSCD0017, TSC Document re: Foreign Partnerships

- TSCA0229, HSPD 6 Foreign Partner Terrorism Screening Information Sharing Strategy Document

With respect to the above list, Plaintiffs disagree that non-classified foreign dissemination information qualifies for the state secrets privilege.  As the Fourth Circuit

---

[2] For example, the Government asserts the state secrets privilege over just three classified paragraphs of TSCD0003, a *MOU on the Integration and Use of Screening Info to Protect against Terrorism*.  Plaintiffs consent to the redaction of those three paragraphs, such that the document should be evaluated for law enforcement privilege alone.

has recognized, courts must "critically … examine instances of its invocation," turning "a very careful, indeed a skeptical, eye," to the Government's state secret assertions, which should not be "accept[ed] at face value." *Abilt v. CIA*, 848 F.3d 305, 311-12 (4th Cir. 2017). The state secrets privilege should only be approved if a court is satisfied that "there is a reasonable danger that compulsion of the evidence will expose military matters" or harm national security concerns. *See Mohamed v. Holder*, Civil Action No. 1:11-cv-50, 2015 U.S. Dist. LEXIS 92997, at *35 n.12 (E.D. Va. July 16, 2015). The Government has not shown a threat to national security from the information Plaintiffs seek.

a. Plaintiffs Have A Compelling Need For A List Of Foreign Countries Who Receive The TSDB

Plaintiffs seek a single list of all countries the Government supplies with TSDB information. This list should be easy to compile, and the Government has not met the high state secrets burden for withholding it.

The Government acknowledges that there are "over 60 countries with whom it shares subsets of TSDB information, including all 38 of the Visa Waiver Program countries"[3] plus Albania and Bulgaria. *See* Opposition, Dkt. 178 at 21; McGarrity Decl., Dkt. 178-19 ¶ 24 n.3. The Government also acknowledges that the identity of some, if not all, of the remaining 20+ countries is *not* classified. McGarrity Decl., Dkt. 178-19 ¶ 24. In some instances, the Government admits it could ask permission from the foreign partner to

---

[3] The State Department publishes the current list of Visa Waiver Program countries. *See* Visa Waiver Program, U.S. State Department, available at https://travel.state.gov/content/travel/en/us-visas/tourism-visit/visa-waiver-program.html.

disclose their name.  *See id.*  In other instances, such as with India, the foreign partner itself

trumpets its TSDB-sharing partnership with the United States.[4]

In still other instances, public Government disclosures do not expressly say

"watchlist" or "TSDB," but they *do* clearly state that terrorist information is being shared.

The State Department reports that "Counterterrorism cooperation between Brazil and the

United States was strong, with increased information sharing in 2016" in connection with

the Olympics.[5]  The same report states that "Mexican and U.S. law enforcement agencies

coordinate closely regarding persons who raise terrorism concerns," particularly at

airports.  *Id.*  Similarly, a "Security Government Initiative" partners with six African

countries (Ghana, Kenya, Mali, Niger, Nigeria, and Tunisia) to use "shared data" to "counter

terrorist activities."[6]  As yet another example, the Government has a longstanding close

intelligence relationship with Israel.  It has accordingly publicly championed its

agreement with Israel "to share vital information relating to their respective domestic

security concerns—including aviation security" in "real-time" in order to respond to

"potential acts of terrorism."[7]  Similar counterterrorism reports regarding the

---

[4] *See, e.g.,* Manan Kumar, *India-USA agree to share secretly maintained terrorist watch list*, DNA INDIA (May 4, 2016), available at http://www.dnaindia.com/india/report-india-usa-agree-to-share-secretly-maintained-terrorist-watch-list-2208902.

[5] *See, e.g., Country Reports on Terrorism 2016: Western Hemisphere*, U.S. DEPARTMENT OF STATE, available at https://www.state.gov/j/ct/rls/crt/2016/272234.htm.

[6] *See FACT SHEET: Security Governance Initiative*, THE WHITE HOUSE (Aug. 6, 2014), available at https://obamawhitehouse.archives.gov/the-press-office/2014/08/06/fact-sheet-security-governance-initiative.

[7] *United States and Israel Announce Agreement to Enhance Joint Aviation Security*, DEPARTMENT OF HOMELAND SECURITY (Mar. 2, 2010), available at https://www.dhs.gov/news/2010/03/02/us-israel-agree-enhance-joint-aviation-security.

Government's relationships with specific foreign countries abound across executive agencies.

Given these multitude of public disclosures about terrorist information sharing outside of the Visa Waiver Program (Plaintiffs just listed ten countries), the Government has not demonstrated why a more fulsome list of foreign countries who receive TSDB exports would compromise national security.  Moreover, Plaintiffs have a compelling need for this list.  Many Plaintiffs frequently travel internationally.  The Government's dissemination of the TSDB to foreign countries, in conjunction with Plaintiffs' status as TSDB listees, is dangerous.  It puts Plaintiffs at a heightened risk of deportation, detention, interrogation and torture should they set foot in or even have a layover in those countries. *See, e.g.,* Reply Ex. B, Kadura Depo. Tr. at 265 ("[Watchlisted p]eople have been detained in Turkey. ... I've read stories about people detained in Kenya, in Morocco. It's something that happens, you know? Other governments are not as -- you know what I mean? They torture. They do it openly....So for that fear, I'm not going to travel other places. That's a reality I have to face.").  Plaintiffs deserve to know the extent of the Government's TSDB dissemination, including to countries with known human rights abuses and imperfect commitments to the rule of law consider.

b. Plaintiffs Have A Compelling Need For The Government's Policy And Overview Documents Regarding Sharing TSDB Information With Foreign Countries

With respect to the four specific documents Plaintiffs seek to compel, the Government acknowledges they are not entirely classified.  Attorney General Sessions qualifies that his "assertion of the state secrets privilege is limited to the classified information in these documents."  Sessions Decl., Dkt. 178-19 ¶ 7.  Plaintiffs therefore request these four documents with classified and other limited redactions only.

7

Plaintiffs have a compelling need to understand the Government's policies for disseminating the stigmatizing label of "terrorist" around the globe.  It is clear that the Government tries to spread the TSDB as far as possible.  Former TSC Director Christopher Piehota once told CNN that "it is concerning that [foreign] partners don't use all of our data" for aviation, maritime, border, and visa screenings.[8]  The scope of potential consequences that may be wrought upon Plaintiffs from the terrorist label will be indicated by the Government's foreign strategy and training documents.

All foreign sharing is done pursuant to HSPD-6, making the core HSPD-6 "Sharing Strategy Document" instructive.  The TSC's internal training documents regarding foreign partnerships and information likewise bear upon Plaintiffs' interests.  For example, the Government may be aware that other countries have tortured TSDB listees, but the Government has still concluded that information sharing is more important than the risk of violence.  The Government may even specifically intend for the sharing of the TSDB to prompt foreign governments with weaker due process regimes to interrogate or detain TSDB listees, then report back to the U.S. on the information learned.  If the Government is intentionally using the TSDB to accomplish internationally what would be unconstitutional for it to accomplish domestically, that information is material to Plaintiffs' claims.

---

[8] *See* Video: An Exclusive Look Inside The Terrorist Screening Center, CNN (April 6, 2016), available at https://www.cnn.com/videos/politics/2016/04/06/exclusive-interview-with-terrorist-screening-center-director-christopher-piehota-origwx-allee.cnn/video/playlists/thwarted-terror-plots/.

## II.    The Government's Assertion Of The Law Enforcement Privilege Should Not Shield Relevant Watchlisting Information From Disclosure

The parties broadly agree on the legal standard applied to law enforcement privilege assertions.  *Compare* Motion to Compel, Dkt. 139 at 19-20 *with* Opposition, Dkt. 178 at 13-14.  Even where proper, the Government's invocation of the law enforcement privilege should nonetheless be lifted because Plaintiffs' (1) suit is non-frivolous and brought in good faith, (2) the information sought is not available through other discovery or from other sources, and (3) they have a compelling need for the information. *Hugler v. BAT Masonry Co.*, 6:15-cv-28, 2017 U.S. Dist. LEXIS 49027, at *11-13 (W.D. Va. Mar. 31, 2017) (citing *In re The City of New York*, 607 F.3d 923, 944-945 (2d Cir. 2010)).

The Government does not contend that Plaintiffs' requests for watchlisting information are frivolous, or brought in bad faith, or available from other sources.  Rather, the Government's key argument seems to be that Plaintiffs lack a compelling need for the requested relevant information because it is not "necessary" to the resolution of Plaintiffs' procedural due process claims.  *See* Dkt. 178 at 2, 14, 15, 16, 22, 24, 27, 28, 30.  For the reasons set forth below, Plaintiffs have established that the balance of interests favors disclosure of law enforcement privileged information to Plaintiffs, so that the procedures surrounding the watchlist can be subjected to judicial review.  *See United States v. Matish*, 193 F. Supp. 3d 585, 597 (E.D. Va. 2016).

In opposition to Plaintiffs' Motion to Compel, the Government identifies eight broad categories of information contained within the compelled documents which are protected

by the law enforcement privilege.  *See* Dkt. 178 at 12.[9]  For the ease of convenient reference

to the Court, Plaintiffs throughout this motion will adopt the Government's categories.[10]

    c.  <u>Plaintiffs Do *Not* Seek Certain Information The Government Contends Is Protected By The Law Enforcement Privilege</u>

      Having reviewed the Government's topical categories and law enforcement privilege

assertions, Plaintiffs wish to ease the burden on the Parties and the Court by identifying

upfront the types of information they do *not* seek.  Specifically, under Government Category

(2), information sharing, Plaintiffs agree to not seek disclosure of private contracting

agreements.  *See* Dkt. 178 at 24-25.  Likewise under Government Category (2), Plaintiffs are

not interested in the portions of documents "containing sensitive details regarding the

information technology infrastructure and security of the TSC and partner systems."  *See*

Dkt. 178 at 21.  Plaintiffs believe that Reply Exhibit A has withdrawn Plaintiffs' request for

nearly every document to which the Government raised the IT infrastructure objection.  To

the extent such sensitive IT information is still contained within documents Plaintiffs

continue to list in Reply Exhibit A, such as TSCD0029, Plaintiffs consent to the limited

redaction of IT infrastructure information.  Finally under Government Category (2),

Plaintiffs will withdraw their request to compel Addendum B (TSCD0004) solely because

---

[9] The categories crafted by the Government are: (1) information related to nominations to and placement on the Terrorist Screening Database; (2) information regarding information-sharing agreements between the TSC and other U.S. agencies as well as foreign governments; (3) information related to screening and encounters; (4) redress policy documents; (5) information related to the identities of government officials with law enforcement functions; (6) audit documents; (7) certain TSDB statistics; and (8) information that would permit identification of watchlist status.  Dkt. 178 at 12.

[10] The Government's categories are similar but not identical to the categories crafted by Plaintiffs in their opening memorandum.  Plaintiffs' original categories were educated guesses based on document titles, privilege log entries, and related deposition testimony.

the details provided by the Government confirm it is the same document attached as

Appendix 4 to the publicly available 2013 Watchlisting Guidance.

In Government Category (5), the Government seeks to protect information related

to the identities of specific TSC and FBI personnel. *See* Dkt. 178 at 12 n.6, 13.  Plaintiffs

assert no interest in the names or identities of individual Government personnel.

Accordingly, Plaintiffs consent to the appropriate redaction of individual, line-level,

counterterrorism or security personnel names in any materials which may be ordered

produced.  Plaintiffs would request, however, that personnel titles and high-level officer or

political appointee names remain unredacted, consistent with existing Government norms.

Government Category (6) refers to audit documents.  The Declaration of Timothy

Groh confirms that the redacted portions of one such audit document remain classified, and

the other is under review by its Original Classification Authority.  *See* Dkt. 178 at 27 & n. 19;

Dkt. 178-18 ¶¶ 65-69.  Accordingly, Plaintiffs will not press further on these documents

except to request that any newly unclassified portions of TSCC0011, the "Audit of the FBI's

Management of Terrorist Watchlist Nominations" be timely produced.

Government Category (8) relates to information that would permit identification of

watchlist status.  The TSA Final Order has designated eight documents as SSI for containing

such status-identification information.  *See* Dkt. 178-21 at 3 & n.3.  Of those eight

documents, Plaintiffs continue to seek one them:  TSCD0051 (Redress Implementation

Plan), as well as information derived from two others, TSCC0001 and -02 (monthly and

weekly statistical reports).  As set forth under the forthcoming Redress and Statistics

sections, *infra*, Plaintiffs for purposes of this motion only seek information from these

11

documents which does *not* relate to the identification of individual watchlist statuses and therefore is *not* SSI.

    d.  <u>Plaintiffs Have A Compelling Need For Information Related To Nomination And Placement On The TSDB</u>

    **Watchlisting Guidance & Related Documents.**  Plaintiffs' procedural due process claim challenges, both facially and as-applied, the procedures surrounding watchlisting. The Government does not dispute this web is best set forth by the 2015 Watchlisting Guidance (TSCA0019).  That one document sets forth the standards all watchlisting agencies follow regarding nominations criteria, procedures, screening, removals, exceptions and more.  In the agencies' 30(b)(6) deposition testimony, they emphasized the Watchlisting Guidance's role as a governing document, while refusing to answer substantive questions about its contents.  *See* Second Motion to Compel, Dkt. 170-1 at 6-11.

    The Government has designated part of the 2015 Watchlisting Guidance as SSI.  *See* TSA Final Order, Dkt. 178-21.  Specifically, the TSA designates as SSI (a) certain airport screening procedures and security measures, Dkt. 178-21 at 5 & n.6, and (b) the criteria for placement on the TSDB and its subset lists, including the Selectee List, Dkt. 178-21 at 6-7 & n.7.  Those two points are core to Plaintiffs claims – they tend to show the restrictions on movement and public stigma Plaintiffs experience from enhanced screenings, as well as the factual bases for which Plaintiffs might be incorrectly labeled as suspected terrorists. Plaintiffs intend to petition the Court of Appeals for review of those SSI designations.  But for purposes of the review of *this* Court, the 2015 Watchlisting Guidance is a lengthy document containing far more information than the SSI-designated airport screening and TSDB inclusion criteria.  The Guidance contains other information on nominations, removal, redress, and TSDB quality control measures, as well as definitions of what

constitutes "known" vs "suspected" terrorists and lists of terrorism-related crimes.  *See, e.g.,* Groh Decl., Dkt. 178-18 ¶¶ 26-35; Dkt. 22-2 (2013 Watchlisting Guidance).  Many of the documents Plaintiffs seek and the Government designates as reproducing portions of the 2015 Watchlisting Guidance are not themselves subject to an SSI designation – they are only listed as falling within the law enforcement privilege.[11]

Indeed, the Government admits that no part of the 2015 Watchlisting Guidance is classified.  Groh Decl., Dkt. 178-18 ¶¶ 27-28.  The Government also admits that some details or portions of the 2015 Watchlisting Guidance may seem innocuous or harmless; it even previously prepared a redacted version for potential public consumption.  Groh Decl., Dkt. 178-18 ¶ 28 & n.6.  Moreover, nowhere in setting forth the *potential* law enforcement harm from the 2015 Watchlisting Guidance's disclosure does the Government point to any *actual* circumvention or law enforcement harm experienced by the leak of the 2013 Watchlisting Guidance.

The 2015 Watchlisting Guidance is *the* critical document which governs all aspects of watchlisting procedures, and thus governs all aspects of Plaintiffs' procedural claims.  It is the center of the Government's secretive watchlisting system that subjects innocent United States citizens and their families to embarrassment, public stigma, restrictions on domestic and international travel, handcuffing, electronics searches, FBI inquisitions, detentions upon entry, immigration delays, denials of certifications and employment, and a

---

[11] Documents the Plaintiffs seek, and which the Government indicates contain information from the 2015 Watchlisting Guidance that is protected by the law enforcement privilege but *not* designated SSI, include: TSCB0013, TSCB0014, TSCD0002, TSCD0003, TSCD0004, TSCD0006, TSCD0009, TSCD0015, TSCD0029, TSCD0046, TSCD0053, TSCD0065, TSCE0002, and TSCE0003.

multitude of other consequences.  Plaintiffs' interests, the Governments' interests, the availability of adequate substitute procedures, and the risks of erroneous deprivations are all implicated by the Guidance.  Accordingly, Plaintiffs have demonstrated a compelling need for its production, as well as that of the related watchlisting documents incorporating the Guidance.[12]  These productions should be subject to, at most, the Court's carefully tailored balancing of limited redactions for particularly sensitive law enforcement information and SSI.

**Exception to Known or Suspected Terrorist Inclusion Standard & Immigration Screening.**  The Government acknowledges that the TSDB includes "identifying information of some individuals who do not meet the reasonable suspicion standard" in order to support "specific screening functions of the Department of Homeland Security and the Department of State," including immigration.  Groh Decl., Dkt. 178-18 ¶ 11.  Later, Mr. Howe added that CBP uses the exception for entry-screening purposes related to foreign nationals.  Howe Decl., Dkt. 196-7 ¶ 28.  From this the Government contends that "these limited exceptions ha[ve] absolutely no relevance to Plaintiffs' claims."  Opposition, Dkt. 178 at 18.  The Government also seeks to preclude discovery into any immigration-related

---

[12] The Government contends (Dkt. 178 at 18) that Plaintiffs did not adequately narrow their original requests, citing as an example the seventeen separate TSC training PowerPoints listed at Dkt. 139-1, Ex. K.  This misreads Plaintiffs' motion, which specifically requested only the most recent and major prior versions of these PowerPoints.  *See* Dkt. 139 at 5-6.  Plaintiffs could not more thoroughly narrow the PowerPoints because many were undated and undetailed in the Government's original privilege logs.  Based on the Government's revised privilege assertions, Plaintiffs believe TSCD0029 is the most comprehensive general TSC training PowerPoint.  Subject to that understanding, Plaintiffs now seek to compel TSCD0029.  Plaintiffs also seek three other more specific PowerPoints as addressed in other portions of this Memorandum: TSCB0013, TSCD0001, TSCD0008.

subject matter at all, asserting that no Plaintiff claims his status on the TSDB has affected immigration or visas.  *Id.* at 21-22 & n.16.

The Government, however, is incorrect in its premise.  At least three Plaintiffs have identified specific immigration-related difficulties due to their presence on the watchlist. Mr. Al-Halabi testified that it took *eight years* for his wife's visa to begin being processed – and then another *nine months* for an additional "security" review before her visa was actually received.   Reply Ex. C, Al-Halabi Depo. Tr. at 134-138.  Mr. Al-Halabi's wife finally began the citizenship process in 2017, but has yet to hear anything back – even while a friend who started the process the same time was invited to an interview within four months.  *Id.* at 139-140, 146-147.  Father Doe 2 is trying to sponsor his wife to become a citizen, but it's been "horrible."  They've had an ongoing delay of "almost two years," including a six month delay just "waiting for an interview" when the whole process should have taken less than five months total.  Reply Ex. D, Father Doe 2 Depo. Tr. at 81-82. Hassan Shibly sponsored his wife for immigration, "and it took forever to get cleared" – more than a year – which they are "certain" was due to Mr. Shibly's status on the watchlist. Reply Ex. E, Shibly Depo. Tr. at 280-286.  In short, Plaintiffs know their watchlist status is affecting immigration and visas for their families.  They have a cognizable interest, therefore, in seeking immigration and visa screening information.  *See, e.g., Hawaii v. Trump*, 878 F.3d 662, 681-82 (9th Cir. 2017) (collecting Supreme Court cases recognizing the standing of U.S. residents to assert interest in entry of a foreigner), *cert. granted* (Jan. 19, 2018).

How the TSDB is used to influence entry proceedings for "known or suspected terrorist" listees, "exception" listees, and their family members, is highly relevant to

Plaintiffs' claims – both facially and as-applied.  Plaintiffs have demonstrated a compelling need to unpack how the "exception" works, and how the TSDB as a whole affects immigration proceedings.

Immigration and visa proceedings also appear to relate to the "exceptions" to the "known or suspected terrorist" standard.  The 2013 Watchlisting Guidance states that alien "Spouses and Children" of watchlistees can be added to the TSDB pursuant to an "exception."  *See* Dkt. 22-2 at § V, 3.14.1.  Accordingly, the Government should produce the operative "Exception" portion of the 2015 Watchlisting Guidance (TSCA0019) and the "Email: Watchlisting Policy Exception" (TSCD0006).  Relatedly, the Government should produce the PowerPoint and Standard Operation Procedures related to "Visa Review" (TSDC0001, -02) and a document on "Screening for Immigration Benefits" (TSCD0046).  Plaintiffs have a compelling need to understand the Government's immigration and visa procedures applied to watchlistees and their families.  These procedures, which work differently for watchlistees than non-listed U.S. citizens, affect future sponsorships, family planning, travel, work permits, and other material aspects of their lives.

**Islamic Terms.**  Plaintiffs request Government documents which refer to or cite specified Islamic terms in the context of setting forth the TSDB inclusion standards.  *See* Dkt. 139 at 6.  This request relates to RFP 47, seeking TSC policies and training documents with words such as "Muslim," "mosque," "masjid," "Hajj," and "Qur'an" – which the Government refused to answer.  *See* Dkt. 139-1, Ex. A at 89-91.  The request also draws upon the 2013 Watchlisting Guidance, which notes that one of the "exceptions" to the "known or suspected terrorist" inclusion standard is any foreign individual with "jihadist" or "mujahideen" in the description of their nomination.  *See* Dkt. 22-2 at § V, 3.14.6.

16

Although the Government contends that it "cannot make sense of" Plaintiffs' request" (Dkt. 178 at 20-21), the thrust is clear.  Plaintiffs are seeking evidence that the Government in its internal documents expressly targets Muslims in its watchlisting practices.

The Government's opposition explains that its training documents include "detailed examples of the types of conduct that are taken into consideration to determine whether a person meets the reasonable suspicion standard."  Dkt. 178 at 19.  If those "detailed examples" and "types of conduct" emphasize legitimate and protected religious activity – such as learning Arabic, traveling to Saudi Arabia on the Hajj, or engaging in regular prayers or mosque attendance – this would indicate a discriminatory intent.  Such an intent would dramatically undercut the Government's interests in its current watchlisting procedures.  Plaintiffs have a compelling need for information showing that the watchlist is laden with religious prejudice and discrimination.

e. Plaintiffs Have A Compelling Need For Information Related To TSDB Information Sharing

Within the Government's broad second category of "information sharing," the Government asserts the law enforcement privilege to withhold documents about (a) information technology infrastructure, Dkt. 178 at 21; (b) law enforcement handling codes, *id.* at 22, (c) information sharing with domestic partners, *id.*; (d) information sharing with foreign partners, *id.* at 23; (e) information sharing with private partners, *id.* at 24; and (f) information sharing with private contractors, *id.*  As discussed in Section II-a, *supra*, Plaintiffs in Reply do not seek further information about (a) or (f).  With respect to (d), Plaintiffs addressed sharing with foreign partners under Section I, *supra*, regarding the state secrets privilege.  Accordingly, Plaintiffs will use this section of their Reply to address

Government Category 2 sub-categories (b), (c), and (e), i.e. handling codes, sharing with domestic partners, and sharing with private partners.

**Handling Codes.**  Plaintiffs have provided substantial evidence that their watchlist status causes them to be held at gunpoint, handcuffed, detained, questioned by the FBI, interrogated, had their electronics confiscated, subjected to enhanced searches, recruited as informants, and more.[13]  Plaintiffs' treatment appears to be the result of specific policies and instructions assigned to TSDB listees' records by the TSC, FBI, CBP, and maybe others. Plaintiffs refer to these instructions as "annotations" or "handling codes."

The TSC's privilege log includes a document entitled "Terrorist Screening Center (TSC) Handling Codes" (TSC0230), and the FBI and CBP have testified as to their use of annotations and handling codes as well.   Dkt. 169-1 Ex. C, CBP Depo. Tr. at 132-135, 227-228, 246; Dkt. 170-2, Ex. D, FBI Depo. Tr. at 144-147, 150-159.  The Court has previously stated that handling codes and/or agency annotations associated with TSDB records "is certainly relevant."  *See* 3/16/2018 Hearing Transcript, Dkt. 169-1, Ex. E at 21.

In invoking the law enforcement privilege, the Government provides a scant single, redacted paragraph about why law enforcement handling codes are sensitive.  *See* Groh Decl., Dkt. 178-18 ¶ 42.  The Government redacted and refuses to even publicly identify the

---

[13] *See, e.g.,* Reply Ex. B, Kadura Depo. Tr. at 162-169, 202-206, 234-239; Reply Ex. C, Al Halabi Depo Tr. at 74-81; Reply Ex. E, Shibly Depo. Tr. at 74-79; Reply Ex. F, Elhady Depo. Tr. at 143-144, 150-177; 184-194; Reply Ex. G, Frljuckic Depo. Tr. at 47-48, 67, 82-84, 93; Reply Ex. H, Elhuzayel Depo. Tr. at 125-131; Reply Ex. I, Ahmed Depo. Tr. at 25-31; Reply Ex. J, El-Shwehdi Depo. Tr. at 57, 180-182; Reply Ex. K, Anwar Depo. Tr. at 86-87; Reply Ex. L, Ali Depo. Tr. at 52, 60; Reply Ex. M, Hakmeh Depo. Tr. at 166-172; Reply Ex. N, John Doe 4 Depo. Tr. at 105-106; Reply Ex. O, Awad Depo. Tr. at 149, 156-158.

documents numbers of the privilege log documents that may contain handling codes.[14]

This is plainly insufficient; after all, the Government apparently enforces no restrictions on

downstream local law enforcement from themselves disclosing the handling codes.  This

public dissemination obviates any law enforcement privilege protection that may exist.

For example, the Baltimore Police Commissioner has published "Policy 802," a list of

four terrorism-related handling codes it receives from the National Crime Information

Center and Terrorist Screening Center.  *See* Reply Ex. P, "Policy 802, Handling Codes:

Terrorist Response" Baltimore Police Department (Sept. 8, 2016), available at

https://www.baltimorepolice.org/802-handling-codes-terrorist-response.[15]  And at least

the State of Oregon publishes a comprehensive, 800-page, "NCIC Code Manual," including

some details about codes assigned to "Known or Suspected Terrorists" and the NCTC's

"KST File."[16]  Moreover, while redacting some information, the Inspector General has also

previously provided far more information about TSC handling codes than the Government

has been willing to provide here.  This included the number of codes, general qualitative

rankings within the codes, general descriptions of who falls within each code, and

aggregate statistics about the number of TSC listees assigned each code.  *See* Reply Ex. Q

---

[14] Plaintiffs guess that TSCA0230, TSCA0231, TSCA0233, TSCB0002 are the most likely privilege log listed documents to contain handling code information, but would request whatever document(s) provides the most fulsome descriptions.

[15] The New York State police department publishes similar information. https://info.publicintelligence.net/NYterroristindicators.pdf.  So does the Defense Technical Information Center, http://www.dtic.mil/get-tr-doc/pdf?AD=AD1013599.  A student study aid website also publishes criminal justice flashcards on the TSC's handling codes, https://www.flashcardmachine.com/operation-orders410.html.

[16] *NCIC Code Manual* (Sept. 30, 2017) at 3, 8, 10, 67, available at http://www.oregon .gov/osp/CJIS/docs/NCIC%20Manuals/2017/NCICCodeManual_FULL.pdf.

*Review of the Terrorist Screening Center*, DOJ OFFICE OF THE INSPECTOR GENERAL (June 2005) (public redacted version) at vii – viii, available at https://oig.justice.gov/ reports/FBI/a0527/final.pdf.

Given this pre-existing dissemination of TSDB and other law-enforcement-related handling codes, the Government's invocation of the law enforcement privilege is not valid. Similar if not identical codes and law enforcement "methods" are already publicly available, and the Court has already indicated these codes are relevant to this case.  But even assuming the Government maintains some law enforcement sensitivity in these codes and associated handling instructions, Plaintiffs have demonstrated a compelling need to set aside the privilege.  Government policies which specifically instruct law enforcement to arrest, detain, handcuff, draw guns against, search, interrogate, or other actions against TSDB listees bear heavily on the deprivations TSDB listees experience.

**Domestic & Private Partners.**  The Government's opposition and declaration related to information-sharing with domestic and private partners almost entirely elides the core points Plaintiffs are seeking.  The Government has not answered questions regarding the full scope of TSDB dissemination.

Despite acknowledging the question, the Government has refused to answer whether any form of TSDB access is provided to courts.  *Compare* Dkt. 139-1, Ex. A, RFP 14 *with* Groh Decl., Dkt. 178-18 ¶ 39.  Plaintiffs have a compelling need to know whether TSDB status is used to affect bail determinations or sentences.  It offends due process for the Government to add an individual to the TSDB based on non-terrorist, non-criminal, utterly legitimate activity – and then, without providing any redress for that listing, use the TSDB status to seek heightened bail and sentences for unrelated crimes.

20

Nor has the Government answered whether any type of private entity, other than financial institutions, receives TSDB information.  *See* Opposition, Dkt. 178 at 22, 24; Groh Decl., Dkt. 178-18 ¶ 39.  Prior Government publications indicate that at least some portions of the private sector do use watch list records, including private employers of critical infrastructure like power plants.[17]  The Government represents that the TSDB "is not generally available to the public or private entities without a government function." Groh Decl., Dkt. 178-18 ¶ 39.  But those "generally" and "government function" qualifiers appear to be hiding untold and undisclosed exceptions.  Every private disclosure potentially impinges upon Plaintiffs' and similarly-situated American Muslims' liberties.  Even *one* private disclosure would undermine the Government's longstanding position that because the TSDB is not shared outside of the government, no possible harm to Plaintiffs' liberty interests exists.  Plaintiffs have a compelling need for a full and frank list of "downstream" private parties who receive TSDB listee information.

The question of downstream or further dissemination by federal agencies to other agencies also remains unanswered.  *See* Dkt. 139 at 7-8.  Plaintiffs have a compelling need to know the full scope of downstream dissemination of TSDB information to other agencies.  As stated in Plaintiffs' opening motion, the existence of information-sharing Memorandums of Understandings between the TSC and various other agencies itself suffices to establish dissemination to those agencies.  *See* Dkt. 139 at 7-8.  Plaintiffs therefore do not request the

---

[17] *See, e.g., Terrorist Watch List Screening: Opportunities Exist to Enhance Management Oversight, Reduce Vulnerabilities in Agency Screening Processes, and Expand Use of the List*, GOVERNMENT ACCOUNTABILITY OFFICE at 6, 11, 45 (October 2007), available at https://www.gao.gov/products/GAO-08-110.

complete documents – only a summary of their terms regarding downstream

dissemination, and a list of which further downstream agencies receive the TSDB.[18]

Plaintiffs also have a compelling need for a few complete domestic sharing and

dissemination documents, as reflected by their narrowed Reply Exhibit A.  Plaintiffs seek

documents related to immigration and visas, due to the delays experienced within their

families and by others on the watchlist, *see supra*.  Plaintiffs also seek non-SSI documents

related to information sharing between the TSC and TSA, where much heightened scrutiny

occurs.[19] Finally, Plaintiffs need information on the TSC's sharing with the Overseas Private

Investment Corporation (TSCD0060).  The Overseas Private Investment Corporation is

highly involved in U.S. foreign and financial policy, including by interfacing with financial

institutions.  OPIC's use of the TSDB may relate to the difficulties some Plaintiffs have

experienced with respect to their financial accounts and transactions.

   f.   <u>Plaintiffs Have A Compelling Need For Information Related To TSDB Screening</u>

The Government's Category 3 of law enforcement privilege protected information

relate to screening of and encounters with TSDB listees.  In response to the Government's

assertions, Plaintiffs have attempted to narrow the total documents they seek, including

eliminating all but one "SSI" screening document, as reflected in Reply Exhibit A.[20]  What

---

[18] To better reflect that Plaintiffs are *only* seeking information on downstream or private dissemination, Plaintiffs have largely dropped the specific information-sharing Memorandums of Understanding listed in Motion Exhibit K from their Reply Exhibit A.

[19] The TSC – TSA information sharing documents Plaintiffs have identified are document numbers TSCD0055, TSCD0058, TSCD0063, and TSCD0065.

[20] The referenced document is the "Terrorist Screening Overview" (TSDB0012).  It is only designated SSI to the extent is discloses specific details of airport security procedures and the substantive criteria for TSDB and Selectee List inclusion.  Accordingly, Plaintiffs only request that this Court compel the non-SSI portions.

remains related to screening largely overlaps with previously covered topics, including

handling codes (§ II-e), immigration processing (§ II-d), and domestic information sharing

for purposes of screening (§ II-e).

The Government most heavily emphasizes TSCD0065, An Updated Strategy for

Comprehensive Terrorist-Related Screening Procedures.  Opposition, Dkt. 178 at 26; Groh

Decl., Dkt. 178-18 ¶ 60.  The Government did not provide a date for this document, but the

GAO has publicly indicated it was prepared in late 2007.[21]  This "Updated Strategy"

document appears to be the result of prior criticism leveled by the GAO regarding the

Government's 2007-era watchlisting schema.[22]  The "Updated Strategy" document thus

likely provides key insight into the history and evolution of the Government's watchlisting

practices over time, a topic the Court has indicated is an appropriate subject of inquiry.  *See*

2/16/2018 Hearing Transcript, Dkt. 131-1, Ex. L, at 22; 3/16/2018 Hearing Tr., Dkt. 169-1,

Ex. E at 23.

The Government broadly asserts that disclosure of its screening practices –

particularly in the "Updated Strategy" – could assist U.S. adversaries in circumventing its

terrorist screening systems.  *See* Opposition, Dkt. 178 at 25- 26; Groh Decl., Dkt. 178-18 ¶¶

56-60.  However, these screening practices bear on the effectiveness of the Government's

procedures.  For example, in the GAO discussion of the "Updated Strategy," the FBI

explained that TSDB encounters can actually hurt more than help: "unnecessary detentions

---

[21] *See Homeland Security: Better Use of Terrorist Watchlist Information and Improvements in Deployment of Passenger Screening Checkpoint Technologies Could Further Strengthen Security*, Government Accountability Office at 14 (Jan. 27, 2010), available at https://www.gao.gov/products/GAO-10-401T.

[22] *See generally supra* n. 17 *Terrorist Watch List Screening*, GAO.

or queries of misidentified persons [are] counterproductive and potentially damaging to the efforts of the FBI to investigate and combat terrorism."[23]  Similarly, the TSC has acknowledged that "Without current, reliable and accurate information in the TSDB, the purpose of sharing information in order to protect the national security of the United States would be defeated."  2d Groh Decl., Dkt. 196-5 ¶ 12.  Plaintiffs contend that the Government's redress procedures, as presently constituted, have *exactly* that counterproductive effect – they prevent the Government from maintaining reliable information about actual terrorists.  If the Government acknowledges in the "Updated Strategy" document that too many people are listed on the TSDB, too many people are falsely matched to the TSDB, or that the TSDB can pragmatically operate to inform listees of their status and thus prompt listees to circumvent Government screening, those would be material facts bearing on the efficacies of the Government's chosen procedures.

Adding weight to Plaintiffs' need for screening documents is that screening procedures bear directly on the deprivations Plaintiffs and other listees experience, including the high risk of erroneous deprivation.  Plaintiffs have therefore shown a compelling need to limit the law enforcement privilege and compel additional information regarding the Government's watchlist screening practices.

g.  Plaintiffs Have A Compelling Need For Redress Policy Documents

Plaintiffs' procedural due process claim asserts that the redress available for their placement on the terror watchlist is constitutionally insufficient.  Although other watchlisting documents may touch on redress, both Plaintiffs and Defendants have

---

[23] *See supra* n. 17 *Terrorist Watch List Screening*, GAO at 34.

identified just two documents as central to the Government's current redress process. *Compare* Dkt. 139 at 10-11 *with* Dkt. 178 at 26-27.  The first is the TSC's "Redress Program Standard Operating Procedure" (TSCA0014), dated December 2015.  The second is the "U.S. Government Redress Implementation Plan" (TSCD0051), dated April 2015.  DHS TRIP's testimony indicates that these are the procedures currently in effect.  *See generally*, Dkt. 139-1, Ex. N, DHS TRIP Depo. Tr. at 24-28.

The TSC – Redress Program Standard Operating Procedure appears to be the governing document for how redress is handled at the TSC, the only government agency with the authority and ability to remove individuals from the TSDB.  The Redress SOP sets forth the process that exists (or lack thereof) for the remedy Plaintiffs want: notice of their TSDB status, notice of the factual basis for that status, and a meaningful opportunity to seek removal.  Yet the Government insists that disclosure of this process is itself protected by the law enforcement privilege and therefore immune from scrutiny.  *See* Groh Decl., Dkt. 178-18 ¶¶ 59-60.  Plaintiffs have a compelling need for the TSC – Redress Program Standard Operating Procedure.  It is fundamentally unfair to force Plaintiffs to litigate a procedural due process claim without telling them what the responsible Government agency's redress process even *is*.

With respect to the "Implementation Plan," the Government contends that it "relates solely to the revised redress process available to U.S. persons on the No Fly List," and is therefore irrelevant.  Dkt. 178 at 26-27.[24]  However, the process available to No Fly Listees

---

[24] The Government has designated part of this document "SSI" to the extent it could disclose the particular status of individuals on the TSDB.  Plaintiffs ask this Court to compel the non-SSI portions; Plaintiffs may seek relief regarding the SSI portions in the Court of Appeals.

is *highly* relevant because it provides the most comparable alternative procedure.  Right

now, the Government's policies nonsensically provide *more* information about watchlist

status, *more* opportunities to learn the facts underlying watchlist status, and *more* redress

opportunities for correction for the "No Fly" individuals the Government considers a

*greater* threat to national security.  Yet the Government has offered no indication that the

last three years of providing a more fulsome redress process to No Fly designees has

exasperated the Government's counterterrorism efforts.  Plaintiffs have a compelling need

to understand this No Fly redress process, because it will advance their arguments about

how the Selectee/TSDB redress process could be changed to better procedurally serve

Plaintiffs' interests while not harming the Government's.

Furthermore, at least four Plaintiffs were on the No Fly List in 2016.  *See* Am. Compl.,

Dkt. 22 ¶¶ 179, 207, 319, 371, 538.   They were all removed from the No Fly List following

commencement of litigation.  *See* Am. Compl., Dkt. 22 ¶ 376; Notice of Factual

Developments, Dkt. 43; Motion to Dismiss Opinion, Dkt. 47 at 2 n.2.  Yet in discovery the

Government has conceded that *no one* has been removed from the No Fly List <u>by the TSA

Administrator</u> in either 2016 or 2017.  Reply Ex. R, DHS TRIP Depo. Tr. at 208.  This is

contrary to the Government's January 2018 representation, which states that "The TSA

Administrator...makes final determinations concerning listing on the No Fly List" and

provides listees with final orders which "state the basis for the TSA Administrator's

decision." *Overview*, Dkt. 139-1, Ex. O at 9.  It thus appears that these four Plaintiffs were

removed from the No Fly List pursuant to some undisclosed shadow process designed to

avoid judicial scrutiny.  Plaintiffs have therefore shown a compelling need to review the

"Implementation Plan," in order to learn the No Fly List and TSDB redress procedures the Government actually follows, not the ones it publicly purports to follow.

h. <u>Plaintiffs Have A Compelling Need For Aggregate TSDB-Related Statistics</u>

In many different forms, Plaintiffs have propounded discovery seeking aggregate statistics for the purpose of understanding the size and scope of the watchlist, vis-à-vis acts of terrorism.   Thus, Plaintiffs have requested yearly statistics on nominations, rejections, and removals to the No Fly, Selectee, and TSDB lists, sub-categorized by how many are U.S. citizens or children.  *See generally*, Dkt. 139-1 at 13-14.  Plaintiffs have also requested statistical information on encounters with TSDB listees, terrorist attacks carried out within the United States, and how often the perpetrators of those attacks were listed in the TSDB. *Id.* at 14.

The Government insists that it "does not track much of the information requested by Plaintiffs," but does little to further specify what types of information are, or are not, calculable through simple queries.  *See* Groh Decl., Dkt. 178-18 ¶¶ 70-71.  The Government points out, as its only example, that the TSDB does not separately classify "known" (i.e. charged or convicted) and "suspected" terrorists, so these numbers would be extremely burdensome to calculate.   This representation doesn't entirely make sense, given that the Baltimore Police Commissioner (and other law enforcement agencies) publish four TSC / NCIC "handling codes" that readily differentiate between known, suspected, and possible terrorists.  *See* Reply Ex. P; *accord* Reply Ex. Q, 2005 OIG Report at viii.

Nevertheless, the Government does not dispute that other statistics, like the numbers of individuals in the TSDB, No Fly, Selectee, and Expanded Selectee Lists, how many are U.S. citizens, and how many are children, should be readily calculable.  Plaintiffs

27

are willing to adjust their requests to more precisely map onto the statistics the

Government maintains or which would not be resource-burdensome for the Government to

calculate.  At present, however, the Government refuses to provide *any* aggregate statistical

information absent a Court order.

The Government's assertion of the law enforcement privilege with respect to

aggregate statistical information is narrow.  The Government contends most forcefully that

weekly or monthly TSC statistical reports are too detailed and would provide too much

opportunity for detailed trend-analysis.  *See* Groh Decl., Dkt. 178-18 ¶ 77; TSA Final Order,

Dkt. 178-21 at 7.  In acknowledgement of that concern, Plaintiffs are willing to narrow their

request to annual aggregate data that could be gleaned from those weekly and monthly

reports (*i.e.* TSCC0001, TSCC0002, TSCD0043).  The Government has provided annualized

data in the past, so there should be no law enforcement bar to providing annual numbers

here.  *See, e.g.,* Dkt. 169-1, Ex. G, Hearing before the House Subcommittee on Transportation

Security, No. 113-86 at 25 (Sept. 18, 2014) (Testimony of TSC Director Christopher M.

Piehota providing number of individuals and U.S. Citizens on No Fly and Selectee lists in

2014); Reply Ex. Q, 2005 OIG Report at viii (public redacted report providing pie chart of

watch listed persons by handling code).  The Government cannot credibly assert the law

enforcement privilege over comparable statistical information to what it has previously

published and Plaintiffs have Googled.

The Government separately contends that aggregate statistics "could be invaluable

to terrorists in selecting operatives that are more likely to avoid detection because they are

less likely to be identified during screening."  Groh Decl., Dkt. 178-18 ¶ 16.  That statement

defies logic.  Aggregate statistics speak solely to how big the TSDB and its sub-

classifications are, not the "likelihood" of any one terrorist avoiding detection.  Presumably,

if a terrorist meets the criteria to be a known or suspected terrorist, they will already be on

or added to the TSDB regardless of how many *other* people are on the list.  The Government

has repeatedly asserted that it only nominates "known or suspected terrorists" (plus some

exceptions) who possess minimum substantive derogatory information.  Everyone else is

rejected or removed.  But once on the list, *every* KST is distributed to law enforcement

through the NCIC, *every* KST is flagged by CBP, and *every* KST with a name and birthdate is

at least on the Expanded Selectee List and subjected to enhanced screening by the TSA.

Information on TSDB statistical totals thus says *nothing* about the likelihood of a KST being

identified during screening, because *everyone* who is a potential or confirmed match to a

KST will be scrutinized.

The Government has repeatedly in the past disclosed aggregate and annual trend

statistics comparable to those Plaintiffs seek; the Government here identifies no concrete

harms that have resulted from such disclosures.[25]  The desire to avoid embarrassment due

to Plaintiffs' comparison of TSDB's size with its inefficacy at identifying actual terrorists is

not a valid law enforcement interest.

Even if some law enforcement privilege attached to Plaintiffs' requested statistics,

Plaintiffs have demonstrated a compelling need to pierce it here.  Plaintiffs bring a facial

---

[25] *See, e.g.,* Video: An Exclusive Look Inside The Terrorist Screening Center, CNN (April 6, 2016), available at https://www.cnn.com/videos/politics/2016/04/06/exclusive-interview-with-terrorist-screening-center-director-christopher-piehota-origwx-allee.cnn/video/playlists/thwarted-terror-plots/ (TSC Director Christopher Piehota explaining that "U.S. persons on the watchlist comprise less than half of a percent of the total population"); *Overview*, Dkt. 139-1 at 2 ("The vast majority of the identities in the TSDB are foreign nationals who are not located in the U.S. and have no known nexus to the United States).

and as-applied challenge to the procedures which label more than a million individuals as terrorists without meaningful redress.  The statistical size and scope of the watchlist, compared to actual incidents of terrorism, is important context bearing on both the Government's interests and the risks of erroneous deprivation.

### III.   The TSA's Final Order Designating Portions Of Information As SSI Does Not Insulate Non-SSI Portions From Compelled Disclosure

In response to Plaintiffs' Motion to Compel, the TSA issued a Final Order designating discrete categories of information as SSI.  *See* Dkt. 178-20.  As has been noted throughout this reply, Plaintiffs intend to file a petition to review some of the SSI designations in the Court of Appeals.  The TSA's SSI designations are overbroad, particularly regarding the criteria for designating individuals as No Fly, Selectee, or Expanded Selectee.  These TSDB criteria and classifications are the product of Watchlisting Advisory Council discussion and consensus, a council chaired by non-DHS agencies.  Individual nominations are submitted by all watchlisting agencies, not just the TSA.  The *sole* power to approve someone to the TSDB or any of the component lists is held by the TSC.  *See, e.g.,* Watchlisting Overview, Dkt. 139-1, Ex. O at 4.  The fact that the TSA receives an export of the TSDB to use designations nominated and approved by other agencies does not mean the entire TSDB and its criteria qualify as SSI.

In any event, the SSI designations within the Final Order apply only to discrete pieces of information and not entire documents.  Plaintiffs therefore request the Court review and compel the documents as appropriate, subject to limited SSI redactions.  This request applies to the Watch Listing Guidance 2015 (TSCA0019); the Terrorist Screening Overview (TSCB0012); the U.S. Government Redress Implementation Plan (TSCD0051); the

Watchlist User Form and Guide (TSCE0002, TSCE0003); and the TSC statistical reports, for which Plaintiffs only seek annualized data (TSCC0001, TSCC0002, TSCD0043).

## IV.    The Government's Technical Objections On Timing And Conferring Should Be Rejected

The Government objects to the timing of this Motion to Compel, principally on the basis that it was filed after the close of written discovery, and that it was filed more than two months after Plaintiffs stated they would be filing a motion to compel soon.  While the demands of this and other cases did cause Plaintiffs' counsel to file later than expected, no deadline was missed and the delay did not prejudice the Government.  Written discovery had finished just three weeks earlier on February 23, and a half-dozen depositions were still pending.  No motions cut-off had passed, no dispositive motions had begun, and a scheduling conference was held the same day of filing.  Moreover, Plaintiffs believed it would be far more efficient for the Parties and the Court to address written discovery in bulk, rather than piecemeal.  This afforded the Parties the opportunity to narrow their requests and their privilege assertions, and permitted the Government to only seek one state secrets privilege declaration from the Attorney General.  Any prejudice was further diminished by Plaintiffs' liberal consent to Government-requested extensions during the briefing process.

The Government also objects to Plaintiffs' alleged failure to meet and confer on some interrogatory responses and DHS TRIP requested information.  Plaintiffs' counsel met and conferred with the Government extensively regarding their discovery responses over a period of multiple months.  These discussions happened via email, phone, and in person at depositions and hearings.  To the extent some discrete topics were not fully discussed, the

Government's fulsome opposition and invocation of governmental privileges indicates that any additional conferral effort would have been futile.

The Court should reject the Government's technical bases for denying discovery requests and instead evaluate the merits of Plaintiffs' requests, the adequacy of the Government's asserted interests, and the need for Plaintiffs' to obtain the sought-after discovery.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court GRANT their First Motion to Compel, as narrowed by this Reply.

Respectfully submitted,

COUNCIL ON AMERICAN-ISLAMIC RELATIONS

BY:     /s/ Gadeir Abbas
LENA F. MASRI (P73461)
GADEIR I. ABBAS (VA: 81161)
*Attorneys for Plaintiff*
453 New Jersey Ave, SE
Washington, DC 20003
Phone: (202) 742-6420

*Gadeir Abbas is licensed in VA, not in D.C.
Practice limited to federal matters.*

AKEEL & VALENTINE, PLLC
SHEREEF H. AKEEL (P54345)
*Attorney for Plaintiffs*
888 W. Big Beaver Rd., Ste. 910
Troy, MI 48084
Phone: (248) 269-9595
shereef@akeelvalentine.com

Dated: May 8, 2018

## CERTIFICATE OF SERVICE

I hereby certify that on May 8, 2018, I electronically filed the foregoing by using the

Court's ECF system.  I further certify that all participants in the case are registered ECF users

and will be electronically served by the Court's ECF notification system.

Respectfully submitted,

COUNCIL ON AMERICAN-ISLAMIC
RELATIONS

BY:     /s/ Gadeir Abbas
LENA F. MASRI (P73461)
GADEIR I. ABBAS (VA: 81161)
*Attorneys for Plaintiff*
453 New Jersey Ave, SE
Washington, DC 20003
Phone: (202) 742-6420

*Gadeir Abbas is licensed in VA, not in D.C.
Practice limited to federal matters.*

AKEEL & VALENTINE, PLLC
SHEREEF H. AKEEL (P54345)
*Attorney for Plaintiffs*
888 W. Big Beaver Rd., Ste. 910
Troy, MI 48084
Phone: (248) 269-9595
shereef@akeelvalentine.com

Dated: May 8, 2018