**INDEX OF REPLY EXHIBITS**

| Exhibit | Description | Date |
|---|---|---|
| A | Plaintiffs' Narrowed List of Government Privilege Log Documents to Compel | May 8, 2018 |
| B | Excerpts of Kadura Deposition Transcript | November 30, 2017 |
| C | Excerpts of Al-Halabi Deposition Transcript | February 23, 2018 |
| D | Excerpts of Father Doe 2 Deposition Transcript | January 17, 2018 |
| E | Excerpts of Shibly Deposition Transcript | February 12, 2018 |
| F | Excerpts of Elhady Deposition Transcript | February 22, 2018 |
| G | Excerpts of Frljuckic Deposition Transcript | December 1, 2017 |
| H | Excerpts of Elhuzayel Deposition Transcript | January 18, 2018 |
| I | Excerpts of Ahmed Deposition Transcript | February 20, 2018 |
| J | Excerpts of El-Shwehdi Deposition Transcript | November 29, 2017 |
| K | Excerpts of Anwar Deposition Transcript | February 15, 2018 |
| L | Excerpts of Ali Deposition Transcript | March 14, 2018 |
| M | Excerpts of Hakmeh Deposition Transcript | March 2, 2018 |
| N | Excerpts of JD4 Deposition Transcript | December 18, 2018 |
| O | Excerpts of Awad Deposition Transcript | January 9, 2018 |
| P | Baltimore Police Department, Policy 802 | September 8, 2016 |
| Q | Review of the Terrorist Screening Center, DOJ Office of the Inspector General | June 2005 |
| R | Excerpts of DHS TRIP Deposition Transcript | December 20, 2017 |

# Exhibit A

## PLAINTIFFS' NARROWED LIST OF DOCUMENTS TO COMPEL

| PRIVLOG DATE | DOCUMENT # | BATES | DOCUMENT DATE (if available) | DOCUMENT TITLE OR DESCRIPTION | GOV'T REVISED PRIVILEGES |
|---|---|---|---|---|---|
| 11/15/2017 | TSCA0014 | | 12/8/2015 | TSC - Redress Program Standard Operating Procedure | LEP |
| 11/15/2017 | TSCA0019 | | 2015 | Watch Listing Guidance 2015 | LEP SSI |
| 11/15/2017 | TSCA0229 | | January 2009 | HSPD 6 Foreign Partner Terrorism Screening Information Sharing Strategy Document | LEP SSP |
| 11/15/2017 | TSCA0230 | | | Terrorist Screening Center (TSC) Handling Codes | LEP |
| 11/15/2017 | TSCA0231 | | | Terrorist Screening Center Law Enforcement Information Sheet | LEP |
| 11/15/2017 | TSCA0233 | | | Terrorist Screening Center Identity Intelligence Unit Info Sheet and FAQ | LEP |
| 11/15/2017 | TSCA0235 | | 8/21/2015 | Foreign Dissemination of Classified Information Policy Guide | LEP SSP |
| 11/30/2017 | TSCB0002 | Elhady-FBITSC-PRIV00002 | | Watchlist Submission Form Interface Page | LEP |
| 11/30/2017 | TSCB0012 | Elhady-FBITSC-PRIV00320-Elhady-FBITSC-PRIV00346 | | Terrorist Screening Overview | LEP SSI |
| 11/30/2017 | TSCB0013 | Elhady-FBITSC-PRIV00347-Elhady-FBITSC-PRIV00354 | | Nominations and Data Integrity Unit training PowerPoint re: HSPD-6 and USG Restricted Information | LEP |
| 11/30/2017 | TSCB0014 | Elhady-FBITSC-PRIV00355-Elhady-FBITSC-PRIV00356 | 5/18/2016 | SOP re: nomination procedures | LEP |
| 12/22/2017 p1 | TSCC0001 | Elhady-FBITSC-PRIV000445-Elhady-FBITSC-PRIV001912 | 2012-2017 | TSDB Director's Monthly Statistical Reports | LEP SSI |
| 12/22/2017 p1 | TSCC0002 | Elhady-FBITSC-PRIV001913-Elhady-FBITSC-PRIV002703 | 2012-2017 | TSDB Weekly Statistical Reports | LEP SSI |
| 12/22/2017 p1 | TSCC0003 | Elhady-FBITSC-PRIV002704-Elhady-FBITSC-PRIV002719 | 12/30/2008 | MOU between TSC and Department of Homeland Security re: the Secure Flight Program | LEP |
| 12/22/2017 p2 | TSCD0001 | Elhady-FBITSC-PRIV003099-Elhady-FBITSC-PRIV003104 | 05/2014 | PowerPoint re: Visa Review and International Liaison Unit Functions at the Terrorist Screening Center | LEP |
| 12/22/2017 p2 | TSCD0002 | Elhady-FBITSC-PRIV003105-Elhady-FBITSC-PRIV003117 | 5/11/2017 | Visa Review: Standard Operation Procedures | LEP |
| 12/22/2017 p2 | TSCD0003 | Elhady-FBITSC-PRIV003118-Elhady-FBITSC-PRIV003129 | 9/16/2003 | MOU on the Integration and Use of Screening Info to Protect against Terrorism | LEP SSP |
| 12/22/2017 p2 | TSCD0006 | Elhady-FBITSC-PRIV003144 | 11/25/2013 | Email: Watchlisting Policy Exception | LEP |
| 12/22/2017 p2 | TSCD0008 | Elhady-FBITSC-PRIV003150-Elhady-FBITSC-PRIV003184 | | TSC Training Powerpoint re: Foreign Government Information | LEP SSP |
| 12/22/2017 p2 | TSCD0009 | Elhady-FBITSC-PRIV003185 | 4/7/2015 | Flowchart: Nomination Priority Standard Model | LEP |
| 12/22/2017 p2 | TSCD0015 | Elhady-FBITSC-PRIV003267-Elhady-FBITSC-PRIV003268 | 5/26/2014 | NDIU: Nomination Prioritization Standard | LEP |

## PLAINTIFFS' NARROWED LIST OF DOCUMENTS TO COMPEL

| PRIVLOG DATE | DOCUMENT # | BATES | DOCUMENT DATE (if available) | DOCUMENT TITLE OR DESCRIPTION | GOV'T REVISED PRIVILEGES |
|---|---|---|---|---|---|
| 12/22/2017 p2 | TSCD0017 | Elhady-FBITSC-PRIV003291-Elhady-FBITSC-PRIV003293 | | TSC Document re: Foreign Partnerships | LEP SSP |
| 12/22/2017 p2 | TSCD0029 | Elhady-FBITSC-PRIV003567-Elhady-FBITSC-PRIV003625 | | TSC Overview PowerPoint | LEP |
| 12/22/2017 p2 | TSCD0043 | Elhady-FBITSC-PRIV003727-Elhady-FBITSC-PRIV003801 | 2012-2017 | TSC monthly statistical reports | LEP SSI |
| 12/22/2017 p2 | TSCD0044 | Elhady-FBITSC-PRIV003802-Elhady-FBITSC-PRIV003806 | 10/3/2008 | DOJ Memo from Deputy Attorney General to Heads of Department Components re: Department of Justice Protocol Regarding Terrorist Watchlist Nominations | LEP |
| 12/22/2017 p2 | TSCD0046 | Elhady-FBITSC-PRIV003817-Elhady-FBITSC-PRIV003827 | April 2007 | MOU between TSC and DHS re: Screening for Immigration Benefits | LEP |
| 12/22/2017 p2 | TSCD0051 | Elhady-FBITSC-PRIV004326-Elhady-FBITSC-PRIV004332 | 4/9/2015 | U.S. Government Redress Implementation Plan | LEP SSI |
| 12/22/2017 p2 | TSCD0053 | Elhady-FBITSC-PRIV004343-Elhady-FBITSC-PRIV004357 | March 2005 | State Department memorandum and report re: terrorist screening information sharing | LEP |
| 12/22/2017 p2 | TSCD0055 | Elhady-FBITSC-PRIV004372-Elhady-FBITSC-PRIV004377 | March 2006 | MOU between TSC and TSA re: Screening | LEP |
| 12/22/2017 p2 | TSCD0058 | Elhady-FBITSC-PRIV004400-Elhady-FBITSC-PRIV004404 | December 2006 | Addendum B to the MOU between TSC and TSA re: Use of Terrorist Information | LEP |
| 12/22/2017 p2 | TSCD0060 | Elhady-FBITSC-PRIV004413-Elhady-FBITSC-PRIV004418 | September 2006 | MOU between TSC and the Overseas Private Investment Corporation re: Terrorist Screening | LEP |
| 12/22/2017 p2 | TSCD0063 | Elhady-FBITSC-PRIV004427-Elhady-FBITSC-PRIV004443 | 05/12/2006 | MOU between TSC and TSA re: Use of Terrorist Information | LEP |
| 12/22/2017 p2 | TSCD0065 | Elhady-FBITSC-PRIV004446-Elhady-FBITSC-PRIV004488 | | An Updated Strategy for Comprehensive Terrorist- Related Screening Procedures | LEP |
| 12/22/2017 p2 | TSCD0067 | Elhady-FBITSC-PRIV004499-Elhady-FBITSC-PRIV004521 | July 2012 | FBI TSC Privacy Impact Assessment | LEP |
| 2/16/2018 | TSCE0002 | Elhady-FBITSC-PRIV004628-Elhady-FBITSC-PRIV004668 | | Watchlist Submission Form User Guide | LEP SSI |
| 2/16/2018 | TSCE0003 | Elhady-FBITSC-PRIV004669-Elhady-FBITSC-PRIV004678 | 12/8/2017 | Watchlist Submission Form FAQ | LEP SSI |

# Exhibit B

Case 1:16-cv-00375-AJT-JFA   Document 208-1   Filed 05/08/18   Page 6 of 138 PageID# 7219

Yaseen Kadura                                    November 30, 2017
Elhady vs. Kable

Page 1

1            IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF VIRGINIA
2                  Alexandria Division
3
4
5
    ANAS ELHADY, et al,
6
             Plaintiffs,        Civil Action No.
7
      vs.                       1:16-cv-375
8
    CHARLES H. KABLE, et al,     (AJT)(JFA)
9
             Defendants.
10
11
12
13           Deposition of Yaseen I. Kadura
14                 Washington, D.C.
15            Thursday, November 30, 2017
16                  10:00 a.m.
17
18
19
20
21
22
23   Job No. 2759927
24   Reported by:  Laurie Donovan, RPR, CRR, CSR
25

Yaseen Kadura
Elhady vs. Kable

November 30, 2017

Page 2

1           Deposition of
2         YASEEN I. KADURA
3
4 Held at the offices of:
5       U.S. Department of Justice
6       20 Massachusetts Avenue, N.W.
7       Washington, D.C. 20001
8       (202)514-2395
9
10
11
12
13
14
15
16
17
18         Taken pursuant to notice, before
19 Laurie Donovan, Registered Professional
20 Reporter, Certified Realtime Reporter, and
21 Notary public in and for the District of
22 Columbia.
23
24
25

Page 3

1          A P P E A R A N C E S
2 ON BEHALF OF THE PLAINTIFFS:
3       Council on American-Islamic Relations
4       453 New Jersey Avenue, S.E.
5       Washington, D.C. 20003
6       (202)742-6420
7       By:  Gadeir I. Abbas, Esq.
8          gabbas@cair.com
9          Ahmed Mohamed, Esq.
10 ON BEHALF OF THE DEFENDANTS:
11       Department of Justice, Civil Division
12       20 Massachusetts Avenue, N.W.
13       Washington, D.C. 20001
14       (202)514-2395
15       By:  Antonia Konkoly, Esq.
16          antonia.konkoly@usdoj.gov
17          Jayme Kantor, Esq.
18          jayme.kantor@usdoj.gov
19 ALSO PRESENT:
20       Jennifer Greenband, counsel for TSA
21
22
23
24
25

Page 4

1         EXAMINATION INDEX
2                  PAGE
3 EXAMINATION BY MS. KONKOLY . . . . . . . . .   6
4
5
6
7
8         E X H I B I T S
9 EXHIBIT    DESCRIPTION            PAGE
10 Exhibit A  Plaintiffs' Responses to
11       Defendants' First Set of
12       Discovery Requests to
13       Plaintiffs . . . . . . . . . . .  19
14 Exhibit B  Plaintiff Yaseen Kadura's
15       Supplemental Responses to
16       Defendants' First Set of
17       Requests to Plaintiffs  . . . . .  23
18 Exhibit C   Copy of Yaseen I. Kadura's
19       U.S. passport . . . . . . . . . .  37
20 Exhibit D   Defendants' First Request for
21       Production of Documents to
22       Plaintiffs . . . . . . . . . . .  38
23 Exhibit E  Xerox copies of cell phone
24       packaging materials . . . . . . .  180
25

Page 5

1 (Exhibits continued)
2 EXHIBIT    DESCRIPTION            PAGE
3 Exhibit F  Plaintiffs' First Complaint for
4       Injunctive and Declaratory Relief
5       and Jury Demand . . . . . . . . .  266
6 Exhibit G  Letter from Department of
7       Homeland Security dated
8       September 4, 2015, to Lena Masri,
9       Bates Kadura-000018 . . . . . . .  298
10 Exhibit H   Certification of Identity for
11       Yaseen I. Kadura, Bates number
12       Kadura-000023 . . . . . . . . . .  306
13
14
15
16
17
18
19
20
21
22
23
24
25

2 (Pages 2 - 5)

Yaseen Kadura
Elhady vs. Kable
November 30, 2017

Page 162

1    Q   Okay.  What do you recall about
2  September 22, 2012?
3    A   Okay.  So September 22, that Port Huron
4  crossing, I was coming back.  It was at night.  I
5  believe I was driving my mom's Toyota Camry, 2011.
6  It's a gray car, you know.  Every time I cross the
7  border, I'm uneasy because of, you know, all the
8  past incidents that I had had and just the general
9  awareness of how, you know, Muslim-Americans,
10 Arab-Americans are treated.
11       I was crossing the border.  I had a nice
12 conversation with the border guard.  He asked me
13 where I went to school.  I told him IUPUI.  What
14 were you doing in Canada?  I told him I was
15 visiting family.  You know, it was a nice
16 conversation.
17       He ended up, you know, when he swiped
18 me -- actually, you know what?  It wasn't at
19 night.  I'm going to take that back.  It wasn't at
20 night.  I think it was around five in the
21 afternoon, but I'm not 100 percent, but it wasn't
22 at night.  That's my mistake.  I was let out at
23 night.
24       So anyways, I go to cross the border,
25 had a nice conversation, he scans my passport, and

Page 163

1  I've been waiting for it, and that red screen
2  popped up.
3    Q   Was this your American passport?
4    A   Yes.
5       So then he says keep your hands on the
6  steering wheel and look forward.  I keep my hands
7  on the steering wheel, I'm looking forward.  I'm
8  like okay.  He's like I'm going to open the door,
9  keep your hands where I can see them.  He had
10 pressed some kind of button.  I didn't look around
11 to see what was going on.  I'm just looking
12 forward kind of in disbelief, like okay, what's
13 going on.  You know, I'm just going to listen to
14 everything he says.
15       He opens the door.  He tells me to get
16 out of the car with my hands first.  I turn, I get
17 out of the car, and I stand up.  He says put your
18 hands up in the air and look forward.  I'm looking
19 forward.  Hands are up in the air, you know?  He
20 pats me down.  Then he tells me I want you to walk
21 out into the middle of the road until -- and
22 there's going to be a voice behind you.  Until he
23 says to stop.
24       So I had my hands up in the air, I'm
25 walking, I'm kind of like laughing, and he tells

Page 164

1  me don't look back, don't make any moves.  I'm
2  walking.  I kind of looked to my left.  I see a
3  bunch of cops were their hands on their hips to
4  the left of me.  I'm walking back.  I look to my
5  right, I see that all the border crossings are --
6  no cars are going through, and like the same
7  formation is over on the right of me, behind the
8  little barrier.  They have their hands on their
9  hips, right, I'm assuming near their guns.
10       I'm walking back.  Then there's a voice
11 behind me that tells me come, come, come.  Okay,
12 stop.  Grabs my hand, handcuffs me, right, and
13 then him and all of the cops that had pulled that
14 formation on me escorted me inside.  On my way
15 going inside to the building, I saw all the cars
16 are stopped up, all the traffic going from Sarnia
17 to Port Huron is stopped, right?  And there's
18 literally a girl has her camera phone open and is
19 like videotaping me, you know, while I'm being
20 handcuffed and taken in for I don't know what.
21       As I'm being taken in, I asked one of
22 the cops why did you guys need to do that.  I'm
23 sure you have in your computer that I've been
24 nothing but cooperative with you guys, and he said
25 oh, it's for your own safety, and I was like what

Page 165

1  do you mean?  He was like, oh, so we don't shoot
2  you, right?
3    Q   I get taken to this back room.  There's
4  no windows.  I'm handcuffed, I'm sitting on the
5  ground.  One of them tells me to take my shoes
6  off.  I'm kind of doing it, but I'm a little slow.
7  I had never had anything happen, I'd never been
8  handcuffed, you know, never had this happen to me
9  before.
10       He takes my shoe, throws it against the
11 wall.  He takes my other shoe, looks in it, throws
12 it against the wall, you know, and there's just
13 someone sitting there minding the door, and I'm
14 sitting there in my handcuffs, barefoot.  He had
15 patted me down, all that.  I'm sitting there
16 waiting, and I'm just like really?  Like what is
17 going on, you know?
18       And I had someone that was waiting for
19 me on the other side, right, because he wanted to
20 go take me to dinner, and I was thinking about how
21 do I contact him, how do I contact my family,
22 because they're always worried every time I cross
23 the border, because they want to know what's going
24 on, right?
25       Eventually, after I don't know how long,

42 (Pages 162 - 165)

Case 1:16-cv-00375-AJT-JFA   Document 208-1   Filed 05/08/18   Page 9 of 138 PageID# 7222

Yaseen Kadura                                    November 30, 2017
Elhady vs. Kable

1 it might have been one or two hours, they take me
2 out of this room with no windows, and they take to
3 me another room that nobody is in.  There's people
4 that are being taken in and detained in a normal
5 room, and I'm in this other room where there's
6 nobody.
7        They take my fingerprints, they take a
8 picture of me, and I tell them, listen, someone is
9 waiting for me on the other side.  Can I make a
10 phone call?  They said no.  Can I call my dad, can
11 I let him know?  They said no.  Why are you guys
12 stopping me?  They're not telling me.  Why this,
13 why that.  They're not telling me.
14        Eventually they told me to unlock my
15 phone for them.  I asked them what happens if I
16 don't.  They said you have to.  I unlocked my
17 phone for them.  I saw them take my phone and plug
18 it into a computer.
19        You know, I saw them coming and going,
20 and I'm sitting in this room, and it's cold, it's
21 freezing, and I have like a bunch of books just
22 like whatever in my car.  All my clothes.  It's my
23 mom's car.  She had her stuff all over the place
24 and my stuff all over the place, and it's the same
25 deal.  I see them coming and going, photocopying

1 papers, not telling me why I'm being held, not
2 being nice at all, being extremely callous toward
3 me.
4        And I'm talking to them, hey, look, why
5 are you guys stopping me?  Like what can I do?
6 All they referred me to was DHS TRIP, right?  It
7 was just the same list for everything, but you
8 never get any answers.  I couldn't make a phone
9 call.  Eventually they said okay, and they called
10 my father for me, and they told my father, right,
11 but they didn't let me make the phone call.
12        They ended up holding me for a good
13 seven and a half, eight hours, and they took my
14 phone, and like when I came to leave, they took my
15 phone and they said they're going to keep it, and
16 then in 24 hours someone would -- I was like,
17 well, how do I get my phone back?  I don't live in
18 Michigan.  I live in Indianapolis.  How am I going
19 to get home?  Because I don't know how to go home.
20 I'm a millennial.  I'm a GPS baby.  I don't know
21 how to get there, you know, especially from up in
22 Michigan.
23        So then they tell me -- they just have
24 no answers for me, and then I'm like how do I get
25 my phone back?  What do you mean you're taking my

1 phone?  And look, like I had everything in there,
2 like text messages to girls, you know what I'm
3 saying?  Like everything.  This is my phone.  I
4 got some music on there, I got pictures on there,
5 I have like little selfies close up to my face and
6 stuff, you know what I'm saying?  Like this is my
7 personal device.  Why do they have this?  What
8 could they possibly do?
9        And I'm aware of what happens to, you
10 know, how the FBI operates and what their modus
11 operandi is in terms of -- you know, I'm aware of
12 COINTELPRO.  If they want something, they'll twist
13 your arm into doing it.  It doesn't matter whether
14 or not you're innocent or anything like that.
15 They'll hold whatever over your head, you know, be
16 it a personal situation, be it whatever, and
17 that's the truth, right?
18        Anyways, then the drive is supposed to
19 take maybe five hours to get back.  They gave me a
20 number -- sorry to backtrack.  They gave me a
21 number, they said this is the number for ICE.
22 They didn't give it to me like on a formal paper.
23 They didn't give me anything.  They wrote a number
24 on like a little sheet of paper.  They gave it to
25 me.  They said call these people, you'll have your

1 phone in 24 hours.  You can call them after 24
2 hours, and you should be able to get your phone.
3 They told me whatever they needed to tell me to
4 get me out of there.  They gave me a number for
5 ICE.
6        Then I ended up going -- I go to a pay
7 phone.  I call my dad.  I told him I finally got
8 out.  This is like, I don't know, midnight, 1:00,
9 2:00 a.m.  I don't know.  He's like okay.  I end
10 up like looking on a map, trying to figure out how
11 to get home.  I ended up getting lost.  I got home
12 at like 7:00 or 8:00 a.m., right?
13        The next day, I waited 24 hours, I start
14 calling this number for ICE.  It's like not even a
15 number people are supposed to call.  I'm calling,
16 I'm like, hey, someone told me that this is the
17 number I should call.  My phone was taken away
18 from me.  I get hung up on.  I'm like okay.  I
19 started changing the last digit of the phone
20 number to get different offices in the building.
21 It was a 313 Detroit number.  I'm calling, people
22 are literally hanging the phone up in my face.  No
23 one is responding to me.  I'm freaking out.  I
24 don't know what to do.  I ended up contacting
25 CAIR.

43 (Pages 166 - 169)

Yaseen Kadura
Elhady vs. Kable
November 30, 2017

Page 198

1 testimony.
2       To be clear, I'm going to be very clear
3 that I am not in any way, in any question, asking
4 for any attorney/client privileged communications,
5 so I'm not asking you to disclose those.
6       MS. KONKOLY: However, Mr. Abbas,
7 it is not appropriate for you to be
8 interrupting your client in the middle of an
9 answer when I have not asked for anything.
10 You can speak an objection to my questions,
11 but not interrupt your client in the middle
12 of his answer.
13       MR. ABBAS: You have regularly
14 asked questions that the answer to those
15 questions involve attorney/client
16 communications. Sometimes you've asked
17 directly for attorney/client privileged
18 communications, and to the extent that your
19 questions are asking for attorney/client
20 privileged communications, I will remind and
21 instruct the deponent not to reveal
22 attorney/client privileged communications.
23 That's absolutely how the rules work.
24       MS. KONKOLY: Gadeir, you have an
25 opportunity, after I ask a question, to state

Page 199

1 your objection before your client starts
2 speaking. Once he starts speaking, he has
3 the opportunity to decide whether he wants to
4 waive the privilege, and it is not
5 appropriate for you to interrupt his answer.
6 Your opportunity to make an objection is
7 after I ask my question. That's when you
8 make your objection. Okay?
9       MR. ABBAS: That's your view, and I
10 think we might have to agree to disagree
11 about whether it's appropriate for me to,
12 when you ask questions that regard
13 attorney/client communications, to instruct
14 my client to not provide attorney/client
15 privileged information.
16       If he wants to waive the privilege
17 knowingly after I invoke it, I guess. So if
18 you'd like to ask him would he like to waive
19 the attorney/client privilege --
20       MS. KONKOLY: Gadeir, the process
21 is question, objection, answer. Question,
22 objection, answer. The objection does not
23 come in the middle of an answer. I would
24 like the record to reflect that you have made
25 a number of those improper assertions of

Page 200

1 objections in the middle of an answer.
2       I would like to request that you
3 refrain from making those kind of objections
4 going forward. You have every opportunity,
5 if you think my question out of bounds, to
6 state your objection at that time. I think
7 I've been very clear about how I'm not asking
8 about any of that information.
9       THE WITNESS: I have a question.
10 BY MS. KONKOLY:
11   Q   You can ask a clarification question
12 about a question that I ask you. Otherwise, I'm
13 asking the questions and you're answering them.
14       MR. ABBAS: There's no question
15 pending, so let's have a question pending,
16 and then we'll deal with it from there.
17 BY MS. KONKOLY:
18   Q   So Agent Fout contacted you, he told you
19 that he had your phone. What else did he tell
20 you?
21   A   Okay. So I have a bit of a question.
22   Q   Is it a clarification question about the
23 question that I asked you?
24   A   It's a question about like if I, if I
25 want to waive the privilege for like a second and

Page 201

1 then bring it back.
2       Can I do that?
3       MR. ABBAS: I'm instructing the
4 witness -- can I have a few minutes with --
5 there's not a pending -- I guess there is
6 kind of a pending question.
7       MS. KONKOLY: We can take a
8 60-second break.
9       MR. ABBAS: Yeah, two minutes will
10 probably be fine.
11       THE WITNESS: Thank you. I've
12 never done this before, you know what I'm
13 saying?
14       MS. KONKOLY: Please be back in 90
15 seconds. We're running late.
16       (Whereupon, a short recess was
17       taken.)
18 BY MS. KONKOLY:
19   Q   You were testifying about your
20 conversations with Agent Fout. You said you
21 received a call from him, that he told you that he
22 had your phone.
23       My question to you, which I'll repeat,
24 is: What else did he tell you at that time?
25   A   Okay. So I got this phone call from

51 (Pages 198 - 201)

Yaseen Kadura
Elhady vs. Kable

November 30, 2017

Page 202

1 Special Agent Arkin Fout, identified himself as
2 Special Agent Arkin Fout, and he told me that he
3 had my phone, right?  And this comes after -- my
4 understanding was that my attorney had contacted
5 ICE after ICE had been unresponsive to me.  My
6 understanding is that ICE told my attorney that
7 they had my phone, they wanted to talk.
8        My understanding also is that my
9 attorney told them that she would be willing to
10 engage them in a back-and-forth like written
11 correspondence, and then they -- my understanding
12 is that they completely went radio silence, hadn't
13 heard anything from them.
14        And then I had this incident on
15 October 22 at the airport in Chicago, and
16 basically I had heard nothing, right?  And my
17 understanding also is that my attorney was
18 extremely explicit and said that you do not
19 contact Yaseen, you contact me, right?
20        So Arkin Fout called me.  He said,
21 listen, he's like we have your phone -- I have
22 your phone.  He said, you know, I understand that
23 you've had a lot of travel difficulties.  He's
24 like, you know, I don't want to jam you up.  He
25 said I know that you're a good guy.  I know that

Page 203

1 you want democracy in Libya.  I know that you're a
2 good American and you want to help America, and I
3 think there's a way for us to -- and this is what
4 he told me.  He said that this is -- he's like I
5 think there's a way for us to fix your travel
6 issues and kind of help us both, right?
7        And I said listen, man, I want to stick
8 to my attorney.  I don't mean to be uncooperative,
9 you know.  You know, I want to stick to my
10 attorney, I don't mean to be uncooperative, but I
11 just want -- I was like, you know, I just want to
12 stick with my attorney, and I don't want these
13 things, and he's like, look, you know -- he
14 basically said that, he said that if I stuck with
15 my attorney, that my travel difficulties would be
16 nearly impossible to get rid of.  He said that
17 they're not going anywhere, right?  And he said
18 that, you know, if we met informally without my
19 lawyers, things would be much easier.
20        And then I said like what?  And then he
21 said I'll come down.  He's like, you don't even
22 have to come to Detroit.  I'll come down to
23 Indianapolis and I'll get a hotel room, and you
24 can meet me in my hotel room.  And then I said,
25 you know, like with all due respect, I don't mean

Page 204

1 to be uncooperative, but if you could contact my
2 attorney, I'm willing to engage you guys, but I
3 want to stick with my rights.
4        Again, I was afraid of this man, and,
5 you know, I threw this out there just because I
6 didn't know what he was getting at, and I said I'm
7 just a broke college kid, like I'm just trying to
8 keep my head down and live my life.  If I ever had
9 any information, of course, I'd directly go to the
10 authorities.
11        And he said, well, you're broke?
12 There's a way for us to fix that, right?  He
13 mentioned, he said, oh, you're from a prominent
14 family in Benghazi.  Basically he said he would
15 pay me.  He said you're from a prominent family in
16 Benghazi, you know.  I think that we could find an
17 arrangement that helps you the most.
18        Then I said, you know, sir, with all due
19 respect, I still want to stick to my attorney.
20 Then he said, well, call me before you call your
21 lawyer, okay?  He basically told me not to talk to
22 my lawyer and then told me to contact him and to
23 give it some time and to think about it.
24        First thing I did was -- and when I
25 heard him tell me that he wanted me to go to a

Page 205

1 hotel room, the first thing I thought was, okay,
2 I'm going to meet this guy in a hotel room in
3 downtown Indianapolis, I'm going to go up to his
4 room, and then I walk out, someone says I pressed
5 a detonator, is going to handcuff me and put some
6 kind of charge on me, because when this guy sees
7 me, he sees a guy that was in Libya,
8 Muslim-American.  All he sees are dollar signs.
9 All he sees is, okay, this is a way for me to get
10 a promotion, right?  That's the first thing that
11 went through my head, because that's how they do,
12 you know?  So he went around my attorney, told me
13 to meet him in a hotel, not even in a hotel lobby.
14 In his hotel room, right?  Like what is that?  It
15 was insane.
16        So immediately what I did is I took my
17 phone apart, put it in like five different pieces,
18 and just like scattered around my house, went and
19 parked my car, walked a mile to a pay phone.  I
20 ended up -- first thing I did was I got a calling
21 card, I called my dad in Libya.  My dad said,
22 okay, call your lawyer immediately.  I was scared
23 to call my lawyer, because I didn't know what this
24 guy would do to me.  My dad told me to call my
25 lawyer.  I was 22.  I didn't know how to act.  You

52 (Pages 202 - 205)

Yaseen Kadura
Elhady vs. Kable
November 30, 2017

Page 206

1 know what I mean?  Like this is the scariest thing
2 that ever happened to me.
3      I ended up calling my lawyer --
4      MR. ABBAS:  And I'm instructing the
5 witness not to reveal any attorney/client
6 privileged communications.
7      MS. KONKOLY:  I'm going to again
8 note that you can object to my question, but
9 I would ask you to refrain from interrupting
10 your client.
11      MR. ABBAS:  If you want, every
12 single question you ask, I'll now, from now
13 on and henceforth, make the same
14 attorney/client privilege objection.  If you
15 want to do it that way, that's fine.
16      MS. KONKOLY:  You can make the
17 objection after I ask my question, but you
18 cannot interrupt in the middle of an answer.
19      MR. ABBAS:  That's not true.
20 That's your view, but that's not actually how
21 these things work.
22      THE WITNESS:  Okay, so --
23      MR. ABBAS:  Was there a question
24 pending?  Hold on.  There's not a question
25 pending.  What's the question that's pending?

Page 207

1 BY MS. KONKOLY:
2    Q   What happened next in your interactions
3 with Agent Fout?
4    A   So then I wasn't comfortable talking to
5 my lawyer on the phone.  I just feel like this is
6 important for me to say, like just the degree to
7 which like I was so paranoid after this.  I told
8 her, look, I need to talk to somebody, and I can't
9 like say why.
10      I got the name of a lawyer in Michigan,
11 and I went up and spoke to the lawyer in Michigan.
12 As per my understanding, that lawyer immediately
13 sent out complaints and CC'd multiple important
14 people, including congressmen, and it was directly
15 in response to that, that that was express-shipped
16 back to me.
17    Q   Directly -- can you explain directly in
18 response to what?
19    A   Directly in -- so the only thing that
20 changed and the reason that I got that back, as
21 per my understanding, was the TRIP complaints, the
22 amendments made to my DHS TRIP, and the fact that
23 important congressmen and important people were
24 CC'd.
25    Q   And how were they CC'd?  Who initiated

Page 208

1 those communications?
2    A   My lawyer, as per my understanding.
3    Q   Okay.
4    A   So then I remember I had to go up to, go
5 up to Canada, so I stopped in Michigan to see my
6 lawyer.  Then I went up to Canada, because my
7 brother had some kind of thing for his engagement
8 that I had to go be at, right?  I mentioned it
9 before.  He was engaged to a girl that was in the
10 Toronto area.
11      I went up there, and then like they had
12 like a little pre-Thanksgiving dinner or
13 something.  I don't know if they have like
14 Canadian Thanksgiving.  Whatever it was, we had
15 turkey at someone's house on my way back.  Like
16 literally on my way back, I stopped at someone's
17 house, one of my brother-in-law's family's house,
18 and while I was there, I got a text message from
19 Arkin Fout.
20      And I don't know if it's in here, but I
21 have the verbatim on my phone -- on my email.  I
22 remember seeing it the other day.  What he said is
23 I hope you are thinking about what we -- like on
24 Thanksgiving he texted me, like, or whatever that
25 day was, you know?  It's like I hope you're

Page 209

1 thinking about what we had discussed over, you
2 know, not too long ago, and I hope that you're
3 having a good Thanksgiving.  Like intimidating
4 stuff, you know what I'm saying?
5      So then immediately I just forwarded
6 whatever that was, I sent it to my lawyer.
7      MR. ABBAS:  Again I'm instructing
8 the deponent not to reveal any
9 attorney/client privileged communications.
10      THE WITNESS:  So then I --
11      MS. KONKOLY:  I'm going to again
12 note for the record that plaintiff's counsel
13 is interrupting his client in the middle of
14 his speech and directing his testimony.
15      MR. ABBAS:  And I'll just for the
16 record note that because your questions are
17 consistently calling for information --
18      MS. KONKOLY:  You had an
19 opportunity to object to my question.
20      MR. ABBAS:  I'm speaking.  Can I
21 finish?
22      All right.  Your questions are
23 calling for attorney/client privileged
24 communications, and so to the extent that
25 those come up in the course of the answers,

53 (Pages 206 - 209)

Yaseen Kadura
Elhady vs. Kable

November 30, 2017

Page 234

1  my thing, right?  Went to the beach.  They had
2  like surfing and stuff.  Did all that.  Ended up
3  taking -- flew up to Monterrey, and then from
4  Monterrey -- I booked a bus from Monterrey all the
5  way to Laredo in Texas.
6        I knew that when I got to the border, I
7  wanted to get off the bus before the bus crossed
8  the border, because I didn't want to hold up
9  everyone on the bus.  I didn't want to be
10  humiliated in that way in front of everybody that
11  was on the bus.  So I spoke to the bus driver, who
12  doesn't speak any English, I was like, listen, I
13  need to get off there, right?  He's telling me no,
14  no, no.  I just grabbed my stuff, I got off the
15  bus.
16        I walked all the way around, I don't
17  know how long, maybe a half mile, maybe a mile, to
18  the foot crossing for when you cross -- see,
19  that's what I mean like by "it's complicated,"
20  because I took a bus up to the border, but I
21  didn't cross with the bus.  I got off the bus, I
22  walk over to where you can cross by foot, and
23  that's how I crossed.
24        Did you want to hear that story about
25  what happened there?

Page 235

1     Q   In a minute.
2        So how many flights did you take inside
3  of Mexico altogether?
4     A   I think three.  I'm not sure.
5     Q   What are the three that you remember, if
6  you could lay that out for me again?
7     A   Monterrey to Mexico City.  Mexico City
8  to Puerto Escondido.  Puerto Escondido -- no, I
9  took a bus from Puerto Escondido to Oaxaca.
10  Oaxaca to Juarez -- and then a flight from Oaxaca
11  to Juarez to -- I think it was direct to
12  Monterrey, and then a bus over.
13     Q   Okay.  Were there any issues, delays,
14  barriers to any of that travel?
15     A   Zero.  Perfect.  I was treated like a
16  normal human being.  It felt good.
17     Q   So let's get back to your recrossing
18  into the United States on August 11, 2015.  Did
19  you have any issues making that border crossing?
20     A   Absolutely.
21        So I walk over, right?  And I'm walking
22  by myself, and I got my duffle bag, and I'm like,
23  I'm like okay, all right, here we go, you know?
24  So I'm walking through the like little walkway or
25  whatever.  There's a bunch of people in front of

Page 236

1  me, some people behind me, just young kids that I
2  guess crossed over to have like a little good time
3  in Mexico and come back, that lived in Laredo or
4  something.
5        And to be honest, I looked like the
6  least criminalistic of all of them, you know what
7  I mean?  And here I come, and then, you know, all
8  of a sudden they scan my passport, boom, right?  I
9  get handcuffed in front of this whole crowd of
10  people.  They're all looking at me like is this El
11  Chapo?  I didn't know what was happening.
12        They handcuffed me.  They took me into
13  the room.  I see a room full of Cubans.  I find
14  out later that Laredo is like a -- basically a lot
15  of Cubans present themselves at the Laredo border,
16  and then they end up getting like packages for
17  like asylum or whatever.  A bunch of Cubans
18  sitting in the room looking at me like what did he
19  do, because I'm handcuffed outside of the room,
20  like to a bench, right, and like they kept me
21  handcuffed for a good four or five hours there.
22        So I was handcuffed.  Basically they
23  took me in, same deal, but this time they were
24  like actually much more aggressive than at the
25  Canadian border, and I was like -- this time I was

Page 237

1  talking back a little bit.  I said, look, you
2  know, I'm a medical student, I have my master's
3  degree, you know what I mean?  And I have been
4  nothing but cooperative every single time, and
5  courteous, you know?  Like why would you be
6  treating me this way?
7        I know this isn't -- like this is not
8  typical.  I've never been kept handcuffed to a
9  seat.  Even when I was handcuffed in Port Huron,
10  they ended up taking them off after a couple
11  hours.  This one, they kept me there for a long
12  time, and they were tight, and they wouldn't
13  loosen them up.
14        And they started asking me questions.
15  They were like why are you crossing over, and I
16  didn't even have my cell phone with me.  Because
17  I'm so used to it, what I did was I shipped my
18  cell phone back home, and I just crossed the
19  border.  I would have crossed in a G string if I
20  could, you know what I mean?
21        I'm just kidding.  Sorry.
22        So I crossed the border with nothing but
23  my passport in my pocket and my clothes, and I had
24  one book in my duffle bag, because this is the
25  routine, right?  I'm just like -- I'm used to it.

60 (Pages 234 - 237)

Yaseen Kadura
Elhady vs. Kable

November 30, 2017

Page 238

1 And they're just asking me questions, but this
2 time they asked me like what my religion was, what
3 mosque I went to, and I was like I'm not answering
4 that question.  You know, like really?  We're
5 going there?
6       And I asked them for some food.  They
7 didn't bring me food for a long time.  Didn't
8 allow me a phone call.  It was really cold.  They
9 were really rude.  They ended up bringing me like
10 a crushed bag of Oreos and I think some chips, I'm
11 not sure, you know, but not like a good bag of
12 chips.  It was like very little chips in the bag,
13 probably crushed, too.
14       And then like after I finished the chips
15 and the Oreos, I went to throw it away.  I stood
16 up to throw it away, and then I went to drop it,
17 and then literally one of the guys made an
18 explosion sound after I dropped it, like boom, and
19 I turned around, and it was like did I really just
20 hear this guy just do that, you know.
21       And they held me for all the way to a
22 whole seven hours.  I had to like memorize the map
23 of like Laredo, basically, so that -- they let me
24 out in the morning after like the whole seven
25 hours, let me loose into this random town.  I

Page 239

1 ended up walking.  I had to memorize where the
2 Greyhound station was.  I walked over to the
3 Greyhound station, booked a bus ticket to -- I
4 think it was San Antonio, maybe all the way to
5 Dallas, and then from Dallas I took a bus all the
6 way back to Chicago.
7       That's paraphrasing the whole seven,
8 eight hours that I was stopped.
9     Q    Okay.
10    A    And they handcuffed me in front of a
11 bunch of people, asked me about my religion, made
12 an explosion sound when I threw away my bag of
13 chips that they gave me, kept me handcuffed to a
14 bench for an extremely long time, and they didn't
15 keep me in a room with anyone else.
16    Q    Did you talk to anyone about your
17 experiences on this day?
18    A    No.  Maybe like somebody on the bus.
19    Q    I'm sorry.  Anybody aside from your
20 attorney about your experiences on that day.
21    A    Okay.  No.  I mean not that I recall.
22 It's just routine at this point.  So much has
23 happened, I forget.
24    Q    Did you make any writings in any form
25 about this?

Page 240

1    A    Definitely not.
2    Q    Did you make any social media postings
3 about it?
4    A    No.  That's something I'm happy I got
5 rid of.  I no longer put my feelings up on social
6 media.  Silver lining.
7    Q    Is there anyone who was present there
8 you could identify as a witness to those events?
9    A    No.
10    Q    Okay.  If we could go back to Exhibit A,
11 that's your original responses.  I am looking at
12 page 18, paragraph 9 which states "ORD to LGA."
13       Can you elaborate what the travel
14 disclosed in that paragraph was?
15    A    Okay.  So after my lawsuit got to a
16 certain stage where it was then, you know, you
17 could Google it --
18    Q    Let me just start by ORD to LGA.  Is
19 that O'Hare to LaGuardia, New York?
20    A    Mm-hmm, yes, O'Hare to LaGuardia.
21    Q    And what do you recall about this
22 travel?
23    A    So this travel took place after you
24 could publicly find my name associated with the
25 lawsuits against the government that I was a part

Page 241

1 of, and I was like, okay, that's it, you know, my
2 name is out there.  It's time to go to media,
3 because what's done is done, right?
4       I had been avoiding that, and it's
5 something I'm going to have to, you know, deal
6 with when I apply to residency next year is what
7 people can find about me online, right, and this
8 is some scary stuff is to be no-fly-listed at a
9 certain point in time.
10       So I was like, okay, let's talk to
11 Murtaza at The Intercept.  A journalist named Ryan
12 Deveraux had covered -- at The Intercept, he had
13 covered my lawsuit, so it just made sense that,
14 you know, they would keep following my lawsuit and
15 do it in a little detail by interviewing me.
16       So this was my first time trying to fly
17 after that incident when they had denied me
18 flight, being able to get on the plane, and I go
19 to check in at the kiosk.  They can't.  I've tried
20 to check in online.  They won't let me.  I didn't
21 get any sleep the night before, of course, right?
22 Arguing with everybody, freaking out, like
23 stressed out about it.  Went and tried to check in
24 online.  Couldn't check in online.  Go to the
25 kiosk.  Couldn't check in at the kiosk.

61 (Pages 238 - 241)

Yaseen Kadura
Elhady vs. Kable

November 30, 2017

Page 262

1 destination wedding in Cancun.
2     Q    When?
3     A    2014 as well.  One year there was a lot
4 of weddings.  I didn't go to that.
5           I also think this is worth mentioning.
6 I had applied to a lot of places for my master's
7 program, and because of my placement on the no-fly
8 list, I decided to go to the master's program at
9 Rosalind Franklin.  I had also gotten into Tufts
10 University, which would have been my number one
11 choice.  I got into Boston University.  I also
12 wanted to go there.  Those are both much better
13 schools than the one I go to now.  Both master's
14 programs are designed to get you into the host
15 medical school, but because it was so far away
16 from my family, I chose to go to this school which
17 has extremely high tuition, and it's just not as
18 good a school.
19           I also got into --
20     Q    When you say because it was so far away
21 from your family, is that because you wanted to be
22 close to your family?
23     A    Yeah, to visit my mom and dad when I
24 like -- I don't want to have to drive from Boston,
25 because Tufts and the other one are in Boston, you

Page 263

1 know.  I can't fly domestically or I couldn't fly
2 domestically.  Like when I was applying, I was
3 applying for the year 2013/2014.  Yeah, I got into
4 those schools.
5           I got into a few more, but those are the
6 ones that I wanted to go to, and it was just
7 like -- what made me go to the master's school in
8 Chicago, even though it was not as good an
9 opportunity, was just because I -- you know,
10 let's, God forbid, something happened, my parents
11 both have their own respective health issues.  My
12 dad has had a few heart attacks.  My mom has got a
13 ton of like back issues and needs like knee
14 replacements and is always doing rehab for
15 something.  Both my parents were born in the '50s,
16 so I just like -- I didn't want to leave the
17 midwest.  So there's that.
18           Additionally, yeah, I mean I'm just --
19 like I said, yeah, I mean it's just this reality
20 of like I have family all over world, and if
21 something happens to someone, if an event happens,
22 I didn't have that option of going there, you
23 know?  When my uncle fell into -- when he fell
24 into his coma, and like he hasn't been the same
25 since, you know, I drove cross-country to be there

Page 264

1 for him.  Family is extremely important to me, you
2 know?
3     Q    You testified earlier, though, that you
4 haven't had a single issue with any of the flights
5 you've taken since the article about you in The
6 Intercept was published; is that correct?
7     A    Right, yeah.
8     Q    And what date did that come out again?
9           MR. ABBAS:  Objection.
10 Mischaracterizes his testimony.
11           MS. KONKOLY:  He answered the
12 question.
13           THE WITNESS:  So I don't know the
14 date of the article, but what I was referring
15 to was my time when I was on the no-fly list.
16 Now I have no intention of traveling overseas
17 for fear of proxy detention, for countries
18 that may have kept me on whatever list that
19 they have.
20 BY MS. KONKOLY:
21     Q    Okay.  What do you mean by "proxy
22 detention"?
23     A    So when the United States places people
24 on certain select watchlists, this list is shared
25 with foreign governments, right?  So sometimes

Page 265

1 when people who are on watchlists travel to
2 countries that are not bound by US laws, yet have,
3 you know, these people listed as, you know, known
4 as suspected terrorists or such, they then get
5 detained by those respective governments, right?
6           So this is something that's happened to
7 many people before.  People have been detained in
8 Turkey.  People have been detained in -- I've read
9 stories about people detained in Turkey.  I've
10 read stories about people detained in Kenya, in
11 Morocco.  It's something that happens, you know?
12 Other governments are not as -- you know what I
13 mean?  They torture.  They do it openly.  I mean,
14 sure, I guess we do it here, too, but thankfully
15 the United States government is not anywhere near
16 as bad as the other ones.
17           So for that fear, I'm not going to
18 travel other places.  That's a reality I have to
19 face.  I, you know, I understand how slow
20 government bureaucracies work, and overseas
21 they're not any better, right?  So it's just a
22 reality that I was on these lists.  Those
23 countries that had -- that this list may have been
24 shared with may not have taken me off.
25           MS. KONKOLY:  Let me introduce the

67 (Pages 262 - 265)

# Exhibit C

Page 1

1             IN THE UNITED STATES DISTRICT COURT

2            FOR THE EASTERN DISTRICT OF VIRGINIA

3                   ALEXANDRIA DIVISION

4

5    ANAS ELHADY, ET AL.,

6            Plaintiffs,

7       v.                          Case No.

8    CHARLES H. KABLE, ET AL.,        16-cv-00375

9            Defendants.

10

11               DEPOSITION OF AHMAD AL HALABI

12   DATE:        Friday, February 23, 2018

13   TIME:        10:01 a.m.

14   LOCATION:

                  U.S. Department of Justice

15                Civil Division

16                20 Massachusetts Avenue, NW

17                Washington D.C.  20001

18   REPORTED BY:  Michael Farkas, Notary Public

19

20

21

22

Ahmad Al Halabi
Elhady vs. Kable

February 23, 2018

Page 2

A P P E A R A N C E S

On behalf of Plaintiffs:

    LENA MASRI, ESQUIRE
    Council on American-Islamic Relations
    453 New Jersey Avenue, SE
    Washington, D.C. 20003
    lmasri@cair.com
    (202) 640-4934

On behalf of Defendants:

    DENA M. ROTH, ESQUIRE
    Department of Justice, Civil Division
    200 Massachusetts Avenue, NW
    Washington, D.C. 20001
    dena.m.roth@usdoj.gov
    (202) 514-5108

Page 3

C O N T E N T S

EXAMINATION BY:                    PAGE
By Ms. Roth                     4
By Ms. Masri                  183
By Ms. Roth                   190

E X H I B I T S
No. DESCRIPTION                    PAGE
Exhibit A  Copy of complaint          14
Exhibit B  Plaintiff's First Set of Discovery
    Responses
                                  18
Exhibit C  Itinerary Detroit Michigan April 30, 2012  45
Exhibit D  Los Angeles, 8/23/13 - 9/13/13 - Expedia  58
Exhibit E  Delta Itinerary - June 2014        70
Exhibit F  2016 - ticket for Emirates flight      90
Exhibit G  Letter from DHS - 10/15/12        112
Exhibit H  Letter from DHS - 7/7/14          116
Exhibit I  Travel inquiry form             118
Exhibit J  Page from Halabi passport dated 2012    122
Exhibit K  Halabi redacted court-martial        158
    (Exhibits attached to transcript.)

Page 4

P R O C E E D I N G S

WHEREUPON,

        AHMAD AL HALABI

called as a witness, and having been sworn by the

notary public, was examined and testified as follows:

    EXAMINATION BY COUNSEL FOR DEFENDANTS

BY MS. ROTH:

    Q  Good morning, Mr. Halabi.

    A  Good morning to you.

    Q  My name is Dena Roth, I represent the

defendants in this case.  I'll be taking your

deposition today.

    A  Okay.

    Q  Before we start, I'd like to go over a few

things that I find hopefully make this day a little

easier, a little clearer.

    A  Mm hmm.

    Q  So the first thing I want to ask you is if

you understand that you just took an oath, that's the

same oath as if you were in a courtroom to tell the

truth; do you understand that?

    A  Mm-hmm.  Yes.

Page 5

    Q  Because we're on the record and because the

court reporter is with us today, it's very important

that all of your answers to my questions be verbal and

audible.  So, in other words, whenever I ask a

question, please make sure that you give a yes or a no

or whatever other answer you have, and that you state

so clearly so that it can be captured by the court

reporter, okay?

    A  Yes.

    Q  Okay.  Relatedly, it's also extremely

important that we do our best not to interrupt each

other, which I realize is very easy to do and neither

of us will mean offense by doing it, but to make sure

that the record is clear, please wait until I finish

my question before you answer it, and I will endeavor

not to interrupt you when you are answering a

question; is that clear?

    A  It's clear.

    Q  Thank you.  If you need me to clarify my

question, feel free to ask me to do so.  Otherwise, if

you answer my question, I will assume that you

understood my question; is that fair?

2 (Pages 2 - 5)

Ahmad Al Halabi                                                  February 23, 2018
Elhady vs. Kable

Page 74

1    Q   You traveled to Canada?

2    A   Yes, that's correct.

3    Q   You described here, obviously, a lot that's

4  happened.  What do you remember about this incident?

5    A   Well, we -- I wanted to take my wife to

6  Niagara Falls, and me, my dad, and my sister -- my

7  sister came from California to see -- to meet my wife.

8  And we all wanted to, you know, go on a family trip.

9  So me, my brother, my wife, my sister, my dad, we all

10  drove through Canada.  We had a good time in Niagara

11  Falls for three days -- three days, two nights, I

12  think or something, and then we came back.

13         Crossing the bridge was -- you know, as soon

14  as we -- as soon as I gave all of the passports, the

15  agent was scanning through, and you could hear a green

16  light.  You know, deet, deet, deet (makes sounds).

17  And when mine was scanned, like, err, err, err (makes

18  sounds); you hear that noise as if, you know,

19  something wrong.

20         So the agent said something to the effect of

21  don't move, and he called in into his mic, and -- as

22  if something happened -- something terrible happened.

Page 75

1  So he came out.  He asked me to step out of the car.

2  Two or three other agents came, and as soon as I

3  exited, he took my hand, put it on the back, he shoved

4  me on the car -- van.  And he said, you know, this is

5  for your safety.  We're going to handcuff you.  I'm

6  like, this never happens.  Let's talk about it.  I

7  know how things go.  Like, be quiet.

8         And I looked to the right, and you see all of

9  these cars just -- you know, lights, lots of lights,

10  lots of cars just looking at me being arrested.  My

11  daughter from inside the car was -- started screaming

12  because now she sees me being handcuffed, and she was

13  terrified.  My sister started crying.

14         And I was handcuffed, and I didn't have

15  anything on me, I just had a T-shirt.  So we were

16  walking to the holding cell, it was like, you know,

17  don't -- don't talk, don't walk, we're just going to

18  talk about it inside.

19         So they took me inside, asked me to take off

20  my shoes.  I took off my shoes.  I was -- you know,

21  they took everything I had, so cellphone, wallet,

22  everything, money, whatever I had, watch, and they put

Page 76

1  me in a holding cell.

2         The cell was concrete.  There's

2  nothing.  There's -- there was a toilet and just a

3  seat, just concrete, I think, I don't know what it --

4  what it was.  And it was very cold.

5         And I was like, you know, this is how -- not

6  how we normally do it, but let me see the manager.

7  Let me talk to a supervisor.  Like, we'll get to you.

8  You sit tight.  And some time passed.  I -- I don't

9  know how much.

10         It was -- actually, when we arrived, it was -

11  - it was late at night, so it was already late, I

12  think 11:00 or something at night.

13         And I called for a supervisor.  She came.

14  She asked me what's your mobile PIN number.  I'm like,

15  I'll give it to you, no problems.  I gave her my PIN

16  number, and --

17    Q   Can you just explain what you mean by that?

18  Your cell -- like your cellphone number?

19    A   Yeah.  Cellphone PIN code, so she wants to

20  access my cone (sic) --

21    Q   I see.  Okay.

22    A   -- my phone.  All right.  Probably about an

Page 77

1  hour passed.  The -- the cell -- the holding cell was

2  -- was very, very cold.  A lot of lights, and there

3  was only a very small window that you can talk to

4  people through, probably a feet -- one feet by one

5  feet.  And everything was concrete.  My feet were

6  frozen, my -- I was shivering, it was just cold.

7         I -- I mean, I had like a flashbacks of the

8  time being in Guantanamo.  And that's when -- that's

9  how prisoners were in that holding cell.  Terrified,

10  not knowing what happened with my family or my dad.

11  My dad was with me, my sister, and the kids and my

12  wife.  She was pregnant.  So the last thing we need is

13  more trouble.  So I was hoping that, you know, they

14  would let them go or something.

15         About an hour later, they came back and they

16  gave me my shoes, and they put me -- or they let --

17  left me for -- for I don't know how much time, maybe

18  another 30 minutes or so, and then they said, we're

19  going to move you to be with your family.  So I walked

20  out, and I saw my family just all sitting down, very

21  small chairs, very uncomfortable.  My dad couldn't

22  stand, himself.  He -- he looked extremely tired.  My

20 (Pages 74 - 77)

Ahmad Al Halabi
Elhady vs. Kable
February 23, 2018

Page 78

1 sister, she was with him, she's a doctor. And he --
2 he had this heart condition where you need to put the
3 pill under your tongue. They're like, do we need to
4 call you an ambulance, and he said no, just let us go.
5       So the kids were all sleeping by that time,
6 and there was nowhere to sleep, so they were on the
7 laps, my dad, my sister, my wife. I took one of them
8 also, and we were just waiting and waiting and waiting
9 to see what's going on. No questions.
10      Every time I asked, maybe every half an hour,
11 any updates, like, just wait. We will call you.
12 Very, very rude people. They -- they didn't want to
13 answer any questions. They didn't want to provide any
14 -- any water, any food, or, you know, at least let my
15 dad go and sit in the car or, you know -- it was very,
16 very cold. It was a very cold night. Nope. Didn't
17 happen. My dad -- we were -- we were three cars. So
18 my brother passed through with his car, then he came
19 back after probably two hours or three hours, you
20 know, just to check on us. So he dropped off his
21 family, and he came back to the border.
22      So as soon as he walked in, like, what're you

Page 79

1 doing here? You -- he's like, I'm -- I'm asking about
2 my family, what's going on with my family. Like,
3 nope, you go sit there. Don't say anything. So very
4 rude to them -- to him also. They put him in a
5 different room, a different holding -- not holding but
6 waiting room. So he -- he -- he didn't even -- he was
7 not allowed to talk to us, even an attempt. Like, we
8 want to say something, you know, what happened, no, be
9 quiet. Shut up, don't say anything, to -- to that --
10 to that effect.
11      It was about 4:30 in the morning when they
12 told us that -- they called my name, and they said you
13 can go. They gave us my passport -- our passports
14 back, and they said we're going to hold onto your
15 iPhone. They asked for a mailing address so in case
16 that phone would be mailed back. I assume that it's
17 not going to be mailed back anymore, so it -- it was -
18 - I didn't care. I just want to get out of there.
19 Extremely terrible experience.
20      And then we were let go, so we went to the
21 car, and we found the car upside down. They -- it was
22 like a dog was sitting there for two hours.

Page 80

1 Everything all -- papers and, you know, food and
2 everything was just -- it was a mess. They messed it
3 all up. I don't know what they were looking for.
4 There's nothing.
5       And then, yeah, so we drove home, finally,
6 and we had a flight out two days later. But before
7 that, after we reached home, the following day -- I
8 believe it was the following day or maybe two days
9 later -- one or two days after the incident, two FBI
10 agents knocked on the door and like, can we talk to
11 you? I'm like, of course you can talk to me, come in.
12 So I asked them to come in the house, gave them
13 coffee, tea, whatever, and we just sat there. They
14 sat for about three hours in my brother's house, and
15 we were just talking about it, you know, what
16 happened.
17      We talked about the incident. And one of the
18 agents, he's like, I'm the person -- I'm the authority
19 for the Canada bridge, and as soon as I received the
20 clearance request, I cleared you. I'm like, why did -
21 - why did it take them four hours to clear me, I mean,
22 if you cleared me immediately? I don't know to -- the

Page 81

1 answer to that question. And, you know, I asked him
2 about the phone. He said, you know, this is something
3 -- a process that has to be taken to -- it's a process
4 that needs to take place, I don't know. I assume they
5 copied everything. I don't care. I've got nothing to
6 hide.
7       And one day before our travel -- so I think
8 we stayed for three days after the incident, so when
9 did we travel out, the 25th? Anyways, just one day
10 before we traveled, I received the phone back in the
11 mail. But that was probably the worst -- very, very
12 worst experience that I ever had, especially with my
13 dad and my sister and everyone. I mean, being
14 arrested like that -- the -- the kids seeing me like
15 that, and it was terrifying.
16   Q   How long, if you recall, were you with the
17 FBI agents that next day?
18   A   About three hours in my house -- my brother's
19 house.
20   Q   What more do you remember about that
21 questioning?
22   A   They were fairly reasonable people. I mean,

21 (Pages 78 - 81)

Ahmad Al Halabi
February 23, 2018
Elhady vs. Kable

Page 82

1  one was a supervisor.  The other person was -- he
2  didn't say much.  And, actually, he offered that next
3  time if I would ever come to Detroit, I would give him
4  a call, and he would come to the airport, we would
5  have a discussion, and he would let me go.  He gave me
6  his card, and -- and, actually, I was relieved at that
7  point, you know, because now someone is -- on the
8  inside knows, hopefully, it would make things clearer,
9  better, faster.  Well, unfortunately, the next time I
10  wanted to travel, I called, and they said he was
11  transferred, so that -- that wasn't help.  So yeah.  I
12  was -- we discussed everything.  I mean, we discussed
13  the case, the background, Syria again, the whole nine
14  yards.
15      Q  The case --
16      A  It seemed like --
17      Q  You mean your Air Force case?
18      A  Yes.  Seems like deja vu every time.  I mean,
19  I kind of knew the line of questions that they want go
20  through.
21      Q  Did I understand correctly, though, that the
22  day before when you were at the border and being held,

Page 83

1  you were not questioned, you were just simply held?
2      A  Yes.
3          MS. MASRI:  Objection.  Misstate --
4          THE WITNESS:  Well, that's --
5          MS. MASRI:  One -- sorry.  Objection.
6  Misstates prior testimony, but go ahead.
7          THE WITNESS:  One thing they -- they said
8  they want to do was to take my 10 fingers, so they --
9  they took my 10 finger --
10  BY MS. ROTH:
11      Q  Your fingerprints, you mean?
12      A  Fingerprints, yes.  But other than that, it
13  was not a lot of questioning as usual, and they said
14  they're waiting for clearance.
15      Q  Do you know whether anyone else in your
16  family was questioned during that time period?
17          MS. MASRI:  Objection.  Calls for
18  speculation.
19  BY MS. ROTH:
20      Q  Well, I asked if you know, so --
21      A  No.  I don't know.
22      Q  When the FBI agents came to your brother's

Page 84

1  that next day, you did not expect them to show up;
2  they just showed up?
3      A  They just showed up.  Yeah.  I didn't expect
4  anyone.  Actually, my family were very scared.  I'm
5  like, relax, it's only the FBI.  But, you know, why --
6  you know, why they're here -- so I just took them to
7  the upstairs, and we just sat.  They were very, very
8  scared but I wasn't.  Yeah.
9      Q  Was --
10      A  (Inaudible) not some scary people.
11      Q  Was this occasion -- this incident in June of
12  2014, was this the first time that you had been back
13  at a U.S. land border crossing since the time from
14  Tijuana --
15      A  Yes.
16      Q  -- almost 10 years earlier?
17      A  Yes, that's correct.
18      Q  So you returned from -- you returned back to
19  Dubai on July 2nd?
20      A  Hmm, yeah, I think so.
21      Q  So on Page 9 of Exhibit B, Paragraph 3, see
22  where it says July 2, 2014 in --

Page 85

1      A  Yes.
2      Q  -- Paragraph 3?
3      A  Yes.
4      Q  So this is your return on this trip?
5      A  Mm-hmm.  Yes.
6      Q  You traveled from Detroit to Atlanta and then
7  I assume from Atlanta on back to Dubai?
8      A  That's correct.
9      Q  It says your boarding pass was stamped with
10  the 4-S's?
11      A  That's correct.
12      Q  Anything else about that return trip in terms
13  of what you experienced?
14      A  I believe my wife's boarding pass was also
15  stamped, and not the children.  So we -- we both had
16  to go through security, but with more concentration on
17  me, and not as eventful.  I mean, normal -- the
18  normal, again, fiasco of going through security and
19  the mess -- a supervisor would come, they would search
20  thoroughly, and they asked me a few questions, and,
21  you know, they would let go -- let me go.
22      Q  Do you remember your wife's boarding pass

22 (Pages 82 - 85)

Ahmad Al Halabi
Elhady vs. Kable
February 23, 2018

Page 134

1 somewhere.

2    Q  Okay.  I think we'll ask for that
3 information.  So if you could give that to your
4 counsel.

5        So aside from Bank of America and the issues
6 you just described, have you ever had a problem wiring
7 money out or receiving money by wire in the United
8 States?

9    A  No.

10    Q  Are there any other difficulties that you've
11 experienced with financial institutions, aside from
12 the Bank of America, that you attribute to your
13 allegations in this case?

14        MS. MASRI:  Objection as to form.  Go ahead
15 and answer if you know.

16 BY MS. ROTH:

17    Q  And again, I'm asking specifically about
18 financial institutions?

19    A  Um hmm.  No.  That is the -- that is the one
20 bank.  Yeah.

21    Q  Have you ever sponsored anyone to become a
22 U.S. citizen?

Page 135

1    A  Yes.  We -- we've got different things here
2 going on with this issue.  I first submitted
3 sponsorship to my wife, which then was my fiancé.  So
4 I was in the Air Force and I went to the JAG Office,
5 they drafted the document saying that this is so-and-
6 so, he needs his wife, approve his visa, with some
7 backup.  We sent that document to the embassy and that
8 was approved immediately.  So she got her visa.  That
9 was a fiancé visa.

10    Q  I'm sorry to interrupt you.  Would this have
11 been sometime around 2004?

12    A  Yes.

13    Q  Okay.

14    A  Well actually, earlier.  2002.

15    Q  Okay.

16    A  Yeah.  So given my military service and
17 whatever happened next, as far as the case and things,
18 she wasn't able to use that visa and that was expired.
19 So they give you a visa for six months.  She came in -
20 - my wife came, or fiancé then, came in 2004, we got
21 married, now the case turned into an I-130.  It is now
22 a wife.  That case stayed pending.  I finished the

Page 136

1 active duty and I was -- I interviewed for a few jobs,
2 I've got a couple of classes left to graduate.  And I
3 was ready, I found a house, was ready to settle in in
4 Orange County.  But my wife's visa was not approved.
5 The first time took like three -- three or four
6 months, now it's been six months, seven months, eight
7 months and they're not even saying anything.

8        So I had to make that call to go to Dubai and
9 see what the situation is.  I went and I stayed with
10 the wedding party, whatever.  And I came back, waited
11 a little bit more, nothing happened.  And I had to
12 make that decision, very, very difficult decision to
13 move because I wanted to be with my wife.  And so I
14 had to uproot everything that I -- that I'd done here.
15 Sold what I had to sell, gave up, you know, apartment
16 and everything and I moved to Dubai.

17        And I stayed there for three months, hoping
18 that things would -- you know, maybe she would get
19 approved and we move back, because we haven't done
20 anything yet.  So I stayed with my in-laws in her --
21 in their houses.

22    Q  This is in Dubai?

Page 137

1    A  In Dubai and one hour from Dubai, in
2 (inaudible) it's called.  Nothing happened, then I
3 started looking for a job, because I thought this is
4 going to be a long process.  We waited years, not
5 months.  So from 2005, '6, '7, '8, '9, '10, '11, '12 I
6 think sometime 2012 or '13 we finally received would
7 from USCIS that you are -- your visa is being
8 processed.  Now you start paying the fees, you submit
9 the documents, the originals, you know, all of that,
10 which we did.

11        A few more month later we get called by the
12 embassy to come to the embassy and get the visa
13 stamped, which was amazing.  You know, because it's so
14 many steps that you have to do.  Medical, shots, x-
15 rays, you know, you gather all that, sponsorship from
16 the states.  You have to show that you're domiciled in
17 the states, that you want to go back and live and it's
18 so much.  It's a huge process.  So we did that, we
19 paid everything and we went for the interview.

20        Interview went great.  They said, just drop
21 off your Syrian passport, come back Monday.  Simple as
22 that.  I came back Monday to pick up the passport, and

35 (Pages 134 - 137)

Ahmad Al Halabi
February 23, 2018
Elhady vs. Kable

Page 138

1  you think said, well, your passport is not ready
2  because it's going to go under security process,
3  security clear -- there's a term, security clearance
4  or something like that.
5        How long?  They said, we'll let you know.
6  About eight month or nine month later that we get
7  called.  They said, your passport is ready.  So that's
8  how long it took.  I went to get -- to get the
9  passport.  They gave me the passport, I found the visa
10  that was stamped two days after the interview date,
11  but now the visa is expired because the visa is only
12  six months.
13        So I'm like, the visa's expired, I'm glad I
14  checked.  And she's like, oh, yeah.  Let me get that
15  passport back.  So they took the passport back.  And
16  we had to wait probably another two weeks to get the -
17  - you know, about -- I don't know how long, probably a
18  week or so to get a new visa now.  And that's when she
19  was approved for that -- for that visa.
20        So something that normally takes, you know, a
21  couple of years, it took us, I think, almost, I don't
22  know nine -- eight -- eight years or nine years.

Page 139

1    Q   The passport you're describing right now,
2  this is your wife's passport?
3    A   Yes.
4    Q   So this would be the U.S. passport, which
5  will have her visa in it?
6    A   The Syrian passport.
7    Q   It's a Syrian passport --
8    A   Yes.
9    Q   -- with a U.S. visa?  Okay.
10    A   Yes.
11    Q   Has she since become a U.S. citizen?
12    A   That is another story.  We applied -- well,
13  now that she entered in 2015 and there is time limit
14  that she has to wait before she can apply for
15  citizenship, which is 18 month plus one day, in the
16  states, and three years as a permanent resident, which
17  she met -- she met those requirements, I did apply --
18  or we did apply in May of 2017.  And a month later we
19  received a letter to go and get the fingerprints,
20  which means the process was going smooth in the
21  beginning.
22        Normally my wife and her -- her friend

Page 140

1  applied almost in the same month.  Her friend received
2  a letter to come and interview for citizenship four
3  months later.  My wife, to date she has not received
4  anything.  We're still waiting to get a date for an
5  interview.  So now we're talking about almost nine --
6  nine months, almost nine month later and I think it's
7  all because of this case or this complaint or my case,
8  or whichever you want to put it under.
9        So that is now affecting not only me and, you
10  know, I have to explain to my wife, and explain to the
11  kids.  Because now the kids misses their -- they miss
12  their grandparents and, you know, back in Dubai.  My
13  wife's sister is getting married.  She was supposed to
14  get married in the spring, now in a couple of months,
15  but since my wife cannot leave while an N-400 is
16  pending for the U.S. citizenship, she cannot leave and
17  -- or she doesn't want to leave until we get that
18  citizenship and she cannot enter UAE anyways.
19    Q   Why is that?
20    A   Because you need a sponsor or you need a visa
21  and for Syrians, no, there's no visas available.  So
22  she has to have a U.S. citizen or passport.  They UA

Page 141

1  government have stop giving visas for Syrians for one
2  reason or another.
3        So now her sister's wedding is postponed,
4  hopefully end of the summer, if things go as planned,
5  you know, my wife would get citizenship, she get the
6  passport and travel to -- to see the wedding.  But
7  that is still now in the air, we don't know.  That is
8  one case.
9        A second case is my sister.  My sister is a
10  doctor, she's a midwife, she delivers.  It's the
11  second one, one in California, one in Syria, the third
12  one was a pharmacist, she died.  But my sister's house
13  was destroyed in Syria, Damascus.  So she had to live
14  with some family and she was given like a five foot I
15  want to say second room, on top of a room, you know,
16  so the height of that room is five foot and that's
17  where she's been -- she stayed for almost a year after
18  her house destroyed.
19        And she -- she works for the UNICEF, the
20  United Nations Children Fund, whatever.  She teaches -
21  - she lectures on, you know, safe practices about
22  woman's health and all of that and babies and she

36 (Pages 138 - 141)

Case 1:16-cv-00375-AJT-JFA   Document 208-1   Filed 05/08/18   Page 24 of 138 PageID# 7237

Ahmad Al Halabi                                        February 23, 2018
Elhady vs. Kable

Page 142

1 delivers babies.
2       But eventually she -- she couldn't stay there
3 anymore so she became a refugee and now she moved to
4 Jordan -- sorry, to Egypt.  So she moved to Egypt.
5 She was, like, kicked out of the house, right?  So she
6 couldn't stay anymore.  She is now in Egypt, as a
7 refugee.  We've been sending her money every year --
8 every month to pay for rent, because you can't work.
9 She had to work as a maid, or as a cleaning houses
10 just to pay for food.  And I did apply for her to
11 travel -- to -- to immigrate to the states.
12      Now there's a program in USCIS where if
13 someone is a -- from a crisis country, like Syria,
14 they can come in as a refugee.  And that process is
15 way much faster than a normal process.  Because if a
16 brother applies to a sibling, that takes about 12
17 years, talk about extreme vetting.  And if that
18 process is under the refugee, if she is registered
19 with the U.N., she would fall under -- I don't know
20 what that code is, R1 or R -- some -- PS2 or something
21 like that, one of those codes.  The U.N. would help
22 her to get the visa.  And if -- if someone applies for

Page 143

1 her to travel, they would link that -- that file to
2 the, you know, immigration and she'd get approved in
3 like a couple years or so.
4       So I did apply last year for her.  And
5 normally when you apply you get a receipt for the
6 payment that you made, which is 5 - $600.  And then
7 you get a priority date, which says your file is now
8 approved, we've got all the -- all the information,
9 this is your priority date.  You just wait, right?
10 Until a visa number becomes available.
11      That second receipt has not arrived, which
12 normally takes three months or so.  And now when I
13 called the U.N. -- well, not the U.N., I called --
14 communicated with these people at the -- the program
15 under DHS, they actually sent us a letter saying that
16 you may be eligible for that program, for my brother.
17 We -- they told us to call the USCIS and say to -- to
18 at least approve the I-130 so we can help you.
19      I called in and in December of last year I
20 received a letter saying, we need more evidence, send
21 us whatever evidence you want, you know, so we can
22 review that case, which never normally the case.  They

Page 144

1 would -- it's -- it's only you take the information,
2 you approve it and you just wait in line, right?
3 Because they don't ask for anything, normally.  I have
4 not been able to send a response yet, because I've
5 been trying to get my sister to give me something.
6       You know, they wanted pictures of, you know,
7 whatever wreckage, they want, you know, evidence of
8 payments, you know, just to see why she's a refugee.
9 Well, at least she's registered in the UA -- U.N. and
10 those people already made that decision so -- but
11 anyways, that's the process now, that's how people go
12 through.  So now I think that is also connected to my
13 case, because they have not approved the case.
14      My sister is still living in hell, even
15 though in Egypt, but Egypt is not a very good country
16 to live, believe me.  And I can't tell her -- you
17 know, I just tell her, you're in line, just wait and
18 be patient, things will get better.  And we're sending
19 her money just to make ends meet or to -- for her to
20 live, she and her husband only living alone.  All of
21 her other family, one -- one daughter she went to
22 Germany, and the -- they're all over the place.  One

Page 145

1 in Egypt but in a total different city, was also
2 living with some people.  It's a mess.
3    Q  Are these adult children?
4    A  Yeah.
5    Q  So you described the immigration situation
6 with your wife and then the situation with your
7 sister.  Are there any other immigration related
8 applications or statuses that you believe are linked
9 to you?
10      MS. MASRI:  Objection.  Calls for
11 speculation.  Calls for a legal conclusion.
12      THE WITNESS:  Not related to me exactly, I
13 mean, directly.  I mean I have not petitioned to -- to
14 anyone except for these two.  However, when my dad
15 petitioned for my two other brothers, who are in
16 Syria, they also lost their house, they're living very
17 horrible situations.  We applied in the beginning of
18 that civil war in 2012.  And that immediately got
19 approved.  So those -- now approved, they have a
20 priority date and they're waiting.  But since they're
21 not in a country that has that program where the U.N.
22 would accept, you know -- I mean one brother is still

37 (Pages 142 - 145)

Case 1:16-cv-00375-AJT-JFA   Document 208-1   Filed 05/08/18   Page 25 of 138 PageID# 7238

Ahmad Al Halabi
Elhady vs. Kable                                                    February 23, 2018

Page 146

1  in Syria, the other one is in Malaysia, so that
2  country doesn't have that program.  So they're not
3  able to get the benefit of this USCIS program.  So
4  those two situations are connected to me but my
5  brothers are pending and they're going, in process.
6       Q   Describe for me a little bit more about why
7  you think that your wife and your sister's situation
8  are attributable to your situation.
9          MS. MASRI:  Objection.  Calls for a legal
10  conclusion.  Objection as to form.  Go ahead and
11  answer if you know.
12          THE WITNESS:  I mean, I don't know.  To me
13  the thing is other people apply and they get faster
14  process.  When I apply it gets extremely slow.  My
15  wife, you know, from the beginning, from her beginning
16  visa got even longer than expected.  And now the
17  citizenship is even longer.  Even my children's Social
18  Security was delayed in the embassy.  Normally you get
19  it in two weeks, a new Social Security when -- when a
20  child is -- is born.  My oldest child had hers in I
21  think eight months.  So a new Social Security doesn't
22  take eight months.  An I-130 doesn't take nine months

Page 147

1  to -- or nine years to approve.  An N-400 doesn't take
2  now almost ten months to approve.  I mean, all these
3  cases fall in the one percent of the cases that USCIS,
4  you know, processes.
5       Q   How did -- how are you coming to that
6  knowledge about what the usual or quote/unquote normal
7  processing time is?
8       A   Because I read.  I read --
9       Q   What are you reading?
10       A   -- I read the law, I read the -- the -- you
11  know, the statistics.  I'm pretty good in analyzing
12  data and I -- you know, I -- look at the stats of
13  the approved cases and I look at, you know, the normal
14  timing for -- for those things and I immediately can
15  connect, you know, that this is something they did to
16  me.
17       Q   The statistics and the timing that you're
18  talking about, are those -- is that information you're
19  seeing on some government, you know, sourced website
20  or other literature that comes from the government?
21       A   Yeah.  USCIS.com or .org.  Sorry, .gov.  The
22  websites.

Page 148

1       Q   Other than the delay that you just mentioned
2  with your Social Security numbers for your children,
3  did you encounter any other issues or delays with
4  securing your children's citizenship in the United
5  States?
6       A   No.  That has been okay.  But we can still go
7  back to the issue of, you know, we had to move, we had
8  to make -- we had to -- to raise a family outside of
9  the U.S., which was never the intention.  And the
10  education level and the, you know, benefits that the
11  children can get outside is way much different than
12  here.  You know, you would want to raise your children
13  in the U.S. system, you know, education and medical
14  and, you know, way of life.  And my children had to
15  miss that for the past whatever 11 years.  You know?
16  My -- my daughter, when she first came, she came at
17  six years old and we permanently moved when she was
18  nine.  You know, and that affected every --
19  everything.
20       Q   Were all of your children born abroad?
21       A   Yes.
22       Q   Has anyone told you -- has anyone from DHS or

Page 149

1  any other federal government agency told you that any
2  of the delays or other issues with your wife or your
3  sister's immigration status is because of you?
4       A   No one would ever tell you that.  No.
5       Q   You allege, in this lawsuit, that you're on a
6  watch list, right?
7       A   Yes.
8       Q   Do you believe you're still on a watch list?
9       A   I can't -- you tell me.  I don't know.  I
10  hope not.  I mean, given that the improvements of the
11  travel, I -- I think that's one aspect of it, which
12  has been improved, but I don't think it's fully clear
13  whether I'm still on some sort of watch list or not.
14       Q   Has anyone at all, whether working for the
15  government or not, ever said to you, using the word
16  "watch list" that you were on a watch list?
17          MS. MASRI:  Objection.  I'm going to instruct
18  you not to reveal any attorney/client privileged
19  information.  If you can answer without revealing that
20  information, go ahead.  Otherwise, state that you
21  can't.
22          THE WITNESS:  No.

38 (Pages 146 - 149)

# Exhibit D

Page 1

```
1            IN THE UNITED STATES DISTRICT COURT

2               EASTERN DISTRICT OF VIRGINIA

3

4    ANAS ELHADY, et al.,

5            Plaintiff,

6       v.                          Civil Action No.:

7    CHARLES H. KABLE, et al.,       1:16-cv-375(AJT/JFA)

8            Defendant.

9

10                                       Washington, D.C.

11                               Wednesday, January 17, 2018

12   Deposition of:

13                    ████████████

14   called for oral examination by counsel for Defendant,

15   pursuant to notice, at Department of Justice, 20

16   Massachusetts Avenue, NW, Washington, D.C., before

17   Natalia Thomas, a Notary Public in and for the District

18   of Columbia, beginning at 10:37 a.m., when were present

19   on behalf of the respective parties:

20

21

22
```

January 17, 2018
Elhady vs. Kable

Page 2

1               A P P E A R A N C E S
2  On behalf of Plaintiff:
3      LENA F. MASRI, ESQUIRE
4      Council on American-Islamic Relations (CAIR)
5      453 New Jersey Avenue, SE
6      Washington, D.C. 20003
7      lmasri@cair.com
8      (202) 742-6420
9
10  On behalf of Defendant:
11     DENA M. ROTH, ESQUIRE
12     United States Department of Justice
13     20 Massachusetts Avenue, NW
14     Washington, D.C. 20001
15     dena.m.Roth@usdoj.gov
16     (202) 514-5108
17
18  Also Present:
19     Melissa A. Pachikara, FBI
20     Jennifer Greenband, TSA
21
22

Page 3

1               C O N T E N T S
2  WITNESS: ████████████           PAGE
3  By Ms. Roth                    6
4
5               E X H I B I T S
6  EXHIBIT  DESCRIPTION           PAGE
7  Exhibit A Complaint
                                  16
8  Exhibit B Plaintiff's first discovery
9       responses
                                  18
10  Exhibit C Plaintiff's second discovery
11      Reponses               21
12  Exhibit D Request for documents       24
13  Exhibit E Copies of board passes       62
14  Exhibit F Travel itinerary Aug. - Dec. 2017   63
15  Exhibit G Baby Doe 2 copy of passport     66
16
17
18
19
20      (*Exhibits attached to transcript.)
21
22

Page 4

1               P R O C E E D I N G S
2  WHEREUPON,
3           ████████████
4  called as a witness, and having been sworn by the
5  notary public, was examined and testified as follows:
6      MS. ROTH: Thank you. Good morning. My name
7  is Dena Roth and I represent the defendants in this
8  action.
9      Before we get started with the questioning
10  today I'd like to go over a few rules to help make sure
11  that this goes smoothly, if that's all right?
12      THE WITNESS: Sure. Yeah.
13      MS. ROTH: The first question I want to make
14  sure you understand is that you just took an oath to
15  tell the truth. That's the same kind of oath as if you
16  were in court, even though we're obviously not in
17  court. So I want to make sure you understand that all
18  of your answers today are being provided under oath.
19      THE WITNESS: Yes, ma'am.
20      MS. ROTH: You're already doing great with
21  giving me audible answers but I do just want to remind
22  you that because we have a court reporter in the room

Page 5

1  who's recording everything we're saying, it's very
2  important that she be able to capture what I say and
3  what you say, and so I'll ask, every time I ask a
4  question, that you make sure to give me a verbal
5  response; do you understanding?
6      THE WITNESS: Okay. Yes, I do.
7      MS. ROTH: Relatedly, it's obviously very
8  nature and easy to interrupt each other or talk over
9  each other. But because of the court reporter and
10  making sure we have a clear record, I'm going to ask
11  that we both be very careful to not interrupt each
12  other and not cut each other off. So I'll ask that you
13  wait until I finish my question before answering. And
14  I will certainly wait until you finish answering the
15  question before I ask another question. Do you
16  understand?
17      THE WITNESS: Okay. I do.
18      MS. ROTH: Thank you. Any time you answer a
19  question today I'm going to assume that you understood
20  the question, but I want to make sure that you know
21  that if you don't understand my question, you can
22  absolutely ask me to clarify it, okay?

2 (Pages 2 - 5)

Elhady v

January 17, 2018

Page 6

1       THE WITNESS:  Yes.

2       MS. ROTH:  And one of the unique circumstances

3   of today's deposition is that you are going to -- I'm

4   going to be asking you questions not only about you,

5   but also about your child and so when I ask a question

6   I will do my best to make sure I'm being specific about

7   whether or not I'm asking about your experiences or

8   whether or not I'm asking about your child's

9   experiences.

10       THE WITNESS:  Okay.

11       MS. ROTH:  But it's not clear to you who I'm

12   asking about, please do tell me and I'll make sure to

13   clarify. Okay.

14       THE WITNESS:  Okay.  Yeah.

15       MS. ROTH:  Okay.

16       EXAMINATION BY COUNSEL FOR DEFENDANT

Veritext Legal Solutions

800.808.4958                                          770.343.9696

4     Q   Okay.  I'm going to ask a series of questions
5   now that are going to sound strange in the light of the
6   fact that I'm asking it -- them -- I'm asking you to
7   answer them about your son, who is -- just turned
8   three.
9          Does your son have a bank account?
10     A   He does not.
11     Q   He does not?  Have you ever tried to open a
12   bank account for your son?
13     A   I have not.
14     Q   Have you ever tried to wire money to anyone in
15   your son's name, like on behalf of your son?
16     A   No.
17     Q   Have you, so not your son but you, have you
18   ever sponsored anyone to become a United States
19   citizen?
20     A   My wife.
21     Q   And was that resolved positively, she became a
22   citizen?

21 (Pages 78 - 81)

Page 82

1     A   No, it was horrible actually.  It's been
2   almost two years we applied for her citizenship, her
3   N400.  I know they state it takes approximately five
4   months and it's been almost two years now.  She's been
5   in -- waiting for an interview since -- since August of
6   2017, so it's been six months now waiting for an
7   interview where she should have been done with the
8   whole process.
9     Q   Where is she is a citizen of?
10    A   Jordan.
11    Q   To your knowledge is she a citizen of any
12  other country?
13    A   She is not.
14    Q   Okay.  But your son is a citizen of the United
15  States, right?
16    A   He is.
17    Q   Have you sponsored anyone else other than your
18  wife for citizenship?
19    A   I have not.

# Exhibit E

Page 1

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF VIRGINIA
2                   ALEXANDRIA DIVISION
3

     ANAS ELHADY, et al.,

4
           Plaintiffs,

5
           vs.                    Case No.: 1:16-cv-375

6

     CHARLES H. KABLE, et al.,

7
           Defendants.

8
9               DEPOSITION OF: HASSAN SHIBLY
10

     DATE:           February 12, 2018

11

     TIME:           10:26 a.m. to 4:33 p.m.

12

     LOCATION:       Department of Justice

13                   20 Massachusetts Avenue, N.W.
                     Washington, D.C. 20001

14

     REPORTED BY:  Felicia A. Newland, CSR

15
16
17
18
19
20
21
22

Hassan Shibly
Elhady vs. Kable
February 12, 2018

Page 2

1          A P P E A R A N C E S
2    On behalf of Plaintiffs:
3       LENA F. MASRI, ESQUIRE
4       Council on American-Islamic Relations
5       30201 Orchard Lake Road, Suite 260
6       Farmington Hills, Michigan 48334
7       lmasri@cair.com
8
     On behalf of Defendant:
9
10      DENA M. ROTH, ESQUIRE
11      Civil Division, Department of Justice
12      Federal Programs Branch, Room 7112
13      940 Pennsylvania Avenue, N.W.
14      Washington, D.C. 20530
15      (202) 514-5108
16      dena.m.roth@usdoj.gov
17   Also present:
18      Lea Reizman, Esquire, FBI
19      Melissa Pachikara, Esquire, FBI
20      Jennifer Green, Esquire, TSA
21
22

Page 3

1            C O N T E N T S
2    EXAMINATION BY:                    PAGE
3    Counsel for Defendants          5
4       SHIBLY DEPOSITION EXHIBITS
5    NO.  DESCRIPTION                   PAGE
6    Exhibit 1 First Amended Complaint for Injunctive   19
7       and Declaratory Relief
8    Exhibit 2 Plaintiff Hassan Shibly's Second Amended  25
9       Responses to Defendants' First Set of
10      Discovery Requests To Plaintiffs
11   Exhibit 3 Email from AA Customer Relations to   192
12      Hassan Shibly, dated March 28, 2016,
13      Subject: Your Response from American
14      Airlines
15   Exhibit 4  Audio recording            215
16   Exhibit 5 Letter to Hassan Shibly from Jeffrey S.  236
17      Blumberg, Director of Compliance, US
18      Department of Homeland Security
19   Exhibit 6  Letter to Hassan Shibly from Laura   239
20      Lynch, Director, DHS Traveler Redress
21      Inquiry Program, dated March 8, 2011
22   Exhibit 7  Traveler Inquiry Form to Hassan Shibly,   242

Page 4

1       dated 8/26/13
2    Exhibit 8  Email exchange sent from Hassan Shibly,   245
3       dated July 28, 2014, Re: Detains at
4       Niagara CBP
5    Exhibit 9  Letter to Hassan Shibly from Todd C.   252
6       Owen, Assistant Commissioner, Customs,
7       dated September 22, 2015
8    Exhibit 10  Composite exhibit consisting of several   256
9       emails, Bates Nos. Shibly-000105 through
10      109
11   Exhibit 11 Composite exhibit consisting of various   264
12      color photographs of passports, Hassan
13      Shibly
14      (*Exhibit No. 4 retained by counsel for Defendants.)
15      (*Exhibits attached to transcript.)
16
17
18
19
20
21
22

Page 5

1            P R O C E E D I N G S
2            * * * * * *
3    WHEREUPON,
4            HASSAN SHIBLY
5    called as a witness, and having been first duly
6    sworn, was examined and testified as follows:
7       EXAMINATION BY COUNSEL FOR DEFENDANTS
8    BY MS. ROTH:
9       Q    Good morning, Mr. Shibly.
10      A    Good morning.
11      Q    My name is Dena Roth.  I will be
12   taking the deposition today on behalf of the
13   defendants.  I'll give my colleagues here a chance
14   to introduce themselves for the record.
15      MS. PACHIKARA:  I'm Melissa
16   Pachikara.
17      MS. REIZMAN:  Lea Reizman.
18      MS. GREEN:  Jennifer Green.
19      THE WITNESS:  Good morning.
20   BY MS. ROTH:
21      Q    Mr. Shibly, before we get underway,
22   with the substance of the questions today, there

2 (Pages 2 - 5)

Hassan Shibly
Elhady vs. Kable

February 12, 2018

Page 74

1    And what really stuck out, it wasn't one of those
2    instances where I was like -- not that it would
3    justify, but I wasn't snarky, I wasn't having an
4    attitude, I wasn't just the Lawyer Shibly that you
5    see before you today, you know, I was, I believe,
6    you know, maybe Law Student Shibly, Student Shibly.
7    And I didn't expect to be in handcuffs when I'm
8    driving my grandmother to take her home.
9         I mean, there were -- the officers
10   were relatively polite, I remember, at that time.
11   He said, "Look, we want to search you, but for our
12   safety we're going to want to put you in handcuffs.
13   There's no choice."
14        Okay. And it was the first time, I
15   remember, and never having broken the law, besides
16   again maybe a speeding ticket, or something like
17   that, a minor traffic infraction just to be honest,
18   which wasn't at that incident, being put in
19   handcuffs while they searched me. Growing up, it
20   was a traumatizing experience.
21        I believe that may have been the --
22   the incident where there was sort of some hint

Page 75

1    through conversation, although these kind of
2    conversations happened on more than one occasion
3    of, hey, you're on some sort of list, we've got to
4    do what we've got to do. Like, it's not me, don't
5    blame me -- the officer -- it's not me looking at
6    you looking like a Muslim and wanted to pick you
7    out. It's, I've got to do what I've got to do,
8    type of thing.
9         So that's what I remember, just being
10   put in handcuffs for the first time. What hurt the
11   most about it was having your own grandmother sort
12   of being a witness to that. You know, you don't
13   want your grandma seeing you in handcuffs no matter
14   what, because it hurts her heart, she loves you.
15   And you hope that she doesn't think anything bad of
16   you, but at the same time, you don't want her
17   seeing you in handcuffs.
18        So I remember that. And I remember
19   taking her to her sister's house. You know, I
20   think at that time being fingerprinted and
21   photographed. And then, you know, I don't remember
22   particularly right now off the top of my head how

Page 76

1    long it was, but we were left go. And then the
2    next day, when we were going back and was being
3    stopped again. And I'm trying to sort of shift
4    through my memory and this may clarify later,
5    because, like I said, the difficult thing with this
6    is they all merge together.
7         There was the time when my
8    grandmother -- and I don't remember if it was in
9    the interrogatories here or in the original
10   complaint, we were driving back with my
11   grandmother, I don't remember the exact date or if
12   it's the exact incident or not, I can double-check
13   quite easily, but just speaking from my memory, the
14   date I was driving back with my grandmother and she
15   ended up being in the hospital, you know. And I
16   think it was just the stress of what we had to go
17   through at CBP and being held for hours. That's
18   the gist of what I recall.
19   Q    So let's look back at the complaint.
20   So that's Exhibit 1.
21   A    Uh-huh.
22   Q    I think if you go to paragraph 273 of

Page 77

1    your complaint.
2    A    Wait, what did you say, paragraph
3    273?
4    Q    Yes. That's on page 45 at the
5    bottom.
6    A    Okay.
7    Q    Do you see where it says, "On
8    November 25, 2009"?
9    A    Yes. Yes.
10   Q    If you could just take an opportunity
11   to read through the next few paragraphs --
12   A    Yes.
13   Q    -- and see if that helps refresh your
14   recollection.
15   A    Thank God, that was adding up with
16   what I recall. Because I definitely remember it
17   was in Michigan going in in handcuffs. I will
18   never forget -- like whenever I -- now, whenever I
19   cross the bridge between Michigan and Canada, I
20   always remember the handcuffs.
21        Yes, and I remember being warned by
22   the officer that I would likely receive the same

20 (Pages 74 - 77)

Hassan Shibly
Elhady vs. Kable
February 12, 2018

Page 78

1  treatment on the way back.  And I remember the
2  1022s being mentioned as well.  I don't know what
3  that means.  I remember being stopped by armed
4  officers.  And yes -- so yeah, my grandmother was
5  with me.  It was that date when she fainted and she
6  was sent to the hospital.  I couldn't even go with
7  her.  Here I am an American citizen, I verified my
8  ID, being held for God knows why, and my
9  grandmother had to go to the hospital.
10         So that was one of the most troubling
11  times, really because of the handcuffs and seeing
12  what happened to my grandmother.  Again, for no
13  reason.
14     Q    Do you remember, was it just you and
15  your grandmother on this trip?
16     A    Most likely it would have just been
17  my grandma and myself, yes.  I don't recall there
18  would have been anyone else with us at the time.
19     Q    When it says that she fainted and
20  then was taken by ambulance to a hospital, do you
21  recall that being once you were already back in
22  Buffalo?  You were at the Buffalo --

Page 79

1     A    I believe this was at the Buffalo --
2  I don't remember -- I'd have to double-check the
3  notes, maybe it was Lewiston-Queens, which exact
4  point of entry around Buffalo, but I remember it
5  the hospital.  And I believe it was just not far at
6  all from the point of entry.
7     Q    So she would have entered into
8  Buffalo and the ambulance --
9     A    Correct.
10     Q    -- took her somewhere --
11     A    Correct.
12     Q    -- alone?
13     A    Correct.
14     Q    Meaning not with you?
15     A    Yes, as far as I remember.  And
16  that's part of what sucked about it, pardon my
17  language, is they took her and I'm still stuck
18  there.  Now it's the added stress of why is my
19  government stopping me, when are they going to let
20  me out, and my grandmother is at the hospital, is
21  she okay, and why are we being subjected to all of
22  this again.  It was a very traumatic experience.

Page 80

1  It's easy to smile and talk about it now, it wasn't
2  easy to go through.
3     Q    I understand.
4     A    Yeah.
5     Q    Let's turn back to Exhibit 2.
6     A    Sure.
7     Q    So you --
8     A    Sure.
9     Q    Back to the top of page 9.
10     A    Sure.  Sure.  Sure.  Sure.  Page 9,
11  yes.
12     Q    Top of page 9.  And this -- I don't
13  mean to be nitpicky --
14     A    Sure, exactly.
15     Q    -- I just want to make sure it's
16  clear for the record, on November 26, 2009, it
17  says, "Plaintiff Shibly exited the United States by
18  car at the Lewiston-Queens Bridge border crossing,"
19  is it possible "exited" should say "entered,"
20  because you were -- the day on the 25th --
21     A    Oh, correct.
22     Q    -- you drove out of Buffalo through

Page 81

1  Ontario in to Detroit, where you had the issues you
2  described --
3     A    Correct.
4     Q    -- the next day you drove back
5  through Ontario and then entered the United
6  States --
7     A    Yeah.
8     Q    -- to Buffalo?
9     A    Maybe it just should have said,
10  exited to the United States or exited Canada to
11  the -- but yes, you're -- it's correct, what you're
12  saying is correct.
13     Q    That's fine.  And, again, I don't
14  mean to be nitpicky, it's just I wanted to make
15  sure it's clear.
16     A    No, I appreciate that opportunity for
17  a clarification correction.
18     Q    Okay.  Is there anything else about
19  this November trip that you remember but you
20  haven't said yet?
21     A    The key things that -- giving a
22  document that the car and electronics were

21 (Pages 78 - 81)

Hassan Shibly
Elhady vs. Kable

February 12, 2018

Page 278

1    Q    Okay. The discovery requests, I'm
2  stating for the record, do continue through -- you
3  know, through this litigation and so --
4    A    Do you want me to forward you a copy
5  every time I travel?
6    Q    You should be giving that information
7  to your counsel, yes.
8    A    Okay. That's fine. I mean, a lot of
9  that I booked, frankly, within the last week or
10  two.
11    Q    Whatever there is, you'll talk to
12  your counsel about it.
13    A    Yeah.
14    Q    Okay. Moving to a different topic.
15  Do you have a bank account in the United States?
16    A    Absolutely.
17    Q    Have you ever had a problem opening a
18  bank account in the United States?
19    A    Not that I recall.
20    Q    Okay. Have you ever had one closed,
21  you know, against -- in a way that was not of your
22  choosing?

Page 279

1    A    I had a savings account close, but I
2  want to say maybe because I didn't put enough
3  balance in there. I'm not alleging in that
4  particular incident it was the government. So not
5  that I recall, no. But I definitely got a lot of
6  complaints, a lot of calls from Muslims that I know
7  who have had their accounts closed.
8    Q    Okay. Just to be clear, I'm asking
9  about your personal --
10    A    No. Personally, as far as I recall,
11  I haven't had any of my own accounts close.
12    Q    And you haven't had any problem
13  opening any?
14    A    Not that I recall, no issue.
15    Q    First question here now is have you
16  ever wired money from the United States to somebody
17  else?
18         I will clarify that, to somebody else
19  outside the United States?
20    A    There's nothing that stands out in my
21  memory. That's not to say I never did, but there's
22  nothing that rings a bell.

Page 280

1    Q    So no --
2    A    Nothing memorable.
3    Q    But no memories of any problems --
4    A    Correct.
5    Q    -- being able to do that to
6  contribute to your allegations in this case?
7    A    Correct. Not that I recall, no.
8    Q    Okay. You testified earlier that you
9  became a U.S. citizen a long time ago?
10    A    Correct.
11    Q    And I believe that you also said that
12  your wife is naturalized U.S. citizen, right?
13    A    Yes.
14    Q    Did you sponsor her immigration
15  process?
16    A    I did, and it took forever to get
17  cleared. And then she ultimately got denied level
18  entry, as did I. And we are certain that it
19  happened because of her connection with me and we
20  were both quite upset about that.
21    Q    So let's -- let's first talk about
22  just the immigration status.

Page 281

1    A    Yes.
2    Q    Do you -- you said that it --
3    A    Took longer than what I think is
4  normal. You know, I think it was held up and I
5  think it was probably held up because of her
6  affiliation with me.
7    Q    Did anyone tell you that?
8         MS. MASRI: I'm going to object and
9  instruct you to answer the question, only if you
10  can answer without revealing attorney-client
11  privilege.
12  BY MS. ROTH:
13    Q    Did anyone other than your attorneys
14  tell you that?
15    A    Not that I recall right now.
16    Q    Your wife did ultimately become a
17  U.S. citizen?
18    A    She did.
19    Q    How long did it take from start to
20  finish?
21    A    I don't remember, but it took a
22  while, you know, to the point where we were

71 (Pages 278 - 281)

Page 282

1  considering litigation.
2      Q    Can you please give me some better
3  sense than "a while"?
4      A    I really would have to double-check
5  with her.
6      Q    More than a year?
7      A    Probably.
8      Q    More than two years?
9      A    I don't know.  Maybe -- I want to
10  guesstimate between a year or two, but honestly,
11  it's one of many issues that we are dealing with,
12  so I don't know off the top of my head.  I don't
13  want to give you anything wrong, so I would have to
14  double-check.
15      Q    How did you come to an understanding
16  of what a quote, unquote, normal process would
17  take?
18      A    Well, I mean, I'm an attorney and I
19  know a lot of people that apply, we help a lot of
20  people that apply, I've hired an immigration
21  attorney to work for me full-time in my capacity at
22  CAIR, so we see what's normal and what's not, and

Page 283

1  her's definitely fell into what was abnormal, to
2  the point where we were considering litigation.
3      Q    What would you consider normal?
4      A    Whatever is --
5          MS. MASRI:  Objection.  Calls for a
6  legal conclusion.
7          Go ahead and answer if you can.
8          THE WITNESS:  Well, I think
9  whatever's generally -- to be frank, whatever the
10  average waiting time for a non-Muslim, non-Middle
11  Eastern applicant is.  I tend to find those who
12  fall in the Muslim and Middle Eastern -- I --
13  Middle Eastern time frame have to wait quite a bit
14  extra.
15          And the ACLU did great work
16  discovering that there were a lot of unfair
17  holdups probably involving the FBI, I guess
18  called the CARP, or something, that put extra
19  scrutiny on Muslims.  It's not a surprise
20  considering DHS -- a memo just leaked from DHS
21  saying they want to have extra scrutiny of Muslim
22  immigrants.  So, again, the same pattern of

Page 284

1  targeting people because of their religion.
2          So I get a lot of calls from people
3  within the community that their naturalization
4  process is taking a year or two or much more, and
5  often it's not resolved until you get an
6  attorney, a writ of mandamus, I think that's
7  the -- or other legal action to get it sped up.
8          And from what I recall, we were
9  really getting -- just getting ready with the
10  attorney -- I don't want to get into the
11  conversations, but her attorney who is not
12  present right now to --
13          MS. MASRI:  Don't divulge any
14  communications with --
15  BY MS. ROTH:
16      Q    But you didn't end up having to take
17  legal action, correct?
18      A    We didn't at the last minute.
19      Q    Okay.
20      A    Well, let me hold up on that.  We
21  didn't file suit, that's not to say that her
22  attorney did or did not take any action sort of a

Page 285

1  suit to speed it up.
2      Q    Okay.  And I just want to be very
3  clear and make sure I understand you.  Do you
4  attribute that slowness to the issues that you
5  described in connection with this litigation?
6          MS. MASRI:  Objection.  Calls for a
7  legal conclusion.
8          Answer only if you know.
9          THE WITNESS:  I think it's connected
10  to the whole issue of being treated as a
11  second-class citizen as a Muslim, as a visible
12  Muslim, as a Muslim leader or as being connected
13  with one.
14  BY MS. ROTH:
15      Q    Okay.  But is that something
16  different than your allegation that you're on a
17  watchlist?
18          MS. MASRI:  Same objection.
19          THE WITNESS:  Same answer.  I think
20  being on the watchlist is if you're Muslim, you're
21  much more likely to be on these watchlists without
22  basis and without having a proper way to get off

72 (Pages 282 - 285)

Hassan Shibly
Elhady vs. Kable
February 12, 2018

Page 286

1    them. So it's all interacted. I think the
2    watchlist is a -- is basically a Muslim list and it
3    has way too many false positives.
4            And why in the world are there so
5    many American-Muslim leaders that are all well
6    respected -- and we all know each other -- that
7    have these same issues and we all appear to be on
8    the same watchlist? It's really disturbing.
9    BY MS. ROTH:
10       Q    Have you sponsored anyone else for a
11   U.S. citizenship?
12       A    Not that I recall.
13       Q    We spent some time earlier talking
14   about --
15       A    Before you ask, it's 3:44, I need to
16   take a break to do prayer before 4:00.
17       Q    Yes. I was keeping that in mind.
18       A    We should do it now, I would say.
19       MS. ROTH: Okay. Let's take a break.
20   We are off the record.
21       (Recess from 3:44 p.m. to 4:00 p.m.)
22       MS. ROTH: We are back on the record.

Page 287

1    BY MS. ROTH:
2        Q    Have you ever applied for a job as a
3    contractor for the federal government?
4        A    I don't think so. No.
5        Q    You mentioned earlier you own a
6    firearm?
7        A    I do.
8        Q    And you own that lawfully?
9        A    Absolutely.
10       Q    How many firearms do you own?
11       THE WITNESS: Do I have to disclose
12   that number?
13       MS. MASRI: Yes.
14       THE WITNESS: Okay. Three.
15   BY MS. ROTH:
16       Q    When did you purchase them?
17       A    The -- I want to say the rifles in my
18   Buffalo days. And then the handgun would be within
19   the past year, I want to say.
20       Q    Do you have a concealed weapons
21   permit in connection with all of them or just the
22   handgun?

Page 288

1        A    Yeah. So I only needed it with the
2    handgun, so I only got it within the past year. I
3    can pull it out and check the date.
4        Q    Did you encounter any obstacles or
5    problems purchasing any of the firearms that you
6    just mentioned?
7        A    So in purchasing, no, in getting the
8    concealed weapon permit, the first time they made
9    me come back in and redo the fingerprints for the
10   FBI, so it -- I got it a little later than normal,
11   but I don't know what's happening on the back end
12   there.
13       Q    Any reason to think any of that is in
14   connection to your allegations in this lawsuit?
15       MS. MASRI: Objection. Calls for a
16   legal conclusion. Calls for speculation.
17       THE WITNESS: Yeah, I don't have
18   enough information from side to determine that.
19   BY MS. ROTH:
20       Q    I'm asking for your opinion. Do you
21   think --
22       A    I'm suspect. I've learned not to

Page 289

1    trust when it comes to engaging the federal
2    government with everything that I've seen, so I
3    would be interested to know. Sorry.
4        MS. MASRI: He's answered your
5    question.
6    BY MS. ROTH:
7        Q    You've never been -- have you ever
8    tried to purchase a gun but were denied?
9        A    No.
10       Q    And --
11       A    Well, there was an incident in
12   Florida, the Muslim Free Gun -- Muslim Free Gun
13   Shop in Florida, it also made national media, where
14   I was denied the ability to go to that shop and
15   make any purchases whatsoever. And even though the
16   owner had agreed for me to come and meet with him
17   and visit the shop and engage with him and have a
18   dialogue about Islam and the Muslim community and
19   do business together.
20           Unfortunately, he was contacted by
21   hate groups, who I know sent him a lot of hate
22   articles about me, which referenced sort of how the

73 (Pages 286 - 289)

# Exhibit F

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE EASTERN DISTRICT OF VIRGINIA

3

4    ANAS ELHADY, et al.,

5              Plaintiffs,              Case No.

6        v.                            1:16-CV-375

7    CHARLES H. KABLE, et al.,         (AJT/JFA)

8              Defendants.

9

10                 DEPOSITION OF ANAS ELHADY

11   DATE:         Thursday, February 22, 2018

12   TIME:         10:05 a.m.

13   LOCATION:

                   U.S. Department of Justice

14                 20 Massachusetts Avenue, N.W.

15                 Washington, DC  20001

16   REPORTED BY:  Casey Smith

17

18

19

20

21

22

Anas Elhady
Elhady vs. Kable
February 22, 2018

Page 2

1       A P P E A R A N C E S
2  On behalf of Plaintiffs:
3      LENA MASRI, ESQUIRE
4      Council on American-Islamic Relations (CAIR)
5      453 New Jersey Avenue, S.E.
6      Washington, DC  20003
7      (202) 640-4934
8      lmasri@cair.com
9
10  On behalf of Defendants:
11     ANTONIA KONKOLY, ESQUIRE
12     U.S. Department of Justice
13     20 Massachusetts Avenue, N.W.
14     Washington, DC  20001
15     (202) 514-2395
16     antonia.konkoly@usdoj.gov
17
18
19
20
21
22

Page 3

1       C O N T E N T S
2  EXAMINATION BY:                  PAGE
3     By Ms. Konkoly             4
4     By Ms. Masri              267
5
6       E X H I B I T S
7  NO.      DESCRIPTION           PAGE
8  Exhibit A    Complaint           26
9  Exhibit D    Answers to interrogatories   29
10 Exhibit F    Answers to interrogatories   33
11 Exhibit G    Travel inquiry form      26
12 Exhibit H    Copy of passport       199
13 Exhibit K    (Not described)        198
14       (*Exhibits attached to transcript.)
15
16
17
18
19
20
21
22
23

Page 4

1       P R O C E E D I N G S
2  WHEREUPON,
3          ANAS ELHADY
4  was called as a witness, and having been sworn, was
5  examined and testified as follows:
6          EXAMINATION BY COUNSEL FOR DEFENDANTS
7  BY MS. KONKOLY:
8     Q  Good morning, Mr. Elhady.
9     A  Good morning.
10    Q  My name is Toni Konkoly.  I'm an attorney for
11 the Department of Justice.  I represent the defendants
12 in this lawsuit.  I'll be taking your deposition
13 today.  Before we get started, I just have some
14 instructions to go over with you, to make sure that
15 you understand how this will work.  So first, do you
16 understand that you're under oath?
17    A  Yes.
18    Q  Okay, and were -- one of the purposes of what
19 we're doing here today is to create a transcript that
20 we can submit to the Court later.  So it's important
21 that we create a clear transcript, and so one of the
22 things that can get in the way of that is when we talk

Page 5

1  over each other or if you gave an answer, you know.
2  Like an uh-huh doesn't translate well, or if you nod
3  your head the transcript's not going to pick that up.
4          So I need you to number one, wait until I'm
5  finished speaking to provide your answer, and then I
6  need you to provide audible answers, like a yes or a
7  no instead of shaking your head or saying "uh-huh."
8  Do you understand?
9     A  Yes.
10    Q  Okay.  If you don't understand a question
11 that I ask you, you can ask me to clarify.  If you
12 answer the question, I'm going to assume that you did
13 understand it.  Do you understand that?
14    A  Yes.
15    Q  Okay.  Is there any reason that you cannot
16 answer my questions truthfully and accurately today?
17    A  There is not, no.
18    Q  Okay.  Have you taken any medications in the
19 last 48 hours?
20    A  No.
21    Q  Have you consumed any alcohol in the last 48
22 hours?

2 (Pages 2 - 5)

Anas Elhady
Elhady vs. Kable

February 22, 2018

Page 142

1  to.
2      Q   Well let's take them in order.  Tell me what
3  you remember about your trips into Canada in September
4  2014.  I don't want you to read from the
5  interrogatory.  I want to know what you remember.
6      A   So I remember that I got scenario each time.
7  So if you're referring to September trips, I remember
8  informing my attorney about each trip that I had, and
9  we --
10     MS. MASRI:  Just make sure you don't disclose
11  the substance of the conversations.
12     THE WITNESS:  Yes.  So I wrote them down, and
13  if you're asking about a specific trip --
14     Q   I'm asking what you remember today, as you
15  sit here, about your trips into Canada in 2014.
16     A   I just remember I was stopped the same exact
17  way for more than five hours each time, and every time
18  I used to come back it was like I mentioned.  It was a
19  weekend, so there will be a long line, and everyone
20  will take the exit except me, will get the sticker on
21  my windshield and I take a different route.
22         And it was the same agent or supervisor that

Page 143

1  used to lead the other agent to search me, ask me
2  questions, the same questions all the time.  He would
3  ask me like really do you have to do this again?  It
4  seems like you like the treatment that you're getting,
5  and also, he would mention I don't know why you do
6  this, wasting our time, even though you're getting --
7  even though you're going to go through this.
8         And I was also, I remember the second time,
9  which should be my first time in September crossing
10  the border, I was also got my phone taken away, and
11  had the same thing.  But it was different, that it was
12  shipped to me.  But after the second time my phone was
13  taken away from me, I stopped traveling with phone or
14  my wallet.
15     I just take my ID, even my cards I keep them.
16  I just take cash, my ID and travel, just to help me
17  not getting my phone taken or my, you know, wallet
18  searched and everything in it.
19     Q   Was the phone that was taken from you in
20  September 2014 the same phone or a different phone
21  that was taken earlier?
22     A   It was a different phone because when my

Page 144

1  first phone was taken and they told me they're not
2  sure how long it's going to take for them to return it
3  back to me, so I had to get another phone.  When that
4  phone came back, I just put it aside and kept using my
5  new phone.
6         So when I crossed the border, they took my
7  new phone.  I had to get a third phone and waited
8  until that second phone came back and just put it
9  aside next to the first one.
10     Q   Okay.  How long was it before you got your
11  phone back?
12     A   About two months.
13     Q   Okay, and did you say your wallet was taken
14  too?
15     A   It was not taken.  It was taken at the --
16  when I entered the tunnel, but they gave it back to me
17  when I exited, when I left, when they let me go.
18     Q   Okay.  Did you post about any of your
19  experiences crossing the U.S.-Canada border in
20  September 2014 on any social media account?
21     A   I did not post about the experience.  I
22  posted that I was in Canada when I was in Canada.

Page 145

1      Q   Okay, but not about your experience of
2  crossing the border?
3      A   No.
4      Q   Okay.  For any of these trips in September
5  2014?
6      A   No.
7      Q   Okay.  Did you talk to anyone aside from your
8  attorneys about your experience crossing the border in
9  September 2014?
10     A   I did talk to my family mostly, and my
11  friends about the treatment I've been getting every
12  time I cross a border and how worse it's getting for
13  me each time.
14     Q   How many friends did you talk to about those
15  experiences?
16     A   I do not recall.
17     Q   More than five?
18     A   Probably, yes.
19     Q   More than ten?
20     A   I'm not sure.
21     Q   Did you write about your experiences crossing
22  the border in September 2014 in any other place, like

37 (Pages 142 - 145)

Page 146

1 a journal?

2     A   No.

3     Q   Do you believe that your experiences crossing

4 the border in September 2014 are because you are on a

5 watch list?

6         MS. MASRI:  Objection, calls for a legal

7 conclusion, calls for speculation.  Objection as to

8 form.

9         THE WITNESS:  The second time I crossed, I

10 believed it wasn't something normal that the Border

11 Patrol do.  It's just something based on something pop

12 up in their system, because every time, I noticed

13 every time the person I get to the window, even though

14 they seem nice and talking to me at the beginning.

15        But after they swipe my card they seemed

16 confused and they just close the window right away and

17 call for, on the radio.  So I realized it was not

18 something normal, and must be something to do with the

19 -- with being on the watch list.

20 BY MS. KONKOLY:

21    Q   Okay, and how -- for each of your three trips

22 in 2014, let's take them one by one.  So for the first

Page 147

1 time you crossed from the United States into Canada,

2 how long were you detained at the border?

3     A   The first time in September?

4     Q   The first time in September.

5     A   It was five hours to six hours.

6     Q   And the second time you crossed over, going

7 from the United States to Canada, how long were you

8 detained?

9     A   It was about that time, five to seven hours.

10    Q   Five to seven?

11    A   Yes.

12    Q   Okay, and the third time you crossed in

13 September 2014, about how long were you detained?

14    A   Five to seven hours.

15    Q   Okay, and on your return trip, we'll take

16 them one by one as well.  The first time you crossed

17 from Canada to the United States, how long were you

18 detained at the border in September 2014, the first

19 trip back?

20    A   In September?

21    Q   Yeah.  So I just asked you -- I hope I was

22 clear.  I was talking about going from the United

Page 148

1 States to Canada.

2         MS. MASRI:  I was going to ask for

3 clarification actually.  I misunderstood the question

4 as well.

5         THE WITNESS:  I misunderstood it too.

6 BY MS. KONKOLY:

7     Q   Okay.  So you took three trips in September

8 2014.  We'll call them trip A, B and C?

9     A   Correct.

10    Q   For Trip A, from the United States to Canada,

11 how long were you detained at the border?

12    A   I was not detained on the way to Canada.  It

13 was normal crossing from the United States to Canada.

14 It just one time, I do not recall which one, I was

15 stopped randomly, even though there was -- there is no

16 agent usually after the booth.  But one of the time

17 there was, and they were letting everyone go to Canada

18 except me.  They asked me to do a U turn and go park,

19 park where I parked the times before.  I was stopped

20 for approximately four hours.

21    Q   So that was one of the times going into

22 Canada?

Page 149

1     A   Correct.

2     Q   During those three trips in September 2014?

3     A   Yes.

4     Q   Okay.  Did you say that was a random search

5 that time?

6         MS. MASRI:  Objection, misstates prior

7 testimony.

8         THE WITNESS:  I do not know.

9 BY MS. KONKOLY:

10    Q   Okay.  On your return trips on Trip A, B and

11 C, how long were you detained on your return on Trip A

12 in September 2014?

13    A   From Canada to the United States?

14    Q   From Canada to the United States.

15    A   Okay.  That's the ones I was referring to

16 earlier, six hours.  Then the second is five to seven,

17 and the third is five to seven.  I was not stopped all

18 of the time going from United States to Canada except

19 one time, and I do not recall which one, and it took

20 about four hours.

21    Q   Okay.  If I could have you flip to -- back to

22 Exhibit G.  We looked at it earlier, page three, the

38 (Pages 146 - 149)

Anas Elhady
Elhady vs. Kable

February 22, 2018

Page 150

1 DHS trip form.

2    A   Uh-huh.

3    Q   So there it says you get detained for three
4 to six hours.  Can you explain why you said three to
5 six on your form if it's actually five to seven?

6    A   It was around six hours for sure, because
7 every time I cross the border I get my phone taken
8 from me and my watch, and I just remember I cross at
9 midnight, around 12:00 and I don't leave until the sun
10 is about to rise.

11    Q   Okay.  If I could have you look at paragraph
12 14 back in Exhibit F?  It says, "On October 4th, 2014,
13 you exited the United States into Canada"; is that
14 correct?

15    A   I'm sorry where, what paragraph is that?

16    Q   Paragraph 14, page eight.

17    A   Page eight.  Can you repeat your question?

18    Q   I'm just confirming the accuracy of the
19 statement here, that says on October 4th, you exited
20 the United States by land into Canada?

21    A   Yes.

22    Q   Okay.  Where, can you be more specific than

Page 151

1 the United States into Canada.  What were the cities,
2 specific cross point?

3    A   It was from Detroit to Windsor.

4    Q   Was that the Windsor Tunnel?

5    A   Yes.

6    Q   Okay.  What was the purpose of that trip?

7    A   Just to visit friends.

8    Q   Okay, the same friends?

9    A   Yes.

10    Q   If you look at paragraph 21, it says "In
11 early October 2014 you returned from Canada back to
12 the United States"; is that correct?

13    A   Yes.

14    Q   Is this the same trip as the October 4th,
15 2014 crossing we just discussed?

16    A   Yes.

17    Q   Okay, and what happened on this crossing back
18 into the United States?  I'd like to know what you
19 remember today.

20    A   Just I'm not sure which of the trips that I
21 crossed.  I don't know if it was Trip C on September
22 or the early October trip, when I came back to the

Page 152

1 United States.  My car was searched and the carpet,
2 even the carpet was tortured and removed, and also the
3 same treatment and the same agents that were at the
4 border questioning me, giving me the same attitude of
5 it's you, come on.

6    Q   Are you -- you seem like you like it?  What
7 do you have in Canada?  Are you serious?  Someone like
8 you should have stopped crossing the border by now.
9 It was just some words that hurts and makes me, you
10 know, even though I love my friends and want to go see
11 them if I can every day, but that made me escalate it
12 from going back each weekend to each month or maybe
13 more, and try to, you know, avoid crossing the border.

14    Q   Were you alone or traveling with anyone on
15 this trip back into the United States in early October
16 2014?

17    A   Alone.

18    Q   Was there anyone else who you knew who
19 witnessed the events at the border checkpoint in
20 October 2014?

21       MS. MASRI:  Objection, calls for speculation.

22       THE WITNESS:  No, not at the border.  But my

Page 153

1 family used to notice, because each time I come, I
2 used to come back home further as 1:00 a.m., but every
3 time I get stopped, I do not show up at home until the
4 next day, morning, which caused a lot of family, you
5 know, family worried.  I get home and everyone is
6 waiting for me, and my aunt that I was living with at
7 the time she -- sometimes she never slept until she
8 sees me coming in the next morning.

9 BY MS. KONKOLY:

10    Q   Did you write about this experience crossing
11 back into the United States in early October 2014 on
12 any of your social media accounts?

13    A   No.

14    Q   Did you talk to anyone aside from your
15 attorney about that experience?

16    A   My family and friends.

17    Q   How many friends?

18    A   I do not recall.

19    Q   More than five?

20    A   I'm not sure.

21    Q   More than ten?

22    A   I'm not sure.

39 (Pages 150 - 153)

Anas Elhady
Elhady vs. Kable

February 22, 2018

Page 154

1    Q  Did you write about this experience in any
2  other place?
3    A  No.
4    Q  If you could look at paragraph 15.  There it
5  indicates that on October 12th, 2014, you left the
6  United States into Canada.  Is that accurate?
7    A  Yes.
8    Q  Is that also the Detroit-Windsor Bridge
9  Tunnel?
10      MS. MASRI:  Objection as to form.  The bridge
11  and tunnel are two different --
12  BY MS. KONKOLY:
13    Q  I meant tunnel.  Was this the Windsor Tunnel?
14    A  Yes.
15    Q  Okay.  Were you traveling alone or with
16  anyone?
17    A  I did travel alone, but I'm not sure if the
18  late October one or the November crossing was with one
19  of my friends that also came to pick me up, like the
20  cross -- we took the bridge.  I'm not sure if it's the
21  October 12th or the one in November that was with my
22  friend and we took the bridge.

Page 155

1    Q  Okay.  So there was one of these trips where
2  you traveled with a friend and you went by bridge
3  instead of tunnel?
4    A  Correct.
5    Q  Okay, and what was the purpose of the mid-
6  October trip to Canada?
7    A  Just go with my friends, hang out.
8    Q  The same friends?  They were from Yemen but
9  living in Canada?
10    A  Correct.
11    Q  Okay.  How long did you stay?
12    A  I used to stay one to two days maximum.
13    Q  Okay, and in paragraph 22, it indicates that
14  you returned in mid-October 2014.  Is this paragraph
15  the return trip of the same -- the return leg of the
16  same trip that we're talking about right now?
17    A  Yes.
18    Q  Okay, and what happened on this crossing into
19  the United States?
20    A  Basically a similar scenario.  The same
21  officers asking me the same exact questions and it
22  just escalated.  What I realized each time does not

Page 156

1  get less than the one before.  I have to go up, up.
2  So I believe this one was more than six hours.  It was
3  about seven to eight hours waiting, because I remember
4  leaving and it was morning already.
5    Q  And was anyone with you on this trip or were
6  you traveling alone?
7    A  On my way back, I was alone.
8    Q  Okay.  Was there anyone else who you knew who
9  was there at the border while you were being detained?
10    A  No.
11    Q  Did you write or post about this experience
12  on any of your social media accounts?
13    A  No.
14    Q  Did you write to anyone aside from your
15  attorneys about this experience?
16    A  I talked to my family and friends.
17    Q  Did you write about it in an email or
18  otherwise to anyone aside from your attorney?
19    A  No.
20    Q  How many friends did you talk to?
21    A  I'm not sure.  But I do want to mention one
22  thing, that my friend that crossed with me to Canada,

Page 157

1  I believe it was I don't know.  I'm not sure if it's
2  the October one or November.  When I came back, he
3  came back with me.  He actually drove me back.
4      It's one of the two that we went together to
5  Canada.  He drove me back to the United States, and he
6  was -- because we came back through the tunnel, he was
7  stopped and they also told me oh no, now you have a
8  friend to come with and they also asked him -- they
9  asked him the same exact questions about my trips to
10  Canada, and basically to confirm if they're true or
11  not.
12      They asked him what we, what I used to do,
13  where we used to go and all the details about my
14  previous trips to Canada.  They made him, they stopped
15  him for four hours, you know.  They asked, they kept
16  asking him for like four hours, and then they had him
17  wait in the waiting room until they finished
18  questioning me for about seven hours or more, then we
19  left.
20      But after that, he used to cross the border
21  every day or at least five times a week.  But after
22  that time, he -- for him crossing the border through

40 (Pages 154 - 157)

Page 158

1 the bridge or the tunnel, I'm not sure, but they
2 stopped him for his first time ever crossing the
3 border being stopped, other than the one being with
4 me, and they asked him the same questions he was asked
5 when he was with me.
6        After finishing questioning him, they told
7 him you're not allowed to cross the border.  You have
8 to go back to Canada.  He asked why the reason, and he
9 never had this before.  They told him we cannot tell
10 you why.  Just you're not allowed in the United
11 States.  He never had anything in his record, nothing
12 to stop him from crossing the border because he was a
13 Canadian citizen.
14        And after that he -- after that week, he
15 tried to come to the United States and they told him I
16 think we mentioned that to you.  You're not allowed in
17 the United States permanent, and thought it was
18 something just at that time.  So he was like okay, so
19 what's the reason?  They told him we cannot reveal any
20 information.  Just we don't want to see you crossing
21 the border again, and please stay away and we don't
22 want to see you here again.

Page 159

1        So since that time, he did not come into the
2 United States until a year or two years after.  He got
3 a lawyer in Canada, tried to find out what's the
4 reason of him not being allowed to cross the border
5 like he always used to, and his case went for a year
6 or more, and then his lawyer told him that they --
7 they told him not to have any contact with anyone.
8 They don't want him to have contact with people in the
9 United States.
10        They did not tell him exactly who, but he was
11 just in the United States, know me and know one other
12 friends.  So his lawyer basically asked him who do he
13 know, and his lawyer told him not to contact me
14 because it appears that they are referring to me as
15 being away from me, and he cannot cross the border to
16 see me again.
17        And his case stayed for a year or more, and
18 then he was -- then they allowed him, I'm not sure if
19 it's a year or two years after that, he got a permit
20 or something so he can cross the border.  I just after
21 that, after he had his case in Canada, he stopped
22 contacting me, even though we were best friends and we

Page 160

1 know each other since high school.
2        But we -- he just, he tried to stay away from
3 me and every time I tried to call him, and he just
4 mentioned that I wish I never knew you.  You caused
5 all this trouble for me.  At the beginning he used to
6 make it as a joke, but it became serious when he
7 literally stopped calling me like we used to contact
8 every day.
9        And just the also my friends in Canada, after
10 that used to make fun of me and make fun of -- they
11 told me all the time you're a U.S. citizen and you get
12 stopped at the U.S. border but not at the Canadian
13 border.  Your country is treating you like this.  When
14 we cross a border, we never used to get treated like
15 this.  But you're the citizen one and you get treated
16 like that.
17        They used to ask me some weird questions that
18 really hurt my feelings.  The beginning was a joke,
19 but it escalated to all my friends that oh, the
20 American government think Anas is a terrorist, Anas is
21 a -- he get asked all these weird questions.  What do
22 you have done Anas, tell us?

Page 161

1        To the point that I start playing in my head
2 what, what kind of person am I, because every time I
3 get treated like this it affects me and how I feel.
4 That caused me basically to try to stay away out of my
5 friends that I was very close with.  That's it.
6    Q   You kept referring to "they" told your friend
7 he couldn't come into the United States.  Who is they?
8    A   I'm sorry?
9    Q   You kept saying "they" told your friend that
10 he couldn't come into the United States.  Who do you
11 mean by they?
12    A   The United States Border.
13    Q   Okay.  Were you present for any of these
14 conversations where they allege that they told him
15 that?
16    A   No.  His lawyer told him, other than two
17 times he was crossing the border and they stopped him.
18 The Border told him not to come to the United States,
19 and then when he started the case, his lawyer told him
20 the same thing, that the Border are not -- don't want
21 him in the United States because they don't want him
22 to have contact with certain people in the United

41 (Pages 158 - 161)

Anas Elhady
February 22, 2018
Elhady vs. Kable

Page 162

1  States.
2    Q   Okay.  My question is simply yes or no.  Were
3  you present when these things were allegedly said to
4  your friend?
5    A   No.
6    Q   Did you hear Border Patrol -- did you
7  personally hear Border Patrol say these things to your
8  friend?
9    A   No.
10   Q   Okay.
11      MS. MASRI:  Toni, if you're in between stops,
12  do you mind really a quick break?
13      MS. KONKOLY:  Three minutes.
14      MS. MASRI:  That's fine.  Just a quick
15  restroom break.
16      (Whereupon, a short recess was taken.)
17  BY MS. KONKOLY:
18   Q   Are we back on the record?  Mr. Elhady, do
19  you understand that you're still under oath?
20   A   Yes.
21   Q   If I could have you look at paragraph 16,
22  page nine?

Page 163

1    A   Okay.
2    Q   It indicates that in November 2014 you exited
3  through the Windsor Tunnel to Canada again?
4    A   Yes.
5    Q   And if you could flip to paragraph 23, it
6  also says in November 2014 you returned to the United
7  States by land at the Windsor Tunnel?
8    A   Yes.
9    Q   Are these -- do these paragraphs belong to
10  the same trip?
11   A   Yes.
12   Q   Okay.  If you could tell me what you remember
13  about the first leg of that trip, crossing from the
14  United States into Canada?  I want to know what you
15  remember today.
16   A   Okay.  I just remember like I mentioned
17  earlier, I'm not sure which one of these was the
18  scenario that I was stopped, you know, getting the
19  same treatment.  It was definitely more time than the
20  October one, and just basically the same questions
21  over and over.
22   Q   Okay.  That was going into Canada.

Page 164

1    A   Yeah, I'm sorry.  Going into Canada, at that
2  time on November, I had for the first time different
3  scenario, which is the Canadian border stopped me.
4  They stopped me and it was weird, because it was the
5  first time for them to enter my name in their system
6  and get the same reaction that I used to see in the
7  agents when I go back to the United States, where he
8  close the window and called on the radio and told me
9  to turn right.  This is on the Canadian side, and they
10  asked me to leave my car and they searched my car, and
11  then they asked me to go inside, where they questioned
12  me and made some phone calls while they're questioning
13  me.
14      And then they go back to me, ask me to come
15  up to the counter and ask me new questions.  When I
16  answer, they write them down and then they ask me to
17  go back to my seat and then they go back.  I can see
18  them through the window make a phone call, and then
19  come back with the same question, I mean with a
20  different question.
21      And they also -- it seems like, based on what
22  I had in this experience, that they were directed to

Page 165

1  ask me these questions, and stop me because they
2  seemed like they didn't know who I am or what are they
3  doing.  It was just the something they were instructed
4  to do.
5      And also, they asked me, they asked me what
6  time exactly I'm going back to the United States, and
7  if I change that time to give them a phone call to let
8  them know if I'm not coming at the time I mentioned to
9  them.
10   Q   How long were you detained at the Canadian
11  border on your way into Canada in November 2014?
12   A   Two to three hours.
13   Q   Did you write or post about this experience
14  on any social media site?
15   A   No.
16   Q   Did you talk to anyone aside from your
17  attorney about this experience?
18   A   My friends that were in Canada were waiting
19  for me outside the border.
20   Q   Did you talk to anyone else?
21   A   Other than my friends, no.
22   Q   Did you write about this experience anywhere,

42 (Pages 162 - 165)

Anas Elhady
Elhady vs. Kable

February 22, 2018

Page 166

1 aside from emailing your attorney potentially?

2     A   No.

3     Q   How long did you stay in Canada this trip?

4     A   One to two days.

5     Q   What was the purpose of this trip?

6     A   Just to see my friends.

7     Q   Okay, the same friends from Yemen who were

8 living in Canada?

9     A   Yes.

10    Q   Okay.  Were you traveling alone or by

11 yourself on the trip from the United States into

12 Canada?

13    A   By myself.

14    Q   Were you traveling alone or by yourself when

15 you returned to the United States?

16    A   By myself.

17    Q   Was there anyone you knew who was

18 present, had to be present at the Canadian border when

19 you had that experience with the Canadian officials

20 that you just discussed?

21        MS. MASRI:  Objection, calls for speculation

22 and objection as to form.

Page 167

1        THE WITNESS:  No one was with me.

2        MS. KONKOLY:  Okay, and there wasn't anyone

3 else who you knew who happened to be there?

4        MS. MASRI:  Same objections.

5        THE WITNESS:  Not at the border.

6 BY MS. KONKOLY:

7     Q   Okay.  What about on the way back?  Can you

8 tell me what happened on your return trip into the

9 United States at the Windsor Tunnel in November 2014?

10 I'd like to know what you remember about that today.

11    A   Okay.  So when I came back, I was -- are you

12 referring to which one?

13    Q   I'm talking about the trip that you disclosed

14 in paragraph 23, but I want to know what you remember

15 about it today, not what you wrote down there?

16    A   Okay.  So I was -- when I'm returning from

17 Canada to the United States, I'm not sure which one.

18 If you just want the back of my head, from November to

19 December, one of the trips I was -- I was -- when I

20 got to the booth, I was -- had the same scenario.

21        Called on the radio and the first one was

22 three agents approached my car instead of me going to

Page 168

1 the right and have a sticker on my car.  The agents

2 came to the car, asked me to leave the car and search

3 myself and took my phone and handcuffed me inside.

4 That was the first time.  But I'm not sure if that or

5 the December one was also the second one.  I was

6 approached by four to six agents, asked me to leave

7 the car and keep my hands up.  This happened at the

8 booth.  Leave the car, keep my hands up and walk back

9 next to the trunk and put my hands on the trunk, and

10 two officers or two agents came, handcuffed me and I

11 remember seeing there is more than just three agents.

12 There was a lot.

13        I can feel them walking with me, and just

14 looking through the cars, that were guarding through

15 other booth, they were all looking at me and pointing

16 like what happened to this guy, that you know, a lot

17 of agents came to handcuff him and put him inside.

18        At that time, I was -- I used to always being

19 put in the waiting room and get questioned.  But that

20 time, I was being put in a cell with only toilet and a

21 seat there, and get my watch, my wallet of course,

22 everything I had in my pocket, my phone and my watch

Page 169

1 taken, and search and more detail for my body.

2        The same questions again and again, and they

3 used to take an hour or half hour to come back and ask

4 me more questions.  I also mentioned at that time if I

5 can call my attorney, Lena, and spoke to her about the

6 kind of treatment that I'm having at that point, and

7 they asked me --

8        I asked them for my card, the card in my

9 wallet and I was like when they give it to me, I was

10 like I want to call my lawyer Lena.  They told me oh,

11 it's okay.  You can call her when you get your phone

12 back, even though I asked them I want to call her

13 right now to tell her what's going on, because I got

14 so scared at that point.

15        I never been handcuffed in my life.  I never

16 was in that position where people pointing at me in

17 public, feeling like a criminal.  I asked them many

18 times if I can call my attorney Lena, and the officer

19 took the card and mentioned -- and was like oh, Lena.

20 He laughed and he was okay, well you can call her when

21 we give you your phone back.

22        I asked them if I can have my phone so I can

43 (Pages 166 - 169)

Anas Elhady
Elhady vs. Kable

February 22, 2018

Page 170

1 call her, then give it back to them, but they refused
2 that. They said the policy is that they cannot give
3 me the phone until I leave, and I cannot make phone
4 calls until I leave. So I had no choice, just wait
5 until I leave so I can call my attorney, and that's
6 what happened.
7    Q   You said you were traveling alone at that
8 time?
9    A   Yes.
10    Q   Was there anyone else who you knew who was
11 there who witnessed those events?
12       MS. MASRI: Objection, calls for speculation.
13 Objection as to form.
14       THE WITNESS: No one I knew.
15 BY MS. KONKOLY:
16    Q   Did you write or post about that experience
17 on any of your social media accounts?
18    A   No.
19    Q   Did you talk to anyone aside from your
20 attorney about that experience at the time?
21    A   I talked to my friends and my co-workers
22 because I was going to work that morning, but it took

Page 171

1 about eight hours at that experience. So I missed
2 sleeping and wake up the next morning for work. So I
3 had to explain to my co-workers and manager what
4 happened, of the experience that I had.
5    Q   Where were you working at the time?
6    A   I was in 13 Hoover gas station.
7    Q   The gas station?
8    A   Yes.
9    Q   The same one you mentioned earlier?
10    A   Yes.
11    Q   How many people would you estimate that you
12 spoke to about that experience at the time?
13    A   More than ten people.
14    Q   More than ten?
15    A   Yes.
16    Q   Okay. Did you write about it anywhere?
17    A   No.
18    Q   What is the name of your friend you were
19 talking about earlier, who was allegedly told that
20 -- by Border Patrol that they didn't want him to come
21 to the United States?
22    A   Ousama Almirani.

Page 172

1    Q   Okay. Did we already spell his name for the
2 record earlier?
3    A   Yes.
4    Q   Okay. So I understand that the testimony you
5 just provided, you're unclear whether that happened in
6 November or December of 2014. It was one of those
7 crossings? Is that accurate?
8       MS. MASRI: Objection as to form.
9       THE WITNESS: I mentioned it was one of them.
10 I'm not sure which is which.
11 BY MS. KONKOLY:
12    Q   Okay. So on the occasion is not the one that
13 you just described, so what we've got to. We've got
14 November 2014 and December 2014, and you just told me
15 about an experience that I understand to have been
16 either November or December; correct?
17    A   Yes.
18    Q   Okay. So I'm asking about the other one,
19 whichever, whichever way that falls. We don't know
20 whether the one you just told us was November or
21 December, but whichever it was. In other instance
22 between those two crossings in November 2014, can you

Page 173

1 tell me about your experience of crossing back into
2 the United States?
3       MS. MASRI: Objection, vague. Objection as
4 to form, compound, confusing. I don't even understand
5 the question.
6 BY MS. KONKOLY:
7    Q   Do you understand the question?
8    A   I do not understand the question. I
9 understand that you're asking me based on my head
10 right now, even though I'm asking you if I can read,
11 because I remember writing to know which is which.
12 But you want it based on my head, so that's what I
13 told you. I don't know which is which.
14    Q   Let's call it November 2014 Trip A and
15 December 2014 Trip B.
16    A   Okay.
17    Q   Okay, and you just told me about an
18 experience you had, but you don't recall whether it
19 was Trip A or Trip B. It was one or the other;
20 correct?
21    A   Correct.
22    Q   Okay. So I'm just asking you about if you

44 (Pages 170 - 173)

Anas Elhady
February 22, 2018
Elhady vs. Kable

Page 174

1 just told me about Trip A, then I'm asking about Trip
2 B, and if you just told me about Trip B, then I'm
3 asking about Trip A.  Do you understand?
4        MS. MASRI:  I'm going to --
5        MS. KONKOLY:  I don't know how to ask this
6 otherwise, because I don't know which trip you just
7 told me about.
8        MS. MASRI:  I understand, but it's going to
9 be confusing unless you allow him to take a look at
10 the notes.  That way, we can all look at the same
11 trip.
12        MS. KONKOLY:  I'm not asking him to read from
13 his interrogatory responses today.  I would like to
14 know what he remembers.
15        MS. MASRI:  Then your question is not going
16 to make sense, to be honest with you.  It's vague.  It
17 is vague.
18        MS. KONKOLY:  I'm doing the best I can, when
19 I don't know which date was the one he just told me
20 about.
21        MS. MASRI:  Well, he talked about a lot of
22 different things, and he was hopping back and forth

Page 175

1 between the two trips.  That's why I was objecting to
2 form earlier, is your follow-up question is not clear
3 which of the two.  He's talking about both at the same
4 time.  So your question is not going to make sense,
5 unless we're looking at something that we can all
6 agree on.
7        THE WITNESS:  This happened four years ago,
8 within a month for both trips.  So I do not recall
9 which one is which, unless I look at my notes, because
10 that's -- you're asking me a vague question basically.
11 BY MS. KONKOLY:
12    Q  You told me about an instance in which you
13 were handcuffed when you were crossing back over from
14 the United -- from Canada to the United States.
15 That's the incident that we just discussed; is that
16 correct?
17    A  Yes.
18    Q  Okay.  Were you telling me about one incident
19 or were you crossing over and telling me about
20 multiple incidents all at the same time?
21    A  I got handcuffed twice.
22    Q  You were handcuffed twice.  Were you

Page 176

1 handcuffed both in November 2014 and in December 2014?
2    A  Yes.
3    Q  Okay.  Let's assume that the incident you
4 just told me about was the November 2014 crossing.
5 I'd like you to tell me about the other one, the
6 December 2014 crossing back into the United States,
7 and what you recall about that today.
8        MS. MASRI:  Objection as to form.
9        THE WITNESS:  The other one is very similar
10 to the one before.  I just the -- let's name them A
11 and B, and the one I mentioned earlier, let's say it's
12 A, and the second one is B.  B was very similar to A,
13 and the only difference was is I -- I wait, what
14 happened.  It was less officers.  The first one was
15 more, about more than four officers.  B was three,
16 around three because I did not know how many people
17 behind me walking.
18        But I was both handcuffed, both walked to a
19 cell, taking a different door than the normal one that
20 I used to take.  It was like a back door to the cell,
21 and being searched the same way with my body, and
22 taking my everything I had and my phone, and that's

Page 177

1 it.
2 BY MS. KONKOLY:
3    Q  Was your phone and your belongings returned
4 to you before you passed back over to the United
5 States?
6    A  Yes.
7    Q  Okay, and approximately how long were you
8 held at the border on this Incident B trip back into
9 the United States?
10    A  One of them was eight hours and either B or
11 C, I mean A or B, and the other one was about seven
12 hours.
13    Q  Okay, and how did you know it was about seven
14 hours?
15    A  Because it was from the time I get to the
16 border and get to my house.  I leave at midnight and I
17 get home in the morning.
18    Q  Okay.  Was anyone traveling with you on the
19 second incident, on the second time that you crossed
20 over into the United States in November and December
21 of 2014?
22    A  No.

45 (Pages 174 - 177)

Anas Elhady
Elhady vs. Kable

February 22, 2018

Page 178

1    Q  Okay.  Was there anyone else who you knew who
2  was present at the border while you were detained in
3  this second incident between November and December
4  2014?
5       MS. MASRI:  Objection, calls for speculation.
6       THE WITNESS:  Not that I know of.
7  BY MS. KONKOLY:
8    Q  Did you write about this incident or post
9  about it on any of your social media accounts?
10   A  No.
11   Q  Did you talk to anyone about it aside from
12  your attorney?
13   A  I talked to my family and friends.
14   Q  How many people?
15   A  More than ten.
16   Q  Okay.  Did you write about it anywhere else?
17   A  No.
18   Q  Do you believe that these experiences we've
19  talked about in the fall and winter of 2014 crossing
20  the bridge back and forth from Canada to the United
21  States are the result of your placement on the watch
22  list?

Page 179

1       MS. MASRI:  Objection, calls for a legal
2  conclusion, calls for speculation.  Objection as to
3  form.  Answer if you can.
4       THE WITNESS:  It was definitely because I was
5  being chose out of everyone crossing the border, and
6  every time I get worse treatment and scarier than the
7  one before.  Just makes me feel that I had something
8  different than everyone else crossing the border.  So
9  yes.
10  BY MS. KONKOLY:
11   Q  Did anyone, did any government official ever
12  tell you that you were on a watch list?
13   A  Personally, no.
14   Q  If you could turn to paragraph 18?  It says,
15  "On April 11th, 2015, you exited the United States and
16  went into Canada."  Is that accurate?
17   A  Yes.
18   Q  Okay.  Where specifically did you make that
19  crossing?
20   A  The April 11th, right?
21   Q  April 11th, 2015.
22   A  Tunnel from Detroit to Windsor.

Page 180

1    Q  The Windsor Tunnel?
2    A  Yes.
3    Q  And what was the purpose of this trip?
4    A  Visiting friends.
5    Q  The same friends?
6    A  Yes.
7    Q  Were you traveling alone or by yourself?
8    A  By myself.
9    Q  Okay.  What happened on your crossing from
10  the United States into Canada?
11   A  What happened?
12   Q  Did anything happen?
13   A  From the United States to Canada, I was
14  stopped at the Canadian border, and the same thing.
15  Got pulled the side, searched and I stayed about three
16  hours, questions about where I'm going, where I will
17  be staying, basically the same questions I had in the
18  trip before.
19       And also, it was more details about
20  questioning getting what they had through the phone.
21  What I mean by detailed, they used to come approach me
22  at the counter, ask me one question and keep the phone

Page 181

1  to the side so they can go back, give the answer, then
2  come back and ask me another question.
3    Q  And you're talking about Canadian officials?
4  I just want to make it clear?
5    A  Yes, yes.
6    Q  When you say "they"?
7    A  Yes.
8    Q  Canadian?
9    A  Canadian.  This is at the Canadian border,
10  and it was very detailed, where I'm going to be, when
11  I'm going to come back exactly.  And especially at
12  this time, they asked me -- they asked me tell us
13  exactly what time are you going to be there, and I
14  told them around 12:00.  They said okay, if you do not
15  be at the border at 12:00 exactly, this is the number.
16  Call us and let us know if you're coming earlier or
17  before, just to know exactly when are you crossing the
18  border.  That's it, yeah.
19   Q  Okay.  How long did that conversation last?
20   A  At the Canadian border?
21   Q  At the Canadian border on your way into
22  Canada?

46 (Pages 178 - 181)

Anas Elhady
Elhady vs. Kable

February 22, 2018

Page 182

1    A   Three, two, around three hours.

2    Q   And how long did you stay in Canada on this

3  trip?

4    A   Same day I came back.

5    Q   Okay.  What was -- I can't remember if I've

6  asked this question for this particular trip.  What

7  the purpose of this trip?

8    A   Visit friends.

9    Q   Just for one day?

10   A   Yeah.

11   Q   The same friends?

12   A   Yes.

13   Q   You didn't stay overnight?

14   A   Actually we, there was like lunch because my

15 friend there got engaged, so I just went there for

16 lunch and came back.

17   Q   Okay, and what time did you intend to come

18 back?

19   A   I told them I'm coming back at between 11:30

20 and 12:00, and I got there between 11:30 and 12:00.

21   Q   P.M.?

22   A   Yes.

Page 183

1    Q   Did you write or post about your experience

2  crossing into Canada in April 2015 on any of your

3  social media accounts?

4    A   No.

5    Q   Did you talk to anyone about that crossing,

6  aside from your attorney?

7    A   I talked to friends, family, every students

8  in my school and everyone that knew about this

9  incident I was questioned by.

10   Q   So how many people would you estimate that

11 you talked to about this crossing into Canada in April

12 2015?

13   A   Into Canada?

14   Q   Yeah, into Canada.

15   A   Oh.  More than ten people.

16   Q   Okay.  Did you write about this experience

17 anywhere?

18   A   No.

19   Q   So you came back the same day?

20   A   Yes.

21   Q   Okay.  Did you take the Windsor Tunnel or a

22 different crossing?

Page 184

1    A   Took the bridge.

2    Q   Which bridge?

3    A   The Detroit-Windsor Bridge.

4    Q   Okay, and what happened when you arrived at

5  the Detroit-Windsor Bridge?

6    A   Okay.  At that time, I was -- I had just

7  gotten a car, a new car.  I had -- the person at the

8  booth, I was actually -- when I got to the booth at

9  the bridge, I gave him my ID and the letter that I had

10 from Homeland Security that I received after

11 submitting that first, the travel inquiry.

12       I received a letter for a number that I had

13 to present when I cross the border, and when they did

14 that, he swiped my ID and had the same reaction, and

15 because they're not used to me crossing the bridge,

16 there was different people and a different scenario.

17 Basically, I was asked to put my hands on the wheel

18 until three agents or four came to the back of the

19 car.

20       They asked me to get out, leave everything in

21 the car, the keys.  I was also asked by the agent at

22 the booth how did -- he asked me where I work, and I

Page 185

1  told him I work at a gas station, and he told me how

2  can you work at a gas station and afford this car?  Is

3  that really yours or not?

4        I told him it's mine, and it was registered

5  under my uncle's name.  So he was just making fun of

6  that, and then when I got out of the car, I was

7  basically handcuffed in the back of my car, walked

8  into the building at the bridge.  They took me to a

9  cell that was very bright light and very cold, and for

10 -- they took my shoes, they took my watch, my phone,

11 everything I had, even my belt.

12       They even the seat in that room was a metal

13 seat and it was freezing.  So I tried to stand up or

14 stay away from it because it was cold either way I sit

15 or stand.  So I was asked questions every -- at the

16 beginning, I was asked a lot of questions for about an

17 hour, and then they left me alone.  They sent another

18 agent, basically asked me the same questions just in a

19 different form, and I couldn't say I already answered

20 the questions because it was a different person.

21       Until the fourth time I was approached by

22 another agent, and I told them, you know, there's

47 (Pages 182 - 185)

Case 1:16-cv-00375-AJT-JFA   Document 208-1   Filed 05/08/18   Page 54 of 138 PageID# 7267

Anas Elhady
February 22, 2018
Elhady vs. Kable

Page 186

1 three other agents that came and asked me the same
2 exact questions over and over, just different
3 questions. He told me this is a different shift. If
4 you want to get out, you have to answer my questions,
5 and I just have to repeat myself even though I was
6 freezing.
7         I stayed there for approximately more than
8 ten hours. Every hour, hour and a half I get agent
9 coming to the cell, ask me questions, more everything
10 about my family, everyone I knew, even like my
11 cousins, my cousins' names, my uncles, everyone I
12 knew, and everything I'd done in my past.
13         Also, they asked me to -- one of the last
14 ones I was feeling so cold and my head started hurting
15 because of the bright light, I asked the officer if I
16 can get my shoes or a blanket because it's getting so
17 cold, and he told me that we're almost there to let
18 you out. I waited another hour, and then started
19 knocking on the door for --
20         I know when they walked me, it was at the end
21 of the hall. So I started knocking on the door. They
22 hear me, no one answered and I also waited for like

Page 187

1 10, 15 minutes and I heard someone came by, and I
2 started asking for help. Hey, can someone hear me.
3 But I heard the officers talked by the cell, listen to
4 what I was saying and then kept on walking.
5         All I remember after that is I started
6 getting so drowsy and the headache started getting
7 more and I started shaking, and I started asking for I
8 need to go to the hospital, I need an ambulance. Then
9 an officer came and told me what's going on, why you
10 need the ambulance?
11         I told him I'm freezing. I'm freezing to
12 death. Please let me out or let me out, at least in
13 the waiting room. I cannot wait here longer, and he
14 told me okay, we're almost there. Just hang up, just
15 hang on. We'll let you out shortly. I waited, you
16 know, another like 30 minutes. I couldn't hold it.
17 All I remember after that is I was laying on the
18 floor, and the officer was waking me up, asking me if
19 I'm okay and I was shaking when he woke me up.
20         That was my first time falling unnoxious
21 (sic) ever in my life. Never felt like I was freezing
22 to death. I never felt like I was going to die, and

Page 188

1 he took me -- he realized that it's dangerous. So he
2 told me to get up and asked for -- he called on the
3 radio.
4         Another two officers came and took me to the
5 waiting room, and I was still shaking by then, and
6 they told me you okay? What's going on? I was like I
7 can't hold it. It's freezing in there. I've been
8 asking you guys to give me my shoes, something that
9 can keep me warm.
10         They said okay, we'll let you out in a few
11 minutes. Just hold on. I told them I can't, I cannot
12 leave in this situation. My whole body is shaking. I
13 don't think I'm going to be able to drive. I really
14 need to go to the hospital. So they called an
15 ambulance. When the ambulance arrived, they took me
16 to the -- by the way I was -- in the waiting room I
17 was handcuffed.
18         When I walked to the ambulance they -- I was
19 -- no, I'm sorry. I did not walk to the ambulance.
20 The ambulance brought the bed. They put me in the bed
21 and then took me to the ambulance outside, and then
22 the officer handcuffed me to the bed in the ambulance.

Page 189

1 The nurse that was at the ambulance asked the officer
2 why are you still handcuffed him, he's barely moving,
3 and he told her to shut up and that's not her
4 business.
5         And I remember like she was back and forth,
6 like why are you still doing this to him? He's barely
7 moving. I was just trying to grab the blanket and
8 stay warm at that time. When I was listening to them,
9 I felt like it's an echo, it's not real what's
10 happening because I was so -- I never felt that way. I
11 felt like I was going to die, and what happened is
12 something I never experienced in my life.
13         I was just thinking of if I die, these people
14 that, referring to the Border agents that kept me in
15 the cell for more than ten hours, nobody knows about
16 me, I can die and they can -- they can do whatever
17 with my body, and nobody would know what happened to
18 me. So I was just trying to stay strong and trying to
19 stay awake so I know everything that's happening
20 around me.
21         I remember going to the hospital and they put
22 me on a chair because I couldn't walk, cuffed me into

48 (Pages 186 - 189)

Anas Elhady
Elhady vs. Kable

February 22, 2018

Page 190

1  the chair.  We were -- the officer took me inside and
2  then I was -- I was taken to a room inside the
3  hospital.  They put me in a bed and I asked -- I
4  remember asking the nurse for extra blankets, because
5  I cannot stop shaking from how cold I was.
6         She gave me blankets and then a doctor came
7  and asked me what happened, and I remember the officer
8  told him not to ask me these kind of questions, and
9  the doctor asked him to step outside and he talked to
10 him, that he have to do this in order to process me or
11 in order to help me.
12        I heard them getting into an argument, and
13 then the doctor told the Border Patrol agent or
14 officer to stay out the room if he wants me to get
15 medical treatment.  At the end, the doctor came and I
16 told him everything happened to me.
17        I was actually, I was so happy that I was
18 left alone with the doctor, I started telling him
19 everything, thinking I was going to die, and if I die,
20 there's someone I can trust that would send the story
21 or give it to my family so they know what happened to
22 me.

Page 191

1         So I started telling him everything.  I
2  started telling him what kind of treatment I had in
3  the past on the border, and I remember like explaining
4  everything for about an hour or so.  That's when I
5  felt real comfortable and came down.  He gave me I
6  believe it was -- we did the blood tests and urine
7  test and also, he gave me a pill or a shot, I do not
8  remember.
9         All I remember just it put me to sleep.  I
10 slept and my body just calmed down.  I felt so
11 comfortable after I was speaking to the doctor, and
12 told him what happened and because honestly, I felt
13 like at that point I was -- I was dying and I just
14 wanted my mom to know what happened to me.
15        So after I woke up, the doctor came to
16 release me and he woke me up and told me you're ready
17 to go, how do you feel?  I told him I feel better, but
18 I don't know why my head's going -- is still hurting
19 me.  He said you'll feel better, just as long as you
20 can get up and walk.
21        He released me.  We got back in the Border
22 Patrol bus, and they put me in the back of the bus,

Page 192

1  which is metal seats and they handcuffed me to the
2  floor of that bus.  It was -- there was a handcuff
3  area they can handcuff me to the floor, until we got
4  to the bridge.
5         They gave me everything back the minute I
6  exited the bus, and they gave me everything, and they
7  gave me my car keys.  They told me you're ready to go.
8  I wasn't feeling good, but I drove home and it was
9  about noon at that time when I arrived home, and I was
10 also -- I was -- yeah, after I got home, I remember my
11 brother was home and he was asking me what happened.
12        I just couldn't talk.  I told him can we talk
13 about this a different time.  After that experience, I
14 remember staying home, not going to school, not going
15 to work for about four days, just scared leaving the
16 house.  I got scared of my situation.  I stayed in
17 bed.  My body couldn't actually function.  Every time
18 I wake up, I feel like I'm hearing sounds in my head.
19        I'm hearing the questions that guy repeated
20 to me in the cell, and so I kept -- I stayed home for
21 about four days sleeping most of the time, and just
22 scared of travel again.  After that was basically my

Page 193

1  last time crossing the border until August or June
2  2017.
3     Q   June of 2017?
4     A   Yes, when I went to -- drove to JFK, then --
5     Q   Saudi Arabia and Yemen?
6     A   Yes.
7     Q   Okay.  Have you crossed the border by land
8  since this April 2015 incident?
9         MS. MASRI:  I'm sorry.  I don't want to
10 interrupt.  I just want a quick clarification, that
11 last one.  You said fall noxious.  What was --
12        MS. KONKOLY:  Wait, I'm going to -- Lena,
13 this is my deposition.  I don't think this is proper
14 for you to be correcting your witness' testimony in
15 this matter.
16        MS. MASRI:  Well I mean --
17        MS. KONKOLY:  If you have a question you'd
18 like to ask on redirect --
19        MS. MASRI:  I'll redirect.
20        MS. KONKOLY:  --I'm going to ask you to save
21 it for then.
22        MS. MASRI:  That's fine.  I'll redirect.

49 (Pages 190 - 193)

Anas Elhady
Elhady vs. Kable

February 22, 2018

Page 194

1 BY MS. KONKOLY:

2    Q   Have you crossed the United States border

3 into Canada or Mexico since this incident in April

4 2015?

5    A   No.

6    Q   Okay, and I believe you said you were

7 traveling alone on April 11th, 2015; is that correct?

8    A   Yes.

9    Q   Okay.  Was anyone else there who you knew,

10 who witnessed this incident crossing back into the

11 United States?

12   A   No.

13   Q   Did you write or post about this on any of

14 your social media accounts?

15   A   No.

16   Q   Did you talk to anyone, aside from your

17 attorney, about this incident?

18   A   I talked to everyone I knew that knew about

19 what happened to me, and that's probably more than 30

20 people.

21   Q   More than 30?

22   A   Yes.

Page 195

1    Q   Okay.  Did you write about it anywhere?

2    A   No.

3    Q   Do you believe that this happened to you

4 because you were on a watch list?

5    A   I do, and I -- yes, I do.

6    Q   Did anyone tell you at the time?  Did any CBP

7 officials tell you that you were on a watch list?

8    A   No.

9    Q   What is your basis for believing that this

10 happened because you were on a watch list?

11   A   Because of the treatment I had on the kind of

12 questions I was being asked, and every time I was

13 asked, especially that April 11th crossing, when I was

14 asked about terrorist groups and what I have been

15 doing in -- who do I contact in Yemen and if I have --

16 they started asking me about people that I knew from

17 TV happened to be terrorist people like bin Laden and

18 others.

19   Q   You mentioned that you missed class and work

20 for three or four days.  Is that -- did I understand

21 that correctly?

22   A   I missed my life in that three and four days

Page 196

1 because I did not answer phone.  I did not leave my

2 bed, just to the bathroom and back.  I was so --

3 sometimes I used to wake up in the middle of my sleep

4 shaking, feel my body still cold inside, even though I

5 was covered with blankets at home.

6    I basically felt like that four days was the

7 worse four days of my life, because I used to hear

8 sounds like in my head.  The only person I talked to

9 at that four days was my brother that used to live

10 with me.

11   Q   Are there any consequences from this April

12 11th, 2015 incident that we haven't already discussed?

13   MS. MASRI:  Objection, calls for a legal

14 conclusion, calls for speculation.  Objection as to

15 form.

16   THE WITNESS:  Consequence was actually after

17 that, and actually before that, but this made it very

18 clear, that my friends and family used to make fun of

19 me about what happened, and not just fun.  Even

20 friends that I used to hang out with, they used to

21 tell me all the time oh, I don't know if we should go

22 out together.  How about we just meet up over there,

Page 197

1 because we cannot trust you after what happened to

2 you.

3    We don't know if it's true or not.  If the

4 government is taking it serious, why wouldn't we take

5 it serious?  So it affected me and also made me stay

6 away from my friends.  I stayed away from my cousins

7 that used to bring this up all the time, because it

8 used to affect me emotionally.

9    Also, that also one of the things that made

10 me stop crossing the border and I -- made me also

11 doubt myself, am I a bad person that needs to be given

12 or treated this way, even though I'm going to school,

13 work, paying for rent and trying to stay -- live like

14 a normal person.

15   But every time I used to, you know, hear this

16 from my friends or family or anyone that knew about

17 it, I used to feel like I'm -- I need to take a step

18 back and realize who I am and if I'm really a bad

19 person like the people at the Tunnel and Bridge think

20 I am.

21   But there is nothing I have done in my life

22 that makes me being suspicious or anything.  It

50 (Pages 194 - 197)

Anas Elhady
Elhady vs. Kable

February 22, 2018

Page 198

1 affected me every day.  Until this day I think about
2 it and watch every step I do, every move I do.  It's
3 really sad that incident, and I remember April 11th
4 like it's yesterday.
5        MS. KONKOLY:  If I could have you turn to
6 Exhibit J in your binder?  Go ahead and mark it.  You
7 produced these documents to us in discovery.  They
8 appear to be medical records related to your treatment
9 on April 11th, 2015.  I'll just have you go through
10 those documents and confirm that understanding.
11        (Witness reviewing documents.)
12        THE WITNESS:  Yes.
13        MS. KONKOLY:  Go ahead and mark it, and if
14 you could flip to Exhibit K.  Have you seen this
15 document before?
16             (Whereupon, the document
17             referred to was marked for
18             identification as Exhibit K.)
19        (Witness reviewing document.)
20        THE WITNESS:  I do not remember.
21 BY MS. KONKOLY:
22    Q   You don't know what this document is?

Page 199

1    A   I do not remember.
2        MS. KONKOLY:  Okay.  You can go ahead and
3 mark it anyway, since we've talked about it.  If we
4 could flip to Exhibit H, mark that one.  Is this a
5 copy of your passport?
6             (Whereupon, the document
7             referred to was marked for
8             identification as Exhibit H.)
9        THE WITNESS:  Yes.
10 BY MS. KONKOLY:
11    Q   Have you ever had any other passports?
12    A   No.
13    Q   Have you ever traveled on a passport from
14 another country?
15    A   I'm sorry.  I take that back.  I remember one
16 time I lost my passport in Yemen, when I was in Yemen,
17 and I went to Saudi Arabia and then I -- I got a
18 Yemeni passport so I can travel to Saudi Arabia, but
19 that was the only time I used it.
20    Q   Okay.  Do you still have that Yemeni
21 passport?
22    A   No.

Page 200

1    Q   Did it expire?
2    A   I don't know.  Of course, it expired.  It was
3 a long time ago.
4    Q   Okay, and you said you traveled on it once?
5    A   Yes.
6    Q   From Yemen to Saudi Arabia?
7    A   Correct.
8    Q   And how old were you at the time?
9    A   I'm not sure.  I know I used it once and then
10 I lost it.
11    Q   Were you in high school?
12    A   It was after high school.
13    Q   Were you in college?
14    A   No.
15    Q   In between?
16    A   It was -- it was after 2011, probably between
17 2011 and 2012.  I do not recall exactly.
18    Q   Okay.  So if you could turn to page eight of
19 your passport?
20    A   Page eight.
21        MS. MASRI:  We're talking about Bates 10,
22 right?

Page 201

1 BY MS. KONKOLY:
2    Q   It's Bates 10, page eight on the passport.
3    A   All right.
4    Q   It looks like there's an entry stamp for
5 Yemen, and it says "08/06/2013."
6    A   Okay.
7    Q   I'm unclear whether that's June 8th, 2013 or
8 August 6th, 2013.  Do you know?
9        MS. MASRI:  I'm going to just object, that
10 the document speaks for itself.
11 BY MS. KONKOLY:
12    Q   I'm asking whether you know which way that I
13 should read that date?
14    A   I'm not sure, but it could be August 6th, but
15 I'm still not sure.
16    Q   Okay.  The wallet looks like there's an exit
17 stamp, and it could either be October 5th or May 10th,
18 2012.
19        MS. MASRI:  Again objection, the document
20 speaks for itself.
21 BY MS. KONKOLY:
22    Q   Do you know which way to read that?

51 (Pages 198 - 201)

# Exhibit G

Case 1:16-cv-00375-AJT-JFA   Document 208-1   Filed 05/08/18   Page 59 of 138 PageID# 7272

Murat Frljuckic                                      December 21, 2017
Elhady vs. Kable

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE EASTERN DISTRICT OF VIRGINIA

                   Alexandria Division

3

ANAS ELHADY, ET AL.,

4

                        Plaintiffs,

5          vs.

                   1:16-CV-375(AJT/JFA)

6

CHARLES H. KABLE, ET AL.

7                       Defendants.

8

9                  Washington, D.C.

10                 Thursday, December 21, 2017

11    Deposition of:

12                 MURAT FRLJUCKIC

13    called for oral examination by counsel for

14    Defendants, pursuant to notice, at the office of

15    Department of Justice, 20 Massachusetts Avenue,

16    N.W., Room 7125, Washington, D.C., before

17    Karen Lynn, RPR, of Capital Reporting Company,

18    beginning at 10:31 a.m., when were present on

19    behalf of the respective parties:

20

21

22

Murat Frljuckic
Elhady vs. Kable

December 21, 2017

Page 2

1        A P P E A R A N C E S
2 On behalf of Plaintiffs:
3      DENA ROTH, ESQUIRE
       U.S. Department of Justice
       20 Massachusetts Avenue, N.W.
4      Room 7125
       Washington, D.C. 20001
5      (202) 514-5108
       dena.m.roth@usdoj.gov
6
   On behalf of Defendants:
7      GADEIR ABBAS, ESQUIRE
       Council on American-Islamic Relations
8      453 New Jersey Avenue, S.E.
       Washington, D.C. 20003
9      (202) 742-6423
       gabbas@cair.com
10
11
            * * * * *
12
13
14
15
16
17
18
19
20
21
22

Page 3

1        CONTENT
                     PAGE
2
   EXAMINATION BY COUNSEL FOR DEFENDANTS   4
3
4
      FRLJUCKIC DEPOSITION EXHIBITS
5
   EXHIBIT                   PAGE
6 NUMBER
   Exhibit A   Complaint       13
7 Exhibit B   Plaintiff's      18
       discovery responses
8 Exhibit C   Plaintiff's      22
       discovery responses
9 Exhibit D   Plaintiff's
       discovery responses
10 Exhibit E   Copy of passport   29
   Exhibit F   Department of State   52
11       letter
   Exhibit I   DHS letter      55
12 Exhibit J   DHS letter      88
   Exhibit K   Itinerary       71
13 Exhibit L   Traveler inquiry   92
       form
14 Exhibit M   DHS letter      89
   Exhibit N   DHS letter      57
15 Exhibit P   Traveler inquiry   96
       form
16
17
18      (Exhibits attached to transcript.)
19
20
21
22

Page 4

1        P R O C E E D I N G S
2 WHEREUPON,
3        MURAT FRLJUCKIC
4 called as a witness, and having been first duly
5 sworn, was examined and testified as follows:
6      MR. ABBAS:  I'd like to order today's
7 deposition; electronic copy.
8    EXAMINATION BY COUNSEL FOR DEFENDANTS:
9 Q   Good morning.
10 A   Good morning.
11 Q   My name is Dena Roth, and I am an
12 attorney for the plaintiff in this case.
13      Before we get started this morning, I
14 thought I'd go over a few instructions that I
15 think will help us all to make sure that today's
16 deposition goes smoothly and efficiently.  I want
17 to be respectful of your time and make sure that
18 this -- you know, that we understand each other
19 and this is as clear as possible.
20      First rule about a deposition is, unlike
21 normal conversations where people can interrupt
22 each other or talk over each, because we have a

Page 5

1 court reporter in the room and she's transcribing
2 everything, it's extremely important that we not
3 interrupt each other.  So what I'll ask of you is
4 that you wait until I finish my question before
5 you answer the question.  And I commit to you that
6 I will wait until you answer your question before
7 I say anything further.
8      Does that make sense?
9 A   Yeah.
10 Q   Great.  You understand that you're under
11 oath today, and that's the same as if you were in
12 a courtroom with a judge.  Obviously we're not in
13 a courtroom, but there is a court reporter and she
14 just swore you in, so everything you say is under
15 oath.
16      Do you understand that?
17 A   Uh-huh.
18 Q   I'm going to ask that you give answers
19 that are verbal, yes or no --
20 A   Yes.
21 Q   -- rather than nodding your head?
22 A   Yes.  Yes.

2 (Pages 2 - 5)

Page 46

1    A   Yes.

2    Q   And that was just for a few minutes, but
3  you answered the questions and they let you go?

4    A   Yes.

5    Q   Okay.  So now we're -- I think we're
6  through 2011.  The next paragraph, Paragraph 15,
7  talks about early 2013, but I'd like to just turn
8  to Tab 8.  So if you can turn back to Exhibit A
9  and find the Paragraph 331, which is on Page 53.

10       I'm just going to read this for the
11  record, "On or about October 2002 [sic],
12  Mr. Murat Frljuckic was referred to secondary
13  inspection, handcuffed and detained by CDP at the
14  border stop the Blue Water Bridge port of entry
15  Port Huron, Michigan, where he attempted to
16  reenter the United States after a brief vacation
17  in Canada."

18       So the reason I'm turning to this is
19  because chronologically it looks like it's the
20  next trip that we have.  We just talked about
21  crossing in 2011, and then this is in October of
22  2012.

Page 47

1       Do you recall this --

2    A   2012 --

3    Q   -- incident?

4    A   -- Yes.

5    Q   Can you describe what occurred when you
6  came back in the country on this trip?

7    A   I went to visit my brother in Canada; me
8  and my mom and my four-year-old son.

9       I'm sorry.

10   Q   Take your time.

11   A   When we came back three days later, when
12  I came to the border, the officer swiped my
13  passport and something started ringing.  And the
14  next thing I seen like five guys surrounded my car
15  with guns pointing at me, and the guy told me to
16  slowly come out, walk back.  He was holding the
17  gun on me constantly, and then they handcuffed me
18  in front of my four-year-old kid.  He was crying
19  so much.  That was the hardest thing for me to
20  see.

21   Q   Other than your four-year-old son, was
22  anyone else in the car with you?

Page 48

1    A   My mom, but she's 70-years-old.

2    Q   And after they handcuffed you, what
3  happened?

4    A   They take me aside.  I told them what's
5  going on.  Why are you guys doing this?  He says,
6  it's for our safety.  They took some of my clothes
7  off.  They pat me down.  They tightened my
8  handcuffs -- they tied the handcuffs so hard and
9  then my wrist was hurting.  They hold me like that
10  for maybe 30 minutes.  And after they took off the
11  handcuffs, I went to finger -- how do you say
12  that?  They took my fingerprints, and they reunite
13  me with my mom and my son.

14       And from that on, they made me wait for a
15  while, and then they called me back in, and they
16  asked me all kind of questions, like religious
17  questions, like where I go -- which mosque I
18  attend, who do I listen, who do I associate with.
19  So very, very -- how can I say -- interrogating
20  questions.  I don't even remember some of them.

21       And then I went back in the waiting room
22  with my son and my mom, and four hours later, they

Page 49

1  came back.  They said they were sorry, and we
2  could go.  You're free to go.  Just like that.

3    Q   So you said that was about four hours
4  from start to finish?

5    A   Yeah.

6    Q   Or just from the point where they --

7    A   Waiting period.  Waiting period in there.

8    Q   And during that time, where were
9  your -- where do you recall your mother and son?
10  Where were they?

11   A   They were in the waiting area.  It's like
12  a section you wait -- where I was -- I went to
13  join them later on after they were done with me.

14   Q   They were not in the car?  They were not
15  waiting in the car?

16   A   The whole time, no.  No.

17   Q   Do you recall what time of day it was?

18   A   I was -- I believe around 5:00 maybe.

19   Q   In the evening?

20   A   Yes.

21   Q   When -- when you arrived at the border?

22   A   Yes.

13 (Pages 46 - 49)

Murat Frijuckic
Elhady vs. Kable
December 21, 2017

Page 66

1 16, which I'll read.
2      "In early 2013, plaintiff exited the
3 United States to Canada by car.  In early 2013,
4 the plaintiff entered the United States from
5 Canada by car."
6      Do you recall that trip?
7   A  Yes.
8   Q  Would this be a separate trip from the
9 incident in October?
10   A  Yes.
11   Q  Did you have any problems crossing the
12 border on this trip in early 2013?
13   A  Yes.
14   Q  Can you describe that for me, please?
15   A  This is the one -- if I remember
16 correctly, we went to a wedding, my niece got
17 married.  If I remember correctly, it was in
18 January 2013.
19      Well, at this time, we was -- all of my
20 family together; my eight kids and my wife.  And,
21 of course, I expect it because I had a problem
22 from before.  It was a little bit easier because I

Page 67

1 mentally prepared myself.  But same thing,
2 police -- or I mean, the officers, or whatever
3 they call them there, they surrounded my car with
4 guns.  They told me to use my left hand to shut
5 off the car, to open the door, walk slowly back,
6 don't look at them, put my head down, handcuff me.
7      My family, they told to drive on the side
8 and to go in the waiting area.  I was again -- pat
9 down.  And I don't remember -- I believe that time
10 that happened that one of the officers they -- he
11 tightened my handcuffs so hard and my wrist was
12 hurting.  I was telling him my hand hurts.  He
13 said, well, they're not designed to be
14 comfortable.  They were designed to not be
15 comfortable.  And I say, yes, but not for me.  I
16 didn't do nothing.  He says we'll see about that
17 in a minute.
18      And then, of course, after 30 minutes
19 holding me in handcuffs, they check everything,
20 they went through all my pockets, whatever, my
21 I.D.s and check everything, and they took me to do
22 the fingerprints.  And then they took me in one

Page 68

1 office where they interrogate me so, so much.  I
2 believe it was at least an hour.
3      Then after that, I was released and went
4 in the waiting area, I waited with my family
5 there.  I want to say that time was three and a
6 half hours instead of four hours.  And every once
7 in a while, I would go to them and ask them why is
8 it taking so long, what are we waiting.  They
9 would reply that it's not -- it has nothing to do
10 with them.  It's -- they waiting phone call from
11 Washington or somewhere -- I don't know where --
12 to clear me out so we could leave.
13      Of course, it's very scary and
14 frustrating, including -- all my kids are
15 terrified.  Myself, too.
16   Q  Do you recall who in your family was with
17 you in the car on this occasion?
18   A  All of us; my eight kids and my wife and
19 me.
20   Q  I take it you were driving a van or --
21   A  Yes.
22      MR. ABBAS:  Eight kids.

Page 69

1      MS. ROTH:  It's a big van.
2      THE WITNESS:  Yes.
3 BY MS. ROTH:
4   Q  Do you remember what time of day it was?
5   A  I want to say some time around maybe 2:00
6 or 3:00.
7   Q  When it started?
8   A  Yes, when I arrived.
9   Q  And on this trip -- so this was, you
10 think, January of 2013, and you think it was for a
11 wedding in Canada.  Did you have any problems
12 leaving the United States and going into Canada?
13   A  No.
14   Q  Do you recall when you were released at
15 the border, did you fill out another form like you
16 described earlier?
17   A  I'm not sure, but I think -- I think I
18 just gave up on those letters because they didn't
19 do nothing for me.  I'm not sure if I did, but I
20 know how I feel now.  I just never bothered with
21 that anymore, but I don't think I did.
22   Q  Okay.  We're going to move on to the next

18 (Pages 66 - 69)

Murat Frijuckic
Elhady vs. Kable
December 21, 2017

Page 78

1 cannot travel right now.
2    Q   And when it became clear that the flight
3 had left and you had missed it, I think you had
4 said that the airline rebooked you for the next
5 day.  Did they also give you accommodations for
6 overnight to stay?
7    A   No.  No.  I called my brother because he
8 lives in -- not too from there.  He picked us up
9 and we went over to his house to sleep over.
10    Q   Okay.  Okay.  And then could you just say
11 what the purpose of this trip to Montenegro was?
12 Was it to visit family and --
13    A   Yeah.  My wife has everybody there.  She
14 has nobody here.  So she likes to go often.  But
15 we don't really go often because it's -- we can't
16 afford it.  It's a big family.  So that was one of
17 the -- I believe prior to that, I didn't travel in
18 four or five years to travel to Montenegro.  So we
19 kind of save money for five years just to have a
20 nice trip.  But when you go through these
21 problems, you don't really have a nice trip.
22    Q   Okay.  So I think you were going to tell

Page 79

1 me about the return trip in August.  So please go
2 ahead and tell me about the return trip.
3    A   When I returned to Canada, they also had
4 an email from U.S. government.  And they kind of
5 escort me in the room, and they said to me what is
6 the government -- what does the government have
7 problem with you, or what kind of problems does
8 the government have with you, and I say I don't
9 know.  They said, they don't tell you.  I said,
10 they don't tell me.  I ask them, they never tell
11 me nothing.  I don't know what's going on.  They
12 says that's funny because we would say to our
13 citizens if we have -- what kind of issue we have
14 with the guy, what did he do.  So he says
15 you're -- you [sic] have nothing to do with you.
16 We have -- you're clear here.  We just want to ask
17 you a few questions because they sent us an email.
18 And we left.
19    Q   Did you have any problems boarding the
20 flight from Montenegro to Toronto?
21    A   No.
22    Q   So when you landed in Toronto, you just

Page 80

1 said somebody was waiting for you when you got off
2 the plane.
3    A   No.  When you come to give the passport,
4 the lady stand and said go see the officer there,
5 whatever it was on the side, and then they took us
6 in one small -- not even a room.  It was more like
7 a counter.  They asked us a few questions, and
8 they let us go.
9    Q   And that was your whole family with you?
10    A   Yes.
11    Q   Toronto was your final destination,
12 right, on that trip, by air?
13    A   Yes.
14    Q   So is it fair to say that no real issues
15 on that return trip by air, other than in Toronto
16 they pulled you aside to ask you a few questions
17 but then they let you go?
18    A   Yes.
19    Q   Okay.  Okay.  Let's look back at the
20 complaint, Exhibit A.  It's all the way at the
21 beginning of the binder.
22       On Page 53, the bottom paragraph, which

Page 81

1 is Paragraph 333, can you look this over and tell
2 me whether or not this describes what happened to
3 you when you crossed back into the United States
4 from Toronto after flying home from Montenegro?
5    A   I'm sorry.  What did you ask me?  Just to
6 look at it.
7    Q   Yeah.  Look at it and tell me if you
8 think -- because it's -- so it's talking about
9 August 2014 --
10    A   Yes.
11    Q   -- which is the same -- same month and
12 year that you returned from Montenegro to Toronto.
13 So I want to know if you agree with me that this
14 paragraph is describing your border crossing back
15 from Toronto into the United States from that same
16 trip?
17    A   Yes.
18    Q   Okay.  Do you recall that border
19 crossing?
20    A   Yes.
21    Q   Can you describe that for me?
22    A   Again, it's similar situation.  When we

21 (Pages 78 - 81)

Murat Frijuckic
Elhady vs. Kable
December 21, 2017

Page 82

1 pulled -- the border there, they -- I told the
2 officer, I said, listen, I always have problems
3 coming into the country.  I don't know why.
4 Please try not to panic.  You know, I have my kids
5 here.  And the guy said, you know what?  I'll do
6 your passport last because I'm sure when I swipe
7 your passport, then all the officers run, rush to
8 the car, and that's what they always do.  So I
9 said, okay.  So he did everybody's passport, and
10 he did mine in the end.
11       And, of course, as soon as he did -- as
12 soon as he swiped my passport, they all started
13 running towards me.  And the same thing again,
14 handcuffed me, guns all over, surrounded the car,
15 take me inside.  Again, same thing, pat me down,
16 interrogate me.  They asked so much about
17 religious questions.  I don't even know half of
18 them what they mean.  And fingerprint -- again,
19 they took my fingerprint.
20       This time something was going on in
21 Michigan, I think, some car race or something, so
22 it was so busy.  This time I spent six hours

Page 83

1 there.  So I tell them why so long, and he tell me
2 something going on that day in Michigan, some kind
3 of car race or something.  I don't know.  So they
4 were very busy.  But they were trying to be more
5 nice with the kids.  They tried to -- because it's
6 so long, some of the kinds started, you know,
7 crying and nagging, and they offered them like
8 snacks and coloring books so they could color.
9 They were trying to entertain the kids.
10       But I was being tortured on the other
11 side in the office.  I don't even know what -- I
12 don't even remember how many -- all the questions
13 that they asked me.  So much they focus on
14 religious stuff and where do I go, who do I hang
15 out with, from which scholar do I listen, like on
16 the YouTube or whatever, things like that.  It
17 wasn't -- I guess it's -- becomes like a routine
18 thing for us.  You get to use it.
19       Of course every time I come to the
20 border, I get so -- I get an anxiety attack, and
21 my heart start -- and things -- I don't know why.
22 I'm not guilty of it.  It's just the treatment

Page 84

1 they give you and the rudeness -- beginning they
2 are so rude, and later on, they try to play nice
3 guys.  It's very hard.  Sometimes if I -- like,
4 the next day I want to travel, I can't sleep half
5 of the night thinking about it; when I come to the
6 border, what's going to happen to me.
7       And after that, they -- when they let
8 us -- when they're about to let us go, they talk
9 to me like a human being, nice.  Here's the
10 passport.  Have a good day.  Like nothing
11 happened.  I don't know.  It doesn't make any
12 sense.
13       And I asked one of the border guys there,
14 whatever officers, I said, if I'm about to cross
15 the United States border, and I just make a
16 U-turn, come back, would I go through this again.
17 He says, yes.  I don't know why.  It doesn't make
18 no sense.  I'm the same person always ten minutes
19 ago.  I don't know.
20       Just makes my life so miserable to a
21 point that I'm actually thinking of leaving the
22 country.  And since then, I never want to travel

Page 85

1 anywhere else.  I don't take a plane.  I only
2 drive.  I drove here, nine hours just to come see
3 you guys.  I don't want to -- when I go in the
4 airport, I get anxiety attack.  I get nervous.  I
5 get just -- I don't know.
6    Q   The trip when you landed in Toronto with
7 you family, did you drive directly to the border
8 or did you spend time in Toronto?
9    A   I spent two days there because one of the
10 suitcase didn't come.  So we waited for the
11 suitcase.  We stayed at my brother's house.  Two
12 days later we drove to Michigan.
13    Q   So this would have been -- if you
14 returned to Toronto on the 13th of August, this
15 would have been maybe around the 15th of August or
16 16th of August?
17    A   Yes.  Correct.
18    Q   And I just want to be clear, the missing
19 suitcase, does that have anything to do with your
20 allegations with your travel problems or is
21 that --
22    A   No.  No.  It was just -- I don't know.  I

22 (Pages 82 - 85)

Murat Frljuckic
December 21, 2017
Elhady vs. Kable

Page 86

1  guess the airlines just lost it --
2      Q   Okay.
3      A   -- and they brought it to us later on.
4      Q   I just -- I wanted to make sure.
5      A   No.
6      Q   So if we look back at your list of trips,
7  Exhibit B, Page 47, the very bottom paragraph, 18,
8  "In July 2014, plaintiff entered United States
9  from Canada by car."
10      Now, from what we've discussed and other
11  documents we looked at, you would have been in
12  Montenegro between June and August.  So I just
13  want to -- if this is a mistake, which is --
14  obviously happens all the time -- I just want to
15  make sure that we all agree that July may not be
16  the right month, but it might mean August.
17      A   Yes.
18      Q   Is that right?
19      A   Right.  Correct.
20      Q   Okay.
21      A   This is a mistake.
22      Q   Okay.  That's no problem.  I just want to

Page 87

1  clear it for the record.
2      So after -- back to August of 2014,
3  you've returned from your trip to Montenegro with
4  your whole family, you're held at the border
5  again, I think you said for about six hours.  Do
6  you recall filling out any redress forms on that
7  occasion?
8      A   No.  But I did show them this -- one of
9  these letters -- I just remember now that you
10  remind me -- to the guys when they stopped me.
11  But other than -- they don't look at that.  They
12  don't care for that.
13      Q   Okay.  If you could turn to Tab J, as in
14  Jack.  This is --
15      MS. ROTH:  I'd like to introduce this as
16  Exhibit J.
17      (Defendants' Exhibit J, DHS letter, was
18  marked for identification.)
19  BY MS. ROTH:
20      Q   And this is a letter on DHS letterhead
21  addressed to you and dated August 27, 2014; is
22  that right?

Page 88

1      A   Yes.
2      Q   Do you recall what prompted you to
3  receive this letter?
4      A   I'm not sure.  I'm surprised if I did --
5  if I fill out something right after my trip, they
6  usually don't respond about a month or two.  So I
7  don't know why this -- unless it was something
8  different that I fill out again, and they just
9  responded fast.  I don't know.  I don't know.  I
10  don't remember really this, but I might have
11  filled out something again.  Maybe they encouraged
12  me to.  I don't know.  This I don't remember at
13  all.
14      Q   Okay.  That's fine.  If anything
15  refreshes your memory later on, please make sure
16  to tell your attorney, and we can -- you can
17  supplement the information about this.
18      A   Okay.
19      Q   It does look to me that it's a week or
20  two after the trip we were just talking about --
21      A   Right.
22      Q   -- and so I wanted to ask about it.

Page 89

1      A   It's possible.  But, like I say, they
2  don't respond that fast, so I'm surprised, but it
3  might have been.  It might have been.
4      Q   Okay.  And now I want you to look again
5  at -- we're going to compare two documents because
6  I think they might be the same, and so I just want
7  to make sure we're looking at -- we agree Tab H,
8  as in Harry -- that way -- and then compare that
9  with M, as in Matthew.
10      A   Yeah.  They look the same to me.
11      Q   Okay.  So the document behind Tab M has a
12  second side to it with a few more paragraphs and a
13  signature.  For that reason, it looks to me like
14  the complete version.  Do you agree?
15      A   Yes.
16      MS. ROTH:  I'd like to introduce this as
17  Exhibit M.
18      (Defendants' Exhibit M, DHS letter, was
19  marked for identification.)
20  BY MS. ROTH:
21      Q   And this is another letter addressed to
22  you on DHS letterhead dated October 31, 2014.  Do

23 (Pages 86 - 89)

Murat Frljuckic
Elhady vs. Kable

December 21, 2017

Page 90

1  you recall receiving this letter?
2      A   Yes.  This is -- this is probably what I
3  would -- then after the trip -- because this makes
4  more sense, October.  So I came back, let's say,
5  in August, yeah.  Probably, yes.
6      Q   So you think you did probably fill out a
7  redress form after the August 2014 incident?
8      A   Yes.  Because I remember the people in
9  the airline, they told me if you get this redress
10  control number, when you travel, you show that to
11  us, you will have no problem.  But really it
12  doesn't -- I don't know if it worked because I
13  didn't try it.
14      Q   Okay.  Let's look at two more documents
15  we're going to compare again.  So let's -- Tab L,
16  as in Larry, and P, as in Paul.  Again, both of
17  them appear to contain four pages -- and if you
18  look at the bottom, it says 2 of 4, 1 of 4, so
19  they're out of order.  But if you could just
20  compare them and let me know if they look to you
21  like they're the same documents.
22      A   Okay.  This is the form that you fill

Page 91

1  out, so you get this letter back from them.  So
2  this is the form that you asked me, and I didn't
3  know what to tell you -- so it looks like I had
4  one of the forms in my copy.
5      Q   Okay.  And, actually, it now looks to me
6  like there's different documents because they are
7  dated on different dates.  So why don't we just
8  look at L.
9          MS. ROTH:  And I'd like to introduce this
10  as Exhibit L.
11          (Defendants' Exhibit L, Traveler inquiry
12  form, was marked for identification.)
13  BY MS. ROTH:
14      Q   And on Page -- what it says on the bottom
15  3 of 4, there's a paragraph that says
16  acknowledgment with a date and the name and the
17  signature.
18          Do you see that?
19      A   Yes.
20      Q   And the date looks to me like it's
21  November 23, 2015; is that right?
22      A   Yes.

Page 92

1      Q   Okay.  Do you recall filling this form
2  out?
3      A   Yes.
4      Q   And do you recall what prompted you to
5  fill out the form?
6      A   One of the travel -- whenever I traveled,
7  usually on the border in the car, whenever I had
8  problems, they told me to fill out, and that's
9  what I always did.  So looks like some forms are a
10  little bit different than the others.  I don't
11  know about.
12      Q   So if you look at Page -- the first page
13  of this exhibit, which actually says 2 of 4 at the
14  bottom.  At the top, it says date of entry into
15  United States, and I believe that says 6/13/2015.
16  Does that look right?
17      A   Where do you see that?  At the top?
18      Q   Yeah, at the very -- yeah, date of entry
19  into U.S.
20      A   No, that says 05/13/2015.
21      Q   Okay.  So May 13, 2015?
22      A   Yes.

Page 93

1      Q   So would you have filled this out
2  after -- after coming back into the U.S. in May of
3  2015?
4      A   Yes.  And I remember this trip.  I went
5  by myself.
6      Q   Okay.  So tell me about this trip.
7      A   This trip -- it was a little bit nicer in
8  a way.  When I came to the border, I just said,
9  you know what, let me ask this guy.  I said,
10  listen, man, I'm not a bad person.  I'm not a bad
11  guy.  I didn't do nothing.  Can you don't handcuff
12  me, please?  I know you're going to take me in.  I
13  have problems coming in.  Can you please don't
14  handcuff me?  I don't feel nice.  I don't feel
15  good.  Everybody watch you like you did something.
16  He said, okay, no problem.  And he just had guys
17  come and -- two guys hold me by the side, and they
18  escorted me.  Over there, then they handcuffed me.
19          So that's why I call it a little bit
20  nicer.  But everything else went the same process,
21  and pat you down and ask you all kind of questions
22  and, again, fingerprints.  Wait.  Always is never

24 (Pages 90 - 93)

# Exhibit H

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2             FOR THE EASTERN DISTRICT OF VIRGINIA

3                     ALEXANDRIA DIVISION

4

5     ANAS ELHADY, et al,

6           Plaintiff,

7       v.                          Civil Action No.:

8     CHARLES H. KABLE, et al,      1:16-cv-375 (AJT/JFA)

9           Defendant.

10

11                                      Washington, DC

12                            Thursday, January 18, 2018

13    Deposition of:

14                     AUSAMA ELHUZAYEL

15    called for oral examination by counsel for Plaintiff,

16    pursuant to notice, at Department of Justice, 20

17    Massachusetts Ave., NW., Washington, DC, before Natalia

18    Thomas, a Notary Public in and for the District of

19    Columbia, beginning at 12:54 p.m., when were present on

20    behalf of the respective parties:

21

22

Ausama Elhuzayel
Elhady vs. Kable

January 18, 2018

Page 2

## APPEARANCES

1
2  On behalf of Plaintiff:
3     AMY POWELL, ESQUIRE
4     United States Department of Justice
5     Federal Building
6     310 New Bern Ave., Ste. 800
7     Raleigh, NC 27601
8     Amy.powell@usdoj.gov
9     (919) 856-4013
10 On behalf of Defendant:
11    LENA F. MASRI, ESQUIRE
12    Council on American-Islamic Relations (CAIR)
13    453 New Jersey Ave., SE
14    Washington, DC 20003
15    imasri@cair.com
16    (202) 742-6420
17 On behalf of Government
18    JAYME KANTOR, FBI
19    935 Pennsylvania Ave., NW., Ste. 10140
20    Washington, DC 20535
21    (202) 324-7194
22    Jayme.kantor@ic.fbi.gov

Page 3

## APPEARANCES - Continued

1
2  On behalf of Government
3     JENNIFER GREENBAND/TSA
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 4

## CONTENTS

1
2  WITNESS: AUSAMA ELHUZAYEL          PAGE
3  By Ms. Powell                6
4
5       DEPOSITION EXHIBITS
6  EXHIBIT  DESCRIPTION            PAGE
7  EXHIBIT A  Amended complaint, Document 22.    13
8  EXHIBIT B  Defendant's first set of
9      interrogatories to plaintiff.        17
10 EXHIBIT C  Plaintiff's responses to defendant's
11     first set.                21
12 EXHIBIT D  Plaintiff's amended response to
13     first set of discovery requests
14     dated 12/21/17.            25
15 EXHIBIT E  Plaintiff's amended and supplemental
16     responses to defendant's first set of
17     discovery requests dated 1/10/18.    36
18 EXHIBIT F  Itinerary travel 2012, dated
19     9/8/12.                38
20 EXHIBIT G  Defendant's first request for
21     production of documents to
22     plaintiffs.                42

Page 5

1  Page 5
2  1      DEPOSITION EXHIBITS - continued
3  2  EXHIBIT  DESCRIPTION            PAGE
4  3  EXHIBIT H  Plaintiff's passport.        47
5  4  EXHIBIT I  Plaintiff's production in
6  5      discovery dated 11/2/17.        53
7  6  EXHIBIT J  Plaintiff's passports and boarding
8  7      passes.                120
9  8  EXHIBIT K  Itinerary flight to Dominica and
10 9      back.                126
11 10  EXHIBIT L  Boarding passes.            137
12 11  EXHIBIT M  Redress Control dated 4/28/16.    276
13 12  EXHIBIT N  Redress response letter 12/6/16.   279
14
   13
15
   14
16
   15
17
   16
18
   17      (Exhibits attached to transcript.)
19
   18
20
   19
21
   20
22
   21

2 (Pages 2 - 5)

Ausama Elhuzayel                                      January 18, 2018
Elhady vs. Kable

Page 6

1         P R O C E E D I N G S
2  WHEREUPON,
3              AUSAMA ELHUZAYEL
4  called as a witness, and having been sworn by the
5  notary public, was examined and testified as follows:
6      EXAMINATION BY COUNSEL FOR PLAINTIFF
7  BY MS. POWELL:
8      Q   Great.  Please state your name for the record,
9  please.
10     A   Ausama Elhuzayel.
11     Q   And could you spell it, please?
12     A   A-U-S-A-M-A, Elhuzayel, E-L-H-U-Z-A-Y-E-L.
13     Q   I'm sure your attorney has talked to you a
14  little bit about the deposition today and what to
15  expect.  I'm going to go over that anyway and the
16  format so that we both have the same expectation.  Most
17  importantly, the format here today is mostly that I am
18  going to be asking questions.  You're hopefully going
19  to be answering them.
20     A   Hopefully, yeah.
21     Q   The court reporter is going to be taking down
22  everything we say.  Your attorney will make objections

Page 7

1  from time to time.  Unless she instructs you not to
2  answer, you should answer.  Even if she makes an
3  objection you answer anyway unless she instructs you
4  not to.
5      A   Okay.
6      Q   Do you understand?
7      A   Yes.
8      Q   The other thing to remember about this format
9  is that because the court reporter is writing down
10  everything that we say, it has to be something that can
11  be written down.  So if you give an answer, it has to
12  be audible.  A yes or a no; not shaking or nodding.
13     A   Sure, sure.
14     Q   And it also means that even though people in
15  normal conversation talk over each other a little bit
16  and cut each other off because each knows what the
17  other is about to say, in this setting you need to let
18  me finish a question even if you know what it is, and I
19  need to let you finish your answer even if I know what
20  it is.  Does that make sense?
21     A   Yes.
22     Q   If I ask a question and it is unclear to you

Page 8

1  what I mean, please ask me to clarify.
2      A   Sure.
3      Q   If you answer a question I will assume that
4  you understood it.  Does that make sense?
5      A   Yes.
6      Q   Is there any reason you cannot answer my
7  questions truthfully and accurately today?
8      A   No.
9      Q   If you need to take a break, please let me
10  know.  I'll ask you to finish answering a question if
11  there's a question pending.  And otherwise, we can take
12  a break anytime.  You are not a prisoner here today.
13     A   I may bug you a lot for that just because I'm
14  antsy and I might, you know, use the restroom or
15  something.
16     Q   Sure.  If you need to take a break, just let
17  me know.  Other than talking to your attorney, how did
18  you prepare for the deposition today?
19     A   I really didn't.  I don't how to prepare for
20  it.  I'm just here.  Yeah, I didn't have any
21  preparation whatsoever.
22     Q   In order to prepare for this deposition, did

Page 9

1  you read any documents?
2      A   No.
3      Q   Did you talk to anyone other than your
4  attorney?
5      A   Uh-uh.
6      Q   Say yes or no, please.
7      A   Oh, no, no.  No.
8      Q   Other than the name you already stated and
9  spelled for the record, have you gone by any other
10  names?
11     A   No.
12     Q   Have you gone by any other spellings of your
13  name?
14     A   No.
15     Q   Or -- what is your date of birth?
16     A   February 4, 1976.
17     Q   And where were you born?
18     A   Orange, California.
19     Q   Is that Orange County or --
20     A   No, no.  It's a city, Orange, in California.
21     Q   Okay.
22     A   It is in Orange County, though.

3 (Pages 6 - 9)

Ausama Elhuzayel                                    January 18, 2018
Elhady vs. Kable

Page 122

1 your passport?

2    A   Yes.

3    Q   Talk about one thing you mentioned earlier,

4 which was you said that there was DHS guy, your

5 gentleman that you then ran into at the airport.

6    A   Okay.  Well, where we are, where are we up to

7 this?  You said that I run into a DHS guy --

8    Q   You told me --

9    A   Yes, yes, yes.

10    Q   I, I am repeating what you told me, which was

11 that there was a, someone who worked for DHS at your

12 gym who you later saw at the airport screening --

13    A   Yeah, at the gym.  Yeah, 24 Hour Fitness,

14 yeah, absolutely.

15    Q   So what's the name of your gym?

16    A   24 Hour Fitness on Chapman and Brookhurst in

17 Garden Grove.

18    Q   And it, it, do you have a relationship with

19 the gym or is it just where you work out?

20    A   It's where I work out, yeah.  24 Hour Fitness

21 lets me go any time I want.

22    Q   Do you know this person's name?

Page 123

1    A   I wish I did.  I don't recall.  I just

2 remember that he said he, you know, he worked, he was

3 in the army before and he was in all these things, you

4 know.  You know, and he was, he was a soldier and he

5 worked in, something to do with just, just arms and he

6 was somehow to do with the armed forces.  That's what

7 he told me.  And then he liked to --

8    Q   And when did he tell you that?

9    A   When?  When?  This was before, prior to I took

10 that trip that we were speaking about in 2016.  For a

11 whole year I, I actually saw that gentleman.  It was

12 funny, 'cause I go in the middle of the night.  I like

13 the middle of the night.  Nobody's there.  And he's

14 always there.  He would always be there.  Not anymore,

15 obviously, but at that time he was always there.

16        And he would always ask me funny questions and

17 bring -- he always wanted to bring up ISIS.  It's

18 always ISIS.  Oh, they're going to, ISIS, running

19 people over in the streets.  ISIS, ISIS, like this

20 guy's always trying to pull -- he wants me to say

21 something, you know, all the time.  ISIS, ISIS, this

22 is, you know, oh, they're running people over.  Oh,

Page 124

1 they're doing this.  Oh, we got to do that.  He made me

2 uncomfortable.

3    Q   So you talked to him at the gym?

4    A   Yeah.  He made me uncomfortable.

5    Q   And he told you he was in the armed forces?

6    A   Yeah.

7    Q   And he made you uncomfortable?

8    A   Very uncomfortable.

9    Q   Because he was talking about ISIS?

10    A   Because he seemed to be trying to want to lead

11 me into saying something that would maybe be bad for

12 me.  You understand?  He wanted me to say something

13 really badly.

14    Q   What did he look like?

15    A   He's a white guy.  He's a short white guy.

16 He, he looks like a pear.  You know, he looks like a

17 backwards pear.  He's big up here and he's skinny and

18 small down there.  He's got little legs and a big

19 stomach.  And he's like he's, like he used to probably

20 be buff, but he's just --

21    Q   How old is he?

22    A   Sixtyish.  Fifty-five, sixty.

Page 125

1    Q   What color is his hair?

2    A   Gray.  A white guy.

3    Q   Okay.

4    A   Blue eyes.

5    Q   Okay.

6    A   If I see him, I can definitely -- that's his

7 go around, that was funny.  Who he is.  I wish I had

8 his name.

9    Q   Now we have talked about two international

10 trips.  Your 2012 to Israel and your 2017 trip to

11 Dominica.  And what you said was that back in 2012 you

12 didn't have any problem.

13    A   Never had a problem.

14    Q   But in 2017 you were having trouble all the

15 time?

16    A   2016 it started.  The first time they did not

17 allow me to fly.  That's where this case actually got

18 initiated.

19    Q   All right.  Just a second.  So when was the

20 first time you had trouble with security screening?

21    A   In 2016 when they said you cannot fly on this

22 airplane today.  You will not fly.  You'll, you'll

32 (Pages 122 - 125)

Ausama Elhuzayel                                                      January 18, 2018
Elhady vs. Kable

Page 126

1  leave, and you'll leave as soon a possible.  We don't
2  want you on our, on, on the premises.
3      Q  Was that April 23, 2016?
4      A  Uh-huh.
5      Q  Okay.  And tell me about the trip you planned
6  to take.
7      A  It was the same place.  I was going to
8  Dominica.
9      Q  And what was the reason for the trip?
10     A  Same reason, family, wife.
11     Q  Any other reason?
12     A  That was the reason.  That was the main reason
13 and the only reason.
14         MS. POWELL:  Can we me mark Exhibit K?
15     (Plaintiff's Exhibit K is marked for identification.)
16     Q  And I'd like you if you can to identify this
17 document for me.  Just tell me what it is, if you know.
18     A  April 23, 2016.  This is, this is the one
19 where I was not allowed to fly.
20     Q  And this document is the itinerary for your
21 flight to Dominica and your return flight that you
22 obviously did not get to take?

Page 127

1      A  Correct.
2      Q  Okay.  So your plan was to fly from LAX to San
3  Juan, to Dominica; is that correct?
4      A  Yes.
5      Q  On April 23, 2016?
6      A  Yes.
7      Q  When you got to the airport on April 23, 2016
8  at LAX, were you traveling alone?
9      A  I was alone, yes.
10     Q  And what happened when you got to the airport?
11     A  Well, the, the, the attendant was acting
12 strange and then, you know --
13     Q  What attendant?
14     A  The person who took my, my passport and was
15 going to check me in was like acting weird.  And then -
16 -
17     Q  Sorry.  You went to the ticket counter?
18     A  Yes.  Yes, they, you know --
19     Q  And the person that, the ticket agent was
20 acting weird?
21     A  Yeah, it was like kind of awkward for a moment
22 and then this guy came.  An agent there came after...

Page 128

1      Q  Okay.  And then what happened?
2      A  He asked me what my name was and I told him
3  what my name was.  And he told me I wasn't going
4  anywhere.
5      Q  Okay.  And what did you say?
6      A  Said that was horrible or something.  I said,
7  I said why, and he said I don't know anything.  He
8  doesn't know a thing.  He doesn't know why he's doing
9  what he's doing.  He's just following orders.  He gave
10 me a telephone for the redress and that was your one
11 stop, one shop, shot it.  You have no other way to, to
12 fix this except for through the redress process.
13     Q  So after he told you you weren't going
14 anywhere, what happened then?
15     A  I left.
16     Q  Did you have you any other interaction with
17 security?
18     A  No.  I just left.  Well, actually he had
19 somebody backing him up that looked pretty
20 intimidating, but he stayed, you know, he stayed pretty
21 far back.  They were looking at me funny like I was, I
22 was a criminal or something.  Had their guns ready to

Page 129

1  go.
2      Q  So the guy you talked to, do you know who he
3  worked for or --
4      A  TSA.
5      Q  What makes you -- how do you know he was TSA?
6      A  That's how he introduced himself.
7      Q  Okay.  And you said you saw other security
8  people.  Do you know who they worked for?
9      A  TSA.
10     Q  How do you know?
11     A  Because they were wearing the uniforms.
12     Q  Did they say TSA on them?
13     A  Well, I mean they were armed and they were
14 wearing a uniform.  So that's what I do know.  They
15 were --
16     Q  But you don't know if they were TSA?
17     A  It was, it was part of that.  I believe they
18 were TSA.  I believe they were TSA.
19     Q  Why do you believe they were TSA?
20     A  Because no, there's nobody else in the airport
21 that dresses that way that I know of, that dresses the
22 way they dress.  They dress specifically in that blue

33 (Pages 126 - 129)

Ausama Elhuzayel
January 18, 2018
Elhady vs. Kable

Page 130

1    or that, that like badge or whatever they wear and
2    stuff. They have the same --
3        Q   But you didn't see anything that said TSA?
4        A   He was back. I just saw -- all I saw was a
5    uniform, a person watching from, from behind.
6        Q   Okay.
7        A   That's all I really saw.
8        Q   Okay.
9        A   And I assumed and thought, I believed he was
10   with TSA and only ones that I see wear those types of
11   uniforms are the TSA. But I can't say for 100%.
12       Q   So you didn't --
13       A   Because he was a little bit far back. He was
14   an armed person.
15       Q   So the person who talked to you who told you
16   he was a TSA agent; do you happen to know his name?
17       A   I wish. I can probably go back and try. No,
18   I was so mad -- I was upset at the time. I was really
19   upset and he wanted to give me his name and I told him
20   like what good will it do me. And I left. I didn't
21   take his name. I was upset. What's his name going to
22   do for me?

Page 131

1        Q   Did anybody go with you as you left?
2        A   Nobody. I was alone.
3        Q   Okay.
4        A   They basically escorted me to where, because
5    I, you know, you can park, self-parking, and then you,
6    those shuttles that come and pick you up and take you
7    back. So he escorted me to that point and made sure
8    that I, I boarded --
9        Q   So you got on the shuttle --
10       A   -- the shuttle.
11       Q   -- but nobody like took you back to your car
12   or anything?
13       A   No, no, no. Just made sure I left, I left the
14   premises. I was no longer allowed on their premises.
15   I wasn't welcome.
16       Q   Okay. Did you know anybody at the airport
17   that day?
18       A   No.
19       Q   Do you know if anybody else overheard him say
20   you weren't going anywhere?
21       A   The ticket agent, the one that was trying to
22   book me. That's the only one that would know.

Page 132

1        Q   Okay.
2        A   I remember it was a man. That's all --
3        Q   Right. Other than communications with your
4    attorney, did you write down that experience anywhere?
5        A   I, I wrote it down because of my, of my
6    interaction with CAIR.
7        Q   Okay. Other than what, because of your
8    interaction with CAIR. So other than anything you
9    wrote to CAIR, which I don't need to know about, did
10   you write it down anywhere?
11       A   Not that I'm aware of. I can't recall.
12       Q   Did you write a newspaper article?
13       A   No, no, no.
14       Q   Or a letter to the editor?
15       A   Nothing.
16       Q   A journal entry?
17       A   Not at all.
18       Q   A Facebook post?
19       A   Not at all. Not at all.
20       Q   Did you write an e-mail to a friend?
21       A   No. It's not exactly one of those things
22   you're really proud of. You know what I mean? Like

Page 133

1    you don't go out and tell everybody that you're a
2    possible terrorist. You know what I'm saying? Like
3    according to the people.
4        Q   Did you --
5        A   I don't go out there, hey, guess what,
6    everybody. I known as a possible terrorist. You guys
7    want to know about my story? No, that's not something
8    I tell people.
9        Q   Did you write an e-mail to a friend?
10       A   No, no, nothing, zero. I haven't told anybody
11   anything except for those that needed to know.
12       Q   Who did you tell about it other than your
13   attorney?
14       A   My family.
15       Q   Who in your family?
16       A   Mother, father, brothers, sisters. Everyone
17   who'd obviously know.
18       Q   Okay.
19       A   Yeah. You know, because they knew I was
20   leaving. So obviously when I was returning back, they
21   would know. You know what I mean?
22       Q   So when you told your parents about it, for

34 (Pages 130 - 133)

# Exhibit I

Osama Ahmed
Elhady vs. Kable

February 20, 2018

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE EASTERN DISTRICT OF VIRGINIA

3                   ALEXANDRIA DIVISION

4

5    ANAS ELHADY, et al.,

6                        Plaintiff,

7       v.                            Civil Action No.

8    CHARLES H. KABLE, et al.,        1:16-cv-375 (AJT/JFA)

9                        Defendant.

10

11                                   Washington, D.C.

12                                   Tuesday, February 20, 2018

13   Deposition of:

14                   OSAMA AHMED

15   called for oral examination by counsel for Defendants,

16   pursuant to notice, at United States Department of

17   Justice, 20 Massachusetts Avenue NW, Washington, DC,

18   before Natalia Thomas, a Notary Public in and for the

19   District of Columbia, beginning at 10:00 a.m., when

20   were present on behalf of the respective parties:

21

22

Osama Ahmed                                    February 20, 2018
Elhady vs. Kable

Page 2

1        A P P E A R A N C E S
2  On behalf of Plaintiffs:
3     GADEIR I. ABBAS, ESQUIRE
4     Council on American-Islamic Relations (CAIR)
5     453 New Jersey Avenue SE
6     Washington DC 20003
7     gabbas@cair.com
8     (202) 742-6420
9
10 On behalf of Defendants:
11    CHRISTOPHER HEALY, ESQUIRE
12    United States Department of Justice
13    20 Massachusetts Avenue NW
14    Washington DC 20001
15    christopher.healy@usdoj.gov
16    (202) 514-8095
17
18 Also Present:
19    MELISSA PACHIKARA, ESQUIRE, FBI
20    LILLIAN STEWART, ESQUIRE, FBI
21    MARY BEUCHERT, ESQUIRE, FBI
22    JENNIFER GREENBAND, ESQUIRE, TSA

Page 3

1        C O N T E N T S
2  WITNESS:  OSAMA AHMED              PAGE
3  By Mr. Healy                        7
4        E X H I B I T S

5  EXHIBIT DESCRIPTION                 PAGE
6  EXHIBIT A    Complaint              26
7  EXHIBIT D    Answers to Interrogatories    15
8  EXHIBIT E    Passport               12
9  EXHIBIT F    Boarding pass          39
10 EXHIBIT G    2011 Travel inquiry form    75

11
12       (Exhibits attached to transcript.)
13
14
15
16
17
18
19
20
21
22

Page 4

1        P R O C E E D I N G S
2  WHEREUPON,
3          OSAMA AHMED
4  called as a witness, and having been sworn by the
5  notary public, was examined and testified as follows:
6      MR. HEALY:  Good morning.  My name is
7  Christopher Healy.  I'm an attorney here at the
8  Department of Justice.  I'll be taking your deposition
9  today.  Do you understand you're under oath?
10     THE WITNESS:  Yes.
11     MR. HEALY:  So, everything that you say has to
12 be the full and entire truth.
13     THE WITNESS:  Yes.
14     MR. HEALY:  I'd ask you just to make sure that
15 as we go through the questions today you give audible
16 answers, yeses and noes rather than just nodding your
17 head or saying um-hum.  Your attorney might object at
18 certain points; that's fine.  You can still answer the
19 question unless he instructs you not to.  Ask me if you
20 need me to clarify any particular questions.  If you
21 answer a question, I'm going to understand that you
22 understood the question, and if you didn't, feel free

Page 5

1  to interrupt me and ask me.  Is there any reason you
2  can't answer questions I ask you today truthfully and
3  accurately?
4      THE WITNESS:  No.
5      MR. HEALY:  Okay.  Have you taken any
6  medications that might affect your memory or your
7  ability to answer these questions truthfully?
8      THE WITNESS:  No.
9      MR. HEALY:  Have you consumed any alcohol in
10 the last 48 hours?
11     THE WITNESS:  No.
12     MR. HEALY:  Have you consumed any illegal
13 drugs in the last 48 hours?
14     THE WITNESS:  No.
15     MR. HEALY:  Okay.  What did you do to prepare
16 for today's deposition?
17     MR. ABBAS:  Objection; calls for attorney-
18 client privileged information.  I'm going to instruct
19 the witness not to answer.
20     MR. HEALY:  Okay.  With the exception of any
21 privileged communications between you and your
22 attorney, what did you do to prepare for this

2 (Pages 2 - 5)

Osama Ahmed
Elhady vs. Kable

February 20, 2018

Page 22

1    Q  Okay.  Was there -- do you recall if there was
2  a connection flight?
3    A  I don't -- I don't remember.
4    Q  Okay.  If you go to paragraph 2, it says in
5  February or March of 2010 that you entered Detroit on a
6  flight from Yemen.  That's the same trip?
7    A  Yes.
8    Q  Okay.  So, that was your return flight from
9  Yemen on that trip?
10   A  Yes.
11   Q  Could you describe to me what, if anything,
12  happened when you got to the airport in Yemen?
13   A  In Yemen?
14   Q  Yeah, in Yemen.
15   A  I don't remember anything specifically
16  happening.
17   Q  Okay.  And did you have a connection flight
18  through some other city?
19   A  On the way back?
20   Q  Yeah.
21   A  Through Frankfurt, --
22   Q  Through Frankfurt?

Page 23

1    A  Germany.
2    Q  Okay.  Did anything in particular happen in
3  Frankfurt?
4    A  Yeah, I was screened on my way to the plane
5  three times.  The third time I almost missed my flight,
6  and then they allowed me to go onto the flight.
7    Q  So, just to help me understand sort of what
8  happened, you got off the plane from Yemen in
9  Frankfurt.  Was it immediately after you got off the
10  plane that you were screened or --
11   A  No.  When I was going to the departing gate.
12   Q  Okay.  So, it was when you reached the
13  departure gate?
14   A  Yeah.  So, they have maybe five, six gates,
15  and then there's a security check to go through to
16  those gates.
17   Q  Right.
18   A  I was screened at that check and then after I
19  passed the check, I was screened again, and then I was
20  held to the side until the plane was about to leave and
21  then I was allowed to get on the plane.
22   Q  Okay.  And besides searching your person and

Page 24

1  your belongings, did they do anything else?
2    A  Um, no.
3    Q  Okay.  So, it was just a physical search?
4    A  Yeah.
5    Q  Okay.  And were there any issues once you got
6  on the plane during the flight?
7    A  No.
8    Q  And how about when you landed?  Did you land
9  in Detroit or was there another connection?
10   A  I landed in Detroit.
11   Q  Okay.  And what happened when you got to
12  Detroit?
13   A  I was randomly selected for secondary
14  screening, as was every other Arab coming off that
15  flight.  In secondary screening I was asked about what
16  sect of Islam I followed, what imams I followed, what
17  mosques I went to.  They asked where I lived.  They
18  asked me political questions, on what's going down in
19  Yemen.  They asked if I was affiliated to different
20  organizations.  I was there for about six to seven
21  hours.  They went through all my belongings.  I wasn't
22  allowed to use the phone to allow my family that was

Page 25

1  waiting outside to know where I was until about six
2  hours after I was there.
3        While I was there I was questioned or
4  interrogated by multiple officers.  I was taken into a
5  room.  It was very stressful.  They insisted that I was
6  involved with different organizations.  They stated,
7  "Help us find the big fish," they kept telling me.
8    Q  Was this -- oh, I'm sorry, go ahead.
9    A  When I wanted to go to the restroom, they
10  frisked me.  When I asked to pray, they allowed me to
11  pray in a corner.  That's mostly what happened.
12   Q  Was this immediately after you disembarked
13  from the plane or was this as you -- did this start
14  when you were going through customs?
15   A  Through customs.
16   Q  It notes here in paragraph 2 that your
17  USB card was confiscated and not returned.  What was
18  that?  That was just a --
19   A  Just pictures were on my USB of my trip.
20   Q  So, did you ever get that back?
21   A  I got it back.  I was paid a visit to my house
22  by an FBI officer, as it says.  His name was Joel

7 (Pages 22 - 25)

Osama Ahmed
Elhady vs. Kable

February 20, 2018

Page 26

1 Kelso. I don't remember his partner's name. They came
2 to my house and they gave it to me, and then they
3 proceeded to try to recruit me to be an informant for
4 them. They took me out to eat.
5      Q   Just to help you refresh your memory, there is
6 more information, I believe, about this in the original
7 complaint, which I have in tab A, if you'd like to look
8 it over, to make sure that everybody is looking at the
9 same place, if you want to hear information about this.
10 If you look at the first page.
11        (OSAMA AHMED Exhibit A was marked for
12 identification.)
13      So, if you look at the first page just to sort
14 of make sure that we understand where we are in this
15 document. Do you recognize this document?
16      A   Yes.
17      Q   Okay. Do you see the list of names on the
18 left? Do you recognize your name?
19      A   Yes.
20      Q   Do you recognize any of the other people on
21 this list?
22      A   No.

Page 27

1      Q   Okay. Have you ever spoken with any of these
2 people on this list?
3      A   No.
4      Q   Okay. So, if you turn to page -- I have it
5 written down -- paragraph 201 on page 37. I believe
6 that's the part that has your testimony. Okay. If you
7 would just take a look at that. It looks like the
8 section that documents the experience you were talking
9 about before ends at paragraph 210; is that right?
10     A   Yes.
11     Q   All right. So, if you could just tell me a
12 little bit more about what happened, your experience
13 with Agent Kelso and other allegations?
14     A   So, after they gave me back the USB drive,
15 they told me I was on a no-fly list. And I asked him
16 will that affect my employment in the airport which I
17 was applying for? They said possibly, and they told me
18 that if I cooperate with them, they can get me off the
19 list.
20        After that, then they took me out to eat and
21 they tried enticing me to become an informant for them.
22 From talking to me the first time they knew that I was

Page 28

1 into video games and such, so they told me that they'll
2 teach me how to skydive and I'll be able to shoot cool
3 guns, amongst other things.
4      Q   I don't mean to interrupt you but the --
5      A   Go ahead.
6      Q   When did this happen compared to the
7 experience that you had getting off the plane in
8 Detroit? Like, how long was that? Was this like a
9 couple days later, a couple weeks later?
10        MR. ABBAS: Objection, vague. Objection,
11 compound. You can answer if you understand the
12 question.
13     A   I don't remember.
14     Q   Okay. Was it more or less than a month later,
15 if you recall?
16     A   I believe it was less than two months.
17     Q   Less than two months, okay.
18     A   Yeah.
19     Q   So, just start, if you can, chronologically,
20 is there anything else that happened to you in the
21 airport when you were detained and questioned that
22 you'd like to include in your testimony?

Page 29

1      A   No.
2      Q   Okay. And when this -- you had this
3 experience afterward, less than two months later, these
4 folks who you interacted with, is there anything else
5 that happened that you'd like to share?
6      A   Yes. So, they told me that they were going to
7 get me off the no-fly list, which they didn't. So,
8 then I found out about CAIR, and my attorney at CAIR --
9        MR. ABBAS: Objection. I'm going to instruct
10 the witness not to provide any attorney-client
11 privileged communications.
12     Q   So, did you agree to work with them? How did
13 the -- what was the result of the conversation you had
14 with them?
15        MR. ABBAS: Objection as to -- objection vague
16 as to them. You can answer if you understand what he's
17 talking about.
18     A   The FBI agents?
19     Q   Yes.
20     A   No, I did not work with them.
21     Q   All right. So, you said they -- you didn't
22 agree to work with them and they said goodbye and they

8 (Pages 26 - 29)

Osama Ahmed
Elhady vs. Kable

February 20, 2018

Page 30

1 left?

2    A No, they kept coming back and I instructed

3 them they can speak to my lawyer.

4    Q Okay. So, how many times did they come back?

5    A Two or three times.

6    Q Okay. Was that within a month, longer than a

7 month?

8    A I don't remember.

9    Q Was it always the same people?

10    A It was always Joel and someone. I'm not sure

11 if it was the same guy that was with him.

12    Q Was it always two people?

13    A Yes.

14    Q Never more than two people?

15    A No.

16    Q Okay. You said they showed up how many more

17 times?

18    A Two or three times.

19    Q Two or three times? After those two or three

20 times, did you have any other interactions with Mr.

21 Kelso or anyone else from the FBI?

22    A Yes. Last year, um, I don't remember when,

Page 31

1 two FBI agents came to my door and they asked me --

2 they introduced themselves. I told them they could

3 talk to my lawyer. They told me if I don't cooperate

4 with them that they will not allow my wife or my

5 brother's wife to enter the country. And I told them,

6 again, you can speak to my lawyer, and they walked

7 away.

8    Q And that was the last time you --

9    A Yes.

10    Q -- saw Mr. Kelso?

11    A That wasn't Mr. Kelso.

12    Q Okay.

13    A That was different FBI agents.

14    Q Two different agents?

15    A Yes.

16    Q Okay. Do you remember either of their names?

17    A No.

18    Q And that was the last time you had any

19 interactions with FBI agents?

20    A I believe so.

21    Q Okay. Thank you. If you could flip back to

22 tab D, we'll continue going through the travel, page 6.

Page 32

1 In paragraph 3 it says that in 2014 you traveled from

2 Detroit to Yemen; is that correct?

3    A Yes.

4    Q Okay. And what happened on that -- what was

5 the -- strike that. What was the purpose of that trip?

6    A I went to get married.

7    Q You went to get married?

8    A Yes.

9    Q And who did you travel with?

10    A My mother and father and my little brother.

11    Q And when you arrived at the airport, what

12 happened?

13    A I don't recall what happened when I got there.

14 I do recall receiving the -- after checking in, the

15 boarding pass having the four S's on it, and when going

16 through TSA screening, I was screened on my own by

17 multiple officers.

18    Q So, this wasn't along with your other family

19 members, this was just you?

20    A No, it was just me.

21    Q Okay. About how long did that take before --

22 from the time you got to the airport till the time you

Page 33

1 got to the gate?

2    A I don't remember.

3    Q Was it more or less than an hour?

4    A I don't remember.

5    Q Is it more or less than two hours, do you

6 remember?

7    A Less than two hours.

8    Q Less than two hours. A question I realize I

9 didn't ask from previous flights. Did you miss any of

10 the other flights that we talked about previously?

11    A That we --

12    Q That we've already spoken about?

13    A No.

14    Q No, okay, thank you. Did you miss a flight

15 out of Detroit in 2014?

16    A No.

17    Q No? It says that when you got to the gate

18 your name was called on the loud speaker and you were

19 questioned by customs agents; is that correct?

20    A Yes.

21    Q And what exactly happened?

22    A I was pulled into the jet bridge after my name

9 (Pages 30 - 33)

# Exhibit J

Page 1

1            IN THE UNITED STATES DISTRICT COURT

          FOR THE EASTERN DISTRICT OF VIRGINIA

2                 Alexandria Division

3

4

5

   ANAS ELHADY, et al,

6

            Plaintiffs,        Civil Action No.

7

     vs.                       1:16-cv-375

8

   CHARLES H. KABLE, et al,      (AJT)(JFA)

9

            Defendants.

10

11

12

13          Deposition of Zuhair El-Shwehdi

14                 Washington, D.C.

15          Wednesday, November 29, 2017

16                   10:00 a.m.

17       Reported by:  Laurie Donovan, RPR, CRR, CSR

18

19

20

21

22

23

24

25

Zuhair El-Shwehdi                                                    November 29, 2017
Elhady vs. Kable

|   | Page 2 |
|---|--------|
| 1 | Deposition of |
| 2 | ZUHAIR EL-SHWEHDI |
| 3 | |
| 4 | Held at the offices of: |
| 5 | U.S. Department of Justice |
| 6 | 20 Massachusetts Avenue, N.W. |
| 7 | Washington, D.C. 20001 |
| 8 | (202)514-2395 |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | Taken pursuant to notice, before |
| 19 | Laurie Donovan, Registered Professional |
| 20 | Reporter, Certified Realtime Reporter, and |
| 21 | Notary public in and for the District of |
| 22 | Columbia. |
| 23 | |
| 24 | |
| 25 | |

Page 4

1        EXAMINATION INDEX
2                    PAGE
3   EXAMINATION BY MS. POWELL . . . . . . . . . .   8
4
5
6
7
8
9            E X H I B I T S
10  EXHIBIT      DESCRIPTION              PAGE
11  Exhibit A  Plaintiffs' Complaint . . . . . .  11
12  Exhibit B  Plaintiffs' Responses to
13         Defendants' First Set of Discovery
14         Requests to Plaintiff . . . . . .  12
15  Exhibit C  Copy of El-Shwehdi's passport . .  25
16  Exhibit D  Defendants' First Requests for
17         Production of Documents to
18         Plaintiffs . . . . . . . . . .  29
19  Exhibit E  Plane ticket from Dayton, Ohio
20         to Doha, Qatar, April 3, 2011,
21         Bates Shwehdi-000007 . . . . . .  60
22  Exhibit F  Plane ticket from Doha, Qatar
23         to Dayton, Ohio, May 7, 2011,
24         Bates Shwehdi-000008 . . . . . .  63
25

|   | Page 3 |
|---|--------|
| 1 | A P P E A R A N C E S |
| 2 | ON BEHALF OF THE PLAINTIFFS: |
| 3 | Council on American-Islamic Relations |
| 4 | 453 New Jersey Avenue, S.E. |
| 5 | Washington, D.C. 20003 |
| 6 | (202)742-6420 |
| 7 | By:  Gadeir I. Abbas, Esq. |
| 8 | gabbas@cair.com |
| 9 | ON BEHALF OF THE DEFENDANTS: |
| 10 | Department of Justice, Civil Division |
| 11 | 310 New Bern Avenue |
| 12 | Suite 800 |
| 13 | Raleigh, North Carolina 27601 |
| 14 | (919)856-4013 |
| 15 | By:  Amy E. Powell, Esq. |
| 16 | amy.powell@usdoj.gov |
| 17 | Antonia Konkoly, Esq. |
| 18 | antonia.konkoly@usdoj.gov |
| 19 | Jayme Kantor, Esq. |
| 20 | jayme.kantor@usdoj.gov |
| 21 | ALSO PRESENT: |
| 22 | Lauren Wetzler, U.S. Attorney |
| 23 | Jennifer Greenband, counsel for TSA |
| 24 | |
| 25 | |

Page 5

1   (Exhibits continued)
2   EXHIBIT      DESCRIPTION              PAGE
3   Exhibit G  Plane ticket from Dayton, Ohio
4          to Doha, Qatar, June 17, 2011,
5          Bates Shwehdi-000009 . . . . . .  70
6   Exhibit H  Plane ticket from Washington DC
7          to Dayton, Ohio, September 3,
8          2011, Bates Shwehdi-000010 . . .  73
9   Exhibit I  Plane ticket from Dayton, Ohio
10         to Newark, New Jersey, and then
11         to Geneva and Tunis, June 20,
12         2012, Bates Shwehdi-000012 . . .  79
13  Exhibit J  Plane ticket from Benghazi, Libya
14         to Columbus, Ohio, March 20, 2013
15         Bates Shwehdi-000014 . . . . . .  85
16  Exhibit K  Plane ticket from Columbus, Ohio
17         to Benghazi, Libya, May 6, 2013,
18         Bates Shwehdi-000016 . . . . . .  90
19  Exhibit L  Plane ticket from Benghazi, Libya
20         to Columbus, Ohio, November 22,
21         2013, Bates Shwehdi-000018 . . .  96
22  Exhibit M  Flight information for entire
23         Shewehdi family from Dayton, Ohio
24         to Santa Ana, California, March 21,
25         2012, Bates Shwehdi-000034 . . .  102

2 (Pages 2 - 5)

Case 1:16-cv-00375-AJT-JFA   Document 208-1   Filed 05/08/18   Page 83 of 138 PageID# 7296

Zuhair El-Shwehdi
Elhady vs. Kable                                              November 29, 2017

Page 6

1  (Exhibits continued)
2  EXHIBIT     DESCRIPTION          PAGE
3  Exhibit N  Flight information for Shwehdi
4          family coming back from Santa
5          Ana, California to Dayton, Ohio,
6          March 28, 2012 . . . . . . . . . 112
7  Exhibit O  Boarding passes and other flight
8          information, trip from Cincinnati,
9          Ohio, to San Francisco, May 19,
10         2016, Bates Shwehdi 27 and 38 . . 116
11 Exhibit P  Flight information for Shwehdi
12         family trip from Cincinnati to
13         Denver, Denver to San Francisco,
14         then back to Ohio, December 2016  134
15 Exhibit Q  Application for TSA Precheck,
16         Bates Shwehdi-000022 . . . . . . 213
17 Exhibit R  Document containing DHS Travelers
18         Injury Redress Program (TRIP),
19         Bates Shwehdi-000044 . . . . . . 217
20 Exhibit S  Judgment in a Criminal Case,
21         Zuhair El-Shwehdi, defendant,
22         August 29, 2008, Case number
23         3:07-cr-0176 . . . . . . . . . . 232
24
25

Page 7

1  (Exhibits continued)
2  EXHIBIT     DESCRIPTION          PAGE
3  Exhibit T  Plea Agreement, USA vs. Zuhair
4          El-Shwehdi, Case Number 3:07-cr-
5          0176 . . . . . . . . . . . . . 238
6  Exhibit U  Letter from Greene Pak Psychiatric
7          Services, February 18, 2015,
8          with regarding to El-Shwehdi,
9          Bates Shwehdi-000006 . . . . . . 245
10 Exhibit V  One-page typewritten commentary
11         on El-Shwehdi's experiences with
12         various flights, Bates Shwehdi
13         000045 . . . . . . . . . . . . 252
14
15
16
17
18
19
20
21
22
23
24
25

Page 8

1           P R O C E E D I N G S
2       ZUHAIR EL-SHWEHDI,
3     having been first duly sworn, testified
4     upon his oath as follows:
5       EXAMINATION BY COUNSEL FOR DEFENDANT
6  BY MS. POWELL:
7     Q   Mr. El-Shwehdi, good morning.
8     A   Good morning.
9     Q   My name is Amy Powell. I'm an attorney
10 for the government here today. I'm sure your
11 lawyer has explained to you about what will happen
12 at a deposition today. I'm going to repeat some
13 of that information to make sure that you
14 understand it. If you can just indicate to me
15 that you understand it.
16    A   Okay.
17    Q   I am asking you questions under oath.
18 Do you understand that?
19    A   Yes.
20    Q   I'll need you to answer so that the
21 court reporter can take down your answers, so you
22 need to answer in words, not by nodding your head.
23       Do you understand?
24    A   Yeah.
25    Q   If you do not understand me for any

Page 9

1  reason, if I am unclear, if you cannot hear me,
2  please ask me to clarify.
3       Do you understand?
4     A   Yes.
5     Q   If you answer my question, I will assume
6  that you understood the question.
7       Does that make sense?
8     A   Yes.
9     Q   We will take breaks whenever you like
10 to. Please feel free to ask me if you need a
11 break. I will ask you to finish answering the
12 question, if you need to, before we take a break.
13    A   Okay.
14    Q   Do you have any questions about the
15 deposition today?
16    A   I never attended any deposition. I
17 don't know, okay, but I'm ready to, to answer any
18 question you have.
19    Q   I understand.
20       Is there any reason you cannot testify
21 truthfully and accurately today?
22    A   No. I have to tell the truth, whatever
23 I were.
24    Q   Have you ever been deposed before?
25    A   No.

3 (Pages 6 - 9)

Page 54

1 your belongings.
2      Is that true?
3   A   Yes.
4   Q   Is that much like the experience you
5 just described yesterday?
6   A   Exactly the same thing in front of
7 everybody and the same hassle.
8   Q   And about how long did that take?
9   A   I don't know if I write something here
10 or not.
11   Q   Let's see.  This says it lasted about 20
12 minutes.
13   A   Yeah, various.  Sometimes the gentleman
14 who search, he search everything, and he said --
15 because everybody had to report to somebody, the
16 one who took the, my board -- because when I go
17 overseas, I have my passport with me, and they
18 took my passport with me, with the boarding
19 pass, and they kept it somewhere.  I think there
20 is a station somewhere, okay?  And then after they
21 finish searching, they search me and my
22 belongings, they said everything is okay, they
23 stamp it over there.
24   Q   So sometimes it takes less time?
25   A   No, not, not less than 30 minutes, I

Page 55

1 think.
2   Q   Okay.
3   A   This is the April 3 flight.
4   Q   Now, have you written down a description
5 of this experience anywhere that we haven't
6 already talked about?
7   A   No.
8   Q   Have you talked to anyone other than
9 your attorney about this?
10   A   My wife and my kids, yeah.  My wife, she
11 knows everything, because they feel it with me,
12 see?  And my kids, when they were young, they
13 didn't understand.  My child, Hamed, now he's 13,
14 yesterday he start asking me, because he
15 recognize, he start to recognize things, but
16 before that, the only one, Hamed, because he was
17 young, does not know anything, but Nuria and
18 Salha, they know, of course.  Those are my
19 daughters, and my son is Hamed.
20   Q   So this flight in 2011 was the first
21 time you had this experience where you were pulled
22 out for special screening, you think?
23   A   No, no.  Even the previous, the one in
24 London, but I don't have any, any document on
25 that.  This is why -- you see, I, myself, you see,

Page 56

1 I have to speak the truth.  When I told you, and I
2 have to bring them evidence, this is when I start
3 collecting the problem.
4   Q   Got it.  So you were trying to collect
5 evidence on this day?
6   A   2005, I think it happened the same
7 thing, but I don't recall, to be honest with you,
8 but I think -- but this one I think enough for me.
9   Q   I understand.
10   A   Really about, about how many years now?
11 Seven years, the same hassle, but I think 2005 I
12 went to England.  The same thing happened, but I
13 don't have any, any boarding pass or any --
14   Q   On this occasion in 2011 --
15   A   Yes.
16   Q   -- did you take any photos or video?
17   A   No.  I was afraid, really, because we --
18 back home, you see, because I born in Libya, I
19 came here adult, I finish high school.  When we
20 see police, that mean you start shaking, not like
21 you American or this guy, you see?  Nowadays, if I
22 go in my car, today after I leave from you, I saw
23 the red light of the police, I start shaking,
24 because we have in our back mind an agenda of the
25 rules, and not like my son or my daughter or my

Page 57

1 other daughter.  Papa, why you are afraid of the
2 police?  They say it with a, with a very, very
3 comfortable way, see?
4      So I couldn't, I couldn't take picture.
5 What are you talking about?  Even lately I never
6 took my phone.  This is my first time I took my
7 phone with me, ma'am, because I'm coming to -- I
8 want to reach those, and maybe they want to
9 reach it.
10   Q   This was the first trip where you had
11 your phone with you?
12   A   No.  Lately.  When I go to California,
13 because my daughter has the phone with me, but
14 because when I go, come from overseas, they took
15 my phone and they took it to another terminal.
16 Maybe we can come to international.  They delay me
17 two or three times.  I have to go to the -- I
18 missed my flight.  This is another maybe you want
19 to ask me about.
20   Q   I want to ask you about every time you
21 traveled.
22   A   But it's connected to each other, ma'am,
23 everything.  This is my situation.  It's mixed.  I
24 mean mixed problem.  What they call it?
25   Q   So just one more question about this

                                        15 (Pages 54 - 57)

Zuhair El-Shwehdi
Elhady vs. Kable

November 29, 2017

Page 178

1 to marry her, okay? So I couldn't come early. My
2 wife and Nuria, they came before me. They came on
3 that purpose, but my main purpose to do my tax for
4 myself. And Nuria and my wife, they met that
5 gentleman, but they didn't get locked or engaged.
6    Q    And you stayed in the US a little more
7 than a month?
8    A    I think so. I'm not sure how many --
9 the return --
10   Q    Okay. We'll talk about the return trip
11 in a minute.
12   A    I went back May 6th.
13   Q    Okay. That sounds right to me.
14   A    Yep.
15   Q    So the March 20th trip --
16   A    March 20, 2013.
17   Q    -- you moved back to the US via Geneva
18 and landed in Dulles?
19   A    Which one? JFK, March 20.
20   Q    You're right.
21   A    2013.
22   Q    Yep, you're right.
23   A    JFK; yes?
24   Q    Yes. Yes, that's correct.
25       Now, your interrogatory responses on

Page 179

1 page 85 say that officers or agents entered the
2 aircraft and escorted you to a room. This was --
3 so the plane landed at Dulles, and then they came
4 onto the plane?
5    A    No. JFK.
6    Q    Sorry. At JFK they came onto the plane?
7    A    Yeah, I remember. Maybe I didn't write
8 it. I forgot.
9       When the airplane taxiing and they start
10 moving toward the gate, the captain, he said
11 everybody put the boarding pass on the, on the, on
12 the passport, and people, they stand up to take
13 their luggage. He said please, everybody, be
14 seated, so everybody sit back.
15       And then the Turkish agency or something
16 like that, Turkish airline ground from the station
17 in New York with the, with the, with the
18 authorities, they enter to the airplane and they
19 took me. I stood up. I'm the only one on that
20 airplane. I stood up. They told me follow us.
21 Everybody sit down. Even the first class.
22 Everybody. They took me. I am the first one, the
23 ID.
24       I went through, and then I went with
25 them immediately, like what I told you before, to

Page 180

1 scan my passport and then to a private room in
2 the same situation. They asked me about myself,
3 my family back home and everything. That's it.
4    Q    Were any of the questions different this
5 time?
6    A    No, no. The same thing. Everything. I
7 don't know what -- this takes a long time. I
8 missed the flight. I remember. This take me a
9 long time, because I went to make ablutions, went
10 to the bathroom, and it take me long time. Even I
11 told them I need to call my wife, because they
12 took my phone. I remember they took it to another
13 terminal somewhere, so they allowed me to talk,
14 because I already, I know the flight is missing.
15       So I phone my wife. I told her I am in
16 New York, I am safe, but I still inside
17 Immigration. I cannot leave. I think I am going
18 to miss the flight. When I go out, I'll give
19 you the -- I thought I can catch another flight on
20 the same night, but I couldn't. This is what
21 happened.
22   Q    You stayed overnight in New York. Was
23 it like before where they gave you a voucher?
24   A    When I finish, I went upstairs to the
25 Turkish airline, and they told them -- they give

Page 181

1 me a voucher to the hotel, and I don't know the
2 carrier. I forgot the carrier. Before I go, they
3 give me -- they issue -- they told me we, we book
4 you on the second flight, second day flight. So I
5 don't know. Maybe morning, afternoon. I forgot.
6       So I went to the hotel. I slept.
7 Second morning I come back to the, to the airport,
8 and it's a domestic flight like what I told you
9 before.
10   Q    Now, for this one you said that it was a
11 substantially similar experience to the previous
12 returns but that the whole experience took five or
13 six hours this time.
14   A    This one is more time.
15   Q    And I'm wondering which part of it took
16 longer. Did they ask you more questions, or did
17 you wait longer?
18   A    I wait longer, because they took my, I
19 think my phone, and they couldn't do it in their
20 terminal. This is what the gentleman told me. He
21 said we want to take it to another place to check
22 your phone.
23   Q    Who told you this?
24   A    One of the officer, the men who, who --
25 they are surrounding me, because they didn't send

46 (Pages 178 - 181)

Zuhair El-Shwehdi
Elhady vs. Kable

November 29, 2017

Page 182

1  me -- even if I go to the bathroom, they go with
2  me, and I still waiting until I saw somebody come
3  and they bring the phone.  He said everything is
4  clear.  They give me my passport and they open the
5  door, and I was outside with my luggage.
6       So the waiting is for that equipment,
7  not for the question and answer.  The same period
8  of time, I think.
9    Q   Did you get everything back?
10       (Discussion held off the record.)
11  BY MS. POWELL:
12    Q   We're still talking about the trip on
13  March 20, 2013, where you landed at JFK.
14    A   Okay.
15    Q   After they searched your belongings and
16  took your phone and you waited, did you get
17  everything back?
18    A   Yeah, yeah.  No, nothing missing, yeah.
19  They gave me the phone, they gave me everything,
20  and they hand me my passport, and I went out.  I
21  went to the hotel.  They give me voucher for food.
22  This is the airline.
23    Q   Were there any consequences of the
24  missed flights, missed --
25    A   My family, they are worried on me,

Page 183

1  because my wife, when I talk to her, I told her
2  don't worry, I am safe, I am safe.  You see, they
3  expecting this.  This is what -- for the family,
4  this is -- what they call it in English?  But for
5  myself, I'm used to it.  This is my God willing.
6  So I stay.  I never did anything wrong.  So this
7  is -- maybe our friends, they never, they never
8  touch them in the airport, but they single me out.
9  No problem.  I try to take my name off, and this
10  is one of the means, when I found those people.
11    Q   I understand.
12       Okay.  I think we are down to the last
13  international trip.  That's a flight out and a
14  flight back.  There's more questions after that,
15  but this is --
16    A   Okay.  Take your time.  I'm available.
17  Don't worry.
18    Q   Just letting you know there's light up
19  ahead.
20    A   Don't worry.  I'm available.
21    Q   Okay.  Look at your interrogatory
22  response on page 84.
23    A   84, okay.
24    Q   It is the May 6, 2013 flight, so that's
25  paragraph 4 on page 84.

Page 184

1    A   Okay.
2    Q   You list here a flight from JFK to
3  Istanbul.  I take it from our previous
4  conversation that this was you returning to Libya.
5    A   Yes.  Not this.  This is the tax, when I
6  finish the tax.  When I came in March, this is
7  coming back to my family.
8    Q   Yes.  So you are returning --
9    A   After this, I didn't come and fill the
10  other flight until November something.
11    Q   So let's talk about this May 6, 2013
12  flight.  When you got back to Libya, were you
13  doing the same --
14    A   Same thing.  I went to my family,
15  because we try to settle, I told you, but in that
16  year, the country or the city went downhill.  They
17  start killing.
18       I told you they killed one of our
19  teachers.  He's an American teacher.  He is the
20  teacher of my -- because my daughter, they speak
21  English, and the local, the local school, they
22  didn't provide English, so I put them in -- they
23  call it International School.  At International
24  School they bring teacher from America, from
25  Canada, from Australia, from Britain.

Page 185

1       So the environment, my kids, they are
2  American, they speak good, so I put them over
3  there, okay?  And they make very, very contact
4  with this gentleman, the one who was killed,
5  because his wife, she is American, but she is
6  originally Lebanese.
7       My kids, they have a good relation with
8  those people, okay, and when they kill them and
9  the situation was bad, all my family, my relative,
10  they told me, Zuhair, your kids, they didn't raise
11  up here.  We used to this system, but your kids,
12  they just came one year.  We wish you to go back.
13       So I decide.  I send them I think in
14  September, and I stayed until November, and then I
15  came back forever until now.  I never went back.
16    Q   But from May to November of 2013, you
17  were doing the same things you were doing --
18    A   The same thing, yeah, all my --
19    Q   Let me finish just so that it's clear on
20  the record.
21    A   Sorry.
22    Q   You were doing the same things to earn
23  income --
24    A   Yes.
25    Q   -- that you were before?

47 (Pages 182 - 185)

# Exhibit K

Page 1

1           IN THE UNITED STATES DISTRICT COURT

2             FOR EASTERN DISTRICT OF VIRGINIA

3                  ALEXANDRIA DIVISION

4

5    ANAS ELHADY, et al,

6           Plaintiffs,

7      v.                          Case No.:

8    CHARLES H. KABLE, et al,      1:16-cv-375(AJT/JFA)

9           Defendants.

10

11                          Washington, D.C.

12                          Wednesday, January 3, 2018

13   Deposition of:

14                  SAMIR ANWAR

15   called for oral examination by counsel for Defendants,

16   pursuant to notice, at Department of Justice, 20

17   Massachusetts Avenue, NW, Washington, DC, before

18   Natalia Thomas, a Notary Public in and for the District

19   of Columbia, beginning at 10:10 a.m., when were present

20   on behalf of the respective parties:

21

22

Page 86

1    Q   How long did the pat down last?

2    A   A few minutes.  Like the pat down

3 specifically, you are saying like just --

4    Q   Yeah.

5    A   About a minute or two maybe, not even.

6    Q   Okay.

7    A   And then I was sat down and questioned as to

8 the purpose of the trip and then I was sent back to the

9 lobby where I was able to sit with my father and we sat

10 there and waited.  I was pulled aside again by another

11 officer, there was two officers took me to another room

12 and started asking me questions specifically -- not

13 specifically but like not specific to the trip in

14 general but more or less what I did for a profession

15 and what type of things I was involved with other than

16 my normal work, what type of hobbies and stuff I had.

17        Actually, before they did that one of the

18 other officers had asked for my phone password.  And I

19 had initially refused to give it to them because I just

20 didn't want them in my phone I guess.  It is my

21 personal item.  And at that point he had notified me

22 that he would be taking my phone and he wouldn't be

Page 87

1 giving it back if I didn't give him a password.  So I

2 gave him the password.  I had nothing to hide.  It is

3 just a sense of privacy I guess that I was

4 uncomfortable with giving them my password initially.

5 After that that is when I was pulled back went back to

6 the room I guess and questioned.  And they started

7 inquiring about a trip, the addresses that were stored

8 in my phone and stuff specifically to the address that

9 we had stayed at while we were there, who lived there

10 and what their affiliations are with me.  If I remember

11 correctly they asked about my family, my -- I'm

12 assuming it is from pictures that they had saw.  At

13 that time, we were also looking to move so there was

14 other listings and stuff in my phone, so I was asked

15 about those.

16        After that I was sent back to the lobby and I

17 sat there with my father for a little while.

18    Q   So you were questioned apart from your father?

19    A   Yes.  My father was not questioned at --

20    Q   Okay.

21    A   -- he just sat in the lobby the whole time.

22    Q   Okay.

Page 88

1    A   And then after some time which was about three

2 and a half to four hours we were -- I was given my

3 stuff back and I was let go.  There were some things

4 they found in my car that I did not know I had in

5 there, that they were questioning me about.  And I

6 later recalled what they were for and they -- it was

7 piece of paper that had a bit locker number on it.  And

8 it was the bit locker for my work laptop --

9    Q   Bit locker?

10    A   Yeah, they require us --

11    Q   B-I-T?

12    A   Yes.

13    Q   What is a bit locker?

14    A   I'm assuming it is -- I'm not an IT person so

15 whenever I turn my computer on it prompts a screen

16 where you have to put this bit locker in so you can

17 access the computer.  Once you put the pin in then you

18 can log in, then you put your log in ID.  So if you

19 wanted to use my work laptop you'd be able to log in

20 yourself but we would still be using the same bit

21 locker if that makes sense.

22    Q   Okay.

Page 89

1    A   I don't -- I don't know -- I'm not an IT

2 person.  It is just the one step before getting into

3 the log in screen for the computer.

4    Q   Okay.  And what did they -- this is a piece of

5 paper they found?

6    A   Yeah, it was a piece of paper, it was like a

7 notepad, sticky note --

8    Q   Okay.

9    A   -- that had my bit locker on there and I

10 forgot I had it in there and they had made it seem like

11 -- and I understand I guess but the way the questioning

12 happened with -- about the bit locker it seemed like I

13 was made a bigger deal than it really needed to be.

14 But I guess that's from my perspective.  I understand

15 they are officers and they have to figure it out but

16 once I recalled that it was the bit locker for my work

17 laptop then it seemed to be clear.

18    Q   So you didn't recall what this piece of paper

19 was at first?

20    A   No because they wouldn't show it to me.  They

21 just said what is the -- and I don't recall it being a

22 bit locker -- I didn't know -- I guess the term bit

# Exhibit L

Case 1:16-cv-00375-AJT-JFA   Document 208-1   Filed 05/08/18   Page 91 of 138 PageID# 7304

Saleem Ali
March 14, 2018
Elhady vs. Kable

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE EASTERN DISTRICT OF VIRGINIA

3                      ALEXANDRIA DIVISION

4

5    ANAS ELHADY, et al.

6              Plaintiff,

7         v.                          Case No.

8    CHARLES H. KABLE, et al.          1-:16 cv-375

9              Defendants.            (AJT/JFA)

10

11                   DEPOSITION OF SALEEM ALI

12   DATE:          Wednesday, March 14, 2018

13   TIME:          9:17 a.m.

14   LOCATION:

                    Department of Justice

15                   1100 L Street, NW

                    Washington D.C. 20005

16

17   REPORTED BY:  Natalia Thomas, Notary Public

18

19

20

21

22

Saleem Ali
Elhady vs. Kable

March 14, 2018

Page 2

1        A P P E A R A N C E S

2 On behalf of Plaintiffs:

3    DENA M. ROTH, ESQUIRE

4    United States Department of Justice

5    20 Massachusetts Avenue, NW

6    Washington, DC  20001

7    dena.m.roth@usdoj.gov

8    (202) 514-5108

9

10 On behalf of Defendants:

11    GADEIR I. ABBAS, ESQUIRE

12    Council on American-Islamic Relations (CAIR)

13    453 New Jersey Avenue, SE

14    Washington, D.C. 20003

15    gabbas@cair.com

16    (202) 742-6420

17

18 Also Present:

19    MELISSA PACHIKARA/FBI

20

21

22

Page 3

1        C O N T E N T S

2 EXAMINATION BY:                    PAGE

3 By Ms. Roth                    4

4

5        E X H I B I T S

6 No. DESCRIPTION                    PAGE

7 Exhibit B   Second amended responses to discovery

8        requests                    23

9 Exhibit A   Complaint

                        125

10

11

12

13

14

15        (*Exhibits attached to transcript.)

16

17

18

19

20

21

22

Page 4

1        P R O C E E D I N G S

2 WHEREUPON,

3        SALEEM ALI

4 called as a witness, and having been sworn by the

5 notary public, was examined and testified as follows:

6        EXAMINATION BY COUNSEL FOR PLAINTIFFS:

7 BY MS. ROTH:

8    Q   Okay Mr. Ali good morning or good evening

9 where you are.

10    A   Yes.

11    Q   My name is Dena Roth.  We met a few days ago

12 and we did a very short test of this and I told you at

13 that time that I'm ah, an attorney for the Department

14 of Justice.  I represent the Defendants.

15        I uh, am going to walk through a few

16 instructions today because we're doing this over Skype

17 and because I think it's fair to anticipate that, you

18 know, it'll be a little bit more difficult with making

19 sure we hear each other.

20        Um, I'm just going to talk for a few minutes

21 and then pause after I finish speaking to give you a

22 chance to respond and that's how we'll do this today.

Page 5

1 Ah, I really ah, appreciate that it's late where you

2 are um, so we'll just try and keep this going as

3 smoothly as possible.

4        The first thing I want to explain is you are

5 under oath ah, the same way you would be if you were

6 in a courtroom here in the United States.  I'm going

7 to ask to make sure that you understand that that's

8 the case, is that true -- do you understand that?

9    A   Yes -- yes, I do.

10    Q   Okay, um, again while we're doing this over

11 Skype you're presently located in Indonesia.  We are

12 present in Washington, D.C.  We have a court reporter

13 in the room who's going to be transcribing everything

14 that I say and everything that you say and everything

15 your counsel says.

16        It's very important that we not interrupt

17 each other and that all of the answers that you give

18 me are audible and verbal.  I will do my absolute best

19 not to interrupt you and so I also ask that you make

20 sure you wait until I finish asking my question and

21 related to that same thought -- because it's possible

22 there'll be a delay in you hearing what I'm saying and

2 (Pages 2 - 5)

Saleem Ali
Elhady vs. Kable

March 14, 2018

Page 46

1    to Abu Dhabi, then Abu Dhabi to Jakarta but there was
2    a change in the flight so they ended up flying from
3    Toronto to New York.
4         And so when you enter into the Toronto
5    Airport in order to fly into America you actually have
6    to go through customs in order to fly a flight from
7    Toronto to New York back in the U.S.
8         And so I remember my wife -- she had called
9    me and said they had stopped her and the kids and
10   questioned them for about 45 minutes to an hour or so
11   before they were able to make their flight from
12   Toronto to New York.
13   Q    Did they make the flight from Toronto to New
14   York?
15   A    They did, yeah, they made their flight.
16   Q    Okay, um, so that's all in June of 2015,
17   right?
18   A    Yes, yes.
19   Q    And in September did you -- you went to go
20   meet them?
21   A    Yes in September then um, I drove back across
22   to Toronto because I mean we were flying back to

Page 47

1    Toronto from Indonesia and I flew to Indonesia from
2    Toronto and I was there a little short of a month um,
3    in Indonesia and then we all flew back together ah, to
4    Toronto.
5    Q    Did you --
6    A    Then we drove back from Toronto to Detroit.
7    Q    Did you encounter any problems crossing from
8    Detroit over into Canada to get to the airport?
9    A    No.
10   Q    Did you encounter any problems or delays ah,
11   at check-in or security when you were flying from
12   Toronto to Jakarta?
13   A    No.
14   Q    Okay and then returning from Jakarta to
15   Toronto, did you encounter any problems checking in or
16   with security?
17   A    No.
18   Q    So then once you landed in Toronto you drive
19   with your family back across into Detroit, right?
20   A    Yes that's right.
21   Q    And what happened ah, when you were crossing
22   the border back into the United States?

Page 48

1    A    Uh this particular time um, actually, we
2    drove from -- I had to cross the Blue Water Bridge
3    because at the time when I -- because we had a problem
4    at that -- I mean because they stopped me so this time
5    I decided we would cross in Detroit as opposed to Port
6    Huron.
7         And there -- we crossed at the tunnel and I
8    didn't have any issues um, at the tunnel.  There's a
9    um, -- I don't know this -- if there's reality to it
10   or not but there's a saying amongst some of the people
11   in Detroit that it's easier to cross at the tunnel
12   than it is the bridge and so that's why I chose the
13   tunnel and we didn't have any problems at the tunnel.
14   Q    Okay so if you're looking at page 10,
15   paragraph 15 -- is that the tunnel crossing you are
16   referring to ah, October 4?
17   A    Um, yes it is.
18   Q    Okay.
19   A    Yes, it is, yes, it is.
20   Q    Okay so then paragraph 14 it says you exited
21   the United States again, is that right?
22   A    No.  You know I don't know about number 14.

Page 49

1    I don't know if that is tied into number 15 or not,
2    not for sure.
3    Q    Okay then so paragraph 13 which is also in or
4    about October 2015 and describes a secondary
5    inspection and detention by CPB for six hours?
6    A    Um-hmm, um-hmm.
7    Q    Do you recall this?
8    A    Yeah and that date should be November.
9    Q    Okay.  Okay, what -- so what can you tell me
10   about that trip?
11   A    Um, about -- say about noon my friend and I,
12   we went to have lunch um, in Windsor and it was just
13   supposed to be a short trip.  We were going to go have
14   lunch and then I had to pick my children up from
15   school at, at 3:30.
16        So I mean it was just a quick trip.  I mean I
17   don't know if you are familiar with Detroit but I mean
18   from where I live at to the bridge it's only about 15
19   minutes and then the restaurant that I go to has got
20   to be 3 or 4 minutes from the bridge.
21        And so we went and we ate and then we prayed
22   and then we came back and we literally -- I think we

13 (Pages 46 - 49)

Saleem Ali
Elhady vs. Kable

March 14, 2018

Page 50

1  may have been in Windsor for maybe an hour and 15
2  minutes or so because I mean I had prior engagements
3  and we were just going to have lunch.
4        Um, when we got back to the bridge, um, they
5  chose -- chose us for a secondary inspection and so I
6  mean, I've been in secondary inspections before and I
7  -- I mean I wasn't.  You know, normally they just --
8  they call you up they ask for your information and you
9  know sometimes they let you go.
10        On this particular time, they called for my
11  information and told me to go sit back down they were
12  still waiting and then they searched the car because
13  you have to leave everything in the car and so then
14  they started bringing my things in from the car and my
15  phones and uh, you know anything that was in the car.
16        Normally I would bring food back because we
17  can't bring like -- normally when I go to Canada I eat
18  goat meat and so I know not to bring the goat meat
19  back because I don't want any problems at the border.
20        Um, and so I'm watching the clock, you know,
21  go by you know, we were sitting there and it got to a
22  point to where we were just sitting for a long period

Page 51

1  of time and then they would call either myself or my
2  friend up and they did an iris scan and then we'd go
3  sit back down and then they wanted -- they have one of
4  us come behind the counter.
5        They swiped the bottoms of our feet and then
6  I had to go back out still sitting, waiting um, we
7  weren't allowed to us the phone to call anybody.  I
8  mean I couldn't call my wife to let her know that I
9  wasn't going to be able to pick up the kids because
10  I'm still here at the border.
11        Um, I mean by this time I was -- I would say
12  I was angry because of you know, this detention and so
13  and I was angry with the supervisor who was in charge
14  and he kept saying that it wasn't him, that it was
15  above him, that it wasn't him -- the reason why they
16  were holding us.
17        And they took my fingerprints and then maybe
18  -- I mean you know we've been there now three or four
19  hours or so um, they called each of us back separately
20  into their office and um, I got back to the office he
21  had like a file, the officer had got a file and he was
22  asking me questions about my wife and my kids.

Page 52

1        Whether my kids were born at -- where I
2  worked at and I told him, you know, you guys asking me
3  all these things just in June, you should have all
4  this information already.  You know, why are you
5  asking me the same questions that you already have
6  information to?
7        And even at that time I explained to them I
8  mean you guys should have my information.  I crossed
9  the border frequently they have my information.  I
10  mean I have an FBI background check because I have a
11  hazardous materials endorsement so you should have my
12  information.  I'm upset and um, it happened that they
13  wanted my, my password to my personal phone and the
14  password to my work phone.
15        And around -- I mean this is going on, you
16  know, maybe 9-10 o'clock at night.  They wanted to --
17  they told us at that time they were going to keep our
18  phones and so of course I was livid because the one
19  phone didn't even belong to me, it was my work phone.
20        And um, maybe around 11 o'clock they released
21  us and that was the day that boiled my blood so much
22  to where I mean I contacted uh, Representative ah,

Page 53

1  John Conyers Office and also contacted ah, I believe
2  at that time Senator Levin in regards to this
3  particular issue because I think that they were going
4  -- on that particular time, especially when I was only
5  in Canada for a little over an hour so I wasn't there
6  for a long period of time.
7    Q   You received your phone back.  It says that
8  you returned -- you received your phones the following
9  day, is that right?
10    A   Yeah, they called me the next morning and
11  told me that I could come and pick up my phone.
12    Q   Okay.
13    A   Two phones.
14    Q   Was there any other time in your travels
15  where you had your phone taken and then you had to
16  pick it up later?
17    A   No.
18    Q   We skipped over one -- one trip in the
19  relative same time period, it's at paragraph 21, page
20  11 where it says December 15, 2014?
21    A   Hold on one second.
22    Q   Sure, take your time.

14 (Pages 50 - 53)

Saleem Ali
Elhady vs. Kable
March 14, 2018

Page 54

1    A  Um, what page is it?
2    Q  Page 11, paragraph 21.
3    A  Okay, yeah, December 14, 2014.
4    Q  It says here that you traveled uh, back
5    through the Detroit Windsor Tunnel and I'm reading,
6    "Plaintiff Ali was questioned and went through
7    secondary inspection."  Do you remember this trip
8    through the tunnel?
9    A  Ah, yes, this was um, this was right around
10   the time when my wife had -- she had just got her
11   green card and we -- I hadn't been able, I hadn't
12   taken her to Canada and so, you know, I thought maybe
13   it would be nice, you know, to with her to go to
14   Canada and so her and my son had just received their
15   green cards like maybe a couple of weeks prior to
16   that.
17        And so we went over, had dinner because
18   normally um, we go to ah -- actually I'm sorry.  We
19   went to um, Toronto on this trip.  We wanted to spend
20   the weekend, maybe a couple of days in Toronto in
21   Niagara Falls and then we came back from Toronto and
22   like I said this is when she had just received her --

Page 55

1    her green card and my son.
2        Um, and we got back they put us into a
3    segregated inspection because it was her, I and all
4    the kids and so normally when we travel it's -- at
5    that time it was one, two, three, four, I mean there
6    was like seven of us travelling.
7    Q  And how long were you questioned if you
8    remember?
9    A  I mean I don't recall the exact amount of
10   time um, I mean it could have been a half hour so I
11   mean because we sat -- we sat there waiting for a
12   little while and dealing with that.  It wasn't like an
13   excessively long period of time.
14   Q  Okay, ah, so one paragraph above that on the
15   same page -- paragraph 20 where it says April 9, 2015,
16   do you see that?
17   A  Um-hmm.
18   Q  And ah, do you recall that your April 2015
19   trip back over the Blue Water Bridge?
20   A  April 9, 2015 -- yeah this would have been
21   uh, another time where um, we went to Toronto.  My
22   wife I and the kids and um, I'm probably returning

Page 56

1    we had the -- we were stopped and had to go through a
2    secondary inspection.  Um, I don't recall the -- ah
3    it's mainly them asking me what my work was and I
4    don't recall there being a long period of ah time in
5    which we had to ah wait or be detained.
6    Q  Okay, okay so then the next trip in your
7    responses is a trip by air in April of 2016.  That
8    trip is listed on page 8, paragraph 19.
9    A  Okay.
10   Q  Just let me know when you see that.
11   A  Page 8, paragraph 19?
12   Q  Correct, do you see where it says April 11,
13   2016?
14   A  Yes.
15   Q  Do you recall your trip to Indonesia in April
16   of 2016?
17   A  Yeah but that date, that date is incorrect.
18   That was the -- I don't know maybe the numbers got
19   transposed or something because that's the initial
20   trip it looks like from San Francisco to Indonesia,
21   detained by three hours by CBP.
22   Q  So explain that one more time.  What should

Page 57

1    the date be?
2    A  That -- that was the April 2011 trip, the
3    information that's contained in number 19.
4    Q  I see.
5    A  Pertained to the April yeah --
6    Q  Is that -- and that's in paragraph 20?
7    A  Uh, yeah, I guess paragraph 20 would be --
8    yeah that would -- yes, that would be the, the same
9    information but the date is -- the dates are
10   incorrect.  I mean March 29 it was April, it was
11   actually April 1st or 2nd, 2011, there's no 2016 trip.
12   Q  Okay.  Can you um, the very last page of this
13   document if you just scroll to the last page you'll
14   see a document that says verification.  Let me know
15   when you're there.
16   A  Yes.
17   Q  Do you see your signature there Mr. Ali?
18   A  Yes, I do.
19   Q  Okay and it says here that you're signing
20   under oath that the responses in the foregoing
21   interrogatories are true and correct to the best of
22   your information and belief?

15 (Pages 54 - 57)

Saleem Ali
Elhady vs. Kable
March 14, 2018

Page 58

1    A  Um-hmm.

2    Q  You're telling me about a bunch of errors --

3  at least one error, maybe two -- did you review these

4  before you signed that last page?

5    A  I didn't go through all of them, no.

6    Q  Okay and the -- am I right that the date next

7  to your signature says December 23, 2017?

8    A  Yes, that's correct.

9    Q  If you scroll up one more page do you see

10  where it says certificate of service?

11    A  Um-hmm.

12    Q  And do you see where it says, "I hereby

13  certify that on February 2nd, 2018 I served the

14  foregoing document to Defendants via electronic mail?"

15    A  Um-hmm.

16    Q  Do you recall if you looked at your responses

17  to these interrogatories between December 23rd, 2017

18  and February 2nd, 2018?

19    MR. ABBAS:  Objection asked and answered.

20  You can answer if you remember.

21    MS. ROTH:  I don't recall asking that

22  question before.

Page 59

1    MR. ABBAS:  You can answer if you remember.

2    THE WITNESS:  I don't remember.

3  BY MS. ROTH:

4    Q  You don't remember looking at them between

5  December 23rd and February 2nd?

6    MR. ABBAS:  Objection mischaracterizes

7  assessment on it, you can answer.

8    THE WITNESS:  I don't recall looking at them

9  in between December 23rd and February 2nd.

10    MS. ROTH:  Okay.

11    THE WITNESS:  Of 2018.

12    MS. ROTH:  Okay.

13  BY MS. ROTH:

14    Q  Alright let's go back to uh um, another land

15  trip on your list.  It's at page -- page 10, paragraph

16  12.  Let me know when you're there.

17    A  Okay, page 10, paragraph 12.

18    Q  Do you see where it says November 15, 2016?

19    A  You're looking um, actually I answered this

20  question already.  This was the one which I told you

21  it said October but the date said October but it was

22  November.

Page 60

1    Q  Okay we did talk about a trip -- a trip in

2  October where you said it was November but I think

3  that was in 2015 so I just want to make sure I

4  understand.

5    A  Yeah, yeah, the date the 2016 date is

6  incorrect on that.

7    Q  So this should say --

8    A  2015.

9    Q  I'm sorry so this should --

10    A  Should be 2015.

11    Q  November 15, 2015?

12    A  Um-hmm.

13    Q  Okay and this is the occasion where your --

14  your phones were confiscated and you were detained for

15  six hours right?

16    A  Yes.

17    Q  And you were supposed to pick up your kids

18  from school but you were still at the border?

19    A  Yeah.

20    Q  Okay.

21    A  Yes, that's correct.

22    Q  Okay.  Okay so then I think the next trip is

Page 61

1  by air.  Turn to page please 8, paragraph 18.

2    A  Page 8, paragraph 18?

3    Q  Correct, do you see where it says March 1st,

4  2017?

5    A  Yes.

6    Q  So first I should just ask were -- this is

7  the -- I understand you're identifying some you know,

8  errors and the dates and you know I'm glad that you're

9  pointing those out.  So I think I haven't seen travel

10  by land or by air from 2016.  Do you recall if you

11  travelled domestically or internationally by air in

12  2016?

13    A  No, I did not.

14    Q  Okay so March 1st, 2017 is the next time you

15  recall flying somewhere?

16    A  Yeah, the date is incorrect.

17    Q  Okay what should the date be?

18    A  Um, March 3.

19    Q  But 2017?

20    A  Yes.

21    Q  Okay when you're spotting these um,

22  corrections, are you looking at something else to help

16 (Pages 58 - 61)

# Exhibit M

Wael Hakmeh                                                    March 2, 2018
Elhady vs. Kable

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE EASTERN DISTRICT OF VIRGINIA

3                    ALEXANDRIA DIVISION

4

5      ANAS ELHADY, et al.,

6              Plaintiffs,

7         v.                          Case No.

8      CHARLES H. KABLE, et al.,        1:16-cv-375

9              Defendants.

10

11             DEPOSITION OF WAEL HAKMEH, D.O.

12     DATE:        Friday, March 2, 2018

13     TIME:        10:34 a.m.

14     LOCATION:

                    Department of Justice

15                  200 Massachusetts Avenue

16                  Room 7125

17                  Washington D.C.

18     REPORTED BY:  Michael Farkas, Notary Public

19

20

21

22

Wael Hakmeh
Elhady vs. Kable
March 2, 2018

Page 2

1          A P P E A R A N C E S
2 On behalf of Plaintiffs:
3    GADEIR ABBAS, ESQUIRE
4    Council on American-Islamic Relations (CAIR)
5    453 New Jersey Avenue, SE
6    Washington, DC 20003
7    gabbas@cair.com
8    (202) 742-6420
9
10 On behalf of Defendants:
11   CHRISTOPHER R. HEALY, ESQUIRE
12   U.S. Department of Justice, Civil Division
13   20 Massachusetts Avenue, NW
14   Washington, DC 20001
15   christopher.healy@usdoj.gov
16   (202) 514-8045
17
18
19
20
21
22

Page 4

1          E X H I B I T S
2 No. DESCRIPTION                    PAGE
3 Exhibit 20 Boarding pass              180
4 Exhibit 21 Boarding pass stamped and signed
                                       181
5 Exhibit 25 Travel document           184
6 Exhibit 15 Boarding pass, 2/2        184
7       Amman Istanbul Chicago
8 Exhibit 7  Boarding pass,            205
9       San Diego Phoenix Detroit
10 Exhibit 11 Boarding pass,           228
11      Stockholm Copenhagen
12 Exhibit 13 Boarding pass            230
13 Exhibit 1  Lawsuit document         279
14
15
16
17
18
19
20
21
22

Page 3

1          C O N T E N T S
2 EXAMINATION BY:                    PAGE
3 By Mr. Healy                    5
4 By Mr. Abbas                    291
5
6          E X H I B I T S
7 No. DESCRIPTION                    PAGE
8 Exhibit 5 Interrogatory response          8
9 Exhibit 4 12/21                    8
10 Exhibit 3 1/9                    9
11 Exhibit 37 Current passport            23
12 Exhibit 35 Passport & driver's license     24
13 Exhibit 8  Email                    32
14 Exhibit 17 Boarding pass, 2/4/15          86
15 Exhibit 29 Boarding pass Dubai & Chicago    86
16 Exhibit 18 Boarding pass, 5/1/16         101
17 Exhibit 36 Boarding pass, 5/1/16         101
18 Exhibit 28 Boarding pass, 5/15         102
19 Exhibit 33 Boarding pass, 7/30/15         107
20 Exhibit 34 Flight stub, 11/11          116
21 Exhibit 16 Boarding pass, 1/24 and 1/25    132
22 Exhibit 31 Boarding pass, Amman, Istanbul, Chicago 144

Page 5

1          P R O C E E D I N G S
2 WHEREUPON,
3         WAEL HAKMEH
4 called as a witness, and having been sworn by the
5 notary public, was examined and testified as follows:
6       EXAMINATION BY COUNSEL FOR DEFENDANT
7 BY MR. HEALY:
8    Q  Good morning.  My name is Christopher Healy.
9 I'm an attorney here at the Department of Justice, and
10 I'll be taking your deposition today.  Do you
11 understand you're under oath?
12   A  Yeah.
13   Q  So, as we get started today, just a couple of
14 preliminary things.  When you answer my questions, try
15 to do your best to say yes or no audibly, as opposed
16 to saying yeah or uh-huh or shaking your head yes or
17 no.  Your attorney might object to some of my
18 questions.  That's okay.  You can still answer the
19 questions, unless your attorney recommends that you
20 don't.  Is there any reason you can't answer the
21 questions I'm asking you today truthfully or
22 accurately?

2 (Pages 2 - 5)

Waal Hakmeh                                                                          March 2, 2018
Elhady vs. Kable

Page 166

1  scanner they had --
2     Q  Uh-huh.
3     A  -- against my objections.
4     Q  Uh-huh.
5     A  Despite the fact I told them I'm a physician,
6  and that I have health concerns about it.  All that
7  was discounted.  They didn't care.  One of the TSA
8  officers was -- basically said it in a bit of an
9  obnoxious manner, that if I didn't want to be screened
10 then I can drive to Chicago from San Diego.  Then,
11 they made me go through a metal detector.  Then they
12 made me go through the other scanner again.  Which to
13 me didn't make sense.  If one scanner works, why am I
14 going through a second one.  And why am I being
15 exposed to radiation if it's unnecessary?  If one
16 scanner is generally good for the public, why am I
17 being subjected to two scanners.
18    Q  Okay.
19    A  Keep in mind, this is happening when my wife
20 is -- so, my wife is like seven, eight months
21 pregnant, okay.  We go in.  I go through.  I -- you
22 know, against my wishes and despite my reservations I

Page 167

1  went through both scanners.  Okay.  I'm inside.
2  They're tearing apart -- you know, they're pulling out
3  everything from my backpack.  And it's mostly medical
4  books, stethoscope, things like that.  ID.  They pull
5  everything out, piece by piece.  Then somebody called
6  the police.
7     Q  And this was in the security area at San
8  Diego airport.
9     A  That's correct.
10    Q  Okay.
11    A  Then somebody calls the police on me, and --
12    Q  So somebody -- like an individual --
13    A  One of the TSA.
14    Q  -- like a traveler --
15    A  No, no, no, no.
16    Q  No.
17    A  One of the TSA officers.
18    Q  Did you see them call the police?
19    A  I saw them walk out and then I saw them walk
20 back in.
21    Q  Uh-huh.
22    A  And then I saw the police show up.

Page 168

1     Q  Okay.
2     A  And the whole time, I'm calm.  I'm talking to
3  them like I'm talking to you now.  Then I'm sitting
4  there waiting for them to go through my bag.  I have
5  went through security, you know, they are both of --
6  the pat down and both of the screening machines  And
7  we're just sitting there waiting for them to finish.
8  And the police show up.
9     Q  Uh-huh.
10    A  And they start asking me why I didn't want to
11 go through the -- both of the scanners.  And I
12 explained to them --
13    Q  And these were local police?
14    A  This was San -- to my knowledge, these were
15 San Diego police officers.
16    Q  Okay.
17    A  And there was about three or four them.
18    Q  Okay.
19    A  It's not just one officer that showed up.
20    Q  Okay.
21    A  Why would I need four -- three or four police
22 officers to show up for a physician going to a medical

Page 169

1  conference and a pregnant woman?  Why do we need four
2  police officers?  Why do I need one police officer?
3  We're sitting there.  They're asking me -- they're
4  telling me, well, why didn't you want to go through
5  it.  And I explained to them.  You know, there's
6  medical reasons I don't want to go through, and then
7  there's privacy reasons.  And he told me -- this is
8  one of the officers -- he said if you don't go through
9  it I can charge you with a misdemeanor right now and
10 send you to jail.  Now, that's news to me.  Number
11 one, nobody there ever said if you don't go through
12 the -- either one of the scanners, or both of the
13 scanners, that you would be charged with a misdemeanor
14 and go to jail.  Number two, I don't even think that's
15 legal.  I've never heard that.  There's never been --
16 I've traveled a fair amount, as you can see.  There's
17 never been any warning that says that if you do that
18 you'll go to jail.  That's punishable -- it's a
19 misdemeanor punishable with jail  Number three, I've
20 already went through this scanner.  What's the point
21 of making that kind of accusation and charging me for
22 it, or threatening to charge me with something like

43 (Pages 166 - 169)

Page 170

1 that, when I've already went through the scanning
2 machine. Why would you --
3    Q  So, they didn't actually charge you with a
4 misdemeanor?
5    A  He threatened to charge me.
6    Q  He threatened to.
7    A  Even though --
8    Q  Okay.
9    A  He threatened to charge me with a bogus
10 charge, for not going through one of the scanners,
11 when I had already went through both of them before
12 they even arrived.
13   Q  And so, how did this interaction conclude?
14   A  So, at this point I'm thinking I have two
15 options. Either I basically just say nothing,
16 renounce my rights. Or I can fight it and say show me
17 where it's at. And call their bluff and see, because
18 I don't believe that's legal. I don't believe that
19 they can arrest me, charge me with a misdemeanor, when
20 I've acquiesced and done everything that they've asked
21 me, despite my personal objections to it.
22   Q  And so what did you do?

Page 171

1    A  So, at that point I thought about my wife,
2 who is pregnant. And if I were to go to jail, the
3 last thing I want -- we tried hard to have a kid, and
4 I don't want her having a miscarriage. And she's
5 stuck in San Diego by herself, and I'm trying to get
6 back to Detroit.
7    Q  Was she with you during this interaction?
8    A  She was sitting there.
9    Q  Okay.
10   A  She sees four police officers come up. What
11 do you think a pregnant woman is going to do? She's
12 worried. So, at that point, I basically decided I'm
13 going to renounce my own rights, not say anything, let
14 them do what they want to do. I'm not going to argue
15 with them, and I just want to get out of that
16 situation. Although it was my right to make them
17 prove what they were saying -- prove to me that that's
18 a misdemeanor. If you're threatening to send me to
19 jail, send me to jail. But they -- but I didn't do
20 that. Because I didn't want something bad to happen
21 to my wife and my son, God forbid.
22   Q  Uh-huh. And about how long did this whole

Page 172

1 interaction take? From start to finish.
2    A  I would encourage you to look at the
3 videotape. If I had to guess, probably about -- it
4 was over an hour, because I remember waiting for
5 someone to come, while we were waiting. Because
6 initially they wouldn't come. They said you have to
7 wait. And I told them I don't want to go through it.
8 And then I asked them can I speak with whoever is in
9 charge of, you know, TSA here or anybody in the
10 airport who is in charge, because it doesn't seem
11 reasonable to force somebody against their wish to go
12 through the scanners. And I waited for what I
13 remember was over an hour. Then they showed up. Then
14 I had to go through both scanners. Then they went
15 through my bag for another ten minutes or so. Then I
16 had to talk to the police. So, the whole encounter
17 probably about two hours or more. I would encourage
18 you to try to get the videotape for -- you know, if
19 you could subpoena it, that would be great.
20   Q  And did you make the flight?
21   A  I made the flight.
22   Q  You made the flight. When you arrived at the

Page 173

1 gate, was -- did anything happen at the gate? After
2 this interaction, after you arrived at the gate.
3    A  Not with me personally. I found somebody's
4 bag and I told one of the officers about it. So, they
5 could announce it to whoever it was. But they didn't
6 seem particularly excited about talking to me.
7    Q  All right. What do you mean you found --
8    A  Because they --
9    Q  -- you found somebody's bag? Like, somebody
10 had left a bag?
11   A  Somebody walked away and forgot their bag.
12 And then I alerted one of the officers that I think
13 somebody left their bag. They took it and then they
14 opened it up, found the person's name and announced it
15 overhead.
16   Q  Okay.
17   A  But despite doing a good deed, I was still
18 treated like I was a criminal, the way they looked at
19 me.
20   Q  And did anyone ask you any questions at the
21 gate, related to the kinds of search that you
22 described earlier?

44 (Pages 170 - 173)

# Exhibit N

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE EASTERN DISTRICT OF VIRGINIA

3               ALEXANDRIA DIVISION

4

5   ANAS ELHADY, ET AL,

6          Plaintiff,

7     v.                        Case No.:

8   CHARLES H. KABLE, ET AL        1:16-cv-375 (AJT/JFA)

9          Defendant.

10

11                              Washington, D.C.

12                      Monday, December 18, 2017

13   Deposition of:

14   ████████████████

15   called for oral examination by counsel for Plaintiff,

16   pursuant to notice, at Department of Justice, 20

17   Massachusetts Avenue, NW, Washington, D.C., before

18   Natalia Thomas, a Notary Public in and for the District

19   of Columbia, beginning at 10:35 a.m., when were present

20   on behalf of the respective parties:

21

22

Elhady vs. Kable

Page 2

1           A P P E A R A N C E S
2  On behalf of Defendants:
3     ANTONIA KONKOLY, ESQUIRE
4     United States Department of Justice
5     Federal Building
6     310 New Bern Avenue, Suite 800
7     Raleigh, NC  27601
8     Antonia.Konkoly@usdoj.gov
9     (919) 716-6830
10
11  On behalf of Plaintiffs:
12     LENA MASRI, ESQUIRE
13     Council on American-Islamic Relations (CAIR)
14     453 New Jersey Avenue, SE
15     Washington, D.C. 20003
16     lmasri@cair.com
17     (202) 742-6420
18
19
20
21
22

Page 4

1           P R O C E E D I N G S
2  WHEREUPON,
3
4  called as a witness, and having been sworn by the
5  notary public, was examined and testified as follows:
6        EXAMINATION BY COUNSEL FOR PLAINTIFF
7  BY MS: KONKOLY:
8     Q   Good morning            .  My name is Antonia
9  Konkoly.  I am an attorney for the Department of
10  Justice.  I'm defending the Defendants in this suit.
11  Have you ever been deposed before?
12     A   No.
13     Q   I'm going to start by just going over some
14  ground rules and instructions just to make sure that
15  you understand how this works.  So do you understand
16  that you are under oath?
17     A   Yes.
18     Q   I am going to ask that for all questions that
19  I ask today that you give audible answers meaning we
20  are here to create a transcript and so if you just nod
21  your head or say things like uh-huh it is not going to
22  create a clear record of what was said here.  So please

Page 5

1  answer with words clearly so the court reporter can
2  record those; do you understand?
3     A   Yes.
4     Q   Your attorney may offer objections to some of
5  the questions that I ask but unless she instructs you
6  to you can still answer notwithstanding the objection;
7  do you understand that?
8     A   Yes.
9     Q   I'm going to ask that if you need
10  clarification for any of my questions you just ask,
11  tell me that you don't understand.  If you do answer a
12  question I'm going -- I'm going to assume that you did
13  understand what I asked?
14     A   Okay.
15     Q   Is there any reason why you cannot answer
16  truthfully and accurately today?
17     A   No.
18     Q   Are you on any medications that would affect
19  your memory?
20     A   No.
21     Q   Did you prepare for this deposition?
22        MS. MASRI:  I'm going to object to the extent

2 (Pages 2 - 5)

Page 102

1    A  For the no-fly list?

2    Q  Yes.

3    A  No.

4       MS. KONKOLY:  Exhibit G.

5           : Thank you.

6       (WHEREUPON, Defendant's Exhibit G was marked

7  for identification.)

8    Q  Do you recognize this document?  It says case

9  report subject accident failed to stop and identify,

10 has a date of September 21, 2011; is that correct?

11   A  Correct.

12   Q  Okay.  Does this document have anything to do

13 with your allegations in this lawsuit?

14      MS. MASRI:  I'm going to object on the basis

15 that it calls for a legal conclusion, calls for

16 speculation. Only answer if you know?

17      : Can you repeat what you said?

18      MS. KONKOLY:  To your understanding does this

19 document have anything to do with your allegations in

20 this lawsuit:

21      MS. MASRI: Same objection.

22      MS. KONKOLY:  You can answer.

Page 103

1           : To the best of my knowledge this

2  does not have to do with the law -- the no-fly list.

3       MS. KONKOLY:  Okay.

4       Document Number H.

5       (WHEREUPON, Defendant's Exhibit H was marked

6  for identification.)

7  BY MS. KONKOLY:

8    Q  Do you recognize this document?  It appears to

9  be an arrest report of a time in which you were

10 arrested for -- it says you were armed with another

11 firearm.

12   A  I do.

13   Q  Okay.  What is the date of this incident.

14      MS. MASRI:  Only answer if you know.

15           : I do not know.

16 BY MS. KONKOLY:

17   Q  You can turn to, which exhibit is the

18 complaint again?  I think it might be B.  Where is the

19 official copy of Exhibit B for the witness?  All those

20 documents need to go with the Court Reporter in the

21 end, we need to keep track of them.

22   A  Yeah, I'm keeping it relatively organized.

Page 104

1    Q  So if you could turn to Page 79. Starting on

2  Paragraph 545 if you could read those paragraphs to see

3  if it refreshes your recollection.

4    A  On or about December 12, 2014, after having

5  been pulled over while driving for a minor traffic

6  violation by a local police officer in Warren,

7  Michigan, the police officer conducted a search of Mr.

8  Doe Number 4's vehicle.

9    Q  Okay.  Are -- is the document in front of you,

10 the document that is related to this incident?

11   A  Yes.

12   Q  In the paragraph that you just read?

13   A  Yes.

14   Q  Okay. Can you describe what happened here?

15   A  I was pulled over for a minor traffic

16 violation.  And the officer pulled me over and I -- he

17 said that you were driving bad and then --

18   Q  Was there anyone in the car with you?

19   A  Yes.

20   Q  Had you been drinking alcohol prior to driving

21 that night?

22   A  No.

Page 105

1    Q  Had you taken any medications prior to

2  driving?

3    A  No.

4    Q  Had you taken any illegal controlled

5  substances?

6    A  No.

7    Q  What was the minor violation for which you

8  were pulled over?

9    A  For pulled over was reckless driving.

10   Q  Okay. And what about your driving did the

11 officer tell you was the problem?

12   A  I turned hard.

13   Q  Can you elaborate?

14   A  I went down the middle lane and turned, that

15 was it.

16   Q  Were you driving in -- was the middle lane a

17 lane that you were legally allowed to be in?

18   A  Yes, like you know a turn --

19   Q  A turn lane?

20   A  Yeah, I went in the turn lane and turned but I

21 turned hard.

22   Q  Okay.  And it was right after that that you

27 (Pages 102 - 105)

Elhady vs. Kable

Page 106

1  were pulled over?

2      A   Yes.

3      Q   Okay. Had you taken any Tramadol prior to

4  driving that evening?

5      A   No.

6      Q   So what happened after the officer pulled you

7  over?

8      A   He searched my car and I was handcuffed and

9  placed in the back of the police vehicle.  And then he

10  searched my car for seems to be like a good 30 to 45

11  minutes.  And from there he found a broken in two toy

12  like air soft gun that had an orange tip and it really

13  doesn't represent -- doesn't even resemble really

14  anything and from there I was arrested.  And it started

15  off with just one officer but it seemed like within

16  five minutes the whole entire Warren and Centerline

17  police department was there.  And they were all

18  surrounding the car and surrounding my vehicle and I

19  got arrested.

20      Q   Was your brother also arrested?

21      A   Yes.

22      Q   Had your brother been smoking marijuana that

Veritext Legal Solutions

800.808.4958                                                           770.343.9696

# Exhibit O

Ibrahim Awad                                                    January 9, 2018
Elhady vs. Kable

Page 1

1                IN THE UNITED STATES DISTRICT COURT

2               FOR THE EASTERN DISTRICT OF VIRGINIA

3                       ALEXANDRIA DIVISION

4

5     ANAS ELHADY, et al.,

6              Plaintiff,

7        v.                              Civil Action No.:

8     CHARLES H. KABLE, et al.,          1:16-cv-375 (AUT/JFA)

9              Defendant.

10

11                                          Washington, D.C.

12                                     Tuesday, January 9, 2018

13    Deposition of:

14                        IBRAHIM AWAD

15    called for oral examination by counsel for the

16    Plaintiff, pursuant to notice, at the Department of

17    Justice, 20 Massachusetts Avenue, NW, Washington, D.C.,

18    before Natalia Thomas, a Notary Public in and for the

19    District of Columbia, beginning at 10:10 a.m., when

20    were present on behalf of the respective parties:

21

22

Ibrahim Awad                                    January 9, 2018
Elhady vs. Kable

<table>
<tr><td>

Page 2

```
              A P P E A R A N C E S
 1
 2   On behalf of Plaintiff:
 3       AMY POWELL, ESQUIRE
 4       United States Department of Justice
 5       Federal Building
 6       310 New Bern Avenue, Suite 800
 7       Raleigh, NC 27601
 8       amy.powell@usdoj.gov
 9       (919) 856-4013
10
11   On behalf of Defendant:
12       Lena F. Masri, Esquire
13       Council on American–Islamic Relations (CAIR)
14       453 New Jersey Avenue, SE
15       Washington, DC, 20003
16       lmasri@cair.com
17       (202) 742-6420
18
19
20
21
22
```

</td><td>

Page 4

```
              P R O C E E D I N G S
 1
 2   WHEREUPON,
 3              IBRAHIM AWAD
 4   called as a witness, and having been sworn by the
 5   notary public, was examined and testified as follows:
 6       EXAMINATION BY COUNSEL FOR PLAINTIFF
 7   BY MS. POWELL:
 8   Q   Please state your name for the record.
 9   A   Ibrahim Hetham Awad.
10   Q   I'm sure your attorney has talked to you a bit
11   about the format of a deposition and what will happen
12   here today.  I'm going to go over it anyway, even
13   though you probably already know it.
14   A   Okay.
15   Q   Just so that we all understand what's
16   happening and that I know that you know it and you know
17   that I know.
18       The format is generally that I am going to ask
19   you questions.  You are, hopefully, going to answer
20   them.  And she is going to write down everything we
21   say.
22   A   Okay.
```

</td></tr>
<tr><td>

Page 3

```
              C O N T E N T S
 1
 2   WITNESS:  IBRAHIM AWAD                    PAGE
 3   By Ms. Powell                    4
 4
 5              E X H I B I T S
 6   EXHIBIT  DESCRIPTION                     PAGE
 7   EXHIBIT A  Amended Complaint            13
 8   EXHIBIT B  Plaintiffs' Responses (to original
 9       set of complaints)          16
10   EXHIBIT C  Mr. Awad's responses to first
11       set of discovery requests   21
12   EXHIBIT D  Mr. Awad's passport         29
13   EXHIBIT E  Request for document production   32
14   EXHIBIT F  Itinerary–Detroit/Istanbul, 2013   37
15   EXHIBIT G  Itinerary—Detroit/Istanbul, 2014   52
16   EXHIBIT H  Itinerary—Detroit/Saudi Arabia, 2017  68
17   EXHIBIT I  tinerary—Orlando/Detroit, 2016   109
18   EXHIBIT J  Itinerary—Detroit/Phoenix, 2017   115
19   EXHIBIT K  Traveler Inquiry form        180
20   EXHIBIT L  Itinerary—Detroit/Washington, 2018   186
21       (Exhibits attached to transcript.)
22
```

</td><td>

Page 5

```
 1   Q   Or record everything we say.
 2       Your attorney will make some objections along
 3   the way, I am sure.  If she instructs you not to
 4   answer, you won't answer the question.  But otherwise,
 5   objection or not, we expect to get answers and to
 6   proceed.
 7   A   Okay.
 8   Q   Do you understand?
 9   A   Yes.
10   Q   Do you have any questions?
11   A   At the moment, no.
12   Q   Because the deposition and what we say is
13   being recorded, that imposes some constraints on how we
14   talk.
15   A   Okay.
16   Q   First, when you answer questions, I need you
17   to answer audibly and aloud, instead of shaking your
18   head or nodding.
19   A   Okay.
20   Q   Does that make sense?
21   A   Yes.
22   Q   Also, even though people might normally, in
```

</td></tr>
</table>

2 (Pages 2 - 5)

Ibrahim Awad
Elhady vs. Kable

January 9, 2018

Page 146

1 forward?

2    A  I don't know what the conversation was, to be

3 honest.

4    Q  I'm asking what you were told.

5    A  Well, I --

6    Q  You weren't told any of that, I take it.

7    A  No.  What I shared with you is exactly what I

8 told you -- that he had to wait for clearance, and once

9 he was given clearance, that's when I was allowed to

10 test drive the vehicle.

11    Q  Okay.  And he did not mention the Department

12 of Treasury?

13    A  No.

14    Q  Or OFAC?

15    A  I don't --

16       MS. MASRI:  Objection.  Asked and answered.

17 BY MS. POWELL:

18    Q  Or the SDN list?

19    A  No.

20    Q  Or Iraq?

21    A  No.  He specifically said the FBI terrorist

22 watch list.  And he had showed me the email that said

Page 147

1 FBI terrorist watch list.

2    Q  He showed you an email?

3    A  It was an email or a printed-off sheet.  But

4 there was a red flag on my name.

5    Q  And it said FBI terrorist watch list on it?

6    A  From what I believe, or he told me that this

7 is --

8    Q  What he told you or what you saw?

9    A  I don't recall.

10    Q  What did you see?

11    A  I recall a red flag on my name of Ibrahim

12 Hetham Awad.

13    Q  But you don't recall it saying terrorist FBI

14 watch list?

15    A  I just recall him saying that my name was on

16 the FBI terrorist watch list.

17    Q  Okay.  Other than what the car salesman told

18 you, do you have any other reason to think that he had

19 access to a terrorist watch list?

20    A  What do you mean?

21    Q  Do you have any other reason to think he was

22 telling you the truth?

Page 148

1    A  Reason why -- he was just trying to sell a car

2 and he's telling me the truth because it's my right to

3 know.  I'm not sure if I understood the question

4 correctly.  Is that what you --

5    Q  Okay.  Did you see any documents that would

6 show that you were on an FBI terrorist watch list?

7    A  Other than, it was a printed-out sheet that

8 had a red flag on my name.

9    Q  But it did not say FBI terrorist watch list?

10    A  I don't recall, to be honest.

11    Q  Did you see any other documents that said FBI

12 terrorist watch list on them?

13    A  He didn't show me anything other than that

14 sheet.  He just went like that (indicating), and then

15 he took it back because he said he wasn't supposed to

16 show me.  So it wasn't something I was able to actually

17 go over and actually read.  And he just pointed out

18 where my name was with a red flag.

19    Q  Right.

20    A  And then he, obviously, took it back.

21    Q  Right.

22       MS. MASRI:  For the record, he just held up a

Page 149

1 sheet kind of sideways and pointed out where his name

2 would be.

3 BY MS. POWELL:

4    Q  The car dealership incident -- scratch that.

5       That's all I have on that, for now.

6       Outside of what we have already talked about,

7 have you ever been interviewed by the FBI or other law

8 enforcement?

9    A  Yes, I have.  It should be somewhere here.  The

10 FBI came to my home.

11    Q  In May 2015?

12    A  Correct.

13    Q  Did you contact them, or did they contact you?

14    A  No, they contact -- well, they came.  They

15 showed up at my doorstep at --

16       (Cross-talk)

17 BY MS. POWELL:

18    Q  They didn't call ahead or anything?  They just

19 showed up?

20    A  No.

21       MS. MASRI:  Counsel, I don't know if the last

22 response was clear on the record because you're both

38 (Pages 146 - 149)

Page 150

1  talking over each other.  Can we just double-check?
2  BY MS. POWELL:
3      Q  They did not contact you ahead of time, they
4  just showed up; is that correct?
5      A  They did not contact me beforehand.  They just
6  showed up.
7      Q  Okay.  And did they come and ring the doorbell
8  or knock on the door?
9      A  Yeah.  So, they came and knocked on the door
10  at 7:30 in the morning.  And obviously, I didn't hear
11  it.  My brother-in-law actually was dropping off my
12  niece at her house because my dad would take her to
13  school every morning.  And my niece actually woke me
14  up.  And she said, she was like, "Uncle, there's two
15  FBI agents outside."
16      And I jumped out of bed, because why is there
17  two FBI guys just asking for me?  And I went to the
18  door, and they asked, "Are you Ibrahim Hetham Awad?"
19  And I was like, "Yes.  Can I help you?"  They were
20  like, "Can we please come inside to have a talk?"  I
21  was like, "No.  We could stand out here and talk for as
22  long as you want.  I have nothing to hide and I have

Page 151

1  done nothing wrong."
2      They're like, "You're sure your neighbors and
3  everybody here to know your business?"  I was like,
4  "Again, I've done nothing wrong and I have nothing to
5  hide."  There was two blacked-out cars in front of my
6  home on the street.
7      Q  What were the agents' names?
8      A  One of them was Hank, right here.  Josh, I
9  don't know how to say that last name, Hauxhurst, and
10  Hank Impola.
11      Q  Did you ask them for their names at the time?
12      A  I asked for their card.
13      Q  Their cards.  Okay.  Do you still have those
14  cards?
15      A  I have -- I remember I took a picture of one
16  of the cards.  The other agent didn't have a card, he
17  said, on him.
18      Q  And did you -- so one of them gave you a card
19  or you took a picture of it.  And the other one didn't
20  have a card.  How did you remember their names?
21      A  He wrote down his --
22      Q  You wrote it down?

Page 152

1      A  No.  He wrote his name down behind, the other
2  side of the card.
3      Q  Got it.  All right.  Keep going.
4      A  So I told them, "I have nothing to hide, I
5  have done nothing wrong.  We can talk out here for as
6  long as you want."
7      And, which was kind of embarrassing because my
8  neighbors across the street were having work done on
9  their house.  So they're outside and there's workers
10  outside.  And they see two blacked-out cars in front of
11  the house and two guys in a suit talking to me on the
12  porch.  It's kind of embarrassing, especially when they
13  know this is a Muslim household.
14      And even though I haven't talked to them since
15  I was going to school with the kid back in middle
16  school, I haven't really had much interaction with
17  them.  So when they see this, "Oh, Muslims live here.
18  The FBI is outside.  Oh, something is fishy."
19      But, so what -- so they came to the house.
20  They questioned for me for either an hour and 15
21  minutes or an hour and 30 minutes outside.  And the
22  first question they started off with was, "How was

Page 153

1  Syria?"  And I was taken aback by that because the last
2  time I went to Syria was 2000.  So I responded back, I
3  said, "Back in 2000, Syria was great.  I had a great
4  time there."
5      They were like, "No.  How was your recent
6  visit to Syria?"  I was like, "I've never been to Syria
7  recently."  They were like, "You didn't go when you
8  went to Turkey?"  I was like, "No."  I was like, "I
9  have no purpose or need to go to Syria."  I was like,
10  "All my family lives here.  Or if I have family
11  overseas, they live in Dubai and Abu Dhabi."
12      And so they questioned me about my Turkey trip
13  and what that was all about, and the organization I was
14  with, and where they were located.  And their office
15  was actually down the street in Troy, and I gave them
16  the address.
17      They asked for all my email addresses, my
18  phone number, the school I go to, the car that I own.
19  Excuse me.  Who I was traveling with.  And they kept on
20  asking me about Syria and Turkey and my political
21  opinion on the Syria issue, whether I was with the
22  Assad regime, the Free Syrian Army, ISIS, or neutral.

39 (Pages 150 - 153)

Page 154

1 And they kept on asking me if I wanted to join ISIS or
2 if I went to Turkey to join ISIS.  And I told them, no,
3 I did not.  I went there for this program, and that was
4 strictly it.
5        And they said, "Has anyone from ISIS ever
6 approached you or reached out to you in joining them?"
7 Obviously, that has not happened, and I would never do
8 that.
9        They, every time they'd question me, they were
10 holding a folder.  And they'd open it up, and they
11 would say, "On this day, you said this, this, this on
12 social media."  Or, "You were in this place in Turkey.
13 Why were you there?"  And I answered all the questions
14 that they wanted.
15        And they, again, went back to the whole ISIS
16 issue like, "You never thought about it or tried going
17 there?"  And they were like, "If somebody were to
18 approach you about joining, would you join?"  I said,
19 "Obviously, no, that everything they do is completely
20 against the religion of Islam.  Everything they do is
21 completely wrong.  I would never think about that."
22        And they were like, "Would you try going into

Page 155

1 Syria?"  I said, "Why would I even want to go to Syria?
2 Yeah, my parents are from there.  But it's a completely
3 destroyed country and there's issues.  And I'm born and
4 raised in America.  Like it's my -- it's my home."
5        And they asked about social media posts as far
6 as what I've said.  And they were like, "What do you
7 mean by you had a tough summer?"  Well, I said, "Well,
8 to start off, my uncle, my aunt, and my grandma all
9 passed away in that summer.  And that's why I had a
10 tough summer."
11        And they would close it up and open up the
12 folder again, and they'd say, "Well, let me ask you
13 this."  And again, social media posts are, I guess,
14 because of the -- I don't know how they knew where I
15 was in Turkey, but they said, "You were near the border
16 in Turkey.  Why were you there?"  And I told them, you
17 know, I was teaching Syrian refugees.
18        But I wasn't -- when I taught Syrian refugees,
19 I wasn't near the border.  The day that I did go to the
20 border, where they asked me why I was there, I went
21 there because there was a restaurant, a really known,
22 neat place that was in a different city.  And so I had

Page 156

1 went there.  And that was like a one-day trip.
2        And when they were talking to me, they also
3 asked me if I'd ever thought of being an informant or
4 if I would be an informant for them.  And I declined.
5 And the group that they wanted to inform on was
6 Saudi international students at the University of
7 Michigan, Flint campus, and because U of M Flint has
8 one of the largest Saudi international students within
9 America at the time.
10   Q    Did they ask you about any specific students?
11   A    They asked me if I had known, I believe it was
12 two or three Saudi students, by name.  And I said no, I
13 didn't know them.  They said they had traveled to,
14 supposedly, join ISIS.  And their friends don't know
15 their whereabouts anymore.  And they asked if I had
16 known them or if they are like part of ISIS.  I didn't
17 know either.
18        They asked me about other guys like in the
19 Flint area, if I had known them.
20   Q    You said they asked you to inform or provide
21 information about Saudi international students.  Was
22 that a specific group they wanted to know about, or --

Page 157

1        MS. MASRI:  Objection.  Mischaracterized his
2 prior testimony.
3 BY MS. POWELL:
4   Q    Well, you explain it to me, please.
5   A    So, they wanted me to become -- they asked me
6 if I could become an informant for them to be within
7 the Saudi students.  They didn't specify what group.
8 They just said Saudi students.
9   Q    Okay.  There wasn't like an organization they
10 wanted you to gather information about?
11   A    Well, they had their own like Saudi student
12 club.  So I don't know if they wanted me to be with
13 them or not.  They just said Saudi students.
14   Q    Yeah.
15   A    But when they said this, I told them that me,
16 as a Muslim, it's my obligation, I would report and
17 would have reported, obviously, anything that would put
18 anybody at harm.  I would never allow that to happen.
19 And for me to go into a group and act like somebody
20 that I'm not, to inform on people that may have done
21 nothing wrong, I'm not going to do that.
22        But if I do hear something or if I ever did

40 (Pages 154 - 157)

Ibrahim Awad
Elhady vs. Kable

January 9, 2018

Page 158

1 hear anything, I would report that because that's what
2 I'm supposed to do.  First off, as a Muslim; second
3 off, I'm an American.  This is my home.  And I rejected
4 becoming an informant for them.
5       And they asked like if they would ever call my
6 house, would you know who Hank is?  And I was kind of
7 confused by the question.  I was like, "Yeah, why?"
8 He's like, "Oh, well, just we're going to call in every
9 so often to check up on you.  Or do we have to call in
10 and say, 'This is the FBI, Hank?'"  I was like, "No,
11 you don't have to do that."
12       So, the questioning went on for an hour and
13 15, hour and 45 minutes, something like that, about
14 mainly Turkey and Syria and my political opinions on
15 Syria and if I wanted to join ISIS or if I ever snuck
16 into Syria while I was there.
17       And that, in and of itself, two FBI agents
18 coming to your front doorstep and interrogating you at
19 7:30 in the morning in front of your neighbors, it's
20 embarrassing.  Like till this very day, my father, my
21 mother, and my brother don't even know that that
22 happened.

Page 159

1       And the reason why they don't know it happened
2 is because I don't want to share it with them.  It's
3 something that you don't want your parents to know.
4 It's not just humiliating, but it puts fear into your
5 parents, people that raised you, that your son could be
6 wrongfully accused of something that he didn't do.
7       And it was funny because, ironically, I had a
8 beard.  It wasn't this long.  My mom told me to shave
9 it.  And I was like, "Mom, why do you want me to
10 shave?"  She said, "I don't want anybody to wrongfully
11 accuse you of something."
12    Q   When was this?
13    A   It was the day before the FBI came to my
14 house.  But my mom's always been saying this.  She's
15 not a fan of beards, either.  And so, the day before, I
16 actually shaved my beard.  And so when the FBI came
17 out, I didn't have a beard at that time.  But it was
18 ironic that my mom's fear of me having a beard would
19 lead to me being interrogated by FBI or me being --
20 having an eye on me and being watched.
21       And I never shared this with my parents
22 because I didn't want them to stress out over something

Page 160

1 that they shouldn't stress out over or there's nothing
2 to be stressed out over.
3       And I never shared this with my brother
4 because, throughout like my freshman year of college
5 and senior year of high school, I used to always help
6 out with fundraising as far as raising funds for
7 refugees and Syrian medical fundraisers to provide
8 medical help.
9       And my brother always told me, like, "Don't
10 get too involved in these.  I don't want -- I don't
11 want anything to happen to you as far as you being
12 wrongly accused for something that you're not.
13 Obviously, you're just helping out with fundraisers,
14 but people will see, 'Oh, you're Muslim and you're
15 Syrian and helping out these fundraisers.'  It might
16 cause like an issue."
17    Q   But do you think there was something wrong
18 with the fundraiser?
19    A   No, no, nothing wrong with the fundraiser.  But
20 he just didn't want me to be labeled as anything that
21 I'm not.  Even though the fundraiser, the group is
22 still going on until today and they're very known.  You

Page 161

1 hear them on national television as far as like SAMS,
2 Syrian American Medical Society.  And they're big
3 organizations.
4    Q   Yeah.
5    A   And the reason why I didn't share this
6 information with him that the FBI came to the house is
7 because he specifically didn't want me to be involved
8 in fundraisers or anything that had to do with Syria at
9 the time because of the whole political issue.
10       Because he didn't want -- even though what I
11 was doing was perfectly legal and perfectly fine,
12 nothing wrong with it, he didn't want anybody to get
13 the wrong opinion of it, which apparently is what's
14 happening or could be happening to cause this issue.  I
15 don't know.
16       And this just allows it that our entire
17 family, basically, is being watched because of me.  And
18 the reason I just never shared it with my brother and
19 my parents -- like I shared it with my two sisters; I'm
20 very close to them.  But they know not to share it with
21 the rest of my family.
22    Q   Other than your sisters and your attorney --

41 (Pages 158 - 161)

# Exhibit P

# Policy 802



| Subject |
| --- |
| **HANDLING CODES: TERRORIST RESPONSE** |

| Date Published | Page |
| --- | --- |
| **8 September 2016** | **1 of 4** |

### *By Order of the Police Commissioner*

## POLICY

**Homeland Security.**  The Baltimore Police Department (BPD), in conjunction with federal, state and local law enforcement agencies, is committed to strategic and preventive measures for the protection of homeland security in the State of Maryland.

## DEFINITIONS

**Terrorist Screening Center (TSC) —** Created to consolidate a terrorist watch list that is automatically linked to the National Crime Information Center (NCIC) and is always accessible. The TSC provides operational support, information and expertise so that law enforcement personnel can respond quickly and act accordingly. When law enforcement personnel conduct an NCIC check on an individual and a positive match is detected, the TSC will return to the requesting agency one of four Handling Codes:

1.   **Handling Code 1:** The subject is confirmed to associate with terrorism, and there is a valid, outstanding arrest warrant.

2.   **Handling Code 2:** The subject is of an "investigative interest" regarding their association with terrorism.

3.   **Handling Code 3:** This individual may have possible ties with terrorism.

4.   **Handling Code 4:** The identity provided by this individual may have possible ties with terrorism.

## REQUIRED ACTION

**Member**

1.   Whenever an individual is checked through NCIC, and there is a positive match referred to by the Communications Unit as a "10-80" followed by one of the aforementioned numerical Handling Codes, immediately request back-up units. Use extreme caution when approaching and conversing with the individual.

<u>NOTE</u>: Do not alert the individual of the warning.  Conduct all matters consistent with the law and BPD policy and procedures.

2.   Request a permanent-rank supervisor to respond to all "10-80" incidents.

3.    Radio transmissions are to be kept at a minimum regarding all "10-80' incidents. If more discussion is needed, other than information between the Communications Unit and the member, use an alternate/lateral channel.

4.    Be aware of the possible presence of, or materials for constructing, explosives, weapons, and weapons of mass destruction (WMD).

5.    Complete an Administrative Report, Form 95, to include details of the NCIC check and subsequent actions.

6.    Scan and email the Administrative Report and any related documents to HomelandSecurityDivision1@baltimorepolice.org before the end of your tour of duty.

<u>Code 1 Encounters</u>

1.    When a 10-80, Code 1 is advised:

   1.1.    Arrest the subject.

   1.2.    Isolate the subject from the scene and from other associates.

   1.3.    Immediately notify the Watch Center, and be guided by their instructions.

   1.4.    Do not allow the subject to make any telephone calls and do not make any calls on behalf of the subject. Keep portable electronic items such as cellular phones, tablets, and mobile devices away from the subject.

   1.5.    All other persons associated with the subject will be secured, segregated, and checked through NCIC. Handle all associates as Code 3, unless otherwise directed by the Watch Center or a member of the Homeland Security Division. The disposition of all associates will be determined by the Homeland Security Division.

2.    If the subject is in possession of a vehicle:

   2.1.    Do not move the vehicle.

   2.2.    Do not retrieve, or allow occupants to retrieve, any property from the vehicle until cleared by the Homeland Security Division.

   2.3.    Request a bomb detection dog via the K-9 Unit.

      2.3.1.    If the dog elicits a positive response, immediately notify the Bomb Squad and adhere to Policy 707, *Bomb or Bomb Threat - Call for Service*.

      2.3.2.    If there is no indication of an explosive device, follow appropriate search/inventory procedures, and hold/release the vehicle according to current policy, unless otherwise directed by the Homeland Security Division.

| Policy 802 | HANDLING CODES: TERRORIST RESPONSE | Page 3 of 4 |

## Code 2 Encounters

1.      When a 10-80, Code 2 is advised:

    1.1.      Detain and isolate the subject from the scene and from other associates.

    1.2.      Immediately notify the Watch Center and be guided by their instructions.

    1.3.      Do not allow the subject to make any telephone calls and do not make any calls on behalf of the subject. Keep portable electronic items such as cellular phones, tablets, and mobile devices away from the subject.

    1.4.      All other persons associated with the subject will be secured, segregated, and checked through NCIC. Handle all associates as Code 3, unless otherwise directed by the Homeland Security Division. The disposition of all associates will be determined by the Homeland Security Division.

2.      If the subject is in possession of a vehicle:

    2.1.      Do not move the vehicle.

    2.2.      Do not retrieve, or allow occupants to retrieve, any property from the vehicle until cleared by the Homeland Security Division.

    2.3.      Request a bomb detection dog via the K-9 Unit.

        2.3.1.  If the dog elicits a positive response, immediately notify the Bomb Squad and adhere to Policy 707, *Bomb or Bomb Threat - Call for Service*.

        2.3.2.  If there is no indication of an explosive device, follow appropriate search/inventory procedures, and hold/release the vehicle according to current policy, unless otherwise directed by the Homeland Security Division.

## Code 3 and Code 4 Encounters

1.      When a 10-80, "Code 3" or "Code 4" is advised:

    1.1.      Do not arrest the individual, unless there is evidence of a violation of federal, state, or local law.

    1.2.      Contact the Watch Center and be guided by their directions.

    1.3.      Conduct an on-scene investigation:

        1.3.1.  Determine if the individual is of law enforcement interest; and/or,

        1.3.2.  Gain sufficient information to positively identify the individual.

| Policy 802 | HANDLING CODES: TERRORIST RESPONSE | Page 4 of 4 |
|------------|-------------------------------------|-------------|

**Permanent-Rank Supervisor**

Respond to all "10-80" incidents.

**Chief, Homeland Security Division**

1.     Ensure members under your Command provide operational support to members of the BPD.

2.     Establish a Unit Standard Operating Procedure (SOP) regarding the "10-80" Handling Code response. Ensure subordinates adhere to the SOP, to include taking command of the scene/investigation when needed and/or when in the best interest of the community, member and BPD.

3.     Coordinate cooperative investigations between the Joint Terrorism Task Force (JTTF), the Maryland Coordination and Analysis Center, and any other entities, as needed.

**Shift Commander, Communications Unit**

1.     When a "10-80" response is appropriate, ensure dispatchers communicate the correct information, to include Handling Code, to the field member.

2.     Immediately notify the Watch Center on behalf of the field member, and convey all necessary information to the Watch Center and/or Homeland Security Division.

**ASSOCIATED POLICIES**

Policy 707,     *Bomb Or Bomb Threat – Call For Service*
Policy 706,     *Hazardous Material Incidents*

**RESCISSION**

Remove and destroy/recycle General Order H-2, *Handling Codes: Terrorist Response,* dated 11 July 2006.

**COMMUNICATION OF POLICY**

This policy is effective on the date listed herein. Each employee is responsible for complying with the contents of this policy.

# Exhibit Q

**REDACTED FOR PUBLIC RELEASE**





# Review of the
# Terrorist Screening Center

U.S. Department of Justice
Office of the Inspector General
Audit Division

Audit Report 05-27
June 2005

# REVIEW OF THE
# TERRORIST SCREENING CENTER[*]

# EXECUTIVE SUMMARY

On September 16, 2003, the President signed Homeland Security Presidential Directive-6 (HSPD-6), requiring the establishment of an organization to "consolidate the Government's approach to terrorism screening and provide for the appropriate and lawful use of Terrorist Information in screening processes."  Specifically, the Attorney General was directed to create a new organization to consolidate terrorist watch lists and provide 24-hour, 7-day a week operational support for federal, state, local, territorial, tribal, and foreign government as well as private sector screening across the country and around the world.[1]  As a result of this presidential directive, the Terrorist Screening Center (TSC) was created.  As of the end of fiscal year (FY) 2004, the TSC was a $27 million organization with approximately 175 staff.

The Office of the Inspector General (OIG) initiated this audit to examine whether the TSC:  1) has implemented a viable strategy for accomplishing its mission; 2) is effectively coordinating with participating agencies; and 3) is appropriately managing terrorist-related information to ensure that a complete, accurate, and current consolidated watch list is developed and maintained.[2]

## Identifying the Need for a Screening Agency

Prior to the establishment of the TSC, the federal government relied on information from numerous separate watch lists maintained at a variety of federal agencies to prevent terrorists from obtaining visas or entering the United States illegally, and to track suspected terrorists within U.S. borders.

---

**\*  The full version of this audit report includes a limited amount of information that the Federal Bureau of Investigation (FBI) considered to be law enforcement sensitive and therefore could not be publicly released.  To create this public version of the report, the OIG redacted (deleted) the portions of the full report that were considered sensitive by the FBI, and we indicated where those redactions were made.**

[1]  "Screening" refers to a process that may include, but is not limited to, government officials searching for available information on an individual in various databases.  For example, a person may go through a screening process when:  1) applying for a visa, 2) attempting to enter the United States through a port of entry, 3) being stopped by a local law enforcement officer for a traffic violation, or 4) attempting to travel internationally on a commercial airline.

[2]  Appendix I contains detailed information on the audit's objectives, scope, and methodology.

In 2002, the President and Congress recognized this fragmentation and called for the consolidation of terrorist information to unify the government's counterterrorism efforts.

In July 2002, the President issued the National Strategy for Homeland Security, which created a "comprehensive plan for using America's talents and resources to enhance our protection and reduce our vulnerability to terrorist attacks."[3]  One aspect of the President's strategy was for the FBI to create a consolidated terrorism watch list that would serve as a central point for information about individuals of investigative interest.  This list was seen as an answer to the uncoordinated and ad hoc approach that the U.S. government was then pursuing.

In addition, the 9/11 Congressional Joint Inquiry Committee reported in December 2002 that the U.S. government was not adequately collecting and integrating terrorism-related information from all domestic and foreign sources.  As a result, the Joint Inquiry also recommended the creation of a national watch list center to facilitate the appropriate collection, declassification, and sharing of information on known or suspected terrorists.

In April 2003, the Government Accountability Office (GAO) issued a report identifying 12 separate watch lists used for various purposes.[4]  The following table lists the systems identified by the GAO.

---

[3]  Office of Homeland Security, National Strategy for Homeland Security (July 2002).

[4]  *Information Technology: Terrorist Watch Lists Should Be Consolidated to Promote Better Integration and Sharing*, Government Accountability Office (GAO-03-322, April 2003).

| TERRORIST-RELATED WATCH LISTS IDENTIFIED BY THE GOVERNMENT ACCOUNTABILITY OFFICE IN APRIL 2003[5] | | |
|---|---|---|
| | **Description** | **Agency** |
| 1 | TIPOFF System | Department of State (DOS) |
| 2 | Violent Gang and Terrorist Organizations File (VGTOF) | FBI |
| 3 | Interagency Border Inspection System (IBIS) | Department of Homeland Security (DHS) |
| 4 | National Automated Immigration Lookout System (NAILS) | DHS |
| 5 | Consular Lookout and Support System (CLASS) | DOS |
| 6 | No-Fly List | DHS |
| 7 | Selectee List | DHS |
| 8 | Integrated Automated Fingerprint Identification System (IAFIS) | FBI |
| 9 | Automated Biometrics Identification System (IDENT) | DHS |
| 10 | Warrant Information Network | U.S. Marshals Service |
| 11 | Top Ten Fugitives | Department of Defense, U.S. Air Force |
| 12 | Interpol Terrorism Watch List | Department of Justice (DOJ) |
| Source:  GAO Report Number GAO-03-322 | | |

## Establishing the TSC

In a September 2003 news release announcing the signing of HSPD-6 and the creation of the TSC, the White House directed that the organization to consolidate watch lists should begin operations by December 1, 2003. Following the issuance of HSPD-6, the Attorney General, the Secretary of Homeland Security, the Secretary of State, and the Director of Central Intelligence signed a Memorandum of Understanding (MOU) entitled "Integration and Use of Screening Information to Protect Against Terrorism." The MOU, dated September 16, 2003, designated the FBI as the lead agency responsible for administering the TSC.

The MOU provided details related to the watch list consolidation effort, including the data that should be included and the cooperation required from the participating agencies.  The MOU and HSPD-6 also mandated that federal agencies continually provide the FBI with domestic terrorism information, defined as information about U.S. persons with no connection to foreign intelligence, counterintelligence, or international terrorism.  In addition, the agencies were required to provide, on an ongoing basis, the Terrorist Threat Integration Center (TTIC) with all other terrorism information in their custody or control.  In turn, the FBI and TTIC were to provide domestic and international

---

[5]  A complete listing of the acronyms used in this report is found in Appendix II.

terrorist information to the TSC for consolidation.[6]   The goal was to create a unified, *unclassified* terrorist watch list, not to replace existing watch lists. Federal agencies were expected to continue gathering and developing terrorist information and to maintain separate systems to fulfill their distinctive missions.

Standing-up the TSC

In October 2003, the Attorney General appointed the Director of the TSC, and within one month two deputy directors were brought on board.  An additional deputy director arrived in December 2003.  TSC management initially developed working groups with participating agencies to establish an initial planning document detailing how the new organization would function. Also, the TSC designed a process flow chart to illustrate how terrorist information should be received, shared, and ultimately consolidated into an unclassified database.

The TSC's initial planning document stated that personnel detailed from the DOJ, DOS, DHS, and other agencies would make up the staff at the TSC. These individuals would represent their respective Departments while supporting the functions of the TSC and reporting to the TSC Director.

**Initial Operating Capability**

In accordance with the President's mandate, the TSC began operating on December 1, 2003, as the primary point of contact for screening individuals with ties to terrorism.  The TSC's initial capabilities were limited, and its primary operations consisted of maintaining a 24-hour, 7-day-a-week call center staffed with personnel temporarily assigned to the TSC from agencies such as the FBI and the DHS.[7]   Although TSC staff had begun developing the first consolidated watch list, it was not ready to be used for screening purposes by December 1.  Instead, the TSC's protocol was to separately query a variety of existing agency watch listing systems, including:  1) Transportation Security Administration's No Fly and Selectee lists; 2) TIPOFF; 3) the FBI's National Crime Information Center (NCIC), namely the Violent Gang and Terrorist Organizations File (VGTOF); and 4) the Treasury Enforcement Communications

---

[6]   The Terrorist Threat Integration Center was established on May 1, 2003, to develop comprehensive threat assessments through the integration and analysis of terrorist information collected domestically and abroad by the U.S. government.  On August 27, 2004, the President signed an Executive Order establishing the National Counterterrorism Center (NCTC), to which all functions and activities of the TTIC were transferred.  Regardless of the time period being discussed, all future references to this organization in our report will use the acronym NCTC.

[7]   Throughout this report, we refer to this operation as the "call" center.  However, inquiries related to some activities, such as visa applications processed through the State Department, are handled through various modes of communication.

System (TECS), which includes the Interagency Border Inspection System (IBIS) and the National Automated Immigration Lookout System (NAILS).

## The Consolidated Watch List

A major challenge for the TSC was to integrate different types of information in varying formats from agencies' existing systems into a comprehensive index of watch listed individuals.  The new system would ultimately need to provide real-time connectivity to users and be able to incorporate evolving technology, such as advanced name-search capability and biometric data.

To meet this goal, TSC officials and partner agency members formed a working group to define existing database structures and determine the basic functionality and future uses of the planned consolidated database.  As a result of the identification of several barriers to the timely implementation of the consolidated database (such as differences in legacy systems and a shortage of qualified employees or contractors), the TSC divided the creation of the consolidated database, which was named the Terrorist Screening Database (TSDB), into three phases:  1) TSDB 1A, 2) TSDB 1B, and 3) Advent TSDB.

TSDB 1A

The TSDB 1A database, which became operational on March 12, 2004, and was discontinued on April 1, 2005, was created using proprietary software owned by a contractor.  According to TSC officials, they chose this approach in an effort to consolidate the information in the most expedient way possible. The TSDB 1A was populated with data received directly from the individual supporting agencies' watch list systems.  According to TSC officials, they recognized that this consolidation effort caused some names that appeared on multiple watch lists to be present in the database many times.

This database was manually updated on a daily basis using diskettes of new or revised information from participating agencies.  While operating, the entire TSDB 1A database was overwritten each day when the new data file was loaded.  Given the design of the TSDB 1A database, this overwriting was the only method to update the terrorist-related information.  However, this process eliminated the ability to retrieve historical data from the system.  In addition, the TSDB 1A could not automatically export data to the participating agencies. Rather, TSC staff was required to send manual update files to participating agencies using diskettes.

TSDB 1B

The TSDB 1B came on-line in June 2004 in a parallel environment with the 1A database.[8]  In this second phase of developing the consolidated database, the TSC sought to improve connectivity between the TSDB and other databases.  In creating TSDB 1B, the TSC obtained batches of records primarily from the FBI and NCTC.

On April 1, 2005, the TSC stopped using TSDB 1A, and the 1B database became the single consolidated watch list.  In contrast to the TSDB 1A, the 1B database can communicate with the participating agencies' systems and provides for the electronic exchange of data.  As a result, since its creation, the TSDB 1B system has been used to export records to the databases of the various participating agencies.  In addition, unlike the 1A database, the TSDB 1B is updated only with additions, deletions, and modifications to the existing records in the database, and therefore the system retains a history of all changes made.

Advent TSDB and the Future of the Consolidated Database

In the next phase of its development of the consolidated database, Advent TSDB, the TSC plans to establish automatic, real-time connectivity with participating agency databases.  However, most of the supporting agency database systems cannot currently accommodate this type of connection and will need to upgrade their systems.  While the TSC expects that it will take years to fully implement this plan, the first segment (real-time connectivity with the FBI's NCIC) is planned for completion in FY 2005.

Also, in FY 2005 the TSC expects to receive biometric data from NCTC and export that data to NCIC.  This process is not expected to be fully mature for some time and, in its initial phase, will allow for only text fields to be shared.  TSC officials stated that graphic files, such as a picture of biometric data, can be made available in the TSDB 1B system, but this information would not be searchable.  TSC officials said development of a plan to incorporate data into the TSDB database in this way is expected to be complete by spring 2005.

Evolution of IT Management

While the TSDB is constantly evolving, we found that the TSC's management of its information technology (IT), a critical part of the terrorist

---

[8]  Despite the TSDB 1B coming online, TSC officials had concerns about the completeness of the records in the TSDB 1B and decided to run the TSDB 1A and 1B in parallel until these concerns could be fully addressed.  Our review did reveal significant differences in the number of records between TSDB 1A and 1B.  This is discussed further in the report in Chapter 7.

screening process, has been deficient.  From its inception, the TSC's IT Branch – staffed with numerous contractors – did not have strong, effective, and focused leadership over the agency's IT functions.  In addition, the TSC has experienced significant difficulty in hiring qualified staff with adequate security clearances to perform IT functions.

The TSC did not establish a formal technical advisory group until June 2004 and in August 2004 hired its first Chief Information Officer (CIO).  Unfortunately, many major IT decisions had been made prior to this time, such as the creation and implementation of TSDB 1A and 1B and various support systems, as well as the establishment of controls and standards for operating and administering these systems.  The TSC CIO acknowledged that the TSC has been operating in an immature IT environment since its inception.  He told us that the need to expeditiously create a consolidated database hindered systems planning.  He further stated that the IT Branch was understaffed and had not been sufficiently focused on establishing controls to ensure data integrity.

Content of the Consolidated Watch List

Each record within the consolidated watch list is designed to contain information about the law enforcement action to be taken when encountering an individual on the watch list, which provides insight into the level of threat posed by that individual.  This information is conveyed through a "handling code" that provides law enforcement personnel with instructions on what to do when a suspected terrorist is encountered.  These handling codes are defined as follows:



| **HANDLING CODE DEFINITIONS** |
|---|
| [SENSITIVE INFORMATION REDACTED] |

Source:  The Terrorist Screening Center

To gain a general understanding of the distribution of individuals on the watch list, we reviewed a sample of 109,849 records in the TSDB 1B database and found that the vast majority of watch listed individuals were included in

the two lowest categories.[9]  As depicted in the following graph, approximately 75 percent of the records we reviewed were categorized at handling code 4 (the lowest handling code), and 22 percent were categorized at the second to lowest level, handling code 3.[10]  Only 318 records of the 109,849 records in the watch list subset that we reviewed were categorized at the two highest levels, handling codes 1 and 2.  This means that the records for the overwhelming majority of watch listed individuals indicated that encounters with these persons required the lowest levels of law enforcement response and that these individuals [SENSITIVE INFORMATION REDACTED].



Source:  TSC Management

We asked the TSC Director about the content of the TSC's consolidated watch list.  She informed us that, to err on the side of caution, individuals with any degree of a terrorism nexus were included on the consolidated watch list, as long as minimum criteria was met (i.e., the person's name was

---

[9]  Our sample consisted of all records in the TSDB 1B database that were eligible for sharing with the FBI's VGTOF as of October 7, 2004.  The VGTOF system is queried by most federal, state, and local law enforcement officers because it is part of the National Crime Information Center (NCIC).  This universe of 109,849 records represented 53 percent of the total of 207,553 records in the TSDB 1B.  We selected these records for review in consultation with TSC IT staff.

[10]  Records for individuals categorized as a handling code 4 often do not have enough identifying information to categorize the individual at a higher handling code.  In addition, individuals at a handling code 4 level could be associates of a suspected terrorist and therefore may not pose a direct terrorist threat.

[11]  The "Other" handling codes refer to one record in the subset of 109,849 records that was was transferred to the TSDB 1B from the TIPOFF database with a non-existent handling code (handling code 5).  The TSC informed us that this record has been corrected.  The remaining 2,990 records [SENSITIVE INFORMATION REDACTED].

partially known plus one other piece of identifying information, such as the date of birth).  The Director further explained that one of the benefits of watch listing individuals who pose a lower threat was that their movement could be monitored through the screening process and thereby provide useful intelligence information to counterterrorism investigators.  In addition, she stated that lower-threat level individuals can have associations with higher-threat level terrorists, and watch listing lower-threat individuals may lead to uncovering the location of other watch list individuals.

**TSC Operations**

The TSC's FY 2004 budget consisted of contributions totaling about $27 million from four participating agencies.  As of November 2004, the TSC had 177 staff members, which included permanent and detailed personnel.  Also, as detailed in the following staffing chart, contract personnel made up 61 percent of the total TSC staffing.



Source:  FBI Budget Formulation Office and the TSC Administrative Unit

In FY 2005, the TSC's budget of $29 million was incorporated into the FBI's overall appropriation.  This eliminated the need to transfer funds between agencies.

<u>The TSC Call Center</u>

The basic tasks performed by call center staff — fielding inquiries, researching terrorist information, and facilitating the identification and apprehension of terrorists — remain the same as the functions performed at the point of the TSC's initial operating capability on December 1, 2003.  However, the creation of the consolidated watch list has allowed the call center staff to begin its research with a single database – the TSDB.

the TSC's databases and manual processes.  Such audit trails and controls are important because our review of the current TSC databases found little tracking and retention of historical transactions within the databases, as well as a shortage of human access controls.[40]

**Content of the Consolidated Watch List**

Each record within the consolidated watch list is designed to contain information about the law enforcement action to be taken when encountering an individual on the watch list.  This information is conveyed through a "handling code," which provides insight into the level of threat posed by that individual.  Generally, handling codes are expressed on a scale of 1 through 4.  These handling codes are described in the following exhibit.

---

[40] More details on our review of the accuracy and completeness of the database are provided in Chapter 7 of this report.

**FBI Handling Codes**



[SENSITIVE INFORMATION REDACTED]

Source:  TSC Management

We reviewed a subset of the records in the TSDB 1B to gain an understanding of the characteristics of the individuals on the consolidated watch list.  Our review of these records revealed that, as of October 7, 2004, the bulk of the records in the TSDB 1B were designated in handling codes 3 and 4.[41]  Specifically, 22 percent of the individuals in our sample were categorized by the FBI as handling code 3.  In addition, 75 percent of the

---

[41]  Our sample consisted of the universe of records in the TSDB 1B that were identified for export to the VGTOF database as of October 7, 2004.  This universe of 109,849 records represented 53 percent of the 207,553 total records in the TSDB 1B.  We selected these records for review in consultation with TSC IT staff.

records in our sample had a handling code 4, the category requiring the lowest possible law enforcement response.  Handling codes 1 and 2 were assigned to 193 and 125 records, respectively.  Therefore, a total of only 318 records in our sample of 109,849 records were identified at the highest levels.  The following chart provides a breakdown of handling codes applied to the subset of TSDB 1B records that we reviewed.



**Watch Listed Persons by Handling Code**
(Based on the subset of 109,849 records reviewed[42])

Handling Code 4, 81,994 , 74.64%
Handling Code 3, 24,210 , 22.04%
Other,  2,991 , 2.72%
No Handling Code,  336 , 0.31%
Handling Code 1, 193 , 0.18%
Handling Code 2, 125 , 0.11%

Source: TSC Management

As shown in the preceding chart, we also identified 336 records for which no handling code was assigned.  This issue is related to the accuracy and completeness of individual records and is discussed in Chapter 7.

We asked the Director of the TSC about the types of individuals included in the TSC's consolidated watch list.  She informed us that, to err on the side of caution, individuals with any degree of a terrorism nexus were included in the TSDB, as long as minimum criteria was met (at least part of the person's name was known plus one other identifying piece of information, such as date of birth).  The Director further explained that one of the benefits of watch listing individuals who pose a lower threat was that their movement could be monitored through the screening process and this could provide useful intelligence information to investigators.  In addition, she stated that watch listing lower-threat individuals that have associations with higher-threat level terrorists may lead to uncovering the location of higher watch listed individuals.

---

[42] The "Other" handling codes refer to one record that was transferred to the TSDB 1B from the TIPOFF database with the non-existent handling code 5.  The TSC informed us that this record has been corrected.  The remaining 2,990 records [SENSITIVE INFORMATION REDACTED].

**Conclusion**

At this early stage in the TSC's existence, the creation and operation of a single database housing consolidated terrorist information was the most important aspect of its mission.  From the outset, TSC management was aware of the obstacles of fully integrating data from myriad, disparate sources as well as the necessity of blending multiple agency processes and data definitions.  In response to these challenges, they focused on establishing the best possible database as quickly as possible.

TSC management recognized and we observed weaknesses in the TSC's efforts to accomplish this endeavor, including limitations related to name-search capabilities, availability of historical information, and the use of audit trails within the TSDB databases.  However, the TSC successfully integrated different types of information in varying formats from the existing systems into a comprehensive index of watch listed individuals.

Despite providing a consolidated watch list in a compressed timeframe, we identified significant weaknesses related to IT management and planning. The TSC is working to improve its IT management and create a system that facilitates complete real-time connectivity to the end users and includes advanced name-search capability and searchable biometric data.

**Recommendations**

We recommend that the TSC:

1)   Develop a formal IT plan for maturation of the IT environment at the TSC to address:  a) IT staffing needs; b) controls to ensure data integrity; c) adequate oversight over IT contracts and contractors, and d) future improvements in the areas of TSDB connectivity, name-search capabilities, acceptance of biometric data, as well as other IT planning issues.

2)   Enhance the TSDB to add audit trails to track activity within the database, including historical data and detailed transactions by user, as well as to include enhanced human access controls.

# Exhibit R

**Page 1**

```
 1   VIRGINIA:
 2       DISTRICT COURT FOR THE EASTERN DISTRICT OF
 3                    VIRGINIA
 4   - - - - - - - - - - - - x
 5   ANAS EL HADY, ET AL.,   :
 6           Plaintiffs,     :
 7   v.                      :   Civil Action No.
 8   CHARLES KABLE, ET       :   16-CV-375 (E.D. Va)
 9   AL.,                    :
10           Defendants.     :
11   - - - - - - - - - - - - x
12
13           Deposition of DEBORAH MOORE
14               Arlington, Virginia
15           Wednesday, December 20, 2017
16                  9:30 a.m.
17
18
19
20   Job No.: 171201
21   Pages: 1 - 309
22   Reported By: Tasiana T. Basdekis, RPR
```

**Page 2**

```
 1       Deposition of DEBORAH MOORE, held at the
 2   offices of:
 3
 4
 5           TSA HEADQUARTERS
 6           East Tower
 7           601 12th Street South
 8           Arlington, Virginia 20598
 9
10
11
12
13       Pursuant to notice, before Tasiana T. Basdekis,
14   RPR, Notary Public in and for the Commonwealth of
15   Virginia.
16
17
18
19
20
21
22
```

**Page 3**

```
 1          A P P E A R A N C E S
 2   ON BEHALF OF THE PLAINTIFF, EL HADY:
 3       GADEIR ABBAS, ESQUIRE
 4       LENA MASRI, ESQUIRE
 5       COUNCEIL ON AMERICAN-ISLAMIC RELATIONS
 6       453 New Jersey Avenue SE
 7       Washington, District of Columbia 20003
 8       (202) 742-6423
 9
10   ON BEHALF OF THE DEFENDANT, KABLE:
11       AMY E. POWELL, ESQUIRE
12       U.S. DEPARTMENT OF JUSTICE
13       310 New Bern Avenue
14       Federal Building Suite 800
15       Raleigh, North Carolina 27601
16       (202) 514-9836
17
18
19
20
21
22
```

**Page 4**

```
 1    A P P E A R A N C E S   C O N T I N U E D
 2
 3       JENNIFER GREENBAND, ESQUIRE
 4       KEVIN HOULIHAN, ESQUIRE
 5       U.S. DEPARTMENT OF JUSTICE
 6       601 12th Street South
 7       Arlington, Virginia 20598
 8
 9       JAYME KANTOR, ESQUIRE
10       YEORA PARK, ESQUIRE
11       U.S. DEPARTMENT OF JUSTICE
12       935 Pennsylvania Ave. NW
13       Suite 10140
14       Washington, District of Columbia 20535
15       (202) 324-7194
16
17   ALSO PRESENT:
18       DEBBY CAVAZOS, Videographer
19
20
21
22
```

5

C O N T E N T S

EXAMINATION OF DEBORAH MOORE          PAGE
  By Mr. Abbas                         6

E X H I B I T S

          (Attached)

PLAINTIFF'S FOR IDENTIFICATION        PAGE
1   DHS TRIP Statistics                91
2   DHS TRIP Correspondence to Murat
    Frijuckic                          282
3   DHS TRIP Correspondence to Yaseen
    Kadura Date 5/8/2013               290
4   DHS TRIP Correspondence to Yaseen
    Kadura Date 9/4/2015               300
5   One Page of a DHS TRIP Close Out
    Letter                             304

6

P R O C E E D I N G S

THE VIDEOGRAPHER:  Here begins tape number one in the videotaped deposition of Deborah Moore in the matter of Anas El Hady, et al., v. Charles Cable [sic], et al., in the District Court for the Eastern District of Virginia, Case No. 16-CV-375 (E.D. Va).

Today's date is December 20th, 2017.  The time on the video monitor is 9:48.  The videographer for today is Debbie Cavazos, representing Planet Depos.

This video deposition is taking place at 601 South 12th Street, Arlington, Virginia, 20598.

Could counsel please voice-identify themselves and state whom they represent?

MR. ABBAS:  This is Gadeir Abbas appearing for the Plaintiffs.  I'll be taking the deposition.

MS. POWELL:  Amy Powell of the Department of Justice, for the Defendants.

THE VIDEOGRAPHER:  The court reporter today is Tasiana Basdekis, representing Planet

7

Depos.

Would the reporter please swear in the witness?

Whereupon,

DEBORAH MOORE,

being first duly sworn or affirmed to testify to the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY MR. ABBAS:

Q  Dr. Moore -- is that correct?

A  Yes.

Q  Have you ever had your deposition taken before?

A  No.

Q  Okay.  I'm going -- I'm sure your attorneys have explained how this works, but I'm going to, for the record.

I'll be asking you questions, and you'll be answering them, unless your attorney instructs you not to answer them.

Because Alaina [sic] is typing every word

8

that you say, that I say, that anybody in this room says, it's really important for you to allow my question to finish before you answer the question, even if you know what I'm going to answer [sic], and I'll do the same.

Even if I know what you're going to say, I'm going to wait for you to finish before answering [sic] another question -- before asking another question.  And that's just to make Alaina's [sic] job easier.

Is there any reason why I shouldn't take your deposition today?  Are you on any medication that affects your ability to provide answers to questions that I'll ask you?

A  No.

Q  Okay.  Are you -- is there any other condition that would prevent you from answering accurately and truthfully to the questions that I'll ask you?

A  No.

Q  At any point in time today, if you'd like a break, so long as a question isn't pending, just

Transcript of Deborah Moore
Conducted on December 20, 2017

52 (205 to 208)

---

205

1    (Whereupon the record was read.)

2    MS. POWELL:  Same objection.  She's

3 answered.

4    THE WITNESS:  I've answered.

5 BY MR. ABBAS:

6  Q  What's the answer to that question?

7  **A  That I don't know.**

8  Q  Okay.  Great.

9    Of the recommendations that TSC made in

10 2017, how many recommendations were made to remove

11 a person from the No Fly List?

12    MS. POWELL:  Objection.  Calls for

13 privileged information.  I'm going to direct the

14 witness not to answer.

15    MR. ABBAS:  What's the privilege?

16    MS. POWELL:  Deliberative process,

17 potentially SSI, and law enforcement privilege.

18    MR. ABBAS:  So is the deliberative process

19 privilege, is it your position that the

20 recommendation that TSC makes are privileged?

21    MS. POWELL:  They certainly can -- well,

22 certainly the recommendations themselves are, yes.

---

206

1 But --

2    MR. ABBAS:  And even --

3    MS. POWELL:  -- certain --

4    MR. ABBAS:  Go ahead.

5    MS. POWELL:  Particularly given the

6 numbers we're talking about here, giving numbers

7 of those denied would give substantial

8 information.

9    MR. ABBAS:  In what manner would they give

10 substantial information?

11    MS. POWELL:  We can talk about this later.

12 I'm instructing the witness not to answer.

13    MR. ABBAS:  That's fine.  I'm just trying

14 to hash this out now so we don't have to bring

15 Dr. Moore back.

16    MS. POWELL:  We are asserting privilege

17 over that number.

18    MR. ABBAS:  All right.  So I'm going to

19 ask it again, just to make sure that we have all

20 the privileges that you're asserting.

21  Q  Of the recommendations that Terrorist

22 Screening Center has made in 2017, how many were

---

207

1 recommendations to remove a person from the No Fly

2 List?

3    MS. POWELL:  And I'm instructing the

4 witness not to answer on the grounds of

5 privileges.

6    MR. ABBAS:  What privileges?

7    MS. POWELL:  SSI, law enforcement

8 privilege, and the deliberative process privilege.

9    MR. ABBAS:  So you're using SSI privilege

10 to cover a Terrorist Screening Center

11 recommendation?

12    MS. POWELL:  In context.

13    MR. ABBAS:  I don't think that SSI applies

14 to Terrorist Screening Center.

15    MS. POWELL:  SSI is a category of

16 information that is --

17    MR. ABBAS:  That's TSA-specific.  So --

18 that's fine.

19  Q  Has the -- have you ever -- do you --

20 does -- has the TSA administrator ever not

21 followed TSC's recommendation with regards to a

22 person on the No Fly List's DHS TRIP complaint?

---

208

1    MS. POWELL:  Same objections and same

2 instruction, I think.

3    MR. ABBAS:  What is the privilege that

4 you're asserting over whether the TSA

5 administrator has followed the recommendations of

6 Terrorist Screening Center?

7    MS. POWELL:  Well, certainly the

8 deliberative process privilege, but potentially

9 covers SSI and law enforcement-privileged

10 information as well, at least in conjunction with

11 other publicly-available information.

12 BY MR. ABBAS:

13  Q  Did -- are you aware of the TSA

14 administrator making any determinations regarding

15 a U.S. person's status on the No Fly List in 2016?

16  **A  I don't think so.**

17  Q  So in 2016 and 2017, you don't believe

18 that the TSA administrator has made any

19 determinations regarding a U.S. person's DHS TRIP

20 complaint regarding the No Fly List?

21  **A  That's correct.**

22  Q  I mean -- okay.

---

Transcript of Deborah Moore
Conducted on December 20, 2017

53 (209 to 212)

---

209

1    Why?  Why is it that in the last two
2  years, the TSA administrator has not made any
3  determinations regarding a U.S. person's DHS TRIP
4  complaint regarding the No Fly List?
5    MS. POWELL:  Objection.  Asked and
6  answered.  And also, I'm going to instruct the
7  witness, in part, not to answer as to any ongoing
8  deliberative processes or specific opinions,
9  advice, or recommendations.
10    To the extent you can answer generally, as
11 you did previously to this same question, you may
12 give that answer again.
13    THE WITNESS:  I would refer back to my
14 previous answer.
15 BY MR. ABBAS:
16   Q  What is your previous answer?  What -- I'm
17 sorry.  What previous answer are you referring
18 back to?
19   **A  The response I gave regarding as to why**
20 **the administrator hasn't made a decision during**
21 **that time period about a U.S. person on the No Fly**
22 **List.**

---

210

1    Q  And I don't know what that answer -- what
2  is that answer?
3    MS. POWELL:  It's on the record.
4    MR. ABBAS:  I'm asking her again.  Asked
5  and answered is not a basis -- I don't -- I
6  actually don't honestly remember what her answer
7  is, so I'm wondering what her answer -- I don't
8  remember asking this specific question about 2016
9  and 2017, so I'm not trying to be difficult.
10    MS. POWELL:  I'm not instructing her not
11 to answer.
12    MR. ABBAS:  Okay.
13    MS. POWELL:  I am preserving the
14 objection.  You don't get to keep asking in order
15 to get a different answer.  So I think her second
16 answer was proper, too, which is what she just
17 said.
18    MR. ABBAS:  Sure.
19   Q  So I'm going to ask you again, and if it's
20 an answer you've already given, just -- I'm asking
21 for the same answer.  You know, I'm not asking you
22 for a different answer, just -- but I don't

---

211

1  remember asking it with regards to 2016/2017.  I
2  apologize if I have asked it previously.
3    Why is it that the administrator has not
4  made a decision with regards to a U.S. person on
5  the No Fly List's DHS TRIP complaint in 2016 and
6  2017?
7    MS. POWELL:  Same objection and
8  instruction, but your answer's yours.
9    THE WITNESS:  The administrator has not
10 had the opportunity, during that time period, to
11 make a decision.  Generally, because the
12 process -- this is a complex process that involves
13 working with multiple agencies, and as we work out
14 its implementation, it has taken longer than we
15 might have wanted it to take.
16   Q  Is there, in your RMS -- what does the RMS
17 stand for again?
18   **A  Redress Management System.**
19   Q  In the Redress Management System, is there
20 a way to notate DHS TRIP complaints submitted by
21 persons that have filed lawsuits against the
22 Federal Government?

---

212

1    **A  No.  Not specifically by persons who have**
2  **filed any federal lawsuit.  If we are aware of**
3  **someone who has legal representation, we have**
4  **that, per the submission of the 590.**
5    **If someone is -- I believe if someone is**
6  **in ongoing litigation, we can notate that.**
7    Q  Is it DHS TRIP's practice to notate which
8  DHS TRIP complainants are engaged in litigation
9  against the Federal Government regarding their
10 Watchlist status?
11    MS. POWELL:  Objection.  Vague.
12    THE WITNESS:  Not specifically regarding
13 their Watchlist status, no.
14   Q  Is it DHS TRIP's practice to notate in its
15 records whether DHS TRIP complainants are engaged
16 in litigation against the Federal Government?
17   **A  Yes.  We -- if we are aware that an**
18 **applicant has ongoing litigation, we make a note**
19 **of that so that the analysts understand that**
20 **communication with the applicant could be**
21 **something that the legal staff would need to be**
22 **aware of.**

---