**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | | |
|---|---|---|
| **ANAS ELHADY,** *et al.*, | ) | |
| | ) | **Case No. 16-cv-00375** |
| Plaintiffs, | ) | **Hon. Anthony J. Trenga** |
| | ) | |
| v. | ) | |
| | ) | |
| **CHARLES H. KABLE,** Director of the | ) | |
| Terrorist Screening Center; in his official | ) | |
| capacity, *et al.;* | ) | |
| | ) | |
| Defendants. | ) | |

_____

**REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS'**
**SECOND MOTION TO COMPEL (DKT. 167)**

# TABLE OF CONTENTS

Table of Contents ........................................................................................................................... ii

Index of Reply Exhibit ................................................................................................................. iii

Introduction ................................................................................................................................... 1

Argument ....................................................................................................................................... 2

    I.   The Government's Assertions of The Law Enforcement Privilege Should Not
Prevent Disclosure Of Relevant Watchlisting Information ........................................................ 2

        a.    Plaintiffs Have a Compelling Need for Information about Watchlisting
Advisory Council Operations and its Conclusions ..................................................................... 3

        b.    Plaintiffs Have a Compelling Need for Information about FBI Handling Codes,
Informants, Counterterrorism Policy, and Watchlisting Statistics.................................... 6

        c.    Plaintiffs have a Compelling Need for Information about CBP Border Practices
Related to Watchlistees ............................................................................................................. 10

        d.    Plaintiffs Crossreference their Reply to their First Motion to Compel for
Discussion if Their Compelling Need for Watchlisting Guidance and Standards ....... 11

    II.   Plaintiffs May Seek Consideration Of The TSA's SSI Order In The Court of
Appeals. ....................................................................................................................................... 11

    III.   The Government's Threshold Objections On Timing And Conferring Should Be
Rejected ....................................................................................................................................... 12

Conclusion.................................................................................................................................... 13

**INDEX OF REPLY EXHIBIT**

| Exhibit | Description | Date |
|---------|-------------|------|
| A | TSC Deposition Transcript - Excerpts | March 1, 2018 |

**INTRODUCTION**

Within days of the last Government 30(b)(6) deposition, Plaintiffs filed this Second

Motion to Compel regarding deficiencies in all agencies' deposition testimony.  *See* Dkt.

167.   Most notably, these depositions revealed for the first time the Watchlisting Advisory

Council and the Council's regular preparation of Summaries of Conclusions.  Plaintiffs also

learned that Chapter 11 of the FBI's *Counterterrorism Program Guide* is a governing

document related to watchlisting.  Specific questions about handling codes, informants,

children, and core statistics related to watchlisting and terrorism were also either outside

the knowledge of the deponents (although known to the agency), or the Government

refused to answer.  Answers to these questions relate to the deprivations Plaintiffs

experience as a matter of Government watchlisting policy and practice, and the

Government's interests in its current systems and procedures.  Although the Government

invokes the law enforcement privilege to not answer, its interests are weak whereas

Plaintiffs' need for answers is compelling.

The Government complains that Plaintiffs' Second Motion to Compel overlaps with

the first and constitutes an "attempt to take a second bite at this same apple."  Dkt. 196-1 at

1, 14.  This mischaracterizes Plaintiffs' motions and their sought-after relief.   Plaintiffs' first

motion focuses on written discovery and documents (Dkt. 139), while the second focuses

on deposition testimony (Dkt. 167).  While there is some overlap between the documents

and information sought via written discovery and the questions posed during agency

depositions, the Government cannot use all the same privileges to shield agency

defendants' deposition testimony in the global manner they did in response to written

discovery.  And the true nature of so many of their privilege assertions—asserting, for example, a law enforcement privilege over the number of children in the TSDB in a transparent attempt to avoid disclosing a reprehensible fact—becomes undeniable when the transcripts are reviewed.

## ARGUMENT

### I.    The Government's Assertions of The Law Enforcement Privilege Should Not Prevent Disclosure Of Relevant Watchlisting Information

The Parties broadly agree on the legal standard applied to law enforcement privilege assertions.  *Compare* Memorandum on Second Motion to Compel, Dkt. 170-1 at 23-26 *with* Opposition, Dkt. 196 at 9-11.  The Government has sought to invoke the law enforcement privilege through four declarations.  Dkt. 196-4 through 196-7. Even if proper, the Government's invocation of the law enforcement privilege should nonetheless be lifted because Plaintiffs can show (1) that their suit is non-frivolous and brought in good faith, (2) that the information sought is not available through other discovery or from other sources, and (3) they have a compelling need for the information. *Hugler v. BAT Masonry Co.*, 6:15-cv-28, 2017 U.S. Dist. LEXIS 49027, at *11-13 (W.D. Va. Mar. 31, 2017) (citing *In re The City of New York*, 607 F.3d 923, 944-945 (2d Cir. 2010)).  The Government does not contend that Plaintiffs' requests for watchlisting information are frivolous, or brought in bad faith, or available from other sources.  The only remaining question is whether on balance Plaintiffs have demonstrated a compelling need for the information.  Plaintiffs have established that the balance of interests favors disclosure of discrete law enforcement privileged information to Plaintiffs, so that the procedures surrounding the watchlist can be subjected to judicial review. *See United States v. Matish*, 193 F. Supp. 3d 585, 597 (E.D. Va. 2016).

For the ease of reference for the Parties and the Court, Plaintiffs in this Reply will largely adopt the grouping of topics the Government utilized in opposition.

a. <u>Plaintiffs Have a Compelling Need for Information about Watchlisting Advisory Council Operations and its Conclusions</u>

The Government in response to Plaintiffs' Motion to Compel has now provided significantly more detailed information about the operation of the Watchlisting Advisory Council ("WLAC") than it provided during its depositions. *Compare* 2d Groh Decl., Dkt. 196-5 ¶¶ 40-45 *with* Dkt. 170-1 at 3 (referencing all the information the FBI deponent did not know). The Government explains that the WLAC was established in 2014 as a successor to the TSC Policy Board. *Id.* ¶ 42. The Council fields "questions from member agencies about how specific provisions of the Watchlisting Guidance should be interpreted or implemented" and "drafts" and "recommends specific modifications" to the Watchlisting Guidance. *Id.* ¶ 43. These answers and recommendations are memorialized in Summaries of Conclusions. *See id.* ¶¶ 40, 43-44.

Based on this additional information the Government has now provided, Plaintiffs are narrowing the information sought by their Second Motion to Compel. Plaintiffs still maintain that a 30(b)(6) deposition of the NCTC regarding the WLAC is necessary to understand it, including to cross-examine the representations the Government makes in its declarations. Plaintiffs would seek further information regarding the WLAC's authority and reporting structure. The FBI's testimony appeared to consider the prior TSC Policy Board and the current WLAC to be effectively the same, making questions about that evolution relevant. *See, e.g.,* Dkt. 169-1, Ex. A, TSC Depo. Tr. at 31-32; Dkt. 170-2, Ex. D, FBI Depo. Tr. at 53-56.

More importantly, the Government states that the WLAC "reports" to the National Security Council (Dkt. 196 at 22), but provides no other information about the relationship between the two bodies.  Nor did the FBI deponent know those answers.  *See* Dkt. 170-2, FBI Depo. Tr., Ex. D at 16-20.  Plaintiffs do not know what actions the National Security Council takes on Watchlisting Advisory Council recommendations – is it a rubber stamp, or does it undertake fulsome review and make major modifications?  After all, the TSC previously testified that only "disagreements" at the WLAC level were escalated to the National Security Council – and those disagreements are rare because usually the WLAC is unanimous.  *See, e.g.,* Reply Ex. A, TSC Depo. Tr. at 38-39, 44, 47-50, 219.  Does the National Security Council itself have authority to make watchlisting changes, or is another layer of review required?  The Government has not even revealed *who* the "senior government officials with the authority to approve changes to the Watchlisting Guidance" *are.  See* 2d Groh Decl., Dkt. 196-5 ¶ 43.  Plaintiffs have a compelling need to know how policies and procedures surrounding watchlisting and redress are set.

Plaintiffs also continue to compel the unclassified portions of the Watchlisting Advisory Council's Summaries of Conclusions.  Although the Government contends that these summaries "would reflect the internal deliberate decision-making process of the WLAC," this is far from established.  The Government says the WLAC is "*intended* to function as a deliberative, predecisional body" (2d Groh Decl., Dkt. 196-5 ¶ 44 (emphasis added)).  But the agencies' deposition testimony indicates that *in practice* the WLAC has final decision-making authority.  *See, e.g.,* Reply Ex. A, TSC Depo. Tr. at 15 ("Our policies and procedures generally are governed by whatever the current Watch Listing Guidance is, which is promulgated by … the Watch Listing Advisory Council."), 68, 88, 131, 197, 228-229

4

(TSC testimony about the WLAC generally "governing" watchlisting).  *Accord* TSA Depo. Tr.,

Dkt. 169-1, Ex. B at 126 ("[T]here have been standards established for watchlisting via the

Watchlisting Advisory Council, and TSA follows that watchlisting guidance for the

standards and criteria.").  To the extent Watchlisting Advisory Council actions are not

"predecisional" but rather reflect actual, adhered-to, unanimous decisions, they do not

qualify for the deliberative process privilege.  *See, e.g., Ethyl Corp. v. United States EPA*, 25

F.3d 1241, 1248 (4th Cir. 1994) (deliberative process privilege protects drafts and

recommendations which are not themselves "the policy of the agency").

It may be that the Watchlisting Advisory Council's Summaries of Conclusions are

*technically* "predecisional" – but quickly become "postdecisional" once they are adopted by

a higher authority.  The National Security Council or other "senior government official with

authority" may issue boilerplate or rubber-stamp or minor-modification decisions adopting

the WLAC's recommendations.  In that instance, Plaintiffs would request the Court compel

the "final" decisional documents of the authoritative body which embody or reflect the

WLAC's Summaries of Conclusions.

Regardless of whether the Summaries of Conclusions initially qualify for the

deliberative process privilege, that privilege can be overcome by balancing the interests of

the parties and showing Plaintiffs' compelling need for production.  *See, e.g., Cipollone v.

Liggett Grp., Inc.*, 1987 U.S. App. LEXIS 19775, at *7 (4th Cir. Feb. 13, 1987) (affirming

district court decision to compel deliberative process documents in litigation).  Plaintiffs

have a compelling need for these Summaries of Conclusions, particularly as they relate to

nomination policies, awareness of watchlisting defects, references to this or related

watchlisting litigation, redress procedures, alternative available procedures, and other core issues.

These Summaries of Conclusions fall, at a minimum, within the scope of Requests for Production 1-2 and 18 to the TSC and FBI.  *See* Dkt. 139-1, Ex. A.  Should the Court conclude those requests are insufficient basis to compel production, Plaintiffs would request leave to propound additional RFPs aimed at production of the Summaries of Conclusions, or any final decisional document reflecting WLAC conclusions.  One or two highly targeted RFPs would is warranted in light of the Government's decision to hide the existence of WLAC until after the close of discovery.  The Terrorist Screening Center has already testified that it has copies of all these Summaries of Conclusions.  *See* Reply Exhibit A, TSC Depo. Tr., at 229.

b. <u>Plaintiffs Have a Compelling Need for Information about FBI Handling Codes, Informants, Counterterrorism Policy, and Watchlisting Statistics.</u>

Based on additional information the Government has now provided, Plaintiffs narrow their requests related to the FBI to those regarding FBI Handling Codes, FBI Informants, Chapter 11 of the Counterterrorism Program Guide, and FBI Statistics.

**Handling Codes.**  The TSC declares – with only redacted explanation – that the FBI's handling codes and handling instructions are law enforcement privileged.  *See* 2d Groh Decl.,. Dkt. 196-5 ¶¶ 29-31.  Plaintiffs challenge this privilege assertion because state and local law enforcement agencies who receive the TSDB through the NCIC already publish the codes and related instructions.  *See* Reply to MTC1, Dkt. 208 at 17-19.  Moreover, for the reasons outlined in Plaintiffs first Reply, they have a compelling need for these codes – handling instructions relate directly to the deprivations, including potentially

unconstitutional searches and seizures, that Plaintiffs and other watchlistees experience. *See id.*

  **Informants.**  The TSC declares that it does not nominate individuals as known or suspected terrorists *solely* for the purpose of using them as informants.  *See* 2d Groh Decl., Dkt. 196-5 ¶ 27.  But with respect to whether the FBI *ever* annotates the TSDB regarding informants, or whether the FBI leverages TSDB status in relationship to informants, the FBI refuses to answer on the basis of law enforcement privilege.  *Id.*  Plaintiffs here have been recruited as informants in direct connection with their watchlist status.  *See, e.g.*, MTC1 Reply Ex. I, Dkt. 208-1, Ahmed Depo. Tr. at 25-31.  There are numerous other public examples of American Muslims who have had the FBI parlay or retaliate with a watchlist status in connection with recruiting Muslims as informants.  *See, e.g.,* Compl., Dkt. 22 ¶¶ 100-101.  Just last week the Second Circuit reinstated the Religious Freedom Restoration Act claims of five American Muslim plaintiffs who had each been approached by the FBI, then had their watchlist status leveraged against them in connection with being recruited as informants.  *See Tanvir v. Tanzin*, No. 16-1176, slip. op. at 4-15 (2d Cir. May 2, 2018). The U.S. Commission on Civil Rights called in 2014 for improved "independent oversight of use of informants in counterterrorism" particularly in connection with houses of worship.[1]

  Plaintiffs have a compelling need to know the relationship between the watchlist and FBI (or CBP) informants.[2]  For example, the FBI or CBP may consider refusal to become

---

  [1] *See* Federal Civil Rights Engagement With Arab and Muslim American Communities, U.S. COMMISSION ON CIVIL RIGHTS (Sept. 2014), p. available at http://www.usccr. gov/pubs/ARAB_MUSLIM_9-30-14.pdf.

  [2] Because the same rationales apply to the CBP's invocation of law enforcement privilege regarding its recruitment of informants (Howe Decl., Dkt. 196-7 ¶ 15) Plaintiffs address it here.

an informant as derogatory information supporting nomination; the FBI or CBP may also consider agreement to become an informant as positive information supporting removal. The FBI may instruct agents about the value of the TSDB as an intelligence-gathering measure against Muslim communities.  Any information which indicates that a significant Government interest in the watchlist is not the prevention of terrorist acts by listed individuals, but rather the expansion of informant infrastructure within communities, is probative.  It weakens the Government's interests in the watchlist, increases the erroneous deprivations of listees, and bears on the adequacies of current procedures.

**Counterterrorism Guide.**  The FBI testified in its deposition about the importance of Chapter 11 of the Counterterrorism Policy Guide to Watchlisting.  The FBI is primarily responsible for domestic counterterrorism operations and watchlisting nominations.  In opposition, the Government explains that Chapter 11 contains information about "the type, quality, and amount of information needed to watchlist an individual, as well as how watchlisting is shared with foreign and domestic partners."  2d McGarrity Decl., Dkt. 196-6 ¶ 14.  It includes "Detailed information about watchlisting nomination and inclusion, including examples of the application of the criteria, the Selectee List inclusion standards, handling codes and an explanation of the relationship between watchlisting and ongoing investigations."  *Id.* ¶ 15.  All of this is precisely why Plaintiffs have a compelling need to review the unclassified portions of Chapter 11.  Plaintiffs need to assess the Government's interests in its watchlisting practices, the risks of erroneous deprivation inherent in those practices, and whether official Government policy targets the American Muslim community for disfavored treatment.   This document, even more so than the Watchlisting Guidance, appears to bear on how the FBI uses the watchlist in its day-to-day work, including with

respect to investigations, non-investigative subjects, and informants.   These questions have long been implicated by the Plaintiffs' claims, and deserve to be resolved through production of Chapter 11.

**Statistics.**   Plaintiffs have requested information about the number and breakdown of nominations the FBI makes to the TSDB each year.  This is information substantially similar to the chart the Government already provided in response to Interrogatory No. 7. MTC1 Ex. B, Dkt. 139-1 at 22. Plaintiffs simply request for the same chart to be broken down by the FBI's own actions.  Although the Government asserts that it does not track the "failure to provide sufficient substantive derogatory information," it raises no such concern regarding the FBI's involvement in nominations generally.  Plaintiffs have a compelling need for this information because they are United States citizens and the FBI is the primary driver of domestic (as opposed to international) watchlisting.  The FBI's own statistics will therefore be highly indicative of the scope of domestic watchlist operations.

Plaintiffs have also requested information regarding the FBI's public disclosures of watchlist status of perpetrators, arrestees, and criminal defendants related to acts of terrorism.  Although the Government contends that because this information would be "found in public court filings, defendants are in no better position than plaintiffs to search for" it, this is nonsensical.  The Government knows better what terrorism cases exist, what it has prosecuted, and what it has publicly filed.  No mechanism yet exists for Plaintiffs to search the internal contents of criminal ECF filings across all federal district courts for "TSDB" and "terrorist watchlist."  The Government's internal knowledge and internal case management systems are far more likely to efficiently find its own public filings.  The

Government asserts no privilege related to information it has published, and therefore

Plaintiffs respectfully request this search be compelled.

    c.   <u>Plaintiffs have a Compelling Need for Information about CBP Border Practices Related to Watchlistees</u>

       Based on additional information the Government has now provided, Plaintiffs

narrow their requests related to the CBP to CBP Informants (addressed above), as well as

CBP Handling Codes and CBP Statistics.

       **Handling Codes.**  Plaintiffs rationale for needing CBP handling codes and

instructions is comparable to their need for codes from the FBI, *see supra*.  The CBP

testified repeatedly about its use of an "armed and dangerous" message that may be

displayed in conjunction with TSDB listees.  *See* Dkt 170-1 at 14-17.  The CBP now declares

that it has no policy which *requires* aggressive operational responses (*e.g.* handcuffs, guns)

due to TSDB status.  Howe Decl., Dkt. 196-7 ¶ 12.  CBP invokes the law enforcement

privilege and refuses to answer, however, whether "armed and dangerous" codes or

aggressive operational responses to TSDB listees may be something less than *required* – i.e.

recommended, or approved, or common.  Plaintiffs at this point also do not know whether

"armed and dangerous" is an annotation added by the CBP itself, whether it is

automatically mapped onto some TSDB listees based on their separate NCIC handling

codes, or whether the annotation attaches to TSDB listees via some other mechanism.

Plaintiffs have a compelling need for this information, for the reasons previously outlined

in connection with FBI handling codes, *supra*, and in their Reply to their First Motion to

Compel.  *See* Dkt. 208 at 16-19.

       **Statistics.**  The CBP contends that it does not track, and it would be burdensome to

track, much of the statistical information sought by Plaintiffs.  At a minimum, however, the

10

CBP clearly *does* track encounters with TSDB listees, and has published statistics related to those encounters from 2017.  *See* Howe Decl., Dkt. 196-7 ¶ 26.  Plaintiffs accordingly seek to compel, at a minimum, the same CBP encounter data for the last 10 years, as well as how many, if any, of those encounters led to terrorism-related arrests.

    d. <u>Plaintiffs Crossreference their Reply to their First Motion to Compel for Discussion if Their Compelling Need for Watchlisting Guidance and Standards</u>

The Government in opposition outlined twelve pieces of information also sought by Plaintiffs' pending First Motion to Compel.  *See* Dkt. 196 at 4-5 (discussing Dkt. 170-1 at 6-11).  Plaintiffs agree these items overlap; the purpose of the overlap was to demonstrate how agency testimony obtained following the filing of the first motion to compel emphasized Plaintiffs' need for the Watchlisting Guidance, its substantive nomination standards including exceptions, and its evolution.  Because information about the Watchlisting Guidance is diffuse, many of Plaintiffs' deposition questions do not implicate TSA's SSI assertions.  Accordingly, Plaintiffs cross-reference their Reply in support of their First Motion to Compel with respect to their compelling need for governing watchlisting information.  *See* Dkt. 208 at 11-16.

**II.    Plaintiffs May Seek Consideration Of The TSA's SSI Order In The Court of Appeals.**

In response to Plaintiffs' First Motion to Compel, the TSA issued a Final Order designating discrete categories of information as SSI.  *See* Dkt. 178-21.  The Government has reattached that Final Order as an exhibit to their response to this Second Motion to Compel.  *See* Dkt. 196-8.  The Final Order includes criteria for the No Fly, Selectee and Expanded Selectee lists (*id.* at 2-3, 5-7), technical details of watchlist matching during aviation screening (*id.* at 4), specific screening measures and security measures used by the

TSA (*id.* at 5), and certain aggregate watchlist statistics (*id.* at 7-8).   According to the

Government, this Final Order covers the six pieces of information about TSA watchlisting

practices Plaintiffs seek in their Second Motion to Compel.  *See* Dkt. 196 at 7, 36-38.

The TSA's SSI designations are overbroad, particularly regarding the criteria for

designating individuals as No Fly, Selectee, or Expanded Selectee.  These TSDB criteria and

classifications are the product of Watchlisting Advisory Council discussion and consensus,

a council chaired by non-DHS agencies.  Individual nominations are submitted by all

watchlisting agencies, not just the TSA.  The *sole* power to approve someone to the TSDB or

any of the component lists is held by the TSC.  *See, e.g.,* Watchlisting Overview, Dkt. 139-1,

Ex. O at 4.  The fact that the TSA receives an export of the TSDB to use designations

nominated and approved by other agencies does not mean the entire TSDB and its criteria

qualify as SSI.

In light of the TSA Final Order and for purposes of this Second Motion to Compel,

however, Plaintiffs will no longer pursue the information TSA purports to have the

authority to designate as SSI.  Plaintiffs intend to file a petition to review some of the

Government's SSI designations in the Court of Appeals.

## III.   The Government's Threshold Objections On Timing And Conferring Should Be Rejected

The Government separately raises several threshold objections to Plaintiffs' Second

Motion to Compel, principally that the requested information relates to prior written

discovery, or was insufficiently conferred[3] about.  *See* Dkt. 196 at 18-20.  The Government

---

[3] The parties have exhaustively conferred about everything and have been in near daily contact throughout 2018.  The defendants made clear long ago that no statistical information beyond what they initially produced would be provided, that no additional information about the inclusion standards would be provided, and that there was not room

also objects that some of Plaintiff's deposition questions sought information related to prior written discovery. *See, e.g.,* Dkt. 196 at 3, 14-19.  There is no provision in the Federal Rules of Civil Procedure, however, that bars overlap between written and verbal discovery.

Due to additional information provided by the Government, Plaintiffs have narrowed the relief sought by this motion, including most of what the Government's technical objections cover.  This includes the withdrawal of requests for NCIC policy documents and the current "DIOG" manual.  Plaintiffs do continue to seek Chapter 11 of the Counterterrorism Policy Guide (TSCA0234), as discussed above.  Chapter 11 was added to this motion solely because the FBI testified on April 9 that Chapter 11 governed watchlisting.  *See* Dkt. 170-1 at 12.   Prior to that time Plaintiffs lacked enough information about the Counterterrorism Policy Guide or its contents to understand its watchlisting importance.  Plaintiffs did not seek to compel Chapter 11 in their first motion in consideration of the Government's privilege log indication that portions of the 203-page document are classified.  As stated above, Plaintiffs now seek only an unclassified version of a single chapter.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court GRANT their Second Motion to Compel, as narrowed by this Reply.

Respectfully submitted,

COUNCIL ON AMERICAN-ISLAMIC RELATIONS

---

to discuss a resolution of the written discovery issues short of motion practice.  Indeed, the parties have continued to confer—including a resolution yesterday regarding some of the foreign documents.

BY:      /s/ Gadeir Abbas
LENA F. MASRI (P73461)
GADEIR I. ABBAS (VA: 81161)
*Attorneys for Plaintiff*
453 New Jersey Ave, SE
Washington, DC 20003
Phone: (202) 742-6420

*Gadeir Abbas is licensed in VA, not in D.C.*
*Practice limited to federal matters.*

AKEEL & VALENTINE, PLLC
SHEREEF H. AKEEL (P54345)
*Attorney for Plaintiffs*
888 W. Big Beaver Rd., Ste. 910
Troy, MI 48084
Phone: (248) 269-9595
shereef@akeelvalentine.com

Dated: May 8, 2018

**CERTIFICATE OF SERVICE**

I hereby certify that on May 8, 2018, I electronically filed the foregoing by using the

Court's ECF system.  I further certify that all participants in the case are registered ECF users

and will be electronically served by the Court's ECF notification system.

Respectfully submitted,

COUNCIL ON AMERICAN-ISLAMIC
RELATIONS

BY:      /s/ Gadeir Abbas
LENA F. MASRI (P73461)
GADEIR I. ABBAS (VA: 81161)
*Attorneys for Plaintiff*
453 New Jersey Ave, SE
Washington, DC 20003
Phone: (202) 742-6420

*Gadeir Abbas is licensed in VA, not in D.C.
Practice limited to federal matters.*

AKEEL & VALENTINE, PLLC
SHEREEF H. AKEEL (P54345)
*Attorney for Plaintiffs*
888 W. Big Beaver Rd., Ste. 910
Troy, MI 48084
Phone: (248) 269-9595
shereef@akeelvalentine.com

Dated: May 8, 2018

# Exhibit A

Transcript of Timothy P. Groh, Designated Representative    1 (1 to 4)
Conducted on March 1, 2018

---

**Page 1**

```
 1        UNITED STATES DISTRICT COURT
 2        EASTERN DISTRICT OF VIRGINIA
 3              ALEXANDRIA DIVISION
 4  - - - - - - - - - - - - x
 5  ANAS EL HADY, ET            :
 6  AL.,                        :
 7        Plaintiffs, :   Case No. 16-cv-00375
 8        v.                    :
 9  CHARLES H. KABLE,           :
10  Director of the             :
11  Terrorist Screening         :
12  Center; in his              :
13  official capacity,          :
14  et al.,                     :
15        Defendants.           :
16  - - - - - - - - - - - - x
17  Videotaped Deposition of Terror Screening Center
18     By and through its Designated Representative
19            TIMOTHY P. GROH
20            Washington, D.C.
21         Thursday, March 1, 2018
22              9:07 a.m.
```

---

**Page 2**

1      Deposition of TIMOTHY P. GROH, held at the
2  offices of:
3
4
5         Department of Homeland Security
6         20 Massachusetts Avenue, N.W.
7         Washington, D.C.  20001
8
9
10
11
12
13      Pursuant to Notice, before Carla L. Andrews,
14 Notary Public in and for the District of Columbia.
15
16
17
18
19
20
21 Job No.:  180014
22 Pages: 1 - 389

---

**Page 3**

1           A P P E A R A N C E S
2  ON BEHALF OF THE PLAINTIFFS:
3      GADEIR ABBAS, ESQUIRE
4      LENA MASRI, ESQUIRE
5      CAROLYN HOMER, ESQUIRE
6      Council on American-Islamic Relations
7      453 New Jersey Avenue, SE
8      Washington, D.C.  20003
9      202-742-6423
10
11
12 ON BEHALF OF THE DEFENDANT CHARLES H.
13 KABLE:
14      ANTONIA KONKOLY, ESQUIRE
15      United States Attorney's Office
16      2100 Jamieson Avenue
17      Alexandria, Virginia 22314-5702
18      703-299-3799
19
20
21
22

---

**Page 4**

1  APPEARANCE CONTINUED:
2      AMY POWELL, ESQUIRE (via phone)
3      U.S. DEPARTMENT OF JUSTICE
4      310 New Bern Avenue
5      Federal Building, Suite 800
6      Raleigh, North Carolina 27601
7      202-514-9836
8
9      DENA M. ROTH, ESQUIRE
10      U.S. DEPARTMENT OF JUSTICE
11      20 Massachusetts Avenue, N.W.
12      Room 7112
13      Washington, D.C. 20529-2099
14
15      JENNIFER GREENBAND, ESQUIRE
16      KEVIN HOULIHAN, ESQUIRE (via phone)
17      U.S. Department of Justice
18      601 12th Street, South
19      Arlington, Virginia 20598
20
21
22

Transcript of Timothy P. Groh, Designated Representative

4 (13 to 16)

Conducted on March 1, 2018

13

1  stated in my previous answer, established and gave
2  rise to it.  But there have been many subsequent
3  executive orders and other direction from the
4  attorney general that modifies that.  So I think
5  there's a whole constellation of authorities that
6  govern what we do.
7       BY MR. ABBAS:
8   Q.   Does another agency control the Terror
9  Screening Center?
10      MS. KONKOLY: Objection.  Vague.
11      THE WITNESS:  Again, what do you mean by
12 control?
13      BY MR. ABBAS:
14  Q.   Can another federal government agency
15 tell the Terror Screening Center what to do?
16      MS. KONKOLY: Objection.  Vague.
17      THE WITNESS:  The Terror Screening Center
18 is an interagency body, which works to facilitate
19 the mission of many other agencies.  So to say that
20 can another agency order us -- is that what you are
21 saying?  Tell us to do something we don't want to
22 do?

14

1       BY MR. ABBAS:
2   Q.   Sure.  Let me ask you that.  Can another
3  agency command the Terror Screening Center to do
4  something?
5       MS. KONKOLY: Objection.  Vague.
6       THE WITNESS:  The Terror Screening Center
7  is administered by the FBI, so that our chain of
8  command goes through the FBI.
9       BY MR. ABBAS:
10  Q.   So the FBI can tell the Terror Screening
11 Center what to do?
12      MS. KONKOLY: Objection.
13 Mischaracterized prior testimony.
14      BY MR. ABBAS:
15  Q.   I will withdraw my question.  Can the FBI
16 tell the Terror Screening Center what to do?
17      MS. KONKOLY: Objection.  Vague.  Go
18 ahead.
19      THE WITNESS:  Generally, yes.
20      BY MR. ABBAS:
21  Q.   Please elaborate on why you attach the
22 qualification generally to your answer.

15

1   A.   Because in the service of our other
2  partners, both from the nominations and the
3  encounter side of things, we work to facilitate
4  their mission.  Our policies and procedures
5  generally are governed by whatever the current Watch
6  Listing Guidance is, which is promulgated by an
7  interagency -- you know, the Watch Listing Advisory
8  Council, which certainly includes many, many other
9  parties other than the FBI.  Generally, that council
10 works through consensus.  If there is ultimately a
11 disagreement, then that's going to be handled
12 through other processes.  And the FBI, of course, is
13 also part of that.
14  Q.   As an aside, Mr. Groh, at times you will
15 hear me say Arizona.  At times you will hear me say
16 Indiana.  I am just making notes to myself in the
17 transcript.  So please excuse me.  What agencies are
18 a part of the Watch Listing Advisory Council?
19      MS. KONKOLY: Objection.  A complete
20 answer to that question would implicate law
21 enforcement and potentially state secrets
22 privileges.  But you can answer to the extent that

16

1  you can without waiving either of those.
2       THE WITNESS:  Sure.  It is basically made
3  up of agencies that are involved in either
4  nominating identities to the Terror Screening
5  Database or that then screen from our database.
6  That would certainly include our colleagues from
7  both of those pools of organizations.  It does
8  include, of course, TSA.  It does include the FBI.
9       BY MR. ABBAS:
10  Q.   You can go ahead.
11  A.   And it includes, for instance, members of
12 the intelligence community.  But I can't get into
13 more detail as to specifics with that.
14  Q.   I am going -- I don't think you answered
15 the question.  What agencies comprise the Watch
16 Listing Advisory Council?
17      MS. KONKOLY: I am going to assert the
18 same objection that a comprehensive answer to that
19 question would implicate the law enforcement
20 privilege.  I believe the witness has already
21 answered to the extent that he can without waiving
22 the privilege.  To the extent there is anything

---

**37**

1 the Watch Listing Advisory Council's consultative
2 process?
3    **A.  Yes.**
4    Q.   And the Watch Listing Guidance has been
5 the product of the Watch Listing Advisory Council's
6 unanimous consensus each time it has been issued?
7    **A.  To the best of my knowledge, yes.**
8    Q.   What is the Terror Screening Database?  I
9 am sorry.  A few more questions on the Terror
10 Screening Center.  The Terror Screening Center, you
11 said, was created in 2003?
12   **A.  Yes.**
13   Q.   Was there -- did the Watch Listing
14 Advisory Council exist in 2003?
15   **A.  Pursuant to my previous answer, I don't**
16 **know precisely when that body was composed.  I know**
17 **the attorney general directed the FBI to stand up**
18 **Terror Screening Center in 2003.  I don't know the**
19 **precise sequence of events following that.**
20   Q.   And you might not know, and that's fine.
21 You know, if you don't know, that's a reasonable
22 answer.  But just for the clarity of the record, did

**38**

1 the Watch Listing Advisory Council exist in 2003?
2        MS. KONKOLY:  Objection.  Asked and
3 answered.
4        THE WITNESS:  I don't know when it was
5 established, so.
6        MR. ABBAS:  Indiana.
7        BY MR. ABBAS:
8    Q.   Did the Watch Listing Advisory Council
9 produce a Watch Listing Guidance in 2003?
10       MS. KONKOLY:  Objection.  I am going to
11 object on the basis of the scope of the topics we
12 have before us today and also potential law
13 enforcement sensitive information.  You can answer
14 if you can.
15       THE WITNESS:  I think I have.  If I don't
16 know if it existed, I wouldn't know if it did
17 something.
18       BY MR. ABBAS:
19   Q.   Is there a Watch Listing Guidance as old
20 as 2003?
21       MS. KONKOLY:  Objection.  Asked and
22 answered.  And same objections as I stated

**39**

1 previously.
2        THE WITNESS:  I don't know.
3        MR. ABBAS:  Indiana.
4        I will just note, for the record, that
5 the Magistrate Judge Anderson made it really clear
6 in the hearing a few weeks ago that he quote, thinks
7 there needs to be some discussion as to how this has
8 evolved over time if that has evolved over time and
9 what period of time.  Quote, this has to be put in
10 some context of a continuum, not just on the day
11 that the deposition gets taken.
12       MS. KONKOLY:  And I would note, for the
13 record, that that discussion was in the context of
14 measures to improve the reliability and accuracy of
15 the watch listing process.  And we are prepared to
16 testify about that today, but we do not understand
17 that instruction to cover every iteration Watch
18 Listing Guidance going back to 2003.  So at a
19 certain point, I will need to invoke the protective
20 order.
21       BY MR. ABBAS:
22   Q.   What is the Terror Screening Database?

**40**

1        MS. KONKOLY:  Objection.  Vague.
2 Objection.  Potentially it calls for law enforcement
3 sensitive information or state secrets privilege.
4 But you can answer to the extent that you can.
5        THE WITNESS:  The Terror Screening
6 Database is the consolidated watch list with respect
7 to terrorism for the United States Government.
8        BY MR. ABBAS:
9    Q.   Who owns the Terror Screening Database?
10       MS. KONKOLY:  Objection.  Vague.
11       THE WITNESS:  If you mean who is
12 responsible to maintain it, ownership, I think,
13 maybe has different connotations.  But if I take it
14 that that is your meaning, it is administered by the
15 Terror Screening Center.
16       BY MR. ABBAS:
17   Q.   Who controls the Terror Screening
18 Database?
19       MS. KONKOLY:  Objection.  Vague.
20       THE WITNESS:  The Terror Screening
21 Center.
22       BY MR. ABBAS:

Transcript of Timothy P. Groh, Designated Representative     11 (41 to 44)
Conducted on March 1, 2018

---

41

1    Q.    It was TSC's testimony today that the FBI
2 controls the Terror Screening Center; is that
3 correct?
4         MS. KONKOLY:  Objection.
5 Mischaracterizes his prior testimony.  Objection.
6 Vague.
7         THE WITNESS:  It is by direction of the
8 attorney general administered by the FBI.  But see
9 my prior testimony with regard to the role of the
10 Watch Listing Advisory Council.
11        BY MR. ABBAS:
12    Q.    Does the FBI control the Terror Screening
13 Database?
14        MS. KONKOLY:  Objection.  Asked and
15 answered.  Objection vague.
16        THE WITNESS:  The FBI administers the
17 Terror Screening Center.  The Terror Screening
18 Center administers the TSDB.
19        BY MR. ABBAS:
20    Q.    Can the FBI tell the Terror Screening
21 Center what to do with the Terror Screening
22 Database?

---

42

1         MS. KONKOLY:  Objection.  Vague.
2 Objection.  Asked and answered.
3         THE WITNESS:  I think that's an over
4 simplification of my prior testimony.
5         MR. ABBAS:  There is a question.  Can you
6 read back the question?
7         (The record was read.)
8         MS. KONKOLY:  Same objections.  And I
9 will add -- sorry.  I lost my train of thought.
10 Mischaracterizes prior testimony.
11        THE WITNESS:  I go back to my same
12 answer.  The form you put that leading question in
13 assumes certain things I have not testified to.  And
14 my answer is it is more complex than that.
15        BY MR. ABBAS:
16    Q.    So I will ask leading questions.  And
17 if --
**18    A.    I know.  And I will answer them as -- and**
**19 I will answer them as --**
20    Q.    You haven't answered it.  So just let's
21 -- let me try asking it a different way.  Who is the
22 person in charge of the Terror Screening Center?

---

43

1         MS. KONKOLY:  Objection.  Vague.
2         THE WITNESS:  The director of the Terror
3 Screening Center.
4         BY MR. ABBAS:
5    Q.    And what's his name?
**6    A.    Charles Kable.**
7    Q.    Does he have a boss?
**8    A.    He does.**
9    Q.    Who is his boss?
**10    A.    The executive assistant director for the**
**11 National Security of the FBI.**
12    Q.    Can the executive assistant director -- I
13 am sorry.  What was the title one more time?
**14    A.    Executive assistant director for National**
**15 Security.**
16    Q.    So the executive assistant director for
17 National Security of the FBI is the boss of the head
18 of the Terror Screening Center, correct?
**19    A.    Yes.**
20    Q.    Can the boss of the Terror Screening
21 Center's head tell the Terror Screening Center head
22 what to do?

---

44

1         MS. KONKOLY:  Objection.  Vague.
2 Objection.  Asked and answered.  Objection.
3 Misleading.
4         THE WITNESS:  Again, I think we are at
5 the same place we were before.  Yes.  And there is
6 also an important role for the Watch Listing
7 Advisory Council and the interagency to play in
8 governing how the Terror Screening Center functions.
9 If the -- if there is disagreement, then those
10 disagreements would be resolved through the National
11 Security Council.
12        BY MR. ABBAS:
13    Q.    They wouldn't be resolved through the
14 Watch Listing Advisory Council?
15        MS. KONKOLY:  Objection.  Vague.
16 Objection.
17        THE WITNESS:  Going with this construct,
18 then the situation you are describing is whether
19 there is not consensus with the terrorist with the
20 Watch Listing Advisory Council.  Disagreements
21 within when the consensus can't be reached are
22 resolved through National Security Council

---

45

1 processes.
2      BY MR. ABBAS:
3    Q.   Is the Watch Listing Advisory Council
4 advisory or can it tell the Terror Screening Center
5 what to do?
6      MS. KONKOLY:  Objection.  Vague.
7      THE WITNESS:  Since I have already
8 testified that the Terror Screening Center is a
9 member of the Watch Listing Advisory Council, that
10 would mean there is not a consensus within the
11 council.  And, again, that would go to the national
12 security process.  And, certainly, the
13 administration through the national security process
14 can tell the TSC what to do.
15    Q.   So the National Security Council ask tell
16 the Terror Screening Center what to do?
17      MS. KONKOLY:  Objection.
18 Mischaracterizes priors testimony.  Objection
19 misleading.  Objection.  Vague.  You can answer if
20 you can.
21      THE WITNESS:  As part of the Executive
22 Branch of the U.S. Government, yes.

46

1      BY MR. ABBAS:
2    Q.   Can the EPA tell the Terror Screening
3 Center what to do?
4    **A.   No.**
5    Q.   Okay.  Can the FBI tell the Terror
6 Screening Center what to do?
7      MS. KONKOLY:  Objection.  Vague.
8 Objection.  Misleading.  Objection.  Asked and
9 answered.  This question has been posed five times
10 at this point.  And I may need to start instructing
11 the witness not to answer if it is asked again.
12      MR. ABBAS:  And I am just struggling to
13 understand.  So I apologize for -- the repetition is
14 for my sake.  And I apologize for covering ground
15 that I might have already covered.  I just want to
16 make sure that I have a clear understanding of how
17 the Terror Screening Center works.
18      MS. KONKOLY:  I am just going to note,
19 for the record, that I believe that is the fourth or
20 fifth time that exact question has been asked.  I
21 will allow the witness to answer one more time.
22 After that, I am going to instruct not to answer of

47

1 that question is posed in the exact same terms.
2      BY MR. ABBAS:
3    Q.   Sure.  So I am going to pose it in a
4 little different terms.  In what sense is the
5 executive assistant director of the National
6 Security of the FBI the boss of the head of the
7 Terror Screening Center?
8    **A.   I think that's really, really broad and**
9 **vague, hard to answer.  I would say that he is the**
10 **boss in the sense that that is normally generally**
11 **thought of with the caveat that there are --**
12 **basically, if higher management in the FBI**
13 **instructed the Terror Screening Center to do**
14 **something that was contrary to the consensus reached**
15 **by the Watch Listing Advisory Council, there is a**
16 **process to go higher in the government to resolve**
17 **those differences.  And even though the Terror**
18 **Screening Center is administered by the FBI, it is**
19 **truly an interagency center.  And it is a complex --**
20 **what I am trying to explain is it is complex.  There**
21 **is not a simple answer to your question.**
22    Q.   Yeah, I agree that it is complex.  And so

48

1 has there ever been a disagreement between TSC and
2 the FBI as to how to administer the Terror Screening
3 Database?
4      MS. KONKOLY:  I am going to object
5 insofar as that calls for deliberative process
6 information within the deliberative process
7 privilege.  You can answer to the extent that you
8 can.
9      THE WITNESS:  I don't think I can get
10 into specifics.  But I think I can say that yes, we
11 have had disagreements with our FBI colleagues from
12 time to time.
13      BY MR. ABBAS:
14    Q.   Has the National Security Council
15 resolved disagreements between the FBI and TSC
16 regarding the TSDB?
17      MS. KONKOLY:  Objection.  Vague.
18 Objection.  Potentially deliberative process.
19 Objection.  Potentially law enforcement.  You can
20 answer to extent that you can.
21      BY MR. ABBAS:
22    Q.   And just to clarify, I am just asking for

49

1 decisions of the National Security Council. Has the
2 National Security Council ever made decisions that
3 resolved differences of opinion between the Terror
4 Screening Center and the FBI as to how the TSDB
5 should be maintained and operated?
6         MS. KONKOLY: Same objection. But you
7 can answer.
8         THE WITNESS: Not to my knowledge.
9         BY MR. ABBAS:
10    Q.   So in the history of the Terror Screening
11 Center, there has never been a disagreement between
12 the Terror Screening Center and the FBI that the
13 National Security Council has made a decision to
14 resolve?
15        MS. KONKOLY: I am going to object.
16 Mischaracterized his prior testimony. I am going to
17 make an objection based on the scope of the topics
18 before us here today. You can answer to the extent
19 that -- and also vagueness. You can answer to
20 extent that you can.
21        THE WITNESS: Not that I am aware of.
22        BY MR. ABBAS:

50

1    Q.   Is the National Security Council's
2 authority to resolve differences between the Terror
3 Screening Center and the FBI as to how to TSDB
4 should be the maintained and operated memorialized
5 in some document?
6         MS. KONKOLY: Objection. Vague.
7 Objection. Potentially law enforcement. You can
8 answer if you can.
9         THE WITNESS: I believe it is generally
10 memorialized in the executive order.
11        BY MR. ABBAS:
12    Q.   HSPD-6?
13        MS. KONKOLY: Objection. Calls for a
14 legal conclusion.
15        THE WITNESS: I may have to confer. I am
16 not sure if that document itself is privileged. I'm
17 not sure.
18        MR. ABBAS: Do you want to take a second?
19        MS. KONKOLY: If the witness needs advice
20 as to whether he can answer without waiving the
21 privilege, we would ask to take a break.
22        MR. ABBAS: It's up to you.

51

1         THE WITNESS: If you want me to answer.
2         MR. ABBAS: Do you want us to step out?
3         MS. KONKOLY: You can step out.
4         THE VIDEOGRAPHER: We are going off the
5 record. The time is 9:49 a.m.
6         (A recess was held.)
7         THE VIDEOGRAPHER: We are back on the
8 record. The time is 10:04 a.m. And we have been on
9 the record for 42 minutes and 3 seconds.
10        MR. ABBAS: Could you read the last
11 question, please? Oh, I'm sorry. Lena Masri is now
12 here for the plaintiffs. Could you read the last
13 question back?
14        (The record was read.)
15        MS. KONKOLY: And I am going to object
16 that that calls for a legal conclusion. I am going
17 to object on the basis of the scope of the
18 protective order that was entered. And I am also
19 going to object insofar as the answer to that
20 question involves information that is within the
21 purview of another agency and note that while
22 Mr. Groh can answer this question based on his

52

1 understanding he cannot bind any other agency with
2 his answer.
3         THE WITNESS: So I think the --
4 generally, I wasn't sure if there was a privilege
5 associated with it. But I don't believe there is.
6 NSPM-4, which was published last year, which lays
7 out National Security Council procedures generally,
8 is the process that would be used to resolve any
9 differences between any members of the Watch Listing
10 Advisory Council, include the TSC and the FBI.
11        MR. ABBAS: Arizona.
12        BY MR. ABBAS:
13    Q.   NSPM-4?
14    A.   **National Security Presidential Memorandum**
15 **4.**
16    Q.   And the National Security Presidential --
17    A.   **Memoranda or memorandum.**
18    Q.   The National Security Presidential
19 Memorandum was first published in 2017; is that
20 correct?
21    A.   **This particular one, yes.**
22    Q.   Are there prior versions of the NSPM?

65

1 Screening Database that does not satisfy the TSDB
2 inclusion standard?
3       MS. KONKOLY: Objection. Vague.
4 Objection. Potentially calls for law enforcement or
5 state secrets information. But you can answer to
6 the extent that you can.
7       THE WITNESS: There are limited purposes
8 for which individuals who do not meet the reasonable
9 suspicion standard can be included in the Terror
10 Screening Database in order to facilitate screening
11 processes specifically for the Department of
12 Homeland Security and Department of State.
13       BY MR. ABBAS:
14   Q.   So the Terror Screening Center does not
15 apply the TSDB inclusion standards to every person
16 that is in the TSDB?
17       MS. KONKOLY: Objection. Vague. Calls
18 for -- objection. Vague.
19       THE WITNESS: I would clarify that you
20 keep use the word TSDB inclusion standard. That's
21 not a word I have used. I would say that is the
22 reasonable suspicion standard that's applied to

66

1 known or suspected terrorists.
2       BY MR. ABBAS:
3   Q.   So we are going to argue -- not argue. I
4 am going to ask you questions about the content of
5 the reasonable suspicion standard. And I am using
6 the inclusion standard, because I don't think it is
7 a reasonable suspicion standard. But is the
8 standard that TSC applies to determine whether
9 someone is included in the TSDB, you refer to that
10 as the reasonable suspicion standard, correct?
11   **A.   That is correct.**
12   Q.   Okay. I refer to that as the inclusion
13 standard.
14   **A.   Okay. I am just saying that my concern**
15 **about that is precision is important here.**
16   Q.   Of course.
17   **A.   It is going to be confusing going**
18 **forward. And we may have to keep clarifying this**
19 **because this is complex stuff. So we have got to be**
20 **precise.**
21   Q.   And I appreciate you working together
22 with me as we are trying to clarify the language. I

67

1 have not worked at the TSC, so I don't know your
2 language.
3   **A.   I understand.**
4   Q.   Does the TSC -- let me try asking the
5 question a different way. Does the TSC apply the
6 same standard to every person in the Terror
7 Screening Database?
8       MS. KONKOLY: Objection. Vague.
9 Objection. Calls for information that's potentially
10 -- a full answer may call for information protected
11 by the law enforcement or state secrets privilege.
12 But you can answer to the extent that you can.
13       THE WITNESS: I believe, as I just
14 testified, the answer to that is no.
15       BY MR. ABBAS:
16   Q.   Why doesn't the Terror Screening Center
17 apply the same standards to every person in the
18 Terror Screening Center? I am sorry. Let me start
19 that again. Why doesn't the Terror Screening Center
20 apply the same standard to each person in the Terror
21 Screening Database?
22       MS. KONKOLY: Objection. Vague.

68

1 Objection. Calls for information potentially
2 protected by the law enforcement or state secrets
3 privilege. You can answer to the extent that you
4 can.
5       THE WITNESS: Because we were directed by
6 the Watch Listing Advisory Council in certain
7 instances for certain purposes to apply a different
8 standard.
9       BY MR. ABBAS:
10   Q.   When did the Watch Listing Advisory
11 Council tell the Terror Screening Center to
12 establish exceptions to what you are calling
13 reasonable suspicion standard of the TSDB?
14       MS. KONKOLY: Objection. Vague.
15 Objection. Potentially calls for law enforcement
16 sensitive information. You can answer to the extent
17 that you can answer. And SSI.
18       THE WITNESS: I think I can only give a
19 general answer to that to say that was after 2009.
20       BY MR. ABBAS:
21   Q.   Okay. Are the exceptions to the TSDB
22 inclusion standards memorialized in the document?

85

1  there is an investigation of an individual, I think
2  that is appropriate.  But to fully answer your
3  question, that would assume a predicated
4  investigation pursuant to -- if we are talking about
5  the FBI, pursuant to the guidelines that the FBI
6  follows.  But is not, per se, simply to recruit
7  someone who is not subject to a predicated
8  investigation.
9          BY MR. ABBAS:
10    Q.    Are there individuals on the Terror
11  Screening Database that are informants for the FBI?
12          MS. KONKOLY:  Objection. Calls for
13  information protected by the law enforcement
14  privilege, potentially the state secrets.  I am
15  going to instruct him not to answer that one.
16          BY MR. ABBAS:
17    Q.    Does the TSDB contain notations if
18  someone is an informant of the FBI?
19          MS. KONKOLY:  Objection.  Calls for law
20  enforcement sensitive and potentially state secrets.
21  I am instructing him not to answer that question.
22          BY MR. ABBAS:

86

1    Q.    Is -- does the FBI utilize -- I am sorry.
2  In TSC's understanding, does the FBI utilize the
3  TSDB to track persons in the FBI?
4          MS. KONKOLY:  Objection.  Calls for
5  information potentially within law enforcement,
6  state secrets privileges.  Also within the purview
7  of another agency.  You can answer to the extent
8  that you can.
9          BY MR. ABBAS:
10    Q.    Let me withdraw that question.  I just
11  asked it poorly.  Does the TSC know whether the FBI
12  utilizes the TSDB to track the movement of persons
13  listed in the FBI?
14          MS. KONKOLY:  Same objections.
15  Potentially law enforcement sensitive, potentially
16  state secrets.  Vague and within the purview of
17  another agency.  But you can answer as to your
18  understanding.
19          THE WITNESS:  I think generally, the FBI
20  may use -- we would -- someone that the FBI has
21  interest or equities with respect to, we would
22  report what we would call encounters generally to

87

1  the FBI.
2          BY MR. ABBAS:
3    Q.    The Terror Screening Center knows that
4  the FBI utilizes the TSDB to monitor the movement of
5  persons listed in the FBI, correct?
6          MS. KONKOLY:  Objection.
7  Mischaracterizes prior testimony.  Objection.
8  Potentially law enforcement information within the
9  purview of another agency.  You can answer to the
10  extent that you can.
11          THE WITNESS:  I think the word monitor is
12  -- I wouldn't use that particular word.  We report
13  encounters when we become aware of them.
14          BY MR. ABBAS:
15    Q.    Why do you report -- why does TSC report
16  encounters with TSDB listees to the FBI?
17          MS. KONKOLY:  Objection.  Potentially
18  calls for law enforcement sensitive information.
19  You can answer to the extent that you can.
20          THE WITNESS:  To maintain that common
21  operating picture, I formally referred to, as it was
22  one of the key lessons to be found in the 9/11

88

1  Commission Report.
2          BY MR. ABBAS:
3    Q.    Who told the Terror Screening Center to
4  report encounters with TSDB listees to the FBI?
5          MS. KONKOLY:  Objection.  Vague.
6  Objection.  Potentially law enforcement sensitive.
7  You can answer to the extent that you can.
8          THE WITNESS:  I am going to assume that
9  that happened very early on in the creation of that.
10  You know, that would be something governed by the
11  Watch Listing Advisory Council.  It has long and/or
12  always been the case that that's been true.
13          BY MR. ABBAS:
14    Q.    What is TSC's understanding of what the
15  FBI generally does with TSDB listee encounter
16  information that it receives from the Terror
17  Screening Center?
18          MS. KONKOLY:  Objection.  Potentially
19  calls for law enforcement sensitive information.
20  Also, information within the purview of another
21  agency to which Mr. Groh cannot bind any other
22  agency.  But you can answer as to your understanding

Transcript of Timothy P. Groh, Designated Representative
Conducted on March 1, 2018

33 (129 to 132)

129
1       MS. KONKOLY: Objection.  Asked and
2  answered.
3       THE WITNESS: It is EMA, which stands for
4  Encounter Management Application.  We refer to it as
5  EMA.
6       BY MR. ABBAS:
7  Q.   So EMA?
8  A.   Yes.
9  Q.   Does TSC -- TSC creates, maintains, and
10 disseminates TSS, correct?
11 A.   Disseminates -- I just want to make a
12 distinction between the way TSDB is disseminated.
13 It is quite different from the way EMA or encounter
14 information, would be a better way to put it, is
15 disseminated.  They are not the same kind of
16 automatic access to that data that there is for the
17 Terror Screening Database.  In some ways they are
18 quite different.
19 Q.   Okay.  So they are disseminated
20 differently and access to them -- I'm sorry.  TSC
21 regulates access to EMA information differently than
22 -- I am sorry.  Let me back up.  TSC manages access

130
1  to encounter information differently than it manages
2  access to TSDB information?
3  A.   Correct.
4  Q.   Was it always TSC that managed -- I am
5  sorry.  Was it always TSC that always maintained
6  encounter information regarding TSDB listees?
7       MS. KONKOLY: Objection.  Vague,
8  objection.  Potentially law enforcement privilege.
9  Objection.  Scope.  But you can answer that if you
10 know.
11      THE WITNESS: The -- the encounters have
12 always been reported to TSC.  There was a change, I
13 believe, in about 2013 where that encounter
14 information used to be housed at FBI and is now
15 housed at TSC.
16      BY MR. ABBAS:
17 Q.   Who made the decision to transfer
18 encounter information from FBI to TSC?
19      MS. KONKOLY: Objection.  Vague.
20 Objection.  Potentially law enforcement privilege.
21 Objection.  Scope.  You can answer if you know.
22      THE WITNESS: Certainly the FBI, I

131
1  believe, and TSC probably in concurrence decided
2  that that was the thing to do.  I assume that that
3  was then ratified by the Watch Listing Advisory
4  Council.
5       MR. ABBAS: Indiana.
6       BY MR. ABBAS:
7  Q.   The -- why did TSC assume control over
8  encounter information from the FBI?
9       MS. KONKOLY: Objection.  Calls for a
10 legal conclusion.  Objection.  Potentially
11 privileged under the law enforcement privilege.  But
12 you can answer if you know without waiving the
13 privilege.
14      THE WITNESS: I think it was found -- it
15 was believed to be more efficient to have the folks
16 that made decisions on dissemination co-located with
17 the individuals who received the initial report of
18 the encounter.  It was an opportunity for better
19 collaboration.  And to the best of my knowledge,
20 that's why a decision was made.
21      BY MR. ABBAS:
22 Q.   Did the transfer of encounter information

132
1  from the FBI to the Terror Screening Center involve
2  the export of information that TSC did not already
3  have?
4  A.   I am sorry.  To export to who?
5  Q.   TSC.  From the FBI to TSC.  Let me try to
6  ask it a different way.
7  A.   Sure.
8  Q.   Was the FBI -- did the FBI collect
9  encounter information -- I am sorry.  Prior to TSS,
10 did the FBI collect encounter information that TSC
11 didn't have?
12 A.   I believe TSC had access to that
13 information.  But yes, I think -- it was really a
14 two-step -- it was really a two-step process prior
15 that we have now made more seamless by co-locating
16 and honestly bringing what was previously separate
17 systems together.
18 Q.   So now there is only one single system
19 that houses TSDB listee encounter information,
20 correct?
21 A.   Yes.
22 Q.   And the name of that system is TSS?

197

1  Objection.  Calls for a legal conclusion insofar as
2  -- also, objection insofar as the answer would call
3  for information protected by the law enforcement
4  privilege.  You can answer to the extent that you
5  can.
6          THE WITNESS:  It would be governed by the
7  Watch Listing Advisory Council as we discussed -- as
8  we discussed earlier.
9          BY MR. ABBAS:
10   Q.   Does TSC know which entities have access
11  to the NCIC?
12          MS. KONKOLY:  Objection insofar as the
13  information -- the answer would call for information
14  protected by the law enforcement privilege.  You can
15  answer to the extent that you can.
16          THE WITNESS:  Certainly, NCIC knows who
17  they then export to.  But the TSC does not have
18  direct knowledge of that.
19          BY MR. ABBAS:
20   Q.   Does TSC have access to NCIC?
21   **A.   TSC has access to NCIC via the State of**
22  **Virginia, who then receives it from the Criminal**

198

1  **Justice Information System's division, CJIS, which**
2  **runs NCIC.**
3      Q.   So the Terror Screening Center has access
4  to the NCIC because Virginia has access to the NCIC?
5      **A.   Yes.**
6      Q.   Why is that the arrangement?
7          MS. KONKOLY:  Objection insofar as the
8  answer would call for --
9          BY MR. ABBAS:
10     Q.   Let me withdraw it.  Why doesn't the
11  Terror Screening Center get access to the NCIC
12  directly from the FBI?
13          MS. KONKOLY:  Objection.  Vague.
14  Objection insofar as the answer would call for
15  information protected by the law enforcement
16  privilege.  You can answer to the extent you can.
17          THE WITNESS:  I honestly don't know why
18  the system was set up that particular way.  It is
19  true nationwide.
20          BY MR. ABBAS:
21     Q.   What's true nationwide?
22     **A.   The entities geographically located**

199

1  **within a state or territory receive NCIC through**
2  **that state or territorial -- I forget what the term**
3  **is -- NCIC bureau or something along those lines.**
4          BY MR. ABBAS:
5      Q.   So there is like a single point of
6  contact for NCIC information per state?
7      **A.   Yes.**
8      Q.   Okay.  And territories?
9      **A.   Yes.**
10     Q.   Okay.  Which Federal Government entities
11  -- I am sorry.  TSC provides -- I am sorry.  Let me
12  start over.  TSC exports TSDB information in a
13  variety of different ways to recipients of TSDB
14  information, correct?
15     **A.   Yes.**
16     Q.   Are there a fixed number of ways that TSC
17  provides TSDB information to entities that receive
18  TSDB information?
19          MS. KONKOLY:  Objection.  Vague.
20  Objection insofar as the answer would call for
21  information protected by the law enforcement
22  privilege.  You can answer to the extent you can.

200

1          THE WITNESS:  I think each individual
2  export is -- each system is unique in some way.  So
3  I think they are all different.
4          BY MR. ABBAS:
5      Q.   Which Federal Government entities have
6  real-time access to TSDB information?
7          MS. KONKOLY:  Objection insofar as the
8  answer would call for information protected by the
9  law enforcement privilege.  You can answer to the
10  extent you can.
11          THE WITNESS:  So, generally, the
12  Department of Homeland Security, the State
13  Department we have already talked about; the FBI,
14  including NCIC.  I think that covers -- I think that
15  covers most of them.  Of course, there are
16  subcomponents to some of those.
17          BY MR. ABBAS:
18     Q.   To DHS?
19     **A.   Including DHS.**
20     Q.   Does USCIS have real-time access to TSDB
21  information?
22          MS. KONKOLY:  Objection insofar as the

Transcript of Timothy P. Groh, Designated Representative          55 (217 to 220)
Conducted on March 1, 2018

217

1 compound.  Objection insofar as the information
2 calls -- I'm sorry -- as the answer calls for
3 information protected by the law enforcement
4 privilege.  You can answer to the extent that you
5 can.
6       THE WITNESS:  I think violations is a
7 very strong word.  I think that this is a complex
8 process.  And as we see here in this deposition,
9 terms are important and often misunderstood and
10 clarification is required.  So I think there is
11 constant ongoing clarification, discussion,
12 adjusting to changing circumstances that goes on
13 across the entire enterprise.  I am not aware of
14 something where I believe it would constitute a
15 violation of an intentional misuse of TSDB data.
16       BY MR. ABBAS:
17   Q.    So the Terror Screening Center is not
18 aware of a single instance in which an agency has
19 misused TSDB information?
20       MS. KONKOLY:  Objection.
21 Mischaracterized his prior testimony.  Objection
22 insofar as the answer would call for information

218

1 protected by the law enforcement privilege.  You can
2 answer if you can.
3       THE WITNESS:  Again, I have a hard time
4 with the word misused.  I think there is often
5 clarification needed on what we or one of our
6 partners is doing, how we interact.  But you are
7 implying certain nefarious activity in there.  And
8 as far as something I would describe as nefarious,
9 not liking the word misused, I would say no.
10       BY MR. ABBAS:
11   Q.    Has TSC ever withheld TSDB information
12 from an entity that would otherwise receive TSDB
13 information as a result of how that entity was
14 utilizing TSDB information?
15       MS. KONKOLY:  Objection.  Vague.
16 Objection as to scope.  Objection insofar as the
17 answer would call for any information protected by
18 the law enforcement privilege.  You can answer to
19 the extent that you know and can do so.
20       THE WITNESS:  I think those kind of
21 disagreements to take a sanction against a partner
22 like that would require us to go to the Watch

219

1 Listing Advisory Council and go through the
2 aforementioned process to reconcile that.
3       BY MR. ABBAS:
4   Q.    And, ultimately, if there is a dispute,
5 the National Security Council resolves that?
6   A.    That's correct.
7   Q.    And the National Security Council has
8 never resolved a dispute regarding -- I am sorry,
9 let me ask that question.  Has the National Security
10 Council ever resolved a dispute regarding the use of
11 TSDB information?
12       MS. KONKOLY:  Objection.  Vague.
13 Objection as to scope.  Objection insofar as the
14 answer would call for information protected by the
15 law enforcement privilege.  You can answer to the
16 extent you know and can do so without waiving any
17 privilege.
18       THE WITNESS:  Not to -- not to my
19 knowledge and certainly not recently if it ever did
20 happen.
21       MR. ABBAS:  Indiana.
22       BY MR. ABBAS:

220

1   Q.    Has the Watch List Advisory Council -- is
2 it the Watch Listing Advisory Council or Watch List
3 Advisory Council?
4   A.    Watch Listing.
5   Q.    Oh, Watching Listing, okay.  Has the
6 Watch Listing Advisory Council ever made a decision
7 regarding the -- I am sorry.
8       MR. ABBAS:  Can you read back my last
9 question?
10       (The record was read.)
11       BY MR. ABBAS:
12   Q.    Has the Watch Listing Advisory Council
13 ever resolved a dispute regarding the use of TSDB
14 information?
15       MS. KONKOLY:  Objection.  Asked and
16 answered.  Objection as to scope, both temporarily
17 and now insofar as the topics for this deposition
18 are defined.  Also objection as to the information
19 calling or the question calling for information
20 within the purview of another agency.  Objection
21 insofar as the answer calls for information
22 protected by law enforcement privilege.  You can

225

1  you.  But I thought counsel would slap me around.
2          BY MR. ABBAS:
3      Q.   What is it called?  What is it?
4  Statements of conclusion?
5      **A.   Statement of conclusion.**
6      Q.   Statement of conclusion.
7      **A.   And periodically the Watch Listing**
8  **Guidance is updated.  And we have previously --**
9      Q.   We have covered that.
10     **A.   There you go.**
11     Q.   How many statements of conclusion has --
12  well, how many times a year does -- let's take 2017.
13  How many times in 2017 did the Watch Listing
14  Advisory Council meet?
15         MS. KONKOLY:  Objection insofar as that
16  call for information protected by the law
17  enforcement privilege.  You can answer if you can.
18         THE WITNESS:  I would say generally
19  quarterly.  I don't remember specifically.
20  Quarterly, sometimes more frequently.
21         BY MR. ABBAS:
22     Q.   So at least -- at least multiple times a

226

1  year?
2      **A.   Yes.**
3      Q.   And I have asked this, but I just can't
4  remember the answer.  The Watch Listing Advisory
5  Council has existed since at least 2009?
6         MS. KONKOLY:  Objection.  Asked and
7  answered.
8         BY MR. ABBAS:
9      Q.   And I could be wrong.
10     **A.   I believe so.  I believe so.**
11     Q.   Okay.  It has existed for at least the
12  last five years?
13     **A.   Yes.**
14     Q.   Okay.  And during those five years the
15  Watch Listing Advisory Council -- each of those five
16  years it has met multiple times?
17     **A.   Yes.**
18     Q.   And each time the Watch Listing Advisory
19  Council meets, it issues a statement of conclusion?
20     **A.   It certainly has since I have been there.**
21  **And I have reason -- as far as I know, it did prior**
22  **to that.**

227

1          MR. ABBAS:  Arizona.
2          BY MR. ABBAS:
3      Q.   What kinds of things are in these
4  statement of conclusions?
5          MS. KONKOLY:  Objection.  Vague.
6  Objection insofar as it calls for information
7  protected by either the deliberative process
8  privilege or the law enforcement privilege.  You can
9  answer to the extent that you can.
10         THE WITNESS:  Topics discussed, consensus
11  reached, do-outs, report-backs from various
12  participants.
13         BY MR. ABBAS:
14     Q.   Are you -- is the Terror Screening Center
15  aware of any Watch Listing Advisory Council
16  statement of conclusions that regards the -- I am
17  sorry.  I am going to start that question over
18  again.  When the Watch Listing Advisory Council
19  issues a statement of conclusion, are the member
20  agencies of the Watch Listing Advisory Council bound
21  to follow the substance of those conclusions?
22         MS. KONKOLY:  Objection.  Vague.

228

1  Objection insofar as the information -- the answer
2  calls for information protected by the law
3  enforcement privilege or a legal conclusion.  And I
4  will also note an objection to scope.  You can
5  answer if you can.
6          THE WITNESS:  I think because those
7  decisions are reached by consensus, it is understood
8  that that is the agreement.  And if somebody wants
9  to revisit that agreement, there's the
10  aforementioned processes to do so.
11         BY MR. ABBAS:
12     Q.   So is the Terror Screening Center's
13  testimony that the member agencies that comprise the
14  Watch Listing Advisory Council adhere to the
15  substance of the Watch Listing Advisory Council's
16  statements of conclusions?
17         MS. KONKOLY:  Objection as to the extent
18  that information calls for information within the
19  purview of other agencies Mr. Groh cannot bind.
20  Objection.  Vague.  Objection insofar as the
21  information calls for any information protected by
22  the law enforcement privilege.  You can answer to

Transcript of Timothy P. Groh, Designated Representative          58 (229 to 232)
Conducted on March 1, 2018

229

1  the extent that you can.
2        THE WITNESS:  Yes.  If it has been
3  concluded by the council, that means it was at that
4  point without dissent.  And so my expectation would
5  be that that's what we would follow until -- unless
6  and until we ever revisited the issue.
7        BY MR. ABBAS:
8    Q.   Does the Terror Screening Center maintain
9  a record of all of the statements of conclusions
10 that the Watch Listing Advisory Council has issued?
11   **A.   I believe so.**
12   Q.   Have any of those statement of
13 conclusions that the Watch Listing Advisory Council
14 has issued regard tightening or loosening the TSDB's
15 inclusion standard?
16       MS. KONKOLY:  Objection insofar as that
17 information calls for information protected by
18 either the law enforcement privilege or the state
19 secrets privilege potentially SSI.  Objection
20 insofar as the information is within the purview of
21 other agencies.  You can answer to the extent that
22 you can.

230

1        THE WITNESS:  I believe that it is likely
2  that they do.
3        BY MR. ABBAS:
4    Q.   So there have been Watch Listing Advisory
5  Council statement of conclusions that regard
6  loosening or tightening the TSDB's inclusion
7  standards?
8        MS. KONKOLY:  Objection.
9  Mischaracterizes prior testimony.  Objection.  Same
10 objections insofar as the answer would implicate
11 information protected by the law enforcement,
12 potentially the state secrets or SSI privileges.
13 You can answer if you can.
14       THE WITNESS:  I believe it would be
15 reflected there or in an update to the Watch Listing
16 Guidance or both.
17   Q.   Has the TSDB inclusion standard ever been
18 tightened?
19       MS. KONKOLY:  Objection.
20       BY MR. ABBAS:
21   Q.   I'm sorry.  Let me rephrase.  Has the
22 TSDB inclusion standard ever been made more

231

1  permissive?
2        MS. KONKOLY:  Objection.  Vague.
3  Objection insofar as the answer --
4        THE WITNESS:  Yeah, it was vague.
5  Describe which way you mean permissive to be.
6        BY MR. ABBAS:
7    Q.   So the number of nominations to the TSDB
8  varies by year, correct?
9    **A.   Yes.**
10   Q.   And the number of nominations accepted by
11 TSC varies by year, correct?
12   **A.   Yes.  It varies all the time, but it can
13 be reflected by the year.**
14   Q.   Has TSC ever made it -- has TSC ever
15 taken actions that would produce a higher nomination
16 acceptance rate by making the TSDB inclusion
17 standards more permissive?
18       MS. KONKOLY:  Objection.  Vague.
19 Objection insofar as the answer calls for
20 information protected by the law enforcement
21 privilege and state secrets privilege.  You can
22 answer if you can.

232

1        THE WITNESS:  So you mean -- you mean to
2  -- I take it you mean to raise or lower the bar.
3  You mean to lower the bar for nominations.  Is that
4  what you are saying?
5        BY MR. ABBAS:
6    Q.   To make more permissive would be lowering
7  the bar.  To make less permissive would be raising
8  the bar.
9        MS. KONKOLY:  Same objections.
10       BY MR. ABBAS:
11   Q.   So let me -- with that understanding, let
12 me ask the question again.  I think now -- I think
13 now we are on the same page.  Has TSC taken any
14 actions that would make the inclusion process more
15 permissive?
16       MS. KONKOLY:  Objection.  Vague.
17 Objection insofar as the answer would call for any
18 information protected by the law enforcement or
19 potentially state secrets privileges.  You can
20 answer to the extent you can.
21       THE WITNESS:  So I think we already
22 described changes that were made circa 2009 with