**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | | |
|---|---|---|
| **ANAS ELHADY,** *et al.,* | ) | |
| | ) | **Case No. 16-cv-00375** |
| Plaintiffs, | ) | **Hon. Anthony J. Trenga** |
| | ) | **Mag. John F. Anderson** |
| | ) | |
| v. | ) | |
| | ) | |
| **CHARLES H. KABLE,** Director of the | ) | |
| Terrorist Screening Center; in his official | ) | |
| capacity, *et al.;* | ) | |
| | ) | |
| Defendants. | ) | |

**EXHIBITS IN SUPPORT OF PLAINTIFFS'**
**FOURTH MOTION TO COMPEL**
**RE: "QUIET SKIES" DOCUMENTS AND INFORMATION**

**INDEX OF EXHIBITS**

| Exhibit | Description | Date |
|---------|-------------|------|
| A | Jana Winter, "Welcome to the Quiet Skies," *Boston Globe*, *available at* http://apps.bostonglobe.com/news/ nation/graphics/2018/07/tsa-quiet-skies/ ?p1=HP_SpecialTSA | July 28, 2018 |
| B | *TSA's Quiet Skies Program*, Federal Air Marshal Service Information Bullet – Quiet Skies Selectees | March 13, 2018 |
| C | Quiet Skies Surveillance Checklist | unknown |
| D | Excerpts of 30(b)(6) TSA Deposition | March 20, 2018 |
| E | Excerpts of Deposition of Plaintiff El-Shwedhi | Nov. 29, 2017 |
| F | Excerpts of Deposition of Plaintiff Mark Amri | March 8, 2018 |
| G | Excerpts of TSC Responses to Second Set of RFPs No. 4. | Dec. 22, 2017 |
| H | Defendants' Responses to Third Set of RFPs No. 1. | Jan. 4, 2018 |
| I | Excerpts of TSC Responses to First Set of Interrogatories No. 23. | Feb. 21, 2018 |
| J | Excerpts of TSC Responses to Second Set of Interrogatories No. 1. | Feb. 23, 2018 |

# Exhibit A

 **Nation** 

Did you scan the boarding area from afar?

Have a cold, penetrating stare?

Sleep on the plane? Use the bathroom? Talk to others?

This is just some of the information that federal air marshals collect on thousands of regular US citizens under a secret, domestic surveillance program.

Last free article. **Subscribe now →**

# Welcome to the Quiet Skies

**By Jana Winter**

July 28, 2018

---

*Read more: Lawmakers demand answers on 'Quiet Skies' surveillance program after Globe report*

---

Federal air marshals have begun following ordinary US citizens not suspected of a crime or on any terrorist watch list and collecting extensive information about their movements and behavior under a new domestic surveillance program that is drawing criticism from within the agency.

The previously undisclosed program, called "Quiet Skies," specifically targets travelers who "are not under investigation by any agency and are not in the Terrorist Screening Data Base," according to a Transportation Security Administration bulletin in March.

The internal bulletin describes the program's goal as thwarting threats to commercial aircraft "posed by unknown or partially known terrorists," and gives the agency broad discretion over which air travelers to focus on and how closely they are tracked.

Last free article. **Subscribe now →**



Brynn Anderson/Associated Press

But some air marshals, in interviews and internal communications shared with the Globe, say the program has them tasked with shadowing travelers who appear to pose no real threat — a businesswoman who happened to have traveled through a Mideast hot spot, in one case; a Southwest Airlines flight attendant, in another; a fellow federal law enforcement officer, in a third.

It is a time-consuming and costly assignment, they say, which saps their ability to do more vital law enforcement work.

TSA officials, in a written statement to the Globe, broadly defended

Last free article. **Subscribe now →**

declined to discuss whether Quiet Skies has intercepted any threats, or even to confirm that the program exists.

Release of such information "would make passengers less safe," spokesman James Gregory said in the statement.



[Read the checklist](#)

Already under Quiet Skies, thousands of unsuspecting Americans have been subjected to targeted airport and inflight surveillance, carried out by small teams of armed, undercover air marshals, government documents show. The teams document whether passengers fidget, use a computer, have a "jump" in their Adam's apple or a "cold penetrating stare," among other behaviors, according to the records.

Air marshals note these observations — minute-by-minute — in two separate reports and send this information back to the TSA.

All US citizens who enter the country are automatically screened for

Last free article. **Subscribe now →**

checked and their names run against a terrorist watch list and other
databases, according to agency documents.

```
Explore the behavior checklist
```

## 1. SUBJECT WAS ABNORMALLY AWARE OF SURROUNDINGS ▾

```
(If observed, check any that apply below) | Y N Unknown
```

Reversing or changing directions
and/or stopping while in transit
through the airport

Attempting to change appearance by
changing clothes, shaving etc. while in
the airport or on the plane

Using the reflection in storefront
windows to identify surveillance

Observing the boarding gate area
from afar

Boarded last

Observing other people who appear
to be observing FAM team and/or
subject

## 2. SUBJECT EXHIBITED BEHAVIORAL INDICATORS ▾

```
(If observed, check any that apply below) | Y N Unknown
```

## 3. SUBJECT'S APPEARANCE WAS DIFFERENT FROM INFORMATION PROVIDED ▾

```
(If yes, check any that apply below) | Y N Unknown
```

## 4. SUBJECT SLEPT DURING THE FLIGHT ▾

```
(If observed, check any that apply below) | Y N Unknown
```

## 5. GENERAL OBSERVATIONS ▾

```
(Provide detailed descriptions of any electronic devices in subject's
```

Last free article. **Subscribe now →**

## 6. FOR DOMESTIC ARRIVALS ONLY ▾

(If possible, provide identifiers (license plate, vehicle description) of pick up vehicle in AAR) | Y N Unknown

The program relies on 15 rules to screen passengers, according to a May agency bulletin, and the criteria appear broad: "rules may target" people whose travel patterns or behaviors match those of known or suspected terrorists, or people "possibly affiliated" with someone on a watch list.

The full list of criteria for Quiet Skies screening was unavailable to the Globe, and is a mystery even to the air marshals who field the surveillance requests the program generates. TSA declined to comment.

When someone on the Quiet Skies list is selected for surveillance, a team of air marshals is placed on the person's next flight. The team receives a file containing a photo and basic information — such as date and place of birth — about the target, according to agency documents.

The teams track citizens on domestic flights, to or from dozens of cities big and small — such as Boston and Harrisburg, Pa., Washington, D.C., and Myrtle Beach, S.C. — taking notes on whether travelers use a phone, go to the bathroom, chat with others, or change clothes, according to documents and people within the department.

### Flying the quiet skies

Air marshals are following citizens to or from cities big and small, including those airports.

Last free article. **Subscribe now →**



Quiet Skies represents a major departure for TSA. Since the Sept. 11 attacks, the agency has traditionally placed armed air marshals on routes it considered potentially higher risk, or on flights with a passenger on a terrorist watch list. Deploying air marshals to gather intelligence on civilians not on a terrorist watch list is a new assignment, one that some air marshals say goes beyond the mandate of the US Federal Air Marshal Service. Some also worry that such domestic surveillance might be illegal. Between 2,000 and 3,000 men and women, so-called flying FAMs, work the skies.

Since this initiative launched in March, dozens of air marshals have raised concerns about the Quiet Skies program with senior officials and colleagues, sought legal counsel, and expressed misgivings about the surveillance program, according to interviews and documents reviewed by the Globe.

Last free article. **Subscribe now →**

7/31/20      TSA Quiet Skies JFA tracking program could track citizens traveling on domestic flights with secret surveillance plan of the Boston Globe

Case 1:16-cv-00375-AJT-JFA   Document 229-1   Filed 08/01/18   Page 11 of 99 PageID# 7763



## Send The Boston Globe a confidential news tip

Send a tip

"What we are doing [in Quiet Skies] is troubling and raising some serious questions as to the validity and legality of what we are doing and how we are doing it," one air marshal wrote in a text message to colleagues.

The TSA, while declining to discuss details of the Quiet Skies program, did address generally how the agency pursues its work.

"FAMs [federal air marshals] may deploy on flights in furtherance of the TSA mission to ensure the safety and security of passengers, crewmembers, and aircraft throughout the aviation sector," spokesman James Gregory said in an e-mailed statement. "As its assessment capabilities continue to enhance, FAMS leverages multiple internal and external intelligence sources in its deployment strategy."

Last free article. **Subscribe now →**

▶ Play

Scott LaPierre/Globe Staff

Agency documents show there are about 40 to 50 Quiet Skies passengers on domestic flights each day. On average, air marshals follow and surveil about 35 of them.

In late May, an air marshal complained to colleagues about having just surveilled a working Southwest Airlines flight attendant as part of a Quiet Skies mission. "Cannot make this up," the air marshal wrote in a message.

One colleague replied: "jeez we need to have an easy way to document this nonsense. Congress needs to know that it's gone from bad to worse."

Experts on civil liberties called the Quiet Skies program worrisome and potentially illegal.

"These revelations raise profound concerns about whether TSA is conducting pervasive surveillance of travelers without any suspicion of actual wrongdoing," said Hugh Handeyside, senior staff attorney with the American Civil Liberties Union's National Security Project.

"If TSA is using proxies for race or religion to single out travelers for surveillance, that could violate the travelers' constitutional rights.

Last free article. **Subscribe now →**

using unreliable and unscientific techniques to screen and monitor travelers who have done nothing wrong."

George Washington University law professor Jonathan Turley said Quiet Skies touches on several sensitive legal issues and appears to fall into a gray area of privacy law.

---

## If this was about foreign citizens, the government would have considerable power. But if it's US citizens — US citizens don't lose their rights simply because they are in an airplane at 30,000 feet.

— Jonathan Turley, George Washington University law professor

"If this was about foreign citizens, the government would have considerable power. But if it's US citizens — US citizens don't lose their rights simply because they are in an airplane at 30,000 feet," Turley said. "There may be indeed constitutional issues here depending on how restrictive or intrusive these measures are."

Turley, who has testified before Congress on privacy protection, said the issue could trigger a "transformative legal fight."

Geoffrey Stone, a University of Chicago law professor chosen by President Obama in 2013 to help review foreign intelligence surveillance programs, said the program could pass legal muster if the selection criteria are sufficiently broad. But if the program targets by nationality or race, it could violate equal protection rights, Stone said.

Last free article. **Subscribe now →**

7/31/2018    The Quiet Skies TSA intelligence-gathering program quietly tracks non-suspect air travelers - The Boston Globe

Case 1:16-cv-00375-AJT-JFA   Document 229-1   Filed 08/01/18   Page 14 of 99 PageID# 7766

Asked about the legal basis for the Quiet Skies program, Gregory, the agency's spokesman, said TSA "maintains a robust engagement with congressional committees to ensure maximum support and awareness" of its effort to keep the aviation sector safe. He declined to comment further.



Chip Somodevilla/Getty Images

Beyond the legalities, some air marshals believe Quiet Skies is not a sound use of limited agency resources.

Several air marshals, who spoke on the condition of anonymity because they are not authorized to speak publicly, told the Globe the program wastes taxpayer dollars and makes the country less safe because attention and resources are diverted away from legitimate

Last free article. **Subscribe now →**

potential threats. The US Federal Air Marshal Service, which is part of TSA and falls under the Department of Homeland Security, has a mandate to protect airline passengers and crew against the risk of criminal and terrorist violence.

John Casaretti, president of the Air Marshal Association, said in a statement: "The Air Marshal Association believes that missions based on recognized intelligence, or in support of ongoing federal investigations, is the proper criteria for flight scheduling. Currently the Quiet Skies program does not meet the criteria we find acceptable.

"The American public would be better served if these [air marshals] were instead assigned to airport screening and check in areas so that active shooter events can be swiftly ended, and violations of federal crimes can be properly and consistently addressed."

## These revelations raise profound concerns about whether TSA is conducting pervasive surveillance of travelers without any suspicion of actual wrongdoing.

— Hugh Handeyside, American Civil Liberties Union's National Security Project

TSA has come under increased scrutiny from Congress since a 2017 Government Accountability Office report raised questions about its management of the Federal Air Marshal Service. Requested by Congress, the report noted that the agency, which spent $800 million in 2015, has "no information" on its effectiveness in deterring attacks.

Last free article. **Subscribe now →**

Late last year, Representative Jody Hice, a Georgia Republican, introduced a bill that would require the Federal Air Marshal Service to better incorporate risk assessment in its deployment strategy, provide detailed metrics on flight assignments, and report data back to Congress.

Without this information, Congress, TSA, and the Department of Homeland Security "are not able to effectively conduct oversight" of the air marshals, Hice wrote in a letter to colleagues.

"With threats coming at us left and right, our focus should be on implementing effective, evidence-based means of deterring, detecting, and disrupting plots hatched by our enemies."

Hice's bill, the "Strengthening Aviation Security Act of 2017," passed the House and is awaiting consideration by the full Senate.



[Read the bulletin](#)

Last free article. **Subscribe now →**

The Globe, in its review of Quiet Skies, examined numerous TSA internal bulletins, directives, and internal communications, and interviewed more than a dozen people with direct knowledge of the program.

The purpose of Quiet Skies is to decrease threats by "unknown or partially known terrorists; and to identify and provide enhanced screening to higher risk travelers before they board aircraft based on analysis of terrorist travel trends, tradecraft and associations," according to a TSA internal bulletin.

The criteria for surveillance appear fluid. Internal agency e-mails show some confusion about the program's parameters and implementation.



Last free article. **Subscribe now →**

Quiet Skies focuses on a person's international travel patterns and potential affiliations. Passengers are not under investigation and their names are not on a terrorist watch list or in a screening database.

Last free article. **Subscribe now →**

7/31/2018                    The TSA's Air Marshals secretly track regular travelers traveling in and out of the United States on separate planes of The Boston Globe

Case 1:16-cv-00375-AJT-JFA   Document 229-1   Filed 08/01/18   Page 19 of 99 PageID# 7771

Air marshals have surveilled a businesswoman, a Southwest Airlines flight attendant, and a fellow federal law enforcement officer, sources said.

A bulletin in May notes that travelers entering the United States may be added to the Quiet Skies watch list if their "international travel patters [sic] or behaviors match the travel routing and tradecraft of known or suspected terrorists" or "are possibly affiliated with Watch Listed suspects."

Travelers remain on the Quiet Skies watch list "for up to 90 days or three encounters, whichever comes first, after entering the United States," agency documents show.

Travelers are not notified when they are placed on the watch list or have their activity and behavior monitored.

Last free article. **Subscribe now →**

Quiet Skies surveillance is an expansion of a long-running practice in which federal air marshals are assigned to surveil the subject of an open FBI terrorism investigation.

In such assignments, air marshal reports are relayed back to the FBI or another outside law enforcement agency. In Quiet Skies, these same reports are completed in the same manner but stay within TSA, agency documents show, and details are shared with outside agencies only if air marshals observe "significant derogatory information."



Pat Greenhouse/Globe Staff

According to a TSA bulletin, the program may target people who have spent a certain amount of time in one or more specific countries or whose reservation information includes e-mail addresses or phone numbers associated to suspects on a terrorism watch list.

Last free article. **Subscribe now →**

The bulletin does not list the specific countries, but air marshals have been advised in several instances to follow passengers because of past travel to Turkey, according to people with direct knowledge of the program.

One air marshal described an assignment to conduct a Quiet Skies mission on a young executive from a major company.

"Her crime apparently was she flew to Turkey in the past," the air marshal said, noting that many international companies have executives travel through Turkey.

"According to the government's own [Department of Justice] standards there is no cause to be conducting these secret missions."

*Jana Winter can be reached at jana.winter@globe.com and on Twitter @JanaWinter. This investigation was made possible through the Spotlight Investigative Journalism Fellowship, a social impact initiative of Participant Media. For more, go to www.spotlightfellowship.com.*

---

**Join the discussion**

---

Design and development: Saurabh Datar and Irfan Uraizee

Audience engagement: Heather Ciras

Photo editor: Leanne Burden Seidel

Last free article. **Subscribe now →**

# Exhibit B




SENSITIVE SECURITY INFORMATION
TRANSPORTATION SECURITY ADMINISTRATION
OFFICE OF LAW ENFORCEMENT/FEDERAL AIR MARSHAL SERVICE
LAW ENFORCEMENT INFORMATION COORDINATION SECTION
703-563-3279 | TSOCICD@TSA.DHS.GOV

Information Bulletin – Quiet Skies Selectees                    March 15, 2018

*Effective Tuesday, March 13, 2018, OLE/FAMS will initiate Special Mission Coverage (SMC) on flights carrying Quiet Skies Selectees.*

**TSA's Quiet Skies Program**

The purpose of the Quiet Skies Program is to mitigate the threat to commercial aviation posed by unknown or partially known terrorists; and to identify and provide enhanced screening to higher risk travelers before they board aircraft based on analysis of terrorist travel trends, tradecraft and associations.

Through the Quiet Skies Program, TSA's Office of Intelligence and Analysis designates potentially higher risk travelers for enhanced screening and security measures because they engaged in travel fitting intelligence driven, risk-based passenger targeting rules. Quiet Skies rules are triggered when individuals enter the United States from foreign locations.

- TSA OIA currently employs 17 Quiet Skies rules to screen passengers.
- Quiet Skies rules change based on current intelligence.
- Quiet Skies rules target specific travel patterns or affiliations, for example:
    - Rules may target individuals who have spent a certain amount of time in one or more specific countries; or
    - Rules may target individuals whose reservation information includes email addresses or phone numbers associated to watch listed terrorism suspects.

- Quiet Skies Selectees receive enhanced screening at security checkpoints.
- Individuals who meet the requirements for addition to the Quiet Skies list remain on the Quiet Skies list for up to 90 days or 3 encounters, whichever comes first, after entering the United States.
- TSA currently sees 40 – 50 Quiet Skies Selectees on domestic carriers nationwide each day.

**Special Mission Coverage**

Quiet Skies Selectees are different from traditional SMC subjects because they are not under investigation by any agency and are not in the Terrorist Screening Data Base (TSDB). However, SMC operations on Quiet Skies Selectees will be conducted in the same manner; with two exceptions:

1. Briefings to SMC teams will not include traditional "derogatory" information. However, if available, teams will be briefed on which Quiet Skies rules the passenger triggered.
2. SMC AARs on Quiet Skies Selectees will not be shared with partner agencies unless significant derogatory information is documented by the FAM team.

Requirements for submission of the SMC AAR for Quiet Skies Selectees remain the same.

WARNING: This record contains Sensitive Security Information that is controlled under 49 CFR parts 15 and 1520. No part of this record may be disclosed to persons without a "need to know," as defined in 49 CFR parts 15 and 1520, except with the written permission of the Administrator of the Transportation Security Administration or the Secretary of Transportation. Unauthorized release may result in civil penalty or other action. For U.S. government agencies, public disclosure is governed by 5 U.S.C. 552 and 49 CFR parts 15 and 1520.

# Exhibit C

| ... apparently aware of surroundings. (If observed, check any that apply | Y N Unknown |
|---|---|

- Reversing or changing directions and/or stopping while in transit through the airport
- Attempting to change appearance by changing clothes, shaving etc. while in the airport or on the plane
- Using the reflection in storefront windows to identify surveillance
- Observing the boarding gate area from afar
- Boarded last
- Observing other people who appear to be observing FAM team and/or subject

| ... Subject exhibited Behavioral Indicators. (If observed, check any that apply below) | Y N Unknown |
|---|---|

| | | |
|---|---|---|
| Excessive fidgeting<br>Excessive perspiration<br>Facial flushing<br>Rapid eye blinking<br>"Adam's apple jump" | Rubbing/wringing of hands<br>Strong body odor<br>Sweaty palms<br>Trembling<br>Cold penetrating stare | Exaggerated emotion<br>Gripping / "White knuckling" bags<br>Wide open, staring eyes<br>Face touching<br>Other |

| ... Subject's appearance was different from information provided. (If yes, check any that apply below) | Y N Unknown |
|---|---|

| | | |
|---|---|---|
| Lost weight<br>Gained weight<br>Balding<br>Graying<br>Hair length/style change | Goatee<br>Visible Tattoos (Describe)<br>Visible Piercings (Describe)<br>Beard<br>Mustache | Apparent Altered Appearance (Explain)<br>Clean shaven<br>Other |

| 4. Subject slept during flight. (If yes, check any that apply below) | Y N Unknown |
|---|---|

- Subject slept during most of the flight
- Subject slept briefly

| 5. General Observations (provide detailed description of any electronic devices in subject's possession in AAR) | | | |
|---|---|---|---|
| Checked baggage? | Y N Unknown | Used lavatory? | |
| In possession of cell/smartphone? | Y N Unknown | In possession any unusual items? | Y N Unknown |
| In possession of multiple phones? | Y N Unknown | Traveled with others? | Y N Unknown |
| Used phone to talk? | Y N Unknown | Met with others in the airport? | Y N Unknown |
| Used phone to text? | Y N Unknown | Engaged in conversation with others? | Y N Unknown |
| In possession of computer? | Y N Unknown | Subject initiated conversation with FAM? | Y N Unknown |
| Used computer? | Y N Unknown | | Y N Unknown |
| Seated in first/business class? | Y N Unknown | Carryon baggage? | Y N Unknown |
| | | Other notable activity? | |

| Subject engaged in "more than casual contact" with airport or airline employee? | Y N Unknown |
|---|---|

| 6. For Domestic Arrivals Only | |
|---|---|

| | | |
|---|---|---|
| Picked up at curbside by shuttle, taxi, bus or public transit? | Y N Unknown | If possible, provide iden... |
| Picked up at curbside by private vehicle? | Y N Unknown | plate, vehicle descripti... |
| Obtained rental car for transportation? | Y N Unknown | vehicle in AAR. |

**Exhibit D**



# Transcript of Hao-Y Froemling, Corporate Designee

**Date:** March 20, 2018
**Case:** El Hady, et al. -v- Kable, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING | INTERPRETATION | TRIAL SERVICES

**1**

```
 1          UNITED STATES DISTRICT COURT
 2          EASTERN DISTRICT OF VIRGINIA
 3               ALEXANDRIA DIVISION
 4   - - - - - - - - - - - - - - - - - - x
 5   ANAS EL HADY, et al.,            :
 6          Plaintiffs,              :
 7   v.                  : Case No.
 8   CHARLES H. KABLE, Director of the  : 16-cv-00375
 9   Terrorist Screening Center;       :
10   in his official capacity, et al.,  :
11          Defendants.              :
12   - - - - - - - - - - - - - - - - - - x
13
14          Videotaped Deposition of TSA
15     By and Through its Designated Representative
16               HAO-Y FROEMLING
17             Arlington, Virginia
18           Tuesday, March 20, 2018
19               9:29 a.m.
20   Job No.: 182337
21   Pages: 1 - 369
22   Reported By: Tasiana T. Basdekis, RPR
```

**2**

```
 1      Videotaped deposition of HAO-Y FROEMLING, held
 2   at the offices of:
 3
 4
 5          TRANSPORTATION SECURITY ADMINISTRATION
 6          601 South 12th Street
 7          East Tower
 8          Arlington, Virginia 20598
 9
10
11
12
13     Pursuant to notice, before Tasiana T. Basdekis,
14   RPR, Notary Public in and for the Commonwealth of
15   Virginia.
16
17
18
19
20
21
22
```

**3**

```
 1        A P P E A R A N C E S
 2   ON BEHALF OF THE PLAINTIFF, EL HADY:
 3       CAROLYN HOMER, ESQUIRE
 4       LENA MASRI, ESQUIRE
 5       GADEIR ABBAS, ESQUIRE
 6       AHMED MOHAMED, ESQUIRE
 7       COUNCIL ON AMERICAN-ISLAMIC RELATIONS
 8       453 New Jersey Avenue, S.E.
 9       Washington, District of Columbia 20003
10       (202) 516-4724
11
12   ON BEHALF OF THE DEFENDANT, KABLE:
13       ANTONIA KONKOLY, ESQUIRE
14       DENA ROTH, ESQUIRE
15       U.S. DEPARTMENT OF JUSTICE
16       CIVIL DIVISION
17       2100 Jamieson Avenue
18       Alexandria, Virginia 22314
19       (202) 514-2000
20
21
22
```

**4**

```
 1     A P P E A R A N C E S   C O N T I N U E D
 2   ON BEHALF OF THE DEFENDANT, KABLE:
 3       JENNIFER GREENBAND, ESQUIRE
 4       KEVIN BOGUCKI, ESQUIRE
 5       JOSEPH CLARK, ESQUIRE
 6       KATHLEEN GANNON, ESQUIRE
 7       U.S. DEPARTMENT OF JUSTICE
 8       TRANSPORTATION SECURITY ADMINISTRATION
 9       601 12th Street South
10       Arlington, Virginia 20598
11
12   ALSO PRESENT:
13       JOE DONOHOE, Videographer
14
15
16
17
18
19
20
21
22
```

Transcript of Hao-Y Froemling, Corporate Designee
Conducted on March 20, 2018

---

5

C O N T E N T S

EXAMINATION OF HAO-Y FROEMLING                    PAGE
   By Ms. Homer                                      7


         E X H I B I T S

              (Attached)

PLAINTIFF'S FOR IDENTIFICATION                    PAGE
 1   Hao-Y Froemling Notice of Deposition          11
 2   2014 GAO Report                              132

---

7

1  Plaintiffs.
2       MR. MOHAMED:  Ahmed Mohamed on behalf of
3  Plaintiffs.
4       MS. KONKOLY:  Antonia Konkoly from the
5  Department of Justice on behalf of Defendants.
6       MS. GREENBAND:  Jennifer Greenband, TSA.
7       MR. BOGUCKI:  Kevin Bogucki, TSC.
8       MS. ROTH:  Dena Roth, Department of
9  Justice.
10      MR. CLARK:  Joseph Clark, U.S. Customs and
11 Border Protection.
12      MS. GANNON:  Kathleen Gannon, TSA.
13      THE VIDEOGRAPHER:  Would the court please
14 swear in the witness.
15 Whereupon,
16            HAO-Y FROEMLING,
17 being first duly sworn or affirmed to testify to
18 the truth, the whole truth, and nothing but the
19 truth, was examined and testified as follows:
20            EXAMINATION
21 BY MS. HOMER:
22   Q  Good morning, Ms. Froemling.  Can you

---

6

PROCEEDINGS

1       THE VIDEOGRAPHER:  Here begins disk number
2  one in the videotaped deposition of Hao-Y
3  Froemling in the matter of Elhady, et al., v.
4  Kable, et al., in the United States District Court
5  for the Eastern District of Virginia, Case No.
6  16-cv-375.
7       Today's date is March 20th, 2018, and the
8  time on the video monitor is 9:29 a.m.
9       The videographer today is Joe Donahoe,
10 representing Planet Depos, and this videotaped
11 deposition is taking place at 601 South 12th
12 Street, Arlington, Virginia.
13      Would counsel please voice-identify
14 themselves and state whom they represent?
15      MS. HOMER:  Hi.  I'm Carolyn Homer from
16 the Counsel on American-Islamic Relations on
17 behalf of the Plaintiffs.
18      MS. MASRI:  Lena Masri on behalf of the
19 Plaintiffs.
20      MS. KONKOLY:  Antonia Konkoly from --
21      MR. ABBAS:  Gadeir Abbas on behalf of the

---

8

1  please state your full name for the record.
2    A  It's Hao-Y Tran Froemling.
3    Q  Have you ever been deposed before?
4    A  No.
5    Q  So I'm going to cover some quick ground
6  rules that you may have already previously covered
7  with your attorney, but you recognize that you are
8  under oath today?
9    A  Yes.
10   Q  And that you're obliged to tell the truth?
11   A  Yes.
12   Q  Is there any medical or other reason why
13 you are unable to provide complete and truthful
14 testimony today?
15   A  No.
16   Q  You're already doing a good job of this,
17 but because everything is being transcribed, the
18 court reporter will need clear yes or no or stated
19 answers.  So can you try not to just nod or
20 mm-hms?
21   A  Okay.  Yes.
22   Q  Okay.  And we're trying to have a

---

**181**

1 additional screening that is conducted after the
2 checkpoint?
3     MS. KONKOLY: Objection; vague. Okay
4 insofar as the answer calls for information
5 protected by SSI or law enforcement.
6     You can answer, if you can.
7     THE WITNESS: Generally, screening --
8 generally speaking, I wouldn't say there's a
9 specific name for the different security measures
10 that we -- that may occur after the checkpoint.
11 There's not a name given for that.
12 BY MS. HOMER:
13   Q So when you use the term "enhanced
14 screening," is that term limited to
15 out-of-the-ordinary screening conducted at a
16 checkpoint, or does it also encompass screening
17 that may occur after the passenger has left the
18 checkpoint?
19     MS. KONKOLY: Objection; vague. Objection
20 insofar as the question calls for information
21 protected by SSI or the law enforcement privilege.
22     You can answer, to the extent that you

**182**

1 can.
2     THE WITNESS: I believe my understanding
3 is that enhanced screening is primarily used for
4 -- at the checkpoint.
5 BY MS. HOMER:
6   Q Okay. What term do you use to describe
7 post-checkpoint screening?
8     MS. KONKOLY: Objection; vague.
9 Objection; scope.
10     THE WITNESS: There's not any one term.
11 TSA deploys multiple security measures
12 post-checkpoint screening that may occur to,
13 really, any passenger. So there's not any one
14 term post-security screening.
15   Q What sorts of post-security screening
16 measures does the TSA undertake, generally?
17     MS. KONKOLY: Objection insofar as that
18 question calls for information protected by SSI or
19 the law enforcement privilege. Objection; vague.
20     You can answer, to the extent that you
21 can.
22     THE WITNESS: At a high level, TSA has

**183**

1 multiple security measures, some of which occur
2 post-security screening, and they can occur in
3 different areas of the sterile areas of the
4 airport to include screening measures at the gate.
5     Otherwise -- at a high level, yeah.
6 BY MS. HOMER:
7   Q And what types of security procedures are
8 those?
9     MS. KONKOLY: Objection; asked and
10 answered. Objection insofar as the question calls
11 for information protected by SSI or the law
12 enforcement privilege.
13     Again, you can answer to the extent that
14 you can without waiving any privilege.
15     THE WITNESS: At a high level, it could be
16 -- TSA has multiple security measures that it may
17 employ.
18     To go into more details beyond what was
19 already stated, would get into SSI.
20   Q Are there any post-checkpoint screening
21 procedures applied as a matter of course to
22 individuals on the Selectee List?

**184**

1     MS. KONKOLY: Objection. That information
2 calls for -- or that question calls for
3 information protected by SSI and the law
4 enforcement privilege.
5     I'm going to instruct the Witness not to
6 answer that.
7 BY MS. HOMER:
8   Q Does the TSA annotate any individual
9 records in Secure Flight that post-checkpoint
10 screening of that individual is required?
11     MS. KONKOLY: Objection; vague.
12 Objection; that calls for information protected by
13 SSI and the law enforcement privilege.
14     I will instruct the Witness not to answer.
15     THE WITNESS: Okay.
16   Q Does the TSA use screening of individuals
17 on the TSDB list as an opportunity to collect
18 intelligence on those listees?
19     MS. KONKOLY: Objection; vague,
20 misleading. Objection insofar as the question
21 calls for any information protected by SSI or the
22 law enforcement privilege.

185
1    You can answer, if you can.
2       THE WITNESS:  So to rephrase:  Versus --
3 using it as an opportunity to collect intelligence
4 information?  No, we do not perform intelligence
5 collection on passengers at the airport.
6       So -- yeah.
7 BY MS. HOMER:
8    Q  The TSA reports on encounters it has with
9 TSDB listees to the TSC; correct?
10   **A  Yes.**
11   Q  Do that -- does the TSA's report on those
12 encounters contain any comments about the
13 encounter, including any conversations the TSA may
14 have had with the listee?
15      MS. KONKOLY:  Objection; vague.  Objection
16 insofar as the answer calls for any information
17 protected by SSI or the law enforcement privilege.
18      You can answer, if you can.
19      THE WITNESS:  So at a high level, we
20 communicate the encounter, which would be the
21 passenger information, flight information, and to
22 the extent of did they check in.  That is the

186
1 general information that we are providing to the
2 TSC on our encounter.
3 BY MS. HOMER:
4    Q  Does the TSA have the option to add
5 additional information about the encounter in
6 notations to the TSC?
7       MS. KONKOLY:  Objection; vague.  Objection
8 insofar as the question calls for information
9 protected by the law enforcement privilege or SSI.
10      You can answer, if you can.
11      THE WITNESS:  So the question is can it be
12 annotated in our notifications to the TSC
13 additional information --
14   Q  Than what you report automatically --
15   **A  -- than what is standardly --**
16   Q  -- or regularly.
17   **A  -- reported?**
18      MS. KONKOLY:  Same objections.
19      THE WITNESS:  At a high level, it would
20 depend on the situation if there was law
21 enforcement or other related information.  Other
22 than that, we would be getting into SSI and law

187
1 enforcement-sensitive information.
2 BY MS. HOMER:
3    Q  Are encounters with persons listed on the
4 TSDB reported automatically to the TSC?
5    **A  So not 100 percent automatic.  There is**
6 **always a review and an actual TSA person that is**
7 **acknowledging, okay, we are sending information to**
8 **the TSC.**
9    **So does --**
10   Q  Okay.  Is the information that the TSA is
11 reporting to the TSC on encounters populated
12 automatically, even though it is then subject to
13 review by a TSA employee before actually being
14 sent to the TSC?
15      MS. KONKOLY:  Objection; vague.  Objection
16 insofar as the question calls for information
17 protected by SSI or the law enforcement privilege.
18      You can answer, if you can.
19      THE WITNESS:  So there is certain
20 information that is -- that the system pulls
21 together, to an extent, but there is always an
22 individual who is effectively confirming and

188
1 populating some of the information before it is
2 sent to the TSC.
3 BY MS. HOMER:
4    Q  And does that individual, or any TSA
5 individual, manually type in any notes about the
6 encounter before sending it to the TSC?
7       MS. KONKOLY:  Objection; vague.  Objection
8 insofar as the question calls for information
9 protected by the law enforcement privilege or SSI.
10      You can answer, if you can.
11      THE WITNESS:  So generally speaking, no.
12 We're providing the passenger and itinerary
13 information, as discussed earlier, in our
14 notifications to the TSC.
15   Q  Is there a box or field within the
16 encounter reporting system where a TSA employee
17 has an option to add detailed notes about the
18 encounter before sending it to the TSC?
19      MS. KONKOLY:  Objection; vague.
20 Objection; asked and answered.  Objection insofar
21 as the question calls for information protected by
22 SSI or the law enforcement privilege.

201
1 also designated as being on the Expanded Selectee
2 List?
3       MS. KONKOLY:  Objection; vague.
4 Objection; mischaracterizes prior testimony.
5 Objection insofar as the question calls for
6 anything implicated -- or I should say protected
7 by SSI or the law enforcement privilege.
8       You can answer, if you can.
9       THE WITNESS:  So two parts.  TSA receives
10 its export of the TSDB.  Secure Flight's passenger
11 prescreening does receive the list with the full
12 name and date of birth in that list; however,
13 going into the criteria of which of the lists, or
14 how they're there, I cannot speak further.  If I
15 understood the question correctly.
16 BY MS. HOMER:
17    Q  Does the description of the Expanded
18 Selectee List that this document contains in the
19 top paragraph of page 14, is that a complete
20 description of what constitutes the Expanded
21 Selectee List?
22       MS. KONKOLY:  I'll object as to scope.

202
1 Objection; vague.
2       You can answer, if you can.
3       And insofar as it calls for any
4 information protected by SSI or law enforcement
5 privilege.
6       You can answer, if you can.
7       THE WITNESS:  Right.  I don't know if I
8 can answer for a complete description, but to the
9 extent -- without getting into SSI or law
10 enforcement information -- it -- that is an
11 accurate description.
12 BY MS. HOMER:
13    Q  Does the TSA currently use the Expanded
14 Selectee List to determine that passengers are
15 subject to enhanced screening?
16    **A  Yes.  The Secure Flight system does use**
17 **the Expanded Selectee List as part of its**
18 **determination of whether a passenger should**
19 **receive enhanced screening or not.**
20    Q  Okay.
21       I think that's a good breaking point for
22 lunch.

203
1    A  Okay.
2       MS. KONKOLY:  How long do you guys want to
3 take?
4       MR. CLARK:  Go off the record.
5       THE VIDEOGRAPHER:  We are going off the
6 record.  The time is 1:39 p.m.
7       (A recess was taken from 1:39 p.m. to 2:43
8 p.m.)
9       THE VIDEOGRAPHER:  Here begins disk number
10 three in the videotaped deposition of Hao-Y
11 Froemling.
12       The time on the video monitor is
13 2:43 p.m., and we have been on the record for
14 three hours and 41 minutes.
15       MS. KONKOLY:  Counsel, if I may, there
16 were two points that we'd like to just add
17 clarifications on the record with your leave.
18       MS. HOMER:  Please do.
19 BY MS. KONKOLY:
20    Q  Okay.  First, Ms. Froemling, right before
21 the break you were discussing with Plaintiffs'
22 counsel what was introduced as Exhibit No. 2, a

204
1 GAO report.  Can I have you turn to page 14 of
2 that report again?
3       Okay.  Do you see the paragraph at the
4 top, the Expanded Selectee List that you were
5 discussing with Plaintiffs' counsel right before
6 the break?
7    **A  Yes.**
8    Q  Okay.  And does the definition of the
9 Expanded Selectee List offered in this paragraph
10 offer a complete and accurate definition of that
11 list?
12    **A  Yes.**
13    Q  Okay.
14       Second point of clarification from earlier
15 this morning, over the lunch break were you able
16 to confirm the number of intelligence analysts
17 employed by TSA who both conduct watchlist
18 matching and have access to the underlying
19 derogatory information?
20    **A  Yes.  It's 68.**
21    Q  Okay.  Thank you.
22       MS. HOMER:  Thank you.

205

1    Q  So continuing with Exhibit 2, going back
2  to page 19 above where we were where -- within
3  high risk, we had just finished talking about the
4  Expanded Selectee List.
5        And above that it says "rules-based list."
6  What is a rules-based list that the TSA uses to
7  designate passengers for enhanced screening?
8        MS. KONKOLY:  I'm going to offer an
9  objection based on scope.  Additionally, to the
10 extent that the information would call for
11 information protected by SSI or law
12 enforcement-protected privilege.
13       You can answer, to the extent that you
14 can.
15       THE WITNESS:  Okay.  Sorry.  So at a high
16 level, similar to our discussion about the
17 low-risk rules risk assessments, we also have high
18 risk, where I mentioned before there may be
19 particular circumstances of a passenger's travel.
20       TSA, on a flight-by-flight basis, also has
21 intelligence-based or derived information where we
22 would identify criteria that may designate a

206

1  passenger for -- as high risk.
2  BY MS. HOMER:
3    Q  Does the TSA maintain a single list of
4  individuals who, through the operation of rules,
5  are designated for enhanced screening, or is this
6  a case-by-case automatic assignment?
7        MS. KONKOLY:  Objection as to scope.
8  Objection; vague.  Objection insofar as the
9  question calls for information protected either by
10 SSI or the law enforcement privilege.
11       But you can answer, to the extent that you
12 can.
13       THE WITNESS:  So it is not a list direct,
14 similar to our watchlist matching.  It is
15 rules-driven based on the particular travel --
16 passenger circumstances of travel.
17       So -- yeah, so it's a flight-by-flight
18 distinction of identifying passengers that may be
19 designated as high-risk based on the set of rules.
20    Q  Can a passenger -- start over.
21       If a passenger is determined to be
22 high-risk on the basis of these flight-by-flight

207

1  rules, is that a basis for the TSA to then
2  nominate them to the TSDB?
3        MS. KONKOLY:  Objection; vague.  Objection
4  insofar as the question calls for information
5  protected by SSI or the law enforcement privilege.
6        You can answer, to the extent that you
7  can.
8        THE WITNESS:  So not directly.  TSA
9  follows very specific processes and information
10 review to determine if they meet the criteria for
11 watchlist nominations.
12       There may be information, as a pointer, or
13 others that may then lead TSA in its determination
14 to go to watchlist matching.  But the rules by
15 themselves do not provide the basis for TSA
16 watchlist nominations.
17 BY MS. HOMER:
18    Q  If an individual, through the operation of
19 the rule, is designated as high-risk for a
20 particular flight, does the TSA have a systematic
21 process for reviewing other individual -- like,
22 for reviewing other information about those

208

1  individuals in order to determine whether or not
2  the TSA should nominate that individual to a
3  watchlist?
4        MS. KONKOLY:  Objection; vague.  Objection
5  insofar as the answer calls for information
6  protected by SSI or the law enforcement privilege.
7        You can answer, to the extent that you
8  can.
9        THE WITNESS:  So if I understand the
10 question, TSA does not have a specific procedure
11 to say every passenger, if they've been identified
12 as high-risk, automatically pull them into a
13 review for watchlist nominations.
14       TSA, for the watchlist nominations, just
15 pulls in multiple pieces of information.  It may
16 sometimes include information from the rules-based
17 resultant information, but I would not say that
18 that one thing direct from the rules drives the
19 watchlist nomination process.
20 BY MS. HOMER:
21    Q  So there are circumstances where an
22 individual's inclusion on a rules-based list

Transcript of Hao-Y Froemling, Corporate Designee
Conducted on March 20, 2018

53 (209 to 212)

209

1 identifying that individual for further screening
2 could lead to the TSA's investigation of that
3 individual for potential inclusion upon the
4 watchlist?
5      MS. KONKOLY:  Objection; vague.
6 Objection; mischaracterizes prior testimony.
7 Objection insofar as the answer calls for
8 information protected by the law enforcement
9 privilege or SSI.
10     You can answer, to the extent that you
11 can.
12     THE WITNESS:  So -- I'm trying to think.
13     So, generally speaking, that information
14 of the designation for a higher-risk passenger
15 does not directly go to watchlist.
16     However, in the course of just TSA's
17 overall security processes, additional information
18 comes in or passengers are then subsequently
19 identified as -- are detecting something as
20 they're going through screening -- additional
21 prohibited items or additional information or
22 other investigation or other just information

210

1 provided overall -- then it will go into a
2 watchlist nomination process of does it meet the
3 criteria for watchlist nomination.
4      So, again, it is a -- may be a factor, but
5 multiple pieces of information would need to be
6 reviewed as well as meet the criteria for a
7 watchlist nomination.
8 BY MS. HOMER:
9    Q If a passenger -- let me start over.
10     Does -- is it Secure Flight that applies
11 these rules to incoming itineraries in order to
12 designate a passenger as potentially high-risk and
13 subject to enhanced screening for that flight?
14     MS. KONKOLY:  Objection; vague.  Objection
15 insofar as the answer calls for information
16 protected by SSI or law enforcement privilege.
17     But you can answer, if you can.
18     THE WITNESS:  So depending, as there's
19 multiple pieces of information that tie into the
20 -- effectively, the rules, Secure Flight is the
21 end engine that would be doing the matching to
22 determine whether the passenger's been deemed

211

1 high-risk.
2      There may be other pieces of information
3 that would feed into Secure Flight that then --
4 for Secure Flight to then apply rules.  So --
5 BY MS. HOMER:
6    Q Okay.  Is Secure --
7 **A So not always.**
8    Q Okay.  Is Secure Flight matching names on
9 itineraries to names generated by a rules-based
10 list?
11     MS. KONKOLY:  Objection; vague, and
12 insofar as the answer calls for any information
13 protected by law enforcement privilege or SSI.
14     But you can answer, if you can.
15     THE WITNESS:  I would say sometimes,
16 depending on the rules.  We are matching -- it's
17 more of the matching the passenger to the
18 rules-based list.
19     From an itinerary perspective, it may or
20 may not come into play, depending on the -- sorry.
21 There's just the different rules.  It depends.
22     Q Can you give me an example of the rules,

212

1 or the sort of rules, that trigger enhanced
2 screening?
3      MS. KONKOLY:  I'm going to object to that
4 question on the basis of law enforcement
5 privilege, SSI, potentially state secrets
6 privilege, and instruct the Witness not to answer.
7 BY MS. HOMER:
8    Q Is the country that a flight is traveling
9 to, if it's an international flight, one basis for
10 a rule that would subject passengers on that
11 flight to enhanced screening?
12     MS. KONKOLY:  Objection on the basis of
13 SSI, law enforcement privilege, potentially state
14 secrets.
15     I'm going to instruct the Witness not to
16 answer based on those privileges.
17    Q If a passenger is selected for enhanced
18 screening on the basis of the application of a
19 rules-based list, are they subject to the same
20 level of enhanced screening as an individual on
21 the Selectee List?
22     MS. KONKOLY:  Objection; vague.

Transcript of Hao-Y Froemling, Corporate Designee
Conducted on March 20, 2018

213

1 Objection; calls for speculation. Objection
2 insofar as the answer implicates information
3 protected by SSI or the law enforcement privilege.
4     You can answer, if you can.
5     THE WITNESS: So at a high level, are
6 enhanced screening procedures at the checkpoint
7 effectively the same as --
8 BY MS. HOMER:
9     Q Does the TSDB contain any information
10 about whether or not the TSA has applied any
11 rules-based list to passengers?
12     MS. KONKOLY: Objection as to scope and
13 insofar as that question implicates information
14 outside of the purview of TSA, also insofar as it
15 implicates information protected by state -- or --
16 I'm sorry -- by law enforcement privilege or SSI.
17     But you can answer, if you can.
18     THE WITNESS: So does the TSC have
19 awareness that TSA applies rules-based list to --
20 list? Was that the question.
21     Q Yeah.
22     **A Sorry.**

214

1     MS. KONKOLY: Same objections.
2     THE WITNESS: Okay.
3     MS. KONKOLY: Go ahead.
4     THE WITNESS: So just making sure I
5 understood the question.
6     So generally speaking, insofar as TSA has
7 stated that this is our procedure for identifying
8 passengers for a high-risk standard screening or a
9 low-risk, the TSC would know that we do have these
10 procedures in place.
11 BY MS. HOMER:
12     Q Would the TSC know for any individual
13 passenger whether that passenger had been flagged
14 for enhanced screening by operation of a TSA
15 rules-based list?
16     MS. KONKOLY: Objection; vague. Objection
17 as to scope, and so far as this answer calls for
18 information within the purview of the TSC as
19 opposed to TSA.
20     Further object insofar as the answer would
21 implicate information protected by SSI or the law
22 enforcement privilege.

215

1     You can answer, to the extent that you
2 can.
3     THE WITNESS: So at a high level, we do
4 not send -- because the TSC is about -- our
5 notifications are primarily about those that we
6 have matched on the watchlist, we do not
7 automatically send our -- all -- any passenger
8 that's been designated as high-risk or high -- for
9 enhanced screening.
10 BY MS. HOMER:
11     Q Is the operation of the TSA's rules-based
12 list entirely a TSA internal process?
13     MS. KONKOLY: Objection; vague. Objection
14 insofar as it might implicate information within
15 the purview of other agencies, and as to the scope
16 of the approved topics of this deposition.
17 Further objection insofar as the answer implicates
18 information protected by SSI or the law
19 enforcement privilege.
20     But you can answer, if you can.
21     THE WITNESS: So, no, not necessarily.
22     Q What other federal agencies are involved

216

1 in the creation of rules-based lists?
2     MS. KONKOLY: Objection as to scope.
3 Objection insofar as the information -- or the
4 answer calls for information protected by SSI or
5 the law enforcement privilege.
6     You can answer, if you can.
7     THE WITNESS: So from the construct, for
8 example, of international, we may also collaborate
9 with CBP related to the identification of
10 high-risk passengers.
11 BY MS. HOMER:
12     Q Is being a traveling companion of someone
13 listed on the Selectee List a basis for being
14 subject to enhanced screening?
15     MS. KONKOLY: Objection. That question
16 has information protected by SSI as well as the
17 law enforcement privilege.
18     I'm going to instruct the Witness not to
19 answer.
20     Q How is the fact that someone has been
21 designated for enhanced screening indicated on
22 that person's boarding pass?

217

1      MS. KONKOLY:  Objection insofar as that
2  question calls for information protected by SSI or
3  law enforcement privilege.
4      But you can answer, if you can.
5      THE WITNESS:  TSA instructs the airlines
6  to print an indicator for enhanced screening on
7  the boarding pass.
8  BY MS. HOMER:
9    Q  Is that indicator typically S-S-S-S?
10   **A  Yes.**
11   Q  What does SSSS stand for?
12     MS. KONKOLY:  Objection insofar as that
13 question calls for information protected by law
14 enforcement privilege or SSI.
15     But you can answer, if you can.
16     THE WITNESS:  I don't know what -- if each
17 S stands for something.  At a high level, it is a
18 designation used to designate enhanced screening.
19   Q  I have seen SSSS expanded as an acronym to
20 Secondary Security Screening Selection.  Is that a
21 phrase that the TSA uses?
22     MS. KONKOLY:  Objection; vague.

218

1      THE WITNESS:  Yeah.  I have not heard it
2  written out that way all the time.  I'd have to go
3  back to confirm if that's actually what the four
4  Ss stand for.
5  BY MS. HOMER:
6    Q  Okay.
7      Does the TSA ever use the phrase Quad-S as
8  a further shortening of SSSS?
9    **A  Yes.**
10   Q  Does the TSA use any other phrase to
11 indicate that a passenger has been selected for
12 enhanced screening?
13     MS. KONKOLY:  Objection; vague.
14     THE WITNESS:  If -- we pretty much say
15 enhanced screening.
16   Q  Okay.  Is SSSS synonymous with enhanced
17 screening?
18   **A  It's synonymous with designation for**
19 **enhanced screening.**
20   Q  How are TSA employees instructed to handle
21 boarding passes with the abbreviation SSSS?
22     MS. KONKOLY:  Objection; vague.  Objection

219

1  insofar as the answer calls for information
2  protected by SSI or the law enforcement privilege.
3      But you can answer, to the extent that you
4  can.
5      THE WITNESS:  If they've identified a
6  passenger that's been designated for enhanced
7  screening, they will enact and conduct their
8  enhanced screening procedures.
9  BY MS. HOMER:
10   Q  Do TSA employees know that SSSS could mean
11 that an individual is on a federal terrorist
12 watchlist?
13     MS. KONKOLY:  Objection; vague, calls for
14 speculation.
15     THE WITNESS:  So at a high level, they do
16 know that there's multiple reasons why an
17 individual may be designated for enhanced
18 screening, and one of those may be that they have
19 matched.
20   Q  Are TSA employees instructed to treat all
21 individuals with SSSS on their boarding pass as a
22 known or suspected terrorist?

220

1      MS. KONKOLY:  Objection; vague.
2  Objection; misleading.  Objection as to scope.
3  Also, insofar as an answer would implicate any
4  information protected by SSI or the law
5  enforcement privilege.
6      But you can answer, to the extent you can.
7      THE WITNESS:  No.  They're instructed to
8  conduct enhanced screening, not to -- to your
9  question -- treat them as a known or suspected
10 terrorist.
11 BY MS. HOMER:
12   Q  Does the TSA apply any subdivisions within
13 the enhanced screening category?
14     MS. KONKOLY:  Objection; vague.  Objection
15 insofar as the question calls for any information
16 protected by SSI or the law enforcement privilege.
17     You can answer, to the extent that you
18 can.
19     THE WITNESS:  So insofar as conducting
20 enhanced screening, passengers are designated for
21 enhance screening with no subdivisions.
22     When they're going through the screening

**221**

1 checkpoint, there's multiple reasons why they
2 might have been designated for enhanced screening
3 and the officers are instructed to carry out the
4 enhanced screening procedures.
5 BY MS. HOMER:
6   Q  Does the TSA apply any subdivisions
7 between passengers designated for enhanced
8 screening once those passengers have exited the
9 screening area and are in the sterile area?
10   MS. KONKOLY:  I'm going to object to that
11 question as calling for information protected by
12 SSI and the law enforcement privilege and instruct
13 the witness not to answer.
14   Q  Would you agree that all individuals
15 designated for enhanced screening receive the same
16 operational response at checkpoints when they pass
17 through them?
18   MS. KONKOLY:  Objection; vague. Objection
19 insofar as the question calls for information
20 protected by law enforcement privilege or SSI.
21   You can answer, to the extent that you
22 can.

**222**

1   THE WITNESS:  So the enhanced screening
2 procedures that are applied when passengers have
3 been designated for enhanced screening are the
4 same.
5 BY MS. HOMER:
6   Q  If an infant is designated for enhanced
7 screening, are the procedures applied to that
8 infant the same as any other passenger?
9   MS. KONKOLY:  Objection; vague.
10 Objection; calls for speculation. Objection
11 insofar as the question implicates information
12 protected by the law enforcement privilege or SSI.
13   You can answer, to the extent that you
14 can.
15   THE WITNESS:  So without going into SSI,
16 TSA has enhanced screening procedures to be
17 conducted for all passengers that have been
18 designated for enhanced screening.
19   Q  Can an infant under the age of three
20 receive enhanced screening by the TSA?
21   MS. KONKOLY:  Objection; vague. Objection
22 insofar as the question calls for information

**223**

1 protected by law enforcement privilege or SSI.
2   You can answer, if you can.
3   THE WITNESS:  My answer would be the same
4 of "can," is TSA has security procedures for
5 enhanced screening for its passengers, so to the
6 extent that there's a -- your question is "can."
7 TSA applies its procedures for those passengers
8 designated with enhanced screening on a boarding
9 pass.
10 BY MS. HOMER:
11   Q  Is a person on -- let me back up.
12   Does the TSA add any annotations to the
13 TSDB information it has in Secure Flight to
14 indicate that that person is on the Enhanced
15 Selectee List?
16   MS. KONKOLY:  Objection; vague.
17 Objection; I think that might have been asked and
18 answered this morning. Objection insofar as the
19 question calls for information protected by SSI or
20 the law enforcement privilege.
21   You can answer, to the extent that you
22 can.

**224**

1   THE WITNESS:  So -- sorry -- can you
2 repeat the question of -- I'm just trying to --
3 clarity of annotation where?  Sorry.
4 BY MS. HOMER:
5   Q  In Secure Flight.
6   A  In Secure Flight?
7   Q  Yeah.
8   A  So to the extent that we receive
9 information as part of our export of the TSDB,
10 with the designations of the No-Fly the Selectee
11 and the Expanded Selectee, Secure Flight would
12 have that information when it's doing its
13 watchlist matching.
14   So to the extent that whether somebody is
15 going in after the fact and annotating, it's not
16 so much an after-the-fact.  It's part of the
17 Secure Flight system in the information when it's
18 doing its matching.
19   Q  Is Expanded Selectee a designation that
20 the TSA receives from the TSC?
21   MS. KONKOLY:  Objection insofar as that
22 question calls for any information protected by

Transcript of Hao-Y Froemling, Corporate Designee
Conducted on March 20, 2018

69 (273 to 276)

273

1     MS. KONKOLY:  Objection; vague.  Objection
2  insofar as that calls for anything protected by
3  SSI or the law enforcement privilege.
4     But you can answer, to the extent that you
5  can.
6     THE WITNESS:  No.
7  BY MS. HOMER:
8    Q  A private airline employee who checks in a
9  passenger who is on the TSDB is able to see the
10 SSSS designation on a boarding pass; correct?
11   **A  Yes.**
12   Q  But that SSSS designation does not
13 necessarily mean that the individual is on the
14 TSDB?
15   **A  That is correct.**
16   Q  Okay.
17     Has the TSA ever subjected a child under
18 the age of five to enhanced screening?
19     MS. KONKOLY:  Objection insofar as that
20 calls for information protected by SSI or the law
21 enforcement privilege.
22     You can answer, to the extent that you

274

1  can.
2     THE WITNESS:  So I would refer to the
3  prior testimony to the extent of any passenger
4  that's designated for enhanced security screening,
5  TSA will conduct its enhanced screening procedures
6  overall, like, protocols.
7  BY MS. HOMER:
8    Q  And there are passengers under the age of
9  five who have been designated for advanced --
10 enhanced security screenings?
11     MS. KONKOLY:  Objection; mischaracterizes
12 prior testimony.  Objection; calls for information
13 protected by SSI, the law enforcement privilege.
14 Also, asked and answered.
15     I will instruct the Witness not to answer
16 that one.
17     THE WITNESS:  Okay.
18   Q  Has any TSA employee ever been disciplined
19 for improper disclosure of TSDB information?
20     MS. KONKOLY:  Objection; vague.
21     THE WITNESS:  I don't know.  I don't
22 believe so.  Improper disclosure of TSDB

275

1  information?  I don't know.  I would -- well, to
2  the extent of which one, I don't know.
3  BY MS. HOMER:
4    Q  Would improper disclosure of TSDB
5  information be a basis for a TSA employee to be
6  disciplined?
7     MS. KONKOLY:  Objection; vague.
8     THE WITNESS:  Generally speaking, yes.
9    Q  Has any TSA employee ever been disciplined
10 for improperly screening a TSDB listee?
11     MS. KONKOLY:  Objection as to scope.
12 Objection; vague.
13     THE WITNESS:  I know that TSA has
14 disciplinary procedures for the full -- not
15 carrying out screening procedures, but I don't
16 know that I can answer specific for Selectees.
17   Q  Does the TSA track the number of times
18 that TSA employees failed to screen a TSDB listee
19 at the appropriate level of screening for that
20 listee?
21     MS. KONKOLY:  Objection; vague.  Objection
22 as to scope.  Objection insofar as it calls for

276

1  anything protected by SSI or the law enforcement
2  privilege.
3     But you can answer, to the extent that you
4  can.
5     THE WITNESS:  So at a high level, we do
6  have that -- we do record if there are cases where
7  individuals may have been improperly screened.
8  BY MS. HOMER:
9    Q  Has a travel companion of someone
10 subjected to enhanced screening ever been
11 themselves subjected to enhanced screening?
12     MS. KONKOLY:  Objection.  That calls for
13 information protected by SSI and the law
14 enforcement privilege.
15     I will instruct the Witness not to answer.
16   Q  Has the TSA ever revoked an airline
17 employee's access to the TSDB based on their
18 improper disclosure of TSDB information?
19     MS. KONKOLY:  Objection; scope.
20 Objection; vague.
21     THE WITNESS:  Not that I'm aware of.
22   Q  Has --

369

1        CERTIFICATE OF SHORTHAND REPORTER
2              NOTARY PUBLIC
3        I, TASIANA T. BASDEKIS, Registered
4   Professional Reporter and Notary Public, the
5   officer before whom the foregoing deposition was
6   taken, do hereby certify that the foregoing
7   transcript is a true and correct record of the
8   testimony given; that said testimony was taken by
9   me stenographically and thereafter reduced to
10  typewriting under my supervision; that reading and
11  signing was requested; and that I am neither
12  counsel for or related to, nor employed by any of
13  the parties to this case and have no interest,
14  financial or otherwise, in its outcome.
15        IN WITNESS WHEREOF, I have hereunto set my
16  hand and affixed my notarial seal this 27 day of
17  March, 2018.
18  My commission expires September 30, 2021.
19
20  _____
21  NOTARY PUBLIC IN AND FOR
22  THE COMMONWEALTH OF VIRGINIA

**Exhibit E**



Deposition of:

# Zuhair El-Shwehdi

*November 29, 2017*

In the Matter of:

# Elhady vs. Kable

Veritext Legal Solutions
1075 Peachtree St. NE , Suite 3625
Atlanta, GA, 30309
800.808.4958 | calendar-atl@veritext.com  | 770.343.9696

Case 1:16-cv-00375-AJT-JFA   Document 229-1   Filed 08/01/18   Page 42 of 99 PageID# 7794

Zuhair El-Shwehdi                                    November 29, 2017
Elhady vs. Kable

Page 1

1              IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF VIRGINIA
2                   Alexandria Division
3
4
5
   ANAS ELHADY, et al,
6
              Plaintiffs,        Civil Action No.
7
     vs.                         1:16-cv-375
8
   CHARLES H. KABLE, et al,      (AJT)(JFA)
9
              Defendants.
10
11
12
13          Deposition of Zuhair El-Shwehdi
14                 Washington, D.C.
15           Wednesday, November 29, 2017
16                   10:00 a.m.
17        Reported by:  Laurie Donovan, RPR, CRR, CSR
18
19
20
21
22
23
24
25

Page 86

1    MR. ABBAS:  What's the Bates
2  number?  I'm not sure what page you're
3  looking at either.
4 BY MS. POWELL:
5    Q   Well, I want to attempt to identify the
6  whole exhibit which seems to reflect an itinerary
7  from Benghazi back to the United States.
8    Is that correct?
9    MR. ABBAS:  She's asking you what
10  is this document?  What is this?
11    THE WITNESS:  This is from Istanbul
12  to -- from Benghazi to Libya -- to, to
13  America.
14 BY MS. POWELL:
15    Q   Yes.  Okay.
16    A   Yeah, I know.  I remember.
17    Q   On the second page of this, which is
18  Bates-stamped Shwehdi 15 at the bottom, there is a
19  flight, March 21st, from JFK to Columbus.
20    A   Yes.
21    Q   Is that the flight you took?
22    A   No, because I think they, they put me in
23  another flight, because it was delayed, I think,
24  in this one.
25    Q   So that's not reflected in your

Page 87

1  interrogatory responses.
2    A   Where is that?
3    Q   I'm on page 88.
4    Q   Okay.  Page 88.
5    Q   It's possible -- oh, wait.  Yes, you did
6  miss your flight on this one.  Sorry.
7    A   Yeah, I know.
8    Q   You're correct.  Your responses reflect
9  that you did miss the planned flight.
10    Do you have any information or documents
11  about the flight you actually took?
12    A   I am really -- this one, I couldn't find
13  it, because they took me, the Turkish Airlines,
14  and they give me a voucher for a hotel, and I
15  think American Airlines, they give me another
16  ticket for second date.
17    Q   So your interrogatory responses reflect
18  a flight from JFK to Dayton.  Your originally
19  planned itinerary was into Columbus.  Do you know
20  which --
21    A   Yep, this one, because if I want to go
22  to JFK, if I want to use Dayton airport, I have to
23  go to LaGuardia, something called LaGuardia, but
24  Columbus goes directly to --
25    Q   So do you recall which one you

Page 88

1  actually --
2    A   I mean when I wrote "Dayton," sorry.  It
3  should be Columbus, because I drove, I drove
4  from -- they drove me from Dayton to Columbus.
5    Q   So your interrogatory response on page
6  88, number 6, should probably read "JFK to
7  Columbus"; is that correct?
8    A   Yes, yes, exactly.  Maybe I made a
9  mistake on that one, all right, because I use it
10  from Columbus.
11    Q   Were you traveling alone on this flight?
12    A   Yes.
13    Q   Your interrogatory responses say it was
14  a substantially similar experience as that on your
15  April 3 travel.
16    Is that correct?
17    A   Exactly.  This is domestic still, yes,
18  yes, the same thing.
19    Q   And does anything stand out about that
20  trip to you as different?  Do you remember
21  anything happening differently on that flight?
22    A   No.  The same thing, the same treatment,
23  search me, SSS, and they put my hand up, search
24  me.  The same procedure what I told you before.
25    Q   Did you take any photo or video?

Page 89

1    A   No.
2    Q   Did you write it down anywhere that we
3  haven't talked about?
4    A   No.
5    Q   Other than your resentment of the
6  treatment and the time it took, were there any
7  other consequences to the screening experience on
8  this trip?
9    A   The humiliation and that stuff I told
10  you before.  Maybe I need to repeat it, but I mean
11  this is what happened to me.
12    Q   Now, why might you choose on one
13  occasion to fly out of Columbus versus Dayton?  Is
14  one more convenient for you?
15    A   If you go -- you see, it depends on the
16  flight.  If you go to like Washington, D.C.,
17  Dayton, they have frequent.  I think of that
18  because we have the base, the Patterson base, so
19  they have more commuting with Washington, I think,
20  but if you want to go to JFK, you cannot fly there
21  from Dayton.  You have to go to Cincinnati or to
22  Columbus, and I don't need to be go to LaGuardia
23  and then take a bus and walk with my situation, so
24  I rather go to the car, go to Columbus, and then
25  all the way to JFK.

23 (Pages 86 - 89)

Zuhair El-Shwehdi
Elhady vs. Kable
November 29, 2017

1    Q   Let's go to the next flight.  It is
2  listed on page 88 of Exhibit B as May 6, 2013 --
3    A   Okay.
4    Q   -- from Columbus to JFK; is that
5  correct?
6    A   Yes.
7        MS. POWELL:  Let's mark the next
8  exhibit, please.
9        (Exhibit K was marked for
10       identification.)
11       THE WITNESS:  May 6.  Yes, okay.
12  BY MS. POWELL:
13   Q   Do you see Exhibit K?
14   A   Yes.
15   Q   Does this look familiar to you?
16   A   Yes.
17   Q   Is this the flight reflected in your
18  interrogatory response?
19   A   Yes.
20   Q   And this is the flight you took?
21   A   Yes.
22   Q   So you did not miss this flight?
23   A   No.  From Columbus to -- I told you, all
24  my flights out of the United States, the domestic,
25  I didn't miss.

1    Q   Was anyone traveling with you?
2    A   By myself.
3    Q   Did you see anybody you knew at the
4  airport?
5    A   No.
6    Q   Your interrogatory response says it was
7  a substantially similar experience to the April 3,
8  2011 flight with one addition, someone following
9  you.
10   A   Yeah, this is the one --
11   Q   This is what you were talking about
12  before?
13   A   -- what we talk about.  This is when I
14  arrive to the airport, JFK.  Somebody -- I know he
15  is African-American.  I remember him.  He start.
16  Where I go, he like my shadow, really.  I was
17  really afraid.
18   Q   Did you speak to him?
19   A   No.
20   Q   Did he speak to you?
21   A   No.  Finally, when I enter the airplane,
22  I told him "thank you, have a nice day," because I
23  noticed.  I went -- because I have a gastric band
24  for losing weight, I cannot eat too much directly.
25  I have to do liquid, so I went to take a soup, I

1  think.  He went with me and he stand about a
2  couple of feet away.
3    Q   How do you know he was a security
4  officer?
5    A   Because -- well, I don't know.
6    Q   Was he wearing a uniform?
7    A   No, no, no.
8    Q   Was he carrying a gun?
9    A   No, no.  He's civilian.
10   Q   So he's just dressed like --
11   A   With a clipboard with some paper, and he
12  didn't talk to me, really.  He was very nice with
13  me, but he watching me, I notice.
14   Q   When did you notice him?
15   A   From when I come to the counter.
16   Q   Why did you notice him then?
17   A   What?
18   Q   Why did you notice him then?
19   A   Because when I went, I go like from --
20  because I stayed about one hour, maybe, to clear
21  me to go overseas in the Turkish counter.  I saw
22  him behind me, and then when I start walking
23  toward the gate with security, they start search
24  me to go to the --
25   Q   So you had noticed him already at that

1  point.  Were you keeping an eye on him?
2    A   Of course, because you couldn't miss it,
3  and, and by the way, when I went in there, he
4  mark, and I saw him, when I finally to enter the
5  Turkish airline, and I told him "have a nice day."
6  He went out and I went in.  This is why I notice.
7  This is my --
8    Q   So when you went through security, you
9  got pulled aside again, right?
10   A   Of course.
11   Q   Where was he?
12   A   On the other side.
13   Q   So he went through security?
14   A   Somewhere.  I don't know.
15   Q   So you weren't watching him to see
16  how --
17   A   What?
18   Q   You weren't -- you don't know how he --
19   A   I don't know.  I saw him in front of me
20  after I finish the security.  I start putting my
21  belt again and my shoes.  I saw him stand over
22  there, the same guy that stand outside near the
23  counter, near the ticket counter.
24   Q   Did he get on your flight?
25   A   No.  I told you after I came and I sit

Zuhair El-Shwehdi
Elhady vs. Kable
November 29, 2017

Page 94

1  down and I am waiting about two hours for the
2  flight to go to overseas, he stand somewhere, and
3  then after I went to the door, I told him "have a
4  nice day," he smiled, and I went inside the
5  airplane. I never saw him again.
6      Q   Otherwise you said this was a
7  substantially similar experience, correct?
8      A   Yes.
9      Q   Anything else stand out as different?
10     A   No.
11     Q   Did you take any photos or video?
12     A   No.
13     Q   Did you write about it anywhere?
14     A   No, except what I wrote to this, this
15  deposition.
16     Q   Got it.
17         Did you otherwise make any complaint
18  about the person following you at the airport?
19     A   Really I am afraid.
20     Q   What are you afraid of?
21     A   Because I told you, our background, any
22  authorities. I said maybe next time you're not
23  going to do it for me, and I don't know. Maybe
24  they sent somebody else. I don't know. Maybe. I
25  don't know. Maybe other flight, but this is the

Page 95

1  only flight I noticed somebody escort me. Really.
2  This is the truth. I'm not --
3      Q   But you don't know whether he was a
4  government official?
5      A   I don't know. I never asked him, but
6  wherever I go -- even I told you I went to the
7  bathroom, he stand outside the bathroom. When I
8  start walking, he follow me.
9      Q   Got it, and this flight, like the
10  previous, were there any consequences other than
11  your resentment about your treatment and the time
12  it took to get through security?
13     A   The humiliation. This is the -- if they
14  do it to one of you guys, you would feel it
15  forever. You singled out. The other people,
16  even, even if they -- sometime they told me it's
17  randomly, but they didn't treat me -- just one
18  second and they let them go.
19     Q   But someone following you, that has not
20  happened again?
21     A   I'm not sure.
22     Q   As far as you know?
23     A   This is what I wrote, I think. I don't
24  know if I wrote another thing, but this is my
25  notes, I think, in the previous flight, but now

Page 96

1  you just tell me in this flight.
2      Q   Let's talk about the next trip. It
3  is --
4      A   How many trips?
5      Q   You took a lot, it turns out. On page
6  88 of Exhibit B, there is a flight listed
7  November 23, 2013, from JFK to Columbus.
8      A   Coming back. Okay.
9      Q   So this is your connecting flight coming
10  back, right?
11     A   Yes.
12     Q   And there was no reason for you to be at
13  JFK other than the connecting flight?
14     A   The same thing, the same treatment, the
15  same . . .
16         MS. POWELL: Let's mark the next
17  exhibit, Exhibit L.
18         (Exhibit L was marked for
19         identification.)
20  BY MS. POWELL:
21     Q   Does this look familiar to you?
22     A   November 23. Yeah, this is my last time
23  I enter United States. I, I remember.
24     Q   So what is Exhibit L?
25     A   This is traveling from Benghazi to

Page 97

1  Istanbul, Istanbul to JFK.
2      Q   And this is your itinerary? If you flip
3  to the third page of the exhibit, which is Shwehdi
4  24, there appears to be a ticket stub.
5         Is that your ticket stub from this
6  flight?
7      A   Yeah, because my name, Zuhair, they
8  didn't spell it good. They spell it Z-U-H-A-I.
9  There is no R.
10     Q   And then the next two pages after that,
11  Shwehdi 25 and 26, appear to be just a slightly
12  different copy of the same itinerary?
13     A   Which one?
14     Q   Shwehdi 25 and 26. Just at the end
15  there.
16     A   What do you mean?
17     Q   This appears to be the same itinerary,
18  correct?
19     A   Yes. It's the same one. Maybe they
20  give me two copies. I don't know.
21     Q   Looking at just the domestic flight from
22  JFK to Columbus, Saturday, November 23, 2013 --
23     A   Yes. I missed that flight.
24     Q   You missed this flight?
25     A   I think, yes.

25 (Pages 94 - 97)

Case 1:16-cv-00375-AJT-JFA  Document 229-1  Filed 08/01/18  Page 46 of 99 PageID# 7798

Zuhair El-Shwehdi
Elhady vs. Kable                                                                                                                                                     November 29, 2017

Page 98

1    Q   I thought you did not.
2    A   Yes, because this one, they single me
3 out from the -- I remember.  They came to my seat,
4 ma'am.
5    Q   Now, did you --
6    A   I don't know if I have the other ticket
7 or not.  I don't know.  I don't have the domestic,
8 because, because they give me the, they give me
9 the --
10    Q   I don't have any documents about your
11 flight, the flight you actually took back.
12    A   From JFK to Columbus, I think.  I don't
13 have -- I tried to find it, but --
14        MR. ABBAS:  Just make sure and let
15 her finish the question.
16        THE WITNESS:  Okay.  Sorry.
17        MS. POWELL:  That's okay.
18 BY MS. POWELL:
19    Q   But speaking about the flight you
20 actually took, was it on the 23rd, as planned?
21    A   Which one?  This is the -- it start the
22 22nd, okay?
23    Q   Right, but we're talking about the
24 domestic leg of the flight.  Your interrogatories
25 say you traveled on November 23, 2013, as planned.

Page 99

1 It's not clear to me if that's the case.
2        Do you remember?
3    A   Because I slept one night, 22nd, is it?
4 From Friday, from, from Benghazi to Istanbul,
5 okay, and then I slept, I went to the hotel.
6 Second day it will be the 23rd.
7    Q   Yes, I understand, so that was the
8 planned flight.  Is the flight you actually took
9 also on the 23rd?
10    A   Yes, but -- no, no, no.  I think this
11 one you are right.  It would be 24.
12    Q   So that's not reflected in your
13 interrogatory responses?
14    A   Yeah, I think it will be 24.  I think
15 because I -- they put me in a hotel.
16    Q   Do you recall whether you had to pay for
17 a new flight?
18    A   No, no.  The Turkish airline, they
19 issuing me a voucher, the same thing, and I went
20 to the hotel.
21    Q   Did you pay for the hotel?
22    A   No, because they sent the luggage all
23 the way to Columbus.  They have an agreement or
24 something like that.  If your luggage all the way
25 to Columbus, they have to give you a voucher for

Page 100

1 the hotel.
2    Q   I understand.
3        So your interrogatory response about
4 this flight on page 88 of Exhibit B just says you
5 had a substantially similar experience as that
6 described in your April 3rd flight.
7        Is that accurate?
8    A   Yes.
9    Q   And you had a similar experience at
10 check-in and security?
11    A   Domestic, the same thing.
12    Q   Does anything stand out about this
13 flight?
14    A   No.  The same, the same treatment as
15 before.
16    Q   Were you traveling with anyone you know?
17    A   No.
18    Q   Did you see anyone you know at the
19 airport?
20    A   No.
21    Q   Are there -- were there any consequences
22 other than what we have already talked about?
23    A   The same, the similar situation,
24 humiliation, the same thing, the same, the same
25 situation I just wrote.

Page 101

1    Q   Okay.  Did you write about this
2 experience anywhere?
3    A   Excuse me?
4    Q   Did you write about --
5    A   No, no.  Whatever I wrote here, this is
6 my writing.
7    Q   Okay.
8    A   Maybe I do a book later on.
9    Q   So the next flight that's listed is
10 actually a 2012 flight.  We have your flight in
11 2012 to Santa Ana and back, California.
12    A   Yes.
13    Q   Was this for your daughter's --
14    A   No.  This is for my brother's son's
15 wedding.
16    Q   Okay.
17    A   And my daughter last year, '16.
18    Q   Got it.
19        Okay.  So the March 21, 2012, there are
20 two flights listed in your interrogatory
21 responses, from Dayton to Chicago and from Chicago
22 to Santa Ana; is that correct?
23    A   Yes.
24    Q   And is that a flight you actually took?
25    A   Yes.

26 (Pages 98 - 101)

Zuhair El-Shwehdi                                                                November 29, 2017
Elhady vs. Kable

Page 154

1 And I have Mohammed.  He is American, but he teach
2 in Saudi Arabia.  And Sadek executed in '84.  We
3 are seven.
4        Q    And your parents are both passed away?
5        A    My father passed away in '81.  I
6 couldn't go back home because of my situation.
7 And my mother, she passed away after the
8 revolution on March 13, I think.  I tried to reach
9 to see her, but I couldn't, so this is God
10 willing.
11       Q    Do you have any children in Libya?
12       A    No way, no way.  I married in Cairo.  I
13 couldn't go back, ma'am, because if I go back, I
14 be killed by Gaddafi's junta.
15       Q    Okay.  So the trip abroad to Doha and to
16 Libya, I take it, beginning April 3, 2011, did you
17 travel with anyone on that trip?
18       A    By myself.
19       Q    Okay.  I'm trying to make sure we have
20 covered the usual questions about screening.
21            On your flight there, did you take any
22 photo or video?
23       A    Nothing.
24       Q    Did you write down your experience
25 anywhere we have not talked about?

Page 155

1        A    No.  When I came back with the hassle
2 and the sit-down, I wrote this.  You know, you
3 will find some mistake.  I forgot something,
4 because I don't remember everything, some things.
5        Q    You have testified that it took you a
6 long time to get through security and that you
7 were, you were humiliated by your travel
8 experience.  I just mean that's what you've told
9 me.  That's what you have told me.
10            Other than what we have already talked
11 about, are there any consequences from your
12 screening on this travel?
13       A    No.  The same thing.  The same thing
14 like previous.
15       Q    On this trip beginning April 3, 2011,
16 did you go to any countries other than Qatar or
17 Libya?
18       A    No.  This trip?  No.
19       Q    Did you travel into Libya more than
20 once?
21       A    No.  I went, I went from Qatar to Libya
22 and then from Libya I think to Qatar, Qatar back
23 here.
24       Q    I wasn't sure if you went in and out
25 more than once.

Page 156

1        A    No, no.  There is another trip.  I don't
2 know it's this one.  You can find the stamp.  I
3 went from, from, from Libya to Tunisia, because we
4 went to the -- you see, Libya like this.  We are
5 on this side.  This is the military.  Tripoli
6 here, Benghazi here.  We cannot go here, because
7 this is Gaddafi.  So from Benghazi liberated, we
8 go by airplane to Tunisia, and we help -- we can,
9 we can stay there, okay?
10       Q    So hang on just a second.  On this early
11 April 2011 --
12       A    I didn't go anywhere.
13       Q    Okay.  You don't go anywhere on that
14 trip.  Let's wait then.
15       A    Okay, okay.
16       Q    Let's talk about the return trip.
17       A    Which one?
18       Q    That would be May 7, 2011.  It is on
19 page 85 of the interrogatories.  That's Exhibit B.
20       A    May 7, Doha to -- yeah.
21       Q    Your interrogatory responses say that
22 there was a flight from Doha to Dulles on Qatar
23 Airways QR51; is that correct?
24       A    Yes.
25       Q    Unlike the previous flights we've talked

Page 157

1 about, your interrogatory responses here describe
2 a search by CBP, Customs & Border Protection; is
3 that correct?
4        A    Yes.
5        Q    Tell me about that search.
6        A    When I come from overseas, this is what
7 they usually -- some of the flight, they come to
8 my seat.  This one I don't think so.  When I go
9 out from that airplane, I found the Custom or the
10 police, they waiting.  They search everybody
11 coming out, the passport and the boarding pass or
12 the custom, what we fill in the, in the sky.
13            There is a form they give us in the
14 airplane.  You have to fill it out, and when they
15 start everybody, when they saw my name, they said
16 that's it.  They escort me, three or two,
17 sometimes four, okay?  And I go with them and we
18 go the same way, okay, until we go to the lobby.
19 There is thousands of people there coming to the
20 United States.  They took me aside and they got
21 one of the control rooms.  They scan my
22 passport --
23       Q    Just a moment.  This time you're in a
24 private room, right?  You're not out in front of
25 the bigger group?

40 (Pages 154 - 157)

Zuhair El-Shwehdi
Elhady vs. Kable
November 29, 2017

Page 178

1 to marry her, okay? So I couldn't come early. My
2 wife and Nuria, they came before me. They came on
3 that purpose, but my main purpose to do my tax for
4 myself. And Nuria and my wife, they met that
5 gentleman, but they didn't get locked or engaged.
6     Q    And you stayed in the US a little more
7 than a month?
8     A    I think so. I'm not sure how many --
9 the return --
10    Q    Okay. We'll talk about the return trip
11 in a minute.
12    A    I went back May 6th.
13    Q    Okay. That sounds right to me.
14    A    Yep.
15    Q    So the March 20th trip --
16    A    March 20, 2013.
17    Q    -- you moved back to the US via Geneva
18 and landed in Dulles?
19    A    Which one? JFK, March 20.
20    Q    You're right.
21    A    2013.
22    Q    Yep, you're right.
23    A    JFK; yes?
24    Q    Yes. Yes, that's correct.
25         Now, your interrogatory responses on

Page 179

1 page 85 say that officers or agents entered the
2 aircraft and escorted you to a room. This was --
3 so the plane landed at Dulles, and then they came
4 onto the plane?
5     A    No. JFK.
6     Q    Sorry. At JFK they came onto the plane?
7     A    Yeah, I remember. Maybe I didn't write
8 it. I forgot.
9         When the airplane taxiing and they start
10 moving toward the gate, the captain, he said
11 everybody put the boarding pass on the, on the, on
12 the passport, and people, they stand up to take
13 their luggage. He said please, everybody, be
14 seated, so everybody sit back.
15         And then the Turkish agency or something
16 like that, Turkish airline ground from the station
17 in New York with the, with the, with the
18 authorities, they enter to the airplane and they
19 took me. I stood up. I'm the only one on that
20 airplane. I stood up. They told me follow us.
21 Everybody sit down. Even the first class.
22 Everybody. They took me. I am the first one, the
23 ID.
24         I went through, and then I went with
25 them immediately, like what I told you before, to

Page 180

1 scan my passport and then to a private room in
2 the same situation. They asked me about myself,
3 my family back home and everything. That's it.
4     Q    Were any of the questions different this
5 time?
6     A    No, no. The same thing. Everything. I
7 don't know what -- this takes a long time. I
8 missed the flight. I remember. This take me a
9 long time, because I went to make ablutions, went
10 to the bathroom, and it take me long time. Even I
11 told them I need to call my wife, because they
12 took my phone. I remember they took it to another
13 terminal somewhere, so they allowed me to talk,
14 because I already, I know the flight is missing.
15         So I phone my wife. I told her I am in
16 New York, I am safe, but I still inside
17 Immigration. I cannot leave. I think I am going
18 to miss the flight. When I go out, I'll give
19 you the -- I thought I can catch another flight on
20 the same night, but I couldn't. This is what
21 happened.
22    Q    You stayed overnight in New York. Was
23 it like before where they gave you a voucher?
24    A    When I finish, I went upstairs to the
25 Turkish airline, and they told them -- they give

Page 181

1 me a voucher to the hotel, and I don't know the
2 carrier. I forgot the carrier. Before I go, they
3 give me -- they issue -- they told me we, we book
4 you on the second flight, second day flight. So I
5 don't know. Maybe morning, afternoon. I forgot.
6         So I went to the hotel. I slept.
7 Second morning I come back to the, to the airport,
8 and it's a domestic flight like what I told you
9 before.
10    Q    Now, for this one you said that it was a
11 substantially similar experience to the previous
12 returns but that the whole experience took five or
13 six hours this time.
14    A    This one is more time.
15    Q    And I'm wondering which part of it took
16 longer. Did they ask you more questions, or did
17 you wait longer?
18    A    I wait longer, because they took my, I
19 think my phone, and they couldn't do it in their
20 terminal. This is what the gentleman told me. He
21 said we want to take it to another place to check
22 your phone.
23    Q    Who told you this?
24    A    One of the officer, the men who, who --
25 they are surrounding me, because they didn't send

46 (Pages 178 - 181)

Zuhair El-Shwehdi
November 29, 2017
Elhady vs. Kable

Page 182

1  me -- even if I go to the bathroom, they go with
2  me, and I still waiting until I saw somebody come
3  and they bring the phone.  He said everything is
4  clear.  They give me my passport and they open the
5  door, and I was outside with my luggage.
6       So the waiting is for that equipment,
7  not for the question and answer.  The same period
8  of time, I think.
9       Q    Did you get everything back?
10           (Discussion held off the record.)
11  BY MS. POWELL:
12       Q    We're still talking about the trip on
13  March 20, 2013, where you landed at JFK.
14       A    Okay.
15       Q    After they searched your belongings and
16  took your phone and you waited, did you get
17  everything back?
18       A    Yeah, yeah.  No, nothing missing, yeah.
19  They gave me the phone, they gave me everything,
20  and they hand me my passport, and I went out.  I
21  went to the hotel.  They give me voucher for food.
22  This is the airline.
23       Q    Were there any consequences of the
24  missed flights, missed --
25       A    My family, they are worried on me,

Page 183

1  because my wife, when I talk to her, I told her
2  don't worry, I am safe, I am safe.  You see, they
3  expecting this.  This is what -- for the family,
4  this is -- what they call it in English?  But for
5  myself, I'm used to it.  This is my God willing.
6  So I stay.  I never did anything wrong.  So this
7  is -- maybe our friends, they never, they never
8  touch them in the airport, but they single me out.
9  No problem.  I try to take my name off, and this
10  is one of the means, when I found those people.
11       Q    I understand.
12           Okay.  I think we are down to the last
13  international trip.  That's a flight out and a
14  flight back.  There's more questions after that,
15  but this is --
16       A    Okay.  Take your time.  I'm available.
17  Don't worry.
18       Q    Just letting you know there's light up
19  ahead.
20       A    Don't worry.  I'm available.
21       Q    Okay.  Look at your interrogatory
22  response on page 84.
23       A    84, okay.
24       Q    It is the May 6, 2013 flight, so that's
25  paragraph 4 on page 84.

Page 184

1       A    Okay.
2       Q    You list here a flight from JFK to
3  Istanbul.  I take it from our previous
4  conversation that this was you returning to Libya.
5       A    Yes.  Not this.  This is the tax, when I
6  finish the tax.  When I came in March, this is
7  coming back to my family.
8       Q    Yes.  So you are returning --
9       A    After this, I didn't come and fill the
10  other flight until November something.
11       Q    So let's talk about this May 6, 2013
12  flight.  When you got back to Libya, were you
13  doing the same --
14       A    Same thing.  I went to my family,
15  because we try to settle, I told you, but in that
16  year, the country or the city went downhill.  They
17  start killing.
18           I told you they killed one of our
19  teachers.  He's an American teacher.  He is the
20  teacher of my -- because my daughter, they speak
21  English, and the local, the local school, they
22  didn't provide English, so I put them in -- they
23  call it International School.  At International
24  School they bring teacher from America, from
25  Canada, from Australia, from Britain.

Page 185

1       So the environment, my kids, they are
2  American, they speak good, so I put them over
3  there, okay?  And they make very, very contact
4  with this gentleman, the one who was killed,
5  because his wife, she is American, but she is
6  originally Lebanese.
7       My kids, they have a good relation with
8  those people, okay, and when they kill them and
9  the situation was bad, all my family, my relative,
10  they told me, Zuhair, your kids, they didn't raise
11  up here.  We used to this system, but your kids,
12  they just came one year.  We wish you to go back.
13       So I decide.  I send them I think in
14  September, and I stayed until November, and then I
15  came back forever until now.  I never went back.
16       Q    But from May to November of 2013, you
17  were doing the same things you were doing --
18       A    The same thing, yeah, all my --
19       Q    Let me finish just so that it's clear on
20  the record.
21       A    Sorry.
22       Q    You were doing the same things to earn
23  income --
24       A    Yes.
25       Q    -- that you were before?

47 (Pages 182 - 185)

Zuhair El-Shwehdi                                    November 29, 2017
Elhady vs. Kable

Page 186

1    A   Yes, yes.
2    Q   Were you doing anything else?
3    A   No.
4    Q   Let's talk about this trip out,
5  specifically, the May 6, 2013 flight.
6    A   Mm-hmm.
7    Q   We have already talked about the
8  connecting flight to JFK.
9    A   This is from Istanbul.
10   Q   Yes, from JFK to Istanbul.  You said it
11 was a substantially similar experience to the
12 April 3, 2011 flight.
13       So you checked in again at JFK?
14   A   Yes.
15   Q   And it took some amount of time for you
16 to receive a boarding pass?
17   A   Yes.
18   Q   This answer here suggests it took longer
19 this time; is that correct?
20   A   Yes.
21   Q   It also says you noticed an individual
22 watching and following you.
23   A   Yes.
24   Q   When did you notice him?
25   A   On the counter.

Page 187

1    Q   When you were checking in at the
2  Turkish --
3    A   At Turkish counter.
4    Q   At the Turkish counter at JFK?
5    A   Yes.
6    Q   Was the person wearing a uniform?
7    A   No.
8    Q   How did you happen to notice him?
9    A   Because later on, when I go -- I told
10 you about -- this is the same -- this is what I
11 told you about.
12   Q   Well, this is a different time.  We
13 talked about this on a previous encounter.
14   A   Maybe not, but this one I know.  It's
15 the same.  When I went out, I went to the gate, he
16 follow me.  I noticed that, but he never told me.
17   Q   Did you talk to him?
18   A   No.
19   Q   And did he talk to you?
20   A   No.
21   Q   Did you talk -- did you make a complaint
22 about him following you or anything like that?
23   A   No.  To whom?  To whom?  This is my
24 first time, and I spoke to authorities yesterday.
25 I have the carriage, because I'm coming to you.  I

Page 188

1  said let's do it.  I came to the lady.  I told her
2  I need your badge, the business card.  She said
3  this is my -- I am Supervisor Allen, so I wrote it
4  down.  This is my -- I was brave yesterday to do
5  it.
6    Q   Just making sure I asked all of my
7  questions here.
8        Did your conversation with the Turkish
9  airlines agent on that day go any different than
10 the previous ones?
11   A   No.
12   Q   Did anyone tell you you were on a
13 watchlist?
14   A   No, nobody, nobody.
15   Q   Was the screening experience itself any
16 different?
17   A   The same like before.
18   Q   Were you also screened at the gate?
19   A   I don't recall on this one.  I don't
20 recall, but they screen me when I enter into the
21 airport or something like that, but I don't
22 recall.
23   Q   Okay.  On this trip did you go to any
24 countries other than Libya?
25   A   No.  This one, no.

Page 189

1    Q   Did you enter and exit Libya more than
2  once?
3    A   No, because after this, I told you we
4  came back on the -- I came back on the following
5  trip.  I don't know which time.
6    Q   We have one return flight left.  It
7  appears on page 86 of your interrogatory
8  responses.
9    A   Okay.
10   Q   Page 86, paragraph 4.
11   A   November 22.
12   Q   Yes, the flight on November 22 from
13 Istanbul to JFK.
14   A   Okay.
15   Q   This is your return to the United States
16 after you decided not to live in Libya, correct?
17   A   Yes.  This is my last time I enter
18 America.
19   Q   When you returned, did you have a job in
20 the US?
21   A   No, because I work for Hope, but when I,
22 I went to Libya, I don't have any job.
23   Q   When did you start working for Hope
24 again?
25   A   After, after -- I think in December, the

48 (Pages 186 - 189)

Zuhair El-Shwehdi
November 29, 2017
Elhady vs. Kable

Page 190

1 month of -- because I am -- everybody knows me, so
2 the board, they decide to -- they said, Zuhair,
3 you are the only one, because I am one of the
4 founders. Please take it, but I make, I make a
5 new request. I told them because of -- we need to
6 help, inside the United States, the widows and the
7 orphans, because we have some family. The
8 grandfather -- we establish the organization after
9 I came back from Libya to inside the United States
10 only.
11    Q   So you no longer send funds overseas?
12    A   No.
13    Q   What kind of work do they do in the US?
14    A   We have some widows, we have some sick
15 people, some orphans.
16    Q   Charity for Libyans?
17    A   Charity for Libyans, and we have two
18 occasions. Maybe you know the Ramadan when we
19 fast for a whole month, and the sacrifice.
20 Sacrifice is after Ramadan, when we sacrifice
21 lambs, and we distribute the money for the poor.
22 So on that occasion we have to give hope to the
23 unfortunate, the ones that didn't have money.
24 This is my job.
25    Q   Okay. So for this last international

Page 191

1 flight, returning to the US, you again missed your
2 flight going --
3    A   Yes.
4    Q   -- to Columbus and had to rebook. Did
5 you have to pay money for a new flight?
6    A   No. The airline, they did everything
7 and they give me the hotel. The same thing.
8    Q   So for this return to the US, were you
9 screened by CBP again?
10    A   Yeah, the, the one that I don't know the
11 name, the CBP -- the one, yes, the same thing.
12    Q   Did they enter the plane again or meet
13 you outside the plane?
14    A   I don't recall on this one, but -- the
15 other one I remember, but this one, if they didn't
16 enter, they wait me on the front of the door.
17 Doesn't matter. Maybe three steps inside there.
18    Q   But you're not sure?
19    A   I don't think so. The front of the
20 door. And by the way, the same gentleman, I told
21 him I think one time -- he's African-American. He
22 said no, no, no. When we went back to the screen,
23 he start laughing. He told me you're right, I am
24 the one who do the same search previous.
25    Q   It was the same agent who had searched

Page 192

1 you a previous time?
2    A   Because I recognize his face. He is
3 African-American. He told me I saw a thousand
4 faces every day, but when we went to the machine,
5 maybe when he log on or something, he start
6 laughing. He said you are right, I am the one
7 that took down your information, the same guy,
8 because it's in the same airport.
9    Q   Did he ask you any different questions
10 this time?
11    A   No.
12    Q   Did anyone ask you anything different?
13    A   No. They treat me good, really, but
14 the, the hassle -- everybody treat me good. This
15 is, this is -- I have to say it because I am a
16 Muslim and this is the truth. They treat me good,
17 but they put me aside until I miss my flight. My
18 family, they try to call me, and the phone is
19 closed. They are worried. This is the problem
20 only, but nobody treat me, not like back home.
21 They kill you and they put you on the street.
22        I have my cousin. By the way, two
23 months ago they killed him and they throw him in
24 the street. It's crazy over there, but in this
25 country we have --

Page 193

1    Q   I would like to look at Exhibit A, which
2 is the amended complaint.
3    A   This one?
4    Q   Yes.
5    A   Okay. What's this?
6    Q   This is the amended complaint in this
7 action. We've already marked it, and if you'd
8 turn to the orange tab.
9    A   Okay, orange tab, yes, page 69.
10    Q   And turn to the next page.
11    A   Okay.
12    Q   Page 70.
13    A   Okay.
14    Q   So some of these paragraphs describe the
15 November 22nd experience.
16    A   November 22, okay.
17    Q   The November 22, 2013 experience which
18 we were just talking about. Paragraph 467 --
19    A   On November 22, okay.
20    Q   It says the pilot announced over the
21 loudspeaker that all passengers should have their
22 passports and boarding passes ready for
23 inspection.
24        Is that different than --
25    A   This is, this is what I told you. This

49 (Pages 190 - 193)

Page 194

1 is the last flight, yeah.
2    Q    Okay, but is that different than
3 previous flights?
4    A    Yes.  This is I think the first time I
5 listen to the pilot.  He said I told you,
6 everybody sit down, and the ones they want to
7 grab -- they went back to their seats and
8 everybody sit, and they enter and they took me
9 from my seat.
10    Q    So you described that about a previous
11 flight as well, I believe.
12    A    Yes, two times, yes, yeah, the same
13 thing, the same thing happened at JFK.
14    Q    Okay.
15    A    This is what I wrote.  This is exactly.
16    Q    Paragraph 468 says "FBI and/or TSA
17 agents boarded the plane and inspected the
18 passengers' passports and boarding passes until
19 they located Mr. El-Shwehdi."
20        You have not previously talked about FBI
21 or TSA agents taking those sorts of activities.
22 Do you know what agency the agents were from?
23    A    No, I don't know, but I wrote like this
24 because I don't know.  Maybe FBI or TSA.  This is
25 what I assuming, but I don't know anybody, but

Page 195

1 it's an agency from -- United States agency, the
2 border agency.  I don't know who.
3    Q    Did they identify themselves to you at
4 the time?
5    A    No, no.
6    Q    Did they show you any ID?
7    A    No.
8    Q    But they had badges?
9    A    They had, they had the --
10    Q    But you don't remember what agency?
11    A    No.
12    Q    Paragraph 468 says you were "escorted
13 off the plane, detained, and subjected to
14 prolonged questioning and searches."
15        Is that correct?
16    A    The same situation.  They took me across
17 the -- they scan my passport and they took me to
18 the special room.
19    Q    Did anything happen different this time?
20    A    No.
21    Q    When you say -- when the complaint says
22 it was "prolonged," how long did it take?
23    A    What do you mean "prolonged"?  What do
24 you mean?
25    Q    That's what the complaint says, that it

Page 196

1 was prolonged questioning.  How long did it take?
2    A    From airplane until, until down?
3    Q    How long were you questioned?
4    A    I don't know.  The same, the same thing.
5 Maybe 30 minutes.  The problem is for the waiting.
6 After they question me, nicely -- because I
7 remember everything, and I told them the same
8 story, and then they told me please go, and they
9 search my -- because they didn't search until I
10 present in front of them.  They start searching my
11 belongings, and then after they return everything,
12 they close my luggage, and I go and sit down until
13 they come back to give me my passport.
14    Q    All right.  Other than a missed flight
15 on your return, were there any consequences for
16 your delay on this trip?
17    A    It's my family and myself.  This is what
18 I told you before.  This is a hassle, but overall
19 they treat me good.  The problem is why they
20 single me out.  This is my, my, my suffering, and
21 my family -- most of it overseas, my suffering
22 from the flight, from the treatment, the way they
23 treat me.
24    Q    So those are the specific flights and
25 trips you identified for us in your interrogatory

Page 197

1 responses, plus a few others we talked about, like
2 the one to England and two to Egypt and one to
3 Switzerland.
4        Are there any others that you recall?
5    A    This is what I recall, ma'am, and this
6 is what I have.  I have this document for myself,
7 I hand it to those people, and this is my
8 handwriting, I know, but maybe -- but what I
9 recall, I told you thoroughly.
10    Q    Have you ever been denied entry to a
11 foreign country?
12    A    No.
13    Q    Have you ever been denied a visa that
14 you applied for?
15    A    Because I'm American, they never.
16    Q    Have you ever crossed the US border into
17 Canada?
18    A    Yes.
19    Q    When?
20    A    When I was living in 990 Princewood.
21 Let me go back.
22        Before I went to, to my 52 South Glen
23 Oak, I moved, I moved in 2004, okay?  Something
24 between 2001 and 2004.  I don't recall the date.
25    Q    So was there just one trip?

50 (Pages 194 - 197)

Zuhair El-Shwehdi
Elhady vs. Kable
November 29, 2017

Page 270

```
1     (Signature having not been waived,
2     the deposition of ZUHAIR EL-SHWEHDI
3     was concluded at 5:08 p.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 271

```
1
2
3
4
5
6           ACKNOWLEDGEMENT OF WITNESS
7     I, Zuhair El-Shwehdi, do hereby
8     acknowledge that I have read and examined the
9     foregoing testimony, and the same is a true,
10    correct and complete transcription of the
11    testimony given by me, and any corrections
12    appear on the attached Errata sheet signed by
13    me.
14
15
16    _____  _____
17   (DATE)        (SIGNATURE)
18
19
20
21
22
23
24
25
```

Page 272

```
1        E R R A T A   S H E E T
2  IN RE:  ANAS ELHADY VS. CHARLES KABLE, ET AL
3  RETURN BY:
4  PAGE   LINE        CORRECTION AND REASON
5  ____  ____  _____
6  ____  ____  _____
7  ____  ____  _____
8  ____  ____  _____
9  ____  ____  _____
10 ____  ____  _____
11 ____  ____  _____
12 ____  ____  _____
13 ____  ____  _____
14 ____  ____  _____
15 ____  ____  _____
16 ____  ____  _____
17 ____  ____  _____
18 ____  ____  _____
19 ____  ____  _____
20 ____  ____  _____
21 ____  ____  _____
22 ____  ____  _____
23 ____  ____  _____
24 _____      _____
25 (DATE)      (SIGNATURE)
```

Page 273

```
1
2
3
4
5  CERTIFICATE OF SHORTHAND REPORTER -- NOTARY PUBLIC
6       I, Laurie Donovan, Registered
       Professional Reporter, Certified Realtime
7      Reporter, the officer before whom the
       foregoing deposition was taken, do hereby
8      certify that the foregoing transcript is a
       true and correct record of the testimony
9      given; that said testimony was taken by me
       stenographically and thereafter reduced to
10     typewriting under my supervision; and that I
       am neither counsel for, related to, nor
11     employed by any of the parties to this case
       and have no interest, financial or otherwise,
12     in its outcome.
13          IN WITNESS WHEREOF, I have hereunto
       set my hand and affixed my notarial seal this
14     8th day of December, 2017.
15     My commission expires:  March 14th, 2021
16
17
18
       Laurie Donovan
19  LAURIE DONOVAN
    NOTARY PUBLIC IN AND FOR
20  THE DISTRICT OF COLUMBIA
21
22
23
24
25
```

69 (Pages 270 - 273)

# Exhibit F



Deposition of:

# Mark Amri

*March 8, 2018*

In the Matter of:

# Elhady vs. Kable

Veritext Legal Solutions

1075 Peachtree St. NE , Suite 3625
Atlanta, GA, 30309
800.808.4958 | calendar-atl@veritext.com  | 770.343.9696

Case 1:16-cv-00375-AJT-JFA   Document 229-1   Filed 08/01/18   Page 56 of 99 PageID# 7808

Mark Amri                                                                  March 8, 2018
Elhady vs. Kable

Page 1

1            IN THE UNITED STATES DISTRICT COURT

2           FOR THE EASTERN DISTRICT OF VIRGINIA

3                    ALEXANDRIA DIVISION

4

5    ANAS ELHADY, et al.

6            Plaintiff,

7       v.                          Civil Action No.

8                                   1:16-cv-375

9    CHARLES H. KABLE, et al.        (AJT/JFA)

10           Defendant.

11

12                 DEPOSITION OF MARK AMRI

13   DATE:         Thursday, March 8, 2018

14   TIME:         10:23 a.m.

15   LOCATION:     Department of Justice

16                 20 Massachusetts Avenue NW

17                 Washington, D.C. 20001

18   REPORTED BY:  Natalia Thomas, Notary Public

19

20

21

22

Mark Amri
Elhady vs. Kable

March 8, 2018

Page 2

1        A P P E A R A N C E S

2 On behalf of Plaintiff:

3    DENA M. ROTH

4     United States Department of Justice

5     20 Massachusetts Avenue, NW

6     Washington, DC 20001

7     dena.m.roth@usdoj.gov

8     (202) 514-5108

9

10 On behalf of Defendant:

11    GADEIR I. ABBAS

12     Council on American-Islamic Relations (CAIR)

13     453 New Jersey Avenue, SE

14     Washington, DC 20003

15     gabbas@cair.com

16     (202) 742-6420

17

18 Also present:

19    Jayme Kantor, FBI

20    Jennifer Greenband, TSA

21

22

Page 3

1        C O N T E N T S

2 EXAMINATION BY:            PAGE

3 By Ms. Roth            4

4 By Mr. Abbas          140

5

6        E X H I B I T S

7 No. DESCRIPTION         PAGE

8 Exhibit A   Copy of complaint      15

9 Exhibit C   Stipulation of Plaintiff Mark Amri   37

10 Exhibit E   Boarding pass 08/04/16, 08/05/16

            57

11 Exhibit H   First Department of Homeland Security   54

12    letter, 07/19/16

13 Exhibit M   Department of Homeland Security document 59

14 Exhibit N   Email to Maureen Dadaphoy      60

15 Exhibit O   Second Department of Homeland Security   55

16    letter, 09/01/16

17     (Exhibits attached to transcript.)

18

19

20

21

22

Page 4

1       P R O C E E D I N G S

2 WHEREUPON,

3       MARK AMRI

4 called as a witness, and having been sworn by the

5 notary public, was examined and testified as follows:

6    EXAMINATION BY COUNSEL FOR DEFENDANT

7 BY MS. ROTH:

8    Q   Good morning, Mr. Amri. My name is Dena

9 Roth. I represent the defendants in this litigation.

10 I have a few things I'd like to go over with you at

11 the beginning of the deposition. So if you'll indulge

12 me.

13     One of the things I always say with everyone I am

14 in a deposition with is that the most important thing

15 that we can do today is make sure we're not

16 interrupting each other because the court reporter is,

17 of course, transcribing what we say. So what I'm

18 going to ask is that you not interrupt me, let me

19 finish my questions, and then you'll have an

20 opportunity to respond. And I, of course, will do

21 everything I can not to interrupt you.

22    A   Sure.

Page 5

1    Q   Does that -- does that work for you? Great.

2    Relatedly, because we're on the record, it's very

3 important that your answers all be verbal. So, yes or

4 no --

5    A   Yes.

6    Q   -- or anything else. So if you nod your

7 head, I may ask, are you saying yes? Is that okay?

8    A   Yes, sure.

9    Q   Okay. Do you understand that you're under

10 oath today just as if you were in a court room with a

11 judge?

12    A   Yes.

13    Q   Okay. Have you ever been in a deposition

14 before?

15    A   No.

16    Q   Okay. So I'll try to make this as painless

17 as possible for you. Is there any reason today that

18 you believe you're not able to testify honestly,

19 completely, truthfully?

20    A   No.

21    Q   Okay. Have you taken any medication, in the

22 last 24 hours, that could affect your memory or your

2 (Pages 2 - 5)

Mark Amri
Elhady vs. Kable

March 8, 2018

Page 58

1    Q   You see that?

2    A   Yes.

3    Q   Okay.  And then if you turn to the second

4  page, this is the boarding pass from Ontario to San

5  Francisco.  And it looks like it's dated Thursday,

6  August 4, 2016, right?

7    A   Okay.

8    Q   So does that refresh your memory as to --

9    A   Yeah.  I mean, of course, it's a -- that's

10  the boarding pass.

11    Q   Right.  And it's marked with the four S's.

12    A   I had sent these pictures to my -- my --

13        MR. ABBAS:  Objection, I'm instructing the

14  witness not to provide --

15        THE WITNESS:  Oh.

16        MR. ABBAS:  -- attorney/client privilege

17  communication.

18  BY MS. ROTH:

19    A   So I didn't have the access to them again.

20    Q   But they both -- they -- you see that they --

21  is this the four S's you're referring to?

22    A   Yes.

Page 59

1                    Page 59

2    1    Q   Okay.  Could you turn to Tab M, as in

3    2  Matthew, please?  And I've introduced that as Exhibit

4    3  M.

5    4        *(Plaintiff's Exhibit M was marked for

6    5        identification.)

7    6  BY MS. ROTH:

8    7    Q   For the record, Mr. Amri, I'm just describing

9    8  this another document that has the Homeland

10   9  Security symbol at the top.  And below that, it says,

11  10  print this page for your records.  Do you recall this

12  11  document?

13  12    A   I don't remember it, but I signed it, so --

14  13    Q   Is that -- so that's your signature at the

15  14  bottom?

16  15    A   Yes.

17  16    Q   Okay.  Do you see at the bottom, very bottom

18  17  right hand of the page, there's a date, and it looks

19  18  to me like it's March 4, 2016?

20  19    A   Mm-hmm.

21  20    Q   Is it possible that that's -- that that's the

22  21  date you were printing this form?

    22    A   Probably.

Page 60

1    Q   Okay.  And the redress number at the top --

2    A   Yes.

3    Q   -- that -- is that the redress number you

4  used --

5    A   Mm-hmm.

6    Q   -- and that you've been assigned?  Okay.

7  Turn to the next tab please, Tab N, as in Nancy.

8  Introducing that as Exhibit N.

9        *(Plaintiff's Exhibit N was marked for

10       identification.)

11  BY MS. ROTH:

12    Q   This is an email to someone named Maureen

13  Dadaphoy (phonetic).  I apologize if I'm

14  mispronouncing that.

15    A   Hmm.

16    Q   Do you know who that person is?

17    A   She works for CAIR.

18    Q   Okay.  And do you see that it's dated Friday

19  March 4, 2016?

20    A   Mm-hmm.

21    Q   Have you seen this email before?

22    A   I -- I believe I did.

Page 61

1    Q   Do you believe this is an email response you

2  received in -- after you, whether through your agent

3  or directly --

4    A   Yes.

5    Q   -- submitted your redress to DHS trip?  Okay.

6  And this, again, is dated March 4, 2016.  Do you

7  know -- can you recall, relative to March 4, 2016,

8  when you submitted the form?

9    A   I don't know exactly.

10    Q   Is it possible that it was that day or the

11  day before?

12        MR. ABBAS:  Objection, calls for speculation.

13  BY MS. ROTH:

14    Q   If you remember?

15    A   I don't remember, honestly.

16    Q   The trip where you were denied boarding,

17  where you've said that you were denied boarding, that

18  was in January --

19    A   Mm-hmm.

20    Q   -- of 2016.  So do you recall either way,

21  between January, February and March, when you would

22  have filed the DHS trip form?

16 (Pages 58 - 61)

Mark Amri
Elhady vs. Kable

March 8, 2018

Page 62

1     A   I -- I know what happened after that, but I
2 don't know exactly the date.
3     Q   Okay. But as of March 4th, you've received
4 an email back, through your --
5     A   Mm-hmm.
6     Q   -- attorneys, that they have received --
7     A   Yes.
8     Q   Okay. Okay. I believe I asked you this
9 earlier, and I honestly just don't remember the
10 answer. Between August of 2016 and your trip to D.C.
11 today, have you flown domestically?
12     A   No.
13     Q   Okay. So it's now March 2018. Can you
14 please describe for me what happened on your travel to
15 the -- to Washington, D.C.?
16     A   Okay.
17     Q   I believe that was two days ago; is that
18 right?
19     A   Yes.
20     Q   Okay.
21     A   I -- I went to American Airlines. First of
22 all, the lady asked me to go to the computer -- the,

Page 63

1 you know, self-check-in. So I put my ID. It didn't
2 allow me to check in. She sent me to the counter. I
3 go to the counter, and I gave her my ID.
4     Same thing had happened. She has to call
5 somebody. She can't get me a boarding pass. It took
6 about 30 minutes or so to get a boarding pass. So I
7 got boarding pass for both flights from Ontario to
8 Dallas and Dallas to Washington, D.C.
9     I go to the security check. The same thing
10 happened again. I gave my ID and my boarding pass.
11 The light turns red so the TSA agents asked me to --
12 to stand on the side until he calls the supervisor.
13     He calls the supervisor. The supervisor comes in,
14 takes the boarding pass and my ID, and goes to the
15 back, about ten minutes maybe. And then he comes
16 back, and asked me to come in to go through screening.
17     I go through the, of course, I took off
18 everything. I go through the medical detector, and
19 then I go to the screening machine, and then I got
20 asked to go to the back to get patted and do that
21 test, the chemical test, whatever that is.
22     So I did all that. So I asked them, am I clear to

Page 64

1 put my -- take my stuff. And he said, no. He's like,
2 I need you to sit over here on the chair. I sat on
3 the chair. I assumed, because this is the first time
4 I -- like last flight, I didn't check any bags.
5     So I'm like, I'm thinking they're probably
6 checking my bag that I checked in. So it took about
7 another 10 or 15 minutes until I got the okay to take
8 my stuff. I heard them say, he's clear, you know.
9     So I take my stuff and go, sit in front of the
10 gate. Again, two TSA agents in front of the gate. At
11 the time of the boarding pass, they were checking
12 everybody for ID and all that. That went smooth.
13     So I go into the flight. I don't have any
14 handbags or anything with me, I just have my phone.
15     Q   You've checked a bag, right?
16     A   Yeah, I've checked a bag. Yes. I go to
17 Dallas, we fly into Dallas. I go down from the
18 flight, and I made a phone call to the business. And
19 then I go use the bathroom.
20     And then after that, I like have a couple of
21 hours, so I said I'll -- I'll eat lunch. So I went to
22 Pizza Hut. I ordered pizza with a Sprite. And I ate

Page 65

1 my food.
2     And then I went to -- in front if the gate. It
3 was Gate C-22. So I stood there -- I mean I was
4 sitting there until about the boarding time. I've
5 noticed six TSA agents with the machine that they test
6 the -- the stuff, you know.
7     So they were standing out there in front of the
8 gate. So like well, I'm thinking, but I'm like, okay,
9 maybe they're just going to check me and, you know, it
10 should be okay.
11     Two guys were checking IDs for everybody, one guy
12 in front of the gate where the tunnel goes to the
13 flight. So I gave my ticket. You know, the ticket
14 beeps the first time and then I got -- I get the okay
15 to go into the tunnel.
16     Once I go into the tunnel, I see the three guys
17 inside the tunnel, the TSA agents. They stopped me.
18 Only me. And like, he's like, sir, we need to, you
19 know, do a body-check and all that on you.
20     I was like, why did you wait until, you know, I go
21 inside the tunnel like that? Anyways, so I'm like,
22 okay, no problem. They checked me, and everything is

17 (Pages 62 - 65)

Mark Amri
Elhady vs. Kable

March 8, 2018

Page 66

1  okay. And then they used the -- the chemical thing
2  on. And they put it on the machine and that thing
3  starts beeping red. It says, explosive detected.
4      And I was like -- I was just -- I fell into shock.
5  And I'm like, oh, my God, these guys are just, you
6  know, trying to put something on me, trying to, you
7  know, you know -- I don't know.
8      I felt that was intentional, you know. The whole
9  thing just meant -- it's like why are they waiting for
10 me inside the tunnel? There's no cameras or nothing.
11 And then this happens. I just got checked in Ontario.
12 I mean, and I'm like, you know, I -- just all kind
13 of stuff going through my mind, you know. You know,
14 I -- I almost like -- I was really mad at the same
15 time. I was like, what's going on? You know, they're
16 just trying to make me look like a terrorist, or --
17 or -- I mean, it just -- it looks like it was set up.
18 Okay?
19     So anyways, so they asked me like, we have to take
20 you out to the TSA area. And they unchecked me from
21 the flight, I go to their area, I got checked again.
22 Okay? I got cleared.

Page 67

1      Q  Okay. I'm sorry to interrupt you. When you
2  said checked again, can you describe?
3      A  Yeah. I got patted and all that, and --
4  and -- but they didn't do that test again, which I
5  thought that was weird, you know. I was like, you
6  know, I even asked them to do it.
7      I'm like, please do that test. I'm like, I
8  want -- I want to know why that -- why it beeped like
9  that, you know. But it was -- I don't know. It
10 seemed to me that it was done intentionally.
11     So I go back to the flight and then, you know, I
12 had just left, you know. It was -- it took about ten
13 minutes, and came back, and then they told me, oh, the
14 door is closed, we have to put you on another flight.
15     I wasn't too happy about that, you know. She
16 gives me a boarding pass that doesn't have a seat on
17 it. And she's like -- I'm like, this doesn't have a
18 seat or anything on it. She's just like, oh, you can
19 get it in the other -- when they're boarding the --
20 the other flight.
21     So I'm not too happy about that. I called my
22 lawyer.

Page 68

1      MR. ABBAS: Objection, I'm instructing --
2      THE WITNESS: Yeah.
3      MR. ABBAS: -- the witness no to provide any
4  attorney/client privileged communications.
5  BY MS. ROTH:
6      A  So I -- I walked down. And I think it was
7  Gate C-8, there was a lady on the counter, and I asked
8  her. I'm like, she gave me a boarding pass but it
9  doesn't have a seat. So there was like two and a half
10 hours to that flight. She said, it's not time yet,
11 you know, come and see me an hour before. And then I
12 go and sit down.
13     Five minutes later, the same TSA agent comes back
14 to me. He said, oh, we did the wrong procedure. I
15 need you to come with me. And I looked at him like,
16 what do you mean wrong procedure? And he said, I
17 can't tell you, I'm just, you know. I'm like, okay.
18     So all that, I'm just, you know, I didn't yell or
19 nothing. I'm just -- I mean from inside, I'm like
20 really pissed off. I don't know what to think. And
21 I'm like, you know, so I went with him.
22     He said, you have to wait, when we got the TSA

Page 69

1  area. He said -- he was talking to somebody all the
2  time on the phone. And he said, you have to wait for
3  somebody here.
4      And you know, in my head, I'm like, you know,
5  what's going on? You know, it's just -- I'm shocked.
6  I'm still in state of shock. You know, I'm like,
7  what's going on? Why am I being treated like this?
8      You know, I wait another 15 minutes. And then a
9  guy with a black shirt comes in, it says explosives
10 expert on it. I'm like, you know -- he comes in, and
11 he's asking them, what's going on here? He said, oh,
12 we need to check this guy. And he's looking at me.
13     He's like, there is no handbag, there's nothing,
14 you know. He was like -- he's asking them, what am I
15 going to check? You know, he was even making fun of
16 it. He's like, what am I -- there's nothing to check
17 here, you know.
18     And -- and I'm like, please -- I was telling him.
19 I was like, please, check it again. I want you to do
20 that test again, because, you know, this is not fair
21 what you guys are doing. I got delayed from my
22 flight, got pulled over, I got humiliated in front of

18 (Pages 66 - 69)

Mark Amri
Elhady vs. Kable

March 8, 2018

Page 70

1 everybody, you know.

2     Inside the tunnel, I'm sitting -- they're

3 searching me, and everybody's passing by, and that

4 thing beeped like that, you know.  And even, you know,

5 it's just like --

6   Q   Mm-hmm.

7   A   Even the TSA agent, like he was wondering.

8 You know, he was nice but, you know, and he's like, I

9 can feel that he's feeling with me, you know.  So that

10 guy, he's like, uh, uh, you're cleared.  You know,

11 there's -- there's nothing to do.

12     So I go back to sit and wait.  An hour before the

13 flight, I go see that lady on the counter.  And there

14 was another -- a guy, a guy came and he actually

15 started helping me out.

16     I gave him my boarding pass, and I'm like, I need

17 to get a seat, you know, in my boarding pass.  And,

18 you know, he couldn't do anything.  He's like, I've

19 never seen this.  He'd been working there for ten

20 years.  Like, I've never seen this happen before.

21     He said, have a seat, and I'll call you when we

22 get -- when I get you a seat.  It took about 45

Page 71

1 minutes to get me a seat.  He was calling people, they

2 put him on hold, and he's like, I can't get you

3 cleared.  And, you know, I finally got you cleared.

4     And then I got a seat at the end of the plane,

5 which I -- I actually paid for seats that are in the

6 front.  So I ended up getting a seat at the end of the

7 plane.

8     I got my boarding pass.  Not even five minutes

9 after that, okay -- it was about 15 minutes or ten

10 minutes to go into the plane, start boarding -- and I

11 see six TSA agents, with the guy wearing a suit, come

12 in to the flight.

13     They stand -- they stood in front of the gate.

14 And I'm like, okay, here we go again.  I'm like, I'm

15 not going to miss this flight.  So I go to them -- I

16 go to that guy, you know, that actually came to me the

17 first time.

18     I'm like, if you guys need to check me, please go

19 ahead and check me right now.  I'll do whatever you

20 guys want.  I just want to get into the flight.  I

21 don't want no problems, okay?

22     And he said, okay, but if -- he asked his boss or

Page 72

1 whoever he was calling -- the -- he told me, okay, if

2 I take you right now, I'll check you and all that, you

3 just have -- I have to stay with you until you -- you

4 board the flight.

5     I'm like, no problem.  You know, I just don't want

6 to be humiliated like that in front of people.  You

7 know, that -- whatever happened to me.  I'm like, and

8 I'll do whatever you guys want.

9     So I went with him.  Okay.  They put me in a room.

10 Obviously, all that time, he's on the phone with

11 somebody and telling him what to do, you know.  And

12 the guy, the TSA agent was super nice.

13     All the time, he's like, I'm sorry.  You know, I

14 know this is not -- not right and all that.  He's

15 like, you know, he knew there was something going on.

16 He was super nice about it.

17     And then I -- they take me to a room, okay, I go

18 inside the room, took off my jacket, took off my

19 shoes, emptied all my pockets.  I have bought like

20 chocolate and Sprite in a bag, too, so I gave it to

21 them.

22     I got patted everywhere -- a little bit extra,

Page 73

1 just to say, and then they take my stuff.  They want

2 to get it screened.  I go with them, and they started

3 putting the -- those little strips on every piece of

4 what I'm wearing.

5     And this is the first time it happened to me.  And

6 they all came out green.  So they put it on my shoes,

7 my pants, my -- everything was okay, you know.  And so

8 I heard them say -- whoever he's talking to -- he was

9 like, everything is good, everything is good.

10     And the same guy, he's like, okay, you can just

11 walk with me to the flight.  And while he was walking,

12 he's like, man, I'm really sorry, you know, I know --

13 You know, I almost had tears in my eyes.  He saw that.

14     You know, I'm like, I'm U.S. citizen.  I've never

15 done anything wrong to -- to deserve this, you know,

16 so -- and he just kept saying, oh, I'm sorry.  You

17 know, I just follow orders and stuff like that.

18     And so he walks me through, and I was group 8,

19 like one of the last guys to go in.  And at that time,

20 there was a lady with a suit, with another TSA agent

21 standing there.  Another, maybe five TSA agents,

22 they're all looking at me while I'm going to the

19 (Pages 70 - 73)

Mark Amri
Elhady vs. Kable
March 8, 2018

Page 74

1 flight.
2      I go inside the tunnel, and there's another two
3 inside the -- the tunnel. And I -- I hear him, you
4 know, once I passed by them, like they were saying,
5 yup, he -- he, you know, like -- like I went through
6 in front of them.
7      And that's it. You know, it was just very
8 humiliating. It was -- it was -- I don't know. I
9 felt it was intentional. It was really bad
10 experience, a very bad experience.
11     I wasn't too happy about it. I don't, you know,
12 it was -- all kind of thoughts was going through my
13 head.
14     Q  What kind of thoughts?
15     A  I mean I -- I honestly think I was -- at the
16 beginning when that happened, I was like I'm -- I'm
17 being set up or something. You know, they're trying
18 to make me look like a terrorist or something like
19 that.
20     And I'm like, I just went -- I went crazy when
21 I -- when I saw that screen, I was like, you know.
22 And, you know, what can I think, you know?

Page 75

1     Q  When you described being in the tunnel, is
2 that -- so that I' make sure I understand -- is that
3 like the jet bridge between the --
4     A  Yes.
5     Q  -- airport and the plane?
6     A  Yes. Which I thought was weird, you know.
7 If you want to check me, why didn't you check me
8 before I go in, in front of everybody, in front of the
9 camera? Why would -- why are you waiting for me to go
10 inside there and do all that to me?
11     Q  The first -- the first flight from Dallas to
12 D.C., where you were checked in the jet bridge, were
13 other passengers also being checked by the TSA in the
14 jet bridge?
15     A  Nobody.
16     Q  Just you?
17     A  No -- nobody. It was meant for me. I mean
18 it was obvious, you know. And -- and the way it was
19 done, it was just -- it was so obvious. I mean it's
20 just, you know, I don't know how to describe it, you
21 know. I felt really bad.
22     I honestly, for the first time -- I'm a very

Page 76

1 patient guy. I'm very, you know, you know, I don't
2 get mad -- get mad that easy. I don't get emotional
3 that easy. But it sucked. Honestly, it sucked. I
4 don't -- I'm a man, you know. I don't tear up that
5 easy, you know.
6      And then I felt like, you know, why has this been
7 happening to me? You know, I'm not a bad person, why
8 is this happening to me? You know, I've just been
9 having the worst -- last couple of years and, you
10 know, and this is -- this was like worst by far.
11     Q  I just want to make sure I'm asking you the
12 question as clearly as possible. I understand that
13 you think that the TSA agents were there to check you,
14 but did you see any other passengers also being
15 checked?
16     A  No. No.
17     Q  So no one else was being swabbed?
18     A  No.
19     Q  Is it your understanding that the swab test
20 that you had done in Dallas was the same one that had
21 been done in Ontario?
22     A  Yes. Yes.

Page 77

1     Q  Did anyone describe that test for you before
2 it was done either time?
3     A  No. I mean they told me that I'm going to be
4 checked and all that. But, you know, I mean even like
5 the -- the explosive expert, when he saw the printout,
6 I guess, of that machine, you know, he kind of smiled,
7 laughed, you know. He's like, there's nothing I can
8 do. And he's like, just let him go, you know.
9      It's just -- it felt like even the TSA agents,
10 it's like it felt like somebody is calling the shot
11 from somewhere, and it was weird; it was weird for
12 them. So, you know, and that's why.
13     You know, it's -- it was -- I wasn't comfortable.
14 And he, the guy that was walking with me, he was like,
15 you know, it felt like he wasn't comfortable with it
16 too, so --
17     Q  Can you describe a little bit more why you
18 got that sense from the TSA agent, that he wasn't
19 comfortable of what was going on?
20     A  I mean it just that it -- it felt that it's
21 unfair. He told me that. So it -- it felt that, you
22 know, it's like they don't usually do that to anybody.

20 (Pages 74 - 77)

Mark Amri
Elhady vs. Kable

March 8, 2018

Page 78

1  They pull people on the side with four S's and stuff
2  like that, they check it, but not that way.
3      Q  The whole time this is happening in Dallas,
4  have you, has your checked bags been wherever luggage
5  is, or it's --
6      A  Yeah, they went -- it went -- it arrived
7  earlier with the -- with the earlier flight.
8      Q  So your bag wasn't with you the whole time
9  this was happening?
10     A  No.
11     Q  The -- if you recall it, and it was only two
12  days ago.  Relative to when you've landed in Dallas,
13  when was the first flight to D.C. supposed to take
14  off?  When was that scheduled?
15     A  Three --
16     Q  How many hours?
17     A  3:15.  It was supposed to arrive here at
18  7 p.m.
19     Q  And do you remember roughly what time you've
20  landed in Ontario -- in Dallas?
21     A  In Dallas?
22     Q  Yeah.

Page 79

1      A  It was two hours before that.
2      Q  So you landed around 1?
3      A  I know because I know we had, yeah, I know we
4  had like about two hours.  That's why I said I'll go
5  have lunch and all that.  And then, it was, yeah,
6  about two hours.
7      Q  And the flight that you were rebooked on,
8  that you ultimately flew on to get to D.C., what time
9  did that depart?
10     A  Like 5:30?  5:30, 5:35.
11     Q  Was that on schedule?
12     A  Yeah.
13     Q  So it wasn't delayed in any way?
14     A  No.
15     Q  But it was about two -- two plus hours later?
16     A  Because -- because I went to them.  At the
17  end, I was like, I went to them because I felt that
18  the same thing has happened, because I saw them take
19  that machine inside the tunnel.  And I'm like, I'm not
20  going to let this happen again.  I'm like, I'm going
21  to go before, and just tell them, hey, take your time.
22  Do whatever you want, you know.

Page 80

1      If I didn't go, I probably had to miss my flight.
2  So -- and I'm worried that this is going to happen to
3  me again, when I go -- I'm going back through Dallas
4  again, so --
5      Q  Have you ever had an experience in an airport
6  before where you were swabbed and it came up positive
7  for explosives?
8      A  No.  No.  Never.
9      Q  Did anyone explain to you --
10     A  I asked the guy if he -- I'm sorry -- you
11  know, I asked the guy.  I'm like, I mean what could it
12  be, something like -- he's like, oh, it could be
13  anything.
14     And I'm like, you pulled me out of the flight and
15  all that, and it's like it could be anything?  It just
16  didn't seem right to me.  It just -- it was -- I don't
17  know, it felt that it was intentional.  I don't know.
18     Q  Can you think of any reason why you would
19  have tested positive for that, based on anything
20  you've been in contact with?
21     A  There's no way.  No, of course.  I mean, I go
22  to construction, you know, tiles and stuff like that,

Page 81

1  but I don't -- there's no way anything near -- it was
2  close, or anything like that.  And then they, again,
3  they checked everything, you know, everything, every
4  piece I'm wearing.  And everything came back green.
5  So that's why I'm telling you, it -- it just didn't
6  make sense.
7      You know, I was even thinking, I was like, oh,
8  maybe it's the pizza I ate?  And I'm not kidding.  I
9  swear, I was thinking even about that.  I'm like, how
10  the pizza came out of the oven.  Maybe something, you
11  know, spilled on me.
12     MR. ABBAS:  Parmesan cheese.
13  BY MS. ROTH:
14     A  I'm like, I'm not kidding, I was -- was
15  thinking about that.  I'm like, gosh, what could it
16  be?  I'm like, you know, it was -- it was horrible,
17  you know.
18     Q  After you were in the jet bridge, and the
19  test came back positive, was it your -- is it your
20  understanding that everything that happened subsequent
21  to that was because you tested positive?
22     A  I -- I -- I believe that it was done

21 (Pages 78 - 81)

Mark Amri
Elhady vs. Kable

March 8, 2018

Page 82

1  intentionally to me.  I don't know.  I -- that's what
2  I believe, and I still believe that whatever happened
3  to me, the way it happened, okay, I think it was
4  intentionally to me.  I don't know why.
5      But it's just the way -- they were waiting for me
6  over there.  They, you know, the way it was done, you
7  know, the guy standing in front of the flight, the
8  three guys inside, you know.  It was just, you know,
9  hey, this guy is coming, let's do this to him.  I mean
10  there's -- I -- I see no other reason.
11     Q   Did anyone from TSA say verbally or
12  communicate, in any way to you, anything that would
13  suggest that this was a deliberate attempt on their
14  part?
15     A   No.  But, at the same time, it's like they
16  were taking instruction from somebody else at all
17  time.  You know, at all -- at all time, I can hear him
18  talking on the, you know, that guy had a cellphone
19  with him, and he was talking on it, and he had an ear
20  thing, so -- which I thought that was weird, you know.
21     If you already have the earplug and you're talking
22  to boss, why are you talking on the cellphone with

Page 83

1  somebody else?  You know.  And that's why I thought it
2  was intentional.
3      Q   Is there anything else about the experience
4  that you haven't described?
5      A   That's it.  I mean it's like I said, you
6  know, I wasn't -- I wasn't too happy about it.  It's
7  just that I was going through a lot of mixed emotions,
8  and I don't want to go through that again.  I honestly
9  don't want to go through that again.
10     Q   Once you landed in D.C., did you have any
11  problems exiting the plain?
12     A   No.  No.  Nobody talked to me.  Nothing.  You
13  know, I went, I got -- rented a car, and went to the
14  hotel.  I was really tired.  I got -- it got like
15  really late, so -- it was really cold, and I got sick.
16     Q   I'm going to propose we take a break, go off
17  the record for about ten minutes?
18         MR. ABBAS:  Up to you.  I --
19         MS. ROTH:  Is it -- okay, let's do that.
20  Let's go off the record please.
21         (OFF THE RECORD)
22         (ON THE RECORD)

Page 84

1  BY MS. ROTH:
2      Q   Okay.  Mr. Amri, and we're back from our
3  break.  Did you talk to anyone other than your
4  attorney during your break?
5      A   No.
6      Q   I have a few more questions about what
7  happened on Tuesday.
8      A   Sure.
9      Q   I understand that it was a very unpleasant
10  experience for you, so please bear with me.  And if
11  you need break at any time, feel free to ask, okay?
12     A   Okay.
13     Q   You testified earlier that you were swabbed
14  in Ontario, right, and negative?  And --
15     A   Mm-hmm.
16     Q   And then you were swabbed again in Dallas.
17  Between when you were swabbed in Ontario and when you
18  were swabbed in Dallas the first time, can you
19  describe what, if anything, you got -- you were in
20  contact with?  Like you touched or did you purchase
21  anything that you recall?
22     A   I went into the bathroom.  And then I went

Page 85

1  and bought a pizza and, you know, ate it.
2      Q   Yup.
3      A   And I bought chocolates -- a bag of
4  chocolate, a bag of Skittles, and a Sprite.
5      Q   And that was before -- that all happened
6  before you got --
7      A   Yes.
8      Q   -- swabbed in Dallas, right?
9      A   Yes.
10     Q   And then after you were swabbed the first
11  time in Dallas --
12     A   Mm-hmm.
13     Q   And then the explosive expert tested
14  everything else?  Did you wash your hands?
15     A   I didn't do nothing.
16     Q   Okay.  So did you --
17     A   I haven't bought anything.  I didn't go
18  anywhere.  Nothing.
19     Q   Okay.  And you were -- were you swabbed again
20  on the jet way when you board --
21     A   Before boarding.  Everything, they took my
22  shoes, my clothes, everything, they put a strip on it.

22 (Pages 82 - 85)

Mark Amri
March 8, 2018
Elhady vs. Kable

Page 142

1  to be the subject of additional proceedings.  And so
2  we would note that the preservation of all evidence
3  regarding the incident in Dallas on March 6th, 2018 --
4        MS. ROTH:  Can you go off the record please?
5  Please stop the record.
6        MR. ABBAS:  No.  No.  It takes two -- it
7  takes two --
8        MS. ROTH:  Yup.  Yup.  This is -- none of
9  this is proper.
10       MR. ABBAS:  It takes two to go off the
11  record.  It takes two to go off the record.
12       MS. ROTH:  This is in -- completely improper
13  deposition.
14       MR. ABBAS:  All right.  Well, I -- well, I'm
15  done.  I'm done.  So we're issuing our preservation
16  notice on the record.
17       MS. ROTH:  Nothing about this is going on the
18  record.  It's -- anything to do with the -- your
19  so-called preservation notice in unrelated actions.
20  So none of this is proper, on the record for this --
21       MR. ABBAS:  It's on the record.  It's on the
22  record already, and I'm -- I'm happy with the --

Page 143

1        MS. ROTH:  I will seek a motion to strike.
2  You can now go off the record.
3        MR. ABBAS:  I agree.  You should.  Yeah, we
4  can you off the record.
5        (Whereupon, at 1:13 p.m., the deposition of
6  MARK AMRI was concluded.)

Page 144

1        CERTIFICATE OF NOTARY PUBLIC
2        I, NATALIA THOMAS, the officer before whom
3  the foregoing proceeding was taken, do hereby certify
4  that the proceedings were recorded by me and
5  thereafter reduced to typewriting under my direction;
6  that said proceedings are a true and accurate record
7  to the best of my knowledge, skills, and ability; that
8  I am neither counsel for, related to, nor employed by
9  any of the parties to the action in which this was
10  taken; and, further, that I am not a relative or
11  employee of any counsel or attorney employed by the
12  parties hereto, nor financially or otherwise
13  interested in the outcome of this action.
14
15
16       *Natalia Thomas*
17       NATALIA THOMAS
18       Notary Public in and for the
19       District of Columbia
20
21
22

Page 145

1        CERTIFICATE OF TRANSCRIBER
2        I, CHRISTINE URREGO, do hereby certify that
3  this transcript was prepared from audio to the best of
4  my ability.
5
6        I am neither counsel for, related to, nor
7  employed by any of the parties to this action, nor
8  financially or otherwise interested in the outcome of
9  this action.
10
11
12
13
14
15
16
17
18
19
20
21
22

37 (Pages 142 - 145)

# Exhibit G

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | | |
|---|---|---|
| **ANAS ELHADY,** *et al.*, | ) | |
| | ) | **Case No. 16-cv-00375** |
| Plaintiffs, | ) | **Hon. Anthony J. Trenga** |
| | ) | |
| v. | ) | |
| | ) | |
| **CHARLES H. KABLE,** Director of the | ) | |
| Terrorist Screening Center; in his official | ) | |
| capacity, *et al.;* | ) | |
| | ) | |
| Defendants. | ) | |
| | / | |

## DEFENDANTS' REVISED RESPONSES TO PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO TSC AND FBI

Pursuant to Federal Rule of Civil Procedure 26 and 33, Defendants Charles H. Kable, Director of the Terrorist Screening Center ("TSC"); Kelli Ann Burriesci, Principal Deputy Director of TSC; Timothy P. Groh, Deputy Director for Operations at TSC; and Christropher Wray, Director of the Federal Bureau of Investigation, hereby submit revised  objections and responses to the discovery requests titled, "Plaintiffs' First Requests for Production of Documents to Defendants Piehota, Mabeus, Grigg and Wray," served October 6, 2017.   Defendants Kable, Burriesci, and Groh are automatically substituted for the previous officeholders, pursuant to Rule 25(d).  The Defendants' responses are provided in accordance with Federal Rule 26(b)(1), which permits the discovery of any information, not privileged, that is both (1) relevant to any party's claim or defense, and (2) proportional to the needs of the case.  The Defendants do not, by providing such information, waive any objection to its admissibility on the grounds of relevance, proportionality, accessibility, materiality, or other appropriate ground. The inadvertent production by the Defendants of information or documents protected by any privilege or protection shall not

constitutional or common law privilege.  Nothing contained in the following responses shall be construed as a waiver of any applicable objection or privilege as to any Request or as a waiver of any objection or privilege generally. Inadvertent disclosure of information subject to a claim of privilege shall not be deemed a waiver of such privilege.

**Response:**  In light of the Court's ruling of October 27, 2017 (Dkt. No. 61), Defendants clarify that they withdraw "and seeking irrelevant information" from the first sentence of the first paragraph above. Subject to and without waiving any of the remaining foregoing objections, TSC and FBI will search for and process any current policies and procedures regarding dissemination of TSDB information to banks and other financial institutions.  Defendants do not currently believe that any responsive documents exist.  To the extent any nonprivileged, non-SSI documents exist, they will be produced beginning November 15, 2017, and thereafter on a rolling basis.  Consistent with Defendants' proposal in the Discovery Plan, including limitations on identifying classified information, privilege logs will be provided as appropriate with the rolling production of documents.

> ***RFP 4:        All directives, written policies, protocols, practices, procedures, agreements, memorandums, memorandums of understanding, contracts, records, communications, written/computer generated embodiments, statistical information, and/or other documents that relate or refer to the dissemination of any information contained in the TSDB to airlines and airline personnel, whether to screen passengers or to screen airline personnel for employment at airports.***

**Objections:** Defendants object to the request as overbroad and seeking irrelevant information. None of the Plaintiffs makes an allegation that they were denied employment at an airport, and

there is a separate procedural mechanism for individuals to challenge employment decisions. Even if the dissemination of TSDB information generally could be relevant, the request is overbroad, burdensome and disproportionate to the needs of the case because it appears to require a search for all documents "that relate" to the sharing of "any information" in the TSDB at every point since its creation. Defendants object to the terms "records," "written computer generated embodiments", "statistical information" and "dissemination" as vague. Moreover, read broadly, it is potentially extraordinarily burdensome. TSC does not export TSDB information directly to airlines as a general matter. Rather, TSC exports certain subsets of TSDB data to TSA for use in screening. To the extent the request seeks information about how TSA uses that data, the request is mis-directed to TSC and FBI.

Defendants further object to any document request that seeks the disclosure of policies and procedures not currently in effect; the complaint seeks only injunctive relief and past policies and procedures are not relevant to determining whether the process currently available is adequate.

Defendants further object to this request to the extent that it defines the requested material to include all predecisional and deliberative material, which is not relevant to any claim or defense of any party, not relevant to the subject matter of the action, and not likely to lead to the discovery of admissible evidence and, as such, are overbroad and impose an undue burden and expense upon the Defendants. Defendants will neither search for nor produce documents reflecting draft or predecisional positions.

Defendants further object to this request to the extent it seeks information that is classified and/or may be subject to an assertion of the state secrets privilege or other appropriate statutory protection pertaining to such information. Defendants object to this request to the extent it seeks information subject to the law enforcement and investigatory files privilege, Sensitive Security

Information (including Sensitive Security Information that is not appropriate for disclosure under Section 525(d) of the Department of Homeland Security Appropriations Act of 2007, Public Law No. 109-295, 120 Stat. 1355, as reenacted), national security information, or information otherwise protected by the deliberative process privilege, the attorney-client privilege, the work product doctrine, the Privacy Act (5 U.S.C. § 552a), or any other appropriate statutory protection or constitutional or common law privilege.  Nothing contained in the following responses shall be construed as a waiver of any applicable objection or privilege as to any Request or as a waiver of any objection or privilege generally. Inadvertent disclosure of information subject to a claim of privilege shall not be deemed a waiver of such privilege.

**Response:**  In light of the Court's ruling of October 27, 2017 (Dkt. No. 61), Defendants clarify that they withdraw "and seeking irrelevant information" from the first sentence of the first paragraph above, as well as the second sentence of the same paragraph. Based on the remaining foregoing objections, Defendants will not respond.

> *RFP 5:       All directives, written policies, protocols, practices, procedures, agreements, memorandums, memorandums of understanding, contracts, records, communications, written/computer generated embodiments, statistical information, and/or other documents that relate or refer to the dissemination of any information contained in the TSDB to non-federal government agencies, including states, and all state and local law enforcement agencies.*

**Objections**: Defendants object to the request as duplicative with RFP 4 to TSC, served September 26, 2017.  Defendants object to the request as overbroad and seeking irrelevant information.   Even if the dissemination of TSDB information generally could be relevant, the request is overbroad,

**Objections:**  Defendants object to the extent that this request exceeds Defendants' obligations under the Federal Rules of Civil Procedure.

**Response:**  Subject to and without waiving all of the foregoing objections, FBI and TSC will process unclassified, nonprivileged, non-SSI policies and procedures as described in response to Section B, items (1) and (2) of Defendants' Initial Disclosures.  They will be produced beginning November 30, 2017, and thereafter on a rolling basis.  Consistent with Defendants' proposal in the Discovery Plan, including limitations on identifying classified information, privilege logs will be provided as appropriate with the rolling production of documents.

Dated: December 22, 2017

Respectfully submitted,

DANA J. BOENTE
United States Attorney

CHAD READLER
Acting Asst. Attorney General, Civil Division

ANTHONY J. COPPOLINO
Deputy Director, Federal Programs Branch

*/s/    Amy E. Powell*_____
AMY POWELL
Trial Attorney, Federal Programs Branch
Civil Division, Department of Justice
310 New Bern Avenue, Suite 800
Federal Building
Raleigh, NC 27601-1461
Phone: 919-856-4013
Email:  amy.powell@usdoj.gov

*Attorneys for Defendants*

93

# Exhibit H

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | | |
|---|---|---|
| **ANAS ELHADY,** *et al.*, | ) | |
| | ) | **Case No. 16-cv-00375** |
| Plaintiffs, | ) | **Hon. Anthony J. Trenga** |
| | ) | |
| v. | ) | |
| | ) | |
| **CHARLES H. KABLE,** Director of the | ) | |
| Terrorist Screening Center; in his official | ) | |
| capacity, *et al.;* | ) | |
| | ) | |
| Defendants. | ) | |
| | )/ | |

## DEFENDANTS' OBJECTIONS TO PLAINTIFFS' THIRD
## REQUEST FOR PRODUCTION OF DOCUMENTS

Pursuant to Federal Rules of Civil Procedure 26 and 34, Defendants Charles H. Kable, Director of the Terrorist Screening Center ("TSC"); Kelli Ann Burriesci, Principal Deputy Director of TSC; Timothy P. Groh, Deputy Director for Operations at TSC; Deborah Moore, Director of Department of Homeland Security Traveler Redress Inquiry Program ("DHS TRIP"); Nicholas J. Rasmussen, Director of the National Counterterrorism Center ("NCTC"); David Pekoske, Administrator of the Transportation Security Administration ("TSA"); Christopher Wray, Director of the Federal Bureau of Investigation ("FBI"); and Kevin K. McAleenan, Acting Commissioner of U.S. Customs and Border Protection ("CBP"); hereby submit objections and responses to the discovery requests titled, "Plaintiffs' Second Requests for Production of Documents to All Defendants," served November 29, 2017.[1]   The Defendants' responses are provided in accordance with Federal Rule 26(b)(1), which permits the discovery of any information, not privileged, that is

---

[1] Plaintiffs have previously served RFPs on September 26, 2017 (to TSC only) and October 6, 2017 (to TSC and FBI only).  Accordingly, this is the third set of requests for production of documents and the only one directed at all Defendants.

1

both (1) relevant to any party's claim or defense, and (2) proportional to the needs of the case. The Defendants do not, by providing such information, waive any objection to its admissibility on the grounds of relevance, proportionality, accessibility, materiality, or other appropriate ground. The inadvertent production by the Defendants of information or documents protected by any privilege or protection shall not constitute a waiver of the applicable privilege or protection as to any information or documents disclosed. The Defendants reserve the right to supplement or amend their responses should additional or different information become available.

## OBJECTIONS AS TO DEFINITIONS AND INSTRUCTIONS

1.      Defendants object to the Plaintiffs' Definition 8 (of "you" and "your" "Defendants" and "Defendant") to the extent that such definitions purport to apply to any of the Defendants individually.  In responding to the Requests for Production, Defendants respond in each and every response on behalf of their respective agencies, based upon information in the agency's possession, custody, or control.

2.      Defendants object to other definitions (including, but not limited to, Definitions 1, 4, 5, 10 and 11) because they define terms not actually used in this set of requests for production. Defendants reserve all objections to such definitions if they are used in future discovery requests.

3.      Defendants object to Instructions 1 and 6 insofar as they apply to privileged communications between counsel, or between parties and their counsel, to the extent they conflict with the Parties' Joint Discovery Plan, as approved by the court, which specifically provides that: "If any discovery request is susceptible of a construction that calls for the production of such documents, those documents need not be produced or identified on any privilege log."  They also conflict with the Federal Rules of Civil Procedure and ordinary practice by supposing that privilege

2

is waived if not asserted on such a log and by requiring identification of privileged documents beyond what is ordinarily required on a privilege log.  With respect to each and every request, Defendants respond consistently with the Discovery Plan and the Federal Rules.

4.     Defendants object to Instruction 2 and 4 to the extent they impose obligations in excess of those imposed by the Federal Rules, which do not require production of redacted documents for any and all requests and do not require a particular form of a privilege log. Privileged or protected information is not always readily segregable and the placement or number of redactions may themselves reveal privileged or protected information.  The redaction process may also be burdensome and disproportionate to the needs of the case.  As set forth in the discovery plan, Defendants reserve the right NOT to produce a specific privilege log when such a log would itself reveal privileged or protected information.

5.     Defendants object to Instruction 5 to the extent it imposes obligations in excess of those imposed by the Federal Rules, which do not require identification of documents that no longer exist.  Such an exercise is likely impossible, but in any event burdensome, disproportionate and not required by the Federal Rules.  Defendants will comply with the Federal Rules.

## **OBJECTIONS**

*RFP 1: All documents or records relating to each and every domestic and/or international travel undertaken by all Plaintiffs for the last sixteen years, whether by air, land, or sea, including, but not limited to, boarding passes, or any documents containing information such as date(s) of travel, carrier name, point of origin and point of entry, and any documents that describe or refer to screening and/or inspection for all Plaintiffs.*

3

**<u>Objections:</u>**    Defendants object to the request as overbroad and seeking information not relevant to any claim or defense in this case and disproportionate to the needs of the case.  The request on its face seeks any records remotely related to travel (e.g. - documents which only happen to contain a Plaintiff and a carrier name) and is not limited to documents that are specifically about Plaintiffs' travel experiences.  Specifically, Defendants object to the phrase "relating to each and every domestic and/or international travel" as vague and confusing and likely overbroad, and to the phrase "describe or refer to screening and/or inspection" as vague and confusing.  Searching for such documents would be burdensome or impossible, and under no circumstances will Defendants search for materials that only incidentally contain information related to Plaintiffs' travel. Additionally, the request is duplicative and improperly directed to all Defendant agencies.

Moreover, Plaintiffs' travel experiences are only relevant to the procedural due process claim insofar as they establish the deprivation of a liberty interest – i.e., how Plaintiffs' experiences were impacted.  That information is uniquely within the custody and control of Plaintiffs.  If there were travel records or screening measures of which Plaintiffs were unaware, it could have no impact on their liberty interests; accordingly, Plaintiffs improperly seek information about their own travel experiences from Defendants, when such information is more appropriately gleaned from their own records.  Defendants previously requested that Plaintiffs provide documentation and details of their travel screening experiences, including dates, times, and departure and arrival information.  After Plaintiffs propounded the instant discovery request, they stated the purpose was to assist them in compiling the information requested by Defendants (even though the response deadline has long since lapsed).  Plaintiffs should not be able to use a request for production of documents directed to Defendants to belatedly satisfy their own discovery

obligations. Instead, Plaintiffs should use information uniquely within their knowledge to respond to Defendants' discovery requests.

Defendants further object to this request to the extent that it defines the requested material to include all predecisional and deliberative material, which is not relevant to any claim or defense of any party, and not relevant to the subject matter of the action. As such, the request is overbroad and imposes an undue burden and expense upon the Defendants. Defendants will neither search for nor produce documents reflecting draft or predecisional positions.

Defendants further object to this request because it seeks information that is classified and/or may be subject to an assertion of the state secrets privilege or other appropriate statutory protection pertaining to such information. Defendants object to this request as seeking information subject to the law enforcement and investigatory files privilege, and Sensitive Security Information ("SSI") (including SSI that is not appropriate for disclosure under Section 525(d) of the Department of Homeland Security Appropriations Act of 2007, Public Law No. 109-295, 120 Stat. 1355, as reenacted). Defendants further object to this request to the extent it seeks national security information, or information otherwise protected by the deliberative process privilege, the attorney-client privilege, the work product doctrine, the Privacy Act (5 U.S.C. § 552a), or any other appropriate statutory protection or constitutional or common law privilege. Nothing contained in the following responses shall be construed as a waiver of any applicable objection or privilege as to any Request or as a waiver of any objection or privilege generally. Inadvertent disclosure of information subject to a claim of privilege shall not be deemed a waiver of such privilege.

Each Defendant agency further objects as follows:

5

**CBP:**  In addition to the foregoing objections, CBP further objects as follows:  TECS is the principal law enforcement information collection, analysis and sharing environment used by officers at the border to facilitate the law enforcement and antiterrorism mission of CBP.  It therefore contains information about the inbound and outbound travel of individuals to and from the United States, including the inspection of travelers seeking entry to the United States.  Defendants object to the production of information from TECS that is law enforcement privileged, sensitive security information or otherwise protected by privilege or statute.  Privileged or protected information that cannot be produced from such records includes, but is not limited to: any information that could reveal or indicate status in the TSDB, law enforcement handling codes, system codes, sensitive information reflecting the nature of law enforcement and/or intelligence interest in particular travelers, other information that would tend to reveal confidential law enforcement information, investigative methods or techniques, or sensitive security information, and private or personally identifiable information related to the identities of law enforcement officers, government officials or third parties.

CBP also receives Passenger Name Records (PNR) from commercial air carriers or their travel reservation systems which include data regarding persons travelling to and from the United States on commercial air carriers, to the extent collected by the carrier.  CBP further objects to the production of PNR as overbroad, burdensome, irrelevant and disproportionate to the needs of the case since PNR is only incidentally related to Plaintiffs' travel and is unrelated to Plaintiffs' travel experiences. It is maintained in readily searchable form for only a limited period.  CBP further objects to the production of PNR information that is law enforcement privileged, sensitive security information, confidential business information, or otherwise protected by privilege or statute,

including the Privacy Act, or by international agreements or obligations pertaining to the collection or retention of PNR.

CBP objects to the search of any other system maintained by CBP for responsive records. Information about the travel of particular individuals might in theory exist in records in other law enforcement or intelligence systems, or incidentally in emails or reports, but existence of such records is speculative, and searching for all such records would be unduly burdensome.   The existence or nonexistence of particular such records is not relevant to the procedural due process claim before the Court, and falls within the category of information excluded by the Court in the order dated October 27, 2017.   The existence or nonexistence of such documents may itself be protected by the law enforcement privilege and potentially the state secrets privilege.   If such responsive documents existed, such documents would likely contain information protected by privilege or statute, including but not limited to SSI, law enforcement privilege, investigative methods and techniques, the state secrets privilege, the deliberative process privilege, and the attorney client privilege.   Finally, CBP objects to any broader search for responsive material that might in theory incidentally exist in emails or other reports.   Such a search would be burdensome and disproportionate to the needs of the case.


**TSA**:  In addition to the foregoing objections, TSA further objects as follows:  TSA's Secure Flight program matches identifying information of aviation passengers and certain non-travelers against the consolidated and integrated terrorist watch list maintained by the Federal Government.   Under the Secure Flight program, TSA receives passenger and certain non-traveler information from aircraft and airport operators, including itinerary information.   TSA uses this information to conduct watch list matching and then transmits boarding pass printing results back to aircraft and

airport operators.  TSA retains Secure Flight records for 99 years for individuals who are a confirmed match to a government watch list, for 7 years for individuals who are a potential match to a government watch list, and for up to 7 days for individuals who are not a match to a government watch list.  Accordingly, TSA will neither confirm nor deny the existence of records that would indicate the individual is a potential match or a confirmed match to a government watch list because the existence or nonexistence of such information is SSI and protected by the law enforcement privilege.  In addition, to the extent the Secure Flight records include travel within seven days of the search, TSA cannot provide any Secure Flight records containing such information, as Secure Flight cannot be searched solely for records within that time frame and the search results would include any information retained for 7 years or 99 years.

Various offices within TSA may create and retain documents about the travel of particular individuals, which are derived from Secure Flight records, when necessary to carry out their mission.  TSA objects to the search of such documents, which would reveal privileged and protected information, including TSDB status and/or the use or consideration of particular security measures. Accordingly, the existence or non-existence of such information is properly withheld on grounds of both relevance and privilege.  Such information, if it exists, would be sensitive security information and may be protected by other privileges, including the law enforcement privilege and the state secrets privilege.  If such responsive documents existed, such documents would likely contain information protected by privilege or statute, including but not limited to SSI, law enforcement privilege, deliberative process privilege, and the attorney client privilege. TSA further objects to the production of any private or personally identifiable information related to the identities of law enforcement officers or other government officials.

8

TSA objects to the search of any other system maintained by TSA for responsive records. There may in theory exist incident reports from airport security incidents or arrests, or emails among personnel that mention travel plans incidentally.  TSA objects to the search for such documents as burdensome, irrelevant and disproportionate to the needs of the case.  If such responsive documents existed, such documents would likely contain information protected by privilege or statute, including but not limited to SSI, law enforcement privilege, deliberative process privilege, and the attorney client privilege.  TSA further objects to the production of private or personally identifiable information related to the identities of law enforcement officers or other government officials.

**DHS TRIP**:   In addition to the foregoing objections, DHS TRIP further objects as follows:  DHS TRIP ordinarily possesses travel information only insofar as it is submitted by the travelers seeking redress in their DHS TRIP inquiry, and travelers do not always submit such information.  DHS TRIP objects to the search and production of this information, which is presumed to be already in Plaintiffs' possession and is not the most efficient way to retrieve travel information.  If responsive documents existed only incidentally, DHS TRIP objects to the search for such documents as burdensome, irrelevant and disproportionate to the needs of the case.  If such responsive documents existed, such documents would likely contain information protected by privilege or statute, including but not limited to SSI, law enforcement privilege, deliberative process privilege, and the attorney client privilege.

**TSC**:  In addition to the foregoing objections, TSC further objects as follows:  TSC maintains encounter records related to, *inter alia*, travelers who are a match or a near-match with the TSDB.

TSC objects to the search of these records because confirmation of the existence or nonexistence of records within a particular timeframe would potentially reveal TSDB status at that time, which is protected by statute and privilege, as described above. Moreover, neither current nor past status is relevant and necessary to the litigation of Plaintiffs' claims.

TSC may in theory possess other documents reflecting travel information of particular individuals, including underlying derogatory information (which has already been excluded from this case), emails or memoranda regarding particular encounters or nominations or reflecting particular security measures or other operational or intelligence information. The existence or nonexistence of such documents would also tend to confirm or deny TSDB status. TSC further objects to the search for such documents as burdensome, irrelevant and disproportionate to the needs of the case; such documents have already been properly excluded by the Court in the order dated October 27, 2017. If such responsive documents existed, such documents would likely contain information protected by privilege or statute, including but not limited to SSI, law enforcement privilege, the state secrets privilege, deliberative process privilege, and the attorney client privilege. Defendants further object to the production of private or personally identifiable information related to the identities of law enforcement officers or other Government officials.

**FBI**: In addition to the foregoing objections, FBI objects as follows: In addition to the TSC records described above, travel-related information pertaining to individuals may be contained in investigatory files or communication or memoranda related to other FBI activity, but a search for such information would be burdensome, irrelevant and disproportionate to the needs of the case, and the Court has already properly excluded it from this case in the order dated October 27, 2017. Moreover, the existence or nonexistence of such documents would also tend to confirm or deny

whether an individual was a subject of FBI investigation, which is information properly subject to the law enforcement privilege and potentially the state secrets privilege. If such responsive documents existed, such documents would likely contain information protected by privilege or statute, including but not limited to SSI, law enforcement privilege, the state secrets privilege, deliberative process privilege, and the attorney client privilege. Defendants further object to the production of private or personally identifiable information related to the identities of law enforcement officers or other Government officials.

**NCTC**: In addition to the foregoing objections, NCTC further objects as follows: NCTC objects to the search for or production of any responsive information, if it exists. NCTC is responsible for integrating the national counterterrorism (CT) effort by fusing foreign and domestic CT information, providing terrorism analysis, sharing information with partners across the CT enterprise, and driving whole-of-government action to secure our national CT objectives. As part of its intelligence collection and analysis responsibilities, NCTC may possess some travel information related to particular individuals who are relevant to the agency's CT mission, but it does not systematically collect or maintain such information, and is therefore not a proper source for this information in discovery. Nor is NCTC the originator of such information. The only unique information Plaintiffs could glean from the fact that NCTC possesses such information (as opposed their own possession, or that of a screening agency) is more specifically whether the individual is of some intelligence interest to NCTC. Such information is not relevant and is likely privileged. NCTC's possession of this information, if any, also falls within the category of irrelevant information that was excluded by the magistrate in the order dated October 27, 2017.

Furthermore, the fact that such information exists or does not exist in NCTC's databases or repositories would likely be information subject to the law enforcement and investigatory files privilege, Sensitive Security Information (including Sensitive Security Information that is not appropriate for disclosure under Section 525(d) of the Department of Homeland Security Appropriations Act of 2007, Public Law No. 109-295, 120 Stat. 1355, as reenacted), national security information, or information otherwise protected by the deliberative process privilege or statute.

Finally, even if NCTC's possession of such information were not privileged or protected, the documents in which such information was contained would likely contain or reveal privileged or protected information.  If such responsive documents existed, such documents would likely contain information protected by privilege or statute, including but not limited to SSI, law enforcement privilege, the state secrets privilege, deliberative process privilege, the attorney client privilege, and the Privacy Act.

**Response:**     Subject to and without waiving the foregoing objections, Defendants have conducted a reasonable search for responsive TECS records and PNR and have identified hundreds of potentially responsive law enforcement records.  Defendants are in the process of producing redacted versions of those records, consistent with the above objections.  Attached hereto are documents stamped Elhady-CBP-000001-Elhady-CBP-000471. The remaining responsive records are still being processed for production.  Defendants anticipate completion of processing on or before February 12, 2018.   Otherwise, Defendants stand on their objections, particularly in light of the burdensome and duplicative nature of the requests.

Dated: January 4, 2018

Respectfully submitted,

DANA J. BOENTE
United States Attorney

CHAD READLER
Acting Asst. Attorney General, Civil Division

ANTHONY J. COPPOLINO
Deputy Director, Federal Programs Branch

_/s/___Amy E. Powell_____
AMY POWELL
Trial Attorney, Federal Programs Branch
Civil Division, Department of Justice
310 New Bern Avenue, Suite 800
Federal Building
Raleigh, NC 27601-1461
Phone: 919-856-4013
Email:  amy.powell@usdoj.gov

*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing document was sent via electronic mail to

Counsel of Record in this case.

*/s/     Amy E. Powell*
AMY POWELL
Trial Attorney, Federal Programs Branch
Civil Division, Department of Justice
310 New Bern Avenue, Suite 800
Federal Building
Raleigh, NC 27601-1461
Phone: 919-856-4013
Email:  amy.powell@usdoj.gov

January 4, 2018

# Exhibit I

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
## ALEXANDRIA DIVISION

ANAS ELHADY, *et al.*,                           )
                                                 )          **Case No. 16-cv-00375**
      Plaintiffs,        )          **Hon. Anthony J. Trenga**
                                                 )
v.                                               )
                                                 )
**CHARLES H. KABLE,** Director of the            )
Terrorist Screening Center; in his official      )
capacity, *et al.;*                              )
                                                 )
      Defendants.        )
_____/

### DEFENDANTS' OBJECTIONS TO PLAINTIFFS' FIRST
### SET OF INTERROGATORIES TO TSC

Pursuant to Federal Rules of Civil Procedure 26 and 33, Defendants Charles H. Kable, Director of the Terrorist Screening Center ("TSC"); Kelli Ann Burriesci, Principal Deputy Director of TSC; Timothy P. Groh, Deputy Director for Operations at TSC; Deborah Moore, Director of Department of Homeland Security Traveler Redress Inquiry Program ("DHS TRIP"); Nicholas J. Rasmussen, Director of the National Counterterrorism Center ("NCTC"); David Pekoske, Administrator of the Transportation Security Administration ("TSA"); Christopher Wray, Director of the Federal Bureau of Investigation ("FBI"); and Kevin K. McAleenan, Acting Commissioner of U.S. Customs and Border Protection ("CBP"); hereby submit objections to the discovery requests titled, "Plaintiffs' First Set of Interrogatories to Defendant Piehota," served January 22, 2018. Defendant Charles Kable, the current Director of TSC, pursuant to Federal Rule of Civil Procedure 25(d), has been substituted for Christopher Piehota. Defendants will refer to these hereafter as the First Set of Interrogatories to TSC.

1

Hungary (https://www.state.gov/documents/organization/278373.pdf)

As to all other information responsive to this Interrogatory, TSC stands on its objections.

***Int. 3. Identify the names of the federal government entities that have had access of any kind to TSDB information.***

**Objections:**        Defendants object to the request as vague, burdensome, irrelevant and disproportionate to the needs of the case. "Federal government entities" is not defined and could include, for example, only those agencies with which TSC works directly, or could include individuals or companies working for the federal government, such as IT contractors who service software used at TSC and might have incidental access to data. Moreover, the phrase "access of any kind" is undefined, vague and overbroad. It could include, for example, only external exports of TSDB data, or it could include instances of illicit access, screening conducted by and at TSC, further use of TSDB data by an end user of which TSC may not be institutionally aware, or other possibilities. "TSDB information" could mean information within the TSDB or information about the TSDB.

Defendants object to the request as overbroad and seeking information not relevant to any claim or defense in this case and disproportionate to the needs of the case. Incidental or indirect access to TSDB data in ways that have not impacted the Plaintiffs is not relevant to their claims. Moreover, the request goes beyond the uses of data that Plaintiffs allege have impacted them. Additionally, searching for information about entities with which TSC has no direct relationship would be burdensome or impossible, and disproportionate to the needs of the case.

Defendants object to the interrogatory to the extent it seeks information that is subject to the law enforcement and investigatory files privilege, and SSI (including SSI that is not appropriate

9

for disclosure under Section 525(d) of the Department of Homeland Security Appropriations Act of 2007, Public Law No. 109-295, 120 Stat. 1355, as reenacted).   Such information could include, for example, a full description of all end users of TSDB information, and the details described in the definitions and instructions.

Nothing contained in the responses shall be construed as a waiver of any applicable objection or privilege as to any Request or as a waiver of any objection or privilege generally. Inadvertent disclosure of information subject to a claim of privilege shall not be deemed a waiver of such privilege.

**Response:**        Subject to and without waiving the foregoing objections, TSC refers plaintiffs to the privilege logs produced in response to plaintiffs' requests for production of documents and further responds:  TSC exports subsets of TSDB information to the following federal government entities:  DHS (for use by Customs and Border Protection (CBP), TSA, U.S. Citizenship and Immigration Services (USCIS), and U.S. Immigration and Customs Enforcement (ICE)), Department of State (DOS), NCIC, FBI, and the Department of Defense.   For other agencies and events, TSC runs lists of names against the TSDB and reports the results to the agency requester.   As to all other information responsive to this interrogatory, TSC stands on its objections.

*Int. 4. Identify all legal limitations on TSC's authority to disseminate TSDB information.*

**Objections:**        Defendants object to the request as vague, burdensome, irrelevant and disproportionate to the needs of the case.  "Legal limitations" is not defined and could include, for example, only direct statutory restrictions on TSC, or it could also include regulations, common practices and norms, whether they bind TSC or other agencies, and even hypothetical legal

claims related to the No Fly List. Defendants also object to the unlimited time frame, which goes beyond what is useful in evaluating Plaintiffs' claim for prospective relief.

Defendants object to the interrogatory because it seeks information that is subject to the law enforcement and investigatory files privilege, and SSI (including SSI that is not appropriate for disclosure under Section 525(d) of the Department of Homeland Security Appropriations Act of 2007, Public Law No. 109-295, 120 Stat. 1355, as reenacted). This interrogatory seeks specific information about what might reasonably be assumed to be a rare occurrence – a small child who meets the reasonable suspicion standard for inclusion in the TSDB as a No Fly, Selectee, or known or suspected terrorist. Any response would provide operationally valuable information to persons planning terrorist attacks.

Nothing contained in the responses shall be construed as a waiver of any applicable objection or privilege as to any Request or as a waiver of any objection or privilege generally. Inadvertent disclosure of information subject to a claim of privilege shall not be deemed a waiver of such privilege.

**Response:** Subject to and without waiving the foregoing objections, TSC notes that to be listed as a No Fly, Selectee, or KST, a child would have to meet all applicable standards and criteria. Otherwise, TSC stands on its objections.

*Int. 23. Identify all the different ways a person's watchlist status is considered in any way by any federal agency.*

**Objections:** Defendants object to the request as vague, burdensome, irrelevant and disproportionate to the needs of the case. The terms "considered" and "ways" are vague and undefined. The interrogatory could include only final agency actions, any type of use for

42

investigatory or analytical purposes, including specific statistical analyses conducted, characterizations of the thoughts of individual employees, or any number of other possibilities.

Defendants object to the request as overbroad and seeking information not relevant to any claim or defense in this case and disproportionate to the needs of the case. Incidental or indirect "consideration" of TSDB information in ways that have not impacted the Plaintiffs is not relevant to their claims. Moreover, the request goes beyond the uses of data that Plaintiffs allege have impacted them. The request is further misdirected; TSC cannot speak authoritatively on behalf of other agencies. Additionally, searching for information about entities with which TSC has no direct relationship would be unduly burdensome or impossible, and disproportionate to the needs of the case.

Defendants object to the interrogatory because it seeks information that is subject to the state secrets privilege, the law enforcement and investigatory files privilege, and SSI (including SSI that is not appropriate for disclosure under Section 525(d) of the Department of Homeland Security Appropriations Act of 2007, Public Law No. 109-295, 120 Stat. 1355, as reenacted). Such information could include, for example, a full description of all end users of TSDB information, and all classified and privileged analyses conducted that even reference the TSDB status of an individual, such as the details described in the definitions and instructions.

Nothing contained in the responses shall be construed as a waiver of any applicable objection or privilege as to any Request or as a waiver of any objection or privilege generally. Inadvertent disclosure of information subject to a claim of privilege shall not be deemed a waiver of such privilege.

**Response:** Subject to and without waiving the foregoing objections, see Response to Interrogatory 3. Otherwise, TSC stands on its objections.

43

cannot be considered to represent the actual basis for the decision.   A search for any such information would be unduly burdensome.  For these reasons, TSC is not able to provide an answer to this interrogatory.


For the Responses:

TIMOTHY P. GROH
Deputy Director for Operations
Terrorist Screening Center


For the Objections:

Respectfully submitted,

Dated: February 21, 2018

CHAD READLER
Acting Asst. Attorney General, Civil Division

ANTHONY J. COPPOLINO
Deputy Director, Federal Programs Branch

/s/    Amy E. Powell
AMY POWELL
Trial Attorney, Federal Programs Branch
Civil Division, Department of Justice
310 New Bern Avenue, Suite 800
Federal Building
Raleigh, NC 27601-1461
Phone: 919-856-4013
Email:  amy.powell@usdoj.gov

*Attorneys for Defendants*

# Exhibit J

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| **ANAS ELHADY,** *et al.*,  ) | |
|  ) | **Case No. 16-cv-00375** |
| Plaintiffs,  ) | **Hon. Anthony J. Trenga** |
|  ) | |
| v.  ) | |
|  ) | |
| **CHARLES H. KABLE,** Director of the  ) | |
| Terrorist Screening Center; in his official  ) | |
| capacity, *et al.*;  ) | |
|  ) | |
| Defendants.  ) | |

## DEFENDANTS' OBJECTIONS TO PLAINTIFFS' SECOND SET OF INTERROGATORIES TO TSC

Pursuant to Federal Rules of Civil Procedure 26 and 33, Defendants Charles H. Kable, Director of the Terrorist Screening Center ("TSC"); Kelli Ann Burriesci, Principal Deputy Director of TSC; Timothy P. Groh, Deputy Director for Operations at TSC; Deborah Moore, Director of Department of Homeland Security Traveler Redress Inquiry Program ("DHS TRIP"); Russell Travers, Director of the National Counterterrorism Center ("NCTC"); David Pekoske, Administrator of the Transportation Security Administration ("TSA"); Christopher Wray, Director of the Federal Bureau of Investigation ("FBI"); and Kevin K. McAleenan, Acting Commissioner of U.S. Customs and Border Protection ("CBP"); hereby submit objections and responses to the discovery requests titled, "Plaintiffs' Second Set of Interrogatories to Defendant Piehota," served January 24, 2018.  Defendant Charles Kable, the current Director of TSC, pursuant to Federal Rule of Civil Procedure 25(d), has been substituted for Christopher Piehota.  Defendants will refer to these hereafter as the Second Set of Interrogatories to TSC.

## OBJECTIONS

### *Int. 1. Identify all uses of TSDB information by any entity*

**Objections:**  Defendants object to the request as vague, burdensome, irrelevant and disproportionate to the discovery needed for the sole remaining claim in the case concerning procedural due process. "Uses" is not defined and could include only final agency actions or could include investigative activity, ordinary security screening, purely analytical uses, or any number of other possibilities. Moreover, the phrase "any entity" could mean the names of federal agencies, or it could include suboffices within TSC, entities with whom TSC has no direct relationship or any number of other possibilities. "TSDB information" could mean information within the TSDB or information about the TSDB. The broader readings are both burdensome and irrelevant, as they do not even arguably evidence any deprivation of a liberty interest. Defendants further object to the interrogatory as duplicative.

Defendants object to the request as overbroad and seeking information not relevant to the sole remaining claim in this case or defense thereto and is disproportionate to the needs of the case. Incidental or indirect access to TSDB data in ways that never have and never arguably could impact the Plaintiffs is not remotely relevant to their claims. Investigative and analytical uses of TSDB data are not relevant to Plaintiffs' claims. Moreover, the request goes beyond the uses of data that Plaintiffs allege have impacted them. Additionally, searching for information about actions taken by other agencies or entities, including entities with which TSC has no direct relationship, would be unduly burdensome and disproportionate to any discovery needed in the case. Additionally, the interrogatory is misdirected, because TSC is not responsible for actions taken by other agencies and cannot speak on their behalf.

5

Defendants also object to the interrogatory to the extent it seeks information that is subject to the state secrets privilege, law enforcement and investigatory files privilege, and SSI (including SSI that is not appropriate for disclosure under Section 525(d) of the Department of Homeland Security Appropriations Act of 2007, Public Law No. 109-295, 120 Stat. 1355, as reenacted). A comprehensive answer could theoretically require, for example, a full description of all end users of TSDB information, and the specific uses to which it is put and under what circumstances, including investigatory uses, and ways in which the data is analyzed alongside other intelligence. Generally, the identities of foreign partners who receive information from TSC are protected by the law enforcement privilege, and in some instances the state secrets privilege, except as otherwise officially acknowledged.

Nothing contained in the responses shall be construed as a waiver of any applicable objection or privilege as to any Request or as a waiver of any objection or privilege generally. Inadvertent disclosure of information subject to a claim of privilege shall not be deemed a waiver of such privilege.

**Response:**  Subject to and without waiving the foregoing objections, TSC responds that agencies and officials authorized or required to conduct terrorist screening or to use information for diplomatic, military, intelligence, law enforcement, immigration, transportation security, visa, and protective processes are given access to terrorism information to facilitate their respective public missions. TSC further refers Plaintiffs to its responses to Interrogatories No. 2, 3, 6 (responses served February 21, 2018).  Otherwise, TSC stands on its objections.

6

For the Responses:

TIMOTHY P. GROH
Deputy Director for Operations
Terrorist Screening Center

For the Objections:

Respectfully submitted,

CHAD A. READLER
Acting Asst. Attorney General, Civil Division

Dated: February 23, 2018

ANTHONY J. COPPOLINO
Deputy Director, Federal Programs Branch

/s/    Amy E. Powell
AMY POWELL
Trial Attorney, Federal Programs Branch
Civil Division, Department of Justice
310 New Bern Avenue, Suite 800
Federal Building
Raleigh, NC 27601-1461
Phone: 919-856-4013
Email:  amy.powell@usdoj.gov

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 1, 2018, I electronically filed the foregoing by using the Court's ECF system.  I further certify that all participants in the case are registered ECF users and will be electronically served by the Court's ECF notification system.

Respectfully submitted,

COUNCIL ON AMERICAN-ISLAMIC RELATIONS

BY:      /s/ Gadeir Abbas
LENA F. MASRI (DC 1000019)
GADEIR I. ABBAS (VA 81161)*
CAROLYN M. HOMER (DC 1049145)
*Attorneys for Plaintiff*
453 New Jersey Ave, SE
Washington, DC 20003
Phone: (202) 742-6420

*\*Gadeir Abbas is licensed in VA, not in D.C. Practice limited to federal matters.*

AKEEL & VALENTINE, PLLC
SHEREEF H. AKEEL (P54345)
*Attorney for Plaintiffs*
888 W. Big Beaver Rd., Ste. 910
Troy, MI 48084
Phone: (248) 269-9595
shereef@akeelvalentine.com