## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
## ALEXANDRIA DIVISION

| | | |
|---|---|---|
| **ANAS ELHADY,** *et al.*, | ) | |
| | ) | **Case No. 16-cv-00375** |
| Plaintiffs, | ) | **Hon. Anthony J. Trenga** |
| | ) | **Hon. Mag. John F. Anderson** |
| | ) | |
| v. | ) | |
| | ) | |
| **CHARLES H. KABLE,** Director of the | ) | |
| Terrorist Screening Center; in his official | ) | |
| capacity, *et al.*; | ) | |
| | ) | |
| Defendants. | ) | |

---

### PLAINTIFFS' EXHIBIT A TO MOTION TO COMPEL COMPLIANCE WITH THE COURT'S FEBRUARY 22 ORDER

Please see attached the public transcript of the February 22, 2019 proceedings before Judge Anderson, which is Exhibit A to Plaintiffs' Memorandum in Support of their pending motion to compel (Dkt. 282), as refiled to correct a technical deficiency.

Respectfully submitted,

COUNCIL ON AMERICAN-ISLAMIC RELATIONS

BY:       /s/ Gadeir Abbas
LENA F. MASRI (DC 1000019) (pro hac vice)
GADEIR I. ABBAS (VA 81161)*
CAROLYN M. HOMER (DC 1049145) (pro hac vice)
*Attorneys for Plaintiffs*
453 New Jersey Ave, SE
Washington, DC 20003
        Phone: (202) 742-6420

*Gadeir Abbas is licensed in VA, not in D.C.  Practice limited to federal matters.*

AKEEL & VALENTINE, PLLC
SHEREEF H. AKEEL (P54345)

888 W. Big Beaver Rd., Ste. 910
Troy, MI 48084
Phone: (248) 269-9595
shereef@akeelvalentine.com

Dated: March 5, 2019

# Exhibit A

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
------------------------------:
                              :
ANAS ELHADY, et al.,          :
             Plaintiffs,      :
                              :
     -vs-                     :        Case No. 1:16-cv-375
                              :
                              :
CHARLES H. KABLE, et al.,     :
             Defendants.      :
                              :
------------------------------:
```

HEARING ON MOTIONS

February 22, 2019


Before:  John F. Anderson, Mag. Judge

APPEARANCES:

Gadeir I. Abbas, Lena F. Masri, and Carolyn M. Homer,
Counsel for the Plaintiffs

Antonia Konkoly and Dena M. Roth,
Counsel for the Defendants

1          NOTE:  The case is called to be heard at 10:03 a.m.

2    as follows:

3          THE CLERK:  Anas Elhady, et al. versus Charles H.

4    Kable, et al., civil action number 16-cv-375.

5          THE COURT:  Let me have counsel introduce themselves

6    for us.  Thank you.

7          MR. ABBAS:  Good morning, Your Honor.  I'm here for

8    the plaintiffs, Gadeir Abbas, Lena Masri, and Carolyn Homer.

9    I'll be presenting argument today.

10          THE COURT:  Thank you.

11          MR. KONKOLY:  Good morning, Your Honor.  Antonia

12    Konkoly from the Department of Justice.  With me is my

13    colleague, Dena Roth.

14          THE COURT:  Is Ms. Powell here?

15          MS. KONKOLY:  I'm sorry?

16          THE COURT:  Is Ms. Powell here?

17          MR. KONKOLY:  She is not today, no.

18          THE COURT:  Is someone here to be able to speak on

19    her behalf as to why the deposition that was taken back in

20    April of last year has remained on the public record or known

21    without being corrected?

22          MS. KONKOLY:  Yes, I am prepared to address that

23    today.

24          THE COURT:  Okay.  Why don't you do that first.

25          MR. KONKOLY:  Your Honor, I would just like to be

1    very clear up front that there was absolutely no -- the

2    plaintiffs' insinuation that there was some kind of intentional

3    or deliberate misstatement on the record, there is absolutely

4    no basis for that.  We take strong exception to it.

5              THE COURT:  Well, hold on.

6              MR. KONKOLY:  To the extent there was any error --

7              THE COURT:  There was an error.

8              MR. KONKOLY:  It was an error on the part of counsel.

9              THE COURT:  There was a misstatement.

10             MR. KONKOLY:  In the preparation --

11             THE COURT:  Clear misstatement.

12             MS. KONKOLY:  Your Honor, the error -- accepting your

13   characterization of that, it was on the part of counsel.  It

14   was not on the part of the witness.

15             THE COURT:  No, it was the witness who testified.

16             MR. KONKOLY:  And he spoke honestly that he was not

17   personally aware.  And we -- the error was in the preparation.

18   There were 11 topics, they were pretty broad.  This private

19   aspect of the NCIC is a very small part of how NCIC works.  He

20   was not personally aware of it.  It was something that slipped

21   through the cracks in the preparation.

22             And we, you know, could have caught it sooner.  And

23   as soon as it was pointed out to us, we certainly acknowledged,

24   you know, that -- it was certainly very unclear and could be,

25   you know, misleading and --

4

1          THE COURT:  Your opposition talks about you went to

2   these efforts to try and correct the record at various points

3   in time.  You clearly didn't do that on that misstatement.

4          MR. KONKOLY:  Well, it didn't come to our attention

5   until after we had provided the supplemental response.

6          THE COURT:  Are you telling me --

7          MS. KONKOLY:  And at that point --

8          THE COURT:  That's why I want Ms. Powell here to be

9   able to say -- Ms. Powell had no understanding that private

10  entities were getting this information?  Because when she heard

11  that testimony, that certainly was the testimony on behalf of

12  the deponent, not just the individual, but this was not an

13  individual's deposition.

14         MR. KONKOLY:  We understand that.  And NCIC is a

15  very, very broad operation.  The portion of it that deals with

16  or touches upon any private entity having access to it is about

17  4 percent of the total entity.  It is a very small part of how

18  NCIC operates in general.

19         Any time -- as we pointed to some other instances in

20  that deposition, there were certainly many other in other

21  depositions, any time we understood a witness to have, you

22  know, misspoken or have -- you know, needing -- had a need to

23  provide clarification to the testimony provided, we provided it

24  on the spot.

25         We didn't catch that one.  We didn't catch it at the

1    time.  We didn't catch it afterwards until it was pointed out

2    to us in the wake of the supplemental response.

3            THE COURT:  Almost a year later.  I mean, you then

4    had to answer an interrogatory that you didn't provide

5    responses to.  I mean, clearly --

6            MR. KONKOLY:  There was no -- Your Honor, there was

7    absolutely no intentional intention to mislead or deceive here.

8    It was simply an error that fell through the cracks.  And the

9    error was on counsel, it was not on the witness.

10           THE COURT:  All right.

11           MR. KONKOLY:  I am prepared to acknowledge that.  Ms.

12   Powell would acknowledge that.  We can acknowledge the error on

13   the part of counsel.  We would like to be very clear, it was

14   not an error on the part of the witness, who was not aware of

15   this in the course of his job duties and, you know, was not --

16   we certainly spent a great deal of time preparing the witness

17   for the deposition on a great many topics.

18           This was a small portion of the information that we

19   had to cover, and it was something that fell through the

20   cracks.  We weren't trying to hide anything, I can absolutely

21   assure Your Honor of that.

22           THE COURT:  Well, so that deposition was taken in

23   April of 2018.

24           MR. KONKOLY:  Correct.

25           THE COURT:  The issues having to do with the

6

1    disclosure of this information to private entities, or -- has

2    been litigated for several months.  I mean, that was an issue

3    that was in front of Judge Trenga and pending in front of Judge

4    Trenga for several months.

5            When was the first time that the Government

6    acknowledged that that information in that deposition was

7    incorrect?

8            MR. KONKOLY:  It did not come to our attention until

9    we provided the supplemental interrogatory response on

10   February 8, I believe.

11           THE COURT:  So as you were litigating that issue,

12   providing your answer to the interrogatory, and dealing with

13   Judge Trenga on these issues, it didn't come to the

14   Government's attention that that was a misstatement?

15           MR. KONKOLY:  Your Honor, to be -- to be clear, there

16   is information in public regulations indicating that this

17   happened.  We weren't aware of it, but it was publicly

18   available.  Plaintiffs' counsel could have found it in the

19   C.F.R. the same as we could.  We missed it.

20           THE COURT:  So --

21           MR. KONKOLY:  But it was --

22           THE COURT:  He's supposed to completely say, I have

23   to go back and research every statement that is made by a

24   government employee under oath in a deposition and crosscheck

25   every regulation to see whether his testimony under oath

1    represented by counsel is accurate or not?

2          MR. KONKOLY:  No, Your Honor.  This was, again, one

3    very small part of one of 11 topics.  There was a lot of

4    information to cover and to prepare the witness for.  We missed

5    it.  It fell through the cracks.

6          THE COURT:  All right.  So that was in April.

7          MS. KONKOLY:  I don't --

8          THE COURT:  That was in April.  And over the last ten

9    months when this issue has been litigated, how come it didn't

10   come to your attention that the Government had misstated its

11   position on this information being disclosed to private

12   entities?

13         MR. KONKOLY:  I'm sorry, Your Honor, I think I missed

14   part of the question.  I was reading a note from my colleague.

15   Can you repeat that?  I want to make sure I'm answering your --

16         THE COURT:  So the motion to compel that was heard in

17   front of Judge Trenga --

18         MR. KONKOLY:  Yes.

19         THE COURT:  -- had been pending for several months.

20         MR. KONKOLY:  Yes.

21         THE COURT:  One of the issues in that motion to

22   compel that has brought us here today, because he granted it as

23   to this issue, had to do with being disclosed to private

24   entities, public companies.

25         MR. KONKOLY:  Yes.

1          THE COURT:  At no point in time up until you were

2     doing your supplemental answer to your interrogatory after you

3     lost that motion to compel did it come to the Government's

4     attention that that testimony was inaccurate?

5          MS. KONKOLY:  Two things I would point out, Your

6     Honor.  One is that the interrogatory in question was directed

7     at the TSC, not the FBI.

8          The second is that, you know, we had several 30(b)(6)

9     depositions.  We had 20-some plaintiff depositions.  We had a

10    lot of discovery.  We weren't in the practice of rereading the

11    deposition transcripts on a daily basis.  We had the

12    depositions, we obtained the transcripts.  I think they were

13    reviewed at the time, and it was missed at the time.

14         But it wasn't a process of continually, you know,

15    needing -- we didn't have a need to go back and reference it.

16    It didn't come up again during that time period until we

17    provided this response and it was pointed out that there was an

18    inconsistency.

19         THE COURT:  All right.  You need to help me now

20    understand what it really is that you have said in your

21    supplemental responses.

22         MR. KONKOLY:  Okay.

23         THE COURT:  You've indicated that there are at least

24    1,441 ORIs that are issued.

25         MR. KONKOLY:  And those are distinct from entities,

1    if I could provide that clarification.

2              THE COURT:  That's all we know.

3              MR. KONKOLY:  No, I can provide additional

4    information at this time.

5              THE COURT:  Well, it's not under oath.  All I'm

6    looking at what's under oath right now.

7              MR. KONKOLY:  There are less than 700 actual

8    entities.  It took a little bit of time to disaggregate those

9    numbers.  The list has a lot of duplicates on it and some

10   confusing ones.  Like, such as, you know, XYZ Railroad Police

11   Department would be one line.  XYZ Police Department-Baltimore

12   might be another.

13             THE COURT:  Have you provided that under oath to the

14   plaintiffs yet --

15             MR. KONKOLY:  We --

16             THE COURT:  -- in a supplemental answers to

17   interrogatories --

18             MR. KONKOLY:  We only --

19             THE COURT:  -- under oath signed by someone under the

20   penalty of perjury?

21             MS. KONKOLY:  We don't have a precise number.  We

22   weren't able --

23             THE COURT:  Well, you just gave me a precise number.

24   What do you mean you don't have a precise number?  You just

25   said 771.  That's pretty precise.

1          MR. KONKOLY:  No, no, no, I said under 700.  Under

2    700.  It also says in the declaration -- it clarifies that the

3    ORIs are not equivalent to entities because there are

4    duplicates.

5          THE COURT:  It doesn't say how many --

6          MR. KONKOLY:  That was provided under oath up front.

7    The ORIs are not equivalent to entities.  And when you do the

8    disaggregation, we are confident that the number is under 700.

9    It is difficult to be precise given the nature of some of the

10   entries.  And some of them would require some research into the

11   appropriate structure of the bodies to be sure that they were,

12   you know, the same --

13         THE COURT:  These are entities that the Government is

14   giving this information to, providing them access to this

15   information.

16         MS. KONKOLY:  Yes.

17         THE COURT:  And you're saying that the applications

18   and information is hard to decipher?

19         MR. KONKOLY:  There is a lot of entities with

20   multiple ORIs.  Some of that is a historical sort of accident

21   in -- before the age of modern computing, there would be actual

22   terminals that were -- special terminals that the FBI would

23   deliver to authorized users, and each terminal would have an

24   ORI.

25         My understanding is that's not how it works anymore.

1   But some of that is sort of grandfathered in, that there are

2   just multiple ORIs associated with one entity.  Sometimes

3   depending upon the size of the entity, they may have a need for

4   several.

5           And the names are sometimes very similar and it can

6   be difficult just from, you know, a quick look at the list.  It

7   would require going line by line through 1,400 of them and

8   check -- it would just -- it would require --

9           THE COURT:  So 1,400, I mean, I'm not overwhelmed by

10  you having to look at 1,400 entries given the significance of

11  this case and the issues that have arisen in this case as to

12  whether the Government has actually been responsive to

13  discovery.

14          MR. KONKOLY:  Your Honor, I would like to just make

15  sure I am being crystal clear that the entities on this list,

16  they are not companies.  They are law enforcement adjacent

17  agencies.  They are by and large police departments of

18  universities and colleges or railroads.

19          The remainder are the type of law enforcement

20  adjacent agencies that we have described in our -- in our sworn

21  supplemental response.

22          I would actually like to take this opportunity to

23  suggest that the Government would request an opportunity to

24  submit the list ex parte to the Court.

25          THE COURT:  Well, you know, I'm going to be ruling on

1   whether it's ex parte or whether it's disclosed to the

2   plaintiffs.  And, you know, that's part of this motion.  But

3   we're not getting to the remedy yet.  I'm still trying to

4   figure out what it is that you said in your supplemental

5   answers to interrogatories under oath.

6           And you said in those supplemental responses that

7   there are 1,441 ORIs that have been issued.  So we know that

8   there are those.

9           And you've indicated in sort of uncertain terms, and

10  that there may be multiple ORIs issued to single entities.

11          MR. KONKOLY:  There are.

12          THE COURT:  So we have got that.

13          MR. KONKOLY:  Yes.

14          THE COURT:  So -- all right, we've got that.  Now

15  tell me about the information that is also -- as you say in

16  your second part of the supplemental response, that the

17  Department of Homeland Security discloses this information to

18  various other entities.  And what that means.  And what

19  information TSP has about -- TSC has about that information.

20          MR. KONKOLY:  And that answer is also complete.

21  Again --

22          THE COURT:  So you -- so let me just make sure.  You

23  have no idea how many of them -- how many entities it has

24  described that information to?  Or what it means that they --

25  that they permit entities who are authorized to receive subsets

1   of the TSP to share that information with authorized

2   representatives they have contracted to perform the vetting

3   function.

4           You have no other information other than that?

5           MR. KONKOLY:  No.  It has to do with -- as the

6   supplemental response explains, it has to do with certain

7   airports will sometimes be given access to the information to

8   screen -- there might be an, you know, an instance where

9   someone is disabled and needs someone to help accompany them to

10  a gate who is not a passenger, not a ticketed passenger.  So

11  wouldn't proceed through security in that means, would need

12  special access to proceed to the gate.  The check would need to

13  be done.

14          Charter flights, certain kind of charter airlines

15  that are operating flights that do not fall within the

16  parameters of the Secure Flight Program, may be given the --

17  you know, regulated entities --

18          THE COURT:  Under what procedure are they given that

19  information?

20          MR. KONKOLY:  They are regulated entities and there

21  are --

22          THE COURT:  I mean, what procedure -- you understand

23  that TSA permits them to have -- this undisclosed number of

24  other entities, to have that information.

25          Under what terms and conditions are they allowed to

1   get that information?

2           MS. KONKOLY:  Oh, I believe that's also in the

3   supplemental response.  That all information sharing is subject

4   to -- there is a specific regulation that is cited that has the

5   security protections --

6           THE COURT:  How do you know that they do that?  How

7   do you -- I mean, you go through this whole process of what --

8   an ORI must be issued, and an application must be made, and all

9   these kinds of things, as to the information that the TSC

10  discloses.  But there is nothing specific like that for the

11  information that you know of that Homeland Security gives out.

12          You just list a bunch of people that they may have

13  and say, you also know that they have contracted with others to

14  do vetting functions.

15          MR. KONKOLY:  Your Honor, I would note that this

16  interrogatory was directed to the TSC.

17          THE COURT:  Right.  And I am trying to find out --

18          MS. KONKOLY:  No interrogatories were ever served on

19  TSA or DHS, which is not a defendant to the lawsuit.  So it was

20  directed to a particular defendant about the information in its

21  possession about this.

22          THE COURT:  So TSC has --

23          MR. KONKOLY:  And if TSC --

24          THE COURT:  They don't have -- no ability -- they

25  have no knowledge about what Homeland Security does with this

1   sensitive information?

2          MR. KONKOLY:  We have described the information that

3   they are aware of in this response.  Each of the entities, you

4   know, that may -- the defendants in this suit when they receive

5   the TSA information, they're operating pursuant to their own

6   authorities and restrictions.  And the TSC is not necessarily

7   aware of every small detail of those arrangements.  They are

8   aware at a high level, and that is the information that we have

9   provided here in this response as to TSC's understanding of how

10  that operates.  TSC is not able to speak for TSA.  And the

11  interrogatory was directed to the TSC.

12         THE COURT:  So TSC has no control over what the

13  information is disseminated by the Homeland Security -- so they

14  have no way of monitoring, making sure that it's staying safe,

15  making sure that it's not being disclosed?

16         And then I want to now how you can say that and then

17  say that none of the information would be shared with car

18  dealerships or banks if you don't know what Homeland Security

19  or these other entities that get it through memorandums of

20  understandings do with the information.

21         MR. KONKOLY:  Your Honor, there is no -- there is

22  absolutely no evidence to back up the allegation that the

23  information is shared with car dealerships and banks.

24         THE COURT:  I'm not asking evidence to back it up.

25  I'm asking, you made an affirmative statement in your

1    supplemental answers to interrogatories that you are not aware

2    of any policy or practice that would permit that information to

3    be shared.

4           What I'm trying to understand is what's the basis for

5    that because you don't know -- you've just given me the

6    indication that you don't know what HHS does with the

7    information.

8           MR. KONKOLY:  Your Honor, there are agreements about

9    -- the information is not just passed along without any

10   restraints.  They are subject to agreements about safeguarding

11   of the information at a high level.

12          From working on this case, I can tell you that I have

13   absolutely no information that there is anything authorizing

14   information sharing with car dealerships or banks from any of

15   the defendants.  That's not -- that's not a thing that happens.

16          THE COURT:  Well, what do you know about what happens

17   with HHS?

18          MR. KONKOLY:  We know what is described here.  We

19   know that they receive an export of the TSDB subject to the --

20   there is an acronym for it, the Watchlist Service, I believe it

21   is.  That's the one that is ultimately passed onto TSA for

22   purposes of the Secure Flight Program.  That has been disclosed

23   in many places throughout the deposition testimony and other

24   responses.

25          So that is the export that ultimately TSC -- or TSA

1   would use to operate the Secure Flight Program.

2              THE COURT:  Well --

3              MR. KONKOLY:  It also makes its way to CBP.  We have

4   discussed at length -- I have provided, you know, testimony on

5   the record at the deposition about what CBP does with, you

6   know, its export of the TSDB as well.

7              So that is what the "for example" is encompassing

8   there.  It is encompassing that Watchlist Service MOU, that,

9   you know, testimony has been provided elsewhere.  And TSC is

10  not the entity that is the most competent to speak to the finer

11  details of that.

12             THE COURT:  I'm not asking who is the most competent.

13  I'm asking about what information TSC has.

14             MR. KONKOLY:  Yeah.

15             THE COURT:  And, you know, whether it does or doesn't

16  have it, obviously that's an issue.  But if they have it, and

17  what you're telling me -- and TSC is making some statements

18  here about, you know, what -- you know, this information is

19  safe.  This information is secure.

20             But I am trying to find out what the basis is for TSC

21  to be able to make those statements if they don't have specific

22  detailed information about what the other entities do with this

23  information.

24             And so, you know, TSC can't take the position,

25  which -- in my view, that, you know, they know what happens

1    with this information if they can't have some sense as to what

2    happens when HHS distributes it to other people.  Or that it's

3    distributed to other people through these memorandums of

4    understanding that apparently came out in the second

5    supplemental response to your interrogatories.

6           Help me understand what that meant.  I mean, that was

7    never addressed in your first supplemental response.  You then

8    provided another supplemental response.

9           MR. KONKOLY:  The MOU, supplemental --

10          THE COURT:  The MOUs, yes.

11          MR. KONKOLY:  Yeah, I would be happy to address that.

12   That came out of a meet and confer call that we had with

13   plaintiffs' counsel.  They had some questions about the MOUs.

14   We don't think it was responsive to this interrogatory.  But in

15   an effort to confer in good faith and provide the maximum

16   amount of information, we supplemented to say, to be clear,

17   these MOUs, all of which were on the privilege logs that you

18   received a long time ago, so they have been identified for you,

19   there is no sharing of TSDB information with private entities.

20          So it is not responsive to the interrogatory.  What

21   happens, you know, is that names may be submitted and checked

22   against the TSDB.  And if, you know, if there is a match, the

23   company may be told, you know, to deny, you know, USAID, you

24   know, application or sorts.  They are not provided a reason

25   why.  They are not provided any KST information.  They are not

1    provided access to the TSDB.

2              But there is sometimes a provision of employee names

3    for private companies that can go through those MOUs to be

4    checked and then, you know, just an up/down answer provided

5    back to the company in appropriate instances.

6              THE COURT:  Well, I also am concerned about the

7    language that you put in that supplemental answer that says:

8    These MOUs do not contemplate.

9              And, you know, given our need to be specific:  Do not

10   contemplate any TSDB export to private entities or access by

11   those private entities.

12             MR. KONKOLY:  They don't authorize --

13             THE COURT:  Contemplating -- "contemplating" is a

14   weak word.

15             MR. KONKOLY:  They don't authorize.

16             THE COURT:  How do we know that?

17             MR. KONKOLY:  I discussed how these MOUs worked with

18   agency counsel, and that is my understanding, that they neither

19   contemplate nor authorize the sharing or export of that

20   information.

21             THE COURT:  Okay.  All right.  So let's go back to

22   what information, specific information, detailed information,

23   complete information that you have about what HHS does with

24   this information.

25             MR. KONKOLY:  Your Honor, again, this interrogatory

1    was directed to TSC.  DHS is not even a defendant in this suit.

2    Each of the other agencies who participated in the Watchlisting

3    project and receive exports of the data, have their own

4    authorities, are exercising their own authorities in their use

5    of the data.  And TSC is not in a position to answer a sworn

6    declaration on their behalf.

7            We did our best to speak to our -- to TSC's

8    understanding of a common -- some common uses by TSA because it

9    has an awareness of that.  But the interrogatory is not

10   directed to DHS, who, again, is not even a defendant in this

11   suit.

12           THE COURT:  So you really don't know what they do

13   specifically?  You have just got vague, general understandings

14   as to what they may be doing.

15           MR. KONKOLY:  I am explaining that we have listed the

16   uses of TSA.  That when they share the information with certain

17   airports and charter airline operators for the purposes I

18   described.  I have explained that there is also the

19   Watchlisting Service export to DHS that is then, on my

20   understanding, funneled to TSA for use in Secure Flight.  Also

21   on to CPB.

22           THE COURT:  And so you don't know --

23           MR. KONKOLY:  There are --

24           THE COURT:  -- what --

25           MS. KONKOLY:  That is --

1        THE COURT:  -- what kinds of agreements there are

2   between HHS and any of these charter airline companies or

3   anything like that?  You don't know whether there are any

4   applications, whether there are any contracts, whether there

5   are any requirements other than what you mention as, you know,

6   the regulations would apply.

7        MR. KONKOLY:  Your Honor, I am sure that they are.

8   And there are also MOUs that govern the export between TSC and

9   DHS.

10       THE COURT:  Well, if, you know -- why isn't that in

11  this answer to interrogatories that is supposed to be complete,

12  specific, and detailed?

13       MR. KONKOLY:  We think we've provided the information

14  at the level of specificity that complies with the Court's

15  order, Your Honor.

16       THE COURT:  So detailed --

17       MS. KONKOLY:  We can't -- yes, we believe this is all

18  the information that is necessary to -- that is relevant -- we

19  believe this answer is complete, detailed, and specific, Your

20  Honor.

21       We believe we've answered it at the level of

22  specificity required by the Court's order.

23       THE COURT:  The level of specificity as to how HHS

24  distributes this information, or TSA, which is part of HHS, is

25  completely different from the level of detail that you provided

1    for the OCIs and that process.  That's what I'm getting at.

2    Is, you know -- and acknowledging that you went through the

3    process that one has to go through in order to get that

4    information, the numbers of, you know, ORIs that are out there

5    to put some, you know, understanding as to how extensive this

6    may be disclosed to private entities -- you know, I can see an

7    argument where that is specific, detailed, and complete.

8    Whether the names are going to be necessary is something we

9    will address later.

10           But that level of specificity and detail is lacking

11   on these others.

12           MR. KONKOLY:  And, Your Honor, I would point out that

13   the plaintiffs had every opportunity to serve interrogatories

14   on TSA, and they declined to do so.  They served this

15   interrogatory on the TSC, not the TSA.  TSC is not in a

16   position to speak for the TSA on the granular levels of what it

17   is doing pursuant to its own authorities.

18           THE COURT:  It doesn't know, is what you're saying?

19           MR. KONKOLY:  It understands at a high level, and we

20   have provided that information here.

21           THE COURT:  So --

22           MR. KONKOLY:  And I would --

23           THE COURT:  Again, you know, I don't want you to come

24   in here and say, we don't know now, and then at a trial or some

25   other level some TSC person comes in and tries to testify

1    about, you know, we know what happens to this information,

2    because it doesn't what happens to this information if HHS --

3    if it doesn't know what HHS does with the information.

4          MR. KONKOLY:  Your Honor, there are MOUs governing

5    those exports.  And again, DHS is not a defendant in this suit.

6    They are not even a party to this, to this litigation.

7          I would also just take issue with the -- I would just

8    say that we believe that the information we have provided about

9    TSA is actually pretty specific.  And I won't read it into the

10   record, I am sure you're familiar with it, but we do think we

11   have provided it at a pretty specific level.  Describing, you

12   know, vetting airline employees who may have access to SSI, to

13   regulated operators for the purposes of vetting non-traveling

14   or other individuals who are authorized to have access to the

15   airport, and so on.

16         We did try to be as granular as we could within the

17   limits of --

18         THE COURT:  Well, you say that, but, you know, we

19   don't know how many there are that are authorized charter

20   companies.

21         And then there is this statement, and this is the one

22   that bothers me the most:  It is also TSC's understanding --

23   not based on any specifics as to how you got that

24   understanding -- that TSA permits regulated entities who are

25   authorized to receive subsets of the TSDB to share this

1    information with authorized representatives they have

2    contracted to perform the vetting function on their behalf.

3         So this is another tier that is allowed to have that

4    information.  And there is no -- I mean, it doesn't say what --

5    how that contracting is done, how it's performed, what

6    obligations there are under the contract.

7         MR. KONKOLY:  Again, that's a level of specificity

8    that a discovery request would have to be directed to TSC --

9    TSA itself in order to get into.

10        But my understanding is that that is similar to the

11   types of contracts that are the ones we're talking about on the

12   ORI list with access to NCIC.  There is contractual

13   relationships to basically outsource certain, you know, aspects

14   of their operations.  And they are contracting with companies

15   to do certain vetting procedures for them.

16        And TSA -- you know, this is a very highly regulated

17   industry.  TSA works closely with all of these airlines and has

18   authorized that in discrete circumstances.  I am sure it is

19   governed by, you know, very specific contracts and agreements

20   regulating how that is done.  But I don't have those here with

21   me today.  This was directed to the TSC and not the TSA.

22        THE COURT:  All right.  So -- but again, I mean,

23   you're making the representation that TSC doesn't have any more

24   specific information than that.

25        MR. KONKOLY:  About TSA?

1          THE COURT:  TSA, right.

2          MR. KONKOLY:  Your Honor, I'm --

3          THE COURT:  You know, I don't want the plaintiffs be

4    put in the position that you are coming in here today making

5    these representations that there is no other detailed specific

6    information that, you know, TSC has about the way TSA

7    distributes this information.  Because if they come in and, you

8    know, somehow or another, you know, change their story at a

9    later time and they say, we do know.  You know, we have this,

10   you know, way to make sure all this information is safe and

11   secure and that it isn't disclosed to banks or car companies,

12   you know, that's not going to be consistent with what you're

13   saying here today.

14          MR. KONKOLY:  Your Honor, to be clear, I am not

15   representing that the words that have come out of my mouth

16   today necessarily represent the sum total of the possession of,

17   you know, information in the hands of the TSC as an entity.

18          I am saying that we think that the level that we

19   have -- the level of detail we have provided in the

20   supplemental response satisfies our obligations to the Court

21   order.  If some other level of specificity were required, we

22   could take that back to our clients and see what else we

23   could --

24          THE COURT:  What more other than detailed, complete,

25   and specific?

1          MR. KONKOLY:  We --

2          THE COURT:  I mean, that's what you were ordered to

3    do.

4          MR. KONKOLY:  Yes.

5          THE COURT:  Provide a detailed, complete, and

6    specific response.

7          MR. KONKOLY:  And again, we think we have provided

8    that.

9          THE COURT:  Okay.  So --

10          MR. KONKOLY:  There is nothing that I am standing

11   here knowing about and not disclosing to the Court.  We have

12   provided the information that we understand is responsive to

13   this request.

14          THE COURT:  Okay.  All right.

15          Mr. Abbas, let me -- for you, I mean, I need to

16   understand the significance of this information in the context

17   of where this case is.

18          And, I mean, you know, I think you've now gotten on

19   the record and it is established that this information,

20   whatever adjective you want to use, whether it's limited or

21   widely, one can argue, but it is disseminated to private

22   entities under some sort of control.  And how that is

23   controlled and those kind of things is up for argument.

24          But help me understand where this information comes

25   in as far as, you know, the merits of this case and what you

1  need in order to pursue this case.

2          MR. ABBAS:  Yes, Your Honor.  And to emphasize, the

3  federal government has provided what we think are -- they have

4  partially fulfilled their obligations to comply with the order.

5  So we do know the broad contours of their private dissemination

6  practices.

7          There are some, you know, what we would characterize

8  as defendant friendly terminology that doesn't let us kind of

9  into -- but we need a first -- we need to make a firsthand

10  assessment over their private dissemination practices.  And no

11  facts will allow us to do that better than a list of the

12  private entities that they disseminated the information to.

13          And the reason the Court should allow the plaintiffs

14  to make their own assessment of that list is because the facts

15  and extent of the federal government's private dissemination of

16  watchlist information was deliberately held -- deliberately

17  hidden from the plaintiffs throughout discovery.

18          In March at TSC's deposition -- it was no mystery to

19  anybody that the plaintiffs believed from the very beginning of

20  this case that the federal government disseminates watchlist

21  information not only to other countries and every federal

22  agency, but to private companies.

23          At the TSC deposition we asked:  Aside from airlines,

24  what other non-governmental entities --

25          THE COURT:  Mr. Abbas, I'm right here.  So --

1          MR. ABBAS:  Oh, I'm sorry, I apologize.

2          THE COURT:  We've upgraded the recording system so

3    the amplification is probably a little better than it used to

4    be the last time you were here.

5          MR. ABBAS:  I am sorry, Your Honor.  I have been

6    thinking about the watchlist a lot.

7          We asked the federal government, we asked the TSC

8    deponent, who was a high-ranking TSC official:  What other

9    non-governmental entities, aside from airlines, receive access

10   of any kind to TSDB information.

11         The witness said:  Outside the example we have

12   excluded, airlines, I am not aware of any.

13         A month later, just to double-check, we asked the FBI

14   deponent:  Do any private entities have access to NCIC?  The

15   FBI deponent's answer was, a little cagey:  I'm not aware of

16   any private entities that have carte blanche access to the

17   NCIC.

18         So we followed up:  Does any private entity have any

19   type of access to NCIC?

20         His answer was:  Not that I am aware of.

21         There were more than ten Government lawyers at that

22   deposition and there were more Government lawyers on the phone.

23   This was not a casual affair.  This was a serious moment in

24   discovery in this case, and the agency deponent did not provide

25   accurate information.

1          The remedy in light -- in light of that dynamic, in

2    light of the fact that the Government hid this information,

3    this Court should also take into account that this isn't the

4    first time in this case that the Government has withheld

5    critical facts from the plaintiffs.

6          THE COURT:  We're going to just deal with this

7    motion.

8          MR. ABBAS:  Yes, Your Honor.

9          THE COURT:  We don't need to go back to what we have

10   already dealt with.

11         MR. ABBAS:  The Government will argue -- the

12   Government takes the position that we can't win our stigma-plus

13   argument because there isn't a publication of the stigmatizing

14   watchlist.

15         Well, the way that the plaintiffs plan on

16   establishing that publication prong of their stigma-plus claim

17   is by saying that -- by examining the extent of the

18   dissemination.  We disseminate to more than 60 foreign

19   countries.  Disseminate it to every single of the 19,000 law

20   enforcement agencies in the countries.  And you also

21   disseminate it to private entities who are authorized to

22   disseminate it to other private entities.

23         We want to be able to describe the extent of the

24   dissemination because the plaintiffs will argue that the

25   breadth of the dissemination is effectively a public -- a

1    publication of it.

2         And so, that's where it fits into our argument.  And

3    here, you know, they are saying 700 entities now.  You know,

4    they said 1,400 to begin with.  700 is just as shocking as

5    1,400.  So even if it ends up being a lower number, 700 is a

6    staggering amount.

7         Especially because while the federal government is

8    emphasizing that some of the entities might be related, so it

9    really should only count as one single entity, certainly some

10   of those ORIs correspond to private companies that should count

11   as more than one entity.  If they're disseminating to the

12   Virginia public university system, sure, maybe that is one

13   entity and it's being disseminated to one entity, but really

14   and truly it is being disseminated or made available to every

15   single public college, university in Virginia.

16        And the Government -- now plaintiffs are obviously

17   unwilling, and this Court shouldn't as well, rely upon the

18   federal government's characterizations of what they're doing.

19   The federal government should have to submit the evidence in an

20   admissible form on all these points.

21        And progress has been made, you know.  As we promised

22   to do at the outset, opposing counsel and plaintiffs' counsel

23   were meeting and conferring yesterday, and there are some

24   points, low-hanging fruit, that the defendants have committed

25   to providing additional information in admissible form.

1           And we would suggest to the Court that perhaps

2   memorializing those commitments and a time line for meeting

3   them does narrow the dispute somewhat.

4           THE COURT:  Well, that's all news to me, obviously.

5   I got your reply, it got filed late last night, I read that.

6   But that doesn't give me any indication that you all have made

7   any substantial efforts to get this matter resolved through

8   some other form of agreement.

9           So, I mean, and I got the opposition -- your motion

10  said, we are going to keep talking.  The opposition that came

11  in on Wednesday didn't really say, you know, we've resolved

12  these issues.  The reply certainly doesn't say, you know, we're

13  limiting our motion to X, we've resolved everything else.

14          MR. KONKOLY:  Yeah.  And that's just -- the situation

15  is fluid and complex, and both teams I think are spread out

16  with the summary judgment briefing.

17          But the defendants have provided additional

18  information via e-mail that they are willing to memorialize in

19  an admissible form.  And that information provides details

20  about the ways in which private entities apply for access to

21  TSDB information and how that process works.  It's all, you

22  know, things that the plaintiffs did not know and know now

23  because the opposing counsel has provided that.

24          And so, we would ask that the Court set out what I

25  think is the agreement of the parties, that all the information

1   that has been provided about the private dissemination

2   practices of defendants via e-mail will be reduced to an

3   admissible form via some declarations.

4           The second broad category, which is really important

5   that is unresolved, is use information.  We don't have -- the

6   supplemental interrogatory response has almost no information

7   about how these private entities are actually utilizing this

8   information.

9           THE COURT:  And that -- and, you know, I can

10  understand why you want it.  That's not what interrogatory

11  number 30 addresses.  Interrogatory 30 says:  Possesses that

12  information.  Identify information that TSC possesses that

13  indicates have received the information.  It's not what they do

14  with the information.

15          So, you know, that goes beyond interrogatory number

16  30.

17          MR. ABBAS:  I agree, Your Honor, it does go beyond

18  interrogatory number 3 -- but interrogatory number 30 was meant

19  to set the -- you know, set the stage for the depositions.

20          If we had interrogatory 30 prior to the TSC and FBI

21  depositions, those depositions would have looked a lot

22  differently because we would have had -- our inquiry into the

23  private dissemination practices would not have just been waived

24  off because they would have acknowledged the substantial and

25  extensive private dissemination that they cause.

1        And so, yes, yes, the plaintiffs are seeking

2   information beyond that information which is strictly

3   responsive to interrogatory 30.  And I think that is consistent

4   with Judge Trenga's order because while Judge Trenga ordered a

5   supplemental response to interrogatory 30, he also made note

6   that the -- the source of the violation, the reason he was

7   granting plaintiffs the complete, detailed, and specific

8   information about the private dissemination is because it came

9   up both in the depositions as well as the interrogatory.

10       For instance, on page 2 of Judge Trenga's order

11  Judge Trenga wrote, "the Court concludes that defendants should

12  provide a further detailed, complete, and specific response to

13  plaintiffs' interrogatory number 30 and related questions at

14  the TSC's Rule 30(b)(6) deposition."

15       The question that was -- the inquiry that was stopped

16  cold at the TSC's 30(b)(6) deposition was:  Is there any

17  private dissemination at all other than private dissemination

18  to airlines?

19       And the answer from the TSC's deponent was:  Not that

20  I am aware of.

21       Which is the exact same answer the FBI provided.  We

22  want -- the opportunity for follow-up questions is meaningful.

23  And it's not -- the plaintiffs do not want to -- are not eager

24  to take on the burden of deposing the FBI again.  And as -- and

25  so, we do believe that absent a time period to redepose the FBI

1   based on the new information that we have, that this Court

2   require a comprehensive answer to the -- to interrogatory 30

3   that doesn't allow the federal government to pass the buck

4   between TSC and DHS.

5           DHS Trip is a defendant in this lawsuit.  DHS Trip --

6   TSA is a defendant.  CBP is a defendant in this lawsuit.  The

7   Terrorist Screening Center chairs the Watchlisting Advisory

8   Council, another secret body that was kept from the plaintiffs.

9           That's why this Court's response to the defendants'

10  discovery violations should be substantial and require the

11  federal government to provide truthful comprehensive answers.

12          THE COURT:  What about -- and again, going back to

13  how does that come into play -- obviously, if TSC doesn't know

14  what TSA does, the specifics of what -- you are still not going

15  to have a complete picture by just getting an answer from TSC,

16  right?

17          MR. ABBAS:  If they don't know, that is an answer.

18  That is absolutely an answer.  If they do not know which

19  private entities or how TSA is allowing private dissemination

20  of TSDB information, that answer is relevant to one of the

21  Mathews factors.  The risk of erroneous deprivation of the

22  plaintiffs' liberty interests is increased via a willy-nilly

23  approach to dissemination of the watchlist, certainly.

24          THE COURT:  What purpose does it serve for you to

25  know the actual names of the entities as opposed to just

1  knowing the number and the general categories of those

2  entities?

3          MR. ABBAS:  The only way to establish the collective

4  character of the -- the list of private entities that have

5  access, is to know their names.

6          So, for instance, it's -- opposing counsel used the

7  term that it's disseminated, the private entities are "law

8  enforcement adjacent entities."

9          That category, it sounds like the -- that Amazon, you

10 know, shipping packages all around the country, has its own

11 security force that has a close relationship with, you know,

12 law enforcement to inspect packages.  Perhaps Amazon's internal

13 security force is a law enforcement adjacent entity.

14         And Apple's security around its technological

15 developments is a law enforcement adjacent entity.

16         Those are -- and the plaintiffs remain convinced that

17 somehow, some way this watchlist is making its way into the

18 financial system.  That banks are receiving it.  Companies that

19 wire -- that facilitate wire transfers are receiving this list.

20 And we don't know exactly how, but we strongly suspect that

21 indirect dissemination is -- is their means.

22         And what we are seeing in interrogatory answer, what

23 we saw in the deposition, is a really perhaps misleadingly

24 technical answer, or the answer is being provided by someone

25 that does not know, that does not know about the bank

1    dissemination that they're doing.

2         THE COURT:  All right.  Okay.

3         Let me hear from the defendants one more time.

4         MR. KONKOLY:  If I could clarify the term "law

5    enforcement adjacent."  That's a term I just made up in a

6    colloquial sense.  That is not a, you know, technical term, to

7    be clear.

8         The term -- the entities that are able to access the

9    NCIC through an ORI are described in the regulations.  They are

10   described in our supplemental response.  They are specific

11   categories of entities that we have listed.  And they are law

12   enforcement partners that have specific contracts pursuant to

13   which there is always a specific security addendum.  We've

14   included the link to that addendum in our supplemental response

15   that includes controls, very specific controls over the use of

16   that information.  The KST file is a restricted file.

17        To be clear, when counsel was using the word

18   "disseminate," the only -- the only access that these entities

19   are getting is to NCIC through a specific search.  You need a

20   name, you need some other numeral identifier.  The name alone

21   won't do it.  You can't scroll through the list.  You have to

22   have a name, some other type of identifier in order to query a

23   very specific person.

24        All you would come back with is a hit or not.  It

25   doesn't give you anything beyond that.  If you don't query

1    someone who is on there, you are never going to know someone

2    who is on there.

3              There are also audits that are conducted.  The --

4              THE COURT:  Well, what information do we have in your

5    answers to interrogatories about any audit being conducted?

6              MR. KONKOLY:  There is information about audits in

7    the CDIS security policy that is available online.  The

8    addendum that we have linked to is a part of that.

9              The audits happen -- so NCIC works through -- each

10   state has a central point of contact, I believe the acronym is

11   a CSA, who administers the NCIC for all entities that are

12   accessing it within that given state.

13             So every three years there is an audit of that given

14   state entity, as well as I understand to be a random sampling

15   of entities within that state.

16             And also, on an ongoing basis any time that NCIC

17   would learn of an improper use of the NCIC, someone running a

18   search they shouldn't have run, they are required to report

19   that back to the CSA who is required to take corrective action

20   with the entity that had that issue.

21             So that is an ongoing accountability mechanism that

22   happens in realtime, it doesn't wait for the three-year cycle

23   of audits.

24             Regarding the issue of the entities on this list,

25   also I would just like to emphasize that there are no

1   surprises.  There are no -- there is nothing shocking about any

2   of the entities on there.  They are exactly as we have

3   described them.

4             THE COURT:  Who knows?

5             MR. KONKOLY:  Well --

6             THE COURT:  You know, what may not be shocking to you

7   may be shocking to me.

8             MR. KONKOLY:  Sure.

9             THE COURT:  And it may be shocking to the plaintiffs.

10            MR. KONKOLY:  Sure.

11            THE COURT:  So --

12            MS. KONKOLY:  We do -- we do see a significant law

13   enforcement interest in keeping the list confidential, and

14   that's why we would propose submitting the list ex parte.  We

15   are prepared to do that in very short order after the

16   conclusion of this hearing, we could get it to you hopefully

17   within half an hour of walking out of this courtroom.  It takes

18   a very short time to review.

19            Your Honor could then satisfy yourself as to whether

20   the way we have described this list is accurate.  Whether there

21   are any surprises that -- you know, along the lines of what

22   counsel is suggesting.

23            And assess the value of the information to this case,

24   which we think is absolutely zilch, there is nothing that the

25   names of the entity adds to the assessment of the plaintiffs'

1    claims.

2         THE COURT:  Anything else?  Help me understand why

3    you think the names need to be protected from -- and as Judge

4    Trenga indicated for production, you know, could be produced to

5    attorney's eyes only and only for the use in this litigation

6    restrictions.

7         MR. KONKOLY:  Right.  And our concern is just a

8    concern that is articulated in that City of New York case from

9    the Second Circuit that we have cited.  They are not fail proof

10   measures.  They are just inherently mitigation measures.

11        We have concerns that if somehow the list were to get

12   out, it could be used -- that the entities would be perhaps

13   more susceptible to being a target for -- you know, to seek to

14   find a way into the NCIC for improper use through these private

15   entities.  And we would like to protect them from public view

16   just to protect that possibility.

17        We also very strongly think that they just don't add

18   any value to this case.  They are exactly as we have described.

19   And we don't see how it furthers the analysis of the claims to

20   make those specific names.

21        And again, we are prepared to make that ex parte

22   submission very quickly if Your Honor would honor that request.

23        THE COURT:  All right.  Well, this has been an

24   interesting argument, as there have been many interesting

25   arguments in this case over its length.  And while I appreciate

1    the plaintiffs' comment that this may be the last one, and I

2    hope you're right, only time will tell.

3         You know, I think it's clear from the way this

4    argument has gone that I am very concerned about the way that

5    this information didn't get disclosed until late in the ball

6    game.  And I appreciate the Government's recognition of that

7    and acceptance that, you know, that shouldn't have happened.

8         And, you know, but it did, and we need to deal with

9    it going forward and get the case in the best position we can

10   get it in given the current circumstances such that it can be

11   presented to Judge Trenga on these pending motions for summary

12   judgment, and see where that shakes out, whether the case

13   survives or doesn't survive based on that.

14        And, you know, this is -- this is one of many issues

15   in the case that may not have been, you know, the number one

16   issue, but, you know, the dissemination of this information has

17   been a significant issue in this case, at least in my mind,

18   from the very early on.

19        So this isn't something that is, you know, way out in

20   left field.  I think this is something that does have some

21   significance to the issues that need to be resolved.

22        And, you know, I do think that the idea that -- and

23   again, we appreciate providing information, having

24   conversations, doing those kinds of things, but that

25   information does need to be formatted, whether it's in an

1   answer to interrogatory that is signed under oath or through

2   declarations or something like that, but the statements that

3   have been made in the e-mails that have gone back and forth

4   over the last, you know, seven days or so need to be put in a

5   format that makes it useful for the purposes of the litigation.

6            I also think that there needs to be some type of a

7   statement that, you know, this is the information that TSC has

8   relating to what TSA does.  And that we don't have any more

9   specific information.  I mean, I don't want that to be an issue

10  that is hanging out there.

11           So if that is going to be the position that TSC is

12  taking, that that is, you know, the level of information that

13  they have as to the way in which TSA does distribute that

14  information, then, you know, that's the answer that it needs to

15  provide.  But it has to be up front, and not try and be -- you

16  know, give them this, but not say that's all we have.

17           Okay.  So I am going to require supplemental answer

18  to the interrogatory that includes the information that has

19  been exchanged informally, whether it's in a declaration or a

20  supplemental answer to interrogatories, that doesn't

21  necessarily impact -- as long as its useful for the purposes of

22  this litigation, you all can work that out.

23           But I do think that it also needs to provide some,

24  whether it has more information about how the process works

25  with TSA, and TSC does have that information as to TSA, it

1    needs to provide it.  If it doesn't, you need to say, this is

2    the level of information that we have within our possession.

3          I am going to go ahead and I -- you know, this is a

4    close call, but I think given what has gone on in this case,

5    and given the time period in which this information has come

6    out, that it is going to be appropriate for the plaintiffs'

7    counsel, and these are people who are members of the Bar who

8    have responsibilities, to have access to that list.

9          And I'm going to arrange for that to be you go and

10   look at the list at a Government location, to look at the list,

11   read it, not copy it, to check and see if there is anything

12   surprising or not.  That information can only be used for the

13   purposes of this litigation.

14         So the restrictions are access at a government

15   facility, or U.S. Attorney's Office, or DoJ, or somewhere like

16   that.  You are not going to have possession of the list.  You

17   can look at the list and the ORIs or whatever, you know,

18   whether it's a list of 1,400 and 700 or whatever -- I mean, I

19   want you to be able to have access to that.

20         Member of the Bar.  Only for the purposes of this

21   litigation.  No copying.  Just -- and then if in fact after you

22   have reviewed that list there are issues that I need to

23   address, contact me.  Okay?

24         But I -- you know, I appreciate both sides' concerns,

25   but I don't think it's appropriate for you to have a copy of

1    the list at this point in time.  I just want you to be able to

2    hopefully, you know, assure yourself that the categories that

3    have been laid out in the supplemental answer to

4    interrogatories are consistent with what have been indicated

5    here today.  Okay?

6            MR. ABBAS:  Your Honor, just one --

7            THE COURT:  Mr. Abbas, yes, sir.

8            MR. ABBAS:  -- clarifying point.  Myself and Lena

9    Masri are members of the Virginia Bar, I have been a

10   long-standing member of the Bar of this court.

11           THE COURT:  Right.

12           MR. ABBAS:  Lena began this case with a pro hac vice

13   motion --

14           THE COURT:  Yeah.  No, I mean, you know, anybody who

15   is a member of a Bar and admitted to practice in this court in

16   this case.  So --

17           MR. ABBAS:  So anybody that has a pro hac vice motion

18   would have access?

19           THE COURT:  Pro hac.

20           MR. ABBAS:  Yes, sir.

21           THE COURT:  But, you know, they have to be Barred --

22   so not to -- not to say anything bad about paralegals --

23           MR. ABBAS:  Of course, yep.

24           THE COURT:  -- or that kind of thing, they serve a

25   very useful purpose in all cases.

44

1          MR. ABBAS:  Yes.

2          THE COURT:  But, you know, this rises to a level of I

3    want someone who is a member of the Bar who is subject to my

4    jurisdiction having been admitted in this case.  Okay?

5          MR. ABBAS:  Yes, Your Honor.

6          THE COURT:  Thank you.  Anything else?

7          MR. KONKOLY:  No, Your Honor.

8          THE COURT:  Okay.

9          MR. ABBAS:  Your Honor, just in terms of time line,

10   you know --

11         THE COURT:  Well, I would assume that you could make

12   that list available and arrangements for him to come to see it

13   by Monday.  Is that probably going to be -- if you could

14   provide me with the list by later today, you can make

15   arrangements for them to come see it, hopefully sometime on

16   Monday.

17         I assume the supplemental answer to the interrogatory

18   can be done by next Friday.  I mean, I want to give you,

19   obviously, putting in the information that you have already

20   gotten isn't going to be a significant undertaking.  Double

21   checking about what, if other -- any other information that you

22   have that you want to include as to TSA, may take some time.

23         And I suspect you are going to want to also include

24   in that usable form whatever subsequent information you have

25   gotten about however many actual entities there are other than

1    just the number of applications that have been out there.

2          So what has been communicated here today of a number

3    in the 700 range or something of being actual entities, that

4    needs to be in a format that is outlined in the response.

5    Okay?

6          MR. ABBAS:  Your Honor, if the time line is for the

7    Government to provide a supplement next Friday, right now the

8    summary judgment briefs are due the Monday after that Friday.

9          THE COURT:  It is the Monday after that -- I thought

10   that --

11         MR. ABBAS:  It is March 4.  Right?

12         MS. KONKOLY:  Correct, the Monday after that Friday.

13         THE COURT:  All right.

14         MR. KONKOLY:  If you think a week would be an

15   appropriate time period that just to make sure we have done

16   everything to be done for that supplemental --

17         MR. ABBAS:  Your Honor, we would have -- we would ask

18   for two weeks.  This really is a big disclosure for us.  And

19   really to process it and process what the federal government is

20   saying, we feel that two weeks is a good amount of time to get

21   our hands and decide how to handle that information.

22         THE COURT:  Well -- well, I guess what you're saying

23   is should we modify the time period for filing the summary

24   judgment motions further than what Judge Trenga did yesterday?

25   Is that what you're saying?

1          MR. ABBAS:  Yes, Your Honor.

2          THE COURT:  If you're not going to get the answer to

3     the interrogatory until Friday, you're saying turning around

4     and doing something on Monday, it is -- you still want to have

5     a week to do the answers to interrogatories?

6          MR. KONKOLY:  Yes, we do, about a week.

7          THE COURT:  All right.  I will confer with Judge

8     Trenga.  My inclination is to go ahead and continue it one

9     week, not two weeks.  Is to suggest to him that instead of it

10    being due on the 4th, that it be due on the 11th.  And that we

11    delay it one more week just to give the parties that extra time

12    period to do it.

13         So I will -- I can't commit, it's not my schedule

14    that I am dealing with, but I will talk to Judge Trenga about

15    my granting of this motion requiring some additional

16    information be provided by next Friday, and requesting that we

17    be able to move the summary judgment motion briefing one more

18    week.

19         I will hear any opposition you all have to that, but

20    I think given -- I know it's only one part of the summary

21    judgment, but it's probably fair under the circumstances.

22         MR. KONKOLY:  I know.  We would just request, could

23    the order make clear that the entire schedule is moving back by

24    the same amount?  So that will be clear on the record.

25         THE COURT:  Right, yeah.  So I think the whole

1    briefing would then be -- did he set an argument date?

2             MR. KONKOLY:  April 4.

3             THE COURT:  April 4.  Well --

4             MR. KONKOLY:  We will note that we may not -- Judge

5    Trenga set that for a Thursday.  So we're assuming he wanted to

6    do that on a special docket.  But if that pushes us back by a

7    week, we have a conflict on the 11th.

8             THE COURT:  Okay.

9             MR. KONKOLY:  April 11.

10            THE COURT:  Okay.  When was the last brief due under

11   the schedule that he had the hearing set for the 4th?

12            MR. KONKOLY:  So it was March 4.  And then 14 days.

13   So that would take us to the 18th.  And then I believe to the

14   25th is the standard 14/7-day interval.

15            THE COURT:  Okay.  Well, I'll talk to him and see if

16   he thinks it would be necessary to move the argument date.  But

17   I'll talk to him about moving the briefing dates.

18            If for some reason it's important that he keep the

19   argument date, I may cut it down from seven days to five days,

20   or something to be able to keep that argument.  And that's

21   important to get this case heard.

22            But I suspect I'll be able to do my best to keep you

23   from having to file a brief on the Monday after you get the

24   supplemental answer on Friday.  Whether it's the following

25   Monday or sometime later in that week, I will work with Judge

1   Trenga and try and come up with something that seems doable.

2   Okay?

3           MR. ABBAS:  Thank you, Your Honor.

4           THE COURT:  Thank you, counsel.

5           MR. KONKOLY:  Thank you, Your Honor.

6           NOTE:  The hearing concluded at 11:07 a.m.

7   -------------------------------------------------

8

9

10          C E R T I F I C A T E  of  T R A N S C R I P T I O N

11

12          I hereby certify that the foregoing is a true and

13  accurate transcript that was typed by me from the recording

14  provided by the court.  Any errors or omissions are due to the

15  inability of the undersigned to hear or understand said

16  recording.

17          Further, that I am neither counsel for, related to,

18  nor employed by any of the parties to the above-styled action,

19  and that I am not financially or otherwise interested in the

20  outcome of the above-styled action.

21

22

23              ___/s/ Norman B. Linnell___
                Norman B. Linnell
24              Court Reporter - USDC/EDVA

25

**CERTIFICATE OF SERVICE**

I hereby certify that on March 5, 2019, I electronically filed the foregoing by using the

Court's ECF system, and all counsel will receive service through the Court's ECF system.

Respectfully submitted,

/s/ Gadeir I. Abbas

Dated: March 5, 2019