# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

|  |  |  |
|---|---|---|
| Anas ELHADY, et al., | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No. 1:16-cv-375 (AJT/JFA) |
| CHARLES H. KABLE, et al., | ) | |
| Defendants. | ) | |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

G. ZACHARY TERWILLIGER
United States Attorney

JOSPEPH HUNT
Assistant Attorney General
Civil Division

ANTHONY J. COPPOLINO
Deputy Director, Federal Programs Branch

AMY POWELL
DENA M. ROTH
ANTONIA KONKOLY
CHRISTOPHER HEALY
Trial Attorneys, Federal Programs Branch
United States Department of Justice
Civil Division, Federal Programs Branch

LAUREN A. WETZLER
Chief, Civil Division
Assistant United States Attorney
2100 Jamieson Ave.,
Alexandria, VA. 22314
Tel: (703) 299-3752
Fax: (703) 299-3983
Lauren.Wetzler@usdoj.gov

*Attorneys for Defendants*

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

STATEMENT OF UNDISPUTED MATERIAL FACTS ......................................................3

    The Threat Environment ................................................................................................3

    The Defendant Agencies ...............................................................................................4

    The TSDB .......................................................................................................................7

    Redress ..........................................................................................................................10

    Information-Sharing .....................................................................................................14

    The Plaintiffs ................................................................................................................17

SUMMARY JUDGMENT STANDARD ...........................................................................34

ARGUMENT ......................................................................................................................35

    I.     Plaintiffs Lack Standing to Pursue Their Due Process Claim Because
          They Cannot Demonstrate Any "Certainly Impending" Future Injury ......................35

    II.    Several of Plaintiffs' Claims Are Barred Because They Failed to Avail
          Themselves of DHS TRIP. ..........................................................................................38

    III.   The Watchlisting Enterprise Comports with Procedural Due Process. ....................39

          a.      Plaintiffs Have Not Been Deprived of a Liberty Interest ...........................40

    i.     Plaintiffs Have Not Been Deprived of a Right to Travel. ...........................................41

    ii.    Plaintiffs Do Not Have a Stigma-Plus Reputational Interest Cognizable
          Under the Due Process Clause. ....................................................................................48

          a.      Demanded Process Would Impair Government Interest. ..............................55

          b.      The Process Afforded by DHS TRIP is Appropriate and
               Adequate. ......................................................................................................58

    IV.   The Court Should Also Grant Summary Judgment in Defendants'
          Favor on Plaintiffs' Administrative Procedure Act Claim. ........................................60

CONCLUSION ...................................................................................................................60

**INTRODUCTION**

Terrorism remains a grave and persistent threat to our national security and civil aviation. One crucially important tool for U.S. counterterrorism efforts has been the creation of a consolidated terrorist watchlist, the Terrorist Screening Database ("TSDB"), which allows U.S. authorities to identify known and suspected terrorists seeking to board aircraft, enter the country, or engage in other potentially threatening activity. Several different components of the federal government work together to secure the U.S. and its borders and aviation system from these terrorist threats. The Federal Bureau of Investigation ("FBI") investigates terrorist activity, and the Terrorist Screening Center ("TSC"), an interagency operation within the FBI, maintains the TSDB. The Department of Homeland Security ("DHS") is charged with preventing terrorist attacks within the U.S. Within DHS, the Transportation Security Administration ("TSA") is responsible for securing all modes of transportation, with a focus on preventing terrorist attacks against civil aviation and other methods of transportation. Among other things, TSA relies upon certain subsets of the TSDB to screen passengers attempting to fly on United States commercial aircraft, or any commercial flight to, from, over, or within the U.S. Also within DHS, U.S. Customs and Border Protection ("CBP") has authority to inspect all those who are entering the United States, including for the purpose of preventing terrorist attacks.

While working to ensure that air travel is safe and secure, the Government has also undertaken efforts to protect civil rights and civil liberties. Before an individual is placed in the TSDB, his or her nomination undergoes several independent layers of review to ensure that the requisite criteria are met and the underlying information is reliable. When combined with regular post-placement reviews and audits of TSDB information, these procedures offer ample assurance that TSDB placements are appropriately supported and warranted by the underlying information. Individuals who suspect or believe their travel has been affected by TSDB placement may also seek redress with DHS's Traveler Redress Inquiry Program ("DHS TRIP").

Plaintiffs' sole remaining claim relates to procedural due process, and the Government is entitled to summary judgment on that claim for several reasons. First, following the conclusion of months of wide-ranging discovery, Plaintiffs—especially the numerous Plaintiffs who admit that they currently travel without experiencing any unusual scrutiny or security procedures—cannot establish a certainly impending future injury sufficient to support standing.

Plaintiffs also cannot establish a violation of procedural due process, even construing all facts in their favor. Neither placement in the TSDB, nor placement on any subset thereof requiring enhanced screening, prohibits any form of travel, including by aircraft. Indeed, all Plaintiffs concede that they have repeatedly traveled by air, both domestically and internationally. And although Plaintiffs make a wide variety of claims about how their alleged status with respect to the TSDB has supposedly disrupted their travel or other activities, the evidence shows that many of these alleged experiences, such as difficulties with banks or car dealerships, bear no possible plausible causal relationship with the TSDB. Others describe security screening or inspection that every traveler may be asked to undergo. Plaintiffs' asserted right to travel by airplane and across borders, unimpeded by any delays or inconveniences, is not an interest so deeply rooted in the Nation's history and tradition, or implicit in the concept of ordered liberty, that it implicates due process.

Nor can Plaintiffs establish a due process claim based on reputational harm. Such a claim must be based on government stigmatization and requires that the government publicly disseminate information to the community at large. But the Government does not publicly disclose any information about an individual's inclusion or non-inclusion on the TSDB. Information regarding the status of individuals with respect to the TSDB is generally limited to law enforcement and homeland security entities and the intelligence community and is subject to strict controls.  A stigmatization claim also requires (in addition to reputational harm) an alteration of a legal right or status, but Plaintiffs have not shown any such injury from their alleged placement in the TSDB. Notwithstanding the Complaint's lengthy allegations about harms that Plaintiffs speculate might

befall an individual in the TSDB, Plaintiffs have established no facts that would constitute deprivation of a liberty or property interest within the scope of the Fifth Amendment. As a matter of law, they cannot establish that their alleged status with respect to the TSDB deprives them of a liberty interest protected by the Due Process Clause. Neither their travel nor their reputations are impaired. And in any event, the current redress process is more than constitutionally sufficient to protect their limited private interests, particularly given the extraordinary public interest in preventing catastrophic terrorist attacks.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### The Threat Environment

1.      The United States continues to face terrorist threats from foreign terrorist organizations, including al Qaeda in the Arabian Peninsula, al Qaeda in the Islamic Maghreb, and the Islamic State of Iraq and ash-Sham ("ISIS"). Declaration of Michael J. Orlando, Acting Assistant Director of the Counterterrorism Division, FBI, Defendants' Exhibit ("DEX") 2 ¶ 15; Declaration of Hao-Y Froemling, Executive Director for Vetting, Office of Intelligence and Analysis, TSA, DEX1, ¶¶ 4, 17-27. These and other organizations are adept at disseminating propaganda and training materials in an effort to spur attacks worldwide. *See* Orlando Decl. ¶ 15 (describing recent terrorist activity). "Global jihadists in dozens of groups and countries threaten local and regional US interests, despite having experienced some significant setbacks in recent years, and some of these groups will remain intent on striking the US homeland." 2019 Worldwide Threat Assessment, cited in Orlando Decl. ¶ 15 n.4.

2.      Terrorists remain intent on attacking civil aviation, and the threat environment remains complex, diverse, and persistent. Froemling Decl. ¶ 4. Aviation remains a principal target for terrorists who seek to instill fear, disrupt the economy, and undermine the American way of life, and terrorists are constantly working to find new methods for evading security measures. *Id.* ¶¶ 17-21. Multiple terrorist attacks on civil aviation in recent years demonstrate the persistent threat and

that adversaries continue to try to find ways to defeat security measures. *Id.* ¶¶ 21-26 (describing

recent attacks on commercial aircraft in Egypt and Somalia, in 2015 and 2016, respectively, and a

2017 terrorist plot in Australia). Terrorist groups are expected to continue to use insiders to execute

attacks and also to apply their ingenuity to devise new ways to bypass or defeat aviation security

measures. *Id.* ¶ 27.

       3.      Effective and timely governmental information-sharing is crucial to preventing

terrorist attacks. In recent years, through the information sharing system supported by the TSDB,

the U.S. has been able to track potential terrorist plots by coordinating derogatory information from

the intelligence community with encounter information from local law enforcement or other

screening partners. Declaration of Timothy P. Groh, Deputy Director for Operations of TSC,

DEX3, ¶ 6. As was noted by the 9-11 Commission, this was not possible before 9-11 when, for

example, the Central Intelligence Agency ("CIA") might have known an individual had ties to

terrorism—but did not know the individual was in the U.S.—while local law enforcement knew the

individual was in the U.S.—but did not know the individual had ties to terrorism. The common

operating picture afforded by the information sharing system (as supported by the TSDB) is

absolutely critical to preventing such terrorist plots from coming to fruition in the future. *Id; see also*

*The 9/11 Commission Report*, § 13.3 (recommending greater information-sharing), § 8.2 (describing

what the Commission found to be specific information failures in the months leading up to the 9/11

attacks), available at https://www.9-11commission.gov/report/.

**The Defendant Agencies**

       4.      Several different components of the federal government work together to secure the

United States and its borders and aviation system from these terrorist threats. The FBI investigates

and analyzes intelligence relating to both domestic and international terrorist activities, *see* 28 U.S.C.

§ 533, 28 C.F.R. § 0.85(l). The FBI also administers the TSC, a multi-agency Executive organization

established by Presidential Directive in 2003 and tasked with, *inter alia*, "consolidat[ing] the

4

Government's approach to terrorism screening and provid[ing] for the appropriate and lawful use of Terrorist Information in screening processes." Homeland Security Presidential Directive ("HSPD") 6 (Sept. 16, 2003), https://fas.org/irp/offdocs/nspd/hspd-6.html.

5.     The National Counterterrorism Center ("NCTC") analyzes and integrates intelligence relating to international terrorism and counterterrorism. 50 U.S.C. §§ 3056(a), (d)(1). NCTC maintains classified national security information concerning international terrorists within its Terrorist Identities Datamart Environment ("TIDE"). Groh Decl. ¶ 21.

6.     DHS is charged with "prevent[ing] terrorist attacks within the United States," 6 U.S.C. § 111(b)(1)(A), and "reduc[ing] the vulnerability of the United States to terrorism," *id.* § 111(b)(1)(B); *see also id.* § 202(1) (charging DHS with the responsibility of "[p]reventing the entry of terrorists and the instruments of terrorism into the United States."). Within DHS, TSA is responsible for securing all modes of transportation, including prevention of terrorist attacks against civil aviation and other methods of transportation. *See* 49 U.S.C. § 114(d). TSA is further responsible for day-to-day federal security screening operations for passenger air transportation, 49 U.S.C. § 114(e)(1), and for developing "policies, strategies, and plans for dealing with threats to transportation security," *id.* § 114(f)(3). TSA may "issue . . . such regulations as are necessary to carry out [its] functions," *id.* § 114(l)(1), as well as "prescribe regulations to protect passengers and property on an aircraft," *id.* §44903(b).

7.     The Froemling Declaration details TSA's multi-faceted approach to aviation security, which includes pre-screening, checkpoint screening, post-checkpoint security measures, and security threat assessments. Froemling Decl. ¶¶ 30-51. One of TSA's responsibilities is to ensure aircraft security by using information from government agencies to identify individuals on airline passenger lists who may be a threat to civil aviation or national security and prevent such individuals from boarding an aircraft, or take other appropriate actions. *See* 49 U.S.C. § 114(h)(3). TSA executes this mandate in part through the Secure Flight program, which "compar[es] passenger information to the

automatic selectee and no fly lists and utilizes all appropriate records in the [TSDB]." 49 C.F.R. §

44903(j)(2)(C)(ii). After completing the comparison of passenger information, TSA provides

instructions to aircraft operators to identify individuals for standard, enhanced, or expedited

screening at a security checkpoint, or to deny individuals transport or authorization to enter a U.S.

airport's sterile area. Froemling Decl. ¶ 31.

8.      All aviation passengers must undergo security screening prior to entering the secure

area of an airport and boarding an aircraft, and any passenger may be selected for enhanced

screening. *Id.* ¶ 10; 34. TSA applies the same checkpoint screening procedures to individuals Secure

Flight designates for enhanced screening, regardless of whether the individual is designated due to

TSDB status, randomly, or for other reasons, and the boarding pass does not indicate why someone

has been selected for enhanced screening. *Id.* ¶ 11. The majority of passengers designated for

enhanced security screening are so designated for reasons other than TSDB status. *Id.* ¶ 10.

Enhanced screening typically includes screening of the person through a walk-through metal

detector, the Advanced Imaging Technology (also known as an "AIT"), and a pat-down, and

screening of accessible property through a scanner, an explosives trace detection search, and physical

search of the interior of the passenger's accessible property, electronics, and footwear. *Id.* ¶ 39. A

typical enhanced screening takes 10 to 15 minutes. *Id.* ¶ 39.

9.      Also within DHS, CBP has authority to inspect all those who are entering the United

States. CBP exercises authority under numerous statutes to search persons and goods at the nation's

border. *See, e.g.*, 19 U.S.C. §§ 482, 1455, 1459, 1461, 1467, 1499, 1581, 1582; *United States v. Flores*

*Montano*, 541 U.S. 149, 152-53 (2004). These authorities include, but are not limited to, inspections

for the purpose of preventing terrorist attacks. *See, e.g.*, 6 U.S.C. § 211(g)(3)(a); *Tabbaa v. Chertoff*, 509

F.3d 89, 97 (2d Cir. 2007) (describing antiterrorism mission of CBP and DHS).

10.     The Howe Declaration describes some of the methods used by CBP to execute its

mission. Declaration of Randy Howe, Exec. Dir. for Operations, Office of Field Operations, CBP,

DEX51 ¶¶ 12-20. All travelers attempting to enter the U.S. are required to present themselves and their effects for inspection at the port of entry. *Id.* ¶ 13. A CBP officer will verify the identity of the person, and ask the person questions regarding his or her travel and intent in entering the U.S. CBP also performs law enforcement system queries to see if there are any alerts in the system. Alerts may be present in the system for a wide variety of reasons. *Id.*

11.      CBP officers have discretion in conducting their inspections, subject to legal and policy requirements and in accordance with their training and experience. *Id.* ¶ 14. There are myriad reasons a CBP officer may refer a traveler for additional scrutiny, sometimes referred to as secondary inspection. *Id.* For example, CBP randomly refers a percentage of travelers for additional scrutiny. *Id.* Consideration of TSDB information at the border is also an important element of accomplishing CBP's border security responsibilities. *Id* ¶ 15. Once a traveler is referred for additional scrutiny, the specific actions taken during the secondary border inspection vary depending on the officer's evaluation of each traveler's situation. *Id.* ¶ 17. For example, an officer may choose to search that traveler's luggage or other belongings, subject to legal and policy requirements. *Id.*

### The TSDB

12.      Pursuant to HSPD-6, TSC consolidated several government terrorist watchlists into a single database. Groh Decl. ¶¶ 4-5. The TSDB contains unclassified identifying information of known or suspected terrorists. *Id.* ¶¶ 9-11. The vast majority of the identities in the TSDB are foreign nationals who are not located in, and have no known nexus to, the U.S. *Id.* ¶ 19. In fact, U.S. persons[1] make up less than 0.5 percent (*i.e.*, one two-hundredth) of the identities in the TSDB. *Id.* As a result of the dynamic intelligence environment, regular reviews of the data, and the redress process, the TSDB is constantly changing as it is continuously reviewed and updated. *Id.* ¶ 13.

13.      To include a known or suspected terrorist identity in the TSDB, the nomination must rely upon articulable intelligence or information which, based on the totality of the

---

[1] U.S. Persons, as defined in Executive Order 12333, are U.S. citizens and legal permanent residents.

circumstances and, taken together with rational inferences from those facts, creates a reasonable suspicion that the individual is engaged, has been engaged, or intends to engage, in conduct constituting, in preparation for, in aid or in furtherance of, or related to, terrorism and/or terrorist activities, and the nomination must include sufficient identifying information. Groh Decl. ¶ 22. Mere guesses or "hunches" or the reporting of suspicious activity alone are not sufficient to establish reasonable suspicion. *Id.* ¶ 24. Nominations must not be based solely on the individual's race, ethnicity, or religious affiliation, nor solely on beliefs and activities protected by the First Amendment. *Id.* ¶ 25.

14.     TSA may designate airline passengers for enhanced screening who meet the reasonable suspicion standard for TSDB inclusion and for whom the TSDB record contains a full name and a full date of birth. Individuals who meet this minimum requirement are included in the "Expanded Selectee List," a subset of the TSDB. Froemling Decl. ¶ 10 & n. 15. The No Fly List and the Selectee List are separate subset lists of the TSDB, and placement on those subsets requires additional heightened substantive derogatory criteria to be met. *See* 49 C.F.R. § 1560.105(b)(2), (b)(7)(iii); Groh Decl. ¶ 26; Froemling Decl. ¶ 10.[2] The TSA Administrator has final authority over implementation of the No Fly, Selectee, and Expanded Selectee Lists and makes final determinations concerning inclusion on the No Fly List for U.S. persons seeking redress through DHS TRIP. *Id.*

15.     To maintain thorough, accurate and current terrorism information, the TSDB is subjected to rigorous and ongoing quality control measures. Groh Decl. ¶ 41. First, before any individual is added to the TSDB, the nominating agency assesses the available, relevant information,

---

[2] While TSA applies the same checkpoint procedures to individuals on the Expanded Selectee List as individuals on the Selectee List, TSA values having separate Selectee and Expanded Selectee Lists. More specific details related to why TSA values having both subset lists is SSI, which Defendants would be willing to provide the court *ex parte* if necessary. Froemling Decl. ¶ 10 n. 15. Plaintiffs' counsel never sought access to SSI in this case, despite being repeatedly informed about the process for applying. Although the No Fly List criteria are public, the Selectee List criteria are not public because disclosure would give known or suspected terrorists information that may assist in developing strategies to circumvent security screening. Groh Decl. ¶ 27; Froemling Decl., Ex. A.

including any exculpatory information, to determine whether the applicable standard is met, and the TSC completes a de novo review of available, relevant information to make the same assessment before the individual is included in the TSDB. *Id.* ¶ 16. In addition, TSC conducts biannual reviews of all US citizens and lawful permanent residents in the TSDB to ensure continued placement is warranted based on available, relevant information, and further conducts a review at each encounter. *Id.* ¶¶ 16, 44. Nominating agencies also conduct annual reviews. *Id.* Individuals who experience travel-related screening difficulties such as delayed or denied boarding may also seek redress through DHS TRIP. Moore Decl. ¶¶ 3-16; Groh Decl. ¶¶ 16, 52-63.

16.     Nominations to the TSDB are made by federal agencies based on credible information from a wide variety of intelligence sources; additionally, foreign partners may submit identities to be considered for nomination to the TSDB. Groh Decl. ¶ 18. Nominating agencies and partners provide identities that meet the standard for inclusion in the TSDB and which have a nexus to international terrorism to the NCTC, and to the FBI for identities with a nexus to domestic terrorism. *Id.* ¶ 19. Accordingly, before an individual is added to the TSDB, the nomination undergoes a multi-step review process at the nominating agency, at the NCTC or FBI (as appropriate), and then again at TSC to ensure compliance with interagency standards for inclusion. *Id.* ¶ 20.

17.     TSDB determinations are not categorical judgments based on statistical models or generic behavioral indicators. Orlando Decl. ¶ 11. The watchlisting system combines intelligence analysis with policy-based criteria for requiring additional security screening before boarding an aircraft. *Id.* This system relies on informed judgments by experienced analysts and agents who evaluate TSDB nominations based on individual circumstances, taking into account the particular intelligence that distinguishes the individual under review. *Id.* These analysts and agents draw on years of experience and training and from a body of source material; they have a variety of investigative and intelligence-gathering tools at their disposal to inform their judgment and make use

of subject-matter experts from throughout the intelligence community. *Id.* ¶ 14 Agents and analysts are also guided in their decision-making by detailed analytical standards that structure their discretion and promote scrutiny and professionalism in their work. *Id.* ¶ 11.

18.      TSC is responsible for determining if the information associated with a nomination meets the established standards for inclusion in the TSDB or its subset lists. Groh Decl. ¶ 26.

19.      At any time that a federal agency (whether or not it was the nominator) identifies new or updated information about a watchlist record, is expected to make a request to NCTC/TSC to modify or remove that record. *Id.* ¶ 45. Nominating agencies conduct annual reviews of all their nominations of U.S. persons to the TSDB, and each nominating agency has internal procedures to prevent, identify, and correct any errors. *Id.* ¶ 43.

20.      TSC also regularly reviews data in the TSDB to ensure the underlying information supports the nomination and performs audits to confirm the data in the TSDB is thorough, accurate, and current. Groh Decl. ¶ 44. In addition to these reviews, the TSC conducts a biannual review for all U.S. person records in the TSDB, and there is a review following each encounter when there is a potential match to an individual in the TSDB ("a TSDB identity"). *Id.* Available, relevant information, including exculpatory information, is carefully reviewed to evaluate whether the record still meets the standard for inclusion. *Id.*

21.      Other government entities provide further oversight and input into watchlisting procedures, including Inspectors General, the Privacy and Civil Liberties Oversight Board, the Government Accountability Office, and Congress. *Id.* ¶¶ 48-50. Such reviews have resulted in additional quality assurance mechanisms at TSC, which have improved accuracy and efficiency. *Id.*

## Redress

22.      Congress directed DHS to establish a timely and fair redress process for travelers who believe they have been delayed or prohibited from boarding a commercial aircraft because they have been wrongly identified as a threat. *See* 49 U.S.C. § 44926(a). Congress further directed the

Administrator of TSA to create a process to enable airline passengers who are delayed or prohibited from boarding a flight because TSA's "passenger prescreening system determined that they might pose a security threat to appeal such determination and correct information contained in the system" as necessary. *Id.* § 44903(j)(2)(C)(iii)(I). TSA implements this mandate through DHS TRIP, which serves as a single point of contact for a wide variety of complaints and inquiries regarding travel difficulties. Declaration of Deborah O. Moore, Branch Manager, Transportation Security Redress Branch, TSA. DEX 4, ¶ 5.

23.     Travelers who have experienced a screening-related travel difficulty, including those who believe that they experienced such problems because they were wrongly identified as a threat may submit a Traveler Inquiry Form to DHS TRIP. Moore Decl. ¶ 7. When a traveler files an inquiry with DHS TRIP online, the system automatically provides the traveler a Redress Control Number ("RCN"), which helps the traveler monitor the progress of the inquiry. An additional feature of the RCN is that a traveler may use the RCN when making future air travel reservations. *Id.* ¶ 8. In conjunction with TSA's Secure Flight Program, airlines have modified their reservation systems to allow an individual with an RCN to enter it into the reservation system to prevent the individual from being misidentified. *Id.*

24.     Upon receipt of a Traveler Inquiry Form, DHS TRIP reviews the information submitted by the traveler and evaluates each inquiry to determine which DHS components or other governmental agencies have equities in the issues underlying the claimed travel difficulties. In addition to reviewing the traveler's submission, DHS TRIP also reviews relevant government databases, and refers the inquiries to the appropriate DHS TRIP component(s), and/or any other governmental agencies with equities. Moore Decl. ¶ 9. Approximately 98 percent of DHS TRIP inquiries have no connection with any identity in the TSDB. Moore Decl. ¶ 11.

25.     If a traveler experienced problems because he or she was "misidentified"—*i.e.*, the traveler's name is the same as or similar to the name of a different individual who is included in the

11

TSDB—then DHS TRIP, in coordination with all relevant government agencies, attempts to prevent future misidentification. Moore Decl. ¶ 10.

26.     In the small fraction of cases when DHS TRIP determines that a traveler is an exact or possible match to an identity in the TSDB, DHS TRIP refers the matter to the TSC Redress Office. Moore Decl. ¶ 11. When this occurs and the traveler is a confirmed match to the TSDB, TSC reviews the available derogatory and exculpatory information about the traveler, including any information provided by the traveler as a part of the inquiry, to determine whether the identity in the TSDB continues to satisfy the criteria for inclusion or should be removed or have its status otherwise modified. Moore Decl. ¶ 12; Groh Decl. ¶¶ 56-60. The TSC Redress Office consults with the nominator to ensure that any new or exculpatory information is considered as part of the redress review. Groh Decl. ¶ 58. When changes to a record's status are warranted, TSC's Redress Office ensures such corrections are made and verifies that such modifications or removals are carried over to the various screening systems that receive TSDB data.  DHS TRIP sends a determination letter advising the traveler of the results of the adjudication of the redress inquiry. *Id.* ¶ 60. When appropriate, the DHS TRIP redress process will result in removal of a traveler from the TSDB and/or one of its subsets. Moore Decl. ¶ 12; Groh Decl. ¶ 60.

27.     Once all relevant agencies have reviewed a redress inquiry and record, DHS TRIP issues a determination letter to the traveler. Moore Decl. ¶ 13. In light of national security and law enforcement interests, the determination letter generally provides the results of the individual's redress inquiry without disclosing whether the traveler was, or is, included in a federal watchlist used by TSA for passenger pre-boarding screening (including the TSDB and its subsets) or revealing other sensitive information. Moore Decl. ¶ 14;[3] *see also, e.g.,* March 23, 2015 DHS TRIP Redress letter to Plaintiff Shahir Anwar, Bates No. Elhady-DHSTRIP-000811-12, DEX 56.

---

[3] Additional process is available to U.S. persons who have been denied boarding and request redress through DHS TRIP because they are on the No Fly List. *See* Groh Decl. ¶ 62; Moore Decl. ¶ 17; *see Mohamed v. Holder*, No. 1:11-CV-50 AJT/MSN, 2015 WL 4394958, at *13 (E.D. Va. July 16, 2015).

28.     FBI, TSC, CBP, and TSA have each assessed that disclosure of TSDB status during the redress process—to individuals who have not been denied boarding—would cause harm to national security and law enforcement efforts, and would be detrimental to transportation security, and that disclosure of underlying derogatory information would cause additional harm to national security. Orlando Decl. ¶¶ 19-36; Groh Decl. ¶¶ 64-67; Froemling Decl. ¶¶ 52-60, Howe Decl. ¶ 20. Compelled disclosure of a traveler's TSDB status in these circumstances would have a devastating effect on the usefulness of the TSDB and imperil the effectiveness of critical law enforcement tools used to protect national security. Orlando Decl. ¶¶ 19, 36.

29.     If the Government were forced to disclosed TSDB status—beyond the limited disclosure contemplated by the DHS TRIP process for U.S. persons denied boarding—terrorists would know who would be required to undergo additional screening at airports, and could use that information to attempt to evade security measures to gain access to the commercial aviation system to perpetrate an attack. Froemling Decl. ¶¶ 53-59. The information could be used to identify the best operatives, to predict the likelihood of detection, and to take countermeasures to attempt to avoid that detection, and could specifically compromise countermeasures such as federal air marshals. *Id.* Moreover, requiring disclosure of whether or not an individual is in the TSDB or the reasons for such inclusion, beyond the disclosure contemplated by the DHS TRIP procedures, could jeopardize the integrity and secrecy of ongoing counterterrorism investigative or intelligence activities, and prompt individuals to take countermeasures and evade detection. Orlando Decl. ¶¶ 19-36; *see also* Groh Decl. ¶¶ 64-67; Froemling Decl. ¶¶ 49-59. Finally, DHS TRIP assesses that if the enhanced redress process for U.S. persons on the No Fly List were applied to U.S. persons who receive enhanced screening as a result of TSDB status, its workload for enhanced redress cases would increase by approximately 1400%. Moore Decl. ¶¶ 17-20.

**Information-Sharing**

30.      It is the policy of the U.S. Government not to disclose TSDB status; it is law enforcement sensitive, and certain subset lists of the TSDB are also Sensitive Security Information ("SSI"); *see* 49 U.S.C. § 114(r) and 49 C.F.R. part 1520. Groh Decl. ¶ 61; Orlando Decl. ¶ 20; Howe Decl. ¶ 9; Froemling Decl. ¶ 52 & Ex. A. TSDB information therefore is not shared with the public and is subject to strict access controls. Froemling Decl. ¶ 62. The information is protected from disclosure and is accessible only to persons who have an official "need to know," such as federal law enforcement officials for their screening and vetting functions. Groh Dec. ¶ 10.

31.      Pursuant to HSPD-6, agencies and officials authorized or required to conduct terrorist screening or to use information for diplomatic, military, intelligence, law enforcement, immigration, transportation security, visa, and protective processes are given access to terrorism information to facilitate their respective public missions. Groh Dec. ¶ 30. TSC exports subsets of TSDB information to the following federal government entities: DHS, Department of State, FBI (including the National Crime Information Center ("NCIC"), a database administered by the Criminal Justice Information Services ("CJIS") Division of the FBI to enable information-sharing among law enforcement agencies), and the Department of Defense. *Id.* ¶ 32. For other agencies and events, TSC runs lists of names against the TSDB and reports the results to the agency requester. *Id.* Memoranda of understanding ("MOUs") between TSC and its screening partners specify the terms by which TSDB information is shared and used. *Id.* As a result, TSC can attest that its screening partners use TSDB information for lawful screening purposes, in accordance with their own legal authorities, and subject to the restrictions specified in relevant MOUs. *Id.* Prohibited disclosure of internal government information, let alone information protected by statutory law and privilege (such as TSDB information), constitutes a serious breach of official duties. *Id.*

32.      TSC exports subsets of TSDB data to foreign partners (including all Visa Waiver Program countries) with which TSC has entered into foreign partner arrangements. Groh Decl. ¶ 33.

14

TSC reasonably expects foreign partners to use TSDB information for lawful terrorist screening purposes, subject to their domestic laws and authorities, and subject to the restrictions specified in relevant arrangements. *Id.*

33.     TSC does not provide TSDB information or access to the TSDB directly to any private company. Defendants are not aware of any mechanism, policy or practice that would permit TSDB information to be shared with entities such as car dealerships, banks, financial institutions, or gun dealers. Groh Decl. ¶ 36; Orlando Decl. ¶ 17; Declaration of Robin A. Stark-Nutter, Section Chief, National Criminal Background Check System ("NICS"), CJIS, FBI ¶¶ 11-13 (explaining that TSDB status is not a basis for denial of a firearm and is not communicated to a gun seller). 34.

34.     Indirectly, as discussed in further detail below, certain MOUs permit some limited private access to some TSDB data when it is necessary to carry out or support a government function. Groh Decl. ¶ 35. For example, TSA provides a subset of TSDB information to regulated U.S. airport and aircraft operators for the purpose of vetting passengers and employees in the limited circumstances in which TSA does not conduct such vetting itself. Froemling Decl ¶ 61. All parties authorized to receive TSDB information by TSA, including authorized representatives, must protect this information as SSI and safeguard this information from unauthorized disclosure in accordance with the provisions of 49 C.F.R. part 1520 and are subject to civil penalty and other enforcement action. *Id.* ¶ 62.

35.     TSA also uses TSDB information as part of its process in conducting security threat assessments of individuals who have access to sensitive transportation areas and systems pursuant to regulation. *See, e.g.*, 49 C.F.R. parts 1540 and 1572; Froemling Decl. ¶¶ 3; 49-51. In conducting security threat assessments, TSA's eligibility determinations draw on information provided from multiple federal databases, including the TSDB. Froemling Decl. ¶ 50. An individual's inclusion in one or more government databases is not determinative of TSA's eligibility determinations. *Id.* TSDB status merely serves as a factor indicating that an individual requires further scrutiny. *Id.* Even

if a person applied for employment requiring a TSA security threat assessment, any determination of ineligibility by TSA resulting from that security assessment would be subject to a separate administrative redress process, *see, e.g.,* 49 C.F.R. Part 1515, and review in the Court of Appeals.

36.     CBP receives TSDB information and considers it as an important element of accomplishing CBP's border security responsibilities, and TSDB status is one of many factors that may indicate that additional scrutiny of a traveler is warranted. Howe Decl. ¶ 14. CBP also uses TSDB information to assist in vetting activities, including for example, vetting of applicants for customs seals. *Id.* ¶ 20. While not dispositive, inclusion in the TSDB could indicate that additional research regarding an individual's eligibility for a custom's seal is needed and the derogatory information supporting TSDB status is one of many factors considered in making a determination to grant, revoke or suspend a customs seal. *Id.* ¶ 24. CBP's determination will be based upon all available information, including but not limited to any derogatory information supporting TSDB status. *Id.* Customs seals are governed by a separate administrative scheme with its own appeals process. *See generally* 19 C.F.R. §§ 122.181-89.

37.     TSDB exports enable the FBI to share relevant information necessary for its partners to carry out their respective missions in a concerted effort to prevent terrorist attacks. Orlando Decl. ¶ 16. The TSDB allows FBI to leverage the combined resources of state, local and federal law enforcement to provide information on the activities of known or suspected terrorists whom they encounter. *Id.* The TSC exports a subset of TSDB, referred to as the Known or Suspected Terrorist ("KST") File, to the NCIC. Orlando Decl. ¶ 17. Users access information in the NCIC Files by entering a name and identifier, such as a date of birth or social security number; a user cannot perform a search if only a name is entered, and information is returned to the user only if both the name and numeric identifier match a record in any of the files in NCIC. Declaration of Scott A. Rago, Acting Deputy Assistant Director, Operational Programs Branch, CJIS, FBI, DEX52, ¶ 6. NCIC access is available to over 18,000 governmental law enforcement entities nationwide. DEX

58. In order for an entity to search information in the NCIC, the entity must apply for and obtain an Originating Agency Identifier ("ORI") from the CJIS Division. Rago Decl. ¶ 9. NCIC access is subject to stringent security controls and regular audits, and the applicable federal security policy is set forth in the CJIS Security Policy. *Id.* ¶¶ 20-23;[4] *see* https://www.fbi.gov/file-repository/cjis-security-policy_v5-7_20180816.pdf/view.

### The Plaintiffs[5]

38.     All of the Plaintiffs are U.S. citizens. Although four of the Plaintiffs were previously denied boarding on flights, none of the Plaintiffs believe they are currently on the No Fly List, and none of the Plaintiffs has been prohibited from travel. Dkt. No. 47, at 2 n.2. None of the Plaintiffs believes that he has been denied the ability to purchase a gun because of the watchlist.[6] None of the Plaintiffs has ever:  sought a HAZMAT license; been denied a job at an airport, or been denied the ability to board a ship or boat.[7]  None of the Plaintiffs claims to have been informed by government officials whether they are on a watchlist that would require enhanced screening.

---

[4] A limited number of private entities (estimated at 533) have access to the NCIC because they are performing or supporting law enforcement functions. In order to obtain an ORI, a qualified private entity must certify the criminal justice duties the entity will be performing, either as a qualified police department of a railroad or college or university, 28 U.S.C. § 534(e), or on behalf of a criminal justice agency pursuant to 28 C.F.R. § 20.33(a)(6)-(7), and if applicable, must also submit the contract between the criminal justice agency and the entity, which must include the FBI CJIS Security Addendum. *See* Rago Decl. ¶¶ 10-16, 24; *see also* 28 C.F.R. § 20.20(a) The Security Addendum limits the use of the NCIC information, ensures the security and confidentiality of the information consistent with regulations and CJIS security policies, provides for sanctions for misuse, and contains such other provisions as the Attorney General may require. Rago Decl. ¶¶ 14-15.

[5] The following statement of facts is recited in the light most favorable to the Plaintiffs, consistent with the standard for summary judgment. Defendants do not concede all of Plaintiffs' recited claims.

[6] *See* DEX6, at 55; DEX8 at 155; DEX10 at 115-16; DEX12, at 110-12; DEX14 at 100-01; DEX16 at 75; DEX18 at 173; DEX19 at 143-44; DEX22 at 82-83; DEX24, at 131; DEX26 at 235-36; DEX28 at 164-68; DEX30 at 240-43; DEX32 at 262-70; DEX34 at 225-26; DEX36 at 159; DEX38 at 111; DEX40 at 262-64; DEX42 at 277; DEX44 at 189-92; DEX46 at 179; DEX48 at 287-91; DEX49 at 149.

[7] *See* DEX6 at 55-58; DEX8 at 155-56; DEX10 at 111-15; DEX12, at 100-01, 109-10; DEX14 at 101-03; DEX16 at 75-77; DEX18 at 173-76; DEX19 at 143-46; DEX22 at 83-86; DEX24 at 132-33; DEX26 at 236-40; DEX28 at 168-71; DEX30 at 243-46; DEX32 at 270-71; DEX34 at 226-28; DEX36 at 159-62; DEX38 at 111-12; DEX40 at 265-67; DEX42 at 277-79; DEX44 at 192-95; DEX46 at 179-180; DEX48 at 291-93; DEX49 at 149-51.

39.    **Osama Ahmed:** Since reaching the age of majority,[8] Ahmed has thrice (in 2010-2011, 2014, and 2016-2017, respectively) traveled by air to Yemen. DEX5 p. 6-9. On the latter two trips, he was selected for enhanced screening by TSA, and on each of the trips, he was referred for secondary inspection by CBP upon his reentry into the U.S. *Id.*; DEX6 at 20-24, 32-33, 37-40, 44-45. Upon his reentry in 2011, CBP officers detained a USB drive in order to complete a border search; FBI agents subsequently returned the drive to him in a home visit. DEX5 at 6; DEX6 at 25-28. In 2017, he missed a connecting flight following this border inspection, and was rebooked for a flight that departed one or two hours later. DEX6 at 44-45. Ahmed did not have any issues flying to Washington, DC for his deposition in February 2018. *Id.* at 72-73.

40.    Osama Ahmed completed a DHS TRIP traveler inquiry form on April 20, 2011, related to enhanced screening. DHS TRIP issued a final determination letter in response to that inquiry on or about October 4, 2011. Moore Decl. ¶ 24.

41.    **Ahmad Al Halabi**: In 2005, Al Halabi entered the U.S. by land near San Diego, and was questioned, searched, and he estimates that he was detained for approximately four and a half hours. DEX7 at 5-6.[9] From 2005 to 2016, Al Halabi lived in Dubai. DEX8 at 32. Between 2012 and 2017, he took approximately seven round trip international flights and three round trip domestic flights. DEX7 at 6-8. During that time, when he traveled by air to the U.S., prior to boarding he was questioned by someone from the U.S. Embassy; upon arrival in the U.S., he estimates that he would be questioned by CBP up to four and a half hours, and he afterwards missed two connecting flights. DEX8 at 37-41, 48-51, 72, 88-89. He was also selected for enhanced screening by TSA, which he

---

[8] While a minor, Ahmed traveled around twice a month from the U.S. to Canada. DEX5 at 5-6. He estimates that around 70% of those trips involved an inspection delay of around 15 minutes, on the "low end," and around 20 percent were four to five hours, on the "high end." DEX6 at 20.

[9] Defendants do not concede that any of Plaintiffs' estimated timeframes regarding their various screening and inspection encounters are accurate, and in the event this case were to proceed to trial, reserve the right to question or impeach Plaintiffs regarding these assertions. However, for the purposes of this summary judgment motion only, Defendants do not dispute that the timeframes provided are in fact Plaintiffs' estimates.

recalls lasting 30 to 45 minutes. *Id.* at 54-55, 60. In 2014, Al Halabi and his family entered the U.S. by land from Canada, and were detained at the border for approximately five hours. *Id.* at 74-79, DEX7 at 7. He continued travelling, and beginning in 2016, he "started seeing less and less interrogation and . . . invasive searching," including on two trips to Canada, and he had no problems travelling for his deposition. DEX8 at 107-08.

42.     Al Halabi recently worked for a contractor, for which employment he acquired a security badge giving him full access to the Detroit airport's facilities. DEX8 at 151-52. He has submitted three DHS TRIP inquiries and was issued a final determination letter each time. Moore Decl. ¶ 25.

43.     **Saleem Ali:** From 2011 to 2017, Ali traveled by air on more than 15 flights. DEX9 at 5-9, 12-15.[10] Upon reentry into to the U.S. in 2011, he recalls being questioned by CBP for around three hours. DEX10 at 34. On an outgoing domestic flight in 2014, he experienced additional screening at the TSA checkpoint, and was told it was random selection. *Id* at 41. Upon reentry from a March 2017 trip to Indonesia, he recalls being questioned by CBP for 45 minutes; he was told his selection for this questioning was random. DEX10 at 69-71; DEX9 at 8.

44.     From 2014 to 2016, Ali frequently exited and reentered the U.S. by land. On two or three occasions in 2014 and 2015, Ali was detained and questioned by CBP, which he recalls lasting about 30 to 45 minutes. DEX10 at 45, 55-56. On one occasion in October 2015, Ali was detained for secondary inspection, which he estimates lasted approximately six hours, and was told to return the next day to retrieve his phone. *Id.* at 49-53. From September and December 2017, Ali made 12 additional trips into Canada as part of his employment as a truck driver. DEX9 at 5-11. After driving

---

[10] Ali testified that some of his international travel by air between 2011 and 2016 does not appear in his interrogatory responses, but did not explain the omission. DEX10 at 39-40, 43. He also testified that several of the dates of other travel described in his interrogatory responses are incorrect. For example, a 2011 trip to Indonesia is incorrectly described as having taken place in 2016. DEX10 at 56-59; *compare* DEX9 at 8 ¶ 19. Another trip by land to Canada is incorrectly listed as taking place in November 2016, when it occurred in 2015. DEX10 at 60; *compare* DEX9 at 10 ¶ 12.

into Canada, Ali would return to the U.S. by air. DEX10 at 77-79. He was unable to obtain a

boarding pass from a self-service kiosk for these flights; he did not encounter any additional security

screening at the checkpoint. *Id.* at 78-80, 86-89.

45.     Ali continued travelling and did not undergo additional or enhanced screening or

secondary inspection when traveling internationally by air or land on other occasions between 2015

and 2017. *Id.* at 48, 68, 90-92.

46.     Ali submitted a DHS TRIP inquiry on March 15, 2011, related to travel difficulties.

DHS TRIP issued a final determination letter in response to that inquiry on or about March 30,

2011. Moore Decl. ¶ 26.

47.     **Mark Amri:** Between June 2006 and July 2014, Amri exited and re-entered the U.S.

by air or land on at least six occasions, without any relevant incident. DEX11 at 5-6; DEX55.[11]

48.     Amri also flew domestically without incident in June 2014. DEX11 at 7; DEX 12 at

40. In January 2016, Amri attempted to fly to Las Vegas, but was unable to obtain a boarding pass at

the airport. DEX11 at 8; DEX12 at 42-44. Amri subsequently submitted a DHS TRIP inquiry on

March 4, 2016, related to a denial of boarding. DHS TRIP issued a final determination letter in

response to that inquiry on or about September 1, 2016, which stated, "At this time the U.S.

Government knows of no reason, related to your inquiry, that you should be unable to fly." Moore

Decl. ¶ 27. In August 2016, Amri flew to San Francisco, and was required to undergo enhanced

screening at the TSA checkpoint. DEX11 at 7-8; DEX12 at 48-52. In March 2018, prior to boarding

a connecting flight en route to his deposition in this litigation, a swab taken from Amri's hands

tested positive on an explosive trace detection test; he was thereafter required to undergo two pat-

downs because a trainee had erroneously been assigned to conduct the first pat-down, requiring that

---

[11] Amri has fully and completely disclaimed as a factual matter that he was in any way injured by
Defendants' conduct during his international travel experiences, and his international travel experiences
do not form any part of his claims against Defendants. DEX55 (Stipulation).

it be re-done. Amri missed his connecting flight and was rebooked on a later flight. *See* Dkt. No. 187

(Defs.' Opp'n Mot. for Disc.) p. 2, Dkt. No. 187-4 (Decl. of Timothy Joseph).

49.      **Samir Anwar:** Samir Anwar estimates that prior to 2014, he made 15 round trips by

car into Canada, all without incident. DEX14 at 79-82. In May 2014 and again in February 2015,

Anwar was detained by CBP, which he estimates lasting for approximately 3.5 hours, upon crossing

into the U.S. by land from Canada; on each occasion, he received a patdown search and was

questioned. *Id.* at 67-73, 83-89; DEX13 at 6-7. He chose to forego an additional trip to Canada.

DEX 14 at 92-93. In September 2017, he again traveled to Canada, without incident. *Id.* at 94;

DEX13 at 7-8.

50.      In June 2014, Samir Anwar flew round-trip domestically and on both legs was

screened for approximately 15 additional minutes at the security checkpoint. DEX14 at 31-41. Aside

from this trip, he has "never ha[d] an issue or delay boarding a flight." *Id.* at 62-63. Since then, he

has flown domestically without incident on at least three occasions. *Id.* at 47-57, 61-62; DEX13 at 9-

10.

51.      Samir Anwar completed a DHS TRIP traveler inquiry form on July 9, 2014, related

to enhanced screening. DHS TRIP issued a final determination letter in response to that inquiry on

or about August 7, 2014. Moore Decl. ¶ 28.

52.      **Shahir Anwar:** Since 2005, Shahir Anwar has traveled by land to Canada and back

approximately once or twice per year, without issue. DEX16 at 43-44; 65-66; DEX15 at 6. In 2006,

he additionally entered the U.S. by land from Canada, after traveling by air round-trip from Toronto

to Afghanistan with his parents; their luggage was searched at the border, and they were detained at

the border for an estimated two to three hours. DEX16 at 46-48. In 2010, Shahir Anwar flew

internationally without incident. DEX15 at 5-6; DEX16 at 48-51.

53.      Shahir Anwar has also flown round-trip domestically five times. DEX15 at 7-9. On

trips in 2013 and 2014, he was unable to print his boarding pass from a kiosk. Security searched him

and through all of his items. *Id.*; DEX15 at 58-62. Subsequently, he has taken at least three additional domestic airline trips, all without incident. DEX15 at 9; DEX16 at 62-65, 74. He does not believe his reputation has been affected by his purported watchlist status. DEX16 at 82-83.

54.     Shahir Anwar completed a DHS TRIP traveler inquiry form on November 3, 2014, related to enhanced screening. DHS TRIP issued a final determination letter in response to that inquiry on or about March 23, 2015. Moore Decl. ¶ 29.

55.     **Ibrahim Awad:** Since becoming an adult (around 2009), Awad has encountered no unusual security on domestic flights, including on at least four round trips. DEX17 at 11; DEX18 at 108-18. He makes no allegation that he was ever subject to any significant delays by CBP. Rather, on a connecting flight to the U.S. from Turkey (via the Netherlands) in 2013, he was subjected to patdowns and questions by the Netherlands security, but entered the U.S. without delay. DEX18 at 37-42. In 2014, he was questioned by NYPD officers at customs, which he recalls taking about 15 minutes. *Id.* at 55-65. In 2017, he flew from Saudi Arabia to the U.S. via Canada; on the first leg of this trip he and others were selected for additional screening by foreign officials at the gate; he experienced no delay. *Id.* at 72-82.

56.     Awad has made several trips to Canada by car, including three trips in which he estimates he was questioned at the border for less than an hour. DEX17 at 5-10. He continued travelling, and in December 2016, he crossed the border without incident or delay. DEX18 at 95-96.

57.     In 2016, Awad was required to undergo a short waiting period before Buff Whelan Chevrolet in Sterling, Michigan, would lease a truck to him. *Id.* at 126-49. Subpoenaed records reflect that Awad's name was a near match to a name on the Specially Designated National ("SDN") list maintained by the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC"); accordingly, the dealer was required to verify that Awad was not the individual on the list before it could complete the transaction. Declaration of Amy Powell, attaching Subpoena Response from

Robert Y. Weller, February 2, 2018, *attached as* DEX54. Accordingly, the apparent delay in his test drive was unrelated to the TSDB.[12]

58.     DHS TRIP has no record of receiving any inquiry from Awad. Moore Decl. ¶ 30.

59.     **Michael Coleman:** Between 2012 and 2015, Coleman traveled to Canada by land on multiple occasions, without incident. DEX19 at 55. During his last such entry, in or about March 2015, he was subject to secondary inspection that he recalls lasting one to two hours. *Id.* at 51-53.

60.     Coleman has taken at least five round-trip domestic flights and four round-trip international flights since 2015. DEX20 at 5-13. Between 2015 and 2017, he was routinely required to undergo enhanced screening by TSA; in conjunction with delays in obtaining his boarding pass, he estimates that he was typically delayed by thirty minutes to one hour. DEX19 at 87. Coleman missed one flight due to enhanced screening, *Id.* at 74-75, 88, and was twice referred for secondary inspection by CBP upon returning to the U.S. *Id.* at 96-97, 105-06.

61.     Between September 2017 and February 2018, Coleman traveled more than five times by air domestically, and twice internationally. *Id.* at 118 Coleman did not experience any travel difficulties in connection with these trips. *Id.* at 119. Coleman does not believe that he is currently on any watchlist. *Id.* at 154.

_____

[12] Dr. Ibrahim Awad Ibrahim Al-Badri remains on the SDN List because he was designated by the State Department pursuant to Executive Order 13224, 66 Fed. Reg. 49079 (2001). *See* https://sanctionssearch.ofac.treas.gov/Details.aspx?id=2971; https://www.un.org/press/en/2011/sc10405.doc.htm; https://www.treasury.gov/resource-center/sanctions/OFAC-Enforcement/Pages/20111004.aspx; https://2009-2017.state.gov/r/pa/prs/ps/2011/10/174971.htm. U.S. persons, including financial institutions, are generally prohibited from conducting any business with designated persons. *See* E.O. 13224; 50 U.S.C. §§ 1701-06. Accordingly, it is common practice at financial institutions to automatically search for close matches and to ensure that near matches to SDN list have provided verification of their identity. *See generally* OFAC FAQs, https://www.treasury.gov/resource-center/faqs/Sanctions/Pages/faq_lists.aspx#sdn ("**What do I do if I have a match to the Specially Designated Nationals (SDN) or one of OFAC's other sanctions lists?**  If you have checked a name manually or by using software and find a match, you should do a little more research. Is it an exact name match, or very close? Is your customer located in the same general area as the SDN or another entry on one of OFAC's sanctions lists? If not, it may be a 'false hit.' If there are many similarities, contact OFAC's "hotline" at 1-800-540-6322 for verification.").

62.     Coleman's sole application to DHS TRIP was administratively closed due to his failure to provide the requisite documentation. Moore Decl. ¶ 31.

63.     **Baby Doe:** Baby Doe has taken three roundtrip international flights. DEX21 at 5-6. On one trip, both Baby Doe and Baby Doe's father's boarding passes were stamped "SSSS." DEX22 at 44. Upon arrival in the U.S., Baby Doe's father was referred for secondary inspection, while Baby Doe remained with his mother. *Id.* at 48-49. Baby Doe was suffering from a fever and his father requested that CBP call an EMS to evaluate him, which CBP obliged. *Id.* at 50-51. Baby Doe traveled without incident on the other two trips. *Id.* at 59-60; DEX21. DHS TRIP has not received an inquiry on behalf of Baby Doe 2. Moore Decl. ¶ 32.

64.     **John Doe 2:** Doe 2 has never encountered enhanced screening on domestic flights, including more than 20 flights from 2000 to 2018. DEX23 at 8-11; DEX24 at 26-54, 120-22. From 2006-2015, he flew four times to Turkey. DEX23 at 5-8. He encountered no unusual airport security, but on re-entry was stopped and interviewed by CBP, and his luggage and electronic devices were searched; he estimates that delays were between 1-3 hours. DEX24 at 63-107. Doe 2 completed a DHS TRIP traveler inquiry form on December 21, 2015, related to travel delays. DHS TRIP issued a final determination letter in response to that inquiry on or about January 21, 2016. Moore Decl. ¶ 33. He plans to travel internationally in 2019, and is concerned that it may take extra time or affect his wife. DEX24 at 114-15, 143-45.

65.     **John Doe 3:** Since 2002, Doe 3 has flown internationally and domestically on multiple occasions. *See generally* DEX25.[13] He claims to have received enhanced screening from TSA

---

[13] At a discovery hearing on January 19, 2018, Magistrate Judge Anderson ruled from the bench that Plaintiffs "will be limited to those instances of disruption, or impeding their liberty, or whatever they claim is a result of the watchlist to those that have been identified as of today either through answers to interrogatories or through the depositions that have been taken [through] today." Jan. 19 Tr., attached as DEX58, at 25-26. Notwithstanding this clear instruction, when Doe 3 supplemented his interrogatory responses on February 2, 2018, he improperly attempted to bring new events, disclosed for the first time at this belated date, into the suit. Because these events are excluded from the suit, Defendants do not discuss them above.

on all domestic flights, DEX26 at 109-10, 144, but does not recall any specific incidents for at least

five domestic round trip flights. *Id.* at 194-202; 203-04. He has also encountered additional screening

or inspection during at least two international trips, which involved questioning, physical search, and

searches of electronic devices. *Id.* at 109-10, 146-49.

66.     In 2016, Doe 3 estimates that he was detained for approximately 5.5 hours while

reentering the U.S. by land from Canada. Officers drew their weapons while he exited his car, and

CBP performed border searches of his and his family's electronic devices. DEX25 at 5-7; DEX26 at

46-71.

67.     Doe 3 moved from the U.S. to Germany in January 2017. DEX25 at 13.

Subsequently, he has traveled to Morocco, Saudi Arabia, Turkey, and Canada. DEX26 at 213.

68.     DHS TRIP has no record of receiving any inquiry from Doe 3. Moore Decl. ¶ 34.[14]

69.     **John Doe 4:** In July 2012, Doe 4 traveled round-trip from Detroit to Oman, without

incident. DEX27 at 5-6; DEX28 at 19, 24-26. His passport additionally bears a stamp marked

January 3, 2013; Doe 4 does not allege anything with respect to this trip. DEX27. In August 2016,

he was denied boarding on an intended flight to Morocco. DEX27 at 6; DEX28 at 29-33. Doe 4

subsequently submitted a DHS TRIP inquiry on August 3, 2016, related to a denial of boarding.

DHS TRIP issued a final determination letter in response to that inquiry on or about September 21,

2016, which stated, "At this time the U.S. Government knows of no reason, related to your inquiry,

that you should be unable to fly." Moore Decl. ¶ 35.

70.     In September 2016, Doe 4 flew to Morocco. DEX28 at 44. At the boarding gate,

officers searched his luggage and questioned him for approximately 30 minutes; otherwise, the trip

and return flight were without incident. DEX28 at 45-48, 59-61; DEX27 at 6-7. Since September

2016, Doe 4 has flown domestically on at least two occasions, without incident. DEX28 at 71-73,

---

[14] Doe 3 claims to have attempted to submit one. DEX26 (Doe 3 Tr.) at 211. DHS TRIP cannot receive
files over 10MB. Moore Decl. ¶ 22 n.8.

85-86; *see id.* 49 (stating that since this time, air travel has been "easy"). Doe 4 has also entered the U.S. by land twice, without incident. DEX27 at 7.

71.     **Anas Elhady:** Between 2012 and 2018, Elhady took approximately seven one-way international flights with a departure or arrival point in the U.S.[15] DEX29 at 6-12. His departures on these trips were without incident, DEX30 at 43-45, 77-78, 88-89, except for a "system issue" that delayed his and his family's check-in by an hour in 2017, *Id.* at 114. During this same period, upon his re-entry to the U.S., CBP searched Elhady's luggage and questioned him for periods of two hours, DEX29 at 6, DEX30 at 70-72; one hour, DEX29 at 6, DEX30 at 84-85; four hours, DEX29 at 6-7, DEX30 at 91, 93-95, and thirty minutes. DEX29 at 7; DEX30 at 123-25.

72.     Between 2013 and 2018, Elhady took at least three round trip domestic flights, all without any incident relevant to this suit. DEX29 at 13-14, DEX30 at 46-50, 127-28.

73.     Elhady also traveled by land from the U.S. to Canada on at least eight occasions between 2014 and 2015. DEX29 at 8-12. During this time, he was typically questioned, searched, and detained by CBP for approximately three to eight hours. *Id.*; DEX30 at 131-35, 142-44. On two occasions, his cell phone was detained; each time it was returned to him approximately two months later. DEX29 at 9-10. During one re-entry in April 2015, Elhady claims he was detained by CBP for somewhere between 6 and 12 hours, *compare* Am. Compl. ¶ 148 (alleging detention of 6 hours) *with* Tr. p. 186 (10 hours) *with* DEX29 (Interrogatory responses, 12 hours), during which time he also received medical care at a hospital. DEX29 at 12; DEX30 at 179, 182-93.

74.     Elhady submitted a DHS TRIP inquiry on January 27, 2015, related to enhanced screening. DHS TRIP issued a final determination letter in response to that inquiry on or about May 11, 2015. Moore Decl. ¶ 36.

---

[15] Additionally, from July through September 2012, Elhady traveled by air among several countries in Africa and the Middle East, without relevant incident. DEX 78-80, 82.

75.     **Ausama Elhuzayel:** Prior to 2016, Elhuzayel traveled by air on multiple occasions without incident. DEX31 at 5-6; DEX32 at 125, 136-37, 160. On April 23, 2016, Elhuzayel was denied boarding on a flight to San Juan. DEX31 at 7-8; DEX32 at 125-31. Elhuzayel subsequently submitted a DHS TRIP inquiry on April 24, 2016, related to a denial of boarding. DHS TRIP issued a final determination letter in response to that inquiry on or about December 6, 2016, which stated, "At this time the U.S. Government knows of no reason, related to your inquiry, that you should be unable to fly." DEX32 at 280-81; Moore Decl. ¶ 37.

76.     Since then, he has taken two trips by air, and encountered additional screening. DEX31 at 5-6; DEX32 at 53-106, 138-50. For each flight, he was delayed at check-in, required to undergo additional screening, and screened again at the gate before each connecting flight, and his estimates of the time required varied. *Id.* When re-entering the U.S., he estimates that he was questioned for about three hours. DEX32 at 89-97. Some flights had to be re-booked due to delays. He has not avoided travel due to his perceived placement. DEX32 at 184.

77.     **Zuhair El-Shwehdi:** El-Shwehdi has flown commercially more than 20 times since 2011, including 17 domestic flights, and has regularly experienced enhanced security screening at the airport. DEX33 at 5-12. He estimates that he was typically delayed 30-45 minutes at check-in, as well as 20-30 minutes at security screening, and that it was "substantially similar" for all trips. *Id.*; DEX34 at 58. On four trips to Libya between 2011 and 2013, he was inspected at customs on re-entry; he estimates that the inspections were usually about two hours but once he recalls approximately six hours. DEX33 at 5-8; DEX 34 at 145-70, 176-81. On three of these occasions, he missed his connecting flight and was required to stay overnight at the transfer point before continuing to his final destination. *Id.* He has continued to travel, but sometimes avoids flying as a result. DEX34 at 202-06, 253.

78.     El-Shwehdi completed a DHS TRIP traveler inquiry form on August 18, 2016, related to enhanced screening. DHS TRIP issued a final determination letter in response to that inquiry on or about November 21, 2016. Moore Decl. ¶ 38.

79.     **Hassan Fares:** Hassan Fares has taken at least 14 round-trip domestic flights and at least seven round-trip international flights since 2005. DEX35 at 5-11. Beginning in 2005, he was unable to print his boarding pass at a self-service kiosk, but experienced no other issues while traveling. DEX36 at 29-32, 38. At some point between 2010 and 2014—continuing to the present day—he became able to check in at the self-service kiosk. DEX36 at 43-45, 55, 105-06.

80.     In May 2015, Fares and his wife were questioned at the gate for approximately ten minutes before boarding a flight to Jordan. DEX35 at 6; DEX36 at 78-81. In August 2016, Fares missed a connecting flight from Detroit to Jordan after TSA officers asked him to deplane after boarding, for additional security screening. DEX35 at 9; DEX36 at 101-02. He was initially rebooked on another flight, but decided to forego his travel to Jordan. No one told Fares that he could not fly to Jordan. DEX36 at 103.[16]

81.     Between 2005 and 2014, Fares made "numerous" land border crossings from Detroit to Canada and back. DEX35 at 7. When crossing back into the U.S., Fares would be questioned he estimates for "maybe 10, 15 minutes." DEX36 at 65-66. The maximum amount of time that he estimates he was delayed for questioning was 1.5-2 hours. *Id.* at 71. In 2017, Fares flew from the U.S. to Jordan three times without incident, with the sole exception that on one occasion he was questioned by CBP for approximately one hour upon arrival in the U.S. *Id.* at 123, 129, 139.

82.     DHS TRIP has no record of receiving any inquiry from Fares. Moore Decl. ¶ 39.

---

[16] Fares contacted TSA, who responded via e-mail that "[t]he Officer who was checking [Fares's] documents prior to entering the Checkpoint failed to recognize the selectee boarding pass" which should have alerted the TSA Security Officer that he was to receive additional screening before leaving the Checkpoint. DEX 36 (Fares Depo. Ex. 12).

83.    **Murat Frljuckic**: Between 2002 and 2009, Murat Frljuckic took six round-trip international flights, without incident. DEX37 at 5-7; DEX38 at 36-40.

84.    Between December 2012 and April 2013, he traveled by air between Detroit and New York on a monthly basis. During these trips, he was selected for enhanced screening by TSA. DEX37 at 9; DEX38 at 60. In June 2014, he flew from Canada to Montenegro, via Vienna. He was unable to print his boarding pass and missed the flight to Vienna. The airline booked Frljuckic and his family on another flight for the following day. DEX38 at 74-76.

85.    On five occasions between October 2012 and May 2016, Frljuckic traveled to Canada by car. *Id.* at 46-51, 66-69, 81-85, 93-94, 101-03. On each occasion, upon re-entry to the U.S., CBP officers drew their weapons and handcuffed Frljuckic before he was held for inspection for what he estimates was approximately 3.5 to four hours; on one occasion, he estimates that the inspection lasted six hours. *Id.* at 105, 82-83.

86.    Frljuckic first completed a DHS TRIP inquiry on November 7, 2012, related to enhanced screening. DHS TRIP issued a final determination letter in response to that inquiry on or about January 4, 2013. Frljuckic submitted a second DHS TRIP inquiry on August 18, 2014, related to enhanced screening. DHS TRIP issued a final determination letter in response to that inquiry on or about October 31, 2014. Moore Decl. ¶ 40. Frljuckic claims that he has stopped flying and does not "want to go anywhere crossing the borders" he claims he made his most recent trip to Canada in May 2016 because his "intention was really to move there." DEX38 at 103.

87.    **Wael Hakmeh:** In April 2014, upon reentry to the U.S. from travel to Syria, Hakmeh was questioned about his travels, which he estimates delayed him by one to two hours, and he missed his connecting flight. DEX39 at 6-7; DEX40 at 53-63. Subsequently, when he flew internationally, he generally drove to (and flew out of) Chicago, in order to avoid the need for a connecting flight. *Id.* at 68-69. Out of at least ten subsequent international trips, he recalls being referred for secondary inspection twice: in Abu Dhabi, in March 2017, DEX39 at 6-7; DEX40 at

212-15; and upon reentry to the U.S. in July 2017, DEX 39 at 5; DEX40 at 219-22. Hakmeh has also taken at least five domestic roundtrip flights between 2013 and 2018. DEX39 at 8-10; *see also* DEX40 at 158-59, 232, 234. On one of these trips, in June 2016, he was required to undergo enhanced screening, on both legs of the trip. DEX39 at 9-10; DEX40 at 156-57. He encountered no relevant issues on subsequent domestic roundtrip flights. DEX39 at 9.

88.     DHS TRIP has no record of receiving any inquiry from Hakmeh. Moore Decl. ¶ 41.

89.     **Yasseen Kadura**: Between 2009 and 2011, Kadura flew roundtrip twice domestically and once internationally, without incident. DEX41 at 9-11; DEX42 at 45, 48, 59, 60-64, 72-74.[17] In February 2011, he additionally flew to Cairo, and from there traveled by land into Libya. DEX41 at 5; DEX42 at 83, 85-87. Upon his reentry into the U.S. in August 2011, he was detained by CBP and searched, which he recalls lasting about one hour, DEX41 at 6-7; DEX42 at 104, 113-16.

90.     In 2011 and 2012, Kadura made at least five trips by land into Canada. On three of these occasions, he estimates he was detained for six to eight hours, and received a patdown search and was questioned. DEX41 at 7-8; DEX42 at 132-33, 136-37, 158-67, 211. Once, officers drew their weapons while he exited his car, and his phone was detained for the completion of a border search. DEX41 at 162-67. Two other land entries from Canada were without incident. *Id.* 158-61.

91.     On October 22, 2012, Kadura was denied boarding on an attempted flight to Istanbul. *Id.* at 189, 191-93. In August 2015 Kadura entered the U.S. by land, at Laredo. He was detained and questioned by CBP, which he estimates lasted approximately seven hours. *Id.* at 235-39. Between 2014 and 2017, he claims he declined to travel on a number of occasions due to his perceived watchlist status. *Id.* at 260-62.

---

[17] Kadura has provided conflicting testimony about the date of one of these trips, from Indianapolis to Charlotte. His interrogatory responses (including a final amended version served subsequent to his deposition) identify this trip as occurring in 2009, but at his deposition he testified that this trip "was most definitely in like 2011 or so." DEX42 at 68-70.

92.     Kadura completed a DHS TRIP traveler inquiry form on November 21, 2012, related to a denial of boarding. DHS TRIP initially issued a final determination letter in response to that inquiry on or about May 8, 2013. DHS TRIP issued a superseding final determination letter on or about September 4, 2015, which stated, "At this time the U.S. Government knows of no reason Mr. Kadura should be unable to fly." Moore Decl. ¶ 42.

93.     In January 2016, Kadura made a round-trip domestic trip; on both legs, he received enhanced screening from TSA. DEX42 at 242-45, 251-52. Since January 2016, he has taken at least four round-trip domestic trips, on which he has experienced "zero" travel issues. *Id.* at 253-56; DEX41 at 10-11.

94.     **Muhammad Khan**: In 2012, Khan was referred for secondary inspection upon entering the U.S. by land in Michigan. DEX43 at 5-6; DEX44 at 93-95. In 2013, Khan moved to Islamabad; this trip was without incident. DEX44 at 103-04. In 2015, he moved back to Michigan; upon his arrival in the U.S., he was referred for secondary inspection by CBP, and missed his connecting flight. DEX43 at 7-8, 12; DEX44 at 29-35, 131-33.

95.     In 2016 and 2017, Khan took three round-trip international trips. For his departure flights, he was selected for enhanced screening by TSA, and at the boarding gate his luggage was re-inspected. DEX43 at 6-9, 12; DEX44 at 35-36, 39, 41-42, 45-50, 52, 64-71, 150-54. On his return trips, he estimates that he was delayed by thirty minutes to three hours in obtaining his boarding passes, and upon arrival in the U.S. received secondary inspection. DEX43 at 6-7, 9; DEX44 at 35-36, 42, 45-46, 52-53, 55-59, 63, 65, 78, 80-81, 83-84.

96.     Khan claims he has foregone specific trips due to his perceived TSDB status. DEX44 at 166, 168. He also claims he has driven to avoid any issues at the airport. *Id.* at 157-58, 161-64, 166. Khan has also flown domestically "quite a few time[s]," *id.* at 155, including a minimum of three round-trip flights. On a trip to Los Angeles in 2016, he was selected for enhanced screening

31

by TSA on both legs. DEX43 at 11; DEX44 at 137-46. Two other trips, of unknown dates, were without incident. DEX44 at 156-57.

97.     Khan first submitted a DHS TRIP inquiry on January 7, 2014, related to enhanced screening. DHS TRIP administratively closed this inquiry on or about February 26, 2014, due to plaintiff Khan's failure to submit required documentation. Plaintiff Khan submitted a second DHS TRIP inquiry on April 13, 2015. DHS TRIP issued a final determination letter in response to that inquiry on or about July 14, 2015. Moore Decl. ¶ 43.

98.     **Adnan Khalil Shaout**: Shaout has taken approximately 36 international flights and at least ten domestic flights since 2004. DEX45 at 5-17. Shaout first began experiencing additional screening and inspection in December 2004 when he was returning to Detroit from a conference in Algeria. DEX46 at 34-36. As a result of the inspection, he missed his connecting flight. *Id.* at 90. Between December 2004 and May 2017, Shaout experienced delays in obtaining his boarding pass. *Id.* at 137, 143. In addition, upon reentry to the U.S., he would be subject to secondary inspection by CBP, *Id.* at 38-39, 77-78, 86-87, which he estimates typically lasted half an hour to three hours, *Id.* at 170. In June 2011, Shaout was asked to deplane after boarding a domestic flight, which was held until he was cleared. *Id.* at 74-75. Once Shaout was screened an additional time at the gate after clearing the security checkpoint. *Id.* at 88-89.

99.     Since May 2017, Shaout has not experienced enhanced screening or inspection by TSA or CBP. *Id.* at 72.

100.    Shaout submitted three DHS TRIP inquiries between 2011 and 2015 and received a final determination letter in response to each. Moore Decl. ¶ 44.

101.    **Hassan Shibly:** Shibly entered the U.S. by land at the U.S.-Canada border on 12-13 occasions between 2004 and 2017. DEX47 at 8-10. Until 2016, he was routinely referred by CBP for secondary inspection, which he estimates to have lasted anywhere from 15-30 minutes, up to "an

hour or two, plus" with "an hour, two being the norm." DEX48 at 112-13. On one occasion in 2004, he estimates that the inspection lasted approximately six hours. DEX48 at 48.[18]

102.     Shibly took at least ten round-trip international flights between 2006 and 2016, and has also taken more than 80 domestic flights since 2015. DEX47 at 5-8, 12-13 (citing Shibly-000143-Shibly-000455). Beginning in approximately 2010, Shibly was unable to check in for flights online and he could not always print his boarding pass at a kiosk; when he could not, he estimates that he would wait 15-20 minutes for an airline agent to assist him, with the longest time taking around 45 minutes. DEX48 at 86, 89-90, 131. Typically, if he was unable to print his boarding pass, then he was also selected for enhanced screening by TSA. *Id.* at 102. Twice, he missed a flight due to such screening. *Id.* at 104, 124-27. On the second of these two occasions, Shibly was only having problems printing a boarding pass with one specific airline. *Id.* at 188-89, 209. During this time period, Shibly also traveled by land and by air, domestically and internationally, without incident or delay. *Id.* at 141-45. As of the time of his deposition, Shibly does not recall experiencing any travel problems since 2016, and he continued to travel. *Id.* at 190.

103.     Shibly first submitted an inquiry to DHS TRIP on November 30, 2009, related to enhanced screening. DHS TRIP issued a final determination letter in response to that inquiry on or about March 8, 2011. Shibly subsequently submitted a DHS TRIP inquiry on August 26, 2013, related to travel difficulties. DHS TRIP issued a final determination letter in response to that inquiry on or about November 15, 2013. Moore Decl. ¶ 45.

104.     **Donald Thomas:** Prior to 2015, Thomas travelled regularly without incident. DEX49 at 18-19, 114-15, 120-22. On two flights in 2015 and 2016, he was selected for enhanced screening and was re-screened at the gate; he estimates total delays of one to two hours. *Id.* at 98-100, 114-19, 161-63. Additionally, in February 2016 he traveled to Canada by land, and upon his

---

[18] Mr. Shibly previously sued CBP regarding his treatment during a 2004 border crossing. The Second Circuit upheld summary judgment for the defendants. *See Tabbaa*, 509 F.3d at 97.

return to the U.S. he estimates that he was detained for about eight hours along with his co-travelers. DEX50 at 6; DEX49 at 68-76. In April 2016, he was denied boarding on a flight to Malaysia. DEX50 at 5-6; DEX49 at 44-59.

105.    Subsequently, Thomas has taken at least three roundtrip domestic flights. Trips in January and October 2017 were without incident. DEX49 at 66-67, 90-97. In January 2018, he was selected for enhanced screening; he missed the flight and was rebooked. DEX49 at 78-87. He also received additional screening at the gate. *Id.* at 85-86. He reported no incident in connection with the return flight. *Id.* at 87-88.

**106.**    Thomas submitted an inquiry to DHS TRIP in April 2016, shortly before his denial of boarding. On or about September 1, 2016, he received a final determination and did not submit another TRIP inquiry after his denial of boarding. *Id.* at 153-60; Moore Decl. ¶ 46.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when, viewing the facts in a light most favorable to the non-moving party, "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has satisfied its burden, it is entitled to summary judgment if the non-moving party fails to present, by affidavits, depositions, answers to interrogatories, or admissions on file, "specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323. On summary judgment, a plaintiff may not rest on "mere allegations," but must "set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true." *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017).

# **ARGUMENT**

Defendants are entitled to judgment as a matter of law as to Plaintiffs' procedural due process claim. Plaintiffs have not established an ongoing injury that is redressable through this court, and they have not established that their perceived status with respect to the TSDB deprives them of a liberty interest. In any event, the process available through DHS TRIP is constitutionally sufficient given the nature of the private interests Plaintiffs allege, the negligible value of additional measures in light of the robust internal review procedures already in place, and the profound government interest in protecting information vital to preventing terrorist attacks.

## I.      **Plaintiffs Lack Standing to Pursue Their Due Process Claim Because They Cannot Demonstrate Any "Certainly Impending" Future Injury**

As a threshold matter, the Court should dismiss Plaintiffs' claims under Rule 12(h) for lack of standing, because they cannot demonstrate any "certainly impending" future injury. Article III, Section 2, clause 1 of the Constitution limits federal court jurisdiction to "Cases" and "Controversies," and as the Supreme Court has explained, an "essential and unchanging part of the case-or-controversy requirement" is that a plaintiff must establish Article III standing to sue. *Lujan v. Def. of Wildlife*, 504 U.S. 555, 560 (1992). The well-settled test for standing requires that a litigant must demonstrate an "(1) injury in fact (2) that is fairly traceable to the defendant's conduct and (3) that is likely to be redressed by a favorable decision." *Retail Indus. Leaders Assoc, v. Fielder*, 475 F.3d 180, 186 n. 1 (4th Cir. 2007). Importantly, where—as here—the relief sought is prospective relief only, it is well-established that a plaintiff must demonstrate a risk of future injury that is both "real" and "immediate" and neither "conjectural" nor "hypothetical." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102, 103 (1983). Thus, a plaintiff seeking forward-looking relief must demonstrate the existence of a future "'threatened injury [that is] certainly impending.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).

Defendants acknowledge that the Court previously found Plaintiffs to possess, at the outset of the case, standing sufficient to pursue a due process claim. *Elhady v. Piehota*, 303 F. Supp. 3d 453, 462 (E.D. Va. 2017). However, "standing represents a jurisdictional requirement which remains open to review at all stages of the litigation," *Nat'l Org. for Women v. Scheidler*, 510 U.S. 249, 255, (1994); *see also Hollingsworth v. Perry*, 570 U.S. 693, 705, (2013) ("Article III demands that an 'actual controversy' persist throughout all stages of litigation.");  Fed. R. Civ. P. 12(h). Here, although a limited number of the Plaintiffs claim to have experienced additional screening at airports or the border, this does not establish, even for those Plaintiffs, a threat of future harm suffient to establish standing to seek prospective relief. The burden is on Plaintiffs to establish, as a factual matter, a certainly impending future injury—and none of them can do so.

Several Plaintiffs have experienced only occasional, past or intermittent screening. For example, aside from one instance of a 15 minute screening delay, Plaintiff Samir Anwar has "never ha[d] an issue or delay boarding a flight." *See supra* Statement of Material Facts ("SMF") ¶ 50. He was referred for secondary inspection from CBP officials twice when he entered the U.S. by land from Canada, but has since traveled to and from Canada without incident. *Id.* ¶ 49. Plaintiff Shahir Anwar has traveled back and forth from Canada without issue approximately once or twice per year since 2005. *Id.* ¶ 52. He has since traveled both internationally and domestically at least six times without incident since 2014. *Id.* ¶ 53. Plaintiff Coleman has not experienced any travel difficulties since September 2017, failed to provide documentation to complete the DHS TRIP redress process, and does not believe he is currently on any watchlist. *Id.* ¶¶ 59-62. Plaintiff Baby Doe has only one travel incident, in which he had SSSS on his boarding pass during a trip in which his father was selected for enhanced screening—he has since traveled without incident. *Id.* ¶ 63. Plaintiff John Doe 2 has never encountered enhanced screening on more than 20 domestic flights since 2000. *Id.* ¶ 64. Plaintiff John Doe 4 has had no travel incidents since September 2016, although he has traveled both domestically and internationally on multiple occasions since. *Id.* ¶ 70. Plaintiff Hakmeh has

traveled multiple times to Turkey and Syria—out of at least 10 international trips since 2014, he recalls being selected for secondary inspection or additional questioning twice. He also took at least 5 roundtrip domestic flights since 2013, and only encountered issues on one trip. *Id.* ¶ 87.

Even construing their claims generously, only five of the Plaintiffs arguably claim to currently, regularly experience enhanced screening. But individuals are subjected to enhanced screening for reasons unrelated to a watchlist. *See Scherfen v. DHS*, No. 3:CV-08-1554, 2010 WL 456784, at *7 (M.D. Pa. Feb. 2, 2010) ("Heightened screening at airports and border-crossing points does not necessarily signify inclusion" on a watchlist, as "[t]ravelers may be pulled out of line, searched, and questioned for a variety of reasons, unrelated to watchlists."); 73 Fed. Reg. 64,018, 64,025 (Oct. 8, 2008) ("standard passenger and baggage screening . . . may include additional, random screening"); *id.* at 64,026 ("[Passengers who are not on the Selectee List] will not always avoid enhanced screening."). As further explained in the Froemling declaration, TSA designates passengers for enhanced screening for a variety of reasons, including random selection, and the majority of passengers designated for enhanced screening are so designated for reasons other than TSDB status. Froemling Decl. ¶ 10. And while individuals included in the TSDB may be designated for enhanced screening on multiple consecutive flights, the same is true for individuals not in the TSDB. *Id.* ¶ 11. Further, the boarding passes of anyone selected for enhanced screening do not include the reason for the enhanced screening designation and do not indicate status in the TSDB. *Id.* ¶ 12. Passengers designated by Secure Flight for expedited or standard screening are not guaranteed to receive that type of screening and may be required to undergo additional or enhanced screening, for a variety of reasons. *Id.* Likewise, given CBP's significant authorities authorizing the inspection of all persons and goods entering the country, the fact that a person has been subjected to a border search is not sufficient to establish that they will be subject to a search in the future.[19]

---

[19] Given Plaintiffs' failure to establish any certainly impending future injury or the deprivation of any liberty interest, Defendants do not believe that the current TSDB status of Plaintiffs is necessary to

Accordingly, the Court lacks jurisdiction over Plaintiffs' claims.[20]

**II.    Several of Plaintiffs' Claims Are Barred Because They Failed to Avail Themselves of DHS TRIP.**

Additionally, several Plaintiffs have failed to exhaust the administrative redress process for travel-related difficulties. Specifically, DHS TRIP found no inquiries from or on behalf of Plaintiffs Awad, Baby Doe 2, Doe No. 3, Fares, or Hakmeh, Moore Decl. ¶ 22, and administratively closed an inquiry from Plaintiff Coleman due to his failure to provide all required documentation, *id.* ¶ 23.

Ripeness is an aspect of the justiciability analysis, "inextricably linked to [the] standing inquiry," since it is one of the "doctrines that cluster about Article III." *Cooksey v. Futrell*, 721 F.3d 226, 239–40 (4th Cir. 2013). The ripeness doctrine prevents the court from premature adjudication and protects "agencies from judicial interference until an administrative decision has been formalized." *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148-49. A case is not ripe when "problems such as the inadequacy of the record . . . or ambiguity in the record . . . will make [the] case unfit for adjudication on the merits." *Ostergren v. Cuccinelli*, 615 F.3d 263, 288 (4th Cir. 2010); *Reg'l Mgmt. Corp. v. Legal Servs. Corp.*, 186 F.3d 457, 465 (4th Cir. 1999). Likewise, the exhaustion doctrine is premised on "the notion, grounded in deference to Congress' delegation of authority to coordinate branches of Government, that agencies, not the courts, ought to have primary responsibility for the programs that Congress has charged them to administer." *McCarthy v. Madigan*, 503 U.S. 140, 145 (1992).

Applying these principles, several courts have dismissed the claims of travelers who failed to exhaust their administrative remedies through DHS TRIP, reasoning that an exhaustion requirement

---

adjudicate this matter. If the Court disagrees, however, and enters an order, Defendants would provide current status of Plaintiffs *ex parte* and *in camera.*

[20] Defendants maintain that this Court also lacks jurisdiction over Plaintiffs' claims because these are claims to the adequacy of the redress process and are properly heard only in the Court of Appeals under 49 U.S.C. § 46110. See also Groh Decl. ¶ 26 (describing TSA's final authority). The Court previously held that it does have jurisdiction, relying on the unpublished opinion of the Fourth Circuit. *Elhady*, 303 F. Supp. 3d at 462. The Government will not repeat those arguments here, as its position is otherwise reserved.

in this context promotes judicial efficiency, encourages administrative accuracy, and creates an administrative record. *See Shearson v. Holder*, 725 F.3d 588, 594-95 (6th Cir. 2013); *Mokdad v. Holder*, No. 13-cv-12038, Order, Dkt. No. 43 (E.D. Mich. Dec. 16, 2015); *see also Latif v. Holder*, No. 3:10-cv-750-BR, Dkt. No. 152 (D. Or. Oct 3, 2104); *Fikre v. FBI*, No 3:13-cv-899, Dkt. 57 (D. Or. Jan 14, 2015); *Tarhuni v. Holder*, No. 3:13-cv-001, Dkt. 79, 86 (D. Or. Oct. 3, 2014). The Court should follow the same approach here with respect to the Plaintiffs who have not filed for DHS TRIP, or who filed but did not complete the redress process. *See* Moore Decl. ¶¶ 22-23.

Additionally, the Court should dismiss the procedural due process claim of these Plaintiffs for the separate but related reason that these Plaintiffs have failed to avail themselves of the procedures available to them. It is well established that "in order to state a claim for failure to provide due process, a plaintiff must have taken advantage of the processes that are available to him." *Alvin v. Suzuki*, 227 F.3d 107, 116 (2d Cir. 2000).[21] Thus, Plaintiffs "cannot plausibly claim that [the government's] procedures are unfair when [they have] not tried to avail [themselves] of them." *Mora v. City of Gaithersburg*, 519 F.3d 216, 230 (4th Cir. 2008). Here, these Plaintiffs have not availed themselves of the procedures they are challenging, making dismissal of their procedural due process claim and co-extensive APA claim proper.[22]

## III.     The Watchlisting Enterprise Comports with Procedural Due Process.

In order to make a procedural due process claim, Plaintiffs must establish "(1) a cognizable liberty or property interest; (2) the deprivation of that interest by some form of state action; and (3)

---

[21] *See also, e.g.*, *Carmody v. Bd. of Trustees of the Univ. of Illinois*, 747 F.3d 470, 479 (7th Cir. 2014); *Farhat v. Jopke*, 370 F.3d 580, 596 (6th Cir. 2004);*Tri-Cnty. Paving v. Ashe Cnty.*, 281 F.3d 430, 436 (4th Cir. 2002).

[22] In *Mohamed v. Holder*, 995 F. Supp. 2d 520, 533-34 (E.D. Va. 2014), this Court held that DHS TRIP redress procedures then applicable to someone denied boarding were not mandatory and that the plaintiff's failure to exhaust did not prevent adjudication of a due process claim regarding the No Fly List. For the reasons set forth above, Defendants respectfully maintain that the claims of those Plaintiffs who have not availed themselves of DHS TRIP should be dismissed. In *Mohamed*, the Court ultimately held that it could not adjudicate the due process claims raised regarding the revised redress process unless Plaintiff availed himself of the revised DHS TRIP redress procedures available to U.S. persons denied boarding.  *Mohamed v. Holder*, No. 1:11-CV-50, 2015 WL 4394958, at *13 (E.D. Va. July 16, 2015).

that the procedures employed were constitutionally inadequate." *Shirvinksi v. U.S. Coast Guard*, 673

F.3d 308, 314 (4th Cir. 2012) (quoting *Kendall v. Balcerzak*, 650 F.3d 515, 528) (4th Cir. 2011). "[D]ue

process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time,

place and circumstances." *Gilbert v. Homar*, 520 U.S. 924, 930 (1997). Rather, "[d]ue process is

flexible and calls for such procedural protections as the particular situation demands." *Id*. Plaintiffs

fail to establish the deprivation of any liberty interest, much less the deprivation of a liberty interest

related to the TSDB. Plaintiffs' speculation about their possible watchlist status based on minor

travel delays does not give rise to rights to notice and a hearing. In any event, the current procedures

are constitutionally adequate given the limited Plaintiffs' interest at issue and the extraordinary public

interest in preventing acts of terrorism.

### a.   Plaintiffs Have Not Been Deprived of a Liberty Interest.

Plaintiffs claim that their alleged watchlist status is a deprivation of a liberty interest in travel

or in their reputations. Both claims fail as a matter of law and fact. To be constitutionally cognizable

as a matter of due process, the liberty interest at issue "must rise to more than an abstract need or

desire and must be based on more than a unilateral hope;" rather, "a plaintiff must demonstrate a

legitimate claim of entitlement" to the asserted interest. *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454,

460 (1989) (citation omitted). "Protected liberty interests 'may arise from two sources—the Due

Process Clause itself and the laws of the States.'" *Id*.

In this Court's opinion on the Motion to Dismiss, the Court described the Supreme Court

opinions in *Kerry v. Din*, 135 S. Ct. 2128 (2015). *See Elhady*, 303 F. Supp. 3d at 463-64. The *Din*

plurality "found that procedurally protected liberty interests are those within the historic

understanding of the Due Process Clause and, at most, also include implied fundamental liberty

interests for the purposes of substantive due process," *id*. at 463, whereas the dissent found "that

procedurally protected liberty interests are those sufficiently important to flow implicitly from the

design, object, and nature of the Due Process Clause," *id*. Here, the parties do not dispute that there

40

is some procedurally protected interest in travel and that outright bans on all means of travel would trigger due process requirements. The scope of the liberty interest, however, cannot reasonably be described under either test as including a right to travel through airports or across borders without screening or delay. All travelers at airports and borders must submit to a search. Delay-free travel is neither an implicit nor historical feature of the due process clause.

### i. Plaintiffs Have Not Been Deprived of a Right to Travel.

Plaintiffs mistakenly allege that they have been deprived of a right to travel as a result of TSA screening at airports and CBP inspections at the border. At most, the evidence shows that some Plaintiffs have experienced modest delays while traveling, not that they were unable to travel. Plaintiffs have no "legitimate claim of entitlement" to not being screened at airports or inspected at the border and, even construing all facts in their favor, their ability to travel is not impaired.

The due process clause protects, at most, only against "statutes, rules, or regulations which *unreasonably* burden or restrict" the right to travel. *Saenz* v. *Roe*, 526 U.S. 489, 499 (1999) (emphasis added). The right to travel is not violated by "minor burdens," *Miller* v. *Reed*, 176 F.3d 1202, 1205 (9th Cir. 1999), or "[m]inor restrictions," *Cramer* v. *Skinner*, 931 F.2d 1020, 1031 (5th Cir. 1991), on travel. *See League of United Latin American Citizens* v. *Bredesen* ("*LULAC*"), 500 F.3d 523, 535 (6th Cir. 2007) ("To the extent this inconvenience burdens exercise of the right to travel at all, the burden is incidental and negligible, insufficient to implicate denial of the right to travel."); *see also Green* v. *TSA*, 351 F. Supp.2d 1119, 1122, 1130 (W.D. Wash. 2005) (plaintiffs who "allege [they are] subjected … to enhanced security screening … do not have a right to travel without any impediments whatsoever"). Thus, "a screening of passengers" at an airport "does not exceed constitutional limitations" including "the passenger's right to travel." *United States* v. *Davis*, 482 F.2d 893, 913 (9th Cir. 1973).[23]

---

[23] Suspicionless airport searches have uniformly been upheld under the Fourth Amendment. *See, e.g., United States* v. *Aukai*, 497 F.3d 955, 958-63 (9th Cir. 2007) (en banc); *United States* v. *Hartwell*, 436 F.3d 174, 177-81 (3d Cir. 2006); *United States* v. *Allman*, 336 F.3d 555, 556 (7th Cir. 2003); *United States* v.

As explained in the Froemling Declaration, all airport travelers are required to undergo screening and all can be designated for enhanced screening for a variety of reasons, including random selection or TSDB status. Froemling Decl. ¶¶ 9-10, 31. Individuals selected for enhanced screening by TSA have their boarding passes marked "SSSS," and TSA applies the same checkpoint screening procedures to such individuals, regardless of whether the individual is designated due to TSDB status, randomly, or for other reasons. *Id.* ¶¶ 12, 32. The boarding pass does not indicate why someone has been selected for enhanced screening. *Id.* ¶ 32. The majority of passengers designated for enhanced security screening are so designated for reasons other than TSDB status. *Id.* ¶ 10. Enhanced screening typically includes screening of the person through a walk-through metal detector, the AIT, and a pat-down, and screening of accessible property through a scanner, an explosives trace detection search, and physical search of the interior of the passenger's accessible property, electronics, and footwear. *Id.* ¶ 39. A typical enhanced screening takes approximately 10-15 minutes. *Id.* For all passengers, additional screening may occur at the gate. *Id.* ¶ 46.

Some additional delay may also occur for passengers at check-in for the purposes of identity resolution. The average time for such calls is 12.5 minutes. *Id.* ¶ 31 n.21. Some of the Plaintiffs claim to have experienced slightly longer delays, *see e.g.,* Statement of Material Facts ("SMF") ¶ 77 (estimation by El-Shwehdi that he was typically delayed 30-45 minutes at check-in, as well as 20-30 minutes at security screening); SMF ¶ 95 (estimation by Khan that he was delayed by 30 minute to three hours in obtaining boarding passes for international flights into the U.S.), but the record nonetheless supports a conclusion that, in general, selection for enhanced screening results in delays of well under an hour. Froemling Decl. ¶¶ 31 n.21, 39. Moreover, the due process analysis looks to the "generality of cases," beyond the particular application of the process to the individual at bar. *Mathews*, 424 U.S. at 344 ("[P]rocedural due process rules are shaped by the risk of error inherent in

---

*Edwards*, 498 F.2d 496 (2d Cir. 1974); *United States* v. *Skipwith*, 482 F.2d 1272, 1275-76 (5th Cir. 1973); *Davis*, 482 F.2d at 912; *United States* v. *Slocum*, 464 F.2d 1180 (3d Cir. 1972).

the truthfinding process as applied to the generality of cases, not the rare exceptions."); *Veterans for Common Sense v. Shinseki*, 678 F.3d 1013, 1034 (9th Cir. 2012) (en banc) (same).

Construing all testimony in Plaintiffs' favor for the purposes of this motion only, some Plaintiffs experience enhanced screening by TSA on a regular basis, but most do not. Some have experienced enhanced screening only once or even never. *See, e.g.*, Ali (once); Baby Doe (once or never); Samir Anwar (once); Awad (never since adulthood); John Doe 2 (never); John Doe 4 (once); Elhady (never). Construing their allegations favorably, only five of the 23 Plaintiffs testified that they continue to receive enhanced screening on a regular basis (Amri, John Doe 3, Elhuzayel, El-Shwehdi, Frljuckic). And the remainder have described occasional, intermittent, or past experiences with enhanced screening. *See* SMF, *supra*. But travelers can receive enhanced screening for many reasons unrelated to the TSDB, including on multiple consecutive trips. Froemling Decl. ¶¶ 10, 31; *see also Scherfen*, 2010 WL 456784, at *7 ("Heightened screening at airports and border-crossing points does not necessarily signify inclusion" on a watchlist, as "travelers may be pulled out of line, searched, and questioned for a variety of reasons, unrelated to watchlists."); 73 Fed. Reg. at 64,025 ("standard passenger and baggage screening . . . may include additional, random screening"); *id.* at 64,026 ("[Passengers who are not on the Selectee List] will not always avoid enhanced screening.").

Courts have held that this sort of airport screening, even on a regular basis, does not deprive the passenger of a protected liberty interest in travel. In *Beydoun v. Sessions*, the Sixth Circuit addressed a due process challenge brought by two individuals who alleged they were included on the Selectee List. 871 F.3d 459 (6th Cir. 2017). Similar to the allegations in the present case, the plaintiffs in *Beydoun* alleged that they "missed 'countless flights' after being subjected to lengthy secondary screenings," *id.* at 467, citing "delays ranging from ten minutes to one hour in duration" and contended that they "had been deterred from flying on one occasion," *id.* at 467-68. The court affirmed the dismissal of both plaintiffs' claims, holding that "Plaintiffs did not allege that any protected interest was violated by the[ir] being on the Selectee List." *Id.* at 468. The court reasoned

43

that "Plaintiffs may have been inconvenienced by the extra security hurdles they endured in order to board an airplane," but "these burdens do not amount to a constitutional violation" because "Plaintiffs have not actually been prevented from flying altogether or from traveling by means other than an airplane." *Id.* In addition, the court held, plaintiffs' delays and inconveniences "can only be described as incidental or negligible and therefore do not implicate the right to travel….When Plaintiffs' only allegations amount to delays that many individuals are likely to experience at the airport, it is hard to conclude that the fundamental right to travel has been implicated." *Id.*[24] *See also Abdi v. Wray*, No. 2:17-CV-622-DB, 2018 WL 1940411, at *3 (D. Utah Apr. 23, 2018), appeal pending (rejecting due process claim based on alleged watchlist status because "Plaintiff has failed to show that the right to movement is a liberty interest that is protected under the Constitution, particularly where, as here, Plaintiff has been able to travel, albeit inconveniently."); *Kovac v. Wray*, No. 3:18-CV-0110-L, 2019 WL 1057935, at *18 (N.D. Tex. Mar. 5, 2019) ("the Screening List Plaintiffs have failed to state a claim that their inclusion in the Screening List caused them to suffer a deprivation of a liberty interest based on their right to travel, as that term is historically understood.").

Even in the context of interstate travel, the courts have held that travel delays ranging from a few hours up to a full day do not unconstitutionally burden the right to travel. *See, e.g., Cramer*, 931 F.2d at 1031 (finding no violation where a statutory restriction "makes travel less convenient" but "does not bar travelers from using the airport"); *City of Houston v. FAA*, 679 F.2d 1184, 1186-99 (5th Cir. 1982) (upholding regulation limiting use of airport so that certain passengers must use connecting flights or land at a more distant airport); *Town of Southold v. Town of E. Hampton*, 477 F.3d 38, 51 (2d Cir. 2007) (upholding law banning certain ferry travel to an island thereby making

[24] The Sixth Circuit decision ("*Beydoun II*") was addressing a substantive due process claim, while affirming two district court decisions that reached similar conclusions on the procedural due process claim: *Beydoun v. Lynch* ("*Beydoun I*"), No. 14-CV-13812, 2016 WL 3753561 (E.D. Mich. July 14, 2016); *Bazzi v. Lynch*, No. 16-10123, 2016 WL 4525240 (E.D. Mich. Aug. 30, 2016).

interstate travel "longer and more expensive"); *Torraco v. Port Auth. of N.Y. & N.J.*, 615 F.3d 129, 141 (2d Cir. 2010) (holding that a delay of "a little over one day . . . was a minor restriction" that did not deny the right to travel"); *cf. George v. Rehiel*, 738 F.3d 562 (3d Cir. 2013) (holding in the Fourth Amendment context that unusual TSA screening taking much longer was nonetheless constitutionally reasonable). Plaintiffs claiming to be on the Selectee List "can still fly after additional screening." *Beydoun I*, 2016 WL 3753561, at *5 (E.D. Mich. July 14, 2016); *Bazzi*, 2016 WL 4525240 at *6-7; *Kadura v. Lynch*, No. CV 14-13128, 2017 WL 914249, at *6-7 (E.D. Mich. Mar. 8, 2017). Inconvenience, inspections, or delays at the airport or at the border, like those alleged by the Plaintiffs, do not amount to a constitutionally cognizable deprivation of the liberty interest in travel. *See, e.g.*, *LULAC*, 500 F.3d at 535; *Beydoun I*, 2016 WL 3753561, at *5; *Bazzi*, 2016 WL 4525240 at *6-7; *see also Gilmore* v. *Gonzales*, 435 F.3d 1125, 1137 (9th Cir. 2006) (TSA's policy "requir[ing] airline passengers [to] either present identification or be subjected to a more extensive search" does not violate right to travel).

Some Plaintiffs also claim to have experienced delays at secondary inspection by CBP— ranging from 15 minutes (Awad's most recent re-entry) to one outlier delay allegedly lasting 12 hours (Mr. Elhady's most lengthy inspection, including time spent in medical care).[25]   Others have had one or no experiences with secondary inspection, despite travelling internationally (Baby Doe, John Doe 3, John Doe 4). And some who had such experiences in the past no longer do (al Halabi, Ali, Samir Anwar, Shahir Anwar, Coleman, Fares, Shaout, Shibly). Only three of the 23 Plaintiffs testified that they are *always* subject to significant delays of more than 2 hours at the border (Elhady, Frjulcklic, Kadura), and none have testified that they have been prohibited from travel. *See* SMF, *supra*.

This testimony about widely varying experiences is consistent with CBP testimony that officers exercise discretion at the border, subject to legal and policy requirements and in accordance

---

[25] Elhady's description of this detention is notably inconsistent and has lengthened considerably over the course of this litigation. *Compare* Am. Compl. ¶ 148 (alleging detention of 6 hours) *with* DEX30, p. 186 (10 hours) *with* DEX29 (Interrogatory responses, 12 hours).

with their training and experience. Howe Decl. ¶ 14. Although TSDB status is one factor that may indicate additional scrutiny of an individual is warranted, there are many other possible reasons that individuals may be referred for secondary inspection, related to CBPs many statutory authorities. *Id.* Once a traveler is referred for additional scrutiny, the specific actions taken during the secondary border inspection vary depending on the officer's evaluation of each traveler's situation. *Id.*

The Supreme Court has held that "delays of one to two hours at international borders are to be expected," *Flores-Montano*, 541 U.S. at 155, and other courts of appeal have found detentions at the border of four to six hours to be constitutional, *Tabbaa*, 509 F.3d at 100-01. The right to travel across the border is highly qualified and certainly does not include a right to travel across the border without delay or inspection. *Cf. Flores Montano*, 541 U.S. at 152-53 ("The Government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border. Time and again, we have stated that searches made at the border, pursuant to the longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border.").[26] Thus, a law causing "inconvenience" for the traveler, including delays at the border, does not amount to a constitutional "denial of the right to travel." *LULAC*, 500 F.3d at 535.

Finally, some of the Plaintiffs claim that they have avoided specific travel due to their perceived watchlist status. *See, e.g.*, DEX34, at 202-06, 253 (El-Shwehdi sometimes avoids flying)); DEX36, at 103 (Fares decided to forego a specific trip); DEX38, at 102 (Frljuckic does not "want to go anywhere crossing the borders"); DEX26, at 213-15 (Doe 3 refuses to travel to the United

---

[26] CBP exercises authority under a wide array of statutes to stop, search, and examine persons at international borders. *See, e.g.*, 19 U.S.C. §§ 482, 1455, 1459, 1461, 1467, 1499, 1581, 1582. These statutes touch on a wide array of violations, including alien smuggling, drug violations, agriculture concerns or monetary reporting requirements. *See, e.g.*, 19 U.S.C. § 1584; 8 U.S.C. § 1324; 6 U.S.C. § 231(b); 7 U.S.C. § 8301 *et seq.*; 31 U.S.C. § 5316; *see also* 19 C.F.R. § 162 (inspections of, *inter alia* vehicles, aircraft, persons, baggage, and merchandise). Moreover, the Government has the authority to perform border searches without a warrant, probable cause, or reasonable suspicion. *See United States v. Montoya de Hernandez*, 473 U.S. 531, 538 (1985).

States); DEX44, at 157-68 (Khan has foregone specific trips); DEX16, at 67 (Shahir Anwar skipped one trip). Others admit that they have not been deterred from travel. DEX32, at 184 (Elhuzayel); DEX6, at 48-49 (Ahmed); DEX40, at 246-48 (Hakmeh). And many Plaintiffs have extensive, repeated domestic and international travel, notwithstanding their perceived watchlist status. *See, e.g.,* SMF ¶¶98-99(Shaout), 101-02(Shibly). None have refrained from travel entirely as a result, even those who claim to have avoided specific travel. Mr. El-Shwehdi, for example, has flown more than 20 times since being subjected regularly to enhanced screening. SMF ¶ 77. Mr. Fares has travelled internationally on a number of occasions since the one trip he did not take. SMF ¶¶79-81.  Mr. Khan has flown several times during the same timeframe as he was being screened. SMF ¶¶ 94-96.

The Court previously held that, in theory, government actions that "actually deter[]" travel might create such an unreasonable burden as to deprive someone of their liberty interest in travel. *Elhady*, 303 F. Supp. 3d at 463 (citation omitted). Mere deterrence, especially deterrence based on a subjective chilling effect on some individuals' decision to travel, however, is not a deprivation of the right to travel. Other courts have rejected much more significant "burdens" on one's ability to travel as not constituting sufficient deprivation to trigger due process protections. *Torraco.*, 615 F.3d at 141 (holding that a delay of "a little over one day … was a minor restriction that did not result in a denial of the right to travel"); *City of Houston*, 679 F.2d at 1186–99 (upholding regulation limiting use of airport). But, even if accurate, the deterrence theory cannot possibly extend to individual decisions to avoid specific trips such as those explained by Plaintiffs. People might plausibly avoid travel as a response to any number of government actions: they may dislike vaccination requirements or showing identification or flying without a weapon, or being subject to any security screening whatsoever. That does not mean that such ordinary requirements constitute a deprivation of a liberty interest in travel. *See, e.g., Abdi*, 2018 WL 1940411, at *3.

Plaintiffs bear the burden of showing the deprivation of a liberty interest in travel due to their perceived TSDB status. But by their own account, they routinely are able to fly and to travel

internationally and domestically and have done so numerous times since they first experienced travel difficulties. Many do so regularly and extensively. What they allege, rather than a deprivation, is delay resulting from additional screening. Regardless of how regular or predictable those delays may be, they do not constitute a deprivation of a protected liberty interest in travel. *Beydoun I*, 2016 WL 3753561, at *5; *Bazzi*, 2016 WL 4525240, at *6-7; *Abdi*, 2018 WL 1940411, at *3.

### ii. Plaintiffs Do Not Have a Stigma-Plus Reputational Interest Cognizable Under the Due Process Clause.

In addition to their movement-related liberty interest claims, Plaintiffs have also alleged an infringement of their "right to be free from false government stigmatization as individuals who are known or suspected to be terrorists." Am. Compl. ¶ 564. Injury to reputation alone does not suffice to give rise to a liberty interest protected under the Due Process Clause. *See Paul v. Davis*, 424 U.S. 693, 712 (1976); *Shirvinski*, 673 F.3d at 315; *Evans v. Chalmers*, 703 F.3d 636, 654 (4th Cir. 2012). Instead, the "stigma-plus" test requires that plaintiffs demonstrate (1) they suffered a stigma from governmental action; plus (2) they experienced an alteration or extinguishment of "a right or status previously recognized by state law." *Paul*, 424 U.S. at 711.

The Supreme Court has held that even false charges made by the Government will not satisfy the stigma prong unless they are "made public" or there is "public disclosure." *Bishop v. Wood*, 426 U.S. 341, 348 (1976). A plaintiff must show not only some mere possibility that stigmatizing information may be available to the public, but instead a "likelihood" of dissemination to the public for there to be a cognizable stigma. *See Sciolino v. City of Newport News*, 480 F.3d 642, 650 (4th Cir. 2007). Even where a Plaintiff has made such a showing, the "plus" requirement must be satisfied by a present injury through transformation of some recognized legal status such as the termination of government employment, *see Ridpath v. Bd. of Governors of Marshall Univ.*, 447 F.3d 292, 309 n.16 (4th Cir. 2006), not simply some "damage [that] flows from injury caused by the defendant to a plaintiff's reputation." *Siegert v. Gilley*, 500 U.S. 226, 234 (1991) (defamatory post-resignation letter from an

employer, although it "undoubtedly damage[d] the reputation. . . and impair[ed] future employment," did not rise to a constitutional injury). For a plaintiff to prevail in demonstrating a cognizable constitutional injury with respect to the "plus" prong, they must have either been deprived of a right or interest protected by state law, or have a harm that "rise[s] to the level of a constitutional deprivation." *Randall v. United States*, 30 F.3d 518, 522 (4th Cir. 1994).

In its opinion on the Government's Motion to Dismiss, this Court recognized that the case law is unsettled with respect to how broadly defamatory information must be disseminated to satisfy the stigma prong. *See* Mem. Op. at 14. In doing so, the Court cited *Palka v. Shelton*, which would require that defendants "actually disseminate the stigmatizing comments in a way that would reach potential future employers or the community at large," 623 F.3d 447, 454 (7th Cir. 2010) and *Johnson v. Martin*, which would find that dissemination within a proper chain of command does not constitute public disclosure, 943 F.2d 15, 17 (7th Cir. 1991). Under either test, Plaintiffs' claim must fail, because the information has been kept within the proper chain of command and because it has not been actually disseminated in a way that would reach the community at large.

The record makes clear that TSDB status is closely guarded to make sure that the information is only disseminated to those who absolutely need to receive it. As Plaintiffs note in their complaint, government policy provides that an individual's status with respect to the TSDB or Selectee List generally cannot be disclosed to the individual, let alone the general public. Am. Compl. ¶¶ 196, 213, 228. There is a limited exception for the revised redress process for some individuals on the No Fly List, who may be informed of their status after actually being denied boarding, but otherwise, TSDB status is protected as law enforcement sensitive, and an individual's status on the subsets of the TSDB that TSA uses for pre-screening constitutes SSI, because TSA has determined that its disclosure would be detrimental to transportation security, Froemling Decl. ¶¶ 52-59 & Ex. A; *see also* Groh Decl. ¶¶ 10, 61. Defendant agencies keep such information closely protected because they recognize that release of information regarding an individual's inclusion on the TSDB

could have "a devastating effect on the usefulness of the TSDB and a potentially calamitous effect on the national security." Declaration of Orlando Decl. ¶ 36; *see also id.* ¶¶ 19-36 (describing the importance of safeguarding TSDB information, and the potential consequences of release of TSDB information on investigations and investigative sources and methods).

Indeed, dissemination is carefully circumscribed and limited to entities that require such information in furtherance of their missions. For example, TSDB information is shared internally between those government agencies that require the information "for diplomatic, military, intelligence, law enforcement, immigration, transportation security, visa, and protective" purposes. Groh Decl. ¶ 30. For example, TSA uses certain subsets of the TSDB in its Secure Flight program. Froemling Decl. ¶¶ 10, 30-33. TSA shares a subset of information under limited circumstances with regulated U.S. aircraft and airport operators, to conduct passenger and employee vetting in the limited circumstances where TSA does not itself conduct that vetting. *See* Froemling Decl. ¶ 61. In each circumstance, all parties authorized to receive TSDB information by TSA must protect this information as SSI in accordance with the provisions of 49 C.F.R. part 1520 and are subject to civil penalty and other enforcement action by TSA if they improperly disclose this information. *See id.*

TSC does not provide access to the TSDB directly to any private companies, nor is the Government aware of any mechanism, policy, or practice, that would permit TSDB information to be shared with entities like car dealerships or banks or other financial institutions. *See* Groh Decl. ¶ 36. Some TSDB information is exported through the NCIC, a computerized information system administered by the FBI, which serves to provide criminal information to nationwide law enforcement agencies, including access to KST File. *See* Rago Decl. ¶ 5-6. Inclusion of the KST File in the NCIC allows for federal, state, and local law enforcement and criminal justice agencies to share relevant information necessary to carry out their respective missions in a concerted effort to prevent terrorist attacks. *Id.* ¶ 6.

Any entity that has access to NCIC must obtain an ORI from the FBI's Criminal Justice Information Services Division. A governmental law enforcement or criminal justice agency's request for an ORI assignment must be accompanied by, among other things: documentation demonstrating that the agency was established pursuant to executive order, statute, or ordinance; documentation of its arrest powers or criminal justice functions, as also outlined via executive order, statute, or ordinance; and documentation that more than fifty percent of its budget is allocated to the administration of criminal justice functions, as defined in 28 C.F.R. § 20.3(b). Moreover, none of these entities have access to the entire KST File at once—access to the File is restricted to individual searches through name and piece of identifying information such as a date of birth or social security number. *See* Rago Decl. ¶ 6.[27] The CJIS Security Policy provides that data contained in CJIS systems, including data in the NCIC, is sensitive information and security must be afforded to prevent any unauthorized access, use, or dissemination of the information. *Id.* ¶ 14 & n. 4. Under either test contemplated by the Court, there is no probability, let alone "likelihood," that such information has been disseminated to the public at large. *See Sciolino* 480 F.3d at 650.

Plaintiffs allege that their TSDB status is made public because enhanced screening is conducted in view of other passengers and fellow travelers (or in one or two instances, because a traveler was called by name over the loudspeaker). But courts that have been faced with similar allegations in the context of the No Fly List have recognized that the argument that such screening amounts to stigma is insufficient.[28]  *See, e.g., Tarhuni v. Sessions*, No. 3:13-cv-00001-BR, 2018 WL

---

[27] The *only* private entities that may access NCIC are authorized college, university and railroad police departments (that exercise certain police powers under state law) and certain contractors that are providing services on behalf of or in support of a criminal justice agency. *See* Rago Decl. ¶ 10. Plaintiffs have argued in discovery disputes that this is proof of publication or private dissemination of the watchlist. It is not. All of these entities are exercising or supporting law enforcement functions and can only search NCIC in support of those functions. They are bound by federal regulations and CJIS Security Policy, and access is strictly controlled.  *Id.* ¶¶ 11-23. In any event, Plaintiffs cannot (and have not) established any deprivation incurred as a result of law enforcement information-sharing.

[28] Indeed, this Court in *Mohamed* expressed some doubt that No Fly List placement could give rise to a stigma-plus claim, *see Mohamed v. Holder*, No. 1:11-cv-50, 2015 WL 4394958, at *6 (E.D. Va. July 16, 2015) ("There is also a substantial question whether the dissemination of the No Fly List within or

51

3614192, *12 (D. Or. July 27, 2018) (dismissing Plaintiffs' Fourth Amended complaint's stigma-plus

claim on the same grounds as their previous claim, because "government disclosure of No-Fly List

status to the airlines and the additional incidental disclosures to other passengers who may overhear

or witness an individual being denied boarding were not enough to implicate the sort of community-

wide reputational injury required for a stigma-plus claim); *Tarhuni v. Holder*, 8 F. Supp. 3d 1253, 1275

(D. Or. 2014) (prior ruling with the same holding); *see also Beydoun II*, 871 F.3d at 469 ("... [Plaintiffs

claim] their reputation was harmed because those around them when they travel could infer that

they were suspected of terrorism . . . because Plaintiffs cannot show that their liberty interest in

travel was infringed upon by being subject to relatively minor additional screening, Plaintiffs'

reputational harm claims also fail"); *Latif v. Holder*, 28 F. Supp. 3d 1134, 1150 (D. Or. 2014)

(Although being denied boarding or arrested in airports amounted to stigma with respect to the No

Fly List,  "the limited nature of the public disclosure in this case mitigates Plaintiffs' claims of injury

to their reputations," since "the 'public' disclosure is limited to a relatively small group of individuals

in the same area of the airport as the traveler when the traveler is denied boarding"); *Abdi*, 2018 WL

1940411, at *3 ("Plaintiff's repeated screening at airports, while no doubt frustrating to Plaintiff, do

not rise to the level of a change in legal status."); *Kovac*, 2019 WL 1057935, at *20 ("there is no

stigma attached to lawful screening and inspection."); *Scherfen*, 2010 WL 456784, at *7 (enhanced

screening does not signify inclusion on a watchlist).

Unlike the No Fly List, however, which denies certain travelers from boarding, enhanced

screening frequently happens entirely at random and therefore could not possibly support a stigma

allegation. Froemling Decl. ¶¶ 10, 12, 32, 38. Indeed, the majority of passengers designated for

---

among government agencies or to airlines, standing alone, would satisfy the public disclosure prong of a
stigma-plus claim"), although it ultimately held that the possibility of consequences of being on the No
Fly List due to publication to third parties "underscore[d] the need overall for strong procedural
protections for [Plaintiff's] travel related rights." *Id.* This case, unlike *Mohamed*, does not involve the No
Fly List, and thus the Court's concern over "accompanying adverse consequences visited upon" a person
denied boarding does not apply. *Id.* at *6. Unlike denial of boarding, a traveler may receive heightened
screening for multiple reasons, including random selection. *See* Froemling Decl. ¶¶ 12, 32.

enhanced security screening are so designated for reasons other than TSDB status. *Id.* Courts have

observed that "[s]ince every air passenger is subjected to a search, there is virtually no 'stigma

attached to being subjected to search at a known, designated airport search point.'" *United States v.*

*Hartwell*, 436 F.3d 174, 180 (3d Cir. 2006) (quoting *Skipwith*, 482 F.2d at 1275); *accord United States v.*

*Wehrli*, 637 F.2d 408, 409 (5th Cir. 1981) (same). Further, every person entering the United States is

obligated to present themselves and their effects to CBP officials for inspection. *United States v.*

*Ramsey*, 431 U.S. 606, 619 (1977) ("Border searches, then, from the adoption of the Fourth

Amendment, have been considered to be 'reasonable' by the single fact that the person or item in

question had entered our country from outside."); *see also Carroll v. United States*, 267 U.S. 132, 154

(1925) ("Travelers may be so stopped in crossing an international boundary because of national self-

protection reasonably requiring one entering the country to identify himself as entitled to come in,

and his belongings as effects which may be lawfully brought in."); *Flores-Montano*, 541 U.S. at 153;

*Ekiu v. United States*, 142 U.S. 651, 659 (1892).

But even if Plaintiffs had proved their contention that TSDB dissemination constitutes

stigma, they have not shown an alteration in legal status sufficient to constitute a "plus" factor under

the stigma-plus doctrine. *See Randal*, 30 F.3d at 522. In *Paul v. Davis*, the Supreme Court concluded

that reputational harm alone does not implicate a liberty or property interest, and as a result, a

claimant must identify a "plus" factor establishing the deprivation of such an interest. *See* 424 U.S. at

701. In *Green v. TSA*, a district court held that the allegation of reputational harm should be

dismissed because the plaintiffs did "not allege[] any tangible harm to their personal or professional

lives that is attributable to their association with the No-Fly List, and which would rise to the level

of a Constitutional deprivation of a liberty right . . . [or] any injury to a property interest." 351 F.

Supp. 2d at 1130. And in *Beydoun*, the district court held that a plaintiff claiming to be on the Selectee

List "fail[ed] to sufficiently allege that he was deprived of a right previously held under the law."

*Beydoun I*, 2016 WL 3753561, at *5; *Bazzi,* 2016 WL 4525240, at *7; *Abdi*, 2018 WL 1940411, at *3;

*Kovac*, 2019 WL 1057935, at *20. There is no right to enter the country or board a plane without being subjected to inspection or search.

In its opinion on the Motion to Dismiss, this Court focused on potential allegations of "tangible consequences to their legal rights or status" that included Plaintiffs' purported inability to buy guns in certain states, to obtain HAZMAT licenses, or to obtain jobs at airports. *Elhady*, 303 F. Supp. 3d at 465. But even if these amounted to cognizable "plus" elements, the record does not bear out these claims. No plaintiffs have claimed an inability to buy a gun due to purported TSDB status, SMF ¶ 38, and TSDB status is not shared with firearms dealers. Stark-Nutter Decl. ¶ 13. No plaintiff has alleged that they ever applied for a HAZMAT license, let alone that they were denied one. *See*, *supra*, SMF ¶ 38.[29] Additionally, for the one plaintiff who had claimed an inability to get a job at an airport, his deposition testimony revealed that he simply voluntarily put off *applying* for a job at the airport due to the fact that he believed he was in the TSDB—once he actually applied, he got the job a week or two later. *See* Ahmed Tr., DEX6 at 56-58.

So too with Plaintiffs' other one-off allegations. The plaintiff who claimed to have been prevented from test-driving a vehicle had a similar name to an individual on the Specially Designated National ("SDN") list maintained by the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC"); accordingly, the dealer was required to verify that Awad was not the individual on the list before it could complete the transaction. *See* SMF ¶ 57. The SDN List is publically available and not contingent on the TSDB; moreover, none of the other Plaintiffs experienced any similar problems. A few Plaintiffs contend that they had bank accounts closed or were prevented from making wire transfers at financial institutions as a result of their purported TSDB status. Am. Comp. ¶ 566. In each instance, however, Plaintiffs adduced no evidence that their bank accounts or wire transfers were delayed due to their purported TSDB status. The

---

[29] Even if a person applied for employment requiring a TSA security threat assessment, any determination of ineligibility by TSA resulting from that security assessment would be subject to a separate administrative redress process, *see, e.g.,* 49 C.F.R. Part 1515, and review in the Court of Appeals.

Government's testimony confirms that these allegations had nothing to do with Plaintiffs' TSDB status—the government does not share TSDB status with any banks or other financial institutions. Groh Decl. ¶ 36. Thus, Plaintiffs have not alleged any alteration or extinguishment of "a right or status" under state law or under the Constitution, and cannot prevail on their stigma-plus claim.

Finally, the Amended Complaint names NCTC and appears to seek relief against NCTC coextensive with the other Defendants. The evidence shows, however, that NCTC's role in the watchlisting process is to analyze intelligence and make nominations, but not to make placement determinations. *See* Groh Decl. ¶¶ 19-21, 26. NCTC participates in some interagency deliberations on behalf of the intelligence community, but Plaintiffs have put forward no evidence that NCTC has taken any action that deprives any Plaintiff here of a liberty interest.[30] Nomination alone is insufficient to result in placement, and NCTC is separately entitled to judgment as a matter of law.

### a.   Demanded Process Would Impair Government Interest.

"[A]ssessing the adequacy of a particular form of notice requires balancing the 'interest of the State' against 'the individual interest sought to be protected.'" *Jones v. Flowers*, 547 U.S. 220, 229 (2006) (citation omitted). As this Court and other courts have acknowledged, the government has a compelling interest in protecting the national security. *See Haig v. Agee*, 453 U.S. 280, 307 (1981) ("[N]o governmental interest is more compelling than the security of the Nation."); *Wayte v. United States*, 470 U.S. 598, 612 (1985) ("Unless a society has the capability and will to defend itself from the aggressions of others, constitutional protections of any sort have little meaning."); *Mohamed*, 2015 WL 4394958, at *5 ("the government's interest in protecting the safety of commercial aircraft is compelling").

The process that Plaintiffs demand—notice of the reasons and bases for placement on the TSDB—would impair the government's interest in preventing acts of terrorism through the

---

[30] Plaintiffs directed no discovery to NCTC and sought no information about NCTC during the discovery period. Although Plaintiffs made post-discovery attempts to depose NCTC (that were rejected by the Magistrate Judge), Plaintiffs have never treated NCTC as part of this case.

maintenance of an effective watchlisting system. In light of the Government's paramount interest in preventing terrorist attacks, due process does not require the Government to disclose a traveler's TSDB status every time that traveler experiences enhanced screening, or even after multiple screenings. Unlike the No Fly List, where status is confirmed for U.S. persons who are denied boarding and seek redress, a known or suspected terrorist required to undergo enhanced security screening is not told his or her own status in the TSDB, and it cannot be deduced based upon experiences at airports or the border. Groh Decl. ¶¶ 65-67 & n.13. Travelers may be required to undergo additional screening or inspection for a wide variety of reasons having nothing to do with the TSDB, and the majority of passengers designated for enhanced security screening are so designated for reasons other than TSDB Status. Froemling Decl. ¶ 10; Howe Decl. ¶ 16. Individuals who are not in the TSDB may be designated for enhanced screening on multiple consecutive flights, diminishing the ability of any individual to infer TSDB status from repeated designation for enhanced screening. Froemling Decl. ¶ 11. And, TSA applies the same checkpoint screening procedures to individuals that Secure Flight designates for enhanced screening, regardless of whether the individual is designated due to TSDB status, randomly, or for other reasons. *Id.* ¶¶ 12, 32. Similarly, travelers entering the country may be required to undergo additional inspection for a wide variety of reasons unrelated to the TSDB. Howe Decl. ¶¶ 14, 26.

Compelled disclosure of a traveler's TSDB status—beyond those circumstances contemplated by the DHS TRIP procedures—would have a devastating effect on the usefulness of the TSDB and imperil the effectiveness of critical law enforcement tools used to protect national security. Orlando Decl. ¶ 36. For example, disclosure of TSDB status would tend to reveal the Government's investigative interest (or lack thereof) in that individual, as well as the investigative procedures and techniques of investigating agencies associated with that individual's status. Groh Decl. ¶¶ 65-67; Orlando Decl. ¶¶ 21-23. It would be of considerable value to terrorist groups to confirm which individuals may not be of investigative or intelligence interest and who are thus more

likely to escape scrutiny. Groh Decl. ¶ 66; Orlando Decl. ¶ 23. Signaling the FBI's investigative

interest in a particular person can be especially damaging where FBI subjects or former subjects

have associates whom the FBI may still be investigating for potential ties to terrorist activity.

Orlando Decl. ¶ 22. Information regarding one subject may reflect law enforcement interest in other

subjects, and alerting those other subjects could cause them to flee, destroy evidence, or take steps

to alter their conduct or communications so as to avoid detection of future activities. *Id.*

By the same token, terrorists would know whether they are required to undergo additional

screening at airports, and use that information to attempt to evade enhanced security screening and

other security measures to gain access to the commercial aviation system to perpetrate an attack.

Froemling Decl. ¶¶ 49-59. Unlike persons on the No Fly List, who are denied boarding, persons

otherwise on the TSDB can still gain access to sterile area of airports, and can attempt social

engineering or to find insider threats. *Id.* ¶¶ 10, 55.

The Government also has a strong interest in protecting sensitive and classified information

related to terrorism. Particularly in light of the limited Plaintiffs' interest at issue, due process does

not require that the Government provide notice of the reasons and bases for placement on the

TSDB. Inclusion in the TSDB is sometimes based on sensitive law enforcement information,

including information that pertains to law enforcement techniques and procedures, information that

would undermine the confidentiality of sources, information that would endanger witness and law

enforcement personnel, information that would undermine the privacy of individuals involved in the

investigation, or information that would seriously impair the ability of a law enforcement agency to

conduct future investigations. Orlando Decl. ¶ 30. Revealing information about why a person was

included in the TSDB would therefore reasonably be expected to risk circumvention of the law and

cause harm to national security by providing potential terrorists with operationally valuable

information about the nature of the government's interest in them, as well as exposing Government

sources and methods used to obtain the relevant derogatory information. Groh Decl. ¶ 65; Orlando

Decl. ¶ 31. *See Bassiouni v. CIA,* 392 F.3d 244, 246 (7th Cir. 2004) (disclosing confidential information could demonstrate "how the CIA is deploying its resources and what subjects it is investigating," which "could be useful to both nations and terrorists."); *Snepp v. United States,* 444 U.S. 507, 509 n.3 (1980) (per curiam) ("The Government has a compelling interest in protecting both the secrecy of information important to our national security and the appearance of confidentiality so essential to the effective operation of our foreign intelligence service."). As the FBI attests, requiring Defendants to disclose the reasons and bases for placement on the TSDB would force nominating agencies such as the FBI to choose between, on the one hand, disclosing information that could reasonably be expected to compromise an investigation, expose a source, or reveal sensitive surveillance techniques, and, on the other, withholding information that could be used to identify and prevent a terrorist attack. Orlando Decl. ¶ 32.

As addressed further below, particularly in light of the minimal deprivation at issue— potential delays for additional screening—the balance of interests weighs heavily against the disclosure of watchlist status or the basis for such a status.

### b. The Process Afforded by DHS TRIP is Appropriate and Adequate.

The current DHS TRIP process is appropriate and adequate to protect Plaintiffs' alleged liberty interest from the risk of erroneous deprivation. As set forth *infra*, the private interests affected by alleged TSDB placement is limited, while the Government's interest in prevention of catastrophic terrorist attacks is extraordinary. The current nomination, placement, and quality assurances, and DHS TRIP procedures, ensure that the risk of erroneous deprivation is appropriately low. *See* Groh Decl. ¶¶ 17-29, 41-63; Orlando Decl. ¶¶ 8-14; Moore Decl. ¶¶ 7-16.

Inclusion in the TSDB is subject to multiple levels of review. First, before any individual is added to the TSDB, the nominating agency assesses the available, relevant information, including any exculpatory information, to determine whether the applicable standard is met, and the TSC completes a de novo review of available, relevant information to make the same assessment before

the individual is included in the TSDB. Groh Decl. ¶ 16. In addition, TSC conducts biannual reviews of all U.S. persons in the TSDB to ensure continued placement is warranted based on available, relevant information. *Id.* Further, individuals who experience travel-related screening difficulties may seek redress through DHS TRIP and, if the individual is a match to the TSDB, the TSC Redress Unit and the nominator will consider the individual's inquiry and other available, relevant information to make a determination as to whether continued placement is warranted. *Id.* On balance, the harm to counterterrorism efforts caused by alerting individuals as to whether or not they are on a terrorist watchlist far outweighs the benefits of additional process for people who are merely subject to travel delays. *See Rahman v. Chertoff*, 530 F.3d 622, 627 (7th Cir. 2008) ("Any change that reduces the number of false positives on a terrorist watch list may well increase the number of false negatives.").

Further, any additional procedural requirements would pose an enormous administrative and fiscal burden on the affected agencies. *See Mathews v. Eldridge*, 424 U.S. at 335. For example, expanding the revised redress procedures available to U.S. persons who are denied boarding to U.S. persons who experience enhanced screening would pose an extraordinary burden on the involved agencies, which the impacted private interests do not warrant. As explained *infra*, travelers are required to undergo additional screening or inspection for a wide variety of reasons having nothing to do with the TSDB. And if the revised redress process for U.S. persons on the No Fly List were applied to U.S. persons who receive enhanced screening as a result of TSDB status, DHS TRIP estimates that its workload for revised redress cases would increase by more than 1400 percent. Moore Decl. ¶ 20. This would lead to an impact in DHS TRIP's ability to provide a fair and timely redress process for all applicants, including the 98 percent of applicants who are cleared of any connection to the TSDB. *Id.* Additional challenges are posed by the fact that status in certain TSDB subsets constitutes SSI. Froemling Decl. ¶ 52 & Ex. A; Moore Decl. ¶ 14. None of these administrative and fiscal burdens are warranted by the limited travel delays alleged by plaintiffs.

**IV.    The Court Should Also Grant Summary Judgment in Defendants' Favor on Plaintiffs' Administrative Procedure Act Claim.**

As the Court has previously held, Plaintiffs' Administrative Procedure Act ("APA") claim "essentially conflate[s]" with their procedural due process claim. *Elhady*, 303 F. Supp. 3d at 467. Accordingly, Defendants are entitled to summary judgment on this claim for reasons coextensive with those set forth above, and Plaintiffs cannot separately demonstrate that the DHS TRIP process is arbitrary or capricious in violation of the APA. *See* 5 U.S.C. § 706(2)(A). In other words, in the circumstances here presented, if the challenged redress process comports with due process—which, as shown above, it does—"arbitrary and capricious" scrutiny cannot otherwise limit Defendants' statutory authority and discretion. In any event, if the Court were to consider the due process issue as a separate APA claim, the scope of APA review is narrow and deferential, and a court cannot substitute its judgment for that of the agency. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). As long as the agency's action being challenged—here the adequacy of the redress process—has a rational basis, it must be affirmed. *See Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 729 (1984). As set forth above, the contours of the relevant redress process are plainly reasonable.

**CONCLUSION**

For the foregoing reasons, the Court should grant summary judgment for Defendants as to Plaintiffs' remaining claim.

Dated:  March 11, 2019                     Respectfully submitted,


                                            G. ZACHARY TERWILLIGER
                                            United States Attorney

                                            JOSEPH HUNT
                                            Assistant Attorney General
                                            Civil Division

                                            ANTHONY J. COPPOLINO

60

Deputy Director, Federal Programs Branch

AMY POWELL
DENA M. ROTH
ANTONIA KONKOLY
CHRISTOPHER HEALY
Trial Attorneys, Federal Programs Branch
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue NW, Room 7324
Washington, DC 20530
Tel: (202) 514-2395
amy.powell@usdoj.gov
dena.m.roth@usdoj.gov
antonia.konkoly@usdoj.gov
christopher.healy@usdoj.gov


/s/ Lauren A. Wetzler
LAUREN A. WETZLER
Chief, Civil Division
Assistant United States Attorney
2100 Jamieson Ave.,
Alexandria, VA. 22314
Tel: (703) 299-3752
Fax: (703) 299-3983
Lauren.Wetzler@usdoj.gov

Attorneys for Defendants