# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF VIRGINIA
# ALEXANDRIA DIVISION

**ANAS ELHADY,** *et al.,*                    )
                                              )   **Case No. 16-cv-00375**
Plaintiffs,                                   )   Hon. Anthony J. Trenga
                                              )   Mag. Hon. John F. Anderson
v.                                            )
                                              )
**CHARLES H. KABLE,** Director of the         )   **PLAINTIFFS' MEMORANDUM**
Terrorist Screening Center; in his official   )   **IN SUPPORT OF THEIR MOTION**
capacity, *et al.;*                           )   **FOR SUMMARY JUDGMENT**
                                              )
Defendants.                                   )

---

**CAIR LEGAL DEFENSE FUND**
Lena F. Masri (DC # 100019) ±
Gadeir I. Abbas (VA # 81161) *
Carolyn M. Homer (DC # 1049145) ±
453 New Jersey Ave SE
Washington, DC 20003
Tel: (202) 516-4724
Fax: (202) 379-3317
gabbas@cair.com


± Admitted *pro hac vice*


*Mr. Abbas licensed in VA, not in D.C.*
*Practice limited to federal matters*
*Admitted to practice in this Court*

**AKEEL AND VALENTINE, PLC**
SHEREEF H. AKEEL (MI # P54345) ±
888 W. Big Beaver Rd., Ste. 910
Troy, MI 48084
Phone: (248) 269-9595
shereef@akeelvalentine.com


*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................................i

TABLE OF EXHIBITS ..............................................................................................................iii

TABLE OF ACRONYMS ...........................................................................................................x

INTRODUCTION .........................................................................................................................1

STATEMENT OF MATERIAL FACTS.......................................................................................2

    A.   The Terrorist Screening Center and Terrorist Screening Database..........................2

    B.   Inclusion in the Terrorist Screening Database................................................................4

    C.   Custom and Border Protection Uses the TSDB to Screen Travelers at Ports of Entry ........7

    D.   The Transportation Security Administration Uses the TSDB to Screen Airplane Passengers .........................................................................................................................16

    E.   The State Department and DHS Hinder TSDB Listees and Their Family Members Applying for Visas, Visa Waivers, and Immigration Benefits..........................................27

    F.   The Department of Homeland Security Uses the TSDB to Vet for Employment and Credentialing in both Public and Private Industries...........................................................28

    G.   The FBI Works with State and Local Governments, as well as Private Entities, to Use the TSDB to Impose Consequences on TSDB Listees ......................................................30

    H.   The Federal Government Uses and Disseminates the TSDB for Other Screening, Vetting, and Investigative Functions .................................................................................32

    I.   The Terrorist Screening Center Does Not Provide Redress for TSDB Listees ..............34

    J.   The TSDB Has Always Been Rife With Errors ........................................................37

    K.   The Government Can Identify No Connection Between TSDB Listees and Acts of Terrorism ..........................................................................................................................37

ARGUMENT.................................................................................................................................38

  I.   THE WATCHLISTING SYSTEM VIOLATES PROCEDURAL DUE PROCESS........38

    A.   The Deprivations the Watchlisting System Imposes are Severe .............................39

    B.   The TSDB burdens the right of international travel................................................40

    C.   The TSDB burdens the right of interstate travel.....................................................41

    D.   The Watchlisting System deprives Plaintiffs their reputational interests............................43

  II.   THE WATCHLISTING SYSTEM'S RISK OF ERRONEOUS DEPRIVATION IS HIGH...............................................................................................................................52

  III.   THE GOVERNMENT'S INTEREST IS LOW IN OPERATING A SPRAWLING WATCHLISTING SYSTEM THAT TARGETS INNOCENT PEOPLE, WITHOUT EVER

PROVIDING NOTICE AND USING A SECRET RUBBER-STAMPING INCLUSION STANDARD........................................................................................................................54

A.   The Government's Interest in its Watchlisting System Would Not Be Meaningfully Impacted if the Court Require Defendants to Provide TSDB Listees with Notice......................54

B.   The Government's Interest in its Watchlisting System is not Furthered by Maintaining a Secret Inclusion Standard..........................................................................................................54

C.   The Government's Interest in its Watchlisting System is Compatible with the Court Requiring Defendants to Utilize a Higher Inclusion Standard .........................................................55

IV.     DHS TRIP LACKS THE MOST BASIC ELEMENTS OF DUE PROCESS ..................56

CONCLUSION......................................................................................................................................57

CERTIFICATE OF SERVICE ...........................................................................................................58

# TABLE OF EXHIBITS

| # | Exhibit Title | Short Name | Date |
|---|---|---|---|
| 1 | Deposition of Anas Elhady | Elhady Dep. | February 22, 2018 |
| 1A | Detroit Medical Center and Hart EMS Medical Services Records | Elhady Medical | January 25, 2018 |
| 1B | Elhady Redress Letter | | February 9, 2015 |
| 2 | Deposition of Baby Doe 2, by his next friend, Father Doe 2 | Baby Dep. | January 17, 2018 |
| 2A | Baby Boarding Passes | | November 5, 2015 |
| 3 | Deposition of Yaseen Kadura | Kadura Dep. | November 30, 2017 |
| 3A | Kadura Redress Letter | | May 8, 2013 |
| 3B | Kadura Electronics Receipt | | November 27, 2012 |
| 4 | Deposition of Osama Hussein Ahmed | Ahmed Dep. | February 20, 2018 |
| 4A | Ahmed Boarding Passes | | August 8, 2016 |
| 5 | Deposition of Ahmad Ibrahim Al Halabi | Al Halabi Dep. | February 23, 2018 |
| 5A | Al Halabi Boarding | | April 14, 2018 |
| 5B | Al Halabi Redress Letter | | July 7, 2014 |
| 6 | Deposition of Michael Edmund Coleman | Coleman Dep. | February 6, 2018 |
| 7 | Deposition of Dr. Wael Hakmeh | Hakmeh Dep. | March 2, 2018 |
| 7A | Hakmeh Boarding Passes | | June 1, 2016 |
| 8 | Deposition of Hassan Shibly | Shibly Dep. | February 12, 2018 |
| 8A | Shibly Boarding Passes | | |
| 8B | Shibly Redress Letter | | March 8, 2011 |
| 9 | Deposition of Ausama Elhuzayel | Elhuzayel Dep. | January 18, 2018 |
| 9A | Ausama Elhuzayel – April 23, 2016 travel itinerary | Elhuzayel Itinerary | April 23, 2016 |
| 9B | Elhuzayel Boarding Passes | | January 18, 2018 |
| 9C | Elhuzayel Redress Letter | | December 6, 2016 |
| 10 | Deposition of Donald Thomas | Thomas Dep. | January 17, 2018 |
| 10A | Donald Thomas – April 27, 2016 travel itinerary | Thomas Itinerary | April 27, 2016 |
| 11 | Deposition of Murat Frljuckic | Frljuckic Dep. | December 21, 2017 |
| 11A | Frljuckic Redress Letter | | October 31, 2014 |
| 12 | Deposition of Ibrahim Awad | Awad Dep. | January 9, 2018 |
| 12A | Awad Boarding Passes | | April 10, 2017 |
| 13 | Deposition of Mark Amri | Amri Dep. | March 8, 2018 |
| 13A | Amri Boarding Passes | | August 5, 2016 |

| # | Exhibit Title | Short Name | Date |
|---|---|---|---|
| 14 | Deposition of Dr. Adnan Khalil Shaout | Shaout Dep. | January 4, 2018 |
| 14A | Shaout Boarding Passes | | October 16, 2017 |
| 14B | Shaout Redress Letter | | November 5, 2015 |
| 15 | Deposition of Saleem Ali | Ali Dep. | March 14, 2018 |
| 16 | Deposition of Shahir Anwar | Shahir Dep. | February 15, 2018 |
| 16A | Shahir Redress Letter | | March 23, 2015 |
| 17 | Deposition of Samir Anwar | Samir Dep. | January 3, 2018 |
| 17A | Samir Boarding Passes | | August 28, 2017 |
| 17B | Samir Redress Letter | | August 7, 2014 |
| 18 | Deposition of Dr. Muhammad Yahya Khan | Khan Dep. | February 8, 2018 |
| 18A | Khan Boarding Passes | | December 28, 2017 |
| 18B | Khan Redress Letter | | July 14, 2015 |
| 19 | Deposition of Dr. Hassan Fares | Fares Dep. | January 2, 2018 |
| 19A | Fares Boarding Passes | | August 3, 2016 |
| 20 | Deposition of Zuhair El-Shwehdi | El-Shwehdi Dep. | November 29, 2017 |
| 20A | El-Shwehdi Boarding Passes | | June 2, 2016 |
| 21 | Deposition of John Doe 2 | JD2 Dep. | January 8, 2018 |
| 21A | JD2 Boarding Passes | | March 16, 2017 |
| 22 | Deposition of John Doe 3 | JD3 Dep. | April 11, 2018 |
| 22A | JD3 Boarding Passes | | |
| 23 | Deposition of John Doe 4 | JD4 Dep. | December 18, 2017 |
| 23A | JD4 Boarding Passes | | January 12, 2017 |
| 24 | Transcript of Deborah Moore, DHS TRIP Designated Representative, in *Elhady v. Kable* | DHS TRIP Dep. | December 20, 2017 |
| 25 | Transcript of Timothy P. Groh, TSC Designated Representative, in *Elhady v. Kable* | TSC Dep. | March 1, 2018 |
| 26 | Transcript of Hao-y Tran Froemling, TSA Designated Representative, in *Elhady v. Kable* | TSA Dep. | March 20, 2018 |
| 27 | Transcript of Randy Howe, CBP Designated Representative, in *Elhady v. Kable* | CBP Dep. | March 22, 2018 |
| 28 | Transcript of Matthew J. DeSarno, FBI Designated Representative | FBI Dep. | April 9, 2018 |

| # | Exhibit Title | Short Name | Date |
|---|---|---|---|
| 29 | Transcript of Hao-y Tran Froemling, TSA Designated Representative, in *Elhady v. Kable* | TSA Supp. Dep. | October 4, 2018 |
| 30 | Homeland Security Presidential Directive/HSPD-6 | HSPD-6 | September 16, 2003 |
| 31 | Homeland Security Presidential Directive/HSPD-11 | HSPD-11 | August 27, 2004 |
| 32 | Review of the Terrorist Screening Center, U.S. Department of Justice Office of the Inspector General Audit Report 05-27 | 2005 TSC Audit | June 2005 |
| 33 | Memorandum of Understanding Regarding the Screening of Employees of P&O Ports North America, Inc. | P&O Ports Screening | March 27, 2006 |
| 34 | GAO-06-131: TERRORIST WATCH LIST SCREENING Effort to Help Reduce Adverse Effects on the Public | GAO TSDB Adverse Effects | September 2006 |
| 35 | List of Programs Under Which TSA May Use TSDB Records and Data to Conduct Security Threat Assessments | TSA Programs List | December 18, 2006 |
| 36 | Homeland Security Presidential Directive-11: An Updated Strategy for Comprehensive Terrorist-Related Screening Procedures | HSPD-11 Updated Strategy | Fall 2007 |
| 37 | Follow-up Audit of the Terrorist Screening Center, U.S. Department of Justice Office of the Inspector General Audit Report 07-41 | 2007 TSC Follow-Up Audit | September 2007 |
| 38 | Memorandum of Understanding of Terrorist Watchlist Redress Procedures | 2007 Redress MOU | September 19, 2007 |
| 39 | GAO-08-110: TERRORIST WATCH LIST SCREENING Opportunities Exist to Enhance Management Oversight, Reduce Vulnerabilities in Agency Screening Processes, and Expand Use of the List | GAO Expand Screening | October 2007 |
| 40 | Declaration of Tracey A. North in *Ibrahim v. Department of Homeland Security* | FBI North *Ibrahim* Decl. | November 20, 2009 |

| # | Exhibit Title | Short Name | Date |
|---|---|---|---|
| 41 | GAO-10-401T: HOMELAND SECURITY Better Use of Terrorist Watchlist Information and Improvements in Deployment of Passenger Screening Checkpoint Technologies Could Further Strengthen Security | GAO Screening Tech. | January 27, 2010 |
| 42 | Declaration of Mark F. Giuliano, Federal Bureau of Investigation in *Latif v. Holder* | FBI Giuliano *Latif* Decl. | November 16, 2010 |
| 43 | Declaration of Christopher M. Piehota in *Latif v. Holder* | TSC Piehota *Latif* Decl. | November 17, 2010 |
| 44 | OIG-11-96 Transportation Security Administration Vetting of Airmen Certificates and General Aviation Airport Access and Security Procedures | TSA Airmen Certificates | July 2011 |
| 45 | GAO-14-531: SECURE FLIGHT TSA Should Take Additional Steps to Determine Program Effectiveness | GAO Secure Flight | September 2014 |
| 46 | "Safeguarding Privacy and Civil Liberties while Keeping our Skies Safe," Statement of Christopher M. Piehota, Director, Terrorist Screening Center, before the U.S. House Subcommittee on Transportation Security | TSC Piehota 2014 House Testimony | September 18, 2014 |
| 47 | Declaration of G. Clayton Grigg in *Mohamed v. Holder* | TSC Grigg *Mohamed* Decl. | December 9, 2014 |
| 48 | Declaration of Michael Steinbach in *Latif v. Holder* | FBI Steinbach *Latif* Decl. | May 28, 2015 |
| 49 | Declaration of G. Clayton Grigg in *Latif v. Holder* | TSC Grigg *Latif* Decl. | May 28, 2015 |
| 50 | Declaration of John Giacalone in *Latif v. Lynch* | FBI Giacalone *Latif* Decl. | October 19, 2015 |
| 51 | Terrorist Screening Center Redress Program Standard Operating Procedures | 2015 Redress SOP | December 8, 2015 |
| 52 | Declaration of Michael Steinbach in *Mohamed v. Holder* | FBI Steinbach *Mohamed* Decl. | March 2, 2016 |

| # | Exhibit Title | Short Name | Date |
|---|---|---|---|
| 53 | Declaration of Roderick Allison in *Mohamed v. Lynch* | TSA Allison *Mohamed* Decl. | March 2, 2016 |
| 54 | Privacy Impact Assessment Update for the Watchlist Service, DHS/ALL-027(e) | USCIS PIA | May 5, 2016 |
| 55 | FinCEN Awards Recognize Partnership Between Law Enforcement and Financial Institution to Fight Financial Crime | FinCEN Release | May 10, 2016 |
| 56 | Baltimore Policy Policy 802, Handling Codes: Terrorist Response | TSC Handling Codes | September 8, 2016 |
| 57 | Terrorist Screening Center: Frequently Asked Questions | TSC FAQ | January 2017 |
| 58 | Terrorist Screening Center: Weekly Export Metrics | TSC Sample Weekly Report | September 4, 2017 |
| 59 | Terrorist Screening Center: Director's Monthly Report - September | TSC Sample Monthly Report | October 16, 2017 |
| 60 | Excerpts of FBI/TSC Privilege Log | TSC Priv. Log | November 15, 2017 |
| 61 | Excerpts of Defendants' Responses to Plaintiffs' First Set of Requests for Admissions to Official Capacity TSC Defendants | TSC RFA | December 27, 2017 |
| 62 | Overview of the U.S. Government's Watchlisting Process and Procedures | Overview | January 2018 |
| 63 | Executive Order 13780: *Protecting the Nation From Foreign Terrorist Entry Into the United States*, Initial Section 11 Report | Travel Ban Report | January 2018 |
| 64 | CBP Directive No. 3340-049A: Border Search of Electronic Devices | CBP Electronic Search Policy | January 4, 2018 |
| 65 | On a Typical Day in Fiscal Year 2017, CBP… | CBP 2017 Factsheet | February 13, 2018 |
| 66 | Excerpts of Defendants' Objections to Plaintiffs' First Set of Interrogatories to TSC | TSC 1st Rog | February 21, 2018 |
| 67 | Excerpts of Defendants' Objections to Plaintiffs' First Set of Interrogatories to FBI | FBI 1st Rog | February 22, 2018 |

| # | Exhibit Title | Short Name | Date |
|---|---------------|------------|------|
| 68 | Declaration of Timothy P. Groh Submitted In Camera, Ex Parte, in *Elhady v. Kable* | TSC Groh Decl. I | April 23, 2018 |
| 69 | Declaration of Timothy P. Groh Submitted In Camera, Ex Parte, In Response to Plaintiffs' Second Motion to Compel in *Elhady v. Kable* | TSC Groh Decl. II | April 27, 2018 |
| 70 | Declaration of Timothy Joseph in *Elhady v. Kable* | TSA Joseph Decl. | April 27, 2018 |
| 71 | Defendants' Supplemental Responses to Plaintiffs' First Set of Interrogatories to FBI | FBI 1st Rog Supp. | May 17, 2018 |
| 72 | Declaration of Timothy P. Groh in *Elhady v. Kable* | TSC Groh Decl. III | May 30, 2018 |
| 73 | Declaration of Randy Howe in *Elhady v. Kable* | CBP Howe Decl. | June 14, 2018 |
| 74 | Declaration of Timothy P. Groh in *Elhady v. Kable* | TSC Groh Decl. IV | July 5, 2018 |
| 75 | Myth Buster: TSA's Watch List is More Than One Million People | TSA Myth Release | July 14, 2018 |
| 76 | Supplemental Declaration of Timothy P. Groh in *Elhady v. Kable* | TSC Groh Decl. V | September 5, 2018 |
| 77 | Email from Amy Powell to Gadeir Abbas re: Meet/Confer Request re NSC Approval of WLG | NSC Email | October 11, 2018 |
| 78 | National Strategy to Combat Terrorist Travel of the United States of America | 2018 National Strategy | December 2018 |
| 79 | TSC's Supplemental Response to Interrogatory 30 | TSC. Supp. Rog 30 I | February 8, 2019 |
| 80 | TSC's Addendum to Supplemental Response to Interrogatory 30 | TSC Supp. Rog 30 II | February 21, 2019 |
| 81 | TSC's Second Addendum to Supplemental Response to Interrogatory 30 | TSC Supp. Rog 30 III | March 1, 2019 |
| 82 | CJIS Supplemental Response to Interrogatory 30 | CJIS Supp. Rog 30 | March 1, 2019 |

| # | Exhibit Title | Short Name | Date |
|---|---|---|---|
| 83 | FBI Nominations & VGTOF Training, Redacted Exhibits as filed by the Government in *ACLU v. U.S. Department of Justice*, 2:09-cv-00642 (W.D. Wa. July 7, 2011) | ACLU KST Lawsuit Docs | January 28, 2008 |

**TABLE OF ACRONYMS**

| Acronym | Definition |
| --- | --- |
| ACLU | American Civil Liberties Union |
| CAIR | Council on American-Islamic Relations |
| CBP | Customs and Border Protection |
| DHS | Department of Homeland Security |
| DHS TRIP | DHS Traveler Redress Inquiry Program |
| DOJ | Department of Justice |
| FAQ | Frequently Asked Questions |
| FBI | Federal Bureau of Investigation |
| FinCEN | Financial Crimes Enforcement Network |
| GAO | Government Accountability Office |
| HSPD | Homeland Security Presidential Directive |
| KST | Known or Suspected Terrorist |
| MOU | Memorandum of Understanding |
| MSJ | Motion for Summary Judgment |
| NCTC | National Counterterrorism Center |
| NSC | National Security Council |
| NSPM | National Security Presidential Memorandum |
| OFAC | Office of Foreign Asset Control |
| OIG | Office of the Inspector General |
| OPIC | Overseas Private Investment Corporation |
| PIA | Privacy Impact Assessment |
| RFA | Request for Admission |
| Rog | Interrogatory |
| SOP | Standard Operating Procedures |
| TSA | Transportation Security Administration |
| TSC | Terrorist Screening Center |
| TSDB | Terrorist Screening Database a/k/a "the watchlist" |
| TSDB Listee | An individual with identifying information stored in the Terrorist Screening Database |
| USAID | U.S. Agency for International Development |
| USCIS | U.S. Citizenship and Immigration Services |
| VWP | Visa Waiver Program |
| WAC | Watchlisting Advisory Council |
| WLG | Watchlisting Guidance |
| WLS | DHS Watchlisting Service |

# INTRODUCTION

**"If I am not guilty, why should you ruin my life? Why should you devastate my family life? …[The watch list] destroyed my family. It destroyed me. It destroyed me."** MSJ Ex. 22, John Doe 3 Dep. at 130

The federal government has imposed a kind of second-class citizenship on the Plaintiffs and thousands of American Muslims throughout the country. Without charges, without arrests, without even an investigation sometimes — the agency Defendants act in concert to deprive thousands of innocent Americans, mostly Muslims, of their right to be free from a government that extrajudicially designates them as worthy of permanent suspicion.

It is this permanent suspicion and the consequences that accompany it that pushed John Doe 3 to leave his wife and children in the United States and exile himself to Germany. The Watchlisting System, a set of interlocking programs and joint ventures led by the federal government's Watchlist Advisory Counsel, is so pervasive and creates such a profound fear within its targets that an innocent American fled this country in an attempt to live outside the Watchlisting System's reach.

But the Watchlisting System is no longer a domestic effort. It is a global enterprise, disclosing to more than 60 countries the disfavored status the federal government has assigned to over one million people. At this stage of the Watchlisting System's evolution, there really is no escaping it.

The project has now enlisted tens of thousands of public and private entities in the United States and beyond to make sure a person's status defines the parameters of their lives and affects them no matter what they do. The disfavored status makes certain jobs, licenses, privileges, and benefits impossible to obtain. The status means a trip to Canada by land might result in the Watchlisting System's targets being handcuffed at gun point to be detained and interrogated for the day. These Plaintiffs, who all bear the burdens of the status Defendants have assigned to them, confront distinct and more onerous processes whatever they do and wherever they go. Just as the agency Defendants

intended.

And for what? TSA acknowledges that the key parts of the Watchlisting System it manages have prevented no acts of terrorism. CBP does the same. The FBI is a bit more reserved, admitting that the agency knows, but will not reveal, whether an actual perpetrator of a violent act of terrorism inside the United States has ever been targeted by the Watchlisting System at the time they committed their despicable deed. It is the answer of an agency eager to paper over an illegal boondoggle that makes no one safer.

The Watchlisting System is a violation of the Constitution. The evidence makes it clear. This Court must bring to an end the federal government's practice of imposing on innocent Americans— people who have not been arrested, charged, or convicted of a violent offense—a status that transforms them into second-class citizens.

## STATEMENT OF MATERIAL FACTS

### A. The Terrorist Screening Center and Terrorist Screening Database

1.      President George W. Bush executed Homeland Security Presidential Directive-6 on September 16, 2003. HSPD-6 directed the U.S. Attorney General to "establish an organization to consolidate the Government's approach to terrorism screening." HSPD-6 created the Terrorist Screening Center, which is administered by the FBI. MSJ Ex. 30, *HSPD-6*; MSJ Ex. 62, *Overview* at 1.

2.      The Terrorist Screening Center, alongside the National Counterterrorism Center, co-chairs a federal inter-agency body known as the Watchlisting Advisory Council. The agencies which regularly attend Watchlisting Advisory Council meetings include all Defendants in this action. MSJ Ex. 69, TSC Groh Decl. II ¶ 41; MSJ Ex. 72, TSC Groh Decl. III ¶ 3; MSJ Ex. 28, FBI Dep. 52:8-11.

3.      Through a consensus-driven discussion and resolution process, the Watchlisting Advisory Council writes watchlisting policies. The Watchlisting Advisory Council sets the governing substantive standards and criteria for watchlisting, which its member agencies follow. The National

Security Council ratifies the Watchlisting Advisory Council's policies. Current watchlisting policy is embodied in the 2015 Watchlisting Guidance. The Government refuses to publish or produce the 2015 Watchlisting Guidance in any form; it is a secret document. MSJ Ex. 69, TSC Groh Decl. II ¶¶ 42-43; MSJ Ex. 76, TSC Groh Decl. V ¶ 13; MSJ Ex. 25, TSC Dep. 26:16-27:4, 27:6-12. 27:21-28:11, 28:22-29:9, 37:4-7, 196:19-197:8; MSJ Ex. 28, FBI Dep. 16:3-15, 259:9-260:15, 384:10-22, 395:11-19; MSJ Ex. 26, TSA Dep. 126:8-22, 284:8-20, 343:13-344:9, 366:4-17; MSJ Ex. 24, DHS TRIP Dep. 152:1-153:15; MSJ Ex. 27, CBP Dep. 330:6-331:10; MSJ Ex. 77, NSC Email; MSJ Ex. 48, FBI Steinbach *Latif* Decl. ¶¶ 12, 33; 12; MSJ Ex. 49, TSC Grigg *Latif* Decl. ¶¶ 15 n.7, 23; MSJ Ex. 47, TSC Grigg *Mohamed* Decl. ¶¶ 21-22; MSJ Ex. 60, TSC Priv. Log.

4.      HSPD-6 also directs the Attorney General to consolidate terrorism-related information and then use it to support (a) federal, state, local, territorial, tribal, foreign-government, and private-sector screening processes, and (b) diplomatic, military, intelligence, law enforcement, immigration, visa, and protective processes. The TSC thus houses the Terrorist Screening Database ("TSDB" or "watchlist"). The TSDB is a centralized collection of information about listed individuals (i.e. "TSDB Listees"). The individual identifying information includes biographic and biometric data, such as names, aliases, birthdates, photographs, fingerprints, and iris scans. MSJ Ex. 30, *HSPD-6*; MSJ Ex. 62, *Overview* at 2; MSJ Ex. 68, TSC Groh Decl. I ¶ 7.

5.      The TSDB is updated continuously and disseminated around the country and world in real-time. The TSDB, since 2006, retains copies of "all prior versions of a person's record." *See* MSJ Ex. 62, *Overview* at 2; MSJ Ex. 66, TSC 1st Rog at 8; MSJ Ex. 47, TSC Grigg *Mohamed* Decl. ¶ 18; MSJ Ex. 26, TSA Dep. 105:17-22; MSJ Ex. 27, CBP Dep. 121:20-22; MSJ Ex. 25, TSC Dep. 300:4-13.

6.      The TSC provides a centralized identity resolution service whenever federal, state, or foreign partners encounter an individual who may match a TSDB record. MSJ Ex. 62, *Overview* at 5.

7.      TSDB records are unclassified. The TSDB does not include the underlying derogatory

information which supports an individual's inclusion in the database. MSJ Ex. 42, FBI Giuliano *Latif* Decl. ¶¶ 7, 9; MSJ Ex. 43, TSC Piehota *Latif* Decl. ¶ 6.

**B. Inclusion in the Terrorist Screening Database**

8.     Federal government agencies and foreign government partners may nominate individuals to the TSDB. Any suggested change to the TSDB is known as a nomination. A nomination of a new individual is known as an "Add." A nomination to change an existing record is known as a "Modify." A nomination to delist a record is known as a "Remove." MSJ Ex. 62, *Overview* at 3, 6, 8; MSJ Ex. 66, TSC 1st Rog at 7; MSJ Ex. 47, TSC Grigg *Mohamed* Decl. ¶ 13.

9.     As of 2017, there are approximately 1,160,000 individuals on the watchlist, of which 4640 are U.S. Persons. In 2017, the TSC accepted 166,603 new additions of individuals to the watchlist and rejected 5,215. A decade earlier, in 2008, there were less than 400,000 individuals on the watchlist. MSJ Ex. 74, TSC Groh Decl. IV ¶ 4; MSJ Ex. 66, TSC 1st Rog at 7; MSJ Ex. 75, TSA Myth Release.

10.    Federal government agencies and foreign government partners draw the information supporting their nominations from intelligence, law enforcement, homeland security, embassy, consulate, financial, and immigration records. MSJ Ex. 62, *Overview* at 3; MSJ Ex. 55, FinCEN Release.

11.    New additions to the TSDB must include minimal identifying and substantive information. The minimum identifying information must be sufficient to allow screeners to determine whether an individual's identity is an actual match to a TSDB record. MSJ Ex. 62, *Overview* at 3; MSJ Ex. 48, FBI Steinbach *Latif* Decl. ¶ 9; MSJ Ex. 46, TSC Piehota 2014 House Testimony at 2; MSJ Ex. 66, TSC 1st Rog at 25.

12.    The minimum substantive information must be enough to satisfy the TSDB inclusion standard, which the Government calls the "reasonable suspicion that the individual is a known or suspected terrorist" standard. MSJ Ex. 66, TSC 1st Rog at 25; MSJ Ex. 26, TSA Dep. 76:9-19; MSJ Ex. 62, *Overview* at 3; MSJ Ex. 30, *HSPD-6*; MSJ Ex. 42, FBI Giuliano *Latif* Decl. ¶ 13.

13.     The Government defines a "Known Terrorist" as "an individual who has been (1) arrested, charged by information, or indicted for, or convicted of, a crime related to terrorism and /or terrorist activities by the United States Government or foreign government authorities; or (2) identified as a terrorist or member of a terrorist organization pursuant to statute, Executive Order or international legal obligations pursuant to a United Nations Security Council Resolution." MSJ Ex. 78, 2018 National Strategy at 13; MSJ Ex. 57, TSC FAQ.

14.     The Government defines a "Suspected Terrorist" as "an individual who is reasonably suspected to be engaging in, has engaged in, or intends to engage in conduct constituting, in preparation for, in aid of, or related to terrorism and /or terrorist activities." MSJ Ex. 78, 2018 National Strategy at 14; *accord* MSJ Ex. 57, TSC FAQ.

15.     The Government adds individuals to the TSDB if their nomination is based "upon articulable intelligence or information which, based on the totality of the circumstances and, taken together with rational inferences from those facts, creates a reasonable suspicion that the individual is engaged, has been engaged, or intends to engage, in conduct constituting in preparation for, in aid or in furtherance of, or related to, terrorism and/or terrorist activities." MSJ Ex. 62, *Overview* at 4.

16.     There is at least one exception to the TSDB's inclusion standard.  The exception applies to foreign nationals, with undisclosed additional criteria.  The exception exists to facilitate immigration and border screening by the Department of State and Department of Homeland Security. The exception is also used by the TSA to screen foreign nationals for transportation credentials.  The Government will not disclose the inclusion standard for this exception.  MSJ Ex. 25, TSC Dep. 64:20-65:12, 76:8-77:11; MSJ Ex. 26, TSA Dep. 83:2-12; MSJ Ex. 27, CBP Dep. 123:15-124:2, 124:22-125:12. MSJ Ex. 28, FBI Dep. 394:19-395:3; MSJ Ex. 46, TSC Piehota 2014 House Testimony at 2; MSJ Ex. 49, TSC Grigg *Latif* Decl. ¶ 15 n.8; MSJ Ex. 68, TSC Groh Decl. I ¶ 11.

17.     The Terrorist Screening Center reviews all nominations to the TSDB and their

supporting facts. The final authority to accept, reject, or modify a nomination rests with the TSC alone. *See, e.g.,* MSJ Ex. 62, *Overview* at 4, 5, 7; MSJ Ex. 42, FBI Giuliano *Latif* Decl. ¶ 12; MSJ Ex. 49, TSC Grigg *Latif* Decl. ¶ 27; MSJ Ex. 47, TSC Grigg *Mohamed* Decl. ¶ 11; MSJ Ex. 26, TSA Dep. 280:19-281:8; MSJ Ex. 27, CBP Dep. 110:22-111:8, 112:11-15; MSJ Ex. 66, TSC 1st Rog at 33

18.     The TSC may consider an individual's "race, ethnicity, or religious affiliation" as well as their "beliefs and activities protected by the First Amendment, such as freedom of speech, free exercise of religion, freedom of the press, freedom of peaceful assembly, and the freedom to petition the government for redress of grievances" as information supporting a nomination to the TSDB. *See* MSJ Ex. 62, *Overview* at 4; MSJ Ex. 28, FBI Dep. 305:5-18.

19.     The TSC may consider an individual's travel history, associates, business associations, international associations, financial transactions, and study of Arabic as information supporting a nomination to the TSDB. MSJ Ex. 40, FBI North *Ibrahim* Decl. ¶ 20; MSJ Ex. 50, FBI Giacalone *Latif* Decl.¶ 9; MSJ Ex. 25, TSC Dep. 340:17-341:13, 343:21-344:14; MSJ Ex. 48, FBI Steinbach *Latif* Decl. ¶¶ 24-25, 28-29; MSJ Ex. 55, FinCEN Release; MSJ Ex. 32, 2005 TSC Audit at viii.

20.     TSDB records are not criminal records. The TSC includes individuals in the TSDB who have not been convicted, arrested, investigated, or suspected of any crime. Inclusion in the TSDB does not require evidence that an individual has engaged in any criminal activity. Inclusion in the TSDB does not require evidence that an individual has committed a crime, is committing a crime, or will commit a crime in the future. Individuals who have been acquitted of a terrorism-related crime may still be listed in the TSDB. MSJ Ex. 61, TSC RFA # 12; MSJ Ex. 50, FBI Giacalone *Latif* Decl. ¶ 16; MSJ Ex. 25, TSC Dep. 323:6-9; MSJ Ex. 28, FBI Dep. 254:5-255:8, 261:9-21, 264:15-18, 265:4-21, 276:13-18, 284:21-285:8; MSJ Ex. 52, FBI Steinbach *Mohamed* Decl. ¶ 9; MSJ Ex. 48, FBI Steinbach *Latif* Decl. ¶ 7.

21.     To fulfill its mission as a central repository of watchlist identities, the TSC exports and

shares TSDB information with various partners, including federal, state, and foreign government agencies and officials. Governments use TSDB information to support their screening, vetting, credentialing, diplomatic, military, intelligence, law enforcement, visa, immigration, and other security functions. MSJ Ex. 62, *Overview* at 1-2, 5-6. MSJ Ex. 66, TSC 1st Rog at 6; MSJ Ex. 57, TSC FAQ.

22. Federal, state, local, territorial, and tribal personnel use the TSDB "each day" to "make countless decisions related to immigration, border security, law enforcement, intelligence, transportation security, credentialing, and critical infrastructure." MSJ Ex. 36, *HSPD-11 Updated Strategy* § 1.

23. Based on the specific needs and missions of its various partners, the TSC annotates TSDB records. TSC assigns these annotations based on distinct criteria from TSDB's overall inclusion standard. The final authority to accept, reject, or modify a nomination or annotation to a TSDB rests with the TSC alone. *See* MSJ Ex. 62, *Overview* at 2, 4, 5, 7; MSJ Ex. 46, TSC Piehota 2014 House Testimony at 4; MSJ Ex. 36, *HSPD-11 Updated Strategy* § 3.2.2.

24. TSDB Listees may infer their watchlist status from the adverse consequences they experience, including "delay, inconvenience, or other difficulties at a point of screening where TSDB data is used to screen for terrorists." *See* MSJ Ex. 25, TSC Dep. 174:20-175:7; MSJ Ex. 51, *2015 Redress SOP* § 2.1.1.

## C. Custom and Border Protection Uses the TSDB to Screen Travelers at Ports of Entry

### 1) *CBP Border Screening Policies and Practices*

25. The TSC exports the TSDB to the DHS Watchlist Service. The DHS Watchlist Service then provides CBP with access to the TSDB through CBP's TECS system. CBP screens all individual travelers against the TSDB who are seeking to enter the United States at U.S. ports of entry, between ports of entry, and at preclearance facilities abroad. CBP may also screen and question TSDB Listees seeking to exit the United States via U.S. ports of entry. MSJ Ex. 62, *Overview* at 5; MSJ Ex.

27, CBP Dep. 28:18-21, 29:19-21, 31:4-12, 32:20-33:1, 46:19-50:3.

26.     CBP and the U.S. Coast Guard use the TSDB to screen passenger and crew manifests for ships traveling through U.S. waters and seaports. MSJ Ex. 36, *HSPD-11 Updated Strategy* §§ 3.2.3, 3.3, 3.4.1; MSJ Ex. 27, CBP Dep. 36:21-37:1, 37:19-21.

27.     CBP uses the TSDB to deem foreign national TSDB Listees inadmissible to the United States. CBP denies entry based on TSDB Listee status. In 2017, CBP encountered 2,554 TSDB Listees attempting to enter the United States. *See* MSJ Ex. 27, CBP Dep. 34:10-19, 58:15-18; 59:10-18, 63:8-11; MSJ Ex. 73, CBP Howe Decl. ¶ 7; MSJ Ex. 63, Travel Ban Report at 8-9. MSJ Ex. 51, *2015 Redress SOP* §§ 5.1.1 & Glossary.

28.     CBP uses the TSDB to deny TSDB Listees boarding on international flights, or to recommend to foreign governments that they deny TSDB Listees boarding on international flights. CBP may deny boarding to U.S. Persons located abroad due to their TSDB Listee status, even if the U.S. Person is *not* designated as "No Fly." *See* MSJ Ex. 59, *TSC Sample Monthly Report* at 2, 9, 10; MSJ Ex. 27, CBP Dep. 58:15-18; 59:10-18, 63:8-11; MSJ Ex. 51, *2015 Redress SOP* § 5.1.1 & Glossary.

29.     Once an individual reaches a U.S. port of entry, CBP initial inspection officers are alerted if the individual is a TSDB Listee. CBP requires secondary inspection at U.S. ports of entry for TSDB Listees. MSJ Ex. 27, CBP Dep. 67:2-8, 67:19-68:17, 77:4-79:21. 80:15-19, 221:8-22.

30.     The TSC and CBP assigns an "armed and dangerous" annotation to TSDB Listees based on unknown criteria the Government refuses to disclose. Initial inspection alerts inform CBP officers that some TSDB Listees are designated "armed and dangerous." If an "armed and dangerous" alert appears in connection with a TSDB record, CBP officers may call in law enforcement reinforcements, call in an explosive-sniffing canine, draw their firearms, or handcuff the TSDB Listee. This armed and dangerous operational response will occur in public. *See* MSJ Ex. 27, CBP Dep. 135:2-15, 136:19-137:5, 138:21-139:16, 227:19-228:11, 248:4-249:8, 251:8-22, 255:5-16, 258:12-19, 262:15-

263:1, 350:20-351:6; *See* MSJ Ex. 58, *TSC Sample Weekly Report* at 2; MSJ Ex. 32, 2005 TSC Audit at 54.

31.    Once a TSDB Listee is referred to secondary inspection, CBP officers may pat them down, search their wallet and copy its contents, search their cars, or search their electronics.   CBP also often calls ICE agents and FBI agents in to participate in secondary inspection interviews and investigations of TSDB Listees.  MSJ Ex. 27, CBP Dep. 262:20-263:1, 266:3-267:21, 281:3-19, 285:4-15, 285:18-286:8; MSJ Ex. 28, FBI Dep. 354:21-356:11; MSJ Ex. 62, *Overview* at 5; MSJ Ex. 64, CBP Electronic Search Policy § 5.1.4.

32.    CBP policy provides that TSDB Listee status alone justifies and requires an "advanced search," of their electronic devices.  An advanced search entails the physical connection of the electronic device to CBP equipment in order to review, copy, and analyze the electronic device's contents.  CBP policy prohibits it from performing the advanced search of the electronic device in the TSDB Listee's presence, or from informing the TSDB listee that the electronic device's information has been searched, copied, or conveyed to other agencies.  *See* MSJ Ex. 64, CBP Electronic Search Policy §§ 5.1.4, 5.1.6, 5.4.1.3, 5.4.2.5; MSJ Ex. 27, CBP Dep. 305:4-10, 312:15-313:4; *see also* MSJ Ex. 69, TSC Groh Decl. II ¶ 41.

33.    If a TSDB Listee has any travelling companions, CBP documents the identities of the associated companions.  CBP also searches and copies the contents of the traveling companions' electronic devices.  MSJ Ex. 27, CBP Dep. 270:2-16; MSJ Ex. 32, 2005 TSC Audit at 100.

34.    CBP documents the results of its secondary inspections for TSDB listees in TECS. CBP retains all historical secondary inspection logs and watchlist information about travelers, even if the traveler has since been removed from the TSDB.  MSJ Ex. 27, CBP Dep. 67:2-8, 67:19-68:17, 77:4-79:21. 80:15-19, 198:16-199:5, 221:8-22.

### 2) *Plaintiffs' Adverse Land Border Crossing Experiences*

35.     On his way into Canada in April 2015, Mr. Elhady was detained and interrogated by Canadian authorities. The Canadian authorities asked him to provide the exact time he would be crossing the border back into the United States. Mr. Elhady informed them that he would be crossing between 11:30 p.m. and midnight. Upon approaching the border to return to the United States that evening, Mr. Elhady handed the primary inspection CBP officer his ID and his DHS TRIP redress letter. He was immediately asked to put his hands on his steering wheel and his car was surrounded by CBP officers. He was told to get out of the car and walk to the back of the car, where he was handcuffed in public view. He was then escorted to a freezing cold room with a metal seat and "very bright light[s]." CBP officers then confiscated his shoes and outer clothing and left him in the room for more than ten hours. Every hour or hour and a half, CBP officers would come in and interrogate him about his family members and people he knew. MSJ Ex. 1, Elhady Dep. at 181-186.

36.     Mr. Elhady pleaded with the CBP officers to be let out of the room. Due to the severe conditions of confinement, Mr. Elhady ultimately needed emergency medical attention. Mr. Elhady was taken on a stretcher to an ambulance, handcuffed to the stretcher, and transported to a hospital where he was handcuffed to a chair. According to his medical records, Mr. Elhady was administered Basic Life Support (BLS)."[1] CBP officers then attempted to interfere with his diagnosis and treatment by ordering the treating doctor not to ask questions about what had happened. Upon being discharged, Mr. Elhady was handcuffed to the floor of a CBP bus and taken back to the border before being released. This incident caused Mr. Elhady to stop crossing the border altogether and from flying

---

[1] "Basic Life Support Emergency" is defined by the American Red Cross as "the care healthcare providers and public safety professionals provide to patients who are experiencing respiratory arrest, cardiac arrest or airway obstruction. BLS includes psychomotor skills for performing high-quality cardiopulmonary resuscitation (CPR), using an automated external defibrillator (AED) and relieving an obstructed airway for patients of all ages." *See* Basic Life Support for Healthcare Providers, American Red Cross, *available at:* http://www.redcross.org/images/MEDIA_Custom ProductCatalog/m48040087_BLS_Handbook_(Final).pdf.

for more than a year.  MSJ Ex. 1, Elhady Dep. at 186-192, 194, 269; MSJ Ex. 1A, Elhady Medical at 4.[2]

37.     On at least two prior occasions while Mr. Elhady attempted to cross the border into the United States, CBP officers surrounded Mr. Elhady, told him to step out of his vehicle, handcuffed him, stripped him of his belongings and detained him in a cell for approximately seven to eight hours. Mr. Elhady was refused repeated requests to contact his attorney.  And on at least one occasion, his "car was searched and the carpet, even the carpet was tortured and removed."  The CBP officers frequently told him, "Are you serious?  Someone like you should have stopped crossing the border by now."  MSJ Ex. 1, Elhady Dep. at 150, 152, 156, 165-177.

38.     Like Mr. Elhady, Mr. Kadura has experienced adverse treatment while crossing back into the United States from Canada at a port of entry. On one occasion, CBP officers stopped all traffic at all inspection booths, surrounded Mr. Kadura with hands on their holsters, and then handcuffed him.  At least one individual filmed the incident on her phone.  Mr. Kadura was detained and left shoeless in a freezing cold room without windows or any place to sit for seven and a half to eight hours.  Mr. Kadura was then released without any questioning.  CBP officers refused to return his phone, which they had confiscated as part of taking him into custody.  MSJ Ex. 3, Kadura Dep. at 163-167, 169.

39.     The next time Mr. Kadura crossed a border, returning to the country from Mexico, he was again handcuffed as soon as his passport was swiped.  "[The crowd of people were] all looking at [him] like this is El Chapo."  He was handcuffed to a seat for about four or five hours.  At one point, one of the CBP officers mocked him by mimicking an explosion sound.  MSJ Ex. 3, Kadura Dep. at

_____

[2] Mr. Elhady's medical records state that he had "delayed cap [sic] refill," an indication that he may have suffered from dehydration, shock and hypothermia.  MSJ Ex. 1A, Elhady Medical at 8; "Capillary nail refill test," MedlinePlus, U.S. National Library of Medicine, *available at*: https://medlineplus.gov/ency/article/003394.htm.

236-239.

40.     During another border-crossing instance, CBP extended the adverse treatment to Mr. Kadura's father.  Mr. Kadura's father happened to be traveling with him when CBP subjected Mr. Kadura to another lengthy detention and interrogation.  One of the worst memories of Mr. Kadura's life was seeing his father "have to put his hands up on the wall, have somebody feel up his crotch, you know what I mean, and feel his whole body up, like trying to look for something on him like he's a criminal…" MSJ Ex. 3, Kadura Dep. at 138-141.

41.     Mr. Al Halabi previously worked at Guantanamo Bay detention camp.  On one occasion, while Mr. Al Halabi was returning from vacation at Niagara Falls, CBP handcuffed him and took him into custody in front of his entire family.  CBP placed Mr. Halabi in a brightly-lit freezing holding cell with no shoes and left him there for several hours.  He had "flashbacks of the time being in Guantanamo… that's how prisoners were in that holding cell."  Once he and his family were released several hours later, he found his "car [was] upside down… it was like a dog was sitting there for two hours."  Mr. Al Halabi described his experience as "terrifying."  MSJ Ex. 5, Al Halabi Dep. at 74-81.

42.     On many border-crossing occasions, Mr. Shibly has been stopped by armed officers, handcuffed and placed in custody, including once in front of his grandmother.  That day, his grandmother fainted and ended up being taken by an ambulance and hospitalized because of "the stress of what we had to go through at CBP and being held for hours."  Mr. Shibly described it as "a very traumatic experience."  A CBP officer told Mr. Shibly that he would receive the same treatment on the way back.  MSJ Ex. 8, Shibly Dep. at 74-79.

43.     Mr. Shibly friends experienced similar treatment as Mr. Shibly when they crossed the border with him.  As a result, Mr. Shibly's friends started refusing to cross the border with him and drove in a separate car.  However, eventually, many of Mr. Shibly's friends who had crossed with him

before, along with his wife, children, mother and sister, began experiencing the same treatment as Mr. Shibly even when they travelled without him. MSJ Ex. 8, Shibly Dep. at 110, 111, 115, 122.

44. Mr. Frljuckic has also had scary border-crossing experiences. On one occasion, Mr. Frljuckic was returning from vacation in Canada with his 70-year-old mother and four-year-old son. On another occasion, he was crossing the border with his wife and eight children. On both occasions, CBP offers drew their firearms to place Mr. Frljuckic into custody. A third time, also with his family, Mr. Frljuckic told the primary inspection CBP officer that he is always taken into custody and asked him not to panic. Nevertheless, CBP officers surrounded his car, drew guns in his direction, and again took Mr. Frljuckic into custody in front of his family, this time for six hours. One CBP officer told him that if he were to cross the border, make a U-turn and attempt to cross again, he would be subjected to the same treatment. Mr. Frljuckic described the experience as "very scary and frustrating." Because of anxiety caused by these experiences, Mr. Frljuckic has stopped crossing the border and travelling by air. MSJ Ex. 11, Frljuckic Dep. at 47-48, 67, 82-84.

45. Once when John Doe 3 presented his passport to the primary inspection CBP officer upon returning from Canada with his wife and child, all three of them were ordered out of the car and handcuffed. CBP officers – who John Doe 3 described as "nervous" – drew guns at all three of them. John Doe 3 and his family were taken into custody and detained for approximately five and a half hours. At one point, John Doe 3 overheard CBP officers describe him as "armed and dangerous." After this incident, because John Doe 3 and his family believed that they could have been killed that day, they made a collective decision that he should separate from the family and emigrate from the United States to Germany, which he reluctantly did. MSJ Ex. 22, JD3 Dep. at 26, 34, 37, 44, 45, 47, 50-51, 53, 59-61, 68, 77, 215.

46. Mr. El-Shwehdi has been stopped at the border and questioned. He has struggled to understand the treatment. "[I]f they book me five, six hours, they will hassle [my family] with me…

[My family] will stay with me, because we are driving the same car, yes? But myself I can stay, but why, why my kids?" After one border stop, "my family, they went to wedding, but I decide not to go to Canada. My family, they went two times to attending wedding in Canada… but I didn't went. I stay home. Because of the hassle… so I said no, no, no. I'll stay in America." Mr. Shwehdi's family has traveled on vacation to Canada without him because he wanted to avoid crossing the border. MSJ Ex. 20, El-Shwehdi Dep. at 200, 206.

47.     Other Plaintiffs' border experiences evince similar patterns. Mr. Coleman has been dissuaded from crossing the border to visit his family in Canada due to his treatment while traveling because he does not want to jeopardize missing work or subjecting his mother to lengthy interrogations. MSJ Ex. 6, Coleman Dep. at 57. Dr. Khan stopped crossing the border to Canada since 2012, where he has family, to avoid being detained at the border for seven to eight hours. MSJ Ex. 18, Khan Dep. at 93. Similarly, due to both his own experiences traveling as well as knowledge of how his brother, Mr. Samir Anwar, has been treated at the border, Mr. Shahir Anwar stopped crossing the border entirely. MSJ Ex. 16, Shahir Dep. at 66.

### 3)  *Plaintiffs' Adverse Experiences with Electronic Searches at the Border*

48.     Mr. Kadura has had his phone confiscated twice during secondary inspections at land border crossings. CBP did not return those phones to him upon his release. During one of those trips, Mr. Kadura's father and 17-year-old-brother were traveling with him. CBP seized his father and brother's phones, and his father's laptop. Mr. Kadura witnessed a CBP agent plug his brother's phone into a computer. The second time border agents confiscated Mr. Kadura's phone, an ICE agent contacted him afterwards and asked him to meet him at a hotel room without his attorney to discuss how he can "help America" to achieve "democracy in Libya," in exchange for the return of Mr. Kadura's phone and help to "fix [his] travel issues." Mr. Kadura stopped taking his phone with him when he crosses the border and now ships it home instead. MSJ Ex. 3, Kadura Dep. at 138-140, 148-

149, 202-204, 237, 3B (Electronics).

49.     Border agents have pressured Mr. Elhady to reveal his password to his phone.  Border agents have questioned Mr. Elhady about the pictures and phone numbers of his phone contacts.  Mr. Elhady has had his phone searched and confiscated multiple times, including after international flights and after crossing a land border.  As a result of having his phone confiscated multiple times at the border, Mr. Elhady has had to purchase multiple phones.  He has stopped crossing the border with his phone.  An FBI agent informed Mr. Elhady once that his cell phone conversations were being monitored.  MSJ Ex. 1, Elhady Dep. at 84-85, 94-95, 99, 102-103, 105, 143-144, 150, 168-170, 185.

50.     Dr. Shaout has stopped carrying a cell phone because of repeated searches of his electronic devices at the border.  Border agents take everything electronic in Dr. Shaout's possession, including "stick drives" and "memory drives."  Then the border agents "will take a long time to copy everything… that's what they were taking, my computer, my memory stick… the more information I have, the more time I have to be waiting.  Sometimes I even – I'm so tired, I sleep on the chair.  And they take the computer, the laptop, and I know there's something that they did to it.  Because I'm a computer engineer.  The memory slows down.  They filling it with some software… you feel like dirt, basically."  MSJ Ex. 14, Shaout Dep. at 46-48, 192.

51.     On one occasion, CBP officers demanded the access code to Mr. Al Halabi's phone and then confiscated it.  They did not return his phone upon his release.  An FBI Agent informed Mr. Al Halabi the following day that confiscating his phone is "a process that needs to take place."  MSJ Ex. 5, Al Halabi Dep. at 76, 79, 81.

52.     Several other Plaintiffs have experienced electronics searches.  After returning from his last four international flights, Mr. John Doe 2 was detained and pressured to provide his password to his electronic devices, including his laptop, phone and iPad.  Mr. John Doe 2's camera was searched in his presence.  MSJ Ex. 21, JD2 Dep. at 69, 81-82, 95, 103.  Multiple border searches of Mr. El-

Shwehdi's phone have caused him to miss flights. MSJ Ex. 20, El-Shwehdi Dep. at 57, 180-182. Mr. Samir Anwar initially refused to provide his phone password when detained at the border, but relented under pressure after a CBP officer threatened to confiscate the phone and never return it. MSJ Ex. 17, Samir Dep. at 86-87. Mr. Ali's personal phone and work phone have been confiscated at the border following border officer pressure to provide the passwords. MSJ Ex. 15, Ali Dep. at 52, 60. Dr. Khan's cell phone was seized at least twice at airports and once at a border crossing. MSJ Ex. 18, Khan Dep. at 32, 57, 95. During one of his secondary inspections at a border crossing, a border official provided Mr. Shibly with a document confirming that his electronics were searched. MSJ Ex. 8, Shibly Dep. at 81-82, 238.

53.     Multiple Plaintiffs have had electronics searches extend to their traveling companions as well. Officers at both airports and the border have pressured Mr. John Doe 3 to provide the password to all electronic devices, and then confiscated his phones, his iPad, and his wife's iPad when she travels with him. MSJ Ex. 22, JD3 Dep. at 55-56, 66, 156, 208. Baby Doe's parents' phones were both seized while traveling together at an airport. MSJ Ex. 2, Baby Dep. at 45-46. The phones of Mr. Thomas and his three traveling companions were all seized when crossing the border; they were all compelled to provide their passwords. MSJ Ex. 10, Thomas Dep. at 71-73, 75.

### D. The Transportation Security Administration Uses the TSDB to Screen Airplane Passengers

#### 1) TSA Airport Screening Policies and Practices

54.     The TSC exports the TSDB to the DHS Watchlist Service. The TSA, sometimes involving CBP, then uses the TSDB to screen air travelers. MSJ Ex. 62, *Overview* at 5; MSJ Ex. 35, *TSA Programs List* §§ E, G; MSJ Ex. 27, CBP Dep. 33:10-34:8; MSJ Ex. 57, TSA FAQ.

55.     For the TSA, the TSC annotates TSDB entries in three ways: (1) No Fly, (2) Selectee, and (3) Expanded Selectee. *See* MSJ Ex. 62, *Overview* at 4; MSJ Ex. 51, *2015 Redress SOP* § Glossary; MSJ Ex. 26, TSA Dep. 128:18-21; MSJ Ex. 43, TSC Piehota *Latif* Decl. ¶ 8.

56.     The TSC assigns a No Fly annotation when the TSC determines the individual poses:

(1) a threat of committing an act of international terrorism (as defined in 18 U.S.C. § 2331(1)) or domestic terrorism (as defined in 18 U.S.C. § 2331(5)) with respect to an aircraft (including a threat of piracy, or a threat to airline, passenger, or civil aviation security);

(2) a threat of committing an act of domestic terrorism (as defined in 18 U.S.C. § 2331(5)) with respect to the homeland;

(3) a threat of committing an act of international terrorism (as defined in 18 U.S.C. § 2331(1)) against any U.S. Government facility abroad and associated or supporting personnel, including U.S. embassies, consulates and missions, military installations (as defined by 10 U.S.C. 2801(c)(4)), U.S. ships, U.S. aircraft, or other auxiliary craft owned or leased by the U.S. Government; *or*,

(4) a threat of engaging in or conducting a violent act of terrorism and who is operationally capable of doing so.

MSJ Ex. 62, *Overview* at 4; MSJ Ex. 68, TSC Groh Decl. I ¶ 12.

57.     TSDB Listees with the No Fly List annotation are prohibited from boarding an aircraft that traverses U.S. airspace.   MSJ Ex. 57, TSC FAQ; MSJ Ex. 42, FBI Giuliano *Latif* Decl. ¶ 11; MSJ Ex. 43, Piehota *Latif* Decl. ¶ 12.

58.     The TSC assigns a Selectee List annotation based on unknown criteria.  The federal government refuses to disclose the Selectee List inclusion criteria.  MSJ Ex. 62, *Overview* at 4; MSJ Ex. 68, TSC Groh Decl. I ¶¶ 13, 23; MSJ Ex. 26, TSA Dep. 128:18-129:6, 196:12-20; MSJ Ex. 25, TSC Dep. 317:12-16.

59.     Since 2011, the TSC automatically assigns all TSDB Listees an Expanded Selectee List annotation if the TSDB Listee is not already included on the No Fly or Selectee List, and if their TSDB record has a full name and full date of birth.  MSJ Ex. 45, *GAO Secure Flight* at 14; MSJ Ex. 26, TSA Dep. 197:12-198:11, 203:20-204:12; MSJ Ex. 51, *2015 Redress SOP* § Glossary.

60.     The Government acknowledges that individuals flagged as potential TSDB Listees have "adverse experiences."  These adverse experiences include "experiencing delays and related inconveniences" and "being subjected to more intensive questioning and searches."  Being flagged as

a TSDB Listee can make travel "embarrassing and time consuming," and impose economic consequences, resulting in a "loss of liberty." MSJ Ex. 34, *GAO TSDB Adverse Effects* at 14-15; MSJ Ex. 38, 2007 Redress MOU at 1.

61.     The TSA considers TSDB Listees with the Selectee or Expanded Selectee annotations to be high-risk travelers who must undergo additional security screenings prior to boarding an aircraft. TSDB Listees are subject to an onerous process where they must obtain the TSC's permission to board a plane. TSDB Listees are unable to utilize the convenience of Internet, curbside, and airport kiosk check-in options. The TSA requires the issued boarding passes for TSDB Listees to be stamped with "SSSS." MSJ Ex. 45, *GAO Secure Flight* at 9, 10-12, 21, 24, 29, 49; MSJ Ex. 26, TSA Dep. 143:11-144:3, 146:1-4, 202:13-19, 216:20-217:10, 218:16-219:8.; MSJ Ex. 51, *2015 Redress SOP* § Glossary; MSJ Ex. 34, *GAO TSDB Adverse Effects* at 13-15; MSJ Ex. 42, FBI Giuliano *Latif* Decl. ¶ 11; MSJ Ex. 43, Piehota *Latif* Decl. ¶ 12; MSJ Ex. 40, FBI North *Ibrahim* Decl. ¶ 7; MSJ Ex. 38, 2007 Redress MOU § 3.I; MSJ Ex. 36, *HSPD-11 Updated Strategy* § 3.2.2; MSJ Ex. 32, 2005 TSC Audit at 8.

62.     Once TSDB Listees on the Selectee List or Expanded Selectee List receive their boarding passes, they are required to undergo enhanced screening at the airport security checkpoint. Enhanced screenings include, in addition to the procedures applied during a typical screening experience: advanced imaging technology; hand-wands; pat-downs; a physical search of the interior of a passenger's carry-on luggage, electronics, and shoes; and an explosives trace detection search of the passenger's items. MSJ Ex. 45, *GAO Secure Flight* at 10, 11, 44; MSJ Ex. 41, *GAO Screening Tech.* at 5, 9-10; MSJ Ex. 53, TSA Allison *Mohamed* Decl. ¶ 6; MSJ Ex. 26, TSA Dep. 160:21-162:15.

63.     When TSDB Listees fly internationally, the TSA informs foreign governments that the United States has assigned the TSDB Listee a high-risk status and that U.S.-defined enhanced screening is required. TSA Supp. Dep. 75:16-76:2, 86:12-18,; MSJ Ex. 34, *GAO TSDB Adverse Effects* at 13.

64.     The TSA, in conjunction with CBP, uses the TSDB to identify associates of TSDB listees and designate those associates as "high-risk" and thereby required to undergo enhanced screening.  Such associates are not separately listed in the TSDB; MSJ Ex. 27, CBP Dep. 190:18-191:4; MSJ Ex. 45, *GAO Secure Flight* at 19.

65.     In 2017, CBP reported 585,000 encounters with individuals suspected to have national security concerns, despite only reporting 2,554 encounters with confirmed TSDB Listees.  MSJ Ex. 73, CBP Howe Decl. ¶ 7; MSJ Ex. 65, CBP 2017 Factsheet.

66.     The TSA may assign Federal Air Marshals to special mission coverage on a flight based on a TSDB Listee or other "high-risk" passenger (such as one associated with a TSDB Listee) traveling on that flight.  The Federal Air Marshal will monitor the "high-risk" passenger's behavior and provide a terrorist-related post-mission report to intelligence agencies.  MSJ Ex. 29, TSA Supp. Dep. 11:11-12:1, 15:2-9, 104:12-18; MSJ Ex. 53, TSA Allison *Mohamed* Decl. ¶ 57; MSJ Ex. 32, 2005 TSC Audit at 136.

67.     Airplanes with TSDB Listees on board may be barred from entering U.S. airspace. International flights have been diverted and delayed due to a passenger's TSDB status, thus affecting other passengers' travel plans.  MSJ Ex. 27, CBP Dep. 56:18-57:2; MSJ Ex. 34, *GAO TSDB Adverse Effects* at 15.

### 2) *Plaintiffs' Adverse Air Travel Experiences*

68.     Since 2006, Mr. Shibly has been "treated as a suspect, second-class citizen" and a "criminal" when he travels by air.  This maltreatment occurs not just in the United States, but also in other countries including in Europe and Jordan.  Because of the treatment he has been subjected to while traveling, coupled with his sister being detained in Israel for approximately ten hours and interrogated mostly about him, Mr. Shibly consider the United States to have "completely prohibited

me from even considering visiting [Jerusalem][3] anymore." MSJ Ex. 8, Shibly Dep. at 52, 130-131, 176-180, 310.

69.     Since 2006, Mr. Shibly has been routinely pulled aside for secondary screening, subjected to unreasonable and lengthy delays, and subjected to intrusive and abusive interrogations (oftentimes resulting in missed flights) no less than 20 times by air and once after a cruise.  His treatment has caused him humiliation in front of family members, business leaders, executives and friends that have traveled with him.  On more than one occasion, after being detained for an interrogation before boarding a flight with his family, Mr. Shibly urged his wife to take the children and board the flight without him because he wanted to save them from the "long-term traumatic impact" of having to "see their parents consistently being targeted by their own government.  During one of those detentions, Mr. Shibly was told by a officer that he was being subjected to heightened scrutiny because "[w]e have to protect against bombs and terrorism."  MSJ Ex. 8, Shibly Dep. at 52, 59-60, 66-68, 71-83, 85-90, 91-100, 123-137, 153-154, 163-171, 180-181, 182-186, 206-208, 209-210, 216-227.

70.     The treatment continued even during the time that Mr. Shibly was employed by Regional Elite and given unrestricted access to sterile areas of the airport and airplanes.  It continued despite his professional relationships with senior level government officials, including former Commissioner of CBP Gil Kerlikowske and former Senior Advisor to President Barack Obama Valerie Jarrett.  As Mr. Shibly summarized: "I can go meet the president, I can go meet Valerie Jarrett, and the top President advisors and get into the White House complex without any extra screening, but I can't get on [a] flight to get there."  MSJ Ex. 8, Shibly Dep. at 88, 90, 121, 125-126, 129-130, 183-184, 185-186, 208.

---

[3] Jerusalem, claimed by both Israel and the Palestinian Authority as their capital, is one of the holiest cities for Muslims.

71.     Since being removed from the No Fly List, Mr. Amri has traveled twice and has been subjected to delays and searches both times.  MSJ Ex. 13, Amri Dep. at 48-49, 58, 64-83.

72.     On his way to testify for his deposition in this case, Mr. Amri was subjected to six searches and chemically tested four times.  First, the airline representative had to obtain clearance for him to board the first leg of his flight to Dallas.  A TSA supervisor them met Mr. Amri at the security checkpoint, and took his ID and boarding pass to check them again.  He was taken through the metal detector, then again through the full body scanner, and then patted down and subjected to chemical testing.  A TSA official instructed him to wait again in a chair by the security checkpoint before he was cleared.  Despite having been searched three times, subjected to chemical testing and cleared twice already before boarding the first leg of his trip, three TSA agents stopped him on the jet bridge before boarding his connecting flight in Dallas.  There they subjected him to another body search and round of chemical testing, which tested positive for explosives.[4]  Mr. Amri was then escorted back to the TSA checkpoint where he was searched again before he was cleared a third time.[5]  MSJ Ex. 13, Amri Dep. at 62-83, 85.

73.     Due to these delays, Mr. Amri missed his flight and was forced to book the next flight, scheduled to leave two and a half hours later.  As he was waiting at the gate, a TSA agent – who appeared to be receiving instructions over the phone throughout this ordeal – told him the wrong procedure was performed and escorted him back to the TSA checkpoint for another round of chemical testing.  The explosives expert subjected him to another chemical test and cleared himAfterwards, it took the airline representatives approximately 45 minutes (15 minutes prior to

---

[4] TSA later admitted that the chemical test was cleared as a false positive.  *See* MSJ Ex. 70, TSA Joseph Decl. ¶¶ 13-15.

[5] Mr. Amri was not subjected to additional chemical testing, although he requested it to clear the false positive.  Ex. 13 at 67; Ex. 13A at 4, FN2.

boarding for his rebooked flight) to obtain clearance for him to board his rebooked flight.[6]  Despite having been searched five times, subjected to chemical testing three and cleared three times, he was again met by six TSA agents and a man wearing a suit who escorted him to a room to be searched and chemically tested – again, before he was finally permitted to board his flight.  "I almost had tears in my eyes… I'm a man, you know.  I don't tear up that easy."  MSJ Ex. 13, Amri Dep. at 67-73, 76, 79.

74.    Dr. Hakmeh is consistently subjected to heightened security whenever he flies.  This has caused him to miss many flights and transfers.  Among the transfers missed was a flight returning to the United States after providing emergency medical treatment to victims in Syria.  For the past four years, ss a result of his regular secondary screenings and delays, "so that [his] ability to come back and work as an emergency physician isn't jeopardized," Dr. Hakmeh has been "forced to" book all of his international trips[7] directly out of and back to Chicago. Dr. Hakmeh drives to and from Chicago (a five-hour drive) instead of booking connections to ensure he does not miss a connecting flight. Additionally, Dr. Hakmeh arrives at airports at least four hours before each flight to take into account secondary screening every time he flies.  MSJ Ex. 7, Hakmeh Dep. at 51, 58, 62, 68-70, 94-95, 150, 166-174, 212.

75.    Since 2004, for every one of Dr. Shaout's outgoing flights, he "[has] to wait, sit like a dog, for two hours, for an hour and a half, for if I'm lucky, 45 minutes.  If I'm not lucky, I leave – I miss my flight, until somebody in Washington says, yeah, he can go."  Dr. Shaout arrives at the airport at least three hours in advance of all domestic flights, and four hours in advance of all international flights to account for the secondary screening and lengthy delays he routinely experiences.  On at least

---

[6] The airline representative commented that in ten years of working as an airline representative, he has never seen this happen before.  MSJ Ex. 13, Amri Dep. at 70.

[7] Dr. Hakmeh travels regularly in connection with medical missions to provide critical care training courses and life-saving emergency care to victims of the conflict in Syria.  MSJ Ex. 7, Hakmeh Dep. at 41, 58-60, 73.

one occasion, he had already boarded a plane when he was removed from in public view and searched again. The flight was significantly delayed. Upon being allowed to board the plane again, "people were clapping their hands." When Dr. Shaout returns from international flights, he is likewise consistently interrogated. MSJ Ex. 14, Shaout Dep. at 37, 42-47, 71-72.

76.     Similarly, as a matter of course, for at least seven years, Mr. El-Shwehdi has been subjected to repeated secondary screening similar to other Plaintiffs. During two of his trips, an officer followed him around in the airport, to the point that when he went the bathroom, they waited outside the bathroom. Mr. El-Shwehdi was also singled out at the gate for an additional search and chemical testing after already having been repeatedly cleared by security. On one occasion, CBP officers and Turkish airline personnel walked onto the plane, inspected the passengers until Mr. El-Shwehdi was identified, and escorted him off the plane. MSJ Ex. 20, El-Shwehdi Dep. at 38, 51-53, 56, 66, 70, 75, 81, 88, 95, 100-110, 113, 115, 116, 119-120, 124, 126-129, 133-134, 137, 141-143, 162, 176-177, 179, 181-182, 193-194.

77.     Due to the treatment he receives when flying, Mr. El-Shwehdi has missed connecting flights and been forced to spend multiple nights in a hotel. Mr. El-Shwehdi now avoids traveling by air whenever possible. Every year, Mr. El-Shwehdi and his family drive from Dayton, Ohio to Atlanta, Georgia (an 8-hour, 500-mile drive) two to three times per year to visit his cousin, despite being disabled and despite problems with his hip from two hip replacements. Mr. El-Shwehdi has also driven to Virginia from Ohio at least twice to attend funerals. For the same reasons, Mr. El-Shwehdi did not travel to Libya for the funerals of his brother or his sister's husband. MSJ Ex. 20, El-Shwehdi Dep. at 33, 43-44, 67, 129, 138-139, 159, 180, 190-191, 195, 204.

78.     Mr. Coleman, a Muslim religious scholar and leader, has also routinely been subjected to similar treatment when he travels by air. Mr. Coleman frequently takes students on religious field trips. During one of those trips, he and the students traveling with him to Mexico were subjected to

secondary screening. He now books his ticket separately from his students to avoid the stigma and humiliation. He does not want students or their families to be afraid to travel with him. He also wants to avoid the risk of the students themselves being added to the federal watchlist. MSJ Ex. 6, Coleman Dep. at 23-26, 48, 58-61, 63-67, 73-78, 80-92, 96-97, 105-107.

79.     Once after having been invited to Malaysia as a guest of the Office of the Prime Minister of Malaysia, Mr. Coleman missed his connection on his way home. Despite having a three-and-a-half-hour connection, he missed the connection due to lengthy secondary screening and interrogations. On another occasion, after returning from an international trip, Mr. Coleman's name was announced on the loud speaker upon landing and he was escorted off the plane in front of the rest of the passengers. Once off the plane, he was taken to a room and interrogated. MSJ Ex. 6, MSJ Ex. 6, Coleman Dep. at 66, 73-78, 96-97, 101-102, 153.

80.     Dr. Fares began experiencing air travel problems in 2005, when he was attending medical school in St. Kitts and Nevis. On one occasion, Dr. Fares was removed from the plane after passing through security and boarding. He was removed from the plane, subjected to enhanced screening and interrogations, and by the time he was done, his plane had already taken off. This experience frightened Dr. Fares to the point that he cancelled his entire trip to Jordan altogether. As a result, Dr. Fares lost a business deal that he was traveling to Jordan to finalize. MSJ Ex. 19, Fares Dep. at 29-30, 99, 101, 104.

81.     Dr. Khan recounts similar air travel experiences as the other plaintiffs. Dr. Khan described it as "humiliation again, and again and again. And it's the psychological trauma that I go through, you know I cannot – I can't sleep a day before, you know, I am going to the airport. I [] start[] having upset stomach…" Dr. Khan now avoids flying and drives instead when he can "to avoid going through the hassle of going to the airport." MSJ Ex. 18, Khan Dep. at 29-33, 39, 42, 47-52, 52-60, 64-71, 74-84.

82.     Mr. Shahir Anwar is also subjected to the same routine secondary screening treatment each time he travels.  Once he was informed by an airline ticketing agent that he "had a special designation."  As a result of his experiences at an airport, he did not attend his cousin's funeral in Canada because he wanted to avoid traveling.  MSJ Ex. 16, Shahir Dep. at 52-54, 56, 59, 61, 67.

83.     Mr. Kadura avoids domestic travel.  He has also missed a lot of weddings and funerals of family members in Libya.  Both are due to the treatment the TSA subjects him to at airports.  Mr. Kadura has also chosen to attend a lower-ranked and more expensive masters degree program in order to avoid flying to visit his family.  MSJ Ex. 3, Kadura Dep. at 259-264.

84.     Baby Doe 2 was not even a year old when he first experienced watch list screening.  Baby Doe 2 was "burning up, he had a fever" after returning from an international flight to Jordan.  Then CBP officers pulled him and his parents aside and subjected them to a four-hour secondary inspection and search of all their personal belongings.  "[H]e was still – still a baby.  So this poor little infant – you know, I wouldn't wish that upon anybody…to go through something like that."  Baby Doe 2's family tries to avoid traveling as a result.  MSJ Ex. 2, Baby Dep. at 38, 45-46, 95, 97.

85.     The TSA and TSC have also used the TSDB to deny several Plaintiffs from boarding flights.  Most notably, Mr. Ahmed was informed by the FBI that he was added to the No Fly List and would only be removed if he would act as an informant for the FBI.  MSJ Ex. 4, Ahmed Dep. at 26-28.  Mr. Ahmed's No Fly List annotation to his TSDB record was ultimately removed, for the time being.  Ex. 4-1.

86.   Other Plaintiffs have been blocked from flying as well.  John Doe 4 could not fly from Detroit to Morocco to meet his fiancée's family for the first time.  MSJ Ex. 23, JD4 Dep. at 30-32.  Mr. Elhuzayel could not fly from Los Angeles, California to Dominica to spend time with his wife and family. MSJ Ex. 9, Elhuzayel Dep. at 125-131, 9A. Mr. Thomas attempted to move to Malaysia with his family and all his personal belongings, but could not fly from Sacramento, California to

Malaysia. MSJ Ex. 10, Thomas Dep. at 46-59, Ex. 10H. Mr. Amri, could not fly from Ontario, California to Las Vegas, Nevada for business purposes. MSJ Ex. 13, Amri Dep. at 40-45. And Mr. Kadura could not fly from Chicago to Libya to visit his mother on a religious holiday. MSJ Ex. 3, Kadura Dep. at 190-193.

### 1) *Plaintiffs' Suffering through Religious Questioning*

87.     Being subjected to interrogations about his religious beliefs and practices has been "a consistent theme throughout each and every time" Mr. Shibly is detained at the airports and the border. Among the questions he has been asked are, "Do you recruit people for Islam?" "Do you visit any Islamic extremist website? Are you part of any Islamic tribes?" "Have you ever been to a madrassah?" "Have you ever studied Islam full-time?" Mr. Shibly has also been asked whether he attends a particular mosque, which Muslim scholars he listens to, and how many gods and prophets he believes in. An officer told him he was asking these questions because "we have to protect against terrorism." Mr. Shibly was also interrogated about his father's charitable work for Syrian children. MSJ Ex. 8, Shibly Dep. at 59-60, 92, 93, 94, 108, 172.

88.     Dr. Shaout is interrogated with "the same [religious] questions over and over and over. The same answers that I give over and over." These questions include where he prays, which mosque he goes to and which organizations he donates to. MSJ Ex. 14, Shaout Dep. at 45, 47. Mr. Frljuckic was asked so many religious questions during his travels, including what mosque he attends and which scholars he listens to, that it became "routine." MSJ Ex. 11, Frljuckic Dep. at 48, 82-83.

89.     Mr. Coleman was interrogated about "theological disagreements among Muslim groups and that leading to radicalization of some young people," whether he had met someone who was radicalized, his missionary activities and his religious activities. MSJ Ex. 6, Coleman Dep. at 51-52, 102. Mr. Ahmed was interrogated about his religious views and what organizations he is affiliated with. MSJ Ex. 4, Ahmed Dep. at 24, 44. Mr. Thomas was asked, "What does jihad mean? When does

Islam allow violence?  Why are you going to Malaysia?  Do you know that there's a lot of extremist people in Malaysia?  When did you become Muslim?"  MSJ Ex. 10, Thomas Dep. at 142.  Mr. Kadura was asked what his religion was and what mosque he went to.  MSJ Ex. 3, Kadura Dep. at 238.

### E. The State Department and DHS Hinder TSDB Listees and Their Family Members Applying for Visas, Visa Waivers, and Immigration Benefits

#### 1) State Department and DHS Policies and Practices

90.     The TSC exports the TSDB to the Department of State's Consular Lookout and Support System.   The Department of State uses the TSDB to screen individuals for visa waiver, visa, and passport eligibility.  MSJ Ex. 62, *Overview* at 5; MSJ Ex. 59, *TSC Sample Monthly Report* at 4; MSJ Ex. 57, TSC FAQ.

91.     If a foreign national is a TSDB Listee, the State Department denies their visa application and determines them to be inadmissible.   The Government may also deem a foreign national inadmissible based on them having a family member who is a TSDB Listee.  *See* MSJ Ex. 36, *HSPD-11 Updated Strategy* § 3.1; MSJ Ex. 40, FBI North *Ibrahim* Decl. ¶ 7; MSJ Ex. 38, 2007 Redress MOU § 3.J; MSJ Ex. 27, CBP Dep. 340:4-15.

92.     If a foreign national from a Visa Waiver Program county is a TSDB Listee, the Department of State denies or revokes their Electronic Information for Travel Authorization.   If a foreign national from a Visa Waiver Program country has a family member who is a TSDB Listee, the Government may deny or revoke their Electronic Information for Travel Authorization on that basis. *See* MSJ Ex. 51, *2015 Redress SOP* § 5.1.1; MSJ Ex. 27, CBP Dep. 342:14-21.

93.     The State Department also uses the TSDB to screen State Department employees. It denies employment to TSDB Listees.  MSJ Ex. 36, *HSPD-11 Updated Strategy* § 3.5.

94.     The TSC exports the TSDB to the DHS Watchlist Service, which in turn exports the TSDB to the USCIS Fraud Detection and National Security Data-System.   USCIS uses the TSDB to screen individuals for immigration, asylum and naturalization benefits.  The DHS's U.S. Citizenship

and Immigration Services denies immigration, asylum, and naturalization applications based on individuals' inclusion in the TSDB. *See* MSJ Ex. 54, USCIS PIA at 1; MSJ Ex. 62, *Overview* at 5. MSJ Ex. 36, *HSPD-11 Updated Strategy* § 3.5.

### 2) *Plaintiffs' Adverse Immigration Experiences*

95.    Multiple Plaintiffs have foreign national family members whose immigration cases stalled. After Mr. Halabi filed an immigration petition for his wife, her case was delayed for more than 10 years. Just so he could live with her, Mr. Halabi was forced to uproot his life, sell everything he owned and move to Dubai. MSJ Ex. 5, Halabi Dep. at 135-137.

96.    Similarly, Dr. Hakmeh's immigration petition he filed for his wife was delayed five years. MSJ Ex. 7, Hakmeh at 260-261. Baby Doe's mother's citizenship application was delayed for more than two years. MSJ Ex. 2, Baby Dep. at 81-82. Mr. Elhady recently filed an immigration petition for his wife and is concerned that her petition will similarly be delayed due to his status on the watch list. MSJ Ex. 1, Elhady Dep. at 235-238.

### F.  The Department of Homeland Security Uses the TSDB to Vet for Employment and Credentialing in both Public and Private Industries

97.    DHS and CBP use the TSDB to confer travel privileges, such as TSA PreCheck and Global Entry. Individuals listed in the TSDB are considered high-risk and thus are ineligible for such privileges. *See* MSJ Ex. 26, TSA Dep. 152:2-21; MSJ Ex. 27, CBP Dep. 38:8-19, 338:4-14; MSJ Ex. 62, *Overview* at 5; MSJ Ex. 36, *HSPD-11 Updated Strategy* § 3.4.4.

98.    DHS and the TSA use the TSDB to determine the suitability of the TSA's employees and TSA contractors' employees. The TSC provides TSDB access to some private contractors performing work for the TSC and TSA, including IBM, InfoZen, Stopso and Sotera. MSJ Ex. 35, *TSA Programs List* §§ A-C; MSJ Ex. 26, TSA Dep. 252:6-254:3, 364:17-365:10; MSJ Ex. 25, TSC Dep. 245:4-19.

99.    CBP uses the TSDB to screen all CBP applicants and employees, as well as all

applicants and employees who work at U.S. ports of entry. CBP denies and revokes "Customs Seal" certifications and employment at U.S. ports of entry based on TSDB Listee status. MSJ Ex. 27, CBP Dep. 40:8-41:7, 41:21-42:11, 341:2-9.

100.    DHS, including the TSA and CBP, use the TSDB to screen individuals with any form of an airport identification, including airport employees, vendors, taxi drivers, and shuttle bus drivers. CBP also uses the TSDB to screen workers who access the international portion of domestic airports. MSJ Ex. 35, *TSA Programs List* § D; *see also* MSJ Ex. 36, *HSPD-11 Updated Strategy* § 3.9.1; MSJ Ex. 53, TSA Allison *Mohamed* Decl. ¶ 26; MSJ Ex. 26, TSA Dep. 92:14-93:1, 94:1-95:6.

101.    DHS and the TSA use the TSDB to screen individuals applying for or maintaining Transportation Worker Identification Credentials. TWICs are physical cards which control access to the secure areas of ships, seaports, and other national transportation systems. MSJ Ex. 35, *TSA Programs List* § K; *see also* MSJ Ex. 36, *HSPD-11 Updated Strategy* § 3.9.2; MSJ Ex. 26, TSA Dep. 84:21-85:8; MSJ Ex. 62, *Overview* at 5.

102.    DHS and the TSA use the TSDB to screen individuals applying for or maintaining hazardous material transportation licenses. MSJ Ex. 35, *TSA Programs List* § J; MSJ Ex. 36, *HSPD-11 Updated Strategy* § 3.9.3.

103.    DHS and the TSA use the TSDB to determine individual eligibility to attend flight school. DHS and the TSA use the TSDB to screen individuals applying for or maintaining Federal Aviation Administration airman certificates. TSDB Listees have had their airman certificates revoked due to their watchlist status. MSJ Ex. 35, *TSA Programs List* §§ F, L; *see also* MSJ Ex. 36, *HSPD-11 Updated Strategy* § 3.9.1;   MSJ Ex. 44, *TSA Airmen Certificates* at 3.

104.    Plaintiff Mr. Ahmed, who was employed as a supervisor at Detroit Metro Airport, had his Customs seal revoked without notice or explanation, which interfered with his ability to perform his job. MSJ Ex. 4, Ahmed Dep. at 65-70.

105.     DHS uses the TSDB to screen private sector employees with transportation and infrastructure functions.   DHS screens private employees against the TSDB for the following industries: airlines, airports, general aviation, port authorities, nuclear facilities, chemical facilities, and hazardous material transportation.   DHS also screens the employees of private entities receiving Overseas Private Investment Corporation loans and U.S. Agency for International Development benefits and grants.   MSJ Ex. 66, TSC 1st Rog at 2; MSJ Ex. 30, *HSPD-6*; MSJ Ex. 36, *HSPD-11 Updated Strategy* §§ 3.10, 3.2.2; MSJ Ex. 25, TSC Dep. 241:17-242:12; MSJ Ex. 26, TSA Dep. 255:16-256:5, 257:5-22, 259:3-13, 294:10-295:15, 337:6-13; 6 U.S.C. § 622(d)(2); 6 C.F.R. § 27.230(a)(12); MSJ Ex. 41, *GAO Screening Tech.* at 13; MSJ Ex. 39, *GAO Expand Screening* at 6, 11, 45, 47-48, 54-56; MSJ Ex. 33, *P&O Ports Screening*; MSJ Ex. 80, TSC Supp. Rog 30 II; MSJ Ex. 46, TSC Piehota 2014 House Testimony at 4.

106.     Private entities in these industries are required to block TSDB Listees from accessing sensitive information or physical areas.   TSDB Listees who are applicants to or employees of these private entities are ineligible for employment and/or specific job responsibilities with access to sensitive information or physical areas.   MSJ Ex. 80, TSC Supp. Rog 30 II; MSJ Ex. 26, TSA Dep. 259:3-13.

### G. The FBI Works with State and Local Governments, as well as Private Entities, to Use the TSDB to Impose Consequences on TSDB Listees

107.     The FBI uses the TSDB to conduct and facilitate law enforcement screening.   The TSC exports the TSDB to the FBI's National Crime Information Center system.   The NCIC "is the primary criminal justice database in the country."   The subset version of the TSDB provided to the NCIC is known as the "KST File."   MSJ Ex. 28, FBI Dep. 86:5-19, 87:20-88:1, 144:20-146:17, 154:3-10; MSJ Ex. 62, *Overview* at 5; MSJ Ex. 59, *TSC Sample Monthly Report* at 4; MSJ Ex. 46, TSC Piehota 2014 House Testimony at 4; MSJ Ex. 57, TSC FAQ.

108.    More than 18,000 state, local, county, city, university and college, tribal, and federal law enforcement agencies have access to TSDB information via the NCIC's KST File.  The FBI also provides federal, state, and local criminal courts with access to TSDB information.  MSJ Ex. 28, FBI Dep. 95:7-17, 97:14-21; MSJ Ex. 25, TSC Dep. 187:10-188:13; MSJ Ex. 67, FBI 1st Rog at 12; MSJ Ex. 71, FBI 1st Rog Supp. at 12; MSJ Ex. 66, TSC 1st Rog at 2.

109.    The FBI further provides approximately 533 private entities with access to TSDB information via the NCIC's KST File.  These private entities include the police and security forces of private railroads, colleges, universities, hospitals, and prisons.  The private entities also include animal welfare organizations; information technology, fingerprint databases, and forensic analysis providers; and private probation and pretrial services.  MSJ Ex. 81, TSC Supp. Rog 30 III; MSJ Ex. 82, CJIS Supp. Rog 30.[8]

110.    State, local, and private law enforcement use TSDB information to screen individuals they encounter.  Types of interactions where law enforcement screen individuals against the TSDB include traffic stops, field interviews, house visits, and municipal permit processes.  MSJ Ex. 62, *Overview* at 5; MSJ Ex. 28, FBI Dep. 135:20-137:14.

111.    For the FBI, the TSC annotates TSDB records by assigning standardized alerts or handling codes.  The KST File is sub-differentiated by four "Handling Codes."  MSJ Ex. 56, *TSC Handling Codes* at 1.

>   Handling Code 1: The subject is confirmed to associate with terrorism, and there is a valid, outstanding arrest warrant.
>
>   Handling Code 2: The subject is of an "investigative interest" regarding their association with terrorism.

---

[8] At least three Plaintiffs have affiliated with private entities which have access to the NCIC KST File.  Plaintiffs are not being more specific out of deference to this Court's Protective Order.  *See* Dkt. 274, 296

Handling Code 3: This individual may have possible ties with terrorism.

Handling Code 4: The identity provided by this individual may have possible ties with terrorism.

112.     Approximately 3% of the TSDB is designated as Handling Code 1 or 2.  The remaining 97% is designated at Handling Code 3 or 4.  *See* MSJ Ex. 32, 2005 TSC Audit at viii, 30; MSJ Ex. 37, 2007 TSC Follow-Up Audit at 8-9.

113.     The KST File's four "Handling Codes" notify and instruct law enforcement on different required operational responses for TSDB Listees.  Law enforcement officers are expected to adhere to the guidance contained in the handling codes assigned to TSDB listees.  *See* MSJ Ex. 56, *TSC Handling Codes* at 1-3; MSJ Ex. 83, *ACLU KST Lawsuit* at Original ECF 3-5, 10-16, 32-39, 57-58, 63-65, 67-73, 95-100; MSJ Ex. 28, FBI Dep. 122:10-123:16, 137:22-138:22, 140:22-141:6, 143:8-20, 144:21-145:2, 149:14-18, 152:11-21, 157:4-10.

114.     According to at TSC guidance published by the Baltimore Police and others, an officer who encounters any TSDB Listee is "required" to "immediately request back-up units" and "use extreme caution when approaching and conversing with the individual."  Officers are warned of "the possible presence of, or materials for constructing, explosives, weapons, and weapons of mass destruction."  MSJ Ex. 56, *TSC Handling Codes* at 1-2.

115.     Depending on the severity level of the TSDB / KST File handling code, officers are required to either (1) arrest the TSDB listee and request a bomb detection dog, or (2) detain the TSDB listee and request a bomb detection dog, or (3) contact the TSC for instruction while gathering more information about the watchlisted individual.  When contacted by law enforcement, the TSC reviews the applicable "handling code and any flags to ensure compliance with FBI procedures."  MSJ Ex. 56, *TSC Handling Codes* at 2-3; MSJ Ex. 51, *2015 Redress SOP* §§ Glossary & Appendix B.3.2.

**H. The Federal Government Uses and Disseminates the TSDB for Other Screening, Vetting, and Investigative Functions**

116. The FBI uses the TSDB to conduct investigations. MSJ Ex. 62, *Overview* at 5.

117. The Department of Justice, Federal Bureau of Investigation, uses the TSDB to screen applicants and employees for the FBI itself. No TSDB listees are employed by the FBI. The FBI also uses the TSDB as part of a name check service for employees across the federal government, including for vetting by the Office of Personnel Management. MSJ Ex. 28, FBI Dep. 342:2-343:7, 343:9-344:3, 391:17-392:3.

118. The FBI uses the TSDB to conduct background checks on individuals seeking to purchase firearms or obtain firearm licenses. The FBI imposes a mandatory 3-day waiting period for the purchase of a firearm if the identity is a TSDB hit. TSDB status may be used to deny purchase of a firearm altogether. *See* GAO, Gun Control and Terrorism: FBI Could Better Manage Firearm-Related Background Checks Involving Terrorist Watch List Records, GAO-05-127 (Washington, D.C.: Jan. 19, 2005). MSJ Ex. 34, *GAO TSDB Adverse Effects* at 9 n.11. *See* Elhady-FBITSC-001464 GAO-09-125R re: NICS and Terrorist Watch List Records; Elhady-FBITSC-001504 GAO-05-127 re: Firearms and the Watchlist.

119. The Department of Defense uses the TSDB to screen individuals accessing military bases. TSDB Listees are disqualified from accessing military bases. MSJ Ex. 62, *Overview* at 5; MSJ Ex. 57, TSC FAQ.

120. The Financial Crimes Enforcement Networks uses the TSDB to identify the financial associates of TSDB Listees, and to nominate those financial associates to the TSDB. MSJ Ex. 55, FinCEN Release.

121. The TSC enters into foreign government arrangements and then exports subsets of TSDB data to those foreign governments. The TSC currently exports TSDB data to more than 60 foreign governments, including all Visa Waiver Program countries and Albania, Bulgaria, Slovenia, and Hungary. Foreign governments are broadly authorized to use TSDB data in conjunction with

their foreign government missions and legal authorities. TSC expects foreign governments to use the TSDB information they receive. MSJ Ex. 66, TSC 1st Rog at 2, 6, 31, 32; MSJ Ex. 25, TSC Dep. 170:10-19.

## I. The Terrorist Screening Center Does Not Provide Redress for TSDB Listees

122. DHS TRIP provided no notice to Plaintiffs of their inclusion as TSDB Listees. Nor have any of the Plaintiffs been given an opportunity to rebut the evidence TSC relied upon to assign their TSDB status. *See* MSJ Exs. 1B, 3A, 5B, 8B, 9C, 11A, 14B, 16A, 17B, 18B (Plaintiffs' DHS TRIP Letters).

123. TSC does not notify individuals about their nominations or additions to the TSDB. TSDB Listees have no opportunity to rebut the information on which their TSDB listing is based. Federal Government policy neither confirms nor denies an individual's watchlist status. The lone exception is for TSDB Listees who are U.S. Persons, who have the No Fly List annotation, who have been denied boarding on a commercial aircraft, and who have filed a DHS TRIP complaint. Even then, there are no "adversarial hearings" regarding TSDB status. MSJ Ex. 62, *Overview* at 9; MSJ Ex. 24, DHS TRIP Dep. 17:6-7, 224:9-18, 234:235-2, 255:12-21, 297:2-11; MSJ Ex. 25, TSC Dep. 171:10-15, 183:8-16, 317:2-10; MSJ Ex. 61, TSC RFA # 27; MSJ Ex. 48, FBI Steinbach *Latif* Decl. ¶ 36.

124. The redress policy which governs No Fly List annotations (as set forth below) does not apply to any other TSDB Listees, including those who remain on the TSDB although their No Fly List annotation has been removed. TSDB Listees are never permitted to know the history of any changes to their watchlist status, or the factual basis for those changes. *See* MSJ Ex. 51, *2015 Redress SOP* § 16.3.2 & Table 5.

125. The DHS Traveler Redress Inquiry Program (DHS TRIP) provides a single point of contact for travelers screened by DHS agencies to resolve travel-related screening difficulties. DHS TRIP does not purport to address non-DHS or non-travel related difficulties stemming from TSDB

Listee status.  MSJ Ex. 62, *Overview* at 7; MSJ Ex. 51, *2015 Redress SOP* § 3.1.

126.    Upon initiation of a complaint, DHS TRIP generates an individual DHS Redress Control Number.  The TSA recognizes and uses DHS Redress Control Numbers in connection with air travel reservations.  DHS TRIP maintains a "cleared" list of individuals who have been confirmed to not match the TSDB.  Including a DHS Redress Control Number in future air travel reservations may help prevent a traveler from being misidentified or mismatched to the TSDB.  MSJ Ex. 62, *Overview* at 9; MSJ Ex. 36, *HSPD-11 Updated Strategy* § 5.1; MSJ Ex. 24 DHS TRIP Dep. 19:21-20:7, 274:25-275:15; *See* MSJ Ex. 26, TSA Dep. 119:16-21; MSJ Ex. 34, *GAO TSDB Adverse Effects* at 22, 33-35, 61.

127.    DHS TRIP annotates its redress records with whether the complainant is engaged in litigation against the federal government.  MSJ Ex. 24, DHS TRIP Dep. 211:19-212:22.

128.    CBP does not use DHS TRIP redress control numbers.  MSJ Ex. 27, CBP Dep. 319:22-320:4.

129.    Approximately 2% of all DHS TRIP inquiries relate to the watchlist.  DHS TRIP inquiries which relate to the watchlist are forwarded to the TSC Redress Office.  The TSC Redress Office does not accept, respond, or provide redress to direct inquiries from individuals. MSJ Ex. 62, *Overview* at 8; MSJ Ex. 51, *2015 Redress SOP* § 3.2.

130.    The TSC Redress Office does accept, respond, and provide redress to inquiries received from Congress through the FBI Office of Congressional Affairs, when those inquiries regard the "adverse screening experience of a constituent."  MSJ Ex. 51, *2015 Redress SOP* §§ 4.0, Glossary.

131.    The TSC Redress Office coordinates research into and resolution of TSDB-related complaints.  This resolution process includes notifying any original nominating agency that a TSDB Listee has submitted a complaint.  MSJ Ex. 62, *Overview* at 8; MSJ Ex. 51, *2015 Redress SOP* § 8.1.

132.    The TSC Redress Office has final authority to modify or remove a TSDB record

during the redress process, including by adjusting or removing No Fly List or Selectee List status. MSJ Ex. 62, *Overview* at 8-9; MSJ Ex. 24, DHS TRIP Dep. 168:5-17, 216:15-217:5, 229:7-22; MSJ Ex. 51, *2015 Redress SOP* §§ 12.0, 13.3, 15.1.

133.    Following 2015 litigation in *Latif v. Holder*, the federal government modified the redress process for TSDB Listees who are U.S. Persons and who have the No Fly List annotation. If a U.S. Person on the No Fly List files a DHS TRIP complaint, DHS TRIP (following referral to and consultation with TSC) must inform the individual if they are currently on the No Fly List. The No Fly Listee may then request additional information, including TSC's unclassified summary of the information supporting their No Fly List annotation. The No Fly Listee may respond by submitting information they consider potentially relevant. MSJ Ex. 62, *Overview* at 9; MSJ Ex. 24, DHS TRIP Dep. 24:12-15; 163:2-164:13, 169:2:170-7, 184:13-187:16; *see* MSJ Ex. 51, *2015 Redress SOP* §§ 15.0 *et. seq.*

134.    Upon receipt of the No Fly Listee's response, the TSC may either remove the No Fly List annotation or choose to maintain it. If the TSC chooses to maintain the No Fly List annotation, the TSC must prepare a recommendation to the TSA Administrator regarding the continuing No Fly List annotation on that TSDB Listee's record. The TSA Administrator makes the final written determination concerning the removal of the No Fly List annotation for U.S. Persons. The TSC will technically implement any change to the No Fly List annotation the TSA Administrator directs. (The TSC alone remains responsible for the U.S. Person's overall TSDB Listee status.) If the U.S. Person remains on the No Fly List following both TSC and TSA Administrator review, the TSA Administrator will issue a final order regarding the basis for that individual's continuing placement. The final order will also notify the individual with the continuing No Fly List annotation of their ability to seek judicial review. MSJ Ex. 62, *Overview* at 8-9 & n.5; MSJ Ex. 24, DHS TRIP Dep. 164:6-13; 179:22-180:5; *see* MSJ Ex. 51, *2015 Redress SOP* §§ 15.0 *et. seq.*

135.    The TSA Administrator has not issued a final order regarding a No Fly List annotation since 2015, despite the fact that TSC recommendations regarding No Fly List annotations are pending for his review.  MSJ Ex. 24, DHS TRIP Dep. 191:15-20, 194:21-195:10, 203:12-22; 208:13-21, 214:1-216:14.

### J.    The TSDB Has Always Been Rife With Errors

136.    During the pendency of this litigation, TSDB information has been improperly disclosed.  MSJ Ex. 25, TSC Dep. 212:15-214:1.

137.    TSDB records include misidentifications and erroneous information.  The TSC regularly finds and corrects quality assurance problems with TSDB data.   It is normal for new information to come to light that refutes or discredits the original information supporting a TSDB Listee's status.  *See* MSJ Ex. 62, *Overview* at 7; MSJ Ex. 37, 2007 TSC Follow-Up Audit at 52; MSJ Ex. 34, *GAO TSDB Adverse Effects* at 1, 2, 5, 9, 11, 20, 22, 31, 51, 59, 61-62; MSJ Ex. 51, *2015 Redress SOP* § 14.1.2.2; MSJ Ex. 36, *HSPD-11 Updated Strategy* § 5.1.

138.    Adverse experiences and outcomes occur during terrorism screening because individuals are misidentified as TSDB Listees or near matches to TSDB Listees.  *See* MSJ Ex. 51, *2015 Redress SOP* § Glossary; MSJ Ex. 34, *GAO TSDB Adverse Effects* at 1, 2, 61-62; MSJ Ex. 38, 2007 Redress MOU §§ 4.A - 4.C; MSJ Ex. 37, 2007 TSC Follow-Up Audit at xvi-xix.

### K.    The Government Can Identify No Connection Between TSDB Listees and Acts of Terrorism

139.    CBP has never publicly identified an act of terrorism the TSDB helped it prevent.  *See* MSJ Ex. 27, CBP Dep. 333:12-334:3. "CBP does not track the number of individuals it arrests who are listed on the TSDB and also does not maintain information in a manner than would allow an automated comparison between encounters with individuals listed in the TSDB and arrests made by CBP."  MSJ Ex. 73, CBP Howe Decl. ¶ 10.

140.     The operation of the TSA's high-risk rules, including through Quiet Skies and Silent Partner, has never led to the arrest or prosecution of a high-risk individual, or to the foiling of a terrorist plot.  MSJ Ex. 29, TSA Supp. Dep. 49:15-51:8.

141.     The FBI knows how many acts of terrorism have been committed in the United States, and whether each perpetrator of a U.S. act of terrorism was listed on the TSDB at the time of the act. The FBI has never publicly identified a single terrorism perpetrator as having been listed on the TSDB at the time of the act.  MSJ Ex. 28, FBI Dep. 111:16-112:19, 177:10-14.

## ARGUMENT

Summary judgment is appropriate where "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Because Government watchlist policy and practice is undisputed, and there can be no material dispute as to the adverse experiences Plaintiffs have experienced without redress due to the watchlist, summary judgment for Platiniffs is appropriate.  The Government's watchlisting system violates the Fifth Amendment's guarantee of due process.

## I.     THE WATCHLISTING SYSTEM VIOLATES PROCEDURAL DUE PROCESS

Whenever a person is deprived of "liberty or property interests within the meaning of the Due Process Clause," procedural due process mandates "constraints on governmental decisions." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976).  The strength and scope of those constraints vary "as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).  Nevertheless, there are "basic requirements" that procedural due process, in each instance, demands—including notice and a meaningful opportunity to be heard.  *D.B. v. Cardall*, 826 F.3d 721, 743 (4th Cir. 2016).

"Beyond those requirements," however, the Court must look to the *Matthews* factors to assist it in determining the "need for [further] procedural safeguards."  *Id.* To determine what the

Constitution requires those procedural safeguards to look like, the Court must balance the private interests deprived, the risk that those interests were deprived in error, and the government's interest in causing the deprivation without changes to agency practices. *Mathews*, 424 U.S. at 335.

## A. The Deprivations the Watchlisting System Imposes are Severe

"The consequences," the Ninth Circuit recently observed, of Defendants targeting people with their Watchlisting System "are severe." *Ibrahim v. DHS*, 912 F.3d 1147, 1179 (9th Cir. 2019). These consequences include Mr. Kadura being handcuffed to a seat in a CBP waiting room for four or five hours when he returned by land from Mexico. Ex. 3 at 236-237. They include Defendants aggressively searching Mr. Amri's body six times and chemically testing his hands four times before he was cleared to fly to Washington, D.C. to offer Defendants his testimony in support of his claims in this case. MSJ Ex. 13, El-Shwehdi Dep. at 64-83, 86. They include Mr. Frljuckic's humiliation and terror as CBP officers, with guns drawn, surrounded his vehicle, pulled him out of it, and handcuffed him – three times – as his family watched on in horror. MSJ Ex. 11, Frljuckic Dep. at 47, 67, 82-83. Absences at weddings and funerals, constrained employment opportunities, permanent ineligibility for certain licenses and privileges, the stigma that accompanies being targeting by the Watchlisting System and assigned a status that communicates that the target is "a disloyal American who is capable of, and disposed toward committing, war crimes"—these are all consequences the Watchlisting System metes out. *Mohamed v. Holder*, 995 F. Supp. 2d 520, 529 (E.D. Va. 2014).

The factual basis for the numerous and distinct deprivations is expansive but regards two types of liberty interests. One is Plaintiffs' "movement-related liberty interests." *Elhady v. Piehota*, 303 F. Supp. 3d 453, 463 (E.D. Va. 2017). The other is the reputational interests accorded Due Process Clause protections by the stigma-plus doctrine. *Elhady v. Piehota*, 303 F. Supp. 3d 453, 464 (E.D. Va. 2017). With regards to both liberty interests, the Watchlisting System dilutes Plaintiffs' liberty interests so substantially that Defendants' imposition of a TSDB status constitutes a deprivation under *Matthews*

whatever legal formulation of the two liberty interests the Court adopts.

### B. The TSDB burdens the right of international travel

While the right to international travel is not unqualified in the same manner as interstate travel, it is an "'aspect' of the liberty protected by the Due Process Clause." *Califano v. Gautier Torres*, 435 U.S. 1, 5 n.6 (1978); *see generally Mohamed v. Holder*, No. 1:11-CV-50, 2015 WL 4394958, at *6 (E.D. Va. July 16, 2015). In *Mohamed,* this Court identified a right of international travel, finding "a protected liberty interest in traveling internationally." *Mohamed v. Holder*, No. 1:11-cv-50, 2015 U.S. Dist. LEXIS 92997, at *21 (E.D. Va. July 16, 2015).

The Watchlisting System deprives its targets of their right of international travel not only because it forbids such travel entirely[9] but instead because Defendants impose consequences so grievous that Plaintiffs stop exercising the right. Mr. Elhady's treatment at the border was so severe that he was rushed to the hospital and administered emergency Basic Life Support. MSJ Ex. 1, Elhady Dep. at 186-190, 269; Ex. 1A, Elhady Medical at 4. He traveled by land to Canada three times and Defendants handcuffed him each time in public view, including to a stretcher inside an ambulance, to the floor of a CBP bus, as well as to a hospital chair. MSJ Ex. 1, Elhady Dep. at 150, 156, 165-177, 184-185, 186-192. Mr. Elhady now refrains from exercising his right of international travel to avoid certain humiliation and senseless government conduct. *Id.* at 194. Other Plaintiffs have done the same.[10]

Mr. Frljuckic stopped traveling internationally so that his wife and children, all eight of them, would not have to see him get detained and handcuffed at gunpoint a fourth time. MSJ Ex. 11,

---

[9] John Doe 4 (Ex. 23 at 30-32), Mr. Elhuzayel (Ex. 9 at 125-131, 9K), Mr. Thomas (Ex. 10 at 46-59, 10H), Mr. Amri (Ex. 13 at 40-45) and Mr. Kadura (Ex. 3 at 190-193) have all been denied boarding on international flights.

[10] Mr. Frljuckic (Ex. 11 at 84), Mr. El-Shwehdi (Ex. 20 at 200, 204, 206), Mr. Coleman (Ex. 6 at 57), Dr. Khan (Ex. 18 at 93), Mr. Shahir Anwar (Ex. 16 at 66), Mr. Amri (Ex. 16 at 126) and Dr. Fares (Ex. 19 at 104) have all avoided international travel.

Frljuckic Dep. at 47-48, 67, 82-83. Defendants also handcuffed army veteran Mr. Al Halabi in front

of his family as they returned to the country from a trip to Niagara Falls. MSJ Ex. 5, Al Halabi Dep.

at 74, 77. As Defendants handcuffed him, his daughter "started screaming" and his sister "started

crying." *Id.* at 75. Dr. Fares was removed from a full plane, screened yet again, and interrogated until

his international flight departed without him. MSJ Ex. 19, Fares Dep. at 99. Dr. Fares was frightened

to the point that he cancelled his trip causing him to lose a business deal. *Id.* at 101, 104. Mr. Shibly's

grandmother was hospitalized after seeing Defendants handcuff[11] her grandson during an international

trip. MSJ Ex. 8, Shibly Dep. at 75-79.

Fears about these kinds of things happening during international travel have dissuaded many

of the plaintiffs to not exercise that right. Mr. El-Shwehdi, for example, did not travel internationally

to attend two family weddings. MSJ Ex. 20, El-Shwehdi Dep. at 200. He missed his brother's funeral

in Libya as well as the funeral of his sister's husband. *Id.* at 204   Mr. Shahir Anwar missed his cousin's

funeral in Canada. MSJ Ex. 16, Shahir Dep. at 67. Mr. Kadura missed several weddings and funerals

of family members in Libya. MSJ Ex. 3, Kadura Dep. at 262-263.

As a TSDB listee, the process of exercising one's right to international travel is subject to a

border crossing process so harrowing that John Doe 3, who was once handcuffed along with his wife

and child at gunpoint, exiled himself to Germany and separated from his family in the United States.

MSJ Ex. 22, JD3 Dep. at 26, 34, 37, 44-45, 47-51, 59-61, 215. However, the Court formulates the right

of international travel, the Watchlisting System deprives it.

### C. The TSDB burdens the right of interstate travel

This Court has previously observed that it is "well established that there is a fundamental right

---

[11]"You don't want your grandma seeing you in handcuffs no matter what, because it hurts her heart, she loves you. And you hope that she doesn't think anything bad of you, but at the same time, you don't want her seeing you in handcuffs." MSJ Ex. 8, Shibly Dep. at 75.

to interstate travel." *Mohamed v. Holder*, 266 F. Supp. 3d 868, 877 (E.D. Va. 2017). The right accords all persons the freedom to travel domestically "uninhibited by statutes, rules, or regulations which unreasonably burden or restrict this movement." *Shapiro v. Thompson*, 394 U.S. 618, 629 (1969). Undaunted by the clarity in this area of law, the Watchlisting System deprives Plaintiffs of their right to interstate travel by deterring its exercise.

The operation of Defendants' Watchlisting System generates substantial fear of interstate travel. Dr. Khan described the fear as a "psychological trauma that I go through…I can't sleep a day before, you know, I am going to the airport. MSJ Ex. 18, Khan Dep. at 29-33, 39, 42, 47-52, 52-60, 64-71, 74-84. He avoids flying and drives instead. *Id.* at 77. Mr. Shibly urges his wife to take their children and board their flight without him when he is detained to save them from the "long-term traumatic impact" of having to "see their parents consistently being targeted by their own government." MSJ Ex. 8, Shibly Dep. at 87, 153-154. The anxiety has obvious sources. Mr. El-Shwehdi, for instance, observed "an officer follow[ing] him around the airport" who also had the gall to "wai[t] outside the bathroom" as he used the facilities. MSJ Ex. 20, El-Shwehdi Dep. at 75, 95, 181-182. He now, despite being disabled and having two hip replacements, avoids traveling by air and drives cross-country to visit family. *Id.* at 33, 43-44, 67. In another incident, Defendants removed Dr. Shaout from a fully-boarded flight and searched him yet again. When Defendants returned Dr. Shaout to the plane, his humiliation defined the moment as the passengers began "clapping their hands" while he looked for his seat. MSJ Ex. 14, Shaout Dep at 72. Dr. Hakmeh drives to avoid domestic connections for international trips so his ability to provide emergency medical care is not jeopardized. MSJ Ex. 7, Hakmeh Dep. at 68-69. These are the types of incidents that deter those targeted by the Watchlisting System from exercising their right of interstate travel.

But with the Watchlisting System, worse is possible. During a single domestic trip, Defendants physically searched Mr. Amri six times, subjected him to chemical testing four times, resulting in a

missed flight because TSC would not clear him to fly.  MSJ Ex. 13, Amri Dep. at 64-83, 86.  "I almost had tears in my eyes… I'm a man, you know.  I don't tear up that easy." *Id.* at 73, 76.  These indignities present a formidable deterrent dissuading TSDB listees from exercising their right of interstate travel.

### D.  The Watchlisting System deprives Plaintiffs their reputational interests

The federal government's Watchlisting System also deprives Plaintiffs of their reputational interests protected by the Due Process Clause's stigma-plus doctrine. To satisfy the stigma-plus doctrine, which establishes constitutional protections against government defamation, plaintiffs must show a "stigmatic statement" by the government accompanied by "state action that distinctly alter[s] or extinguishe[s]" the defamed's status or otherwise burdens his interests. *Evans v. Chalmers*, 703 F.3d 636, 654 (4th Cir. 2012).  A stigmatic statement is any statement that "might seriously damage his standing and associations in his community." *Bd. of Regents v. Roth,* 408 U.S. 564, 573 (1972). Because the defamatory statement must affect one's standing, some type of dissemination or publication of the statement must be demonstrated. And the requirement for state action beyond the defamation, the "plus" factor, is simply "other government action adversely affecting the plaintiff's interests." *Doe v. Dep't of Pub. Safety ex rel. Lee*, 271 F.3d at 55 (2d Cir. 2001).

### 3)  *A TSDB designations is stigmatizing*

TSDB status is a stigmatizing label.  As this Court previously explained with respect to the No Fly List, the label identifies a listee as a "disloyal American who is capable of, and disposed toward committing, war crimes." *Mohamed v. Holder*, 995 F. Supp. 2d 520, 529 (E.D. Va. 2014).  The status "transforms a person into a second-class citizen, or worse." *Id.*  It is a stigma that the Watchlisting System imprints on each of its targets.

### i.  The Watchlisting System makes a TSDB Listee's stigmatizing status known

The government-imposed stigma, to satisfy the stigma plus doctrine, must be such that it "might seriously damage his standing and associations in his community." *Bd. of Regents v. Roth,* 408

U.S. 564, 573 (1972).  This means that Plaintiffs do bear the burden of demonstrating at least a likelihood that TSDB status becomes known to the people and organizations in the lives of Plaintiffs. Though this Court has previously observed that "it is unsettled precisely how broadly defamatory information must be disseminated by the government to satisfy the stigma prong," the overwhelming facts of this case meet the stigma prong no matter how the Court formulates the requirement. *Mohamed v. Holder*, No. 1:11-cv-50, 2011 U.S. Dist. LEXIS 96751, at *20-22 (E.D. Va. Aug. 26, 2011).

> a. Defendants make Plaintiffs' TSDB status available to tens of thousands of entities and likely more than one million individual persons.

Defendants make TSDB information available to tens of thousands of public and private entities and individuals, in addition to every single federal agency and more than 60 foreign governments.  Statement of Facts ("SOF") ¶ 121.  While the federal government appears to not know the number of individuals with access to TSDB information, the total certainly exceeds one million people.[12]  In addition to every state, local, and tribal law enforcement agency and many railroad and university security forces, the FBI and TSC make TSDB information available to the following motley group organization types:

> "private correctional facilities, private security services for governmental facilities and hospitals, companies providing criminal justice dispatching services or data processing/information services providing services to governmental criminal justice agencies, private probation and pretrial services companies, private city attorneys," as well as "a private police department for an airport, a private police department for a transportation authority, private police departments for two private incorporated communities…an inmate transport service, an entity that provides forensic services to detect and identify criminals, court constable services," and even animal shelters.  SOF ¶ 109; MSJ Ex. 82, CJIS Supp. Rog 30.

---

[12] The federal Government employs more than 2.5 million people, and there are more than 670,000 law enforcement officers in the United States. *See generally* https://www.opm.gov/policy-data-oversight/data-analysis-documentation/federal-employment-reports/employment-trends-data/2011/december/ and https://www.statista.com/statistics/191694/number-of-law-enforcement-officers-in-the-us/.

The dissemination of TSDB information is difficult to overstate. The Watchlisting System effects a global disclosure, making Plaintiffs' TSDB status accessible to an uncountable sum of people who Defendants do not know individually and cannot determine their quantity in the aggregate.

Aside from tens of thousands of public and private entities and individuals, every federal agency, and more than 60 foreign governments to which the FBI disseminates TSDB information, DHS separately discloses to for-profit companies through an administrative scheme through which DHS uses TSDB information to screen prospective and current-employed private sector workers whose jobs are within various parts of the economy—commercial aviation, port work, trucking, chemical plants, and the nuclear power industry, among other areas. SOF ¶¶ 105-106. Meanwhile, the FBI disseminates the TSDB to more than 500 private entities, including police forces for private universities, hospitals, and railroads, as well as information technology and fingerprint database providers. SOF ¶ 109.

The startling extent of the dissemination—revealed by the federal government for the first time in this case—is independently sufficient to satisfy the stigma-plus doctrine's disclosure element whatever test the Court adopts.

  b.  The Watchlisting System's standard process publicly discloses a listee's status to co-travelers, to family, to friends, to coworkers, among others

This Court previously held that the operation of the Watchlisting System effects a public disclosure of the government-imposed stigma insofar as it will "likely become known over time to persons beyond government agencies or the airlines." *Mohamed v. Holder*, No. 1:11-cv-50, 2015 U.S. Dist. LEXIS 92997, at *22-23 (E.D. Va. July 16, 2015). The Court's rationale in *Mohamed* was based on the fact that "any member of the general public who would actually witness a person being excluded from boarding might draw an adverse inference concerning that person's reputation" and that coworkers, "extended family members," and others who Plaintiffs know through "religious, professional, or social organizations" would come to learn of their stigmatizing status as well. *Id.* This

logic, though applied by the Court in *Mohamed* to the No Fly List, holds true no matter how a person's TSDB status is annotated.

When Mr. El-Shwehdi travels across the country by car rather than plane, when he misses funerals and weddings of close relatives, whenever and however he tries to mitigate the impact his TSDB status has on his life—his disfavored status becomes "known to those outside of government." *Mohamed v. Holder*, No. 1:11-cv-50, 2015 U.S. Dist. LEXIS 92997, at *23 (E.D. Va. July 16, 2015); MSJ Ex. 20, El-Shwehdi Dep. at 33, 43-44, 67, 138-139, 204. His children know. His wife knows. His friends and his extended family know as well.

When Mr. Shibly and his wife debate whether it's better for the family to go through the airport separately from him to shield their children from the "long-term traumatic impact" of having to "see their parents consistently being targeted by their own government," Mr. Shibly's family becomes fully acquainted with his TSDB status. MSJ Ex. 8, Shibly Dep. at 87, 153-154. When Mr. Kadura was handcuffed to a seat at the land border, the other travelers within eyesight were "looking at [him] like this is El Chapo." Ex. 3 at 236. During another border stop where CBP officers, with hands on holsters, stopped all traffic at all inspection booths as they handcuffed him, a traveler filmed the incident on her phone. MSJ Ex. 3, Kadura Dep. at 164. The spectacle communicated to the people witnessing it that Mr. Kadura was a danger to them, an enduring hazard that justifies detainment, threats of deadly force, and physical restraints.

When John Doe 3 and his family made a collective decision that he should separate from the family and emigrate from the United States to Germany after they were all handcuffed at gunpoint, they were fully aware of his status. MSJ Ex. 22, JD3 Dep. at 26, 45, 215. When Mr. Shibly's friends refused to cross the border with him and drove in a separate car, they were aware of his status. MSJ Ex. 8, Shibly Dep. at 110-111. And when Mr. Shibly's wife, children, mother, sister and friends began experiencing problems at the border after traveling with him, they were aware of his status. *Id.* at 111,

115-122.

Mr. Coleman, a religious scholar, understands how this dynamic works to disclose to others his TSDB status – which was confirmed to him when students traveling with him on a field trip were all pulled aside for secondary inspection. MSJ Ex. 6, Coleman Dep. at 63-64. That is why he goes through airport and border security separately from his students and why he books his tickets separately as well. *Id.* at 63-64. Nevertheless, the Watchlisting System's efforts to broadcast Mr. Coleman's TSDB status are multilayered, unrelenting, and ultimately successful. During one particularly intimidating incident, for example, Mr. Coleman's name was announced on the loudspeaker as his international flight arrived back home to Michigan. He was then escorted off the plane in front of still-seated passengers and then interrogated. *Id.* at 96-97, 101-102, 153. Among the travelers observing Mr. Coleman's uniformed-officer-escort departing the plane, there are some who drew "an adverse inference concerning [Mr. Coleman's] reputation." *Mohamed v. Holder*, No. 1:11-cv-50, 2015 U.S. Dist. LEXIS 92997, at *22-23 (E.D. Va. July 16, 2015).

Because the Watchlisting System discloses who it targets in public settings—at land borders, ports of entry, and airports, for example—Defendants cannot credibly assert that TSDB status is some well-kept government secret. The reality that Defendants will ask this Court to deny is that the TSDB status of every listee is known to some part of each listee's personal and professional networks. The Court should do the opposite and acknowledge what all the plaintiffs know: it is impossible to bear, in private, the burden of their TSDB status.

### ii.  There is a plus

The stigma-plus doctrine has never been applied to something like the Watchlisting System. Most Fourth Circuit cases have dealt with the stigma-plus doctrine in the context of government employment. And while those cases provide some guidance as to how the stigma-plus doctrine should work here, this is a unique set of claims unlike others adjudicated by the Fourth Circuit.

47

a. <u>The plus can be due to Government-imposed consequences</u>

The nature of this case calls for the Court to determine what types of facts establish a "plus," making government-imposed stigma actionable. Plaintiffs assert that, because the Supreme Court created the stigma-plus doctrine to protect reputation-based liberty interests not otherwise protected by the Constitution, the "plus" need not be a standalone constitutional violation. A standalone constitutional violation certainly qualifies as a "plus," but the bare existence of government conduct distinct from the imposition of a stigma is sufficient. Therefore, to demonstrate the existence of a "plus," Plaintiffs may simply show that the federal government, in addition to the stigma, imposed further consequences against the Watchlisting System's targets.

The Second Circuit has explained why, though it did so in a case the Supreme Court reversed on grounds unrelated to the stigma-plus doctrine. *Doe v. Dep't of Pub. Safety ex rel. Lee* articulates this. 271 F.3d 38 (2d Cir. 2001). In *Doe*, the Second Circuit sought to determine what would be sufficient to constitute a plus factor in accordance with the seminal stigma-plus decision, *Paul v. Davis*, 424 U.S. 693, 711 (1976). Id. at 54. *Doe* explained that the Supreme Court's aim in creating the stigma-plus doctrine was to ensure that constitutional protections do not "encompas[s] an individual's unadorned interest in his or her reputation." This was objectionable to the Supreme Court, because it did not want the existence of a federal procedural due process claim to depend "entirely on whether the defendant happened to be a state officer or a private citizen." *Id.* at 53–54. It did not want reputation-based constitutional claims to turn the Due Process Clause into "a font of tort law." *Paul v. Davis*, 424 U.S. 693, 701 (1976).

In order to avoid this outcome—which is why the Supreme Court brought the "plus" factor into existence—a plaintiff must identify "some material indicium of governmental involvement beyond the mere presence of a state defendant." *Id.* at 54. It would be enough, then, for "an allegation of defamation" to be accompanied by "other government action adversely affecting the plaintiff's

interests." *Id.* at 55. The plus factor, in short, does not have to be a standalone violation of Plaintiffs' legal rights; it can be something less.

*Doe*'s rationale is also consistent with Supreme Court precedent. *Seigert v. Gilley* instructs that a plus factor exists so long as the damage identified does not "flo[w] from injury caused by [defendants] to [a plaintiff's] reputation." 500 U.S. 226, 234 (1991). In *Seigert*, the defendant provided a former employee's prospective employer with a negative reference that prevented the employee from being hired. *Id.* The employee alleged that the defendant's negative reference was defamatory and that, because it prevented him from being hired by the prospective employer, he also satisfied the plus prong. In deciding against the defamed litigant, the Supreme Court identified the single key inquiry to determine whether the facts of a case satisfy the plus prong. With respect to this part of the stigm-plus doctrine, federal courts must assess whether the consequence alleged "flow[ed] from the injury to [the employee's] reputation" or from other government conduct. *Id.* at 234. In *Seigert*, the defamed litigant lost prospective employment as a result of the stigmatizing negative reference and complained of no other government conduct that accompanied the reference. That is not the case here.

The Statement of Facts is stuffed with examples of "government action adversely affecting the plaintiff[s'] interests." *Paul v. Davis*, 424 U.S. 693, 701 (1976). Plaintiffs are screened aggressively and invasively at airports, they are detained at borders and ports of entry, and they move through their lives and our world "adversely affect[ed]" by the dozens of government actions triggered by TSDB status alone. *Id.*

            b. <u>The plus need not even alter or extinguish a right; it is enough for the plus to be a legal requirement that entities consult the TSDB prior to conferring a right or benefit</u>

This Court should follow the Ninth Circuit and identify a "plus" in how the Watchlisting System requires tens of thousands of entities to use TSDB information before determining a course of action with respect to a listee. In *Humphries*, the Ninth Circuit adjudicated stigma-plus claims based

on inclusion in the Child Abuse Central Index (CACI), a state-maintained database of investigated child abusers. *Humphries v. Cty. of L.A.*, 554 F.3d 1170, 1176 (9th Cir. 2009). California required that certain licensing agencies "search the CACI and conduct an additional investigation prior to granting a number of rights and benefits." Unlike the TSDB, CACI did not legally require licensing agencies to deny CACI listees particular rights and benefits. *Humphries*, 554 F.3d at 1188.

Though, the Ninth Circuit acknowledged that a person's status as a CACI listee did not necessarily "fully extinguish [the claimants'] rights" to particular jobs or licenses, *Humphries* held that even a "tangible burden on a legal right…satisfies the 'plus' test." 554 F.3d at 1188 (finding a tangible burden wherever, "as a practical matter, the law creates a framework under which agencies reflexively check the stigmatizing list…prior to conferring a legal right or benefit.")

The Watchlisting System works in the exact same way. By encouraging and often compelling recipients of TSDB information—a roll of entities almost 20,000 names long—to "reflexively check the stigmatizing list," the Plaintiffs can satisfy the plus prong in a manner identical to the *Humphries* plaintiffs. *Humphries v.Cty.of L.A.* 554 F.3d 1170, 1188 (9th Cir. 2009).[13]

### c. Because TSDB status is a legal status, Plaintiffs satisfy the "plus" prong no matter how the Court formulates it

TSDB status is a legal status. Through it, the federal government imposes a life-spanning set of consequences, applied automatically, in accordance with a person's TSDB status. A legal status is nothing more than a predictable set of consequences levied against people based on the bare fact of their particular status. And the desire to enact a change of legal status is why the operational scale of the Watchlisting System is so important to its leaders: the federal government's already accomplished

---

[13] While the Supreme Court later reversed the Ninth Circuit's decision regarding an aspect of the *Monell* claim, the Circuit's language regarding the registry remains. *See Los Angeles Cnty., Cal. v. Humphries*, 562 U.S. 29, 39 (2010). *Accord Foley v. Arostegui*, No. 2:14-cv-00094, 2018 U.S. Dist. LEXIS 17179, at *8 (D. Nev. Jan. 31, 2018).

goal is to disfavor and disrupt the lives of listees wherever they go and whatever they do.

The distinctiveness of a TSDB listee's legal status is reflected in the numerous disabilities imposed on Plaintiffs. They are all subject to a 3-day waiting period for gun purchases. SOF 76. Defendants will not grant listees certain travel privileges, such as TSA PreCheck and Global Entry. SOF ¶ 97. USCIS unreasonably delays and/or denies any immigration benefits sought by TSDB listees based on their status. SOF ¶¶ 90-94. Mr. Halabi uprooted his life, sold everything he owned, and moved to Dubai so that he can live with his wife because his immigration petition he filed for her was delayed more than 10 years. Ex. 5 at 135-137. Dr. Hakmeh's immigration petition for his wife was delayed more than five years and Baby Doe's mother's citizenship application was delayed more than two years. Ex. 2 at 81-82; 7 at 260-261.

Listees cannot enter military bases, even if only for a delivery driver to drop off his precious cargo. SOF ¶ 119. And it goes without saying that, for TSDB listees, the FBI is not a potential employer. SOF ¶ 117. DHS denies airport identification to all TSDB listees. SOF ¶ 100. In fact, the Watchlisting System renders commercial aviation, as an industry, effectively off limits to TSDB listees. SOF ¶¶ 105. Mr. Ahmed, who was employed as a supervisor at Detroit Metro Airport, had his Customs seal revoked without notice or explanation, which interfered with his ability to perform his job. SOF ¶¶ 99, 104.

If Plaintiffs cross travel with electronic devices, CBP policy requires agents to conduct an "advanced search" of those devices in order to obtain their contents.[14] SOF ¶ 32. For Dr. Shaout, a professor at the University of Michigan College of Engineering, he could discern malware installed on

---

[14] Mr. Kadura along with his father and brother (Ex. 3 at 138-140, 148-149), Mr. Elhady (Ex.1 at 84-85, 94-95, 99, 150, 168-170, 185), Dr. Shaout (Ex. 14 at 192), John Doe 2 (Ex. 21 at 69, 81-82, 95, 103), Mr. El-Shwehdi (Ex. 20 at 57, 180-182), Mr. Samir Anwar (Ex. 17 at 86-7), Mr. Ali (Ex. 15 at 52, 60), Mr. Al Halabi (Ex. 5 at 76, 79), Dr. Khan (Ex. 18 at 32, 57, 95), Mr. Shibly (Ex. 8 at 81-82, 238), John Doe 3 and his wife (Ex. 22 at 55-56, 66, 156, 208), Mr. Thomas and three travel companions (Ex. 10 at 71-73), and Baby Doe 2's parents (Ex. 2 at 45-46) all had their electronics seized.

his phone after CBP officials seized it. Ex. 14 at 7, 46-48, 192. Moreover, Plaintiffs traveling are likely to be interrogated about their Islamic religious beliefs and practices. *See* SOF ¶¶ 87-89 (religious interrogators of Mr. Shibly, Dr. Shaout, Mr. Frljuckic, Mr. Coleman, Mr. Ahmed, Mr. Thomas, and Mr. Kadura).

In the aggregate, all of these consequences indicate that a person's TSDB status is a novel legal status invented by Defendants to impact the lives of innocent people—people who have not been arrested, charged, or convicted of a terrorism-related offense.

## II. THE WATCHLISTING SYSTEM'S RISK OF ERRONEOUS DEPRIVATION IS HIGH

*Matthews* establishes that the "nature of the relevant inquiry" is, ultimately, "central to the evaluation of any administrative process" aimed at determining that scheme's risk of erroneous deprivation. *Mathews v. Eldridge*, 424 U.S. 319, 343 (1976). Thus, while an inquiry regarding risk suggests a numerical assessment, an assessment for which Defendants' Watchlisting System fares poorly, the Supreme Court has explained that this *Matthews* factor has a qualitative dimension as well. An administrative inquiry that is "sharply focused and easily documented" will have a lower risk of erroneous deprivation than an inquiry that regards a "wide variety of information" and raises issues of "witness credibility and veracity." *Mathews v. Eldridge*, 424 U.S. 319, 343-44 (1976). Determinations that, by their nature, are "fact specific" present a "grave risk of erroneous deprivation." *Weller v. Dep't of Soc. Servs.*, 901 F.2d 387, 395 (4th Cir. 1990).

The nature of Defendants' inquiry, as reflected in the TSDB inclusion standard they adopted, presents such a "grave risk." *Id.* This is because none of the Plaintiffs qualify as "known" terrorists, a low risk inquiry this Court previously described as "straightforward and based on certain formal actions taken within the criminal justice system." *Mohamed v. Holder*, 995 F. Supp. 2d 520, 531 (E.D. Va. 2014). All the Plaintiffs, rather, are TSDB listees because Defendants have labeled them as

"suspected terrorists," a determination that appeared to this Court "to be based to a large extent on subjective judgments." *Id.*

This subjectivity is extreme. The inclusion standard is satisfied by demonstrating a reasonable suspicion that an individual is "engaging in, has engaged in, or intends to engage in conduct constituting, in preparation for, in aid of, or related to terrorism and /or terrorist activities." SOF 12. The nature of this open-ended inquiry, and the word salad that miserably fails to give it focus, led this Court to observe in *Mohamed* that the inclusion standard makes it easy to imagine "completely innocent conduct serving as the starting point for a string of subjective, speculative inferences that result in a person's inclusion." *Mohamed v. Holder*, 995 F. Supp. 2d 520, 532 (E.D. Va. 2014). What this Court wrote about the TSDB inclusion standard more than five years ago is still true today: "the Court has little, if any, ability to articulate what information is viewed by the TSC as sufficiently "derogatory" beyond the labels it has provided the Court." *Id.*

The inclusion standard allows the federal government to consider "race, ethnicity, or religious affiliation" alongside a prospective listees' beliefs and activities protected by the First Amendment." SOF ¶ 18. Officials may consider an individual's travel history, his personal and professional associations, and his financial transactions. SOF ¶ 19. As this Court previously reasoned, many protected activities[15], including the study of Arabic, could provide a basis for satisfying the inclusion standard. *Id.* Based on this weak inclusion standard, the watchlist has ballooned over time, increasing by a half-million Listees in just the last five years. SOF ¶ 9 Meanwhile, government oversight agencies

---

[15] "[I]s the academic study of terrorism or the investigative reporting of terrorist activities 'related to terrorism and terrorist activities'? Is providing financial support to a charitable organization enough, even without knowledge that some of the organization's activities are 'in aid of . . . terrorist activities'? Is it enough to be a member of a lawfully operating social or religious organization whose membership may include other persons suspected of terrorism? Is studying Arabic abroad, as Mohamed concedes he did, conduct 'in preparation for . . . terrorist activities'?" *Mohamed v. Holder*, 995 F. Supp. 2d 520, 532 (E.D. Va. 2014).

raise alarms.

## III. THE GOVERNMENT'S INTEREST IS LOW IN OPERATING A SPRAWLING WATCHLISTING SYSTEM THAT TARGETS INNOCENT PEOPLE, WITHOUT EVER PROVIDING NOTICE AND USING A SECRET RUBBER-STAMPING INCLUSION STANDARD

With respect to the final *Matthews* factor this Court must take into account, the "Government's interest" is not simply a generic assertion of a sweeping interest. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). Rather, the Court must assess the Government's interest in maintaining its Watchlisting System as it is, and the effect "additional or substitute" procedures would have on that interest. *Id.* It is misleading to conceive of this *Matthews* factor as simply the "government's interest"; instead, the Court must determine the government's interest "in proceeding without providing such [additional] procedures." *Pa. Coal Mining Asso. v. Ins. Dep't*, 471 Pa. 437, 450 (1977).

### A. The Government's Interest in its Watchlisting System Would Not Be Meaningfully Impacted if the Court Require Defendants to Provide TSDB Listees with Notice

"Notice is the most basic requirement of due process." *Pa. Coal Mining Asso. v. Ins. Dep't*, 471 Pa. 437, 452 (1977). Absent notice, deprived parties "cannot take advantage of any of the other procedural safeguards made available to it." *Id.* It is also not an aspect of procedural due process that varies from case to case. So long as the case does not regard a "de minimis" deprivation, "some form of notice and hearing…is required." *Fuentes v. Shevin*, 407 U.S. 67, 90 n.21, 92 S. Ct. 1983, 1999 (1972).

### B. The Government's Interest in its Watchlisting System is not Furthered by Maintaining a Secret Inclusion Standard

While Defendants have publicly revealed the inclusion standards for the TSDB and the No Fly List, the federal government has continued to insist on its need to keep the Selectee List's inclusion standard a secret. But such secrecy is "not congenial to truth-seeking." *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 171 (1951) (Frankfurter, J., concurring). By hiding one of their core inclusion

standards from listees, the federal government precludes adequate process; "without knowing the exact reasons" or even simply the "regulations they are accused of having violated," injured persons cannot "clear up simple misunderstandings or rebut erroneous inferences." *Gete v. I.N.S.*, 121 F.3d 1285, 1297 (9th Cir. 1997). Indeed, as this Court previously explained, the "Government's 'trust us' approach [to defending the lawfulness of its Watchlisting System] is inconsistent with the fundamental procedural protections applicable to the deprivation of a protected liberty interest." *Elhady v. Piehota*, 303 F. Supp. 3d 453, 465 (E.D. Va. 2017).

### C. The Government's Interest in its Watchlisting System is Compatible with the Court Requiring Defendants to Utilize a Higher Inclusion Standard

The Government's TSDB inclusion standard adopts a novel threshold that is satisfied more than 150,000 times each year. *See* SOF ¶ 9. The inclusion standard is so permissive that the TSDB effectively lacks "any ascertainable standard for inclusion or exclusion." *Smith v. Goguen,* 415 U.S. 566, 578 (1974). And though the standard purports to borrow the language of *Terry v. Ohio's* reasonable suspicion test, there are no other substantive similarities. 392 U.S. 1 (1968). *Terry's* reasonable suspicion standard requires a level of suspicion that criminal activity is afoot, while the Government's TSDB inclusion standard, "is not necessarily related to any unlawful conduct." *Mohamed v. Holder,* 995 F. Supp. 2d 520, 531 (E.D. Va. 2014). The result is what this Court previously characterized as a "**reasonable suspicion**" based on a "**reasonable suspicion**" standard—an administrative innovation, without precedent or analogue, that Defendants conjured out of thin air. *Mohamed*, 995 F. Supp. 2d at 532.

The appropriate substance of an inclusion standard is not entrusted to the Government's imagination but, instead, is "the kind of question which has traditionally been left to the judiciary to resolve." *Woodby v. Immigration & Naturalization Serv.*, 385 U.S. 276, 284 (1966). And for decades, federal courts have outlined the types of standards that maintain the Government's interests in

imposing various kinds of deprivations. In matters about money, for example, a "fair preponderance of the evidence" standard preserves the government interest. *Santosky v. Kramer*, 455 U.S. 745, 755 (1982). In civil cases where "individual interests at stake ... are both particularly important and more substantial than mere loss of money," an intermediate standard like "clear and convincing evidence" must be used. *Cooper v. Oklahoma*, 517 U.S. 348, 363 (1996) (internal quotes and cites omitted).

But the TSDB's inclusion standard sits far below even the lowest standards federal courts require agencies to use. Simply put, the Government's interest is compatible with this Court requiring Defendants to adopt a higher standard such as a clear-and-convincing or a preponderance of evidence standard.

## IV. DHS TRIP LACKS THE MOST BASIC ELEMENTS OF DUE PROCESS

There are "basic requirements" that procedural due process, in each instance, demands: (1) "notice of the reasons for the deprivation," (2) some information regarding the "evidence against" the person injured, and (3) "an opportunity to present [the deprived person's] side of the story." *D.B. v. Cardall*, 826 F.3d 721, 743 (4th Cir. 2016). DHS TRIP comports with none of these basic requirements.

DHS TRIP provided no notice to Plaintiffs—not of the deprivation nor of the inclusion standard Defendants used to determine whether to impose the deprivation. The administrative scheme provides no information to TSDB listees about the evidence TSC relied upon to assign people a TSDB status. This Court previously described DHS TRIP determination letters as "non-substantive," because they do not reveal whether an alteration in status has been accomplished. *Mohamed v. Holder*, No. 1:11-cv-50, 2011 U.S. Dist. LEXIS 96751, at *30 n.6 (E.D. Va. Aug. 26, 2011). And none of the Plaintiffs were given an opportunity to rebut the evidence TSC relied upon to assign them TSDB status. *See* MSJ Exs. 1B, 3A, 5B, 8B, 9C, 11A, 14B, 16A, 17B, 18B (Plaintiffs' DHS TRIP

Letters).

## CONCLUSION

The Court should **GRANT** Plaintiffs' Motion for Summary Judgment and find that the TSDB fails to provide constitutionally sufficient procedural due process, and thereby also violates the Administrative Procedures Act. The Court should **ORDER** supplemental briefing regarding the procedural remedy necessary to cure the constitutional harm.

DATED: March 11, 2019                          Respectfully submitted,

**CAIR LEGAL DEFENSE FUND**

BY: _/s/ Gadeir I. Abbas_
Lena F. Masri (DC # 100019) ±
Gadeir I. Abbas (VA # 81161) *
Carolyn M. Homer (DC # 1049145) ±
453 New Jersey Ave SE
Washington, DC 20003
Tel: (202) 516-4724
Fax: (202) 379-3317
gabbas@cair.com

± Admitted *pro hac vice*

*Mr. Abbas licensed in VA, not in D.C.*
*Practice limited to federal matters*

**AKEEL AND VALENTINE, PLC**
SHEREEF H. AKEEL (MI # P54345) ±
888 W. Big Beaver Rd., Ste. 910
Troy, MI 48084
Phone: (248) 269-9595
shereef@akeelvalentine.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 11, 2019, I filed the foregoing document via the Court's CM/ECF system.  I further certify that counsel for Defendants will automatically receive service of this filing via electronic mail.

/s/ *Gadeir I. Abbas*
Gadeir I. Abbas