# Elhady Plaintiffs
# MSJ Exhibit 25



**Planet Depos®**
We Make It *Happen*™

# Transcript of Timothy P. Groh, Designated Representative

**Date:** March 1, 2018
**Case:** El Hady, et al. -v- Kable, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING | INTERPRETATION | TRIAL SERVICES

**1**

```
1          UNITED STATES DISTRICT COURT
2         EASTERN DISTRICT OF VIRGINIA
3              ALEXANDRIA DIVISION
4    - - - - - - - - - - - x
5   ANAS EL HADY, ET          :
6   AL.,                      :
7          Plaintiffs,   :   Case No. 16-cv-00375
8        v.                   :
9   CHARLES H. KABLE,         :
10   Director of the          :
11   Terrorist Screening      :
12   Center; in his           :
13   official capacity,       :
14   et al.,                  :
15          Defendants.       :
16    - - - - - - - - - - - x
17   Videotaped Deposition of Terror Screening Center
18     By and through its Designated Representative
19            TIMOTHY P. GROH
20             Washington, D.C.
21          Thursday, March 1, 2018
22               9:07 a.m.
```

**2**

```
1          Deposition of TIMOTHY P. GROH, held at the
2   offices of:
3
4
5          Department of Homeland Security
6          20 Massachusetts Avenue, N.W.
7          Washington, D.C.  20001
8
9
10
11
12
13      Pursuant to Notice, before Carla L. Andrews,
14   Notary Public in and for the District of Columbia.
15
16
17
18
19
20
21   Job No.:  180014
22   Pages: 1 - 389
```

**3**

```
1        A P P E A R A N C E S
2   ON BEHALF OF THE PLAINTIFFS:
3        GADEIR ABBAS, ESQUIRE
4        LENA MASRI, ESQUIRE
5        CAROLYN HOMER, ESQUIRE
6        Council on American-Islamic Relations
7        453 New Jersey Avenue, SE
8        Washington, D.C.  20003
9        202-742-6423
10
11
12   ON BEHALF OF THE DEFENDANT CHARLES H.
13   KABLE:
14        ANTONIA KONKOLY, ESQUIRE
15        United States Attorney's Office
16        2100 Jamieson Avenue
17        Alexandria, Virginia 22314-5702
18        703-299-3799
19
20
21
22
```

**4**

```
1   APPEARANCE CONTINUED:
2        AMY POWELL, ESQUIRE (via phone)
3        U.S. DEPARTMENT OF JUSTICE
4        310 New Bern Avenue
5        Federal Building, Suite 800
6        Raleigh, North Carolina 27601
7        202-514-9836
8
9        DENA M. ROTH, ESQUIRE
10        U.S. DEPARTMENT OF JUSTICE
11        20 Massachusetts Avenue, N.W.
12        Room 7112
13        Washington, D.C. 20529-2099
14
15        JENNIFER GREENBAND, ESQUIRE
16        KEVIN HOULIHAN, ESQUIRE (via phone)
17        U.S. Department of Justice
18        601 12th Street, South
19        Arlington, Virginia 20598
20
21
22
```

Transcript of Timothy P. Groh, Designated Representative
Conducted on March 1, 2018

2 (5 to 8)

**Page 5**

1  APPEARANCES (CONTINUED):
2       JAYME KANTOR, ESQUIRE
3       YEORA PARK, ESQUIRE
4       U.S. Department of Justice
5       935 Pennsylvania Avenue, N.W.
6       Suite 10140
7       Washington, D.C.  20535
8       202-324-7194
9  ALSO PRESENT:
10      KEVIN BOGUCKI, Terror Screening Center
11      Law Unit
12      MELISSA PACHIKARA, FBI
13      JOSEPH CLARK, U.S. Customs and Border
14      Protection
15      JOE DONOHOE, Videographer
16
17
18
19
20
21
22

**Page 6**

1            C O N T E N T S
2  EXAMINATION OF TIMOTHY P. GROH          PAGE
3  By Mr. Abbas                 7
4
5          E X H I B I T S
6        (Attached to transcript)
7  DEPOSITION EXHIBIT              PAGE
8  A -- Overview of Watchlisting Process    325
9      and Procedures
10 B -- Defendants' Objections to        350
11     Interrogatories
12
13
14
15
16
17
18
19
20
21
22

**Page 7**

1            P-R-O-C-E-E-D-I-N-G-S
2
3       THE VIDEOGRAPHER:  Here begins disk
4  number one in the videotaped deposition of Timothy
5  Paul Groh in the matter of Elhady, et al. versus
6  Kable, et al, in the District Court for the Eastern
7  District of Virginia, Case No. 16 CV-375.  Today's
8  date is March 1, 2018, and the time on the video
9  monitor is 9:07 a.m.  The videographer for today is
10 Joe Donohoe representing Planet Depos.  This
11 videotaped deposition is taking place at 20
12 Massachusetts Avenue, Northwest, Washington, D.C.
13       Would counsel please voice-identify
14 themselves and state whom they represent?
15       MR. ABBAS:  This is Gadeir Abbas.  I am
16 here for the plaintiffs.
17       MS. KONKOLY:  Antonia Konkoly, for the
18 Department of Justice.
19       MR. BOGUCKI:  Kevin Bogucki, Terror
20 Screening Center Law Unit.
21       MS. GREENBAND:  Jennifer Greenband,
22 Transportation Security Administration.

**Page 8**

1       MS. KANTOR:  Jayme Kantor, FBI.
2       MS. PARK:  Yeora Park, TSC.
3       MS. PACHIKARA:  Melissa Pachikara, FBI.
4       MR. CLARK:  Joseph Clark, U.S. Customs
5  and Border Protection.
6       MS. ROTH:  Dena Roth, Department of
7  Justice.
8       MS. HOMER:  And Carolyn Homer, for the
9  plaintiffs.
10      THE VIDEOGRAPHER:  The court reporter
11 today is Carla Andrews representing Planet Depos.
12      Would the court reporter please swear in
13 the witness?
14 Thereupon,
15         TIMOTHY P. GROH,
16 was called as a witness and, after being duly sworn
17 by the notary, was examined and testified as
18 follows:
19      EXAMINATION BY COUNSEL
20        FOR PLAINTIFFS
21 BY MR. ABBAS:
22   Q.  Good morning, Mr. Groh.

Transcript of Timothy P. Groh, Designated Representative
Conducted on March 1, 2018

9

1    A.    Good morning.

2    Q.    Am I pronouncing your name correctly?

3    A.    Yes, sir.

4    Q.    My name is Gadeir Abbas.  I am an

5    attorney representing the plaintiffs in this action.

6    Today I am going to take your deposition.  Before I

7    begin questioning you, I am going to provide an

8    overview that I am sure your attorneys have already

9    provided, but I feel obligated to provide now.  Do

10   you understand that your obligation today is to tell

11   the truth?

12   A.    I do.

13   Q.    And during the course of the deposition,

14   I will be asking you questions.  And because my

15   words and your words are being typed, I will ask

16   that even if you know what the question is going to

17   be that you wait until the very end of my question

18   to respond.

19   A.    Certainly.

20   Q.    That's not like normal conversations.  So

21   unfortunately, despite our best efforts, we will on

22   occasion interrupt each other.  And I apologize in

10

1    advance for any interruptions I make.  But let's

2    just do our best to not interrupt each other?

3    A.    Of course.

4    Q.    Is there any reason why you are unable to

5    provide truthful testimony today?

6    A.    No.

7    Q.    What is your understanding of why you are

8    here?

9    A.    I am here to provide testimony on behalf

10   of the Terror Screening Center about TSA procedures

11   and activities.

12   Q.    You understand that testimony you provide

13   today is binding as to the agency?

14   A.    I do.

15   Q.    Great.  What is the Terror Screening

16   Database?  I am sorry.  What is the Terror Screening

17   Center?

18   A.    The Terror Screening Center is an

19   interagency center entity administered by the FBI

20   but on behalf of the U.S. Government to maintain the

21   aforementioned TSDB, otherwise known as the terror

22   watch list for the U.S. Government.

11

1    Q.    When was the Terror Screening Center

2    created?

3    A.    It was created in late 2003.

4    Q.    Who created the Terror Screening Center?

5         MS. KONKOLY:  Objection.  Vague.

6         THE WITNESS:  The TSC was created by the

7    attorney general at that time.

8         BY MR. ABBAS:

9    Q.    Why did the attorney general create the

10   Terror Screening Center?

11   A.    The attorney general was reacting to the

12   best of my understanding to HSPD-6 -- Homeland or

13   HSPD-6, which was a presidential order -- an

14   executive order directing the attorney general to

15   consolidate the terror watch list.

16   Q.    Does HSPD-6 govern the operation of the

17   Terror Screening Center?

18        MS. KONKOLY:  Objection.  Calls for a

19   legal conclusion.

20        THE WITNESS:  I am not sure what you mean

21   by govern.

22        BY MR. ABBAS:

12

1    Q.    Does the Terror Screening Center operate

2    in accordance with HSPD-6?

3         MS. KONKOLY:  Objection.  Calls for a

4    legal conclusion.

5         THE WITNESS:  I think it operates

6    consistently with HSPD-6.  But I would say that

7    there are many other orders and policies, procedures

8    that also govern what we do.

9         BY MR. ABBAS:

10   Q.    Does the Terror Screening Center operate

11   in any manner that's inconsistent with HSPD-6?

12        MS. KONKOLY:  Objection.  Vague.

13   Objection calls for a legal conclusion.

14        THE WITNESS:  Not that I can think of.

15        BY MR. ABBAS:

16   Q.    Is it the Terror Screening Center's

17   testimony today that HSPD-6 guides what Terror

18   Screening Center does?

19        MS. KONKOLY:  Objection.

20   Mischaracterizes prior testimony.  Calls for a legal

21   conclusion.

22        THE WITNESS:  The HSPD-6, as previously

Case 1:16-cv-00375-AJT-JFA   Document 306-28   Filed 03/12/19   Page 6 of 100 PageID#
14251
Transcript of Timothy P. Groh, Designated Representative          4 (13 to 16)
Conducted on March 1, 2018

13

1 stated in my previous answer, established and gave
2 rise to it. But there have been many subsequent
3 executive orders and other direction from the
4 attorney general that modifies that. So I think
5 there's a whole constellation of authorities that
6 govern what we do.
7        BY MR. ABBAS:
8    Q.   Does another agency control the Terror
9 Screening Center?
10       MS. KONKOLY: Objection. Vague.
11       THE WITNESS: Again, what do you mean by
12 control?
13       BY MR. ABBAS:
14   Q.   Can another federal government agency
15 tell the Terror Screening Center what to do?
16       MS. KONKOLY: Objection. Vague.
17       THE WITNESS: The Terror Screening Center
18 is an interagency body, which works to facilitate
19 the mission of many other agencies. So to say that
20 can another agency order us -- is that what you are
21 saying? Tell us to do something we don't want to
22 do?

14

1        BY MR. ABBAS:
2    Q.   Sure. Let me ask you that. Can another
3 agency command the Terror Screening Center to do
4 something?
5        MS. KONKOLY: Objection. Vague.
6        THE WITNESS: The Terror Screening Center
7 is administered by the FBI, so that our chain of
8 command goes through the FBI.
9        BY MR. ABBAS:
10   Q.   So the FBI can tell the Terror Screening
11 Center what to do?
12       MS. KONKOLY: Objection.
13 Mischaracterized prior testimony.
14       BY MR. ABBAS:
15   Q.   I will withdraw my question. Can the FBI
16 tell the Terror Screening Center what to do?
17       MS. KONKOLY: Objection. Vague. Go
18 ahead.
19       THE WITNESS: Generally, yes.
20       BY MR. ABBAS:
21   Q.   Please elaborate on why you attach the
22 qualification generally to your answer.

15

1    A.   Because in the service of our other
2 partners, both from the nominations and the
3 encounter side of things, we work to facilitate
4 their mission. Our policies and procedures
5 generally are governed by whatever the current Watch
6 Listing Guidance is, which is promulgated by an
7 interagency -- you know, the Watch Listing Advisory
8 Council, which certainly includes many, many other
9 parties other than the FBI. Generally, that council
10 works through consensus. If there is ultimately a
11 disagreement, then that's going to be handled
12 through other processes. And the FBI, of course, is
13 also part of that.
14   Q.   As an aside, Mr. Groh, at times you will
15 hear me say Arizona. At times you will hear me say
16 Indiana. I am just making notes to myself in the
17 transcript. So please excuse me. What agencies are
18 a part of the Watch Listing Advisory Council?
19       MS. KONKOLY: Objection. A complete
20 answer to that question would implicate law
21 enforcement and potentially state secrets
22 privileges. But you can answer to the extent that

16

1 you can without waiving either of those.
2        THE WITNESS: Sure. It is basically made
3 up of agencies that are involved in either
4 nominating identities to the Terror Screening
5 Database or that then screen from our database.
6 That would certainly include our colleagues from
7 both of those pools of organizations. It does
8 include, of course, TSA. It does include the FBI.
9        BY MR. ABBAS:
10   Q.   You can go ahead.
11   A.   And it includes, for instance, members of
12 the intelligence community. But I can't get into
13 more detail as to specifics with that.
14   Q.   I am going -- I don't think you answered
15 the question. What agencies comprise the Watch
16 Listing Advisory Council?
17       MS. KONKOLY: I am going to assert the
18 same objection that a comprehensive answer to that
19 question would implicate the law enforcement
20 privilege. I believe the witness has already
21 answered to the extent that he can without waiving
22 the privilege. To the extent there is anything

Transcript of Timothy P. Groh, Designated Representative
Conducted on March 1, 2018

17

1 further to add, you can answer.  Otherwise, I will
2 further object that the question has been asked and
3 answered.
4          MR. ABBAS:  Just so that I -- I apologize
5 for interrupting.  Just so the record is clear, are
6 you asserting the law enforcement privilege and the
7 state secrets privilege over the names of the
8 agencies that comprise the Watch Listing Advisory
9 Council?
10         MS. KONKOLY:  Over a comprehensive list
11 of all agencies, yes.
12         MR. ABBAS:  But there are some agencies
13 that you are not asserting the law enforcement and
14 state secrets privilege?
15         MS. KONKOLY:  I am asserting it over a
16 comprehensive list.
17         MR. ABBAS:  And it's -- the assertion is
18 of the law enforcement privilege and the state
19 secrets privilege?
20         MS. KONKOLY:  And potentially the state
21 secrets.
22         BY MR. ABBAS:

18

1     Q.    Is the Terror Screening Center a -- do
2 you call the agency members of the Watch Listing
3 Advisory Council?  What's the language that the
4 inter-agencies use?
5     A.    Yes, I would say members.
6     Q.    Is the Terror Screening Center a member
7 of the Watch Listing Advisory Council?
8         MS. KONKOLY:  Objection.  Potentially it
9 calls for information in the -- that would fall
10 within the parameters of the law enforcement,
11 potentially state secrets privilege.  We cannot go
12 agency by agency because that would ultimately
13 result in a comprehensive list of everyone.  So we
14 cannot proceed in that manner without calling those
15 privileges into play.  However --
16         MR. ABBAS:  He has already answered.  He
17 has already said that the Terror Screening Center is
18 part of Watch Listing Advisory Council?
19         MS. KONKOLY:  Okay.  Then that question
20 has been asked and answered.
21         MR. ABBAS:  Are you instructing him not
22 to answer?

19

1         MS. KONKOLY:  It has been asked and
2 answered.  I will state that objection and --
3         BY MR. ABBAS:
4     Q.    Is the Terror Screening Center a member
5 of the Watch Listing Advisory Council?
6         MS. KONKOLY:  Same objections.  You can
7 answer.
8         THE WITNESS:  I said already yes.
9         BY MR. ABBAS:
10    Q.    Is the FBI a member of the Watch Listing
11 Advisory Council?
12         MS. KONKOLY:  I am going to again assert
13 the same privileges.  A comprehensive list of
14 everyone on the Advisory Council interagency council
15 would implicate the state secret -- potentially
16 state secrets privilege and the law enforcement
17 privilege.  We can't proceed agency by agency in
18 this manner, because to do so would ultimately
19 result in that comprehensive list.
20         BY MR. ABBAS:
21    Q.    I am going to ask --
22         MS. KONKOLY:  However, I will allow the

20

1 witness to answer the question to the extent that he
2 believes he can without waiving those privileges as
3 to this particular agency.
4         MR. ABBAS:  I will just ask that the
5 defendant's counsel not engage in speaking
6 objections.  Just make the objections.  If you want
7 to instruct him not to answer, you are free to do
8 that.
9         BY MR. ABBAS:
10    Q.    Is the FBI a member of the Watch Listing
11 Advisory Council?
12         MS. KONKOLY:  All the same objection that
13 I just stated.
14         THE WITNESS:  In this case, yes.
15         BY MR. ABBAS:
16    Q.    Is the TSA a member of the Watch Listing
17 Advisory Council?
18         MS. KONKOLY:  I am going to again object
19 on the basis of law enforcement privilege,
20 potentially state secrets privilege.  A
21 comprehensive list of everybody on the council would
22 implicate those privileges.  However, you can answer

Transcript of Timothy P. Groh, Designated Representative
Conducted on March 1, 2018

6 (21 to 24)

---

21

1  that question to the extent that you believe you
2  can.  You cannot go too much further down this road
3  or I will need to instruct him not to answer.
4        THE WITNESS:  I don't believe I can go
5  any further.
6        BY MR. ABBAS:
7    Q.   Is CDP a member of the Watch Listing
8  Advisory Council?
9        MS. KONKOLY:  I am going to assert the
10 law enforcement and potentially the state secrets
11 privilege and on that basis instruct the witness not
12 to answer.
13       BY MR. ABBAS:
14   Q.   Is the National Security Agency a member
15 of the Watch Listing Advisory Council.
16       MS. KONKOLY:  I am going to object on the
17 basis of the law enforcement privilege and
18 potentially the state secrets privilege.  On the
19 basis of those privileges, I am going to instruct
20 the witness not to answer.
21       BY MR. ABBAS:
22   Q.   You are not answering?

---

22

1    A.   That's correct.
2    Q.   Is the Department of Homeland Security a
3  member of the Watch Listing Advisory Council?
4        MS. KONKOLY:  I am going to object on the
5  basis of law enforcement privilege, potentially
6  state secrets privilege.  On the basis of those
7  privileges, I am going to instruct the witness not
8  to answer.
9        BY MR. ABBAS:
10   Q.   You are not answering?
11   A.   I am not answering.
12   Q.   Is the NCTC a member of the Watch Listing
13 Advisory Council?
14       MS. KONKOLY:  I am going to object on the
15 basis of law enforcement privilege and potentially
16 the state secrets privilege.  And on the basis of
17 those privileges, I am going to instruct the witness
18 not to answer.
19       BY MR. ABBAS:
20   Q.   You are not answering?
21   A.   I am not answering.
22   Q.   And I apologize.  We just have to go

---

23

1  through a bunch of these.  Is the Department of the
2  Air Force a member of the Watch Listing Advisory
3  Council?
4        MS. KONKOLY:  I am going to object on the
5  basis of law enforcement privilege, potentially
6  state secrets privilege.  On the basis of those
7  privileges, I am going to instruct the witness not
8  to answer.
9        BY MR. ABBAS:
10   Q.   Is the Department of Justice a member of
11 the Watch Listing Advisory Council.
12       MS. KONKOLY:  I am going to object on the
13 basis of the law enforcement privilege, potentially
14 the state secrets privilege.  On the basis of those
15 privileges, I am going to instruct the witness not
16 to answer.
17       BY MR. ABBAS:
18   Q.   How does an agency become a member of the
19 Watch Listing Advisory Council?
20       MS. KONKOLY:  I am going to object.
21 Vague, potentially law enforcement, potential state
22 secrets.  You can answer to the extent you can.

---

24

1        THE WITNESS:  I believe the guidance
2  itself stipulates to certain members.  And I think
3  other agencies who believe that they may have
4  equities in the watch listing and screening process
5  could make their desire known.  And then I think the
6  Watch Listing Advisory Council would decide whether
7  or not an additional party could join.
8        BY MR. ABBAS:
9    Q.   Does an agency have final authority over
10 what the Watch Listing Advisory Council does?
11       MS. KONKOLY:  Objection.  Vague.
12 Objection.  Potentially calls for law enforcement
13 privileged information.  You can answer to the
14 extent you can.
15       THE WITNESS:  Do you mean does a
16 particular agency?
17       MR. ABBAS:  Could you read back the
18 question.
19       (The record was read.)
20       MS. KONKOLY:  Same objections.
21       THE WITNESS:  I believe I already
22 testified that we will work via a consensus.  So

---

Transcript of Timothy P. Groh, Designated Representative       7 (25 to 28)
Conducted on March 1, 2018

---

25

1  there is no agency.  It is a body that comes
2  together to hopefully reach consensus.
3        BY MR. ABBAS:
4     Q.   Does an agency lead the Watch Listing
5  Advisory Council?
6        MS. KONKOLY: Objection. Vague.
7  Objection. Potentially calls for law enforcement
8  information. You can answer to extent that you can.
9        THE WITNESS: There are -- without
10 getting into details as to who they are, there are
11 two agencies that lead it, one of which is I will
12 say is the TSC.
13       BY MR. ABBAS:
14    Q.   What is the other agency that leads the
15 Watch Listing Advisory Council?
16       MS. KONKOLY: Objection. Calls for law
17 enforcement privileges. Calls for potentially state
18 secrets. You can answer if you believe you can.
19       THE WITNESS: I don't believe I can
20 answer.
21       BY MR. ABBAS:
22    Q.   Is it the defendant that leads -- that

---

26

1  co-leads the Watch Listing Advisory Council?
2        MS. KONKOLY: I'm sorry. I didn't hear
3  that question.
4        BY MR. ABBAS:
5     Q.   The Terror Screening Center is the
6  defendant. Is the other leader of the Watch Listing
7  Advisory Council a defendant?
8        MS. KONKOLY: I am going to object on the
9  same grounds. Potentially law enforcement and
10 potentially state secrets. You can answer if you
11 can.
12       THE WITNESS: I don't know exactly who
13 all the defendants are. But even if it is, I don't
14 believe I can answer that.
15       BY MR. ABBAS:
16    Q.   We have asked for all defendants. What
17 does the Watch Listing Advisory Council do?
18       MS. KONKOLY: Objection. Vague.
19 Objection. Potentially calls for law enforcement or
20 state secrets. It's a privileged comprehensive
21 answer. But you can answer to the extent you
22 believe you can.

---

27

1        THE WITNESS: It creates a forum for
2  interagency discussion about how the watch listing
3  and screening enterprise functions amongst the
4  different agencies.
5        BY MR. ABBAS:
6     Q.   Does the Watch Listing Advisory Council
7  produce the Watch Listing Guidance?
8        MS. KONKOLY: Objection. Vague.
9  Objection. Potentially law enforcement. But you
10 can answer to the extent you can.
11       THE WITNESS: If you mean by produce
12 effectively write that guidance, yes.
13       BY MR. ABBAS:
14    Q.   The Watch Listing Advisory Council writes
15 the Watch Listing Guidance?
16       MS. KONKOLY: Objection.
17 Mischaracterizes prior testimony. Go ahead.
18       BY MR. ABBAS:
19    Q.   I am sorry. Let me just --
20    **A.   Please.**
21    Q.   Is it TSC's testimony today that the
22 Watch Listing Advisory Council writes and publishes

---

28

1  the Watch Listing Guidance?
2        MS. KONKOLY: Objection. Vague.
3  Objection. Potentially law enforcement. You can
4  answer if you can.
5        THE WITNESS: When I say writes, I mean
6  there is interagency discussion to agree to
7  language. So from that definition of write, yes.
8  And if you mean publish, if you mean then provides
9  that to U.S. Government's entities and then
10 participate in that process, the answer would also
11 be yes.
12       BY MR. ABBAS:
13    Q.   How does the Watch Listing Advisory
14 Council act? Would it like vote to finalize the
15 Watch Listing Guidance?
16       MS. KONKOLY: Objection. Potentially law
17 enforcement. You can -- objection. Vague. You can
18 answer if you can.
19       THE WITNESS: Generally, it is going to
20 work by unanimous consent.
21       BY MR. ABBAS:
22    Q.   Has the Watch Listing Guidance -- is the

---

29

1 current Watch Listing Guidance that TSC utilizes the
2 product of the unanimous consensus of the Watch
3 Listing Advisory Council?
4       MS. KONKOLY: Objection. Vague.
5 Objection. Potentially law enforcement sensitive.
6 But you can answer if you can.
7       THE WITNESS: I wasn't at the TSC when
8 the most recent guidance was promulgated. But to
9 the best of my knowledge, yes.
10 BY MR. ABBAS:
11   Q.   What are the functions of the Terror
12 Screening Center?
13      MS. KONKOLY: Objection. Vague.
14 Objection. Potentially law enforcement and state
15 secrets in a comprehensive answer. But you can
16 answer to the extent that you can.
17      THE WITNESS: Generally, it is to
18 consolidate the U.S. Government's approach to
19 terrorist watch listing, to build and maintain the
20 Terror Screening Database, and to provide that to
21 appropriate screening agencies in support of their
22 various missions.

30

1 BY MR. ABBAS:
2   Q.   Does TSC serve a function that's
3 unrelated to the Terror Screening Database?
4       MS. KONKOLY: Objection. Vague.
5 Objection. Potentially law enforcement sensitive.
6 But you can answer to the extent that you can.
7       THE WITNESS: Can you restate the
8 question? Do we do --
9       MR. ABBAS: Can you read back the
10 question?
11      (The record was read.)
12      MS. KONKOLY: Same objections.
13      THE WITNESS: I would say that is by far
14 our bigger function. Beyond that, I think -- I
15 don't think I can go into detail.
16 BY MR. ABBAS:
17   Q.   What functions does the Terror Screening
18 Center serve that are unrelated to the Terror
19 Screening Database?
20      MS. KONKOLY: Objection. Vague.
21 Objection. Potentially calls for law enforcement
22 sensitive information. You can answer to the extent

31

1 that you can.
2       THE WITNESS: I don't believe there is
3 anything additional I can say that's not privileged.
4 BY MR. ABBAS:
5   Q.   Going back to the Watch Listing Advisory
6 Council, when did the Watch Listing Advisory Council
7 come into existence?
8       MS. KONKOLY: Objection. Vague.
9       THE WITNESS: I don't know the precise
10 answer to that.
11 BY MR. ABBAS:
12   Q.   Did the Watch Listing Advisory Council
13 come into existence before 2005?
14      MS. KONKOLY: Objection. Vague.
15      THE WITNESS: I don't know.
16 BY MR. ABBAS:
17   Q.   Did the Watch Listing Advisory Council
18 come into existence before 2010?
19      MS. KONKOLY: Objection. Vague.
20      THE WITNESS: I believe so, but I don't
21 know precisely beyond that.
22 BY MR. ABBAS:

32

1   Q.   So it is your testimony today -- Indiana.
2 Is it TSC's testimony today that the Watch Listing
3 Advisory Council came into existence prior to 2010?
4   A.   I believe so.
5   Q.   When did the Watch Listing Advisory
6 Council produce the first version of the Watch
7 Listing Guidance?
8       MS. KONKOLY: Objection. Vague.
9 Objection. Potentially law enforcement. You can
10 answer to the extent that you can.
11      THE WITNESS: To the best of my
12 knowledge, sometime around 2008, but I am not sure
13 before that. I would say by 2008.
14 BY MR. ABBAS:
15   Q.   So it is the Terror Screening Center's
16 testimony that by 2008 the Watch Listing Advisory
17 Council had published a Watch Listing Guidance?
18      MS. KONKOLY: Objection.
19 Mischaracterized his prior testimony.
20      THE WITNESS: To the best of my
21 knowledge, yes.
22 BY MR. ABBAS:

33

1    Q.    The title of that first Watch Listing
2 Guidance, was the title of that first Watch Listing
3 Guidance Watch Listing Guidance 2008?
4         MS. KONKOLY: Objection. Potentially
5 calls for law enforcement or potentially state
6 secrets information. But you can answer to the
7 extent that you can.
8         BY MR. ABBAS:
9    Q.    And just to clarify, I am just asking for
10 the title of the document.
11        MS. KONKOLY: Okay.
12        THE WITNESS: I am not sure. Quite
13 honestly, I was trying to think if I was, but I am
14 actually not sure. This is all quite before my
15 time.
16        BY MR. ABBAS:
17   Q.    Sure. But you are testifying on behalf
18 of the Terror Screening Center?
19   **A.    Sure.**
20   Q.    Was it the Watch Listing Advisory
21 Council's practice to revise and publish new
22 versions of the Watch Listing Guidance each year

34

1 since 2008?
2         MS. KONKOLY: I am going to object on the
3 basis of potentially law enforcement, potentially
4 state secrets, and also state an objection based on
5 the scope of the topics that we are limited to
6 today. But I will allow the witness to answer to
7 the extent that he can.
8         THE WITNESS: I think the only thing I
9 can say about that is that it is periodically
10 updated.
11        BY MR. ABBAS:
12   Q.    How many times has the Watch Listing
13 Guidance been updated by the Watch Listing Advisory
14 Council?
15        MS. KONKOLY: I am going to make the same
16 objections. Potentially law enforcement,
17 potentially state secrets. And I will again note
18 scope issue. I am not sure if this is clearly
19 within the scope that we are proceeding on today,
20 but I will allow the witness to answer if he can.
21        THE WITNESS: I don't think I can,
22 without getting into privilege, get into the number

35

1 of times it has been updated.
2         BY MR. ABBAS:
3    Q.    Has the Watch Listing Guidance been
4 updated more than 10 times since the Watch Listing
5 Advisory Council has first published the Watch
6 Listing Guidance?
7         MS. KONKOLY: I am going to make the same
8 objections. Potentially law enforcement and
9 potentially state secrets. And I will, again, note
10 that I am not sure that this is clearly within the
11 scope. And if at a certain point we continue to
12 press this line of questioning, I may need to
13 instruct not to answer. But for now you can go
14 ahead and answer.
15        THE WITNESS: Yeah, I don't think I -- I
16 don't think I can, the precise number of times or
17 even a characterization of within along these lines.
18 I just don't think I will be able to answer that.
19        BY MR. ABBAS:
20   Q.    Have there been years where the Watch
21 Listing Advisory Council has not updated the Watch
22 Listing Guidance?

36

1         MS. KONKOLY: Objection. Vague.
2 Objection. Calls for law enforcement sensitive
3 information. You can answer to the extent that you
4 can.
5         THE WITNESS: Same answer. I can't
6 answer that.
7         BY MR. ABBAS:
8    Q.    You can't tell me -- what's the basis for
9 -- I am sorry. Just so the record is real clear,
10 what's the basis for the objection to him answering
11 whether the Watch Listing Guidance has been updated
12 every single year?
13        MS. KONKOLY: The categories that we have
14 designated don't necessarily entail every change to
15 the Watch Listing Guidance going back to the
16 beginning of the inception of the council.
17        BY MR. ABBAS:
18   Q.    Fair enough. Let me try a different way.
19 Have there been multiple revisions to the Watch
20 Listing Guidance since 2008?
21   **A.    Yes.**
22   Q.    And those revisions are the product of

37

1  the Watch Listing Advisory Council's consultative
2  process?
3      **A.   Yes.**
4      Q.   And the Watch Listing Guidance has been
5  the product of the Watch Listing Advisory Council's
6  unanimous consensus each time it has been issued?
7      **A.   To the best of my knowledge, yes.**
8      Q.   What is the Terror Screening Database? I
9  am sorry. A few more questions on the Terror
10 Screening Center. The Terror Screening Center, you
11 said, was created in 2003?
12     **A.   Yes.**
13     Q.   Was there -- did the Watch Listing
14 Advisory Council exist in 2003?
15     **A.   Pursuant to my previous answer, I don't**
16 **know precisely when that body was composed. I know**
17 **the attorney general directed the FBI to stand up**
18 **Terror Screening Center in 2003. I don't know the**
19 **precise sequence of events following that.**
20     Q.   And you might not know, and that's fine.
21 You know, if you don't know, that's a reasonable
22 answer. But just for the clarity of the record, did

38

1  the Watch Listing Advisory Council exist in 2003?
2      MS. KONKOLY: Objection. Asked and
3  answered.
4      THE WITNESS: I don't know when it was
5  established, so.
6      MR. ABBAS: Indiana.
7      BY MR. ABBAS:
8      Q.   Did the Watch Listing Advisory Council
9  produce a Watch Listing Guidance in 2003?
10     MS. KONKOLY: Objection. I am going to
11 object on the basis of the scope of the topics we
12 have before us today and also potential law
13 enforcement sensitive information. You can answer
14 if you can.
15     THE WITNESS: I think I have. If I don't
16 know if it existed, I wouldn't know if it did
17 something.
18     BY MR. ABBAS:
19     Q.   Is there a Watch Listing Guidance as old
20 as 2003?
21     MS. KONKOLY: Objection. Asked and
22 answered. And same objections as I stated

39

1  previously.
2      THE WITNESS: I don't know.
3      MR. ABBAS: Indiana.
4      I will just note, for the record, that
5  the Magistrate Judge Anderson made it really clear
6  in the hearing a few weeks ago that he quote, thinks
7  there needs to be some discussion as to how this has
8  evolved over time if that has evolved over time and
9  what period of time. Quote, this has to be put in
10 some context of a continuum, not just on the day
11 that the deposition gets taken.
12     MS. KONKOLY: And I would note, for the
13 record, that that discussion was in the context of
14 measures to improve the reliability and accuracy of
15 the watch listing process. And we are prepared to
16 testify about that today, but we do not understand
17 that instruction to cover every iteration Watch
18 Listing Guidance going back to 2003. So at a
19 certain point, I will need to invoke the protective
20 order.
21     BY MR. ABBAS:
22     Q.   What is the Terror Screening Database?

40

1      MS. KONKOLY: Objection. Vague.
2  Objection. Potentially it calls for law enforcement
3  sensitive information or state secrets privilege.
4  But you can answer to the extent that you can.
5      THE WITNESS: The Terror Screening
6  Database is the consolidated watch list with respect
7  to terrorism for the United States Government.
8      BY MR. ABBAS:
9      Q.   Who owns the Terror Screening Database?
10     MS. KONKOLY: Objection. Vague.
11     THE WITNESS: If you mean who is
12 responsible to maintain it, ownership, I think,
13 maybe has different connotations. But if I take it
14 that that is your meaning, it is administered by the
15 Terror Screening Center.
16     BY MR. ABBAS:
17     Q.   Who controls the Terror Screening
18 Database?
19     MS. KONKOLY: Objection. Vague.
20     THE WITNESS: The Terror Screening
21 Center.
22     BY MR. ABBAS:

Transcript of Timothy P. Groh, Designated Representative
Conducted on March 1, 2018

---

41

1    Q.    It was TSC's testimony today that the FBI
2 controls the Terror Screening Center; is that
3 correct?
4        MS. KONKOLY:  Objection.
5 Mischaracterizes his prior testimony.  Objection.
6 Vague.
7        THE WITNESS:  It is by direction of the
8 attorney general administered by the FBI.  But see
9 my prior testimony with regard to the role of the
10 Watch Listing Advisory Council.
11       BY MR. ABBAS:
12    Q.    Does the FBI control the Terror Screening
13 Database?
14       MS. KONKOLY:  Objection.  Asked and
15 answered.  Objection vague.
16       THE WITNESS:  The FBI administers the
17 Terror Screening Center.  The Terror Screening
18 Center administers the TSDB.
19       BY MR. ABBAS:
20    Q.    Can the FBI tell the Terror Screening
21 Center what to do with the Terror Screening
22 Database?

---

42

1        MS. KONKOLY:  Objection.  Vague.
2 Objection.  Asked and answered.
3        THE WITNESS:  I think that's an over
4 simplification of my prior testimony.
5        MR. ABBAS:  There is a question.  Can you
6 read back the question?
7        (The record was read.)
8        MS. KONKOLY:  Same objections.  And I
9 will add -- sorry.  I lost my train of thought.
10 Mischaracterizes prior testimony.
11       THE WITNESS:  I go back to my same
12 answer.  The form you put that leading question in
13 assumes certain things I have not testified to.  And
14 my answer is it is more complex than that.
15       BY MR. ABBAS:
16    Q.    So I will ask leading questions.  And
17 if --
18    A.    I know.  And I will answer them as -- and
19 I will answer them as --
20    Q.    You haven't answered it.  So just let's
21 -- let me try asking it a different way.  Who is the
22 person in charge of the Terror Screening Center?

---

43

1        MS. KONKOLY:  Objection.  Vague.
2        THE WITNESS:  The director of the Terror
3 Screening Center.
4        BY MR. ABBAS:
5    Q.    And what's his name?
6    A.    Charles Kable.
7    Q.    Does he have a boss?
8    A.    He does.
9    Q.    Who is his boss?
10   A.    The executive assistant director for the
11 National Security of the FBI.
12   Q.    Can the executive assistant director -- I
13 am sorry.  What was the title one more time?
14   A.    Executive assistant director for National
15 Security.
16   Q.    So the executive assistant director for
17 National Security of the FBI is the boss of the head
18 of the Terror Screening Center, correct?
19   A.    Yes.
20   Q.    Can the boss of the Terror Screening
21 Center's head tell the Terror Screening Center head
22 what to do?

---

44

1        MS. KONKOLY:  Objection.  Vague.
2 Objection.  Asked and answered.  Objection.
3 Misleading.
4        THE WITNESS:  Again, I think we are at
5 the same place we were before.  Yes.  And there is
6 also an important role for the Watch Listing
7 Advisory Council and the interagency to play in
8 governing how the Terror Screening Center functions.
9 If the -- if there is disagreement, then those
10 disagreements would be resolved through the National
11 Security Council.
12       BY MR. ABBAS:
13   Q.    They wouldn't be resolved through the
14 Watch Listing Advisory Council?
15       MS. KONKOLY:  Objection.  Vague.
16 Objection.
17       THE WITNESS:  Going with this construct,
18 then the situation you are describing is whether
19 there is not consensus with the terrorist with the
20 Watch Listing Advisory Council.  Disagreements
21 within when the consensus can't be reached are
22 resolved through National Security Council

---

Transcript of Timothy P. Groh, Designated Representative

12 (45 to 48)

Conducted on March 1, 2018

---

**45**

1  processes.
2      BY MR. ABBAS:
3      Q.   Is the Watch Listing Advisory Council
4  advisory or can it tell the Terror Screening Center
5  what to do?
6      MS. KONKOLY:  Objection.  Vague.
7      THE WITNESS:  Since I have already
8  testified that the Terror Screening Center is a
9  member of the Watch Listing Advisory Council, that
10 would mean there is not a consensus within the
11 council.  And, again, that would go to the national
12 security process.  And, certainly, the
13 administration through the national security process
14 can tell the TSC what to do.
15     Q.   So the National Security Council ask tell
16 the Terror Screening Center what to do?
17     MS. KONKOLY:  Objection.
18 Mischaracterizes priors testimony.  Objection
19 misleading.  Objection.  Vague.  You can answer if
20 you can.
21     THE WITNESS:  As part of the Executive
22 Branch of the U.S. Government, yes.

---

**46**

1      BY MR. ABBAS:
2      Q.   Can the EPA tell the Terror Screening
3  Center what to do?
4      **A.   No.**
5      Q.   Okay.  Can the FBI tell the Terror
6  Screening Center what to do?
7      MS. KONKOLY:  Objection.  Vague.
8  Objection.  Misleading.  Objection.  Asked and
9  answered.  This question has been posed five times
10 at this point.  And I may need to start instructing
11 the witness not to answer if it is asked again.
12     MR. ABBAS:  And I am just struggling to
13 understand.  So I apologize for -- the repetition is
14 for my sake.  And I apologize for covering ground
15 that I might have already covered.  I just want to
16 make sure that I have a clear understanding of how
17 the Terror Screening Center works.
18     MS. KONKOLY:  I am just going to note,
19 for the record, that I believe that is the fourth or
20 fifth time that exact question has been asked.  I
21 will allow the witness to answer one more time.
22 After that, I am going to instruct not to answer of

---

**47**

1  that question is posed in the exact same terms.
2      BY MR. ABBAS:
3      Q.   Sure.  So I am going to pose it in a
4  little different terms.  In what sense is the
5  executive assistant director of the National
6  Security of the FBI the boss of the head of the
7  Terror Screening Center?
8      **A.   I think that's really, really broad and**
9  **vague, hard to answer.  I would say that he is the**
10 **boss in the sense that that is normally generally**
11 **thought of with the caveat that there are --**
12 **basically, if higher management in the FBI**
13 **instructed the Terror Screening Center to do**
14 **something that was contrary to the consensus reached**
15 **by the Watch Listing Advisory Council, there is a**
16 **process to go higher in the government to resolve**
17 **those differences.  And even though the Terror**
18 **Screening Center is administered by the FBI, it is**
19 **truly an interagency center.  And it is a complex --**
20 **what I am trying to explain is it is complex.  There**
21 **is not a simple answer to your question.**
22     Q.   Yeah, I agree that it is complex.  And so

---

**48**

1  has there ever been a disagreement between TSC and
2  the FBI as to how to administer the Terror Screening
3  Database?
4      MS. KONKOLY:  I am going to object
5  insofar as that calls for deliberative process
6  information within the deliberative process
7  privilege.  You can answer to the extent that you
8  can.
9      THE WITNESS:  I don't think I can get
10 into specifics.  But I think I can say that yes, we
11 have had disagreements with our FBI colleagues from
12 time to time.
13     BY MR. ABBAS:
14     Q.   Has the National Security Council
15 resolved disagreements between the FBI and TSC
16 regarding the TSDB?
17     MS. KONKOLY:  Objection.  Vague.
18 Objection.  Potentially deliberative process.
19 Objection.  Potentially law enforcement.  You can
20 answer to extent that you can.
21     BY MR. ABBAS:
22     Q.   And just to clarify, I am just asking for

---

Case 1:16-cv-00375-AJT-JFA   Document 306-28   Filed 03/12/19   Page 15 of 100 PageID#
14260
Transcript of Timothy P. Groh, Designated Representative         13 (49 to 52)
Conducted on March 1, 2018

49

1  decisions of the National Security Council. Has the
2  National Security Council ever made decisions that
3  resolved differences of opinion between the Terror
4  Screening Center and the FBI as to how the TSDB
5  should be maintained and operated?
6        MS. KONKOLY: Same objection. But you
7  can answer.
8        THE WITNESS: Not to my knowledge.
9        BY MR. ABBAS:
10   Q.   So in the history of the Terror Screening
11 Center, there has never been a disagreement between
12 the Terror Screening Center and the FBI that the
13 National Security Council has made a decision to
14 resolve?
15       MS. KONKOLY: I am going to object.
16 Mischaracterized his prior testimony. I am going to
17 make an objection based on the scope of the topics
18 before us here today. You can answer to the extent
19 that -- and also vagueness. You can answer to
20 extent that you can.
21       THE WITNESS: Not that I am aware of.
22       BY MR. ABBAS:

50

1    Q.   Is the National Security Council's
2  authority to resolve differences between the Terror
3  Screening Center and the FBI as to how to TSDB
4  should be the maintained and operated memorialized
5  in some document?
6        MS. KONKOLY: Objection. Vague.
7  Objection. Potentially law enforcement. You can
8  answer if you can.
9        THE WITNESS: I believe it is generally
10 memorialized in the executive order.
11       BY MR. ABBAS:
12   Q.   HSPD-6?
13       MS. KONKOLY: Objection. Calls for a
14 legal conclusion.
15       THE WITNESS: I may have to confer. I am
16 not sure if that document itself is privileged. I'm
17 not sure.
18       MR. ABBAS: Do you want to take a second?
19       MS. KONKOLY: If the witness needs advice
20 as to whether he can answer without waiving the
21 privilege, we would ask to take a break.
22       MR. ABBAS: It's up to you.

51

1        THE WITNESS: If you want me to answer.
2        MR. ABBAS: Do you want us to step out?
3        MS. KONKOLY: You can step out.
4        THE VIDEOGRAPHER: We are going off the
5  record. The time is 9:49 a.m.
6        (A recess was held.)
7        THE VIDEOGRAPHER: We are back on the
8  record. The time is 10:04 a.m. And we have been on
9  the record for 42 minutes and 3 seconds.
10       MR. ABBAS: Could you read the last
11 question, please? Oh, I'm sorry. Lena Masri is now
12 here for the plaintiffs. Could you read the last
13 question back?
14       (The record was read.)
15       MS. KONKOLY: And I am going to object
16 that that calls for a legal conclusion. I am going
17 to object on the basis of the scope of the
18 protective order that was entered. And I am also
19 going to object insofar as the answer to that
20 question involves information that is within the
21 purview of another agency and note that while
22 Mr. Groh can answer this question based on his

52

1  understanding he cannot bind any other agency with
2  his answer.
3        THE WITNESS: So I think the --
4  generally, I wasn't sure if there was a privilege
5  associated with it. But I don't believe there is.
6  NSPM-4, which was published last year, which lays
7  out National Security Council procedures generally,
8  is the process that would be used to resolve any
9  differences between any members of the Watch Listing
10 Advisory Council, include the TSC and the FBI.
11       MR. ABBAS: Arizona.
12       BY MR. ABBAS:
13   Q.   NSPM-4?
14   A.   **National Security Presidential Memorandum**
15 **4.**
16   Q.   And the National Security Presidential --
17   A.   **Memoranda or memorandum.**
18   Q.   The National Security Presidential
19 Memorandum was first published in 2017; is that
20 correct?
21   A.   **This particular one, yes.**
22   Q.   Are there prior versions of the NSPM?

53

1     MS. KONKOLY: Objection. Calls for a
2  legal conclusion. Objection. Based on the scope of
3  the protective order, I think this is pretty --
4  getting a little bit afield of the topics we have
5  agreed to and the court has entered. And I am going
6  to object insofar as, again, his answer calls for
7  information within the purview of another agency.
8  Mr. Groh can testify as to his understanding about
9  the answer to this question. But he cannot bind
10 another agency with his answer.
11    MR. ABBAS: And the first topic is the
12 Terror Screening Center's role in the TSDB
13 nominations process. It appears that the Terror
14 Screening Center is part of the Watch Listing
15 Advisory Council. It is the deponent's testimony
16 today that the Watch Listing Advisory Council and
17 the National Security Council play a role in the
18 TSDB nomination process. I am asking for the TSC's
19 role in the TSDB nomination process with regards to
20 this NCPM (sic) document, so --
21    MS. KONKOLY: Okay. And I would note
22 just, for the record, that the court expressly ruled

54

1  out sources of legal authority as a valid topic for
2  today's deposition. I will reassert all the same
3  privilege. And Mr. Groh can answer to the extent
4  that he can.
5     THE WITNESS: Yeah. Let's repeat the
6  question. I lost it after all of that.
7     BY MR. ABBAS:
8     Q.   And just to be clear, I am only asking
9  whether documents exist, right?
10    **A.   Right.**
11    Q.   So there is an NCPM (sic) that was
12 published in 2017, correct?
13    **A.   Yes.**
14    Q.   And the NCPM (sic) published in 2017
15 memorializes how a dispute between the Terror
16 Screening Center and the FBI would be resolved?
17    MS. KONKOLY: Okay. I am going to object
18 that that calls for a legal conclusion. And I am
19 going to object based on the scope of the protective
20 order. I am going to again object insofar as this
21 answer calls for information within the purview of
22 another agency. Mr. Groh can answer as to his

55

1  understanding of the answer to this question, but
2  you cannot bind another agency with his answer.
3     MR. ABBAS: And just speaking objections
4  --
5     MS. KONKOLY: It is not a speaking
6  objection.
7     MR. ABBAS: That was a speaking
8  objection. That was like a 35-second speaking
9  objection.
10    MS. KONKOLY: I am making clear that his
11 answer does not bind other agencies.
12    MR. ABBAS: And it doesn't. I mean,
13 that's just how this deposition works.
14    MS. KONKOLY: Gadeir, I will state that
15 objection when I see fit.
16    THE WITNESS: So the -- once again, I am
17 sorry. One more time. Read the question. Somehow
18 I am --
19    (The record was read.)
20    MS. KONKOLY: Same objection.
21    THE WITNESS: So, first of all, it is
22 NSPM, National Security.

56

1     BY MR. ABBAS:
2     Q.   NSPM?
3     **A.   Security. And NSPM-4, actually, right,**
4  **generally resolves -- I don't know that, for**
5  **instance, the Watch Listing Advisory Council is**
6  **named in there. But it provides for this**
7  **administration general procedures. But I think it**
8  **is also important to add that I don't think that**
9  **materially changed anything that previously existed.**
10    Q.   So last year's NSPM was called NSPM-4?
11    **A.   Correct.**
12    Q.   Is there an NSPM-3?
13    MS. KONKOLY: Objection. Calls for a
14 legal conclusion. Objection potentially beyond the
15 scope.
16    BY MR. ABBAS:
17    Q.   Is there a document that's called NSPM-3?
18    **A.   I honestly don't know.**
19    Q.   Is there a document called NSPM-2?
20    **A.   I don't know.**
21    Q.   Is there a document called NSPM-1?
22    **A.   I don't know.**

57

1        MR. ABBAS:  Arizona, Indiana.
2        BY MR. ABBAS:
3    Q.    Who is responsible for promulgating
4 NSPM-4?
5        MS. KONKOLY:  Objection.  Calls for a
6 legal conclusion.  Objection.  Beyond the scope of
7 the protective order entered by the court.
8 Objection insofar as this information calls for
9 information within the purview of another agency.
10 Mr. Groh cannot bind another agency with his answer.
11 But you can answer to the extent that you can.
12        MR. ABBAS:  Can we just -- I'm sorry.
13 Can we just make that -- I mean, that objection is
14 applicable to every single question I will ask that
15 Mr. Groh's testimony today is not going to bind any
16 other agency because it can't.  I am not asking him
17 to bind any other agency.  Can we just stipulate,
18 for the record, that every single question I ask
19 that you will make the objection that Mr. Groh
20 testimony's cannot bind other agencies?
21        MS. KONKOLY:  There are questions you
22 could ask that would go simply to what the TSC does

58

1 that would bind the agency.  And I think to make a
2 clear record, I think I need to make the objection
3 when you are straying outside of those lines.
4        BY MR. ABBAS:
5    Q.    Who decided what the contents of NSPM-4
6 would be?
7    **A.    An NSPM is signed by the president of the**
8 **United States.**
9    Q.    Does NSPM-4 regard matters that do not
10 include the TSDB?
11        MS. KONKOLY:  Objection.  Vague.
12 Objection.  Calls for a legal conclusion.
13 Objection.  Beyond the scope of the protective
14 order.  Objection insofar as this information calls
15 and -- this question calls for information within
16 the purview of other agencies.
17        THE WITNESS:  I believe it governs the
18 functioning generally of the National Security
19 Council, which would certainly include many matters
20 that are outside the scope of the TSC or the Watch
21 Listing Enterprise.
22        BY MR. ABBAS:

59

1    Q.    Why did the Terror Screening Center
2 create the Terror Screening Database?
3        MS. KONKOLY:  Objection.  Vague.
4 Objection.  Calls for information that may be
5 subject to the law enforcement privilege or the
6 state secrets privilege.  You can answer to the
7 extent that you can.
8        THE WITNESS:  To fulfill our mandate, to
9 consolidate the various watch-listed or various
10 watch lists that existed before 9/11.
11        BY MR. ABBAS:
12    Q.    Did -- has the Terror Screening Center --
13 I am sorry.  Has the Terror Screening Database
14 always had inclusion standards?
15        MS. KONKOLY:  Objection.  Vague
16 objection.
17        BY MR. ABBAS:
18    Q.    I am going to withdraw.  I'm going to
19 withdraw that question.  What are the terror
20 screening databases inclusion standards?
21        MS. KONKOLY:  Objection.  Vague.
22 Objection.  Calls for information within the law

60

1 enforcement privilege, state secrets privilege, SSI.
2 You can answer to the extent that you can.
3        THE WITNESS:  Generally, the standard for
4 inclusion is that we have minimum biographic
5 information and that it meets the reasonable
6 suspicion standard.
7        BY MR. ABBAS:
8    Q.    Has the Terror Screening Database always
9 had a reasonable suspicion -- I am sorry.  Has the
10 Terror Screening Database always had the same
11 inclusion standard?
12        MS. KONKOLY:  Objection.  Vague.
13 Objection.  Beyond the scope of the protective
14 order.  Objection.  Calls for information within the
15 law enforcement privilege, potentially state
16 secrets, potentially SSI.  You can answer to the
17 extent that you can.
18        THE WITNESS:  Generally, I believe it has
19 always been the reasonable suspicion standard.
20        BY MR. ABBAS:
21    Q.    When was the TSDB's inclusion standards
22 first established?  I am going to rephrase that

Transcript of Timothy P. Groh, Designated Representative          16 (61 to 64)
Conducted on March 1, 2018

---

61

1 question. When did the inclusion standards of the
2 TSDB first come into being?
3        MS. KONKOLY: Objection. Vague.
4 Objection. Beyond the scope of the protective
5 order. You can answer to the extent that you can.
6        THE WITNESS: I don't know precisely when
7 the first time the definition was written down going
8 back to my previous answers about when the Watch
9 Listing Guidance was first promulgated. But I don't
10 believe that there was ever a different standard
11 used. So whenever the TSDB actually started
12 operating, that would have been the time the
13 reasonable suspicion standard began to be used.
14        BY MR. ABBAS:
15    Q.   And it has always been the same?
16        MS. KONKOLY: Objection.
17 Mischaracterizes prior testimony.
18        BY MR. ABBAS:
19    Q.   I am sorry. Let me withdraw that
20 question. The TSDB inclusion standard has always
21 been the same, correct?
22        MS. KONKOLY: Objection.

---

62

1 Mischaracterizes prior testimony.
2        THE WITNESS: To the best of my
3 knowledge, the overall standard has been the same.
4        BY MR. ABBAS:
5    Q.   And what do you mean by -- the overall is
6 a little squishy. The TSDB inclusion standard has
7 always been the same, correct?
8    A.   The reasonable suspicion standard has
9 always been, to my knowledge, the same.
10    Q.   Is there another TSDB inclusion standard?
11        MS. KONKOLY: Objection. Vague.
12 Objection. Potential --
13        BY MR. ABBAS:
14    Q.   And I am sorry. Let me withdraw that
15 question. Is there another TSDB inclusion standard
16 other than the reasonable suspicion standard that
17 you mentioned?
18        MS. KONKOLY: Objection. Vague.
19 Objection. Potentially calls for law enforcement or
20 state secrets-privileged information. You can
21 answer to the extent that you can.
22        THE WITNESS: So there are certainly

---

63

1 additional standards for outside of the KST
2 standard. For instance, the criteria for no fly and
3 selectee subcomponents of the TSDB.
4        BY MR. ABBAS:
5    Q.   Can you be on the selectee list and not
6 on -- I am sorry. Can you be on the selectee list
7 and not on the Terror Screening Database? Let me
8 start again. Can a person be on a selectee list but
9 not in the Terror Screening Database?
10    A.   No.
11    Q.   Can a person be on the No-Fly List but
12 not on the Terror Screening Database?
13    A.   No.
14    Q.   So everyone on a selectee list and the
15 No-Fly List is also in the Terror Screening
16 Database, correct?
17    A.   That is correct.
18    Q.   Can a person be included on the terror --
19 I am sorry. Has the -- can a person be included in
20 the Terror Screening Database and not satisfy TSDB's
21 inclusion standard?
22        MS. KONKOLY: Objection. I am going to

---

64

1 object on the ground of vagueness. Also,
2 potentially calls for law enforcement sensitive
3 information and potentially state secrets. You can
4 answer to the extent that you can.
5        THE WITNESS: Can you restate the precise
6 question?
7        MR. ABBAS: Can you read back the
8 question?
9        (The read was read.)
10        MS. KONKOLY: Same objection.
11        THE WITNESS: What do you mean by the
12 TSDB inclusion standard? Sorry.
13        BY MR. ABBAS:
14    Q.   You testified that the TSDB inclusion
15 standard is a reasonable suspicion standard,
16 correct?
17    A.   Correct.
18    Q.   We will -- I will ask you some more
19 questions about the consent of that reasonable
20 suspicion standard. But right now I just want to
21 know can a person be in the terror screening data --
22 I am sorry. Can TSC include a person in the Terror

---

65

1 Screening Database that does not satisfy the TSDB
2 inclusion standard?
3        MS. KONKOLY: Objection.  Vague.
4 Objection.  Potentially calls for law enforcement or
5 state secrets information.  But you can answer to
6 the extent that you can.
7        THE WITNESS: There are limited purposes
8 for which individuals who do not meet the reasonable
9 suspicion standard can be included in the Terror
10 Screening Database in order to facilitate screening
11 processes specifically for the Department of
12 Homeland Security and Department of State.
13        BY MR. ABBAS:
14    Q.    So the Terror Screening Center does not
15 apply the TSDB inclusion standards to every person
16 that is in the TSDB?
17        MS. KONKOLY: Objection.  Vague.  Calls
18 for -- objection.  Vague.
19        THE WITNESS: I would clarify that you
20 keep use the word TSDB inclusion standard.  That's
21 not a word I have used.  I would say that is the
22 reasonable suspicion standard that's applied to

66

1 known or suspected terrorists.
2        BY MR. ABBAS:
3    Q.    So we are going to argue -- not argue.  I
4 am going to ask you questions about the content of
5 the reasonable suspicion standard.  And I am using
6 the inclusion standard, because I don't think it is
7 a reasonable suspicion standard.  But is the
8 standard that TSC applies to determine whether
9 someone is included in the TSDB, you refer to that
10 as the reasonable suspicion standard, correct?
11    **A.    That is correct.**
12    Q.    Okay.  I refer to that as the inclusion
13 standard.
14    **A.    Okay.  I am just saying that my concern**
15 **about that is precision is important here.**
16    Q.    Of course.
17    **A.    It is going to be confusing going**
18 **forward.  And we may have to keep clarifying this**
19 **because this is complex stuff.  So we have got to be**
20 **precise.**
21    Q.    And I appreciate you working together
22 with me as we are trying to clarify the language.  I

67

1 have not worked at the TSC, so I don't know your
2 language.
3    **A.    I understand.**
4    Q.    Does the TSC -- let me try asking the
5 question a different way.  Does the TSC apply the
6 same standard to every person in the Terror
7 Screening Database?
8        MS. KONKOLY: Objection.  Vague.
9 Objection.  Calls for information that's potentially
10 -- a full answer may call for information protected
11 by the law enforcement or state secrets privilege.
12 But you can answer to the extent that you can.
13        THE WITNESS: I believe, as I just
14 testified, the answer to that is no.
15        BY MR. ABBAS:
16    Q.    Why doesn't the Terror Screening Center
17 apply the same standards to every person in the
18 Terror Screening Center?  I am sorry.  Let me start
19 that again.  Why doesn't the Terror Screening Center
20 apply the same standard to each person in the Terror
21 Screening Database?
22        MS. KONKOLY: Objection.  Vague.

68

1 Objection.  Calls for information potentially
2 protected by the law enforcement or state secrets
3 privilege.  You can answer to the extent that you
4 can.
5        THE WITNESS: Because we were directed by
6 the Watch Listing Advisory Council in certain
7 instances for certain purposes to apply a different
8 standard.
9        BY MR. ABBAS:
10    Q.    When did the Watch Listing Advisory
11 Council tell the Terror Screening Center to
12 establish exceptions to what you are calling the
13 reasonable suspicion standard of the TSDB?
14        MS. KONKOLY: Objection.  Vague.
15 Objection.  Potentially calls for law enforcement
16 sensitive information.  You can answer to the extent
17 that you can answer.  And SSI.
18        THE WITNESS: I think I can only give a
19 general answer to that to say that was after 2009.
20        BY MR. ABBAS:
21    Q.    Okay.  Are the exceptions to the TSDB
22 inclusion standards memorialized in the document?

Transcript of Timothy P. Groh, Designated Representative
Conducted on March 1, 2018

18 (69 to 72)

69

1       MS. KONKOLY:  Objection.  Vague.
2 Objection.  Potentially calls for information within
3 the law enforcement or state secrets privileges.
4 You can answer to the extent that you can.
5       THE WITNESS:  I think they would be
6 memorialized in various documents.
7       BY MR. ABBAS:
8   Q.   What documents memorialized the various
9 exceptions to the TSDB's inclusion standard?
10      MS. KONKOLY:  I am going to object on the
11 basis of law enforcement privilege and potentially
12 state secrets.  I am going to instruct the witness
13 not to answer that question.
14      MR. ABBAS:  I am just asking for the
15 titles of the documents.  Are you asserting the --
16 what privileges are you asserting over the titles of
17 the document that memorialized the exceptions to the
18 TSDB inclusion standards?
19      MS. KONKOLY:  Law enforcement,
20 potentially state secrets.  I am instructing him not
21 to answer.
22      MR. ABBAS:  Over the names of the

70

1 documents?
2       MS. KONKOLY:  My objection is on the
3 record.
4       BY MR. ABBAS:
5   Q.   Is the watch listing -- does the Watch
6 Listing Guidance articulate the exceptions to the
7 TSDB inclusion standards?
8       MS. KONKOLY:  Objection.  I am going to
9 object on the basis of law enforcement privilege,
10 potentially state secrets.  And I am going to
11 instruct the witness not to answer that question.
12      BY MR. ABBAS:
13  Q.   How many exceptions are there to the TSDB
14 inclusion standard?
15      MS. KONKOLY:  I am going to again object
16 on the basis of the law enforcement privilege,
17 potentially the state secrets privilege.  And I am
18 going to, again, instruct the witness not to answer
19 that question.
20      MR. ABBAS:  How many -- you are asserting
21 the privilege over how many -- he said that there
22 are various exceptions.  I want to know whether

71

1 there is two exceptions or 40 exceptions.  You are
2 asserting the state secrets privilege and the law
3 enforcement privilege over the number of exceptions
4 to the TSDB inclusion standards?
5       MS. KONKOLY:  My objection is on the
6 record.
7       MR. ABBAS:  I am clarifying.  Are you
8 objecting?  Are you asserting the state secrets
9 privilege and the law enforcement privilege over the
10 number of exceptions to the TSDB inclusion standard?
11      MS. KONKOLY:  My objection is on the
12 record.  And yes, I am.
13      BY MR. ABBAS:
14  Q.   Could the president order the Terror
15 Screening Center to place a person in the TSDB who
16 did not satisfy the TSDB inclusion standard?
17      MS. KONKOLY:  Objection.  Calls for a
18 legal conclusion.  Objection.  Vague.  Objection.
19 Calls for speculation.  Objection.  Potentially law
20 enforcement or state secrets.  But you can answer if
21 you can.
22      THE WITNESS:  I think, subject to the

72

1 Constitution and laws of the United States, the
2 president ultimately is a part of the Executive
3 Branch who can give orders to the TSC, which could
4 include what you are describing.
5       BY MR. ABBAS:
6   Q.   Is the TSDB inclusion standard -- never
7 mind.  Are there more than five exceptions to the
8 TSDB inclusion standards?
9       MS. KONKOLY:  I am going to object on the
10 basis of the law enforcement privilege, potentially
11 the state secrets privilege.  And I am going to
12 instruct the witness not to answer that question.
13      BY MR. ABBAS:
14  Q.   Are there more than 10 exceptions to the
15 TSDB inclusion standards?
16      MS. KONKOLY:  I am going to again object
17 on the basis of the law enforcement privilege,
18 potentially state secrets, and instruct the witness
19 not to answer.
20      BY MR. ABBAS:
21  Q.   The Watch Listing Advisory Council
22 created exceptions to the TSDB inclusion standards

Transcript of Timothy P. Groh, Designated Representative
Conducted on March 1, 2018

19 (73 to 76)

73

1 in 2009, correct?
2        MS. KONKOLY: Objection.
3 Mischaracterizes prior testimony. Objection.
4 Vague.
5        THE WITNESS: I am just testifying that
6 it was after 2009 -- during or after 2009.
7        BY MR. ABBAS:
8    Q.   So you are not sure as to the year. But
9 it was at least after 2009 that the exceptions were
10 created?
11   **A.   That's correct.**
12   Q.   Prior to 2009, were there any exceptions
13 to the TSDB inclusion standard?
14        MS. KONKOLY: Objection. Vague.
15 Objection. Scope of the protective order. You can
16 answer to the extent that you know.
17        THE WITNESS: I don't believe so.
18        BY MR. ABBAS:
19   Q.   Why did the Terror Screening Center
20 create exceptions -- I am sorry. Your testimony is
21 that the Watch Listing Advisory Council created the
22 exceptions to the TSDB inclusion standards, correct?

74

1        MS. KONKOLY: Objection. Vague.
2        THE WITNESS: I mean, just given the word
3 created, but effectively agree that there would be
4 exceptions.
5        BY MR. ABBAS:
6    Q.   What was the rationale of the Watch
7 Listing -- I'm sorry. What was the rationale of the
8 Watch Listing Advisory Council when it created
9 exceptions to the TSDB inclusion standard?
10        MS. KONKOLY: Objection. That calls for
11 information protected by the law enforcement
12 privilege, potentially state secrets privilege. I
13 am instructing the witness not to answer.
14        BY MR. ABBAS:
15   Q.   On how many occasions has the Watch
16 Listing Advisory Council created exceptions to the
17 TSDB inclusion standard?
18        MS. KONKOLY: Objection. Calls for
19 information protected by the law enforcement
20 privilege, potentially the state secrets privilege.
21 I am instructing the witness not to answer.
22        MR. ABBAS: The number of times that the

75

1 Watch Listing Advisory Council has issued new
2 exceptions to the TSDB inclusion standard, you are
3 asserting the law enforcement privilege and the
4 state secrets privilege over the number of times
5 that the TSDB inclusion standards have had
6 exceptions made to them?
7        MS. KONKOLY: My objection is on the
8 record and yes.
9        BY MR. ABBAS:
10   Q.   Has the -- I am sorry. Has the Watch
11 Listing Advisory Council issued -- I am sorry. Has
12 the Watch Listing Advisory Council created
13 exceptions to the TSDB inclusion standards on
14 multiple occasions?
15        MS. KONKOLY: Objection. Calls for
16 information within the law enforcement privilege,
17 potentially the state secrets privilege. And I am
18 going to instruct him not to answer that question.
19        MR. ABBAS: Whether or not the Watch
20 Listing Advisory Council has done so on multiple
21 occasions? That's potentially a state secret if
22 they have done it twice or three or more than once?

76

1 You have told me that they have done it once. Why
2 can't Mr. Groh tell me if it has happened more than
3 once? What's the --
4        MS. KONKOLY: My objection is on the
5 record. The instruction stands. You are welcome to
6 ask your next question.
7        BY MR. ABBAS:
8    Q.   Are there persons listed in the Terror
9 Screening Database for whom the TSC lacks reasonable
10 suspicion that they are a known or suspected
11 terrorist?
12        MS. KONKOLY: Objection. Potentially
13 calls for law enforcement, potentially state
14 secrets. You can answer that if you can.
15        THE WITNESS: I would say that, yes, with
16 a caveat that those individuals are in there for
17 limited purposes. And so being in the database is
18 not the same as being available to all potential
19 screeners.
20        BY MR. ABBAS:
21   Q.   What are the limited purposes that TSC --
22 I am sorry. Let me start all over. What are the

Transcript of Timothy P. Groh, Designated Representative
Conducted on March 1, 2018

20 (77 to 80)

77

1 limited purposes for which the TSC will allow an
2 individual to be included in the TSDB who does not
3 satisfy the TSDB inclusion standard?
4       MS. KONKOLY: Objection. Asked and
5 answered. Objection. Calls for information
6 protected by the law enforcement privilege,
7 potentially the state secrets privilege. You can
8 answer that if you can.
9       THE WITNESS: So as I previously stated,
10 it is for screening conducted by the Department of
11 Homeland Security and by the Department of State.
12      BY MR. ABBAS:
13   Q.   What screening does the Department of
14 Homeland Security and the Department of State do via
15 these TSDB inclusion standard exceptions?
16      MS. KONKOLY: Objection. An answer to
17 that would call for information protected by the law
18 enforcement privilege and potentially the state
19 secrets privilege. I am instructing the witness not
20 to answer.
21      BY MR. ABBAS:
22   Q.   So you can tell me which agency, but you

78

1 can't tell me what the agency does with the
2 information. And just tell me what TSC's knowledge
3 is of what those two agencies do with the exceptions
4 to the TSB inclusion standard?
5       MS. KONKOLY: I will add the objection
6 that that answer would call for information within
7 the purview of other agencies. And Dr. Groh could
8 not bind -- Mr. Groh could not bind them. But I am
9 instructing the witness not to answer on the basis
10 of privileges I have asserted here, which are on the
11 record.
12      BY MR. ABBAS:
13   Q.   Is there a document that memorializes how
14 DHS utilizes this TSDB inclusion standard exception
15 for their screening purposes?
16      MS. KONKOLY: I am going to object to
17 scope potentially but also the fact that that answer
18 would call for information within the purview of
19 another agency. And so, therefore, Mr. Groh can't
20 bind TSA. You can answer, however, as to your
21 understanding.
22      THE WITNESS: Yes. There are -- I am

79

1 aware of certain documents. I assume there are
2 other documents.
3       MR. ABBAS: Arizona.
4       BY MR. ABBAS:
5   Q.   What documents memorialized what
6 screening DHS does via these TSDB inclusion standard
7 exceptions?
8       MS. KONKOLY: Objection. Calls for
9 information protected by the law enforcement
10 privilege, potentially state secrets privilege. On
11 that basis, I am going to instruct the witness not
12 to answer. However, I will also add the objection
13 that the answer would call for information within
14 the purview of other agencies in any event.
15      MR. ABBAS: Can you read back the
16 question. I forgot it already. I apologize.
17      (The record was read.)
18      MS. KONKOLY: I am asserting the same
19 privilege and issuing the same instruction not to
20 answer that question.
21      MR. ABBAS: You are asserting the law
22 enforcement privilege and state secrets privilege

80

1 over the name of the documents that memorialized the
2 agreement. I am sorry. Memorialized how DHS
3 utilizes the TSDB inclusion standard exceptions.
4       MS. KONKOLY: Yes, Gadeir. My objection
5 is on the record.
6       BY MR. ABBAS:
7   Q.   How many documents memorialized how
8 DHS -- I'm sorry. How many documents memorialized
9 how DHS utilizes the TSDB inclusion standard
10 exceptions for their screening?
11      MS. KONKOLY: Objection on the basis of
12 the law enforcement privilege. Potentially state
13 secrets. Also, it would call for information within
14 the purview of another agency. I am instructing the
15 witness not to answer.
16      MR. ABBAS: Over the number of documents?
17      MS. KONKOLY: Gadeir, my objection is on
18 the record.
19      MR. ABBAS: I am just clarifying. I am
20 just making sure of that.
21      MS. KONKOLY: I understood the question,
22 and my objection is on the record.

Case 1:16-cv-00375-AJT-JFA   Document 306-28   Filed 03/12/19   Page 23 of 100 PageID#
14268
Transcript of Timothy P. Groh, Designated Representative          21 (81 to 84)
Conducted on March 1, 2018

81

1         MR. ABBAS: So you have asserted the law
2 enforcement privilege and the state secrets
3 privilege over the names of the documents and the
4 number of documents that memorialize the ways that
5 DHS utilizes the TSDB inclusion standard exceptions
6 for their screeening.
7         MS. KONKOLY: Yes, Gadeir. I understood
8 your question. And I stated my objection and
9 instruction for the record.
10        MR. ABBAS: Thank you.
11        BY MR. ABBAS:
12    Q.   What are the purposes of the Terror
13 Screening Database?
14        MS. KONKOLY: Objection. Vague.
15 Objection. Potentially calls for information within
16 the law enforcement or the state secrets,
17 potentially SSI. But you can answer that to the
18 extent that you can.
19        THE WITNESS: The TSDB's purpose is to
20 consolidate what once were disparate watch-listed --
21 disparate watch lists to provide a common operating
22 picture for the intelligence community screeners and

82

1 the law enforcement community in order to better
2 prevent terrorism.
3         BY MR. ABBAS:
4    Q.   Is the purpose of the Terror Screening
5 Database to prevent terrorism?
6         MS. KONKOLY: Objection. Vague.
7 Objection. Potentially calls for law enforcement
8 sensitive information. You can answer if you can.
9         BY MR. ABBAS:
10   Q.   I am sorry. I am going to withdraw that
11 question. I forgot to ask a few questions regarding
12 the inclusion standards. So I apologize for jumping
13 around. I just missed something. Does the TSC
14 allow the FBI to utilize the TSDB to coerce
15 individuals into becoming informants?
16        MS. KONKOLY: Objection. Misleading.
17 Objection. Vague. Objection. Calls for law
18 enforcement and potentially state secrets privileged
19 information. You can answer to the extent that you
20 can.
21        THE WITNESS: No.
22        MR. ABBAS:

83

1    Q.   Does -- is it TSC's understanding that
2 the FBI utilizes the TSDB for investigative
3 purposes?
4         MS. KONKOLY: Objection insofar as it
5 calls for an answer that goes to information owned
6 by another agency. But you can answer as to your
7 understanding.
8         THE WITNESS: Yes, we support FBI
9 investigations.
10   Q.   Does the TSDB support FBI investigations
11 by helping the FBI recruit informants?
12        MS. KONKOLY: Objection. Misleading.
13 Objection. Potentially law enforcement, potentially
14 state secrets. You can answer to the extent that
15 you can.
16        THE WITNESS: We support investigations.
17 From time to time investigations lead to the
18 recruitment of informants. But I wouldn't say there
19 is any direct relationship between recruit
20 informants and the TSDB.
21        BY MR. ABBAS:
22   Q.   Does TSC have any knowledge that the FBI

84

1 utilizes the TSDB to recruit informants?
2         MS. KONKOLY: Objection. Potentially law
3 enforcement or state secrets. Objection. Vague.
4 Objection. Potentially calls for information within
5 the purview of another agency. You can answer to
6 the extent that you can.
7         THE WITNESS: As I previously stated, we
8 support investigations generally. The FBI does
9 recruit informants, but I don't think it is fair to
10 draw kind of a direct relationship between the
11 presence of TSDB and being used to coerce people to
12 becoming informants.
13        BY MR. ABBAS:
14   Q.   Is the recruitment of informants an
15 appropriate use of the TSDB in the view of Terror
16 Screening Center?
17        MS. KONKOLY: Objection. Vague.
18 Objection. Potentially law enforcement privileged.
19 Potentially goes to information in the purview of
20 another agency. You can answer to the extent that
21 you can.
22        THE WITNESS: My opinion -- inasmuch as

**85**

1  there is an investigation of an individual, I think
2  that is appropriate.  But to fully answer your
3  question, that would assume a predicated
4  investigation pursuant to -- if we are talking about
5  the FBI, pursuant to the guidelines that the FBI
6  follows.  But is not, per se, simply to recruit
7  someone who is not subject to a predicated
8  investigation.
9      BY MR. ABBAS:
10     Q.    Are there individuals on the Terror
11 Screening Database that are informants for the FBI?
12         MS. KONKOLY:  Objection.  Calls for
13 information protected by the law enforcement
14 privilege, potentially the state secrets.  I am
15 going to instruct him not to answer that one.
16         BY MR. ABBAS:
17     Q.    Does the TSDB contain notations if
18 someone is an informant of the FBI?
19         MS. KONKOLY:  Objection.  Calls for law
20 enforcement sensitive and potentially state secrets.
21 I am instructing him not to answer that question.
22         BY MR. ABBAS:

**86**

1      Q.    Is -- does the FBI utilize -- I am sorry.
2  In TSC's understanding, does the FBI utilize the
3  TSDB to track persons in the FBI?
4          MS. KONKOLY:  Objection.  Calls for
5  information potentially within law enforcement,
6  state secrets privileges.  Also within the purview
7  of another agency.  You can answer to the extent
8  that you can.
9          BY MR. ABBAS:
10     Q.    Let me withdraw that question.  I just
11 asked it poorly.  Does the TSC know whether the FBI
12 utilizes the TSDB to track the movement of persons
13 listed in the FBI?
14         MS. KONKOLY:  Same objections.
15 Potentially law enforcement sensitive, potentially
16 state secrets.  Vague and within the purview of
17 another agency.  But you can answer as to your
18 understanding.
19         THE WITNESS:  I think generally, the FBI
20 may use -- we would -- someone that the FBI has
21 interest or equities with respect to, we would
22 report what we would call encounters generally to

**87**

1  the FBI.
2          BY MR. ABBAS:
3      Q.    The Terror Screening Center knows that
4  the FBI utilizes the TSDB to monitor the movement of
5  persons listed in the FBI, correct?
6          MS. KONKOLY:  Objection.
7  Mischaracterizes prior testimony.  Objection.
8  Potentially law enforcement information within the
9  purview of another agency.  You can answer to the
10 extent that you can.
11         THE WITNESS:  I think the word monitor is
12 -- I wouldn't use that particular word.  We report
13 encounters when we become aware of them.
14         BY MR. ABBAS:
15     Q.    Why do you report -- why does TSC report
16 encounters with TSDB listees to the FBI?
17         MS. KONKOLY:  Objection.  Potentially
18 calls for law enforcement sensitive information.
19 You can answer to the extent that you can.
20         THE WITNESS:  To maintain that common
21 operating picture, I formally referred to, as it was
22 one of the key lessons to be found in the 9/11

**88**

1  Commission Report.
2          BY MR. ABBAS:
3      Q.    Who told the Terror Screening Center to
4  report encounters with TSDB listees to the FBI?
5          MS. KONKOLY:  Objection.  Vague.
6  Objection.  Potentially law enforcement sensitive.
7  You can answer to the extent that you can.
8          THE WITNESS:  I am going to assume that
9  that happened very early on in the creation of that.
10 You know, that would be something governed by the
11 Watch Listing Advisory Council.  It has long and/or
12 always been the case that that's been true.
13         BY MR. ABBAS:
14     Q.    What is TSC's understanding of what the
15 FBI generally does with TSDB listee encounter
16 information that it receives from the Terror
17 Screening Center?
18         MS. KONKOLY:  Objection.  Potentially
19 calls for law enforcement sensitive information.
20 Also, information within the purview of another
21 agency to which Mr. Groh cannot bind any other
22 agency.  But you can answer as to your understanding

Transcript of Timothy P. Groh, Designated Representative                23 (89 to 92)
Conducted on March 1, 2018

89

1  without waiving any privileges.
2        THE WITNESS:  We report that information
3  to the -- to the investigator for whatever matter
4  that may relate to.  And I believe that that is then
5  recorded in the investigative case file.
6        BY MR. ABBAS:
7    Q.   Does the dissemination of DHS listee
8  encounter information to the FBI happen
9  automatically?
10       MS. KONKOLY:  Objection.  Vague.
11 Objection.  Potentially law enforcement --
12       BY MR. ABBAS:
13   Q.   Can I back up that question?  You used
14 the word encounter?
15   **A.   Yes.**
16   Q.   What is TSC's definition of an encounter?
17   **A.   So an encounter is -- we use the term**
18 **encounter to describe any time one of our screening**
19 **partners comes into contact physically or**
20 **administratively with somebody that is watch-listed**
21 **in the TSDB.**
22   Q.   Does the TSC try to maximum the number of

90

1  encounters of TSDB listees?
2        MS. KONKOLY:  Objection.  Misleading.
3  Objection, vague.
4        THE WITNESS:  When you say -- I don't
5  understand what you mean by maximize the number.
6        BY MR. ABBAS:
7    Q.   What's the utility of -- well, give me an
8  example of a TSDB listee encounter?
9        MS. KONKOLY:  Objection.  Potentially
10 calls for law enforcement sensitive or state secrets
11 privilege information.  You can answer that if you
12 can without waiving the privilege.
13       THE WITNESS:  It could be a -- it could
14 be a traffic stop by a local law enforcement
15 officer.  It could be something with respect to
16 border screening.  It could be something with
17 respect to a domestic fight.
18       BY MR. ABBAS:
19   Q.   Why is that -- why is whether a TSDB
20 listee -- let me start all over.  Why is a local
21 police officer's traffic-related encounter with a
22 TSDB listee useful information?

91

1        MS. KONKOLY:  Objection.  Vague, calls
2  for speculation, potentially law enforcement
3  sensitive.  You can answer to the extent that you
4  can.
5        THE WITNESS:  So, again, our processes
6  were envisioned as a result of 9/11.  And so as an
7  example, I will give you that there were individuals
8  known to the United States intelligence community
9  who were being sought in relation to various
10 investigations prior to 9/11 who were present in the
11 United States.  They were subsequently encountered
12 by local law enforcement.  But that information did
13 not get back to either the intelligence community or
14 the FBI.  And, thus, opportunities to have
15 intervened and prevented the events of 9/11 were
16 missed.
17       BY MR. ABBAS:
18   Q.   Does the Terror Screening Center believe
19 that increasing the number of tracked encounters
20 with TSDB listees furthers the purposes of the
21 Terror Screening Database?
22       MS. KONKOLY:  Objection.  Vague.

92

1  Objection.  Misleading.  Objection law enforcement
2  sensitive.  You can answer to the extent that you
3  can.
4        MR. ABBAS:  I mean, if you disagree -- I
5  mean, if he says that he doesn't agree with that, he
6  should not agree with that.  I don't understand --
7        MS. KONKOLY:  My objections are stated
8  for the record.  They stand.  You can answer to the
9  extent that you can.
10       THE WITNESS:  I think if -- for people
11 that are appropriately watch-listed in the record,
12 that additional -- additional encounters through
13 additional appropriate screening mechanisms are
14 generally helpful.
15       BY MR. ABBAS:
16   Q.   Why?
17       MS. KONKOLY:  Objection.  Calls for
18 speculation, potentially law enforcement sensitive
19 information.  You can answer to the extent that you
20 can.
21       THE WITNESS:  Because each encounter is
22 an opportunity to gather and match intelligence in

93

1 order to enable identification and disruption of
2 terrorist activities.
3         BY MR. ABBAS:
4     Q.   Does the TSDB have purposes unrelated to
5 the security of commercial aviation?
6         MS. KONKOLY: Objection. Vague.
7 Objection. Potentially law enforcement sensitive
8 information. But you can answer to the extent that
9 you can.
10        THE WITNESS: I think that the TSDB is
11 generally there to prevent terrorist attacks in
12 general, not limited to aviation security.
13        BY MR. ABBAS:
14    Q.   Is every encounter with a TSDB listee
15 added to the TSDB itself?
16    A.   The --
17        MS. KONKOLY: I am going to object on the
18 basis of potential law enforcement. But you can
19 answer to the extent that you can.
20        THE WITNESS: We maintain encounter
21 information in a separate database.
22        BY MR. ABBAS:

94

1     Q.   So you have -- so the Terror Screening
2 Center has encounter information with all TSDB
3 listees, correct?
4         MS. KONKOLY: Objection. Potentially law
5 enforcement. You can answer to the extent that you
6 can.
7         THE WITNESS: We -- we have information
8 on all encounters. We certainly don't have
9 encounters with every person in the TSDB.
10        BY MR. ABBAS:
11    Q.   Sure. Does TSC monitor how TSDB listees
12 are encountered?
13        MS. KONKOLY: Objection. Vague.
14 Objection. Potentially law enforcement privilege,
15 but you can answer.
16        THE WITNESS: Do you mean the method in
17 which or who the encounter came from?
18        BY MR. ABBAS:
19    Q.   Just as an executive. As an executive of
20 a big organization, does the executive leadership of
21 the Terror Screening Center pay attention to
22 encounter patterns with TSDB listees?

95

1         MS. KONKOLY: Objection. Potential law
2 enforcement and vague. But you can answer to the
3 extent that you can.
4         THE WITNESS: Generally, yes.
5         BY MR. ABBAS:
6     Q.   Does the TSC leadership analyze the
7 number of encounter with TSDB listees?
8         MS. KONKOLY: Objection. Potentially law
9 enforcement. You can answer to the extent that you
10 can.
11        THE WITNESS: Yes.
12        BY MR. ABBAS:
13    Q.   Does TSC view -- let me start again.
14 Does TSC attempt to disseminate the TSDB in a way
15 that increases the number of potential encounters
16 with TSDB listees?
17        MS. KONKOLY: Objection. Vague.
18 Objection. Potential law enforcements. But you can
19 answer to the extent you can.
20        THE WITNESS: Not as a first order of
21 analysis. But we look at the screening purposes.
22 And the appropriate screening purposes are the

96

1 beginning of the analysis. But I would certainly
2 want to generally, although there are requirements
3 being met, want to ensure that the way we
4 disseminate our information is helpful to the
5 screening partner, because if we encounter the
6 actual information, we certainly want to -- we
7 certainly want to make sure that we detect that
8 encounter.
9         BY MR. ABBAS:
10    Q.   So the TSC -- so the Terror Screening
11 Center views encounters with TSDB listees as a
12 source of valuable intelligence information?
13        MS. KONKOLY: Objection.
14        BY MR. ABBAS:
15    Q.   Let me start all over. That was
16 terrible. All right. So the Terror Screening
17 Center believes that encounters with TSDB listees
18 have counter-intelligence value?
19        MS. KONKOLY: I will object as vague and
20 mischaracterizes information potentially law --
21 prior testimony -- mischaracterized prior testimony.
22 Potentially implicates the law enforcement

Transcript of Timothy P. Groh, Designated Representative
Conducted on March 1, 2018

25 (97 to 100)

97

1  privilege.  You can answer that to the extent that
2  you can.
3          THE WITNESS:  I certainly -- well, I
4  would certainly not use the word
5  counter-intelligence, which as we give -- maybe this
6  is us using terms differently, I suspect.  I would
7  say counter-terrorism value, yes.  Generally, I
8  agree that positive --
9      Q.   But can I just --
10     **A.   Encounters --**
11         MS. KONKOLY:  Let him finish.
12         TE WITNESS:  -- with people in the TSDB
13  has intelligence or law enforcement value.
14     BY MR. ABBAS:
15     Q.   Yeah, I see your clarification.  I think
16  you are right.  Thank you for translating for me.
17  So let me just kind of for clarity sake rephrase
18  with counter-terrorism rather than
19  counter-intelligence.
20         The TSC's testimony today is that it
21  views encounters with TSDB listees as having
22  counter-terrorism value?

98

1          MS. KONKOLY:  Objection.  Vague,
2  potential law enforcement.  You can answer.
3          THE WITNESS:  Yes.  That's what I just
4  said.
5      BY MR. ABBAS:
6      Q.   What are all the Federal Government
7  entities that can have encounters with TSDB listees?
8          MS. KONKOLY:  Objection.  A comprehensive
9  answer to that would call for information protected
10  by the law enforcement privilege and potentially the
11  state secrets privilege.  I am going to instruct the
12  witness not to answer that question.
13     BY MR. ABBAS:
14     Q.   Does TSC receive encounter reports from
15  the TSA?  I am sorry.  Let me back up.  Does the
16  Terror Screening Center receive information from TSA
17  when TSA encounters a TSDB listee?
18         MS. KONKOLY:  Objection.  SSI.  Objection
19  law enforcement.  Objection.  Calls for information
20  potentially within the purview of a different
21  agency.  Also, I am going to note that for reasons I
22  instruct the witness not to answer the previous

99

1  question, we can't go agency by agency because that
2  would provide a comprehensive answer to that
3  question -- to the previous question.  But you can
4  answer this one to the extent that you believe you
5  can.
6          THE WITNESS:  Yes.
7      BY MR. ABBAS:
8      Q.   Does the -- does CBP -- I am sorry.
9  Does -- does TSC receive information from CBP when
10  CBP encounters a TSDB listee?
11         MS. KONKOLY:  I am going to make largely
12  the same objections.  Law enforcement, potential
13  state secrets.  And for the reason I instructed the
14  witness not to answer the question posed in whole,
15  we can't proceed to go too far down the
16  agency-by-agency path, because that would provide an
17  answer to the question I instructed the witness not
18  to answer.  With that said, you can answer this one
19  to the extent that you believe you can.
20         THE WITNESS:  Yes.
21     BY MR. ABBAS:
22     Q.   Does USCI -- I'm sorry.  Does TSC receive

100

1  information from USCIS when USCIS encounters a TSDB
2  listee?
3          MS. KONKOLY:  I am going to again object
4  on the basis of the law enforcement privilege and,
5  again, note for the reasons I instructed the witness
6  not to answer the previous question asking for all
7  agencies.  I really can't go much further down this
8  line.  So I need to cut off this line of questioning
9  for the same reason.  With that said, you can answer
10  this question to the extent that you can.
11         THE WITNESS:  Yes.
12     BY MR. ABBAS:
13     Q.   Does TSC receive information from the
14  Department of State when the Department of State
15  encounters a TSDB listee?
16         MS. KONKOLY:  Objection.  Calls for
17  information potentially protected by the law
18  enforcement privilege.  For the same reasons as I
19  stated before, we cannot provide to answer this
20  question for every single agency you might want to
21  ask it for, because that would provide an answer to
22  the question that I have instructed the witness not

Transcript of Timothy P. Groh, Designated Representative
Conducted on March 1, 2018

101

1 to answer. So you can answer this one to the extent
2 that you believe that you can.
3          THE WITNESS: Yes.
4          BY MR. ABBAS:
5     Q.   Does DH -- I am sorry. Does TSC receive
6 information from DHS when DHS encounters a TSDB
7 listee?
8          MS. KONKOLY: I am going to object to
9 that question as vague. I am also going to object
10 on law enforcement privilege. I am going to object
11 for the same reason that this constellation of
12 questions will ultimately provide an answer to the
13 question I have instructed the witness not to
14 answer. With that said, you can answer this one to
15 the extent that you can.
16          THE WITNESS: I think inasmuch CBP and
17 TSA are both part of DHS, I have answered the
18 question. Yes.
19          BY MR. ABBAS:
20     Q.   Does TSC receive information from the FBI
21 when the FBI encounters a TSDB listee?
22          MS. KONKOLY: Objection. Calls for law

102

1 enforcement sensitive information, particularly if
2 this constellation of questions were taken together
3 and proceeds further down the line. That said, you
4 can answer this question to the extent that you
5 believe that you can.
6          THE WITNESS: Yes.
7          BY MR. ABBAS:
8     Q.   Does TSC receive encounter information
9 from other Federal Government agencies about
10 encounters with TSDB listees irrespective of whether
11 or not the TSDB inclusion standard has been applied
12 to that individual?
13          MS. KONKOLY: Objection. Vague.
14 Objection. Calls for speculation. Objection.
15 Calls for potentially law enforcement or state
16 secrets privilege. You can answer that to the
17 extent that you can.
18          THE WITNESS: Outside of the agencies we
19 have already discussed, no.
20          MR. ABBAS: I am sorry? Can you read
21 back the question and his answer?
22          (The record was read.)

103

1          BY MR. ABBAS:
2     Q.   What do you mean by outside of the
3 agencies we have already discussed? What do you
4 mean?
5          MS. KONKOLY: Objection. Potentially law
6 enforcement. You can answer to the extent that you
7 can elaborate without waiving a privilege.
8          THE WITNESS: I go back to my previous
9 answer about exceptions. It is for limited
10 screening uses by the Department of Homeland
11 Security and the Department of State, both of whom
12 we had just discussed. You had asked me if we
13 received encounters. There are no other agencies
14 for which we receive encounters to people that are
15 an exception to the reasonable suspicion standard.
16          BY MR. ABBAS:
17     Q.   So the way that DHS and Department of
18 State report encounter information to TSC is
19 different than the way that the TSA and FBI and
20 USCIS report encounter information to TSC?
21          MS. KONKOLY: Objection. Vague,
22 potential law enforcement. You can answer.

104

1          THE WITNESS: I wouldn't say the way they
2 report information is different. What I would say
3 is the way that we export the TSDB is different.
4          BY MR. ABBAS:
5     Q.   Oh, so -- so there are some parts of the
6 TSDB that exist via these TSDB inclusion standard
7 exceptions, correct?
8          MS. KONKOLY: Objection. Vague.
9 Objection. Potential law enforcement. But you can
10 answer.
11          THE WITNESS: Yes.
12          BY MR. ABBAS:
13     Q.   But the information that TSC has that's
14 created via these TSDB inclusion standard exceptions
15 is only disseminated to DHS and DOS?
16          MS. KONKOLY: Objection. Potential law
17 enforcement. You can answer if you can.
18          THE WITNESS: Yes.
19          BY MR. ABBAS:
20     Q.   Does the Terror Screening Center receive
21 encounter information from state and local
22 authorities?

Transcript of Timothy P. Groh, Designated Representative

27 (105 to 108)

Conducted on March 1, 2018

105

1        MS. KONKOLY: Objection.  Potentially law
2  enforcement privilege, but you can answer to the
3  extent that you can.
4        THE WITNESS: Yes.
5        BY MR. ABBAS:
6    Q.    Does the Terror Screening Center receive
7  encounter information from non-government entities?
8        MS. KONKOLY: Objection.  Vague.
9  Potentially law enforcement.  You can answer to the
10  extent that you can.
11        THE WITNESS:  No.
12        BY MR. ABBAS:
13    Q.    Does the Terror Screening Center receive
14  encounter information from foreign governments?
15        MS. KONKOLY: Objection.  Vague.
16  Objection.  Calls for law enforcement sensitive
17  information and potentially the state secrets.  But
18  you can answer to the extent that you can.
19        THE WITNESS: Yes.
20        BY MR. ABBAS:
21    Q.    How many countries provide the Terror
22  Screening Center with encounter information?

106

1        MS. KONKOLY: Huh?
2        BY MR. ABBAS:
3    Q.    I'm sorry.  Let me rephrase the question.
4  How many foreign governments provide the Terror
5  Screening Center with encounter information
6  regarding TSDB listees?
7        MS. KONKOLY: Objection.  That question
8  calls for information protected by the law
9  enforcement privilege, potentially the state
10  secrets.  You can answer to the extent that you can
11  without waiving a privilege.
12        THE WITNESS: We have agreements with
13  more than 60 foreign countries.  They -- and I think
14  that's all I can say.
15        BY MR. ABBAS:
16    Q.    Some of those agreement are public,
17  correct?
18    **A.    Yes, some of the agreements are either —**
19 **have been disclosed by the foreign government**
20 **themselves.  That's true.**
21    Q.    Why does the Terror Screening Center
22  disseminate -- not yet, not yet.  Okay.  So I know

107

1  we got away a little bit from the TSDB purposes.  So
2  I am going to go back to that.  I might cover some
3  ground that we already covered.  But that's just
4  because I can't remember exactly where we are.
5    **A.    I am yours for another six or -- five or**
6  **six hours.**
7    Q.    I will take every minute.  And you can
8  take a break whenever you would like?
9    **A.    I am good.**
10    Q.    But one more encounter-related question.
11  Can -- can the FBI -- does the FBI have access to
12  encounter information that regards TSDB listees.  I
13  am sorry.  Let me start all over.  Do -- does the
14  Terror Screening Center provide encounter
15  information to agencies that did not originate the
16  encounter information?
17        MS. KONKOLY: Objection.  Vague.
18  Objection.  Potentially law enforcement.  You can
19  answer if you can without waiving a privilege.
20        THE WITNESS: One of the -- one of the
21  basic premises of our dissemination of encounter
22  information is to generally inform what we call the

108

1  nominator -- the originator of that information.  It
2  is not necessarily the only consideration.
3        BY MR. ABBAS:
4    Q.    Does the CBP -- does CBP receive
5  encounter information?  I am sorry.  Does TSC
6  provide CBP with encounter information that TSA
7  provided to TSC?
8        MS. KONKOLY: Objection.  Vague.
9        MR. ABBAS: That was well worded.
10        MS. KONKOLY: Objection.  Potentially
11  calls for information protected by the law
12  enforcement privilege, SSI -- potentially SSI, also
13  for information within the purview of another agency
14  as to which Mr. Groh cannot speak in a binding
15  capacity.  But you can answer to the extent that you
16  can.
17        THE WITNESS: Let me make sure I -- make
18  sure I understand this one.  So you are saying if
19  TSA has an encounter, would I inform CBP that TSA
20  has had an encounter?
21        BY MR. ABBAS:
22    Q.    Yes.

---

109

1       MS. KONKOLY: Same objections.
2       BY MR. ABBAS:
3    Q.    Would TSA inform CBP that TSA has had an
4 encounter with a TSDB listee?
5       MS. KONKOLY: Same objections.
6       THE WITNESS: Possibly, not necessarily
7 automatically.
8       BY MR. ABBAS:
9    Q.    So would CBP have to request that
10 information?
11       MS. KONKOLY: Objection. Calls for
12 information protected by the law enforcement
13 privilege, SSI, outside of purview of the TSC. But
14 you can answer to the extent that you believe you
15 can.
16       THE WITNESS: Each circumstance -- we
17 look at every encounter in detail, every what we
18 call positive encounter, which is where we believe
19 it is actually the individual that is listed in the
20 TSDB. Once we have made that determination, we look
21 at the facts and circumstances of the individual
22 encounter. And then we will make appropriate

---

110

1 notification decisions after that. It is possible
2 we might. Again, I go back to what I said. It
3 wouldn't necessarily be automatic.
4    Q.    Are you making individualized decisions
5 about which encounter information to disseminate to
6 which agencies?
7    A.    **Absolutely.**
8    Q.    So every time there is an encounter, TSC
9 makes a decision about which agencies receive
10 information about that encounter?
11       MS. KONKOLY: Objection.
12 Mischaracterized his prior testimony. Objection.
13 Vague. Objection. Potentially law enforcement
14 sensitive. But you can answer to the extent you
15 can.
16       THE WITNESS: Generally yes, every time.
17       BY MR. ABBAS:
18    Q.    Okay. If CBP has an encounter with a
19 TSDB listee, does -- I am sorry. Let me start all
20 over. If CBP has an encounter with a TSDB listee,
21 does CBP receive information from TSC about prior
22 encounters with other agencies?

---

111

1       MS. KONKOLY: Objection. Potentially law
2 enforcement privilege. Objection. Vague. You can
3 answer to the extent you can.
4       THE WITNESS: Generally, if they request
5 it or if we think it is relevant, we wouldn't
6 withhold that. And with our screening partners, if
7 they request encounter information, we will
8 generally provide it. But as a matter of daily
9 practice, I have got to say that depends on the
10 facts and circumstances. It could be because there
11 were other obvious encounters that were related to
12 this one and that might be something we would
13 highlight or it may have been something that does
14 not appear to be related and we might not
15 necessarily highlight that. It would be -- it is
16 hard to say.
17       BY MR. ABBAS:
18    Q.    I am just trying to understand.
19    A.    **Sure.**
20    Q.    I don't understand. A TSDB listee gets
21 on a plane and flies from D.C. to Chicago. Does a
22 human being at TSC decide who receives a

---

112

1 notification that the TSDB listee has flown from
2 D.C. to Chicago?
3    A.    **Yes. I'm sorry?**
4       MS. KONKOLY: Go ahead.
5       THE WITNESS: Yeah.
6       BY MR. ABBAS:
7    Q.    Do recipients of TSDB encounter
8 information request encounter data by a person or
9 can they request it across a large group or a subset
10 of persons?
11       MS. KONKOLY: Objection. Vague.
12 Objection. Potentially law enforcement. You can
13 answer to the extent that you can.
14       THE WITNESS: I think they could do both.
15 I mean, certainly individuals -- and I can envision
16 circumstances where they would for various reasons
17 want to know about broader groupings of
18 intelligence analysis or other purposes. So
19 generally, yes.
20       BY MR. ABBAS:
21    Q.    Does TSC have agreements with other
22 Federal Government agencies regarding the

---

Transcript of Timothy P. Groh, Designated Representative
Conducted on March 1, 2018

113

1  dissemination of encounter information with TSDB
2  listees?  I am going to say that question again.  I
3  am going to try it again.  Does TSC have agreements
4  or understandings with Federal Government agencies
5  that receive TSDB listee encounter information?
6        MS. KONKOLY:  Is that the end of the
7  question?
8        MR. ABBAS:  Yes.
9        MS. KONKOLY:  Objection.  Vague.
10 Objection potentially law enforcement.  Objection.
11 Compound.  You can answer to the extent that you
12 can.
13       THE WITNESS:  Generally, yes.  I would
14 say some of that is governed by via the Watch
15 Listing Advisory Council from a substantive
16 perspective.  But then there is -- I would say there
17 are other technical agreements with, you know, how
18 that can happen.
19 BY MR. ABBAS:
20    Q.   Are those technical agreements that you
21 are referring to memorialized in documents?
22       MS. KONKOLY:  Objection.  Vague.

114

1  Objection.  Potentially law enforcement.  You can
2  answer to the extent that you can.
3        THE WITNESS:  Typically, those will be
4  memorialized in a memorandum of understanding with
5  whoever those partner agencies are.
6        MR. ABBAS:  Arizona.
7        THE WITNESS:  What happens if I say
8  Arizona?
9        MR. ABBAS:  We go to lunch.
10       There is five minutes left on the tape.
11 Why don't we stop now and take 10 minutes while he
12 switches tape.
13       THE VIDEOGRAPHER:  We are going off the
14 record.  The time is 11:13 a.m.
15       (A recess was held.)
16       THE VIDEOGRAPHER:  Here begins disk
17 number two in the videotaped deposition of Timothy
18 Paul Groh.  The time on the video monitor is
19 11:27 a.m.  We have been on the record for 1 hour 51
20 minutes and 35 seconds.  And we are back on the
21 record.
22       MS. KONKOLY:  And I was just noting in

115

1  the break that before we start, defendants have
2  consulted regarding a certain line of questioning as
3  to the members of the Watch Listing Advisory
4  Council.  And we have determined that there is
5  certain information that we can clarify and disclose
6  on the public record.  So Mr. Groh is prepared to do
7  that.
8        THE WITNESS:  So you had asked me
9  previously who sits on the council.  And so we are
10 prepared to advise that also on the council is
11 Department of Homeland Security.  And the National
12 Counter-Terrorism Center is the co-chair of the
13 Watch Listing Advisory Council together with the
14 TSC.
15    Q.   So the Watch Listing Advisory Council is
16 co-chaired by TSC and NCTC?
17    A.   Correct.
18    Q.   And DHS, TSC, and CBP are all members of
19 the Watch Listing Advisory Council?
20       MS. KONKOLY:  Asked and answered.  That
21 would be in the record earlier as to who we were
22 able to disclose.

116

1        MR. ABBAS:  I am not certain that's in
2  the record.
3        THE WITNESS:  So I would say DHS and, of
4  course, CBP, and TSA subcomponents of DHS.
5  BY MR. ABBAS:
6     Q.   And the FBI is also a member of the Watch
7  Listing Advisory Council?
8     A.   Yes.
9     Q.   All of the defendants in this action are
10 members of the Watch Listing Advisory Council?
11       MS. KONKOLY:  Objection.  Calls for a
12 legal conclusion.
13 BY MR. ABBAS:
14    Q.   Oh, you don't know the defendants.
15 That's fine.  That's fair.
16    A.   I don't remember precisely.
17    Q.   I withdraw the question.  Yeah, that's
18 fine.  So we are going to get back to TSDB purposes.
19 And I know -- I think I apologized right before the
20 break that I am probably going to cover some ground
21 that I have already covered.  And that's just
22 because I have a bad memory.

Transcript of Timothy P. Groh, Designated Representative
Conducted on March 1, 2018

30 (117 to 120)

117

1          What -- to what ends does TSC maintain --
2  I am sorry.  To what ends does TSC create, maintain,
3  and disseminate the TSDB?
4          MS. KONKOLY:  Objection.  Calls for
5  information protected by the law enforcement
6  privilege potentially.  You can answer that to the
7  extent that you can.
8          THE WITNESS:  I go back to the previous
9  answer.  We maintain this in order to facilitate a
10 common operating picture amongst the intelligence
11 screening and law enforcement communities in order
12 to detect and ultimately prevent terrorism.
13         BY MR. ABBAS:
14     Q.   What do you mean by common operating
15 procedure?  I am sorry.  What do you mean by common
16 operating picture?
17     **A.   I mean that we are ensuring that all of**
18 **these disparate parts of the government have**
19 **information that enables their mission, and the**
20 **information doesn't get stove-piped in one part of**
21 **the government or another.**
22     Q.   Do all agencies that receive TSDB

118

1  information receive all information regarding
2  encounters with TSDB listees?
3          MS. KONKOLY:  Objection on the basis of
4  law enforcement privilege, potentially SSI.  You can
5  answer that to the extent that you can.
6          THE WITNESS:  So you asked do all
7  individual -- do all agencies that --
8          MR. ABBAS:  Do you want the question read
9  back.
10         THE WITNESS:  Yeah, that would be
11 helpful.
12         (The read was read.)
13         MS. KONKOLY:  Same objections.
14         THE WITNESS:  So no, all individuals that
15 -- or all agencies that receive the TSDB information
16 do not receive information on all encounters.
17         BY MR. ABBAS:
18     Q.   Do all agencies that receive TSDB
19 information receive the same TSDB information?
20         MS. KONKOLY:  Objection.  Calls for
21 information protected by the law enforcement
22 privilege.  You can answer that to the extent that

119

1  you can without waiving the privilege.
2          THE WITNESS:  I believe I already said
3  no, they don't all receive the same information.
4          BY MR. ABBAS:
5      Q.   To what extent does the varied
6  dissemination of TSDB information establish what you
7  have referred to as a common operating picture?
8          MS. KONKOLY:  Objection.  Vague.
9  Objection.  Potentially calling for law enforcement,
10 but you can about answer.
11         THE WITNESS:  I think the idea of a
12 common operating picture is still -- still limited
13 by appropriate legal and policy considerations and
14 practical considerations about how information can
15 be used for screening downstream from us.
16         BY MR. ABBAS:
17     Q.   Explain how the dissemination -- I am
18 sorry.  Explain how TSC's dissemination of TSDB
19 information establishes among Federal Government
20 agencies a common operating picture?
21         MS. KONKOLY:  Objection.  Vague,
22 compound, potentially law enforcement.  But you can

120

1  answer.
2          THE WITNESS:  Well, for instance, I go
3  back to my previous example of the Central
4  Intelligence Agency having been aware of information
5  about individuals, such as Khalid Al-Mihdhar being
6  involved in Al-Qaeda plots.  That information had
7  not been shared with the FBI.  And it certainly
8  hadn't been shared with any local law enforcement
9  border screeners.  And as a result, despite the fact
10 that the U.S. Government had a useful intelligence
11 holding, that information was neither actionable nor
12 useful.
13         BY MR. ABBAS:
14     Q.   So the TSC sees as its role in the watch
15 listing process the facilitating the dissemination
16 of information that maybe CIA has for local law
17 enforcement?
18     **A.   To --**
19         MS. KONKOLY:  Go ahead.
20         THE WITNESS:  I would say -- I wouldn't
21 specify any particular agency.  I would say
22 generally held by intelligence and law enforcement

Transcript of Timothy P. Groh, Designated Representative
Conducted on March 1, 2018

121

1  agencies.
2      BY MR. ABBAS:
3      Q.   Including state and local law enforcement
4  agencies, correct?
5      MS. KONKOLY: Objection. Vague.
6  Objection. Potentially law enforcement. You can
7  answer if you can.
8      BY MR. ABBAS:
9      Q.   Your example was a dissemination of CIA
10 information via TSC to local law enforcement. I am
11 just asking you a question about the example that
12 you provided.
13     MS. KONKOLY: Okay. Same objections.
14     THE WITNESS: Yes.
15     MR. ABBAS: Just for clarity, I am going
16 to ask just that the question is repeated. I will
17 ask her to repeat the question just so we know what
18 you are saying yes to.
19     (The record was read.)
20     BY MR. ABBAS:
21     Q.   Now I remember the question. Let me try
22 again.

122

1      A.   Do them all again.
2      Q.   Yeah. What was the name of the person in
3  the example that you used? What was that name?
4      A.   The 9/11 Commission Report cites what I
5  am referring to — I believe it's Khalid Al-Midhar.
6  It's one of the 9/11 hijackers.
7      Q.   Can you spell the last name the best you
8  can? This is not agency binding.
9      A.   I think it's A-L-M-I-D-H-A-R.
10     Q.   And who is this person?
11     A.   He is one of the 9/11 hijackers.
12     Q.   And deceased, correct?
13     A.   Yes.
14     Q.   So in your example, you indicated that
15 the CIA had information regarding -- what's his last
16 name again?
17     A.   Al-Midhar.
18     Q.   Al-Midhar, correct?
19     A.   Yes. That's what the 9/11 Commission
20 Report says.
21     Q.   And local law enforcement had an
22 encounter with this person?

123

1      A.   They had -- I believe local law
2  enforcement did. I know they definitely had contact
3  with 9/11 hijackers. And I believe they did with
4  Al-Midhar. I am not entirely sure. But by way of
5  example, I know other 9/11 hijackers and probably
6  him.
7      Q.   So does TSC view as one of its objectives
8  the sharing of information that some government
9  agencies have to other government agencies as well
10 as state and local law enforcement?
11     MS. KONKOLY: Objection. Vague and
12 compound.
13     THE WITNESS: Yes.
14     BY MR. ABBAS:
15     Q.   I want to get back to this common
16 operating picture. What information does TSC
17 disseminate that establishes among Federal
18 Government agencies a common operating picture?
19     MS. KONKOLY: Objection. Vague.
20     BY MR. ABBAS:
21     Q.   Let me withdraw that. That was a
22 terrible question. How does TSC establish a common

124

1  operating picture among federal -- I am sorry.
2  Let's try one more time. How does TSC establish a
3  common operating picture among the recipients of
4  TSDB information?
5      MS. KONKOLY: Objection. Potentially
6  calls for information protected by the law
7  enforcement privilege. Objection. Vague. You can
8  answer to the extent that you can.
9      THE WITNESS: So intelligence or
10 information that -- you know, that feeds nominations
11 then is -- you know, the fact that the USG -- U.S.
12 Government -- has information related to terrorism
13 on individuals is -- then facilitates their
14 screening mission to aid them. And possibly
15 depending on the circumstances going back to
16 discover what that derogatory information is, it
17 gives them the opportunity to make further inquiry
18 or otherwise whatever their particular mission is to
19 accomplish that counter-terrorism mission. And the
20 reporting back of encounters of that information
21 completes that what we would describe as the
22 intelligence cycle.

Transcript of Timothy P. Groh, Designated Representative
Conducted on March 1, 2018

32 (125 to 128)

---

125

1    Q.   Does -- it sounds like the purpose of
2  what you are calling the intelligence cycle is
3  broader than addressing imminent threats to
4  commercial aviation, correct?
5        MS. KONKOLY: Objection. Vague,
6  mischaracterizes his prior testimony. You can
7  answer.
8        THE WITNESS: I believe I have already
9  answered that, yes.
10       BY MR. ABBAS:
11   Q.   So TSC disseminates TSDB information to
12 counter threats that are not imminent, correct?
13       MS. KONKOLY: Objection. Vague.
14 Objection. Mischaracterizes his prior testimony.
15       THE WITNESS: What do you describe as
16 imminent?
17       BY MR. ABBAS:
18   Q.   Immediate, forthcoming, about to happen.
19       MS. KONKOLY: Objection. Vague.
20       THE WITNESS: Well, I don't know. To
21 clarify, it is to prevent things like 9/11. And if
22 one of these individuals had been on the watch list

---

126

1  and had been stopped in a traffic stop as they drove
2  across the country, I don't know if that meets your
3  definition of imminent. But that is something we
4  are trying to detect in order to ultimately thwart
5  that. But I don't know what your definition of
6  imminent in that case is.
7        BY MR. ABBAS:
8    Q.   I am just trying to get a little
9  elaboration on what this common operating picture
10 is. Does the -- does the creation of TSDB
11 information, which include this encounter
12 information, correct -- does the TSDB -- I wanted to
13 clarify. Is encounter information regarding TSDB
14 listees in a separate database from the TSDB itself?
15   A.   Yes.
16   Q.   So there is two different databases that
17 -- maybe there is a billion. There are at least two
18 different databases that the Terror Screening Center
19 creates, maintains, and disseminates?
20       MS. KONKOLY: Objection.
21 Mischaracterized his prior testimony. Objection.
22 Potentially law enforcement privilege. You can

---

127

1  answer that to the extent that you can. Also,
2  vague.
3        THE WITNESS: Yes.
4        BY MR. ABBAS:
5    Q.   One of the databases that the Terror
6  Screening Center creates, maintains, and
7  disseminates is called the Terror Screening
8  Database, correct?
9    A.   Yes.
10   Q.   And there is another database that
11 contains information regarding encounters with TSDB
12 listees, correct?
13   A.   Yes.
14   Q.   What is the name of the database that TSC
15 creates, maintains, and disseminates that contains
16 encounter information with TSDB listees?
17       MS. KONKOLY: I am going to object on the
18 basis of the law enforcement privilege. But you can
19 answer that to the extent that you can.
20       THE WITNESS: The database that maintains
21 encounters is now called TSS. I don't remember, to
22 be honest, what the TSS stands for. It used to be

---

128

1  called the Encounter Management Application.
2        MR. ABBAS: Indiana.
3        BY MR. ABBAS:
4    Q.   TSS is the name of the database that
5  contains DHS listee encounter information, correct?
6    A.   Yes.
7    Q.   You don't know what TSS stands for,
8  correct?
9    A.   I don't.
10   Q.   When was TSS created?
11   A.   It shifted over approximately a year ago.
12   Q.   It shifted over. What is that?
13   A.   From MO -- the previous system was
14 replaced by TSS.
15   Q.   So there was a previous system -- there
16 was a -- I'm sorry. Let me start over all. There
17 was a system prior to TSS that contained TSDB listee
18 encounter information, correct?
19   A.   Correct.
20   Q.   What was the name of the system prior to
21 TSS that contained TSDB listee encounter
22 information?

---

129

1        MS. KONKOLY: Objection. Asked and
2    answered.
3        THE WITNESS: It is EMA, which stands for
4    Encounter Management Application. We refer to it as
5    EMA.
6        BY MR. ABBAS:
7    Q.   So EMA?
8    A.   Yes.
9    Q.   Does TSC -- TSC creates, maintains, and
10   disseminates TSS, correct?
11   A.   Disseminates -- I just want to make a
12   distinction between the way TSDB is disseminated.
13   It is quite different from the way EMA or encounter
14   information, would be a better way to put it, is
15   disseminated. They are not the same kind of
16   automatic access to that data that there is for the
17   Terror Screening Database. In some ways they are
18   quite different.
19   Q.   Okay. So they are disseminated
20   differently and access to them -- I'm sorry. TSC
21   regulates access to EMA information differently than
22   -- I am sorry. Let me back up. TSC manages access

130

1    to encounter information differently than it manages
2    access to TSDB information?
3    A.   Correct.
4    Q.   Was it always TSC that managed -- I am
5    sorry. Was it always TSC that always maintained
6    encounter information regarding TSDB listees?
7        MS. KONKOLY: Objection. Vague,
8    objection. Potentially law enforcement privilege.
9    Objection. Scope. But you can answer that if you
10   know.
11       THE WITNESS: The -- the encounters have
12   always been reported to TSC. There was a change, I
13   believe, in about 2013 where that encounter
14   information used to be housed at FBI and is now
15   housed at TSC.
16       BY MR. ABBAS:
17   Q.   Who made the decision to transfer
18   encounter information from FBI to TSC?
19       MS. KONKOLY: Objection. Vague.
20   Objection. Potentially law enforcement privilege.
21   Objection. Scope. You can answer if you know.
22       THE WITNESS: Certainly the FBI, I

131

1    believe, and TSC probably in concurrence decided
2    that that was the thing to do. I assume that that
3    was then ratified by the Watch Listing Advisory
4    Council.
5        MR. ABBAS: Indiana.
6        BY MR. ABBAS:
7    Q.   The -- why did TSC assume control over
8    encounter information from the FBI?
9        MS. KONKOLY: Objection. Calls for a
10   legal conclusion. Objection. Potentially
11   privileged under the law enforcement privilege. But
12   you can answer if you know without waiving the
13   privilege.
14       THE WITNESS: I think it was found -- it
15   was believed to be more efficient to have the folks
16   that made decisions on dissemination co-located with
17   the individuals who received the initial report of
18   the encounter. It was an opportunity for better
19   collaboration. And to the best of my knowledge,
20   that's why a decision was made.
21       BY MR. ABBAS:
22   Q.   Did the transfer of encounter information

132

1    from the FBI to the Terror Screening Center involve
2    the export of information that TSC did not already
3    have?
4    A.   I am sorry. To export to who?
5    Q.   TSC. From the FBI to TSC. Let me try to
6    ask it a different way.
7    A.   Sure.
8    Q.   Was the FBI -- did the FBI collect
9    encounter information -- I am sorry. Prior to TSS,
10   did the FBI collect encounter information that TSC
11   didn't have?
12   A.   I believe TSC had access to that
13   information. But yes, I think -- it was really a
14   two-step -- it was really a two-step process prior
15   that we have now made more seamless by co-locating
16   and honestly bringing what was previously separate
17   systems together.
18   Q.   So now there is only one single system
19   that houses TSDB listee encounter information,
20   correct?
21   A.   Yes.
22   Q.   And the name of that system is TSS?

Transcript of Timothy P. Groh, Designated Representative
Conducted on March 1, 2018

---

133

1    A.    Correct.

2    Q.    We don't know what TSS stands for, but
3 that's the name of the system?

4    A.    Yes.

5    Q.    Is the TSDB and TSS cross-referenced by
6 listee name or in some other way?

7    A.    Certainly by --

8    Q.    I am sorry for interrupting you.  Let me
9 back up.  That was a bad question.  What is the
10 relationship between TSS and TSDB?

11    A.    Well, someone would not be in TSS unless
12 they had been in TSDB, first of all.  There is a
13 reference number that would be -- that would tie the
14 records together.  And so that particular reference
15 number would be -- besides the name -- would be the
16 identifier.

17    Q.    Does TSS and TSDB, do those two databases
18 automatically populate each other in some manner?

19    A.    No.

20    Q.    So any change to TSS requires a human
21 being to make it?

22        MS. KONKOLY:  Objection.

---

134

1 Mischaracterized his prior testimony.  Objection.
2 Potential law enforcement.  You can answer.

3        BY MR. ABBAS:

4    Q.    Let me withdraw the question.  Does -- in
5 order to make a change to TSS, does a human being
6 have to make a change to TSS?  I am sorry.  Let me
7 try one more time.  Does a change to TSS require a
8 human being's involvement?  There we go.

9        MS. KONKOLY:  Objection insofar as it
10 calls for information protected by the law
11 enforcement privilege.  But you can answer if you
12 can.

13        THE WITNESS:  Yes, individuals have to --
14 there may be some data that comes in automatically
15 from various feeds.  But, ultimately, nothing
16 happens without a human being's involvement with
17 TSS.

18        BY MR. ABBAS:

19    Q.    What information enters TSS automatically
20 without a human being's involvement?

21        MS. KONKOLY:  Objection insofar as that
22 calls for law enforcement sensitive information.

---

135

1 You can answer it if you can.

2        THE WITNESS:  Yeah, I don't believe I can
3 answer that without -- without getting into
4 privilege.

5        MR. ABBAS:  Can you repeat the question?

6        (The record was read.)

7        MS. KONKOLY:  Same objections.

8        MR. ABBAS:  What are the objections?

9        MS. KONKOLY:  That it calls for
10 information protected by the law enforcement
11 privilege.  And I said he can answer to the extent
12 that he could.  And he said that he can't.

13        THE WITNESS:  And I think it also
14 involves state secrets.

15        MS. KONKOLY:  Well, then state secrets as
16 well.

17        BY MR. ABBAS:

18    Q.    Does -- flight -- TSC is aware that TSA
19 keeps track of flight records of air travelers,
20 correct?

21        MS. KONKOLY:  Objection.  SSI, potential
22 law enforcement.  You can answer that if you can.

---

136

1        THE WITNESS:  I mean, I generally know
2 that TSA screens against flights, and there are
3 electronic systems that are involves.

4        BY MR. ABBAS:

5    Q.    And that per its screening practices,
6 records are generated of each flight that every
7 person undertakes?

8        MS. KONKOLY:  I am going to object.
9 Potentially SSI, potentially law enforcement.  That
10 is also a question that calls for information in the
11 possession of another agency.  You can speak to your
12 understanding.  But his answer will not bind.

13        MR. ABBAS:  I mean, that stuff is in the
14 overview document.

15        MS. KONKOLY:  Okay.

16        MR. ABBAS:  It in the overview document.

17        THE WITNESS:  Yeah, but you used certain
18 words like every and every passenger.  And records
19 are made -- I don't know -- you know, we could -- a
20 bunch of lawyers in a room could spend all day on
21 that, right?

22        BY MR. ABBAS:

Transcript of Timothy P. Groh, Designated Representative
Conducted on March 1, 2018

137

1    Q.   Sure, sure.  And it is not a trick
2  question.  And if I am wrong, tell me I am wrong.
3  TSC understands that TSC creates records that regard
4  each flight that every passenger that crosses U.S.
5  interspace undertakes?
6        MS. KONKOLY: Objection.  Vague.
7  Objection.  Potentially SSI or law enforcement.
8        THE WITNESS:  Yeah, the way you phrase
9  that, I don't know.
10       BY MR. ABBAS:
11   Q.   Does TSC have information about the
12 flights that TSDB listees undertake?
13       MS. KONKOLY: Objection insofar as that
14 answer calls for information protected by the law
15 enforcement privilege or potentially the state
16 secrets.  But you can answer it to the extent you --
17 or SSI.
18       MR. ABBAS:  I am just asking for TSC
19 information.  I am not asking for TSA information.
20       MS. KONKOLY:  Okay.  The objections
21 stand.  You can answer to the extent that you can.
22       THE WITNESS:  Sorry.  Can you repeat it

138

1  because I lost it?
2        MR. ABBAS:  Can you read it back?  I
3  don't remember, either.
4        (The record was read.)
5        MS. KONKOLY:  And I am going to assert
6  all the same objections.  You can answer to the
7  extent that you can.
8        THE WITNESS:  I would say generally I
9  think they have information.
10       BY MR. ABBAS:
11   Q.   By "they," you mean TSC?
12   **A.   TSA.**
13   Q.   Has information about -- I mean --
14   **A.   About --**
15       MR. ABBAS:  I'm sorry.  Let's do this.
16 Can you read back the answer?
17       (The record was read.)
18       BY MR. ABBAS:
19   Q.   Who is "they" in the answer?
20   **A.   That would be TSA in response to your**
21 **question.**
22   Q.   And what is the information that you are

139

1  referring to in that answer?
2    **A.   I don't think I can go --**
3        MS. KONKOLY:  I object based on SSI and
4  also that being information within the purview of
5  another agency.
6    Q.   So you can tell me that TSC has
7  information that TSA collects about people's
8  travels, but you can't tell me what information TSC
9  collects -- TSA collects.
10       MS. KONKOLY:  Objection.  Vague.
11       THE WITNESS:  I don't understand.
12       BY MR. ABBAS:
13   Q.   Is there a subset of TSDB information
14 that all federal agencies receive?
15       MS. KONKOLY: Objection insofar as that
16 calls for information subject to the law enforcement
17 privilege.  You can answer it if you can.
18       THE WITNESS:  I haven't testified that
19 all federal agencies receive TSDB information, so.
20       BY MR. ABBAS:
21   Q.   Of the federal agencies that do receive
22 TSDB information, is there any subset of TSDB

140

1  information that all of them receive?
2        MS. KONKOLY:  Objection insofar as it
3  calls for information protected by the law
4  enforcement privilege.  You can answer if you can.
5        THE WITNESS:  As a practical matter,
6  there probably is.  I wouldn't say that it is
7  something that we have necessarily defined that way.
8  These are kind of VIN diagrams that overlap.  So as
9  a practical matter, there probably is.  I probably
10 couldn't define for you exactly what that is,
11 because there are separate rules that govern each
12 one of those what we would call an export.
13       BY MR. ABBAS:
14   Q.   Are the rules that govern exports of TSDB
15 information newly created every time that there is
16 an export of TSDB information?
17       MS. KONKOLY:  Objection insofar as it
18 calls for law enforcement information.  You can
19 answer if you can.
20       THE WITNESS:  No.  Generally, those rules
21 are -- they may be adjusted from time to time.  But
22 many of these exports happen automatically and

141

1 continuously.

2     BY MR. ABBAS:

3   Q.  Okay. So I still don't have a sense of

4 what TSC does to establish a common operating

5 picture among federal agencies to detect and stop

6 terrorism. I am sorry. Identify all actions TSC

7 takes to accomplish a common operating picture among

8 recipients of TSDB information or TSS information.

9     MS. KONKOLY: Objection insofar as that

10 would implicate information protected by the law

11 enforcement privilege or SSI. Also, vague. Also

12 compound. You can answer to the extent that you

13 can.

14     THE WITNESS: Well, since that's

15 everything that TSC more or less does, we take

16 intelligence and law enforcement-related

17 information. We build a reliable thorough and

18 current list from that information. We disseminate

19 that information to screening partners commensurate

20 with the law, with policy, with technical and

21 practical considerations to screening partners.

22     We record information about encounters.

142

1 And between that, the other piece I left out of that

2 was we conduct identity resolution with the partner

3 to make sure that the person encountered is indeed

4 somebody that we are looking for, to exclude people

5 that are not on the TSDB and that we are not trying

6 to screen against. We then disseminate that

7 information in a way that it completes the

8 intelligence cycle and other people have operational

9 or intelligence or law enforcement equities --

10 screening equities that can effectively complete

11 their mission.

12     BY MR. ABBAS:

13   Q.  Who decides which agencies have equities

14 in a situation that regards TSDB listee?

15     MS. KONKOLY: Objection. Vague.

16     THE WITNESS: Do you mean post-encounter?

17     BY MR. ABBAS:

18   Q.  Probably more generally. I don't know

19 what you mean by equities. What do you mean when

20 you say -- you used the word equities?

21   **A.  Uh-huh.**

22   Q.  What do you mean by that term in this

143

1 specific context?

2   **A.  By equities -- we talked about earlier**

3 **generally the nominator, the organization that had**

4 **the information originally would tend to have. I**

5 **would define that as an equity. An organization if**

6 **it is something within their mission. So if they**

7 **are responsible for aviation security and it**

8 **involves a flight, they would have an equity. If it**

9 **involves a border encounter, then obviously border**

10 **screening organizations have equities. If it is a**

11 **domestic encounter, generally the FBI would have an**

12 **equity. There are others, but that's generally what**

13 **I mean.**

14   Q.  Aside from establishing a common

15 operating picture among recipients of TSDB

16 information, what else does TSC utilize the TSDB

17 for?

18     MS. KONKOLY: Objection. Vague.

19 Objection insofar as it calls for information

20 protected by the law enforcement privilege. You can

21 answer.

22     THE WITNESS: Well, inasmuch as it is not

144

1 covered by the common operating picture discussion,

2 I think to enable all of our partner agencies to

3 accomplish their mission and ultimately prevent

4 terrorism even above that.

5     BY MR. ABBAS:

6   Q.  Does the -- does each person included in

7 the Terror Screening Database in TSC's view pose a

8 threat to commercial aviation?

9     MS. KONKOLY: Objection. Vague. Calls

10 for speculation. Objection insofar as it calls for

11 information protected by the law enforcement

12 privilege. You can answer to the extent that you

13 can.

14     THE WITNESS: Each person in the database

15 has information about them that relates to terrorism

16 specifically and inasmuch as terrorists generally

17 pose a threat to aviation, I think, potentially.

18 But I do think there, you know, within the Terror

19 Screening Center of course we have different

20 subcomponents, which more neck at threats to

21 aviation.

22     BY MR. ABBAS:

Transcript of Timothy P. Groh, Designated Representative
Conducted on March 1, 2018

145

1   Q.   A person can be included -- I am sorry.
2 TSC includes persons in the TSDB for whom it
3 possesses no information that they pose any threat
4 to commercial aviation, correct?
5        MS. KONKOLY:   Objection.
6 Mischaracterized his prior testimony.   Objection
7 vague.   Objection insofar as that calls for
8 information by the law enforcement privilege.   You
9 can answer to the extent that you can.
10       THE WITNESS:   I believe I already
11 testified I can't agree with that statement.
12       BY MR. ABBAS:
13   Q.   Explain your disagreement with that
14 statement.
15       MS. KONKOLY:   Objection insofar as that
16 calls for any information protected by the law
17 enforcement privilege.   You can answer to the extent
18 that you can.
19       THE WITNESS:   You said -- well --
20       MR. ABBAS:   Do you want her to read it
21 back?
22       THE WITNESS:   Yeah, read it back.   I

146

1 think it was --
2       (The record was read.)
3       MS. KONKOLY:   Same objections.   And I
4 would also add to the extent that it calls for SSI.
5 But you can answer.
6       THE WITNESS:   My previous answer, the one
7 before that, spoke to the fact that I think
8 terrorism in general poses a threat as history has
9 shown to aviation.   There is not particularized
10 aviation threat information in every record, but
11 there is a relationship to terrorism.
12       BY MR. ABBAS:
13   Q.   So there are TSDB listees for whom TSC
14 possesses no information that they pose a threat to
15 commercial aviation?
16       MS. KONKOLY:   Objection.
17       BY MR. ABBAS:
18   Q.   I'm sorry.   Let me withdraw that
19 question.   TSC includes persons in the TSDB for whom
20 they have no information that that person poses a
21 particularized threat to commercial aviation?
22       MS. KONKOLY:   Objection.

147

1 Mischaracterized prior testimony.   Objection.   Asked
2 and answered.   Objection insofar as it implicates
3 law enforcement or SSI.   But you can answer.
4        THE WITNESS:   I think the gist of your
5 question, the answer is what I just previously
6 stated, that every record does not have
7 particularized information with respect to aviation
8 terrorism.   And I would say that that was never the
9 intent.
10       BY MR. ABBAS:
11   Q.   And I just want to make sure.   You said
12 record.   I just want to make sure I got exactly what
13 record you are referring to.   TSDB records do not,
14 as a rule, always contain information that's
15 particular to -- I am sorry.   Let me start all over.
16 Not all TSDB records contain information regarding
17 an aviation security threat, correct?
18   **A.   So let me just clarify here.   TSDB does**
19 **not contain the actual derogatory information.   Now,**
20 **it is linked to other systems, which do contain that**
21 **derogatory information.   So in no TS -- within the**
22 **TSDB, there is no particularized derogatory**

148

1 **information of anyone.   But we do have a record of**
2 **where to -- well, we can find that information in**
3 **holdings of the National Counter-Terrorism Center or**
4 **the FBI.**
5        **That said, to get in TSDB, we have to**
6 **have access to derogatory information.   And when you**
7 **access that derogatory information, which supports**
8 **the TSDB record, then they do not all have**
9 **particularized aviation threat information, although**
10 **they do have information related to terrorism.**
11   Q.   So particularized aviation threat
12 information is not a requirement for being included
13 in the TSDB, correct?
14   **A.   Correct.**
15   Q.   Okay.   So we have talked about the TSDB,
16 the TSS, and then there is a database that contains
17 all the derogatory information that's the basis of
18 the TSDB, correct?
19   **A.   There are actually two databases.**
20   Q.   There's two databases, okay.   What two
21 databases contain the derogatory information that is
22 the basis for the TSDB?

Transcript of Timothy P. Groh, Designated Representative
Conducted on March 1, 2018

38 (149 to 152)

149

1        MS. KONKOLY: Objection insofar as that
2   answer calls for information protected by the law
3   enforcement privilege.  You can answer to the extent
4   you can.
5        THE WITNESS: So the National
6   Counter-Terrorism Center maintains what's known as
7   TIDE, the Terrorist Identities Datamart Environment.
8   And the FBI maintains Sentinel.  And a distinction
9   is made between records that relate to what we would
10  define as domestic terrorism and what we would
11  define as international terrorism.
12       BY MR. ABBAS:
13   Q.   Does TSC possess complete access to
14  NCTC's TIDE database?
15       MS. KONKOLY: Objection.  Vague.
16  Objection insofar as it calls for law enforcement
17  sensitive information.  You can answer if you can.
18       THE WITNESS: When you say -- I have to
19  qualify complete.  There may be some administrative
20  functions or other pieces that we don't have access
21  to.  But I would say generally the parts that would
22  contain derogatory information supporting TSDB, yes,

150

1   we have access.
2        BY MR. ABBAS:
3    Q.   And so thanks for that clarification.
4   Let me just rephrase.  TSC has complete access to
5   the substantive derogatory information.  I'm sorry.
6   Let me start all over.  TSC has complete access to
7   the derogatory information contained in NCTC's TIDE
8   database, correct?
9    A.   Yes.
10       MS. KONKOLY: Objection insofar as it
11  calls for a law enforcement privilege.  And asked
12  and answered, but.
13       BY MR. ABBAS:
14   Q.   Does -- so Sentinel is the FBI's
15  database?
16   A.   Yes.
17   Q.   TSC -- and that database contains
18  derogatory information that forms the basis of the
19  TSDB?
20       MS. KONKOLY: Objection.  Vague.
21       THE WITNESS: For domestic terrorism
22  cases.

151

1        BY MR. ABBAS:
2    Q.   Does TSC have access to all derogatory
3   information contained in the FBI's Sentinel
4   database?
5        MS. KONKOLY: Objection insofar as it
6   calls for information protected by the law
7   enforcement privilege.  You can answer to the extent
8   that you can.
9        THE WITNESS: Yes.
10       BY MR. ABBAS:
11   Q.   Does TSC -- okay.  So does TSC tell
12  other -- I'm sorry.  Does TSC direct recipients of
13  TSDB information about how the recipients of TSDB
14  information should utilize TSDB information?
15       MS. KONKOLY: Objection.  Vague.
16  Objection insofar as it calls for information
17  protected by law enforcement.  You can answer to the
18  extent that you can.
19       THE WITNESS: No.  We provide the
20  information, and then they exercise their mission
21  pursuant to their own authorities.  They make their
22  own decisions with what to do with it.

152

1        MR. ABBAS: So it is 12:10 now.  I am
2   happy to keep on going, but lunch is whenever you
3   want it to be.  So when --
4        THE WITNESS: I usually don't eat lunch.
5   But I assume that members of the team here probably
6   do.
7        MS. KONKOLY: We have only been going
8   about 40 minutes since we came back.  I would like
9   to keep going.
10       MR. ABBAS: But I would like to set a
11  time for lunch.  Like do you want to set it for 1,
12  1:15?  I am happy to set it as you want to set it.
13  But I would like to set a time for lunch.
14       MS. KONKOLY: 1:30 would get us halfway.
15  Maybe we could take a short break in between.
16       MR. ABBAS: 1:30 feels a little far away.
17  I think I could probably -- I will need a break by
18  one.
19       MS. KONKOLY: Okay.  We can say one.
20       BY MR. ABBAS:
21   Q.   Beyond establishing a common operating
22  picture, does TSC maintain TSDB for any other

---

**153**

1 purposes?
2        MS. KONKOLY: Objection. Vague.
3 Objection. Insofar as it calls for information
4 protected by the law enforcement privilege. You can
5 answer to the extent that you can.
6        THE WITNESS: I think I did already. I
7 think, you know, the general -- it is a common
8 operating picture. But inasmuch as that's not
9 identical to facilitating the missions of our
10 partner agencies and, in general, preventing
11 terrorism, I would just add those two things.
12        BY MR. ABBAS:
13    Q.   How does TSC's TSDB detect and stop
14 terrorism?
15        MS. KONKOLY: Objection. Vague.
16 Objection. Calls for speculation. Objection
17 insofar as it calls for information protected by the
18 law enforcement or potentially the state secrets or
19 SSI privileges. You can answer to the extent you
20 can.
21        THE WITNESS: It provides a mechanism for
22 agencies effectively through an established set of

**154**

1 practices and procedures to share information in a
2 way that was not available -- in many ways that were
3 not available before so they can each exercise their
4 authorities to accomplish their missions, but also
5 kind of through the aggregation of those
6 responsibilities to effectively use existing
7 authorities to detect and stop terrorism. Sometimes
8 it is the detection. And sometimes it is the actual
9 interdiction or, you know, the actual prevention of
10 terrorist activities or at least supports
11 investigations that will accomplish those goals.
12        BY MR. ABBAS:
13    Q.   But TSC doesn't determine how
14 investigations are run, correct?
15    A.   Correct.
16    Q.   TSC does not conduct its own
17 investigations, correct?
18    A.   Correct.
19    Q.   And TSC does not decide who is arrested
20 or charged with a crime?
21    A.   Absolutely not.
22    Q.   TSC does not decide who screens at the

**155**

1 airports?
2        MS. KONKOLY: Objection insofar as that
3 calls for law enforcement or SSI information. But
4 you can answer.
5        THE WITNESS: If you mean how they are
6 screened at the airport, I mean, obviously they --
7 putting people on the list, that may affect
8 somebody's potential screening. But -- but, you
9 know, we do not tell TSA how to screen, if that's
10 what you mean.
11        BY MR. ABBAS:
12    Q.   Can -- when TSC disseminates -- I am
13 sorry. When TSC disseminates TSDB information to
14 TSA, does that information compel TSA to screen the
15 listee in a particular manner?
16        MS. KONKOLY: Objection insofar as that
17 calls for information protected by SSI or law
18 enforcement. Also to the extent that it calls for
19 information within the purview of the Transportation
20 Security Administration. It goes to TSC. But you
21 can answer to the extent that you can and vague.
22        THE WITNESS: Yeah, inasmuch as -- I

**156**

1 mean, we certainly do not set standards for TSA on
2 how they -- on how they screen.
3        BY MR. ABBAS:
4    Q.   It is up to them?
5    A.   Yes.
6    Q.   Is there anything an agency can do with
7 TSDB information that would cause TSC to stop giving
8 the agency TSDB information?
9        MS. KONKOLY: Objection. Vague. Calls
10 for speculation.
11        THE WITNESS: If -- if the TSC believed
12 an agency was violating the law or the Constitution,
13 then we would certainly raise that, you know,
14 through the Watch Listing Advisory Council. Or if
15 it was exigent through the chain of command of the
16 FBI, I can expect that that would be raised to
17 competent authority to address that.
18        BY MR. ABBAS:
19    Q.   Does the TSC consider it to be part of
20 its role in the watch listing process to decide who
21 receives TSDB information?
22        MS. KONKOLY: Objection. Vague.

157

1    THE WITNESS:  Again, through the Watch
2 Listing Advisory Council, I think everybody that
3 sits on the council plays a role in deciding what is
4 -- what would be effective, appropriate, efficient,
5 legal, all of those things.  So I think all of those
6 uses of information would be the kinds of things we
7 would discuss in that forum.
8    BY MR. ABBAS:
9    Q.   Does the TSC impose any limits on its --
10 let me start over.  Does the TSC impose any limits
11 on agencies that receive -- let me start all over
12 one more time.  Does TSC impose any limits on
13 recipients of TSDB information that limit those
14 recipients from further sharing TSDB information?
15    MS. KONKOLY:  Objection.  Vague, compound
16 insofar as it implicates law enforcement privilege,
17 but you can answer.
18    THE WITNESS:  I think it goes back to the
19 aforementioned.  I mean, we have an understanding of
20 the sort of use of that information through the
21 Watch Listing Advisory Council.  There also may be
22 in some of those technical MOU's I described

158

1 earlier, there may be more specific parameters that
2 we agree.  But that's a bilateral agreement between
3 the agencies.
4    And, again, if we thought that somebody
5 was not living up to that agreement, we would either
6 address it directly with that organization or
7 through the aforementioned processes.
8    MR. ABBAS:  Arizona.
9    BY MR. ABBAS:
10    Q.   Who decides which foreign governments
11 receive TSDB information?
12    MS. KONKOLY:  Objection.  Vague.
13 Objection insofar as that calls for the law
14 enforcement -- information protected by the law
15 enforcement or potential state secrets.  But you can
16 answer to the extent that you can.
17    THE WITNESS:  I don't believe I can
18 answer that without violating a privilege.
19    MR. ABBAS:  What's the privilege?  What's
20 the privilege over who decides what foreign
21 governments receive TSDB information?
22    MS. KONKOLY:  The law enforcement or

159

1 potentially state secrets.
2    BY MR. ABBAS:
3    Q.   Does -- can TSC refuse to disseminate
4 TSDB information to foreign governments that engage
5 in a pattern of human rights abuses?
6    MS. KONKOLY:  Objection.  Calls for
7 speculation.  Objection.  Vague.  Objection insofar
8 as that calls for information protected by the law
9 enforcement or the state secrets privilege.  You can
10 answer to the extent you can.
11    THE WITNESS:  I think the only thing I
12 can say about that is the potential for that is
13 absolutely a consideration in that aforementioned
14 decision.
15    BY MR. ABBAS:
16    Q.   Does TSC disseminate TSDB information to
17 foreign governments that engage in patterns of
18 torture?
19    MS. KONKOLY:  Objection.  Vague.
20 Objection.  Calls for speculation, legal conclusion,
21 also insofar as it implicates information protected
22 by the law enforcement or potentially state secrets.

160

1 You can answer to the extent that you can.
2    THE WITNESS:  Boy, that's a loaded word
3 that I hesitate to understand what your definition
4 of that is.  And so I think that's probably so vague
5 that I can't answer it.
6    BY MR. ABBAS:
7    Q.   We will go with a more general term.
8 Human rights abuses.
9    MR. ABBAS:  Can you read -- I forget the
10 question.  Can you read it back just to me so that I
11 will see it again?
12    (The record was read.)
13    MR. ABBAS:  So I will rephrase the
14 question.
15    BY MR. ABBAS:
16    Q.   Does TSC disseminate TSDB information to
17 foreign governments that engage in a pattern of
18 human rights abuses?
19    MS. KONKOLY:  Objection.  Asked and
20 answered.  Objection.  Vague.  Objection.  Calls for
21 a legal conclusion.  Objection insofar as that
22 information calls for information protected by

Transcript of Timothy P. Groh, Designated Representative

41 (161 to 164)

Conducted on March 1, 2018

161

1 either the law enforcement or the state secrets
2 privilege.
3        THE WITNESS:  I have already testified
4 that there are more than 60 countries that we have
5 agreements with.  And I would hesitate to name any
6 60 countries that someone would not have an
7 allegation of a human rights abuse amongst one of th
8 60.  So, again, I feel like this is so vague I can't
9 answer it.
10       BY MR. ABBAS:
11   Q.   Does TSC know names of the foreign
12 governments that it disseminates TSDB information
13 to?
14   A.   Yes.
15   Q.   Does TSC dissemination TSS information to
16 foreign governments?
17       MS. KONKOLY:  Objection insofar as that
18 calls for information protected by the law
19 enforcement or potentially the state secrets
20 privileges.  You can answer if you can.
21       THE WITNESS:  I'm sorry.  Repeat that
22 one.

162

1        BY MR. ABBAS:
2   Q.   Does TSC disseminate TSS information to
3 foreign governments?
4        MS. KONKOLY:  Same objections.
5        THE WITNESS:  Disseminate TSS
6 information?  So, in other words, encounter
7 information.
8        BY MR. ABBAS:
9   Q.   Yes.
10       MS. KONKOLY:  Same objections.
11       THE WITNESS:  Sometimes.
12       BY MR. ABBAS:
13   Q.   In what circumstances does TSC
14 disseminate encounter -- encounter information is
15 the preferred term?
16   A.   It is a little simpler, yes.
17   Q.   Sure.  I will say encounter information.
18 And by encounter information, we are -- that's the
19 information that's contained in TSS, correct?
20   A.   Correct.
21   Q.   In what circumstances does TSC
22 disseminate encounter information to foreign

163

1 governments?
2        MS. KONKOLY:  Objection insofar as this
3 calls for information protected by the law
4 enforcement privilege and potentially the state
5 secrets privilege.  I am instructing the witness not
6 to answer.
7        MR. ABBAS:  You are not going to -- wait
8 -- why -- can you read back the question?
9        (The record was read.)
10       MS. KONKOLY:  And I will just clarify
11 that I should have said not insofar, but objection
12 that this information does call for information
13 protected by the law enforcement privilege and
14 potentially the state secrets privilege.  And I am
15 instructing the witness not to answer.
16       BY MR. ABBAS:
17   Q.   You testified that TSC sometimes
18 disseminates encounter information to foreign
19 governments, correct?
20   A.   I did.
21   Q.   Does -- how many foreign governments does
22 TSC disseminate encounter information to?

164

1        MS. KONKOLY:  Objection insofar as that
2 information is protected by the law enforcement
3 privilege or potentially the state secrets
4 privilege.  Also, asked and answered.  Also, I am
5 going to note that this line of questioning is not
6 clearly within the scope of the topics ordered by
7 the court.  So I will allow it for now.  We will see
8 where it goes.  We may need to force that at some
9 point.
10       THE WITNESS:  I don't think I can -- I
11 don't think I can answer that.
12       BY MR. ABBAS:
13   Q.   Are there agreements between -- let me
14 start all over.  Are there documents that govern how
15 TSC disseminates the encounter information to
16 foreign governments?
17       MS. KONKOLY:  Objection.  Insofar as that
18 calls for information protected by the law
19 enforcement or potentially the state secrets
20 privileges or SSI, also as to scope.  You can answer
21 to the extent that you can.
22       MR. ABBAS:  I mean, this is stuff in the

Transcript of Timothy P. Groh, Designated Representative
Conducted on March 1, 2018

42 (165 to 168)

---

165

1  overview document.  Encounter information is a
2  section of the overview document.  I am asking about
3  encounter information, which is a section of the
4  overview document.  Topic A is the content of the
5  overview document.  I am asking about like literally
6  it's a section heading of the overview document.
7        MS. KONKOLY:  Okay.  My objections are on
8  the record and they stand.  I told the witness he
9  can answer to the extent that he can.
10       THE WITNESS:  Are there documents that
11 document what -- I am sorry.  Can you just read it
12 back again?
13       BY MR. ABBAS:
14    Q.   I will just say it again.  Are there
15 documents that memorialize how TSC disseminates
16 encounter information to foreign governments?
17       MS. KONKOLY:  Again, insofar as the
18 answer calls for information protected by the law
19 enforcement or the state secrets privilege.
20 Objection as to scope.  You can answer if you can.
21       THE WITNESS:  Yes.
22       MR. ABBAS:  Arizona.

---

166

1        BY MR. ABBAS:
2     Q.   Does TSC know the number of countries --
3  I am sorry.  Does TSC know the number of foreign
4  governments that receive encounter information from
5  TSC?
6        MS. KONKOLY:  Objection insofar as the
7  answer calls for information protected by the law
8  enforcement or potentially the state secrets
9  privilege.  Objection.  Asked and answered.
10 Objection as to scope.  You can answer if you can.
11       THE WITNESS:  Yes.
12       MR. ABBAS:  Indiana.
13       MR. ABBAS:
14    Q.   Why does TSC disseminate encounter
15 information to foreign governments?
16       MS. KONKOLY:  Objection.  Calls for
17 speculation.  Objection insofar as that answer calls
18 for information by the law enforcement or state
19 secrets privilege or information within the purview
20 of another agency.  You can answer if you can.
21       THE WITNESS:  I would just say generally
22 inasmuch it goes to our mission to establish a

---

167

1  common operating picture with respect to
2  counterterrorism.  But beyond that, I don't think
3  there is anything else I can say.
4        BY MR. ABBAS:
5     Q.   So TSC disseminates encounter information
6  to foreign governments to establish with those
7  foreign governments a common operating picture?
8        MS. KONKOLY:  Objection.
9  Mischaracterized his prior testimony.  Objection
10 insofar as the answer would call for law enforcement
11 privilege or state secrets potentially.  You can
12 answer if you can.
13       THE WITNESS:  Yes, I would say it's a
14 more limited picture.  But beyond that, I can't say
15 anymore.
16       BY MR. ABBAS:
17    Q.   What does TSC expect foreign governments
18 to do with information that TSC disseminates to
19 them?
20       MS. KONKOLY:  Objection.  Vague.
21 Objection.  Insofar as that calls for information
22 protected by law enforcement or potential state

---

168

1  secrets.  You can answer if you can.
2        THE WITNESS:  Pursuant to HSPD-6, it is
3  to prevent terrorism.
4        MR. ABBAS:  Can you read back the
5  question?  I don't think you answered.
6        (The record was read.)
7        BY MR. ABBAS:
8     Q.   What does TSC expect foreign governments
9  to do with the information that TSC disseminates to
10 them?
11       MS. KONKOLY:  Objection.  Asked and
12 answered.  Same objections as stated previously.
13       THE WITNESS:  To prevent terrorism.
14       BY MR. ABBAS:
15    Q.   How does TSC expect foreign governments
16 to use information that TSC provides them to prevent
17 terrorism?
18       MS. KONKOLY:  Objection.  This
19 information would call for -- this answer would call
20 for information protected by the law enforcement and
21 potentially the state secrets privilege.  I will
22 instruct you not to answer.

169

1          BY MR. ABBAS:
2     Q.    Does TSC expect foreign governments to
3    utilize information that TSC disseminates to them in
4    their visa processes?
5          MS. KONKOLY: Objection insofar as this
6    question calls for information protected by the law
7    enforcement or the state secrets privilege.  I will
8    -- you can answer if you can without waiving a
9    privilege.
10          THE WITNESS: I don't think I can.
11          BY MR. ABBAS:
12     Q.    What information does TSC have about what
13   foreign governments do with information those
14   foreign governments receive from TSC?
15          MS. KONKOLY: Objection.  Asked and
16   answered.  Objection on the basis of the law
17   enforcement and potentially the state secrets
18   privilege.  I am instructing the witness not to
19   answer.
20          MR. ABBAS: You are not going to allow
21   the deponent to say anything?  So they are just
22   disseminating information, and they have no

170

1    knowledge, awareness about what.  I mean, this is an
2    overview document as well.  There is an expectation
3    that the foreign governments are going to use them
4    for lawful screening purposes.
5          MS. KONKOLY: That's been asked and
6    answered.  Insofar as you are asking anything
7    further beyond that, my objections are on the record
8    and they stand.
9          BY MR. ABBAS:
10     Q.    Does TSC expect foreign governments to
11   utilize the information that TSC disseminates to
12   those foreign governments?
13          MS. KONKOLY: Objection.  Asked and
14   answered.  Objection insofar as that question calls
15   for information protected by the law enforcement or
16   potentially state secrets.  You can answer if you
17   can.
18          THE WITNESS: Yes, we expect them to use
19   that information.
20          BY MR. ABBAS:
21     Q.    Has TSC ever stopped disseminating
22   information to foreign governments after learning

171

1    that that foreign government engages in human rights
2    abuses?
3          MS. KONKOLY: Objection insofar as that
4    information -- that question calls for information
5    protected by law enforcement or potentially the
6    state secrets.  You can answer if you can without
7    waiving a privilege.
8          THE WITNESS: Not that I am aware of.
9          BY MR. ABBAS:
10     Q.    Does TSC notify individuals that they
11   have been nominated to be included in the TSDB?
**12     A.    No.**
13     Q.    Does TSC notify individuals that their
14   nominations to the TSDB have been accepted by TSC?
**15     A.    No.**
16     Q.    Why?  Why doesn't TSC notify individuals
17   that they have been nominated no the TSDB?
18          MS. KONKOLY: Objection insofar as that
19   calls for information protected by the law
20   enforcement privilege.  You can answer if you can.
21          THE WITNESS: Because doing so would be
22   highly likely to run counter to the entire purpose

172

1    of having the TSDB.
2          BY MR. ABBAS:
3     Q.    Why?
4          MS. KONKOLY: Objection insofar as that
5    question calls for information protected by the law
6    enforcement privilege.  You can answer if you can.
7          THE WITNESS: Because becoming aware of
8    the investigative interest in an individual would be
9    very likely to change their behavior to cause them
10   to adopt countermeasures that would otherwise make
11   counterterrorism efforts in effective.
12          BY MR. ABBAS:
13     Q.    Do people -- people on the No-Fly List
14   learn that they are on the No-Fly List because they
15   can't fly, correct?
16          MS. KONKOLY: Objection.  Calls for
17   speculation.
18          THE WITNESS: I would say not
19   necessarily.  There are potentially many reasons why
20   somebody couldn't fly besides being on the No-Fly
21   List.
22          BY MR. ABBAS:

Transcript of Timothy P. Groh, Designated Representative
Conducted on March 1, 2018

44 (173 to 176)

---

173

1   Q.   What are the other reasons why a person
2   could (sic) fly other than if they are on the No-Fly
3   List?
4        MS. KONKOLY:  Objection insofar as that
5   question calls for information protected by SSI.
6   You can answer if you can.
7        THE WITNESS:  One example is an airline
8   can deny a person boarding for any host of any
9   number of reasons.
10       BY MR. ABBAS:
11   Q.   Is being on the No-Fly List a reason to
12   be denied boarding?
13   **A.   Potentially it is.  It is one of many.**
14   Q.   Has the Terror Screening Center ever
15   assessed whether individuals in the TSDB become
16   aware of their listing via the dissemination and
17   screening that's predicated on the dissemination of
18   TSDB information?
19       MS. KONKOLY:  Objection insofar as that
20   calls for information protected by the law
21   enforcement privilege.  You can answer to the extent
22   you can.  Also, vague.

---

174

1        THE WITNESS:  We -- it's certainly
2   something we pay attention to.  It is hard to -- it
3   is not like there is a flag in TSDB that goes up
4   when that happens.  But from an analytical
5   perspective and anecdotal sometimes, that is a topic
6   that will cause discussions at the Watch Listing
7   Advisory Council.  That's when I say they discuss
8   what's legal, but also what's effective and what's
9   practical.  And we have to balance those things.
10   Q.   So there is an awareness among the watch
11   listing agencies that when a person is placed in the
12   TSDB, they may learn through the operation and
13   dissemination of the TSDB that there is an
14   investigative interest regarding them?
15       MS. KONKOLY:  Objection.  Calls for
16   speculation, vague.  You can answer.
17       THE WITNESS:  Yeah, there is an awareness
18   that, yeah, actions have effects, yes.
19       BY MR. ABBAS:
20   Q.   So I just want to get a little more
21   specific on the actions and effects.  So TSC is
22   aware that by including someone in the TSDB, the

---

175

1   listee may infer from the operation of the TSDB that
2   there is an investigative interest that regards
3   them?
4        MS. KONKOLY:  Objection.  Asked and
5   answered.  Objection.  Calls for speculation and
6   vague.
7        THE WITNESS:  It can happen.
8        BY MR. ABBAS:
9    Q.   Does the disclosure of -- generally
10   speaking, is it TSC's view that the disclosure of
11   the government's investigative interest in a person
12   is detrimental to national security?
13   **A.   It is -- it has to be balanced with the**
14   **mitigation to whatever other risks that that**
15   **individual may pose and whatever intelligence**
16   **benefit may come from that.  So I think there are**
17   **two sides of that scale.  In general, I would prefer**
18   **that people on the list not know they are on the**
19   **list, but there are other considerations.**
20   Q.   Sure.  And I understand that it is
21   balancing.  But I just want to hone in on the
22   disclosure of investigative interest.  All things

---

176

1   being equal, the TSC's testimony today is that an
2   disclosure of investigative interest regarding a
3   person is detrimental to national security?
4        MS. KONKOLY:  Objection.
5   Mischaracterized his prior testimony.  Objection.
6   Vague.
7        THE WITNESS:  I go back to exactly my
8   previous answer, which is it is detrimental as
9   balanced by those other considerations.
10       BY MR. ABBAS:
11   Q.   Does a person who satisfies the TSDB -- I
12   am sorry.  Does TSC have information regarding
13   whether persons known to nominating agencies who
14   those nominating agencies believe satisfy the TSDB
15   inclusion standards are not ultimately nominated to
16   be included in the FBI because of this balancing
17   issue?
18       MS. KONKOLY:  Objection.  Vague.
19   Objection insofar as the answer would call for
20   information protected by the law enforcement
21   privilege.  You can answer if you can.
22       THE WITNESS:  I am trying to think.  I

---

177

1 may have to confer on the answer to that of whether
2 or not it is covered by the privilege.
3        MR. ABBAS: Do you want to do that? We
4 can step out for a few minutes. And just let us
5 know when you are done.
6        MS. KONKOLY: We could. I would like to
7 wait until one for the lunch break.
8        MR. ABBAS: On this I think I can finish
9 at one with this kind of line.
10       MS. KONKOLY: Okay. If you guys wouldn't
11 mind staying put and letting us step out. We'll
12 step out.
13       MR. ABBAS: Are you sure?
14       MS. KONKOLY: Yeah.
15       MR. ABBAS: It's up to you. We will be
16 ready whenever you are.
17       THE VIDEOGRAPHER: We are going off the
18 record. The time is 12:40 p.m.
19       (A brief recess was held.)
20       THE VIDEOGRAPHER: We are back on the
21 record. The time is 12:45 p.m. And we have been on
22 the record for 3 hours, 4 minutes, and 10 seconds.

178

1        MS. KONKOLY: We had a pending question.
2 Could we read it back, please?
3        (The record was read.)
4        MS. KONKOLY: And I am objecting on the
5 basis of vagueness insofar as the answer would call
6 for information protected by the law enforcement or
7 potentially the state secrets privilege. But you
8 can answer to the extent that you can without
9 violating the privilege.
10       THE WITNESS: I have a -- there is an
11 expectation in the interagency community that
12 agencies that hold such information will nominate
13 those individuals.
14       BY MR. ABBAS:
15   Q.   Does TSC have information that nominating
16 agencies on occasion do not nominate persons they
17 believe would satisfy the TSDB inclusion standards
18 because it may disclose to the potential listee an
19 investigative interest in them?
20       MS. KONKOLY: Objection. Vague.
21 Objection insofar as a complete answer would call
22 for information protected by the law enforcement or

179

1 potentially state secrets. You can answer to the
2 extent that you can.
3        THE WITNESS: No.
4        BY MR. ABBAS:
5    Q.   Who decided that TSC would not provide
6 notice to individuals who have been nominated to the
7 TSDB?
8        MS. KONKOLY: Objection. I am pretty
9 sure that's been asked and answered. Objection
10 insofar as it would implicate law enforcement or
11 state secrets-privileged information. You can
12 answer if you can.
13       THE WITNESS: I think even before the TSC
14 stood up, I think there was a general understanding
15 that that would be counterproductive. I don't know
16 if it was ever -- it hasn't been considered since I
17 have been there. And, certainly, when the TSC was
18 stood up, the decision at that point would have been
19 made not to do it because I don't think we ever
20 have.
21       Beyond that, I don't know. It is one of
22 those things that's so basic that I don't think has

180

1 received a lot of debate.
2        MR. ABBAS: I am pretty sure that we are
3 at like a good stopping point right now. Can you
4 give us like two minutes to step out, and I think we
5 will just come back and adjourn for lunch. I know
6 it's a little bit early. But I am done with this
7 section. And we don't have time to really make a
8 meaningful dent into the next section. Does that
9 work?
10       THE VIDEOGRAPHER: We are going off the
11 record. The time is 12:49 p.m.
12       (A lunch recess was held.)
13       THE VIDEOGRAPHER: Here begins disk
14 number three in the videotaped deposition of Timothy
15 Paul Groh. The time on the video monitor is 1:54
16 p.m. We have been on the record for three hours and
17 eight minutes. And we are back on the record.
18       BY MR. ABBAS:
19   Q.   Does TSC provide individuals nominated to
20 the TSDB the opportunity to rebut the derogatory
21 information that forms the basis of their nomination
22 to the TSDB?

Transcript of Timothy P. Groh, Designated Representative
Conducted on March 1, 2018

46 (181 to 184)

---

**181**

1      MS. KONKOLY: Objection. Vague.

2      THE WITNESS: Individuals who feel that

3 their travel has been somehow inhibited can apply

4 through DHS TRIP for redress. And the complaints

5 that are found through that to have a nexus to the

6 TSDB are then forwarded to the TSDB. And that can

7 include a rebuttal of derogatory information and any

8 information the -- I guess, in that case, the

9 complainant would like to provide.

10 BY MR. ABBAS:

11     Q.   So my question is, is it time specific?

12 So it is before the nomination happens -- before TSC

13 accepts the nomination. So I am going to ask the

14 question again. And I am inquiring about the

15 pre-nomination process that TSC provides to nominees

16 to the TSDB.

17     Does TSD -- I'm sorry. Does TSC provide

18 the opportunity to -- I am sorry. Let me start

19 again. With regards to persons nominated to the

20 TSDB, does TSC provide such persons the opportunity

21 to provide information that rebuts the derogatory

22 information that the nominating agency relies upon

---

**182**

1 for that person's nomination?

2      MS. KONKOLY: Objection. Vague.

3      THE WITNESS: If somebody wanted to rebut

4 the derogatory information, they could provide that

5 information to the nominator. And the nominator

6 would be expected to give exculpatory information as

7 well as derogatory information as part of that

8 nomination process. And it would be something that

9 we would consider.

10 BY MR. ABBAS:

11     Q.   Does TSC provide the prospective nominee

12 with the opportunity to rebut the derogatory

13 information that a nominating agency is relying upon

14 as the basis of their nomination of that person?

15     MS. KONKOLY: Objection. Vague.

16     THE WITNESS: Isn't that the exact same

17 question you just asked me?

18 BY MR. ABBAS:

19     Q.   No.

20     **A.   How is it different?**

21     Q.   So it is not a clear question. We agree

22 with that. Let me try again. So I think let's back

---

**183**

1 up. And I am going to cover a little more ground

2 and I think a little ground we might have already

3 covered just to establish a foundation. Does TSC

4 notify individuals who have been nominated to the

5 TSDB?

6     **A.   I think we covered that earlier. The**

7 **answer is no.**

8     Q.   Does TSC provide individuals who have

9 been nominated to the TSDB with the opportunity to

10 provide TSC information that rebuts the nominating

11 agency's derogatory information that has been

12 included in the TSDB nomination?

13     MS. KONKOLY: Objection. Vague. Asked

14 and answered.

15     THE WITNESS: TSDB does not or the TSC

16 does not.

17     BY MR. ABBAS:

18     Q.   The TSC does not what? That's fine. No,

19 never mind. That's clear. Okay. All right. So we

20 are going to talk about dissemination probably for a

21 while. Does TSC know the name of every individual

22 that has access to TSDB information?

---

**184**

1      MS. KONKOLY: Objection. Vague.

2 Objection. Potentially calls for law enforcement

3 sensitive information. You can answer to the extent

4 that you can.

5      THE WITNESS: So I assume from your

6 question you don't mean access to the TSDB itself

7 because you said TSDB information.

8      BY MR. ABBAS:

9     Q.   So, you know, I am being honest. I don't

10 really know, you know. But you know, I don't know

11 how you disseminate it. So I am asking kind of the

12 --

13     **A.   Thus, I am trying to clarify.**

14     Q.   Yeah. So TSDB information is any kind of

15 part of the TSDB. Any information regarding TSDB.

16 That's what I mean by TSDB information. So let me

17 try with that kind of caveat in mind. Does TSC know

18 the name of all persons who have any type of access

19 to TSDB information?

20     MS. KONKOLY: Objection. Vague.

21 Objection insofar as it calls for law

22 enforcement-protected information. You can answer

---

Transcript of Timothy P. Groh, Designated Representative
Conducted on March 1, 2018

47 (185 to 188)

185

1 if you can.
2      THE WITNESS: So assuming, as I take your
3 question, that you mean any information that is
4 exported from TSDB to partner systems, no. The TSC
5 does not know the name of every individual that
6 would then have access to information in those
7 downstream systems.
8      BY MR. ABBAS:
9      Q.   Does TSC know the number of persons who
10 have access of any kind to TSDB information?
11      MS. KONKOLY: Objection. Vague.
12 Objection insofar as the answer would call for law
13 enforcement-privileged information. You can answer
14 if you can.
15      THE WITNESS: Certainly not a precise
16 number.
17      BY MR. ABBAS:
18      Q.   Does TSC have an estimate of how many
19 persons have access to TSDB -- access -- I am sorry.
20 Let me start again. Does TSC have an estimate of
21 how many persons have access of any kind to TSDB
22 information?

186

1      MS. KONKOLY: Objection. Vague.
2 Objection insofar as the answer calls for law
3 enforcement-privileged information. You can answer
4 if you can.
5      THE WITNESS: I am not aware of a
6 specific estimate. One may have been done in the
7 past. I don't know.
8      BY MR. ABBAS:
9      Q.   Has TSC estimated the number of
10 individuals who have access of any kind to TSDB
11 information?
12      MS. KONKOLY: Objection. Vague.
13      THE WITNESS: Yeah, I think it was the
14 same question. No.
15      BY MR. ABBAS:
16      Q.   TSC has never done an estimate of -- has
17 never ventured a guess as to how many persons have
18 access of any kind to TSDB information?
19      MS. KONKOLY: Objection. Vague and
20 objection as to scope. Protective order. You can
21 answer if you can.
22      THE WITNESS: I am not aware of a

187

1 particular effort to sit down and do that, no.
2      BY MR. ABBAS:
3      Q.   Are there -- does TSC possess any
4 documents that regard how many persons have access
5 of any kind to TSDB information?
6      MS. KONKOLY: Objection. Vague.
7 Objection insofar as the answer would call for law
8 enforcement-privileged information. You can answer
9 if you can.
10      THE WITNESS: So we know who we export
11 our information to. And we know for what purpose.
12 But I don't, for instance, know how many employees
13 at the Department of Homeland Security have access
14 to one of their systems that may have our
15 information or the total number of police officers
16 in the United States have access to NCIC, et cetera,
17 et cetera.
18      BY MR. ABBAS:
19      Q.   Do tens of thousands of individuals have
20 access to TSDB information?
21      MS. KONKOLY: Objection. Vague.
22 Objection insofar as the answer would call for law

188

1 enforcement-privileged information. You can answer
2 if you can.
3      THE WITNESS: I think that's likely.
4      BY MR. ABBAS:
5      Q.   Do hundreds of thousands of individuals
6 have access to TSDB information?
7      MS. KONKOLY: Objection. Vague.
8 Objection insofar as the answer would call for law
9 enforcement-privileged information. You can answer
10 if you can.
11      THE WITNESS: I believe that the total
12 number of police officers in the United States
13 exceeds 100,000.
14      BY MR. ABBAS:
15      Q.   And each police officer through NCIC
16 would have access to TSDB information, correct?
17      MS. KONKOLY: Objection.
18 Mischaracterized his prior testimony.
19      MR. ABBAS: I haven't asked him any
20 questions about NCIC yet.
21      THE WITNESS: In many or most cases they
22 will. I can't speak to every department's policies

Transcript of Timothy P. Groh, Designated Representative

48 (189 to 192)

Conducted on March 1, 2018

189

1 as to who has access to what.
2       BY MR. ABBAS:
3    Q.    Is it TSC's testimony today that hundreds
4 of thousands of individuals have access to TSDB
5 information?
6       MS. KONKOLY:  Objection.
7 Mischaracterized his prior testimony.  Objection.
8 Vague.
9       THE WITNESS:  My testimony is there are
10 hundreds of thousands of law enforcement officers in
11 the United States.  And most of them likely have
12 access to TSDB information through NCIC.
13       BY MR. ABBAS:
14    Q.    So, I mean, if you don't think that
15 hundreds of thousands of individuals have access to
16 TSDB information, you can just say that they don't
17 have access, that it is not hundreds of thousands.
18 If you do believe that hundreds of thousands of
19 individuals have access to TSDB information, then
20 you are not answering the question.
21       So do hundreds of -- are -- is it TSC's
22 testimony that more than 100,000 individuals inside

190

1 the United States have access to TSDB information?
2       MS. KONKOLY:  Objection.  Vague.
3 Objection.  Asked and answered.  Objection.
4 Calls --
5       THE WITNESS:  So I am trying to express
6 how I come to that conclusion.  So based on the
7 number of police officers, I think it is likely that
8 more than a 100,000 people in the United States have
9 access to TSDB information.
10       BY MR. ABBAS:
11    Q.    How many people outside the United States
12 have access to TSDB information?
13       MS. KONKOLY:  Objection.  Vague.
14 Objection.  Calls for speculation.  And objection
15 insofar as the answer would call for information
16 protected by the law enforcement privilege.  You can
17 answer if you can.
18       THE WITNESS:  First of all, let me
19 clarify.  When you say people outside the United
20 States, do you mean physically located outside the
21 United States or do you mean foreigners?
22       BY MR. ABBAS:

191

1    Q.    Physically located outside the United
2 States?
3       MS. KONKOLY:  Same objections.
4       BY MR. ABBAS:
5    Q.    So including foreigners and I am sure
6 embassies and consulates.
7    **A.    Yeah, I don't think I can answer that.**
8       MS. KONKOLY:  Same objections.
9       BY MR. ABBAS:
10    Q.    How many persons -- let's start all over.
11 Does TSC know how many persons associated with
12 foreign governments have access to TSDB information?
13       MS. KONKOLY:  Objection.  Calls for
14 speculation.  Objection.  Vague.  Objection insofar
15 as the answer would call for information protected
16 by the law enforcement privilege.  You can answer if
17 you can.
18       THE WITNESS:  The way the systems --
19 yeah, I don't know -- I do not know that number.
20       BY MR. ABBAS:
21    Q.    Does TSC know that number?
22    **A.    I don't believe so.**

192

1    Q.    Does TSC have an estimate of the number
2 of persons associated with foreign governments that
3 have access to TSDB information?
4       MS. KONKOLY:  Objection.  Vague.
5 Objection.  Calls for speculation.  Objection
6 insofar as the answer would implicate information
7 protected by the law enforcement privilege.  You can
8 answer to the extent you can.
9       THE WITNESS:  I am sorry.  Can you repeat
10 that one?
11       (The record was read.)
12       MS. KONKOLY:  Same objections.
13       THE WITNESS:  Not that I am aware of.
14       BY MR. ABBAS:
15    Q.    Does TSC exercise any control over the
16 number of persons that have access to TSDB
17 information?
18       MS. KONKOLY:  Objection.  Vague.
19 Objection.  Calls for speculation.  Objection
20 insofar as the answer would call for information
21 protected by the law enforcement privilege.  You can
22 answer if you can.

Transcript of Timothy P. Groh, Designated Representative
Conducted on March 1, 2018

---

193

1      THE WITNESS:  What do you mean by
2  control?
3      BY MR. ABBAS:
4      Q.   Let me just do the question again.  Does
5  TSC determine in any way the number of individuals
6  who have access to TSDB information?
7      MS. KONKOLY:  Objection.  Vague.
8  Objection insofar as the answer would call for
9  information protected by law enforcement privilege.
10 You can answer to the extent that you can.
11     THE WITNESS:  I am sorry.  One more time
12 on that particular question.
13     MR. ABBAS:  Can you read it back?
14     (The record was read.)
15     MS. KONKOLY:  Same objections.
16     THE WITNESS:  No, TSC does not control
17 the number of individuals with foreign governments;
18 the same as we don't control the number of
19 individuals domestically.
20     BY MR. ABBAS:
21     Q.   Does TSC establish the process by which
22 recipients of TSDB information make available the

---

194

1  information they receive from TSC to persons?
2      MS. KONKOLY:  Objection.  Vague.
3  Objection insofar as the answer would call for
4  information protected by the law enforcement
5  privilege.  You can answer if you can.
6      THE WITNESS:  I am not sure what you mean
7  by make available to --
8      BY MR. ABBAS:
9      Q.   Let me try again.  Does TSC -- does TSC
10 establish -- I am sorry.  Does TSC require
11 recipients of TSDB information to adhere to
12 standards regarding who recipients of TSDB
13 information allow access in any way to TSDB the
14 information?
15     MS. KONKOLY:  Objection.  Vague.
16 Objection insofar as the answer would call for
17 information protected by the law enforcement
18 privilege.  You can answer to the extent you can.
19     THE WITNESS:  The individual agreements
20 with individual countries would govern generally how
21 they -- what the understanding is between the two
22 governments as to the use of that information.

---

195

1      BY MR. ABBAS:
2      Q.   Let's -- so I will get back to the
3  foreign governments.  I know there is some privilege
4  issues with the foreign governments.  But with
5  regards to -- let's just talk about with regards to
6  domestic, non-Federal Government entities.  Okay.
7  So with regards to domestic, non-Federal Government
8  entities who receive from TSC TSDB information, does
9  TSC require such domestic, non-Federal Government
10 entities to adhere to any standards regarding who
11 those non-Federal Government domestic entities grant
12 access to?
13     MS. KONKOLY:  Objection.  Vague.
14 Objection.  Misleading and compound.  Objection
15 insofar as the answer would call for information
16 protected by law enforcement privilege.  You can
17 answer to the extent that you can.
18     THE WITNESS:  So the TSC doesn't export
19 any non-Federal Government entities any TSDB
20 information with the exception of the aforementioned
21 foreign partners.
22     BY MR. ABBAS:

---

196

1      Q.   Doesn't TSC make TSDB information
2  accessible to state and local authorities, colleges,
3  universities, travel authorities?
4      MS. KONKOLY:  Objection.  Vague.
5  Objection.  Compound.  Objection insofar as the
6  answer would call for information protected by the
7  law enforcement privilege.  You can answer to the
8  extent you can.
9      THE WITNESS:  No.  The TSC exports to the
10 FBI through to the National Crime Information
11 Center.
12     BY MR. ABBAS:
13     Q.   And so the National Crime information
14 Center is the FBI?
15     **A.   It is part of the FBI.**
16     Q.   The FBI controls the National Crime
17 Information Center?
18     **A.   That's correct.**
19     Q.   And who told TSC to export TSDB
20 information to the National Crime Information
21 Center?
22     MS. KONKOLY:  Objection.  Vague.

---

Transcript of Timothy P. Groh, Designated Representative
Conducted on March 1, 2018

50 (197 to 200)

---

197

1 Objection. Calls for a legal conclusion insofar as
2 -- also, objection insofar as the answer would call
3 for information protected by the law enforcement
4 privilege. You can answer to the extent that you
5 can.
6         THE WITNESS: It would be governed by the
7 Watch Listing Advisory Council as we discussed -- as
8 we discussed earlier.
9         BY MR. ABBAS:
10   Q.   Does TSC know which entities have access
11 to the NCIC?
12        MS. KONKOLY: Objection insofar as the
13 information -- the answer would call for information
14 protected by the law enforcement privilege. You can
15 answer to the extent that you can.
16        THE WITNESS: Certainly, NCIC knows who
17 they then export to. But the TSC does not have
18 direct knowledge of that.
19        BY MR. ABBAS:
20   Q.   Does TSC have access to NCIC?
21   **A.   TSC has access to NCIC via the State of**
22 **Virginia, who then receives it from the Criminal**

---

198

1 **Justice Information System's division, CJIS, which**
2 **runs NCIC.**
3    Q.   So the Terror Screening Center has access
4 to the NCIC because Virginia has access to the NCIC?
5    **A.   Yes.**
6    Q.   Why is that the arrangement?
7         MS. KONKOLY: Objection insofar as the
8 answer would call for --
9         BY MR. ABBAS:
10   Q.   Let me withdraw it. Why doesn't the
11 Terror Screening Center get access to the NCIC
12 directly from the FBI?
13        MS. KONKOLY: Objection. Vague.
14 Objection insofar as the answer would call for
15 information protected by the law enforcement
16 privilege. You can answer to the extent you can.
17        THE WITNESS: I honestly don't know why
18 the system was set up that particular way. It is
19 true nationwide.
20        BY MR. ABBAS:
21   Q.   What's true nationwide?
22   **A.   The entities geographically located**

---

199

1 **within a state or territory receive NCIC through**
2 **that state or territorial -- I forget what the term**
3 **is -- NCIC bureau or something along those lines.**
4         BY MR. ABBAS:
5    Q.   So there is like a single point of
6 contact for NCIC information per state?
7    **A.   Yes.**
8    Q.   Okay. And territories?
9    **A.   Yes.**
10   Q.   Okay. Which Federal Government entities
11 -- I am sorry. TSC provides -- I am sorry. Let me
12 start over. TSC exports TSDB information in a
13 variety of different ways to recipients of TSDB
14 information, correct?
15   **A.   Yes.**
16   Q.   Are there a fixed number of ways that TSC
17 provides TSDB information to entities that receive
18 TSDB information?
19        MS. KONKOLY: Objection. Vague.
20 Objection insofar as the answer would call for
21 information protected by the law enforcement
22 privilege. You can answer to the extent you can.

---

200

1         THE WITNESS: I think each individual
2 export is -- each system is unique in some way. So
3 I think they are all different.
4         BY MR. ABBAS:
5    Q.   Which Federal Government entities have
6 real-time access to TSDB information?
7         MS. KONKOLY: Objection insofar as the
8 answer would call for information protected by the
9 law enforcement privilege. You can answer to the
10 extent you can.
11        THE WITNESS: So, generally, the
12 Department of Homeland Security, the State
13 Department we have already talked about; the FBI,
14 including NCIC. I think that covers -- I think that
15 covers most of them. Of course, there are
16 subcomponents to some of those.
17        BY MR. ABBAS:
18   Q.   To DHS?
19   **A.   Including DHS.**
20   Q.   Does USCIS have real-time access to TSDB
21 information?
22        MS. KONKOLY: Objection insofar as the

---

Transcript of Timothy P. Groh, Designated Representative
Conducted on March 1, 2018

---

201

1  answer would call for information protected by the
2  law enforcement privilege.  You can answer to the
3  extent that you can.
4      THE WITNESS:  I believe so.
5      BY MR. ABBAS:
6    Q.   Does CBP have real-time access to TSDB
7  information?
8      MS. KONKOLY:  Objection insofar as the
9  answer would call for information protected by the
10 law enforcement privilege.  You can answer to the
11 extent You can.
12     THE WITNESS:  Yes.
13     BY MR. ABBAS:
14   Q.   Does TSC -- I am sorry.  Does TSA have
15 real-time access to TSDB information?
16     MS. KONKOLY:  Objection --
17     THE WITNESS:  Yes.
18     MS. KONKOLY:  -- insofar as the answer
19 would call for information protected by either the
20 law enforcement privilege or SSI.  You can answer to
21 the extent that you can.
22     THE WITNESS:  Yes.

---

202

1      BY MR. ABBAS:
2    Q.   Do any foreign government have real-time
3  access to TSDB information?
4      MS. KONKOLY:  Objection insofar as the
5  answer would call for information protected by
6  either the law enforcement privilege or the state
7  secrets privilege.  You can answer to the extent
8  that you can.
9      THE WITNESS:  Define for me in the case
10 what you mean by real-time access.
11     BY MR. ABBAS:
12   Q.   Maybe it is time to kind of talk about
13 that.  Some Federal Government agencies have access
14 to -- the TSDB is always changing, correct?
15   **A.   That's correct.**
16   Q.   While we have been doing this deposition,
17 it has changed?
18   **A.   It is likely true.**
19   Q.   And it will change tomorrow and the day
20 after and it changes everyday, correct?
21   **A.   That's correct.**
22   Q.   My understanding is that some agencies

---

203

1  instantaneously have access to the changes that TSC
2  makes to TSDB information?
3      MS. KONKOLY:  Objection.  That's not a
4  question.
5      BY MR. ABBAS:
6    Q.   Is that correct.  That's the question.
7      MS. KONKOLY:  Objection insofar as the
8  answer to that question would call for information
9  protected by the law enforcement privilege.  You can
10 answer to the extent that you can.
11     THE WITNESS:  Yes, that's correct.  Some
12 U.S. Government agencies have what we would call
13 transactional -- it is updated transactionally.  We
14 make a change in the TSDB.  And it is reflected in
15 their system in a matter of seconds or maybe
16 minutes.
17     BY MR. ABBAS:
18   Q.   Got it.  What do you call that type of
19 access?
20   **A.   I say that systems are updated**
21 **transactionally, but I don't -- I don't have a word**
22 **associated with the access for that.  It is a**

---

204

1  transactional update.
2    Q.   So some agencies have like ongoing
3  continuously updated access to TSDB information,
4  correct?
5    **A.   That's correct.**
6    Q.   Does the Department of State have ongoing
7  access to the updates that get made to TSDB
8  information?
9      MS. KONKOLY:  Objection insofar as the
10 answer calls for information protected by the law
11 enforcement privilege.  You can answer to the extent
12 you can.
13     THE WITNESS:  I believe the Department of
14 State's system updates transactionally.
15     BY MR. ABBAS:
16   Q.   And by transactionally you mean that the
17 Department of State receives updates about changes
18 to the TSDB in close to real time?
19   **A.   Yes.**
20   Q.   Do U.S. consulates and embassies receive
21 access -- I am sorry.  Do -- does the TSC provide
22 consulates and embassies with real-time access to

---

Transcript of Timothy P. Groh, Designated Representative
Conducted on March 1, 2018

---

205

1 changes made to the TSDB?

2 MS. KONKOLY: Objection insofar as the

3 answer calls for information protected by the law

4 enforcement. You can answer to the extent you can.

5 THE WITNESS: I honestly don't know. I

6 know what we give to big State Department. What

7 they do downstream with that, I don't know.

8 BY MR. ABBAS:

9 Q. Is it up to them what they do with the

10 real-time access that you provide to the Department

11 of State?

12 MS. KONKOLY: Objection. Vague.

13 BY MR. ABBAS:

14 Q. I am sorry. Let me be a little more

15 clearer. Does -- is it up to the Department of

16 State what access they provide to the near real-time

17 updates that TSC makes available to the Department

18 of State?

19 MS. KONKOLY: Objection. Vague.

20 Objection insofar as the answer calls for

21 information protected by the law enforcement

22 privilege. You can answer to the extent you can.

---

206

1 THE WITNESS: Yes. The State Department

2 would discern what their internal access rules look

3 like and how often remote foreign post systems are

4 updated, so yes.

5 BY MR. ABBAS:

6 Q. Does TSC know -- well, first, does TSC

7 provide near real-time access to TSDB updates to the

8 United Nations?

9 MS. KONKOLY: Objection insofar as the --

10 objection that that question calls for information

11 protected by the law enforcement privilege. And I

12 am going to instruct the witness not to answer. I

13 will revise that. I will say if you feel you can

14 answer without waiving a privilege, you can answer

15 that.

16 BY MR. ABBAS:

17 Q. Let me try making it --

**18 A. So I think I can -- well --**

19 MR. ABBAS: Do you want to confer? We

20 can leave.

21 MS. KONKOLY: Do you want to confer or --

22 MR. ABBAS: We can just step out if you

---

207

1 want.

2 THE WITNESS: No, I think it is not -- we

3 don't export information to the United Nations.

4 BY MR. ABBAS:

5 Q. Does TSC export any TSDB information to

6 any United Nations-affiliated agencies?

7 MS. KONKOLY: Objection insofar as the

8 answer would call for information protected by the

9 law enforcement privilege. You can answer to the

10 extent that you can. Also, vague.

11 THE WITNESS: Yeah. How do you define

12 the United Nations-associated agency.

13 BY MR. ABBAS:

14 Q. We will put a little -- we will come back

15 to it. Does TSC disseminate TSDB information to the

16 UN Refugee agency?

17 MS. KONKOLY: Objection insofar as the

18 information would call for -- I'm sorry -- insofar

19 as the answer would call for information protected

20 by the law enforcement privilege. You can answer to

21 the extent that you can.

22 THE WITNESS: No.

---

208

1 BY MR. ABBAS:

2 Q. Does TSC have any information about

3 whether or not the UN refugee agency has any type of

4 access to TSDB information?

5 MS. KONKOLY: Objection insofar as the

6 answer would call for information protected by the

7 law enforcement privilege. You can answer to the

8 extent that you can.

9 THE WITNESS: No.

10 BY MR. ABBAS:

11 Q. Is TSC able to testify today that the UN

12 refugee agency has no access at all to TSDB

13 information?

14 MS. KONKOLY: Objection insofar as the

15 answer would call for information protected by the

16 law enforcement privilege. Objection. Vague.

17 Objection. Mischaracterizes prior testimony. You

18 can answer to the extent that you can.

19 THE WITNESS: Not that I am aware of.

20 BY MR. ABBAS:

21 Q. So is it possible that the UN refugee

22 agency has some type of access to the TSDB?

---

209

1       MS. KONKOLY:  Objection insofar as the
2  answer calls for information protected the law
3  enforcement privilege.  Objection.  Calls for
4  speculation.  Objection.  Vague.
5       THE WITNESS:  I can't testify to what I
6  don't have any insight or awareness into.  We export
7  our information.  And, you know, I have no reason to
8  believe that they have access to that information.
9       BY MR. ABBAS:
10     Q.   But you don't know what other people --
11 but TSC does not know how recipients of TSDB
12 information further disseminate TSDB information,
13 correct?
14     MS. KONKOLY:  Objection.  Misleading.
15 Objection.  Mischaracterizes prior testimony.
16     BY MR. ABBAS:
17     Q.   All right.  Fine.  I will withdraw.  Does
18 TSC know how recipients of TSDB information
19 disseminate the TSDB information those entities
20 receive?
21     MS. KONKOLY:  Objection.  Vague,
22 compound.  Objection insofar as it calls for

210

1  information protected by enforcement privilege.  You
2  can answer to the extent that you can.
3       THE WITNESS:  The TSC knows what was
4  agreed upon with any partner, whether it is foreign
5  or domestic.  And certainly based on our
6  relationship with the intelligence community, I
7  think there's a good chance that if somebody were
8  doing so that we would know.
9       BY MR. ABBAS:
10     Q.   What do you mean by there is a good
11 chance?  Elaborate on what you mean there.
12     MS. KONKOLY:  I am going to object that
13 that answer calls for information protected by the
14 law enforcement privilege and instruct the witness
15 not to answer that one.
16     BY MR. ABBAS:
17     Q.   Can TSC definitively state which entities
18 receive TSDB information?
19     MS. KONKOLY:  Objection.  Asked and
20 answered.  Objection insofar as the answer would
21 call for information protected by law enforcement
22 privilege.  You can answer.

211

1       BY MR. ABBAS:
2       Q.   I am going to withdraw the question.
3  Does TSC know the names of all of the entities that
4  receive TSDB information globally?
5       MS. KONKOLY:  Objection.  Asked and
6  answered.  Objection insofar as the answer would
7  call for information protected by the law
8  enforcement privilege.  You can answer to the extent
9  you can.
10     THE WITNESS:  We know who we share the
11 information with.  And we know what the agreement
12 governing further dissemination of that information
13 with that entity is.
14     BY MR. ABBAS:
15     Q.   Does TSC -- has it ever happened where a
16 recipient of TSDB information has not followed its
17 agreement with TSC about the use of TSDB
18 information?
19     MS. KONKOLY:  Objection as to scope.
20 Objection insofar as the answer would call for
21 information protected by the law enforcement
22 privilege.  You can answer to the extent you know

212

1  and can do so without waiving the privilege.
2       THE WITNESS:  I know of in my tenure one
3  instance where we became aware of an improper
4  disclosure.  We referred that to the partner agency.
5  And I believe that they have opened an investigation
6  into how that happened.
7       BY MR. ABBAS:
8       Q.   The incident that you are referring to,
9  was it the improper disclosure of like a single
10 person's identity in the TSDB?
11     A.   Yes.
12     Q.   Which agency was that incident -- which
13 agency did that incident regard?
14     MS. KONKOLY:  Objection insofar as that
15 would call for the law enforcement information
16 protected by law enforcement privilege.  You can
17 answer to the extent that you can.
18     THE WITNESS:  I don't believe I can say
19 without -- there is an ongoing investigation.
20     BY MR. ABBAS:
21     Q.   When was the -- so the incident that you
22 are describing was a misuse of TSDB information in

Transcript of Timothy P. Groh, Designated Representative

Conducted on March 1, 2018

54 (213 to 216)

---

213

1  TSDB's view, correct?

**2      A.    Yes.  It was an improper disclosure.**

3      Q.    Who made the improper disclosure of TSDB

4  information?

5          MS. KONKOLY: Objection.

6          MR. ABBAS: I don't need their name.

7  Their title, their agency affiliation would be just

8  fine.

9          MS. KONKOLY: Objection insofar as the

10 answer calls for information protected by the law

11 privilege, which based on the witness' prior answer

12 appears to be the case.  However, I will allow an

13 answer if there's --

14         THE WITNESS: That's thus the

15 investigation so I don't know.  That's why there is

16 an ongoing investigation.

17         BY MR. ABBAS:

18     Q.    When did this incident occur?

19         MS. KONKOLY: Objection insofar as the

20 answer would call for information protected by the

21 law enforcement privilege.  You can answer if you

22 can.

---

214

**1      A.    Within the last several months.  I don't**

**2  know precisely.**

3      Q.    Has there -- in the history of the TSDB

4  other than this incident that occurred in the last

5  several months, is TSC aware of any other use of

6  TSDB information that is inconsistent with any

7  agreements regarding the use of TSDB information?

8          MS. KONKOLY: Objection as to the scope

9  of that question not being within the approved

10 topics for this deposition.  Objection further to

11 the extent the answer would call for information

12 within the law enforcement privilege.  You can

13 answer if you can.

14         THE WITNESS: I am not aware of

15 additional examples.

16         BY MR. ABBAS:

17     Q.    So there has only been one instance in

18 the history of the TSDB that TSC is aware of where

19 there has been an improper use of TSDB information?

20         MS. KONKOLY: Objection.  Asked and

21 answered.  Objection again as to scope and objection

22 as to whether -- to the extent that answer would

---

215

1  call for law enforcement-protected information.  You

2  can answer if you can.

3          THE WITNESS: Not that I am aware of.

4          BY MR. ABBAS:

5      Q.    What measures does the TSC take to ensure

6  that recipient -- let me start over.  What measures

7  does TSC take to ensure that entities who receive

8  TSDB information comply with the terms of their

9  agreements regarding further dissemination of that

10 TSDB information?

11         MS. KONKOLY: Objection.  Vague and

12 compound.  Further objection insofar as the answer

13 would call for information protected by the law

14 enforcement privilege.  You can answer if you can.

15         THE WITNESS: So through the nominations

16 and encounter process if we become aware as we have

17 contact with these agencies of something that does

18 not seem to be according to our agreement, then that

19 would cause us to make inquiry with that

20 organization.

21         So we have in some cases daily --

22 multiple times daily contact with many, although I

---

216

1  wouldn't say all, of the downstream or the watch

2  listing nominators.  So that provides -- that

3  provides some level of understanding.  There is also

4  -- electronically between systems, there is a

5  reconciliation that is a technical thing to make

6  sure that our databases are synched, that the

7  information in their database reflects what it

8  should from what is in ours.

9          And beyond that, there is oversight over

10 this entire process on the part of inspectors

11 general, the General Accounting Office, the Privacy

12 and Civil Liberties Oversight Board.  There are

13 often audits that are conducted across the watch

14 listing enterprise not restricted to any one

15 organization.  And they have an oversight function

16 to ensure that the entire system from beginning to

17 end is functioning as agreed and as is appropriate.

18     Q.    Has TSC ever taken any actions to enforce

19 the terms of its agreements with entities that

20 receive TSDB information who are violating their

21 agreements with TSC?

22         MS. KONKOLY: Objection.  Vague and

---

Transcript of Timothy P. Groh, Designated Representative
Conducted on March 1, 2018

55 (217 to 220)

217

1  compound.  Objection insofar as the information
2  calls -- I'm sorry -- as the answer calls for
3  information protected by the law enforcement
4  privilege.  You can answer to the extent that you
5  can.
6       THE WITNESS:  I think violations is a
7  very strong word.  I think that this is a complex
8  process.  And as we see here in this deposition,
9  terms are important and often misunderstood and
10 clarification is required.  So I think there is
11 constant ongoing clarification, discussion,
12 adjusting to changing circumstances that goes on
13 across the entire enterprise.  I am not aware of
14 something where I believe it would constitute a
15 violation of an intentional misuse of TSDB data.
16      BY MR. ABBAS:
17  Q.   So the Terror Screening Center is not
18 aware of a single instance in which an agency has
19 misused TSDB information?
20      MS. KONKOLY:  Objection.
21 Mischaracterized his prior testimony.  Objection
22 insofar as the answer would call for information

218

1  protected by the law enforcement privilege.  You can
2  answer if you can.
3       THE WITNESS:  Again, I have a hard time
4  with the word misused.  I think there is often
5  clarification needed on what we or one of our
6  partners is doing, how we interact.  But you are
7  implying certain nefarious activity in there.  And
8  as far as something I would describe as nefarious,
9  not liking the word misused, I would say no.
10      BY MR. ABBAS:
11  Q.   Has TSC ever withheld TSDB information
12 from an entity that would otherwise receive TSDB
13 information as a result of how that entity was
14 utilizing TSDB information?
15      MS. KONKOLY:  Objection.  Vague.
16 Objection as to scope.  Objection insofar as the
17 answer would call for any information protected by
18 the law enforcement privilege.  You can answer to
19 the extent that you know and can do so.
20      THE WITNESS:  I think those kind of
21 disagreements to take a sanction against a partner
22 like that would require us to go to the Watch

219

1  Listing Advisory Council and go through the
2  aforementioned process to reconcile that.
3       BY MR. ABBAS:
4   Q.   And, ultimately, if there is a dispute,
5  the National Security Council resolves that?
6   **A.   That's correct.**
7   Q.   And the National Security Council has
8  never resolved a dispute regarding -- I am sorry,
9  let me ask that question.  Has the National Security
10 Council ever resolved a dispute regarding the use of
11 TSDB information?
12      MS. KONKOLY:  Objection.  Vague.
13 Objection as to scope.  Objection insofar as the
14 answer would call for information protected by the
15 law enforcement privilege.  You can answer to the
16 extent you know and can do so without waiving any
17 privilege.
18      THE WITNESS:  Not to -- not to my
19 knowledge and certainly not recently if it ever did
20 happen.
21      MR. ABBAS:  Indiana.
22      BY MR. ABBAS:

220

1   Q.   Has the Watch List Advisory Council -- is
2  it the Watch Listing Advisory Council or Watch List
3  Advisory Council?
4   **A.   Watch Listing.**
5   Q.   Oh, Watching Listing, okay.  Has the
6  Watch Listing Advisory Council ever made a decision
7  regarding the -- I am sorry.
8       MR. ABBAS:  Can you read back my last
9  question?
10      (The record was read.)
11      BY MR. ABBAS:
12  Q.   Has the Watch Listing Advisory Council
13 ever resolved a dispute regarding the use of TSDB
14 information?
15      MS. KONKOLY:  Objection.  Asked and
16 answered.  Objection as to scope, both temporarily
17 and now insofar as the topics for this deposition
18 are defined.  Also objection as to the information
19 calling or the question calling for information
20 within the purview of another agency.  Objection
21 insofar as the answer calls for information
22 protected by law enforcement privilege.  You can

Transcript of Timothy P. Groh, Designated Representative

Conducted on March 1, 2018

56 (221 to 224)

---

221

1 answer to the extent you can.
2        THE WITNESS:  Again, the word dispute is
3 strong.  I think constantly the Watch Listing
4 Advisory Council is the venue for discussion around
5 any number of issues.  Whether or not -- I don't
6 know if you would describe them as disputes or not.
7 But there are certainly things that need to be
8 settled constantly.  And so the Watch Listing
9 Advisory Council frequently is the body -- is the
10 venue to resolve those disputes or discussions.
11 Dispute might be too strong a word.
12        BY MR. ABBAS:
13   Q.   Has there ever been a dispute regarding
14 the use of TSDB information that the Watch Listing
15 Advisory Council has resolved?
16        MS. KONKOLY:  Objection as to scope.
17 Temporally that is not within the topics that have
18 been approved by the court for a discussion in
19 today's deposition.  Objection insofar as the
20 information would call for -- as that answer would
21 call for any information protected by the law
22 enforcement privilege.  You can answer if you can.

---

222

1        MR. ABBAS:  And just for the record,
2 category four is measures TSC undertakes to ensure
3 accuracy and reliability of the TSDB.  Certainly,
4 controls that TSDB places on the usage of TSDB
5 information bear on the accuracy and reliability of
6 the TSDB itself.
7        MS. KONKOLY:  Well, to clarify, that
8 objection goes to your use of the word ever.  My
9 objections have been stated for the record and they
10 stand.  You can answer to the extent you can.
11        MR. ABBAS:  Is your objection -- like is
12 your temporal objection because I am asking for too
13 long a time frame?
14        MS. KONKOLY:  Yes, ever.
15        MR. ABBAS:  Fair enough.  What time
16 frame works for you?
17        MS. KONKOLY:  I might need --
18        MR. ABBAS:  Ten years.  You guys do 10
19 years?  Can I give you 10 years?
20        MS. KONKOLY:  I am not sure we can do 10
21 years.  I am not sure I can give you an answer.
22        MR. ABBAS:  I am going to do -- so I am

---

223

1 going to keep it with ever, then.
2        MS. KONKOLY:  Okay.
3        MR. ABBAS:  I don't remember the
4 question.  Can you read back the question?
5        (The record was read.)
6        MS. KONKOLY:  Same objections.  And I
7 will also add objection insofar as it calls for
8 information protected by the deliberative process
9 privilege.  You can answer if you can.
10        THE WITNESS:  The Watch Listing Advisory
11 Council -- I mean, I don't know exactly how you
12 define a dispute.  But that's the job of the Watch
13 Listing Advisory Council.  And it does it every time
14 -- every time it meets to come to consensus on --
15 you could call it a dispute, a suggestion, a
16 proposal, different points of view.  It does all of
17 those things quite consistently and actively.
18        BY MR. ABBAS:
19   Q.   How does the -- the Watch Listing
20 Advisory Council makes decisions, correct?
21        MS. KONKOLY:  Objection.  Vague.
22        THE WITNESS:  It's -- effectively, yes.

---

224

1 Yes.
2        BY MR. ABBAS:
3   Q.   How does the Watch Listing Advisory
4 Council memorialize its decisions?
5        MS. KONKOLY:  Objection insofar as the
6 answer would call for information protected by
7 either the deliberative process or the law
8 enforcement privilege.  You can answer to the extent
9 you can.
10        BY MR. ABBAS:
11   Q.   I am asking for just the decisions.  Like
12 are they written on a chalkboard?  Do you have a
13 Gchat?  I mean, what is it?  Is there a bulletin
14 board?  How does the Watch Listing Advisory Council
15 memorialize the decisions that it makes?  That's
16 all.
17        MS. KONKOLY:  Same objections.  And you
18 can answer to the extent that you can.
19        THE WITNESS:  So after each meeting,
20 there is a statement of conclusions prepared.
21        MR. ABBAS:  Arizona.
22        THE WITNESS:  I almost said Arizona for

---

Transcript of Timothy P. Groh, Designated Representative     57 (225 to 228)
Conducted on March 1, 2018

---

225

1  you. But I thought counsel would slap me around.
2      BY MR. ABBAS:
3      Q.   What is it called? What is it?
4  Statements of conclusion?
5      **A.   Statement of conclusion.**
6      Q.   Statement of conclusion.
7      **A.   And periodically the Watch Listing**
8  **Guidance is updated. And we have previously --**
9      Q.   We have covered that.
10     **A.   There you go.**
11     Q.   How many statements of conclusion has --
12 well, how many times a year does -- let's take 2017.
13 How many times in 2017 did the Watch Listing
14 Advisory Council meet?
15     MS. KONKOLY: Objection insofar as that
16 call for information protected by the law
17 enforcement privilege. You can answer if you can.
18     THE WITNESS: I would say generally
19 quarterly. I don't remember specifically.
20 Quarterly, sometimes more frequently.
21     BY MR. ABBAS:
22     Q.   So at least -- at least multiple times a

---

226

1  year?
2      **A.   Yes.**
3      Q.   And I have asked this, but I just can't
4  remember the answer. The Watch Listing Advisory
5  Council has existed since at least 2009?
6      MS. KONKOLY: Objection. Asked and
7  answered.
8      BY MR. ABBAS:
9      Q.   And I could be wrong.
10     **A.   I believe so. I believe so.**
11     Q.   Okay. It has existed for at least the
12 last five years?
13     **A.   Yes.**
14     Q.   Okay. And during those five years the
15 Watch Listing Advisory Council -- each of those five
16 years it has met multiple times?
17     **A.   Yes.**
18     Q.   And each time the Watch Listing Advisory
19 Council meets, it issues a statement of conclusion?
20     **A.   It certainly has since I have been there.**
21 **And I have reason -- as far as I know, it did prior**
22 **to that.**

---

227

1      MR. ABBAS: Arizona.
2      BY MR. ABBAS:
3      Q.   What kinds of things are in these
4  statement of conclusions?
5      MS. KONKOLY: Objection. Vague.
6  Objection insofar as it calls for information
7  protected by either the deliberative process
8  privilege or the law enforcement privilege. You can
9  answer to the extent that you can.
10     THE WITNESS: Topics discussed, consensus
11 reached, do-outs, report-backs from various
12 participants.
13     BY MR. ABBAS:
14     Q.   Are you -- is the Terror Screening Center
15 aware of any Watch Listing Advisory Council
16 statement of conclusions that regards the -- I am
17 sorry. I am going to start that question over
18 again. When the Watch Listing Advisory Council
19 issues a statement of conclusion, are the member
20 agencies of the Watch Listing Advisory Council bound
21 to follow the substance of those conclusions?
22     MS. KONKOLY: Objection. Vague.

---

228

1  Objection insofar as the information -- the answer
2  calls for information protected by the law
3  enforcement privilege or a legal conclusion. And I
4  will also note an objection to scope. You can
5  answer if you can.
6      THE WITNESS: I think because those
7  decisions are reached by consensus, it is understood
8  that that is the agreement. And if somebody wants
9  to revisit that agreement, there's the
10 aforementioned processes to do so.
11     BY MR. ABBAS:
12     Q.   So is the Terror Screening Center's
13 testimony that the member agencies that comprise the
14 Watch Listing Advisory Council adhere to the
15 substance of the Watch Listing Advisory Council's
16 statements of conclusions?
17     MS. KONKOLY: Objection as to the extent
18 that information calls for information within the
19 purview of other agencies Mr. Groh cannot bind.
20 Objection. Vague. Objection insofar as the
21 information calls for any information protected by
22 the law enforcement privilege. You can answer to

---

---

229

1  the extent that you can.
2      THE WITNESS:  Yes.  If it has been
3  concluded by the council, that means it was at that
4  point without dissent.  And so my expectation would
5  be that that's what we would follow until -- unless
6  and until we ever revisited the issue.
7      BY MR. ABBAS:
8      Q.   Does the Terror Screening Center maintain
9  a record of all of the statements of conclusions
10 that the Watch Listing Advisory Council has issued?
11     **A.   I believe so.**
12     Q.   Have any of those statement of
13 conclusions that the Watch Listing Advisory Council
14 has issued regard tightening or loosening the TSDB's
15 inclusion standard?
16     MS. KONKOLY:  Objection insofar as that
17 information calls for information protected by
18 either the law enforcement privilege or the state
19 secrets privilege potentially SSI.  Objection
20 insofar as the information is within the purview of
21 other agencies.  You can answer to the extent that
22 you can.

230

1      THE WITNESS:  I believe that it is likely
2  that they do.
3      BY MR. ABBAS:
4      Q.   So there have been Watch Listing Advisory
5  Council statement of conclusions that regard
6  loosening or tightening the TSDB's inclusion
7  standards?
8      MS. KONKOLY:  Objection.
9  Mischaracterizes prior testimony.  Objection.  Same
10 objections insofar as the answer would implicate
11 information protected by the law enforcement,
12 potentially the state secrets or SSI privileges.
13 You can answer if you can.
14     THE WITNESS:  I believe it would be
15 reflected there or in an update to the Watch Listing
16 Guidance or both.
17     Q.   Has the TSDB inclusion standard ever been
18 tightened?
19     MS. KONKOLY:  Objection.
20     BY MR. ABBAS:
21     Q.   I'm sorry.  Let me rephrase.  Has the
22 TSDB inclusion standard ever been made more

231

1  permissive?
2      MS. KONKOLY:  Objection.  Vague.
3  Objection insofar as the answer --
4      THE WITNESS:  Yeah, it was vague.
5  Describe which way you mean permissive to be.
6      BY MR. ABBAS:
7      Q.   So the number of nominations to the TSDB
8  varies by year, correct?
9      **A.   Yes.**
10     Q.   And the number of nominations accepted by
11 TSC varies by year, correct?
12     **A.   Yes.  It varies all the time, but it can
13 be reflected by the year.**
14     Q.   Has TSC ever made it -- has TSC ever
15 taken actions that would produce a higher nomination
16 acceptance rate by making the TSDB inclusion
17 standards more permissive?
18     MS. KONKOLY:  Objection.  Vague.
19 Objection insofar as the answer calls for
20 information protected by the law enforcement
21 privilege and state secrets privilege.  You can
22 answer if you can.

232

1      THE WITNESS:  So you mean -- you mean to
2  -- I take it you mean to raise or lower the bar.
3  You mean to lower the bar for nominations.  Is that
4  what you are saying?
5      BY MR. ABBAS:
6      Q.   To make more permissive would be lowering
7  the bar.  To make less permissive would be raising
8  the bar.
9      MS. KONKOLY:  Same objections.
10     BY MR. ABBAS:
11     Q.   So let me -- with that understanding, let
12 me ask the question again.  I think now -- I think
13 now we are on the same page.  Has TSC taken any
14 actions that would make the inclusion process more
15 permissive?
16     MS. KONKOLY:  Objection.  Vague.
17 Objection insofar as the answer would call for any
18 information protected by the law enforcement or
19 potentially state secrets privileges.  You can
20 answer to the extent you can.
21     THE WITNESS:  So I think we already
22 described changes that were made circa 2009 with

233

1  regard to exceptions to the reasonable suspicion
2  standard.  And to me that would fall into the
3  category that you just described.  So I think the
4  answer is yes.
5          BY MR. ABBAS:
6      Q.   Has TSC ever made the inclusion process
7  less permissive?
8          MS. KONKOLY:  Objection.  Vague.
9  Objection insofar as the answer would call for
10 information protected by the law enforcement and
11 potentially state secrets privilege.  You can answer
12 if you can.
13         THE WITNESS:  In other words, made --
14 raised the bar to go back to our previous.  I don't
15 think I can get into a great deal of specificity,
16 but I believe the answer to that is also yes.
17         BY MR. ABBAS:
18     Q.   When has the Terror Screening Center made
19 the inclusion process less permissive?
20         MS. KONKOLY:  Objection.  Vague.
21 Objection insofar as the answer calls for
22 information protected by either the law enforcement

234

1  or the state secrets privilege potentially.  You can
2  answer if you can.
3          THE WITNESS:  I don't believe I can
4  answer that.
5          MS. KONKOLY:  Okay.
6          MR. ABBAS:  You can't provide it.  What's
7  the basis of the privilege assertion regarding the
8  date as to when the inclusion process was made less
9  permissive?  What privilege are being asserted?
10         MS. KONKOLY:  Law enforcement, state
11 secrets potentially.  They are both on the record
12 and they stand.
13         BY MR. ABBAS:
14     Q.   Fine.  What is -- how many times has the
15 Terror Screening Center made the inclusion process
16 less permissive?
17         MS. KONKOLY:  Objection.  Vague.
18 Objection insofar as the answer would call for
19 information protected by the law enforcement or
20 potentially the state secrets privilege.  Answer if
21 you can.
22         THE WITNESS:  I think in keeping with

235

1  what we said earlier, I don't think I can answer
2  that.
3          MR. ABBAS:  Okay.  So the number of times
4  is also covered by the law enforcement privilege and
5  the state secrets privilege?
6          MS. KONKOLY:  That's the objection on the
7  record.
8          MR. ABBAS:  Okay.  I am just making sure.
9          BY MR. ABBAS:
10     Q.   Does TSC export TSDB information to
11 entities that do not maintain near real-time access
12 to TSDB information updates and changes?
13         MS. KONKOLY:  I am sorry.  Objection.
14 Vague.  Objection.  Compound.  Objection insofar as
15 the answer calls for information protected by the
16 enforcement privilege.  You can answer if you can.
17         THE WITNESS:  Yes, there are entities
18 that do not receive a transactional update.
19         BY MR. ABBAS:
20     Q.   So what happens when TSC exports TSDB
21 information to an entity that does not receive
22 transactional updates to the TSDB and then there are

236

1  transactional updates to the TSDB?
2          MS. KONKOLY:  Objection.  Vague.
3  Objection.  Compound.  Objection insofar as the
4  answer calls for information protected by the law
5  enforcement privilege.  You can answer if you can.
6          THE WITNESS:  So those cumulative changes
7  that you are referring to would be updated the next
8  time that that export is periodically updated.  That
9  actually used to be true of many more, if not all of
10 our exports.  And over time, more and more of them
11 have become transactional at some of the
12 improvements we have made to the system along the
13 way.
14     Q.   So TSC's goal -- is it -- is it TSC's
15 goal to provide TSDB recipients with near real-time
16 access to changes that get made to the TSDB?
17         MS. KONKOLY:  Objection.  Vague.
18         THE WITNESS:  I agree that would be
19 ideal.
20         BY MR. ABBAS:
21     Q.   But there are entities who do not receive
22 near real-time information regarding updates to the

Transcript of Timothy P. Groh, Designated Representative
Conducted on March 1, 2018

237

1  TSDB, correct?
2        MS. KONKOLY: Objection.  Vague.
3  Objection.  Asked and answered.
4        THE WITNESS: Yes.
5        BY MR. ABBAS:
6    Q.   Are there domestic entities that do not
7  receive near real-time updates to changes that get
8  made in the TSDB?
9        MS. KONKOLY: Objection.  Vague.
10 Objection.  Asked and answered.  Objection insofar
11 as the answer would call for information protected
12 by the law enforcement privilege.  You can answer if
13 you can.
14       THE WITNESS: I don't believe there are
15 domestic entities that don't have transactional
16 updates anymore.
17       MR. ABBAS: Indiana.
18       BY MR. ABBAS:
19   Q.   So TSC's testimony today is that all
20 domestic entities that receive TSDB information are
21 receiving that information in near real time to
22 reflect changes to the TSDB?

238

1        MS. KONKOLY: Objection.  Vague.
2  Objection.  Asked and answered.  Objection insofar
3  as any additional answer would call for information
4  protected by the law enforcement privilege.  You can
5  answer if you can.
6        THE WITNESS: Yes.
7        BY MR. ABBAS:
8    Q.   Do all foreign governments receive near
9  real-time access to the updates and changes to TSDB?
10       MS. KONKOLY: Objection.  Vague.
11 Objection insofar as the answer calls for
12 information protected by the law enforcement or
13 potentially state secrets privilege.  You can answer
14 if you can.
15       THE WITNESS: No.
16       BY MR. ABBAS:
17   Q.   Does -- I am sorry.  Does TSC disseminate
18 information to foreign governments in the absence of
19 an agreement with that foreign government regarding
20 the dissemination and use of TSDB information?
21       MS. KONKOLY: Objection insofar as that
22 information calls for -- that answer calls for

239

1  information protected by the law enforcement or
2  potentially the state secrets privilege.  You can
3  answer if you can.
4        THE WITNESS: No.
5        BY MR. ABBAS:
6    Q.   So every foreign government that receives
7  TSDB information has an agreement with TSC regarding
8  the dissemination of TSDB information?
9    A.   **Every recipient of information has an**
10 **agreement with the United States Government.**
11   Q.   Okay.  So it might not be with the Terror
12 Screening Center.  It could be with the U.S.
13 Government?
14   A.   **Correct.**
15   Q.   Who would -- who in the U.S. Government
16 is signing these agreements, if not, TSC?
17       MS. KONKOLY: Objection.  Vague.
18 Objection insofar as that question calls for
19 information within the purview of other agencies.
20 You can testify as to your understanding, but that
21 answer will not bind the agency.  And objection
22 insofar as the question calls for information

240

1  protected by any law enforcement privilege.  You can
2  answer if you can.
3        THE WITNESS: I don't know if we need to
4  confer on that.  I am not sure.
5        MS. KONKOLY: Okay.
6        MR. ABBAS: Do you want us to leave?  I
7  could use like a five-minute break.
8        MS. KONKOLY: Okay.  We will take a
9  five-minute break.
10       THE VIDEOGRAPHER: We are going off the
11 record.  The time is 3:01 p.m.
12       (A recess was held.)
13       THE VIDEOGRAPHER: We are back on the
14 record.  The time is 3:12 p.m.  And we have been on
15 the record for 4 hours and 15 minutes.
16       BY MR. ABBAS:
17   Q.   Does TSC have any information that any
18 non-governmental entities receives in any way access
19 to TSDB information?
20       MS. KONKOLY: Objection insofar as that
21 -- objection.  Vague.  Objection insofar as the
22 answer calls for information protected by law

Transcript of Timothy P. Groh, Designated Representative
Conducted on March 1, 2018

61 (241 to 244)

241

1  enforcement or SSI privileges.  You can answer to
2  the extent you can.  I will also interpose that I
3  believe that question has been asked and answered.
4      THE WITNESS:  I am sorry.  Repeat that
5  one more time for me.
6      MR. ABBAS:  Can you read it back.
7      (The record was read.)
8      THE WITNESS:  I am trying to determine
9  what the word access means in this question.  For
10 instance, when you describe TSA, you know, and
11 denials of boardings on aircraft, obviously an
12 airline is aware that one of their passengers has to
13 some degree been denied boarding.  So I don't know
14 what you mean.  You mean the ability to search TSDB
15 information or that could be in some downstream
16 process somehow?
17     Q.   Both.  So, yeah, I would agree with you
18 that the airlines have some kind of access to TSDB
19 information, because certainly when a boarding press
20 printing result doesn't issue because of a person's
21 status on the No-Fly List, the airline gets that
22 indication whether or not the passenger does.  But

242

1  beyond airlines, what other non-governmental
2  entities receive access to information -- I am
3  sorry.  What other non-airline -- I am sorry.  Aside
4  from airlines, what other non-governmental entities
5  receive access of any kind to TSDB information?
6      MS. KONKOLY:  Objection.  Vague.
7  Objection.  Compound.  Objection insofar as that
8  information calls -- that answer calls for
9  information protected by the law enforcement
10 privilege.  You can answer to the extent you can.
11     THE WITNESS:  Outside the example we have
12 excluded, I am not aware of any.
13     BY MR. ABBAS:
14     Q.   Do -- are there other non-governmental --
15 are there other non-governmental entities who learn
16 of TSDB information via the utilization of TSDB
17 information?
18     MS. KONKOLY:  Objection.  Vague.
19 Objection insofar as the answer would call for
20 information protected by the law enforcement
21 privilege.  You can answer to the extent that you
22 can.

243

1      THE WITNESS:  Again, subject to just -- I
2  think it is the same as the previous answer.  Not
3  that I am aware of, excluding some interaction with
4  airlines.  And even in that case, I would say that
5  the example you described with a boarding pass or
6  such that there are other ways that somebody can
7  receive additional screening or be denied boarding.
8  So, you know, that information is used in that case.
9  And I think often people assume they know what's
10 going on.  But it is sometimes more complicated than
11 that.  But subject to that exclusion, none that I am
12 aware of.
13     BY MR. ABBAS:
14     Q.   Federal Government employees have access
15 to TSDB information, correct?
16     MS. KONKOLY:  Objection.  Misleading.
17 Objection.  Vague.
18     BY MR. ABBAS:
19     Q.   Let me -- it's not a trick question.
20 There are some Federal Government employees that
21 have access to TSDB information, correct?
22 **A.   Yes.**

244

1      Q.   Are there contractors to the Federal
2  Government who are not Federal Government employees
3  who also have access to TSDB information?
4  **A.   Yes.**
5      Q.   Are there contractors at TSC who are not
6  employees of TSC who have access to TSDB
7  information?
8  **A.   I would call them contract employees of**
9  **TSDB.  But yes, they are contractors, not Federal**
10 **Government employees.**
11     Q.   They are not -- so there are
12 non-employees that TSC -- I am sorry.  There are
13 persons who are not TSC -- I am sorry.  Let me start
14 over again.  There are persons who work for
15 companies that contract with the Federal Government
16 who have access via their employer to TSDB
17 information?
18     MS. KONKOLY:  Objection.  Vague.
19 Objection.  Asked and answered.
20     THE WITNESS:  They work -- I wouldn't say
21 they have -- they have access because their employer
22 has a contract.  But they don't have access via

Transcript of Timothy P. Groh, Designated Representative
Conducted on March 1, 2018

245

1 their own employer. They have access because they
2 work at the TSC.
3        BY MR. ABBAS:
4    Q.   Which companies does -- which contracting
5 companies does TSC have agreements with?
6        MS. KONKOLY: Objection insofar as that
7 question calls for information protected by the law
8 enforcement privilege. But you can answer if you
9 can.
10       THE WITNESS: It is what it is.
11       BY MR. ABBAS:
12   Q.   It is what it is.
13   **A.   So yeah, I think that's the prime -- the**
14 **two primary companies. One called STOPSO.**
15   Q.   Can you spell that?
16   **A.   That's their acronym S-T-O-P-S-O. The**
17 **second would be Sotera Defense.**
18   Q.   Can you spell that?
19   **A.   S-O-T-E-R-A.**
20   Q.   S-O?
21   **A.   T-E-R-A, I believe.**
22   Q.   STOPSO and Sotera?

246

1    **A.   Yes.**
2    Q.   I'm sorry. Go ahead.
3    **A.   No, go ahead.**
4    Q.   No, no, no. Please.
5    **A.   No, no. I am good.**
6    Q.   Is STOPSO an acronym or is that just like
7 a cute name?
8    **A.   I am trying to remember exactly. It's**
9 **strategic --**
10   Q.   Oh, you think it is an acronym?
11   **A.   I think it is an acronym, yes.**
12   Q.   Got it. Strategic Operation Solutions?
13   **A.   That sounds right.**
14   Q.   Is STOPSO a U.S. company?
15   **A.   Yes.**
16   Q.   Is Sotera a U.S. company?
17   **A.   Yes.**
18   Q.   How long has TSC had a contract with
19 STOPSO? Well, I am sorry. Let me back up. Does
20 TSC have an agreement with STOPSO?
21   **A.   Yes.**
22       MR. ABBAS: Arizona.

247

1        BY MR. ABBAS:
2    Q.   How long has TSC had an agreement with
3 STOPSO?
4    **A.   The current contract is, I believe, in**
5 **its fourth year. There may -- I believe that STOPSO**
6 **has for some time before that. But I don't know**
7 **offhand exactly when their first interaction with**
8 **TSC was. I believe there was a period before the**
9 **current contract. But the current one is in the**
10 **fourth year.**
11   Q.   In the fourth year?
12   **A.   Yes.**
13   Q.   Got it. How much does TSC pay STOPSO?
14       MS. KONKOLY: Objection insofar as that
15 question calls for information protected by the law
16 enforcement privilege or proprietary information.
17 But you can answer to the extent that you can.
18       MR. ABBAS: So hold on. I want to
19 understand the objections. So the amount of money
20 that TSC spends on STOPSO is proprietary
21 information?
22       MS. KONKOLY: I don't know if it is. I

248

1 am raising the potential objection and allowing the
2 witness to instruct if he can or to answer if he
3 can.
4        MR. ABBAS: Are you instructing him not
5 --
6        MS. KONKOLY: No.
7        MR. ABBAS: -- to provide proprietary
8 information?
9        MS. KONKOLY: I did not make an
10 instruction not to answer. I said you can answer to
11 the extent that you can.
12       MR. ABBAS: And I want to understand the
13 law enforcement privilege assertion. Why was --
14       MS. KONKOLY: It was to the extent that.
15 And I am telling the witness that he can answer to
16 the extent that he can.
17       BY MR. ABBAS:
18   Q.   Sure. Okay.
19   **A.   I don't -- I don't recall exactly what --**
20 **I don't manage the contract, per se. And I don't**
21 **recall exactly what -- what we are paying them in**
22 **any given period of time.**

Case 1:16-cv-00375-AJT-JFA   Document 306-28   Filed 03/12/19   Page 65 of 100 PageID#
14310
Transcript of Timothy P. Groh, Designated Representative          63 (249 to 252)
Conducted on March 1, 2018

249

1    Q.   Is it millions of dollars?

2    **A.   Yes.**

3        MS. KONKOLY:  Objection.  Calls for

4 speculation.

5    BY MR. ABBAS:

6    Q.   Is it over $10 million?

7        MS. KONKOLY:  I am going to object again

8 that this calls for speculation.  I am also going to

9 note that these questions are outside the scope of

10 the protective order entered by the court.  I will

11 allow the witness to answer this question.  But if

12 this proceeds too much further, I have to --

13       MR. ABBAS:  These are dissemination

14 questions.  The size of the contract bears on how

15 many people STOPSO has working -- STOPSO.

16       MS. KONKOLY:  Objection stands.  You can

17 answer to the extent that you can.

18       THE WITNESS:  I believe it is likely more

19 than $10 million.  Beyond that, I would be wildly

20 speculating.

21       BY MR. ABBAS:

22    Q.   Are all these STOPSO contractors located

250

1 at the Terror Screening Center's headquarters in

2 Vienna, Virginia?

3    **A.   Yes.  Every one that we employ from**

4 **STOPSO would work at TSC.**

5    Q.   How many contractors from -- how many

6 contractors from STOPSO are working at the Terror

7 Screening Center's headquarters in Vienna, Virginia?

8        MS. KONKOLY:  Objection.  Calls for

9 speculation.

10       THE WITNESS:  First, let me clarify.

11 There is one other -- there is -- the contract calls

12 for them to also work at one other site beyond the

13 TSC in Vienna.  So there is one additional.  Beyond

14 that, I can't tell you -- I don't know exactly how

15 many of the contractors work for STOPSO.  They also

16 have arrangements with some subcontractors through

17 that arrangement that I really don't know a lot of

18 particulars about.  They all work at the TSC.

19       BY MR. ABBAS:

20    Q.   So TSC contracts with STOPSO, and then

21 STOPSO contracts with other people.  And they all

22 are in Vienna, Virginia at the Terror Screening

251

1 Center Headquarters?

2    **A.   And one other small site.**

3    Q.   Where is that other small site?

4    **A.   I don't think I can say.**

5        MS. KONKOLY:  Objection insofar as that

6 answer calls for information protected by the law

7 enforcement privilege.

8        BY MR. ABBAS:

9    Q.   Is that other site a Terror Screening

10 Center office?

11       MS. KONKOLY:  Objection insofar as the

12 answer would call for information protected by the

13 law enforcement privilege.  You can answer if you

14 can.

15       THE WITNESS:  Yes.

16       BY MR. ABBAS:

17    Q.   What is your best estimate of how many

18 contractors work out of the TSC Headquarters in

19 Vienna, Virginia whether they work ultimately for

20 STOPSO or one of the subcontractors of STOPSO?

21       MS. KONKOLY:  Objection.  Compound.

22 Objection.  Calls for speculation.

252

1        THE WITNESS:  Approximately 300.

2        BY MR. ABBAS:

3    Q.   There's 300 STOPSO contractors or STOPSO

4 subcontractors that work at the Terror Screening

5 Center?

6    **A.   300 STOPSO contractors or Sotera.**

7    Q.   So you are not sure how many -- is it

8 about half and half between STOPSO and Sotera?

9        MS. KONKOLY:  Objection.  Calls for

10 speculation.

11       THE WITNESS:  Yeah, I couldn't tell you.

12       BY MR. ABBAS:

13    Q.   I mean, is it -- like is it really

14 lopsided where STOPSO has three people and Sotera

15 has 297 people?  Is it split somewhere down -- I

16 mean, give me what your sense is.

17       MS. KONKOLY:  Calls for speculation.

18       THE WITNESS:  My sense, which is an

19 estimate, is it is maybe two thirds STOPSO or

20 subcontractors and about one third Sotera.  Sotera

21 handles IT development.  STOPSO handles most other

22 things.

Transcript of Timothy P. Groh, Designated Representative
Conducted on March 1, 2018

253

1      BY MR. ABBAS:
2      Q.    What's -- what are those other things
3  that STOPSO handles?
4      **A.    They work together with the government**
5  **employees for all the things we have been talking**
6  **about.**
7      Q.    Is a STOPSO -- are there STOPSO
8  contractors that can accept nominations on behalf of
9  TSC to the TSDB?
10      MS. KONKOLY: Objection insofar as that
11 question calls for information protected by the law
12 enforcement privilege.  You can answer if you can.
13      THE WITNESS: Not for U.S. persons.
14      BY MR. ABBAS:
15      Q.    So with regards to U.S. persons, the only
16 individuals who can accept the nomination of a U.S.
17 person to the TSDB are TSC employees, correct?
18      **A.    Yes.  I would say government employees**
19 **just to add that qualification.  Some of our**
20 **personnel actually work for other government**
21 **agencies that are detailed to the TSC.**
22      Q.    Got it.  What else does -- what else do

254

1  STOPSO contractors do?  I am sorry.  Let me ask you
2  this.  Why?  Why is it that STOPSO contractors can
3  accept the nominations of non-U.S. persons to the
4  TSDB, whereas U.S.-person nominations can only be
5  accepted by Federal Government employees?
6      MS. KONKOLY: Objection insofar as that
7  answer would call for information protected by the
8  law enforcement privilege.  But you can answer if
9  you can.
10      THE WITNESS: Well, I think it would
11 require me to draw a legal conclusion.
12      BY MR. ABBAS:
13      Q.    Has that always been -- has it always
14 been the case that STOPSO contractors cannot accept
15 the nominations of U.S. persons to the TSDB?
16      MS. KONKOLY: Objection as to scope.
17      THE WITNESS: I don't know if -- I don't
18 know if it has always -- if it never changed along
19 the way.
20      BY MR. ABBAS:
21      Q.    Is it TSC's testimony today that STOPSO
22 contractors have never been able to accept the

255

1  nominations of U.S. persons to the TSDB?
2      MS. KONKOLY: Objection.
3  Mischaracterizes his prior testimony.  Objection as
4  to scope of the approved topics for this deposition.
5  You can answer to the extent you can.
6      THE WITNESS: I think I just answered.  I
7  don't know that that role has always been the case.
8  I know what it is now.
9      MR. ABBAS: Indiana.
10      BY MR. ABBAS:
11      Q.    Who made the rule that STOPSO contractors
12 cannot accept the nominations of U.S. persons to the
13 TSDB?
14      MS. KONKOLY: Objection insofar as that
15 information -- as that question calls for
16 information protected by the law enforcement
17 privilege.  You can answer to the extent that you
18 can.
19      THE WITNESS: I presume TSC management.
20      BY MR. ABBAS:
21      Q.    And you don't know when TSC management
22 made the decision to forbid STOPSO contractors from

256

1  accepting U.S.-person TSDB nominations?
2      **A.    It may have always been the case, so I**
3  **don't know that it was decision.**
4      MR. ABBAS: Sure.  Indiana.
5      BY MR. ABBAS:
6      Q.    Do the STOPSO -- I know -- so right now
7  today, STOPSO contractors do not have the authority
8  to accept TSDB nominations of U.S. persons, correct?
9      **A.    Not the final authority.**
10      Q.    They can make a recommendation about
11 whether a nomination of a U.S. person to the TSDB
12 should be accepted?
13      **A.    Effectively, yes.**
14      Q.    Has -- what does Sotera do for the Terror
15 Screening Center?
16      MS. KONKOLY: Objection.  Vague.
17      BY MR. ABBAS:
18      Q.    Well, hold on.  Let me withdraw that
19 question.  Sotera is a U.S. company that contracts
20 with the Terror Screening Center, correct?
21      **A.    Yes.**
22      Q.    There is an agreement between Sotera and

257

1 the Terror Screening Center that governs the
2 services that Sotera provide TSC, correct?
3    **A.   Yes, the contract.**
4    Q.   When did Sotera and TSC enter into a
5 contract?
6        MS. KONKOLY: Objection. Scope. You can
7 answer if you know.
8        THE WITNESS: Most recently it was
9 sometime last year. And I believe they were the
10 incumbent. So it was awarded to them after a
11 competition. So they had -- they had a previous
12 contract. And I am not sure before that contract.
13       BY MR. ABBAS:
14    Q.   When was the -- so as far as you know,
15 how long has Sotera and TSC been in a contract
16 together?
17    **A.   I would have to say at least likely six**
18 **years. It was probably a five-year period of**
19 **performance before. And it was re-competed last**
20 **year almost exactly a year, maybe a little bit more.**
21    Q.   What other companies competed for the
22 contract that Sotera competed for?

258

1        MS. KONKOLY: Objection. Scope. You can
2 answer if you know.
3        THE WITNESS: I don't remember. I wasn't
4 on the selection.
5        BY MR. ABBAS:
6    Q.   Who was on the Selection Committee?
7        MS. KONKOLY: Objection. Scope.
8 Objection. Privacy Act.
9        THE WITNESS: I don't recall.
10       BY MR. ABBAS:
11    Q.   Yeah. And I don't want names. I really
12 don't. Was the -- who is the head of the Terror
13 Screening Center?
14    **A.   Charles Kable.**
15    Q.   Was Charles Kable involved with deciding
16 which company was going to provide the services that
17 Sotera ultimately provided to TSC?
18       MS. KONKOLY: I am going to object. This
19 question is outside of the scope of the agreed-upon
20 topics. You can answer if you know.
21       THE WITNESS: I don't believe he was on
22 the Technical Review Committee. The folks actually

259

1 look at those contracts. I can't tell you if he had
2 some role in some final review of that. Also, who
3 would have been involved would have been our --
4 would have been the FBI's IT -- IT branch from a
5 technical perspective. So it is not entirely TSC.
6        BY MR. ABBAS:
7    Q.   Who -- so let's back up to STOPSO. Did
8 TSC decide to hire STOPSO?
9        MS. KONKOLY: Objection. Scope. You can
10 answer if you know.
11       MR. ABBAS: These are all dissemination
12 questions?
13       MS. KONKOLY: And the objection stands.
14 He can answer if he knows.
15       THE WITNESS: I am not an expert on
16 procurement. It would have gone through, I think,
17 the departmental. So for Department of Justice, it
18 would have gone through Department of Justice
19 procurement and then ultimately the FBI procurement
20 process. Beyond that, I am not able to tell you. I
21 didn't participate in it.
22       MR. ABBAS: Indiana.

260

1        BY MR. ABBAS:
2    Q.   Who decided that TSC was worth a contract
3 with Sotera?
4        MS. KONKOLY: Again, objection as to this
5 being outside of the scope of the designated topics.
6 You can answer if you know.
7        THE WITNESS: It would ultimately be
8 awarded by the contracting officer for that
9 particular contract.
10       BY MR. ABBAS:
11    Q.   Who is the contracting officer for the
12 Sotera contract?
13       MS. KONKOLY: Objection. Privacy Act.
14       BY MR. ABBAS:
15    Q.   I am not asking for a name. Just like --
16 I'm sorry. What agency was -- is the contracting
17 officer for the Sotera agreement employed by?
18       MS. KONKOLY: Objection. Scope. This is
19 not within the designated topics for this
20 deposition. You can answer if you happen to know.
21       THE WITNESS: I believe the FBI.
22       BY MR. ABBAS:

Transcript of Timothy P. Groh, Designated Representative
Conducted on March 1, 2018

66 (261 to 264)

---

261

1    Q.    And the contracting officer, that's what
2 you called him or her?
3    **A.    It is a term of art.  It is a designated**
4 **position, yes.**
5    Q.    And likely does the term of art mean that
6 that's the person who has the kind of final
7 authority to enter the agency into the contract?
8    **A.    I believe that's generally the case.**
9    Q.    And so with regards to the Sotera
10 contracts, there was an FBI contracting officer that
11 had the authority to enter TSC into that contract?
12          MS. KONKOLY:  Objection as to scope.  You
13 can answer if you happen to know.
14          THE WITNESS:  I believe that's how it
15 works.
16          BY MR. ABBAS:
17    Q.    With regard to the STOPSO contract, was
18 it also an FBI contracting officer who entered TSC
19 into the contract with STOPSO?
20          MS. KONKOLY:  Objection as to scope.  You
21 can answer if you know.
22          THE WITNESS:  That would be the normal

---

262

1 course of things.  I have no reason to believe that
2 wouldn't have what happened.
3          BY MR. ABBAS:
4    Q.    Why is the FBI deciding who TSC contracts
5 with?
6          MS. KONKOLY:  Objection.  Calls for
7 speculation.  Objection as to this being outside of
8 the scope of the designated topics for this
9 deposition.  Objection.  Calls for a legal
10 conclusion.  You can answer if you know.
11          THE WITNESS:  The TSC is administered by
12 the FBI.  And the TSC is not large enough to provide
13 all of those different services.
14          BY MR. ABBAS:
15    Q.    How many employees does TSC have?
16    **A.    Do you mean government, contract, both?**
17    Q.    So you said that there is about 300
18 contractors that provide services to the Terror
19 Screening Center, correct?
20    **A.    Yes.**
21    Q.    So let's put them to the side.  How many
22 individuals does the Terror Screening Center employ?

---

263

1    **A.    Approximately 200 total individuals**
2 **outside of contractors.**
3    Q.    And other agencies assign their employees
4 to the Terror Screening Center like on detail.  Is
5 that what the language is?
6    **A.    Fair enough, yes.**
7          MS. KONKOLY:  Objection.  Vague.
8          THE WITNESS:  And I included that in the
9 200.
10          BY MR. ABBAS:
11    Q.    Oh, okay, okay.  And I just want to -- I
12 am only talking about the people that -- when a
13 Terror Screening Center employee gets a check, like
14 their paycheck, does it say the Terror Screening
15 Center?  Does it say Charles Kable on it?
16    **A.    No.  Nobody is paid by the Terror**
17 **Screening Center.**
18    Q.    Who pays Terror Screening Center
19 employees?
20          MS. KONKOLY:  Objection.  Outside of
21 scope.  You can answer if you happen to know.
22          THE WITNESS:  If -- well, their home

---

264

1 agency indicates.  If they are an FBI employee, the
2 FBI.  If they were a DHS employee, it would come
3 from whatever DHS component that they worked for.
4          BY MR. ABBAS:
5    Q.    Right.  But Charles Kable is not on
6 assignment.  You are not on assignment?
7    **A.    Uh-huh.**
8    Q.    You know, you are a Terror Screening
9 Center employee, correct?
10    **A.    My check says FBI.**
11    Q.    So for Terror Screening Center employees,
12 their checks say FBI?
13    **A.    Yes.**
14    Q.    Charles Kable's check says?
15    **A.    Would say FBI.**
16    Q.    Would say FBI.  The persons at the Terror
17 Screening Center that accept nominations of U.S.
18 persons to the TSDB, do their checks as well say FBI
19 on them?
20    **A.    If they are FBI employees.**
21    Q.    So there are some persons who accept
22 nominations of U.S. -- I am going to start again.  I

---

Transcript of Timothy P. Groh, Designated Representative
Conducted on March 1, 2018

265

1  am not going to.  I am actually going to change
2  directions.  Do STOPSO contractors have access to
3  TSDB information that regards U.S. persons in the
4  TSDB?
5          MS. KONKOLY:  Objection.  Vague.
6  Objection insofar as the answer would call for
7  information protected by the law enforcement
8  privilege.  You can answer if you can.
9          THE WITNESS:  Yes.
10         BY MR. ABBAS:
11     Q.   Do Sotera employees - do Sotera
12 contractors have access to TSDB information
13 regarding U.S. persons on the TSDB there?
14         MS. KONKOLY:  Objection.  Vague.
15 Objection insofar as the answer calls for
16 information protected by the law enforcement
17 privilege.  You can answer if you can.
18         THE WITNESS:  Some would, yes.
19         BY MR. ABBAS:
20     Q.   Does TSC have a view as to whether TSDB
21 listees like being in the Terror Screening Center
22 database?

266

1          MS. KONKOLY:  Objection.  Vague.
2  Objection.  Calls for speculation.
3          THE WITNESS:  I almost don't know how to
4  answer that.  Do they like being in the TSDB?  One,
5  I don't -- if they know.
6          BY MR. ABBAS:
7      Q.   Sure.
8      **A.   Then, sure, I could speculate that people**
9  **might not like that idea.**
10     Q.   Why?  Why does TSC believe that persons
11 in the TSDB would not like being in the TSDB?
12         MS. KONKOLY:  Objection.  Vague.
13 Objection.  Calls for speculation.
14         THE WITNESS:  I can think of a variety of
15 different reasons that people --
16         BY MR. ABBAS:
17     Q.   I would like all of the reasons.  I would
18 like all of the variety of reasons you can think of?
19     **A.   Okay.  Then how much time have we got**
20 **left?**
21     Q.   We will spend 20 minutes.
22     **A.   So I would say --**

267

1          MS. KONKOLY:  And let just put an
2  objection that that's vague and calls for
3  speculation.  It is not within the scope of the
4  topics here.  You can answer to the extent you feel
5  you can.
6          THE WITNESS:  In the first instance, I
7  think someone that is involved in terrorism who is
8  trying to further whatever their ultimate aim is
9  would be disheartened to know that their -- that
10 they had been detected and that they might need --
11 you know, that their intentions might be thwarted by
12 virtue of the additional scrutiny that they may
13 receive.
14         BY MR. ABBAS:
15     Q.   Are there any other reasons why TSC
16 believes a person on the TSDB would not like being
17 in the TSDB?
18         MS. KONKOLY:  Objection.  Vague.  Calls
19 for speculation.  Outside the scope.  You can
20 answer.
21         THE WITNESS:  Well, it is hard for me to
22 know what is in other people's minds as to what the

268

1  potential consequences of what they believe might or
2  might not happen by virtue of being watch listed.
3  They might believe that it subjects them to all
4  kinds of potential surveillance.  They might believe
5  that, you know, they could actually be followed,
6  might be arrested.  Just any number of -- boy, the
7  hypotheticals are endless of what people might
8  believe from that.
9          BY MR. ABBAS:
10     Q.   Is -- the inclusion standard for the TSDB
11 is that there is reasonable suspicion that you are a
12 known or suspected terrorist; is that correct?
13         MS. KONKOLY:  Objection.  Vague.
14 Objection insofar as a complete answer would call
15 for information protected by the law enforcement
16 privilege.  You can answer to the extent you can.
17         THE WITNESS:  The standard to be a known
18 or suspected terrorist is reasonable suspicion,
19 which would include being on the TSDB.
20         BY MR. ABBAS:
21     Q.   Is that a -- is that a positive
22 description of a person that they are reasonably

269

1  suspected of being a known or suspected for
2  terrorist?
3        MS. KONKOLY: Objection. Calls for
4  speculation.
5        THE WITNESS: I think it leaves open the
6  possibility that the information -- I take it, it's
7  exactly what it means. It means the person is
8  suspected. It is certainly not proof beyond a
9  reasonable doubt. It is not conclusive.
10       BY MR. ABBAS:
11   Q.   But you disseminate it to 60 foreign
12  partners and more than 100,000 people inside the
13  United States?
14       MS. KONKOLY: Objection. Argumentative.
15       MR. ABBAS: That's fair. I withdraw the
16  question.
17       BY MR. ABBAS:
18   Q.   Identify all the consequences that TSC is
19  aware of that are experienced by TSDB listees?
20       MS. KONKOLY: Objection. Calls for
21  speculation. Objection insofar as the answer
22  implicates information protected by law enforcement

270

1  privilege or SSI or any information within the
2  purview of another agency. You can answer to the
3  extent that you can.
4        THE WITNESS: The consequences of being
5  in TSDB, I don't know that any of them are
6  automatic. We pass it downstream to the partners,
7  and then they make that decision thereafter. So I
8  can't say that as a consequence of being in TSDB
9  there is necessarily any consequence other than
10  reporting. And in many cases, individuals listed in
11  TSDB would be unaware of that.
12       BY MR. ABBAS:
13   Q.   I mean, you know, the screening agencies
14  clearly impose some type of consequence on persons
15  in the TSDB. And TSC has awareness of how some
16  agencies utilize TSDB information, correct?
17       MS. KONKOLY: Objection.
18       THE WITNESS: Sure. But for --
19       MS. KONKOLY: Argumentative, not a
20  question. You can answer if you can.
21       THE WITNESS: But for different
22  components. But you are saying just being listed in

271

1  the TSDB. So we understand selectee, right? But,
2  you know, people believe the consequences of that
3  are. No fly what they believe the consequences of
4  that are. Those are subcomponents of the TSDB. But
5  your question was for being part of TSDB in general.
6  And so I would say that there are no automatic
7  consequences for being part of the TSDB in general.
8        BY MR. ABBAS:
9    Q.   Does TSC have information about how
10  entities that receive TSDB information utilize the
11  disseminated TSDB information to the detriment of
12  TSDB listees?
13       MS. KONKOLY: Objection. Vague.
14  Objection insofar as that question calls for
15  information within the purview of other agencies or
16  would then -- that would be protected by the law
17  enforcement privilege or SSI. You can answer to the
18  extent that you can.
19       THE WITNESS: Well, I think it comes down
20  to what you mean by detriment. If you are a
21  terrorist, there are a lot of detriments to
22  intelligence being collected and reported back to

272

1  investigative agencies and intelligence agencies. I
2  think in -- for many individuals, they are likely
3  unaware of any TSDB status.
4        BY MR. ABBAS:
5    Q.   Is TSC aware of any consequences to
6  listees when their status as TSDB listees is
7  disseminated to other entities?
8        MS. KONKOLY: Objection. Vague.
9  Objection insofar as that calls for information
10  within the purview of other entities and/or insofar
11  as the answer calls for information protected by the
12  law enforcement privilege. You can answer to the
13  extent you can. And if I didn't say vague, I want
14  to make sure I got that.
15       THE WITNESS: Certainly we are aware that
16  TSA, for instance, subjects people to additional
17  screening for a variety of reasons, one of which
18  might be that they are listed on the selectee list.
19  And boarding is denied as a consequence sometimes
20  when it happens as a consequence of being on the
21  No-Fly List. So with respect to those two
22  components, yes, clearly State Department Customs

Transcript of Timothy P. Groh, Designated Representative
Conducted on March 1, 2018

69 (273 to 276)

273

1  and Border Protection as they are doing their border
2  authorities would obviously use the fact that
3  somebody is listed in TSDB to make further inquiry.
4  And they might make a decision based on that, that's
5  triggered really by the pointer that somebody is
6  included in TSDB.
7     Q.  Pointer.  What do you mean pointer?
8     **A.   That mere presence in the TSDB is not**
9  **going to -- they will make their own determination**
10 **based on information.  TSDB will help them find**
11 **information.  But mere presence in the TSDB does not**
12 **have automatic consequences outside of the aviation**
13 **security context for anyone with a possible**
14 **exception of if they have an active warrant.**
15    Q.  Does -- does TSC believe that USCIS, for
16 instance, adjudicates immigration applications
17 differently with regards to TSDB listees than it
18 does with persons who are not TSDB listees?
19    MS. KONKOLY:  Objection insofar as that
20 answer calls for information within the purview of
21 CIS.  You can answer to the extent that you know.
22 But your answer does not bind any other agency.

274

1  And, also, insofar as it would call for any law
2  enforcement-protected information, you can answer to
3  the extent you can.
4     THE WITNESS:  Fundamentally the answer is
5  no.  But I would go back to our effort to provide
6  that common operating picture to make it easier for
7  them to discover information that they need to have
8  in order to make their -- to make their decisions
9  per their authorities.  I just want to clarify.
10 Derogatory information isn't contained in TSDB.
11    BY MR. ABBAS:
12    Q.  Right.  Yeah, that's my next question.
13 So when TSC disseminates TSDB information to CBP, it
14 is literally -- it is just a list of names, correct?
15    MS. KONKOLY:  Objection.
16    BY MR. ABBAS:
17    Q.  I am sorry.  Let me withdraw.  It is a
18 compilation of identifying information?
19    MS. KONKOLY:  Objection insofar as the
20 answer calls for information protected by the law
21 enforcement privilege.  You can answer to the extent
22 that you can.

275

1     THE WITNESS:  It is identifying
2  information -- biographic and biometric information.
3     BY MR. ABBAS:
4     Q.   And it does not contain any of the
5  derogatory information that TSC relied upon to
6  accept the nomination to the TSDB, correct?
7     **A.   Correct.**
8     Q.   So when CBP -- does CBP -- so a secure
9  flight is TSA's way of matching TSDB information to
10 passenger information, correct?
11    MS. KONKOLY:  Objection insofar as that
12 calls for information from the purview of TSA.  You
13 can answer to the extent you understand.
14    THE WITNESS:  I don't believe I can
15 answer that one.
16    MS. KONKOLY:  Okay.
17    BY MR. ABBAS:
18    Q.   Does TSC understand -- is it TSC's
19 understanding that CBP utilizes TSDB information to
20 screen persons that cross U.S. borders?
21    MS. KONKOLY:  Objection insofar as that
22 question calls for information within the purview of

276

1  TSA.  You can answer as to your understanding.  The
2  answer isn't binding.
3     THE WITNESS:  Yes, I believe that CBP
4  uses TSDB information amongst lots of other
5  information as they do border screening.
6     BY MR. ABBAS:
7     Q.   I am sorry.  Does CBP have any access to
8  the derogatory information that was -- that TSC
9  relied upon to accept a nomination to the TSDB?
10    MS. KONKOLY:  Objection insofar as that
11 answer calls for information within protections of
12 the law enforcement privilege and to the extent it
13 calls for information within another agency's
14 purview.  You can answer to the extent you can.
15    THE WITNESS:  I believe they have access
16 to the derogatory information.
17    BY MR. ABBAS:
18    Q.   How?  How does CBP have access to the
19 derogatory information that TSC relies upon to
20 accept nominations to the TSDB?
21    MS. KONKOLY:  Objection insofar as that
22 answer calls for information protected by the law

277

1 enforcement privilege.  Also, objection insofar as
2 that answer calls for information within another
3 agency's purview.  You can answer to the extent that
4 you can.
5          THE WITNESS:  I don't think I can answer
6 that on their behalf.
7          BY MR. ABBAS:
8     Q.   I mean, TSC has the database that holds
9 the derogatory information that TSC relies upon to
10 accept TSDB nominations, correct?
11         MS. KONKOLY:  Objection.
12 Mischaracterizes prior testimony.  Objection insofar
13 as --
14         BY MR. ABBAS:
15    Q.   I am going to withdraw it.  Where does
16 the derogatory information that underlies TSDB
17 nominations live?
18         MS. KONKOLY:  Objection insofar as the
19 answer to that question calls for information
20 protected by law enforcement privilege.  You can
21 answer to the extent that you can.  Also, vague.
22         THE WITNESS:  So we have talked about it

278

1 previously.  In the case of international terrorism,
2 it primarily or fully resides in TIDE.  And in the
3 context of domestic terrorism information, it would
4 reside in Sentinel.
5          BY MR. ABBAS:
6     Q.   Right, Sentinel.  And the FBI controls
7 Sentinel, correct?
8     **A.   Sentinel is the FBI's case management**
9 **system, yes.**
10    Q.   Does TSC always have access to the
11 underlying derogatory information that regards
12 nominations to the TSDB?
13         MS. KONKOLY:  Objection insofar as that
14 answer calls for law enforcement privileged
15 information.  Objection.  You can answer to the
16 extent that you can.
17    THE WITNESS:  Yes.
18         BY MR. ABBAS:
19    Q.   Does TSC facilitate the dissemination of
20 Sentinel information to other agencies?
21         MS. KONKOLY:  Objection.  Vague.
22 Objection insofar as the answer calls for

279

1 information protected by the law enforcement
2 privilege.  You can answer to the extent that you
3 can.
4          THE WITNESS:  I mean, Sentinel -- as the
5 FBI manages its investigations there when the FBI
6 does a nomination, it begins in Sentinel.  It goes
7 through the various processes.  It ends up in
8 TSDB -- you know, the biographic information.  So in
9 as much as Sentinel feeds nominations into TSDB, I
10 suppose that would be true.  But beyond that, I
11 don't know if you have a question beyond that.
12         BY MR. ABBAS:
13    Q.   No, I think that does that.  Does TSC
14 believe that the Terror Screening Center database is
15 an effective counterterrorism program?
16         MS. KONKOLY:  Objection.  Vague.
17 Objection as to scope.  Objection insofar as the
18 answer calls for law enforcement-protected
19 information or information within the purview of
20 another agency.  You can answer to the extent that
21 you can.
22         THE WITNESS:  Yes.

280

1          BY MR. ABBAS:
2     Q.   What is the basis of TSC's belief that
3 the TSDB is an effective counterterrorism program?
4          MS. KONKOLY:  Objection.  Vague.
5 Objection insofar as the answer calls for
6 information protected by the law enforcement
7 privilege or information within the purview of
8 another agency.  You can answer to the extent that
9 you can.
10         THE WITNESS:  So I think there are many
11 layers to that.  And that is, you know, a central
12 question of my position.  I think that you begin by
13 looking at what doesn't happen, which is one way of
14 evaluating.  I think you also look at what does
15 happen.  And any time there is a terrorist event of
16 any kind, then that will cause us to do an after
17 action to determine if the individual or individuals
18 involved in that were known to us, if they were
19 watch-listed.  If they were not, why not; what
20 screening opportunities either way might we have
21 had; what screening opportunities did we have, how
22 were those handled.  Was anything missed?  Were

Transcript of Timothy P. Groh, Designated Representative
Conducted on March 1, 2018

71 (281 to 284)

---

281

1 things properly disseminated?  So there is that
2 constant after action going on.
3          Beyond that, we look to make sure that
4 our data is current, accurate, thorough.  So there
5 are consistent audits.  There are internal reviews.
6 There is extensive oversight on the part of the
7 inspector general from DOJ, the inspector general
8 from Homeland Security, and other inspectors
9 general.
10          There is oversight by the Privacy
11 Liberties Oversight Board.  So there are constant
12 audits that sometimes are the result of an event,
13 sometimes are the result of a periodic review.
14 There is the anecdotal feedback we get as we
15 disseminate as to whether or not that information
16 was useful to our screening partners and to
17 investigative and intelligence agencies.
18          MR. ABBAS:  How much time do we have left
19 before the tape ends?
20          THE VIDEOGRAPHER:  Three minutes.
21          BY MR. ABBAS:
22     Q.    You said that TSC creates these

---

282

1 after-action reports?
2     **A.    We conduct an after action.  We review it**
3 **after each incident.  It doesn't necessarily result**
4 **in a written report.**
5     Q.    Every time there is an active terrorism
6 inside the United States?
7     **A.    And often internationally.**
8     Q.    And often internationally.  So let's do
9 domestic first and then we will do international.
10 Every time there is a domestic terrorism event, TSC
11 reviews that incident to determine whether the
12 perpetrator was in the TSDB or not, correct?
13     **A.    That's the beginning of the analysis,**
14 **yes.**
15          MR. ABBAS:  Indiana, Arizona.
16          BY MR. ABBAS:
17     Q.    Do those after-action reports -- I am
18 sorry.  Do those after-action reviews get
19 memorialized in documents?
20          MS. KONKOLY:  Objection insofar as the
21 answer calls for any information protected by the
22 law privilege.  You can answer to the extent that

---

283

1 you can.
2          THE WITNESS:  They are sometimes
3 memorialized, not always.  Sometimes via email and
4 sometimes in significant cases there may be a
5 written product that might be something we have done
6 or something the FBI has done or something an IG or
7 inspector general has done.  And there have been
8 reports published by the inspector general on such
9 major events anyway.
10          BY MR. ABBAS:
11     Q.    But, certainly, the Terror Screening
12 Center has as its goal the inclusion of persons who
13 intend to commit acts of terrorism, correct?
14     **A.    Absolutely.**
15     Q.    And in pursuit of that goal, TSC reflects
16 on instances when perpetrators of terrorism are not
17 in the TSDB, correct?
18     **A.    Yes, together with our other partners.**
19     Q.    How many perpetrators of terrorism inside
20 the United States were not in the TSDB at the time
21 they committed their act of terrorism?
22          MS. KONKOLY:  Objection.  That question

---

284

1 calls for information protected by the law
2 enforcement privilege and potentially the state
3 secrets.  I am going to instruct the witness not to
4 answer that question.
5          BY MR. ABBAS:
6     Q.    Does TSC know how many persons who have
7 committed an act of terrorism inside the United
8 States have not been in the TSDB at the time they
9 committed their act of terrorism?
10          MS. KONKOLY:  Objection insofar as that
11 answer calls for information protected by the law
12 enforcement or the state secret privilege, but you
13 can answer to the extent that you can.
14          THE WITNESS:  I don't know the answer off
15 the top of my head, but the TSC could determine
16 that.
17          MR. ABBAS:  Let's stop there.  Can we
18 take a 10-minute break?  I am feeling winded.
19          MS. KONKOLY:  I would like to keep it as
20 short as possible to get out of here as soon as
21 possible.
22          MR. ABBAS:  Ten minutes is very

---

Transcript of Timothy P. Groh, Designated Representative

72 (285 to 288)

Conducted on March 1, 2018

285

1  reasonable.  How much time is -- how much on the
2  record do we have?
3        MS. KONKOLY:  Can we say seven, so we
4  actually mean 10?
5        THE VIDEOGRAPHER:  We are going off the
6  record.  The time is 4:03 p.m.
7        (A recess was held.)
8        THE VIDEOGRAPHER:  Here begins tape
9  number one for the videotaped deposition of Timothy
10 Paul Groh.  We have been on the record for five
11 hours and six minutes.  The time on the video
12 monitor is 4:16 p.m.  And we are back on the record.
13       BY MR. ABBAS:
14  Q.   Has the TSDB ever stopped an act of
15 terrorism inside the United States?
16       MS. KONKOLY:  Objection.  Calls for
17 speculation.  Objection insofar as that information
18 -- answer calls for information protected by law
19 enforcement or the state secret privilege.
20 Objection.  Vague.  You can answer if you think you
21 can.
22       THE WITNESS:  So I think it is impossible

286

1  for the TSDB alone to ever stop anything.  That
2  said, I do believe there are cases where the TSDB
3  has led to information that wouldn't have been
4  discovered but for the TSDB that has then stopped
5  acts of terrorism in the United States.
6        BY MR. ABBAS:
7   Q.   How many acts of terrorism inside the
8  United States does TSC believe that the TSDB has
9  prevented?
10       MS. KONKOLY:  Objection.  Vague.
11 Objection insofar as that question calls for
12 information protected by the law enforcement or
13 potentially state secret privileges.  You can answer
14 if you can.
15       BY MR. ABBAS:
16  Q.   And I am asking for a number.  That's all
17 I am asking for.
18       MS. KONKOLY:  Same objections.
19       THE WITNESS:  The only thing I think I
20 can say is multiple.
21       BY MR. ABBAS:
22  Q.   More than five?

287

1        MS. KONKOLY:  Objection.  Calls for
2  speculation.  Objection insofar as that information
3  -- the answer calls for information protected by law
4  enforcement or potentially the state secrets
5  privilege.  If you think you can answer, you can.
6        THE WITNESS:  I think more than five.
7        BY MR. ABBAS:
8   Q.   More than ten?
9        MS. KONKOLY:  Same set of objections.
10 Vague.  Calls for speculation insofar as it calls
11 for information protected by the law enforcement or
12 potentially the state secrets privilege.  But you
13 can answer if you can.
14       THE WITNESS:  Yeah, I don't think I can
15 further answer that.
16       BY MR. ABBAS:
17  Q.   More than 20.
18       MS. KONKOLY:  Same objections.  Vague,
19 calls for speculation.  Calls for information
20 protected by the law enforcement, potentially state
21 secrets privileges.  If you think you can answer,
22 you can.

288

1        THE WITNESS:  Same.
2        BY MR. ABBAS:
3   Q.   When you say that the TSDB has prevented
4  multiple acts of terrorism inside the United States,
5  in your head do you have specific instances of the
6  TSDB stopping acts of terrorism inside the United
7  States?
8        MS. KONKOLY:  Objection.  Vague.
9  Objection insofar as that calls for information
10 protected by the law enforcement or potentially
11 state secrets privileges.  You can answer if you
12 think you can.
13       THE WITNESS:  I do.  And in particular
14 cases, yes.
15       BY MR. ABBAS:
16  Q.   How many particular cases are you
17 specifically aware of that you are claiming the TSDB
18 has stopped acts of terrorism inside the United
19 States?
20       MS. KONKOLY:  Objection.  Vague, calls
21 for speculation.  Objection.  Asked and answered.
22 Objection insofar as this answer calls for

Transcript of Timothy P. Groh, Designated Representative
Conducted on March 1, 2018

73 (289 to 292)

---

289

1  information protected by the law enforcement
2  privilege or the state secrets privilege.  If you
3  think there is something where you haven't already
4  said that is not privileged --
5  　　　THE WITNESS:  I do not.
6  　　　BY MR. ABBAS:
7  　　Q.　And is it your testimony today that the
8  TSDB has stopped more than 20 acts of terrorism
9  inside the United States?
10  　　　MS. KONKOLY:  Same set of objections.
11 Asked and answered.  Calls for speculation, vague.
12 Objection.  Calls for information protected by the
13 law enforcement and potentially the state secrets
14 privilege.
15  　　　THE WITNESS:  I don't know why you would
16 think that I said that.  I did not say that.
17  　　　MS. KONKOLY:  Mischaracterizes prior
18 testimony.
19  　　　BY MR. ABBAS:
20  　　Q.　If you do not believe that the Terror
21 Screening Center -- I am sorry.  I think you must
22 have misunderstood my question.  Is it the -- does

---

290

1  the Terror Screening Center believe that the TSDB
2  has stopped more than 20 acts of terrorism inside
3  the United States?
4  　　　MS. KONKOLY:  Objection.  Asked and
5  answered.  Objection.  Vague, calls for speculation.
6  Objection.  Calls for information protected by the
7  law enforcement privilege and potentially the state
8  secrets privilege.  If you think there's --
9  　　　THE WITNESS:  I don't think I can further
10 answer.
11  　　　BY MR. ABBAS:
12  　　Q.　So you have no -- you are not going to
13 tell me anything about the number of times you have
14 in your head when -- you said multiple.  So that
15 means at least two times you believe that the TSDB
16 has stopped an act of terrorism inside the United
17 States, correct?
18  　　A.　I agree that I said multiple.  And I
19 agree that multiple means more than two.
20  　　Q.　Okay.  So I want to see like an upper --
21 I think you see.  I want to see like the upper
22 threshold.

---

291

1  　　A.　Yes, I understand.  And I am saying that
2  I don't believe I can.
3  　　　MS. KONKOLY:  And I want to interpose an
4  objection.
5  　　　BY MR. ABBAS:
6  　　Q.　Well, I will ask an easy question.  Let
7  me ask an easy question.  Has the Terror Screening
8  Center stopped more than a thousand acts of
9  terrorism inside the United States?
10  　　　MS. KONKOLY:  Objection.  Calls for
11 speculation.  Objection.  Vague.  Objection.  Calls
12 for information within law enforcement and
13 potentially the state secrets privilege.  If you
14 think you can answer --
15  　　　THE WITNESS:  I don't believe I can
16 answer anything more than I already have.
17  　　　BY MR. ABBAS:
18  　　Q.　You don't know whether the terror
19 screening -- so TSC doesn't have a position as to
20 whether or not the Terror Screening Database has
21 stopped more than 1000 acts of terrorism inside the
22 United States?

---

292

1  　　　MS. KONKOLY:  Objection.  Asked and
2  answered.  Objection.  Argumentative.
3  　　　BY MR. ABBAS:
4  　　Q.　I am done.  That's fine.  But what's the
5  answer?
6  　　A.　That I'm not answering.
7  　　　MS. KONKOLY:  Objection.  I entered the
8  privileges.  Same law enforcement and potentially
9  state secrets.
10  　　　BY MR. ABBAS:
11  　　Q.　Has there ever -- has TSC ever conducted
12 an assessment of the effectiveness of the Terror
13 Screening Center?
14  　　　MS. KONKOLY:  Objection.  Vague.
15 Objection insofar as it calls for information
16 protected by law enforcement.  You can answer to the
17 extent that you can.
18  　　　THE WITNESS:  As per my prior testimony,
19 I think that process is ongoing.  And there have
20 been certainly other large-scale comprehensive
21 audits.  I would just caution that it is necessary
22 to determine the effectiveness since the TSDB does

---

Transcript of Timothy P. Groh, Designated Representative

Conducted on March 1, 2018

293

1 not by itself do anything.  It is only in
2 partnership with other agencies that those sort of
3 determinations require a look across multiple
4 agencies.  Those kinds of broad assessments are
5 being almost continuously conducted by the
6 inspectors general and the GAO at the request of
7 Congress.
8        BY MR. ABBAS:
9    Q.  I am going to ask a question.  We are now
10 going to move to the DHS TRIP process and TSC's role
11 in the DHS TRIP process.  How are persons removed
12 from the TSDB?
13        MS. KONKOLY: Objection.  Vague.
14        BY MR. ABBAS:
15    Q.  I'm sorry.  Let me withdraw that
16 question.  Are there multiple ways in which a person
17 listed in the TSDB can be removed from the TSDB?
18    **A.  I don't know if you mean that the process**
19 **could be started or that the actual removal is**
20 **accomplished.**
21    Q.  Are there multiple ways in which a person
22 can be ultimately removed from the TSDB?

294

1    **A.  Any removal is going to go through the**
2 **same technical process.**
3    Q.  What is the technical process of removal
4 of a person from the TSDB?
5        MS. KONKOLY: Objection.  Vague and
6 objection insofar as this answer calls for
7 information held by or equities possessed by other
8 agencies.
9        THE WITNESS: The Nominations Data
10 Integrity Unit that handles nominations would
11 process.  Their analysts would go in and in their
12 work flow with TSDB, they would enter a removal
13 action.  And no matter how we got to that point,
14 that's the ultimate point at which that removal
15 would occur.
16        BY MR. ABBAS:
17    Q.  So the folks in NDIU would enter what's
18 called a removal action?
19    **A.  Correct.**
20    Q.  Is that like a form?
21    **A.  It is an electronic form.  So electronic**
22 **work flow might be a better way to put it.**

295

1    Q.  But there are multiple ways at arriving
2 at a removal action, correct?
3    **A.  Yes.**
4    Q.  Identify all the ways that we can arrive
5 at a removal action?
6        MS. KONKOLY: Objection.
7        BY MR. ABBAS:
8    Q.  Let me withdraw.  Identify all the ways
9 that TSC personnel issue a removal action.
10       MS. KONKOLY: Objection.  Vague.  I would
11 also just note that topic two expressly excluded the
12 revised redress process for U.S. persons on the
13 No-Fly List, so.
14       MR. ABBAS: I am asking about the TSDB.
15 I am not asking about the No-Fly List.
16       MS. KONKOLY: Well, the TSDB includes the
17 No-Fly List.
18       By MR. ABBAS: I am asking about the
19 TSDB.  The topic includes the TSDB.  And I'm asking
20 about the TSDB.
21       MS. KONKOLY: Well, I am objecting as to
22 scope insofar as that implicates the No-Fly List,

296

1 which has been expressly excluded from this topic by
2 the court's order.  And I would instruct the witness
3 not to answer questions that have to do with the
4 revised redress process insofar as your answer
5 implicates or could potentially implicate that
6 revised process for U.S. persons on the No-Fly List.
7 I am instructing you not to answer questions as to
8 that piece of the process.
9        THE WITNESS: I understand.
10       MS. KONKOLY: You can answer the
11 remaining portion of that question.
12       THE WITNESS: So it is -- there could be,
13 as I previously stated, a multitude.  I would
14 endeavor to give you the ones that I can think of
15 with the caveat that wherever it makes sense to do a
16 removal, then that's where we would do it.  The
17 simplest way is the original nominating agency
18 request removal based on either new information,
19 exculpatory information, or a retraction of the
20 derogatory information.  Then we would look at that,
21 look at all the information out there and make a
22 determination whether or not the person still meets

Transcript of Timothy P. Groh, Designated Representative

Conducted on March 1, 2018

75 (297 to 300)

297

1  the appropriate standard.  That would come from the
2  nominating agency.  It is possible as a result of an
3  encounter that we would acquire new information.
4  Again, it could be exculpatory.  It could be
5  information that refutes.  It could be something
6  that goes to the credibility of a source that would
7  cause us to re-evaluate that and cause us to perform
8  a removal.
9      Q.   Are nominating agencies obligated in some
10 manner to provide TSC with exculpatory information
11 regarding TSDB listees?
12         MS. KONKOLY: Objection insofar as that
13 calls for any information protected by the law
14 enforcement privilege or any information within the
15 purview of other equities belonging to other
16 agencies.  But you can answer so far as you can.
17         BY MR. ABBAS:
18     Q.   Let me rephrase the question.  Does TSC
19 require nominating agencies to provide TSC with
20 exculpatory information regarding TSDB listees that
21 the nominating agency learns of?
22         MS. KONKOLY: Objection.  Vague.

298

1          THE WITNESS: Yes.
2          BY MR. ABBAS:
3      Q.   You require -- how do you enforce the
4  requirement against nominating agencies that
5  requires them to provide TSC with exculpatory
6  information that the nominating agency finds about
7  TSDB listees?
8          MS. KONKOLY: Objection.  Vague.  You can
9  answer.
10         THE WITNESS: So you say require.  I
11 would go back to my previous testimony about -- it
12 is the same as our expectation that they will
13 provide nominations to us when they have
14 information.  I also have the expectation and
15 agreement that they will provide exculpatory.
16         To go to your question when, we conduct
17 periodic reviews based on a number of factors.
18 Periodic reviews are different kinds of reviews for
19 different categories of records.  Some are random
20 reviews where we review derogatory.  We review
21 derogatory information in U.S. Government holdings,
22 not just necessarily that's reported to us.  And we

299

1  can -- basically, we will modify our records on our
2  own if we find information out there that
3  contradicts, refutes, or otherwise would cause us to
4  modify a record.  We want it to be thorough and
5  accurate and current.  And we have no interest in
6  anybody being in TSDB who shouldn't be there.
7          BY MR. ABBAS:
8      Q.   Are there innocent people in the TSDB?
9          MS. KONKOLY: Objection.  Calls for
10 speculation.  Vague.
11         THE WITNESS: There are no innocent
12 people that I am specifically aware of that are in
13 TSDB.  Inasmuch as we find people that, again, those
14 previous -- as soon as we find somebody that we no
15 longer believe meets criteria, then we immediately
16 remove them.
17         BY MR. ABBAS:
18     Q.   Does TSC keep track of which TSDB
19 listees' entries have been supplemented with
20 exculpatory information uncovered by any entity
21 subsequent to the TSDB's placement in the TSDB?
22         MS. KONKOLY: Objection.  Vague.

300

1  Objection insofar as the answer calls for
2  information protected by the law enforcement
3  privilege.  You can answer if you can.
4          THE WITNESS: So if somebody is removed,
5  they are removed.  So they don't show up if you do a
6  search as somebody that's been removed with the
7  caveat that there is an audit history that only a
8  very, very few individuals at TSC have access to.
9          BY MR. ABBAS:
10     Q.   So TSC keeps a record of persons that
11 have once been in the TSDB but are no longer in the
12 TSDB, correct?
13     **A.   It is necessary to do so, yes.**
14     Q.   Why is it necessary to do so?
15         MS. KONKOLY: Objection.  Vague.
16 Objection insofar as that answer calls for --
17         MR. ABBAS: He said necessary.  I am just
18 asking --
19         MS. KONKOLY: And the rationale may
20 implicate privileged information protected by the
21 law enforcement privilege and potentially state
22 secrets in an individual case.  You can answer to

Transcript of Timothy P. Groh, Designated Representative
Conducted on March 1, 2018

76 (301 to 304)

301

1  the extent that you can.
2       THE WITNESS:  For instance, if somebody
3  was then renominated, you would want to be able to
4  have a flag that you had previously removed them.
5  For instance, you could have circular reporting that
6  came up to another agency -- another agency, based
7  on the same original derog; nominate somebody we
8  would want to be able to detect that so we don't
9  accidently re-watch list somebody that had
10 previously been removed.
11     Q.   People listed on the Terror Screening
12 Database have filed lawsuits against the Terror
13 Screening Center, correct?
14     **A.   I am aware of that.**
15     Q.   Including the 25 plaintiffs in this case,
16 correct?
17     MS. KONKOLY:  Objection.  Misleading
18 insofar as that question implies that the 25
19 plaintiffs are in the TSDB.  And objection --
20     BY MR. ABBAS:
21     Q.   Sure.  That's fair.  Question withdrawn.
22 People who believe that they are in the TSDB have

302

1  filed lawsuits against the Terror Screening Center,
2  correct?
3      **A.   Yes.**
4      Q.   Does TSC annotate TSDB entries to reflect
5  whether the listee is currently engaged in
6  litigation against the Federal Government?
7      **A.   No.**
8      MS. KONKOLY:  Objection.  Vague.
9      BY MR. ABBAS:
10     Q.   Has TSC made any removal decisions in
11 light of ongoing litigation against the TSC brought
12 by persons who allege they are included in the TSDB?
13     MS. KONKOLY:  Objection vague.  Objection
14 insofar as the answer would indicate any information
15 protected by law enforcement privilege.  But you can
16 answer if you can.
17     THE WITNESS:  Not because they filed --
18 not because they filed litigation or I would say
19 redress.  Any reason that causes us to look at a
20 record where we then find that it either -- that it
21 does no longer meet criteria, we would remove at
22 that point regardless of status of litigation or not

303

1  litigation.
2      BY MR. ABBAS:
3      Q.   So litigation is a reason that TSC has
4  utilized in the past to assess the sufficiency of
5  the derogatory information relied upon to accept a
6  TSDB nomination?
7      MS. KONKOLY:  Objection.  Vague and
8  mischaracterizes prior testimony.
9      THE WITNESS:  Yeah, absolutely is not a
10 criteria for removal.  For instance, in the scope of
11 answering an interrogatory or preparing it,
12 certainly if we come across for any reason,
13 including that, a reason to believe that a record is
14 not properly maintained or is no lopper properly
15 maintained, then we are -- regardless of any status,
16 we are going to make the appropriate decision on
17 that.
18     BY MR. ABBAS:
19     Q.   So has litigation ever prompted TSC to
20 reconsider a listee's status in the TSDB?
21     MS. KONKOLY:  Objection.  Asked and
22 answered.

304

1      THE WITNESS:  I can't think of
2  particular -- if you are talking about Federal
3  Government litigation, no.  If you are talking about
4  redress, I would say yes.
5      BY MR. ABBAS:
6      Q.   So federal litigation has never prompted
7  TSC to revisit the priority of a placement in the
8  TSDB?
9      MS. KONKOLY:  Objection.  Vague and
10 mischaracterizes prior testimony.
11     THE WITNESS:  I just -- I just can't
12 think of a particular one.  There is no reason why
13 it would be different from redress.  I just can't
14 think of one.
15     BY MR. ABBAS:
16     Q.   I don't understand.  You can't think of
17 one what?
18     **A.   Of a situation where pending formal**
19 **litigation has caused us to review a particular**
20 **record and in that review, we have decided that it**
21 **didn't meet the appropriate standards.  I can think**
22 **of redress cases where in the course of reviewing --**

Transcript of Timothy P. Groh, Designated Representative
Conducted on March 1, 2018

77 (305 to 308)

305

1  reviewing something, we became aware of information
2  that caused us to remove or modify a record. But
3  there is no reason why those would be fundamentally
4  different.
5      Q.   Sure. Could TSC remove someone from the
6  TSDB prior to the conclusion of the DHS TRIP redress
7  process?
8      A.   Yes. As I just testified, at any point
9  if we become aware of that, then we are not going to
10 wait for the process to terminate. Again, we want
11 it to be current, accurate, and thorough. And if it
12 no longer meets, it no longer meets regardless of
13 any process.
14     Q.   So my understanding is that the TSA
15 administrator has -- I guess that's no final
16 specific -- who has final -- what is TSC's
17 understanding of who has the final say as to whether
18 a person on the selectee list's redress complaint
19 results in a change in watch list status?
20         MS. KONKOLY: Calls for a legal
21 conclusion. You can answer.
22         THE WITNESS: The TSA administrator.

306

1          BY MR. ABBAS:
2      Q.   Okay. In that regards, whether it is the
3  No-Fly List or the selectee list, the TSA
4  administrator has the final say, correct?
5      A.   Yes.
6          MS. KONKOLY: Objection. Vague.
7          MR. ABBAS: Luckily we got that answer.
8          BY MR. ABBAS:
9      Q.   TSC has a Redress Unit, correct?
10     A.   Yes.
11     Q.   How many people are in the Redress Unit?
12     A.   About half a dozen.
13     Q.   What do -- what does the TSC Redress Unit
14 do?
15     A.   They receive redress. I think it is
16 complaints from -- from DHS TRIP that DHS TRIP
17 believes have an nexus to the TSDB. They then do a
18 de novo review of those complaints. They go back to
19 the beginning of the record wherever that started.
20 They will contact the nominator to find out if the
21 information originally provided is still current,
22 check with them to see if there is any additional

307

1  information. They will compare that against the
2  standards and ultimately make either -- either
3  decide if it's a TSDB status or recommend to the TSA
4  administrator any appropriate changes to watch
5  listing status for that person.
6      Q.   How does TSC Redress Unit personnel
7  confirm the accuracy of information the nominating
8  agency relied upon to submit the nomination?
9      A.   So they will review the derogatory
10 information as it appears in those other two systems
11 in Sentinel and/or TIDE.
12     Q.   So say they just review the face of the
13 derogatory -- whatever the description is that the
14 nominating agency provided in Sentinel.
15         MS. KONKOLY: Okay. I just note that
16 that was an interruption to his answer. He was not
17 done. Your question mischaracterizes his testimony,
18 which he was not finished giving. Objection. Vague
19 and argumentative and potentially protected by
20 attorney -- I am sorry. Not attorney/client
21 privilege, but a law enforcement privilege. Let's
22 rephrase. I think we can continue with --

308

1          BY MR. ABBAS:
2      Q.   Sure. And I apologize Mr. Groh for
3  interrupting. I am just trying to understand. This
4  is all new to me. I mean, how is the derogatory
5  information -- how does the -- how does the
6  derogatory information appear to TSC Redress Unit
7  employees?
8          MS. KONKOLY: Wait. Can you repeat the
9  question? I didn't hear that.
10         MR. ABBAS: Sure. Could you read it
11 back?
12         (The record was read.)
13         THE WITNESS: The same way it does to
14 NDIU employees. They access TIDE or Sentinel and
15 review whatever the original derogatory information
16 was.
17         BY MR. ABBAS:
18     Q.   Is the derogatory -- does the like -- so
19 if the FBI nominates someone, the derogatory
20 information would be in Sentinel, correct?
21     A.   Yes.
22     Q.   So it's like the FBI agent that nominates

Transcript of Timothy P. Groh, Designated Representative

78 (309 to 312)

Conducted on March 1, 2018

309

1  a person to the TSDB, they will type information
2  into Sentinel that's viewable by NDIU and redress --
3  TSC Redress Unit employees?
4        MS. KONKOLY: Objection insofar as that
5  calls for information in the purview of the FBI.
6  You can answer as to your understanding.
7        THE WITNESS: The -- yeah, there is a
8  nominations form that they will fill out.  But there
9  is also basically the case file that that nomination
10 form is part of.  And so, generally, they are going
11 to have access to that entire case file.
12       BY MR. ABBAS:
13    Q.    Does TSC require NDIU employees to review
14 the entire case file prior to making a decision
15 regarding whether or not to remove a person from the
16 TSDB?
17       MS. KONKOLY: Objection insofar as that
18 calls for information protected by a law enforcement
19 privilege.  You can answer if you can.
20       THE WITNESS: So it is a multi-step
21 process.  If the agent nominates their supervisor,
22 we will approve.  It then comes to a unit in the

310

1  Terror Screening Center Terrorist Review and
2  Examination Unit, otherwise known as TREX.  They
3  will then review the nomination.  They will
4  generally review the file.  I don't know that -- I
5  can't speak for did they look at every one of
6  potentially hundreds of thousands serials.  You
7  know, they are going to look at the derog.  And they
8  are going to make an assessment based on that
9  information.  That will then, if it's an
10 international terrorism nomination, go to the
11 National Counter-Terrorism Center.  They will review
12 the nomination.  Then it will come back to NDIU.
13 And they will as almost a third agency review the
14 nomination before it is then accepted in the TSDB.
15    Q.    Or rejected?
16    **A.    Or rejected.  And it could have been
17 rejected in any of those previous steps, also.**
18    Q.    Got it.  So nomination -- so let me just
19 make sure I got it.  You have a nominating agent?
20    **A.    In the FBI, yes.**
21    Q.    In the FBI.  But there are other
22 nominating agencies, correct?

311

1    **A.    Absolutely.  That's the FBI's process.**
2    Q.    HHS can nominate, correct.
3        MS. KONKOLY: Objection insofar as that
4  calls for law enforcement privilege.
5        BY MR. ABBAS:
6    Q.    Whether HHS -- who are the agencies that
7  can submit nominations to the Terror Screening
8  Center?
9        MS. KONKOLY: And I am going to object on
10 the grounds --
11       MR. ABBAS: I am going to withdraw the
12 question.  I actually have the answer.
13       BY MR. ABBAS:
14    Q.    So let me just go with the FBI.  So are
15 there individual FBI agents that can just submit
16 nominations to the Terror Screening Center without
17 supervisory approval?
18    **A.    No.**
19    Q.    Are there variations in how FBI field
20 offices manage their agents submitting nominations
21 to the Terror Screening Center?
22       MS. KONKOLY: Objection that that

312

1  information calls for information within the purview
2  of the FBI.  You can testify as to your
3  understanding.  Also objection insofar as it calls
4  for information protected by the law enforcement
5  privilege.
6        THE WITNESS: It is a standardized
7  process across the FBI.
8        BY MR. ABBAS:
9    Q.    So there is no geographic variation in
10 the FBI nominating process?
11       MS. KONKOLY: Again, objection.
12       MR. ABBAS: Okay.  He answered.
13       MS. KONKOLY: Okay.  I am going to state
14 the objection that that called for information with
15 the purview of the FBI and that answer is not
16 binding on the agency.
17       BY MR. ABBAS:
18    Q.    Has TSC ever questioned the voracity of
19 information that a nominating agency has provided to
20 the Terror Screening Center?
21       MS. KONKOLY: Objection as to scope.
22 Objection, vague.  Calls for speculation;

Transcript of Timothy P. Groh, Designated Representative                79 (313 to 316)
Conducted on March 1, 2018

313

1 potentially information within the law enforcement
2 privilege.  You can answer to the extent that you
3 can.
4          THE WITNESS:  When you say voracity, I
5 mean, clearly from the fact that we reject
6 nominations, we disagree with the standard.  Whether
7 or not that is the same as voracity, I am not sure.
8 I don't know -- exactly understand what you mean by
9 voracity.
10          BY MR. ABBAS:
11     Q.    Well, you reject nominations for two
12 reasons, right?  If it doesn't meet the minimum
13 substantive derogatory information.  Is that what
14 you call it?
**15     A.    Yeah, you can.  That's fine.  I**
**16 understand what that means.**
17     Q.    The second reason is it doesn't meet the
18 minimum identifying information?
**19     A.    Basically, yes.**
20     Q.    And you all don't keep track of how many
21 nominations are rejected because of a failure to
22 meet minimum identifying derogatory information

314

1 versus minimum substantive derogatory information,
2 correct?
**3     A.    No, it is not easily tracked.**
4     Q.    Are you aware of nominations that have
5 been rejected because those nominations do not meet
6 the minimum substantive derogatory information?
7          MS. KONKOLY:  Objection insofar as it
8 calls for any information protected by law
9 enforcement privilege.  You can answer it insofar as
10 you can.
11          THE WITNESS:  Yes, we do reject for that
12 reason.
13          BY MR. ABBAS:
14     Q.    Which reason is more common -- more
15 commonly a basis for nomination rejection -- a
16 failure to meet minimum substantive derogatory
17 information standards or a failure to meet minimum
18 identifying information?
19          MS. KONKOLY:  Objection insofar as it
20 calls for information pertaining to the law
21 enforcement privilege.  You can answer insofar as
22 you can.

315

1          THE WITNESS:  I suspect that that answer
2 varies over time.  I think there have been times in
3 history where it has been one.  And I think there
4 have been times in history when it has been the
5 other.  I couldn't tell you at this particular
6 moment which one is more common.
7          MR. ABBAS:  Indiana.
8          BY MR. ABBAS:
9     Q.    Does the Terror Screening Center
10 independently investigate derogatory information
11 provided to it in support of nominations to the
12 TSDB?
13          MS. KONKOLY:  Objection insofar as that
14 question calls for information protected by the law
15 enforcement privilege.  You can answer if you can.
16          THE WITNESS:  So it depends on what you
17 mean by the word investigate.  If what we -- yeah,
18 so I will let you tell me.  What did you mean by the
19 word investigate?
20          BY MR. ABBAS:
21     Q.    Do you make an independent determination
22 as to the truthfulness of the information that

316

1 nominating agencies provide to the TSC?
2          MS. KONKOLY:  Objection insofar as it
3 calls for any information protected by law
4 enforcement privilege.  You can answer if you can.
5          THE WITNESS:  So certainly the TSC
6 doesn't go out into the field and interview people.
7          BY MR. ABBAS:
8     Q.    Okay.
**9     A.    That said, when we assess, we check all**
**10 the intelligence that's available to us.  And if a**
**11 nominator were to provide us a piece of information**
**12 and we find another piece of information in our own**
**13 searches of intelligence holdings that contradicts**
**14 that, we would certainly take that into**
**15 consideration where we found exculpatory or**
**16 something that discredits the source or something**
**17 along those lines.  And we make a totality of**
**18 circumstances determination as to whether or not the**
**19 person meets the standard.**
20     Q.    Are persons on the selectee list who
21 apply for redress via DHS TRIP notified by TSC as to
22 what their status on the TSDB is?

317

1  **A.   No.**
2     Q.   Does TSC provide persons on the selectee
3  list who have applied for redress via DHS TRIP with
4  an opportunity to contest the derogatory information
5  TSC relied upon to accept their nomination to the
6  TSDB?
7        MS. KONKOLY: Objection.  Vague.
8        THE WITNESS:  They can certainly submit
9  any information they would like to submit through
10 the redress process and we will consider it.
11       BY MR. ABBAS:
12    Q.   Does the Terror Screening Center identify
13 the inclusion standard -- has the Terror Screening
14 Center ever publicly identified the inclusion
15 standard for the selectee list?
16 **A.   I don't believe so.**
17    Q.   Are there people on Terror Screening
18 Database who are not on the selectee list or the
19 No-Fly List?
20       MS. KONKOLY:  Objection insofar as that
21 question calls for any information implicated by law
22 enforcement privilege or potentially state secrets.

318

1  I believe it has already been asked and answered.
2  But you can answer if you can.
3        THE WITNESS:  Yes.
4        BY MR. ABBAS:
5     Q.   Is the selectee list inclusion standard
6  more permissive or less permissive than the
7  inclusion standard for the selectee -- let me start
8  again.  Is the selectee list inclusion standard more
9  permissive or less permissive than the Terror
10 Screening database's inclusion standard?
11       MS. KONKOLY:  I am going to object on the
12 basis of SSI, also the law enforcement privilege.
13 And on the basis of each of those privileges, I am
14 going to instruct the witness not to answer.
15       MR. ABBAS:  How is the TSC's inclusion
16 standard SSI, because it belongs to TSC?  It doesn't
17 belong to TSA.  TSC can't call everything that it
18 would like to call SSI.  It has to make that
19 information.
20       MS. KONKOLY:  The objection is on the
21 record and it stands.
22       MR. ABBAS:  Let me just make sure it is

319

1  clear.  Can you read back the last question?
2        (The record was read back.)
3        BY MR. ABBAS:
4     Q.   Is the -- now I remember.  Is the
5  selectee list inclusion standard more permissive or
6  less permissive than the TSDB inclusion standard?
7        MS. KONKOLY:  I am going to issue the
8  same objections and instructions.  That might be
9  something we can confer on and get back to you on
10 after a break.  But for the moment, I am going to
11 stand on this.  I would like to keep going.
12       MR. ABBAS: No, I don't want to keep
13 going.  If you need to confer, I would like to get
14 this question answered.
15       MS. KONKOLY:  Okay.  Then let me just
16 step out and confer for a moment.
17       MR. ABBAS:  Can we go off the record?
18       THE VIDEOGRAPHER:  We are going off the
19 record.  The time is 4:55 p.m.
20       (A brief recess was held.)
21       THE VIDEOGRAPHER:  We are back on the
22 record.  And we have been on the record for 5 hours

320

1  and 44 minutes.  And the time is 4:59 p.m.
2        MS. KONKOLY:  There was a pending
3  question.  Can we have that read back?
4        (The record was read back.)
5        MS. KONKOLY:  I am going to object
6  insofar as a comprehensive answer would call into
7  play information protected by the law enforcement
8  privilege, potentially state secrets, potentially
9  SSI.  However, you can answer.
10       THE WITNESS:  So the selectee criteria
11 are inclusive of the standard -- the reasonable
12 suspicion standard.  And there are additional
13 criteria beyond that.  So it is a higher bar for my
14 higher bar than your more permissive or less
15 permissive language.  So I would say a higher bar
16 than the general TSDB standard.
17       BY MR. ABBAS:
18    Q.   So there are persons in the TSDB who are
19 not in the selectee list, but there are not persons
20 on the selectee list who are not in the TSDB?
21 **A.   That is correct.**
22    Q.   Okay.  All right.  Great.  Does -- at any

Transcript of Timothy P. Groh, Designated Representative

Conducted on March 1, 2018

---

321

1 time, does TSC inform TSDB listees -- at any time,
2 does TSC inform selectee listees of the derogatory
3 information that TSC relied upon to accept the
4 listees' nomination to the selectee list?
5 **A.   No, we do not.**
6    Q.    Does the -- is the reasonable suspicion
7 -- is what you call -- okay.  So the TSDB reasonable
8 -- I am sorry.  The inclusion standard for -- let me
9 get that.  Is the -- does TSC provide notice to
10 persons on the selectee list that they are on the
11 selectee list at any time?
12 **A.   No.**
13    Q.    And I know I have asked this question.  I
14 am just asking it for foundation purposes.  And I
15 will ask a follow-up question.  What is the
16 inclusion standard for the TSDB?
17       MS. KONKOLY:  Objection.  Calls for
18 information protected by the law enforcement
19 privilege, potentially SSI, potentially SSP, vague.
20       MR. ABBAS:  The inclusion standard for
21 the TSDB?
22       MS. KONKOLY:  Oh, I'm sorry.  I heard you

---

322

1 say selectee.  I withdraw.  I misheard the question.
2       MR. ABBAS:  Okay.
3       THE WITNESS:  It is generally what we
4 refer to as the reasonable suspicion standard.
5       BY MR. ABBAS:
6    Q.    Okay.  And I am going to spend probably
7 like 30 minutes asking you questions about this
8 standard.  Why do you all call it a reasonable
9 suspicion standard?
10 **A.   I wasn't there when it was originally --**
11 **you know -- so when it was originally -- what the**
12 **rationale originally was when it was come up with, I**
13 **don't know.  I would say that as of sitting here**
14 **right now, it is a quick explanation of that**
15 **particular standard.  There are more words behind**
16 **it.  But it is simply the term that we use to refer**
17 **to what is a longer definition.**
18    Q.    The -- to be included -- so is the TSDB
19 inclusion standard a lower bar than a probable cause
20 standard?
21 **A.   Yes.**
22    Q.    Is the TSDB inclusion standard a lower

---

323

1 bar than a preponderance of the evidence standard?
2       MS. KONKOLY:  Objection.  Calls for a
3 legal conclusion.
4       THE WITNESS:  I believe it is.
5       BY MR. ABBAS:
6    Q.    Does -- to satisfy the TSDB inclusion
7 standard, must a person have engaged in criminal
8 activity?
9 **A.   No, not necessarily.**
10    Q.    So lawful activity can be the basis of a
11 person's inclusion in the TSDB?
12       MS. KONKOLY:  Objection.  Misleading.
13 Objection.  Mischaracterizes prior testimony.
14       MR. ABBAS:  If I am wrong, tell me.
15       MS. KONKOLY:  Calls for a legal
16 conclusion.
17       THE WITNESS:  Lawful inasmuch as it is
18 not a chargeable offense.  I think I can't give
19 purchase to the word lawful in that case.  I know
20 that the person does not need to be chargeable to be
21 in the TSDB.  However, activities they are involved
22 in could depending on how circumstances finally turn

---

324

1 out end up being part of conduct that could
2 eventually be determined to be unlawful through the
3 course of investigation or depending on what the
4 person chooses to do.
5    Q.    Does -- does there need to be reasonable
6 suspicion of unlawful activity to include a person
7 in the Terror Screening Center?
8       MS. KONKOLY:  Objection.  Calls for a
9 legal conclusion.  You can answer.
10       THE WITNESS:  I am sorry.  Can you repeat
11 that?
12       BY MR. ABBAS:
13    Q.    Yeah.  I will repeat it.  Reasonable
14 suspicion of what?
15 **A.   Involvement in terrorist activities.**
16    Q.    I am going to introduce Exhibit A.
17 Exhibit A is the overview document.
18 **A.   Okay.**
19    Q.    I am not going to -- you are not -- we
20 are not going to ask all about it.  I just really
21 want to go to page three of the section titled Watch
22 Listing and Screening.

---

325

1    A.   Okay.
2         MR. ABBAS:  I am sorry.  It is like in
3    support of -- I am sorry.  We are going to go
4    through some documents in a little bit.  We need
5    five minutes.  Can we go off the record?
6         THE VIDEOGRAPHER:  We are going off the
7    record.  The time is 5:07 p.m.
8         (A recess was held.)
9         THE VIDEOGRAPHER:  We are back on the
10   record.  The time is 5:17 p.m.  And we have been on
11   the record for 5 hours and 51 minutes.
12        MR. ABBAS:  Five hours and 51 minutes?
13        THE VIDEOGRAPHER:  Correct.
14        (Exhibit A, marked for identification.)
15        BY MR. ABBAS:
16   Q.   The document in front of you has been
17   marked as Exhibit A.  Are you familiar with this
18   document?
19   A.   It appears to be what we could call a
20   transparency document.
21   Q.   Who decided to create this document?
22        MS. KONKOLY:  Objection.  Vague.

326

1         THE WITNESS:  The Watch Listing Advisory
2    Council.
3         BY MR. ABBAS:
4    Q.   What I suspected.  Why did the Watch
5    Listing Advisory Council decide to create this
6    document?
7         MS. KONKOLY:  Objection.  Vague.
8    Objection insofar as an answer would call for law
9    enforcement sensitive information.  You can answer
10   to the extent you can.
11        THE WITNESS:  Because we had -- it is a
12   -- the watch listing community, the watch listing
13   enterprise is broad.  And we wanted to -- because
14   there are so many, as you see, privileges and other
15   information-sharing restrictions related to what we
16   do, we thought it was important to agree on things
17   that we could provide in an unclassified public
18   setting about what we do.
19        BY MR. ABBAS:
20   Q.   Have you disseminated -- I'm sorry.  Has
21   the Terror Screening Center or any of the member
22   agencies of the Watch Listing Advisory Council

327

1    publicly disseminated this document in any way?
2         MS. KONKOLY:  Objection insofar as that
3    question calls for information within the purview of
4    other agencies.
5         THE WITNESS:  I am not aware of a
6    particular public release of this document.
7         BY MR. ABBAS:
8    Q.   Are you aware that this document has been
9    provided to the plaintiffs in response to
10   plaintiff's discovery requests?
11   A.   Yes.
12   Q.   Was this document prepared for the
13   purposes of litigation?
14        MS. KONKOLY:  You can answer.
15        THE WITNESS:  It was prepared for many
16   purposes, not to exclude litigation.
17        BY MR. ABBAS:
18   Q.   Was one of the purposes, Exhibit A, the
19   overview of the U.S. Government's watch listing
20   process and procedures?  Is one of the purposes of
21   this -- is one of the reasons this document was
22   created for purposes of use in this litigation?

328

1         MS. KONKOLY:  Objection insofar as it
2    calls for information in the purview of other
3    agencies.  You can answer.
4         THE WITNESS:  You mean for this
5    particular lawsuit?
6         BY MR. ABBAS:
7    Q.   Yes.
8    A.   No, not in particular for this lawsuit.
9    Q.   Was this document created for general
10   litigation purposes?
11        MS. KONKOLY:  Objection insofar as it
12   calls for information in the purview of other
13   agencies and a legal conclusion.
14        THE WITNESS:  It was -- as I said before,
15   it was created to provide agencies with the
16   information as so much of what we do is interrelated
17   and interlocked with other agencies.  It was created
18   -- and the process of creating this took some time.
19        BY MR. ABBAS:
20   Q.   How long?  How long did it take to create
21   this document?
22   A.   At least six months, maybe as much as a

Transcript of Timothy P. Groh, Designated Representative

Conducted on March 1, 2018

83 (329 to 332)

329

1  year.
2      Q.   When was this document created?
3      A.   **My recollection is it was probably**
4  **finalized at the end of the last calendar year.**
5      Q.   Was -- was the creation of this document
6  communicated in a statement of conclusions that the
7  Watch Listing Advisory Council issued?
8          MS. KONKOLY:  Objection insofar as that
9  would call for any law enforcement sensitive
10 information.  You can answer if you can.
11         THE WITNESS:  I would expect the
12 discussion about this document would appear in those
13 statements of conclusion.
14         BY MR. ABBAS:
15     Q.   Great.  I would like you to turn to page
16 four.  Oh, Arizona.  So the top paragraph of page
17 four describes the reasonable suspicion standard.
18 Can you just review that top paragraph.  I have some
19 questions about that.  Let me know when you have
20 finished reviewing that paragraph.
21     A.   **(Witness reading.)**
22     Q.   Oh, you are done?

330

1      A.   **Yes.**
2      Q.   So it is my understanding that this
3  paragraph -- this first paragraph on page four of
4  Exhibit A elaborates on the meaning of the
5  reasonable suspicion standard that you have referred
6  to as the TSDB inclusion standard, correct?
7      A.   **Yes.**
8      Q.   And it identifies what -- as to what the
9  reasonable suspicion is of; is that correct?
10     A.   **Yes.**
11     Q.   And the TSDB inclusion standard is a
12 reasonable suspicion of -- is a reasonable suspicion
13 that the individual is engaged in conduct
14 constituting terrorism or terrorism activities,
15 correct?  That would -- reasonable suspicion of that
16 would satisfy the TSDB inclusion standard, correct?
17         MS. KONKOLY:  Objection.  Calls for a
18 legal conclusion.  The document speaks for itself.
19 You can answer.
20         THE WITNESS:  So I am sorry.
21         BY MR. ABBAS:
22     Q.   Let me just try it again.  That was bad.

331

1  So you see in the third line where it says
2  reasonable suspicion that the individuals engaged,
3  has been engaged, or intends to engage in conduct
4  constituting in preparation for, in aid, or
5  furtherance of, or related to terrorism and/or
6  terrorism activities, correct?
7      A.   **Yes.**
8      Q.   So it is reasonable suspicion of a
9  variety of different things, correct?
10     A.   **Yes.**
11     Q.   One of those things is pretty easy to
12 understand.  Reasonable suspicion that the
13 individual is now engaged in terrorism or terrorist
14 activities?
15     A.   **Yes.**
16     Q.   That's straightforward.  Engaging in
17 terrorist and terrorism activities is a crime,
18 correct?
19         MS. KONKOLY:  Objection.  Calls for a
20 legal conclusion.
21         MR. ABBAS:  He is the deputy director of
22 the Terror Screen Center.

332

1          MS. KONKOLY:  Okay.  He can answer.
2          THE WITNESS:  You know, I don't think
3  there is any federal statute that says that.  So if
4  you are going to -- you know, I think the elements
5  of crime are much more particularized than that.
6  Now, I think they generally will -- might, but you
7  are not in a charging document for probable cause.
8  You are going to have be more specific.
9      Q.   Is it the Terror Screening Center's view
10 that individuals engaged in terrorism or terrorist
11 activities are engaged in criminal activity?
12         MS. KONKOLY:  Objection.  Calls for a
13 legal conclusion.  You can answer.
14         THE WITNESS:  So there is no federal
15 criminal statute that is that brief.  The federal
16 criminal statutes have elements that you have to
17 meet the elements.
18         BY MR. ABBAS:
19     Q.   So what does this --
20     A.   **And your description does not -- does not**
21 **give the elements of any particular federal crime**
22 **that I am aware.**

Transcript of Timothy P. Groh, Designated Representative
Conducted on March 1, 2018

84 (333 to 336)

333

1    Q.   So what does terrorism mean in this
2 paragraph.  In paragraph -- in the first paragraph
3 on page four, what does terrorism or terrorist
4 activities mean?
5    **A.   Terrorist activities are going to be --**
6    Q.   Let me withdraw the question.
7    **A.   Okay.**
8    Q.   Does the Terror Screening Center define
9 the terms terrorism and/or terrorist activities in
10 any material that it possesses?
11       MS. KONKOLY:  I am going to object
12 insofar as that question implicates information
13 protected by law enforcement or potentially state
14 secrets privilege.  You can answer to the extent
15 that you can.
16       THE WITNESS:  This -- this paragraph
17 cites to the standard that we apply.  The actual
18 application of this in practice is the subject of
19 training materials of other -- of other things that
20 analysts use to where we train the analysts in order
21 to apply the standard.
22       BY MR. ABBAS:

334

1    Q.   Does TSC define the phrase terrorism
2 and/or terrorist activities as it appears on page
3 four of Exhibit A in any materials?
4       MS. KONKOLY:  Objection insofar as that
5 question calls for information protected by the law
6 enforcement and potentially state secrets privilege.
7 You can answer to the extent that you can.
8       THE WITNESS:  There is no definition
9 other than this definition that defines those words.
10      BY MR. ABBAS:
11   Q.   What definition are you referring to?
12   **A.   The one on the page that you just read.**
13   Q.   I don't see a definition of terrorism and
14 or terrorist activities on page four of Exhibit A.
15      MS. KONKOLY:  Objection.  Argumentative.
16 Objection.  Not a question.
17      BY MR. ABBAS:
18   Q.   You are right.  I withdraw it.  Can you
19 identify what definition of terrorism and/or
20 terrorist activities you are the referring to on
21 page four of Exhibit A?
22   **A.   I am referring to the definition of the**

335

1 reasonable suspicion standard.
2    Q.   Got it.  Okay.  So you agree that the
3 first paragraph of page four of Exhibit A defines
4 the reasonable suspicion standard of the TSDB,
5 correct?
6    **A.   Yes.**
7    Q.   Is there -- within the reasonable -- the
8 definition of reasonable suspicion standard of the
9 TSDB, there appears the phrase, quote, terrorism and
10 or terrorist activities, unquote.  Did you see that
11 part of the reasonable suspicion standard
12 definition?
13   **A.   I do.**
14   Q.   Is the phrase terrorism and/or terrorist
15 activities defined by TSC in any documents that it
16 has?
17      MS. KONKOLY:  Objection insofar as it has
18 -- well, let me assert the objection.  Objection
19 insofar as that question calls for information
20 protected by law enforcement privilege, potentially
21 state secrets privilege.  If you think you can
22 answer, you can.  If you would like to consult, we

336

1 can do that.
2       THE WITNESS:  I can't think of a place
3 where that is further defined.  In our previous
4 conversation, though, you were trying to equate that
5 to a criminal charge.  And I object to equating the
6 language here to the elements of something that we
7 found in the United States code.
8       BY MR. ABBAS:
9    Q.   Duly noted.  Does the -- does the Terror
10 Screening Center -- in any material that TSC
11 possesses or is aware of, is the phrase conduct
12 constituting defined by the Terror Screening Center?
13   **A.   No.**
14   Q.   In any material that TSC maintains or is
15 aware of, is "in preparation for" as it appears in
16 that reasonable suspicion standard definition
17 defined by TSC.
18      MS. KONKOLY:  Objection insofar as the
19 question calls for any information protected by law
20 enforcement other privileges.  But you can answer to
21 the extent that you can.
22      THE WITNESS:  Along this line of

Transcript of Timothy P. Groh, Designated Representative

85 (337 to 340)

Conducted on March 1, 2018

---

337

1 questions, I think I would like to consult.
2        MR. ABBAS: I am going to do it for every
3 little kind of phrase in that. So if you guys want
4 to do like a global consultation.
5        MS. KONKOLY: Sure.
6        THE VIDEOGRAPHER: We are going off the
7 record. The time is 5:31 p.m.
8        (A recess was held.)
9        MS. KONKOLY: So the witness has a
10 correction to make to some of the lines of
11 questioning that we have just been engaged in?
12        THE WITNESS: So indeed the standards --
13 the different causes that you have identified within
14 this, they are further defined in the Watch Listing
15 Guidance. And then in the interrogatories, I made
16 reference to the training materials, which I started
17 to review to a few minutes ago for the NDIU analyst
18 -- that two-week class in there. And that is then
19 part of those training materials that is applied to
20 the actual application that I was talking about of
21 the standards.
22        So this is the standard. There is not

---

338

1 another standard. But to further break down the
2 practical application of these standards is found in
3 the guidance and the training materials for each one
4 of those clauses.
5        Q.   What is conduct constituting -- what's --
6 what does TSC consider conduct constituting
7 terrorism and/or terrorist activities?
8        MS. KONKOLY: And I am going to object on
9 the basis of the answer implicating law enforcement
10 sensitive information. Also calling for a legal
11 conclusion. You can answer to the extent that you
12 can.
13        THE WITNESS: I think without getting
14 into the guidance itself that's privileged, I think
15 the words have to stand for themselves generally. I
16 think it is a -- well, no, I will just leave it at
17 that.
18        BY MR. ABBAS:
19        Q.   What is conduct in preparation for
20 terrorism? I'm sorry. What does TSC consider
21 conduct in preparation for terrorism and/or
22 terrorist activities?

---

339

1        MS. KONKOLY: I am going to object
2 insofar as that answer would implicate law
3 enforcement, potentially state secrets information.
4 Also calls for a legal conclusion. You can answer
5 to the extent that you can.
6        THE WITNESS: Again, I don't think that I
7 can further answer that without getting into
8 privileged materials.
9        MR. ABBAS: And what are the privileges?
10        MS. KONKOLY: I said law enforcement and
11 potential state secrets.
12        BY MR. ABBAS:
13        Q.   What does Terror Screening Center
14 consider as conduct in aid of terrorism and/or
15 terrorist activities?
16        MS. KONKOLY: I am going to again object.
17 It calls for a legal conclusion. But, also, insofar
18 as it calls for information protected by the law
19 enforcement privilege and potentially the state
20 secrets privilege. You can answer if you can.
21        THE WITNESS: I feel the same.
22        BY MR. ABBAS:

---

340

1        Q.   How do you feel?
2        **A.   That I can't answer further beyond what's**
3 **on this page without getting into privileged**
4 **materials. And, quite candidly, that's why this is**
5 **what's on this page.**
6        Q.   What does TSC consider as conduct in
7 furtherance of terrorism and/or terrorist
8 activities?
9        MS. KONKOLY: Again, I object that it
10 calls for a legal conclusion. Object on the basis
11 that an answer would call for information protected
12 by the law enforcement privilege and potentially
13 state secrets privilege. If you think you can
14 answer, you can.
15        THE WITNESS: The same.
16        BY MR. ABBAS:
17        Q.   Is learning Arabic in furtherance of
18 terrorism and/or terrorist activities?
19        MS. KONKOLY: Objection. Calls for
20 speculation. Objection. Calls for a legal
21 conclusion. Objection insofar as the answer would
22 implicate law enforcement sensitive information.

341

1 You can answer that if you can.
2      THE WITNESS: I think that would be as
3 one of many factors. In context, I would say that
4 by itself, no. But in context of additional
5 factors, it could be relevant.
6      BY MR. ABBAS:
7    Q.   So learning Arabic could be conduct in
8 furtherance of terrorism and/or terrorist
9 activities?
10      MS. KONKOLY: Objection.
11 Mischaracterizes prior testimony. Asked and
12 answered.
13      THE WITNESS: Not by itself.
14      BY MR. ABBAS:
15    Q.   I know not by itself, but learning Arabic
16 could be conduct in furtherance of terrorism and
17 terrorist activities?
18      MS. KONKOLY: Objection.
19 Mischaracterizes --
20      MR. ABBAS: I'm sorry. I am going to
21 withdraw it. You are right. He answered it.
22      BY MR. ABBAS:

342

1    Q.   What is conduct related to -- I am sorry.
2 What does TSC consider conduct related to terrorism
3 and/or terrorist activities?
4      MS. KONKOLY: Objection. Calls for a
5 legal conclusion. Objection insofar as it
6 implicates information protected by the law
7 enforcement privilege or potentially the state
8 secrets privilege. If you think you can answer, you
9 can.
10      THE WITNESS: I don't think I can answer
11 that any further without getting into privileged
12 information.
13      BY MR. ABBAS:
14    Q.   Is -- is having a relative who is under
15 investigation for a terrorism-related reason conduct
16 related to terrorism and/or terrorist activities?
17      MS. KONKOLY: Objection. That calls for
18 a legal conclusion and for speculation. It also
19 calls for information protected by the law
20 enforcement privilege, potentially state secrets. I
21 am going to instruct the witness not to answer.
22      MR. ABBAS: And, again, I am not asking

343

1 for legal information. I am asking how the TSC
2 applies the standard that it has adopted for TSDB
3 inclusion.
4      MS. KONKOLY: And my objections are on
5 the record. And they stand as does the instruction.
6      BY MR. ABBAS:
7    Q.   If a person has a relative who is in the
8 TSDB, can their association with that person be a
9 basis of their inclusion in the FBI?
10      MS. KONKOLY: Objection. Calls for
11 speculation; potentially calls for a legal
12 conclusion. Objection that that question calls for
13 information protected by the law enforcement
14 privilege, potentially state secrets. And I am
15 going to again instruct the witness not to answer.
16      MR. ABBAS: On what grounds are you going
17 to instruct the witness not to answer?
18      MS. KONKOLY: Law enforcement,
19 potentially state secrets.
20      BY MR. ABBAS:
21    Q.   Is international travel conduct in
22 furtherance of terrorism and/or terrorist

344

1 activities?
2      MS. KONKOLY: Objection. Calls for
3 speculation. Objection. Calls for legal conclusion
4 insofar as it -- I am also objecting insofar as it
5 implicates information protected by the law
6 enforcement potentially state secrets privilege.
7 You can answer if you think you can.
8      THE WITNESS: I would again say that's a
9 factor. And it is -- but it would be -- simply
10 standing alone, the fact that somebody has travelled
11 internationally, I don't think generally would. But
12 you know, it is dependent upon a combination
13 totality of the circumstances. And it could
14 certainly be relevant.
15      BY MR. ABBAS:
16    Q.   Does the TSDB inclusion standard -- I am
17 sorry. When a person is nominated to the TSDB, must
18 the nomination include the prospective listee's date
19 of birth?
20      MS. KONKOLY: Objection insofar as that
21 calls for law enforcement-privileged information.
22 You can answer if you can.

Transcript of Timothy P. Groh, Designated Representative

87 (345 to 348)

Conducted on March 1, 2018

---

345

1         THE WITNESS:  It does not necessarily
2   require the provision of a date of birth, although
3   that will affect a screenability for various
4   partners.
5         BY MR. ABBAS:
6      Q.    Most TSDB entries include date of birth
7   information --
8         MS. KONKOLY:  Objection. Calls for
9   speculation.
10        BY MR. ABBAS:
11     Q.   -- correct?
12     **A.   I don't know if I can actually -- I would**
13 **be speculating to say that that's true.**
14     Q.    For U.S. persons, does the TSC require
15  that the nominating agency identify the date of
16  birth for the person that they are nominating to be
17  included in the TSDB?
18        MS. KONKOLY:  Objection insofar as that
19  calls for law enforcement sensitive privileged
20  information.  You can answer if you can.
21        THE WITNESS:  I think it is more likely
22  that U.S. persons will have date of birth, but it is

---

346

1   not required.
2         BY MR. ABBAS:
3      Q.    So there are some U.S. persons who are
4   included in the TSDB for which TSDB does not have
5   any date of birth information in the TSDB?
6         MS. KONKOLY:  Objection insofar as that
7   calls for information protected by law enforcement
8   privilege.  Speculation.  You can answer if you can.
9         THE WITNESS:  I would speculate that it
10  is possible that there is.  I don't know of a
11  particular one.
12        BY MR. ABBAS:
13     Q.    For the individuals in the TSDB who have
14  date of birth information, TSC obviously knows how
15  old they are, correct?
16     **A.   Yes.**
17     Q.    Are there children on the TSDB?  I am
18  sorry.  Are there children in the TSDB?
19        MS. KONKOLY:  Objection insofar as that
20  calls for information protected by the law
21  enforcement privilege, potentially state secrets.
22  You can answer if you think you can.

---

347

1         THE WITNESS:  I don't think I can answer.
2   I think that's privileged.
3         BY MR. ABBAS:
4      Q.    You don't know whether or not there is
5   children on the Terror Screen Database?
6         MS. KONKOLY:  Objection.
7   Mischaracterizes his testimony.  He said he can't
8   answer without providing privileged information.
9         MR. ABBAS:  What's privileged?  What's
10  the -- what's privileged?  I'm unclear.
11        MS. KONKOLY:  I asserted -- I asserted
12  law enforcement, potentially state secret.
13        MR. ABBAS:  It is a state secret whether
14  the Terror Screening Database --
15        MS. KONKOLY:  In an individual case,
16  state secret could apply to an individual case.  And
17  I am asserting those privileges.
18        BY MR. ABBAS:
19     Q.    How many children are in the Terror
20  Screening Database?
21        MS. KONKOLY:  Objection.  Calls for
22  information implicating the law enforcement

---

348

1   privilege, potentially the state secrets.  And I
2   will just instruct you not to answer that.
3         BY MR. ABBAS:
4      Q.    Is there anything about the TSDB
5   inclusion standards that constrains TSC's ability to
6   list children in the TSDB?
7         MS. KONKOLY:  Objection insofar as that
8   calls for information implicating the law
9   enforcement privilege and potentially state secrets.
10  You can answer if you can.
11        THE WITNESS:  I think the age of an
12  individual just like those other factors we talked
13  about is relevant.  But no single factor is
14  dispositive.
15        BY MR. ABBAS:
16     Q.    Does TSC provide its personnel guidance
17  as to how to consider the age of a prospective TSDB
18  listee when TSC personnel consider accepting or
19  rejecting a nomination?
20        MS. KONKOLY:  Objection insofar as that
21  calls for information protected by law enforcement
22  privilege or potentially state secrets.  If you

---

349

1 think you can answer, you can without waiving the
2 privilege.
3       THE WITNESS:  I don't think I can answer
4 that in particular.
5       MR. ABBAS:  Because of the law
6 enforcement privilege?
7       MS. KONKOLY:  I have asserted the
8 privileges.  They are on the record.
9       BY MR. ABBAS:
10   Q.    Does TSC have any information that a
11 child has ever been placed in the TSDB?
12       MS. KONKOLY:  Objection.  Calls for
13 information implicated by the law enforcement
14 privilege and potentially the state secrets
15 privilege.  I will instruct him not to answer.
16       BY MR. ABBAS:
17   Q.    How about this?  Does TSC have any
18 information that an adult has ever been placed in
19 the Terror Screening Database?
20   A.    Yes.
21   Q.    Has TSC placed an adult in the Terror
22 Screening Database?

350

1   A.    Yes.
2   Q.    Has the TSC placed a child in the Terror
3 Screening Database?
4       MS. KONKOLY:  Objection.  Calls for
5 information protected by law enforcement privilege
6 and potentially the state secrets privilege.  I will
7 instruct you not to answer.
8       MR. ABBAS:  I mean, we will find out that
9 later.
10       MS. KONKOLY:  Okay.
11       (Exhibit B, marked for identification.)
12       BY MR. ABBAS:
13   Q.    I am going to introduce Exhibit B.
14 Exhibit B is the defendant's answers to Plaintiff's
15 first set of interrogatories to TSC.  Mr. Groh, we
16 are not going to go through the whole document.  It
17 is a very, very long.  And there is a lot of
18 gobbledygook at the beginning especially.  I want to
19 --
20   A.    I object to the description of this
21 gobbledygook.
22   Q.    Well, I want to take your attention to

351

1 almost the very back, the second to last page.  It
2 is page 63.  Do you see your signature on page 63?
3   A.    I appear -- I see what appears to be my
4 signature.
5   Q.    That's your signature?
6   A.    Yes, it is.
7   Q.    And why is your signature on this
8 document?
9       MS. KONKOLY:  Objection.  Calls for a
10 legal conclusion.  You can answer as to your
11 understanding.
12       THE WITNESS:  As the same reason that I
13 am here.  I am representing the TSC.  And what is in
14 this -- in the response to the interrogatories is
15 true.
16       BY MR. ABBAS:
17   Q.    So you participated in the -- you have
18 read these answers previously, correct?
19   A.    I have.
20   Q.    And they are accurate as far as you know?
21   A.    Yes.
22   Q.    I would like you to turn to page 14.  Do

352

1 you see at the bottom half of 14, interrogatory
2 number six?
3   A.    I do.
4   Q.    So I am going to ask you to review
5 interrogatory number six.  That's the interrogatory
6 in bold italics.  And there is a section of
7 objections.  I would say that's legal gobbledegook.
8 You are welcome to review it.  The part that I am
9 going to ask you about is on page 16.  It is the
10 response.  But you can go ahead and review that
11 actual interrogatory, objections, and response.  Let
12 me know when you are done, and then I am going to
13 ask you a few questions.
14   A.    (Witness reading.)
15   Q.    You are done.  Okay.  So I am looking at
16 page 16, the response paragraph.  In your response,
17 you say that you export subsets of TSDB data to
18 partner agencies and foreigner partners for use by
19 those partners in a variety of lawful terrorist
20 screening functions.  Do you see where I am?
21   A.    Yes.
22   Q.    What do you mean by lawful terrorist

Transcript of Timothy P. Groh, Designated Representative
Conducted on March 1, 2018

89 (353 to 356)

353

1 screening functions?
2          MS. KONKOLY:  Objection.  Calls for a
3 legal conclusion.
4          MR. ABBAS:  It is his answer.  I am
5 asking him to explain his answer.
6          MS. KONKOLY:  You can answer.
7          THE WITNESS:  I mean that these are
8 functions that the respective agencies are
9 authorized to do by law as part of their mission
10 that relate to -- have some nexus to terrorism and
11 ultimately has been agreed to by the Watch Listing
12 Advisory Council.
13          BY MR. ABBAS:
14     Q.   Well, I see how that could be applicable
15 to partner agencies.  Partner agencies you are
16 referring to like domestic entities, correct?
17     **A.   Yes.**
18     Q.   And then you have like the conjunction
19 "and" and the foreign partners.  So I am imagining
20 that's kind of dividing.  You have partner agencies
21 that are domestic.  Is that what you meant by
22 partner agencies?

354

1     **A.   Yes.**
2     Q.   And then foreign partners are --
3     **A.   Yes.**
4     Q.   -- the foreign governments?
5     **A.   Yes.**
6     Q.   How -- who -- the foreign partners
7 utilizing TSDB data for lawful terror screening
8 functions.  Is it TSC's testimony today that foreign
9 partners are utilizing TSDB data in compliance with
10 U.S. law?
11     **A.   No.  Well, there may be applicable U.S.**
12 **laws.  But I would say generally there are U.S. laws**
13 **that govern interactions with foreign governments.**
14 **So it certainly complied with those.  I think beyond**
15 **that, that it would also, the conjunctive, both need**
16 **to -- well, no, I think it has to do with, yeah, our**
17 **laws that deal with dealing with foreign partners.**
18     Q.   Does TSC require foreign partners to
19 utilize TSDB information in accordance with U.S.
20 law?
21          MS. KONKOLY:  Objection insofar as this
22 answer calls for any information protected by the

355

1 law enforcement privilege and potentially state
2 secrets.  Also calls for a legal conclusion.  But
3 you can answer to the extent that you can.
4          THE WITNESS:  I don't assert that by
5 signing an agreement with us suddenly American law
6 becomes applicable to a foreign partner if that's
7 what you mean.
8          BY MR. ABBAS:
9     Q.   So TSC does not require foreign partners
10 to abide by U.S. law in how those foreign partners
11 utilize TSDB information?
12          MS. KONKOLY:  Objection.
13 Mischaracterizes prior testimony and objection so
14 far as the answer calls for anything protected by
15 law enforcement state secrets.  You can answer to
16 the extent that you can.  Also calls for legal
17 conclusion.
18          THE WITNESS:  I don't think it would be
19 really possible for American law to apply to a
20 foreign sovereign.
21          BY MR. ABBAS:
22     Q.   So TSC does not require foreign partners

356

1 to utilize TSDB information in accordance with U.S.
2 law, correct?
3          MS. KONKOLY:  Objection.  Asked and
4 answered.
5          MR. ABBAS:  Not asked and answered.
6          MS. KONKOLY:  Objection insofar as this
7 indicates any information implicating the law
8 enforcement and potentially the state secrets
9 privilege.  Objection.  Calls for a legal conclusion
10 and vague.  You can answer to the extent that you
11 can.
12          THE WITNESS:  I think there's a
13 difference -- there's a distinction that I am trying
14 to emphasize in my answer between what binds us to
15 U.S. law and what binds a partner to U.S. law.  So I
16 am bound by United States law.  A foreign sovereign
17 would not be.  They may by agreement choose to
18 invoke certain -- certain things comparable to U.S.
19 law.  But, again, we cannot bind a foreign partner
20 to U.S. law.  That's simply the basis of
21 international law.
22          BY MR. ABBAS:

357

1    Q.   I don't know what you mean when you say
2  lawful terror screening functions.  I understand
3  what you mean when that regards the domestic partner
4  or agencies.  It is U.S. law?
5    **A.   Uh-huh.**
6    Q.   But like you said, the Terror Screening
7  Center does not -- is not in a position to require
8  foreign partners to abide by U.S. law, correct?
9    **A.   We may in a particular agreement have an**
10 **agreement with the foreign partner to do things that**
11 **are consistent.  But I do not think that that binds**
12 **the partner with the force of law.**
13   Q.   Could a foreign partner use TSDB
14 information in a way that if it were used in that
15 manner in the U.S. would be illegal?
16       MS. KONKOLY:  Objection.  Calls for
17 speculation.  Objection, vague.  Objection insofar
18 as that legal conclusion.  And also object insofar
19 as it calls for any information implicating the law
20 enforcement, potentially the state secrets
21 privilege.  You can answer to the extent that you
22 can.

358

1        THE WITNESS:  I guess I don't know how to
2  answer that -- that question.  I could imagine so
3  many different situations with particular American
4  legal constraints that may or may not apply in a
5  foreign country.  You could -- if you tried to
6  overlap those two legal systems, I mean, you might
7  not.  It would be totally ineffectual, so.
8    Q.   So it sounds like foreign partners do not
9  -- are not obligated to utilize TSDB information in
10 a manner that complies with U.S. laws?
11       MS. KONKOLY:  Objection.  Argumentative.
12 Objective.  Calls -- mischaracterizes his prior
13 testimony.
14       BY MR. ABBAS:
15   Q.   I will withdraw the question.  Is it true
16 that TSC does not require foreign partners to
17 utilize TSDB information in a manner that is
18 consistent with U.S. law?
19       MS. KONKOLY:  Objection.  Asked and
20 answered.  Objection insofar as this answer calls
21 for information implicating the law enforcement
22 privilege or the state secrets privilege.  If you

359

1  think you can answer.
2        THE WITNESS:  I think the agreements
3  stand for themselves.  I think the agreement is the
4  agreement.  The agreement is a text of what is in
5  that agreement.
6        BY MR. ABBAS:
7    Q.   Are there -- are there agreements with
8  foreign partners that do not require the foreign
9  partner to utilize TSDB information in a way that is
10 in compliance with U.S. law?
11       MS. KONKOLY:  Objection insofar as this
12 calls for any information protected by the law
13 enforcement privilege or the potential state secrets
14 privilege.  If you think there is a way you can
15 answer without implicating those privileges, you
16 can.
17       THE WITNESS:  I mean, the form of the
18 question makes it very, very difficult to answer.
19 We have obligations under U.S. law that we meet.  If
20 we reach an agreement with a foreign partner -- and
21 I don't think every agreement the United States
22 makes with a foreign partner obligates that foreign

360

1  partner to follow American -- American law otherwise
2  every place would be like America.  So given all of
3  that --
4    Q.   I --
5        MS. KONKOLY:  Okay.  Let him finish.
6        BY MR. ABBAS:
7    Q.   I'm sorry.  If I cut you off, sorry, but
8  I think we got what I was looking for.
9    **A.   Okay.  Then I am done.**
10   Q.   Okay.  Let's -- do you see also on page
11 16, do you see interrogatory number seven?
12   **A.   Yes.**
13   Q.   It is a long one.  And it culminates in
14 an answer on page 22 that has that chart.  Do you
15 recall making or reviewing a chart as part of these
16 interrogatory responses?
17   **A.   I do.**
18   Q.   Are you familiar with the contents of
19 this chart?
20   **A.   Generally, yes.**
21   Q.   This chart identifies the number of total
22 nominations that TSC received in -- from 2008 to

Transcript of Timothy P. Groh, Designated Representative

Conducted on March 1, 2018

361

1  2017 on a yearly basis, correct?

**2      A.   Yes.**

3      Q.   The total nominations refer to total

4  nominations to the Terror Screening Database,

5  correct?

**6      A.   Yes.**

7      Q.   And total adds refers to the number of

8  new persons that were added to the Terror Screening

9  Database, correct?

**10     A.   Yes.**

11     Q.   And with regards to the rejections, you

12 reject in every year less than 5 percent of the

13 total nominations?

14         MS. KONKOLY: Objection.

15         BY MR. ABBAS:

16     Q.   So 95 percent of total nominations that

17 were submitted to the Terror Screening Center from

18 2008 to 2017 were accepted by the Terror Screening

19 Center, correct?

20         MS. KONKOLY: Objection. Vague.

21         THE WITNESS: It would appear it is less

22 than 5 percent, yes.

362

1          BY MR. ABBAS:

2      Q.   Less than 5 percent of the nominations

3  from 2008 to 2017 were rejected by the Terror

4  Screening Center, correct?

**5      A.   Yes.**

6      Q.   So the Terror Screening Center accepts

7  more than 95 percent of all nominations it receives

8  -- it has received from 2008 to 2017, correct?

9          MS. KONKOLY: Objection. Vague and

10 misleading.

11         BY MR. ABBAS:

12     Q.   I am going to withdraw that question and

13 just so I get it out cleanly. The Terror Screening

14 Center accepted more than 95 percent of all

15 nominations it received from 2008 to 2017, correct?

16         MS. KONKOLY: I am just going to object.

17 Vague and misleading. And make sure that we are

18 referencing the definition of nominations that was

19 provided in his answer in the context to this

20 question.

21         THE WITNESS: Yes.

22         BY MR. ABBAS:

363

1      Q.   Ninety five percent is a very high

2  number. It is close to a hundred, right?

3          MS. KONKOLY: Objection. Argumentative.

4          BY MR. ABBAS:

5      Q.   That might be a little bit argumentative.

6  You know, 95 percent is a high number. That means

7  that -- does TSC believe that it is receiving

8  nominations that are credible and justified

9  generally?

**10     A.   Absolutely, and especially given the fact**

**11 that they have been reviewed at multiple levels**

**12 before they get to us.**

13     Q.   How many of the persons that have been in

14 the TSDB have committed acts of terrorism inside the

15 United States?

16         MS. KONKOLY: Objection. That question

17 calls for information implicating the law

18 enforcement privilege and potentially state secrets

19 in two instances. I am instructing the witness not

20 to answer.

21         BY MR. ABBAS:

22     Q.   Does TSC know how many persons that have

364

1  at any time been in the TSDB -- let me start all

2  over. Does TSC know how many persons who have been

3  placed at any time in the TSDB have been charged

4  with a terrorism-related offense?

5          MS. KONKOLY: Objection insofar as that

6  would implicate any law enforcement-privileged

7  information. You can answer without -- if you can

8  answer, you can.

9          THE WITNESS: It is not a data field that

10 we collect. And I don't know if you are restricting

11 it to domestically or are you also including

12 foreign?

13         BY MR. ABBAS:

14     Q.   I am not restricting it.

**15     A.   Then it is fair to say no, we don't know.**

16     Q.   Does -- with regards to the persons who

17 have perpetrated acts of terrorism inside the United

18 States, does TSC know how many of those persons have

19 been in the TSDB at any time?

20         MS. KONKOLY: Objection. Vague.

21 Objection insofar as it calls for law

22 enforcement-privileged information. If you can

Transcript of Timothy P. Groh, Designated Representative
Conducted on March 1, 2018

365

1 answer, you can answer if you can.
2      THE WITNESS: That information is not --
3 again, it is not information we keep in the TSDB. I
4 suppose with sufficient effort it could be
5 discerned.
6      BY MR. ABBAS:
7   Q.   Do you see in 2008 that more than 248,000
8 nominations were received by TSC?
9   **A.   I do.**
10  Q.   And then in 2016 that number doubled to
11 500 -- more than 518,000 total nominations. Do you
12 see that?
13  **A.   I do.**
14  Q.   What happened between 2008 to 2016 that
15 led to a doubling of the total nominations that TSC
16 received?
17      MS. KONKOLY: Objection. Vague. It is
18 not clear to me that you are using this term
19 consistently with the way it was expressly defined
20 within this interrogatory. Further objection as to
21 any information that -- I further object to the
22 extent that the answer would call for information

366

1 protected by the law enforcement privilege. If you
2 think you understand the question and can answer,
3 you can.
4      THE WITNESS: I think in very broad
5 strokes -- so, one, you are referring to total
6 nominations. Total -- which that can be
7 modifications of record, of course, right, not adds
8 when you are referring to those numbers. So that
9 refers, in some cases, to TSDB being updated, right,
10 as opposed to the adds, which I -- you know, which
11 clearly have also gone up.
12      But I just want to be specific here. But
13 I think, you know, if you just look -- I think I can
14 broadly say from a geopolitical standpoint that we
15 have been engaged in a conflict with ISIS in that
16 period of time as one of many global factors going
17 on, but that being a very significant one.
18      BY MR. ABBAS:
19  Q.   Has the number of persons that submit
20 nominations to the Terror Screening Center gone up
21 from 2008 to 2016?
22  **A.   You mean the individual people in the**

367

1 **nominating agencies?**
2   Q.   Yes.
3      MS. KONKOLY: Objection. That calls for
4 information outside of TSC's purview. You can
5 answer as to your understanding, but.
6      THE WITNESS: Yeah, I don't know.
7      BY MR. ABBAS:
8   Q.   Can foreign governments nominate persons
9 to the TSDB?
10      MS. KONKOLY: Objection insofar as that
11 calls for any law enforcement or potentially state
12 secrets-privileged information. You can answer. If
13 you think you can answer without waiving, you can.
14      THE WITNESS: Potentially pursuant to the
15 agreement with that foreign government.
16      BY MR. ABBAS:
17  Q.   And potentially. So I think it is clear
18 in the overview document. Is it TSC that accepts
19 nominations to the TSDB from foreign partners?
20      MS. KONKOLY: Asked and answered. Same
21 objections insofar as the answer calls for
22 information protected by the law enforcement and

368

1 potentially state secrets. You can answer if you
2 can.
3      THE WITNESS: Yes.
4      BY MR. ABBAS:
5   Q.   Has the number of -- I see the total
6 adds. Does TSC know how many persons are in the
7 TSDB right now?
8      MS. KONKOLY: Objection. Calls for
9 information protected by -- that was formulated,
10 right, if they know. So I will just say so far as
11 an answer, a complete answer would implicate any
12 information protected by law enforcement or
13 potentially state secrets privilege, but you can
14 answer insofar as you can.
15      THE WITNESS: Yes, we know how many
16 people are in TSDB.
17      BY MR. ABBAS:
18  Q.   How many people are in the TSDB?
19      MS. KONKOLY: And there I am going to
20 object on the basis of law enforcement and
21 potentially state secrets privilege and instruct the
22 witness not to answer.

Transcript of Timothy P. Groh, Designated Representative
Conducted on March 1, 2018

93 (369 to 372)

369

BY MR. ABBAS:
1
2    Q.   Is there -- are there more than a million
3 people in the TSDB?
4        MS. KONKOLY: Objection. Calls for
5 information protected by the law enforcement and
6 potentially state secrets. And I am instructing the
7 witness not to answer.
8        BY MR. ABBAS:
9    Q.   Are there more than five people in the
10 TSDB? Are there -- I mean, some numerical
11 information is appropriate.
12       MS. KONKOLY: Okay. Objection insofar as
13 this question calls for information protected by law
14 enforcement or potentially state secrets. But
15 insofar as there are public information that has
16 been made available, the witness can answer.
17       THE WITNESS: They are in excess of --
18 there are over a million individuals in TSDB.
19       BY MR. ABBAS:
20   Q.   Has the increase in the number of
21 individuals in the TSDB in TSC's view enhanced the
22 effectiveness of the TSDB?

370

1        MS. KONKOLY: Objection. Calls for
2 speculation.
3        BY MR. ABBAS:
4    Q.   It is TSC's view?
5    A.   Yes.
6    Q.   More names in the TSDB -- I will withdraw
7 that question. Why? Why does TSC believe that more
8 names in the TSDB furthers its counter-terrorism
9 objectives?
10       MS. KONKOLY: Objection. Calls for
11 speculation. Objection insofar an answer would
12 implicate any law enforcement-privileged
13 information. You can answer insofar as you can.
14       THE WITNESS: It is not more names by
15 itself. It is more names that are appropriately
16 nominated, I believe, enhance the TSDB. If -- we
17 have no interest in it being bigger for the sake of
18 it being bigger. It is bigger based on the
19 intelligence that we have. The better that that
20 represents the threat that is facing the nation and
21 our partners, the more effective it will be.
22       BY MR. ABBAS:

371

1    Q.   With regards to the more than one million
2 persons in the TSDB, some of those -- some of those
3 TSDB listees have never generated any encounter
4 information, correct?
5    A.   Yes.
6        MS. KONKOLY: Objection. Asked and
7 answered.
8        BY MR. ABBAS:
9    Q.   Out of the million names in the TSDB --
10 out of the more than million names in the TSDB, is
11 there a lot of individuals who have not generated
12 any encounter information?
13       MS. KONKOLY: Objection. Vague.
14 Objection. Calls for speculation. Objection
15 insofar as it implicates any law
16 enforcement-protected information. You can answer
17 insofar as you can.
18       THE WITNESS: Yes, there are a lot.
19       BY MR. ABBAS:
20   Q.   Can you -- give me your best
21 characterization of what amount of TSDB listees have
22 never generated encounter information?

372

1        MS. KONKOLY: Objection. Vague.
2 Objection. Calls for speculation. Objection
3 insofar as the answer would implicate any law
4 enforcement-privileged information. You can answer
5 to the extent that you can.
6        THE WITNESS: Say by far the majority of
7 people in TSDB have never generated an encounter.
8        BY MR. ABBAS:
9    Q.   More than 75 percent?
10   A.   I think that's fair.
11   Q.   More than 90 percent?
12       MS. KONKOLY: Objection. Calls for
13 speculation.
14       MR. ABBAS: If he knows. If you don't
15 know, you can just stop --
16       MS. KONKOLY: Objection insofar as any
17 answer would implicate a law enforcement or
18 potentially state secret privilege. If you think
19 you can answer without waiving.
20       THE WITNESS: I think I would say in
21 excess of 90 percent. And I would want to cut it
22 off there.

Transcript of Timothy P. Groh, Designated Representative
Conducted on March 1, 2018

94 (373 to 376)

373

1      BY MR. ABBAS:
2      Q.   Okay.  And so in excess of 90 percent of
3   all TSDB listees have never generated any encounter
4   information?
5      **A.   That's correct.**
6          MS. KONKOLY:  Could we take a break?  I
7   could stand to stretch --
8          MR. ABBAS:  Yeah, I hear you.  I'm not
9   going to fight that.
10         THE VIDEOGRAPHER:  We are going off the
11  record.  The time is 6:12 p.m.
12         (A recess was held.)
13         THE VIDEOGRAPHER:  We are back on the
14  record.  The time is 6:28 p.m.  And we have been on
15  the record for 6 hours and 43 minutes.
16         BY MR. ABBAS:
17     Q.    What is the last publicly available total
18  of TSDB listees?
19     **A.    I believe it was a million individuals in**
20  **2016 -- 2016.**
21     Q.   A million total?
22     **A.   Yes.**

374

1      Q.   How many TSC employees are authorized to
2   remove persons from the TSDB?
3      **A.    To remove persons?**
4          MS. KONKOLY:  Objection.  Vague.
5          THE WITNESS:  All of those transactions
6   require two individuals.  So I would say at least 35
7   individuals, but it may be as high as 90 on a
8   removal.  But -- and that would require two
9   individuals.  But the second one may have to be one
10  of the 35, but it may be as high as 90.  I am basing
11  it on that level of authority within.
12         MR. ABBAS:  Indiana.
13         BY MR. ABBAS:
14     Q.    How many TSC employees are authorized to
15  accept or reject nominations to the TSDB?
16         MS. KONKOLY:  Objection.  Vague.
17         THE WITNESS:  There are approximately 35
18  individuals that would be the final -- there may be
19  other people that looked at it before that.  But to
20  be the final approval before it actually goes into
21  TSDB, approximately 35.
22         BY MR. ABBAS:

375

1      Q.   How many layers of review are there for
2   removal actions?
3      **A.   Two.**
4      Q.   How many layers of review are there for
5   decisions regarding TSDB nominations?
6          MS. KONKOLY:  Objection insofar as that
7   would call for information protected by the law
8   enforcement privilege.  You can answer to the extent
9   that you can.
10         THE WITNESS:  So I think that depends on
11  the nomination.  It is at least two.  It may be more
12  depending on particularized criteria pertaining to
13  that nomination.
14         BY MR. ABBAS:
15     Q.   How many persons does TSC remove from the
16  TSDB on a yearly basis?
17         MS. KONKOLY:  Objection insofar as that
18  calls for any information protected by the law
19  enforcement privilege.  You can answer to the extent
20  that you can.
21         THE WITNESS:  I don't believe I can
22  answer that.

376

1      BY MR. ABBAS:
2      Q.    Does TSC know how many persons have been
3   removed from the TSDB in 2017?
4          MS. KONKOLY:  Objection insofar as a
5   complete answer would call for any information
6   protected by the law enforcement privilege, but you
7   can answer.
8          THE WITNESS:  Yes, TSC knows.
9          BY MR. ABBAS:
10     Q.    Does TSC know how many individuals were
11  removed from the TSDB in all calendar years?
12         MS. KONKOLY:  Same objection insofar as
13  any answer would call for any law enforcement
14  privileged information.  But you can answer.
15         THE WITNESS:  I would say generally, yes.
16  The only thing is you go way back to the beginning.
17  And I can't attest to exactly when that capability
18  came online.  I believe it would be the case for
19  everything represented on this chart.
20         BY MR. ABBAS:
21     Q.    So for the last 10 years, TSC knows how
22  many persons it has removed from the TSDB?

Transcript of Timothy P. Groh, Designated Representative
Conducted on March 1, 2018

95 (377 to 380)

377

1          MS. KONKOLY:  Objection.
2  Mischaracterized his prior testimony.
3          THE WITNESS:  Yes.
4          BY MR. ABBAS:
5      Q.   Can a -- can TSC commence a removal
6  action at the end of the DHS TRIP redress process.
7  I'm sorry.  Let me rephrase that question.  Does the
8  DHS TRIP redress process -- is one of the outcomes
9  -- is one of the possible outcomes of the DHS TRIP
10 redress process a removal action?
11     A.   Yes.
12         MR. ABBAS:  Well, I am pressing.  How
13 many more minutes do we have?  Thirteen?
14         THE VIDEOGRAPHER:  Twelve.
15         BY MR. ABBAS:
16     Q.   Does TSC commence all removal actions
17 from the TSDB?
18         MS. KONKOLY:  Objection insofar as an
19 answer would implicate any law enforcement
20 privileged information.  You can answer to the
21 extent that you can.
22         THE WITNESS:  When you say commence --

378

1          MS. KONKOLY:  And vague.
2          BY MR. ABBAS:
3      Q.   That's fair.  I will withdraw.  Let me
4  try to rephrase.  Does -- TSC personnel are the ones
5  that execute the key strokes to execute a removal
6  action regarding a person that's listed in the TSDB?
7          MS. KONKOLY:  Objection.  Vague.
8          THE WITNESS:  Yes.
9          BY MR. ABBAS:
10     Q.   And that removal action can come about as
11 a result of TSC's auditing processes?
12     A.   Yes, it could.
13     Q.   Does TSC keep statistical information
14 regarding how -- the outcomes of its auditing
15 process?
16     A.   Yes.
17     Q.   Does the executive leadership of TSC
18 receive statistical information regarding the
19 performance of the TSDB?
20         MS. KONKOLY:  Objection.  Vague.
21         THE WITNESS:  You know, regarding the
22 performance, we receive a lot of different

379

1  statistical information about TSDB.  I would say it
2  generally relates to performance, but I don't know
3  in particular what you mean by that.
4          BY MR. ABBAS:
5      Q.   You are an executive at TSC, correct?
6      A.   I am.
7      Q.   Is there like an executive team that runs
8  TSC?
9      A.   Yes.
10     Q.   What are the names of the positions that
11 are part of the executive team of TSC?
12     A.   I believe we are named as defendants.  So
13 the three executives of TSC are myself, the director
14 Mr. Kable, and the principal deputy director Ms.
15 Burriesci.
16     Q.   And those three comprise the executive
17 leader at the TSC?
18     A.   They are three executives.  We have other
19 people on our team that are not executives that work
20 in the front office.
21     Q.   Sure.  Do the three of you review
22 statistical information regarding the TSDB?

380

1      A.   Yes.
2      Q.   In what form -- what documents -- how
3  does the statistical information regarding the TSDB
4  get presented to the executive leadership team of
5  TSC?
6      A.   There are a number of different periodic
7  reports, everything from daily to weekly to monthly
8  reports that we look at in all different aspects of
9  our operations across TSDB and across encounters.
10     Q.   Arizona.  Is there like a standard
11 monthly report that you receive that includes the
12 statistical information regarding the TSDB?
13     A.   Probably multiple ones.
14     Q.   Do they -- are they titled?
15     A.   Generally, yes.
16     Q.   What are the titles of the reports that
17 TSC's executive leadership team receives that regard
18 statistical information?
19         MS. KONKOLY:  Objection insofar as the
20 answer would implicate any law enforcement sensitive
21 information.  You can answer to the extent that you
22 can.

Transcript of Timothy P. Groh, Designated Representative
Conducted on March 1, 2018

381

1       THE WITNESS: I think there is a TSDB
2  monthly report. I think there is an encounter
3  weekly report. There is a daily encounter report.
4  I am trying to think of -- I believe Redress
5  produces a report. It doesn't come to me, but it
6  goes to Ms. Burriesci. I am sure there are more,
7  but those are the ones that come to mind.
8       BY MR. ABBAS:
9    Q.  Arizona. Is TSC involved in assisting
10 federal agencies who utilize TSDB information for
11 screening purposes and hoping those agencies confirm
12 whether or not they have actually encountered a
13 person in the TSDB?
14   **A.  Yes. We call that identity resolution.**
15   Q.  How does TSC provide identity resolution
16 support to federal agencies that utilize TSDB
17 information?
18       MS. KONKOLY: Objection insofar as the
19 answer would implicate any law enforcement
20 privileged information. But you can answer.
21       THE WITNESS: The screening agency will
22 contact us through any one of a number of variety of

382

1  means. They provide the information that they
2  believe that leads them to believe they may have
3  encountered someone. And we then compare that to
4  information in TSDB. And, in some cases, we compare
5  that to information beyond TSDB. It may even come
6  down to the original derogatory information. We may
7  not be able to share that with the screening agency.
8  But there may be information there that we can ask
9  questions to rule in or rule out the individual
10 that's been encountered. And we can make the
11 decision as to whether or not we believe the person
12 is identical to the person in the database.
13       BY MR. ABBAS:
14   Q.  Are there -- is there dedicated TSC staff
15 that assists recipients of TSDB information in
16 identity resolution efforts?
17   **A.  Yes.**
18   Q.  How many TSC persons provide recipients
19 of TSDB information assistance with identity
20 resolution efforts?
21   **A.  I think that unit has approximately 40**
22 **individuals.**

383

1       Q.  And those people are called by the
2  screening agencies?
3    **A.  In some cases.**
4    Q.  In other cases, what happens?
5    **A.  It could be via some other platform. It**
6  **could be via email. It depends on the nature of the**
7  **enforcement.**
8    Q.  TSA calls TSC, correct? I am sorry.
9  When TSA has a potential TSDB listee that's trying
10 to check into a flight, TSC receives a call from
11 TSA.
12       MS. KONKOLY: Objection insofar as that
13 would implicate any SSI.
14       BY MR. ABBAS:
15   Q.  I will ask the question differently. I
16 will ask the question differently. Does TSC receive
17 calls from TSA?
18   **A.  We are contacted by TSA. I don't believe**
19 **I can -- I can state exactly how they contact us.**
20   Q.  Do they contact you by phone?
21       MS. KONKOLY: Objection insofar as any
22 answer would implicate SSI. If you think you can

384

1  answer, you can.
2       THE WITNESS: I don't believe I can
3  further specify how they contact us.
4       BY MR. ABBAS:
5    Q.  You testified that screening agencies
6  contact -- let's talk about CBP. Does the CBP
7  contact TSC by phone when it believes that it is
8  screening a person who is in the TSDB?
9       MS. KONKOLY: Objection insofar as that
10 would call for law enforcement privileged
11 information. You can answer if you think you can.
12       THE WITNESS: Again, with CBP I don't
13 think I can get into details about how they, in
14 particular, contact us. But they do contact us.
15       BY MR. ABBAS:
16   Q.  You can't tell me whether it was by phone
17 or by email?
18       MS. KONKOLY: Objection. Asked and
19 answered.
20       BY MR. ABBAS:
21   Q.  Why can't you tell me whether the TS --
22 CBP contacts you by phone or by email?

385

1      MS. KONKOLY: Objection. Calls for law
2 enforcement --
3      MR. ABBAS: I withdraw the question.
4      BY MR. ABBAS:
5  Q.  Have you, Mr. Groh, as an executor of the
6 Terror Screening Center ever recommended raising the
7 bar for the TSDB's inclusion standard?
8      MS. KONKOLY: Objection. Vague.
9 Objection insofar as that would call for
10 deliberative process privileged information. You
11 can answer if you can.
12      THE WITNESS: I have not personally
13 advocated for changing the reasonable suspicion
14 standard.
15      BY MR. ABBAS:
16  Q.  Are you aware of any prior members of
17 TSC's executive leadership team who have recommended
18 raising the bar for the TSDB's inclusion standard?
19      MS. KONKOLY: Objection. I think that
20 calls for deliberative process, protected
21 information. If you think there is a way to answer
22 without waiving that privilege, you can.

386

1      THE WITNESS: No, I don't think I could
2 waive that. Yeah, I think the privilege applies.
3      BY MR. ABBAS:
4  Q.  Two minutes. Has Charles Kable -- and
5 that's the name of the Terror Screening Center,
6 right?
**7  A.  It is Charles Kable.**
8  Q.  Has Charles Kable ever recommended
9 raising the bar for the TSDB's inclusion standard?
10      MS. KONKOLY: I am going to object that
11 that appears to call for deliberative process
12 privileged information. If you think you can answer
13 without waiving that privilege, you can.
14      THE WITNESS: I do not.
15      BY MR. ABBAS:
16  Q.  When is the next meeting of the Watch
17 Listing Advisory Council?
**18  A.  Within the next two weeks.**
19      MR. ABBAS: Can I come? I think that's
20 it. We are done. Thanks so much. I really
21 appreciate it.
22      THE VIDEOGRAPHER: We are going off the

387

1 record. The time is 6:44 p.m.
2      (At 6:44 p.m., the deposition was
3 concluded.)

388

1      ACKNOWLEDGMENT OF DEPONENT
2
3
4      I, TIMOTHY P. GROH, do hereby acknowledge
5 that I have read and examined the foregoing
6 testimony and the same is a true, correct and
7 complete transcription of the testimony given by me
8 and any corrections appear on the attached errata
9 sheet signed by me.
10
11 _____  _____
12  (SIGNATURE)      (DATE)
13
14
15
16
17
18
19
20
21
22

389

1          CERTIFICATE OF NOTARY PUBLIC

2

3          I, Carla L. Andrews, the officer before

4    whom the foregoing deposition was taken, do hereby

5    certify that the witness, whose testimony appears in

6    the foregoing deposition was duly sworn by the

7    Notary, that the testimony of said witness was taken

8    by me in stenotype and thereafter reduced to

9    typewritten form under my supervision, that said

10   deposition is a true record of the testimony given

11   by said witness; that I am neither counsel for,

12   related to, nor employed by any of the parties to

13   the action in which this deposition was taken, and

14   further that I am not a relative or employee of any

15   attorney or counsel employed by the parties thereto

16   nor financially or otherwise interested in the

17   outcome of the action.

18

19   _____

20          Carla L. Andrews, Notary Public

21          for the District of Columbia

22   My Commission Expires:  January 14, 2019