# Elhady Plaintiffs
# MSJ Exhibit 27



# Transcript of Randy Howe, Designated Representative

**Date:** March 22, 2018
**Case:** El Hady, et al. -v- Kable, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

Transcript of Randy Howe, Designated Representative    1 (1 to 4)
Conducted on March 22, 2018

---

**1**

```
1            IN THE UNITED STATES DISTRICT COURT
2           FOR THE EASTERN DISTRICT OF VIRGINIA
                     Alexandria Division
3
  --------------------------------x
4                                  )
  ANAS ELHADY, et al.,            )
5                                  )
          Plaintiffs,             )
6                                  )
          vs.                     ) Case No.
7                                  ) 16-cv-00375
  CHARLES H. CABLE, Director of   )
8 the Terrorist Screening Center; )
  in his official capacity, et al.,)
9                                  )
          Defendants.             )
10 --------------------------------x
11
12          VIDEOTAPED DEPOSITION OF
13       U.S. CUSTOMERS AND BORDER PROTECTION,
14    By and through its designated representative,
15                  RANDY HOWE
16                 Washington, DC
17             Thursday, March 22, 2018
18                   9:14 a.m.
19
20 Job No.: 182324
21 Pages: 1 - 353
22 Reported by: Donna Marie Lewis, RPR, CSR (HI)
```

---

**2**

```
1            IN THE UNITED STATES DISTRICT COURT
2           FOR THE EASTERN DISTRICT OF VIRGINIA
                     Alexandria Division
3
  --------------------------------x
4                                  )
  ANAS ELHADY, et al.,            )
5                                  )
          Plaintiffs,             )
6                                  )
          vs.                     ) Case No.
7                                  ) 16-cv-00375
  CHARLES H. CABLE, Director of   )
8 the Terrorist Screening Center; )
  in his official capacity, et al.,)
9                                  )
          Defendants.             )
10 --------------------------------x
11
12
13         Video Deposition of RANDY HOWE,
14   witness held at Department of Homeland Security,
15   20 Massachusetts Avenue,Northwest, Washington, D C
16   20001, pursuant to Notice, before Donna Marie
17   Lewis, Registered Professional Reporter and Notary
18   Public of and for the District of Columbia.
19
20
21
22
```

---

**3**

```
1               A P P E A R A N C E S
2 ON BEHALF OF PLAINTIFF:
3         COUNCIL ON AMERICAN-ISLAMIC RELATIONS
4         BY:  CAROLYN HOMER, ESQUIRE
5         453 New Jersey Avenue, S.E.
6         Washington, D C 20003
7         Telephone: (202) 516-4724
8         Facsimile: (202) 379-3317
9         Email: chomer@cair.com
10
11
12        COUNCIL ON AMERICAN-ISLAMIC RELATIONS
13        BY:  LENA MASRI, ESQUIRE
14        453 New Jersey Avenue, S.E.
15        Washington, D C 20003
16        Telephone: (202) 640-4934
17        Facsimile: (202) 488-0833
18        Email: Lmasri@cair.com
19
20
21
22
```

---

**4**

```
1 APPEARANCES: (Continued)
2        (Telephonically)
3        COUNCIL ON AMERICAN-ISLAMIC RELATIONS
4        BY: GADEIR ABBAS, ESQUIRE
5        453 New Jersey Avenue, S.E.
6        Washington, D C 20003
7        Telephone: (202) 516-4724
8        Facsimile: (202) 488-0833
9        Email: gabbas@cair.com
10
11 ON BEHALF OF DEFENDANTS:
12        U S DEPARTMENT OF JUSTICE, CIVIL DIVISION
13        BY: DENA M. ROTH, ESQUIRE
14        20 Massachusetts Avenue, NW
15        Washington, D.C. 20001
16        Telephone: (202) 514-5108
17        Email: dena.m.roth@usdoj.gov
18
19
20
21
22
```

5

```
1   APPEARANCES: (Continued)

2

3          U S DEPARTMENT OF HOMELAND SECURITY
           U S CUSTOMS AND BORDER PROTECTION
4          BY:  CONSTANTINA A GLOVER, ESQUIRE

5          1300 Pennsylvania Avenue, NW

6          Suite 4.4B

7          Washington, D C 20229

8          Telephone: (202) 344-2950

9          Facsimile: (202) 344-2950

10         Email: constantina.glover@dhs.gov

11

12  ALSO PRESENT:

13         CHRIS SCHAFFER, LEGAL VIDEOGRAPHER

14         JOSEPH CLARK, CUSTOMS AND BORDER PATROL

15         ADAM BLANK, CUSTOMS AND BORDER PATROL

16         JENNIFER GREENBAND, TSA

17         AHMED MOHAMED, (Telephonically)

18

19

20

21

22
```

6

```
1                I N D E X

2   WITNESS:

3       RANDY HOWE

4   EXAMINATION BY:                          PAGE

5       MS. HOMER                              9

6

7

8              E X H I B I T S
    HOWE
9   EXHIBITS:          DESCRIPTION          PAGE

10  No. 1  Notices of Deposition              13

11  No. 2  Privacy Pact Assessment           208

12  No. 3  Border Search of an Electronic Device  297

13  No. 4  Snapshot Summary of CBP Facts &
           Figures                           320
14  No. 5  Executive Order 13780             325

15

16

17

18

19

20

21

22
```

7

```
1              P-R-O-C-E-E-D-I-N-G-S

2       THE VIDEOGRAPHER:  Here begins tape

3   number one in videotaped deposition of Randy Howe,

4   corporate designee of Customs and Border

5   Protection in the matter of Anas Elhady, et al.,

6   v. Charles H. Cable, et al., in the United States

7   District Court Eastern District of Virginia,

8   Alexandria Division, Case Number 16-cv-375.

9   Today's date is Thursday, March 22, 2018.  The

10  time on the video monitor is 9:15 a.m.  The

11  videographer today is Chris Schaffer representing

12  Planet Depos.  This video deposition is taking

13  place at 20 Massachusetts Avenue, Northwest,

14  Washington, D C.

15       Would counsel please voice identify

16  themselves and statement whom they represent.

17       MS. HOMER:  Hi, I'm Carolyn Homer on

18  behalf of plaintiffs from the Council on

19  American-Islamic Relations.

20       MS. MASRI:  Lena Masri on behalf of

21  plaintiff from CAIR.

22       MR. ABBAS:  -- on behalf of plaintiffs.
```

8

```
1       (Court reporter requested

2   clarification.)

3       MR. ABBAS:  Gadeir Abbas on behalf of

4   plaintiffs.

5       MR. MOHAMED:  Ahmed Mohamed on behalf of

6   plaintiffs.

7       MS. ROTH:  Dena Roth of the Department

8   of Justice on behalf of defendants.

9       MS. GLOVER:  Constantina Glover of CBP,

10  Office of Chief Counsel.

11       MR. CLARK:  Joseph Clark for U S Customs

12  and Border Protection.

13       MR. BLANK:  Adam Blank from U S Customs

14  and Border Protection.

15       MS. GREENBAND:  Jennifer Greenband from

16  TSA.

17       THE VIDEOGRAPHER:  The court reporter

18  today is Donna Lewis representing Planet Depos.

19  Would the reporter please swear in the witness.

20

21

22
```

Transcript of Randy Howe, Designated Representative
Conducted on March 22, 2018

3 (9 to 12)

---

9

1  Whereupon,
2         R A N D Y   J.   H O W E
3  after having been first duly sworn by the Notary
4  Public was examined and testified as follows:
5         EXAMINATION ON BEHALF OF PLAINTIFFS
6         MS. HOMER:  Good morning.  Can you
7  please state your full name for the record?
8         THE WITNESS:  Sure.  Randy James Howe.
9  BY MS. HOMER:
10     Q   Have you ever been deposed before,
11 Mr. Howe?
12     **A   I don't think so.**
13     Q   So I'm just going to cover some quick
14 ground rules that you may have already been
15 instructed on prior to today.
16     **A   Okay.**
17     Q   First off, do you understand that you
18 are under oath today?
19     **A   I do.**
20     Q   And that you are obliged to tell the
21 truth?
22     **A   I do.**

---

10

1      Q   Is there any medical or other reason why
2  you are unable to provide truthful testimony
3  today?
4      **A   No.**
5      Q   You will see that everything is being
6  transcribed that we say.  And so please try to
7  answer questions verbally instead of nodding your
8  head or saying uh huh.  Can you do that?
9      **A   Understood.**
10     Q   And lastly, there is -- I'm trying to be
11 conversational, but in order to have a clean
12 record it is best if I'm able to finish a question
13 and if you are able to finish an answer without us
14 interrupting each other.  Can we try not to
15 interrupt each other today?
16     **A   Yes.**
17     Q   And finally, you are responding pretty
18 quickly right now, which I appreciate.  But your
19 counsel is going to want to interject sometimes
20 with objections.  And so try to wait a half beat
21 after I finish a question for Ms. Roth to
22 interpose an objection before you provide an

---

11

1  answer.  Can you do that?
2      **A   Understood.**
3      Q   Okay.  What is your understanding as to
4  why you are here today?
5      **A   Being deposed as the witness for CBP in**
6  **relation to this suit.**
7      Q   What is your position at the CBP?
8      **A   I'm the executive director for**
9  **operations for the Office of Field Operations.**
10     Q   How long have you held that position?
11     **A   Been in this position since October of**
12 **last year.**
13     Q   Okay.  Prior to October of last year did
14 you work for the CBP in any capacity?
15     **A   Yes.**
16     Q   What was your prior title at the CBP?
17     **A   I was the director of field operations**
18 **for the preclearance field office.**
19     Q   Okay.  How long did you hold that
20 position?
21     **A   About two years.**
22     Q   Prior to being the director in the

---

12

1  preclearance operations did you work at the CBP?
2      **A   Yes, I did.**
3      Q   What is the total length of time that
4  you have worked at the CBP?
5      **A   30 years this year.**
6      Q   And during those 30 years could you just
7  provide me a general list of the job
8  responsibilities --
9      **A   -- Sure.**
10     Q   -- you had at the CBP?
11     **A   Started in 1988 in the United States**
12 **Border Patrol for a very brief period of time.**
13 **Transitioned to immigration inspections for INS.**
14 **Became a supervisor with INS in Buffalo, New York**
15 **in 1995.  Transferred to preclearance operations**
16 **in Toronto in 1996.  Worked there for a number of**
17 **years.  Then transferred to our headquarters in**
18 **2004 where I was a program manager for about four**
19 **years for Customs and Border Protection field**
20 **operations.  Transferred back to Buffalo, New York**
21 **in various leadership roles until my current -- my**
22 **previous position as a preclearance director,**

---

13

1  which started in October of '15.

2       MS. HOMER: Okay. Thank you. Can we

3  mark Exhibit 1 to this deposition. Exhibit 1.

4       (Whereupon, Exhibit No. 1 was marked for

5  identification.)

6  BY MS. HOMER:

7     Q    Exhibit 1 is the Notice of 30(b)(6)

8  Deposition of Defendant CBP. Do you see that?

9     A    I do.

10    Q    Do you recognize this document?

11    A    I do.

12    Q    Have you reviewed it before today?

13    A    I have.

14    Q    Do you see that starting halfway down

15  page one and continuing onto page two there are

16  nine listed topics?

17    A    I do.

18    Q    Have you reviewed those topics before

19  today?

20    A    I have.

21    Q    Are you prepared to testify on these

22  topics subject to the limitations imposed by the

14

1  court last Friday?

2     A    Yes.

3     Q    So I have a couple of questions I want

4  to ask just about general CBP operations to

5  establish an overview of its scope and

6  responsibilities. Where does the CBP operate?

7       MS. ROTH: Objection. Vague.

8  BY MS. HOMER:

9     Q    You are allowed to answer unless she

10  instructs you not to answer.

11    A    Okay.

12    Q    So just -- I'll repeat the question.

13  Generally where does the CBP operate?

14    A    I'll speak on behalf of my component

15  within CBP, Office of Field Operations. We

16  operate in 320 ports of entry, also preclearance

17  locations in several different countries.

18    Q    What is a port of entry?

19    A    Port of entry is where people enter the

20  United States. They're applicants for admission.

21  They interact with our CBP, Office of Field

22  Operations.

15

1     Q    Do port of entries include airports?

2     A    They do.

3     Q    Do port of entries include seaports?

4     A    They do.

5     Q    Do port of entries include land border

6  crossings to the United States?

7     A    They do.

8     Q    All right. Are there any other

9  categories of ports of entry that I just missed?

10    A    Preclearance locations, which I also

11  believe are considered ports of entry.

12    Q    What is a preclearance location?

13    A    Where we perform the same function that

14  we do at a port of entry in the United States but

15  at a foreign location.

16    Q    And how many preclearances locations are

17  there?

18    A    We have 16.

19    Q    Are -- where primarily are those --

20  well, let me scratch that.

21       How many of those preclearance locations

22  are in Europe?

16

1     A    One. One.

2     Q    One?

3     A    Actually, two. I apologize. Shannon

4  and Dublin, Ireland.

5     Q    How many are in Asia?

6     A    Geography is a little weak here. But in

7  Abu Dhabi if that's considered Asia or Middle

8  East.

9     Q    Okay. Well, here I'll try it this way.

10  Can you just describe, I guess, generally? Do you

11  have a rough breakdown of where these preclearance

12  locations are located around the world?

13       MS. ROTH: I'll object as to form and as

14  to vagueness. Answer to the extent --

15       THE WITNESS: -- Sure.

16       MS. ROTH: -- that you think you

17  understood the question.

18       THE WITNESS: So we have 16 preclearance

19  locations. The first location was started in 1952

20  in Toronto, Canada. Our largest footprint of

21  preclearance locations is in Canada located from

22  Vancouver to Halifax. There's eight locations,

Transcript of Randy Howe, Designated Representative
Conducted on March 22, 2018

---

17

1 eight or nine.  And we are in the Caribbean.  So
2 we are in Freeport, Nassau, Bahamas.  We're in
3 Bermuda.  We're in Aruba.  Shannon and Dublin,
4 Ireland.  And then of course Abu Dhabi.
5 BY MS. HOMER:
6     Q   If I were to look on the CBP website
7 could I find a map of all of the preclearance
8 locations in the world?
9     A   I believe so.  On our CBP.gov.  But I
10 don't know for sure.
11    Q   How many employees does CBP have?
12    A   Within the whole organization I believe
13 more than 60,000.
14    Q   And how many employees are within the
15 Office of Field Operations?
16    A   23,000 or so, is my understanding.
17    Q   And what are the general duties of the
18 Office of Field Operations?
19    A   We perform the border security function
20 at our nation's port entries, so the screening of
21 travelers that are entering the U S.
22    Q   What does -- what is CBP's overall

18

1 mission?
2     A   It is to prevent -- to put it simply,
3 prevent dangerous people and things from entering
4 the U S to a critical piece of facilitating
5 legitimate travelers and trade.
6     Q   How does CBP facilitate legitimate
7 travel?
8         MS. ROTH: Objection.  Vague.
9         THE WITNESS: It's a risk base.  So
10 identifying people in advance that we may
11 potentially have concern with through those means.
12 BY MS. HOMER:
13    Q   Why is it important to the CBP to
14 facilitate legitimate travel?
15        MS. ROTH: Objection, vague.  Objection,
16 calls for speculation.  Answer if you think you
17 understood the question.
18        THE WITNESS: Can you restate it again
19 just to restate the question?
20        MS. HOMER: Could you read it back,
21 please.
22        (Court reporter read back the requested

19

1 portion.)
2         THE WITNESS:  Vast majority of the
3 travelers that enter the U S are legitimate
4 travelers, so it is in our best interest to
5 facilitate their entry.
6 BY MS. HOMER:
7     Q   Would CBP agree that law abiding United
8 States citizens have a right to enter the
9 United States?
10        MS. ROTH: Objection.  Calls for a legal
11 conclusion.  Objection as to vagueness and as to
12 form.  You can answer the question.
13        THE WITNESS:  United States citizens
14 should have the right to enter the U S, yes.
15 BY MS. HOMER:
16    Q   Are there any negative consequences in
17 the CBP's view to blocking or deterring legitimate
18 travel?
19        MS. ROTH:  Objection as to form and
20 vagueness.
21        THE WITNESS:  I don't understand your
22 question.

20

1 BY MS. HOMER:
2     Q   If -- let me try and rephrase it.  If
3 CBP prevents law abiding citizens from entering
4 the United States does CBP consider that to be a
5 problem?
6         MS. ROTH:  Objection as to form and
7 vagueness.
8         THE WITNESS:  We don't prevent people
9 that are admissible.
10 BY MS. HOMER:
11    Q   If CBP through its screening procedures
12 makes it more difficult to enter the United States
13 for law abiding citizens does CBP consider that to
14 an problem?
15        MS. ROTH:  Objection as to form and
16 vagueness.
17        THE WITNESS:  It's a difficult business,
18 screening passengers in a facilitative way.  There
19 are times -- we have an important role in
20 protecting our nation.  In order to do that we
21 have to fulfill our role in border security.  So
22 sometimes if individuals are delayed it's an

21

1 unintended consequence, but our role is to protect
2 the nation.
3 BY MS. HOMER:
4    Q   Would you agree that if an individual is
5 delayed for longer than is necessary to assess
6 their risk that that's a problem?
7        MS. ROTH: Objection. Vagueness.
8        THE WITNESS: We delay travelers as
9 necessary in order to do our job.
10 BY MS. HOMER:
11   Q   Does CBP ever evaluate whether delays
12 for legitimate travel are too long?
13       MS. ROTH: Objection. Form and
14 vagueness.
15       THE WITNESS: We continually evaluate
16 our operation to ensure that we are efficient in
17 what we do day by day.
18 BY MS. HOMER:
19   Q   Does deterring legitimate travel to the
20 United States harm the United States economy?
21       MS. ROTH: Objection. Outside of the
22 scope of what CBP could testify to, and vagueness.

22

1        THE WITNESS: Our intent is not to deter
2 people from entering the United States.
3 BY MS. HOMER:
4    Q   Is CBP aware that its screening
5 procedures do on occasion deter travel to the
6 United States?
7        MS. ROTH: Objection as to foundation.
8 Objection as to vagueness.
9        THE WITNESS: I don't know. I don't
10 know if I have an answer to that.
11 BY MS. HOMER:
12   Q   Has CBP ever determined that its
13 procedures regarding screening cause harm to the
14 United States economy?
15       MS. ROTH: Objection. Vague. Objection
16 again as to scope as to what CBP could testify to
17 with respect to harm to the economy.
18       THE WITNESS: I'm not aware of any.
19 BY MS. HOMER:
20   Q   Has the CBP ever evaluated whether its
21 procedures regarding entry into the United States
22 harm individual civil liberties?

23

1        MS. ROTH: Objection. Calls for legal
2 conclusion. Objection as to foundation and as to
3 vagueness.
4        THE WITNESS: We continually reassess
5 our operations and it's important for us to ensure
6 that we are not impeding on individual's civil
7 liberties.
8 BY MS. HOMER:
9    Q   And pursuant to CBP's continual
10 reassessment of its policies has there ever been
11 occasion where it concluded that certain policies
12 were harming personal liberties?
13       MS. ROTH: Same objections as to calling
14 for a legal conclusion and as to vagueness.
15       THE WITNESS: I'm not familiar with
16 anything.
17 BY MS. HOMER:
18   Q   Does CBP ever evaluate whether its
19 screening procedures harm the public's trust in
20 the CBP as a government institution?
21       MS. ROTH: Objection as to vagueness.
22       THE WITNESS: I'm not familiar that.

24

1 BY MS. HOMER:
2    Q   Has the CBP ever revised its policies in
3 order to benefit the United States economy?
4        MS. ROTH: Objection as to form and
5 vagueness. Also as to foundation. I also object
6 as to the scope as to what CBP could testify about
7 any economic harm.
8        THE WITNESS: I'm not familiar with any,
9 anything in regard to that type of evaluation due
10 to the economy -- economy.
11 BY MS. HOMER:
12   Q   Has the CBP ever revised its policies to
13 provide greater protections for individual civil
14 liberties?
15       MS. ROTH: Objection as to calling for a
16 legal conclusion and as to vagueness. You can
17 answer if you know.
18       THE WITNESS: I don't know.
19 BY MS. HOMER:
20   Q   Would it be of concern to CBP if it
21 learned that law abiding United States citizens
22 have left the United States permanently due to

Transcript of Randy Howe, Designated Representative
Conducted on March 22, 2018

---

25

1 screening procedures they received at the border
2 by CBP?
3        MS. ROTH:  Objection, calls for
4 speculation.  Objection, vague.
5        THE WITNESS:  Did you ask if I -- if I
6 would be surprised by that?
7 BY MS. HOMER:
8    Q    If you would be concerned?
9    A    **Concerned.  Yes.**
10   Q    Why would that be a concern to the CBP?
11   A    **As I said earlier, our role is very**
12 **important, national security and enforcing our**
13 **nation's borders.  We wouldn't want to have that**
14 **be a result of it, but that's what we do.  That's**
15 **a very important role.**
16   Q    Is the CBP aware of any circumstances in
17 which law abiding U S citizens have permanently
18 left the United States due to negative experiences
19 they had at the border?
20        MS. ROTH:  Objection, vague.  Objection,
21 calls for a legal conclusion.
22        THE WITNESS:  Not that I'm aware of.

---

26

1 BY MS. HOMER:
2    Q    If -- has CBP ever evaluated whether law
3 abiding citizens are permanently leaving the
4 United States due to negative experiences at the
5 border?
6        MS. ROTH:  Objection.  Vague.  Objection
7 to the extent it calls for a legal conclusion.
8        THE WITNESS:  I'm not familiar with
9 that.
10 BY MS. HOMER:
11   Q    If the CBP were to learn of law abiding
12 citizens who have permanently left the
13 United States due to negative experiences at the
14 border would that be a reason for the CBP to
15 reevaluate its screening practices?
16        MS. ROTH:  Objection, vague.  Objection
17 to the extent that calls for a legal conclusion.
18 And objection, calls for speculation.
19        THE WITNESS:  As I said earlier, our
20 role is very important; border security,
21 protecting our nation.  It is important that we
22 follow through with that mission.

---

27

1 BY MS. HOMER:
2    Q    Is that a yes?
3    A    **Restate your question?**
4    Q    If the CBP were to determine that law
5 abiding U S citizens were permanently leaving the
6 United States due to negative experiences at the
7 border would that constitute a reason for the CBP
8 to reevaluate its border screening practices?
9        MS. ROTH:  Same objections.
10       THE WITNESS:  Yeah, I don't know if it
11 is a yes or no answer.  I'll restate that our job
12 is very important; enforcing our laws, protecting
13 our nation.
14 BY MS. HOMER:
15   Q    In your opinion should the CBP
16 reevaluate its screening practices if the CBP were
17 to determine that its screening practices were
18 causing United States citizens to leave the
19 United States?
20       MS. ROTH:  Objection.  Vague.
21       THE WITNESS:  Same answer.  Our job is
22 very important; enforcing our nation's borders,

---

28

1 enforcing our laws, protecting our country.
2 BY MS. HOMER:
3    Q    Does the CBP consider it to be
4 succeeding at protecting the nation's borders if
5 its screening practices are causing law abiding
6 United States citizens to leave the country?
7        MS. ROTH:  Objection as to vagueness.
8 Objection, calls for speculation.  Counsel, you
9 have asked this question three or four different
10 times now.  So objection as to asked and answered.
11       THE WITNESS:  I haven't changed my
12 answer.
13       (Court reporter requested
14 clarification.)
15       THE WITNESS:  I haven't changed my
16 answer.
17 BY MS. HOMER:
18   Q    Part of CBP's mission is to screen
19 individuals before letting them enter the
20 United States.  Correct?
21   A    **Correct.**
22   Q    And CBP also screens physical items like

---

Transcript of Randy Howe, Designated Representative
Conducted on March 22, 2018

---

29

1   cargo at ports of entry. Is that correct?
2       A   Correct.
3       Q   And is screening the cargo also within
4   the Office of Field Operations responsibilities?
5       A   It is.
6       Q   For purposes of this deposition, unless
7   other specified, I am only going to be talking
8   about the process of screening individuals, not
9   things. Is that okay with you?
10      A   That's fine.
11      Q   In what circumstances does CBP screen
12  individuals?
13          MS. ROTH: Objection. Vague.
14          THE WITNESS: Everyone who presents
15  themselves for inspection at a port of entry is --
16  interacts with officers from Custom and Border
17  Protection, Office of Field Operations.
18  BY MS. HOMER:
19      Q   Does CBP screen all individuals who are
20  entering a point of -- point entry?
21      A   Yes.
22      Q   Does CBP screen all individuals who are

---

30

1   exiting a United States point of entry?
2       A   No.
3       Q   Under what circumstances does CBP screen
4   individuals whose are exiting a United States
5   point of entry?
6       A   We have the authority to screen
7   individuals as they are departing. It's part of
8   our authorities. So there are certain situations
9   where we would choose to screen a particular
10  flight or question an individual that's departing
11  the United States based on that authority.
12      Q   Can you give me examples of situations
13  where CBP would choose to screen an individual who
14  is exiting the United States?
15          MS. ROTH: I'm going to object to the
16  extent that that answer requires law enforcement
17  sensitive information. You can answer the
18  question without waiving that privilege.
19          THE WITNESS: Customs and Border
20  Protection enforces many, many laws for that of
21  CBP and other agencies, so there's a host of
22  reasons why we would have concerns about an

---

31

1   individual and want to question them before they
2   depart.
3   BY MS. HOMER:
4       Q   Is an individual's presence on the
5   terrorist screening database a reason that you
6   would question them before exiting the
7   United States?
8           MS. ROTH: Objection to the extent that
9   that calls for law enforcement sensitive
10  privileged information. You can answer if you can
11  answer in a non-privileged way.
12          THE WITNESS: That's one of the reasons.
13  As I said, many reasons why we may question
14  somebody that's departing. That is one of the
15  reasons.
16  BY MS. HOMER:
17      Q   What other reasons might you inspect
18  someone as they are departing the United States?
19          MS. ROTH: Same objection as to the
20  extent that that calls for law enforcement
21  sensitive information. You can answer if you can
22  answer in a non-privileged way.

---

32

1           THE WITNESS: The CBP, as I said,
2   enforces many laws immigration, customs related.
3   So we, for a host of different reasons we may.
4   Somebody that might be wanted by an agency, might
5   be information. Or they may be somebody that CBP
6   has an interest in collecting information from
7   that person.
8   BY MS. HOMER:
9       Q   So for an example if the FBI had an
10  outstanding warrant for somebody's arrest that
11  might be a reason that CBP would screen them as
12  they were trying to exit the United States?
13          MS. ROTH: Object as to law enforcement
14  sensitive information. And you can answer that
15  question if you can answer in a non-privileged
16  way.
17          THE WITNESS: That might be one of the
18  reasons.
19  BY MS. HOMER:
20      Q   Does CBP screen all individuals at
21  preclearance locations who are planning to enter
22  the United States?

---

---

33

1    A   Yes.
2    Q   Does CBP screen all individuals in
3 foreign countries who are boarding an
4 international flight headed to the United States?
5       MS. ROTH: Objection. Vague.
6       THE WITNESS: I don't understand your
7 question.
8 BY MS. HOMER:
9    Q   Let's see if I can try to rephrase.
10 Every day there are many flights that fly from
11 foreign countries to the United States. Correct?
12   A   Yes.
13   Q   Does CBP screen the passengers on those
14 flights before they depart a foreign country?
15   A   There is certain requirements that
16 airlines have to provide advance information on
17 passengers. So there would be instances where
18 that individual may require some questioning.
19   Q   So airlines leaving a foreign country
20 and headed to the United States, are they required
21 to provide their complete passenger manifest with
22 CBP?

---

34

1    A   Yes.
2    Q   And does CBP screen that manifest to
3 determine if there any persons of concern on those
4 flights?
5       MS. ROTH: Objection. Vague.
6       THE WITNESS: It's part of what we do is
7 looking at information that -- in advance, part of
8 our facilitation.
9 BY MS. HOMER:
10   Q   Does CBP ever instruct international
11 flights departing a foreign country to the
12 United States to not let persons board that
13 flight?
14      MS. ROTH: Objection. Vague.
15      THE WITNESS: We do have a way of
16 communicating with foreign carriers relaying that
17 if a passenger potentially could be inadmissible
18 to the U S, we do advise carriers that they should
19 not board certain passengers.
20 BY MS. HOMER:
21   Q   What is the mechanism that the CBP has
22 for communicating with international carriers in

---

35

1 order to advise them that a person is not
2 admissible to the United States?
3    A   There are several locations where we
4 actually have CBP officers on site. So that would
5 be directly from CBP in those certain foreign
6 airports. And then there are other locations were
7 we don't have a physical location, there would
8 communication from CBP to points of contact within
9 the carrier industry.
10   Q   So in situations where CBP does not have
11 internationally stationed CBP officers, CBP
12 communicates directly with the airline about
13 screening in that circumstance?
14      MS. ROTH: Objection, vague. Objection,
15 mischaracterizes the prior testimony.
16      THE WITNESS: We are not -- they are not
17 doing screening for us. We are just making a
18 recommendation that that passenger may be
19 inadmissible when they arrive at the
20 United States.
21 BY MS. HOMER:
22   Q   Does CBP ever communicate with foreign

---

36

1 countries, as in the governments of those foreign
2 countries, regarding the presence of passengers
3 who are seeking boarding to an international
4 flight to the United States who may be
5 inadmissible to the United States?
6       MS. ROTH: Objection, vague. Objection
7 to the extent the question calls for law
8 enforcement privileged information. You can
9 answer if you think you can answer in a
10 non-privileged way.
11      THE WITNESS: CBP communicates with law
12 enforcement partners from around the world in
13 various ways.
14 BY MS. HOMER:
15   Q   And that would include law enforcement
16 partners in foreign countries?
17   A   Yes.
18   Q   That would include law enforcement
19 partners in foreign countries at foreign airports?
20   A   Yes.
21   Q   Does CBP screen all individuals who are
22 on a ship that enters a United States port?

Transcript of Randy Howe, Designated Representative
Conducted on March 22, 2018

37

1    A   Yes.
2    Q   Does CBP screen all individuals who may
3 be employed on a ship that enters a United States
4 port, even if the crew and employees don't
5 actually themselves seek entry into the
6 United States?
7        MS. ROTH:  Objection.  Vague.
8        THE WITNESS:  I'm not sure I understand
9 your question.
10 BY MS. HOMER:
11   Q   Let me try and rephrase it.  If a ship
12 passes through U S waters, but does not stop at a
13 U S port, does CBP screen the list of employees
14 and passengers on that ship?
15       MS. ROTH:  Objection.  Vague.
16       THE WITNESS:  Yeah, I don't get -- I
17 don't get your question.
18 BY MS. HOMER:
19   Q   Does CBP receive the passenger manifest
20 of every ship that passes through U S waters?
21   **A   I believe so.**
22   Q   Does CBP apply any automatic screening

38

1 to the identities of the individuals on that
2 passenger manifest?
3        MS. ROTH:  Objection.  Vague.
4        THE WITNESS:  In any mode that we have
5 that advance information we would do screening,
6 CBP would do the screening.
7 BY MS. HOMER:
8    Q   Does CBP screen all individuals who
9 apply for trusted traveler programs administered
10 by the CBP?
11   **A   Yes.**
12   Q   That includes Global Entry?
13   **A   Yes.**
14   Q   NEXUS?
15   **A   Yes.**
16   Q   SENTRI?
17   **A   Yes.**
18   Q   Any others that I'm missing?
19   **A   I don't think so.**
20   Q   Does CBP screen all individuals located
21 abroad who apply for visas through the State
22 Department?

39

1    A   **Yes, it is my understanding that the**
2 **State Department does.**
3    Q   But the State Department sends the list
4 of visa applicants to the CBP for screening.  Am I
5 correct?
6        MS. ROTH:  Objection as to scope and
7 objection as to if that is calling for information
8 not in the possession of the CBP.
9        THE WITNESS:  Department of State
10 functions independently.  They screen individuals,
11 make a determination of whether or not they would
12 issue a visa.  That -- that's their function.
13 BY MS. HOMER:
14   Q   And what is CBP's role in the visa
15 issuance process, if any?
16   **A   Department of State may ask Customs and**
17 **Border Protection information on individuals.**
18   Q   What sort of information might this
19 Department of State ask the Customs and Border
20 Protection to provide on individuals?
21       MS. HOMER:  Let me object as to the
22 extent that that question calls for law

40

1 enforcement privileged information and is vague.
2 You can answer if you can answer in a
3 non-privileged way.
4        THE WITNESS:  As an example, just
5 previous encounters, previous admissions to the U
6 S, previous interactions with CBP.
7 BY MS. HOMER:
8    Q   Does the CBP screen all individuals who
9 apply to work for the CBP?
10   **A   Yes.**
11   Q   Does the CBP screen all individuals who
12 apply to work at a point of entry even if not
13 directly for the CBP?
14       MS. ROTH:  Objection, vague.  Objection,
15 scope.
16       THE WITNESS:  Yes.
17 BY MS. HOMER:
18   Q   Does the CBP issue any credentials to
19 employees who work at points of entry indicating
20 that they are authorized to work at that point of
21 entry?
22       MS. ROTH:  Objection, vague.

Transcript of Randy Howe, Designated Representative
Conducted on March 22, 2018

11 (41 to 44)

41

1         THE WITNESS:  Yes.
2    BY MS. HOMER:
3        Q    What are those credentials called?
4        A    **The CBP seal.  So it is something that**
5    **is affixed, our way of highlighting on whatever**
6    **the local -- you know, security pass -- pass they**
7    **have in that environment.**
8        Q    What are the criteria for an individual
9    to receive a customs seal?
10        MS. ROTH:  Objection as far as that
11    mischaracterizes previous testimony and calls for
12    a legal conclusion.
13        THE WITNESS:  Any -- any port director
14    that is responsible for that port of entry has to
15    be satisfied that that individual is permitted to
16    enter the space.  So they would interview that
17    person and make a determination whether or not
18    they would be -- you know, trusted to be within
19    that highly sensitive CBP environment.
20    BY MS. HOMER:
21        Q    Before an individual can receive a
22    customs seal are their identities matched against

42

1    the terrorist screening database?
2        A    **Part of our review process is to query**
3    **an individual through our system, so as to any**
4    **information that might be in the system that would**
5    **help guide that port director's decision on**
6    **granting them a customs seal.**
7        Q    Is an individual's presence in the
8    terrorist screening database a reason for denying
9    a customs seal?
10        A    **There's many reasons why, but that's one**
11    **of them.**
12        Q    I just walked through a long list of
13    examples of when CBP might screen individuals.
14    Are there any categories or instances of times
15    that the CBP screens individuals that I missed?
16        MS. ROTH:  Objection, vague.  Objection,
17    compound.
18        THE WITNESS:  I haven't been taking
19    notes, but it seems like you covered it all.
20    BY MS. HOMER:
21        Q    If you think of any in the future, let
22    me know.

43

1        A    **Okay.**
2        Q    But I did endeavor to cover them all.
3    Okay.  For every category of individuals that CBP
4    screens does part of that screening include
5    matching the individual against the terrorist
6    screening database?
7        A    **So when someone presents themselves for**
8    **inspection at a port of entry, they interact with**
9    **a CBP officer.  And the process is fairly routine.**
10    **But they present their identification documents,**
11    **passport.  The officer will verify the identity of**
12    **the person, make sure that it is the true bearer**
13    **of the document.  They will ask them questions**
14    **about if they are a foreign national, about their**
15    **intent in visiting the United States.  Ask to**
16    **ensure that they have the means to support**
17    **themselves.  So ask them questions to be satisfied**
18    **that they're admissible to the United States.**
19    **Also a part of the processes is to perform a query**
20    **of our database of all individuals to see if**
21    **there's any alerts in the systems for various**
22    **amount of -- you know, a host of different**

44

1    **reasons, all the laws that CBP enforces or other**
2    **agencies.  One of those alerts may be for a TSDB.**
3        Q    Okay.  When you said that officers may
4    verify the identity of a person seeking entry into
5    the United States, what does the process of
6    verifying an identity entail?
7        A    **Looking at the document, comparing the**
8    **individual to the document, questioning the**
9    **individual to ensure that they are able to answer**
10    **simple questions about their identity.  That's**
11    **part of it.**
12        Q    Does the CBP require that the document
13    the individual presents contain a photograph of
14    the individual?
15        A    **That is one of the requirements in all**
16    **travel documents, is there's a photo.**
17        Q    So one step in an officer's verification
18    of the identity would be to match the photograph
19    on the ID to the person standing in front of them?
20        A    **Yes.**
21        Q    You said that the officer might also ask
22    simple questions about their identity.  Correct?

45

1    A    Uh huh.
2    Q    Would that include for example a date of
3  birth?
4    A    Yes.
5    Q    Or the address that is on the government
6  ID where the person resides?
7    A    Yes.
8    Q    Or their nationality?
9    A    Yes.
10   Q    Are there any examples of simple
11 questions about an identity that an officer might
12 ask?
13       MS. ROTH:  I'm going to object as to the
14 extent that that question calls for law
15 enforcement privileged information.  You can
16 answer if you can answer in a non-privileged way.
17       THE WITNESS:  I think you covered a good
18 number of the things we would do.
19 BY MS. HOMER:
20   Q    Are there any major ones that you can
21 think of that I missed?
22       MS. ROTH:  Object to the extent that

46

1  that question calls for law enforcement privileged
2  information.  You can answer if you can answer in
3  a non-privileged way.
4        THE WITNESS:  Again, I think you
5  provided a good amount of what we look at and talk
6  to the passenger about.
7  BY MS. HOMER:
8    Q    You said that in the process of an
9  officer encountering an individual seeking entry
10 that a query will be run in a database.  Am I
11 stating that correctly?
12       MS. ROTH:  Objection.  I think it
13 mischaracterizes the prior testimony.
14       THE WITNESS:  Part of the process of
15 screening individuals, verifying identity, in some
16 cases collecting biometrics is performing a query
17 in our system.
18 BY MS. HOMER:
19   Q    What is the name of the CBP system in
20 which that query is performed?
21   A    TECS.
22   Q    And does the TECS system receive an

47

1  import of TSDB information?
2    A    Yes, it does.
3    Q    So part of the query that is run when an
4  individual is seeking entry to the United States
5  includes a query against the TSDB information in
6  TECS?  Is that accurate?
7        MS. ROTH:  Objection as to vagueness.
8        THE WITNESS:  The TSDB information is
9  shared by the terrorist screening center through
10 the DHS Watchlist Service, which is an electronic
11 portal.  And that information is provided to
12 agencies seamlessly and in realtime.  So that
13 information is provided into TECS.
14 BY MS. HOMER:
15   Q    And when an individual identity is
16 queried against TECS as they are seeking admission
17 to the United States that query includes an
18 examination as to whether that person matches the
19 TSDB information present in TECS.  Is that
20 correct?
21       MS. ROTH:  Objection.  Vague.
22       THE WITNESS:  Can you restate your

48

1  question?
2        MS. HOMER:  Could you read it back for
3  me, please?
4        (Court reporter read back the requested
5  portion.)
6        THE WITNESS:  There are alerts in TECS
7  from the various agencies, CBP, other DHS
8  components.  So there are alerts that we may see
9  on many different reasons.  One of them may be a
10 TSDB.
11 BY MS. HOMER:
12   Q    The TSDB is one of the alerts that may
13 trigger when an individual is queried against TECS
14 when they are seeking entry in the border.  Is
15 that correct?
16   A    Yes.
17   Q    Are both citizens and noncitizens
18 queried against TECS when they seek entry at the
19 border?
20   A    All individuals that present themselves
21 for inspection at a port of entry are queried in
22 TECS.

---

**49**

1    Q    And all individuals who present
2  themselves at a port of entry would therefore also
3  be queried against the TSDB if they were present
4  in the TSDB. Is that correct?
5         MS. ROTH: Objection as to foundation.
6  Objection as to vagueness.
7         THE WITNESS: I think I already answered
8  the question.
9  BY MS. HOMER:
10    Q    Can you repeat your answer?
11    A    **All applicants for admission that**
12  **present themselves --**
13         (Court reporter requested
14  clarification.)
15         THE WITNESS: All applicants for
16  admission that present themselves for inspection
17  at a port of entry are queried against the TECS
18  system.
19  BY MS. HOMER:
20    Q    And the TECS system incorporates TSDB
21  information. Correct?
22    A    **TSDB information is shared from the TSC**

---

**50**

1  **through Watchlist Service to TECS.**
2    Q    Is that a yes?
3    A    **Yes.**
4    Q    Thank you. We were just discussing
5  points of entry. But to clarify the other
6  screening -- I'm going to ask about the other
7  screening functions CBP performs as well.
8         So when CBP screens individuals who are
9  listed on an airplane manifest departing a foreign
10  country and heading to the United States, is that
11  screening performed in TECS?
12    A    **No.**
13    Q    What system is that screening performed
14  in?
15         MS. ROTH: Objection to the extent that
16  it calls for law enforcement privileged
17  information. You can answer if you can answer in
18  a non-privileged way.
19         THE WITNESS: Yes. Through an automated
20  targeting system.
21  BY MS. HOMER:
22    Q    What's an automated targeting system?

---

**51**

1    A    **It's a CBP system that takes**
2  **information, advance information on individuals**
3  **applying for admission to the U S against our**
4  **database.**
5    Q    What is the Advance Passenger
6  Information System or APIS, A-P-I-S?
7    A    **Certain information that the carriers**
8  **collect and provide to CBP in advance of the**
9  **conveyance departing, information on the**
10  **passenger.**
11    Q    Does APIS apply to domestic flights?
12  Well, here. Let me ask the question because I'm
13  just honestly confused or I don't know. How does
14  the APIS system relate to the TSA's Secure Flight
15  system?
16         MS. ROTH: Objection as to scope.
17  Objection that it calls for him to speculate as to
18  information outside of CBP's authority or
19  knowledge. You can answer if you know.
20         THE WITNESS: Yeah, I don't know how
21  they -- how those two systems interact.
22

---

**52**

1  BY MS. HOMER:
2    Q    Is the APIS system still in use by CBP?
3    A    **Yes.**
4    Q    How does the APIS system interact with
5  TECS?
6         MS. ROTH: Objection. Foundation.
7         THE WITNESS: It feeds into TECS as
8  well. It's advance passenger information.
9  BY MS. HOMER:
10    Q    What advance passenger information is
11  APIS gathering?
12    A    **Biographical information of the**
13  **passenger passport --**
14    Q    And is APIS --
15    A    **-- and documents.**
16    Q    Is APIS gathering biographical passenger
17  information and documents for foreign flights?
18         MS. ROTH: Objection. Vague.
19         THE WITNESS: I don't understand your
20  question.
21  BY MS. HOMER:
22    Q    What types of flights does APIS receive

---

---

53

1 passenger information about?
2    A   Any inbound flights to the United States
3 and I believe international departures from the
4 United States.
5    Q   Okay.  But APIS does not track -- let me
6 start over.
7         APIS does not receive passenger
8 information and documents for entirely domestic
9 flights in the United States.  Is that --
10   A   -- no.  No.
11   Q   No, as in it is correct?  Let me
12 rephrase it.
13        Is it correct that APIS does not receive
14 passenger manifest information for entirely
15 domestic flights in the United States?
16   A   That's correct.  We do not.
17   Q   Does CBP receive passenger manifest
18 information for entirely domestic flights directly
19 from the TSA Secure Flight system?
20        MS. ROTH:  Objection to the extent that
21 that calls for law enforcement privileged
22 information.  It is vague.  Answer, if you can.

---

54

1         THE WITNESS:  I don't know.
2 BY MS. HOMER:
3    Q   Does TECS receive Secure Flight data
4 from the TSA?
5    A   I don't know, but since TSA is a key DHS
6 partner, possibly.  But I don't know.
7    Q   Does APIS screen the international
8 flight data it receives against the TSDB?
9         MS. ROTH:  Objection.  Vague.
10        THE WITNESS:  APIS is a mechanism to
11 collect the information that is shared with CBP
12 into our TECS system.
13 BY MS. HOMER:
14   Q   Okay.  So to the extent that TECS
15 receives APIS data about passengers on
16 international flights any screening of that data
17 would be done against the TSDB information that is
18 already in TECS?
19        MS. ROTH:  Objection.  Vague.
20        THE WITNESS:  I think I understand your
21 question.  That is, the APIS information as it is
22 shared with TECS is it -- if that person we have

---

55

1 the information on is in TSDB would it be alerted
2 to us at that point?  Is that your question?
3 BY MS. HOMER:
4    Q   Yes.
5    A   Yes.
6    Q   Okay.  And I will try to make that more
7 clear.  TECS receives APIS data on international
8 flights.  Correct?
9    A   Correct.
10        MS. ROTH:  Objection.  Vague and
11 mischaracterizes prior testimony.  International
12 flights that are inbound to the United States.
13 BY MS. HOMER:
14   Q   Fair.  I will ask to be clear.
15        TECS receives data on international
16 flights inbound to or exiting the United States
17 from APIS.  Correct?
18   A   Correct.
19   Q   And TECS separately receives TSDB data
20 from the DHS Watchlist Service, which received it
21 from the TSC.  Correct?
22   A   Correct.

---

56

1    Q   And TECS will perform a match between
2 the APIS data it receives and the TSDB data it
3 receives to determine if there are any hits
4 between the two.  Is that correct?
5         MS. ROTH:  Objection.  Vague.
6         THE WITNESS:  Yes.  I think I answered
7 that question earlier.
8 BY MS. HOMER:
9    Q   Does the CBP ever refuse to let
10 airplanes enter U S airspace if there is an
11 individual on board that airplane who is listed in
12 the TSDB?
13        MS. ROTH:  Objection, vague.  Objection,
14 foundation.  Objection, calls for speculation.
15        THE WITNESS:  I don't know who has the
16 authority to do that.
17 BY MS. HOMER:
18   Q   To CBP's knowledge has it ever occurred
19 that an airplane has been instructed to not enter
20 U S airspace because there is an individual who
21 matches the TSDB on board?
22        MS. ROTH:  Same objections.

57

1  THE WITNESS: I don't recall firsthand,
2  but I believe that has happened before.
3  BY MS. HOMER:
4  Q  Does the -- sorry. Does the CBP
5  instruct airlines to not permit passengers
6  attempting to board an airline to the
7  United States -- that was a mess. Let me start
8  over.
9  Does the CBP instruct airlines departing
10 a foreign country and traveling to the
11 United States to deny boarding to persons who are
12 listed on the TSDB?
13  MS. ROTH: Objection, vague. Objection,
14 asked and answered.
15  THE WITNESS: What did you say?
16  MS. ROTH: Vague and asked and answered
17 earlier.
18  THE WITNESS: Yeah, I believe I already
19 answered that question.
20  MS. HOMER: I'm not quite sure I asked
21 the question exactly that way. So I'd like a yes
22 or no answer even if you did already answer it.

58

1  So could I have the court reporter please read
2  back the question?
3  (Court reporter read back the requested
4  portion.)
5  MS. ROTH: Same objections which are to
6  vagueness. And again, I believe this question is
7  asked and answered earlier. But you can answer
8  the question.
9  THE WITNESS: CBP makes recommendations
10 to carriers based on admissibility. So if that
11 person's bound to be found inadmissible to the
12 United States we will make a recommendation to the
13 carrier not to board them.
14 BY MS. HOMER:
15  Q  Is an individual's presence on the TSDB
16 a reason for the CBP to deny admission to the
17 United States?
18  **A  On a case by case basis, perhaps.**
19  Q  Is a foreign national's presence on the
20 TSDB --
21  (Court reporter requested
22 clarification.)

59

1  BY MS. HOMER:
2  Q  Is a foreign national's presence on the
3  TSDB a basis for the CBP to deny admission to that
4  foreign national to the United States?
5  **A  There's a host of reasons why somebody**
6  **would be found inadmissible to the United States.**
7  **So the fact that somebody is on a TSDB is a**
8  **contributing factor to final determination of**
9  **admissibility.**
10  Q  So yes or no, is a foreign national's
11 presence on the TSDB a reason to deny that foreign
12 national entry to the United States?
13  MS. ROTH: Objection. Vague.
14  THE WITNESS: I think I already answered
15 that question. It's one of the contributing
16 factors to totality of circumstances case by case
17 on how we assess somebody's admissibility to the
18 United States.
19 BY MS. HOMER:
20  Q  Is a U S citizen's presence on the TSDB
21 a basis to deny that U S citizen reentry to the
22 United States?

60

1  MS. ROTH: Objection. Vague.
2  THE WITNESS: U S citizens cannot be
3  denied reentry.
4  BY MS. HOMER:
5  Q  Is a U S citizen's presence on a TSDB a
6  basis for the CBP to instruct a foreign airline to
7  not let that citizen board the foreign aircraft?
8  MS. ROTH: Objection. Vague.
9  BY MS. HOMER:
10  Q  Actually, let me rephrase that. Is a U
11 S citizen's presence on the TSDB a basis for the
12 CBP to recommend to an airline departing a foreign
13 country to the United States for that airline to
14 not let the U S citizen board the airline?
15  **A  I think I already answered the question.**
16 **U S citizens won't be prevented from entering the**
17 **United States.**
18  Q  So the CBP does not recommend to
19 airlines departing a foreign country that they
20 should deny boarding to a U S citizen who is
21 listed on the TSDB who is seeking to board that
22 airline?

61

1    **A    For a United States citizen, no.  U S**
2    **citizens would not be prevent -- prevented from**
3    **traveling to the United States for that reason.**
4    Q    Would a citizen who is listed on the
5    TSDB and on the no fly list subcomponent of the
6    TSDB be denied boarding at a foreign airport on a
7    flight bound to the United States?
8        MS. ROTH: Objection as to scope.
9    Counsel is very aware that the court ordered that
10   no fly is not a subject for this examination.  So
11   I'm going to instruct him not to answer it.
12   BY MS. HOMER:
13   Q    Okay.  Does the CBP refuse to let ships
14   enter U S ports if there is an individual who
15   matches the TSDB on board?
16       MS. ROTH: Objection.  Vague.
17       THE WITNESS: I don't believe so.
18   BY MS. HOMER:
19   Q    Has it ever happened that the CBP has
20   refused to let a ship enter the U S -- enter a U S
21   port on the basis that there was an individual who
22   matched the TSDB on board?

62

1    **A    Not that I'm aware of.**
2        MS. ROTH: I'm just going to remind my
3    witness to give me a second to object.
4        THE WITNESS: Sorry.
5        MS. ROTH: That's okay.
6    BY MS. HOMER:
7    Q    Has the CBP ever refused to let a
8    foreign national who matches the TSDB enter the
9    United States at a port of entry?
10       MS. ROTH: Objection.  Vague.
11       THE WITNESS: I don't understand the
12   question.
13   BY MS. HOMER:
14   Q    I will try and break it up.  It
15   occasionally happens that a foreign national who
16   is listed on the TSDB, seeks entry to the
17   United States.  Correct?
18   **A    Correct.**
19   Q    In the event that a foreign national who
20   is listed on the TSDB seeks entry into the
21   United States, has the CBP ever denied that person
22   admission on the basis that they are listed in the

63

1    TSDB?
2    **A    One of the roles of CBP is to determine**
3    **admissibility at port of entry, to determine**
4    **whether or not somebody can be admitted to the**
5    **United States, so that there is a host of factors**
6    **that we consider in making that final**
7    **determination.**
8    Q    And is one on the factors used by the
9    CBP to deny entry to a foreign national that
10   foreign national's presence on the TSDB?
11   **A    One of many factors that we consider.**
12   Q    Has a foreign national who is listed on
13   the TSDB ever been admitted to the United States?
14   **A    I don't know of firsthand, but**
15   **potentially.**
16   Q    Is that information the CBP could
17   determine by looking at its records?
18   **A    I suppose.**
19   Q    You earlier described that during the
20   initial screening process the CBP runs a query in
21   its TECS system for every individual who presents
22   themselves at a port of entry.  Is that correct?

64

1    **A    Correct.**
2    Q    And you earlier testified that on
3    occasion that TECS system may return a match or
4    alert against a wide variety of other government
5    databases.  Is that correct?
6        MS. ROTH: I'm going object to the
7    extent that that mischaracterizes prior testimony.
8        THE WITNESS: I don't know if I stated
9    it the way you just did.
10   BY MS. HOMER:
11   Q    How would you state what I just
12   described in your own words?
13   **A    Restate the question, please?**
14       MS. HOMER: Could you please reread it.
15       (Court reporter read back the requested
16   portion.)
17       THE WITNESS: I'm not sure how many
18   databases, but other agencies have -- CBP has
19   records in their alerts.  And other agencies have
20   records in alerts.  If we are talking about the
21   TSDB information that's shared with -- that
22   information is placed in the TECS.

Transcript of Randy Howe, Designated Representative

Conducted on March 22, 2018

---

65

1  BY MS. HOMER:
2       Q    When an initial screener for the CBP
3  runs a query on an individual to the TECS system
4  will the TECS system then indicate to the screener
5  whether or not the individual needs to undergo
6  secondary screening?
7            MS. ROTH: Objection. Vague.
8            THE WITNESS: The officer, not the
9  screener.
10 BY MS. HOMER:
11      Q    Okay. Sorry.
12      **A    The officer as completing the**
13 **inspection, alerts in the system are one of the**
14 **contributing factors and the guidance that's in**
15 **that alert in determining whether or not somebody**
16 **should be referred to secondary.**
17      Q    Does an officer who is completing an
18 initial inspection also have the discretion to
19 refer any individual passenger to secondary
20 screening?
21           MS. ROTH: Objection. Vague.
22           THE WITNESS: Yes, they have the

---

66

1  discretion to refer individuals that wish to
2  continue the inspection, what we call our
3  secondary inspection for additional questioning.
4  BY MS. HOMER:
5       Q    Okay. So secondary inspection is the
6  phrase the CBP uses in the circumstances where an
7  individual is sent by an initial inspecting
8  officer to further inspection?
9       **A    Yes.**
10      Q    Are individuals who seek entry to the
11 United States and who match the TSDB automatically
12 referred to secondary inspection?
13           MS. ROTH: Objection, vagueness.
14 Objection, compound. And objection as to the
15 extent that that calls for law enforcement
16 privileged information. If you can answer it in a
17 non-privileged way, you can.
18           THE WITNESS: The officer, based on the
19 information they have in front of them, they have
20 to make a decision whether or not to refer to
21 secondary or not.
22

---

67

1  BY MS. HOMER:
2       Q    If an individual is listed in the TSDB
3  will an alert be displayed to the inspecting
4  officer that the individual is listed to the
5  TSDB -- is listed in the TSDB?
6       **A    The officer would know that that person**
7  **would require additional questioning for being a**
8  **TSDB.**
9       Q    How is the information communicated to
10 the officer that the person in front of them is a
11 match to the TSDB?
12           MS. ROTH: Objection to the extent that
13 it calls for law enforcement privileged
14 information. You can answer it if you can answer
15 it in a non-privileged way.
16           THE WITNESS: I don't know if I can
17 without jeopardizing.
18 BY MS. HOMER:
19      Q    Is there a specific alert or message
20 that is displayed to initial inspection officers
21 that indicates an individual is a match to the
22 TSDB?

---

68

1            MS. ROTH: I'm going to object to the
2  extent that calls for law enforcement privileged
3  information. You can answer yes or no, but that's
4  it.
5            THE WITNESS: I think I already answered
6  the question. The officer is aware.
7  BY MS. HOMER:
8       Q    And the officer is specifically aware
9  that the individual is a match to the TSDB.
10 Correct?
11           MS. ROTH: Objection, vagueness.
12 Objection, form and foundation.
13           THE WITNESS: They know that that
14 individual is a potential match.
15 BY MS. HOMER:
16      Q    A potential match to what?
17      **A    To the TSDB.**
18      Q    Okay. Is it CBP's policy for any
19 potential match to the TSDB to be referred to
20 secondary inspection?
21           MS. ROTH: Objection that that calls for
22 law enforcement privileged information. You can

---

Transcript of Randy Howe, Designated Representative
Conducted on March 22, 2018

18 (69 to 72)

69

1 answer if you can answer in a non-privileged way.
2      THE WITNESS: I think I already answered
3 that. The officer has to make the judgment based
4 on the information that they have.
5 BY MS. HOMER:
6    Q   Does the officer have the discretion to
7 not refer a potential match to the TSDB to
8 secondary inspection?
9      MS. ROTH: Objection to the extent that
10 it calls for law enforcement privileged
11 information. You can answer if you can answer in
12 a non-privileged way.
13      THE WITNESS: I'm not so sure I can.
14 BY MS. HOMER:
15    Q   That you cannot what?
16 **A   Answer it, because it's a law**
17 **enforcement privileged.**
18    Q   Does the officer who receives the alert
19 that an individual may be a match to the TSDB take
20 any steps to confirm whether or not that
21 individual is in fact a match to the TSDB?
22 **A   If the person is referred to secondary**

70

1 **for additional questioning, part of that**
2 **questioning would be to determine whether or not**
3 **it is a match.**
4    Q   What is the process by which the CBP
5 determines whether or not a potential match to the
6 TSDB is in fact a match to the TSDB?
7      MS. ROTH: I'm going to object to the
8 extent that it calls for law enforcement
9 privileged information. You can answer if you can
10 answer in a non-privileged way.
11      THE WITNESS: From secondary inspection,
12 different officers than were on primary. We
13 question the individual, verify identity, and then
14 we consult our headquarters personnel on any other
15 information that might be helpful in determining
16 whether or not that person is a match.
17 BY MS. HOMER:
18    Q   When you say headquarters personnel are
19 you referring to the National Targeting Center?
20 **A   I am.**
21    Q   And is the National Targeting Center a
22 subdivision within the Office of Field -- wait.

71

1    A   Operations?
2    Q   Of Field Operations, yes?
3 **A   Not a subdivision. They are a part of**
4 **Office of Field Operations.**
5    Q   So the National Targeting Center is a
6 division within the Office of Field Operations?
7 **A   Yes.**
8    Q   And what are the responsibilities of the
9 National Targeting Center?
10 **A   They perform the advanced screening or**
11 **targeting of individuals that are traveling to the**
12 **United States.**
13    Q   Is it part of the National Targeting
14 Center's job responsibilities to determine whether
15 or not individuals seeking entry to the
16 United States are listed on the TSDB?
17 **A   Could you restate your question?**
18      MS. HOMER: Could you read it back,
19 please?
20      (Court reporter read back the requested
21 portion.)
22      THE WITNESS: They provide guidance to

72

1 the ports of entry. The ports of entry, the
2 officers there are conducting the evaluation or
3 inspection. They are guided and supported by the
4 NTC.
5 BY MS. HOMER:
6    Q   What sort of guidance does the NTC
7 provide to individual officers at ports of entry
8 regarding the CBP?
9      MS. ROTH: Object as to law enforcement
10 sensitive information that could be implicated by
11 that question. I'm going to let you answer if you
12 can in a non-privileged way.
13      THE WITNESS: If we are talking about
14 verifying the identity of whether or not this
15 person is a match, any information that would help
16 us do that, that would help us confirm that they
17 are indeed a match or not.
18 BY MS. HOMER:
19    Q   Is it one of the job responsibilities of
20 the National Targeting Center to confirm whether
21 any single individual is in fact a match to the
22 TSDB?

73

1        MS. ROTH:  I'm going to object to the
2   extent that question calls for law enforcement
3   sensitive information.  You can answer if you can
4   answer in a non-privileged way.
5        THE WITNESS:  They work with the
6   Terrorist Screening Center to help the port of
7   entry, the NTC to help the port of entry make that
8   determination.
9   BY MS. HOMER:
10     Q    Do individual officers at ports of entry
11  themselves conduct the research to confirm whether
12  or not any one individual is a match to the TSDB?
13       MS. ROTH:  Objection.  Vague.
14       THE WITNESS:  The coordination with the
15  TSC happens at our NTC level.
16  BY MS. HOMER:
17     Q    So let's see if I can walk through this.
18  If an individual officer learns during the
19  screening process that an individual may be a
20  match to the TSDB, does that officer contact the
21  National Targeting Center for assistance in
22  determining whether or not the individual being

74

1   screened is in fact a match to the TSDB?
2        A  I think we already answered that and
3   that's -- I already answered that.  The officer
4   conducting the secondary inspection, not
5   screening, is -- coordinates with the NTC.  The
6   NTC supports them in making the final
7   determination whether or not the person is a
8   match.
9       Q    And in the process of making a final
10  determination about whether or not any one
11  individual is a match, the NTC may itself
12  communicate with the TSC.  Is that correct?
13      A  Correct.
14      Q    The ultimate determination as to whether
15  anyone individual who is seeking entry to the
16  United States is in fact a match to the TSDB is
17  made by the National Targeting Center.  Is that
18  correct?
19       MS. ROTH:  Objection, vague.  You can
20  answer if you know.
21       THE WITNESS:  Yeah, the TSDB database is
22  administered by the FBI's TSC.  To the NTC in

75

1   close collaboration with the TCS.
2        (Court reporter requested
3   clarification.)
4        THE WITNESS:  NTC works directly with
5   the TSC.  And then the NTC -- I got -- lost the
6   question here.  But the NTC works with the port of
7   entry to verify that this person is a match.
8   BY MS. HOMER:
9       Q    In the process of verifying whether or
10  not any individual is a match to the TSDB, does
11  the CBP add any comments or remarks describing the
12  basis for the match to that individual's record?
13       MS. ROTH:  Objection.  Vague.
14       THE WITNESS:  You have to restate the
15  question.  I don't understand.
16  BY MS. HOMER:
17     Q    Let me see if I can.  Let me see if I
18  can rephrase it.  If an individual seeking entry
19  to the border is flagged as a potential match to
20  the TSDB then that requires some further analysis
21  by CBP to determine whether or not the individual
22  is in fact a match.  Is that fair?

76

1        MS. ROTH:  Objection.  Vague.
2        THE WITNESS:  Yeah, I think this is the
3   third time you have asked.  When somebody is
4   potentially a match, a match to the TSDB, the port
5   of entry works with our NTC.  NTC guides the
6   inspection.  NTC corresponds with the TSC to help
7   us verify if it is a match.
8   BY MS. HOMER:
9       Q    Right.  And I'm not trying to repeat
10  myself.
11      A  Okay.
12      Q    I'm just trying to kind of establish a
13  framework of where I'm going.  So during this
14  process of verifying whether or not someone is a
15  match do any CBP officers type in annotations to a
16  person's record indicating yes, this is a
17  confirmed match?
18       MS. ROTH:  Objection, vague.  Objection
19  to the extent that it calls for law enforcement
20  privileged information.  You can answer if you can
21  answer in a non-privileged way and if you
22  understand the question.

Case 1:16-cv-00375-AJT-JFA   Document 306-30   Filed 03/12/19   Page 22 of 91 PageID#
14462
Transcript of Randy Howe, Designated Representative
Conducted on March 22, 2018

20  (77 to 80)

77

1       THE WITNESS:  Are you asking if we are
2  making notations to the TSDB record?
3  BY MS. HOMER:
4       Q   I'll ask that first.  Does -- I'll ask
5  that.  Does the CBP make any notations to an
6  individual's TSDB record when they are seeking
7  entry to the United States?
8       A   No.  The -- I'm sorry.
9       MS. ROTH:  It's okay.  Go ahead.
10      THE WITNESS:  The owner of the record,
11 in this case the FBI administers the TSC.  So we
12 can't make any adjustments, edits to the TSDB.
13 BY MS. HOMER:
14      Q   Does the CBP make any annotations to its
15 own records about that same individual regarding
16 that individual's presence on the TSDB?
17      A   Yes.
18      Q   What sorts of comments does the CBP add
19 to its own records about individuals listed in the
20 TSDB?
21      MS. ROTH:  I'm going to object to that
22 to the extent it calls for law enforcement

78

1  privileged information.  If you think you can
2  answer that in a non-privileged way.
3       THE WITNESS:  I think I can.  TECS is
4  our main system to document everything that we do.
5  Any individual that's entering the United States
6  is queried through our system.  That entry to the
7  U S, their primary inspection is documented in our
8  system.  If the person is referred to secondary,
9  it's documented in TECS.  And as we complete each
10 and every secondary inspection for everything that
11 we do, agriculture, customs work, immigration
12 work, counterterrorism work, every single
13 secondary inspection that we do is documented in
14 TECS for that -- for that encounter.
15 BY MS. HOMER:
16      Q   And if the secondary encounter -- let me
17 start over.  Does the CBP's documentation of
18 encounters with individuals listed in the TSDB add
19 any information in TECS about -- about whether
20 that individual is a confirmed match to the TSDB?
21      MS. ROTH:  Objection to the extent that
22 it calls for law enforcement sensitive

79

1  information.  You can answer if you can answer in
2  a non-privileged way.
3       THE WITNESS:  Secondary results of every
4  secondary we do are captured no matter what,
5  agriculture, customs, immigration work, it's
6  documented.
7  BY MS. HOMER:
8       Q   So if an individual seeks entry to the
9  United States and is identified as a potential
10 match to the TSDB, would the fact that they had
11 been identified as a potential match to the TSDB
12 be retained in the CBP's records of that
13 encounter?
14      A   All of our secondary inspections are
15 recorded in TECS and the results are recorded for
16 everything that we do.
17      Q   And is one of the pieces of information
18 that is recorded regarding your secondary
19 inspection whether or not an individual is a
20 potential match to the TSDB?
21      A   Yes.
22      Q   Is one of the --

80

1       MS. HOMER:  Are we out of --
2       (Discussion with court reporter
3  concerning request.)
4       MS. HOMER:  Oh, you need a break.  Let
5  me ask one more, two more questions and then I'll
6  take a break.
7  BY MS. HOMER:
8       Q   Is one of the pieces of information that
9  the CVT -- CBP retains following a secondary
10 inspection whether or not an individual is a
11 confirmed match to the TSDB?
12      MS. ROTH:  Objection.  Vague.
13      THE WITNESS:  Yeah, could you restate?
14 BY MS. HOMER:
15      Q   Is one of the pieces of information that
16 the CBP documents following the secondary
17 inspection whether or not an individual is a
18 confirmed match to the TSDB?
19      A   Yes.
20      Q   If an individual begins as a potential
21 match to the TSDB and by the end of the encounter
22 is a confirmed match to the TSDB, will the CBP

81

1 retain a record for future inspections of the same
2 person that they are a confirmed match to the
3 TSDB?
4       MS. ROTH: Objection to the extent that
5 that calls for law enforcement privileged
6 information.
7       THE WITNESS: All of our secondary
8 inspection results are recorded and kept for every
9 secondary inspection that we complete.
10 BY MS. HOMER:
11    Q   If the TSDB determines during a border
12 inspection on day one that a potential match is in
13 fact a confirmed match will the CBP automatically
14 conclude that person is a confirmed match the next
15 time they cross the border?
16       MS. ROTH: Objection. Vague.
17       THE WITNESS: Each and every inspection
18 that we complete is completed individually.
19 BY MS. HOMER:
20    Q   Will an officer -- start over.
21       Will an officer at an initial screening
22 of someone who is listed on the TSDB be able to

82

1 see whether that same person has been concluded to
2 be a confirmed match to the TSDB previously?
3       MS. ROTH: I'm going to object to the
4 extent that calls for law enforcement privileged
5 information. If you can answer in a
6 non-privileged way.
7       THE WITNESS: I don't believe primary
8 inspection -- primary inspection officers have
9 access or have knowledge of previous inspections
10 as they are completing a primary inspection.
11 BY MS. HOMER:
12    Q   So, if the first time an individual who
13 is listed in the TSDB crosses the border, if on
14 that first time they are listed as a potential
15 match the initial screener will see that they are
16 a potential match to the TSDB? Is that correct?
17    A   Yes.
18    Q   If that same individual recrosses the
19 border a week later and that individual has since
20 been confirmed to be a match in the TSDB, will the
21 officer conducting the initial screening a week
22 later see that the individual is now a confirmed

83

1 match to TSDB?
2       THE WITNESS: I --
3       MS. ROTH: -- Objection. I think this
4 was asked and answered also.
5       MS. HOMER: Okay.
6       (Court reporter requested
7 clarification.)
8       THE WITNESS: I don't know. I think I'm
9 with the court reporter. I would like to take a
10 break, too.
11       MS. HOMER: Okay. We'll take a quick
12 break.
13       MS. ROTH: Off the record.
14       THE VIDEOGRAPHER: We are going off of
15 the record. The time is 10:45 a.m.
16       (The proceedings recessed from
17 10:45 a.m. to 11:05 a.m.)
18       THE VIDEOGRAPHER: We are back on the
19 record. The time is 11:04 a.m.
20 BY MS. HOMER:
21    Q   Do officers conducting the initial
22 screening at ports of entry have access to the

84

1 underlying derogatory information that forms the
2 basis for an individual being listed on the TSDB?
3    A   No.
4    Q   Do officers conducting secondary
5 inspections at ports of entry have access to the
6 underlying derogatory information that forms the
7 basis for an individual being listed on the TSDB?
8       MS. ROTH: I'm going to object to the
9 extent that that calls for law enforcement
10 privileged information. You can answer if you
11 think you can.
12       THE WITNESS: No.
13 BY MS. HOMER:
14    Q   Who at the CBP has access to the
15 underlying derogatory information that forms the
16 basis for an individual being listed in the TSDB?
17       MS. ROTH: Objection to the extent that
18 it calls for law enforcement privileged
19 information. You can answer if you think you can
20 in a non-privileged way.
21       THE WITNESS: As described before, our
22 National Targeting Center, NTC.

---

85

BY MS. HOMER:

2   Q   How many employees are there in the
3 National Targeting Center?

4   **A   I don't know.**

5   Q   Do you have an estimate?

6   **A   Couple hundred.**

7   Q   Are all of the individuals working in
8 the National Targeting Center employees of CBP?

9       MS. ROTH: Objection. Vague.

10      THE WITNESS: I believe that we house
11 numerous other agencies other than CBP, but I
12 don't know.

13 BY MS. HOMER:

14   Q   Are there any private government
15 contractors working on assignment within the
16 National Targeting Center?

17   **A   I don't know.**

18   Q   Are there any private government
19 contractors working on assignment as CBP officers
20 within the Office of Field Operations?

21   **A   No.**

22   Q   Besides the employees of the National

---

86

1 Targeting Center do any other employees of CBP
2 have access to the underlying derogatory
3 information for the records of individuals listed
4 on the TSDB?

5       MS. ROTH: I'm going to object to the
6 extent that it calls for law enforcement
7 privileged information. You can answer if you
8 think can you.

9       THE WITNESS: I think generally most of
10 the people that have that access are at the NTC.

11 BY MS. HOMER:

12   Q   Are you aware of any CBP employees not
13 within the NTC who have access to underlying
14 derogatory information?

15      MS. ROTH: Objection. Vague. And
16 objection to the extent that it calls for law
17 enforcement privileged information.

18      THE WITNESS: There may be, but I don't
19 know.

20 BY MS. HOMER:

21   Q   Could you find out the answer to that
22 question about who at the CBP aside from the NTC

---

87

1 has access to underlying derogatory information?

2       MS. ROTH: Same objection as to law
3 enforcement sensitive information.

4       THE WITNESS: I suppose I could find
5 out.

6 BY MS. HOMER:

7   Q   Does the CBP consider lawful permanent
8 residents of the United States to be foreign
9 nationals?

10      MS. ROTH: Objection to the extent that
11 it calls for a legal conclusion. You can answer
12 if you know.

13      THE WITNESS: Inherently they're foreign
14 nationals.

15 BY MS. HOMER:

16   Q   Is that a yes?

17   **A   Yes.**

18   Q   Thanks. Okay. I'm going to go back to
19 the questions on the matching process I was asking
20 before the break. Okay.

21      If the CBP reaches a conclusion about
22 whether or not a potential match to the TSDB is in

---

88

1 fact a match to the TSDB does the CBP retain that
2 conclusion for future use?

3       MS. ROTH: Objection. Vague. Objection
4 to the extent it calls for law enforcement
5 sensitive privileged information. You can answer
6 if you can answer in a non-privileged way.

7       THE WITNESS: All of the secondary
8 inspections that we complete for the various
9 reasons are documented.

10 BY MS. HOMER:

11   Q   Can an individual who was listed as a
12 potential match to the TSDB be identified the next
13 time they cross the border as a potential match to
14 the TSDB again?

15      MS. ROTH: Objection. Vague.

16      THE WITNESS: If the information is
17 still resident and in the system, then yes.

18 BY MS. HOMER:

19   Q   Does it ever happen that an individual
20 who was identified as a potential match to the
21 TSDB, that the next time they cross the border CBP
22 records will indicated they are a confirmed match

Transcript of Randy Howe, Designated Representative
Conducted on March 22, 2018

---

89

1  to the TSDB?
2      MS. ROTH:  Objection, vague.  Objection,
3  calls for speculation.
4      THE WITNESS:  All of our secondary
5  inspections are recorded in our system, the result
6  of those inspections.
7  BY MS. HOMER:
8      Q    That doesn't quite answer my question.
9  So let's take a step back.  When an individual who
10 is seeking entry into the United States scans
11 their travel document, like a passport, does that
12 process automatically determine whether that
13 person is a potential match to the TSDB?
14     MS. ROTH:  Objection.  Vague.  Objection
15 to the extent that it calls for law enforcement
16 privileged information.  You can answer if you
17 think you can answer -- if you think you
18 understood the question and if you think you can
19 answer it in a non-privileged way.
20     THE WITNESS:  I think it goes back to
21 several questions ago.  When people apply for
22 admission to the United States, part of the

---

90

1  process the officer undergoes is to query their
2  name, their documents in the system.  So if there
3  is a potential match in the system as shared by
4  TSC through the Watchlist Service, if there is a
5  record there then it would hit in the system.
6  BY MS. HOMER:
7      Q    Okay.  If an individual is identified as
8  a potential match to the TSDB in the CBP's TECS
9  system and the CBP determines that the individual
10 is not in fact a match to the TSDB, will that
11 person still be listed as a potential match to the
12 TSDB the next time they cross the border?
13     MS. ROTH:  Objection.  Vague.
14     THE WITNESS:  It's difficult to
15 speculate.  But if that person is indeed not a
16 match we would, the port of entry officer would
17 coordinate with our NTC personnel.  And they would
18 in turn, in this instance potentially work with
19 the TSC to advise them that this individual is not
20 a match.
21 BY MS. HOMER:
22     Q    Does it occur that the CBP updates its

---

91

1  records for potential matches to indicate that
2  they are no longer potential matches?
3      MS. ROTH:  Objection.  Vague.
4      THE WITNESS:  As I earlier described, we
5  don't and can't make adjustments to the TSDB, but
6  we would complete our secondary inspection results
7  in our system, the TECS system.
8  BY MS. HOMER:
9      Q    Okay.  So -- okay.  So we are talking
10 about an individual who was flagged as a potential
11 match and it is determined that they are no longer
12 a match.  In that circumstance does the CBP have
13 to inform the TSC that the individual is not a
14 match to the TSDB?
15     MS. ROTH:  Objection to the extent that
16 it calls for law enforcement privileged
17 information.  You can answer if you can answer in
18 a non-privileged way.
19     THE WITNESS:  That is the relationship
20 we have.  So the port of entry will communicate
21 with the NTC and work with the TSC and the FBI who
22 administer it and rely on it in relaying that

---

92

1  information through the NTC.
2  BY MS. HOMER:
3      Q    Is there ever a circumstance in which
4  the CBP will annotate its own records that an
5  individual who was a potential match is not in
6  fact a match to the TSDB?
7      MS. ROTH:  Objection.  Asked and
8  answered.  And objection to the extent that it
9  calls for law enforcement privileged information.
10 You can answer if you can.
11     THE WITNESS:  The results of all of our
12 secondaries are summarized in TECS through
13 secondary records.
14 BY MS. HOMER:
15     Q    And are the summary results, are they
16 like written out as a paragraph or are they --
17 does it result in a permanent change of status?
18     MS. ROTH:  Objection, vague.  Objection,
19 form.  Objection to the extent that it calls for
20 law enforcement privileged information.
21     THE WITNESS:  And we couldn't control
22 the TSDB information.  We own the TECS.  We are

---

Transcript of Randy Howe, Designated Representative

24 (93 to 96)

Conducted on March 22, 2018

---

93

1 going to record the information at the completion
2 of the secondary inspection.  It does include a
3 narrative.
4 BY MS. HOMER:
5     Q    Is there a field in TECS about whether
6 or not an individual is a potential or confirmed
7 match to the TSDB?
8         MS. ROTH:  Objection to the extent that
9 it calls for law enforcement sensitivity
10 information.
11        THE WITNESS:  I don't know.
12 BY MS. HOMER:
13    Q    Is the determination as to whether an
14 individual is a potential or confirmed match to
15 the TSDB always made by the TSC?
16        MS. ROTH:  Objection to the extent that
17 calls for law enforcement privileged information
18 and objection as to scope to the extent that CBP
19 has an understanding of TSC's decision making.
20        THE WITNESS:  We're completing an
21 inspection at the port of entry.  We are
22 ultimately responsible.  We rely on information

94

1 from other entities like the TSC.  And the
2 ultimate decision is ours.  But you know, the
3 owner of the record, the information we have and
4 the correspondence with our NTC is important in
5 making the final determination.
6 BY MS. HOMER:
7     Q    Does the CBP rely on the TSC's records
8 to determine whether or not an individual is a
9 confirmed match to the TSDB?
10        MS. ROTH:  Objection to the extent that
11 it calls for law enforcement privileged
12 information.  You can answer if you can.
13        THE WITNESS:  Yeah, FBI administers the
14 TSC.  It's their -- they're the designated entity
15 that houses that information.  In working with
16 them with our NTC and the information we have in
17 the port of entry they are the owner of the
18 records, so -- you know, they are going to have
19 input into whether or not that person is a match
20 or not.
21 BY MS. HOMER:
22    Q    Do you agree that the ultimate decision

95

1 as to whether or not an individual is a confirmed
2 match to the TSDB lies with the TSC?
3        MS. ROTH:  Objection.  Asked and
4 answered.  So I'm really going to let you ask that
5 just this one last time, to the extent that he
6 didn't answer that question already.  And
7 objection to the extent it calls for law
8 enforcement privileged information.  And objection
9 to the extent -- to scope and calls for a legal
10 conclusion.
11        THE WITNESS:  CBP is responsible for
12 what happens at the port of entry.  We have the
13 individual in front of us.  We have their
14 documents.  We make that final determination with
15 input from the NTC and TSC.
16 BY MS. HOMER:
17    Q    If an individual crosses the same port
18 of entry twice in the same day is it possible that
19 they will be a potential match to the TSDB each
20 time?
21        MS. ROTH:  Objection, vague.  Objection,
22 calls for speculation.

96

1        THE WITNESS:  If they are in the -- if
2 they are in TECS the potential is there, yes.
3 BY MS. HOMER:
4     Q    If an individual crosses the same port
5 of entry twice in the same day is it possible that
6 they will be a potential match to the TSDB at the
7 first crossing and a non-match to the TSDB at the
8 second crossing?
9        MS. ROTH:  Objection, vague.  Objection
10 to the extent that it calls for law enforcement
11 privileged information.  And objection as to scope
12 to the extent that you are asking about TSDB
13 information, not CBP information.
14        THE WITNESS:  And I don't understand the
15 question.
16 BY MS. HOMER:
17    Q    I'm trying to walk through scenarios of
18 an individual crossing the border multiple times
19 --
20    A    Uh huh.
21    Q    -- in quick succession and how that
22 interacts with TSDB information.  So my question

97

1  is, to repeat.  If -- let's say an individual
2  crosses the border once and on their first
3  crossing is flagged as a potential match to the
4  TSDB.  Is it possible that the second time they
5  cross the border their status could have changed
6  to not matching the TSDB at all?
7      A   It's possible.
8      Q   Okay.  Is it possible that if an
9  individual crosses the border once and is a
10 potential match to the TSDB that the next time
11 they cross the border they will be listed as a
12 confirmed match to the TSDB?
13         MS. ROTH:  Objection.  Vague.
14         THE WITNESS:  I don't know.  I don't
15 know if I can speculate.
16 BY MS. HOMER:
17     Q   Does the CBP conduct analysis to
18 determine whether or not potential matches to the
19 TSDB are actually confirmed matches to the TSDB?
20         MS. ROTH:  Objection.  Vague.
21         THE WITNESS:  Well, that is the process.
22 They're a potential match.  On primary they're

98

1  referred to secondary inspection for additional
2  questioning to determine whether or not they are a
3  match.
4  BY MS. HOMER:
5      Q   If the CBP determines that an individual
6  is a confirmed match to the TSDB during an --
7  during an initial inspection -- scratch that.
8  That is the wrong term of art.
9          If the CBP during one border crossing of
10 an individual determines that the individual is a
11 confirmed match to the TSDB, is it possible that
12 the next time that same individual crosses the
13 border they will be automatically designated as a
14 confirmed match to the TSDB?
15         MS. ROTH:  Objection, vague.
16         THE WITNESS:  I think I understood your
17 question.  If somebody is confirmed a match as a
18 TSDB the first time are they going to be a
19 confirmed match the second time?
20 BY MS. HOMER:
21     Q   Yes?
22     A   Yes.

99

1      Q   Thank you.  In that second instance
2  after an individual has been concluded to be a
3  confirmed match will the initial screening officer
4  see that that individual is a confirmed match to
5  the TSDB?
6          MS. ROTH:  Objection to the extent that
7  calls for law enforcement privileged information.
8  But you can answer if you can in a non-privileged
9  way.
10         THE WITNESS:  I don't know.  Certainly
11 the officer would know that there is a concern of
12 a TSDB either potential or confirmed, but I don't
13 know.
14 BY MS. HOMER:
15     Q   If an individual at one screening is
16 confirmed to be a match to the TSDB, will
17 secondary inspection officers be able to see the
18 records of prior entries that that individual has
19 had at the border?
20         MS. ROTH:  Objection to the extent that
21 calls for law enforcement privileged information.
22 You can answer if you can.

100

1          THE WITNESS:  One of the tools that the
2  officers use in secondary is to review previous
3  secondary inspection results.
4  BY MS. HOMER:
5      Q   Okay.  So then you -- would you agree
6  that an officer at secondary inspection would be
7  able to see whether the individual they are
8  inspecting has previously been confirmed by the
9  TSDB -- I said that wrong.  Sorry.
10         Would you agree that an officer
11 conducting a secondary inspection would be able to
12 see prior border crossing records of that
13 individual which indicate that that individual had
14 previously been determined to be a confirmed match
15 to the TSDB?
16         MS. ROTH:  Objection to the extent that
17 it calls for law enforcement privileged
18 information.  And objection, asked and answered.
19         THE WITNESS:  Yeah, one -- again, one of
20 the tools that the officers use is the secondary
21 inspection result of previous encounters, and they
22 inform the current inspection.

Transcript of Randy Howe, Designated Representative
Conducted on March 22, 2018

101

1 BY MS. HOMER:
2    Q   So is that a yes, secondary inspection
3 officers are able to see whether that individual
4 has been a confirmed match to the TSDB during
5 prior encounters?
6        MS. ROTH:  Objection to the extent that
7 calls for law enforcement privileged information.
8 You can answer if you can.
9        THE WITNESS:  I'm just going to restate
10 the same answer.  We have access to the previous
11 secondary encounters and the results of those
12 encounters to inform the inspection.
13 BY MS. HOMER:
14    Q   So secondary inspection officers have
15 access to results of previous encounters that
16 indicate when an individual was a confirmed match
17 to the TSDB.  Is that correct --
18        MS. ROTH:  -- Objection.  I apologize.
19 Objection to the extent that it calls for law
20 enforcement privileged information.  This is
21 probably the last time I'm going to let you ask
22 the same question.  So asked and answered as well.

102

1        THE WITNESS:  They have access to the
2 results of all the previous secondary encounters.
3 BY MS. HOMER:
4    Q   And the results of previous secondary
5 encounters include whether the individual is a
6 confirmed match to the TSDB, yes?
7        MS. ROTH:  Objection to the extent that
8 calls for law enforcement privileged information.
9        THE WITNESS:  Whatever the results are,
10 they're recorded in the system.
11 BY MS. HOMER:
12    Q   And those results include whether or not
13 an individual is a confirmed match to the TSDB,
14 correct?
15        MS. ROTH:  Objection to the extent that
16 calls for law enforcement privileged information.
17        THE WITNESS:  Whatever the results are
18 of the inspection from a myriad of things,
19 immigration, customs, counterterrorism, whatever
20 the results are they're recorded in the secondary
21 inspection.
22

103

1 BY MS. HOMER:
2    Q   I'm just looking for a yes or no answer.
3 One of the results that would be recorded during
4 its secondary inspection documents is whether the
5 individual had previously been confirmed to be a
6 match to the TSDB, correct?
7        MS. ROTH:  Objection to the extent that
8 it calls for law enforcement privileged
9 information.
10       THE WITNESS:  I think I answered it
11 already.
12 BY MS. HOMER:
13    Q   Is that a yes?
14    **A   I have answered the question.  Yes.  I**
15 **have answered the question already.**
16    Q   If the CBP confirms that an individual
17 is a match to the TSDB, but the TSC does not
18 update its records will that individual still be
19 listed as a potential match to the TSDB at future
20 border crossings?
21       MS. ROTH:  Objection to the extent that
22 it calls for law enforcement privileged

104

1 information.  You can answer if you can.
2        THE WITNESS:  I think I understood your
3 question.  Information that the FBI has in their
4 database, they administer the TSDB.  As I
5 understand it, it is shared through the DHS
6 Watchlist Service and then to that electronic
7 portal to CBP.  And any changes, as I understand
8 it, are instantaneous.  It's seamless.  And so any
9 changes that would be made -- we would have -- it
10 would all be in synch.
11 BY MS. HOMER:
12    Q   Is it possible for CBP to update its
13 records that an individual is a confirmed match to
14 the TSDB, but not have the TSC update its records
15 that that individual is a confirmed match?
16       MS. ROTH:  Objection, vague.  Objection,
17 scope to the extent you are asking the question
18 about what TSC is doing with TSC's records.
19       THE WITNESS:  Yeah, so the port of entry
20 works with the NTC.  NTC, when appropriate, works
21 with the TSC.
22

105

BY MS. HOMER:
2    Q   I'm just trying to understand if there
3 is a situation where the CBP would record that an
4 individual is a confirmed match, but the TSC would
5 not have that same information?
6        MS. ROTH:  Again, objection as to
7 vagueness and as to scope.  You are asking a CBP
8 witness about TSC handling of information.
9        THE WITNESS:  Yeah, I couldn't speculate
10 as to how TSC does that.
11 BY MS. HOMER:
12   Q   Try it this way.  Is it possible that
13 CBP would have an annotation in the TECS database
14 that an individual is a confirmed match to the
15 TSDB, but that the actual TSDB information that
16 CBP has access to, also in the TECS database,
17 would not have that same confirmation?
18       MS. ROTH:  Objection as to vagueness and
19 again, as to scope.  If you understand the
20 question you can answer it.
21       THE WITNESS:  I mean, I will try to.  I
22 mean, CBP is dealing with an individual that is a

106

1 potential match to a TSC record.  We are making a
2 determination at the port of entry.  If we confirm
3 on a match our NTC personnel would be confirmed,
4 would also be aware of that.  And whatever
5 interaction we have with the TSC, I don't know how
6 that works.  But I would assume the TSC would be
7 aware as well, but I don't know for sure the TSC
8 process.
9 BY MS. HOMER:
10   Q   Is it the National Targeting Center
11 within the CBP that is responsible for reporting
12 on encounters with individuals listed on the TSDB
13 to the TSC?
14       MS. ROTH:  Objection to the extent that
15 it calls for law enforcement privileged
16 information, but you can answer if you think you
17 can.
18       THE WITNESS:  I'm not sure of the
19 mechanism of reporting.  I don't know.
20 BY MS. HOMER:
21   Q   Does the CBP report on an -- on its
22 encounters with individuals listed on the TSDB to

107

1 the TSC?
2        MS. ROTH:  Objection to the extent that
3 it calls for law enforcement privileged
4 information, and asked and answered.
5        THE WITNESS:  The correspondence would
6 be between the NTC and the TSC in response to the
7 watch list that they administer.  So to what
8 extent that they communicate, I don't have the
9 finer details.
10 BY MS. HOMER:
11   Q   Does CBP as a whole report on every
12 encounter it has with individuals on the TSDB to
13 the TSC?
14       MS. ROTH:  Objection to the extent that
15 it calls for law enforcement privileged
16 information.  You can answer if you think you can.
17       THE WITNESS:  I think it is the same
18 response.  That port of entry working with the NTC
19 and deal with the passenger or traveler that
20 potentially is a TSDB.  The inner workings and the
21 finer details of how the NTC and the TSC
22 communication, I don't have that information.

108

1 BY MS. HOMER:
2    Q   Does the CBP share all encounter
3 information it creates regarding individuals
4 listed on the TSDB, does it share that encounter
5 information with the TSC?
6        MS. ROTH:  Objection, vague.  Objection,
7 asked and answered.
8        THE WITNESS:  It is going to be the same
9 answer.  NTC coordinates when appropriate with the
10 TSC.
11 BY MS. HOMER:
12   Q   So is that a yes that the CBP shares all
13 encounter information with the TSC?
14       MS. ROTH:  Objection, mischaracterizes
15 the prior testimony.  Objection, asked and
16 answered.  He has now answered this question three
17 times.
18 BY MS. HOMER:
19   Q   I'm just looking for a yes or no.
20   A   The principle entity that corresponds
21 with the TSC is the NTC.  The inner workings and
22 finer details of how that communication happens, I

---

109

1 don't -- I do not know.
2    Q   Is the National Targeting Center the
3 entity -- the entity within the CBP responsible
4 for nominating additional individuals to the TSDB?
5        MS. ROTH:  Objection.  Vague.
6        THE WITNESS:  CBP is one of the agencies
7 that participates in that community of agencies
8 that deal with terrorists watch lists.  CBP is one
9 of those entities.  And we do have the ability to
10 nominate individuals and that is through the
11 individuals, the small group of trained
12 individuals at the NTC.
13 BY MS. HOMER:
14    Q   How many individuals at the NTC have the
15 ability to nominate persons to the TSDB?
16        MS. ROTH:  I'm going to object to the
17 extent that it calls for law enforcement
18 privileged information and instruct the witness
19 not to answer that question.
20 BY MS. HOMER:
21    Q   How many nominations to the TSDB does
22 the CBP submit on average every year?

---

110

1        MS. ROTH:  I'm going to object on the
2 basis of the law enforcement privilege and
3 instruct the witness not to answer.
4 BY MS. HOMER:
5    Q   Are you going to follow your counsel's
6 instruction?
7    A   I am.
8    Q   What is the CBP's role in removing
9 individuals from the TSDB?
10        MS. ROTH:  Objection as to vagueness and
11 objection to the extent that calls for law
12 enforcement privileged information, but you can
13 answer if you think can you.
14        THE WITNESS:  As part of the
15 facilitation part of CBP, if we have an individual
16 that we believe is not a match or if there is
17 information that we would like to rely -- relay to
18 the TSC on individuals on the TSDB to include the
19 potential removal of people, yes, the NTC does do
20 that.
21 BY MS. HOMER:
22    Q   Does the NTC itself have the authority

---

111

1 to remove an individual from the TSDB?
2        MS. ROTH:  Objection to the extent that
3 it calls for a legal conclusion.  And objection to
4 the extent that calls for law enforcement
5 privileged information.  You can answer if you
6 know.
7        THE WITNESS:  The FBI administers the
8 TSC.  They are the sole owner of that.
9 BY MS. HOMER:
10    Q   So if the NTC were to recommend the
11 removal of an individual from the TSDB, that
12 individual could in fact only be removed from the
13 TSDB by the FBI.  Is that correct?
14        MS. ROTH:  Objection.  That
15 mischaracterizes prior testimony.  And objection
16 calls -- to the extent it calls for a legal
17 conclusion.
18        THE WITNESS:  Again, TSC is the owner of
19 the record.  The ultimate decision of removing
20 would be with them with the totality of the
21 information.
22

---

112

1 BY MS. HOMER:
2    Q   So the NTC does not have the technical
3 ability to click delete on any individual record
4 listed on the TSDB.  Is that fair?
5        MS. ROTH:  Objection.  Vague.  You can
6 answer.
7        THE WITNESS:  TSC is the owner of the
8 record.  They have -- they administer the
9 lookouts.
10 BY MS. HOMER:
11    Q   So is that a yes that the NTC does not
12 have the ability to click delete on any record
13 listed in the TSDB?
14    A   We don't have the authority to remove
15 it.  It is up to the TSC.
16    Q   Thank you.  What is the CBP's role in
17 addressing DHS TRIP, redress complaints for
18 individuals who are listed in the TSDB?
19    A   Well, DHS TRIP, the Traveler Redress
20 Inquiry Program, is the sole point of contact for
21 individuals that have any complaints or concerns
22 about their interaction with CBP or TSA for that

---

Transcript of Randy Howe, Designated Representative
Conducted on March 22, 2018

113

1  **matter, I believe.  So, since we are -- we**
2  **participate in the DHS community we would support**
3  **DHS TRIP and fact findings to be responsive to the**
4  **complainant.**
5      Q    When you say that the CBP would support
6  DHS TRIP fact finding in response to the
7  complaint, what does that entail?
8      **A    You are talking about DHS TRIP in**
9  **general?**
10     Q    Yes.
11     **A    So if they would reach out to CBP asking**
12 **for information regarding a particular passenger**
13 **or traveler's encounter with CBP, to be responsive**
14 **to whatever the complaint might be.  If they were**
15 **allegations that our officers were rude or**
16 **unprofessionally or that they were delayed**
17 **unnecessarily, CBP would do research into that**
18 **secondary inspection and provide the results to**
19 **DHS TRIP, which would ultimately respond to the**
20 **complaint.**
21     Q    More specifically, if the individual who
22 was the subject of a DHS TRIP redress report is

114

1  listed on the TSDB, is CBP's approval required
2  before that individual can be removed from the
3  TSDB as part of the redress process?
4          MS. ROTH:  Objection, vague.  Objection
5  to the extent that it calls for law enforcement
6  sensitive information.
7          THE WITNESS:  And I don't understand the
8  question.
9  BY MS. HOMER:
10     Q    Does DHS TRIP need CBP's authorization
11 to remove individuals from the watch list?
12         MS. ROTH:  Objection, vague.  Objection,
13 foundation.  Objection, scope.
14         THE WITNESS:  TSC, as previously stated,
15 is the owner of record of the records.  So the
16 ultimate say is TSC, not CBP.
17 BY MS. HOMER:
18     Q    Okay.  So I will just walk through this.
19 On occasion CBP nominates individuals to the watch
20 list.  Correct?
21     **A    Correct.**
22     Q    Then those individuals to actually be

115

1  added to the watch list, that has to be approved
2  by the TSC.  Correct?
3      **A    Yeah.  Our nomination process is to**
4  **nominate to the National Counterterrorism Center.**
5      Q    Oh.
6      **A    And they would evaluate the**
7  **recommendation and then they would pass it on to**
8  **the TSC.**
9      Q    Right.  So if the National
10 Counterterrorism Center and the TSC both agreed
11 with the CBP's nomination of an individual then
12 that individual would be added to the watch list,
13 correct?
14     **A    They have the ultimate approval.  So if**
15 **they -- if they concurred with the recommendation,**
16 **then yes.**
17     Q    Now, sometimes individuals who the CBP
18 nominated to the watch list and have been accepted
19 to the watch list will later file DHS TRIP reports
20 regarding their presence on the watch list.
21 Correct?
22         MS. ROTH:  Objection.

116

1          THE WITNESS:  Potentially --
2          MS. ROTH:  -- Objection, vague.
3  Objection, calls for speculation and foundation.
4          THE WITNESS:  Potentially, I guess.
5  BY MS. HOMER:
6      Q    If a person who was a -- regionally
7  nominated to the TSC by the CBP is seeking
8  redress, because they are on the watch list, can
9  their name be removed from the watch list without
10 any input from the CBP?
11         MS. ROTH:  Objection, vague.  Objection
12 to the extent it calls for law enforcement
13 privileged information and objection as to scope
14 to the extent that you are asking him for
15 processes outside of CBP control.
16         THE WITNESS:  I think I kind of lost the
17 question there in all of that.
18 BY MS. HOMER:
19     Q    Does the CBP have to approve the removal
20 of individuals from the watch list which the CBP
21 originally nominated?
22     **A    I can't speak on behalf of the TSC, but**

117

1  **I think I understand that the TSC would have to**
2  **interact with the nominating agency for input into**
3  **any removal.  But I don't know for a fact.  I'm**
4  **not intimately involved in how that works at the**
5  **TSC.**
6      Q   So to your understanding before an
7  individual can be removed from the watch list the
8  TSC has to check with the original nominating
9  agency about that individual.  Is that correct?
10        MS. ROTH:  Objection.  Mischaracterizes
11 prior testimony.
12        THE WITNESS:  I believe it's part of
13 their procedures, but I can't speak on behalf of
14 the TSC.
15 BY MS. HOMER:
16     Q   Is the CBP consulted regarding every
17 removal from the watch list?
18        MS. ROTH:  Objection to the extent that
19 it calls for law enforcement privileged
20 information, but you can answer to the extent you
21 can.
22

118

1        THE WITNESS:  You know what, I don't
2  know.
3  BY MS. HOMER:
4      Q   Could you find out?
5      **A   I suppose.**
6      Q   Who would you ask to find out the answer
7  to that question?
8      **A   I'm not sure.**
9      Q   What is the terrorist screening
10 operations unit?
11     **A   I don't know if I've ever heard of it**
12 **before.**
13     Q   Okay.  I will be honest with you, I saw
14 it in one document and I never saw it anywhere
15 else and I didn't know what it was --
16     **A   — I never heard of it.**
17     Q   If you don't know what it is, that's
18 fine.
19        To your knowledge has the TSC ever
20 removed an individual from the watch list over
21 CBP's objection to that individual's removal?
22        MS. ROTH:  I'm going to object to the

119

1  extent that calls for law enforcement privileged
2  information and deliberative process privileged
3  information.  I'm going to instruct the witness
4  not to answer.
5  BY MS. HOMER:
6      Q   Does CBP receive reports from the TSC
7  regarding the percentage of CBP's nominations to
8  the TSC which are accepted?
9        MS. ROTH:  Objection to the extent that
10 it calls for law enforcement privileged
11 information.  You can answer if you can and if you
12 know.
13        THE WITNESS:  Not aware.
14 BY MS. HOMER:
15     Q   Do you know what percentage of CBP
16 nominations to the TSC were accepted in 2017?
17        MS. ROTH:  Objection to the extent that
18 it calls for law enforcement information.
19 Objection as to vague.  Objection, calls for
20 speculation.
21        THE WITNESS:  I do not know.
22

120

1  BY MS. HOMER:
2      Q   Could CBP calculate that number?
3      **A   I don't know if we could, but perhaps**
4  **the TSC could.**
5      Q   If the CBP were to ask the TSC for the
6  percentage of its nominations which had been
7  accepted last year would you expect that TSD would
8  provide an answer?
9        MS. ROTH:  Objection, calls for
10 speculation.  Objection to the extent that it
11 calls for law enforcement privileged information.
12        THE WITNESS:  I don't know their
13 capabilities.
14 BY MS. HOMER:
15     Q   Does the CBP communicate with foreign
16 law enforcement specifically about the presence of
17 individuals listed in the TSDB in those foreign
18 countries?
19        MS. ROTH:  I'm going to object to the
20 extent that it calls for law enforcement sensitive
21 privileged information.  I'm going to instruct the
22 witness not to answer.

Transcript of Randy Howe, Designated Representative
Conducted on March 22, 2018

121

BY MS. HOMER:

Q   Okay.  We have been talking about it for a while now, but would you agree that the CBP regularly uses TSDB information to carry out its screening functions?

MS. ROTH:  Objection.  Vague.

THE WITNESS:  CBP is the sole entity responsible for border security for the United States, and the sole database the U S government uses is the TSDB.

BY MS. HOMER:

Q   The sole database that the U S government uses?

**A   For watch listing.**

Q   For watch listing.  But that is not the sole database for -- strike that.  That is not the sole database the U S government uses for national security purposes?

**A   No.  For watch listed individuals it is.**

Q   You testified earlier that CBP receives close to realtime updates to the TSDB, correct?

**A   That's what I understand.**

122

Q   And the CBP receives its export -- or import rather, start over.

CBP does not receive TSDB information directly from the TSC.  Correct?

**A   As I understand, they receive it through the DHS Watchlist Service.**

Q   Do multiple CBP systems import TSDB information from the DHS Watchlist Service?

MS. ROTH:  Objection to the extent that calls for law enforcement privileged information.  You may answer if you think you can in a non-privileged way.

THE WITNESS:  The information that is shared from the TSC to the watch list, as I understand it, is shared -- is directly shared through that automated process into our TECS, our TECS system.

BY MS. HOMER:

Q   Are there any other systems at the CBP other than TECS, which receive TSDB imports?

MS. ROTH:  Object to the extent that it calls for law enforcement privileged information.

123

THE WITNESS:  I understand that it rests in TECS, is what I understand.

BY MS. HOMER:

Q   Does CBP receive a list of every individual listed in the TSDB?

MS. ROTH:  Objection, vague.  Objection to the extent it calls for law enforcement privileged information.  You can answer if you can.

THE WITNESS:  Speculating, but if somebody is listed on the TSDB and it's shared with the watch listing service than we would have that information in our system.

BY MS. HOMER:

Q   Does the CBP consider everyone listed in the TSDB to be a known or suspected terrorist?

MS. ROTH:  Objection to the extent that it calls for law enforcement privileged information.  You can answer if you can.

THE WITNESS:  I believe there is an exception where information is shared on aliens with I think the Department of State and CBP with

124

regards to immigration matters in order for us to carry our immigration function.

BY MS. HOMER:

Q   Okay.  We're going to explore that exception in a second.  Okay.

The CBP receives an import of TSDB information, which contains both all individuals listed in the TSDB pursuant to the reasonable suspicions standard -- let me break it down.  She's going to object.

Does the CBP receive from the TSDB every individual who is listed in the TSDB pursuant to the reasonable suspicions standard?

MS. ROTH:  Objection, foundation.  Objection, vague.

THE WITNESS:  I think I answered that two questions ago, and that is we do receive that information.  And as I understand it those that are on the list do have that reasonable suspicion standard in order for them to be nominated.

BY MS. HOMER:

Q   Does the CBP also receive as part of the

Transcript of Randy Howe, Designated Representative
Conducted on March 22, 2018

---

125

1 TSDB every individual who is listed in the TSDB
2 pursuant to the international immigration
3 exception you just mentioned?
4      MS. ROTH:  Objection to the extent that
5 mischaracterizes his prior testimony.  And
6 objection, asked and answered.
7      THE WITNESS:  Yeah.  There is an
8 exception.  We do get information on aliens shared
9 with us and DO -- Department of State and
10 related -- related to immigration matters in order
11 for us to carry out our immigration function
12 enforcing the INA.
13 BY MS. HOMER:
14     Q   How does the information that CBP
15 receives from the TSDB differentiate between
16 individuals who are known or suspected terrorists
17 and individuals who are in the TSDB pursuant to
18 that alien exception?
19     MS. ROTH:  Object on the grounds of the
20 law enforcement privilege.  I'm going to instruct
21 the witness not to answer that.
22

126

1 BY MS. HOMER:
2      Q   Is the CBP capable of differentiating
3 between individuals who are listed in the TSDB
4 pursuant to the known or suspected terrorist
5 standard and individuals who are listed in the
6 TSDB pursuant to the alien exception you just
7 mentioned?
8      MS. ROTH:  Object on the basis of the
9 law enforcement privilege.  You can answer that
10 question if you think you can in a non-privileged
11 way.
12     THE WITNESS:  It seemed like the same
13 question to me, so I guess I'm confused.
14 BY MS. HOMER:
15     Q   I just want to make sure that the CBP
16 has an internal way to separate out known and
17 suspected terrorists and the exception?
18     MS. ROTH:  Objection on the basis of
19 law enforcement privilege.  And I'm going to
20 instruct the witness not to answer that question.
21 BY MS. HOMER:
22     Q   Okay.  What is CBP's understanding as to

127

1 why the alien exception you mentioned exists?
2      MS. ROTH:  Objection on the basis of law
3 enforcement privilege.  I'm going to instruct the
4 witness not to answer that question.
5 BY MS. HOMER:
6      Q   How long has the alien exception
7 existed?
8      MS. ROTH:  I object on the basis of the
9 law enforcement privilege and instruct the witness
10 not to answer that question.
11 BY MS. HOMER:
12     Q   Do individuals who are listed in the
13 TSDB pursuant to the alien exception lack any
14 information indicating that they have a personal
15 involvement in terrorism?
16     MS. ROTH:  Object on the basis of the
17 law enforcement privilege and I'm going to
18 instruct the witness not to answer.
19 BY MS. HOMER:
20     Q   Also, I will just backtrack for a
21 second.  If I refer to the exception as the alien
22 exception --

128

1      A   That's fine.
2      Q   Is that -- yeah.  Do you understand what
3 I'm talking about?
4      A   Yes.
5      Q   Under what circumstances can an
6 individual be listed in the TSDB pursuant to the
7 alien exception?
8      MS. ROTH:  Object on the basis of the
9 law enforcement privilege, and I instruct the
10 witness not to answer that question.
11 BY MS. HOMER:
12     Q   Can you describe at a high level what
13 the alien exception is?
14     MS. ROTH:  Objection on the basis of the
15 law enforcement privilege, and I instruct the
16 witness not to answer.
17 BY MS. HOMER:
18     Q   Other than the alien exception does the
19 CBP know of any other exceptions to the known or
20 suspect terrorist standard contained within the
21 TSDB?
22     A   I'm not aware of any other.

129

1   Q   Can lawful permanent residents of the
2 United States be listed in the TSDB pursuant to
3 the alien exception?
4       MS. ROTH:  Objection on the basis of the
5 law enforcement privilege, and I'm going to
6 instruct the witness not to answer.
7 BY MS. HOMER:
8   Q   Can individuals residing in the
9 United States pursuant to a valid visa be listed
10 on the TSDB pursuant to the alien exception?
11      MS. ROTH:  Objection on the basis of the
12 law enforcement privilege, and I'm going to
13 instruct the witness not to answer that question.
14 BY MS. HOMER:
15   Q   Can U S citizens be listed in the TSDB
16 pursuant to the alien exception?
17   A   **Inherently, no.**
18   Q   What screening purpose is the alien
19 exception meant to facilitate?
20      MS. ROTH:  I'm going to object on the
21 basis of the law enforcement privilege and
22 instruct the witness not to answer.

130

1 BY MS. HOMER:
2   Q   Is the alien exception meant to facility
3 a screening purpose?
4       MS. ROTH:  Objection on the basis of the
5 law enforcement privilege, and I'm going to
6 instruct the witness not to answer.
7 BY MS. HOMER:
8   Q   When you earlier referred to this
9 exception as applying to aliens, what definition
10 of alien were you thinking of in your mind?
11   A   **Foreign nationals.**
12   Q   And when you say foreign nationals, you
13 mean -- start over.
14      When you say foreign nationals do you
15 mean any individual who is not a United States
16 citizen -- that also doesn't work.
17   A   **No.**
18   Q   Let me start over.  Is every individual
19 in the world who is not a United States citizen a
20 foreign national?
21      MS. ROTH:  Objection.  Vague to the
22 extent it calls for a legal conclusion.  You can

131

1 answer.
2       THE WITNESS:  My understanding of the
3 INA, if you are not a U S citizen, you are a
4 foreign national.
5 BY MS. HOMER:
6   Q   Okay.  So only foreign nationals are
7 eligible to be added to the TSDB pursuant to the
8 alien exception we have been discussing?
9       MS. ROTH:  Objection to the extent it
10 calls for law enforcement privileged information
11 and asked and answered.  But you can answer.
12      THE WITNESS:  It applies to foreign
13 nationals.
14 BY MS. HOMER:
15   Q   I may have asked this, but I apologize.
16 I will just ask it one more time to be sure.  Why
17 does the alien exception exist?
18      MS. ROTH:  Objection on the basis of the
19 law enforcement privilege and I instruct the
20 witness not to answer.
21 BY MS. HOMER:
22   Q   Is one of the criteria by which an alien

132

1 can be listed on the TSDB pursuant to the alien
2 exception that that person is known to have any
3 ties to extremist Islam?
4       MS. ROTH:  Objection on the basis of the
5 law enforcement privilege and I'm going to
6 instruct the witness not to answer that question.
7 BY MS. HOMER:
8   Q   During the course of inspecting
9 individuals at the border does the CBP ever
10 display a message to its officers indicating that
11 the person is "armed and dangerous"?
12      MS. ROTH:  Objection to the extent that
13 calls for law enforcement privileged information.
14 You can answer if you can.
15      THE WITNESS:  There are instances where
16 individuals of -- by some law enforcement entity
17 have been determined to be armed and dangerous, so
18 that could be recorded in our system.
19 BY MS. HOMER:
20   Q   Under what circumstances does the CBP
21 designate individuals as armed and dangerous?
22      MS. ROTH:  Objection to the extent that

Transcript of Randy Howe, Designated Representative
Conducted on March 22, 2018

133

1  mischaracterizes his prior testimony.  Objection,
2  vague.  Objection to the extent it calls for law
3  enforcement privileged information.  You can
4  answer if you can in a non-privileged way.
5       THE WITNESS:  Sure.  So I mean the
6  entity that is the owner of the record would have
7  information that would lead somebody to be
8  concerned that they're armed and potentially
9  dangerous.
10 BY MS. HOMER:
11    Q   Is every individual listed in the TSDB
12 indicated to be armed and dangerous?
13      MS. ROTH:  Objection to the extent that
14 calls for law enforcement privileged information.
15 Objection as to scope to the extent you are asking
16 a CBP deponent about TSDB information that it does
17 not control or maintain.
18      THE WITNESS:  I don't know the
19 information that TSC administers the -- the watch
20 list.  And what information they have there, I
21 don't know.
22

134

1  BY MS. HOMER:
2     Q   Is it always the determination of
3  another law enforcement agency to annotate
4  individual records that an individual may be armed
5  or dangerous?
6       MS. ROTH:  Objection to the extent that
7  calls for law enforcement privileged information.
8  You can answer.
9       THE WITNESS:  It is the agency that --
10 the owner of the record that is entering the
11 information.
12 BY MS. HOMER:
13    Q   Is the CBP itself ever an owner of a
14 record that the CBP designates as being armed and
15 dangerous?
16      MS. ROTH:  Objection to the extent that
17 calls for law enforcement privileged information.
18 You can answer if can you.
19      THE WITNESS:  I'm sure there have been
20 situations where we have, based on previous
21 encounters or information we may have that they
22 are a threat.

135

1  BY MS. HOMER:
2     Q   Does the CBP itself ever indicate in the
3  CBP's records about individuals who are listed on
4  the TSDB that that individual is armed and
5  dangerous?
6       MS. ROTH:  Objection, vague.  Objection
7  based on that it calls for law enforcement
8  privileged information.  You can answer if you
9  can.
10      THE WITNESS:  The CBP, as -- as we do
11 our business at the border if we independently
12 determine that somebody is a potential threat,
13 then we may make notations in our system that that
14 person could be -- you know, armed and dangerous
15 or of concern.
16 BY MS. HOMER:
17    Q   How does the CBP communicate to initial
18 screeners that an individual may be armed and
19 dangerous?
20      MS. ROTH:  Objection to the extent that
21 it calls for law enforcement privileged
22 information.  You can answer in a general

136

1  non-privileged way.
2       THE WITNESS:  The information is
3  inputted into the system, so that would be evident
4  to the primary officer when that query is made of
5  the individual.
6  BY MS. HOMER:
7     Q   If a primary officer determines at the
8  moment of an initial query that an individual is
9  potentially armed and dangerous, does that set off
10 CBP alarms in the screening area?
11      MS. ROTH:  Objection as to vagueness.
12 Objection, foundation.  Objection to the extent
13 that calls for law enforcement privileged
14 information.  Again, you can answer if you can
15 answer in a non-privileged way.
16      THE WITNESS:  I don't know what you mean
17 by alarms.
18 BY MS. HOMER:
19    Q   Okay.  In the initial screening area are
20 there alarms that can go off during a security
21 incident?
22      MS. ROTH:  Objection as to vagueness.

Transcript of Randy Howe, Designated Representative
Conducted on March 22, 2018

137

1      THE WITNESS:  If somebody is the -- been
2  determined to be armed and dangerous and a threat
3  and that has been notated in the system the
4  officer would be alerted to that and would have to
5  react appropriately.
6  BY MS. HOMER:
7      Q    What are -- what is the appropriate
8  reaction that an officer -- well, start over.
9          What are examples of the appropriate
10 reactions an officer may take at the point that
11 the officer is informed that a person he or she is
12 screening may be armed and dangerous?
13         MS. ROTH:  Objection to the extent that
14 calls for law enforcement privileged information.
15 But you can answer it in a non-privileged way if
16 you can.
17         THE WITNESS:  Officer has to use their
18 best judgment, assess the situation, the
19 passenger, whoever else in the vehicle, and safely
20 interact with that individual to ensure that there
21 is no threat.  If they are deemed armed and
22 dangerous, then the officer is concerned about

138

1  their safety and others.
2  BY MS. HOMER:
3      Q    Is an officer potentially alerted that
4  an individual may be armed and dangerous through a
5  message on his computer screen?
6          MS. ROTH:  Objection to the extent that
7  it calls for law enforcement sensitive
8  information.  You can answer if you can in a
9  non-privileged way.
10         THE WITNESS:  Going back, as they query
11 the information on system the system would alert
12 that they are armed and dangerous.  So they would
13 be aware of the alert.
14 BY MS. HOMER:
15     Q    What does an alert look like?
16         MS. ROTH:  Objection to the extent that
17 calls for law enforcement sensitive information.
18 I'm going to instruct the witness not to answer
19 that.
20 BY MS. HOMER:
21     Q    Could an alert that an individual is
22 potentially armed or dangerous include a flashing

139

1  message on a computer screen?
2          MS. ROTH:  Objection to the extent that
3  calls for law enforcement privileged information.
4  You can answer if you can.
5          THE WITNESS:  It alerts the officer.
6  The system indicates that this person is armed and
7  dangerous.
8  BY MS. HOMER:
9      Q    And when you refer to the system are you
10 talking about a computer system?
11     A    TECS system.
12     Q    Okay.  So if an individual is determined
13 to potentially be armed and dangerous the TECS
14 system would notify the officer of that fact?
15     A    That is the system that we use, our
16 primary, yes.
17     Q    If an individual is indicated by the
18 TECS system to potentially be armed and dangerous,
19 does that ever set off any flashing red strobe
20 lights?
21         MS. ROTH:  Objection to the extent that
22 calls for law enforcement privileged information.

140

1  You can answer if you can.
2          THE WITNESS:  I don't know.
3  BY MS. HOMER:
4      Q    Has it ever happened that an officer has
5  been alerted that an individual is potentially
6  armed and dangerous by seeing a red light go off
7  as a result of his TECS query?
8          MS. ROTH:  Objection to the extent that
9  calls for law enforcement privileged information.
10 Objection to the extent that this has been asked
11 and answered.  Also objection as to scope.
12         THE WITNESS:  Yeah, I don't know.  I
13 don't know the exact way that it's alerted.
14 BY MS. HOMER:
15     Q    Is it possible that one form of alerting
16 an officer that an individual is potentially armed
17 and dangerous is via a red light?
18         MS. ROTH:  Same objections, law
19 enforcement privilege, scope.
20         THE WITNESS:  I don't want to speculate.
21 I don't know.
22

141

1  BY MS. HOMER:
2     Q   Could you find out the answer to that
3  question?
4     A   I suppose so.
5     Q   Are individuals who are confirmed
6  matches to TSDB always referred to secondary
7  inspection?
8         MS. ROTH: Objection to the extent that
9  calls for law enforcement privileged information.
10 Objection, asked and answered.
11        THE WITNESS: Yeah, I think that was one
12 of the first questions of the day.  The officer
13 makes a decision in the totality of the
14 inspection.
15 BY MS. HOMER:
16    Q   I think you are right that I asked all
17 of that earlier.
18    A   Yeah.
19    Q   Okay.  We have discussed before that the
20 CBP receives TSDB information from the DHS
21 Watchlist Service.  Correct?
22    A   Correct.

142

1     Q   Does the CBP itself share its version of
2  TSDB information with other entities?
3         MS. ROTH:  Object to the extent that it
4  calls for law enforcement privileged information,
5  but you can answer.
6         THE WITNESS:  TSC is the sole
7  administrator of the watch list.  There would be
8  nothing for us to share as far as far as the watch
9  list.  TSC owns that.  They would share it, not
10 CBP.
11 BY MS. HOMER:
12    Q   Does the CBP ever export the copy of the
13 TSDB information it has in TECS to anyone else?
14        MS. ROTH:  Objection to the extent that
15 calls for law enforcement privileged information.
16 You can answer to the extent you can.
17        THE WITNESS:  We wouldn't have the
18 authority to do so, so no.
19 BY MS. HOMER:
20    Q   Does the CBP have the technical ability
21 to export the TSDB information it has in TECS with
22 other entities?

143

1         MS. ROTH:  Objection to the extent that
2  calls for law enforcement privileged information.
3  You can answer if you can.
4         THE WITNESS:  I don't know.  That's a
5  technical question for OIT.
6  BY MS. HOMER:
7     Q   What does OIT stand for?
8     A   Office of Information Technology.
9     Q   And is the Office of Information
10 Technology within the CBP?
11    A   Yes.
12    Q   Yeah.  Is the Office of Information
13 Technology the office that handles the importing
14 and exporting of TSDB information from a technical
15 perspective?
16    A   All computer related matters are handled
17 by our OIT.
18    Q   Okay.  So the OIT would handle the
19 exporting or importing of all technical
20 information shared across all of the government
21 data?  Like --
22    A   They are responsible for computers.

144

1     Q   Okay.  Fair enough.  Fair enough.  So to
2  your knowledge the CBP does not share its copy of
3  the TSDB with any other federal agencies?
4     A   Correct.
5     Q   To your knowledge the CBP does not share
6  its copy of the TSDB with foreign governments?
7     A   Correct.
8     Q   The CBP does not share its copy of the
9  TSDB with state or local law enforcement?
10    A   Correct.
11    Q   The CBP does not share its copy of the
12 TSDB with providers of criminal background checks?
13    A   Correct.
14    Q   Does the CBP share TSDB information with
15 any private contractors working for the CBP?
16    A   No, not that I'm aware of.
17    Q   Does the CBP share TSDB information with
18 private airlines?
19    A   No.
20    Q   Does the CBP share TSDB information with
21 private boats?
22    A   No.

Transcript of Randy Howe, Designated Representative
Conducted on March 22, 2018

145

1    Q    Does the CBP share TSDB information with
2  operators of trains?
3    A    No.
4    Q    Does the CBP share TSDB information with
5  the private owners of ports?
6    A    No.
7    Q    Does the CBP share TSDB information with
8  any financial institutions?
9    A    No.
10    Q    Has the CBP's use of the TSDB evolved
11  over time?
12        MS. ROTH: Objection, vagueness.
13  Objection to the extent it calls for law
14  enforcement sensitive information. You can answer
15  if you know.
16        THE WITNESS: I don't know what you
17  mean.
18  BY MS. HOMER:
19    Q    Okay. Fair enough. Has the CBP's
20  process for using the TECS system -- start over.
21        Has the CBP used the TECS system to
22  screen individuals against the TSDB for the last

146

1  decade?
2    A    I believe so.
3    Q    Has there, to your knowledge, been any
4  material changes in how the TECS system matches
5  individuals against the TSDB within the last
6  decade?
7        MS. ROTH: Objection. Vagueness.
8        THE WITNESS: We use the Watchlist
9  Service, DHS. I don't know how long we have been
10  doing that. So, that was one change, whenever
11  that was.
12  BY MS. HOMER:
13    Q    Prior to the TECS system receiving the
14  watch list from the DHS Watchlist Service did the
15  TECS system import the TSDB directly from TSC?
16    A    I don't know, but I would assume so.
17    Q    At all points in the last -- well, that
18  is too vague. Has the CBP consistently used the
19  TSDB over the last decade?
20        MS. ROTH: Objection as to vagueness.
21  BY MS. HOMER:
22    Q    To screen individuals?

147

1        MS. ROTH: Objection as to vagueness.
2        THE WITNESS: Yes, as the sole
3  repository for watch listed people on our border
4  security mission it -- we would be using it.
5  BY MS. HOMER:
6    Q    Has the CBP noticed any increase in
7  total encounters with individuals listed on the
8  TSDB over the last decade?
9        MS. ROTH: Objection to the extent that
10  calls for law enforcement information.
11        THE WITNESS: I don't know.
12  BY MS. HOMER:
13    Q    Has the CBP nominated more individuals
14  to the TSDB year over year during the last decade?
15        MS. ROTH: Objection to the extent that
16  calls for law enforcement privileged information
17  and objection as to vagueness.
18        THE WITNESS: I don't know the answer.
19  BY MS. HOMER:
20    Q    Could the CBP calculate the total number
21  of individuals it has nominated to the TSDB every
22  year for the last ten years?

148

1    A    I would assume so.
2        MS. HOMER: Now would be an okay time to
3  break for lunch if you want, or I can keep going.
4        MS. ROTH: I'd like to keep going.
5        MS. HOMER: Okay. Then I'll keep going.
6        MS. ROTH: Let's check back in 20
7  minutes.
8  BY MS. HOMER:
9    Q    Okay. We have been talking about the
10  TECS system as the main electronic system the CBP
11  uses to screen individuals. Is that a fair -- or
12  is that correct?
13    A    Yes, that's correct.
14    Q    Okay. Broadly speaking what data
15  sources does TECS pull information from?
16        MS. ROTH: Objection to the extent that
17  calls for law enforcement privileged information.
18  You can answer in a non-privileged way if you can.
19        THE WITNESS: It is CBP's main system to
20  track the work that we do, so the primary and
21  secondary inspection results. It's also for
22  lookouts self-generated by CBP for individuals

Transcript of Randy Howe, Designated Representative
Conducted on March 22, 2018

149

1 that are of concern, as well as other agencies
2 that have been provided access to make lookouts.
3 BY MS. HOMER:
4    Q   When you say lookouts self-generated by
5 CBP, what does that mean?
6    **A   By entering a system alert for**
7 **individuals that CBP wants to have additional**
8 **questioning of to refer them to secondary**
9 **inspection.**
10   Q   How does the CBP determine that an
11 individual is a lookout?
12      MS. ROTH:  Objection to the extent that
13 calls for law enforcement privileged information.
14 If you can answer that question in a
15 non-privileged way, go ahead.
16      THE WITNESS:  It is by the primary
17 required query, running that individual's document
18 through the system.
19 BY MS. HOMER:
20   Q   Okay.  When you say the word lookout,
21 what does that mean?
22   **A   It's an alert for the primary officer to**

150

1 **indicate that there is some additional questioning**
2 **needed for that traveler.**
3    Q   So is the term lookout used by CBP
4 synonymously to mean designated for second
5 inspection?
6    **A   Yeah, be on the lookout for somebody**
7 **that needs additional questioning, yes.**
8    Q   Okay.  That was helpful.  Does the TECS
9 system pull data from TSA's Secured Flight system?
10      MS. ROTH:  Objection to the extent that
11 calls for law enforcement privileged information.
12 You can answer if you know.
13      THE WITNESS:  I think you asked earlier
14 and I think the answer is yes, but I don't know.
15 TSA is one of our close DHS partners, so it would
16 make sense for us to collaborate and share
17 information.
18 BY MS. HOMER:
19   Q   Does the TECS system pull information
20 from the State Department?
21   **A   I believe so.**
22   Q   Does the TECS system pull information

151

1 from the State Department's Consular Lookout and
2 Support System?
3    **A   I believe so in some regard, yes.**
4    Q   What is the State Department's Consular
5 Lookout and Support System, to the extent you
6 know?
7    **A   It's -- sorry.**
8      MS. ROTH:  I'm going to object on the
9 basis of scope and that any answer CBP provides,
10 that does not bind either CBP or Department of
11 State.
12      THE WITNESS:  I think it's similar to
13 our TECS system.  It is their main system to track
14 their business.
15 BY MS. HOMER:
16   Q   So to your understanding it is the State
17 Department's main system to track passports?
18   **A   To track their business of granting**
19 **nonimmigrant visas and immigrant visas.  You know,**
20 **their process.**
21   Q   Okay.  Does the TECS system pull
22 information from the U S Citizenship and

152

1 Immigration Services Central Index System?
2    **A   I believe so.  Again, CIS is another**
3 **close DHS partner.**
4    Q   Does the TECS system pull information
5 from the FBI's National Crime Information Center?
6    **A   National -- oh, NCIC?**
7    Q   Yeah.
8    **A   Yes, it does.**
9    Q   Does the TECS system pull information
10 from passenger manifests issued by airlines and
11 ships?
12   **A   I believe so.**
13   Q   Does the TECS pull information from
14 state law enforcement systems?
15   **A   I believe so, yes.**
16   Q   Does the TECS system contain underlying
17 derogatory information about individuals listed in
18 the TSDB?
19   **A   No.**
20   Q   You testified earlier that some analysts
21 within the National Terrorism -- sorry.
22      You testified earlier that some

Case 1:16-cv-00375-AJT-JFA   Document 306-30   Filed 03/12/19   Page 41 of 91 PageID# 14481
Transcript of Randy Howe, Designated Representative
Conducted on March 22, 2018

39 (153 to 156)

153

1 individuals within the National Targeting Center
2 within the CBP do have access to underlying
3 derogatory information.  Correct?
4     A   Yes.
5     Q   What system did those individuals use to
6 access the underlying derogatory information?
7         MS. ROTH:  Objection to the extent that
8 calls for law enforcement privileged information.
9 You can answer.
10        THE WITNESS:  I don't know if I know the
11 name of it.  It's a secure database.
12 BY MS. HOMER:
13    Q   Is it possible that it is a database
14 called TSS -- no, wait.  That's wrong.  That would
15 not be possible, I don't think.  Okay.  Could you
16 find out the name of the database that NTC
17 employees use to access underlying derogatory
18 information?
19        THE WITNESS:  If it could be shared,
20 yes, I guess.
21 BY MS. HOMER:
22    Q   In other words you could find out, but

154

1 you may not necessarily be able to tell me?
2     A   Yes.
3         MS. ROTH:  Also I'm going to belatedly
4 object as to vagueness.
5         THE WITNESS:  Sorry.
6         MS. ROTH:  And make sure we're talking
7 about TSDB derogatory information?
8         MS. HOMER:  Yes.  Yes.
9 BY MS. HOMER:
10    Q   Do you know what DHS privacy impact
11 assessments are?
12    A   I think so.
13    Q   Is it your understanding that the DHS
14 publishes documents detailing the privacy impacts
15 of various CBP electronic systems?
16    A   Yes.
17    Q   Okay.  Would you agree that a
18 comprehensive list of data sources that TECS
19 ingests would be listed in the DHS privacy impact
20 assessments covering TECS?
21    A   I understand that is correct.
22    Q   What information, broadly speaking, do

155

1 CBP employees themselves add to TECS due to their
2 inspections?
3         MS. ROTH:  Objection, vague.  Objection
4 to the extent it calls for law enforcement
5 privileged information.  You can answer in a
6 non-privileged way if you can.
7         THE WITNESS:  Yeah, so it's TECS system
8 is our main system to document everything that we
9 do.  The primary queries are automatically in the
10 system.  Secondary requires us to put information,
11 the results of that secondary inspection of that
12 passenger.  So it's inputted by us.
13 BY MS. HOMER:
14    Q   So the TECS system would automatically
15 create a record of every border crossing by every
16 individual.  Is that fair?
17        MS. ROTH:  Objection, vague.  Objection,
18 mischaracterizes prior testimony.
19        THE WITNESS:  The primary inspection is
20 automatic, that's recording individuals when and
21 where.  The secondary referral and the information
22 is inputted by the officer.

156

1 BY MS. HOMER:
2     Q   Okay.  So during an initial screening
3 when somebody scans their passport that passport
4 scan is automatically uploaded to TECS somehow?
5     A   The biographical information is captured
6 by the system and a query is made in the system.
7     Q   And then the fact that the individual
8 scanned their passport at that date and time,
9 that's recorded in TECS?
10    A   The fact that they made entry or they
11 were an applicant for admission, yes.
12    Q   Is all of the information that an
13 individual may declare at customs, such as they
14 bought jewelry in a foreign country, is that
15 automatically stored in TECS?
16    A   It may or may not dependent upon why
17 they were referred to secondary.  If they were
18 referred to pay a customs duty, if they were
19 referred for some -- what was the question again?
20 I'm sorry.  I lost it.
21    Q   I just -- okay.  Under what
22 circumstances would an individual's custom

157

1 declaration form be stored in TECS?

2    **A    If they were referred to secondary and**
3 **there was some type of action that was taken,**
4 **collecting duty or they had some prohibited items,**
5 **they had currency in excess of the reporting**
6 **requirement. Those kinds of things.**

7    Q    Okay. Is the fact as to whether any
8 individual was designated for secondary screening,
9 is that recorded in TECS?

10    **A    The reason?**

11    Q    Just the fact that they went to
12 secondary screening?

13    **A    All secondary inspections are recorded.**
14 **So the fact that they are referred, yes.**

15    Q    And then the reason why they were
16 referred to secondary screening, that would also
17 be recorded?

18    **A    Correct.**

19    Q    And then any information that CBP
20 officers collected during secondary screening,
21 that would also be recorded?

22    **A    When appropriate, yes.**

158

1    Q    What do you mean when you say that when
2 appropriate information that CBP agents learned
3 would be recorded?

4    **A    Well, if it's pertinent to the**
5 **inspection that we are completing. So the final**
6 **determination of admissibility or whatever the**
7 **reason is for them to be there.**

8    Q    Does the CBP share its TECS data that it
9 generates with any other entity?

10    **A    Well, any entity that has access to**
11 **TECS, so our DHS partners and/or other agencies**
12 **maybe that outside of DHS that have an agreement,**
13 **they would have -- they would have access to the**
14 **information we have in there for law enforcement**
15 **purposes.**

16    Q    Does the CBP share TECS data with any
17 entities that are not federal government agencies?

18    **A    Not that I'm aware of.**

19    Q    Does the CBP share TECS data with any
20 foreign governments?

21    **A    No.**

22    Q    Does the CBP share TECS data with any

159

1 state or local law enforcement agencies?

2    **A    I would say potentially. I mean, if we**
3 **had somebody that had a stolen vehicle, so, we**
4 **would let that state government know.**

5    Q    Okay. So some information from TECS
6 might be shared with state law enforcement,
7 correct?

8    **A    Yes.**

9    Q    But does CBP share broad access to all
10 TECS data with state and local law enforcement?

11    **A    No. It's all strictly need to know. So**
12 **dependent upon the agency and what they have to**
13 **have access to. Part of that agreement we have in**
14 **the way that they are provided access at different**
15 **levels.**

16    Q    Does the CBP share TECS data with any
17 private corporations?

18    **A    Not that I'm aware of.**

19    Q    Does the CBP share TECS data with any
20 state or federal court systems?

21    **A    I don't know.**

22    Q    Could you find out the answer?

160

1    **A    I suppose.**

2    Q    The information that CBP records
3 regarding secondary inspections does not contain a
4 complete transcript of the secondary inspection
5 interaction, correct?

6    **A    I don't know what you mean by**
7 **transcript.**

8    Q    Does the CBP record every question and
9 answer that it may ask to an individual during
10 secondary inspection in the TECS system?

11    **A    No.**

12    Q    Does every employee of CBP have access
13 to TECS?

14    **A    No.**

15    Q    Does every employee of your office, the
16 Office of Field Operations, have access to TECS?

17    **A    I don't think so.**

18    Q    Approximately how many employees of CBP
19 have access to TECS?

20    **A    I don't have the exact number, but our**
21 **uniform — we are talking about field operations?**

22    Q    Uh huh.

161

1    A   23,000, you know, foreign officers.
2 They would have access.
3    Q   Are there -- are there subdivisions
4 within TECS that some officers have access to that
5 other officers don't.
6    A   I don't think so.  I think they're
7 all -- they would have the same -- same access.
8    Q   So all 23,000 officers approximately who
9 have access to TECS would also have access to the
10 TSDB information listed in TECS?
11      MS. ROTH:  Object on the basis that that
12 question calls for law enforcement privileged
13 information, but you can answer.
14      THE WITNESS:  It would be in a need to
15 know and in the interaction of their duties.  The
16 frontline personnel that are interacting with
17 travelers and secondary.  But we have people that
18 do other jobs that are not interacting with
19 passengers in the same way.
20 BY MS. HOMER:
21    Q   Okay.  So can users of TECS ordinarily
22 see a complete list of every single individual

162

1 listed on the TSDB that TECS has?
2      MS. ROTH:  Object as to vague.  Object
3 as to foundation.
4      THE WITNESS:  I don't think there is a
5 list.  It's a reaction to encountering an
6 individual that's a TSDB.  There is no browsing or
7 looking at lists.  It's doing the function, the
8 border security function.
9 BY MS. HOMER:
10    Q   Okay.  So what an end user would see
11 when they log into TECS is -- is only if a
12 specific individual is a match to the TSDB.  Is
13 that fair?
14    A   In performing the border security
15 function in the primary capacity or secondary in
16 querying a particular individual if they are a
17 match.  That is the opportunity we see, and the
18 only opportunity.
19    Q   So a CBP officer using TECS would see
20 the records associated with the specific
21 individual.  Correct?
22    A   Correct.

163

1    Q   They would not see or be able to see all
2 records on all individuals that the TECS system is
3 querying against in the background?
4      MS. ROTH:  Objection.  Vague.  Go ahead
5 and answer.
6      THE WITNESS:  Not a part of the access
7 that we would have.
8 BY MS. HOMER:
9    Q   Okay.  Thanks.  Does the CBP use any
10 watch list other than the TSDB?
11      MS. ROTH:  Objection, vague.  Objection
12 to the extent it calls for law enforcement
13 privileged information.  You can answer if you can
14 in a non-privileged way.
15      THE WITNESS:  U S government's sole
16 repository for watch listed individuals is the
17 TSC's.
18 BY MS. HOMER:
19    Q   Does the CBP use any list of lookouts
20 other than the TSDB?
21      MS. ROTH:  Objection, vague.  Objection
22 to the extent it calls for law enforcement

164

1 privileged information.  You can answer if you
2 can.
3      THE WITNESS:  There are lookouts that we
4 make in our system for immigration, customs,
5 agriculture, a myriad of different reasons other
6 than TSDB.
7 BY MS. HOMER:
8    Q   Okay.  Do you also make lookout lists
9 for, for example, individuals who have an
10 outstanding criminal warrant?
11      MS. ROTH:  Objection, vague.  Objection
12 to the extent it calls for law enforcement
13 privileged information.
14      THE WITNESS:  We may.  Generally that
15 would come from the originating agency unless they
16 didn't have access to TECS.
17 BY MS. HOMER:
18    Q   Okay.  And as we discussed earlier, the
19 CBP uses the term lookout to broadly describe
20 individuals who if the CBP encounters they will
21 refer to secondary inspection?
22    A   Yes.

Transcript of Randy Howe, Designated Representative
Conducted on March 22, 2018

---

165

1    Q    What is the CBP's automated targeted
2 system?
3    **A    We talked about it a little bit earlier.**
4 **It is system that the NTC primarily uses to**
5 **identify high risk individuals or conveyances for**
6 **additional scrutiny.**
7    Q    Okay.  You said individuals or
8 conveyances.  Are there subdivisions within the
9 automated targeting system?
10   **A    Well, we use the ATS -- sorry, for**
11 **targeting individuals.  But you could also**
12 **identify vehicles.**
13   Q    Okay.
14   **A    That would require additional screening.**
15   Q    Okay.  When I was reviewing documents I
16 saw five different subdivisions of ATS.  And I
17 just want to see if this comports with your
18 understanding.  That there is an ATS system for
19 vehicles that you just mentioned.  Is that
20 correct?
21   **A    I think it is one system.**
22   Q    It is one system?

---

166

1    **A    Uh huh.  Capability of doing it all.**
2    Q    Is there a separate system called
3 ATS/vehicle?
4    **A    I don't know.**
5    Q    Okay.  Is there a separate system called
6 ATS/cargo?
7    **A    I believe so.**
8    Q    Okay.  Is there a separate system called
9 ATS/land?
10   **A    I believe so.**
11   Q    Is there a separate system called
12 ATS/targeting framework?
13   **A    I don't know.**
14   Q    Okay.  And is there a separate system
15 called ATS/passenger?
16   **A    Yes.**
17   Q    Okay.
18   **A    Those are all one system with**
19 **sub-systems.**
20   Q    Okay.  And within those sub-systems I
21 just mentioned is one of those sub-systems
22 primarily focused on screening individual

---

167

1 travelers?
2    **A    Passengers, yes.**
3        MS. ROTH:  Counsel, I apologize for
4 breaking your train of thought.  I was going to
5 propose that we break around one, if that works
6 for you.
7        MS. HOMER:  Okay.
8        MS. ROTH:  Unless somebody needs it
9 sooner.
10       THE WITNESS:  In 20 minutes.
11 BY MS. HOMER:
12   Q    Good for me.  Okay.  What is the ATS
13 Passenger system?
14   **A    It is the system that is used primarily**
15 **to identify high risk individuals, passengers.**
16   Q    And how does the -- does the ATS
17 Passenger system go by any other names?
18   **A    I don't believe so.**
19   Q    Okay.  I saw a reference to UPAKS
20 (phonetic), do you know if that is another name
21 for ATS Passenger?
22   **A    Yeah, I think it is a different**

---

168

1 iteration of ATSP.
2    Q    Okay.  Would you prefer that I refer to
3 that system as ATSP or UPAKS?
4    **A    ATSP is fine.**
5    Q    Okay.  Would you agree that ATSP is a
6 system that engages in data mining in order to
7 identify high risk passengers?
8        MS. ROTH:  Objection, vague.  Objection,
9 foundation.  Objection to the extent it calls for
10 law enforcement privileged information.  You can
11 answer if you can.
12       THE WITNESS:  ATS takes information that
13 is available to us on individuals of concern and
14 different information of previous passengers
15 that -- or travelers that have traveled.  And
16 using APIS information, advanced passenger
17 information, we are able to identify passengers
18 that are, or travelers that are of concern or
19 additional questioning.
20 BY MS. HOMER:
21   Q    So is ATSP being used to predict what
22 passengers may be high risk?

---

Transcript of Randy Howe, Designated Representative

Conducted on March 22, 2018

---

169

1     MS. ROTH:  Objection on the basis of the
2 law enforcement privilege.  You can answer if you
3 can.
4     THE WITNESS:  It's another tool that we
5 use to facilitate.
6 BY MS. HOMER:
7   Q   How long has ATSP been in use?
8   **A   I don't know exactly.  At least the last**
9 **ten years.**
10  Q   Could it be 15 years?
11  **A   It could.**
12  Q   Could it be 20?
13  **A   Don't know.**
14  Q   How does the ATSP system interface with
15 the TECS system, if at all?
16     MS. ROTH:  Objection to the extent that
17 calls for law enforcement privileged information.
18 You can answer.
19     THE WITNESS:  Yeah, since TECS is our
20 main system for recording all encounters with
21 travelers to the U S it is a -- certainly one of
22 the systems that ATS takes information from, ATSP,

---

170

1 yeah.
2 BY MS. HOMER:
3   Q   Okay.  So is ATS taking information from
4 TECS or is TECS taking information from ATS or
5 both?
6   **A   ATS is taking information from TECS.**
7   Q   Okay.
8   **A   And APIS information.**
9   Q   Okay.  And is ATS the primary method by
10 which CBP determines whether an individual poses a
11 high risk to the United States?
12     MS. ROTH:  Objection, vague.  Objection
13 to the extent that it calls for law enforcement
14 privileged information.  You can answer if you
15 can.
16     THE WITNESS:  Did you ask me if it's the
17 system that we use?
18 BY MS. HOMER:
19  Q   Yeah?
20  **A   Yes.**
21  Q   What is the purpose of ATS assigning
22 risk assessments to individuals entering the

---

171

1 United States?
2   **A   It's facilitating the inspectional**
3 **process to identify individuals that are of**
4 **concern so that -- a risk base so that we can**
5 **facilitate the processing at the ports of entry.**
6 **So those that are identified through ATS we are**
7 **able to question a little bit further.**
8   Q   Oh, what does ATSP consider to be an
9 individual of concern?
10     MS. ROTH:  Objection, vague.  Objection
11 to the extent it calls for law enforcement
12 privileged information.
13     THE WITNESS:  We are a border security
14 organization, so enforcing immigration, customs,
15 agriculture, national security, counterterrorism,
16 all of it, CBP's function.
17 BY MS. HOMER:
18  Q   Does ATS assign a risk assessment score
19 to every individual traveler?
20  **A   No.  Sorry.**
21     MS. ROTH:  I'm going to lodge an
22 objection on the basis of the law enforcement

---

172

1 privileges, but you can answer.
2     THE WITNESS:  No.
3 BY MS. HOMER:
4   Q   Does ATS assign a risk assessment level,
5 like low or high to every individual traveler?
6     MS. ROTH:  Objection to the extent that
7 it calls for law enforcement privileged
8 information.  You can answer.
9     THE WITNESS:  No, I don't believe so,
10 no.
11 BY MS. HOMER:
12  Q   Does ATS designate some travelers as low
13 risk?
14     MS. ROTH:  Objection to the extent that
15 it calls for law enforcement privileged
16 information.  You can answer if you know.
17     THE WITNESS:  CBP has a trusted traveler
18 program so Global Entry, NEXUS, SENTRI.  Read them
19 off this morning.  To facilitate individuals that
20 have been pre-vetted and part of the trusted
21 traveler program.
22

---

173

1  BY MS. HOMER:
2     Q   And does ATS look at individuals who are
3  in the trusted traveler program in order to
4  determine that they are not high risk?
5         MS. ROTH:  Objection to the extent that
6  it calls for law enforcement privileged
7  information.  Objection, vague.
8         THE WITNESS:  All of the -- all of their
9  entries to the U S, the information on that person
10 is housed in TECS.  So that would be also
11 something that ATS may draw on, yes.
12 BY MS. HOMER:
13    Q   So what are the categories of risk that
14 ATS breaks people into?
15        MS. ROTH:  Objection, vague.  Objection
16 to the extent it calls for --
17        (Court reporter requested
18 clarification.)
19        MS. ROTH:  To the extent it calls for
20 law enforcement privileged information.  You can
21 answer if you can answer it in a non-privileged
22 way.

174

1         THE WITNESS:  The question again?
2  BY MS. HOMER:
3     Q   What are the categories of risk that ATS
4  breaks people into?
5         MS. ROTH:  Same objections.
6         THE WITNESS:  I'm not sure if there's
7  categories of risk.  But, again border security,
8  immigration, customs, agriculture,
9  counterterrorism.  It's all part of the ATS work
10 to identify people of concern in each one of those
11 categories.
12 BY MS. HOMER:
13    Q   Okay.  It may -- it be that your system
14 just works differently than the TSA.  And I will
15 just -- for a second.
16    A   Okay.
17    Q   But when I was talking to the TSA the
18 other day they said they had a system that just
19 sorted people into low risk, ordinary risk, and
20 high risk.  Does the ATS work like that?  Does it
21 designate every person an individual score of low,
22 ordinary, and high risk?

175

1         MS. ROTH:  Objection to the extent that
2  calls for law enforcement privileged information.
3  You can answer if you are able to.
4         THE WITNESS:  No, it doesn't do what TSA
5  does.
6  BY MS. HOMER:
7     Q   Okay.  Does the ATS system only seek to
8  identify individuals who may be high risk?
9         MS. ROTH:  Objection, vague.  Objection
10 to the extent it calls for law enforcement
11 privileged information.  You can answer if you
12 can.
13        THE WITNESS:  The intent of the system
14 is to identify pass -- or travelers of concern.
15 That is the intent.
16 BY MS. HOMER:
17    Q   So the ATS system either designates
18 individuals as high concern or does nothing with
19 respect to that individual.  Is that fair?
20        MS. ROTH:  Objection, vague.  Objection,
21 mischaracterizes prior testimony.  Objection
22 law -- to the extent it calls for law enforcement

176

1  privileged information.  You can answer if you
2  can.
3         THE WITNESS:  Yeah, ATS is the tool that
4  we use to identify passengers that are a risk.
5  BY MS. HOMER:
6     Q   Okay.  And ATS does not serve any other
7  function with respect to passengers other than
8  identifying whether or not they are a risk?
9     A   Certainly a facilitation tool -- sorry.
10        MS. ROTH:  I'm going to object to the
11 extent that the question calls for law enforcement
12 privileged information.  And you can go ahead and
13 answer in a non-privileged way.
14        THE WITNESS:  Facilitation tool, for
15 sure.
16 BY MS. HOMER:
17    Q   It's a facilitation tool for what?
18    A   For identifying passengers or travelers
19 of high risk.
20    Q   Okay.  Are individuals who are
21 identified as high risk by ATS always referred to
22 secondary inspection?

Transcript of Randy Howe, Designated Representative
Conducted on March 22, 2018

177

1       MS. ROTH:  Objection to the extent that
2   calls for law enforcement privileged information.
3   If you can answer that question in a
4   non-privileged way, you can answer.
5       THE WITNESS:  I don't know for sure.
6   BY MS. HOMER:
7       Q   Are individuals who are designated as
8   high risk by ATS typically referred to secondary
9   inspection?
10       MS. ROTH:  Same objections, to the
11   extent that it calls for law enforcement
12   privileged information.  You can answer if you are
13   able to in a non-privileged way.
14       THE WITNESS:  Yeah, it's our main system
15   to identify high risk travelers.  So generally
16   speaking they probably would be referred for
17   additional questioning.
18   BY MS. HOMER:
19       Q   What percentage of travelers does ATS
20   designate as high risk every given year?
21       MS. ROTH:  I'm going to object on the
22   basis of the law enforcement privilege.  You can

178

1   answer if you know.
2       THE WITNESS:  I don't know.
3   BY MS. HOMER:
4       Q   Do you have any estimate as to the
5   number of individuals that ATS designates as high
6   risk every year in the terms of a percentage?
7       A   No.
8       Q   Less than 20 percent?
9       A   I don't know.
10       Q   Less than ten percent?
11       A   I don't want to speculate.
12       Q   Could you calculate the number of --
13   start over.
14       Could you calculate the percent of
15   individuals that ATS designates as high risk every
16   year?
17       A   I suppose you possibly could, but I
18   don't know.
19       Q   Is whether or not an individual was
20   designated as high risk by ATS a piece of
21   information that is stored in that individual's
22   TECS record for that crossing?

179

1       A   The secondary inspection results would
2   capture the results of that inspection.
3       Q   Do secondary inspection results as a
4   matter of course contain the ATS risk designation
5   for that individual?
6       A   I think actually it would.  ATS would be
7   the system that identified it to the officer, so
8   it would be a part of the record, I'm sure.
9       Q   Are individuals who are listed on the
10   TSDB categorized as high risk by ATS?
11       MS. ROTH:  Objection to the extent that
12   it calls for law enforcement privileged
13   information.  You can answer if you can in a
14   non-privileged way.
15       THE WITNESS:  I'm not sure if there's a
16   clean answer on that.  I mean, if they are a TSDB
17   then you wouldn't need ATS to identify them
18   because they would be in the system already.
19   BY MS. HOMER:
20       Q   Okay.  So if an individual is listed on
21   the TSDB then they would be flagged by the TECS
22   system as being listed on the TSDB.  Correct?

180

1       MS. ROTH:  Objection, vague.  Objection,
2   asked and answered.
3       THE WITNESS:  I think we spent the
4   better part of the morning on that.  Yes.  TSDB
5   information is shared by the TSC through Watchlist
6   Service and then to CBP's tech system.
7   BY MS. HOMER:
8       Q   So the ATS system does not reevaluate or
9   develop risk assessments for individuals listed on
10   the TSDB?
11       MS. ROTH:  Objection, vague.  Objection
12   to the extent that it calls for law enforcement
13   privileged information.  You can answer if you
14   can.
15       THE WITNESS:  It's valuable information
16   to CBP, it would have to be part of the
17   consideration.
18   BY MS. HOMER:
19       Q   If an individual is listed in TSDB, will
20   they also be given a high risk assessment by ATS?
21       MS. ROTH:  Objection to the extant that
22   that question calls for law enforcement privileged

181

1  information.  You can answer if you can.
2       THE WITNESS:  I don't know.
3       MS. ROTH:  Counsel, I just want to
4  know --
5       MS. HOMER:  Yeah.
6       MS. ROTH:  -- if we are approaching one
7  o'clock, so if there is a good stopping point.
8  BY MS. HOMER:
9    Q   I can stop -- oh, wait.  Okay.  If an
10 individual -- yeah, I'll ask like two more
11 questions.
12      If an individual is a potential match to
13 the TSDB does the ATS system categorize them as
14 high risk?
15      MS. ROTH:  Same objection.  Law
16 enforcement privilege and vague.  But you can
17 answer if you can.
18      THE WITNESS:  ATS is our tool to
19 identify high risk passengers.  And if they were a
20 potential match they would be -- you know,
21 identified through the ATS system.
22

182

1  BY MS. HOMER:
2    Q   Okay.  Does CBP notify individuals at
3  the time of screening that they have been
4  categorized as high risk by ATS?
5    **A   We wouldn't share that.  It's law**
6  **enforcement sensitive information.**
7    Q   If an individual is referred to a
8  secondary inspection that could be for many
9  different reasons other than being categorized as
10 high risk, correct?
11   **A   Correct.**
12      MS. HOMER:  Why don't we stop there.
13      MS. ROTH:  Go off the record.
14      THE VIDEOGRAPHER:  We are going off of
15 the record.  The time is 12:59 p.m.
16      (The proceedings recessed from
17 12:59 p.m. to 2:02 p.m.)
18      THE VIDEOGRAPHER:  Back on the record.
19 The time is 2:02 p.m.
20 BY MS. HOMER:
21   Q   Welcome back.  I hope you had a nice
22 lunch.

183

1    A   Thank you.
2       MS. ROTH:  Counsel, I apologize for
3  interrupting.  With your permission my client did
4  want to clarify one bit of testimony from earlier
5  this morning, if that's okay with you.
6       MS. HOMER:  Please go ahead.
7       MS. ROTH:  It has to do with the
8  question about whether or not CBP shares TECS data
9  with foreign governments.
10      MS. HOMER:  Okay.
11      THE WITNESS:  Thank you for the
12 opportunity.  So, I may have misunderstood your
13 question.  I thought you asked if we grant access
14 to TECS by foreign governments, and the answer is
15 no.  But we do share information that may be in
16 TECS with foreign governments on a law enforcement
17 need on a case by case basis, but not access.
18 BY MS. HOMER:
19   Q   So if I understand you correctly on a
20 case by case need to know basis you may share
21 information that is in TECS with some foreign
22 governments?

184

1    **A   Correct, with the exception, obviously,**
2  **of TSDB information, which is owned by the TSC and**
3  **they would have to release that information.**
4    Q   On occasion do you share TECS
5  information with Interpol?
6    **A   I don't know.  I know that Interpol**
7  **has -- there are lookouts in our system, I**
8  **believe, from Interpol.  But the sharing with**
9  **Interpol, I don't know.**
10   Q   What are the lookouts you have in your
11 system from Interpol?
12      MS. ROTH:  I'm going to object to the
13 extent that it calls for law enforcement
14 privileged information.  If you think you can
15 answer that in a non-privileged way, you can.
16      THE WITNESS:  Maybe lost or stolen
17 passport information.
18 BY MS. HOMER:
19   Q   And does the lookout information from
20 Interpol go into TECS or go into ATS Passenger?
21      MS. ROTH:  I'm going to object to the
22 extent that it calls for law enforcement

185

1 privileged information.  You can answer if you
2 can?
3        THE WITNESS:  That information would be
4 in TECS.
5 BY MS. HOMER:
6    Q   What is a rule hit in ATS Passenger?
7        MS. ROTH:  I'm going to object to the
8 extent that the question calls for law enforcement
9 privileged information.  You can answer in a
10 non-privileged way if you can.
11       THE WITNESS:  So ATS is a decision
12 making tool for our officers to use.  It relies on
13 information from TECS and a host of other
14 information that is housed in TECS with some maybe
15 previous law enforcement or intelligence to help
16 guide in the decision process.  So the rule making
17 would be a part of that process.
18 BY MS. HOMER:
19   Q   Does -- okay.  So does the ATS Passenger
20 system apply rules to create risk assessments as
21 to individual passengers?
22       MS. ROTH:  Object to the extent that

186

1 calls for law enforcement privileged information.
2 You can answer it in a non-privileged way if can
3 you.
4        THE WITNESS:  ATS relies on historically
5 information of law enforcement or intelligence to
6 guide the rule hits.
7 BY MS. HOMER:
8    Q   And the result of a rule hit is a risk
9 assessment as to whether or not individual
10 passengers present a high risk of a security
11 threat to the United States?
12       MS. ROTH:  Objection, vague.  Objection,
13 mischaracterizes prior testimony.  Objection to
14 the extent it calls for law enforcement privileged
15 information.  You can answer if you can.
16       THE WITNESS:  Yeah, ATS again is a law
17 enforcement tool helping the decision making of
18 the officer, drawing on that information to help
19 them identify travelers that need a little bit
20 more scrutiny.
21 BY MS. HOMER:
22   Q   Would it be fair to characterize ATS as

187

1 a system that -- that helps identify unknown high
2 risk individuals by comparing their information
3 against a set of rules that have been developed
4 based on intelligence, law enforcement, and other
5 information?
6        MS. ROTH:  Objection to the extent that
7 it calls for law enforcement privileged
8 information and object as to vagueness.  You can
9 answer if you can in a non-privileged way.
10       THE WITNESS:  I felt like you repeated
11 my last answer, that is it draws on law
12 enforcement sensitive information, intelligence to
13 help in that decision making process that the
14 officer is working.
15 BY MS. HOMER:
16   Q   Does CBP share the results of its ATS
17 Passenger rule hits with any other agencies?
18       MS. ROTH:  Objection to the extent that
19 it calls for law enforcement privileged
20 information.  You can answer if you can.
21       THE WITNESS:  It is our tool for us to
22 determine our function at the border, enforcing

188

1 border security.  So it is a tool used by CBP in
2 order to make admissibility determinations and
3 determine whether or not passengers need any
4 addition scrutiny.  It's our tool.
5 BY MS. HOMER:
6    Q   Does -- it doesn't quite answer my
7 question.  Does CBP share the results of the ATS
8 Passenger rule hits with the TSA?
9        MS. ROTH:  I'm going object to the
10 extent that it calls for law enforcement
11 privileged information.  You can answer if you can
12 answer in a non-privileged way.
13       THE WITNESS:  I think I will just
14 restate my answer.  It's a tool that we use to
15 identify passengers or travelers that need a
16 little additional scrutiny.  The result of that
17 security and having them refer to secondary, that
18 would be accessible.  We would be able to share
19 with TSA or our DHS partner.
20 BY MS. HOMER:
21   Q   Can any other government agency see
22 whether an individual was designated by CBP as a

189

1 high risk based on the application of ATS
2 Passenger rules?
3       MS. ROTH:  Object based on the law
4 enforcement privilege.
5       THE WITNESS:  I don't know the answer to
6 that.
7 BY MS. HOMER:
8    Q   Does ATS's system consider information
9 from intelligence agencies in establishing its
10 rules?
11       MS. ROTH:  I'm going to object on the
12 basis of the law enforcement privilege.
13       THE WITNESS:  Yeah, ATS relies on law
14 enforcement information and intelligence to inform
15 the use of ATS.
16 BY MS. HOMER:
17    Q   Does ATS consider the country a traveler
18 is traveling from in determining whether that
19 traveler is high risk?
20       MS. ROTH:  I'm going to object on the
21 basis of the law enforcement privilege.  You can
22 answer if you can do so without disclosing

190

1 privileged information.
2       THE WITNESS:  It could be a contributing
3 factor.  There is a host of different things based
4 on enforcement information, intelligence to
5 include possibly where they are traveling from.
6 BY MS. HOMER:
7    Q   Does the ATS rule assessments designate
8 all travelers from countries listed in Executive
9 Order 13780, known colloquially as the travel ban,
10 as being high risk individuals?
11       MS. ROTH:  I'm going to object as to
12 vagueness.  I'm going to object as to the scope of
13 the properly noticed subject for this deposition.
14 I'm going to object on law enforcement privilege
15 and I'm going to instruct the witness not to
16 answer that question.
17 BY MS. HOMER:
18    Q   Does ATS consider any traveling
19 companions of an individual who is listed on the
20 TSDB to be high risk?
21       MS. ROTH:  I'm going to object on the
22 basis of the law enforcement privilege.  And you

191

1 can answer if you can do so without disclosing
2 privileged information.
3       THE WITNESS:  Associations may be a
4 contributing factor.
5 BY MS. HOMER:
6    Q   Does ATS make its risk assessment
7 determination as to every single individual every
8 single time they cross the border?  Like is it a
9 simultaneous risk assessment?
10       MS. ROTH:  I'm going to object as to
11 vagueness.  I'm going to object as to law
12 enforcement privilege.  You can answer if you can.
13       (Phone is playing music.)
14       THE WITNESS:  They muted it?  Hold
15 music.
16       MS. HOMER:  Just hang up.  Dial back in
17 a minute.
18       THE WITNESS:  One more time?
19       MS. HOMER:  I apologize.  Can you read
20 back the question.
21       (Court reporter read back the requested
22 portion.)

192

1       MS. ROTH:  Object to the extent that it
2 calls for law enforcement privileged information.
3 Once again, object as to vagueness.
4       THE WITNESS:  As in the air environment,
5 as travelers are intending to journey to the U S
6 each and every time they are a ticketed passenger
7 the ATS system is functioning.
8 BY MS. HOMER:
9    Q   Okay.  So does the ATS Passenger system
10 create a new risk assessment every time an
11 individual seeks to enter the United States?
12       MS. ROTH:  Object on the basis of the
13 law enforcement privilege.  You can answer if you
14 can.
15       THE WITNESS:  It's the same answer.
16 Each and every time somebody travels to the U S,
17 ATS performs or CBP performs the, utilizes that
18 decision making tool in determining passengers
19 that need additional scrutiny.
20 BY MS. HOMER:
21    Q   Does ATS Passenger create permanent
22 lists of travelers who will always be designated

193

1  as high risk every time they cross the border?
2       MS. ROTH:  Objection on the basis of the
3  law enforcement privilege and as to vagueness.
4  You can answer if you can.
5       THE WITNESS:  I'm not familiar with
6  lists.  Again, ATS is used each time as a decision
7  making tool independent of new travel to the U S.
8  BY MS. HOMER:
9       Q    If a passenger has been designated as
10 high risk by ATS Passenger in the past is it more
11 likely that the passenger will be designated as
12 high risk by ATS Passenger the next time they
13 cross the border?
14      MS. ROTH:  I'm going to object on the
15 basis of the law enforcement privilege.  You may
16 answer if you can.
17      THE WITNESS:  It's difficult to
18 speculate.  That is case by case.
19      MS. HOMER:  Okay.
20      MS. MASRI:  Is it okay if we call them
21 back?  Apparently they were on the line and the
22 music just started.

194

1       MS. HOMER:  Yeah.  Can we go off of the
2  record for just like one minute.
3       THE VIDEOGRAPHER:  We are going off the
4  record.  The time is 2:15 p.m.
5       (Proceedings recessed from 2:15 p.m. to
6  2:16 p.m.)
7       THE VIDEOGRAPHER:  We are back on the
8  record.  The time is 2:16 p.m.
9  BY MS. HOMER:
10      Q    Does ATS's rules assessment take into
11 account the age of the traveler?
12      MS. ROTH:  I'm going to object on the
13 basis of law enforcement privilege.  And I will
14 let you answer, but I'm just going to note an
15 objection based on scope.  And fair warning, I'm
16 not going to let a lot of questions down this
17 road.
18      THE WITNESS:  ATS takes into
19 consideration multiple reasons, enforcement -- law
20 enforcement and intelligence.
21 BY MS. HOMER:
22      Q    And is the age of the passenger one data

195

1  point that ATS Passenger considers?
2       MS. ROTH:  Same objections.
3       THE WITNESS:  Same answer, we use
4  multiple information.
5  BY MS. HOMER:
6       Q    And is the age of the passenger one of
7  the pieces of information you use?
8       MS. ROTH:  Same objections.
9       THE WITNESS:  Multiple.  Multiple things
10 are used based on the law enforcement and
11 intelligence that we have available to us.
12 BY MS. HOMER:
13      Q    I'm just looking for a yes or no?
14      A    It's one of them.
15      Q    If an individual is consistently
16 designated as high risk by ATS Passenger is there
17 any way that they can contest the factual basis by
18 which ATS Passenger is designating them as high
19 risk?
20      MS. ROTH:  I'm going to object as to
21 vagueness and as to scope.  You can answer if you
22 know.

196

1       THE WITNESS:  I think with any traveler
2  they could utilize DHS TRIP to express concern
3  about an encounter with CBP.
4  BY MS. HOMER:
5       Q    But does DHS TRIP redress process ever
6  lead to CBP lowering the risk assessment as to an
7  individual?
8       MS. ROTH:  Object as to vagueness.
9  Object to the extent it calls for law enforcement
10 privileged information and as to scope.  But you
11 can answer if you know.
12      THE WITNESS:  CBP is continually
13 reassessing information, streamlining our
14 processes in determination whether or not somebody
15 needs additional scrutiny or not.
16 BY MS. HOMER:
17      Q    If an individual is flagged by ATS
18 Passenger as being high risk, does CBP use that
19 flag as a basis for nominating the individual to
20 the watch list?
21      MS. ROTH:  Object on the basis of the
22 law enforcement privilege.  You can answer if you

**197**

1 can answer in a non-privileged way.
2     THE WITNESS:  If somebody is identified
3 through ATS as needing additional scrutiny they
4 are referred to secondary for additional
5 questioning to determine admissibility.  And our
6 nomination process is -- you know, independent to
7 anything else.
8 BY MS. HOMER:
9     Q   Has it ever happened that an individual
10 being designated as high risk by ATS Passenger has
11 led directly to that individual being nominated to
12 the TSDB?
13     MS. ROTH:  Objection as to vagueness.
14 Objection to the extent that it calls for law
15 enforcement privileged information.  You can
16 answer if you know.
17     THE WITNESS:  I don't know.
18 BY MS. HOMER:
19     Q   Does the DHS TRIP redress process
20 address ATS Passenger high risk assessments?
21     MS. ROTH:  I'm going to object as to
22 scope and as to CBP deponent testifying on DHS

**198**

1 TRIP information and as to vagueness.
2     THE WITNESS:  DHS TRIP is responsive to
3 any complaint for any reason submitted by a
4 traveler.
5 BY MS. HOMER:
6     Q   Has CBP ever lowered its risk assessment
7 as to an individual traveler as a result of the
8 DHS TRIP redress process?
9     MS. ROTH:  I'm going to object as to
10 vagueness.  Also I'm going to object asked and
11 answered, I believe, and to the extent that it
12 calls for law enforcement privileged information.
13     THE WITNESS:  I don't know the answer to
14 that.
15 BY MS. HOMER:
16     Q   If an individual was on the watch list
17 but has since been removed does CBP retain a
18 record in the TECS system that the individual used
19 to be on the watch list?
20     MS. ROTH:  I'm going to object to the
21 extent that that calls for law enforcement
22 privileged information.  But you can answer if you

**199**

1 are able to in a non-privileged way.
2     THE WITNESS:  Our secondary inspection
3 results, the -- or the summary of those, they
4 would capture whether or not somebody was a
5 previous TSDB or not.
6 BY MS. HOMER:
7     Q   Does the ATS Passenger system take
8 whether or not an individual used to be on the
9 watch list into account in assigning a high risk
10 designation?
11     MS. ROTH:  I'm going to object on the
12 basis of law enforcement privilege.  You can
13 answer if you can.
14     THE WITNESS:  I don't know the answer.
15 BY MS. HOMER:
16     Q   Could you find out the answer to that
17 question?
18     **A   I suppose so.**
19     Q   Does any other agency exercise oversight
20 over the CBP and the ATS Passenger rules it
21 creates?
22     MS. ROTH:  I'm going to object to the

**200**

1 extent that it calls for law enforcement
2 privileged information.  You can answer.
3     THE WITNESS:  I don't understand the
4 question.
5 BY MS. HOMER:
6     Q   Is there any other agency whether --
7 sorry.  Is there -- start over.
8     Is there any other agency that evaluates
9 the effectiveness of ATS Passenger rules at
10 designating individuals as high risk?
11     MS. ROTH:  Same objection.
12     THE WITNESS:  Sorry.  The U S government
13 has different agencies that evaluate agencies
14 effectiveness in doing their missions.
15 BY MS. HOMER:
16     Q   Has the Privacy and Civil Liberties
17 Board ever evaluated the ATS Passenger risk
18 assessments?
19     **A   I don't know.**
20     Q   Has any agency ever recommended changes
21 to the rules that ATS Passenger applies for its
22 risk assessment?

---

**201**

1    MS. ROTH:  I'm going to object on the
2  basis of the deliberative process privilege.  I'm
3  going to instruct the witness not to answer.
4  BY MS. HOMER:
5    Q   Has it ever been determined that the ATS
6  Passenger rules that it uses to make high risk
7  assessments impermissibly discriminate on the
8  basis of race?
9    MS. ROTH:  I'm going to object to the
10 extent that calls for a law enforcement
11 conclusion.  And I'm also going to object as to
12 scope of this last line of questioning.  You can
13 answer if you know.
14    THE WITNESS:  CBP does not discriminate
15 against individuals for race, religion, sex,
16 origin.
17 BY MS. HOMER:
18    Q   And that includes that it does not
19 discriminate on race or religion in the
20 establishment of rules in ATS Passenger?
21    MS. ROTH:  I'm going to object to the
22 extent that it calls for a legal conclusion and to

---

**202**

1  the extent it calls for law enforcement privileged
2  information.  You can answer if you know.
3    THE WITNESS:  CBP does not target
4  individuals based on race, religion, sex.
5  BY MS. HOMER:
6    Q   What is the Automated Biometric
7  Identification System?
8    **A   I'm not sure.**
9    Q   Is there a system that CBP uses called
10 IDENT?
11   **A   It is.**
12   Q   Okay.  And what does the IDENT system
13 do?
14   **A   I'm not entirely sure.**
15   Q   Okay.  Does the CBP collect biometric
16 information on individuals?
17   MS. ROTH:  I'm going to object to the
18 extent that calls for law enforcement privileged
19 information.  I'll also object to the scope of
20 this line of questioning.  You can answer if you
21 know.
22   THE WITNESS:  We do collect biometrics.

---

**203**

1  BY MS. HOMER:
2    Q   Okay.  In what circumstances does the
3  CBP collect biometric data on individuals?
4    MS. ROTH:  I'm going to object to the
5  extent that the question calls for law enforcement
6  privileged information.  But you can answer if you
7  are able to in a non-privileged way.
8    THE WITNESS:  Part of the inspectional
9  process is to collect biometrics on certain
10 nonimmigrants or aliens, foreign nationals.
11 BY MS. HOMER:
12   Q   Okay.  What foreign nationals -- scratch
13 that.
14   Are the majority of foreign nationals
15 seeking entry into the United States required to
16 provide biometric information in order to obtain
17 entry?
18   MS. ROTH:  I'm going to object as to
19 vagueness.  I'm going to object on the basis of
20 the law enforcement privilege.  You can answer if
21 you are able to.
22   THE WITNESS:  I don't understand the

---

**204**

1  question.  The majority?  It's kind of -- what
2  does majority mean?
3  BY MS. HOMER:
4    Q   Okay.  Okay.  I'll try to ask this the
5  quickest way possible.  Are foreign nationals
6  seeking entry to the United States generally
7  required to provide biometric information with a
8  few exceptions?  It's a broad question.
9    MS. ROTH:  Object as to vagueness and to
10 the extent it calls for law enforcement privileged
11 information.
12   THE WITNESS:  It is a part of the
13 inspectional process for -- generally for
14 nonimmigrants.
15 BY MS. HOMER:
16   Q   Okay.  And is my understanding correct
17 that most Canadians are exempt from providing
18 biometric information to the United States during
19 the entry process?
20   MS. ROTH:  Object as to vagueness.  You
21 can answer if you know.
22   THE WITNESS:  In the primary -- in the

205

1 primary inspection process, yes.
2 BY MS. HOMER:
3    Q    And is my understand correct that
4 children younger than the age of 14 are exempt
5 from providing biometric data in the primary
6 inspection process?
7    **A    I think that's correct.**
8    Q    And is my understanding correct that
9 persons older than 79 are also exempt from
10 providing biometric data during the initial
11 screening process?
12    **A    I believe that's correct.**
13    Q    Is my understanding correct that as a
14 general matter U S citizens are not required to
15 provide biometric information when they are
16 seeking to reenter the United States?
17    **A    That's correct.**
18    Q    Is my understanding correct that the CBP
19 reserves the right to, during secondary
20 inspection, require anyone to provide biometric
21 information in order to enter the United States?
22    **A    I don't know if reserve the right is the**

206

1 **proper way to categorize it, but if necessary.**
2    Q    Does CBP require U S citizens who are
3 listed in the TSDB to provide biometric
4 information in order to enter the United States?
5        MS. ROTH:  I'm going to object to the
6 extent that it calls for law enforcement
7 privileged information.  You can answer if you
8 can.
9        THE WITNESS:  I don't know.
10 BY MS. HOMER:
11    Q    Would it surprise you if the CBP
12 required U S citizens who are listed in the TSDB
13 to provide biometric information upon entry?
14        MS. ROTH:  Object as to form and
15 vagueness and to the extent it calls for law
16 enforcement privileged information.
17        THE WITNESS:  If it helps, if it assists
18 us in verifying identity, then it would not
19 surprise me.
20 BY MS. HOMER:
21    Q    To your knowledge has the CBP ever
22 required, in the exercise of its discretion, a U S

207

1 citizen to provide biometric information as a
2 condition of entry?
3        MS. ROTH:  Object to the extent that
4 calls for law enforcement privileged information.
5 You can answer if you can.
6        THE WITNESS:  I wouldn't say as a
7 condition of entry, but in order to verify
8 identity that might be needed.
9 BY MS. HOMER:
10    Q    Is the biometric information collected
11 by the CBP matched against any biometric
12 information collected by the TSC?
13        MS. ROTH:  Object to the extent that
14 calls for law enforcement privileged information.
15 You can answer.
16        THE WITNESS:  Collected by the?
17 BY MS. HOMER:
18    Q    TSC?
19    **A    That might be privileged.  I don't know.**
20        MS. ROTH:  Okay.  Don't answer.
21 BY MS. HOMER:
22    Q    So you know the answer but you are not

208

1 sure if you are allowed to give me the answer?
2    **A    Yes.**
3    Q    Okay.  That's fine.
4        MS. ROTH:  And I just want to be clear
5 for the record, his answer yes was his answer he
6 cannot give the answer.
7        MS. HOMER:  Correct.
8        MS. ROTH:  Not yes to the question.
9        MS. HOMER:  I would request that at the
10 next break if you're able to if you can confirm
11 whether or not that information is in fact
12 privileged, for the record --
13        MS. ROTH:  -- Yes.
14        MS. HOMER:  I would like to mark
15 Exhibit 2 to today's deposition.
16        (Whereupon, Exhibit No. 2 was marked for
17 identification.)
18 BY MS. HOMER:
19    Q    What is this document?
20    **A    This is that DHS privacy pact assessment**
21 **for TECS.**
22    Q    Do you recognize it?

Transcript of Randy Howe, Designated Representative
Conducted on March 22, 2018

53 (209 to 212)

209

1    A    I believe I have seen this document
2 before.
3    Q    Do you know if the information in this
4 document is still current?
5    A    I don't know.
6    Q    Okay.  Can you -- really the only page
7 I'm going to ask you about on this document is
8 page seven?
9    A    Okay.
10    Q    And I will just ask quickly, to your
11 knowledge has this privacy impact assessment ever
12 been updated regarding the TECS system?
13    A    I don't know.
14    Q    Okay.  Would you be able to look up that
15 information?
16    A    Sure.
17    Q    And I will say for the record I looked
18 and I didn't see any update to this document --
19    A    Okay.
20    Q    -- in my research.  Okay.  So on page
21 seven, broadly speaking what does page seven show?
22    A    It looks like a flowchart that describes

210

1 a traveler and how they may proceed through air
2 and sea, land and vehicle.
3    Q    Okay.  And I know the font is a little
4 small.  This is the original size to the document.
5 But are you able to read --
6    A    Yes.
7    Q    -- what is printed on this?  Okay.
8 Okay.  Can you take a minute to review this
9 broadly and just let me know if this broadly still
10 reflects an accurate flowchart describing the
11 traveler entry inspection process for air, land,
12 and sea and vehicles?
13        MS. ROTH:  Take your time.
14        THE WITNESS:  Okay.
15        MS. ROTH:  If you need her to repeat the
16 question.
17        THE WITNESS:  Yeah.  What was the
18 question?
19 BY MS. HOMER:
20    Q    Does the processes shown on this
21 flowchart remain an accurate description of
22 inspection processes at the port?

211

1    A    After a quick view, I think so.  U S
2 Visit I don't believe that organization or that
3 entity doesn't -- no longer exist.  So I think the
4 biometric is housed within CBP.
5    Q    Okay.  So I'm going to ask you some
6 questions about this flowchart process.  Would you
7 agree with me that essentially everything -- about
8 two-thirds of the way down the page there are
9 three diamonds and squares that say either refer
10 to secondary or secondary referral list.  Do you
11 see that line?
12    A    I see that, yes.
13    Q    Okay.  You would agree that everything
14 above that line is part of the initial inspection
15 process at the border?
16    A    That's what it looks like.
17    Q    And then everything below that line
18 until you get to admit traveler, that is part of
19 the secondary inspection process?
20    A    Yes, it seems so.
21    Q    Okay.  So starting with the air and sea
22 third of the initial inspection process, I just

212

1 want to make sure I understand this flowchart
2 correctly.  Okay?  So if you start at the top left
3 where it says airline and it has an arrow pointing
4 down to APIS receives manifest.  Do you see that?
5    A    That's APIS.
6    Q    APIS.  Thank you.  Does that flowchart
7 signal that private airlines provide the APIS
8 system with their passenger manifest?
9    A    Yes.
10    Q    And then the next box says -- it goes
11 from APIS receives manifest to APIS runs primary
12 queries.  Do you see that?
13    A    I do.
14    Q    What are the primary queries APIS runs?
15    A    Just running it through the TECS
16 database.
17    Q    Okay.  So does this mean that before an
18 airline takes off APIS runs the manifest for that
19 airline through the TECS database?
20    A    Yes.
21    Q    And is that the point at which CBP would
22 inform an airline that there may be persons on the

213

1  manifest who would be -- who would be likely to be
2  denied entry to the United States?
3        MS. ROTH:  Object as to vagueness and to
4  the extent it mischaracterizes previous testimony.
5  You can answer.
6        THE WITNESS:  It may be the opportunity,
7  but we also get information before all of this
8  happens through passenger name record information,
9  PNR.
10 BY MS. HOMER:
11   Q   Okay.
12   A   That happens well before this.
13   Q   Okay.  That's helpful.  So what is the
14 purpose of APIS running the primary query at that
15 stage?
16   A   To determine if there is anybody on the
17 manifest that's of concern to CBP.
18   Q   Okay.  And that would include, for
19 example, anyone who is on the terrorist screening
20 database?
21   A   Yes.
22   Q   Okay.  So the arrow then jogs over to

214

1  air, sea primary application.  Do you see that?
2    A   I do.
3    Q   Is that phrase referring to when
4  individuals who were on a plane or boat actually
5  entered a U S border?
6    A   Kind of.  It is -- that information is
7  now housed in the system for the port of entry,
8  for the port of entry to know that these
9  passengers have been captured in APIS and this
10 flight is on its way to the United States.
11   Q   Okay.  So what is a primary application?
12   A   I think it is just another term for
13 TECS.  Its -- its populated in TECS and the
14 primary officer who is working the primary line,
15 he or she is in the primary mode within TECS, so
16 waiting for passengers to present themselves.  So
17 the databases or the system is holding that
18 information in that primary mode waiting for the
19 passengers to be inspected.
20   Q   Okay.  So if the TECS system knows that
21 an individual is in line to be inspected, but has
22 not yet had a face-to-face conversation with an

215

1  officer, that's the primary application status?
2        MS. ROTH:  Objection as to vagueness.
3        THE WITNESS:  Yeah, if I understand the
4  question.  It's as once the wheels up and the
5  plane is departed that information is then
6  presented in the primary inspection section of
7  TECS waiting for the passengers.  So it might be
8  eight hours before the passenger shows up.  Where
9  the officer -- you know, scans the document and
10 starts matching it to what was captured in APIS.
11 BY MS. HOMER:
12   Q   And while a passenger is in that primary
13 application status does the TECS system match
14 passengers against the TSDB at that point?
15       MS. ROTH:  Objection as to vagueness.
16       THE WITNESS:  Yes, among other.  So any
17 other records that may be there, potential
18 lookouts for a host of different reasons.
19 BY MS. HOMER:
20   Q   Okay.  Thank.  So then the arrow points
21 down from primary applications to scan travel
22 document.  Do you see that?

216

1    A   Yes.
2    Q   So does scan travel document indicate
3  the point at which an individual is physically
4  present at a border and a CBP officer is --
5    A   Scanning the document.
6    Q   Scanning the document?
7    A   Yes.
8    Q   And at that moment of scan does the TECS
9  system cross reference the travel document to the
10 various lookout information it has?
11   A   Yes.
12   Q   Okay.  And so if you go down from scan
13 travel document to display APIS primary query
14 results, is that box referring to the lookout
15 results that are generated by the TECS system?
16   A   It could if there is a lookout.
17 Otherwise, it's just a matching, yes, this is the
18 passenger that provided the information when they
19 checked in through APIS.  And we are just matching
20 it and the person is now here.  So it could be
21 just that, too.
22   Q   Okay.  Thanks.  And then the arrow goes

217

1  down to this diamond that says U S Visit exempt.
2  And you stated earlier that U S Visit is no longer
3  an entity?
4      **A   Right.**
5      Q   Okay.  But is the process the same to
6  determine whether or not an individual is required
7  to provide biometric information at the initial
8  screening?
9      **A   Yes.**
10     Q   And as we discussed earlier a large
11  number -- you didn't say large.  I take that back.
12         As we discussed earlier, international
13  visitors who are not immigrants are often required
14  to provide biometric information at that phase?
15     **A   Yes.**
16     Q   This is just me being curious.  We are
17  going to go to land, pedestrian and the land,
18  vehicle primary in a minute.  I noticed that there
19  is no biometric phase for entries by land.  Is
20  that still true?
21     **A   No.  Biometric application happens at**
22  **the land border as well.**

218

1      Q   Okay.  So this flowchart is inaccurate
2  to the extent it implies that biometric screening
3  does not happen at land ports?
4      **A   Correct.**
5      Q   Thanks.  Okay.  And then going back to
6  this air, sea primary flowchart.  Am I reading
7  this that after the biometric scan is complete, if
8  it's required, and after the initial inspection
9  officer has verified the traveler's identity, at
10  that point the TECS system returns query results
11  about whether or not the individual is required to
12  undergo secondary inspection?
13        MS. ROTH:  Objection as to vagueness.
14        THE WITNESS:  There are two
15  opportunities for results after the document and
16  after the fingerprints are captured, if they are
17  captured.
18  BY MS. HOMER:
19     Q   And at either of those points the TECS
20  system could indicate that a passenger has been
21  referred to secondary screening?
22     **A   If there is a lookout in the system it**

219

1  **could.**
2      Q   Okay.  And if there is no lookout on the
3  system then the passenger at that point will be
4  admitted?
5      **A   No.**
6      Q   No.  Okay.  What happens if there is no
7  lookout from the query result?
8      **A   We have been focusing on the mechanical**
9  **process of an inspection.  The core of what we do**
10  **is questioning passengers to verify intent, to**
11  **verify admissibility, to verify if there's any**
12  **customs concerns, agriculture.  That's the core of**
13  **what we would do to determine whether or not that**
14  **person is going to be permitted to enter the**
15  **United States.  That decision point will guide**
16  **whether or not they are referred to secondary in**
17  **addition to possibly if there is a lookout.**
18     Q   So based on -- let me start over.  So in
19  addition to kind of the technical steps detailed
20  in this flowchart individual initial inspection
21  officers can ask questions and determine whether
22  or not an individual should be referred to

220

1  secondary inspection on the basis of their answers
2  to those questions or for any other reason the
3  officer feels appropriate?
4      **A   Yeah.  Again, this is the -- the top**
5  **part is all of the mechanical process.  The core**
6  **and the most important part of the process is the**
7  **interview of the passenger, verifying identity,**
8  **assessing that that traveler's admissibility to**
9  **the U S, custom issues, agriculture.  That's the**
10  **focus.**
11     Q   Okay.  So the customs officer will ask
12  additional interview questions that are not
13  reflected in this chart that will inform his
14  decision to admit or deny or refer to secondary
15  screening of an individual passenger?
16     **A   Pretty much.**
17     Q   All right.  If these primary query
18  results indicate that an individual is a match for
19  the TSDB, are there certain questions that the
20  initial officer asks a matter of course at that
21  moment?
22        MS. ROTH:  I'm going object to the

Transcript of Randy Howe, Designated Representative

56 (221 to 224)

Conducted on March 22, 2018

221

1 extent that calls for law enforcement privileged
2 information. If you think you can answer that
3 question in a non-privileged way, you can.
4       THE WITNESS: Verifying identity, asking
5 questions about the documents. That may happen in
6 primary.
7 BY MS. HOMER:
8    Q   Okay. But in the circumstance that an
9 initial officer learns that an individual is a
10 match for the TSDB are more specific questions
11 regarding why that individual might be a match for
12 the TSDB allocated to the secondary inspection
13 officers?
14       MS. ROTH: Object to the extent that
15 calls for law enforcement privileged information,
16 and object on vagueness grounds. You can answer
17 if you can answer in a non-privileged way.
18       THE WITNESS: Sure. The primary
19 officer's responsibility normally takes a minute
20 and a half to two minutes or less. So anything
21 that's going to take more than that, that's what
22 secondary is for.

222

1 BY MS. HOMER:
2    Q   That was helpful. Thank you. Okay.
3 And then I just want ask a couple of questions
4 about the other boxes in the initial screening
5 process that we have not covered. So if we move
6 over to the middle of the page where it says land,
7 pedestrian primary. What is a pedestrian primary
8 application?
9    **A   It's another term for TECS.**
10   Q   Okay.
11   **A   It's just a mode in TECS that is**
12 **specifically for land, pedestrian primary.**
13   Q   Okay. So if a pedestrian walked up to a
14 border and had entered their information in one of
15 the automated kiosks would their information be in
16 primary application mode before they approached an
17 actual officer?
18   **A   We do have some of those kiosks at some**
19 **of our land border to help with the facilitation**
20 **where they can do the query in advance, similar to**
21 **the APIS kiosks you see at airports. So it just**
22 **streamlines the process.**

223

1    Q   I guess I was trying to get at, is that
2 pedestrians aren't going to have -- like, there
3 isn't going to be advance notice that they're
4 walking up to the border like there is a plane?
5    **A   Correct.**
6    Q   What is the RFID reader that is listed
7 below the pedestrian primary application?
8    **A   Yep. Some travel documents have a chip**
9 **that is embedded within the document that contains**
10 **a secure number. And we have readers at the**
11 **border that read the chip and correspond with the**
12 **number and it populates the traveler's**
13 **biographical information, photograph. It is a**
14 **facilitative tool.**
15   Q   Okay. So it is -- if I understand it
16 correctly, it's basically just scanning the travel
17 document but with more detail added into your
18 system?
19   **A   It does it a lot quicker so we don't**
20 **have to do a manual query. So as they are waiting**
21 **in line there is a little touch pad. As they are**
22 **walking up, they touch it. It reads it and then**

224

1 **the information is populated on the screen for the**
2 **officer. And they know the person that just**
3 **touched the pad is standing in front of them.**
4    Q   So, it helps speed up processing at the
5 border?
6    **A   Facilitation. Yup.**
7    Q   Okay. And then below that it says
8 perform person query. So, is that just -- you
9 know, checking the travel documents against TECS
10 like we've discussed several times?
11   **A   Yes.**
12   Q   And then below that it says it will
13 return query results and that that's the same
14 procession that will show a lookout --
15   **A   -- Correct.**
16       MS. ROTH: Make sure you give her a
17 chance to finish her question.
18       THE WITNESS: Sorry.
19 BY MS. HOMER:
20   Q   I appreciate the helpfulness. Okay.
21 Moving over to the land vehicle. I think we have
22 covered most of what these terms mean. We know

---

225

1  what a primary application is, but the only one
2  that looks new to me is this license plate reader.
3  What is the license plate reader that the CBP
4  uses?
5      **A    The license plate reader is a scanning**
6  **device that scans the license plate that**
7  **automatically populates in TECS and runs it**
8  **through the system so as the vehicle approaches**
9  **the plate is run through the system and we are**
10 **able to do queries.  Same thing with the RFID.  As**
11 **the car is pulling up they can hold their RFID**
12 **document up, so not only the plate but also the**
13 **passenger information would then be on the screen**
14 **waiting for the officer.**
15     Q    Okay.  And then when it says perform
16 vehicle query, what does the vehicle query entail?
17     **A    It's the same as we've spoken.  It's the**
18 **RFID and the plates, just running it through TECS.**
19     Q    It is crosschecking that against like a
20 list of known stolen vehicles?
21     **A    Yes.**
22     Q    All right.  Is the -- does the license

---

226

1  plate reader check any license plate information
2  against the TSDB?
3          MS. ROTH:  I'm going to object to the
4  extent that calls for law enforcement privileged
5  information.  You can answer if you can.
6          THE WITNESS:  I don't know if that's
7  privileged or not.
8  BY MS. HOMER:
9      Q    Okay.  Same question, if can you look it
10 up at the next break.
11         Then this flowchart, once the vehicle
12 has been scanned and the RFID has been scanned and
13 the travel document has been scanned, the overall
14 TECS query process is the same.  Correct?
15     **A    Yes.**
16     Q    It checks against lookouts and the
17 officer asks additional questions and determines
18 whether someone needs to be referred to secondary
19 screening?
20     **A    Yes.**
21     Q    So I will confess I don't have this
22 document on me, but I have seen a DHS Office of

---

227

1  Inspector General report that published that the
2  average number of travelers referred to secondary
3  screening is approximately 5 percent per day.  Do
4  I have any reason to doubt the accuracy of that
5  number?
6          MS. ROTH:  Object as to foundation.
7  Object as to form.  If you have a document to show
8  the witness, that would be fine.  But it calls for
9  speculation --
10         THE WITNESS:  -- not.
11         (Court reporter requested
12 clarification.)
13         MS. ROTH:  Speculation.
14         THE WITNESS:  I'm not familiar with that
15 document.
16         MS. ROTH:  Are you doing okay?
17         THE WITNESS:  Doing good.
18 BY MS. HOMER:
19     Q    That's fine.  I'm going to move on to
20 secondary screening questions in a second.  I'm
21 just making sure I covered all of my initial
22 screening questions.  If -- during the initial

---

228

1  screening process does the result of querying the
2  various lookout list ever result in a CBP officer
3  immediately calling in law enforcement
4  reinforcements?
5          MS. ROTH:  Object to the extent that
6  calls for law enforcement privileged information
7  and to vagueness.  If you think you can answer
8  that, you can.
9          THE WITNESS:  If you are using the armed
10 and dangerous from this morning, that perhaps
11 might be one potential.
12 BY MS. HOMER:
13     Q    Okay.  So now I want to walk through the
14 secondary screening process that is on the
15 flowchart.  So the result -- okay.  We have two
16 diamonds that say refer to secondary as a possible
17 option at the end of the initial screening query
18 result.  Do you see that?
19     **A    Yes.**
20     Q    They both then point to a box in the
21 middle that says secondary referral list.  Do you
22 see that?

Transcript of Randy Howe, Designated Representative
Conducted on March 22, 2018

58 (229 to 232)

229

1    A    Uh huh yes.
2    Q    What is the secondary referral list?
3    A    You know, I'm not terribly sure.  Just
4 reflecting on individuals that are referred to
5 secondary through TECS.
6    Q    Okay.
7    A    As they are referred they are captured
8 in a secondary mode, so we know -- you know, who
9 has been referred to secondary.
10    Q    Okay.  So is TECS displaying to
11 secondary inspection officers essentially a queue
12 of everybody who is currently awaiting to undergo
13 secondary inspection?
14    A    Yes.
15    Q    Okay.  Then there are three boxes below
16 the secondary referral list.  The one to the left
17 says admissibility inspection.  Do you see that?
18    A    I do.
19    Q    What does an admissibility inspection
20 entail?
21    A    It is the part of border security that
22 we enforce enforcing the Immigration Nationality

230

1 Act, ensuring that people are admissible to the
2 United States.
3    Q    And is the admissibility inspection also
4 where any national security concerns are
5 addressed?
6        MS. ROTH:  Objection as to vagueness.
7 Objection to the extent that it calls for law
8 enforcement privileged information.  You can
9 answer if you can.
10        THE WITNESS:  Generally speaking, yes.
11 BY MS. HOMER:
12    Q    And then in the middle beneath the
13 secondary referral list it says customs
14 inspection.  What is a customs inspection?
15    A    It's just traditional customs work,
16 looking through people's bags, verifying goods,
17 assessment duties, looking for prohibited items,
18 narcotics, things of that nature.
19    Q    Does everybody who is referred to
20 secondary screening undergo a customs inspection
21 -- sorry -- secondary inspection undergo a customs
22 inspection?

231

1    A    If I -- if I understand your question.
2 Do we search bags of everybody that goes to
3 secondary?
4    Q    If that's a better way of asking it,
5 yes.
6    A    The answer is we can.  It is part of the
7 admissibility inspection to verify intent to look
8 into peoples belongings for agriculture as well,
9 for prohibited items, things that are not
10 permitted in the United States.  So searching of
11 an individual's bag and person, that's part of all
12 of what we do.  All three boxes.
13    Q    Okay.  And then can you explain what the
14 third box, the agriculture inspection is?
15    A    Again, enforcing the agriculture
16 mission.  Identifying prohibited items and pests
17 and things that could do our agriculture harm.
18    Q    If a United States citizen is referred
19 to secondary screening they would not undergo an
20 admissibility inspection.  Is that correct?
21        MS. ROTH:  Objection as to vagueness and
22 as to form.  It is inspection, not screening.

232

1        MS. HOMER:  Sorry.
2        THE WITNESS:  Until we are satisfied
3 they are a U S citizen they may be referred for
4 admissibility concerns.  Verifying identity,
5 making sure they are indeed a U S citizen, yes.
6 BY MS. HOMER:
7    Q    So if for example there was a U S
8 citizen who had lost their passport or there was a
9 doubt about the authenticity of the passport they
10 may have to undergo an admissibility inspection?
11    A    Yes.
12    Q    But once it is confirmed that the
13 individual is in fact a U S citizen, then there
14 would be no need for an admissibility inspection?
15    A    Once it is confirmed then the
16 admissibility inspection was completed.
17    Q    Fair enough.  If their U S citizenship
18 status had been determined prior to secondary
19 screening, secondary inspection there would be no
20 need for an admissibility inspection?
21    A    I think the secondary officer that's
22 processing the passenger, they are going to be

Transcript of Randy Howe, Designated Representative
Conducted on March 22, 2018

233

1 making an assessment.  So it is continuous until
2 the passenger is released.
3     Q    Okay.  So even if during the initial
4 inspection a U S citizen had been identified as a
5 U S citizen, the secondary inspecting officer may
6 still reverify that that individual is in fact a U
7 S citizen?
8     A    Yes.
9     Q    Ordinarily do U S citizens go through
10 the customs inspection process as the primary form
11 of secondary inspection?
12        MS. ROTH:  Objection as to vagueness.
13        THE WITNESS:  It's impossible to
14 determine why U S citizens are or for what reasons
15 they are sent to secondary.  They are sent to
16 secondary for all of the different, various
17 reasons.
18 BY MS. HOMER:
19     Q    Are there any other types of inspections
20 then the three listed here that this flowchart
21 does not capture?
22     A    These are pretty general, so probably

234

1 any instance could fit underneath one of these
2 boxes.
3     Q    Okay.  Even if it's not listed in one of
4 these three boxes are there any common forms of
5 inspection that the CBP uses at the secondary
6 inspection process?
7     A    I don't understand the question.
8     Q    Fair enough.  I'm wondering what some of
9 the other words are that CBP officers might use to
10 describe specific types of inspections they may
11 undergo or undertake during a secondary screening
12 of a passenger, secondary inspection of a
13 passenger?
14        MS. ROTH:  Objection as to vagueness and
15 objection as to foundation.
16        THE WITNESS:  I didn't hear the
17 question, either.  I didn't.  I didn't hear your
18 question.
19 BY MS. HOMER:
20     Q    Okay.  That's fine.
21     A    No, I really didn't.
22     Q    Yeah, yeah, yeah.  No, that's fair.  I

235

1 just am wondering if there are any -- if there are
2 any other common phrases that CBP officers use to
3 describe types of secondary inspections?  Like if
4 they might call something luggage inspection or an
5 electronics inspection or just some other
6 category?
7     A    Oh, there's tons of -- I'm sorry.
8        MS. ROTH:  Same objections.
9        THE WITNESS:  There's tons of vernacular
10 that officers -- you know, create port by port.
11 And it's just a common understanding, sure.
12 BY MS. HOMER:
13     Q    Okay.  I want to -- well, I will finish
14 this out and then I have a couple of other
15 questions.  As you were stating earlier -- you
16 know, there are multiple different types of
17 inspections or inquiries that can occur during
18 secondary inspection.  Is that fair?
19     A    Yes.
20     Q    And the CBP has the right if somebody is
21 in secondary inspection to undertake multiple
22 types of secondary inspections or multiple --

236

1 multiple types of inquiries into -- let me start
2 over.
3        It is possible that in a given
4 inspection the CBP could both do an admissibility
5 inspection and a customs inspection, for example?
6     A    They could do all three, sure.
7     Q    Okay.  Once the secondary inspection
8 process is finished, the flowchart indicates that
9 CBP officers ask whether or not the traveler
10 should be admitted to the United States.  Is that
11 correct?
12     A    That is what I said, yes.
13     Q    And if the answer is yes, the traveler
14 is admitted and passes through the port?
15     A    Yes.
16     Q    Port of entry.  And then it says if the
17 answer is no, that CBP may perform an adverse
18 action.  Do you see that?
19     A    I do.
20     Q    What are the types of adverse actions
21 the CBP performs?
22     A    There's a host of different things.  If

237

1 someone is found inadmissible they could be
2 refused admission.  They would be allowed to
3 withdraw their application for admission and
4 returned.  Somebody could be arrested for having
5 narcotics.  Or somebody could have their
6 agriculture seized.  They could pay a fine.  I
7 mean, there's a host of different adverse actions
8 that could come from this.
9      Q   Do different ports of entry have
10 different procedures surrounding secondary
11 inspection?
12        MS. ROTH:  I'm going to object to the
13 extent that calls for law enforcement privileged
14 information.  You can answer if you can.
15        THE WITNESS:  This is the core of what
16 we do.  But based on facility, infrastructure, the
17 type of passenger traffic -- you know, it may vary
18 just to accommodate and facilitate the movement of
19 people.
20 BY MS. HOMER:
21      Q   Are all travelers who are designated
22 high risk by the ATS Passenger system subjected to

238

1 the same types of secondary inspection?
2        MS. ROTH:  Objection to the extent that
3 calls for law enforcement privileged information.
4 You can answer if you can.
5        THE WITNESS:  Yeah.  So ATS is a tool,
6 remember.  A decision making tool for the officers
7 in secondary to address the concern based on law
8 enforcement and intelligence to determine
9 admissibility and to determine what we need to do.
10 BY MS. HOMER:
11      Q   Okay.  So once an individual has been
12 referred to secondary inspection because ATS
13 designated them as high risk, the individual
14 actions of the officers in evaluating that risk
15 may vary?
16        MS. ROTH:  Objection to the extent that
17 calls for law enforcement privileged information.
18 But you can answer if you can.
19        THE WITNESS:  It's all the same end
20 goals to address any issues that we have to
21 determines admissibility or -- you know, to focus
22 in on the passenger to determine if there's any

239

1 concerns.
2 BY MS. HOMER:
3      Q   The exact inspections, whether it be a
4 luggage search or a customs search or an
5 electronic search that individuals will undergo
6 during secondary inspection varies based on the
7 individual.  Is that fair?
8      A   Yes.  Case by case depending upon why
9 they are there and what we need to do to verify.
10      Q   Does the CBP have a standard set of
11 screening -- stop using the word screening.
12        Does the CBP have a standard set of
13 inspection procedures it applies to individuals
14 listed on the TSDB during the secondary inspection
15 process?
16        MS. ROTH:  I'm going to object to the
17 extent that calls for law enforcement privileged
18 information.  If you are able to answer that
19 question, you may.
20        THE WITNESS:  As the port of entry is
21 processing the passenger that is a possible match
22 to TSDB they are coordinating with our NTC

240

1 personnel and they are guiding the inspection to
2 determine whether or not that person is a match
3 and what the next course of action is.
4 BY MS. HOMER:
5      Q   Does the CBP use the phrase handling
6 codes to ever describe what secondary inspections
7 of an individual should be subjected to?
8        MS. ROTH:  I'm going to object to the
9 extent that calls for law enforcement privileged
10 information.
11        THE WITNESS:  I've never heard of that
12 term.
13 BY MS. HOMER:
14      Q   Does the CBP add any annotations to
15 individual records indicating the sort of
16 secondary inspection individuals should be
17 subjected to?
18        MS. ROTH:  I'm going to object as to
19 vagueness and as to the law enforcement privilege.
20 You can answer if you can.
21        THE WITNESS:  Annotate what again?
22

241

1 BY MS. HOMER:
2    Q    Individual passenger records?
3    **A    Again, any -- any traveler that is in**
4 **our secondary we are going to be completing a**
5 **secondary inspection results, which will include**
6 **details as to why they were in secondary.**
7    Q    Will the secondary inspection results
8 include any sort of, like, check boxes about the
9 types of scrutiny the individual was subjected to
10 during the secondary inspection process?
11        MS. ROTH: I'm going to object as to
12 vagueness and also object to the extent that
13 question calls for law enforcement privileged
14 information. You can answer if you can.
15        THE WITNESS: I don't understand what
16 you mean by check boxes. But when we complete the
17 inspection any pertinent actions that we took
18 would be documented in that TECS record in the
19 secondary inspection results.
20 BY MS. HOMER:
21    Q    Does the secondary inspection process
22 ever require the handcuffing of an individual?

242

1        MS. ROTH:  I'm going to object as to
2 vagueness and as to the extent that question calls
3 for law enforcement privileged information.  You
4 can answer if you can.
5        THE WITNESS:  The question was do we
6 handcuff individuals in secondary?
7 BY MS. HOMER:
8    Q    Yeah.
9    **A    When necessary, yes.**
10    Q    Does the CBP consider it necessary to
11 handcuff individuals who are listed on the TSDB?
12        MS. ROTH:  Object to the extent that
13 calls for law enforcement privileged information.
14 You can answer if you can.
15        THE WITNESS:  We may if in the totality
16 of the circumstances it would be required.
17 BY MS. HOMER:
18    Q    Is an individual's presence on the TSDB
19 alone a reason that the CBP might handcuff them?
20    **A    No.**
21        MS. ROTH:  Counsel, I'm going to ask for
22 a break sometime in the next ten or 15 minutes, if

243

1 that's okay.  So you let us know when a good time
2 will be.
3 BY MS. HOMER:
4    Q    When you refer to the totality of the
5 circumstances, what do you mean?
6    **A    Relationship to what?  I don't remember.**
7    Q    I'm sorry.  You said that an individual
8 may be handcuffed based on the totality of the
9 circumstances.  And I'm curious as to what
10 constitutes a totality of circumstances that could
11 lead to an individual being handcuffed?
12    **A    It's case by case.  I mean, if there is**
13 **a need to control the individual, that's probably**
14 **the best way to control them if they are**
15 **exhibiting characteristic or they are not**
16 **controllable or a harm to our officers or to other**
17 **people.**
18    Q    Would an outstanding arrest warrant for
19 an individual be a factor in the totality of
20 circumstances leading to them being handcuffed?
21    **A    Yes.**
22    Q    Does the CBP have policies surrounding

244

1 when handcuffing an individual at the border is
2 appropriate?
3        MS. ROTH:  I'm going to object to the
4 extent that calls for law enforcement privileged
5 information.  If you think you can answer that in
6 a non-privileged way, you may.
7        THE WITNESS:  Our officers are trained
8 on use of force in instances where additional
9 means would be necessary.  So that's all part of
10 the training.  So handcuffing is one of them.
11 Using an -- intermediate devices like batons and
12 things like that, that's all part of the training
13 they receive.
14 BY MS. HOMER:
15    Q    Is there any notation that CBP uses in
16 the TECS system to indicate that a specific
17 individual should be handcuffed?
18        MS. ROTH:  Object to the extent that
19 calls for law enforcement privileged information.
20 You can answer in a general non-privileged way.
21        THE WITNESS:  I don't think so, no.
22

Transcript of Randy Howe, Designated Representative
Conducted on March 22, 2018

245

1      MS. HOMER:  Let's take a break.
2      THE VIDEOGRAPHER:  We are going off the
3  record.  The time is 3:21 p.m.
4      (The proceedings recessed from 3:21 p.m.
5  to 3:37 p.m.)
6      THE VIDEOGRAPHER:  We are back on the
7  record.  The time is 3:37 p.m.
8  BY MS. HOMER:
9      Q   Is the result of a TECS query at an
10 initial screening point ever to direct a
11 particular operational response by all CBP
12 officer?
13     MS. ROTH:  Object as to vagueness and to
14 the extent that calls for law enforcement
15 privileged information.  You can answer if you
16 can.
17     THE WITNESS:  The primary response for a
18 primary query is an alert or a lookout.
19 BY MS. HOMER:
20     Q   And is there some system by which the
21 alerts that show up on the basis of a lookout
22 require a specific law enforcement response to

246

1  address that alert?
2      MS. ROTH:  I'm going to object to the
3  extent that calls for law enforcement privileged
4  information.  But you can answer if you are able
5  to.
6      THE WITNESS:  I guess I don't understand
7  your question.
8  BY MS. HOMER:
9      Q   If an alert appears in the TECS system
10 as a result of a query about an individual there
11 is more than just referring that person to
12 secondary inspection that can happen as a result
13 of that alert.  Is that correct?
14     MS. ROTH:  I'm going to object as to
15 vagueness and to the extent that it calls for law
16 enforcement privileged information.  You can
17 answer in a non-privileged way and if you
18 understand that question.
19     THE WITNESS:  It could be.  For instance
20 back to the armed and dangerous, that could be an
21 annotation that the officer would be aware of.
22

247

1  BY MS. HOMER:
2      Q   Are there any other annotations like
3  armed and dangerous that can appear at the initial
4  TECS query stage?
5      MS. ROTH:  I'm going to object to the
6  extent that calls for law enforcement privileged
7  information and vagueness.
8      THE WITNESS:  Sure.  A vehicle could be
9  a stolen vehicle.
10 BY MS. HOMER:
11     Q   Are there any others?
12     MS. ROTH:  Same objections.
13     THE WITNESS:  Numerous examples.
14 BY MS. HOMER:
15     Q   I would love to hear as many examples as
16 you can come up with.
17     MS. ROTH:  I'll object to the extant
18 that question calls for law enforcement privileged
19 information.  You can answer without waiving the
20 privilege.
21     THE WITNESS:  Advising the officer to
22 refer the person to secondary.

248

1  BY MS. HOMER:
2      Q   Any others?
3      **A   Not that I can think of.**
4      Q   If an individual is flagged by TECS to
5  be armed and dangerous, is one response by CBP
6  officers to draw their weapons?
7      MS. ROTH:  Object to the extant that
8  calls for law enforcement privileged information
9  and also the scope of the subject matters for this
10 deposition.
11     THE WITNESS:  The officer that is
12 conducting the primary inspection -- the primary
13 inspection makes an assessment and interaction
14 based on what they see in determining the
15 situation whether or not the person is a risk of
16 some sort and controlling the individual as they
17 see fit based on the totality of the
18 circumstances.
19 BY MS. HOMER:
20     Q   Is it common for CBP officers to draw a
21 weapon because they see an armed and dangerous
22 notification from the TECS system?

Transcript of Randy Howe, Designated Representative
Conducted on March 22, 2018

63 (249 to 252)

---

249

1    MS. ROTH:  Object as to vagueness and
2  object to the extent it calls for law enforcement
3  privileged information.  You can answer.
4    THE WITNESS:  I wouldn't use -- I
5  wouldn't use the word common, but it is a reaction
6  that if based on the totality of the circumstances
7  the officer made that judgment, that's a decision
8  that that officer made.
9  BY MS. HOMER:
10    Q   Have CBP officers ever drawn a weapon
11 solely because the TECS system flashed an armed
12 and dangerous notification?
13    MS. ROTH:  Objection as to vagueness and
14 to the extent that it calls for law enforcement
15 privileged information.  You can answer if you
16 know and if you can.
17    THE WITNESS:  I don't know.  But, again
18 the officer that is conducting the inspection
19 makes that judgment.  The action that is taken is
20 based on their assessment of the situation case by
21 case.
22

---

250

1  BY MS. HOMER:
2    Q   Is it completely within the discretion
3  of an individual officer whether or not to draw a
4  weapon because he sees an armed and dangerous
5  notification?
6    **A   It is the judgment of that officer**
7  **conducting the inspection whatever action is taken**
8  **based on that officer's judgment.**
9    Q   Does the CBP issue any training guidance
10 to officers about when it is appropriate to draw a
11 weapon in response to an armed and dangerous
12 notification?
13    **A   Yes.  They're trained on use of force**
14 **and handling dangerous people and when to react in**
15 **certain ways.**
16    Q   Are CBP officers instructed that drawing
17 a weapon is an appropriate response to a
18 notification that an individual may be a match to
19 the TSDB?
20    MS. ROTH:  Object as to vagueness and as
21 to foundation and to the extent it calls for law
22 enforcement privileged information.  You can

---

251

1  answer if you can.
2    THE WITNESS:  That officer will have to
3  articulate the reasons why that they made that
4  decision if that's the case based on the totality
5  of the circumstances, the decision they made when
6  they handled that inspection.
7  BY MS. HOMER:
8    Q   If an officer chose to draw a weapon
9  because he saw that a traveler was a match to the
10 TSDB would the CBP consider that to be a
11 reasonable response?
12    MS. ROTH:  Object as to vagueness.
13 Object to the extent that it calls for a legal
14 conclusion and to the extent it calls for law
15 enforcement privileged information.  You can
16 answer if you are able.
17    THE WITNESS:  It seemed like the same
18 question to me.  The answer is the officer makes
19 the judgment based on totality of the
20 circumstances on a case by case basis, they assess
21 that situation and what the appropriate reaction
22 is.

---

252

1  BY MS. HOMER:
2    Q   Would the CBP subject an officer to
3  discipline who drew a weapon because he learned
4  that an individual was on the TSDB?
5    MS. ROTH:  Object to the extent that it
6  calls for deliberative process, privileged
7  information, and law enforcement privileged
8  information.  You can answer if you know.
9    THE WITNESS:  It is difficult to
10 speculate.  If we found that the officer acted
11 inappropriately with excessive force, potentially
12 they could be disciplined.
13 BY MS. HOMER:
14    Q   Has the CBP ever disciplined an officer
15 for drawing a weapon after that officer learned
16 that an individual was a match to the TSDB?
17    **A   I don't know.**
18    Q   Would it surprise you to learn that
19 officers had drawn weapons immediately after
20 learning that the individual they were inspecting
21 was listed on the TSDB?
22    MS. ROTH:  Objection as to form and

---

253

1 foundation.  Object as to vagueness.  You can
2 answer.
3        THE WITNESS:  I don't have enough
4 information to say I'm surprised.
5 BY MS. HOMER:
6    Q   Have you ever heard of an instance
7 occurring where a CBP officer has immediately
8 drawn a weapon learning that and individual was
9 listed on the TSDB?
10   A   Not that I know of firsthand.
11   Q   You're here to testify on behalf of the
12 CBP as an agency.  Correct?
13   A   I believe that's why I'm here.
14   Q   Is it within the knowledge of the CBP
15 whether any individual officer has ever drawn a
16 weapon at an initial screening solely because they
17 learned that the individual they are inspecting is
18 listed on the TSDB?
19   A   That's something that we should be able
20 to determine.
21   Q   Does the CBP have written procedures
22 regarding the appropriate operational response to

254

1 encounters with persons on the TSDB?
2        MS. ROTH:  Objection to the extent that
3 calls for law enforcement privileged information.
4 Objection as to asked and answered.  I believe we
5 covered this already.
6        THE WITNESS:  When a decision is made to
7 refer them to secondary, the decision is to -- or
8 the part of that is to securely refer them to
9 secondary.  So they receive training how to do
10 that and the safe way of getting them to secondary
11 for additional questioning.
12 BY MS. HOMER:
13   Q   Does the process of securely
14 transferring an individual on the TSDB to
15 secondary inspection ever require handcuffing that
16 individual?
17        MS. ROTH:  Objection to the extent that
18 calls for law enforcement privileged information.
19 And again, I believe this topic has been covered,
20 so I object that it has been asked and answered.
21        THE WITNESS:  Case by case if the
22 inspecting officer determines that the handcuffing

255

1 of the individual is necessary in order to control
2 and safely refer them to secondary, that decision
3 is made.
4 BY MS. HOMER:
5    Q   Do the referring officers ever handcuff
6 an individual solely because they are listed on
7 the TSDB?
8        MS. ROTH:  Objection to the extent it
9 calls for law enforcement privileged information.
10 Answer if you can.
11        THE WITNESS:  I believe I have answered
12 it a few times.  The officer makes a decision
13 based on the totality of the circumstances, what
14 they have before them, the individuals, and the
15 judgment that they've made what's necessary in
16 order to securely confer them to secondary.
17 BY MS. HOMER:
18   Q   To the CBP's knowledge has an officer
19 ever handcuffed an individual while transporting
20 them between initial inspection and secondary
21 inspection solely because that individual is
22 listed on the TSDB?

256

1   A   Not to my knowledge, but certainly to
2 CBP.
3    Q   Does CBP consider it an appropriate
4 security measure to handcuff all traveling
5 companions of an individual who is listed on the
6 TSDB?
7        MS. ROTH:  Objection.  Objection as to
8 vagueness and as to foundation.  Objection to the
9 extent that it calls for law enforcement
10 privileged information.  You can answer if you
11 understood that question.
12        THE WITNESS:  Again, it is the judgment
13 of the officer in referring them to secondary what
14 the appropriate response would be to control the
15 individuals.
16 BY MS. HOMER:
17   Q   Is it within the authority of a CBP
18 officer to choose to handcuff all traveling
19 companions of an individual listed on the TSDB
20 solely because they are the traveling companions
21 of an individual listed on the TSDB?
22        MS. ROTH:  Objection to the extent its

257

1  calls for law enforcement privileged information.
2  You can answer if you know.
3        THE WITNESS:  The decision is made in
4  the totality of the circumstances, judgment is
5  made by the primary officer in referring the
6  individuals to secondary.
7  BY MS. HOMER:
8     Q   Are individual officers given wide
9  latitude to determine the appropriate range to
10 enforcement response to any given situation?
11       MS. ROTH:  Objection, foundation.
12 Objection, vagueness.
13       THE WITNESS:  Yeah, I don't understand
14 the question.
15 BY MS. HOMER:
16    Q   Does the CBP generally trust their
17 officers to take appropriate security measures?
18       MS. ROTH:  Objection as to vagueness.
19       THE WITNESS:  Yeah, it's a strange
20 question.  I don't get it.
21 BY MS. HOMER:
22    Q   I'm trying to figure out whether the CBP

258

1  would second guess the decision of an officer to
2  handcuff any given individual?
3     A   In any given shift we have supervisors
4  that are supervising the primary inspection line.
5  And you know, their responsibility is to ensure
6  that they handle travelers in an appropriate way.
7  So if there were instances where officers acted
8  inappropriately -- you know, that's what our
9  first -- that's what our first line supervisors
10 are for, to ensure that they act appropriately and
11 hold them accountable.
12    Q   Do first line officers need the approval
13 of a supervisor before they can handcuff an
14 individual?
15    A   No.
16    Q   Do first line officers need the approval
17 of a supervisor before they can draw their weapon
18 against any given individual?
19    A   If it's primary officer, no.
20    Q   Does secondary inspection ever require
21 individuals to walk through a metal detector?
22       MS. ROTH:  Objection as to vagueness.

259

1        THE WITNESS:  I don't know, yeah.
2  BY MS. HOMER:
3     Q   Does secondary inspection ever required
4  individuals listed on the TSDB to walk through
5  metal detectors as matter of course?
6        MS. ROTH:  Objection as to vagueness.
7        THE WITNESS:  Not that I'm familiar
8  with.
9  BY MS. HOMER:
10    Q   Does secondary inspection require
11 officers to take a photograph of the individual
12 being inspected?
13    A   It could be, based on the secondary
14 inspection.
15    Q   Does secondary inspection require
16 officers to take a photograph of any individual
17 listed on the TSDB?
18    A   I don't know.
19    Q   Does secondary inspection require
20 officers to take biometric information from any
21 individual listed on the TSDB?
22       MS. ROTH:  Objection to the extent that

260

1  calls for law enforcement privileged information.
2  You can answer if you can.
3        THE WITNESS:  Taking biometrics to
4  verify identity is a part of the secondary
5  inspection process, so in those circumstances we
6  would take biometrics.
7  BY MS. HOMER:
8     Q   Do biometrics includes fingerprints?
9     A   Yes.
10    Q   Do biometrics include iris scans?
11    A   No.
12    Q   What information is captured during
13 biometric -- sorry.
14       What biometric information is collected
15 during secondary inspections when biometric
16 information is collected?
17    A   Fingerprints.
18    Q   And only fingerprints?
19    A   Yes.
20    Q   Is every individual who is referred to
21 secondary inspection required to provide biometric
22 fingerprints?

261

1      MS. ROTH:  Objection to the extent that
2  calls for law enforcement privileged information.
3  You can answer.
4      THE WITNESS:  I'm not sure.  If it's --
5  if we need to verify the identity then certainly,
6  yes.
7  BY MS. HOMER:
8      Q    Does the CBP need to verify the identity
9  of every individual listed on the TSDB who is
10 referred to secondary inspection?
11     A    That's the key part of the process is to
12 verify whether or not that person is a match.
13     Q    Does secondary inspection ever entail
14 dogs who are sniffing for contraband?
15     A    Yes.
16     Q    Does secondary inspection require those
17 listed on the TSDB to have their persons and
18 effects be submitted to a dog sniff?
19     MS. ROTH:  Objection to the extent that
20 it calls for law enforcement privileged
21 information.  But you can answer if you are able
22 to.

262

1      THE WITNESS:  As we discussed earlier
2  there's a host of reasons why people are on
3  secondary.  And if there's -- you know, our
4  canines are one of the tools to -- that we utilize
5  to identify contraband.
6  BY MS. HOMER:
7      Q    Is every individual who is listed on the
8  TSDB and referred to secondary inspection
9  subjected to a canine sniff?
10     MS. ROTH:  Object to the extent that it
11 calls for law enforcement privileged information.
12     THE WITNESS:  I think it's case by case,
13 but generally, no.
14 BY MS. HOMER:
15     Q    But a canine sniff is one possible
16 procedure that could occur to any individual who
17 is subjected to secondary inspection?
18     A    To any individual that's in secondary,
19 yes.  It's one of the tools we could possibly use.
20     Q    Does secondary inspection ever entail
21 for anyone a detailed search of their car at a
22 land border?

263

1      A    Yes.
2      Q    Does secondary inspection for any
3  individual entail removing the panels of a car in
4  order to look for contraband?
5      MS. ROTH:  Object as to vagueness.
6      THE WITNESS:  All conveyances are
7  subject to search.  So if we have a reason to
8  believe that there might be contraband within the
9  vehicle we do have non inspection -- nonintrusive
10 inspection capabilities, x-ray.  So if by x-raying
11 an vehicle we see an anomaly that we think there's
12 something behind the door panel we may remove a
13 door panel to see what's there.
14 BY MS. HOMER:
15     Q    Okay.  So in the ordinary course of
16 operations if the CBP chooses to inspect a car
17 they would conduct an x-ray first before taking
18 more intrusive searching measures?
19     A    Not necessarily.  But it's a tool, one
20 of the tools we could use.
21     Q    Okay.  Does the CBP conduct x-rays
22 searches on any car belonging to an individual

264

1  listed on the TSDB?
2      MS. ROTH:  Object to the extent that
3  calls for law enforcement privileged information.
4  You can answer if you know.
5      THE WITNESS:  I think it's case by case.
6  But generally speaking it's not something that is
7  a standard practice that we do.
8  BY MS. HOMER:
9      Q    Does the CBP ever remove the panels of a
10 car to search for contraband even though they
11 don't have a reason to think that there may be
12 contraband hidden more deeply inside of the car?
13     A    That would be counterproductive to what
14 we are trying to do, so I don't know why we would.
15     Q    Are you aware of any instance in which
16 the CBP has removed panels from a car solely
17 because the car is owned by an individual listed
18 on the TSDB?
19     A    No.
20     Q    In the CBP's view is the fact that an
21 individual is listed on the TSDB sufficient reason
22 to justify a removing panel search of a car?

265

1   A   Removing a panel of a car would follow a
2 nonintrusive inspection x-ray.  The removal of
3 panels to get deeper in the vehicle would always
4 be after an x-ray.  And I don't know why we would
5 remove a panel if there is no -- nothing in the
6 x-ray to give us that reason to.
7   Q   The secondary inspections generally may
8 entail a CBP officer searching through an
9 individual's luggage.  Correct?
10   A   Yes.
11   Q   Do secondary inspections for individuals
12 listed on the TSDB specifically always require a
13 search of that individual's luggage?
14       MS. ROTH:  Objection.  Objection to the
15 extent that it calls for law enforcement
16 privileged information.  But you can answer.
17       THE WITNESS:  I'd probably said
18 generally, yes.  We are determining admissibility,
19 determining whether or not this person is a match.
20 So their belongings would certainly help us
21 facilitate their inspection to make that final
22 determination.  We would want to look in their

266

1 bags to help complete our inspection.
2 BY MS. HOMER:
3   Q   Does secondary inspection generally ever
4 entail searching an individual's wallet?
5   A   Generally for anybody?
6   Q   For anybody?
7   A   We could dependent upon why they were
8 referred to secondary.
9   Q   Does secondary inspection for
10 individuals listed on the TSDB specifically
11 require a search of that individual's wallet?
12       MS. ROTH:  Objection to the extent that
13 calls for law enforcement privileged information.
14 You can answer if you are able to.
15       THE WITNESS:  If it helps us complete
16 the inspection, verify identity, verify who they
17 are we may choose to search their wallet.
18 BY MS. HOMER:
19   Q   Does the CBP as matter of course make
20 copies of documents contained within an
21 individual's wallet who is listed on the TSDB?
22       MS. ROTH:  I'm going to object to the

267

1 extent that calls for law enforcement privileged
2 information and you can answer to the extent that
3 you are able to without -- in a non-privileged
4 way.
5       THE WITNESS:  If there is some
6 information that is noteworthy to capture, we may
7 on a case by case basis.
8 BY MS. HOMER:
9   Q   Does the CBP ever write down the credit
10 card numbers contained in an individual's wallet
11 in order to document it as part of an encounter
12 with an individual listed in the TSDB?
13       MS. ROTH:  I'm going to object to the
14 extent that question calls for law enforcement
15 privileged information.  You can answer to the
16 extent you are able to in a non-privileged way.
17       THE WITNESS:  There may be instances
18 where we want to document, verifying credit cards,
19 debit cards, gift cards.  You know, there could be
20 some verification of those credit cards,
21 especially if they are in various names.
22

268

1 BY MS. HOMER:
2   Q   Does the TSDB ever document any medical
3 insurance information that may be contained within
4 an individual's wallet?
5       MS. ROTH:  I'm going to object to the
6 extent that calls for law enforcement privileged
7 information.
8       THE WITNESS:  I don't know.
9 BY MS. HOMER:
10   Q   Does did TSDB ever create a
11 documentation of any government ID information
12 that may be contained in an individual's wallet?
13       MS. ROTH:  First object as vagueness.  I
14 believe you just asked as the TSDB, if can you
15 clarify.
16 BY MS. HOMER:
17   Q   I apologize.  Does the CBP ever document
18 in its systems the government ID information that
19 is found in a TSDB individual's wallet?
20       MS. ROTH:  I'm going to object on the
21 basis of the law enforcement privilege and
22 instruct the witness not to answer that question.

Case 1:16-cv-00375-AJT-JFA   Document 306-30   Filed 03/12/19   Page 70 of 91 PageID# 14510
Transcript of Randy Howe, Designated Representative
Conducted on March 22, 2018

68 (269 to 272)

269

1 BY MS. HOMER:
2    Q   Does the TSDB ever create records of the
3 information that may be found on an individual's
4 business cards that are in their wallet?
5        MS. ROTH:  I think you said TSDB again.
6 BY MS. HOMER:
7    Q   I'm so sorry.  Let me rephrase my
8 question.
9        Does the CBP ever create encountered
10 records containing the information on business
11 cards in a TSDB listed individual's wallet?
12       MS. ROTH:  I'm going to object on the
13 basis of the law enforcement privilege and
14 instruct the witness not to answer that question.
15 BY MS. HOMER:
16   Q   As a matter of course does the CBP
17 provide the information it gathers from a search
18 of an individual's wallet to the FBI?
19       MS. ROTH:  I'm going to object on the
20 basis of the law enforcement privilege and
21 instruct the witness not to answer that question.
22

270

1 BY MS. HOMER:
2    Q   Does the CBP ever search the belongings
3 of the travel companions of an individual listed
4 on the TSDB?
5        MS. ROTH:  Object to the extent that
6 calls for law enforcement privilege.  But you can
7 answer if you are able to.
8        THE WITNESS:  We may choose to do so.
9 BY MS. HOMER:
10   Q   Does the CBP create documentation of the
11 contents of traveling companions' wallets and
12 luggage in its systems?
13       MS. ROTH:  I'm going to object on the
14 basis of the law enforcement privilege.
15       THE WITNESS:  We may if there is some
16 law enforcement need.
17 BY MS. HOMER:
18   Q   Does the CBP ever detain individuals who
19 have been referred to secondary inspection?
20       MS. ROTH:  I'm going to object to the
21 extent that calls for a legal conclusion.  You can
22 answer if you understand the question.

271

1        THE WITNESS:  I don't understand
2 what you -- by what you mean by detained.
3 BY MS. HOMER:
4    Q   Does the CBP use the word detain to
5 describe a possible operational response at the
6 border?
7    **A   It could, depending upon the**
8 **circumstances, whether or not they are going to be**
9 **placed into custody — you know, by another**
10 **agency.  But generally the secondary processing**
11 **not detaining somebody, it's just questioning**
12 **them.**
13   Q   Is one result of secondary inspection
14 to, in your words, place somebody into custody?
15   **A   That's certainly one result.**
16   Q   How does the CBP define a detention?
17       MS. ROTH:  I'm going to object to the
18 extent that calls for a legal conclusion.
19       THE WITNESS:  I don't have the
20 definition of detention in my mind.  But I think
21 generally speaking when we have somebody for I
22 think it is more than 12 hours.  I think that's

272

1 the -- I don't know.
2 BY MS. HOMER:
3    Q   Under what circumstances does the CBP
4 hold an individual for more than 12 hours?
5    **A   In order for us to complete the**
6 **inspection and make a final determination.  That's**
7 **just part of the — you know, the inspectional**
8 **process.**
9    Q   Does the CBP have a written definition
10 of detention somewhere?
11   **A   I'm sure it does.**
12   Q   Do you know what policy that definition
13 may be contained in?
14   **A   The acronym I believe is TEDS, T-E-D-S.**
15 **But I'm not sure what it stands for.  That's our**
16 **detention policy.**
17   Q   But to the best of your knowledge right
18 now the TEDS, T-E-D-S, policy would contain the
19 CBP's detention policy?
20   **A   I believe so.**
21   Q   Is the CBP required to have probable
22 cause before it can detain an individual for more

273

1 than 12 hours?
2       MS. ROTH: I'm going to object to the
3 extent that calls for a legal conclusion. You can
4 answer if you know.
5       THE WITNESS: I would have to consult
6 with our attorneys, but I don't know. I think --
7 I think to detain somebody more than 12 hours you
8 need supervisory approval, but I don't believe
9 probable cause is required.
10 BY MS. HOMER:
11    Q   Does an individual's presence on the
12 TSDB alone constitute a reason to detain them for
13 more than 12 hours?
14    **A   Again, our focus is to complete the**
15 **inspection, to make a determination on**
16 **admissibility, and either to admit or refuse or**
17 **deal with travelers for -- that applied for**
18 **admission to the U.S. So however long that takes.**
19 **Our goal is do it in as short a period of time as**
20 **possible. But while doing that if it goes beyond**
21 **12 hours, it's not our intention, but in order to**
22 **do the border security mission.**

274

1    Q   Does the secondary inspection process
2 ever entail placing an individual alone in a
3 locked room?
4    **A   It could.**
5    Q   Under what circumstances would an
6 individual be placed alone in a locked room?
7       MS. ROTH: I'm going to object to the
8 extent that calls for law enforcement privileged
9 information. So you can answer in a general
10 non-privileged way if you are able.
11       THE WITNESS: If we are completing our
12 secondary inspection and there is a law
13 enforcement concern that they're segregated and
14 controlled in some way, then they may be held
15 until we can complete the inspection in a private
16 room.
17 BY MS. HOMER:
18    Q   Does the CBP ever place individuals who
19 are listed in the TSDB alone in a locked room
20 while the CBP completes the secondary inspection
21 process?
22       MS. ROTH: I'm going to object to the

275

1 extent that that calls for law enforcement
2 privileged information. You can answer if you are
3 able to.
4       THE WITNESS: I don't know.
5       MS. HOMER: Okay. We are out of time,
6 so let's take a break.
7       THE VIDEOGRAPHER: We are going off of
8 the record the time is 4:12 p.m.
9       (The proceedings recessed from 4:12 p.m.
10 to 4:16 p.m.)
11       THE VIDEOGRAPHER: We are back on the
12 record. The time is 4:16 p.m.
13 BY MS. HOMER:
14    Q   Has the CBP ever received complaints
15 that the private rooms individuals are place into
16 during secondary inspection are too cold?
17    **A   I don't know.**
18    Q   Has the CBP ever disciplined an officer
19 for placing an individual in a private holding
20 room that is too cold?
21    **A   I don't know, but we certainly would**
22 **want individuals to be comfortable and have**

276

1 **blankets if it's cold and keep them -- you know,**
2 **in a comfortable situation.**
3    Q   Has the CBP ever refused to provide
4 blankets to an individual who complains about
5 being too cold?
6    **A   I don't know.**
7    Q   Does the CBP ever require an individual
8 undergoing secondary inspection to remove all of
9 their outerwear such as coats and jackets?
10    **A   Potentially.**
11    Q   Does the CBP ever take away the
12 individual's outerwear such as coats and jackets
13 during a secondary inspection process and refuse
14 to give it back?
15    **A   I'm not aware of that, but the purpose**
16 **of taking the coat off would be to search the**
17 **coat. And it would make sense to give it back to**
18 **them. But I'm not aware of any instances why or**
19 **that we did.**
20    Q   Has the CBP ever required an individual
21 to remove their outerwear before the CBP locked
22 that individual in a solitary room?

277

1     A   I don't know the answer.

2     Q   Has the CBP ever received complaints
3  that the lights in a holding room were too bright?

4     A   I don't know.

5     Q   Does CBP have a set policy for the
6  temperature that holding rooms should be kept at?

7     A   Not that I'm aware of, but there are
8  facility standards that we go by which may include
9  thermostat, heating and cooling.

10    Q   Has the CBP ever evaluated the average
11 temperature that rooms in secondary inspection
12 process are kept at?

13    A   Not that I'm aware of.

14    Q   Does the CBP ever require individuals
15 undergoing secondary inspection to remove all of
16 their clothing?

17    A   There may be an incident where that was
18 required, but not that I'm aware of.

19    Q   In what instances might it be required
20 for an individual to remove all of their clothing
21 while undergoing secondary inspection?

22        MS. ROTH:  I'm going to object to the

278

1  extent that calls for law enforcement privileged
2  information.  But you can answer in a general
3  non-privileged way.

4        THE WITNESS:  There is a concern that
5  they have contraband within their clothing or
6  within their body.

7  BY MS. HOMER:

8     Q   Would the CBP consider it appropriate
9  for an officer to require an individual undergoing
10 secondary inspection to remove all of their
11 outerwear and then wait in a locked cell which is
12 cold for hours?

13        MS. ROTH:  Object as to vagueness.
14 Object as to foundation.

15        THE WITNESS:  I don't understand your
16 question.

17 BY MS. HOMER:

18    Q   Would it be -- let me try that again.

19        Would it be against CBP policy for an
20 officer to remove the jacket of an individual,
21 then place that individual in a cold cell and then
22 lock the individual in that cell?

279

1     A   I thought you already asked that
2  question.

3     Q   It's a slight variation, another
4  question.

5     A   I'm not familiar with instances where we
6  would have someone remove their coat and have them
7  wait in a cell without their coat.

8     Q   If an officer removed an individual's
9  jacket and then placed them in a cell that was
10 cold and then refused to give that individual
11 their jacket back, would that officer be subject
12 to discipline?

13    A   I don't know.  There's a lot of unknowns
14 there.  If there was a concern that the coat could
15 be of harm to the individual, not knowing if the
16 officer knew that it was cold.  You know, could
17 they have provided the individual with a blanket.
18 I don't know.  There's a lot of facts there that
19 are unknown.

20    Q   If an individual requested medical
21 attention while being held by the CBP and the
22 officer refused to help that individual get

280

1  medical attention would that be a basis for
2  discipline?

3        MS. ROTH:  Objection.  Objection as to
4  vagueness.  Objection as to foundation.  Object,
5  compound question.

6        THE WITNESS:  The care and well-being of
7  individuals that are within our control are of
8  concern to us.  If somebody is expressing that
9  they are in a medical emergency we should be
10 rendering them aid.  We do have officers that are
11 trained as EMTs that could be called to assist and
12 assess the individual.  And if not, we should be
13 calling appropriate authorities to render aid.

14 BY MS. HOMER:

15    Q   Would the CBP consider it inappropriate
16 for an officer to completely disregard an
17 individual request for medical attention?

18        MS. ROTH:  Objection as to vagueness.

19        THE WITNESS:  It's tough to speculate.
20 There are a lot of unknown facts here.  We care
21 about people's well-being and if somebody is
22 expressing a need for medical attention we should

Transcript of Randy Howe, Designated Representative
Conducted on March 22, 2018

281

1  be providing it to them.
2  BY MS. HOMER:
3      Q    Does the CBP conduct pat-downs on
4  individuals as part of its general secondary
5  inspection processes?
6      A    **We could, depending upon the inspection.**
7      Q    Does the CBP conduct pat-downs on every
8  individual who is listed in the TSDB as part of
9  its secondary inspection processes?
10         MS. ROTH:  Object to the extent that it
11 calls for law enforcement privileged information.
12 You can answer if you are able to.
13         THE WITNESS:  I'm not sure.  But if in
14 the totality of the circumstances if the officer
15 found it necessary to pat-down somebody to look
16 for documents or potentially -- you know,
17 something hidden.  If they believe there is
18 contraband of some sort they may choose to pat
19 them down.
20 BY MS. HOMER:
21     Q    Does the CBP have a term for a pat-down
22 that is more lengthy or extensive than ordinary

282

1  pat-down?
2      A    **Not that I'm aware of.**
3          MS. ROTH:  Objection as to vagueness.
4  BY MS. HOMER:
5      Q    Do CBP pat-downs ever entail body cavity
6  searches?
7      A    **That wouldn't be considered a pat-down.**
8  **It would be considered something different.**
9      Q    What term would the CBP use to describe
10 a body cavity search?
11     A    **I can't think of the exact term.  I**
12 **don't think it is body cavity search.  More an**
13 **invasive.  It would require supervisory approval.**
14     Q    So invasive bodily searches require
15 supervisory approval.  Is what I just understood
16 you to say?
17     A    **Yes.**
18     Q    Okay.  Do CBP officers conduct invasive
19 bodily searches of individuals listed on the TSDB
20 as a matter of course?
21         MS. ROTH:  Objection to the extent that
22 it calls for law enforcement privileged

283

1  information.  You can answer if you are able to.
2          THE WITNESS:  I don't believe so.
3  BY MS. HOMER:
4      Q    Do CBP officers on occasion conduct
5  invasive bodily searches on individuals listed on
6  the TSDB?
7          MS. ROTH:  Object to the extent that
8  that calls for law enforcement privileged
9  information.  You can answer if you can.
10         THE WITNESS:  I don't know.
11 BY MS. HOMER:
12     Q    If an individual who was listed on the
13 TSDB was subjected to an invasive bodily search
14 would that search be documented in the encounter
15 information the CBP prepared afterwards?
16         MS. ROTH:  Objection as to vagueness.
17         THE WITNESS:  It should be documented
18 within a secondary inspection results as well as
19 supervisory approval.
20 BY MS. HOMER:
21     Q    Does secondary inspection for
22 individuals listed in the TSDB require officers to

284

1  call the National Targeting Center as a matter of
2  course?
3          MS. ROTH:  Objection to the extent that
4  calls for law enforcement privileged information
5  and objection to the extent that this has been
6  asked and answered.
7          THE WITNESS:  Ports of entry regularly
8  correspond with the NTC when handling a TSDB and
9  secondary.
10 BY MS. HOMER:
11     Q    Does secondary inspections of
12 individuals listed on the TSDB ever entail the CBP
13 asking the FBI to join them during the inspection?
14         MS. ROTH:  Objection to the extent that
15 calls for law enforcement privileged information.
16 You can answer if you are able.
17         THE WITNESS:  I'm not sure that's
18 privileged or not.
19         MS. ROTH:  Okay.
20 BY MS. HOMER:
21     Q    That is also a question we would like to
22 if possible get confirmed --

285

1    A    Okay.

2    Q    -- if it is privileged.

3        Does the CBP ever bring any other

4 agency -- let me start that over.  Does the CBP

5 ever involve any other agency in the process of

6 conducting secondary inspections for individuals

7 listed on the TSDB?

8        MS. ROTH:  Objection to the extent that

9 calls for law enforcement privileged information.

10       THE WITNESS:  Yes.

11 BY MS. HOMER:

12   Q    What other agencies might the CBP

13 involve in the secondary inspection process for an

14 individual listed in the TSDB?

15   A    Immigration and Customs Enforcement.

16   Q    Any others?

17   A    No.

18   Q    Why would the CBP involve Immigration

19 and Customs Enforcement in the secondary

20 inspection process for an individual listed in the

21 TSDB?

22       MS. ROTH:  I'm going to object to the

286

1 extent that calls for law enforcement privileged

2 information.  You can answer in general

3 non-privileged terms if you are able.

4        THE WITNESS:  ICE is a key DHS component

5 that handles the investigative work within the

6 DHS.  So they are a key partner with us in

7 facilitating the processing of passengers in this

8 regard.

9        MS. MASRI:  I'm going to dial them back

10 -- (mumbling)

11       (Court reporter requested

12 clarification.)

13       MS. HOMER:  We don't need to go off the

14 record.

15       (Discussion off of the record.)

16       THE WITNESS:  They are going to dial

17 into the phone.

18       MS. HOMER:  Yes.

19       (Pause)

20 BY MS. HOMER:

21   Q    Does the CBP generally ask individuals

22 who have been referred to secondary inspection

287

1 additional questions about the individual, their

2 purpose for travel, etc.?

3    A    Yes.

4    Q    Does the CBP specifically for

5 individuals listed in the TSDB have a set of

6 questions it asks individuals listed in the TSDB

7 during secondary inspection?

8    A    There's no list of questions.

9    Q    Does the CBP as matter of course conduct

10 additional interviews during secondary inspection

11 for individuals listed in the TSDB?

12   A    Anybody that's referred to secondary

13 because the purpose is for additional questioning

14 to determine admissibility and further course of

15 action.  That is what we do in secondary.

16   Q    Does the CBP ask the FBI to conduct any

17 additional questioning of individuals listed in

18 the TSDB who are referred to secondary inspection?

19       MS. ROTH:  I'm going to object on the

20 basis of the law enforcement privilege and

21 instruct the witness not to answer that question.

22

288

1 BY MS. HOMER:

2    Q    Does the CBP ever ask individuals listed

3 on the TSDB about their connections to the Middle

4 East as part of the secondary inspection interview

5 process?

6        MS. ROTH:  Objection as to vagueness and

7 foundation.

8        THE WITNESS:  We ask lots of questions

9 to verify identity, verify where they are

10 traveling from, where they are going, who they

11 visited just to verify their identity and

12 admissibility.

13 BY MS. HOMER:

14   Q    Does the CBP ever ask individuals listed

15 in the TSDB if they believe in Islam, the

16 religion?

17       MS. ROTH:  Object as to vagueness.

18       THE WITNESS:  We don't generally ask

19 religious questions.  But depending upon how they

20 are applying for admission, if they are traveling

21 on a certain type of visa and it's a religion visa

22 it might be a good question to be asking somebody.

Transcript of Randy Howe, Designated Representative
Conducted on March 22, 2018

289

BY MS. HOMER:

Q   Does the TSDB ever ask individuals listed on the -- sorry.  I said that wrong.

**A   You did.**

Q   I caught myself this time.

Does the CBP ever ask individuals listed in the TSDB how frequently they pray?

MS. ROTH:  Object as to foundation and vagueness.

THE WITNESS:  I don't know if they do.

BY MS. HOMER:

Q   Would it be against CBP policy for CBP officers conducting secondary inspections to inquire into how often an individual prays?

**A   We generally don't ask questions about religion and their beliefs and how they pray.  But again, as I said earlier, depending upon the type of nonimmigrant visa they may be traveling under we may ask questions about their religion to verify the bona fides of that religious classification.**

Q   To your knowledge has the CBP ever

290

inquired about an individual's practice of the religion of Islam in order to assess whether that individual is affiliated with terrorism?

**A   I don't know if I understand the question.**

Q   Let me see if I can repeat it or rephrase it.  Does the CBP know of any TSDB officers who have asked individuals about their practice of Islam in order to determine whether or not that individual may be a noted suspected terrorist?

**A   I think it's the same answer I provided. We ask questions generally not about religion.**

Q   Would it be against CBP policy for an individual officer to ask questions about the religious practice of Islam as a basis for determining whether or not that individual was likely to be a terrorist?

MS. ROTH:  Objection as to vagueness and foundation.

THE WITNESS:  I'm not sure of the question.  I'm sorry.

291

BY MS. HOMER:

Q   Let me try to simplify it.

Does the CBP ever use an individual's practice of Islam as an indicator that that individual may be a terrorist?

**A   Maybe I'm not understanding the term Islam.**

Q   Does the CBP ever use an individual's religious beliefs and practices as a reason to believe whether or not that individual is likely to be a terrorist?

**A   Absolutely we do not do that.  We are prohibited from making judgments based on religion, sex, race.**

Q   Would a CBP officer be subjected to discipline if it was determined that that officer had discriminated on the basis of religion during interview questioning?

**A   It's difficult to speculate, but if that is the case then, yes, they would be.**

Q   Does the CBP ever ask during secondary inspection interviews whether an individual has

292

ties to specific extremist organizations?

MS. ROTH:  Objection to the extent that calls for law enforcement privileged information. You can answer if you are able to in a general non-privileged way.

THE WITNESS:  We may if after conducting the inspection and looking at their belongings that -- where that's where the questioning is going based on what we have discovered or determined by the inspection.  We may ask those questions, yes.

BY MS. HOMER:

Q   Does the CBP during secondary inspections of individuals listed on the TSDB ever inquire if those individuals have ties to ISIS?

MS. ROTH:  Same objection to the extent that it calls for law enforcement information.

THE WITNESS:  Based on the results of the secondary inspection and the questioning and the searching of their belongings, it may be appropriate to ask that question.

Transcript of Randy Howe, Designated Representative
Conducted on March 22, 2018

293

1  BY MS. HOMER:
2      Q    Does the CBP ever ask an individual
3  listed on the TSDB to identify their associates
4  who may be in organizations of interest to the
5  intelligence agency?
6          MS. ROTH:  Objection as to vagueness and
7  foundation.  Objection as to the extent that calls
8  for law enforcement privileged information.
9          THE WITNESS:  It's impossible to answer.
10 BY MS. HOMER:
11     Q    I will just say I'm trying to skirt this
12 line of being clear enough to have you answer the
13 question and vague enough to not invoke any law
14 enforcement privileges.  So, let me see if I can
15 find a different way to ask that question.
16         If the CBP believes that the known or
17 suspected terrorist in front of them is affiliated
18 with ISIS, might the CBP ask that individual to
19 disclose other persons they also know to be
20 associated with ISIS?
21         MS. ROTH:  Objection as to vagueness and
22 foundation.  Objection, calls for speculation.

294

1  Objection to the extent that it calls for law
2  enforcement privileged information.  You can
3  answer if you think you can in a non-privileged
4  way.
5          THE WITNESS:  I think you just asked if
6  we have somebody that is TSDB exact match and they
7  admit they are a member of ISIS?  Did you just say
8  that?
9  BY MS. HOMER:
10     Q    Then you'd probably arrest them.
11 Well -- okay.  Well, let me ask you that a
12 different way.
13         Does the CBP ever asked an individual to
14 identify anyone that individual might know to be
15 who is a member of ISIS?
16         MS. ROTH:  Objection to the extent it
17 calls for law enforcement privileged information.
18 You can answer if you can.
19         THE WITNESS:  Perhaps.  Especially if
20 they admit to it and they tell us.
21 BY MS. HOMER:
22     Q    Does the CBP ever ask known or suspected

295

1  terrorists undergoing screening if that individual
2  would be willing to stay in contact with law
3  enforcement in order to provide information in the
4  future?
5          MS. ROTH:  Objection as to vagueness.
6  Objection to the extent it calls for law
7  enforcement privileged information.
8          THE WITNESS:  I think it's probably
9  privileged.
10 BY MS. HOMER:
11     Q    I was expecting that.  I'm going to ask
12 the same question, slightly different phrasing,
13 knowing you will object.
14         Does -- does the CBP ever ask an
15 individual listed on the TSDB to provide
16 information to law enforcement in the future about
17 the individual -- the inspected individual's
18 associates?
19         MS. ROTH:  Objection to the extent it
20 calls for law enforcement privileged information.
21         THE WITNESS:  And I believe it's
22 privileged.

296

1  BY MS. HOMER:
2      Q    Has the CBP ever asked an individual
3  listed on the TSDB to become a government
4  informant?
5          MS. ROTH:  Objection to the extent that
6  calls for law enforcement privileged information.
7  If you can answer that.
8          THE WITNESS:  I don't know, but I assume
9  it is privileged.
10 BY MS. HOMER:
11     Q    Does the CBP as part of the secondary
12 inspection process conduct searches on electronic
13 items?
14     **A    That could be a part of our secondary
15 inspection.**
16     Q    Does the CBP as part of the secondary
17 inspection process for individuals listed on the
18 TSDB conduct electronic searches as a matter of
19 course?
20         MS. ROTH:  I'm going to object to the
21 extent that calls for law enforcement privileged
22 information.  You can answer it if you can.

297

1    THE WITNESS: I'm not sure if that's
2 privileged or not.
3    MS. ROTH: We will consult.
4    MS. HOMER: Okay. Well, hopefully this
5 document might help. Can I please mark Exhibit 3
6 to today's deposition?
7    (Whereupon, Exhibit No. 3 was marked for
8 identification.)
9 BY MS. HOMER:
10   Q   Do you recognize this document?
11   **A   I do.**
12   Q   What is this document?
13   **A   This is Border Search of an Electronic**
14 **Device, a new directive from January 4 of this**
15 **year.**
16   Q   Why was this document regarding border
17 searches of electronic devices issued?
18   MS. ROTH: I'm going to object to the
19 extent that it calls for deliberative process
20 privileged information. But you can answer if you
21 are able to.
22   THE WITNESS: It provides direction to

298

1 CBP on the procedures for searching electronic
2 devices.
3 BY MS. HOMER:
4    Q   Does this document reflect a change in
5 CBP policy regarding the searches of electronic
6 devices at the border?
7    **A   There are some changes due to this**
8 **directive, yes.**
9    Q   What are the major changes that occur
10 due to this directive?
11   MS. ROTH: Object as to vagueness.
12   THE WITNESS: It's a couple major
13 changes. There are two main types of searches
14 that are discussed here, basic and advanced.
15 Reasonable suspicion is required for advanced
16 searches now, which wasn't the case previously.
17   The other major change is guidance on
18 handling devices and searching devices without
19 having the phone enabled for the Cloud, so that we
20 are only searching the items that are -- only
21 searching the phone itself without access to the
22 Cloud, guidance with that.

299

1    And then another is a guidance that
2 requires supervisory approval for advanced
3 searches. Those are a couple of the major ones.
4 BY MS. HOMER:
5    Q   Are there other changes that this
6 document reflects to CBP's electronic search
7 policies other than the major ones you just
8 mentioned?
9    **A   Those are the major ones.**
10   Q   Was there a prior version of this
11 guidance published?
12   **A   There was.**
13   Q   What was that guidance called?
14   **A   Same.**
15   Q   What year was it issued?
16   **A   2009.**
17   Q   So if I were to compare the 2009 version
18 to the 2018 version I would be able to identify
19 all of the changes and guidance?
20   **A   If you are able to compare them, I hope**
21 **so.**
22   Q   Okay. So I want to turn to page five,

300

1 paragraph 5.1.4 advanced search. Do you see that?
2    **A   I do.**
3    Q   And this is one of the provisions you
4 said underwent a major change with the issuance of
5 this guidance. Is that correct?
6    **A   Correct.**
7    Q   Okay. So can you read the first
8 sentence of that paragraph out loud for me?
9    **A   If I have to.**
10   Q   Please?
11   **A   We can all read, right?**
12   **An advanced search is any search in**
13 **which an officer connects external equipment**
14 **through a wired or wireless connection to an**
15 **electronic device not merely to gain access to the**
16 **device, but to review, copy, and analyze its**
17 **contents.**
18   Q   Okay. In plain English what does that
19 sentence mean?
20   MS. ROTH: Objection as to vagueness.
21 The document speaks for itself.
22

301
1  BY MS. HOMER:
2     Q   Very well.  Okay.  Would you agree that
3  generally an advanced search is when you plug in
4  an electronic device in order to copy all of the
5  contents on its hard drive?
6        MS. ROTH:  Objection to the extent,
7  again, this document speaks for itself and the
8  witness just read the relevant sentence you
9  directed him to.
10       THE WITNESS:  I can read it again, but I
11 stand by it.
12 BY MS. HOMER:
13    Q   That's fine.  Okay.  Is that sentence
14 accurate?
15    A   Yes.
16    Q   Okay.  And then the next sentence is
17 what sets forth that there must be a reasonable
18 suspicion in order to conduct an advanced search.
19 And the advanced search must have supervisory
20 approval.  Is that accurate?
21    A   That's what it says.
22    Q   Okay.  And then I'm going to read -- I

302
1  will read the next sentence.
2     A   Thank you.
3     Q   Many factors may create reasonable
4  suspicion or constitute a national security
5  concern.  Examples include the existence of a
6  relevant national security related lookout in
7  combination with other articulable factors as
8  appropriate, or the presence of an individual on a
9  government operated and government vetted
10 terrorist watch list.
11       Did I read that correctly?
12    A   You did.
13    Q   Does an individual's presence on the
14 TSDB alone constitute a reason to conduct an
15 advanced searched of that individual's electronic
16 devices pursuant to this policy?
17       MS. ROTH:  Objection to the extent that
18 this document speaks for itself.  You can answer
19 if you can.
20       THE WITNESS:  That's what the sentence
21 states.  It's pretty clear what it says.
22

303
1  BY MS. HOMER:
2     Q   Is the CBP required to conduct an
3  advanced search of the electronic devices of every
4  individual listed on the TSDB?
5        MS. ROTH:  Objection as to vagueness.
6  Objection to the extent that it calls for law
7  enforcement privileged information.  If you
8  understand the question you can answer.
9        THE WITNESS:  National security and what
10 we do is what's required.  So this is the
11 directive, we follow directives.
12 BY MS. HOMER:
13    Q   Is the CBP authorized to conduct an
14 advanced search of the electronic devices of an
15 individual who is a potential match to the TSDB?
16    A   Potentially, dependent upon articulable
17 facts if it rises to the level of reasonable
18 suspicion, yes.
19    Q   Must the CBP determine whether a
20 potential match is in fact a confirmed match to
21 the TSDB before conducting an advanced search of
22 that individual's electronic devices?

304
1        MS. ROTH:  Objection to the extent it
2  calls for law enforcement privileged information.
3        THE WITNESS:  I think the directive
4  speaks for itself on that regard, with other
5  articulable factors as appropriate.
6  BY MS. HOMER:
7     Q   Okay.  So to clarify, if an individual
8  is only a potential match to the TSDB then before
9  the CBP could conduct an advanced search it would
10 need other articulable factors establishing a need
11 for the search?
12    A   I think we are going to want to identify
13 whether or not it is a match or not.  That's the
14 primary concern.  And then we will take it from
15 there.  So in the course of verifying the identity
16 to see if it is a match and there's articulable
17 facts to hook it up to equipment that helps us do
18 that, we may depending on the totality case by
19 case.
20    Q   In general the CBP would likely wait to
21 see whether or not a potential match was a
22 confirmed match before beginning the advanced

Transcript of Randy Howe, Designated Representative
Conducted on March 22, 2018

305

1 search process?
2 **A   I can't make that statement in general,**
3 **no.  It's case by case.**
4    Q   If the CBP had not yet conducted an
5 electronic search and confirmed that an individual
6 was a confirmed match to the TSDB, is it correct
7 that the CBP at that point would conduct an
8 advanced search of the individuals electronic
9 devices?
10   **A   That is what the directive says.**
11       MS. ROTH:  Counsel, I'm going to want a
12 break in the next five minutes.
13 BY MS. HOMER:
14   Q   Okay.  I have I think about three more
15 questions on this and then we can take a break.
16       Does the CBP share all of the
17 information it obtains from the electronic devices
18 of an individual listed on the TSDB with the FBI?
19       MS. ROTH:  I'm going to object on the
20 basis of the law enforcement privilege and
21 instruct the witness not to answer that question.
22

306

1 BY MS. HOMER:
2    Q   Does the CBP share the information it
3 obtains from the electronic devices of an
4 individual listed on the TSDB with any other
5 government agency?
6       MS. ROTH:  I'm going to object on the
7 basis of the law enforcement privilege and
8 instruct the witness not to answer that question.
9 BY MS. HOMER:
10   Q   Prior to the issuance of this guidance
11 was it CBP's policy to conduct an advanced search
12 of the electronic devices of individuals listed on
13 the TSDB?
14       MS. ROTH:  Objection as to vagueness and
15 to form.
16       THE WITNESS:  I would have to refer back
17 to that directive.  I don't recall.
18 BY MS. HOMER:
19   Q   In your experience did CBP officers
20 regularly conduct advanced searches of the
21 electronic devices of individuals listed in the
22 TSDB between 2009 and 2018?

307

1       MS. ROTH:  Objection to the extent that
2 calls for law enforcement privileged information
3 and on vagueness grounds.  I think the witness
4 testified that advance searches is a concept
5 introduced in this policy.
6       THE WITNESS:  I'm not sure if I'm
7 following your question.
8 BY MS. HOMER:
9    Q   I will limit it to one year.  In 2017
10 before this policy was in effect, was it standard
11 practice for CBP officers to copy data off of the
12 electronic devices of individuals listed on the
13 TSDB?
14       MS. ROTH:  Object to the extent it calls
15 for law enforcement privileged information.  You
16 can answer.
17       THE WITNESS:  I believe we did.
18       MS. HOMER:  We can take a break now.
19       MS. ROTH:  Before we go off the record
20 can you restate the question that you asked in
21 connection with CBP and FBI in secondary
22 inspections?

308

1 BY MS. HOMER:
2    Q   I want to know whether -- whether the
3 CBP brings the FBI into secondary inspection
4 interviews with individuals listed on the TSDB?
5       MS. ROTH:  Thank you.  We can go off.
6       THE VIDEOGRAPHER:  We are going off of
7 the record.  The time is 4:59 p.m.
8       (The proceedings recessed from 4:59 p.m.
9 to 5:16 p.m.)
10       THE VIDEOGRAPHER:  We are back on the
11 record.  The time is 5:16 p.m.
12       MS. ROTH:  Counsel, during our break we
13 had the opportunity to consult on some questions
14 where the witness was concerned about the
15 privileged nature of the answers to the questions.
16 So with your permission we would like to begin by
17 clarifying what we are able to on those questions.
18       The first one was whether or not -- and
19 please do correct me if I misunderstood the
20 question.  But is biometric data that is collected
21 by CBP, to the extent that it is collected by CBP,
22 matched against biometric data that TSC possesses.

309

1       MS. HOMER:  Correct.
2       MS. ROTH:  So on that question the
3   witness will answer to the extent he is able to.
4       THE WITNESS:  The answer is yes.  When
5   biometrics are available and it's necessary to
6   verify the identity we would collect biometrics to
7   be able to match them up to the TSC.
8       MS. HOMER:  Thank you.  That's
9   satisfactory.
10      MS. ROTH:  The second was whether or not
11  the CBP's use of license plate readers, if
12  information that comes back from that reader is
13  matched in any way against TSDB information.  Is
14  that right?  So, the witness can answer that to
15  the extent he's able without waiving the law
16  enforcement privilege.
17      THE WITNESS:  So if an individual is a
18  TSDB match there could be an instance where a
19  lookout is entered on the vehicle as the
20  registered owner of that vehicle.
21      MS. HOMER:  Okay.  Thank you.
22      MS. ROTH:  And the last question was

310

1   whether or not in the course of conducting
2   secondary inspections CBP may involve FBI in
3   secondary inspections.  And the witness can answer
4   that question to the extent it doesn't waive law
5   enforcement privilege.
6       THE WITNESS:  The answer is, yes, along
7   with any other agency that we may need their
8   assistance.  ATF for firearms, DEA for drugs, ICE,
9   FBI.  If we can use their assistance in completing
10  that secondary inspection they may witness the
11  secondary inspection.
12  BY MS. HOMER:
13      Q   Does the FBI ever participate in the
14  secondary inspection of an individual listed in
15  the TSDB?
16      MS. ROTH:  I'm going to object to the
17  extent that it calls for law enforcement
18  privileged information.  If you think you can
19  answer that question without waiving the
20  privilege, you can.
21      THE WITNESS:  Secondary inspection is
22  completed by Customs and Border Protection.  That

311

1   determination is made by CBP.
2   BY MS. HOMER:
3       Q   Do FBI officers ever ask questions of an
4   individual within the custody of the CBP?
5       MS. ROTH:  I'm going to object to the
6   extent that that calls for a legal conclusion and
7   as to vagueness and to the extent it implicates
8   law enforcement privileged information.
9       THE WITNESS:  If they are there, they
10  may.  As a general practice secondary inspections
11  are completed by CBP.  We're -- that's what we do.
12  That's our role.  If they are present and they can
13  assist in some way, I guess there is a possibility
14  they could possibly ask the questions.
15  BY MS. HOMER:
16      Q   Does the CBP ever refer individuals from
17  secondary inspection to the authority of the FBI
18  to ask those individuals questions?
19      MS. ROTH:  I'm going to object on the
20  basis of the law enforcement privilege and
21  instruct the witness not to answer that question.
22      Counsel, there was one more

312

1   clarification we wanted to lodge if that's okay
2   with you.  And that is you asked earlier as to the
3   2018 directive on the border search of electronic
4   devices if advanced searches of electronic devices
5   for individuals who are listed on the TSDB are
6   required to be conducted by CBP.  And I think the
7   witness wants to clarify his answer to that
8   question.
9       THE WITNESS:  They are authorized to,
10  but required is a strong word.  It's certainly a
11  factor that could be considered where an officer
12  may choose to do an advanced search, but to use
13  the word required is very, very firm.
14  BY MS. HOMER:
15      Q   Is it the CBP's general practice to
16  conduct advanced searches of electronic devices of
17  individuals listed in the TSDB?
18      MS. ROTH:  Object as to vagueness and to
19  the extent that calls for law enforcement
20  privileged information.  You can answer if you are
21  able.
22      THE WITNESS:  It is authorized.  It is

Case 1:16-cv-00375-AJT-JFA   Document 306-30   Filed 03/12/19   Page 81 of 91 PageID# 14521
Transcript of Randy Howe, Designated Representative
Conducted on March 22, 2018

79 (313 to 316)

313

1  mentioned in the directive in 5.1.4. It depends
2  upon how you define the word generally. It's
3  written in the directive and it is authorized, so
4  it does happen.
5  BY MS. HOMER:
6    Q   Would you say that it happens in the
7  majority of instances that a TSDB individual --
8  let me start that over.
9    When an individual listed in the TSDB
10 undergoes secondary inspection by the CBP does the
11 CBP in the majority of such instances conduct an
12 advanced search on the electronics?
13   MS. ROTH: I'm going to object as to
14 vagueness. Object to the extent it calls for law
15 enforcement privileged information and foundation.
16 You are asking about a policy that is not even
17 three months old.
18   THE WITNESS: It's tough to state that
19 it is generally. It's in the directive. They're
20 authorized.
21 BY MS. HOMER:
22   Q   Prior to January of 2018 was it the

314

1  CBP's practice to copy information off of the
2  electronic devices of individuals listed in the
3  TSDB?
4    MS. ROTH: Objection to the extent that
5  calls for law enforcement privileged. You know,
6  if counsel wants to put in front of my client the
7  previous policy that was in place, I think that
8  would be the appropriate way to have him answer
9  questions about the previous policy.
10   THE WITNESS: That would refresh my
11 memory.
12 BY MS. HOMER:
13   Q   Are individuals listed in the TSDB
14 permitted to observe the CBP's officers search of
15 their electronic devices?
16   **A   I think that is addressed in the**
17 **directives. I think when able they're permitted.**
18 **But there may be instances where due to law**
19 **enforcement sensitivity where they are not**
20 **permitted to. I think it is in the directive.**
21   Q   Okay.
22   **A   Unless it is national security law**

315

1  **enforcement, some kind of safety issue. But**
2  **generally, yes.**
3    Q   Okay. Is an individual who is listed in
4  the TSDB considered to present a national security
5  consideration that would make it inappropriate to
6  permit that individual to remain present during
7  the electronic search?
8    **A   I'm just rereading 5.1.6. I don't think**
9  **necessarily that the fact that they are TSDB.**
10 **There are other factors that contribute to the**
11 **fact that they would not be permitted to view it.**
12   Q   Has it happened that individuals who are
13 listed at the TSDB have had their electronic
14 devices subjected to an advanced search and not
15 been able to observe the search itself?
16   MS. ROTH: Objection as to vagueness and
17 as to foundation.
18   THE WITNESS: I'm not aware of but I
19 wouldn't be surprised to know that that is the
20 case.
21 BY MS. HOMER:
22   Q   What action does the CBP take if a

316

1  traveler provides a DHS TRIP redress number at a
2  land border?
3    **A   It is something that's probably recorded**
4  **in the system, recorded within the secondary**
5  **inspection results.**
6    Q   If an individual both has a DHS TRIP
7  redress number and is listed on the TSDB will that
8  individual be flagged by TECS as being listed on
9  the TSDB?
10   MS. ROTH: Objection to the extent that
11 calls for law enforcement privileged information
12 and vagueness.
13   THE WITNESS: Yeah. I don't understand
14 the question.
15 BY MS. HOMER:
16   Q   Okay. Let me ask it better. Is there
17 ever a circumstances in which a DHS redress number
18 would override an individual's presence on the
19 TSDB?
20   MS. ROTH: Objection as to vagueness.
21   THE WITNESS: Somebody is a match to a
22 TSDB record, they're an exact match; they're an

Transcript of Randy Howe, Designated Representative
Conducted on March 22, 2018

317

1 exact match.
2 BY MS. HOMER:
3    Q   If they are an exact match than their
4 DHS TRIP redress number would be irrelevant to the
5 fact that they were a match?
6    **A   DHS TRIP redress number is a number that**
7 **documents that they filed a complaint. It doesn't**
8 **mean that anything has changed.**
9    Q   Does the CBP use the selectee
10 designation within the TSDB at its land borders?
11        MS. ROTH: Objection to the extent that
12 calls for law enforcement privileged information
13 and to foundation.
14        THE WITNESS: Selectee is a term that is
15 used by TSA. I can't comment on how TSA handles
16 selectees.
17 BY MS. HOMER:
18    Q   The selectee term is not a term
19 ordinarily used by CBP for the purposes of its
20 either primary or secondary inspections?
21    **A   It is not a term that I'm familiar with.**
22    Q   Does the CBP ever use the term expanded

318

1 selectee during the course of it primary or
2 secondary inspections?
3        MS. ROTH: Objection to the extent that
4 calls for law enforcement privileged information.
5        THE WITNESS: I'm not familiar with that
6 term.
7 BY MS. HOMER:
8    Q   Does the presence of a DHS TRIP redress
9 number in a traveler's file ever change the nature
10 of the CBP's operational response to that
11 individual?
12        MS. ROTH: Object to the extent that
13 calls for law enforcement privileged information.
14 You can answer if you can.
15        THE WITNESS: Again, the DHS TRIP number
16 is just -- it's a file number from a complaint
17 that was filed. If the DHS TRIP inquiry and
18 coordination with the components and the TSC led
19 to something changing that would all be seamless
20 to us, if they downgraded or removed somebody.
21 But the mere fact that they filed a complaint
22 doesn't mean things are going to change.

319

1 BY MS. HOMER:
2    Q   Okay. So to restate your answer, if an
3 individual had been provided some relief through
4 the DHS TRIP process, you would expect that relief
5 to show up in one of the systems that CBP relies
6 on to evaluate individuals?
7    **A   What do you mean by relief?**
8    Q   Okay. I'll rephrase. If an individual
9 had been removed from the TSDB as a result of the
10 DHS TRIP redress process, then CBP would rely on
11 the TSDB itself for that record not on a DHS TRIP
12 redress number. Is that fair?
13    **A   I think you are asking me if they filed**
14 **a DHS TRIP and it resulted in them being removed**
15 **from the TSDB, would we rely on the DHS TRIP**
16 **number?**
17    Q   Right.
18    **A   The DHS TRIP number would be a moot**
19 **point because the person wouldn't be a TSDB**
20 **lookout. So there would be no need for the DHS**
21 **TRIP number.**
22    Q   If a traveler has a DHS TRIP redress

320

1 number but doesn't provide it to the CBP, does
2 that effect in any way how the CBP may evaluate
3 that traveler?
4    **A   No.**
5        MS. HOMER: I would like to mark the
6 next exhibit for today, which I believe is
7 Exhibit 4.
8        (Whereupon, Exhibit No. 4 was marked for
9 identification)
10 BY MS. HOMER:
11    Q   Do you recognize this document?
12    **A   I don't know if I've ever seen it before**
13 **but I see what it.**
14    Q   What is this document?
15    **A   It is a snapshot summary of CBP facts**
16 **and figures.**
17    Q   And you see at the bottom of page 2 it
18 says, March 2018?
19    **A   Okay.**
20    Q   And then at the bottom, right of page
21 one it says; Based on fiscal year 2017 data?
22    **A   Okay.**

Transcript of Randy Howe, Designated Representative
Conducted on March 22, 2018

81 (321 to 324)

321

1      Q    So would you agree that this presents a
2 snapshot of CBP facts and figures about its
3 operations in fiscal year 2017?
4      A    Yes.
5           MS. ROTH:  I'm going to object to the
6 extent that I don't believe the witness is able to
7 authenticate this document, having testified that
8 he's never seen it before and counsel for
9 defendants has also never seen it before.  So I
10 would like to proceed with the caveat that we
11 don't know if this is -- I'm not suggesting that I
12 doubt that you've fabricated the document, but
13 without independently seeing this document the
14 witness cannot authenticate it.
15          MS. HOMER:  I will represent, subject to
16 your later verification, that this is a document
17 currently available on the U S Customs and Border
18 Protection website.
19 BY MS. HOMER:
20     Q    If you look at the top of right quadrant
21 of page 1, do you see where it says; On a typical
22 day, CBP:  And then provides a list of numbers and

322

1 statistics?
2      A    I do.
3      Q    So the first number says on a typical
4 day, presumably in 2017, CBP processed 1,880,300
5 passengers and pedestrians.  Do you see that?
6      A    I do.
7      Q    To your knowledge is that number
8 accurate about -- accurately represent the daily
9 passenger processing total that travel through CBP
10 Ports of Entry?
11          MS. ROTH:  I'm going to object on the
12 basis that this document speaks for itself and,
13 again, as to his ability to authenticate this
14 document.  You are welcomed to go down each number
15 and ask if he thinks it is accurate, but again, if
16 that is how you want to use your time that is
17 fine.
18          MS. HOMER:  I'm not going to go through
19 all of them, I promise.
20          MS. ROTH:  You can answer the question.
21 BY MS. HOMER:
22     Q    Is just over a million travelers per day

323

1 at U S Ports of Entry a generally accurate figure.
2      A    It seems pretty accurate.
3      Q    So if you skip down a couple of bullets,
4 it says that on a typical day CBP conducted 851
5 apprehensions between U S Ports of Entry.  Do you
6 see that?
7      A    I do.
8      Q    What's an apprehension?
9      A    It is interdicting somebody attempted to
10 enter the U S between the Ports of Entry.
11     Q    Presumably that person does not have
12 authorization to enter the U S between the U S
13 Port of Entry?
14     A    That generally would be the U S Border
15 Patrol's responsibility.
16     Q    How many of those 851 apprehensions were
17 of individuals listed on the -- listed on the
18 TSDB?
19          MS. ROTH:  I'm going to object, calls
20 for speculation.  Again counsel, the witness
21 testified he's never seen this document before
22 which means he's never seen the number before

324

1 presumably, so I don't know how he is expected to
2 answer a question.
3          THE WITNESS:  Do you realize these
4 apprehensions are not through a Port of Entry,
5 they are in between the Port of Entry.  So at the
6 land borders, talking about the Mexican, Canadian
7 border, somebody entering the U S not going
8 through a Port of Entry, not seeing the blue
9 shirt, but interacting with the green shirt,
10 Border Patrol agent.
11 BY MS. HOMER:
12     Q    And is the Border Patrol a related
13 agency to Customs and Border Protection.
14     A    They sure are.  They're the component
15 that protects in between the Ports of Entry.
16     Q    And so would it be within CBP's
17 knowledge how many apprehensions that occur
18 between Ports of Entry are of individuals who are
19 also listed on the TSDB?
20     A    That would be U S Border Patrol's
21 knowledge of that number which is part of Customs
22 and Border Protection.

Transcript of Randy Howe, Designated Representative
Conducted on March 22, 2018

325

1    Q   I want to skip down just a couple more
2  bullets, where it says; On a typical day CBP
3  identified 1607 individuals with suspected
4  national security concerns.
5       Does, to your knowledge, suspected
6  national security concerns mean individuals who
7  are listed on the TSDB?
8    **A   I don't know.  I don't know what that**
9  **dataset counts.**
10   Q   Do you know how many encounters with
11 persons listed on the TSDB the CBP has each year?
12      MS. ROTH: Objection to that if it calls
13 for law enforcement privileged information.
14      THE WITNESS: I'm not familiar with the
15 number.
16      MS. HOMER: I would like to mark
17 Exhibit 5 to this deposition.
18      (Whereupon, Exhibit No. 5 was marked for
19 identification)
20 BY MS. HOMER:
21   Q   Do you recognize this document?
22   **A   I do.**

326

1    Q   Did you have any involvement in helping
2  prepare this document?
3    **A   No.**
4    Q   Did CBP as an agency have any
5  involvement in helping to prepare this document?
6    **A   I don't know.**
7    Q   And for the record, the title of this
8  document is Executive Order 13780; Protecting the
9  Nation from Foreign Terrorist Entry into the
10 United States.  Initial Section 11 Report.  What
11 is your understanding as to why this report was
12 prepared?
13   **A   Never seen it before intimately so I**
14 **would have to read it.**
15      MS. ROTH: I will add the objection to
16 the extent that the report itself states why the
17 report was created, the document speaks for
18 itself.
19 BY MS. HOMER:
20   Q   Can you please turn to page 9?  In the
21 third paragraph I'm going to read the first
22 sentence.  It says; In fiscal year 2017 DHS had

327

1  2,554 encounters with individuals on the Terrorist
2  Watch List (also known as the FBI's Terrorist
3  Screening Database) traveling to the
4  United States.  Did I read that correctly?
5    **A   Yes.**
6    Q   Were all of those 2,554 encounters with
7  the CBP to your knowledge?
8    **A   To my knowledge, yes.**
9    Q   Is that number of encounters with
10 individuals on the TSDB accurate to your
11 knowledge?
12   **A   To my knowledge it seems accurate.**
13   Q   To your knowledge does the CBP have
14 around 2,500 encounters with individuals on the
15 Terrorist Watch List traveling to the
16 United States every year.
17      MS. ROTH: Objection to the foundation.
18 Objection to the extent that mischaracterizes what
19 the document states.  Objection, calls for
20 speculation.
21      THE WITNESS: The document states that
22 is what we had last year.

328

1 BY MS. HOMER:
2    Q   How many times per year does the CBP
3  arrest an individual who is listed in the TSDB?
4    **A   I don't have that number.**
5    Q   Do you know how many individuals the CBP
6  arrested who were listed on the TSDB in 2017?
7    **A   I thought you just asked that.  No, I**
8  **don't know.**
9    Q   I asked every year.  I was trying to be
10 a bit more specific?
11   **A   No, I don't know.**
12   Q   Does the CBP participate in the Watch
13 Listing Advisory Council?
14   **A   I believe we do.**
15   Q   What is the CBP's role in the Watch
16 Listing Advisory Council?
17   **A   CBP has a representative that sits on**
18 **that council to provide feedback on the watch list**
19 **process and what the operational impact is on CBP.**
20   Q   Are you the representative for CBP to
21 the Watch Listing Advisory Council?
22   **A   I am not.**

Transcript of Randy Howe, Designated Representative
Conducted on March 22, 2018

329

1    Q    What is title of the individual at the
2  CBP who is the representative to the Watch Listing
3  Advisory Council?
4    **A    I don't know if it is one person or a**
5  **few people that sit there.  So I think there's a**
6  **few different people in different titles.**
7    Q    Are individuals within the National
8  Targeting Center on the Watch Listing Advisory
9  Council?
10   **A    I believe so.**
11   Q    Are there any individuals to you
12 knowledge from other sub-components of CBP that
13 sit on the Watch Listing Advisory Council?
14   **A    Not that I'm aware of.**
15   Q    What is CBP's role in the watch listings
16 process?
17       MS. ROTH:  Objection as to vagueness.
18       THE WITNESS:  I'm not sure what that
19 means.  That is a big question.
20 BY MS. HOMER:
21   Q    Does the CBP help to establish watch
22 listing guidance?

330

1    **A    We participate in the council.  We**
2  **provide feedback.  And we're one of the agencies**
3  **that interact with the TSC in that process for**
4  **screening individuals for -- and screening and**
5  **vetting for terrorism, so we're one of a few.**
6    Q    Does the Watch Listing Advisory Council
7  promulgate an official watch listing guidance
8  document?
9    **A    I believe there is, yeah.**
10   Q    What is the most recent version of that
11 watch listing guidance document?
12   **A    Not entirely sure, maybe -- I don't**
13 **know, a couple of years old maybe.  I don't know.**
14   Q    Would the 2015 watch listing guidance
15 sound correct to you?
16   **A    Yes.**
17   Q    Does CBP consider the 2015 watch listing
18 guidance, or whatever the most recent version is
19 to be binding on how CBP operates it own watch
20 listing practices?
21       MS. ROTH:  Objection to the extent that
22 calls for a legal conclusion.

331

1        THE WITNESS:  Binding is a term I
2  wouldn't use, but, you know, we sit on that
3  advisory council with other entities and help
4  formulate the guidance.  What we do in our policy
5  and how we implement it is CBP's policy.
6  BY MS. HOMER:
7    Q    Does CBP follow the current watch
8  listing guidance with respect to its own
9  practices?
10   **A    I believe we do.**
11   Q    Is there any aspect of the watch listing
12 guidance with which CBP is dissatisfied?
13       MS. ROTH:  Object to the question to the
14 extent that it calls for deliberative process,
15 privilege and instruct the witness not to answer.
16 BY MS. HOMER:
17   Q    Does the CBP consider the watch list to
18 be an effective tool at preventing terrorism?
19       MS. ROTH:  Object as to vagueness.  You
20 can answer if you understand the question.
21       THE WITNESS:  The CBP's mandate is
22 national security, border security.  The U S

332

1  government uses one repository for known and
2  suspected terrorists.  So that TSC watch list is
3  very important for us to be effective in our
4  mission.
5  BY MS. HOMER:
6    Q    Does the CBP consider the current TSDB
7  to be an accurate list of known and suspected
8  terrorists?
9        MS. ROTH:  Objection as to vagueness.
10       THE WITNESS:  I think we rely on our
11 close partnerships with other agencies.  And
12 again, it is the single repository for this
13 effort.
14 BY MS. HOMER:
15   Q    Does the CBP think there are too many
16 people on the TSDB?
17       MS. ROTH:  Objection as to vagueness.
18       THE WITNESS:  That is tough to answer.
19 I mean there is no quota.  We are not looking for
20 a number.  We are looking to protect the nation
21 and whatever the list is, it is.
22

333

1 BY MS. HOMER:
2    Q    Does CBP think that right now there are
3 individuals listed on the TSDB who do not actually
4 have any ties to terrorism?
5         MS. ROTH:  Objection to the extent that
6 calls for law enforcement privileged information.
7 You can answer.
8         THE WITNESS:  If we did we would share
9 that view with the appropriate authorities, mainly
10 the TSC for their review and determination.
11 BY MS. HOMER:
12    Q    Has the CBP's use of the TSDB at border
13 inspections prevented an act of terrorism?
14        MS. ROTH:  Objection as to vagueness.
15        THE WITNESS:  It is impossible to
16 speculate what we prevented.
17 BY MS. HOMER:
18    Q    Has the CBP ever publicly identified an
19 act of terrorism that its inspective efforts
20 prevented?
21    **A    Inspective efforts that we've prevented?**
22 **No, not that I'm aware of.**

334

1    Q    Has the CBP ever publicly identified an
2 act of terrorism that it in any capacity helped to
3 prevent?
4    **A    Not that I'm aware of.**
5    Q    Why does the CBP consider the TSDB to be
6 an effective tool at preventing terrorism?
7    **A    I think I will restate what I said four**
8 **questions ago.  National security, border security**
9 **is our mandate, protecting the nation.  The sole**
10 **repository for the watch listed individuals is**
11 **managed by the FBI's TSC.  And it is a means for**
12 **us to identify individuals that are of concern.**
13    Q    In the last ten years how many
14 individuals listed on the TSDB has the CBP
15 arrested?
16        MS. ROTH:  Objection.  Asked and
17 answered.
18        THE WITNESS:  Yeah, I don't know.  That
19 was before.
20 BY MS. HOMER:
21    Q    Do you know if it is more than ten?
22    **A    I don't know.**

335

1    Q    More than 50?
2    **A    I don't know.  I mean we can go back to**
3 **the snapshot, whether there's 1600 individuals in**
4 **a day, so I don't know.**
5    Q    Yeah.  Okay.  Would the CBP be able to
6 calculate how many individuals it has arrested who
7 were also listed on the TSDB at the time of their
8 arrest?
9    **A    I'm sure we have that information.**
10    Q    Would the CBP be able to calculate how
11 many U S citizens it has arrested who were listed
12 on the TSDB at the time of its arrest -- their
13 arrest?
14    **A    I'm sure that is something we can do.**
15    Q    To your knowledge has the CBP ever
16 calculated the number of individuals listed on the
17 TSDB who it has arrested?
18    **A    I don't know.  I'm sure we have.**
19    Q    Does the CBP prepare any regular reports
20 about the encounters it has with individuals
21 listed on the TSDB?
22        MS. ROTH:  Objection to the extent that

336

1 calls for law enforcement privileged information.
2        MS. HOMER:  And it was actually vague.
3        MS. ROTH:  And vague.
4        MS. HOMER:  It was.
5 BY MS. HOMER:
6    Q    Let me rephrase.  Does the CBP ever
7 prepare aggregate statistics on the details of its
8 encounters with individuals listed on the TSDB?
9    **A    I believe they're probably incorporated**
10 **with the daily snapshot you provided me.**
11    Q    Just for the record, I think that
12 snapshot is broader than just individuals listed
13 on the TSDB.
14    **A    It's within there.**
15    Q    Oh, it's within there.  So is it your
16 testimony that if you choose to do so the CBP could
17 break down the numbers listed in the snapshot to
18 only instances that were connected to individuals
19 listed in the TSDB?
20    **A    If it wasn't law enforcement sensitive,**
21 **sure.**
22    Q    So, is it your testimony that the CBP

Transcript of Randy Howe, Designated Representative
Conducted on March 22, 2018

337

1 could calculate aggregate statistics about
2 individuals listed in the TSDB, but it may not be
3 able to publicly disclose those statistics?
4    **A    Yes.**
5    Q    Okay.  Does the CBP ever assess whether
6 it is using TSDB information effectively?
7        MS. ROTH: Objection as to vagueness.
8        THE WITNESS: We re-evaluate the way we
9 do business daily and we reevaluate our processes
10 to look for improvements, improve our method of
11 doing our business all the time.
12 BY MS. HOMER:
13    Q    Can you identify any examples of ways in
14 which the CBP has changed any policy or practices
15 related to individuals on the TSDB?
16        MS. ROTH: Objection to the extent it
17 calls for law enforcement sensitive privileged
18 information.  But if you can answer in general non
19 privileged terms you can.
20        THE WITNESS: I can't point to specific
21 examples of what we changed, but we evolve the way
22 we do business day-to-day to improve our process,

338

1 to streamline it with the overall goal of
2 facilitating people.
3 BY MS. HOMER:
4    Q    Has the CBP ever refused to grant an
5 individual global entry status because they are
6 listed on the TSDB?
7        MS. ROTH: Objection to the extent that
8 calls for law enforcement privileged information.
9 You can answer if you can.
10        THE WITNESS: That is one of the
11 determinations.  It is almost as though they are
12 applying for admission for the U S.  But if they
13 were on a terrorist watch list they would not be
14 permitted a trusted traveler document.
15 BY MS. HOMER:
16    Q    Has the CBP ever revoked the global
17 entry status of an individual because that
18 individual was added to the TSDB?
19        MS. ROTH: Objection to the extent that
20 it calls for law enforcement privileged
21 information.
22        THE WITNESS: I don't know firsthand but

339

1 I wouldn't be surprised if that was the case.
2 BY MS. HOMER:
3    Q    Has CBP ever refused to grant entry to
4 the relative of an individual who was listed on
5 the TSDB even though the relative themselves was
6 not listed on the TSDB?
7        MS. ROTH: Objection to the extent that
8 it calls for law enforcement, privileged
9 information and as to vagueness.
10        THE WITNESS: You're asking if somebody
11 was deemed inadmissible just by being a relative?
12 BY MS. HOMER:
13    Q    Yes.
14    **A    I'm not sure if that is privileged or**
15 **not.**
16    Q    So you know the answer to that question
17 but you're not sure if you can provide it?
18    **A    Yeah.**
19        MS. ROTH: Counsel, is there -- perhaps
20 we can get around the privilege if you rephrase
21 the questions.  You're referring to an alien or
22 non alien.

340

1        MS. HOMER: That is fair.  Let me see if
2 I can try that.
3 BY MS. HOMER:
4    Q    Has the CBP ever refused to permit a
5 foreign national to enter the United States
6 because one of the foreign national's relatives is
7 listed on the TSDB?
8        MS. ROTH: I'll going to still object to
9 the extent it calls for law enforcement privileged
10 information.
11        THE WITNESS: They could be found
12 inadmissible.
13 BY MS. HOMER:
14    Q    They could be found inadmissible?
15    **A    Yes.**
16    Q    Okay.  Has the CBP ever fired a CBP
17 employee because that employee was added to the
18 TSDB?
19        MS. ROTH: Objection, to the extent that
20 it calls for law enforcement privileged
21 information.
22        THE WITNESS: I do not know.

Transcript of Randy Howe, Designated Representative

Conducted on March 22, 2018

341

BY MS. HOMER:

2     Q    Has CBP ever revoked the customs seal
3  credential on an individual because that
4  individual was subsequently added to the TSDB?
5          MS. ROTH: Objection that it calls for
6  law enforcement privileged information.
7          THE WITNESS: I don't know for a fact
8  but if that was the case, that would be a reason
9  to have them revoked.
10 BY MS. HOMER:
11    Q    And to circle back, would it -- would it
12 be a permissible reason for the CBP to fire an
13 employee if the employee had been added to the
14 TSDB?
15    A    I don't know.  I mean that's -- if we
16 had an employee that was a terrorist?  Is that
17 essentially what you are asking me?
18    Q    I'm asking you if you had an employee
19 who was listed on the TSDB?
20    A    Okay.  That would probably be a concern
21 for us.
22    Q    And that concern might lead to firing

342

1  the employee?
2     A    That would be a concern for us that
3  potentially could lead to their firing.
4     Q    Has the CBP ever revoked for permission
5  for an individual to participate in the Visa
6  waiver program because the individual was listed
7  on the TSDB?
8     A    I'm sure --
9          MS. ROTH: I'm sorry.  Objection to the
10 extent that calls for law enforcement privileged
11 information.
12         THE WITNESS: I'm sure that is the case.
13 BY MS. HOMER:
14    Q    Has the CBP ever revoked permission for
15 a foreign national to participate in the Visa
16 waiver program because one of those foreign
17 nationals' relatives was listed on the TSDB?
18         MS. ROTH: Objection to the extent it
19 calls for law enforcement privileged information.
20         THE WITNESS: I'm sure that would be the
21 case.
22

343

1  BY MS. HOMER:
2     Q    Have you read the complaint in this
3  case?
4     A    You are talking about the main
5  complaint?
6     Q    Yeah.
7     A    Most of it.
8     Q    Most of it.  Are you aware of the claims
9  made by plaintiff Anas Elhady about the conditions
10 of his detention by the CBP in Michigan?
11    A    That doesn't sound familiar.
12    Q    Do you recall reviewing any facts
13 regarding an individual who was detained by the
14 CBP for more than six hours in a cold room with
15 bright lights, without his jacket or shoes?
16    A    I'm not familiar with that.
17    Q    Do you have any -- or as a result of
18 this lawsuit, has the CBP changed any of its
19 procedures regarding the secondary screening of
20 individuals?
21    A    I don't know.  I'm not sure.
22    Q    As a result of this lawsuit, has the CBP

344

1  evaluated whether it should make any changes to
2  its procedures regarding the secondary screenings
3  of individuals?
4          MS. ROTH: I'm going to objection on the
5  basis it is deliberative process privilege and
6  instruct the witness not to answer that question.
7  BY MS. HOMER:
8     Q    Has the CBP taken any disciplinary
9  action against any CBP officer who interacted with
10 any of the plaintiffs in this case?
11    A    I do not know.
12    Q    Does CBP believe it would contribute to
13 national security to arrest all individuals
14 currently listed on the TSDB?
15         MS. ROTH: Objection.  Vagueness.
16         THE WITNESS: You may have to restate
17 that question.  I apologize.
18 BY MS. HOMER:
19    Q    That's okay.  In CBP's opinion would it
20 enhance national security to arrest all
21 individuals currently listed on the TSDB?
22         MS. ROTH: Same objection?

345

1     THE WITNESS:  That is a speculation that
2  I'm not prepared to make.
3  BY MS. HOMER:
4     Q   Why do you consider that to be
5  speculation?
6     **A   Many of those individuals are not in the**
7  **United States.**
8     Q   Does CBP believe it would be
9  appropriate -- I'm sorry.  Scratch that.
10       Does CBP believe it would enhance
11 national security to arrest all individuals listed
12 on the TSDB who are currently physically located
13 in the United States?
14       MS. ROTH:  Same objection as to
15 vagueness.
16       THE WITNESS:  Yeah, there are various
17 reasons why somebody might be on the TSDB and that
18 wouldn't be up to CBP to make that determination.
19 BY MS. HOMER:
20    Q   Is it CBP's understanding that
21 individuals may be listed on the TSDB even though
22 there is not enough derogatory information

346

1  available about that individual to justify their
2  arrest?
3        MS. ROTH:  Objection as to vagueness and
4  as to foundation.
5        THE WITNESS:  Yeah, I don't understand
6  your question.
7  BY MS. HOMER:
8     Q   Is it possible that there are
9  individuals listed on the TSDB who have not
10 actually engaged in criminal conduct?
11       MS. ROTH:  Objection as to vagueness.
12 Objection, it calls for legal conclusion.
13       THE WITNESS:  I don't know these
14 individuals and their circumstances for being on
15 the TSDB.
16       MS. HOMER:  Can we go off of the record
17 for a quick minute?
18       THE VIDEOGRAPHER:  We are going off of
19 the record.  The time is 6:08 p.m.
20       MS. ROTH:  How much time is left?
21       THE VIDEOGRAPHER:  We have -- it is
22 seven more minutes, almost six minutes and 90

347

1  seconds.
2        (Whereupon, a recess occurred from
3  6:08 p.m. until 6:19 p.m.)
4        THE VIDEOGRAPHER:  We are back on the
5  record.  The time is 6:19 p.m.
6  BY MS. HOMER:
7     Q   Does the CBP ever refer children to
8  secondary inspection?
9     **A   Sure.**
10    Q   Are the CBP's processes during secondary
11 inspection different for children?
12       MS. ROTH:  Objection to the extent that
13 calls for law enforcement privileged information.
14 You can answer if you are able to.
15       THE WITNESS:  Well, the sensitivities of
16 dealing with children are different than adults .
17 BY MS. HOMER:
18    Q   Does CBP ever encounter children who are
19 listed on the TSDB?
20       MS. ROTH:  Objection to the extent that
21 calls for law enforcement privileged information.
22       THE WITNESS:  We may.

348

1  BY MS. HOMER:
2     Q   Does the CBP conduct screening -- or
3  sorry.  Does the CBP adjust its operational
4  responses for individuals listed on the TSDB if
5  that individual is a child?objection to the extent
6  that calls for law enforcement privileged
7  information and asked and answered.
8        THE WITNESS:  Yeah.  I thought I already
9  answered that.  We adjust accordingly to
10 sensitivities in dealing with a child.
11 BY MS. HOMER:
12    Q   Does CBP assess the effectiveness of its
13 use of TSDB information?
14       MS. ROTH:  Objection, vague.  Objection,
15 asked and answered.
16       THE WITNESS:  I'm not aware of an
17 assessment.  I think that is the answer I gave
18 previously.
19 BY MS. HOMER:
20    Q   How does CBP assess the effectiveness of
21 its use of TSDB information?
22       MS. ROTH:  Objection as to vagueness.

349

1     THE WITNESS:  I'm not sure what you
2  mean.
3  BY MS. HOMER:
4     Q   I guess the answer is implied from the
5  answer to your previous question?
6     **A   If an individual has borrowed the — let**
7  **me start over.**
8        **If an individual has borrowed a car that**
9  **is owned by a different individual who is listed**
10 **on the TSDB, will the driver be subjected to**
11 **secondary inspection.**
12    MS. ROTH:  Objection as to vagueness.
13 Objection to the extent it calls for law
14 enforcement privileged information.  Objection, it
15 calls for speculation.
16    THE WITNESS:  You're asking me if
17 somebody else, if somebody is driving a vehicle
18 owned by a TSDB?
19 BY MS. HOMER:
20    Q   Yes.
21    **A   It is difficult to speculate, but if the**
22 **vehicle is owned by a TSDB, there mostly likely**

350

1  **are going to be some questions that are going to**
2  **follow.**
3     Q   And based on your earlier answer about
4  how initial screeners spend two minutes or less
5  with individuals would it be likely that those
6  additional questions would occur in secondary
7  inspection?
8     **A   I would say it is likely, likely to**
9  **happen in secondary.**
10    Q   Does CBP take steps to minimize the
11 public embarrassment to individuals who are
12 flagged as armed and dangerous during inspections?
13    MS. ROTH:  Objection as to vagueness.
14 And objection to the extent that its calls for law
15 enforcement privileged information.  If you
16 understand the question you can answer.
17    THE WITNESS:  I don't understand what
18 you mean by public embarrassment.
19 BY MS. HOMER:
20    Q   Does CBP, as part of its operational
21 response to individuals who are flagged as armed
22 and dangerous, ever apprehend those individuals in

351

1  public.
2     MS. ROTH:  Objection to the extent it
3  calls for a legal conclusion.  And objection as to
4  vagueness.
5     THE WITNESS:  All of the work that we do
6  is in the public, in primary.
7  BY MS. HOMER:
8     Q   Would the CBP expect that other members
9  of the public who see the CBP handcuffing an
10 individual would assume that the handcuffed
11 individual had done something wrong?
12    MS. ROTH:  Objection, calls for
13 speculation.  Objection, vagueness.
14    THE WITNESS:  I can't speculate what
15 those people believe or see or understand.  Our
16 focus is on the matter at hand.  And if somebody
17 is possibly armed and dangerous, for the safety
18 and security of those people, the officers and the
19 public.
20 BY MS. HOMER:
21    Q   Does the CBP undertake any assessments
22 of whether its border inspection practices deter

352

1  legitimate travel?
2     **A   I think that was the second question you**
3  **asked me this morning.  And I don't know the**
4  **answer to that.**
5     MS. HOMER:  Are we out of time?  No
6  further questions from plaintiff's counsel.
7     MS. ROTH:  No questions from defendant.
8     THE VIDEOGRAPHER:  This marks the end of
9  the deposition of Randy Howe, corporate designee
10 for Customs and Border Protection.  We are going
11 off of the record at 6:25 p.m.
12    (Whereupon, at 6:25 p.m., the above
13 proceedings was adjourned.)
14
15
16
17
18
19
20
21
22

Transcript of Randy Howe, Designated Representative
Conducted on March 22, 2018

89 (353 to 356)

353

1        CERTIFICATE OF SHORTHAND REPORTER
2        I, DONNA M. LEWIS, RPR, the officer
3    before whom the foregoing deposition was taken, do
4    hereby certify that the foregoing transcript is a
5    true and correct record of the testimony given;
6    that said testimony was taken by me
7    stenographically and thereafter reduced to
8    typewriting under my direction; that reading and
9    signing was not requested; and that I am neither
10   counsel for, related to, nor employed by any of
11   the parties to this case and have no interest,
12   financial or otherwise, in its outcome.
13        IN WITNESS WHEREOF, I have hereunto set
14   my hand and affixed my notarial seal this 28th day
15   of March, 2018.
16
17
18   _Donna M Lewis_
19   My commission expires: March 14, 2018
20
21
22