# Elhady Plaintiffs
# MSJ Exhibit 28



# Transcript of Matthew J. DeSarno, Designated Representative

**Date:** April 9, 2018
**Case:** El Hady, et al. -v- Kable, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

**Page 1**

```
 1           UNITED STATES DISTRICT COURT
 2           EASTERN DISTRICT OF VIRGINIA
 3              ALEXANDRIA DIVISION
 4    -------------------------------X
 5    ANAS ELHADY, ET AL.,          :
 6              Plaintiffs,   :
 7        v.                  :   Case No.:
                                  16-CV-00375
 8    CHARLES H. KABLE, DIRECTOR OF :
 9    THE TERRORIST SCREENING CENTER; :
10    IN HIS OFFICIAL CAPACITY, ET AL.,:
11              Defendants.   :
12    -------------------------------X
13    Deposition of The Federal Bureau of Investigations
14         by and through its representative,
15              MATTHEW J. DESARNO
16                Washington, D.C.
17             Monday, April 9, 2018
18                 10:06 a.m.
19
20    Job No.: 184986
21    Pages: 1-399
22    Reported by: Matthew Goldstein, RPR
```

**Page 2**

```
 1        Deposition of MATTHEW J. DESARNO, held at:
 2
 3
 4         Department of Justice
 5         20 Massachusetts Avenue, NW
 6         Washington, D.C. 20001
 7
 8
 9
10
11     Pursuant to Notice, before Matthew Goldstein,
12    RPR, Notary Public in and for the District of
13    Columbia.
14
15
16
17
18
19
20
21
22
```

**Page 3**

```
 1        A P P E A R A N C E S
 2    ON BEHALF OF THE PLAINTIFFS, ANAS ELHADY, ET
 3    AL.:
 4    GADEIR ABBAS, ESQUIRE
 5    LENA MASRI, ESQUIRE
 6    CAROLYN HOMAN, ESQUIRE
 7    COUNCIL ON AMERICAN-ISLAMIC RELATIONS
 8    453 New Jersey Avenue, S.E.
 9    Washington, D.C. 20003
10    202.488.0833
11
12    ON BEHALF OF THE DEFENDANTS, CHARLES H. KABLE,
13    DIRECTOR OF THE TERRORIST SCREENING CENTER;
14    IN HIS OFFICIAL CAPACITY, ET AL.:
15    AMY E. POWELL, ESQUIRE
16    U.S. DEPARTMENT OF JUSTICE CIVIL DIVISION
17    20 Massachusetts Avenue, NW
18    Washington, D.C. 20530
19    202.514.9836
20
21
22
```

**Page 4**

```
 1    A P P E A R A N C E S   C O N T I N U E D
 2        ALSO PRESENT:
 3        JAYME KANTOR, ESQ -
 4        FEDERAL BUREAU OF INVESTIGATION
 5
 6        CIPORA KLIONSKY, ESQ -
 7        FEDERAL BUREAU OF INVESTIGATION
 8
 9        KEVIN BOGUCKI, ESQ -
10        TERRORIST SCREENING CENTER
11
12        JENNIFER GREENBAND, ESQ -
13        TRANSPORTATION  SECURITY ADMINISTRATION
14
15
16
17
18
19
20
21
22
```

Transcript of Matthew J. DeSarno, Designated Representative
Conducted on April 9, 2018

2 (5 to 8)

5

C O N T E N T S

EXAMINATION OF MATTHEW J. DESARNO                    PAGE

By MR. ABBAS                                            7
By MS. POWELL                                         116
By MR. ABBAS                                          117
By MS. POWELL                                         120
By MR. ABBAS                                          121
By MS. POWELL                                         184
By MR. ABBAS                                          185
By MS. POWELL                                         259
By MR. ABBAS                                          260
By MS. POWELL                                         323
By MR. ABBAS                                          323
By MS. POWELL                                         324
By MR. ABBAS                                          325
By MS. POWELL                                         383
By MR. ABBAS                                          384
By MS. POWELL                                         390
By MR. ABBAS                                          391
By MS. POWELL                                         393
By MR. ABBAS                                          393

6

By MS. POWELL                                         394
By MR. ABBAS                                          394

E X H I B I T S

(Attached)

DESARNO       DEPOSITION EXHIBIT                     PAGE

Exhibit A     Notice of 30(b)(6) Deposition          44
              of Defendant FBI

Exhibit B     Overview of the U.S.                   237
              Government's Watchlisting
              Process and Procedures

7

P R O C E E D I N G S

Whereupon,

        MATTHEW J. DESARNO,

being first duly sworn or affirmed to testify to

the truth, the whole truth, and nothing but the

truth, was examined and testified as follows:

    EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

BY MR. ABBAS:

    Q.  Please state your full legal name for

the record.

    **A.  Matthew J. DeSarno.**

    Q.  Mr. DeSarno, why are you here today?

    **A.  I'm here for a deposition related to**

**the -- testifying on behalf of the FBI related to**

**a watchlisting suit.**

    Q.  You understand that your testimony today

is binding on the agency?

    **A.  Yes.**

    Q.  What is the Watchlisting Advisory

Council?

    **A.  The Watchlisting Advisory Council is an**

**advisory council made up of the member agencies**

8

**involved in the U.S. government watchlisting**

**process.  The advisory council meets I believe**

**quarterly to discuss gaps in the watchlisting**

**process, improvements to the watchlisting process,**

**and to provide recommendations to the Homeland**

**Security Council as part of the NCS for proposed**

**modifications to watchlisting guidelines.**

    Q.  Who created the Watchlisting Advisory

Council?

        MS. POWELL:  Objection; vague.

        MR. ABBAS:  I withdraw my question.

BY MR. ABBAS:

    Q.  What is the FBI's role in the

Watchlisting Advisory Council?

    **A.  The FBI is one of the member agencies**

**who sits on the Council.  And we send a**

**representative to the advisory council meetings.**

    Q.  Are all representatives to the

Watchlisting Advisory Council coequal?

    **A.  Meaning do they all have equal vote; is**

**that the question?**

    Q.  That was not the question.

Transcript of Matthew J. DeSarno, Designated Representative

Conducted on April 9, 2018

3 (9 to 12)

9

1       MR. ABBAS:  Could you read back the
2 question?
3       (Record read.)
4       MS. POWELL:  Objection; vagueness.
5       THE WITNESS:  I don't understand
6 coequal.
7 BY MR. ABBAS:
8   Q.  Does the FBI have any special status on
9 the Watchlisting Advisory Council?
10      MS. POWELL:  Objection; vague.
11      You can answer, if you can.
12      THE WITNESS:  I'm not aware of any
13 special status that the FBI has.
14 BY MR. ABBAS:
15  Q.  The Watchlisting Advisory Council is
16 comprised of representatives of various federal
17 government agencies; correct?
18  **A.  That's correct.**
19  Q.  How many agencies send representatives
20 to the Watchlisting Advisory Council?
21      MS. POWELL:  Objection; potentially
22 implicates the law enforcement privilege.

10

1       I'm going to instruct the witness not to
2 answer.
3       MR. ABBAS:  Just to be clear, the number
4 of agencies involved with the Watchlisting
5 Advisory Council is being withheld on the basis of
6 what privilege?
7       MS. POWELL:  The law enforcement
8 privilege.
9       MR. ABBAS:  How does the number of
10 agencies involved in the Watchlisting Advisory
11 Council imperil law enforcement investigative
12 techniques?
13      MS. POWELL:  We've long said a
14 comprehensive list of the nominators to the TSDB
15 is law enforcement privileged.  Since those
16 nominators sit on the council, we can't give a
17 complete number without effectively identifying
18 them.
19 BY MR. ABBAS:
20  Q.  Are there more than ten agencies that
21 send representatives to the Watchlisting Advisory
22 Council?

11

1       MS. POWELL:  Same objection.
2       I'm going to instruct the witness not to
3 answer.
4   Q.  Are there more than five agencies that
5 send representatives to the Watchlisting Advisory
6 Council?
7       MS. POWELL:  Hang on.  I'm trying to
8 think.  We have identified some of them.
9       I think you can answer that, yes.  If
10 you know the answer, you can answer it.
11      THE WITNESS:  I don't know if there are
12 more than five.
13 BY MR. ABBAS:
14  Q.  Okay.  Is the FBI a member of the
15 Watchlisting Advisory Council?
16  **A.  Yes.**
17  Q.  Is the Terrorist Screening Center a
18 member of the Watchlisting Advisory Council?
19  **A.  Yes.**
20  Q.  Is the TSA a member of the Watchlisting
21 Advisory Council?
22  **A.  I believe so, yes.**

12

1   Q.  Is CBP a member of the Watchlisting
2 Advisory Council?
3   **A.  Yes.**
4   Q.  Is NCTC a member of the Watchlisting
5 Advisory Council?
6   **A.  Yes.**
7   Q.  Is the Department of State a member of
8 the Watchlisting Advisory Council?
9       MS. POWELL:  Objection; potentially
10 implicates the law enforcement privilege.
11      I'm going to instruct the witness not to
12 answer.
13      MR. ABBAS:  Which one did I just ask?
14 State.
15      Just so it's clear, what is the basis
16 for withholding whether or not the Department of
17 State is a member of the Watchlisting Advisory
18 Council?
19      MS. POWELL:  The law enforcement
20 privilege.
21      MR. ABBAS:  It imperils investigative
22 techniques whether or not the Department of State

Transcript of Matthew J. DeSarno, Designated Representative                    4 (13 to 16)
Conducted on April 9, 2018

---

13

1 participates in the Watchlisting Advisory Council
2 because --
3        MS. POWELL:  You're going to burn
4 through your time really fast if you spend it all
5 arguing with me.
6        MR. ABBAS:  That's fine.
7        MS. POWELL:  The objection is on the
8 record.
9 BY MR. ABBAS:
10    Q.  Is USCIS a member of the Watchlisting
11 Advisory Council?
12        MS. POWELL:  Objection.
13        I'm going to instruct the witness not to
14 answer on the basis of the law enforcement
15 privilege.
16        MR. ABBAS:  Are there any other
17 privileges that you're invoking to withhold
18 whether or not USCIS is a member of the
19 Watchlisting Advisory Council other than the law
20 enforcement privilege?
21        MS. POWELL:  Not at this time.
22        MR. ABBAS:  Okay.  Now is the time.

---

14

1 BY MR. ABBAS:
2    Q.  Is DHS a member of the Watchlisting
3 Advisory Council?
4        MS. POWELL:  You can answer, if you
5 know.
6        THE WITNESS:  Yes.
7 BY MR. ABBAS:
8    Q.  Is CIA a member of the Watchlisting
9 Advisory Council?
10        MS. POWELL:  I'm going to instruct the
11 witness not to answer on the grounds of the law
12 enforcement privilege and potentially the state
13 secrets privilege.
14    Q.  Is NCTC a member of the Watchlisting
15 Advisory Council?
16    **A.  I already answered.**
17        MS. POWELL:  Asked and answered.
18        THE WITNESS:  I already answered to that
19 one.  The answer remains yes.
20 BY MR. ABBAS:
21    Q.  Great.  Okay.  Thank you.
22        Who created the Watchlisting Advisory

---

15

1 Council?
2        MS. POWELL:  Objection; vague.
3        THE WITNESS:  Who?  Is who a person, is
4 who -- I don't understand.
5 BY MR. ABBAS:
6    Q.  Was the Watchlisting Advisory
7 Council -- let's start there with a person.  Was
8 the Watchlisting Advisory Council a human being's
9 idea?
10        MS. POWELL:  Objection; vague.  I don't
11 know what that means.
12    Q.  That's fine.
13        I mean, did someone have an idea to
14 create a Watchlisting Advisory Council?
15    **A.  I'm not aware of any particular person**
16 **coming up with that idea.**
17    Q.  Did an agency come up with the idea of
18 creating a Watchlisting Advisory Council?
19        MS. POWELL:  Objection; vague.
20        You can answer, if you know.
21        THE WITNESS:  I mean, I don't know who
22 came up with the idea of creating it.  I know that

---

16

1 it exists.
2 BY MR. ABBAS:
3    Q.  Why does the Watchlisting Advisory
4 Council exist?
5        MS. POWELL:  Objection; vague.
6    Q.  That's like the basic question.
7        Why does the Watchlisting Advisory
8 Council exist?
9        MS. POWELL:  Same objection.
10        Go ahead.
11        THE WITNESS:  As I answered before, it
12 exists exactly as it's named, an advisory council
13 to the National Security Council to make
14 recommendations for improvements in or changes to
15 the U.S. government watchlisting process.
16 BY MR. ABBAS:
17    Q.  Who controls the Watchlisting Advisory
18 Council?
19        MS. POWELL:  Objection; vague.
20        THE WITNESS:  I mean, as it's a council,
21 I'm not sure that it's controlled by any specific
22 person.  The Watchlisting Advisory Council is an

---

Transcript of Matthew J. DeSarno, Designated Representative       5 (17 to 20)
Conducted on April 9, 2018

---

17

1 interagency group set up to advise the National
2 Security Council --
3 BY MR. ABBAS:
4     Q.   Does the National Security -- I'm sorry,
5 go ahead.
6     **A.  -- to make changes to or recommend**
7 **changes to or improvements to the watchlisting**
8 **process.**
9     Q.   Does the National Security Council
10 control the Watchlisting Advisory Council?
11       MS. POWELL:  Objection; vague.
12       THE WITNESS:  I'm not sure I understand
13 what you mean by "control."
14 BY MR. ABBAS:
15    Q.   Okay.  Let's try it this way.  Can the
16 National Security Council tell the Watchlisting
17 Advisory Council what to do?
18    **A.   I mean, I don't think that it's set up**
19 **that way.  I think it's an advisory council, the**
20 **advisory council provides recommendations to the**
21 **National Security Council.**
22    Q.   Does the National Security Council

---

18

1 solicit the Watchlisting Advisory Council's
2 recommendations or -- that's it.  I'm sorry.
3       Does the National Security Council
4 solicit the Watchlisting Advisory Council's
5 recommendations?
6     **A.  I'm not -- I don't know.**
7     Q.   How does the National Security Council
8 communicate with the Watchlisting Advisory
9 Council?
10    **A.   As I understand it, the Watchlisting**
11 **Advisory Council provides recommendations to the**
12 **National Security Council.  I'm not familiar with**
13 **the feedback flow from the National Security**
14 **Council to the Watchlisting Advisory Council.**
15    Q.   You're the FBI.  Who is familiar with
16 the feedback flow between the National Security
17 Council and the Watchlisting Advisory Council if
18 not the FBI?
19       MS. POWELL:  Objection; vague and
20 mischaracterizes prior testimony.
21       MR. ABBAS:  You can answer the question.
22       MS. POWELL:  If you can.

---

19

1       THE WITNESS:  I don't know.
2 BY MR. ABBAS:
3     Q.   Does the Watchlisting Advisory Council
4 and the National Security Council communicate with
5 each other?
6       MS. POWELL:  Objection; asked and
7 answered.
8       THE WITNESS:  I think I already answered
9 that.  The advisory council provides
10 recommendations and I am unaware of the specific
11 mechanism by which the National Security Council
12 comes back to the advisory council.
13 BY MR. ABBAS:
14    Q.   How are the Watchlisting Advisory
15 Council's recommendations communicated to the
16 National Security Council?
17    **A.   I mean, I believe they are communicated**
18 **in writing following meetings.**
19    Q.   Is there a particular form that this
20 writing is memorialized in?
21    **A.   A form like a --**
22    Q.   Do you call it something?  Do you

---

20

1 call -- do you call the communications that the
2 Watchlisting Advisory Council makes to the
3 National Security Council, do you have a name for
4 those communications?
5     **A.   I'm not aware of the name.  I haven't**
6 **read any of those communications.  I haven't seen**
7 **them.**
8     Q.   Who communicates to the National
9 Security Council on behalf of the Watchlisting
10 Advisory Council?
11       MS. POWELL:  Objection; vague and
12 mischaracterizes prior testimony.
13       THE WITNESS:  The advisory council
14 communicates to the National Security Council.
15 BY MR. ABBAS:
16    Q.   A human being communicates on behalf of
17 the Watchlisting Advisory Council to the National
18 Security Council; correct?
19       MS. POWELL:  Objection; misleading and
20 mischaracterizes prior testimony.
21       MR. ABBAS:  I withdraw the question.
22

---

---

21

1  BY MR. ABBAS:
2      Q.  Does the Watchlisting Advisory Council
3  communicate to other governmental bodies through
4  human beings acting on behalf of the Watchlisting
5  Advisory Council?
6          MS. POWELL:  Objection; vague.
7          Answer if you can.
8          THE WITNESS:  I mean, it requires human
9  interaction to communicate, yes.
10 BY MR. ABBAS:
11     Q.  Which people on behalf of the
12 Watchlisting Advisory Council communicate to the
13 National Security Council?
14     **A.  I don't know.**
15         MS. POWELL:  Objection; misleading.
16     Q.  How are people authorized to communicate
17 to the National Security Council on behalf of the
18 Watchlisting Advisory Council?
19         MS. POWELL:  Objection; vague and
20 misleading.
21         THE WITNESS:  What do you mean by
22 "authorized"?

---

22

1  BY MR. ABBAS:
2      Q.  The Watchlisting Advisory Council issues
3  recommendations; correct?
4      **A.  Yes.**
5      Q.  And the member agencies of the
6  Watchlisting Advisory Council agree upon the
7  content of recommendations that the Watchlisting
8  Advisory Council makes to the National Security
9  Council; correct?
10     **A.  Yes.**
11     Q.  Okay.  Who takes the Watchlisting
12 Advisory Council's recommendations -- I'm sorry.
13         Who or what agency takes the
14 Watchlisting Advisory Council's recommendations
15 and communicates those recommendations to the
16 National Security Council?
17         MS. POWELL:  Objection; misleading.
18         THE WITNESS:  So the answer is that I
19 don't know of an agency that does that.  The
20 advisory council itself provides the
21 recommendations.
22

---

23

1  BY MR. ABBAS:
2      Q.  Does the Watchlisting Advisory Council
3  have a logo?
4          MS. POWELL:  What?
5      Q.  Does it have letterhead?  Does the
6  Watchlisting Advisory Council have letterhead?
7      **A.  I don't know.**
8      Q.  Does the Watchlisting Advisory Council
9  have a logo?
10     **A.  I don't know.**
11     Q.  Do the recommendations that the
12 Watchlisting Advisory Council issues to the
13 National Security Council, are they stamped or
14 branded or marked in any way that denotes that
15 they're from the Watchlisting Advisory Council and
16 not individual agencies that are members of the
17 Watchlisting Advisory Council?
18     **A.  I have not seen those documents**
19 **firsthand that get pushed from the Watchlisting**
20 **Advisory Council to the National Security Council.**
21     Q.  You've never looked before today, you
22 have not reviewed any documents that the

---

24

1  Watchlisting Advisory Council sends to the
2  National Security Council?
3      **A.  No.**
4      Q.  Does the FBI have access to the
5  documents in which the Watchlisting Advisory
6  Council issues recommendations to the National
7  Security Council?
8          MS. POWELL:  Objection; vague.
9          Answer if you can.
10         THE WITNESS:  Does the FBI have access
11 to those documents?
12 BY MR. ABBAS:
13     Q.  Yes.
14     **A.  Yes.**
15     Q.  So the FBI has access to the documents
16 that the Watchlisting Advisory Council issues to
17 the National Security Council -- I'm sorry, let me
18 withdraw.
19         The Watchlisting -- it's the FBI's
20 testimony today that the Watchlisting Advisory
21 Council -- I'm sorry.
22         It's the FBI's testimony today that the

---

Transcript of Matthew J. DeSarno, Designated Representative          7 (25 to 28)
Conducted on April 9, 2018

25

1  FBI has access to documents in which the
2  Watchlisting Advisory Council issues
3  recommendations to the National Security Council;
4  correct?
5       MS. POWELL:  Asked and answered.
6       THE WITNESS:  I said yes.
7  BY MR. ABBAS:
8    Q.   Why does -- why, in the FBI's view,
9  would it be okay -- would the FBI object if the
10 Watchlisting Advisory Council did not share the
11 documents -- the recommendation documents that it
12 provides to the NSC -- let's back up.  Let's do
13 this; can we call the National Security Council
14 NSC?
15   A.   Yes.
16   Q.   And we can call the Watchlisting
17 Advisory Council WAC?
18   A.   Yes.
19   Q.   Okay.
20       MS. POWELL:  Can you call it the WAC.
21       MR. ABBAS:  That's coming.  That's
22 coming.  I'm just trying to set it up.

26

1  BY MR. ABBAS:
2    Q.   Does the FBI review the WAC
3  recommendations before they get issued to the NSC?
4       MS. POWELL:  Objection; vague.
5       You can answer, if you can.
6       THE WITNESS:  The FBI is a member of the
7  Watchlisting Advisory Council.  As a member of the
8  advisory council, the FBI participates in all
9  aspects of that council.
10 BY MR. ABBAS:
11   Q.   I don't think you answered the question.
12       MR. ABBAS:  Could you read back the
13 question?
14       (Record read.)
15       MS. POWELL:  Objection; asked and
16 answered.
17       MR. ABBAS:  You can answer.
18       THE WITNESS:  That's my answer.
19 BY MR. ABBAS:
20   Q.   You didn't answer the question.
21       MS. POWELL:  Yes, he did.
22   Q.   Does the FBI review -- okay.

27

1       Who was -- you testified that
2  the -- that WAC meets quarterly; is that correct?
3  I'm sorry, does WAC meet quarterly?
4    A.   I believe the WAC meets quarterly and/or
5  as needed in addition to quarterly.
6    Q.   And the WAC issues recommendations at
7  least on a quarterly basis to the National
8  Security Council?
9       MS. POWELL:  Objection; mischaracterizes
10 prior testimony.
11       THE WITNESS:  I don't know that they
12 issue recommendations with each meeting.
13 BY MR. ABBAS:
14   Q.   Did the WAC -- has the WAC issued any
15 recommendations to the NSC in 2018?
16       MS. POWELL:  You can answer, if you
17 know, sorry.
18       THE WITNESS:  I don't know.
19 BY MR. ABBAS:
20   Q.   Has the WAC issued any recommendations
21 to the TSC in 2017?
22   A.   I don't know.

28

1    Q.   Has the WAC issued any recommendations
2  to the NSC in 2016?
3    A.   I don't know.
4    Q.   Are you aware of any year in which the
5  WAC issued recommendations to the NSC?
6    A.   I'm not aware of the specific years, no.
7    Q.   When was the last time the WAC issued
8  recommendations to the NSC?
9    A.   I don't know.
10   Q.   And just to be clear, "I don't know" and
11 "I don't remember" are very common answers to the
12 deposition.  So if I'm asking and you don't know,
13 I'm just wondering whether you know or not and
14 then we'll move on from there.
15       Does the WAC issue statements of
16 conclusions -- I'm sorry, withdraw.
17       Does the WAC issue statements of
18 conclusions following its meetings?
19   A.   I don't know.  I know that in the NSC
20 process, generally we provide conclusions of
21 meetings in what's called a summary of conclusions
22 or statement of conclusions, SOC.  So I have not

Transcript of Matthew J. DeSarno, Designated Representative

Conducted on April 9, 2018

8 (29 to 32)

---

**29**

1    seen any specific WAC SOCs, but it -- but that is
2    the process that the NSC uses.
3        MS. POWELL: It's fair.
4    Q.   Okay. Just to be clear, you referred to
5    SOC, S-O-C, which stands for statements of
6    conclusions; correct?
7        MS. POWELL: Objection; mischaracterizes
8    prior testimony.
9        THE WITNESS: I know it to stand for
10   summary of conclusions.
11   BY MR. ABBAS:
12   Q.   Got it. Fair enough. We'll call
13   summaries --
14   A.   It's a SOC.
15   Q.   It's a SOC.
16       Is the SOC different than the
17   recommendation document that the Watchlisting
18   Advisory Council issues to the NSC?
19   A.   I have not seen those documents. I
20   don't know.
21   Q.   So you have not seen ever a SOC -- I'm
22   sorry, let me withdraw.

---

**30**

1        You have not before today seen a WAC
2    SOC?
3    A.   I have not seen a WAC SOC.
4    Q.   Has the WAC issued any WAC SOCs in 2018?
5    These are -- I'm not trying to be funny, it just
6    happens to be funny.
7        MS. POWELL: You can answer if you know.
8        THE WITNESS: I don't know.
9    BY MR. ABBAS:
10   Q.   Has the WAC issued any WAC SOCs in 2017?
11       MS. POWELL: You can answer if you know.
12       THE WITNESS: I have not seen any.
13   BY MR. ABBAS:
14   Q.   Has the WAC issued any WAC SOCs in 2016?
15   A.   Same answer. I have not seen any.
16   Q.   Has the WAC issued any WAC SOCs in 2015?
17   A.   I don't know.
18   Q.   Has the WAC ever issued any WAC SOCs?
19   A.   I have not seen any so I don't know.
20   Q.   But there is a term "summaries of
21   conclusion" that you're familiar with; correct?
22   A.   Yes.

---

**31**

1    Q.   And that term is associated in the FBI's
2    mind with the deliberations of the WAC; correct?
3    A.   It's associated with the deliberations
4    of the National Security Council.
5    Q.   The NSC issues the SOCs? Whose
6    summaries of -- whose conclusions are being
7    referred to in the summary of conclusions document
8    that you're referring to?
9        MS. POWELL: Objection; mischaracterizes
10   prior testimony.
11       THE WITNESS: I know SOCs to be
12   summaries of conclusions from NSC-related meetings
13   in general. So your question to me was about
14   whether or not the WAC does SOCs and I said I have
15   not seen those SOCs, but that would make sense
16   that they would do those. But I haven't seen them
17   so I don't know.
18   BY MR. ABBAS:
19   Q.   So it's the FBI's testimony today that
20   there may or may not be WAC SOCs?
21       MS. POWELL: Objection; mischaracterizes
22   prior testimony and asked and answered several

---

**32**

1    times now.
2        MR. ABBAS: You can answer.
3        THE WITNESS: I think I clearly answered
4    it in the last response.
5        MR. ABBAS: Could you read back the
6    question?
7        (Record read.)
8        MR. ABBAS: I'll do it again.
9    BY MR. ABBAS:
10   Q.   Is it the FBI's testimony today that
11   there are WAC SOCs?
12       MS. POWELL: Objection; mischaracterizes
13   prior testimony.
14       MR. ABBAS: I just want to know whether
15   there are or are not WAC SOCs. That's all I'm
16   trying to figure out.
17       MS. POWELL: And he's answered that
18   question several times now.
19       MR. ABBAS: No, he hasn't.
20       MS. POWELL: At some point, I'm going to
21   instruct him not to answer. Keep it up.
22       THE WITNESS: I have not seen WAC SOCs.

---

Transcript of Matthew J. DeSarno, Designated Representative
Conducted on April 9, 2018

9 (33 to 36)

---

33

BY MR. ABBAS:

2    Q.   Do you believe -- so you're not prepared
3 today to testify on behalf of the FBI as to
4 whether or not there are WAC SOCs; correct?
5         MS. POWELL:  Objection; mischaracterizes
6 prior testimony.
7         MR. ABBAS:  I'll withdraw it.
8 BY MR. ABBAS:
9    Q.   Are you prepared today to testify as to
10 whether or not there are WAC SOCs?
11   **A.   I have been testifying about whether or**
12 **not there are WAC SOCs for the last several**
13 **minutes.**
14        MR. ABBAS:  Am I missing something?
15 BY MR. ABBAS:
16   Q.   Are there WAC SOCs?
17        MS. POWELL:  Objection; asked and
18 answered several times now.
19        MR. ABBAS:  No, he has not.  I'm really
20 not trying to be difficult, I just want to know
21 whether they exist or not.
22        MS. POWELL:  I really don't think his

---

34

1 answer is going to change the more often you ask
2 the question.
3         THE WITNESS:  It's not going to change.
4 I haven't seen them.
5 BY MR. ABBAS:
6    Q.   Okay.  What's the relationship between
7 NSA SOCs and the Watchlisting Advisory Council?
8         MS. POWELL:  Objection.
9         MR. ABBAS:  I'm sorry, did I say NSA?
10        MS. POWELL:  Yeah.
11        MR. ABBAS:  I'm sorry, I apologize.
12 BY MR. ABBAS:
13   Q.   What is the relationship between the NSC
14 and -- I'm sorry.
15        What is the relationship between the
16 NSC's SOCs and the Watchlisting Advisory Council?
17   **A.   I don't know if I understand that**
18 **question.  The relationship between the NSC's SOCs**
19 **and the council?  I mean, I understand the**
20 **Watchlisting Advisory Council to be an interagency**
21 **council that advises the NSC.  You asked me about**
22 **SOCs I said it -- you know, that's the normal**

---

35

1 **process of communication within the NSC.  So I**
2 **have not seen a Watchlisting Advisory Council's**
3 **SOC, but that's the normal standard protocol of**
4 **communication within the NSC.**
5    Q.   But the SOCs -- when you -- that's fine.
6        What records exist of any work that the
7 Watchlisting Advisory Council undertakes?
8        MS. POWELL:  Objection; vague.
9        THE WITNESS:  I haven't seen records of
10 their work.
11 BY MR. ABBAS:
12   Q.   And do you know -- does the FBI know
13 whether records of the Watchlisting Advisory
14 Council's work exist?
15   **A.   I don't know that they exist.  I expect**
16 **that those records exist, but I haven't seen them.**
17   Q.   Who is currently the FBI's -- and you
18 can -- what is the position of the person
19 who -- well, let me back up.
20        Do you know the name of the person --
21 I'm not asking for the name -- but do you know the
22 name of the person that is the FBI representative

---

36

1 on the Watchlisting Advisory Council?
2         MS. POWELL:  Objections; misleading, but
3 answer if you can without giving the name.
4         THE WITNESS:  The FBI has sent -- has a
5 representative on the council, not necessarily the
6 same person all the time, but there is a
7 representative who goes and I do know their name.
8 BY MR. ABBAS:
9    Q.   What is the FBI's representative to the
10 WAC's position?
11        MS. POWELL:  I think you can answer
12 that.
13        THE WITNESS:  It's a unit chief.
14 BY MR. ABBAS:
15   Q.   What's a unit chief in the FBI's
16 personnel hierarchy?
17   **A.   A unit chief is a GS-15 senior manager.**
18   Q.   What is the -- this particular unit
19 chief -- I'm sorry.
20        The unit chief who is the FBI's
21 representative to the WAC supervises who?  Like
22 what is his unit or her, what is his or her unit?

---

Case 1:16-cv-00375-AJT-JFA   Document 306-31   Filed 03/12/19   Page 12 of 102 PageID# 14543
Transcript of Matthew J. DeSarno, Designated Representative          10 (37 to 40)
Conducted on April 9, 2018

37

1   **A.   The most recent representatives to the**
2   **WAC have supervised units who manage a region of**
3   **the country -- the international terrorism cases**
4   **in a region of the country.**
5   Q.   Who decides -- I'm sorry.
6       Who at the FBI decides who the FBI's WAC
7   representative will be?
8   **A.   I mean, I told my section chief who's in**
9   **charge of the entire United States --**
10  **international terrorism cases in the entire United**
11  **States to send a representative to the WAC.  And**
12  **that section chief made a determination as to**
13  **which person in his section would attend.  So it's**
14  **in my organization and I delegated that to one of**
15  **my subordinates.**
16  Q.   What is your organization, what you are
17  referring to?
18  **A.   So I manage all international terrorism**
19  **investigations and operations for the FBI.  And**
20  **one of those subordinate units manages all**
21  **international terrorism investigations and cases**
22  **inside the United States.  I delegate it to that**

38

1   **unit -- to that section.**
2   Q.   So there's -- how long does -- how long
3   is it your expectation that that person will serve
4   as the WAC representative for the FBI?
5       MS. POWELL:  Objection; misleading.
6       THE WITNESS:  I didn't specify a term,
7   but my expectation is that they would serve for
8   six months to a year depending on personnel
9   turnover and the frequency of meetings.
10  BY MR. ABBAS:
11  Q.   How much time does the FBI
12  representative to the WAC spend on WAC-related
13  duties?
14  **A.   I don't know exactly how much time.**
15  Q.   What is your understanding of the amount
16  of time that the FBI's WAC representative spends
17  on WAC-related duties?
18  **A.   I can say I would not consider it a**
19  **particularly taxing additional duty in terms of**
20  **time.  It would not be an extremely burdensome**
21  **amount of time.**
22  Q.   So there might be weeks when the FBI's

39

1   WAC representative spends no time on WAC-related
2   work?
3   **A.   Correct.**
4   Q.   Is there a particular work cycle that
5   the WAC has in which agency reps are busier or
6   more engaged in WAC-related work?
7   **A.   Yes.**
8   Q.   What is the WAC's work cycle?
9   **A.   As I testified previously, they meet**
10  **quarterly and as needed.  So in the time leading**
11  **up to and probably immediately after the meeting,**
12  **there's more effort involved than in the periods**
13  **of time between meetings.**
14  Q.   Who decides what the WAC's agenda will
15  be for the next meeting?
16      MS. POWELL:  Objection; vague,
17  potentially misleading.
18      THE WITNESS:  I expect that the council
19  does.  I mean, as I testified before, the WAC is
20  an advisory council -- interagency advisory
21  council and I expect that the council creates the
22  agenda.

40

1   BY MR. ABBAS:
2   Q.   Does the council have its own employees,
3   its own support staff?
4   **A.   Not that I'm aware of.**
5   Q.   Does the council have its own facility?
6   **A.   Not that I'm aware of.**
7   Q.   Does the council have its own office
8   space?
9   **A.   Not that I'm aware of.**
10  Q.   So the council is comprised completely
11  of agency personnel contributing work to this
12  Watchlisting Advisory Council; correct?
13  **A.   Yes.**
14  Q.   How is it determined which agency rep
15  will have the responsibility of coordinating these
16  periodic WAC meetings?
17      MS. POWELL:  Objection; vague.
18      THE WITNESS:  I don't know.
19  BY MR. ABBAS:
20  Q.   Does the FBI rep to the WAC facilitate
21  the creation of WAC agendas for WAC's periodic
22  meetings?

Transcript of Matthew J. DeSarno, Designated Representative
Conducted on April 9, 2018

**41**

1       MS. POWELL:  Objection; vague.
2       THE WITNESS:  Not that I'm aware of.
3       MR. ABBAS:  Just for my sake can you
4   read back the question?
5       (Record read.)
6   BY MR. ABBAS:
7       Q.   What do you know about how the WAC
8   meeting agendas are created?
9       **A.   I think as I already testified to I**
10  **expect that the agendas are created by the**
11  **council.**
12      Q.   What do you know about how WAC agendas
13  are created?
14      MS. POWELL:  Objection; asked and
15  answered.
16      Q.   Is that all?  I just want to make sure.
17      **A.   I have no further answer than that.**
18      Q.   I just want to make sure.
19      The only thing you know about WAC agenda
20  meetings is that there are WAC agendas
21  meetings -- I'm sorry.
22      The only thing you know about agendas

**42**

1   for WAC meetings is that there are agendas for WAC
2   meetings --
3       MS. POWELL:  Objection; mischaracterizes
4   prior testimony.
5       Q.   -- correct?
6       **A.   I don't think I said that.  I think**
7   **I -- you asked me how they're created.  I've never**
8   **seen a WAC agenda so I don't know that they exist.**
9   **I expect that they exist and that they're created**
10  **by the council.**
11      Q.   And you have -- the FBI has no knowledge
12  as to who creates WAC agendas?
13      MS. POWELL:  Objection; mischaracterizes
14  prior testimony.
15      MR. ABBAS:  I just would expect that the
16  FBI's deponent would be able to provide basic
17  testimony as to how a -- how the advisory -- how
18  the WAC actually has meetings.  And I just want to
19  be clear --
20      MS. POWELL:  And he did.  The question
21  is asked and answered that the council creates an
22  agenda.

**43**

1   BY MR. ABBAS:
2       Q.   But the council has no staff; correct?
3   And -- okay.  That's fine.  I think I've got my
4   answer.
5       Did the FBI's representative to the WAC
6   always -- I'm sorry, let me start again.
7       Does the FBI's representative to the WAC
8   always receive WAC meeting agendas?
9       **A.   I don't know.**
10      MR. ABBAS:  I think we need to take a
11  five-minute break because I really don't think
12  that -- I think there's huge holes and I'm kind of
13  surprised that we're not getting any information
14  about the FBI's participation in the WAC.  I'm
15  going to take -- let's take five minutes and then
16  we'll be back.
17      Is that all right?
18      MS. POWELL:  You can take as much time
19  as you want.
20      (Recess from the record.)
21      (DeSarno Deposition Exhibit A was marked
22  for identification and attached to the

**44**

1   transcript.)
2       MR. ABBAS:  I've marked Plaintiff's
3   DeSarno Exhibit A -- I'm sorry, Deponent DeSarno
4   Exhibit A as the notice of 30(b)(6) deposition for
5   defendant FBI.  Opposing counsel has a copy.  The
6   court reporter has marked it as A.
7   BY MR. ABBAS:
8       Q.   Mr. DeSarno, please take a moment to
9   review the document.  Let me know when you've
10  finished reviewing it and I'll have some questions
11  for you.
12      MS. POWELL:  I would also note for the
13  record that the court granted in part our motion
14  for protective order with respect to this notice
15  and denied in part.
16      (Witness peruses the exhibit.)
17      THE WITNESS:  Okay.
18  BY MR. ABBAS:
19      Q.   Have you reviewed this document before
20  today?
21      **A.   I have.**
22      Q.   And just as a reminder, I know you knew

Transcript of Matthew J. DeSarno, Designated Representative     12 (45 to 48)
Conducted on April 9, 2018

45

1  what question I was going to ask, I think I had an
2  idea what your answer was, but just for the court
3  reporter's sake, please be sure to wait until the
4  end of my question before answering just to make a
5  clean record and I'll try to do the same as well.
6      **A.  Okay.**
7      Q.  What is your understanding of what this
8  document is?
9          MS. POWELL:  Objection; calls for a
10 legal conclusion.
11         Answer if you can.
12         THE WITNESS:  This is the notice of
13 deposition to depose an FBI witness.
14 BY MR. ABBAS:
15     Q.  Have you had a deposition -- have you
16 been in a deposition previously?
17     **A.  I have not.**
18     Q.  So you've never been deposed yourself?
19         MS. POWELL:  Objection; asked and
20 answered.
21         MR. ABBAS:  They're two different
22 questions.  Have you been in a deposition and have

46

1  you been deposed.
2          MS. POWELL:  I'm pretty sure that counts
3  as asked and answered, but you can answer if you
4  like.
5          THE WITNESS:  I have not been in a
6  deposition, nor have I been deposed which would
7  have required me to be in a deposition.
8  BY MR. ABBAS:
9      Q.  Is it your understanding that there are
10 questions that I may ask you today that you are
11 not obligated to answer?
12         MS. POWELL:  Objection; calls for a
13 legal conclusion.
14         You can answer, if you know.
15         THE WITNESS:  Yes, there potentially
16 could be questions that I would not be obligated
17 to answer.
18 BY MR. ABBAS:
19     Q.  Is it your understanding that -- well,
20 okay.  Let's go to paragraph 10 which is on
21 page 2.  Take a moment to review paragraph 10 and
22 I'm going to have a few questions about

47

1  paragraph 10.
2      **A.  Okay.**
3      Q.  Is it your understanding that it's your
4  obligation today to provide testimony regarding
5  the Watchlisting Advisory Council?
6          MS. POWELL:  Objection; calls for a
7  legal conclusion and does not take into account
8  the court's instructions on this issue, but you
9  may answer it, if you can.
10         THE WITNESS:  The Watchlisting Advisory
11 Council -- just those four words, "The
12 Watchlisting Advisory Council," are included in
13 paragraph 10, yes.  There are other things in
14 paragraph 10, but separated by commas it just
15 says, "The Watchlisting Advisory Council."
16 BY MR. ABBAS:
17     Q.  There's information that the FBI
18 possesses about the Watchlisting Advisory Council
19 that you do not know about here today; correct?
20         MS. POWELL:  Objection; mischaracterizes
21 prior testimony.
22         THE WITNESS:  I've testified a good bit

48

1  over the last hour about the Watchlisting Advisory
2  Council.
3  BY MR. ABBAS:
4      Q.  You didn't answer the question.
5          MR. ABBAS:  Can you read back the
6  question.
7          (Record read.)
8          MS. POWELL:  I'm going to add objections
9  of vagueness and misleading in addition to my
10 previous objection.
11 BY MR. ABBAS:
12     Q.  Do you know everything there is to know
13 about the Watchlisting Advisory Council?
14         MS. POWELL:  Objection; vague and
15 misleading.
16         THE WITNESS:  Clearly I do not know
17 everything there is to know about the Watchlisting
18 Advisory Council.
19 BY MR. ABBAS:
20     Q.  Does someone at the FBI know more about
21 the Watchlisting Advisory Council than you do?
22         MS. POWELL:  Objection; vague and

Transcript of Matthew J. DeSarno, Designated Representative          13 (49 to 52)
Conducted on April 9, 2018

49

1  misleading.
2        THE WITNESS:  I don't know.
3  BY MR. ABBAS:
4     Q.   Do you believe that the FBI's rep to the
5  WAC knows more about the WAC than you do?
6        MS. POWELL:  Objection; vague.
7        THE WITNESS:  The FBI's rep to the WAC
8  has been in meetings and has operated as part of
9  the Council, but I don't know what that rep knows
10 about the overall -- you know, the history of the
11 Council or any of that so I don't know.
12 BY MR. ABBAS:
13    Q.   You don't, Mr. DeSarno, attend any of
14 the WAC meetings; correct?
15    A.   I have not.
16    Q.   Are you cc'd on the WAC e-mails that
17 regard WAC proceedings or WAC activity?
18    A.   I have been cc'd on some e-mails,
19 scheduling-type e-mails leading up to WAC meetings
20 in the past.  I have been one of many recipients
21 of WAC e-mails.
22    Q.   Do you know whether the FBI WAC rep has

50

1  ever made a suggestion as to what should or should
2  not be included on a WAC meeting agenda?
3     A.   I don't know.
4     Q.   Do you know whether the FBI has agreed
5  to all of the WAC recommendations -- I'm sorry,
6  let me withdraw it.
7        Do you know whether the FBI has always
8  agreed with the recommendations that the WAC has
9  made to the NSC regarding watchlisting?
10       MS. POWELL:  Objection; misleading and
11 mischaracterizes prior testimony.  I believe he
12 testified that it operates by consensus.
13       MR. ABBAS:  Objection; that wasn't an
14 objection.  I think that's coaching the witness.
15       MS. POWELL:  It's asked and answered.
16       THE WITNESS:  Yeah, my prior testimony
17 was that it operates by consensus.
18 BY MR. ABBAS:
19    Q.   Is it the FBI's testimony that the WAC
20 operates by unanimous consensus?
21       MS. POWELL:  Objection; asked and
22 answered.

51

1        THE WITNESS:  That's my understanding it
2  is unanimous consensus.
3  BY MR. ABBAS:
4     Q.   Has the FBI ever dissented -- withdraw
5  that.
6        Has the FBI ever objected to proposed
7  activity or recommendations by the WAC?
8        MS. POWELL:  Objection; it seems to call
9  for deliberative process privileged information.
10       I'm going to instruct the witness not to
11 answer.
12    Q.   Does the FBI have a mechanism by which
13 it communicates its objections to activity
14 regarding the WAC?
15       MS. POWELL:  Same objection and
16 instruction I think because it assumes the answer
17 to the previous question, unless I'm
18 misunderstanding.
19    Q.   Is there a mechanism by which the FBI
20 registers its disagreement with things that the
21 WAC has done or is planning to do?
22       MS. POWELL:  Same objection as well

52

1  misleading.
2        MR. ABBAS:  You can answer.
3        THE WITNESS:  As the WAC operates
4  through consent -- unanimous consent as we
5  discussed, I don't know of any instance where the
6  FBI has lodged objections to that consent.
7  BY MR. ABBAS:
8     Q.   Does any agency rep chair the WAC?
9     A.   The WAC is cochaired by the Terrorist
10 Screening Center and the National Counterterrorism
11 Center.
12    Q.   Who decided that TSC and NCTC would
13 cochair the WAC?
14       MS. POWELL:  Objection; vague.
15       THE WITNESS:  Who?
16 BY MR. ABBAS:
17    Q.   Yeah, let's start out with who, yes.
18    A.   I don't know the name of the person who
19 decided that or if there was a person.  I don't
20 know how that decision was made.
21    Q.   At some point a person made the
22 decision, right, at some point?

Transcript of Matthew J. DeSarno, Designated Representative
Conducted on April 9, 2018

14 (53 to 56)

---

53

1      A.   Or the Council maybe.  I don't know.
2      Q.   Which agency decided that the NCTC and
3   TSC would cochair the WAC?
4         MS. POWELL: Objection; vague and
5   mischaracterizes prior testimony.
6         THE WITNESS:  I know that there are
7   cochairs, NCTC, TSC.  I don't know who determined
8   that or when that was determined.  But as the WAC
9   exists right now, that's who cochairs it.
10 BY MR. ABBAS:
11     Q.   Prior to today, what did you do to
12  educate yourself about the Watchlisting Advisory
13  Council?
14        MS. POWELL: Objection.  I instruct the
15  witness not to answer to the extent it calls for
16  communications between counsel, but he can answer
17  as to anything else he did.
18        THE WITNESS:  So I reviewed a document
19  dated 2008 that established the original Terrorist
20  Screening Center Policy Board which evolved into
21  the Watchlisting Advisory Committee [sic], it's a
22  charter document.

---

54

1         I refreshed my recollection of a meeting
2   that I had with executives at the TSC where we
3   discussed the Watchlisting Advisory Council and
4   the need for the FBI to designate a
5   representative.  And I refreshed my recollection
6   of designating a representative.
7   BY MR. ABBAS:
8      Q.   What was the name of the document that
9   you referred to as the charter document of the WAC
10  from 2008?
11     **A.   The document just had on the top of it**
12  **Terrorist Watchlisting Policy Board I think is**
13  **what it was called at its inception.**
14     Q.   Terrorism Watchlisting Policy Board?
15     **A.   It was something policy board, either**
16  **TSC Policy Board or Terrorist Watchlist Policy**
17  **Board.**
18     Q.   Is there a Terrorist Watchlist Policy
19  Board?
20     **A.   No, that's the board that eventually**
21  **evolved into the Watchlisting Advisory Council.**
22     Q.   Got it.  So there used to be something

---

55

1   like the Terrorist Watchlisting Policy Board?
2      **A.   Yes.**
3      Q.   And that became the Watchlisting
4   Advisory Council?
5      **A.   Yes.**
6      Q.   Do you know when the Watchlisting -- I'm
7   sorry, when the Terrorism Watchlist Policy Board
8   was first created?
9      **A.   This charter that I'm referring to was**
10  **signed by some incomplete number of member**
11  **agencies, I don't know how many signatures there**
12  **were, but there were signature blocks that were**
13  **completed in 2008.**
14     Q.   When you say "Some incomplete number of
15  member agencies," why is the number incomplete?
16     **A.   I just don't know who did or did not**
17  **sign it.  I know that there were -- the copy that**
18  **I saw had signatures by some agencies and some**
19  **blank signature blocks, but I don't recall which**
20  **signature blocks were blank and whether or not**
21  **that was the final copy.  It was just a copy that**
22  **was provided to me.**

---

56

1      Q.   So you don't know which agencies are a
2   party to -- I'm sorry.
3         You don't know which agencies were a
4   party to the Terrorism Watchlist Policy Board;
5   correct?
6      **A.   To the 2008 document?**
7      Q.   Yes.
8      **A.   Correct.**
9      Q.   The 2008 document did not create the
10  WAC; correct?
11        MS. POWELL: Objection; misleading.
12        THE WITNESS:  The 2008 document created
13  something called the Policy Board, which is my
14  understanding at some subsequent point became the
15  Watchlisting Advisory Committee.  There may be
16  another document that I haven't seen that changes
17  it, I haven't seen it.
18  BY MR. ABBAS:
19     Q.   The meeting with TSC regarding the FBI
20  designating a rep to the WAC that you referred to
21  a little bit ago, when was that meeting?
22     **A.   It's likely June or July of 2017.**

Transcript of Matthew J. DeSarno, Designated Representative    15 (57 to 60)
Conducted on April 9, 2018

57

1    Q.   At the time of that meeting, were you
2  aware of this litigation of which your testimony
3  is a part of?
4    A.   No.
5    Q.   During that June 2017 meeting, who was
6  present?  And I don't need names, just titles.
7    A.   **The assistant director for**
8  **counterterrorism.**
9    Q.   That's FBI?
10   A.   **FBI.**
11   Q.   Okay.
12   A.   **Me, the deputy assistant director for**
13 **counterterrorism, the director of the TSC, and the**
14 **deputy director of the TSC.**
15   Q.   The director of the TSC at that time was
16 who?
17   A.   **Sandy Kable.**
18   Q.   Okay.
19   A.   **Charles Kable.**
20   Q.   He goes by Sandy; is that --
21   A.   **Charles Kable.**
22   Q.   Charles Kable.

58

1        Okay.  Are you a part of -- what is
2  your -- I'm sorry, what's your job title again?
3    A.   **Deputy assistant director**
4  **counterterrorism division, FBI.**
5    Q.   Is Charles Kable your subordinate?
6    A.   **He's not.**
7    Q.   Who oversees Charles Kable, the director
8  of TSC?
9    A.   **The executive assistant director for**
10 **national security of the FBI.**
11   Q.   Who is?
12   A.   **Currently?**
13   Q.   Yes.
14   A.   **Carl Ghattas.**
15   Q.   Can you spell that name?
16   A.   **G-H-A-T-T-A-S.  First name Carl with a**
17 **C.**
18   Q.   Can Carl Ghattas tell the director of
19 TSC what to do?
20       MS. POWELL:  Objection; vague and
21 misleading.
22   Q.   Not a surprise question.

59

1        MS. POWELL:  Not a surprise objection.
2        THE WITNESS:  So Charles Kable reports
3  directly to the EAD for national security, Carl
4  Ghattas, in his direct reporting work function.
5  The TSC is an interagency organization
6  administered by the FBI.  So in an answer to the
7  question can Carl Ghattas tell Charles Kable what
8  to do, in as much as a manager can tell a
9  subordinate what to do in terms of administrative
10 policy, reporting to work, those types of things,
11 yes, he can.
12 BY MR. ABBAS:
13   Q.   Are there things that Carl Ghattas
14 cannot tell the director of the TSC what to do
15 about?
16       MS. POWELL:  Objection; vague.
17   Q.   I'm sorry, let me rephrase.
18       Are there aspects of the director of
19 TSC's job that is not controlled by FBI supervisor
20 Carl Ghattas?
21       MS. POWELL:  Same objection.
22       THE WITNESS:  The TSC operates as a

60

1  relatively independent interagency entity that has
2  the goal of executing HSPD-6 across the
3  interagency.  So there are -- as that -- as an
4  interagency entity, the EAD of national security
5  and the FBI have administrative responsibility
6  over the organization, but operationally it
7  operates with interagency independence.
8  BY MR. ABBAS:
9    Q.   Does the FBI control TSC?
10       MS. POWELL:  Objection; asked and
11 answered and vague.
12       MR. ABBAS:  Let's withdraw.
13 BY MR. ABBAS:
14   Q.   The FBI pays for all of the operations
15 of the TSC; correct?
16       MS. POWELL:  Objection; vague and
17 misleading.
18       THE WITNESS:  Yeah, that is vague.  I
19 don't -- I'm not certain that that's the case.
20 There are employees of other agencies at the TSC
21 that are paid by their agencies.
22

Transcript of Matthew J. DeSarno, Designated Representative       16 (61 to 64)
Conducted on April 9, 2018

---

61

1  BY MR. ABBAS:
2      Q.  Is anyone paid by the Terrorist
3  Screening Center?
4          MS. POWELL:  Objection; vague.
5          THE WITNESS:  Paid by the Terrorist
6  Screening Center?
7  BY MR. ABBAS:
8      Q.  Yes.
9      **A.  I don't understand the question.**
10     Q.  Is anyone -- does the Terrorist
11 Screening Center pay any salaries of TSC
12 employees?
13         MS. POWELL:  Same objection.
14         THE WITNESS:  Yeah, I mean, that's
15 getting into complexities related to budgets and
16 contracts and --
17 BY MR. ABBAS:
18     Q.  If you don't know, just say you don't
19 know, that's fine, that's an answer.
20         Do you know who pays the salaries of TSC
21 employees?
22     **A.  I know that TSC employees are paid their**

---

62

1  **salaries by their home agencies.**
2      Q.  Does TSC pay any single person a salary?
3          MS. POWELL:  Objection; asked and
4  answered.
5          THE WITNESS:  That was my answer.
6  BY MR. ABBAS:
7      Q.  Does TSC pay any single employee?
8          MS. POWELL:  Objection; asked and
9  answered.
10         THE WITNESS:  I answered that.
11 BY MR. ABBAS:
12     Q.  You're not answering the question, but
13 that's fine, that's your choice.
14         As an executive of the FBI, does the FBI
15 set TSC's budget?
16         MS. POWELL:  Objection; vague.
17         THE WITNESS:  The FBI is not solely
18 responsible for setting the TSC's budget.
19 BY MR. ABBAS:
20     Q.  Who else -- so the FBI does have some
21 responsibility for TSC's budget?
22     **A.  Yes.**

---

63

1      Q.  What is the FBI's responsibility for
2  TSC's budget?
3      **A.  Well, the FBI certainly makes requests,**
4  **budget requests on behalf of the TSC.**
5      Q.  To whom?
6      **A.  To Congress who authorizes budgets.  And**
7  **then --**
8      Q.  Does TSC have its own congressional
9  liaison personnel?
10     **A.  I don't know.**
11     Q.  Does FBI congressional liaison personnel
12 present funding requests to Congress on TSC's
13 behalf?
14     **A.  I don't know.**
15     Q.  What do you know about the financial
16 relationship between the FBI and TSC?
17     **A.  I mean, I know that the FBI provides for**
18 **the administration generally of the TSC, which is**
19 **inclusive of budget.  But I don't know the**
20 **complexities of how other agencies feed into that**
21 **budget, what the sharing agreements are, I don't**
22 **know those details.**

---

64

1      Q.  Does the FBI pay for TSC's office
2  facilities?
3      **A.  I believe so.**
4      Q.  Does the FBI pay for TSC's information
5  technology infrastructure?
6      **A.  I believe the FBI pays for some of that**
7  **or maybe all of that; but, yes, it is included in**
8  **the administration of the TSC.**
9      Q.  Does the FBI pay for the salaries of TSC
10 employees?
11         MS. POWELL:  Objection; asked and
12 answered.
13         THE WITNESS:  The FBI pays the salaries
14 of FBI employees who are assigned to the TSC.
15 BY MR. ABBAS:
16     Q.  Does TSC have -- this is the FBI's
17 testimony which should have really clear knowledge
18 of TSC.
19         Is the FBI aware of whether or not there
20 is such a thing as a TSC employee?
21         MS. POWELL:  Objection; vague.
22         THE WITNESS:  I mean, I consider people

---

Transcript of Matthew J. DeSarno, Designated Representative 17 (65 to 68)
Conducted on April 9, 2018

65

1 who work at the TSC as TSC employees.
2 BY MR. ABBAS:
3    Q.  Even though they report to ultimately
4 the FBI?
5        MS. POWELL:  Objection; vague and
6 mischaracterizes prior testimony.
7        THE WITNESS:  The TSC is made up of
8 interagency personnel who are assigned to the TSC.
9 They get paid by their own agencies, they belong
10 to their own agencies, and they work at the TSC so
11 they are TSC employees.
12 BY MR. ABBAS:
13    Q.  But you don't know how those
14 people -- but they're paid by their home agencies,
15 not TSC itself; correct?
16    **A.  It's my understanding that people who**
17 **are assigned to the TSC are paid by their home**
18 **agencies.**
19    Q.  Including the FBI; correct?
20    **A.  Yes.**
21    Q.  Does each member of the Watchlisting
22 Advisory Council provide personnel to the

66

1 TSC -- I'm sorry, let me withdraw.
2        Does each member of the Watchlisting
3 Advisory Council contribute personnel to TSC's
4 operations?
5    **A.  I don't know.**
6    Q.  Does the FBI, DHS, CBP, and TSA provide
7 personnel contributions to the operations of TSC?
8        MS. POWELL:  Objection as to scope.
9        You can answer, if you know.
10        THE WITNESS:  I don't know.
11 BY MR. ABBAS:
12    Q.  You don't know whether -- does the FBI
13 contribute personnel to the TSC?
14    **A.  They do, yes.**
15    Q.  Does DHS contribute personnel to the
16 TSC?
17    **A.  I believe so, yes.  I --**
18    Q.  Does the -- I apologize for
19 interrupting.
20        Does TSA contribute personnel to TSC's
21 operations?
22        MS. POWELL:  Objection as to scope.

67

1        THE WITNESS:  I answered about DHS which
2 is inclusive of TSA, CBP, and the others.
3 BY MR. ABBAS:
4    Q.  I don't know that so that's why I'm
5 asking.  I'm not sure if there's differences
6 between DHS and so I'm not asking to be difficult,
7 I'm asking because I don't know.
8        Does USCIS contribute personnel to TSC's
9 operations?
10        MS. POWELL:  We're getting really far
11 afield from the topics here.  The court explicitly
12 excluded anything that was TSC specific.  Instead
13 you should be asking questions about FBI's role.
14 FBI does not have a role in how DHS contributes
15 personnel to TSC.
16        MR. ABBAS:  The TSA -- the TSC rep to
17 the Watchlisting Advisory Council is an FBI
18 employee, gets paid by the FBI.
19        MS. POWELL:  What does that have to do
20 with DHS or CBP or USCIS?
21        MR. ABBAS:  Can you just read back the
22 last questions.

68

1        (Record read.)
2        MS. POWELL:  Same objection.
3 BY MR. ABBAS:
4    Q.  If you don't know, you can just say you
5 don't know.
6    **A.  I don't know.**
7    Q.  Okay.  Great.
8        Does the NCTC contribute personnel to
9 TSC's operations?
10        MS. POWELL:  Same objection.
11        THE WITNESS:  Does the NCTC contribute
12 personnel, yes.
13 BY MR. ABBAS:
14    Q.  Okay.  You have no knowledge at all
15 about whether other agencies, aside from the FBI,
16 contribute in ways beyond providing personnel to
17 TSC's operations to help TSC function?
18        MS. POWELL:  Objection as to scope and
19 vagueness and mischaracterizing prior testimony.
20        THE WITNESS:  I am not familiar with the
21 technical resourcing that other agencies bring to
22 the TSC, no.

Transcript of Matthew J. DeSarno, Designated Representative

18 (69 to 72)

Conducted on April 9, 2018

---

**69**

1 BY MR. ABBAS:

2    Q.  Are you aware of any agency other than

3 the FBI making a financial contribution not in the

4 form of personnel to TSC's operations?

5        MS. POWELL:  Objection as to scope and

6 vagueness and asked and answered.

7        THE WITNESS:  I'm not aware of the

8 specifics of other agencies' contributions to the

9 TSC.

10 BY MR. ABBAS:

11    Q.  I'm not asking for specifics, I'm asking

12 if you know anything.

13       Do you know whether another agency

14 has -- I'm sorry.

15       Do you know whether an agency other than

16 the FBI has ever made any financial contribution

17 to TSC's operations other than through personnel

18 assigned to TSC?

19       MS. POWELL:  Objection as to scope and

20 vagueness and misleading and asked and answered

21 several times now.

22       THE WITNESS:  I think I already answered

---

**70**

1 that.

2 BY MR. ABBAS:

3    Q.  You did not answer.  You said you do not

4 know the specifics so I'm not asking for

5 specifics.

6       I'm asking are you aware of an agency

7 ever in the history of the watchlisting system

8 making a financial contribution to TSC's

9 operations not in the form of assigning personnel

10 to TSC?

11       MS. POWELL:  That is roughly the sixth

12 time you've asked that question now.  At some

13 point, I'm just going to instruct him not to say

14 anything.

15       MR. ABBAS:  Just to be clear for the

16 record, I'm just making -- I just want to clarify

17 that if the deponent is not answering the

18 question -- if the deponent does not understand

19 the question, I am eager to issue any clarifying

20 comments, but it seems like the deponent is just

21 refusing to answer the question because the answer

22 is revealing.

---

**71**

1        Can you read back the last question.

2        (Record read.)

3        MS. POWELL:  Objection as to scope and

4 vagueness and misleading and we are way outside

5 the topics at this point.  Other agencies'

6 contributions to TSC are decidedly not within

7 FBI's knowledge.

8        MR. ABBAS:  I'm not asking for other.

9 BY MR. ABBAS:

10    Q.  Does the FBI have any knowledge?  If you

11 don't know, that's fine, that's a totally fine

12 answer.

**13    A.  Okay.  That's the -- I mean, the answer**

**14 I've already provided, which is I'm not aware of**

**15 the specifics of the funding and resourcing other**

**16 agencies are providing to the Terrorist Screening**

**17 Center is the answer.**

18    Q.  Okay.  When you say that you don't know

19 the specifics, does that mean you have general

20 knowledge of the financial contributions that

21 other agencies have made to TSC not in the form of

22 personnel?

---

**72**

1        MS. POWELL:  All right.  I'm going to

2 instruct the witness not to answer at this point.

3        Please ask your next question.

4        MR. ABBAS:  What's the basis of your

5 instruction not to answer?

6        MS. POWELL:  Outside the scope, asked

7 and answered, the court's protective order, it's

8 vague, misleading, some other things,

9 argumentative.

10       MR. ABBAS:  That's -- you know, I think

11 the appropriate mechanism here is if you're not

12 going to answer basic questions about the

13 Watchlisting Council --

14       MS. POWELL:  You're not even asking a

15 question about the Watchlisting Council.

16       MR. ABBAS:  -- is to end the deposition

17 itself.  I think that's --

18       MS. POWELL:  We have a protective order

19 in place.  I've instructed him not to answer.

20       Please ask your next question.

21       MR. ABBAS:  What part of the protective

22 order are you relying upon?

---

Transcript of Matthew J. DeSarno, Designated Representative
Conducted on April 9, 2018

---

73

1      MS. POWELL:  Well, if not nothing else,
2  the court at the end of the deposition explicitly
3  excluded TSC topics and TSC policies and
4  procedures.  He is here only to testify about
5  FBI's role, which the court said was an
6  appropriate topic.  You're not asking him a
7  question about FBI's roles or responsibilities.
8  You're asking him a question about other agencies
9  and their contribution to TSC.  And he's already
10 given you the answer.
11     MR. ABBAS:  Sure.
12 BY MR. ABBAS:
13     Q.  Has the FBI ever accepted a financial
14 contribution made by a federal government agency
15 for the purposes of contributing to TSC's
16 operations?
17     MS. POWELL:  Objection; scope and vague.
18 I'm not sure what that means.
19     THE WITNESS:  So in reviewing this
20 document that you gave me, Exhibit A, in
21 preparation for this, I did not review the
22 financial arrangements between agencies that fund

---

74

1  the TSC so I do not know the answers to the
2  funding questions that you're asking.
3  BY MR. ABBAS:
4      Q.  You previously characterized the TSC as
5  relatively independent; is that correct?
6      **A.  Is that correct?**
7      Q.  He's not going to --
8      **A.  I mean, it sounds like it.  That's an**
9  **accurate characterization.**
10     Q.  So it's not completely independent, it's
11 relatively independent?
12     **A.  Well, it's an interagency entity.**
13     Q.  Who's the most -- which agency is the
14 most influential in determining how TSC operates?
15     MS. POWELL:  Objection; misleading and
16 vague.
17     THE WITNESS:  I don't know that any
18 agency is more influential than the other.
19 BY MR. ABBAS:
20     Q.  What is the FBI's understanding of the
21 role that chairs of the WAC play?
22     MS. POWELL:  Objection; vague.

---

75

1      THE WITNESS:  I mean, they are the
2  chairpersons of the advisory council, the advisory
3  council is an interagency entity, they lead the
4  Council.
5  BY MR. ABBAS:
6      Q.  Does the FBI -- how does the FBI
7  participate in TSC?
8      **A.  The FBI administers TSC, the director**
9  **and one of the deputy directors are FBI employees.**
10 **When President Bush signed HSPD-6 in September of**
11 **2003, he designated the attorney general as the**
12 **lead entity to bring the watchlisting efforts of**
13 **the USG together.  The attorney general delegated**
14 **that to the FBI to be the administrative hub of**
15 **that effort.  And as a result, the TSC exists and**
16 **it is administered by the FBI and led**
17 **by -- currently led by an FBI executive.**
18     Q.  Does the FBI have an opinion about the
19 effectiveness of the watchlisting system?
20     MS. POWELL:  Objection; vague.
21     THE WITNESS:  I don't understand
22 "effectiveness," what do you mean by

---

76

1  "effectiveness"?
2  BY MR. ABBAS:
3      Q.  What does FBI believe are the purposes
4  of the watchlisting system?
5      **A.  Okay.  The purpose of the watchlisting**
6  **system is very clearly to prevent acts of**
7  **terrorism while safeguarding privacy and civil**
8  **liberties.**
9      Q.  Does the watchlisting system -- is the
10 watchlisting system aimed at protecting against
11 all types of acts of terrorism?
12     MS. POWELL:  Objection; vague.
13     THE WITNESS:  The watchlisting system is
14 aimed at preventing terrorism, writ large, and
15 safeguarding privacy and civil liberties.
16 BY MR. ABBAS:
17     Q.  So the watchlisting system is not aimed
18 only at protecting against acts of terrorism
19 involving commercial aviation; correct?
20     **A.  That is correct.**
21     Q.  The watchlisting system -- I understand
22 how the watchlisting system is aimed at protecting

---

Transcript of Matthew J. DeSarno, Designated Representative                    20 (77 to 80)
Conducted on April 9, 2018

---

77

1 acts of terrorism against commercial aviation, but
2 how does the watchlisting system in the FBI's view
3 prevent acts of terrorism that are not related to
4 commercial aviation?
5        MS. POWELL:  Objection; vague and scope,
6 but answer to the extent you can.
7        THE WITNESS:  Okay.  So the watchlisting
8 system is one of -- is one of the key resources
9 that the FBI has in preventing terrorism.  After
10 9/11, our mission shifted pretty significantly
11 from investigating crime after its occurrence to
12 preventing terrorist attacks.  That includes
13 obviously commercial aviation, but it also
14 includes preventing all types of terrorists
15 attacks and the watchlisting system -- the
16 existence of the TSC and the single consolidated
17 watchlist is a critical part of our preventive
18 efforts.
19 BY MR. ABBAS:
20    Q.   Why does the FBI believe that the
21 watchlisting system is a critical part of the
22 federal government's efforts to prevent acts of

---

78

1 terrorism that are not related to commercial
2 aviation?
3        MS. POWELL:  Objection to the extent the
4 question -- a comprehensive answer to the question
5 would require law enforcement privilege and state
6 secret information, but answer to the extent you
7 can.
8        THE WITNESS:  So in general, the
9 prevention of terrorism requires robust
10 partnerships, collaboration, and information
11 sharing among all involved agencies and entities
12 across the intelligence community and law
13 enforcement community and the international
14 community.  What the consolidated watchlisting
15 process does is facilitates that type of
16 collaboration, cooperation, and sharing to enable
17 a common operating picture across those
18 communities to ensure that we are best positioned
19 collectively to prevent terrorism.
20 BY MR. ABBAS:
21    Q.   What information informs the FBI's view
22 that the watchlisting system is an effective means

---

79

1 of preventing acts of terrorism that are unrelated
2 to commercial aviation?
3        MS. POWELL:  Was that a different
4 question than the one you just asked?
5        MR. ABBAS:  Yes.
6        MS. POWELL:  Can you clarify?
7        MR. ABBAS:  It was a totally different
8 question.  It was just a completely different
9 question.
10        MS. POWELL:  Okay.  I'm going to make
11 the same objections then.
12        MR. ABBAS:  Okay.
13        MS. POWELL:  Vagueness and scope to the
14 extent it's not limited to FBI and a comprehensive
15 answer would require state secrets and law
16 enforcement privileged information, but please
17 answer to the extent you can.
18        THE WITNESS:  Can you repeat the
19 question?
20        (Record read.)
21        THE WITNESS:  I think most of that is
22 going to be privileged.  But, I mean, clearly

---

80

1 shared awareness of the identities of known or
2 suspected terrorists across the intelligence and
3 law enforcement communities is a critical resource
4 for prevention.
5 BY MR. ABBAS:
6    Q.   Are you withholding information on the
7 basis of a privilege in your answer to the last
8 question?
9        MS. POWELL:  I'm sorry?
10        MR. ABBAS:  It's a yes or no.
11        MS. POWELL:  If that's a legal question,
12 the answer is --
13        MR. ABBAS:  It's whether he's
14 withholding information on the basis of some
15 privilege assertion he referred to in his answer.
16 I'm unclear.
17        MS. POWELL:  I'm pretty sure the answer
18 is yes.
19 BY MR. ABBAS:
20    Q.   I'd like to hear the deponent.
21        Are you withholding information about
22 why the FBI believes the watchlisting system is an

---

Case 1:16-cv-00375-AJT-JFA   Document 306-31   Filed 03/12/19   Page 23 of 102 PageID#
14554
Transcript of Matthew J. DeSarno, Designated Representative     21 (81 to 84)
Conducted on April 9, 2018

81

1 effective means of preventing acts of terrorism
2 unrelated to commercial aviation on the basis of a
3 privilege?
4    **A. Yes.**
5    Q.   What privilege are you asserting that is
6 the basis of withholding information in your
7 answer?
8        MS. POWELL:  That's a question for me.
9 The law enforcement privilege and the state
10 secrets privilege.
11   Q.   Is the information that the government
12 relies upon to conclude that the watchlisting
13 system is an effective means of preventing acts of
14 terrorism unrelated to commercial aviation
15 memorialized in any documents?
16   **A.   Specific to watchlisting, is that the**
17 **question?  I'm not aware of any.**
18   Q.   You're not aware of any documents that
19 memorialize -- that contain information -- never
20 mind.
21       How does the FBI assess -- let's back
22 up.  Does the FBI assess the effectiveness of its

82

1 actions with regards to preventing acts of
2 terrorism?
3    **A.  Yes.**
4    Q.   Does the FBI assess the effectiveness of
5 its use of the TSDB?
6        MS. POWELL:  Objection; vague.
7        THE WITNESS:  The FBI conducts periodic
8 reviews of investigations which are inclusive of a
9 review of the use of the TSDB, the accuracy of the
10 information transmitted to TSC in nominations, the
11 accuracy of updates.  So we're constantly
12 reviewing investigations and, as part of that,
13 reviewing the use of the TSDB as part of that
14 investigation.
15 BY MR. ABBAS:
16   Q.   Has the FBI -- how has the FBI assessed
17 the effectiveness of the TSDB?
18       MS. POWELL:  Objection; vague, possibly
19 asked and answered.
20       THE WITNESS:  Yeah, I don't really
21 understand the question as you're posing it.  I
22 think I answered that -- when you asked before

83

1 about the opinion, I think I answered that
2 obviously the consolidated terrorist watchlist,
3 the TSDB, and the shared awareness among
4 communities is critical.  The assessment that we
5 do on a regular basis is focused pretty heavily on
6 accuracy of information and protection of
7 safeguarding of civil liberties and privacy and
8 compliance within those areas.
9 BY MR. ABBAS:
10   Q.   Has the TSDB ever prevented an act of
11 terrorism unrelated to commercial aviation?
12       MS. POWELL:  Objection to the extent a
13 comprehensive answer would require law enforcement
14 information and potentially state secrets, but
15 please answer to the extent you can.
16       THE WITNESS:  So as I previously
17 testified, the watchlist and watchlisting in
18 general is one of a suite of tools that we use to
19 prevent terrorism and have successfully used to
20 prevent terrorism.
21 BY MR. ABBAS:
22   Q.   I don't think you answered the question.

84

1       Has the watchlisting system -- well, has
2 the FBI ever used the watchlisting system to
3 prevent a specific act of terrorism unrelated to
4 commercial revelation?
5        MS. POWELL:  Objection; vague,
6 misleading, and a comprehensive answer potentially
7 calls for law enforcement or state secrets
8 information, but please answer to the extent you
9 can.
10       THE WITNESS:  So watchlisting
11 information combined with other information has
12 prevented acts of terrorism.
13 BY MR. ABBAS:
14   Q.   Are there specific instances that you
15 can identify in which the watchlisting system
16 itself has prevented -- let me back up.
17       Has the watchlisting system itself -- by
18 itself ever prevented an act of terrorism
19 unrelated to commercial aviation?
20       MS. POWELL:  Same objections as well as
21 SSI.  And to the extent you're looking for
22 specific examples, I'm going to instruct the

Transcript of Matthew J. DeSarno, Designated Representative
Conducted on April 9, 2018

---

85

1 witness to not answer.
2          MR. ABBAS:  I'm not.  I'm asking -- it's
3 a yes-or-no question.
4          MS. POWELL:  Answer to the extent you
5 can, yes or no only.
6          THE WITNESS:  The question is
7 watchlisting -- just watchlisting all by itself?
8 Since the watchlist only includes identifiers of
9 known or suspected terrorists, by itself I'm not
10 aware of any instance where that identifying
11 information alone prevented an act of terrorism.
12 BY MR. ABBAS:
13     Q.  It's the FBI's understanding that TSC
14 disseminates TSDB identifying information for use
15 by federal government agencies; correct?
16          MS. POWELL:  Objections; scope and asked
17 and answered.
18          MR. ABBAS:  Go ahead.
19          THE WITNESS:  The TSC does disseminate
20 the information, yes.
21 BY MR. ABBAS:
22     Q.  Does the FBI receive TSDB information

---

86

1 from TSC?
2          MS. POWELL:  Objection; vague.
3          THE WITNESS:  Yes.
4 BY MR. ABBAS:
5     Q.  What does the FBI do with TSDB
6 information it receives from TSC?
7          MS. POWELL:  Objection; vague, a
8 comprehensive answer would require the disclosure
9 of law enforcement sensitive information, but
10 please answer to the extent you can.
11          THE WITNESS:  The information received
12 by the FBI from the TSC is inclusive of the
13 information that goes to NCIC and the information
14 that comes into the FBI's case management system,
15 Sentinel.  Information coming into Sentinel is
16 part of FBI investigations so that information
17 would be updating FBI investigations.  And the
18 information that goes to NCIC is in NCIC for use
19 by NCIC users.
20 BY MR. ABBAS:
21     Q.  Who decided to put TSDB information in
22 NCIC?

---

87

1          MS. POWELL:  Objection; vague,
2 potentially misleading.
3          THE WITNESS:  Long before the TSC
4 existed, there was a file inside NCIC referred to
5 as VGTOF, which was the Violent Gang and
6 Terrorists Operational File.  So that file has
7 been -- since the consolidated watchlisting came
8 into being after HSPD-6, there is now a file in
9 NCIC referred to as the Known or Suspected
10 Terrorist File.  I don't know who a couple of
11 decades ago started the VGTOF file, but I know
12 that it has been in existence.  It predates my
13 entry to the FBI.
14 BY MR. ABBAS:
15     Q.  So there's no longer a VGTOF file, it's
16 just a KST file; correct?
**17     A.  There is a KST file and I believe**
**18 there's a separate file for gang members, but I**
**19 don't know what it's called anymore.**
20     Q.  Okay.  But the KST file is the -- when
21 you say "KST file," you're referring to the subset
22 of information at NCIC that reflects TSDB

---

88

1 information; correct?
**2     A.  Yes.**
3     Q.  Okay.  Is it your understanding that it
4 was the FBI's decision to create the KST file and
5 make it available to NCIC users through NCIC?
6          MS. POWELL:  Objection; mischaracterizes
7 prior testimony.
8          THE WITNESS:  I don't know whose
9 decision it was.  Similar to the TSC, NCIC and the
10 administration of NCIC belongs to the FBI, but it
11 is, you know, sort of advised by an interagency
12 policy board.  So I don't know who made the
13 decision or whether it was specifically FBI's
14 decision or it was an interagency agreement that
15 to being compliant with HSPD-6 to go to one
16 consolidated terror watchlist.  Clearly a decision
17 was made to stop commingling gang members and
18 known or supported terrorists in the same file.
19 BY MR. ABBAS:
20     Q.  That's a great decision.
21          So just to kind of clarify and make sure
22 that I understand, you're not -- you don't know

---

Transcript of Matthew J. DeSarno, Designated Representative

Conducted on April 9, 2018

23 (89 to 92)

---

89

1 whether it was the FBI or some other agency that
2 decided to create a KST file within NCIC; correct?
3        MS. POWELL:  Objection; mischaracterizes
4 prior testimony.
5        THE WITNESS:  I don't know exactly who
6 did that.
7 BY MR. ABBAS:
8    Q.  Does the FBI have any information that
9 the dissemination of TSDB information via NCIC has
10 ever prevented an act of terrorism unrelated to
11 commercial aviation?
12        MS. POWELL:  Objection; vague,
13 misleading, and potentially calls for law
14 enforcement sensitive information, but please
15 answer to the extent you can.
16        THE WITNESS:  The dissemination of KST
17 information to local law enforcement has certainly
18 assisted and enhanced investigations in order to
19 enable the prevention of terrorism.
20 BY MR. ABBAS:
21    Q.  I understand your answer and I think
22 that's a fair answer, but I want to clarify one

---

90

1 point.
2        Do you have any information that the
3 dissemination of TS -- I'm sorry, let me back up.
4        Does the FBI have any information that
5 the dissemination of TSDB information via NCIC has
6 directly prevented an act of terrorism unrelated
7 to commercial aviation?
8        MS. POWELL:  Same objections and asked
9 and answered.
10        THE WITNESS:  Yeah, my previous answer
11 is the answer to that.
12 BY MR. ABBAS:
13    Q.  Is there any incident that the FBI can
14 point to where the dissemination of TSDB
15 information via NCIC has prevented an act of
16 terrorism unrelated to commercial aviation?
17        MS. POWELL:  Same objection.  And to the
18 extent you're looking for specific examples, I'm
19 going to instruct the witness not to answer on the
20 grounds of law enforcement privilege.
21        MR. ABBAS:  I'm asking whether there are
22 examples, not information particular to any

---

91

1 example.
2        MS. POWELL:  I think he already answered
3 that.
4        MR. ABBAS:  Go ahead.
5        THE WITNESS:  I already answered that.
6        MR. ABBAS:  You did not.
7        Can you read back the question.
8        (Record read.)
9        MS. POWELL:  Same objection.
10        THE WITNESS:  I did answer that in my
11 previous answer.
12 BY MR. ABBAS:
13    Q.  How many incidents has the dissemination
14 of TSDB information via NCIC -- I'm sorry, let me
15 start again.
16        How many incidents of terrorism
17 unrelated to commercial aviation has the
18 dissemination of TSDB information via NCIC
19 prevented?
20        MS. POWELL:  Same objections.  And I
21 think with the addition of the number I'm going to
22 instruct the witness not to answer altogether.

---

92

1    Q.  Has there ever been to the FBI's
2 knowledge an act of terrorism unrelated to
3 commercial aviation that has been prevented
4 because TSDB information is available via NCIC?
5        MS. POWELL:  Same objections; asked and
6 answered, calls for law enforcement information.
7        MR. ABBAS:  You're not answering whether
8 or not there are incidents that you can --
9        MS. POWELL:  But he did.
10        MR. ABBAS:  -- point to.
11        No, he didn't.
12        MS. POWELL:  Like four questions ago.
13 BY MR. ABBAS:
14    Q.  What's your answer?
15    A.  I already answered that.
16    Q.  That's not an answer.  It's up to you,
17 but the easier way is to actually answer the
18 questions.  If there's a clarification you're
19 looking for, if you want the question read back to
20 you, we're happy to do that and to move it at a
21 pace that you're comfortable with.
22    A.  I'm comfortable.  I completely

---

Transcript of Matthew J. DeSarno, Designated Representative

Conducted on April 9, 2018

---

**93**

1  understand the question and I answered it four
2  questions ago.
3      Q.  What was your answer?
4          MS. POWELL:  Same objections.
5          We could go back and have it read back
6  if you'd like.
7          MR. ABBAS:  Asked and answered is not a
8  basis for an instruction not to answer.  And so if
9  that's your objection, that's fine, that's fair,
10 but he's refusing to answer the question.
11         MS. POWELL:  No, he did answer it and he
12 said refer back to my previous answer, that's an
13 answer.
14         MR. ABBAS:  That's not answer.
15         MS. POWELL:  It is an answer.
16 BY MR. ABBAS:
17     Q.  Has an act of terrorism -- and the
18 reason I'm having to rephrase these questions is
19 because the deponent is not answering the
20 question.
21         Has --
22         MS. POWELL:  If you would like to tell

---

**94**

1  us how the question is different from your
2  previous question, maybe we can get somewhere, but
3  it sounds exactly the same to me and to the
4  witness.
5      Q.  Has the dissemination of TSDB
6  information via NCIC ever stopped an act of
7  terrorism unrelated to commercial aviation?
8          MS. POWELL:  Same objections, and asked
9  and answered, potentially calls for law
10 enforcement and state secrets information, vague,
11 and misleading, and asked and answered, but you
12 can answer if you can.
13         THE WITNESS:  The dissemination
14 alone -- the dissemination of that information
15 through NCIC would clearly require some other
16 action to be taken in order to prevent an act of
17 terrorism.  So the dissemination alone does not do
18 anything to prevent, it just creates awareness on
19 the part of the person making the query to NCIC.
20         So the ability of a dissemination alone
21 to prevent an act of terrorism, that doesn't
22 exist.  But the dissemination of that information

---

**95**

1  and the common operating picture, the common
2  awareness about known or suspected terrorist
3  identities combined with other investigative or
4  enforcement actions have been a successful tool in
5  the prevention of terrorism.
6  BY MR. ABBAS:
7      Q.  State and local authorities have access
8  to NCIC information; correct?
9      A.  Yes.
10     Q.  Who has access -- let's just back up.
11         Who has access to the NCIC?
12     A.  There are approximately 18,000 police
13 departments who have access to the NCIC.
14     Q.  How many individual NCIC users are
15 there?
16     A.  There are approximately 18,000
17 departments whose members have access to it.
18     Q.  Does the FBI know how many individual
19 persons have access to the NCIC?
20     A.  Yes, the FBI knows that.
21     Q.  How many individuals have access to the
22 NCIC?

---

**96**

1      A.  I think that's a fluid number changing
2  all the time, but the FBI administers the NCIC
3  database and, therefore, the FBI on any given day
4  will know how many individual user accounts exist.
5      Q.  Generally, how many user accounts of
6  NCIC exist?
7      A.  The answer is 18,000 different
8  departments and their members have access,
9  approximately 18,000.  So the number of total
10 users on any given day, I'm not aware of that
11 number.
12     Q.  Is the number of -- but the FBI does
13 keep track of how many individual persons have
14 access to the NCIC; correct?
15     A.  I don't know how the FBI keeps track of
16 it.  What I know is that on any given day, there
17 are a -- there's a specific number of individual
18 user IDs or users that have access and that would
19 be -- that would be something that potentially
20 could be known, but I don't know how it's tracked.
21     Q.  Who decides whether an individual has
22 access to NCIC or not?

---

Transcript of Matthew J. DeSarno, Designated Representative           25 (97 to 100)
Conducted on April 9, 2018

---

**97**

1        MS. POWELL: Objection; vague.
2        THE WITNESS: Who decides that?
3   BY MR. ABBAS:
4        Q.   Yes.
5        **A.   Well, each agency is bound by an**
6   **agreement and then there are also compliance and**
7   **audit units within the Criminal Justice**
8   **Information Services Division of the FBI who**
9   **ensure that the user agreements and rules are**
10  **followed and that there is compliance among the**
11  **member agencies.  So there's not a single person**
12  **who decides whether or not an individual gets**
13  **access to NCIC.**
14       Q.   The FBI controls NCIC; correct?
15       MS. POWELL: Objection; mischaracterizes
16  prior testimony and vague.
17       THE WITNESS: NCIC is the primary
18  criminal justice database in the country that is
19  administered and managed by the FBI through our
20  Criminal Justice Information Services Division,
21  yes.
22

---

**98**

1   BY MR. ABBAS:
2        Q.   So the FBI decides what is or is not
3   included in NCIC; correct?
4        MS. POWELL: Objection; vague.
5        THE WITNESS: The FBI does not decide
6   what is or is not in NCIC, that's not correct.
7   BY MR. ABBAS:
8        Q.   Okay.  I'm asking because I don't know.
9        **A.   It's not correct.**
10       Q.   Okay.  That's fine.
11       So does the NCIC information exist on
12  servers that are controlled by the FBI?
13       **A.   They exist on servers, some of it does,**
14  **yes.**
15       Q.   And there's other information that is in
16  the NCIC that does not exist on FBI servers?
17       **A.   Yeah, I'm not familiar with the**
18  **technical landscape of the servers, but, I mean, a**
19  **good deal of it exists on FBI servers.**
20       Q.   Okay.  Is there any particular category
21  of information that you believe is in NCIC, but
22  not within FBI's control?

---

**99**

1        MS. POWELL: Objection; scope.  You're
2   getting kind of weedy here when the court said we
3   should not.
4        You can answer, if you know.
5        MR. ABBAS: Go ahead.
6        THE WITNESS: All I'll say is that the
7   NCIC involves -- part of the role of that is to
8   tie together different state systems.  So there's
9   information on state servers.  So it's not just
10  one database basically, it is a system of law
11  enforcement information interconnected between
12  jurisdictions and states.  So I would imagine
13  there are things that are not on FBI servers that
14  can be accessed through NCIC.
15  BY MR. ABBAS:
16       Q.   Got it.  And does the FBI create the
17  user IDs that individuals use to access the NCIC?
18       MS. POWELL: Objection; scope.
19       THE WITNESS: Yeah, I don't even know
20  the answer to that.
21  BY MR. ABBAS:
22       Q.   Do you have access to the NCIC?

---

**100**

1        **A.   I currently don't, but I have in the**
2   **past and I will again soon.**
3        Q.   Okay.  When you had access -- when was
4   it that you had access to NCIC?
5        **A.   Probably as recently as 2015.**
6        Q.   How were you issued access to the NCIC,
7   did you apply for it?
8        **A.   No, no, by an administrator in my field**
9   **office.  And a local police department would have**
10  **a similar administrator to issue credentials to**
11  **their users.**
12       Q.   So the FBI doesn't decide who the kind
13  of local level users are, that's decided by like
14  an agency?
15       **A.   That's governed by policy created by the**
16  **interagency policy board that is advising NCIC.**
17  **So that policy designates that agencies ensure**
18  **that only authorized users have access.**
19       MS. POWELL: Gadeir, I'm hungry.
20       MR. ABBAS: It's up to you.
21       MS. POWELL: I realize you might want to
22  finish a topic or something.

---

Transcript of Matthew J. DeSarno, Designated Representative
Conducted on April 9, 2018

---

101

1      MR. ABBAS:  Sure.
2      MS. POWELL:  So I don't want to press,
3 but when you do get to a good stopping point.
4      MR. ABBAS:  Okay.  So I'm just -- can we
5 go off the record just for a moment?  Is that all
6 right?
7      MS. POWELL:  Yeah.
8      (Recess from the record.)
9 BY MR. ABBAS:
10    Q.   What are the policy documents that
11 dictate how state and local agencies are to
12 administer access to NCIC, what are those
13 documents called?
14    **A.   I haven't reviewed those documents, I**
15 **don't know what they're called.**
16    Q.   But they're FBI documents that the FBI
17 issues to state and local and other partners --
18     MS. POWELL:  Objection.
19    Q.   -- that have access to NCIC information?
20     MS. POWELL:  Objection; mischaracterizes
21 prior testimony.
22     THE WITNESS:  I haven't seen the

---

102

1 documents.  I don't know what they're called or
2 when they were authored or who authored them.
3 BY MR. ABBAS:
4    Q.   Okay.  Are there more than a million
5 individual -- let me start again.
6      Are there more than 1 million
7 individuals who have access to the NCIC?
8    **A.   I would be speculating if I answered.  I**
9 **don't know how many individual users there are.**
10    Q.   There are more than 18,000 individual
11 users of NCIC; correct?
12    **A.   There are approximately 18,000**
13 **departments who use NCIC.**
14    Q.   So each department that uses NCIC has at
15 least one individual who has NCIC access; correct?
16    **A.   Yes.**
17    Q.   Do you know -- the FBI does know how
18 many total users there are of NCIC though that
19 fluctuates day to day; correct?
20     MS. POWELL:  Objection; asked and
21 answered.
22     THE WITNESS:  Correct.

---

103

1 BY MR. ABBAS:
2    Q.   But you don't know today how many there
3 are?
4    **A.   No, I don't.**
5    Q.   Do you have any information in general
6 form about the number of individuals that have
7 access to NCIC?
8    **A.   No, the only information I have is**
9 **18,000 individual departments and agencies who**
10 **have access.**
11    Q.   Is the number of individuals who have
12 access to NCIC information protected by any
13 privilege?
14     MS. POWELL:  Are you asking me?
15     MR. ABBAS:  Yes.
16     MS. POWELL:  I don't think so.
17 BY MR. ABBAS:
18    Q.   Okay.  You just don't know?
19    **A.   No.**
20    Q.   Okay.  Great.
21      Has the FBI ever publicly identified an
22 incident of terrorism that TSDB information helped

---

104

1 prevent?
2      MS. POWELL:  Objection; vague.
3      THE WITNESS:  It's likely that in court
4 proceedings, you know, in the criminal process
5 that there's been references to -- references to
6 watchlisting, but I don't know of any public
7 disclosure that TSDB information specifically
8 prevented terrorism, I'm not aware of it.
9 BY MR. ABBAS:
10    Q.   When an individual commits an act of
11 terrorism inside the United States, does the FBI
12 determine whether that person was on the watchlist
13 at the time that person committed an act of
14 terrorism?
15    **A.   Absolutely.**
16    Q.   Has a person who has committed an act of
17 terrorism inside the United States been on the
18 watchlist at the time they committed their act of
19 terrorism?
20     MS. POWELL:  Objection.
21      I'm going to instruct the witness not to
22 answer on the grounds of the law enforcement

---

Transcript of Matthew J. DeSarno, Designated Representative
Conducted on April 9, 2018

105

1 privilege.
2        MR. ABBAS:  It's totally -- I'm pretty
3 sure it's not.
4        Is there any other privilege that you're
5 asserting other than the law enforcement
6 privilege?
7        MS. POWELL:  SSI.
8        MR. ABBAS:  That would only
9 regard -- well, that's fine.  Okay.  You're
10 asserting the SSI privilege.
11       You're asserting the SSI privilege over
12 FBI information?  I'm asking for FBI information,
13 I'm not asking for TSA information.
14       MS. POWELL:  FBI can posses SSI, that's
15 not news.
16       MR. ABBAS:  Can you read back the last
17 question.
18       (Record read.)
19 BY MR. ABBAS:
20    Q.  You don't need to answer again.
21       MR. ABBAS:  What are the privileges?
22       MS. POWELL:  Law enforcement privilege

106

1 and SSI.
2 BY MR. ABBAS:
3    Q.  Is there -- I understand you're not
4 answering that question.
5        Do you, as the FBI's representative,
6 have an answer to that question that you're not
7 providing?
8        MS. POWELL:  You can answer as to
9 whether or not you know the answer I suppose.
10       MR. ABBAS:  Yeah.
11       THE WITNESS:  I know the answer to the
12 question.
13 BY MR. ABBAS:
14    Q.  Is the answer to the question that you
15 have, does that answer include SSI information?
16       MS. POWELL:  That's not his call, that's
17 mine to assert --
18       MR. ABBAS:  If he knows.
19       MS. POWELL:  -- in this situation.
20       Then it calls for a legal conclusion.
21       MR. ABBAS:  Okay.  You can answer the
22 question.  She did not instruct you not to answer,

107

1 you have to answer the question.
2        MS. POWELL:  You can give your legal
3 opinion if you'd like.
4        THE WITNESS:  I don't have an opinion
5 about that.
6 BY MR. ABBAS:
7    Q.  Does the answer to your
8 question -- let's go back to the question that has
9 the question.  Does your answer about whether a
10 person -- let me start all over.
11       Does your answer about whether any
12 person who has committed an act of terrorism done
13 so while on the watchlist include any information
14 that you've received from TSA?
15       MS. POWELL:  Objection; calls --
16       MR. ABBAS:  It doesn't, it for sure
17 doesn't.
18       MS. POWELL:  It's confusing is the
19 problem.  I'm going to object on grounds of
20 vagueness.
21       But if you would like to know the legal
22 basis for my objection, I'd be happy to share it

108

1 with you.
2        MR. ABBAS:  I just want the answer.
3        MS. POWELL:  Okay.
4        THE WITNESS:  I'm totally confused by
5 the question because I didn't answer the question.
6 The only question I answered was whether or not I
7 knew the answer.
8 BY MR. ABBAS:
9    Q.  Yes.  So now the question is, does your
10 answer that you know about whether a person has
11 ever committed an act of terrorism inside the
12 United States while on the watchlist include
13 information you've received from TSA?
14       MS. POWELL:  Very confusing.
15       THE WITNESS:  Yeah, it may.  I don't
16 know.  I don't know if it does or not.
17 BY MR. ABBAS:
18    Q.  So you have no idea where the basis of
19 your answer has come from?
20       MS. POWELL:  Objection; vague,
21 confusing, and asked and answered at this point.
22       THE WITNESS:  That's not true either.

109

1 So if someone is on the watchlist, I don't know
2 that information that put them on that watchlist,
3 I don't know whether it did or did not come from
4 TSA. I don't know what information may have come
5 from TSA. There may be information from TSA in
6 lots of investigative case files and lots of
7 watchlisting nominations. I don't know what
8 information did or did not come from TSA.
9 BY MR. ABBAS:
10    Q. Is it your understanding -- TSDB
11 information is not SSI protected; correct?
12        MS. POWELL: Objection; calls for a
13 legal conclusions.
14    Q. Who owns TSDB information?
15        MS. POWELL: Objection; vague.
16    Q. The FBI has no position as to who owns
17 TSDB information?
18        MS. POWELL: Objection; vague.
19        THE WITNESS: I mean, it's my opinion
20 that TSC owns TSDB information.
21 BY MR. ABBAS:
22    Q. Great. Okay.

110

1    A. The TSC is an interagency function.
2    Q. And the FBI possess TSDB information it
3 gets from TSC; correct?
4        MS. POWELL: Objection; vague,
5 misleading.
6        THE WITNESS: I think I previously
7 testified to the ways that TSC pushes TSDB
8 information to the FBI.
9 BY MR. ABBAS:
10    Q. Okay. So TSDB status is shared by TSC
11 with the FBI and other agencies; correct?
12        MS. POWELL: Objection; vague,
13 misleading.
14        THE WITNESS: TSDB status?
15 BY MR. ABBAS:
16    Q. Yes. Whether someone is or is not in
17 the TSDB -- I'll just withdraw it.
18        The FBI knows -- has access to the
19 entire contents of the TSDB; correct?
20        MS. POWELL: Objection; mischaracterizes
21 prior testimony.
22        MR. ABBAS: I'm not referring to his

111

1 prior testimony. If I'm wrong, tell me I'm wrong.
2        THE WITNESS: Yeah, I would not
3 characterize it as the FBI -- the whole FBI has
4 access to the whole TSDB, that is not accurate.
5 BY MR. ABBAS:
6    Q. Does the FBI have access to the
7 identifying information of the TSDB?
8        MS. POWELL: Objection; vague and
9 misleading.
10        THE WITNESS: The FBI has the access,
11 the TSDB pushes information to the FBI in
12 Sentinel, in the case management system, and in
13 NCIC. That information can be viewed if queried
14 in those systems.
15 BY MR. ABBAS:
16    Q. So when an act of terrorism happens
17 inside the United States --
18    A. Yes.
19    Q. -- the FBI has the ability to determine
20 whether the perpetrator of the act of terrorism
21 was or was not in the TSDB at the time they commit
22 an act of terrorism; correct?

112

1    A. Yes.
2    Q. And the FBI could query the NCIC to
3 determine whether the perpetrator of the act of
4 terrorism inside the United States was or was not
5 in the TSDB at the time they committed their act
6 of terrorism; correct?
7        MS. POWELL: Objection; mischaracterizes
8 prior testimony, vague.
9        THE WITNESS: So I previously testified
10 that if an act of terrorism occurs, the FBI will
11 absolutely be interested in whether or not the
12 person was watchlisted.
13 BY MR. ABBAS:
14    Q. And you could query the NCIC to
15 determine whether the person was watchlisted;
16 correct?
17        MS. POWELL: Objection; mischaracterizes
18 prior testimony, vague, and misleading.
19        THE WITNESS: That's accurate.
20 BY MR. ABBAS:
21    Q. Okay. Is the NCIC -- does the NCIC
22 contain SSI information?

Transcript of Matthew J. DeSarno, Designated Representative
Conducted on April 9, 2018

29 (113 to 116)

---

113

1        MS. POWELL: Objection; calls for a
2   legal conclusion.
3        THE WITNESS: I don't know.
4   BY MR. ABBAS:
5        Q.   Okay.
6        A.   That's a legal call.  I don't know.
7        Q.   Fair.  Okay.
8            Is it the FBI's position that the status
9   of individuals on the watchlist is SSI
10  information?
11       MS. POWELL: Objection; calls for a
12  legal conclusion.  There is, in fact, a TSA reg on
13  this.
14       MR. ABBAS: Go ahead.
15       THE WITNESS: Yeah, I don't have -- I
16  don't know the answer to that.  That's a legal
17  question.
18  BY MR. ABBAS:
19       Q.   Who aside from law enforcement agencies
20  have access to NCIC?
21       A.   I don't know of any people that are not
22  affiliated with a law enforcement agency that have

---

114

1   access to NCIC.
2        Q.   Do any private entities have access to
3   NCIC?
4        A.   I'm not aware of any private entities
5   that have carte blanche access to NCIC or have law
6   enforcement access to NCIC.
7        Q.   Does any private entity have any type of
8   access to NCIC?
9        A.   Not that I'm aware of.
10       Q.   Okay.
11       A.   I'm not aware of any.
12       Q.   So when you said "carte blanche," that's
13  where I'm -- is there some access that private
14  entities are given?
15       A.   Not that I'm aware of inside NCIC, no.
16  But as I testified previously, NCIC pulls in from
17  a lot of different systems and some of those may
18  have some private access to a specific system that
19  NCIC's pulling from, but I don't know of any
20  private entities that have access to NCIC.
21       Q.   Does the NCIC provide access to any
22  private databases?

---

115

1        A.   Not specifically through NCIC.  I know
2   that in some states, you can access through a
3   portal -- through your state portal, you can
4   access a suite of tools which include NCIC and may
5   include something like LexisNexis or some public
6   records type system in the same portal, but I
7   don't think that they're part of NCIC, though.
8        Q.   Does the FBI regulate in any way which
9   private databases are made available through NCIC?
10       MS. POWELL: Objection; mischaracterizes
11  prior testimony.
12       THE WITNESS: They're not made available
13  through NCIC.
14  BY MR. ABBAS:
15       Q.   You indicated that some --
16       A.   Different states have different
17  interfaces to the system.  Some of those
18  interfaces include a menu of -- a menu of choices
19  and some of those choices are likely public
20  records checks and private systems as well.
21       Q.   Who decides what private systems are
22  included in those menu of choices that you're

---

116

1   referring to?
2        A.   The FBI does not decide that.
3        Q.   So state and local authorities do?
4        A.   Yes, likely.
5        Q.   Okay.  Great.
6        MR. ABBAS: 30 minutes for lunch?
7        MS. POWELL: Yes.
8        (Luncheon recess from the record.)
9        A F T E R N O O N   S E S S I O N
10           (1:00 p.m.)
11       THE REPORTER: So this is the court
12  reporter and we have been on the record for two
13  and hours nine minutes.
14       MS. POWELL: I propose asking a couple
15  of clarifying questions with respect to prior
16  testimony.
17  MATTHEW J. DESARNO,
18      having been previously sworn, resumed the
19      stand and testified further as follows:
20  EXAMINATION BY COUNSEL FOR THE DEFENDANTS
21  BY MS. POWELL:
22       Q.   First, Mr. DeSarno, you previously

---

Transcript of Matthew J. DeSarno, Designated Representative

30 (117 to 120)

Conducted on April 9, 2018

---

117

1 testified that the FBI knows how many user
2 accounts there are for NCIC. Can you explain what
3 that means?
4    **A.   So that's how many individual ORIs**
5 **exist, which an ORI is an originating record**
6 **identifier.  So an ORI can belong to a department**
7 **or to a specific station to a terminal so the FBI**
8 **can track the ORIs.  And then it's up to the**
9 **individual departments to issue access to the ORI**
10 **and they have a responsibility to have an**
11 **auditable process.**
12    Q.  All right.
13       MR. ABBAS:  Can I ask him a question on
14 that?
15       MS. POWELL:  Sure.
16 EXAMINATION BY COUNSEL FOR THE PLAINTIFFS (CONT'D)
17 BY MR. ABBAS:
18    Q.  So the FBI doesn't know how many
19 individual persons as part of their state and
20 local law enforcement responsibilities query the
21 NCIC; correct?
22    **A.  I guess that's correct.  I mean, I would**

---

118

1 **imagine there is some process, some probably**
2 **exhaustive, burdensome process that if they needed**
3 **to know how many individual users had accessed**
4 **each ORI, it's probably able to be found, but the**
5 **tracking exists to the ORI.**
6    Q.  And ORI stands for what?
7    **A.   Originating record identifier.**
8    Q.  Does the number of -- does the FBI know
9 the number of NCIS -- I'm sorry --
10       MS. POWELL:  That would be different.
11    Q.  Does the FBI know the number of NCIC
12 inquiries that are made of NCIC?
13       MS. POWELL:  Objection; vague, but --
14    Q.  Do you know how many times the NCIC has
15 been queried?
16       MS. POWELL:  Same objection.
17       THE WITNESS:  Yeah, I don't know.  I
18 mean, there is -- there are audit -- there's an
19 audit unit and there are audit -- regular audits
20 so I would expect that there are records of that,
21 but I don't know the answer to it.
22

---

119

1 BY MR. ABBAS:
2    Q.   And just -- and that's fine.
3       And just to clarify, does the -- I asked
4 you if you knew, but let me ask -- you're here as
5 the FBI.
6       Does the FBI know how many times the
7 NCIC database has been queried?
8       MS. POWELL:  Objection; scope and
9 potentially vague.
10       THE WITNESS:  Yeah, I don't know.
11 BY MR. ABBAS:
12    Q.   Does the FBI know how many times each
13 individual -- I'm sorry.
14       Does the FBI know how many NCIC queries
15 are generated by each ORI?
16    **A.   I would expect that they do, but I**
17 **haven't seen that audit report.  But I -- I think**
18 **that that is -- can be audited and confirmed.**
19    Q.   Okay.  But today sitting here, you don't
20 know?
21    **A.   I don't know specifically.**
22    Q.   Okay.

---

120

1       MR. ABBAS:  Okay.
2 EXAMINATION BY COUNSEL FOR THE DEFENDANTS (CONT'D)
3 BY MS. POWELL:
4    Q.   And the second question was you
5 previously testified that the TSDB is a tool to
6 prevent terrorist attacks by providing a common
7 operating picture and we objected to the provision
8 of any specific examples.  With that objection
9 remaining in place and without sharing any
10 privileged information, can you provide any other
11 information about how the FBI uses it to prevent
12 terrorist attacks?
13    **A.   Sure.  So TSDB information combined in**
14 **some cases with encounter information and other**
15 **investigative information or intelligence, that**
16 **body of information and evidence and intelligence**
17 **combined with other potentially -- with other**
18 **sources can inform investigative strategy,**
19 **disruption strategy, prevention of terrorism**
20 **strategy.  So when taken together and combined**
21 **with other information, it can help us to be more**
22 **preventive in our work.**

---

Transcript of Matthew J. DeSarno, Designated Representative
Conducted on April 9, 2018

31 (121 to 124)

121

1  EXAMINATION BY COUNSEL FOR THE PLAINTIFFS (CONT'D)
2  BY MR. ABBAS:
3      Q.  In your answer, are you referring to
4  specific instances when TSDB information combined
5  with other information has prevented an act of
6  terrorism?
7          MS. POWELL: To the extent that's a
8  yes-or-no question --
9          MR. ABBAS: It is.
10         MS. POWELL: -- you can answer.
11         MR. ABBAS: It is a yes-or-no question.
12         THE WITNESS: No.
13 BY MR. ABBAS:
14     Q.  Okay.  Great.
15         Okay.  Is the -- the FBI keeps track of
16 the number of times a person in the TSDB is
17 encountered with -- I'm sorry.
18         The FBI receives information about
19 encounters with persons on the TSDB from other
20 government agencies; correct?
21         MS. POWELL: Objection; vague.
22         THE WITNESS: In some instances, yes.

122

1  BY MR. ABBAS:
2      Q.  When a local police officer pulls
3  someone over and queries the TSDB -- I'm sorry.
4          When a local law enforcement pulls
5  someone over and queries NCIC, if that person that
6  was pulled over is in TSDB, does the FBI learn of
7  the local law enforcement traffic stop?
8          MS. POWELL: Objection; vague and
9  potentially misleading.
10         THE WITNESS: Not necessarily.  If the
11 local law enforcement officer gets a hit to the
12 KST file, it would likely be directed to the TSC
13 to make a notification.  So depending on what's in
14 that record typically the call would go to the
15 24-hour call center at the TSC.  The TSC would
16 then make an assessment as to what to do with that
17 information.
18         In many instances if this occurs inside
19 the United States, there would be a notification
20 to the FBI, but there are instances where it may
21 not.  The other -- I mean, the -- so that
22 basically explains a U.S. -- a continental U.S.

123

1  traffic stop to the TSC for a decision, TSC would
2  push to FBI if applicable.
3  BY MR. ABBAS:
4      Q.  How does the local law enforcement
5  officer know to contact the TSC if that local law
6  enforcement officer pulls over during a traffic
7  stop a TSDB listee?
8      **A.  So if a local law enforcement officer**
9  **runs NCIC, the NCIC return from the KST will tell**
10 **the local law enforcement officer -- depending on**
11 **the entry would tell the local law enforcement**
12 **officer different things which would frequently**
13 **include contact the TSC.  Part of that contact is**
14 **also to resolve the identity, whether or not this**
15 **person that's stopped is actually a match, an**
16 **identity match to a person on the TSDB.**
17     Q.  Why is it of interest to the FBI whether
18 a local law enforcement officer has pulled over a
19 person that's listed in the TSDB?
20         MS. POWELL: Objection; vague,
21 potentially mischaracterizes prior testimony, and
22 misleading.

124

1          MR. ABBAS: I'll withdraw the question.
2  BY MR. ABBAS:
3      Q.  Is the FBI interested in tracking
4  encounters with TSDB listees?
5          MS. POWELL: Potentially calls for law
6  enforcement sensitive information.
7          You can answer at a level of generality.
8          THE WITNESS: I mean, as I testified
9  just previously, the encounter information when
10 combined with other investigative information can
11 inform strategies, disruption efforts, and other
12 investigative steps that are appropriate with
13 regards to specific terrorism subjects.
14 BY MR. ABBAS:
15     Q.  Has an encounter with a TSDB listee ever
16 resulted in a terrorism-related arrest?
17         MS. POWELL: Objection.
18         I'm going to instruct the witness not to
19 answer on the grounds of the law enforcement
20 privilege, also vague and potentially misleading.
21     Q.  Do you know whether an encounter with a
22 person in the TSDB has ever led to a

Transcript of Matthew J. DeSarno, Designated Representative
Conducted on April 9, 2018

32 (125 to 128)

125

1 terrorism-related arrest?
2      MS. POWELL: Do you know?
3      MR. ABBAS: It's a yes-or-no question.
4      MS. POWELL: Okay. Well, I'm still
5 going to object, it's vague and misleading, but
6 answer if you -- I guess --
7      THE WITNESS: The inclusion in the TSDB
8 is not what's at issue in regards to a
9 terrorism-related arrest. If a person, which has
10 happened before, is wanted on an arrest warrant
11 and they're run in NCIC, their inclusion in the
12 TSDB would be secondary to the warrant that pops
13 up that causes the arrest. If that person was
14 wanted on terrorism-related charges, that would be
15 a terrorism arrest. That does happen, yes.
16 BY MR. ABBAS:
17     Q. It's your testimony that an encounter
18 with a TSDB listee has resulted in a
19 terrorism-related arrest?
20      MS. POWELL: Objection; mischaracterizes
21 prior testimony.
22      MR. ABBAS: Yeah, I agree.

126

1      THE WITNESS: My testimony is that an
2 encounter with a wanted person who may also be on
3 the TSDB has resulted in that.
4 BY MR. ABBAS:
5      Q. I understand what you're saying, I
6 apologize for cutting you off. I understand what
7 you're saying about a wanted person, but I'm
8 asking more specifically about a terrorism-related
9 arrest whether or not there's a warrant that's
10 terrorism related.
11      Okay. Has a person in the TSDB ever
12 been arrested for a terrorism-related offense
13 during an encounter?
14      MS. POWELL: Objection.
15      I'm going to instruct him not to answer
16 on the basis of the law enforcement privilege, but
17 it's also vague and confusing.
18     Q. Is the FBI aware of any time in which
19 there was an encounter with a TSDB listee during
20 which there was a terrorism-related arrest?
21      MS. POWELL: Objection; it's vague and
22 confusing I think is the problem, but it also

127

1 potentially calls for law enforcement sensitive
2 information about -- if you're asking questions
3 about specific encounters, I would instruct him
4 not to answer.
5      MR. ABBAS: It's a yes-or-no question.
6 BY MR. ABBAS:
7      Q. Is the FBI aware of any time in which
8 there was an encounter with a TSDB listee during
9 which there was a terrorism-related arrest? The
10 FBI keeps track of encounters with TSDB listees
11 so --
12      MS. POWELL: It mischaracterizes --
13     Q. -- it certainly knows whether any of
14 those encounters lead to terrorism-related arrests
15 so that's what the question is about.
16      MR. ABBAS: So let me ask it and then
17 you can make your objections.
18      MS. POWELL: Okay.
19      MR. ABBAS: And then hopefully we get an
20 answer.
21 BY MR. ABBAS:
22     Q. Is the FBI aware of any encounters with

128

1 TSDB listees that have resulted in
2 terrorism-related arrests? It's a yes-or-no
3 question.
4      **A. It's not a yes-or-no question.**
5      Q. Yes, it is.
6      MS. POWELL: I'm going to instruct the
7 witness not to answer on the grounds of law
8 enforcement privilege.
9      MR. ABBAS: The law enforcement
10 privilege?
11      MS. POWELL: Yes.
12      MR. ABBAS: Okay.
13 BY MR. ABBAS:
14     Q. Why does the FBI disseminate watchlist
15 information to state and local authorities via
16 NCIC?
17     **A. The FBI doesn't disseminate the**
18 **information, the FBI stores the information. And**
19 **if a subject is queried at NCIC, that information**
20 **becomes available to the querying person.**
21     Q. Sure. And the FBI, right, administers
22 NCIC and makes the KST file available to state and

129
1  local authorities --
2        MS. POWELL:  Objection;
3  mischaracterizes.
4     Q.  -- via NCIC; correct?
5     **A.  I would not characterize it that way.**
6        MS. POWELL:  Let me just squirrel in the
7  objection there of vague and misleading, but go
8  ahead.
9        THE WITNESS:  So the way you're
10 characterizing it sounds like you are envisioning
11 that people with access to NCIC have access to
12 this larger list of KSTs, that is not accurate.
13 BY MR. ABBAS:
14    Q.  That's not what my question was.
15       Does the FBI make TSDB information
16 available in any way to state and local
17 authorities?
18       MS. POWELL:  Objection; vague.
19       THE WITNESS:  Yes, upon a query related
20 to a specific person.
21 BY MR. ABBAS:
22    Q.  Got it.  Did the FBI make a conscious

130
1  decision to include the ability in NCIC for state
2  and local authorities to query NCIC in a way that
3  reveals whether the person that is the focus of a
4  law enforcement activity is in the TSDB?
5        MS. POWELL:  Objection; vague.
6        THE WITNESS:  The HSPD-6 issued in
7  September of 2003 specifically calls for the
8  sharing across with state and local law
9  enforcement, the sharing of KST information to
10 state and local law enforcement.  The mechanism by
11 which that occurs is through the NCIC.
12 BY MR. ABBAS:
13    Q.  So the FBI in making TSDB information
14 available to be queried via NCIC is acting in
15 accordance with HSPD-6's directives?
16       MS. POWELL:  Objection; calls for a
17 legal conclusion, but you can answer.
18       THE WITNESS:  President Bush directed
19 the government to make it available to state and
20 local law enforcement officers.  The existing
21 system at the time and currently was the NCIC.
22       MR. ABBAS:  You're not answering the

131
1  question.
2        Can you read back the question.
3        (Record read.)
4  BY MR. ABBAS:
5     Q.  It's a yes-or-no question.
6        MS. POWELL:  Same objection.
7        THE WITNESS:  Yes.
8  BY MR. ABBAS:
9     Q.  Great.  Why did the -- has -- to the
10 FBI's knowledge, has a state or local law
11 enforcement officer who encountered a TSDB listee
12 ever made a terrorism-related arrest of the TSDB
13 listee that they're querying?
14       MS. POWELL:  Objection; vague and
15 potentially calls for law enforcement sensitive
16 information.
17       If you can answer at a level of
18 generality without revealing privileged
19 information --
20       MR. ABBAS:  I'll withdraw the question.
21 BY MR. ABBAS:
22    Q.  If a state and local law enforcement

132
1  officer arrests a person in the TSDB, is it the
2  FBI's expectation that that would be notated
3  somehow in the TSDB?
4        MS. POWELL:  Objection; vague.
5        THE WITNESS:  No, not in the TSDB.
6  BY MR. ABBAS:
7     Q.  Where would it be notated?
8        MS. POWELL:  Objection; scope.
9        THE WITNESS:  I mean, I don't think that
10 the TSDB is where that would be notated.
11 BY MR. ABBAS:
12    Q.  In the Sentinel database, is that where
13 it would be notated if a state and local law
14 enforcement officer encountered someone that's on
15 the TSDB and arrested that person for any reason
16 at all?
17       MS. POWELL:  Objection; vague.
18       THE WITNESS:  Yeah, I don't know -- I
19 mean, based on your question, I don't know where
20 it would be notated.  It would depend on a lot of
21 factors, the circumstances of arrest, who made the
22 arrest, what the offenses were.

Case 1:16-cv-00375-AJT-JFA   Document 306-31   Filed 03/12/19   Page 36 of 102 PageID#
14567
Transcript of Matthew J. DeSarno, Designated Representative         34 (133 to 136)
Conducted on April 9, 2018

133
1  BY MR. ABBAS:
2      Q.  So the FBI has no information about how
3  a state and local law enforcement officer who
4  encounters a TSDB listee, how that encounter gets
5  recorded?
6          MS. POWELL:  Objection; mischaracterizes
7  prior testimony.
8      Q.  It's just -- I'm surprised that the
9  deponent who's testifying on behalf of the FBI has
10 no information about basic --
11         MS. POWELL:  He has information.
12         MR. ABBAS:  -- things.
13         MS. POWELL:  He said it depends.  That's
14 not no information.
15         MR. ABBAS:  Can you just read the last
16 question.
17         (Record read.)
18 BY MR. ABBAS:
19     Q.  Do you have any information about how a
20 state or local law enforcement officer who
21 encounters a TSDB listee records the outcome of
22 that encounter?  It's a yes-or-no question.

134
1      **A.  It's not a yes-or-no question about**
2  **whether I have information.**
3      Q.  So I'll ask you a follow-up question
4  about what information you have, but the first
5  step is I want to know if you have any
6  information.  And if the answer is no, that's fine
7  and we can just move on.  But if you do have
8  information, then I want to ask you questions
9  about it.  Okay.  So that's why the first question
10 is like a foundation question, it's a yes-or-no
11 question.
12         MS. POWELL:  It's also vague and
13 confusing and misleading.
14     Q.  Do you have any information about how a
15 state or local law enforcement officer
16 encountering a TSDB listee records the outcome of
17 that encounter with the TSDB listee?
18         MS. POWELL:  Objection; vague and
19 misleading.
20         THE WITNESS:  I mean, every encounter is
21 different and every encounter may be recorded
22 differently.

135
1  BY MR. ABBAS:
2      Q.  What do you know about how state and
3  local law enforcement officers record encounters
4  with TSDB listees?
5          MS. POWELL:  Objection; vague, but
6  answer to the extent you can.
7          THE WITNESS:  As I said, there are a
8  variety of different encounters.
9  BY MR. ABBAS:
10     Q.  Let's go through all of them.  Let's go
11 through all of the variety of different
12 encounters.
13         Do you have a number of the variety of
14 different encounters with TSDB listees?
15     **A.  I would argue that every encounter is**
16 **different.**
17     Q.  So there's no broad categories of
18 encounters with TSDB listees?
19     **A.  Of course there are broad categories.**
20     Q.  What are the broad categories of
21 encounters with TSDB listees?
22     **A.  By whom?**

136
1      Q.  By the FBI.
2      **A.  The FBI doesn't have encounters.**
3      Q.  Okay.  The FBI doesn't have encounters?
4      **A.  Not in the sense of — an encounter, as**
5  **I understand it, is when an individual is going**
6  **through some screening process to include a law**
7  **enforcement stop or a TSA checkpoint or a border**
8  **checkpoint or a visa application and that**
9  **encounter results in a match or possible match to**
10 **a record in the TSDB.  That's an encounter.**
11         **The FBI generally is not screening**
12 **people, stopping people, encountering unknown**
13 **people and running them through systems.  It**
14 **happens occasionally, but it's very rare.  Local**
15 **law enforcement do that frequently and the**
16 **categories could be traffic stop, it could be**
17 **arrest, it could be field interview, it could be**
18 **call to a house, it could be some sort of an**
19 **application for — some sort of application, local**
20 **municipal permit or something, those are all**
21 **potential encounters with local law enforcement**
22 **where a local law enforcement agency may run a**

Case 1:16-cv-00375-AJT-JFA   Document 306-31   Filed 03/12/19   Page 37 of 102 PageID# 14568
Transcript of Matthew J. DeSarno, Designated Representative    35 (137 to 140)
Conducted on April 9, 2018

137

1  person's identifiers and potentially have an
2  encounter with a person who's on the TSDB.
3        And in each of those instances, if it's
4  a live encounter with a live person, there are
5  many factors informing the police officer's
6  actions, one of which is potentially an alert
7  coming back from NCIC that this person is a KST.
8  Other things are where is this person's hands,
9  what's the lighting situation, how many people are
10 in the car, what's -- all those types of -- all
11 those pieces of information are informing that
12 encounter between a local police officer and a
13 subject, one of which is potentially a
14 notification from NCIC about KST.
15    Q.   Great.  Excellent.
16    A.   That's why it's not such a simple
17 question.
18    Q.   Okay.  The answer would have been yes
19 and then the information you provided.
20    MS. POWELL:  Are we testifying now,
21 Gadeir?
22    Q.   Are there a standard set of alerts that

138

1  NCIC issues to state and local law enforcement
2  encountering TSDB listees?
3        MS. POWELL:  Objection; vague,
4  potentially calls for law enforcement information.
5        To the extent you can answer at a level
6  of generality.
7        THE WITNESS:  Generality only?
8        MS. POWELL:  I think so.
9        MR. ABBAS:  Well --
10       THE WITNESS:  The answer is yes, there
11 are different notifications that accompany the
12 message from NCIC to the police officer based on
13 different circumstances related to that subject.
14 BY MR. ABBAS:
15    Q.   And those alerts provide guidance to the
16 local and state law enforcement officer as to how
17 to handle the encounter with a TSDB listee?
18    A.   The primary purpose of those alerts are
19 for the safety of the officer having the
20 encounter.  The secondary purpose may be to
21 provide some instruction as to how to handle the
22 subject.

139

1     Q.   Well, I don't understand how those two
2  are different.  So I understand the primary
3  purpose is safety.  So if a person is on the TSDB
4  listee, does the NCIC issue an alert to the law
5  enforcement officer to be careful, this person is
6  in the TSDB?
7        MS. POWELL:  Objection.  I think the
8  specifics of the language are going to be covered
9  by the law enforcement privilege.
10       I'm going to instruct him not to provide
11 specifics.
12    Q.   The primary purpose of the alerts that
13 NCIC provides to law enforcement officers who
14 encounter a TSDB listee is their safety; correct?
15       MS. POWELL:  Objection; vague.
16       THE WITNESS:  Correct, officer's safety.
17 BY MR. ABBAS:
18    Q.   Yes.  And how does -- the NCIC alert
19 that is provided to local law enforcement officers
20 who encounter a TSDB listee, how does that
21 contribute to officer safety?
22       MS. POWELL:  Again, the specifics of the

140

1  language are covered by the law enforcement
2  privilege and I'd instruct you not to give them.
3        If there's a level of generality answer
4  you can give, please do.
5        THE WITNESS:  Okay.  As I previously
6  testified, if a local law enforcement officer is
7  in contact with a subject for any variety of
8  reasons that we discussed earlier, they're taking
9  in a lot of information about that subject in a
10 very short period of time.  One piece of that
11 information may be a message from NCIC about the
12 person's inclusion in the KST file.  Other pieces
13 of information may be other messages from NCIC
14 and/or observations that the police officer is
15 making as the encounter occurs.  So all those
16 things together create the situational awareness
17 environment for the police officer in an attempt
18 to ensure that he has a safe operating environment
19 and that he can operate within the laws and
20 policies of his department.
21 BY MR. ABBAS:
22    Q.   Are there standard alerts that NCIC

Case 1:16-cv-00375-AJT-JFA   Document 306-31   Filed 03/12/19   Page 38 of 102 PageID#
14569
Transcript of Matthew J. DeSarno, Designated Representative
Conducted on April 9, 2018

36 (141 to 144)

141
1  issues to law enforcement officers encountering
2  TSDB listees?  It's a yes-or-no question, are
3  there standard alerts?
4      MS. POWELL:  I think you can answer yes
5  or no.
6      THE WITNESS:  Yes.
7  BY MR. ABBAS:
8      Q.  How many standard alerts are there that
9  NCIC issues to law enforcement officers
10 encountering TSDB listees?
11     MS. POWELL:  And I'm instructing the
12 witness not to answer on the grounds of the law
13 enforcement privilege.
14     Q.  So you're not going to tell me the
15 number of -- I think it's probably three, I'm not
16 sure, it may be more.
17     Are there -- how do -- how do these
18 alerts -- who assigns -- let me start all over.
19     Who decides what standardized alert NCIC
20 will provide to law enforcement officers
21 encountering TSDB listees?
22     MS. POWELL:  Objection; vague, but

142
1  answer to the extent you can.
2      THE WITNESS:  I don't know who decides
3  that.
4  BY MR. ABBAS:
5      Q.  What agency decides which alerts NCIC
6  provides to law enforcement officers encountering
7  TSDB listees?
8      MS. POWELL:  I have to register a
9  general objection at this point.  The court's
10 protective order specifically indicated that this
11 topic should be treated at a level of generality
12 which we are long since past.
13     MR. ABBAS:  This is like a super basic
14 question.  You're giving instructions so
15 right -- the FBI's testimony is they're giving
16 instructions or guidance to local law enforcement
17 that's encountering listees and I'm just asking
18 questions about where that guidance comes from or
19 who creates it.
20     MS. POWELL:  And I am registering an
21 objection as to scope.  And at some point if we
22 stay down in the weeds, I'm going to instruct him

143
1  not to answer on the basis of the protective
2  order, but we're not there yet.
3      MR. ABBAS:  Do you want the question
4  read back?
5      THE WITNESS:  No, I got the question.
6  BY MR. ABBAS:
7      Q.  Okay.  Great.  Excellent.
8      A.  So similar to the TSC, the NCIC is
9  administered by the FBI, but not solely controlled
10 by the user term or governed by a single agency.
11 There is a board of multiple state, local, federal
12 agencies that convene regularly to determine
13 things like the language in a specific guidance or
14 message because the FBI doesn't make traffic stops
15 as a matter of course so the FBI doesn't create
16 the language in there that says how to handle
17 different types of subjects during traffic stops.
18 Those come from a consensus among an interagency
19 group of experts in different fields who create
20 that type of guidance.
21     Q.  Okay.  Great.  See I didn't know that,
22 now I do.  That's great.

144
1      MS. POWELL:  We live to please.
2      Q.  What is the board -- the interagency
3  board that oversees NCIC?
4      A.  I don't know the name of the board, but
5  I do know that it exists.
6      Q.  Okay.
7      A.  I don't know the specific name of it.
8      Q.  And the FBI participates in that board?
9      A.  Yes.
10     Q.  Does the FBI chair that board?
11     A.  I don't know who chairs it, but I would
12 imagine the FBI probably has a leadership role
13 since they administer the system.
14     Q.  Got it.  That makes sense.
15     The board is not -- well, I'll ask, does
16 the board for each person that's in the TSDB make
17 a person-by-person determination as to what alert
18 is associated with each TSDB listee?
19     A.  I'm totally confused by that question.
20     Q.  The alerts are attaching to TSDB listees
21 at some point; correct?  At some point, someone is
22 making a decision that this standardized alert is

145

1 going to correspond with this TSDB listee?
2    **A.   Correct.**
3    Q.   Correct?
4    **A.   Correct.**
5    Q.   Okay.  When in the watchlisting process
6 does an alert get paired with a TSDB listee?
7    **A.   Can I answer that?**
8       MS. POWELL:  I think so, yeah.
9       THE WITNESS:  At nomination.
10 BY MR. ABBAS:
11    Q.   Okay.  So if the FBI nominates a person
12 to the TSDB, the FBI agent that's nominating that
13 person is also determining if the nomination is
14 accepted what alert will accompany that TSDB
15 listee when that TSDB listee is queried in the
16 NCIC?
17       MS. POWELL:  Objection; vague and
18 misleading.  And, again, scope.  We're getting
19 well beyond what the court said was appropriate in
20 this area.
21       MR. ABBAS:  Go ahead.
22       MS. POWELL:  To the extent you can

146

1 answer.
2       THE WITNESS:  Upon nomination, the
3 nominating agent, in this case if it was an FBI
4 nomination, can request that the nomination be
5 included and can request a specific handling code
6 with the nomination.  But the FBI does not make
7 any decisions about inclusion on the list, which
8 would mean the FBI is not determining that that's
9 going on the list, that's just information that
10 goes with the nomination.
11 BY MR. ABBAS:
12    Q.   So like the FBI agent that nominates a
13 person to be on the listee [sic] proposes a
14 handling code to be assigned to each listee?
15    **A.   If the circumstances suggest that a**
16 **specific handling code should be applied, the**
17 **agent can request that.**
18    Q.   Whose decision ultimately is it to
19 attach handling codes to TSDB listees -- let me
20 withdraw it.
21       Which agency decides which handling
22 codes are assigned to which TSDB listees?

147

1       MS. POWELL:  I'm sorry, could you ask
2 again?
3       MR. ABBAS:  Yes.
4 BY MR. ABBAS:
5    Q.   Which agency decides which, if any,
6 handling code is assigned to a TSDB listee?
7       MS. POWELL:  Objection.
8       I'm going to instruct the witness not to
9 answer on the grounds of the law enforcement
10 privilege, scope, and the court's protective
11 order.
12       MR. ABBAS:  So it's secret law
13 enforcement privilege about like who decides?  I
14 mean, it's your choice, but that seems like
15 way -- like clearly not law enforcement.
16       MS. POWELL:  Well, handling codes are
17 way outside the scope of the court's order at this
18 point as well as the originally proposed topics.
19       MR. ABBAS:  The transcript which I
20 read --
21       MS. POWELL:  And you're getting far
22 enough into --

148

1       MR. ABBAS:  -- in the morning, again, is
2 very clear that handling codes are absolutely
3 appropriate.  They regard the FBI's use of TSDB
4 information and this is like the easiest kind of
5 compel issue we have.  I would urge opposing
6 counsel to allow the witness to answer something
7 to avoid clearly additional deposition testimony
8 at a later date.  It's your choice.
9       MS. POWELL:  I'm happy to keep arguing
10 with you about it if you like.  We can burn
11 through some deposition time that way.
12       MR. ABBAS:  That's my pitch.  So I'm
13 going to ask the question again and you guys do
14 what you like.
15       Can we go back to the last question?
16       (Record read.)
17 BY MR. ABBAS:
18    Q.   Which agency decides which, if any,
19 handling code is assigned to a TSDB listee?
20       MS. POWELL:  And I'm instructing the
21 witness not to answer on the grounds of the
22 court's protective order, the scope of the topic,

Transcript of Matthew J. DeSarno, Designated Representative

Conducted on April 9, 2018

38 (149 to 152)

149

1  and the law enforcement privilege.
2      MR. ABBAS: Okay.
3  BY MR. ABBAS:
4      Q.  You stated that the primary purpose of
5  the alerts that NCIC provides to law enforcement
6  officials that encounter TSDB listees as the
7  safety of the law enforcement officers; correct?
8      A.  Yes.
9      Q.  But it's not the only purpose; correct?
10     A.  Correct.
11     Q.  You said that there's a secondary
12 purpose; correct?
13     A.  Yes.
14     Q.  What is the secondary purpose of
15 providing alerts to local and state law
16 enforcement officers via the NCIC?
17     A.  To provide guidance to that officer as
18 to how to handle that subject.
19     Q.  Is the guidance that the NCIC alerts
20 binding on the local or state law enforcement
21 officer who is encountering a TSDB listee?
22     MS. POWELL: Objection; calls for legal

150

1  conclusion I think.  Either that or it's a vague
2  question.
3      MR. ABBAS: Go ahead.
4      THE WITNESS: Binding?
5  BY MR. ABBAS:
6      Q.  Yes.
7      A.  I mean, I think that does call for a
8  legal conclusion, but I don't -- there may be some
9  that are binding or some that require them to do
10 something, there's some that don't, some that are
11 notifications.
12     Q.  So it's the FBI's testimony that some
13 alerts require local and state law enforcement
14 officials to do particular things during their
15 encounter with a TSDB listee?
16     MS. POWELL: Objection; mischaracterizes
17 prior testimony, is vague, and calls for a legal
18 conclusion.
19     MR. ABBAS: Go ahead.
20     THE WITNESS: There is no relationship
21 where the FBI is requiring a local law enforcement
22 agency to do something based on an NCIC message.

151

1  That's not the way that works.  The NCIC message
2  is for officer's safety first, for specific
3  handling instructions second.  And based on those
4  instructions, it may require a reasonable officer
5  to take certain steps, it depends on the message.
6  BY MR. ABBAS:
7      Q.  Are there any messages that local and
8  state law enforcement officers receive via NCIC
9  that regard TSDB listees that direct them to do
10 particular things as they encounter a TSDB listee?
11     MS. POWELL: Objection; vague.
12     Q.  If the answer is no, that's fine.
13     MS. POWELL: To the extent you're asking
14 questions about what handling codes do
15 specifically, I'm going to instruct him not to
16 answer.
17     MR. ABBAS: That's not what I'm asking.
18     MS. POWELL: Okay.  What are asking?
19     MR. ABBAS: I'm just asking whether the
20 NCIC alerts require the local and state law
21 enforcement officers to do anything.
22     MS. POWELL: And, again, I'm going to

152

1  object that it calls for a legal conclusion.
2      MR. ABBAS: You can still answer.
3      THE WITNESS: I don't think I can answer
4  without getting into specifically what the
5  differently handling codes are which has been
6  asserted as a privilege.
7      MS. POWELL: Then I'm going to instruct
8  him not to answer.
9      MR. ABBAS: That's fine.
10 BY MR. ABBAS:
11     Q.  But there are handling codes; correct?
12     A.  Yes.
13     Q.  Okay.  Are local and state law
14 enforcement officers expected to adhere to the
15 guidance contained in handling codes assigned to
16 TSDB listees?
17     MS. POWELL: Objection as to scope and
18 protective order and potentially the law
19 enforcement privilege; but to the extent there's a
20 yes-or-no answer, I think you can give it.
21     THE WITNESS: Yes.
22

Transcript of Matthew J. DeSarno, Designated Representative
Conducted on April 9, 2018

153

1 BY MR. ABBAS:
2      Q.  Are you aware of any instances in which
3 local and state law enforcement officers acted
4 contrary to handling codes assigned to TSDB
5 listees?
6           MS. POWELL:  I think I'm going to
7 instruct him not to answer on the grounds of law
8 enforcement privilege, unless you think there's a
9 general answer you can give.
10          THE WITNESS:  No.
11          MS. POWELL:  All right.  I'm instructing
12 him not to answer then.
13          MR. ABBAS:  On what basis?
14          MS. POWELL:  Law enforcement privilege.
15 BY MR. ABBAS:
16     Q.  Are the handling codes themselves stored
17 in the TSDB, the NCIC, or both?
18          MS. POWELL:  Objection as to scope and
19 protective order certainly, but answer if you can.
20          THE WITNESS:  What do you mean by
21 "stored"?
22

154

1 BY MR. ABBAS:
2      Q.  Contained within.
3           If I look at the TSDB, can I see the
4 handling codes assigned to TSDB listees?
5           MS. POWELL:  Objection as to scope and
6 misdirected to FBI in the first place.
7           MR. ABBAS:  Go ahead.
8           THE WITNESS:  The handling codes -- the
9 handling codes are attached to the entity and are
10 viewable through the KST file in NCIC.
11 BY MR. ABBAS:
12     Q.  Okay.  So they're viewable through NCIC,
13 I understand that; correct -- I'm sorry, let me
14 back up.
15          So the handling codes assigned to TSDB
16 listees are viewable via NCIC; correct?
17     **A.  Yes.**
18     Q.  Are the handling codes -- I'm sorry.
19          The FBI has the ability to query the
20 TSDB without using NCIC; correct?
21          MS. POWELL:  Objection; mischaracterizes
22 prior testimony.

155

1           MR. ABBAS:  If I'm wrong, tell me I'm
2 wrong.
3           THE WITNESS:  The FBI can view TSDB
4 status of an individual in the investigative case
5 file of that individual.
6 BY MR. ABBAS:
7      Q.  Which would be through the Sentinel
8 system; correct?
9      **A.  Yes, per individual.  It's not a big**
10 **list of all the people on the list.  It's that**
11 **subject has -- is on the watchlist and that**
12 **handling code would be visible if he has a**
13 **handling code.**
14     Q.  So within the Sentinel database, the FBI
15 can determine whether a person is or is not in the
16 TSDB; correct?
17          MS. POWELL:  Objection; vague,
18 misleading.
19          Answer if you can.
20          THE WITNESS:  Yes.
21 BY MR. ABBAS:
22     Q.  Are the handling codes shared with CBP's

156

1 automated targeting system, Passenger?
2           MS. POWELL:  Objection; scope, it's not
3 FBI information, the protective order and the law
4 enforcement privilege on that.
5           I'm going to instruct the witness not to
6 answer.
7      Q.  Do you know whether the handling codes
8 are shared with CBP's automated targeting system,
9 Passenger?  Yes-or-no question.
10          MS. POWELL:  I think you can answer
11 whether you know, although I still think it's
12 outside the scope and limited by the protective
13 order.
14          THE WITNESS:  If I can't answer the
15 question why --
16          MR. ABBAS:  You can answer.
17          MS. POWELL:  If you can give a yes-or-no
18 answer, please do.
19          THE WITNESS:  I don't know.
20 BY MR. ABBAS:
21     Q.  Okay.  That's an answer.
22          Does -- I think we're fine.

Transcript of Matthew J. DeSarno, Designated Representative
Conducted on April 9, 2018

---

157

1 Why is it -- okay.  Let's get back to
2 the secondary purpose of including TSDB
3 information in the NCIC.
4 What is the secondary purpose of
5 including TSDB information in NCIC?
6 MS. POWELL:  Objection; asked and
7 answered.
8 THE WITNESS:  The secondary purpose of a
9 handling code is to tell the policeman or to tell
10 the encountering person how to handle the subject.
11 BY MR. ABBAS:
12 Q.  And why is TSDB information relevant to
13 how a local officer is to handle a traffic stop
14 with a TSDB listee?
15 MS. POWELL:  Objection; scope, and
16 potentially calls for law enforcement information.
17 To the extent you can answer it at a
18 level of generality, do.  If not, don't.
19 THE WITNESS:  I mean, any information
20 available to an officer about a subject they're
21 encountering is available for two reasons; for
22 that officer's safety, and then as guidance on how

158

1 to handle the subject.  TSDB inclusion is
2 not -- is included in that body of information
3 that can inform an officer as to how to conduct
4 himself or herself in the stop.
5 BY MR. ABBAS:
6 Q.  Does the alert from NCIC that local and
7 state law enforcement officers receive when they
8 query TSDB listees include the derogatory
9 information that forms the basis of the TSDB
10 nomination of that person?
11 MS. POWELL:  Object only to the extent
12 that a comprehensive answer might require the
13 provision of law enforcement sensitive
14 information, but I think you can answer yes or no.
15 THE WITNESS:  No.
16 BY MR. ABBAS:
17 Q.  It just includes -- I'm sorry.
18 The alert from NCIC would just include
19 the handling code; correct?
20 MS. POWELL:  Objection, again, to the
21 extent we're getting into the specifics of the
22 language given and --

159

1 MR. ABBAS:  I'm not asking specifics of
2 the language.
3 MS. POWELL:  But you are it would seem.
4 I'm going to instruct the witness not to
5 answer.
6 MR. ABBAS:  All right.  I'm not asking
7 for the specific language.
8 MS. POWELL:  You're just asking what it
9 is.  Okay.  I'm going to instruct the witness not
10 to answer.
11 BY MR. ABBAS:
12 Q.  Does the NCIC alert include anything
13 other than the handling code?
14 MS. POWELL:  I'm going to instruct the
15 witness not to answer on the grounds of the law
16 enforcement privilege.
17 MR. ABBAS:  It's a yes-or-no question.
18 I'm being clear that I'm asking whether or not the
19 NCIC alert includes anything more than the
20 handling code itself.
21 MS. POWELL:  I'm instructing the witness
22 not to answer on the grounds of the law

160

1 enforcement privilege.
2 MR. ABBAS:  Okay.  Great.
3 BY MR. ABBAS:
4 Q.  How many times has a -- does the FBI
5 monitor -- I know the answer to this question,
6 right, so I'm not trying to be cute, but does the
7 FBI monitor acts of terrorism inside the United
8 States?
9 MS. POWELL:  Objection; vague.
10 MR. ABBAS:  It's foundation.  It's
11 foundation.
12 MS. POWELL:  Objection; vague.
13 MR. ABBAS:  To be clear.
14 THE WITNESS:  Monitor?
15 BY MR. ABBAS:
16 Q.  Yes.
17 Does the FBI keep track of acts of
18 terrorism that occur inside the United States?
19 MS. POWELL:  Objection; vague.
20 THE WITNESS:  Yes.
21 BY MR. ABBAS:
22 Q.  Okay.  Does the FBI know how many acts

Transcript of Matthew J. DeSarno, Designated Representative

41 (161 to 164)

Conducted on April 9, 2018

---

161

1 of terrorism occurred in the United States in the
2 last decade?
3      MS. POWELL:  Objection; vague.
4      THE WITNESS:  Yes.
5 BY MR. ABBAS:
6   Q.  Does the FBI know whether TSDB listees
7 have been responsible for acts of terrorism inside
8 the United States?
9      MS. POWELL:  Objection; vague,
10 misleading, and a comprehensive answer potentially
11 calls for law enforcement sensitive information
12 and SSI and potentially the state secrets
13 privilege.
14      MR. ABBAS:  Just looking for a yes or
15 no.
16      MS. POWELL:  I'm sorry, could you repeat
17 the question?
18      MR. ABBAS:  Yes.
19 BY MR. ABBAS:
20   Q.  Does the FBI know whether TSDB listees
21 have been responsible for acts of terrorism inside
22 the United States?

---

162

1      MS. POWELL:  To the extent you can give
2 a yes-or-no answer I think you can, just to
3 whether you know.
4      THE WITNESS:  Do I know, I already
5 answered that, yes.
6 BY MR. ABBAS:
7   Q.  Okay.  How many TSDB listees have
8 committed acts of terrorism inside the United
9 States?
10      MS. POWELL:  And I'm going to instruct
11 the witness not to answer on the grounds of the
12 law enforcement privilege, potentially the SSI and
13 state secrets privilege.
14   Q.  Does the FBI know whether a person in
15 the TSDB has ever committed an act of terrorism
16 related to commercial aviation?
17      MS. POWELL:  Objection -- wait, is the
18 question whether he knows?
19      MR. ABBAS:  Yes.  It's a yes-or-no
20 question.
21      MS. POWELL:  Okay.  Well, I'm going to
22 object that a comprehensive answer would require

---

163

1 the disclosure of law enforcement sensitive SSI or
2 state secrets information or some combination of
3 the above.  The question is vague and confusing,
4 but he can answer yes or no as to whether he
5 knows.
6      THE WITNESS:  So is the question about
7 an attack to commercial aviation inside the United
8 States?
9 BY MR. ABBAS:
10   Q.  Yeah.  And I'll repeat it.  I think it
11 is, but let me repeat the question just so we have
12 a clean record.
13      Can you read it back.
14      (Record read.)
15      MS. POWELL:  Same objections, but you
16 can answer if you -- if you're just answering yes
17 or no as to whether or not the FBI knows.
18      THE WITNESS:  Yes.
19 BY MR. ABBAS:
20   Q.  Okay.  I'm going to ask two numbers
21 questions that you're going to tell him not to
22 answer, but we just have to --

---

164

1      MS. POWELL:  Just so we're --
2      MR. ABBAS:  We're going to fight about
3 it later so not trying to be difficult.
4 BY MR. ABBAS:
5   Q.  How many persons have committed acts of
6 terrorism inside the United States while they're
7 in the TSDB?
8      MS. POWELL:  I'm going to instruct the
9 witness not to answer on the grounds of the law
10 enforcement privilege, potentially the SSI and
11 state secrets privilege, also vagueness.
12   Q.  And you're not answering the question?
13   **A.  No.**
14   Q.  Okay.  How many persons have committed
15 acts of terrorism regarding commercial aviation at
16 the time that they were in the TSDB?
17      MS. POWELL:  Same set of objections; law
18 enforcement privilege, SSI, and state secrets.
19      Instructing the witness not to answer.
20   Q.  Why does the FBI -- within the
21 watchlisting community, there is this term
22 "encounter information;" correct?

---

165

1    A.  Yes.
2    Q.  How does the FBI -- what does the FBI
3  mean when it refers to encounter information?
4        MS. POWELL:  Objection; vague.
5        THE WITNESS:  I mean, an encounter is
6  when there is a match or potential match between
7  the identity of a person being screened during
8  some screening process.  That's an encounter.
9  BY MR. ABBAS:
10   Q.  And it's an encounter with a TSDB
11 listee; correct?
12   A.  Potentially.
13   Q.  Is the term "encounter information"
14 specific to the TSDB?
15       MS. POWELL:  Objection; vague and
16 misleading.
17       THE WITNESS:  I mean, I consider
18 encounter information in the context of the TSDB
19 and watchlisting, yes.
20 BY MR. ABBAS:
21   Q.  Does the FBI consider encounter
22 information to be specific to the watchlisting

166

1  process?
2        MS. POWELL:  Objection; vague and
3  misleading.
4        THE WITNESS:  There's probably other
5  parts of the -- other places where encounters
6  means something else to other people; but from the
7  context of this conversation, I understand it to
8  mean TSDB encounters.
9  BY MR. ABBAS:
10   Q.  Right.  And you're here -- you're a
11 person, but you're also speaking on behalf of the
12 agency --
13   A.  Yeah.
14   Q.  -- so I just want to be clear that for
15 the purposes of FBI's deposition, when we discuss
16 encounter information during this deposition,
17 we're discussing it exclusively in regards to the
18 TSDB --
19       MS. POWELL:  Objections; vague.
20   Q.  -- correct?
21   A.  I mean, I understand that when we're
22 discussing encounters in this context, we're

167

1  talking about encounters related to the TSDB.
2  There may be other definitions inside of my
3  organization for encounter that are not related to
4  this and not related to the TSDB, so I don't want
5  to say that any time the FBI uses the word
6  "encounter," they're talking about a TSDB
7  encounter.
8    Q.  Where are all the places that encounter
9  information regarding TSDB listees can be found?
10       MS. POWELL:  Objection to the extent it
11 calls for information outside of FBI's role, also
12 vagueness.
13       MR. ABBAS:  Go ahead.
14       THE WITNESS:  I don't really understand
15 the question.  All the places encounter
16 information can be found?
17 BY MR. ABBAS:
18   Q.  Is encounter information with TSDB
19 listees included in the NCIC?
20   A.  No, I don't think so.
21   Q.  Okay.  Is encounter information with the
22 TSDB listees included in the Sentinel database?

168

1        MS. POWELL:  Objection; vague.
2        THE WITNESS:  Not always.
3  BY MR. ABBAS:
4    Q.  Is there encounter information with TSDB
5  listees included in the Sentinel database?
6    A.  It would depend on the case and the
7  encounter.  I mean, I think there could
8  potentially be an encounter with a subject that
9  resulted in a police report being written, that
10 police report ended up in Sentinel.  But in
11 general, there's no large database of encounters
12 of all the TSDB listees in Sentinel.  That doesn't
13 exist in Sentinel.
14   Q.  Okay.  Where does the encounter -- so
15 it's not in NCIC, it's -- there is encounter
16 information that is in the Sentinel database?
17 That's a yes-or-no question.
18       MS. POWELL:  Objection; vague and asked
19 and answered.
20       MR. ABBAS:  Hold on.  Let me try again.
21 He didn't answer it.
22

Case 1:16-cv-00375-AJT-JFA   Document 306-31   Filed 03/12/19   Page 45 of 102 PageID#
14576
Transcript of Matthew J. DeSarno, Designated Representative
Conducted on April 9, 2018

43 (169 to 172)

169
1  BY MR. ABBAS:
2     Q.  Is there any encounter information
3  contained in the Sentinel database?
4        MS. POWELL:  Vague and asked and
5  answered.
6        THE WITNESS:  I answered it.  I said,
7  yes, there are instances --
8  BY MR. ABBAS:
9     Q.  Okay.  Great.  There it is.  That's it.
10       Is there encounter information regarding
11 TSDB listees included in the automated targeting
12 system, Passenger?
13       MS. POWELL:  The what?
14       MR. ABBAS:  That's what it's called.
15       MS. POWELL:  Objection; vague.
16       THE WITNESS:  I don't know what
17 Passenger is.
18 BY MR. ABBAS:
19    Q.  Is there encounter information regarding
20 TSDB listees contained in the automated targeting
21 system?
22       MS. POWELL:  Objection; vague and scope.

170
1        THE WITNESS:  Yes, that's not an FBI
2  system.
3  BY MR. ABBAS:
4     Q.  Are you familiar with the automated
5  targeting system?
6        MS. POWELL:  Objection; scope.
7        THE WITNESS:  Not by that name, no.
8  BY MR. ABBAS:
9     Q.  So you know that I'm referring to
10 something, ATS, are you familiar with --
11       MS. POWELL:  Objection; vague and scope.
12    Q.  Are you familiar with ATS?
13    A.  No.
14    Q.  Are you familiar with the automated
15 targeting system?
16       MS. POWELL:  Objection; asked and
17 answered.
18    Q.  Have you ever heard the term "automated
19 targeting system" before?
20    A.  No.
21    Q.  Today you've never heard of the term
22 "automated targeting system"?

171
1     A.  I don't think so, no.
2     Q.  You don't think.  I mean --
3     A.  I can't remember hearing the term
4  "automated targeting system," no.
5     Q.  Okay.  You said earlier that that's not
6  the term that we use.  Is there a term that you
7  all use that's different than the one that I'm
8  using?
9        MS. POWELL:  Objection; vague.
10       For what?
11       MR. ABBAS:  I don't know.  That's what
12 he said.
13       THE WITNESS:  No, I don't know what the
14 automated targeting system is.  I don't know whose
15 system that is.  That's not my system so I don't
16 know.
17 BY MR. ABBAS:
18    Q.  Are you familiar with a database that is
19 identified as TSS?
20       MS. POWELL:  Objection; scope, but
21 answer if you know.
22       THE WITNESS:  Yes.

172
1  BY MR. ABBAS:
2     Q.  What is TSS?
3     A.  I think that's the TSC's encounter
4  database.
5     Q.  Okay.  So there is an encounter database
6  that contains encounter information with TSDB
7  listees --
8        MS. POWELL:  Objection; scope.
9     Q.  -- correct?
10       MS. POWELL:  Objection; scope.
11       THE WITNESS:  The TSS I believe contains
12 encounter information, but I have not been in it
13 or seen it, but that's what I believe it's for,
14 encounter information.
15 BY MR. ABBAS:
16    Q.  Who administers TSS?
17       MS. POWELL:  Objection; scope and asked
18 and answered.
19       MR. ABBAS:  Go ahead.
20       THE WITNESS:  The TSC.
21 BY MR. ABBAS:
22    Q.  Okay.  Does the FBI have access to TSS?

Transcript of Matthew J. DeSarno, Designated Representative
Conducted on April 9, 2018

44 (173 to 176)

173

1        MS. POWELL:  Objection; asked and
2  answered, but you can answer.
3        THE WITNESS:  I mean, I don't know
4  exactly who has access to it.  I know that not
5  everyone in the FBI has access to it.  But I would
6  imagine there are people at TSC who are FBI
7  employees who have access to it.
8  BY MR. ABBAS:
9     Q.   Are there FBI agents that have access to
10 TSS?
11       MS. POWELL:  Objection; vague and asked
12 and answered.
13       MR. ABBAS:  If he would answer directly,
14 I wouldn't have to ask it a bunch of times.
15       MS. POWELL:  If you can ask a direct
16 question, he might be able to.
17 BY MR. ABBAS:
18    Q.   Is there an FBI agent that has access to
19 TSS?
20       MS. POWELL:  Objection; vague and asked
21 and answered.
22       Go ahead.

174

1        THE WITNESS:  I don't know.
2  BY MR. ABBAS:
3     Q.   You don't know.  That's fine.
4     A.   I don't know if it's an agent, but I
5  expect that there are employees at the TSC who are
6  FBI employees who have access to TSS.  But normal
7  investigators don't have constant access to TSS.
8     Q.   Great.  Are there FBI employees who are
9  not at TSC who have access to TSS?
10       MS. POWELL:  Objection; vague.
11       THE WITNESS:  Not that I'm aware of.
12 BY MR. ABBAS:
13    Q.   So the only FBI employees that have
14 access to TSS are FBI employees that work at TSC?
15    A.   Well, I don't know that FBI employees
16 are excluded from access.  I mean, I think that if
17 there was a need to access that system for some
18 reason, then an FBI employee would be able to,
19 probably other agencies that are participating in
20 the TSC would also be able to.  But I just don't
21 know -- I'm just not familiar with persistent
22 access by large bodies of FBI employees to that

175

1  database.
2     Q.   And when you say you're not familiar, I
3  just kind of have to flush out what you mean.  Is
4  it your testimony -- and I could be wrong -- is it
5  your testimony today that there are no categories
6  of FBI agents -- I'm sorry.
7        Is it your testimony today that there
8  are no groups of FBI agents that are not stationed
9  at TSC who have regular access to TSS?
10       MS. POWELL:  There were a lot of
11 negatives in that question.
12    Q.   Is it your testimony today that there
13 are no groups of FBI agents who are not stationed
14 at TSC who have regular access to the TSDB?  So
15 the ones -- the FBI agents at TSC have access to
16 TSS; correct?
17    A.   I don't know who --
18       MS. POWELL:  Objections; scope.
19       THE WITNESS:  -- has access to it.  I
20 just know it exists and there are people who have
21 access to it.  I don't know exactly who that is.
22       MR. ABBAS:  Yeah, so --

176

1        MS. POWELL:  Gadeir, my objection as to
2  scope on this is going to stand throughout, right,
3  the court specifically excluded TSC topics and TSC
4  testified this is a TSC database that they
5  administer.
6  BY MR. ABBAS:
7     Q.   How many times has the FBI --
8        MR. ABBAS:  I'll just note for the
9  record that the question about which FBI agents,
10 if any, have access to TSS information is a basic
11 question that the FBI deponent should absolutely
12 have an answer for.  And unless the FBI deponent
13 is being deliberately evasive, the FBI deponent
14 does not appear to know which, if any, FBI
15 employees have access to TSS database.
16       MS. POWELL:  It's a mischaracterization
17 of his testimony and of the topic.
18       MR. ABBAS:  That's fine, we can fight
19 about it later.
20 BY MR. ABBAS:
21    Q.   How many times has the FBI publicly
22 identified a perpetrator of a U.S. act of

Transcript of Matthew J. DeSarno, Designated Representative

Conducted on April 9, 2018

177

1 terrorism as having been listed on the TSDB at the
2 time of the act?
3        MS. POWELL:  I'm sorry, is the question
4 how often they have publicly identified it?
5        MR. ABBAS:  Yes.
6        MS. POWELL:  Okay.  You can answer that.
7        THE WITNESS:  Can you repeat the
8 question?
9 BY MR. ABBAS:
10    Q.   How many times has the FBI publicly
11 identified a perpetrator of a U.S. act of
12 terrorism as having been listed on the TSDB at the
13 time of the act?
14    **A.   None that I'm aware of.**
15    Q.   Great.  Okay.
16        How many times has the FBI publicly
17 admitted that a perpetrator of a U.S. act of
18 terrorism has not been on the TSDB at the time of
19 the act?
20        MS. POWELL:  Objection; misleading.
21        THE WITNESS:  Yeah, I don't know of any
22 times.

178

1 BY MR. ABBAS:
2    Q.   There's never been a time where the FBI
3 has publicly admitted that a person who committed
4 an act of terrorism inside the United States was
5 not on the TSDB, that's never happened?
6    **A.   Not that I'm aware of.**
7    Q.   It definitely has so I'm, again,
8 surprised that --
9        MS. POWELL:  It definitely has not.
10    Q.   How many FBI agents are authorized
11 to -- I'm sorry, let me start again.
12        How many FBI employees are able to
13 nominate individuals to the TSDB?
14        MS. POWELL:  Objection; vague and
15 misleading.
16        Answer to the extent you can.
17        THE WITNESS:  So any persons working
18 national security investigations, primarily case
19 agents, but also analysts who are supporting those
20 investigations, have the authority to make
21 nominations to the TSDB.
22

179

1 BY MR. ABBAS:
2    Q.   How many FBI employees does that
3 include?
4        MS. POWELL:  Objection; vague and
5 misleading.
6        Answer to the extent you can.
7        THE WITNESS:  And potentially
8 classified.
9        MS. POWELL:  And potentially classified,
10 potentially calls for the state secrets privilege.
11        THE WITNESS:  That number fluctuates and
12 changes all the time, but it's a large number of
13 investigators and analysts working not only
14 counterterrorism, but all national security
15 investigations.  I can just broadly say it's more
16 than -- more than 3,000 employees.
17 BY MR. ABBAS:
18    Q.   Great.  That's plenty of information.
19        How many -- I'm sorry.
20        So that number changes; correct?
21    **A.   Correct.**
22    Q.   And so at different -- so depending on

180

1 an FBI's employee's duties, they may or may not
2 have the authority to submit nominations of
3 individuals to the TSDB; correct?
4        MS. POWELL:  Objection; vague.
5        THE WITNESS:  Yeah, I mean, authority is
6 not -- I don't think the right term.  It's they
7 may or may not be in a role where that capability
8 is either necessary or exists.
9 BY MR. ABBAS:
10    Q.   So not all -- so the watch -- so the
11 watchlisting nominating process is not relevant to
12 every FBI employee's duties?
13    **A.   Correct.**
14    Q.   Okay.  Some FBI employees have duties
15 that require them to on occasion nominate
16 individuals to the TSDB; correct?
17        MS. POWELL:  Objection; vague and asked
18 and answered.
19        THE WITNESS:  Correct.
20 BY MR. ABBAS:
21    Q.   Okay.  Does every FBI employee receive
22 training on how to nominate a person to the TSDB?

Transcript of Matthew J. DeSarno, Designated Representative
Conducted on April 9, 2018

46 (181 to 184)

---

181

1        MS. POWELL:  Objection; vague.
2        THE WITNESS:  My interrogatory response
3  to this was pretty clear that the TSC offers
4  training to all 56 field offices and FBI
5  headquarters.  Agents also get -- agents and
6  analysts also get training on the job from their
7  training agents and their supervisors.  And then
8  new task force officers who are assigned to FBI
9  task forces who have a watchlisting function go
10 through a training iteration prior to -- prior to
11 or shortly after getting on to a task force where
12 they go through a series of training topics which
13 includes watchlisting.
14 BY MR. ABBAS:
15    Q.   Does the FBI track which FBI employees
16 make nominations to the TSDB?
17        MS. POWELL:  Objection; vague.
18        THE WITNESS:  It is vague.  I mean, the
19 FBI has the ability to audit everything any FBI
20 employee does on any FBI system.  So if the
21 ability to audit is tracking, then yes.
22

---

182

1  BY MR. ABBAS:
2     Q.   Does the FBI keep track of -- does the
3  FBI assess in any way the number of nominations
4  that individual FBI employees make to the TSDB?
5        MS. POWELL:  Objection; vague.
6        MR. ABBAS:  Go ahead.
7        THE WITNESS:  What do you mean by
8  "assess"?
9  BY MR. ABBAS:
10    Q.   Look at.
11       Is it relevant to the FBI how many
12 nominations a particular FBI employee is making to
13 the TSDB?
14        MS. POWELL:  Objection; vague.
15        THE WITNESS:  I mean, the primary review
16 process involves periodic reviews by supervisors
17 of investigative files which includes reviews of
18 watchlisting nominations.  So if a supervisor -- a
19 first-line supervisor of a squad is constantly
20 reviewing for compliance, investigative quality,
21 and efficiency, and effectiveness, every employee.
22 So to the extent that that is measuring who's

---

183

1  producing how much or who's submitting how many
2  nominations, that is occurring.
3  BY MR. ABBAS:
4     Q.   Has the FBI ever disciplined an FBI
5  employee for how that FBI employee was making
6  nominations to the TSDB?
7        MS. POWELL:  Objection; vague.
8        Answer at a level of generality, if you
9  can.
10        THE WITNESS:  I'm aware of many
11 instances where the FBI has disciplined employees
12 for violations of policies, investigative
13 failures, shortcomings, misuse of authority.  I'm
14 not aware of any of those being specifically
15 related to TSDB, but it's possible.
16 BY MR. ABBAS:
17    Q.   And I -- again, because of your
18 qualification I have to follow up.
19        Are you aware of the FBI ever
20 disciplining an FBI employee for how that FBI
21 employee was making nominations to the TSDB?
22        MS. POWELL:  Objection; asked and

---

184

1  answered.
2        MR. ABBAS:  It was not answered.
3        MS. POWELL:  Yeah, it was.
4        MR. ABBAS:  Go ahead.  It's a yes or no.
5        THE WITNESS:  No.
6  BY MR. ABBAS:
7     Q.   Okay.  Great.  That was different than
8  the last answer.
9        MS. POWELL:  Do you want to take a break
10 at some point soon?
11        MR. ABBAS:  We can take a break now.
12 Five minutes, ten minutes?  Let's do ten minutes.
13        MS. POWELL:  Yeah.
14        (Recess from the deposition.)
15        THE REPORTER:  This is the court
16 reporter.  We have now used three hours and 20
17 minutes?
18        MR. ABBAS:  Great.  Three hours and 40
19 minutes left.
20 EXAMINATION BY COUNSEL FOR THE DEFENDANTS (CONT'D)
21 BY MS. POWELL:
22    Q.   I wanted to start off with one

---

Transcript of Matthew J. DeSarno, Designated Representative
Conducted on April 9, 2018

47 (185 to 188)

---

185

1  clarifying question, Mr. DeSarno.
2       You previously testified about -- in
3  response to questions about FBI access to TSS.  Do
4  you have anything to add to your prior testimony?
5  **A.   Just that all access to TSS is**
6  **controlled by the TSC.  So any access or requests**
7  **to access TSS or the information therein has to go**
8  **through the TSC and the TSC controls that.**
9  EXAMINATION BY COUNSEL FOR THE PLAINTIFFS (CONT'D)
10 BY MR. ABBAS:
11     Q.   Director Kable, as the head of TSC,
12 ultimately controls who has access to TSS;
13 correct?
14        MS. POWELL:  Objection; vague.
15        THE WITNESS:  The TSC does.  If Director
16 Kable has -- the director has ultimate
17 responsibility over the TSC.
18 BY MR. ABBAS:
19     Q.   And Director Kable has a supervisor.
20 What is Director Kable's supervisor's name again?
21 **A.   His boss?**
22     Q.   Yes.

---

186

1  **A.   Carl Ghattas.**
2      Q.   And he's with the FBI; correct?
3  **A.   He is, yes.**
4      Q.   Can the FBI's TSC supervisor direct the
5  director of TSC to make TSS available to
6  particular agencies?
7         MS. POWELL:  Objection; vague,
8  misleading.
9         THE WITNESS:  Can the EAD tell the TSC
10 to make something available to someone?
11 BY MR. ABBAS:
12     Q.   Yes.
13 **A.   To make the information available to**
14 **someone?**
15     Q.   And I'm talking specifically about TSS
16 information.
17 **A.   I guess he could.**
18     Q.   Great.  The FBI does have access to TSS;
19 correct?
20        MS. POWELL:  Objection; mischaracterizes
21 prior testimony.
22        MR. ABBAS:  And if I'm misunderstanding

---

187

1  it, it could just be that I don't know.  I'm
2  asking.
3         THE WITNESS:  The TSC controls the
4  access.  The interagency entity that is the TSC
5  that's in charge of consolidated U.S. government
6  watchlisting is administered by the FBI, but it is
7  an independent entity, they control the TSS.  The
8  director of the TSC does work for an FBI
9  executive, but it does not eliminate that --
10 BY MR. ABBAS:
11     Q.   I think you misunderstood the question.
12 **A.   -- independence.**
13     Q.   Does the FBI have access to TSS?
14        MS. POWELL:  Objection; vague,
15 misleading, and asked and answered.
16        MR. ABBAS:  Go ahead.
17        THE WITNESS:  The FBI has the ability to
18 access TSS when a demonstrated need to access it
19 is requested and approved through the TSC.
20 BY MR. ABBAS:
21     Q.   Is TSS a database?  That's it, that's
22 the question.

---

188

1  **A.   Yes.**
2      Q.   Okay.  Does the FBI have employees that
3  have access to TSS?
4         MS. POWELL:  Objection; vague,
5  misleading, and asked and answered.
6         THE WITNESS:  TSC employees, some of
7  whom may be FBI employees, do have access.
8  BY MR. ABBAS:
9      Q.   Well, we don't know whether there are
10 TSC employees; right?  You testified that you
11 don't know whether or not there are actually --
12        MS. POWELL:  Objection; mischaracterizes
13 prior testimony.
14        MR. ABBAS:  That's what you said
15 earlier.
16        THE WITNESS:  Employees who are assigned
17 to the TSC from multiple different agencies --
18 BY MR. ABBAS:
19     Q.   I think that's more accurate.
20 **A.   -- they have access to TSS.**
21     Q.   Okay.  And you don't know whether or not
22 FBI employees not assigned to TSC also have access

---

Transcript of Matthew J. DeSarno, Designated Representative
Conducted on April 9, 2018

48 (189 to 192)

189

1 to TSS?
2       MS. POWELL: Objection; vague,
3 misleading, and asked and answered.
4       THE WITNESS: That's not what I said.
5 BY MR. ABBAS:
6     Q.  Okay.  What did you say?
7     A.  What I said is, if FBI employees who are
8 not assigned to the TSC have a need to access the
9 encountered database, they can request access
10 through the TSC and the TSC can control whether or
11 not they have access and what access they have.
12    Q.  How does the FBI employee request access
13 to TSS?
14    A.  They make a request.
15    Q.  I understand that in order to make a
16 request, one must request.
17    A.  I mean, I don't know if there's a
18 specific form or if they can send an e-mail to
19 someone to create a record or if they have to fill
20 out a form, one of those two things I would think.
21    Q.  And that's fair, right, it's not there
22 are -- I'm asking about a lot of things, there

190

1 might be some things that you don't know, and it's
2 fine if you don't know.  We'll fight about it
3 later.
4     A.  There would not be — the request would
5 be — there would be an electronic record of that
6 request made for audit purposes.  So it's going to
7 be some type of an electronic request.
8     Q.  Okay.  So there is a standardized way
9 that FBI employees make requests to have access to
10 TSS?
11      MS. POWELL: Objection; vague and scope.
12      MR. ABBAS: That's fine.  Go ahead.
13      THE WITNESS: That's not what I said.  I
14 just said they make a request and there was going
15 to be some kind of electronic record of that
16 request.  That's it.  Not standardized.  I don't
17 know if it is or not.
18 BY MR. ABBAS:
19    Q.  Okay.  That's fair.
20      So the electronic request might be via
21 e-mail?  Are you --
22    A.  It might be.

191

1     Q.  I just want to make sure that you're not
2 looking at your phone for answers.
3     A.  No, no.
4       MS. POWELL: I think he's getting a
5 ticktack.
6       THE WITNESS: I put my phone over there
7 because it buzzes all day long.
8 BY MR. ABBAS:
9     Q.  Okay.  So when you said
10 electronic -- you said that -- when you said that
11 FBI employees make the request electronically,
12 the -- your usage of the word "electronically" in
13 that answer would include e-mail; correct?
14    A.  Yes.
15    Q.  Okay.  Your testimony is that there may
16 or may not be some form that gets filled out
17 electronically, correct, you don't know?
18    A.  Correct.
19    Q.  Okay.  What do you know about what the
20 FBI instructs -- let me back up.
21      What do you know about what instructions
22 the FBI provides FBI employees that are making

192

1 requests for TSS?
2       MS. POWELL: Objection; vague.
3       THE WITNESS: The instructions provided
4 to FBI employees regarding searching of any
5 database include a relevant investigation and an
6 actual law enforcement or intelligence need to
7 access the database.  So TSS is no different than
8 any other database that FBI employees access in
9 terms of the guidance for usage.
10 BY MR. ABBAS:
11    Q.  Does the FBI provide FBI employees with
12 a document that memorializes its guidance to FBI
13 employees who seek TSS access?
14      MS. POWELL: Objection; vague.
15      THE WITNESS: The TSS belongs to the TSC
16 so if there's a document, it would be a TSC
17 document outlining how to get access and the
18 process of it.
19 BY MR. ABBAS:
20    Q.  Okay.  So --
21    A.  Not an FBI document.
22    Q.  Okay.  So I'm going to kind of cabin out

Transcript of Matthew J. DeSarno, Designated Representative

49 (193 to 196)

Conducted on April 9, 2018

193

1  whether or not it's an FBI or TSC document.
2        Does the FBI use any documents to guide
3  FBI employees who seek access to TSS?
4        MS. POWELL:  Objection; vague and asked
5  and answered.
6        THE WITNESS:  The FBI has specific
7  policies, guidelines in place regarding the access
8  of databases for investigative purposes and the
9  TSS falls within those guidelines.
10 BY MR. ABBAS:
11    Q.  Is there a guideline that the FBI uses
12 that's TSS specific?
13        MS. POWELL:  Objection; vague.
14        THE WITNESS:  I'm not familiar with one.
15 BY MR. ABBAS:
16    Q.  You're referring to policies; correct?
17    **A.  Yes.**
18    Q.  Are the policies that you're referring
19 to TSS specific?
20        MS. POWELL:  Objection; asked and
21 answered.
22        THE WITNESS:  No.

194

1  BY MR. ABBAS:
2    Q.  Okay.  So there are some general
3  policies that you believe apply to requests for
4  TSS access in the same way that they regard access
5  to other databases; correct?
6    **A.  Yes.**
7    Q.  Okay.  What are the names of the
8  documents that you're referring to?
9    **A.  Of the policy documents?**
10    Q.  Yes.
11    **A.  I mean, we have the Attorney General**
12 **Guidelines for Domestic Operations, the DIOG.**
13    Q.  What does DIOG stand for?
14    **A.  Domestic Investigations and Operations**
15 **Guidelines.**
16    Q.  Okay.
17    **A.  And then general — I'd say those are**
18 **the two primary governing documents.**
19    Q.  I got the DIOG.  What's the other
20 document called?
21    **A.  Attorney General Guidelines for Domestic**
22 **Operations.**

195

1    Q.  Other than the Attorney General's
2  Guidelines for Domestic Operations and the DIOG,
3  are there any other documents that regard how
4  TS -- how FBI employees seek TSS access?
5    **A.  Not that I'm aware of.**
6    Q.  Okay.  Is the Attorney General's -- what
7  was it called again, Attorney General's?
8    **A.  Attorney General Guidelines.**
9    Q.  For Domestic Operations?
10    **A.  For Domestic Operations.**
11    Q.  Okay.  Are the Attorney General's
12 Guidelines for Domestic Operations classified in
13 any way?
14        MS. POWELL:  Objection as to scope.
15        MR. ABBAS:  He brought the document up,
16 not I.
17        MS. POWELL:  That doesn't make it within
18 the scope, but --
19        MR. ABBAS:  Okay.
20        MS. POWELL:  -- you can answer.
21        THE WITNESS:  I think there are portions
22 of it that are classified and portions of it that

196

1  are unclassified.
2  BY MR. ABBAS:
3    Q.  Okay.  And the DIOG also contains
4  classified portions and unclassified portions;
5  correct?
6    **A.  Yes.**
7    Q.  Does the FBI create any reports
8  regarding the effectiveness of its use of TSDB
9  information?
10        MS. POWELL:  Objection; vague.
11        THE WITNESS:  What do you -- how do you
12 mean effectiveness?
13 BY MR. ABBAS:
14    Q.  The FBI uses TSDB information for a
15 purpose or purposes; correct?
16        MS. POWELL:  Objection; vague.
17        MR. ABBAS:  I mean, that's like the most
18 general thing I can possibly ask.
19        MS. POWELL:  Agreed, that's why it's
20 vague.
21        THE WITNESS:  It's pretty vague.  I
22 mean, the FBI uses a lot of information for a lot

197

1  of purposes.  One data point of all that
2  information is watchlisting information.  And the
3  FBI's role in watchlisting is more of a push than
4  a pull, a push to the list and then a pull from
5  the list.
6  BY MR. ABBAS:
7      Q.  You all create a lot of TSDB
8  information; correct?
9      **A.  The FBI is a nominator, not the largest**
10 **nominator, but a nominator of TSDB entries.**
11     Q.  And the FBI is also a consumer of TSDB
12 information; correct?
13     **A.  To some extent, yes.**
14     Q.  Okay.  And, again, I'm asking, this is a
15 yes-or-no question, and I'm sure I know the
16 answer, but you didn't answer it last time.
17        Does the FBI have a purpose in its use
18 of TSDB information?  It's a yes-or-no question.
19     MS. POWELL:  Objection as to vagueness.
20     THE WITNESS:  Is there a purpose to it?
21 BY MR. ABBAS:
22     Q.  Yes.

198

1      **A.  Yes, of course.**
2      Q.  Okay.  Great.
3        Does the FBI assess in reports or other
4  documents how effective the FBI's use of TSDB
5  information is in furtherance of its purposes?
6      MS. POWELL:  Objection as to vagueness.
7      MR. ABBAS:  It's a yes-or-no question.
8  Do you want me to repeat the question?
9      THE WITNESS:  I understand the question.
10 BY MR. ABBAS:
11     Q.  Okay.
12     **A.  I think it's just vague.  I don't —**
13     Q.  I understand you don't like the
14 question.
15     **A.  No, I like it fine.  I think it's vague.**
16     Q.  I think it's a great question to be
17 honest.
18     MS. POWELL:  Very fine question and yet
19 vague.
20     MR. ABBAS:  I mean, I don't know how to
21 ask it any more simply.
22     THE WITNESS:  Look, I don't think

199

1  there's any question in the FBI's mind about
2  whether or not watchlisting is an effective tool.
3  BY MR. ABBAS:
4      Q.  I know.  I know.
5      **A.  So there's no need to measure it.  What**
6  **we're more interested in measuring is compliance,**
7  **timeliness, and accuracy of watchlisting**
8  **submissions and the use of it.  Now, there are**
9  **multiple agencies and entities to include agency**
10 **inspector generals, the GAO, multiple, you know,**
11 **third — Congress who are constantly auditing,**
12 **validating, and looking at the watchlisting**
13 **enterprise.  So, you know, the FBI is clearly --**
14 **as part of that, we're constantly reviewing that,**
15 **but the question as to whether or not it is**
16 **effective is not significant.**
17 **BY MR. ABBAS:**
18     Q.  It's not significant whether it's
19 effective?  Okay.  That's fine.
20     **A.  No, it's not in question.  It's not in**
21 **question.  It is significant, there's no question**
22 **about it.**

200

1      Q.  Okay.
2        MR. ABBAS:  Can you go back up to the
3  question.  He did not answer the question.
4      Q.  Does the FBI assess in reports or other
5  documents how effective the FBI's use of TSDB
6  information is in the furtherance of the purposes
7  it has for using TSDB information?
8      MS. POWELL:  Same objection and asked
9  and answered.
10     MR. ABBAS:  It's a yes or no.
11     THE WITNESS:  The answer -- I just gave
12 you the answer.
13 BY MR. ABBAS:
14     Q.  No, you didn't.
15     MS. POWELL:  Objection and asked and
16 answered.
17     THE WITNESS:  I answered that already.
18 BY MR. ABBAS:
19     Q.  You're not answering the question.
20     MR. ABBAS:  Objection, the deponent is
21 not answering the question.
22     MS. POWELL:  I don't think you get to

201

1 make objections.
2        MR. ABBAS:  I can absolutely make the
3 objection.  I can.
4 BY MR. ABBAS:
5    Q.   Does the FBI -- let's go back up.  I
6 don't know why you're not answering this question,
7 it should be an easy question.
8        If the answer is no, that's fine.  If
9 the answer is yes, that's fine as well.  But
10 you're not -- you did not give me an answer to the
11 question.
12       MR. ABBAS:  Can we go back up?
13    Q.   Does the FBI assess in reports or other
14 documents how effective the FBI's use of TSDB
15 information is in furtherance of the purposes it
16 has for using TSDB information?
17       MS. POWELL:  Same objections; vagueness
18 and asked and answered.
19       THE WITNESS:  Yeah, I -- the FBI is
20 constantly assessing its use, accuracy, compliance
21 in regards to watchlisting for each individual
22 subject that it nominates and that's the focus of

202

1 the assessment.  The effectiveness of it is not in
2 question.
3 BY MR. ABBAS:
4    Q.   Has the FBI ever asked the question
5 about whether or not its use of TSDB information
6 is effective in furtherance of the purposes it has
7 to use TSDB information?
8        MS. POWELL:  Objection; vagueness and I
9 think asked and answered.
10       MR. ABBAS:  No, this is different.
11       THE WITNESS:  So the -- I think the
12 point that is being confused here is that the use
13 of TSDB information is not -- that's not
14 necessarily the main -- I mean, that's just
15 not -- that's not -- the information in TSDB is
16 merely the identifying information of the person
17 entered into the TSDB.  There are other databases
18 that are much more fruitful for use.
19       So the FBI's primary purpose with the
20 TSDB is a push of information to the TSDB.  There
21 are instances where we are also using information
22 from the TSDB, but the primary -- the primary flow

203

1 of information between the FBI and the TSDB is
2 from the FBI to the TSDB.  The agencies having
3 encounters and those things, they're receiving the
4 information.  For the most part our -- the
5 majority of our activity is pushing information to
6 the TSDB.
7        MR. ABBAS:  The deponent is not
8 answering the question so I guess this will be a
9 subject to briefing regarding the adequacy of the
10 deponent's answers during the course of this
11 deposition.
12       MS. POWELL:  Not liking the answers is
13 not the same as not getting answers.
14 BY MR. ABBAS:
15    Q.   Are there reports that the FBI possesses
16 that regard the accuracy of TSDB information?
17       MS. POWELL:  Objection; vagueness and
18 potentially scope, but answer if you can.
19       THE WITNESS:  I mean, as I mentioned
20 before, there are -- there have been several
21 oversight audits, inspector general reports about
22 the TSC and --

204

1 BY MR. ABBAS:
2    Q.   Other than inspector general reports,
3 are there any documents that the FBI authors
4 regarding the accuracy of TSDB information?
5        MS. POWELL:  You should probably let him
6 finish an answer if you want to get full answers.
7        MR. ABBAS:  I -- go ahead.
8        THE WITNESS:  So the FBI is constantly
9 reviewing each of its submissions for accuracy and
10 compliance.  And in instances where the
11 information is not accurate, then we provide
12 accurate information.  In instances where the
13 timeliness of the submission is not in compliance,
14 we correct that.  I mean, there are -- as far as
15 an overall report as to the accuracy of all of the
16 information at TSDB, I'm not aware of that report.
17 BY MR. ABBAS:
18    Q.   Okay.  Are there reports that the FBI
19 authors regarding the accuracy of subsets of
20 information contained in the TSDB?
21       MS. POWELL:  Objection as to scope and
22 vagueness.

Transcript of Matthew J. DeSarno, Designated Representative

Conducted on April 9, 2018

52 (205 to 208)

205

1     You can answer.
2     THE WITNESS:  Not that I'm aware of.
3 BY MR. ABBAS:
4     Q.  Okay.  You say that TSC -- I'm sorry.
5     You say that the FBI is constantly
6 assessing the accuracy of TSDB information;
7 correct?
8     MS. POWELL:  Objection; mischaracterizes
9 prior testimony.
10    THE WITNESS:  Of nominations that the
11 FBI submits to the TSDB.
12 BY MR. ABBAS:
13    Q.  Okay.  So the FBI's focused just on the
14 nominations that the FBI submits to the TSC, the
15 accuracy of those nominations; correct?
16    A.  From a compliance standpoint, that would
17 be our primary concern is our nominations and are
18 they accurate, are they compliant, are they in
19 accordance with our responsibilities to safeguard
20 privacy and civil liberties.
21    Q.  Okay.  Are there reports --
22    A.  I'm not sure why that's funny.

206

1     Q.  Are there reports that -- are there
2 reports that regard the accuracy of FBI
3 nominations to the TSDB?
4     A.  Like reports that are inclusive of all
5 of FBI's nominations?
6     Q.  Yes.
7     A.  Not that I'm aware of.
8     Q.  Are there reports that include a subset
9 of the nominations that the FBI submits to the
10 TSDB?
11    MS. POWELL:  Objection; vagueness.
12    Q.  What documents -- I mean, how -- so it's
13 not a mystery that the FBI reviews nominations
14 that FBI employees submit to TSDB; correct?
15    A.  Yes.
16    Q.  What documents memorialize the outcomes
17 of the FBI's reviews of FBI employee nominations
18 to TSDB?
19    A.  So the FBI is not reviewing big batches
20 of nominations.  When a case agent makes a
21 nomination, through the course of his file
22 review -- his regular file review regarding that

207

1 investigation, the supervisor will look at the
2 nomination for accuracy, compliance, timeliness.
3 The nomination, though, then goes through
4 multiple -- outside of the FBI, TSC will go
5 through and NCTC will go through multiple steps of
6 accuracy review and also potentially additional
7 information can be added to the nomination.
8     So the nomination itself gets reviewed
9 by the supervisor on a regular basis as part of an
10 investigative file review, but the supervisor is
11 reviewing the entire case file of which one small
12 piece is the watchlisting status.
13    Q.  How is the review of an FBI -- how is
14 the -- how is an FBI supervisor's review of an FBI
15 employee's TSDB nomination memorialized --
16    A.  The FBI supervisor's review of the
17 investigative file is memorialized --
18    Q.  I'm not asking about the whole
19 investigative file.
20    A.  That's what they look at, the whole
21 file.
22    Q.  Okay.  So there's never a point in time

208

1 when the FBI supervisor is looking just at the FBI
2 employee's TSDB nomination?
3     MS. POWELL:  Objection; mischaracterizes
4 prior testimony.
5     THE WITNESS:  Yeah, no, the FBI -- the
6 FBI employee will -- the supervisor will see the
7 nomination when it first goes out as part
8 of -- typically as part of the initial -- we're
9 getting kind of into some law enforcement
10 sensitive stuff.
11    MR. ABBAS:  I don't think so, but if you
12 want to assert the law enforcement privilege go
13 ahead.
14    THE WITNESS:  I can say this, every item
15 that goes into an investigative file is reviewed
16 by a supervisor.
17 BY MR. ABBAS:
18    Q.  How do you know that?
19    A.  I know that because I'm an FBI agent.
20    Q.  Sure.
21    A.  Every file -- there's an electronic
22 signature by a supervisor for everything that goes

Transcript of Matthew J. DeSarno, Designated Representative
Conducted on April 9, 2018

53 (209 to 212)

209

1 into a file. So the submission or whatever
2 document the submission is attached -- the initial
3 nomination is reviewed by a supervisor and then
4 goes out to its external reviews at NCTC and TSC.
5 Q. Okay. So I'm not asking about stuff
6 that happens after the nomination leaves the FBI.
7 A. Okay.
8 Q. I'm only asking about the nomination at
9 the FBI.
10 A. Yeah.
11 Q. Can an FBI employee submit a nomination
12 to the TSDB without the approval of the
13 supervisor?
14 A. No.
15 Q. Where is it written down that an FBI
16 employee cannot submit a nomination of the TSDB
17 without a supervisor's approval?
18 A. I don't know where it's written down. I
19 know that in order to upload the serial into the
20 case file, the supervisor will approve it.
21 Q. I don't know what that is.
22 A. The system requires it.

210

1 Q. What system?
2 A. Sentinel.
3 Q. Requires what?
4 A. Requires that supervisor's approval of
5 the document.
6 Q. What do you mean when you say
7 "document"? I think I know what you mean, but
8 just for the record.
9 A. So the agent creates a document.
10 Q. What is that document?
11 A. In this case, it's a watchlisting
12 submission form.
13 Q. Okay.
14 A. In order for that form --
15 Q. Is it a standardized form?
16 A. It is.
17 Q. Okay.
18 A. In order for that form to go into the
19 case file, it has to be reviewed by a supervisor.
20 Q. But the supervisor is reviewing the
21 entire case file?
22 A. No, in this case, reviewing that serial,

211

1 that document.
2 Q. Got it.
3 A. And then regularly -- but all that is
4 the nomination. But then regularly --
5 Q. I'm sorry, I apologize for interrupting,
6 I just want to make sure I got the -- just the
7 process leading up to the nomination leaving the
8 FBI's door.
9 Okay. So the first step in a nomination
10 is that an FBI employee fills out a form in a
11 database; correct?
12 A. Yes.
13 Q. That form is contained within the
14 Sentinel database; correct?
15 A. Yes.
16 Q. When an FBI employee fills out that
17 form, in order to complete it, the FBI employee's
18 supervisor must approve of the form?
19 A. Correct.
20 Q. Okay. After the FBI employee secures a
21 supervisor's approval for his or her TSDB
22 nomination, it becomes a part of the Sentinel

212

1 database; correct?
2 MS. POWELL: Objection; vague.
3 THE WITNESS: It goes into the case
4 file.
5 BY MR. ABBAS:
6 Q. Which is in Sentinel?
7 A. Yes.
8 Q. Okay. But that -- the person -- at this
9 time, at this stage, there's been a nomination to
10 the TSDB, but that person that was nominated is
11 not yet in the TSDB; correct?
12 A. That's correct.
13 Q. Okay. How does TSC know that there's
14 been a nomination that an FBI employee has made to
15 the TSDB?
16 MS. POWELL: Objection; vagueness.
17 THE WITNESS: I mean, the request goes
18 to TREX. I think you guys talked about the TREX
19 before. And then from there --
20 BY MR. ABBAS:
21 Q. What's TREX?
22 A. TREX is a unit inside of -- I can't

Transcript of Matthew J. DeSarno, Designated Representative

Conducted on April 9, 2018

213

1 remember what it stands for, but it's a TSC unit
2 made up of FBI employees, mostly FBI employees,
3 there are probably some other agency employees in
4 there as well, and then from there the nomination
5 goes to the NCTC if it's an international
6 terrorism case or if it's a domestic terrorism
7 case, it goes straight to TSC.
8          After it goes to NCTC for identity
9 resolution, additional information, then it would
10 come back to the TSC for a decision and TSC would
11 make a decision as to whether or not the
12 nomination meets the reasonable suspicion standard
13 for watchlisting, whether or not there's enough
14 identifying information to include it on the list,
15 and whether or not -- what portion of the list the
16 nomination goes to.
17          So once it leaves the FBI, all that
18 other stuff is going on TSC -- NTTC [sic] and TSC
19 are -- NCTC's potentially adding to the nomination
20 or adding clarifying information and the TSC is
21 making the call on whether or not it meets the
22 standard.

214

1     Q.   So does the form that an FBI employee
2 uses -- I'm unclear on how the FBI employee's
3 nomination form gets to TSC.
4     A.   I'm not a technical wizard, but it gets
5 there technically, electronically.  No one carries
6 it.
7     Q.   Got it.  Okay.  Is it through --
8     A.   Somehow through some electronic pipe it
9 arrives at TREX.
10    Q.   Okay.  It arrives via TREX?
11    A.   It arrives via electronic pipe into the
12 TSC and this TREX unit.  TREX sits at the TSC and
13 has access to all these other places, they send it
14 to NCTC --
15    Q.   Sure.
16    A.   -- and then to the adjudication unit
17 which is NDIU I believe.
18    Q.   Okay.  And so beyond the nomination form
19 that an FBI employee gets supervisor approval on
20 and uploads into Sentinel, the FBI employee does
21 not take any additional actions to submit the
22 nomination --

215

1     A.   Correct.
2     Q.   -- to TSC?
3     A.   Yeah, correct.
4     Q.   Okay.  Great.  Excellent.
5          What aggregate statistics does the FBI
6 look at to determine whether its use of TSDB
7 information furthers the purposes it has for using
8 TSDB information?
9          MS. POWELL:  Objection; misleading,
10 foundation, and potentially calls for law
11 enforcement sensitive information, but I'm not
12 sure.
13          If there's an answer you can give, do.
14          THE WITNESS:  So what aggregate
15 information does the FBI use to see if the TSDB
16 information is serving its purpose?
17 BY MR. ABBAS:
18    Q.   Do you want me to read back the
19 question?
20    A.   Yeah.
21          MR. ABBAS:  Could you read back the
22 question?

216

1          (Record read.)
2          MS. POWELL:  Same objections.
3          THE WITNESS:  Whether it furthers the
4 purpose?
5 BY MR. ABBAS:
6     Q.   We can just -- the question is exactly
7 how I want it.
8     A.   Our focus on TSDB information is
9 accuracy, compliance, protection of civil
10 liberties.  That's the focus.
11    Q.   Okay.  Accuracy, compliance --
12    A.   Protection of civil liberties.
13    Q.   Okay.  So let's just -- when you say
14 "compliance," compliance with what?
15    A.   Compliance with standards, right,
16 compliance with guidelines, compliance with time
17 standards.  Timely and accurate basically.
18    Q.   What documents must a FBI employee's
19 nomination to the TSDB comply with?
20          MS. POWELL:  I'm sorry, what was that?
21    Q.   What documents must a FBI employee's
22 nomination to the TSDB comply with?

Transcript of Matthew J. DeSarno, Designated Representative
Conducted on April 9, 2018

55 (217 to 220)

---

**217**

1        MS. POWELL:  Objection; vagueness, but

2    answer.

3        THE WITNESS:  I mean, there are the DIOG

4    and then the program guidelines related to

5    counterterrorism investigations.

6    BY MR. ABBAS:

7        Q.   There are no other documents?

8        **A.   I mean, it's pretty well laid out in the**

9    **program guide.**

10       Q.   And the document's called the program

11   guide?

12       **A.   Yes.**

13       Q.   And is the program guide specific to the

14   TSDB?

15       **A.   It's specific to counterterrorism**

16   **investigations.**

17       Q.   Does it include a section that's

18   specifically related to the TSDB?

19       **A.   To watchlisting, yes.**

20       Q.   Okay.  So the program guidelines do

21   include some content that refers specifically to

22   the TSDB?

---

**218**

1        **A.   Correct.**

2        Q.   Does the FBI believe that the

3    nominations of its employees to the TSDB is in

4    compliance with the policies governing FBI

5    nominations to the TSDB?

6        MS. POWELL:  Objection; vagueness.

7        MR. ABBAS:  Go ahead.

8        THE WITNESS:  You're asking does the FBI

9    believe that its employees are being compliant

10   with its policies?

11   BY MR. ABBAS:

12       Q.   Does the FBI believe that the

13   nominations of its employees to the TSDB is in

14   compliance with FBI policies?

15       MS. POWELL:  Same objection, but answer

16   to the extent you can.

17       THE WITNESS:  Yes, and we're constantly

18   auditing that, identifying areas where we can

19   improve.

20   BY MR. ABBAS:

21       Q.   What is the basis of the FBI's belief

22   that the nominations of FBI employees to the TSDB

---

**219**

1    is in compliance with policies?

2        **A.   Well, we have a compliance unit inside**

3    **the counterterrorism division and what they do is**

4    **audit watchlisting and other investigative areas**

5    **to ensure compliance.  And where there are**

6    **instances outside of compliance, they issue**

7    **reports and make -- and make changes.**

8        Q.   Has an FBI employee ever submitted a

9    nomination to the TSDB not in compliance with the

10   FBI's policies?

11       MS. POWELL:  Objection; vagueness and

12   scope.

13       THE WITNESS:  Not in compliance with

14   policies, I'm not aware of that.  I mean, there

15   may have been timeliness issues, but those are not

16   policy.  Those are program guides, those are

17   guidelines, not policies, so they would not be

18   considered policy compliance issues.

19   BY MR. ABBAS:

20       Q.   So it's the FBI's testimony that there

21   hasn't been a nomination that an FBI employee has

22   made to include somebody in the TSDB that is not

---

**220**

1    in compliance with --

2        MS. POWELL:  Objection; vague and

3    misleading.

4        Q.   I didn't finish that question.  I'm

5    going to start all over.

6        Is it the FBI's testimony that there has

7    never been a noncompliant nomination that an FBI

8    employee has made to the TSDB?

9        MS. POWELL:  Objection; vague and

10   misleading.

11       THE WITNESS:  I would not testify that

12   there's never been a noncompliant issue.

13   BY MR. ABBAS:

14       Q.   Are you aware of any nomination that the

15   FBI has determined was made not in accordance with

16   the FBI's policies?

17       MS. POWELL:  Same objections; vague and

18   misleading.

19       THE WITNESS:  I'm not aware of any.

20   BY MR. ABBAS:

21       Q.   Okay.  What role did the FBI play in

22   determining what the inclusion standard is of the

---

Transcript of Matthew J. DeSarno, Designated Representative
Conducted on April 9, 2018

221

1 TSDB?
2      MS. POWELL:  Objection, it seems to call
3 for deliberative process information as to
4 recommendations and advice.
5      And I would instruct the witness not to
6 answer unless you want to rephrase.
7      MR. ABBAS:  That's almost exactly what
8 the court directed that I be allowed to ask so I
9 don't know how you're going to avoid answering
10 this question.
11      MS. POWELL:  I'm instructing him not to
12 answer as phrased.
13 BY MR. ABBAS:
14    Q.  Did the FBI determine the inclusion
15 standard of the TSDB?
16      MS. POWELL:  Objection; vague, but you
17 can answer.
18      THE WITNESS:  In 2003, when the TSDB
19 came to be?
20 BY MR. ABBAS:
21    Q.  Whenever.
22    **A.  I mean, I know the inclusion standard, I**

222

1 **don't know who specifically was involved in it,**
2 **but I'm sure the FBI was involved in that**
3 **discussion.**
4    Q.  Where did the -- how did the various --
5 how did the FBI -- let me ask this: Does the FBI
6 believe that the TSDB's inclusion standard is the
7 best possible inclusion standard for the TSDB?
8      MS. POWELL:  Objection; vague.  I don't
9 know what else to add to that.
10      THE WITNESS:  I mean, I understand the
11 inclusion standard to be reasonable suspicion and
12 I believe that's the proper inclusion standard.
13 BY MR. ABBAS:
14    Q.  What is the basis of the FBI's belief
15 that what you call the reasonable suspicion
16 standard of the TSDB is the right one?
17      MS. POWELL:  Objection as to vagueness.
18      You can answer, if you can.
19      THE WITNESS:  I mean, that's the
20 standard that it has been since I've been involved
21 in this and that's the standard that the
22 interagency has agreed on.  That's the standard

223

1 that allows us to prevent terrorism while also
2 safeguarding privacy and civil liberties.
3 BY MR. ABBAS:
4    Q.  But the FBI has no testimony today about
5 where what you call the reasonable suspicion
6 inclusion standard has come from?
7      MS. POWELL:  Objection; vagueness and
8 mischaracterizes prior testimony.
9    Q.  Do you have any testimony regarding why
10 TSDB's inclusion standard is what it is?
11      MS. POWELL:  Same objections.
12      THE WITNESS:  No, it is what it is.
13 BY MR. ABBAS:
14    Q.  Right.  Okay.  That's fine.
15      Has the FBI ever considered alternatives
16 to the TSDB's inclusion standard?
17      MS. POWELL:  Objection as to vagueness,
18 misleading, probably scope, but answer if you can.
19      THE WITNESS:  I'm not aware of any
20 alternatives that we've pondered.
21 BY MR. ABBAS:
22    Q.  What role did the FBI play in

224

1 determining the inclusion standard for the
2 selectee list -- I'll withdraw the question.
3      What role, if any, did the FBI play in
4 determining the selectee list inclusion standard?
5      MS. POWELL:  I'm going to objection to
6 the extent that a comprehensive answer could
7 require the disclosure of law enforcement
8 sensitive information, SSI, deliberative process
9 privileged information, but I think you can answer
10 at a level of generality as to what FBI's role in
11 the process is.
12      THE WITNESS:  So in general, the FBI has
13 the primary responsibility with its partners to
14 prevent terrorist attacks.  As a result, over the
15 years, we have developed subject matter expertise
16 about terrorist tactics, techniques, and
17 procedures, and the way known or suspected
18 terrorists operate.  So in that capacity, the FBI
19 would advise the interagency on what types of
20 activity would create more vulnerability.
21 BY MR. ABBAS:
22    Q.  Has the FBI ever recommended the

Transcript of Matthew J. DeSarno, Designated Representative
Conducted on April 9, 2018

57 (225 to 228)

225

1 change -- I'm sorry.
2        Has the FBI ever recommended a change to
3 the selectee list inclusion standards?
4        MS. POWELL:  Objection; definitely calls
5 for deliberative process privilege information and
6 potentially law enforcement sensitive SSI and SSI
7 information.
8        I'm instructing the witness not to
9 answer.
10    Q.   Has the FBI ever assessed the
11 effectiveness of the selectee list inclusion
12 standard?
13       MS. POWELL:  Objection as to vagueness
14 and to scope.  And to the extent you're looking
15 for a detailed description of the selectee list
16 standard, that would call for law enforcement
17 sensitive and SSI information.  But, otherwise,
18 the witness may answer, if he knows.
19       THE WITNESS:  Can you repeat the
20 question?
21       MR. ABBAS:  Can you read it back.
22       (Record read.)

226

1        MS. POWELL:  Same objections.
2        THE WITNESS:  Not that I'm aware of.
3 BY MR. ABBAS:
4    Q.   Has the selectee list inclusion standard
5 ever changed?
6        MS. POWELL:  Objection; calls for law
7 enforcement sensitive and SSI information.
8        I'm instructing the witness not to
9 answer.
10       MR. ABBAS:  You're not going to let him
11 answer whether or not the selectee list inclusion
12 standard has ever changed?
13       MS. POWELL:  That's correct.
14       MR. ABBAS:  On the basis of what?
15       MS. POWELL:  Law enforcement sensitive
16 and SSI.
17       MR. ABBAS:  It's just a yes-or-no
18 question.
19       MS. POWELL:  And I'm instructing him not
20 to answer.
21       MR. ABBAS:  Okay.  That's fine.
22

227

1 BY MR. ABBAS:
2    Q.   Who is responsible for ensuring that
3 nominations that FBI employees make to the TSDB
4 satisfy the TSDB's inclusion standards?
5        MS. POWELL:  Objection as to vagueness,
6 but you can answer.
7        THE WITNESS:  Decisions about inclusion
8 on the list, which are -- which go to whether or
9 not they satisfy the inclusion standards, are made
10 by the TSC, not by the FBI.
11 BY MR. ABBAS:
12    Q.   But the FBI does conduct its own review
13 of whether nominations its employees are making to
14 the TSDB are, in fact, resulting in inclusions to
15 the TSDB?
16       MS. POWELL:  Objection; vague,
17 confusing.
18    Q.   Would it be of concern to the FBI if one
19 of its employees kept on nominating individuals to
20 the TSDB and those nominations kept on being
21 rejected by TSC?
22       MS. POWELL:  Objection; vague, but you

228

1 can answer.
2        THE WITNESS:  There would be several
3 things that would be concerning about that.
4 BY MR. ABBAS:
5    Q.   Why?
6    A.   Well, I mean, we would be looking at the
7 quality of the nominations, the accuracy of the
8 nominations, the compliance of the nominations.
9    Q.   Let me jump in, when you say the quality
10 and the accuracy of the nomination, are you
11 referring to the quality and the accuracy of the
12 derogatory information that is the basis of the
13 nomination to the TSDB?
14       MS. POWELL:  Objection; vague and
15 misleading, but you can answer.
16       THE WITNESS:  The quality of the overall
17 nomination; the quality of the information, the
18 quality of the product that goes forward, the
19 submission form, you know, are there all kinds of
20 errors in it and is it accurate.
21 BY MR. ABBAS:
22    Q.   Every nomination that an FBI employee

Transcript of Matthew J. DeSarno, Designated Representative

58 (229 to 232)

Conducted on April 9, 2018

229

1 makes to the TSDB includes derogatory information
2 about the prospective listee; correct?
3    **A. Yes.**
4    Q.   Is the FBI employee submitting the
5 nomination also responsible for collecting and
6 attesting to the derogatory information they
7 include in a TSDB nomination?
8        MS. POWELL:  Objection; vagueness.
9        THE WITNESS:  The employee who submits
10 that, who includes derogatory information, is
11 responsible to have, you know, the source -- the
12 source documentation that is the -- that the
13 derogatory comes from.  That must be available so
14 that's in the case file.  The information can't
15 just be coming from the agent's head, it has to be
16 documented inside the investigation.  Likewise,
17 when the nomination then goes to NCTC, if there's
18 other information from other agencies that gets
19 added, there's a responsibility to have the
20 underlying documentation available.
21 BY MR. ABBAS:
22    Q.   Does the underlying documentation get

230

1 included in an FBI employee's nomination form?
2        MS. POWELL:  Objection; vagueness.
3        MR. ABBAS:  Go ahead.
4        THE WITNESS:  Typically, no, but the
5 units at TSC have the ability to go into the case
6 file to review.
7 BY MR. ABBAS:
8    Q.   Okay.  Does TSC ever ask an FBI employee
9 who submits a nomination to the TSDB for more
10 information about the prospective listee?
11 Probably not, but --
12        MS. POWELL:  Objection to the extent
13 you're asking about sort of specific
14 deliberations, I'd instruct him not to answer.
15 But to the extent you're asking and answering at a
16 level of generality about communications between
17 TSC and FBI, you can answer.
18        THE WITNESS:  The answer is yes.
19 BY MR. ABBAS:
20    Q.   Does the TSC ever reject an FBI
21 employee's nomination to the TSDB for failing to
22 satisfy the minimum substantive derogatory

231

1 information standard?
2        MS. POWELL:  Same objection.
3        And you can answer at a level of
4 generality.
5        THE WITNESS:  Yes.
6 BY MR. ABBAS:
7    Q.   How often does an FBI nomination to the
8 TSDB get rejected by TSC for failure to satisfy
9 the minimum substantive derogatory standard?
10        MS. POWELL:  Objection.
11        I'm instructing the witness not to
12 answer on the grounds of law enforcement
13 privilege, potentially SSI, potentially state
14 secrets, and deliberative process information.
15    Q.   Has an FBI nomination to the TSDB been
16 rejected by TSC for failure to satisfy the minimum
17 substantive derogatory criteria more than ten
18 times?
19        MS. POWELL:  Same objection.
20        And I'm instructing the witness not to
21 answer on the grounds of the law enforcement
22 privilege.

232

1    Q.   Has the -- has an FBI nomination to the
2 TSDB been rejected by TSC for failure to satisfy
3 the minimum substantive derogatory criteria more
4 than 1 million times?
5        MS. POWELL:  I'm instructing the witness
6 not to answer --
7        MR. ABBAS:  He can't answer that one?
8        MS. POWELL:  -- on the grounds of law
9 enforcement privilege.
10        MR. ABBAS:  Okay.  That's --
11 BY MR. ABBAS:
12    Q.   Has the FBI -- has an FBI nomination to
13 the TSDB been rejected by TSC for failure to
14 satisfy the minimum substantive derogatory
15 criteria more than one time?
16        MS. POWELL:  The number is privileged.
17 I'm -- and he has said it has happened, so we're
18 going to go with at least one and I'm instructing
19 him not to answer more than that.
20        MR. ABBAS:  What is the basis of the
21 privilege?
22        MS. POWELL:  The law enforcement

Transcript of Matthew J. DeSarno, Designated Representative

59 (233 to 236)

Conducted on April 9, 2018

233
1   privilege, potentially SSI.
2        MR. ABBAS:  Anything else?
3        MS. POWELL:  Potentially state secrets.
4   BY MR. ABBAS:
5        Q.   What is the law enforcement interest in
6   not revealing the number of times an FBI
7   employee's TSDB nomination has been rejected by
8   TSC for a failure to satisfy the minimum
9   substantive derogatory criteria?
10       MS. POWELL:  Are you asking me for the
11  legal basis to the question because --
12       MR. ABBAS:  No.  I mean, he's -- you're
13  saying the privilege.  It's the FBI's -- I'm
14  wondering -- I'm asking him about the law
15  enforcement interest, about the secret information
16  that you're keeping.
17       MS. POWELL:  Yes.
18       MR. ABBAS:  So he's the FBI, surely he
19  can explain what the law enforcement value is to
20  the information that you're keeping on the basis
21  of an assertion of law enforcement privilege.
22       MS. POWELL:  Well, I'm going to object

234
1   as to scope and that a comprehensive answer would
2   require discussion of law enforcement sensitive
3   and potentially SSI information.
4        You can answer, if you can.
5        THE WITNESS:  I can't answer any further
6   than that.
7   BY MR. ABBAS:
8        Q.   Are you withholding SSI information as
9   part of your answer?
10       MS. POWELL:  Objection; calls for a
11  legal conclusion.
12       Q.   Do you believe that you're withholding
13  SSI information as part of your answer?
14       MS. POWELL:  Objection; it calls for a
15  legal conclusion.
16       MR. ABBAS:  Go ahead.
17       THE WITNESS:  I have no legal opinion
18  about that.  I don't -- that's a legal -- it's a
19  legal conclusion that I'm not prepared to make.
20       MR. ABBAS:  So you don't know what his
21  answer is and then he doesn't know what his -- he
22  has an answer in his head and so you're asserting

235
1   the privilege over something that you don't know
2   what he's going to say, which is perplexing to me.
3   I think that out of a desire to avoid this
4   dispute, which we will certainly win, it makes
5   sense for you all to confer and assert the SSI
6   privilege with more particularity.  That's my
7   suggestion.
8        MS. POWELL:  The number of nominations
9   rejected for a particular reason is protected
10  information, we've asserted it since sometime last
11  October and that answer has not changed.
12  BY MR. ABBAS:
13       Q.   What about -- can the FBI -- does the
14  FBI know how many nominations its employees have
15  submitted to the TSDB that TSC has rejected for a
16  failure to satisfy the minimum substantive
17  derogatory criteria?
18       MS. POWELL:  So, I'm sorry --
19       MR. ABBAS:  It's a yes-or-no question.
20  BY MR. ABBAS:
21       Q.   Does the FBI know?
22       MS. POWELL:  I think you can answer

236
1   whether or not you know or could figure it out.
2        THE WITNESS:  Yeah, whether the FBI has
3   that number on hand, I don't know, but we
4   could -- we could likely figure that out.  We'd
5   probably have to work with the TSC between our two
6   systems to figure out that number.
7   BY MR. ABBAS:
8        Q.   How hard would that be?
9        MS. POWELL:  Objection; scope.  I'm
10  actually just going to with scope there in being
11  outside FBI's purview.
12       MR. ABBAS:  Sure.  Go ahead.
13       THE WITNESS:  I don't have enough
14  familiarity with the TSC systems to know how easy
15  or hard that would be, but I would imagine it
16  could be done.
17  BY MR. ABBAS:
18       Q.   So you don't know.  That's fine.
19       MR. ABBAS:  I'm going to mark the
20  overview document as Exhibit Plaintiff -- I'm
21  sorry, Deponent DeSarno Exhibit B.
22       (DeSarno Deposition Exhibit B was marked

Transcript of Matthew J. DeSarno, Designated Representative
Conducted on April 9, 2018

60 (237 to 240)

237

1  for identification and attached to the
2  transcript.)
3      Q.  So you can feel free to peruse the
4  document.  I'm going to just ask you questions
5  about the inclusion standard as it's listed at the
6  top of page 4.  So if you like to kind of review
7  the document, that's fine, take your time.  But
8  that top paragraph on page four is what I'm going
9  to ask you about.
10     **A.  Okay.**
11         MS. POWELL:  Take your time and look at
12 it if you need to.
13         MR. ABBAS:  I'll eat waffle fries.
14     (Witness peruses the exhibit.)
15         MS. POWELL:  Are you ready?
16         THE WITNESS:  Ready.
17 BY MR. ABBAS:
18     Q.  Are you familiar with this document?
19     **A.  Yes.**
20     Q.  What is your understanding of what this
21 document is?
22     **A.  This is the overview document or also**

238

1  **referred to sometimes I think as the transparency**
2  **document.**
3      Q.  Why was this document created -- I'm
4  sorry, let me withdraw that question.
5         What is the FBI's understanding of why
6  this document exists?
7      **A.  It's a public unclassified transparency**
8  **document that discusses the watchlisting process**
9  **and enterprise.**
10     Q.  Is this document available on a federal
11 government website somewhere?
12         MS. POWELL:  Objection; scope.
13         THE WITNESS:  I don't know.
14 BY MR. ABBAS:
15     Q.  Has this document been disseminated to
16 the public in any way?
17         MS. POWELL:  Objection; scope.
18         THE WITNESS:  I don't know that either.
19 BY MR. ABBAS:
20     Q.  Okay.  Was this document prepared for
21 the purposes of litigation?
22         MS. POWELL:  Objection; scope and I

239

1  don't know.
2         You can answer, if you know.
3         THE WITNESS:  I don't know.
4  BY MR. ABBAS:
5      Q.  Okay.  What is the -- so you referred to
6  the TSDB inclusion standard as a reasonable
7  suspicion standard?
8      **A.  Correct.**
9      Q.  What is the TSDB inclusion standard?
10     **A.  Reasonable suspicion.  The nominator**
11 **must rely upon articulable intelligence or**
12 **information which based on the totality of the**
13 **circumstances and taken together with rational**
14 **inferences from those facts, creates a reasonable**
15 **suspicion the individual is engaged, has been**
16 **engaged, or intends to engage in conducting,**
17 **constituting, in preparation for, in aid of, or in**
18 **furtherance of or related to terrorism and/or**
19 **terrorists activities.**
20     Q.  What is conduct related to terrorism,
21 what does that mean?
22     **A.  Conduct related to terrorism?**

240

1      Q.  Yes.
2      **A.  That could mean -- that could mean**
3  **preparing to conduct a terrorist attack, it could**
4  **mean financing terrorism, it could mean**
5  **facilitating terrorism, it could mean**
6  **communicating with overseas terrorists.  Those are**
7  **all conduct related to terrorism.**
8      Q.  Does a person have to pose a threat to
9  commercial aviation to satisfy the TSDB's
10 inclusion standards?
11     **A.  No, it doesn't say that in here.**
12     Q.  Okay.  Does a person have to pose a
13 threat to a U.S. land border to be included in the
14 TSDB?
15     **A.  No.**
16     Q.  Does a person have to pose a threat of
17 committing an act of terrorism overseas to be
18 included in the TSDB -- I'm sorry, let me rephrase
19 that question.
20         Does a person have to -- does the
21 federal government have to -- let me start all
22 over.

241

1    Does the FBI have to include in its
2 nominations -- I'm just going to scratch that.
3    What is a known terrorist per the TSDB's
4 inclusion standard, what does that mean?
5    MS. POWELL: Objection that a
6 comprehensive definition of those terms would
7 require discussion of law enforcement sensitive
8 information.
9    MR. ABBAS: Go ahead.
10    MS. POWELL: I don't know -- if there's
11 a general answer you can give, do it. But the
12 comprehensive definition is privileged.
13    MR. ABBAS: Go ahead.
14    THE WITNESS: I mean, I would say
15 generally a known terrorist is someone convicted
16 of a terrorism offense.
17 BY MR. ABBAS:
18    Q.   Now, you said "generally," so I have to
19 ask if there's any exceptions.
20    **A.   Yeah, there are other people who are
21 known terrorists that blow themselves up or
22 conduct terrorist attacks.  Those are known**

242

1 **terrorists that you conduct an attack.**
2    Q.   So people that have committed acts of
3 terrorism as well as people who have been
4 convicted of acts of terrorism?
5    **A.   Or convicted of terrorism offenses.**
6    Q.   Yes, let me start all over.
7    People who have committed acts of
8 terrorism and people who have been convicted of
9 terrorism-related offenses are known terrorists as
10 the TSDB inclusion standards define them?
11    MS. POWELL: Objection that a
12 comprehensive response requires law enforcement
13 sensitive information, but you can answer the
14 question as posed.
15    THE WITNESS: And this would be the
16 FBI's definition of a known terrorists, not
17 necessarily the TSDB's definition of a known
18 terrorists.
19 BY MR. ABBAS:
20    Q.   Got it.
21    **A.   That would be a question for the TSC.**
22    Q.   So the FBI's definition of a known

243

1 terrorist could be different than TSC's definition
2 of a known terrorist; correct?
3    **A.   Potentially.  I don't know their
4 definition.**
5    Q.   Okay.  But it's not necessarily the same
6 as the FBI's definition of a known terrorist;
7 correct?  Let me just --
8    **A.   I don't know what the TSC's definition
9 of a known terrorist is.  I don't see it in this
10 document either.**
11    Q.   Do all the members of the Watchlisting
12 Advisory Council share a single definition of what
13 is a known terrorist for purposes of the TSDB's
14 inclusion standard?
15    MS. POWELL: Same objection that a
16 comprehensive definition of known or suspected
17 terrorists requires disclosure of law enforcement
18 sensitive information.
19    MR. ABBAS: That was a yes-or-no
20 question.  I'm not asking what the definition is,
21 I'm asking whether the definition is the same
22 across all WAC and member agencies.

244

1    MS. POWELL: Same objection.
2    THE WITNESS: Yeah, I don't know that
3 the agency -- member agencies all have the same
4 definition.  But for purposes of watchlisting, the
5 WAC -- if the WAC has its own definition that it
6 has developed among the members of the WAC for
7 watchlisting purposes, that's -- that may be
8 different from what I know as a known terrorist.
9 BY MR. ABBAS:
10    Q.   You're the FBI today; right?  You're
11 testifying on behalf of the FBI?
12    **A.   Correct.**
13    Q.   Does the FBI have a -- use a definition
14 of known terrorist that it shares with other
15 members of WAC agencies?
16    MS. POWELL: Same objection that a
17 comprehensive definition of a known or suspected
18 terrorist as defined for TSDB purposes is
19 protected by the law enforcement privilege.
20    MR. ABBAS: It's a yes-or-no question.
21 I'm just asking whether there is a shared
22 definition, not what that definition is.

Transcript of Matthew J. DeSarno, Designated Representative
Conducted on April 9, 2018

245

1        THE WITNESS:  I don't know.
2   BY MR. ABBAS:
3        Q.   You don't know whether there's a shared
4   definition of known terrorists for purposes of the
5   TSDB's inclusion standard?
6        MS. POWELL:  Same objection.
7        THE WITNESS:  Correct.
8   BY MR. ABBAS:
9        Q.   Okay.  That's fine.  That's all.
10       Now circling back -- but you do know of
11  what the FBI's definition is of a known terrorist
12  for purposes of the TSDB inclusion standard;
13  correct?
14       **A.   Yes.**
15       Q.   What is the definition that the FBI uses
16  for known terrorists?
17       MS. POWELL:  Same objection that a
18  comprehensive definition of a known or suspected
19  terrorist is protected by the law enforcement
20  privilege.  He has already answered and thus it is
21  asked and answered as to what he can tell you
22  about what a known terrorist is.

246

1        MR. ABBAS:  Go ahead.
2        THE WITNESS:  Regarding inclusion or
3   nomination to the TSDB, we use the reasonable
4   suspicion standard.
5   BY MR. ABBAS:
6        Q.   I'm not asking about the reasonable
7   suspicion standard.  I'm asking about within the
8   reasonable suspicion standard, there's a concept
9   of a known terrorist; correct?  There's also the
10  concept of a suspected terrorist; correct?
11       MS. POWELL:  Objection; misleading.
12       Q.   Are those two different things, a known
13  terrorist and a suspected terrorist?
14       MS. POWELL:  Objection; misleading.
15       Q.   If I'm wrong, just tell me I'm wrong and
16  I know it now.
17       MS. POWELL:  Same objection.
18       THE WITNESS:  Yeah, two different
19  things, yes.
20  BY MR. ABBAS:
21       Q.   Got it.  Okay.
22       The FBI's definition of a known

247

1   terrorist for purposes of the TSDB inclusion
2   standard is what?
3        MS. POWELL:  Objection.  A comprehensive
4   definition of a known or suspected terrorist for
5   the purposes of the TSDB is protected by the law
6   enforcement privilege.  Other than what is right
7   here in this document, there's literally nothing
8   else he can tell you at this point.
9        And I'm instructing him not to provide
10  any additional information at this point.
11       MR. ABBAS:  On the basis of?
12       MS. POWELL:  Law enforcement privilege.
13       MR. ABBAS:  What is the -- anything
14  else?  Is there any other privilege besides the
15  law enforcement privilege?
16       MS. POWELL:  For a complete definition
17  under the inclusion standard.
18       MR. ABBAS:  Of a known terrorist.
19       MS. POWELL:  Well, it's a known or
20  suspected terrorist.
21       MR. ABBAS:  Well, I'm just doing known
22  terrorist.  Don't worry, I'll do suspected

248

1   terrorist next.
2        MS. POWELL:  Potentially the state
3   secrets privilege depending on the context.
4        MR. ABBAS:  Okay.
5   BY MR. ABBAS:
6        Q.   What is the FBI's law enforcement
7   interest in keeping secret its definition of what
8   a known terrorist is for purposes of TSDB
9   inclusion?
10       MS. POWELL:  Objection; misleading and
11  vague.
12       Q.   Does the FBI have a law enforcement
13  interest in keeping its definition of a known
14  terrorist secret?
15       MS. POWELL:  Objection.
16       MR. ABBAS:  It's a yes-or-no question
17  about whether there is --
18       MS. POWELL:  That doesn't mean there's a
19  yes-or-no answer.
20       MR. ABBAS:  Okay.
21       MS. POWELL:  Actually, I think it might
22  be useful for all of us to take a break sometime

Transcript of Matthew J. DeSarno, Designated Representative   63 (249 to 252)
Conducted on April 9, 2018

---

249

1 soon.
2        MR. ABBAS:  I'd like to finish this line
3 of questioning; but, yes, after this line of
4 questioning, I would like a break as well.
5 BY MR. ABBAS:
6    Q.  Do you need me to repeat the question?
7    **A.  You asked me if there's a privilege to**
8 **the definition.**
9    Q.  I did not ask you that.
10       Does the FBI have a law enforcement
11 interest in keeping its definition of a known
12 terrorist secret?
13       MS. POWELL:  Objection; misleading,
14 vague, lacks foundation, and calls for a legal
15 conclusion, but you can answer to the extent you
16 can.
17       THE WITNESS:  Yes.
18 BY MR. ABBAS:
19    Q.  What is the FBI's law enforcement
20 interest in keeping secret its definition of a
21 known terrorist?
22       MS. POWELL:  Objection; misleading,

---

250

1 vague, a comprehensive answer would require law
2 enforcement sensitive information, but you can
3 answer to the extent you can.
4        THE WITNESS:  I already provided some
5 examples of known terrorists.  I think
6 that's -- those examples were pretty sufficient.
7 I don't know have anything to add to that.
8 BY MR. ABBAS:
9    Q.  You didn't answer the question.
10       What is the -- so I understand you
11 referred back, you identified as examples of known
12 terrorists people that have actually committed
13 acts of terrorism, you also identified people that
14 were convicted as terrorists.  So I understand
15 from your testimony that those two categories of
16 people would satisfy the FBI's definition of a
17 known terrorist; is that correct?
18       MS. POWELL:  Objection; vague, and
19 misleading, and mischaracterizes prior testimony.
20       THE WITNESS:  Those are two -- those are
21 two examples of known terrorists.
22       MR. ABBAS:  Got it.

---

251

1        MS. POWELL:  All right.  We have a
2 question answered, we're going to take a break.
3        MR. ABBAS:  That's fine.
4        (Recess from the record.)
5        THE REPORTER:  This is the court
6 reporter.  And we've used four and a half hours.
7 BY MR. ABBAS:
8    Q.  Does the FBI have a definition of
9 suspected terrorist that it uses with regards to
10 the TSDB inclusion standard?
11    **A.  Yes.**
12    Q.  What is the FBI's definition of a
13 suspected terrorist with regard to the TSDB
14 inclusion standard?
15       MS. POWELL:  Objection to the extent a
16 comprehensive answer would require the disclosure
17 of law enforcement sensitive information and
18 potentially state secrets, but you can answer.
19       THE WITNESS:  That definition is
20 privileged information that the disclosure of
21 which could affect national security and ongoing
22 investigations.

---

252

1 BY MR. ABBAS:
2    Q.  How could the definition of -- obviously
3 it's something we might -- you know, Amy and I
4 might fight about later so that's why I'm asking
5 you about it, but it's fine if you can't answer,
6 that's how this works but I still ask.
7        How would the disclosure of the FBI's
8 definition of a suspected terrorist have any
9 impact on the FBI's law enforcement interests?
10       MS. POWELL:  Objection to the extent
11 that a comprehensive explanation would require the
12 disclosure of law enforcement sensitive
13 information and potentially state secrets, but you
14 can answer at a level of generality.
15       THE WITNESS:  So the definitions of both
16 known and suspected terrorist potentially could
17 endanger national security or ongoing
18 investigations in a variety of ways.  And really
19 any definition that exceeds the published
20 inclusion standard potentially could harm national
21 security.
22

---

Transcript of Matthew J. DeSarno, Designated Representative

64 (253 to 256)

Conducted on April 9, 2018

253

1 BY MR. ABBAS:
2     Q.  I understand that it's the FBI's opinion
3 that the disclosure of its definition of what is a
4 known terrorist and what is a suspected terrorist
5 could imperil its law enforcement interests, but I
6 need to understand how that disclosure imperils
7 FBI's lawsuit interests.
8         So you said that there are a variety of
9 ways that the disclosure of the definitions of a
10 known terrorist and a suspected terrorist imperil
11 the FBI's law enforcement privileges.  What are
12 the ways in which the disclosure of a known
13 terrorist, the definition of that, and the
14 definition of a suspected terrorist have on the
15 FBI?
16        MS. POWELL:  Objection; vague, compound,
17 and misleading.  Also a comprehensive explanation
18 of the harms to national security and law
19 enforcement investigations would themselves
20 require discussion or disclosure of law
21 enforcement privileged and potentially state
22 secrets information, but you can answer at a level

254

1 of generality if you have anything further to say.
2        THE WITNESS:  No, I don't have anything
3 further to say.
4 BY MR. ABBAS:
5     Q.  Can a suspected terrorist include
6 someone who was acquitted of a terrorism-related
7 offense?
8        MS. POWELL:  Objection.
9        I'm instructing the witness not to
10 answer to the extent it calls for law enforcement
11 sensitive information.
12        If there is a general answer you can
13 give, you may.
14        THE WITNESS:  I think it's a pretty
15 specific question.  I don't know if there's a
16 general answer I can give.
17 BY MR. ABBAS:
18     Q.  What's the basis of you not answering
19 whether --
20        MS. POWELL:  The law enforcement --
21     Q.  -- a person acquitted of a terrorism
22 related offense.

255

1     A.  There is a general answer.
2     Q.  Okay.  What's that general answer?
3     **A.  Okay.  So the standard for conviction is**
4 **beyond a reasonable doubt.  The standard for**
5 **inclusion in the TSDB is reasonable suspicion,**
6 **which is a lower standard than beyond a reasonable**
7 **doubt.  So it is feasible that that could be the**
8 **case.**
9     Q.  Does a person who has actually committed
10 a terrorism-related offense fall within the
11 definition of a suspected terrorist?
12        MS. POWELL:  Objection to the extent a
13 comprehensive answer would require disclosure of
14 the full explanation of the standard which is
15 protected by the law enforcement privilege and
16 potentially the state secrets privilege, but I
17 think you can answer at a level of generality.
18        MR. ABBAS:  It's a yes-or-no question.
19        MS. POWELL:  If you don't think you can
20 answer on the other hand, don't.
21        THE WITNESS:  I mean, generally it would
22 fall within either the known or suspected

256

1 terrorist.
2 BY MR. ABBAS:
3     Q.  Well, so I'm trying to learn as much as
4 I can about the separate -- there are two separate
5 definitions; correct?  One for known terrorists;
6 right?
7     **A.  Yes.**
8     Q.  And there's a separate definition for
9 suspected terrorists; correct?
10    **A.  For watchlisting purposes, yes.**
11    Q.  Yes.  And the FBI has two separate
12 definitions for those two separate things;
13 correct?
14        MS. POWELL:  Objection; vague and
15 misleading.
16        THE WITNESS:  The WAC agencies have
17 agreed on definitions, yes.  All of them.
18 BY MR. ABBAS:
19    Q.  Sure.
20    **A.  For watchlisting purposes.**
21    Q.  Does a person who -- I'm going to ask
22 this question again, I don't think you answered it

257

1 last time.
2       Does a person who's actually committed
3 an act of terrorism fall within the definition of
4 a suspected terrorist for TSDB inclusion standard
5 purposes?
6       MS. POWELL:  Objection because
7 misleading and a comprehensive answer would
8 require disclosure of law enforcement sensitive
9 information at least.
10       THE WITNESS:  It also would require
11 someone to know that they committed that act of
12 terrorism.  Do we know that they committed an act
13 of terrorism?
14 BY MR. ABBAS:
15   Q.  Yeah, right.
16       Does a person who's committed an act of
17 terrorism in the FBI's perspective fall within the
18 definition of a suspected terrorist or a known
19 terrorist?
20       MS. POWELL:  Objection; misleading and
21 same.
22       THE WITNESS:  That's privileged.

258

1       MS. POWELL:  -- privilege assertions as
2 previous.
3       THE WITNESS:  They definitely fall
4 within the inclusion standard.
5 BY MR. ABBAS:
6   Q.  But you can't tell me whether a person
7 who's actually committed an act of terrorism in
8 the FBI's perspective falls within the definition
9 of a suspected terrorist, you can't tell me that?
10       MS. POWELL:  Objection; it's misleading
11 in addition to the privilege assertion.
12       MR. ABBAS:  Go ahead.
13       THE WITNESS:  Those definitions are
14 contained in a privileged document.
15 BY MR. ABBAS:
16   Q.  What document contains the definitions
17 of known terrorist and suspected terrorist?
18   A.  Watchlisting guidance.
19       MR. ABBAS:  Do you want to -- is this
20 what you were going to say to begin with about the
21 shared definition?
22       MS. POWELL:  More or less.

259

1       MR. ABBAS:  All right.  Why don't you
2 say it now since it's coming up.
3       MS. POWELL:  You can ask the question if
4 you'd like.
5       MR. ABBAS:  Well, you had something to
6 say and I imagine it's about this.
7 EXAMINATION BY COUNSEL FOR THE DEFENDANTS (CONT'D)
8 BY MS. POWELL:
9   Q.  I was merely going to ask him whether
10 there is a standard definition of a known or
11 suspected terrorist for the purpose of
12 watchlisting?
13   A.  Yes, there are standard definitions for
14 both known terrorists and suspected terrorists for
15 the purpose of watchlisting found in the
16 watchlisting guidance.
17   Q.  And where do those standards come from?
18   A.  They are developed by the
19 agencies -- member agencies in the WAC and then
20 approved beside the NSC.
21
22

260

1 EXAMINATION BY COUNSEL FOR THE PLAINTIFFS (CONT'D)
2 BY MR. ABBAS:
3   Q.  Did WAC propose that the NSC adopt
4 specific definitions of known terrorist and of
5 suspected terrorist for TSDB inclusion standard
6 purposes?
7   A.  It's my understanding the WAC created
8 the entire document that was then sent to the NSC
9 for approval.
10   Q.  And did the NSC -- by the document,
11 you're referring to the watchlisting guidance?
12   A.  Yes.
13   Q.  And NSC has approved the watchlisting
14 guidance that the WAC proposed to the NSC?
15   A.  Yes.
16   Q.  Did the NSC ever make any changes to the
17 watchlisting guidance that the WAC proposed to the
18 NSC?
19       MS. POWELL:  Objection, I think
20 answering the question calls for deliberative
21 information necessarily.
22       I'm instructing the witness not to

---

261

1  answer.
2     Q.   What does it mean to have reasonable
3  suspicion that a person is a suspected terrorist?
4        MS. POWELL:  Objection; misleading and a
5  comprehensive answer would require disclosure of
6  law enforcement sensitive information.
7        MR. ABBAS:  I'll withdraw the question.
8  BY MR. ABBAS:
9     Q.   Does a suspected terrorist as defined by
10 the watchlisting guidance have to be engaged in
11 criminal conduct?
12       MS. POWELL:  Objection; vague, and
13 misleading, and a comprehensive answer would
14 require disclosure of law enforcement sensitive
15 information, but I do think there's a general
16 answer you can give.
17       THE WITNESS:  I mean, the inclusion
18 standard as stated in this paragraph on page 4 of
19 Exhibit B clearly indicates that there's no
20 requirement for criminal activity to be included
21 in the watchlisting.
22

---

262

1  BY MR. ABBAS:
2     Q.   So it's not reasonable for suspected
3  terrorists that are nominated to the TSDB, the
4  reasonable suspicion is not that they're engaged
5  in criminal conduct; correct?
6        MS. POWELL:  Objection; misleading, and
7  mischaracterizes prior testimony.
8     Q.   If I'm wrong, tell me I'm wrong.  That's
9  fine.
10       MS. POWELL:  You're using different
11 definitions of the words.
12       MR. ABBAS:  I'm using just the
13 government's words.  I'll ask it again.
14 BY MR. ABBAS:
15    Q.   In order to be included in the TSDB,
16 there must be reasonable suspicion that a person
17 is either a known terrorist or a suspected
18 terrorist; correct?
19       MS. POWELL:  Objection; misleading and
20 mischaracterizes prior testimony.
21       THE WITNESS:  In order to be included,
22 there must be reasonable suspicion the individual

---

263

1  is engaged, has been engaged, or intends to engage
2  in conduct constituting in preparation for, in
3  aid, or in furtherance of related to terrorism
4  and/or terrorist activities.
5  BY MR. ABBAS:
6     Q.   Does being related to a person -- let me
7  ask this:  Does a person who is nominated to the
8  TSDB -- let me try again.
9        Must individuals who the FBI nominates
10 to the TSDB be under investigation?
11       MS. POWELL:  Objection; calls for law
12 enforcement privileged information.
13       I'm instructing the witness not to
14 answer.
15    Q.   Must an individual --
16       MR. ABBAS:  On what basis?
17       MS. POWELL:  The law enforcement
18 privilege.
19       MR. ABBAS:  Okay.
20 BY MR. ABBAS:
21    Q.   In order to nominate an individual to
22 the TSDB, must the FBI have conducted an

---

264

1  assessment of that individual?
2        MS. POWELL:  Objection; calls for law
3  enforcement information.
4        I'm instructing the witness not to
5  answer.
6        I do want to withdraw my blanket
7  instruction to the previous question, though.  To
8  the extent there is any non-privileged information
9  you can give about whether there's always an
10 investigation connected to a nomination, you may.
11 If you're not sure, we can consult later, but...
12    Q.   I'll go back to that question.  I'll ask
13 it again.
14    A.   Okay.
15    Q.   In order for the FBI to nominate an
16 individual to the TSDB, must there be an
17 investigation regarding the prospective listee?
18    A.   No.
19       THE WITNESS:  Sorry.
20       MS. POWELL:  Let me sneak in the
21 objection that a comprehensive explanation of the
22 answer would require the disclosure of law

---

Transcript of Matthew J. DeSarno, Designated Representative
Conducted on April 9, 2018

67 (265 to 268)

---

265

1 enforcement privileged information. That answer
2 was not privileged.
3 BY MR. ABBAS:
4     Q.  Why would the FBI try to place people in
5 the TSDB that are not being investigated?
6        MS. POWELL:  Same objection that a
7 comprehensive explanation of the answer would
8 require disclosure of law enforcement privileged
9 information.  To the extent there is a
10 non-privileged answer you can give, you can.  If
11 not, we can come back to it at a later time.
12       THE WITNESS:  If during the course of an
13 investigation or during the course of either a
14 foreign partner engagement or other agency
15 engagement, the FBI developed information about
16 someone who was overseas who met this inclusion
17 standard, but did not -- did not -- the FBI
18 decided that it was not going to open an
19 investigation on that person, in that instance,
20 the FBI could make a nomination if it met this
21 standard on that overseas person.
22

---

266

1 BY MR. ABBAS:
2     Q.  Why would the FBI place someone in the
3 TSDB and not investigate that person?
4        MS. POWELL:  Objection, I think any
5 further answer other than the example he has given
6 you would require disclosure of law enforcement
7 privileged information.
8        MR. ABBAS:  Sure.
9 BY MR. ABBAS:
10    Q.  When the FBI nominates a person to the
11 TSDB, the FBI is expressing its opinion that that
12 person is a known or suspected terrorist; correct?
13    **A.  The FBI is indicating that it meets this**
14 **inclusion standard here that there's reasonable**
15 **suspicion that the individual is engaged, has been**
16 **engaged, or intends to engage in preparation, aid,**
17 **or furtherance of terrorism activities.**
18    Q.  Is it the FBI's testimony today that
19 there are individuals known to it that are
20 reasonably suspected of engaging or having been
21 engaged or intending to engage in conduct
22 constituting in preparation for, in aid, or in

---

267

1 furtherance of or related to terrorism and/or
2 terrorists activities who are not under
3 investigation -- I'm sorry, I'm just going to
4 start all over and we'll get it this time now that
5 I know what the question is.
6        Is it the FBI's testimony today that
7 there are individuals known to the FBI who are
8 reasonably suspected of engaging in or having been
9 engaged or intending to engage in conduct
10 constituting in preparation for, in aid of, or in
11 furtherance of, or related to terrorism or
12 terrorist activities who the FBI chooses not to
13 investigate?
14       MS. POWELL:  Again, a comprehensive
15 answer would require law enforcement privileged
16 information, but you can answer yes or no.
17       MR. ABBAS:  Yes, that's all I'm looking
18 for.
19       THE WITNESS:  Overseas there are people
20 who fit that category who are not subjects of
21 current FBI investigations.
22

---

268

1 BY MR. ABBAS:
2     Q.  When you say "overseas," is the -- so
3 there are individuals that satisfy the TSDB
4 inclusion standard who are known to the FBI that
5 the FBI chooses not to investigate; correct?
6        MS. POWELL:  Asked and answered.
7        MR. ABBAS:  I'm making sure --
8        MS. POWELL:  As well as same objections.
9        MR. ABBAS:  I'm making sure that I have
10 this.
11       MS. POWELL:  And misleading.
12       THE WITNESS:  Yeah, my previous answer
13 was pretty clear.  That there are people overseas
14 who fit into this category who are not subject
15 currently of FBI investigations.
16 BY MR. ABBAS:
17    Q.  Are there U.S. persons overseas that the
18 FBI has nominated to the TSDB who are not subject
19 to an investigation?
20       MS. POWELL:  I'm instructing the witness
21 not to answer on the grounds of law enforcement
22 privilege to that question.

---

Transcript of Matthew J. DeSarno, Designated Representative
Conducted on April 9, 2018

269

1    Q.   Why would the FBI not investigate people
2 that satisfy the TSDB inclusion standard?
3        MS. POWELL:  I'm instructing the witness
4 not to answer on the grounds of the law
5 enforcement privilege.
6    Q.   What is the law enforcement interest in
7 placing people in the TSDB but not investigating
8 them?
9        MS. POWELL:  Objection; misleading at
10 the very least, but also a comprehensive answer
11 would require disclosure of law enforcement
12 sensitive information and --
13       MR. ABBAS:  I think he can answer.
14       MS. POWELL:  He can answer whether or
15 not there's a law enforcement interest.
16 BY MR. ABBAS:
17   Q.   It was a what, not an if.
18       What is the law enforcement interest in
19 placing people on the TSDB but not investigating
20 them?
21       MS. POWELL:  Same objections.
22       You can answer, if there's a general

270

1 answer.
2        THE WITNESS:  Generally, I mean, the FBI
3 may not be investigating them, but someone else
4 may be investigating them if they're in another
5 country and posing -- and fit into this category
6 but are in another country, then it's likely that
7 someone is investigating them, but possibly not
8 the FBI.
9 BY MR. ABBAS:
10   Q.   Are there any persons inside the United
11 States who the FBI has nominated to be in the
12 TSDB, but the FBI is not investigating?
13       MS. POWELL:  Objection.
14       I'm instructing the witness not to
15 answer on the grounds of the law enforcement
16 privilege.
17       MR. ABBAS:  It's a yes-or-no question.
18 BY MR. ABBAS:
19   Q.   Are you familiar with the term
20 "non-investigative subjects"?
21       MS. POWELL:  You can answer yes or no.
22       THE WITNESS:  Yes.

271

1 BY MR. ABBAS:
2    Q.   What is your understanding of what the
3 term "non-investigative subjects" refers to?
4        MS. POWELL:  I'm instructing the witness
5 not to answer on the grounds of law enforcement
6 privilege.
7    Q.   Are there non-investigative subjects
8 that the FBI nominates to the TSDB?
9        MS. POWELL:  Objection; calls for law
10 enforcement privileged information.
11       I'm instructing the witness not to
12 answer.
13   Q.   The FBI conducts assessments; correct?
14   **A.   Yes.**
15   Q.   What is an FBI assessment?
16   **A.   Generally, an assessment is a**
17 **pre-investigative assessment of a threat to**
18 **determine the nature of the threat and to either**
19 **mitigate the threat or develop it to the level of**
20 **an investigation.**
21   Q.   How many assessments did the FBI conduct
22 in 2017?

272

1        MS. POWELL:  Objection; calls for law
2 enforcement privileged information.
3        I'm instructing the witness not to
4 answer.
5    Q.   How many -- we're just going to repeat
6 this a couple of times.
7        MS. POWELL:  I'm good.
8    Q.   How many FBI assessments -- how many
9 assessments did the FBI conduct so far in 2018?
10       MS. POWELL:  Objection.
11       I'm instructing the witness not to
12 answer on the grounds of law enforcement
13 privilege.
14   Q.   How many assessments did the FBI conduct
15 in 2016?
16       MS. POWELL:  Same objection.
17       I'm instructing the witness not to
18 answer.
19   Q.   How many assessments did the FBI conduct
20 in 2015?
21       MS. POWELL:  Same objection.
22       I'm instructing the witness not to

273
1 answer on the grounds of the law enforcement
2 privilege.
3      MR. ABBAS:  I got like three more years.
4      MS. POWELL:  We're just going to --
5 BY MR. ABBAS:
6   Q.  How many -- I'm going to do them one by
7 one.
8      How many assessments did the FBI conduct
9 in 2015?
10     MS. POWELL:  I'm instructing the witness
11 not to answer on the grounds of law enforcement
12 privilege.
13  Q.  How many assessments did the FBI conduct
14 in 2014?
15     MS. POWELL:  I'm instructing the witness
16 not to answer on the grounds of law enforcement
17 privilege.
18  Q.  How many assessments did the FBI conduct
19 in 2013?
20     MS. POWELL:  I'm instructing the witness
21 not to answer on the grounds of the law
22 enforcement privilege.

274
1   Q.  How many assessments did the FBI conduct
2 that resulted in a watchlist nomination?
3      MS. POWELL:  I'm instructing the witness
4 not to answer on the grounds of the law
5 enforcement privilege.
6   Q.  Has an FBI assessment ever resulted in a
7 watchlist nomination?
8      Let's get really metaphysical here.
9 Does the FBI determine whether every single person
10 in the world -- I'm sorry, let's do it this way.
11    Does the FBI -- for every person in the
12 world, does the FBI assess whether every person in
13 the world satisfies the TSDB's inclusion
14 standards?
15     MS. POWELL:  I think you can answer that
16 question.
17     THE WITNESS:  No.
18 BY MR. ABBAS:
19  Q.  So the FBI only applies the TSDB
20 inclusion standard to a subset of people in the
21 world; correct?
22  **A.  Yes.**

275
1   Q.  Okay.  How does the FBI determine which
2 people are subject -- I'm sorry.
3      How does the FBI determine which people
4 it looks at to determine whether they satisfy the
5 TSDB's inclusion standard?
6      MS. POWELL:  I'm sure a comprehensive
7 description of the FBI's activity would require
8 disclosure of law enforcement or state secrets
9 information, but you can answer at a level of
10 generality.
11     THE WITNESS:  The FBI doesn't make
12 determinations about which people or groups of
13 people to look at.  Information -- we receive
14 information through the course of our
15 investigative activities that could potentially
16 cause us to collect additional information about
17 specific people and then that process would then
18 potentially rise to the standard of inclusion in
19 the TSDB.
20 BY MR. ABBAS:
21  Q.  So the FBI only measures people against
22 the TSDB's inclusion standard that it has

276
1 information about; correct?
2      MS. POWELL:  Objection; misleading.
3      THE WITNESS:  The FBI in submitting its
4 nominations reviews its information about people
5 and determines if it fits in this standard.  So
6 it's not -- we're not collecting information about
7 everyone and then seeing who fits there and then
8 nominating people to the TSDB.  We are only
9 collecting information about people for whom we
10 have an investigative -- an investigative interest
11 in collecting that information.
12 BY MR. ABBAS:
13  Q.  But some people are included in the TSDB
14 that are not under investigation; correct?
15 That's -- I just want to make sure that I have
16 that.
17  **A.  There are people included in the TSDB
18 that are not under FBI investigation.**
19  Q.  Great.  Okay.
20     One source of -- so you've testified
21 that the FBI only nominates people to the TSDB
22 that it has information about; correct?

277

1     A.  Yes.
2     Q.  Okay.  And some information the FBI just
3  receives, maybe calls, tips, things like that;
4  correct?
5     A.  Yes.
6     Q.  But the FBI is also engaged in proactive
7  efforts to collect information that's relevant to
8  the FBI's counterterrorism purposes; correct?
9     A.  The FBI conducts investigative activity
10 across a broad spectrum of activity in order to
11 prevent terrorist attacks, yes.
12    Q.  So out of those two broad categories of
13 information, information that the FBI receives as
14 well as information that the FBI collects, that's
15 the information that the FBI utilizes as a basis
16 of deciding who among those people gets included
17 or gets nominated to the watchlist; correct?
18    A.  The FBI does not decide who gets
19 included on the watchlist.  That's very clear.
20    Q.  The FBI decides who they nominate to the
21 watchlist.  So let's try that question again.
22    A.  If the FBI collects information that

278

1  meets this reasonable suspicion standard, we will
2  make a nomination to the TSC for inclusion on the
3  watchlist.
4     Q.  Does the FBI have a list of all the
5  people that it has information about?
6        MS. POWELL:  Objection; vague and
7  misleading.
8     Q.  Do you have a list of all the people
9  that the FBI has conducted an assessment of?
10       MS. POWELL:  Objection; vague and
11 misleading.
12       THE WITNESS:  No.
13 BY MR. ABBAS:
14    Q.  Does the FBI know who it has conducted
15 assessments of?
16    A.  Only insofar as we are allowed to keep
17 that information based on our records management
18 policies.  We don't keep every bit of information
19 forever.  So, no, we don't have a record of every
20 assessment we've ever done.
21    Q.  When does the FBI delete assessments
22 that it's made in the past?

279

1        MS. POWELL:  Wow, objection, scope.
2        You can answer, if you know.
3        THE WITNESS:  Law enforcement sensitive.
4        MS. POWELL:  And law enforcement
5  sensitive for privacy policies.  Okay.
6        If you know a non-privileged answer, go
7  ahead.
8        THE WITNESS:  I don't know a
9  non-privileged answer, but we do not keep all the
10 information we've ever collected.
11 BY MR. ABBAS:
12    Q.  Do you keep the names of the people that
13 you've conducted assessments of?
14    A.  Forever?
15    Q.  Yeah.
16    A.  No.
17    Q.  Do you keep the names of people that
18 you've conducted an assessment of in the last five
19 years?
20       MS. POWELL:  Objection; scope, and
21 vagueness, and law enforcement sensitive.
22       Is there a non-privileged answer you can

280

1  give?
2        THE WITNESS:  No.
3  BY MR. ABBAS:
4     Q.  What's the law enforcement interest in
5  not telling me how long you keep records regarding
6  the names of people the FBI has done assessment
7  of?
8        MS. POWELL:  Are you asking me?
9        MR. ABBAS:  No, I'm asking Mr. DeSarno.
10       MS. POWELL:  I'm definitely objecting as
11 to scope and I think there are sort of statutes
12 and regs governing privacy policies that would
13 call for a legal conclusion, but to the extent
14 there is also a privilege covering specific
15 policies I think he is --
16       MR. ABBAS:  What is the privilege
17 covering policies regarding the destruction of
18 information that's relevant to this lawsuit?  What
19 is that policy?
20       MS. POWELL:  There's nothing remotely
21 relevant to this lawsuit that you're asking about,
22 the lengths to which FBI keeps assessment records.

Transcript of Matthew J. DeSarno, Designated Representative    71 (281 to 284)
Conducted on April 9, 2018

281

1 BY MR. ABBAS:
2    Q.  Assessments are one source of the FBI's
3 TSDB nominations; correct?
4    MS. POWELL:  Objection; vague,
5 misleading, and mischaracterizes prior testimony.
6    MR. ABBAS:  Go ahead.
7    MS. POWELL:  Can you give a
8 non-privileged answer to that?
9    THE WITNESS:  I don't think I can.  I
10 don't know that I can.
11 BY MR. ABBAS:
12   Q.  What is the privilege assertion
13 that's -- do you have an answer that you're not
14 providing?
15   **A.  Yes.**
16   Q.  Okay.  Great.
17      So --
18      MS. POWELL:  There's an applicable
19 privilege and potentially the state secrets
20 privilege for a comprehensive answer as well.
21      MR. ABBAS:  I'm not looking for a
22 comprehensive answer.

282

1 BY MR. ABBAS:
2    Q.  Some people that are subject to FBI's
3 assessments end up getting nominated to the TSDB;
4 correct?
5    **A.  Eventually, yes.  Potentially.**
6    Q.  Okay.  Does the FBI keep track of the
7 number of people that it did assessments of who
8 ended up in the TSDB?
9    MS. POWELL:  Certainly a comprehensive
10 answer to that question would require disclosure
11 of law enforcement sensitive information.  Does it
12 keep -- and I'm also just a little confused.
13      Could you repeat the question?
14   Q.  Does the FBI keep track of the number of
15 people that it did assessments of who ended up in
16 the TSDB?
17      MS. POWELL:  I think this also might go
18 back in part to the previous question about
19 whether or not FBI can track all its nomination to
20 which there was a fairly complicated answer, but
21 it was asked and answered to that extent.
22      MR. ABBAS:  Go ahead.

283

1    THE WITNESS:  We certainly can resolve
2 to that number, yes.
3 BY MR. ABBAS:
4    Q.  When you say "can resolve to that
5 number," do you mean that the number that I ask
6 for is knowable by the FBI?
7    **A.  It is knowable, yes.**
8    Q.  Great.  Do you know what that number is?
9    **A.  I do not.**
10   Q.  Okay.  Would it be difficult for the FBI
11 to determine that number?
12   **A.  Not too difficult, no.**
13   Q.  Great.  Must U.S. persons be under
14 investigation to be added to the TSDB -- I'm
15 sorry, let me withdraw the question.
16      Must U.S. persons be under investigation
17 to be nominated to the TSDB?
18      MS. POWELL:  Objection to the extent a
19 comprehensive answer would require law enforcement
20 privileged information.
21      And I think I'm going to instruct him
22 not to answer beyond what he's already said on the

284

1 subject of investigations and nominations.
2    MR. ABBAS:  Go ahead.
3    THE WITNESS:  Yeah, I think I've already
4 answered that.
5 BY MR. ABBAS:
6    Q.  I don't know what answer you're
7 referring to or what answer she's referring to.
8    MS. POWELL:  Well, I'm instructing him
9 not to answer.
10   MR. ABBAS:  So if he wants to provide
11 the same answer that you're saying he provided,
12 that's fine.  But I'm asking a question and he
13 should answer it and I think it's a different
14 question than I've asked before.
15   MS. POWELL:  Well, I am thoroughly
16 confused if so and I suspect the witness is as
17 well.
18   MR. ABBAS:  Sure.  I'm going to try
19 rewording my question.
20 BY MR. ABBAS:
21   Q.  For the FBI to nominate a U.S. person to
22 the TSDB, must that U.S. person be under

Transcript of Matthew J. DeSarno, Designated Representative
Conducted on April 9, 2018

285

1 investigation?
2       MS. POWELL:  A comprehensive answer
3 would require disclosure of law enforcement
4 privileged information.  I think the witness may
5 provide a general -- fairly general answer to the
6 extent possible without revealing privileged
7 information.  If you disagree, don't answer.
8       THE WITNESS:  The answer is no.
9 BY MR. ABBAS:
10  Q.   For the FBI to nominate a U.S. person
11 who is inside the United States -- I'm sorry, let
12 me start again.
13       For the FBI to nominate a U.S. person to
14 the TSDB while that U.S. person is inside the
15 United States, must that U.S. person be under
16 investigation?
17       MS. POWELL:  Objection.
18       I'm instructing him not to answer beyond
19 the answers already given.
20       MR. ABBAS:  Go ahead.
21       MS. POWELL:  I'm instructing him not to
22 answer.

286

1       THE WITNESS:  I don't have an answer.
2 BY MR. ABBAS:
3   Q.   So you can answer whether or not U.S.
4 persons must be under investigation to be
5 nominated to TSDB, but you can't answer whether
6 U.S. persons, while they're in the United States,
7 must be under investigation to be nominated to the
8 TSDB?
9       MS. POWELL:  I'm instructing him not to
10 answer further.
11       MR. ABBAS:  I just want to -- on the
12 basis?
13       MS. POWELL:  Law enforcement privilege.
14 BY MR. ABBAS:
15   Q.   What is the law enforcement -- what is
16 the FBI's law enforcement interest in not
17 disclosing whether U.S. persons while they're
18 inside the United States may or may not be added
19 to the TSDB?
20       MS. POWELL:  Objection; vague,
21 misleading, and a comprehensive answer would
22 require law enforcement privileged information,

287

1 but if you can describe the interest in general
2 terms --
3       THE WITNESS:  So, generally, defining a
4 clear relationship between FBI investigation and
5 watchlisting status, that would generally
6 compromise law enforcement and potentially state
7 secrets information.
8 BY MR. ABBAS:
9   Q.   Why?  Why does the relationship between
10 FBI investigations and whether targets of FBI
11 investigations at a general level imperil the
12 FBI's law enforcement interests?  You told me that
13 it did, I would like an explanation as to why.
14       MS. POWELL:  Objection; calls for a
15 legal conclusion, calls for law enforcement
16 privilege and potentially state secrets
17 information, and vague, and misleading.
18       But you may answer if there's a general
19 answer you can give.
20       THE WITNESS:  I think my answer was
21 sufficient.
22

288

1 BY MR. ABBAS:
2   Q.   That's not an answer.
3       Why does the relationship between FBI
4 investigations and whether targets of FBI
5 investigations at a general level imperil the
6 FBI's law enforcement interests?
7       MS. POWELL:  Same objections and asked
8 and answered.
9       THE WITNESS:  You asked a pretty
10 specific question about U.S. persons in the U.S.,
11 that's where the privilege is asserted.
12 BY MR. ABBAS:
13   Q.   Why?  But the privilege is asserted
14 regarding whether, now I'm asking why.  What is
15 the law enforcement interest in not disclosing the
16 relationship between TSDB watchlist status of U.S.
17 persons inside the United States and
18 investigations regarding such U.S. persons inside
19 the United States?
20       MS. POWELL:  Same objections.  A
21 comprehensive discussion would require disclosure
22 of law enforcement privilege and state secrets

Transcript of Matthew J. DeSarno, Designated Representative
Conducted on April 9, 2018

73 (289 to 292)

289

1 information, calls for a legal conclusion, it's
2 vague, and misleading, outside the scope, and
3 asked and answered at this point.
4        MR. ABBAS: You can go ahead.
5        THE WITNESS: I mean, like I said,
6 discussion of the relationship between
7 watchlisting status and whether or not someone is
8 a subject of investigation, both of those
9 independently are matters of law enforcement and
10 state secrets privilege, both of them together are
11 even more revealing about both of those
12 privileges. So I'm not going to discuss them any
13 further.
14 BY MR. ABBAS:
15    Q.  Do you -- yes or no, do you know what
16 the relationship is between a person's TSDB
17 status -- I'm sorry.
18        Do you know, as the FBI's deponent
19 today, what the relationship is between a U.S.
20 person who is in the United States' TSDB status
21 and whether there is an investigation of that U.S.
22 person who is in the United States?

290

1        MS. POWELL: You can answer solely as to
2 whether or not you know.
3        THE WITNESS: I'm confused by the
4 question. Is it a specific person you're talking
5 about?
6 BY MR. ABBAS:
7    Q.  In general, do you know what the
8 relationship is between a person's TSDB status --
9 I'm sorry.
10       MR. ABBAS: Can you go back up to the
11 question.
12    Q.  Do you know, as the FBI's deponent
13 today, what the relationship is between a U.S.
14 person who is in the United States' TSDB status
15 and whether there is an investigation of that U.S.
16 person who is in the United States?
17       MS. POWELL: Objection; vague,
18 misleading, potentially calls for law enforcement
19 privileged information, but I think you can answer
20 yes or no as to whether or not you know if you
21 understand the question.
22       THE WITNESS: I mean, if you're talking

291

1 about a specific person or are you talking
2 about --
3 BY MR. ABBAS:
4    Q.  In general.
5    A.  -- every U.S. person in the United
6 States in the TSDB?
7    Q.  In general.
8    A.  I'm confused by that question.
9    Q.  We'll ask it again.
10       MS. POWELL: It might not help.
11       THE WITNESS: I don't really understand
12 the question.
13 BY MR. ABBAS:
14    Q.  Does the FBI have policy
15 documents -- I'm sorry.
16       Does the FBI have any policies or
17 practices that regard whether U.S. persons who are
18 in the United States, whether their watchlist
19 status and whether they're under investigation are
20 related in any way?
21       MS. POWELL: Objection; vague, and
22 misleading, and a comprehensive answer would

292

1 require the disclosure of law enforcement
2 sensitive information.
3        THE WITNESS: And the FBI does not make
4 decisions about watchlisting.
5 BY MR. ABBAS:
6    Q.  The FBI makes nominations to the
7 watchlist; correct?
8    A.  Yes.
9    Q.  So the FBI decides at least who the FBI
10 nominates to the watchlist; right?
11       MS. POWELL: Objection; vague, and
12 mischaracterizes prior testimony.
13       THE WITNESS: Not at least, that's what
14 the FBI does.
15 BY MR. ABBAS:
16    Q.  Right. Does the -- whether the FBI has
17 an investigation of a U.S. person who is in the
18 United States have any bearing on whether the FBI
19 chooses to nominate that person to the TSDB?
20       MS. POWELL: Objection.
21       I'm instructing the witness not to
22 answer on the grounds of a law enforcement

Transcript of Matthew J. DeSarno, Designated Representative
Conducted on April 9, 2018

74 (293 to 296)

293

1 privilege. I'm the instructing the witness not to
2 answer.
3     Q.  Do you have an answer?
4        MS. POWELL:  I'm instructing the witness
5 not to answer.
6        MR. ABBAS:  So I don't know whether he
7 has an answer or not.  Like if something is being
8 withheld on the basis of the law enforcement
9 privilege, then he has an answer and he's
10 withholding it on the basis of the law enforcement
11 privilege.  But if he just doesn't know, then he
12 can't assert the law enforcement privilege if he
13 just doesn't know.  I don't know which one it is.
14        MS. POWELL:  I am instructing him not to
15 answer.
16        MR. ABBAS:  Okay.  Which question are
17 you instructing him not to answer?
18        MS. POWELL:  The one you just asked.
19        MR. ABBAS:  Can you go back up to my
20 last question.
21 BY MR. ABBAS:
22     Q.  Do you know whether the FBI has any

294

1 policies or practices regarding the investigation
2 of U.S. persons who are in the United States and
3 such person's status in the TSDB?
4        MS. POWELL:  Objection; vague,
5 misleading, and a comprehensive answer requires
6 the disclosure of law enforcement sensitive
7 information.
8        If there is a general answer you can
9 give about what you know --
10        THE WITNESS:  Again, the FBI does not
11 determine -- the FBI does not determine the status
12 of an individual in the TSDB.
13 BY MR. ABBAS:
14     Q.  Okay.  We'll ask it with the word
15 "nominate" instead.
16        Does the FBI have any policies or
17 practices regarding U.S. persons in the U.S. --
18 let me start --
19        MR. ABBAS:  Can you go back up.
20     Q.  Do you know whether the FBI has any
21 policies or practices regarding whether U.S.
22 persons who are in the United States who are under

295

1 investigation and whether the FBI nominates such
2 persons to the TSDB?
3        MS. POWELL:  Objection; a comprehensive
4 answer requires disclosure of law enforcement
5 privileged information.
6        I think you can answer yes or no as to
7 whether or not you know which was the question;
8 right?
9        MR. ABBAS:  Yeah.
10        THE WITNESS:  Whether or not there's
11 policy about it; right?
12        MS. POWELL:  Right.
13        THE WITNESS:  Yes.
14 BY MR. ABBAS:
15     Q.  All right.  So there is policy regarding
16 whether persons -- U.S. persons who are in the
17 U.S., who are under investigation should be
18 nominated by the FBI to the TSDB; correct?
19        MS. POWELL:  Objection; misleading, and
20 a comprehensive answer would require disclosure of
21 law enforcement privileged information, and asked
22 and answered.

296

1        MR. ABBAS:  Go ahead.
2        THE WITNESS:  I answered that already,
3 yes.
4 BY MR. ABBAS:
5     Q.  Yes.  Okay.
6        What are the policies and practices
7 regarding whether U.S. persons who are in the
8 United States who are under investigation and
9 whether the FBI should nominate such persons?
10        MS. POWELL:  I'm instructing the witness
11 not to answer on the grounds of law enforcement
12 privilege.
13     Q.  Do you know an answer to that question?
14     A.  Yes.
15     Q.  Okay.  What are the -- are there
16 documents that memorialized the FBI's policies
17 regarding whether individuals who are U.S. persons
18 in the United States who are under investigation
19 should be nominated by the FBI to the TSDB?
20        MS. POWELL:  Objection; vague, but I
21 think you can answer whether or not those
22 documents exist.

Transcript of Matthew J. DeSarno, Designated Representative
Conducted on April 9, 2018

75 (297 to 300)

---

297

1        THE WITNESS:  Yes.
2  BY MR. ABBAS:
3     Q.   What are the names of those documents?
4     **A.   The -- I already talked about it.**
5        MS. POWELL:  Okay.
6        THE WITNESS:  Counterterrorism Program
7  Guide.  It's chapter 11 of that guide is the
8  watchlisting section.
9  BY MR. ABBAS:
10    Q.   What is the counterterrorism programming
11 guide -- I'm sorry, Counterterrorism Program
12 Guide?
13    **A.   Yes.**
14    Q.   Okay.  What is the Counterterrorism
15 Program Guide?
16    **A.   It's the investigative guidance for the**
17 **entire counterterrorism program.  Investigative**
18 **guidance, operational guidance, administrative**
19 **guidance.  And a significant portion of that is**
20 **dedicated to the watchlist.**
21    Q.   What is -- it's chapter 11?
22    **A.   Chapter 11.**

---

298

1     Q.   Chapter 11.
2     **A.   Like bankruptcy.**
3     Q.   Like bankruptcy.  Definitely.
4        What are the -- I'm -- you're not going
5  to answer this one so wait for her objection.
6        What does chapter 11 of the
7  Counterterrorism Program Guide include?
8        MS. POWELL:  I'm instructing the witness
9  not to answer on the grounds of law enforcement
10 privilege and potentially the state secrets
11 privilege and potentially SSI, I'm not sure.
12       MR. ABBAS:  SSI.
13 BY MR. ABBAS:
14    Q.   Are you familiar with chapter 11 of the
15 Counterterrorism Program Guide?
16    **A.   Yes.**
17    Q.   Have you read the chapter 11 of the
18 Counterterrorism Program Guide?
19    **A.   Yes.**
20    Q.   Okay.  Have all FBI employees who
21 are -- whose duties include making nominations to
22 the TSDB, are they required to read chapter 11 of

---

299

1  the Counterterrorism Program Guide?
2        MS. POWELL:  Objection; vague, and
3  misleading.
4        THE WITNESS:  I don't know that they're
5  required to read it, but they receive training on
6  the content of it.
7  BY MR. ABBAS:
8     Q.   Is there any assessment that the FBI
9  makes of FBI agents whose duties include
10 nominating individuals to the TSDB that they do in
11 fact understand the contents of the
12 Counterterrorism Program Guide?
13       MS. POWELL:  Objection; vague.
14       THE WITNESS:  The nomination process is
15 part of the routine investigative process that is
16 reviewed at the time of nomination and
17 periodically throughout an investigation.  So
18 there's always supervisory review and mentoring as
19 to the standards of how to do that properly and
20 what the standards are for it.
21 BY MR. ABBAS:
22    Q.   Is there any formal assessment of FBI

---

300

1  agents who nominate individuals to the TSDB as
2  part of their duties?
3        MS. POWELL:  Objection; vague,
4  misleading, and asked and answered.
5        THE WITNESS:  All employees receive
6  regular performance assessments that include their
7  investigative activity of which part of that is
8  watchlist nominations.  So it's part of the
9  standard duties of FBI investigative personnel.
10 BY MR. ABBAS:
11    Q.   Has an FBI employee ever received a
12 negative performance evaluation as a result of
13 that employee's nomination practices?
14       MS. POWELL:  Objection; vague and
15 misleading.
16       THE WITNESS:  I'm not aware of any.
17 BY MR. ABBAS:
18    Q.   You're not aware of any employee that's
19 ever been -- or let me ask -- I apologize if I've
20 asked the question like this before.
21       Has an FBI employee ever been
22 reprimanded in any manner about a watchlist

---

Transcript of Matthew J. DeSarno, Designated Representative

76 (301 to 304)

Conducted on April 9, 2018

301
1 nomination?
2        MS. POWELL:  Objection; vague and
3 potentially misleading.
4        THE WITNESS:  I don't have any specific
5 knowledge about a reprimand like that.
6 BY MR. ABBAS:
7    Q.  And just to clarify to make sure that I
8 understood your answer, it's the FBI's testimony
9 today that you're not aware of an FBI employee
10 ever being reprimanded for a watchlist nomination
11 issue?
12       MS. POWELL:  Same objections.
13       THE WITNESS:  Same answer.
14 BY MR. ABBAS:
15   Q.  Same answer is not the answer.  So if
16 you feel the question is the same, you can just
17 give me the same answer, but same answer is not an
18 answer to that question.
19       MS. POWELL:  It is an answer, it's just
20 not one you like.
21       THE WITNESS:  I'm not aware of any
22 specific instance where an employee was

302
1 disciplined or reprimanded for misconduct related
2 to a nomination.
3 BY MR. ABBAS:
4    Q.  Great.  So you're still on page 4 of the
5 overview document; right?
6    A.  Yes.
7    Q.  So do you see that second little
8 paragraph that says, "Mere guesses or hunches or
9 the reporting of suspicious activity alone are not
10 sufficient to establish reasonable suspicion"?
11   A.  Yes.
12   Q.  Has any FBI employee ever made a
13 nomination to the TSDB that relied upon mere
14 guesses or hunches?
15       MS. POWELL:  Objection; vague.
16       THE WITNESS:  I'm not aware of any
17 instance like that.
18 BY MR. ABBAS:
19   Q.  Okay.  Has of the FBI -- I'm sorry.
20       Has an FBI employee ever made
21 nominations to the TSDB that regard only the
22 reporting of suspicious activity?

303
1        MS. POWELL:  Objection; vague.
2        MR. ABBAS:  I'm going to withdraw it.
3 BY MR. ABBAS:
4    Q.  Has an FBI employee ever made a
5 nomination to the TSDB that relies upon the
6 reporting of suspicious activity alone?
7        MS. POWELL:  Objection, vague.
8        THE WITNESS:  Yeah, I'm not aware of
9 that.
10 BY MR. ABBAS:
11   Q.  Okay.  Is the reporting of suspicious
12 activity a factor that FBI employees can use as a
13 basis of watchlisting someone?
14       MS. POWELL:  Objection; vague.
15       THE WITNESS:  So if in the totality of
16 the circumstances taken together with rational
17 inferences, those facts include suspicious
18 activity, then yes.
19 BY MR. ABBAS:
20   Q.  And this is a little bit different
21 because I'm going to use the word "alone."  Has an
22 FBI employee made a nomination to the TSDB that

304
1 relies upon mere guesses or hunches only?
2        MS. POWELL:  Objection; vague.
3        THE WITNESS:  Not that I'm aware of.
4 BY MR. ABBAS:
5    Q.  Has the FBI -- I'm sorry.
6        Has an FBI employee ever made a
7 nomination to the TSDB based on a person's race?
8        MS. POWELL:  Objection; vague.
9        THE WITNESS:  Not that I'm aware of.
10 BY MR. ABBAS:
11   Q.  Has an FBI employee ever made a
12 nomination to the TSDB based on a person's
13 religious affiliation?
14       MS. POWELL:  Objection; vague.
15       THE WITNESS:  Not that I'm aware of.
16 BY MR. ABBAS:
17   Q.  A person's religious affiliation has
18 never played any role in a FBI employee's
19 nomination to the TSDB?
20       MS. POWELL:  Objection; misleading and
21 vague.
22       MR. ABBAS:  Go ahead.

305

1      THE WITNESS:  Your question was whether
2 or not the nomination was made based on that and
3 I'm not aware of that.
4 BY MR. ABBAS:
5      Q.  So has a person's religious affiliation
6 ever been a factor in a FBI employee's nomination
7 of a person to the TSDB?
8      MS. POWELL:  Objection; vague and
9 misleading.
10      THE WITNESS:  I don't know that
11 religious affiliation would be considered a
12 factor.  I mean, certainly no nominations are
13 based solely on any of those things.  But if any
14 of those things also go to totality of
15 circumstances taken together with rational
16 inferences, they potentially could be factors, but
17 they're not -- but no nominations is based solely
18 on any of those elements.
19 BY MR. ABBAS:
20      Q.  Got it.  So the FBI's testimony today is
21 that it does not use religious affiliation solely
22 as a basis for nominating a person to the TSDB;

306

1 correct?
2      MS. POWELL:  Objection; vague and asked
3 and answered.
4      MR. ABBAS:  Go ahead.
5      THE WITNESS:  I think I answered that.
6 Based on the totality of circumstances taken
7 together with rational inferences, all of the
8 information together is what the decision is based
9 on.  It's not based on hunches, not based solely
10 on suspicious activity, not based solely on any
11 race, ethnicity, or religious affiliation or First
12 Amendment rights.
13 BY MR. ABBAS:
14      Q.  Is a person's religious affiliation part
15 of the totality of circumstances that an FBI
16 employee would look at in determining whether or
17 not to nominate a person to the TSDB?
18      MS. POWELL:  Objection; vague and
19 misleading.
20      THE WITNESS:  Generally not.
21 BY MR. ABBAS:
22      Q.  So you say "generally" so I have to ask,

307

1 is a person's religious affiliation ever
2 relevant -- I'm sorry.
3      Is a person's religious affiliation ever
4 part of the totality of circumstances an FBI
5 employee would look at in determining whether or
6 not to nominate such a person?
7      MS. POWELL:  Objection; vague and
8 misleading.
9      THE WITNESS:  So specifically religious
10 affiliation, no.  But if there were -- if there
11 were associations with extremists, that could be
12 construed as religious affiliation when it's
13 actually an extremist association, that would be
14 considered as a factor.
15 BY MR. ABBAS:
16      Q.  So associations -- so FBI employees who
17 nominate individuals to the TSDB look at the
18 associations of individuals that they're
19 considering to nominate to the TSDB; correct?
20      MS. POWELL:  Objection; mischaracterizes
21 prior testimony, vague, and misleading, and a
22 comprehensive explanation in application of the

308

1 inclusion standard requires disclosure of law
2 enforcement sensitive information.
3      MR. ABBAS:  I'm sorry.
4      MS. POWELL:  I think the general answer
5 that has been given about the standard and the
6 totality is the one that can be given.  If there's
7 some further non-privileged information you can
8 add here, please do.  If not, you should say so.
9      THE WITNESS:  I don't know if there's
10 anything further non-privileged that I can add.
11 BY MR. ABBAS:
12      Q.  So it's law enforcement privileged
13 information whether the FBI considers the
14 associations of individuals it's determining might
15 be nominated to the watchlist?  You can't tell me
16 that the FBI looks at a person's associations
17 because of law enforcement privilege?
18      MS. POWELL:  I'm telling you that a
19 comprehensive discussion of all the things --
20      MR. ABBAS:  I'm not asking for a --
21      MS. POWELL:  -- that could be part of
22 the totality of the circumstances.  Right.  But

Case 1:16-cv-00375-AJT-JFA   Document 306-31   Filed 03/12/19   Page 80 of 102 PageID#
14611
Transcript of Matthew J. DeSarno, Designated Representative

78 (309 to 312)

Conducted on April 9, 2018

309

1 you can't ask one by one by all the things that
2 you think could theoretically be taken into
3 account either because that also --
4        MR. ABBAS:  I can ask one by one and
5 then you can tell me no at some point and then we
6 can litigate this later.
7        MS. POWELL:  I'm telling you no now and
8 instructing the witness not to answer on the
9 grounds of the law enforcement privilege.
10 BY MR. ABBAS:
11    Q.   Okay.  What is the FBI's law enforcement
12 interest in not disclosing whether or not a
13 person's associations are relevant to determining
14 whether or not the FBI nominates that person to
15 the TSDB?
16        MS. POWELL:  Objection; mischaracterizes
17 prior testimony, is vague, and misleading, and a
18 comprehensive discussion would require disclosure
19 of law enforcement sensitive information.
20        MR. ABBAS:  Go ahead.
21        THE WITNESS:  So clearly the nominator's
22 relying on totality of circumstances based on all

310

1 articulable intelligence and information available
2 when taken together with rational inferences that
3 either does or does not meet the reasonable
4 suspicion standard.  All of the relevant
5 information, that's what's used.
6 BY MR. ABBAS:
7    Q.   Is a person's associations relevant to
8 whether or not an FBI employee nominates such a
9 person to the TSDB?
10       MS. POWELL:  Objection; calls for law
11 enforcement privileged information and potentially
12 SSI as well.
13       I'm instructing the witness not to
14 answer further as to the content of the reasonable
15 suspicion standard.
16    Q.   If a person is related to a person
17 subject to a terrorism-related investigation, can
18 that be a basis for the FBI nominating such a
19 person to the TSDB?
20       MS. POWELL:  I'm instructing the witness
21 not to answer on the grounds of the law
22 enforcement privilege and potentially SSI as to

311

1 specific applications of the reasonable suspicion
2 standard.
3    Q.   As part of the FBI's nomination
4 paperwork, must the FBI employee submitting the
5 nomination know the date of birth of the person
6 that's nominated?
7        MS. POWELL:  Hold on.  Nobody knows.
8 I'm --
9        MR. ABBAS:  It's not SSI because it's
10 FBI information.
11       MS. POWELL:  I think he can answer if he
12 knows.
13       THE WITNESS:  We must have enough
14 identifying information to distinguish between
15 whether or not the person is a match to someone
16 already on the watchlist.
17 BY MR. ABBAS:
18    Q.   That's not an answer to the question.
19 The answer was related to the date of birth.
20       MR. ABBAS:  Can we go back up to the
21 question and read it again?
22       (Record read.)

312

1        MS. POWELL:  Objection; vague, but you
2 can answer if you know.
3        THE WITNESS:  Yes.
4        MR. ABBAS:  Can you go back up to the
5 question.
6 BY MR. ABBAS:
7    Q.   So the FBI knows how old people it
8 nominates to the TSDB are; correct?
9        MS. POWELL:  Objection; vague and
10 misleading.
11       MR. ABBAS:  Go ahead.
12       THE WITNESS:  I'm not sure that those
13 two things necessarily are accurate.  I mean, we
14 have -- there are a lot of people who use dates of
15 birth on official documents that are not accurate
16 and do not indicate the age of that person.  So
17 the knowledge of the date of birth being used on a
18 travel document or other official document is not
19 definitely indicative of that person's age.
20 BY MR. ABBAS:
21    Q.   Got it.  It could be a fake document; is
22 that what you're saying?

Transcript of Matthew J. DeSarno, Designated Representative
Conducted on April 9, 2018

313

1    **A.   It could just be a 1/1/82.  There are a**
2  **lot of people who use dates of birth 1/1, pick a**
3  **year and that's their date of birth.**
4    Q.   That does happen in some countries.
5    **A.   That happens a lot.**
6    Q.   In Iraq, like 50 percent of the country
7  is born on July 1st or the other half is
8  December 1st.
9    **A.   So it may not be indicative of age.**
10   Q.   Fair.  But for U.S. persons, their date
11 of birth is accurate generally in the FBI's view?
12       MS. POWELL:  Objection; mischaracterizes
13 prior testimony and vague.
14       MR. ABBAS:  Fine.
15       MS. POWELL:  And potentially calls for
16 law enforcement information.
17       MR. ABBAS:  I'll withdraw.
18 BY MR. ABBAS:
19   Q.   Has the FBI ever nominated a baby to the
20 TSDB?
21       MS. POWELL:  Objection; calls for law
22 enforcement privileged information.

314

1        I'm instructing the witness not to
2  answer.
3    Q.   You're not going to answer that
4  question?
5        MS. POWELL:  I'm instructing the witness
6  not to answer.
7    Q.   Has the FBI ever nominated an adult to
8  the Terrorist Screening Center Database?
9    **A.   Can I answer that?**
10       MS. POWELL:  Sure.
11       THE WITNESS:  Yes.
12 BY MR. ABBAS:
13   Q.   Has the FBI ever nominated a minor to
14 the TSDB?
15       MS. POWELL:  I'm instructing the witness
16 not to answer on the grounds of the law
17 enforcement privilege.
18   Q.   Has the FBI ever entered -- I'm sorry.
19       Has the FBI ever nominated a child under
20 the age of five to the TSDB?
21       MS. POWELL:  I'm instructing the witness
22 not to answer on the grounds of the law

315

1  enforcement privilege.
2        MR. ABBAS:  We have a few more.
3        MS. POWELL:  And potentially the SSI.
4        MR. ABBAS:  We have a few more.
5  BY MR. ABBAS:
6    Q.   Has the FBI ever nominated someone who
7  is younger than ten years old to the TSDB?
8        MS. POWELL:  I'm instructing the witness
9  not to answer on the grounds of the law
10 enforcement privilege and potentially SSI.
11   Q.   Has the FBI ever nominated to the TSDB a
12 person who is under the age of 15?
13       MS. POWELL:  I'm instructing the witness
14 not to answer on the grounds of the law
15 enforcement privilege and potentially SSI.
16       MR. ABBAS:  You know, James Comey many
17 years ago commented on babies on the watchlist
18 publicly and he commented about it.  So, I mean,
19 it's your choice, but I guess we'll fight about
20 this later.
21 BY MR. ABBAS:
22   Q.   What is the law enforcement interest of

316

1  the FBI in not disclosing whether it has nominated
2  babies to the Terrorist Screening Database?
3        MS. POWELL:  Objection, a comprehensive
4  answer would require disclosure of law enforcement
5  privileged information and potentially SSI.
6        If you can give a general answer, do.
7        THE WITNESS:  Generally there's a law
8  enforcement interest in not disclosing information
9  either way about anyone's inclusion on the
10 watchlist.
11 BY MR. ABBAS:
12   Q.   I'm not asking about anyone
13 specifically, I'm asking in general.
14       What is, in general, the FBI's interest
15 in not disclosing whether or not it's nominated
16 babies to the Terrorist Screening Database?
17       MS. POWELL:  Objection; asked and
18 answered.  His answer included babies.
19       MR. ABBAS:  Go ahead.
20       THE WITNESS:  I said anyone.  Anyone.
21 There's no -- there's a law enforcement purpose to
22 not disclose information about the inclusion or

Transcript of Matthew J. DeSarno, Designated Representative
Conducted on April 9, 2018

---

317

1 non-inclusion of anyone on the watchlist.
2 BY MR. ABBAS:
3    Q.   You told me that there are adults that
4 the FBI has nominated to the TSDB; correct?
5    **A.   Yes.**
6    Q.   Okay.  And that tells me something about
7 the age of some of the people that the FBI has
8 nominated to the TSDB; correct?
9    **A.   Yes.**
10   Q.   And when -- so why is it that there is
11 not a law enforcement interest in withholding
12 whether or not there are adults in the TSDB, but
13 there is a law enforcement interest in withholding
14 whether or not there are babies in the TSDB?
15       MS. POWELL:  Objection, the answer
16 requires the disclosure of law enforcement
17 sensitive information.  I don't think there's a
18 general answer that can be given.
19       THE WITNESS:  No.
20       MS. POWELL:  I'm instructing the witness
21 not to answer.
22

---

318

1 BY MR. ABBAS:
2    Q.   How many babies has the FBI nominated to
3 the TSDB?
4        MS. POWELL:  I'm instructing the witness
5 not to answer on the grounds of the law
6 enforcement privilege and SSI.
7    Q.   How many babies -- I'm sorry.
8        How many U.S. persons under the age of
9 five -- how many persons has the FBI nominated to
10 the TSDB that are under the age of five?
11       MS. POWELL:  I'm instructing the witness
12 not to answer on the grounds of the law
13 enforcement privilege and SSI.
14   Q.   How many persons has the FBI nominated
15 to the TSDB that are under the age of ten?
16       MS. POWELL:  I'm instructing the witness
17 not to answer on the grounds of the law
18 enforcement privilege and SSI.
19   Q.   How many individuals has the FBI
20 nominated to the TSDB under the age of 15?
21       MS. POWELL:  I'm instructing the witness
22 not to answer on the grounds of the law

---

319

1 enforcement privilege and SSI.
2    Q.   How many individuals has the FBI
3 nominated to the TSDB who are minors?
4        MS. POWELL:  I'm instructing the witness
5 not to answer on the grounds of the law
6 enforcement officer privilege and SSI.
7    Q.   How many individuals has the FBI
8 nominated to the TSDB that are adults?
9        MS. POWELL:  We asserted privilege over
10 that.  I'm instructing the witness not to answer
11 on the grounds of the law enforcement privilege.
12   Q.   How many nominations has the FBI made to
13 the TSDB --
14       MS. POWELL:  I'm instructing --
15   Q.   -- in the last five years?
16       MS. POWELL:  I'm instructing the witness
17 not to answer on the grounds of the law
18 enforcement privilege.
19   Q.   What is the -- is there a law
20 enforcement interest in the FBI including babies
21 in the TSDB?
22       MS. POWELL:  Objection.  There's no way

---

320

1 to answer the question without answering the prior
2 question so I'm instructing the witness not to
3 answer on the grounds of the law enforcement
4 privilege and SSI.
5    Q.   You said that the date of birth that's
6 recorded in a FBI submitted TSDB nomination is not
7 an indication of the prospective listee's age; is
8 that correct?
9        MS. POWELL:  Objection; mischaracterizes
10 prior testimony.
11       THE WITNESS:  You asked me about date of
12 birth and then you made an inference that that
13 meant that the FBI knew the ages and what I said
14 is the date of birth may not actually match the
15 age.
16 BY MR. ABBAS:
17   Q.   So the FBI definitely is responsible for
18 ensuring the accuracy of information it includes
19 in nominations that it submits to the TSC;
20 correct?
21       MS. POWELL:  Objection; misleading and
22 mischaracterizes prior testimony.

---

Transcript of Matthew J. DeSarno, Designated Representative

81 (321 to 324)

Conducted on April 9, 2018

---

321

1    MR. ABBAS:  That's totally a fair
2 question.
3    THE WITNESS:  So someone's official date
4 of birth or date of birth on some official
5 document that's accurate may not actually be their
6 date of birth, but it is their record identifier
7 date of birth.
8 BY MR. ABBAS:
9    Q.   So what do you do -- so you're
10 responsible as the FBI for ensuring the accuracy
11 of information that you cause to be included in
12 the TSDB, what do you do to confirm that the date
13 of birth accurately reflects the person's age?
14    MS. POWELL:  Objection; mischaracterizes
15 prior testimony and asked and answered I think.
16    MR. ABBAS:  Definitely not.
17    THE WITNESS:  If someone has a date of
18 birth that is on official records, we consider
19 that their official date of birth.  The ability to
20 verify that is contingent on a lot of factors,
21 sometimes it is true to their age, usually it's
22 true to their age, but sometimes it may not be.

---

322

1 BY MR. ABBAS:
2    Q.   Does the FBI as part of its watchlisting
3 processes include dates of births in nomination
4 forms it believes for whatever reason are
5 inaccurate?
6    MS. POWELL:  Objection; vague,
7 misleading, and asked and answered.
8    THE WITNESS:  I have seen records with
9 multiple dates of birth, multiple Social Security
10 numbers, and a single name.  So that's not
11 including dates of birth that it believes are
12 inaccurate, those are actual dates of birth used
13 by a person in different documents.
14    MS. POWELL:  I'm going to ask to take a
15 break here soon.
16    MR. ABBAS:  Sure.  That's fine.
17    MS. POWELL:  It could be now if you
18 like.
19    MR. ABBAS:  Yeah.  Ten minutes?
20    MS. POWELL:  Yeah.
21    (Recess from the record.)
22    THE REPORTER:  This is the court

---

323

1 reporter.  We have used five hours and 42 minutes.
2 One hour and 18 minutes left.
3 EXAMINATION BY COUNSEL FOR THE DEFENDANTS (CONT'D)
4 BY MS. POWELL:
5    Q.   We had one correction and one
6 clarification for the record.
7    First, Mr. DeSarno, you previously
8 testified that you have to have a date of birth to
9 make a nomination; is that correct?
10    A.   That's not correct.  My first answer was
11 more accurate which was there must be enough
12 identifying information about the person to
13 distinguish it from someone who's on the
14 watchlist.
15 EXAMINATION BY COUNSEL FOR THE PLAINTIFFS (CONT'D)
16 BY MR. ABBAS:
17    Q.   When it comes to U.S. persons, does a
18 FBI nomination to TSDB, must it include a date of
19 birth?
20    A.   I think the answer is the same that you
21 must have enough identifying information about the
22 subject to distinguish it from another person on

---

324

1 the watchlist.
2    Q.   So there's no special identifying
3 information requirements for U.S. persons on the
4 TSDB as opposed to non-U.S. persons?
5    A.   Not that I'm aware of.
6    Q.   Okay.
7 EXAMINATION BY COUNSEL FOR THE DEFENDANTS (CONT'D)
8 BY MS. POWELL:
9    Q.   And, yeah, I have one more.
10    You previously testified about the law
11 enforcement interest in nondisclosure of the
12 comprehensive reasonable suspicion standard.
13    A.   Uh-huh.
14    Q.   And I instructed you not to give further
15 information on the basis of the law enforcement
16 privilege and potentially SSI.
17    Is there additional non-privileged
18 information you can give without the nature of the
19 law enforcement interest in the reasonable
20 suspicion statement?
21    A.   Yeah, so any -- any explanation of the
22 reasonable suspicion standard beyond what's in the

---

Transcript of Matthew J. DeSarno, Designated Representative
Conducted on April 9, 2018

325

1 overview document could potentially give an
2 advantage to adversaries of the United States in
3 terms of providing them ways to avoid detection or
4 otherwise create an environment that is less
5 secure inside the United States.
6 EXAMINATION BY COUNSEL FOR THE PLAINTIFFS (CONT'D)
7 BY MR. ABBAS:
8     Q.  So you don't want -- so the FBI's view
9 is that you don't want to let would-be terrorists
10 know who may or may not be included in the TSDB?
11     MS. POWELL:  Objection; mischaracterizes
12 prior testimony, but you could answer that.
13     THE WITNESS:  That's true and we also
14 would not want any adversaries of the United
15 States to know the specific criteria used to
16 determine inclusion on the watchlist.
17 BY MR. ABBAS:
18     Q.  Does the FBI believe that people on the
19 TSDB like being in the TSDB?
20     MS. POWELL:  Objection; calls for
21 speculation.
22     MR. ABBAS:  Go ahead.

326

1     THE WITNESS:  I'm unaware of
2 notifications outside no-fly redress process where
3 people on the TSDB would have an awareness that
4 they're on the TSDB.
5 BY MR. ABBAS:
6     Q.  So it's the FBI's testimony that there's
7 no way for a person on the TSDB, other than those
8 on the no-fly list, to infer their watchlist
9 status?
10     A.  There are ways where they can make
11 assumptions about their watchlist status, but I'm
12 not aware of a way that would definitively inform
13 them that they are on the watchlist.
14     Q.  Does the FBI ever not nominate a person
15 to the TSDB to make sure that its investigative
16 interests in that person is not disclosed to that
17 person?
18     MS. POWELL:  Objection.
19     I'm instructing the witness not to
20 answer on the grounds of the law enforcement
21 privilege.
22     Q.  People in the TSDB -- the FBI

327

1 understands that -- what is the FBI's
2 understanding of what happens to individuals that
3 it nominates to the TSDB?
4     MS. POWELL:  Objection; vague, also a
5 comprehensive answer would require disclosure of
6 law enforcement sensitive information and SSI.
7     MR. ABBAS:  Go ahead.
8     THE WITNESS:  That question was
9 extremely vague.  I think you'd have to be more
10 specific about that.
11     MR. ABBAS:  The deponent did not answer
12 the question.
13 BY MR. ABBAS:
14     Q.  What is the FBI's understanding of what
15 happens to individuals that it nominates to the
16 TSDB?
17     MS. POWELL:  Same objections; still
18 vague and still calls for privileged information.
19 BY MR. ABBAS:
20     Q.  Okay.  Fine.  Let's take it in really,
21 really, and really, really small pieces.
22     Is the FBI aware that individuals that

328

1 it nominates to the TSDB become included in the
2 TSDB?
3     MS. POWELL:  Objection; misleading, but
4 you can answer.
5     THE WITNESS:  The FBI makes nominations,
6 the TSC makes determinations about inclusion on
7 the watchlist, and sometimes the nominations
8 become inclusions, yes.
9 BY MR. ABBAS:
10     Q.  How often do those nominations that the
11 FBI submits become -- are accepted by the TSC for
12 TSDB inclusion?
13     MS. POWELL:  I'm instructing the witness
14 not to answer on the grounds of the law
15 enforcement privilege.
16     Q.  Does the FBI keep track of the number of
17 nominations that it makes to the TSDB that TSC
18 accepts?
19     A.  I think we've already done this; right?
20     Q.  No.
21     MS. POWELL:  I thought we had too.
22     MR. ABBAS:  We have not done this.  We

Transcript of Matthew J. DeSarno, Designated Representative
Conducted on April 9, 2018

83 (329 to 332)

329

1 did this in other depos, but we have not done this
2 today.
3          MS. POWELL:  I'm pretty sure we did.
4 But you can answer, I think, to the extent you
5 can.
6          THE WITNESS:  Does the FBI keep track --
7 BY MR. ABBAS:
8     Q.   Of the number of nominations -- does the
9 FBI keep track of the number of nominations that
10 it makes to the TSDB that TSC accepts?
11          MS. POWELL:  Objection; vague, but you
12 can answer if you know.
13          THE WITNESS:  Yes.
14 BY MR. ABBAS:
15     Q.   Does the FBI keep track of the number of
16 nominations that FBI employees make that TSC
17 rejects?
18          MS. POWELL:  Objection; vague, but I
19 think you can answer if you know.
20          THE WITNESS:  I don't know.
21 BY MR. ABBAS:
22     Q.   Does the FBI know the total number of

330

1 nominations it's submitted to the TSC?
2          MS. POWELL:  I think you can answer as
3 to whether or not FBI knows.
4          THE WITNESS:  I think we could get that
5 number.
6 BY MR. ABBAS:
7     Q.   How hard would it be for the FBI to
8 determine the total number of nominations that the
9 FBI has submitted to the TSC?
10          MS. POWELL:  Objection; scope.
11          THE WITNESS:  I don't have enough
12 familiarity with the IT systems to know how much
13 of a burden that would be.
14 BY MR. ABBAS:
15     Q.   Would it be hard for the FBI to
16 determine the number of FBI nominations to the
17 TSDB that TSC rejected?
18          MS. POWELL:  Hard -- objection; vague.
19          THE WITNESS:  I don't know enough about
20 the TSC systems to know if that would be hard or
21 not.
22

331

1 BY MR. ABBAS:
2     Q.   You said that some people in the TSDB
3 are informed of their watchlist status; correct?
4          MS. POWELL:  Objection; mischaracterizes
5 prior testimony.
6          THE WITNESS:  What I said is that no-fly
7 subjects who go through a redress process may have
8 a clear understanding that they are on the TSDB
9 no-fly list.
10 BY MR. ABBAS:
11     Q.   Because why?
12          MS. POWELL:  Objection; vague.
13     Q.   Why might those people have an
14 understanding of their watchlist status?
15          MS. POWELL:  Objection; vague and scope.
16          THE WITNESS:  So they may have been
17 denied boarding.  They may have been told at the
18 point of denial of boarding why they were denied
19 boarding.  They may go through a redress process
20 where they're told that they were denied boarding
21 because of their inclusion on the no-fly list.
22

332

1 BY MR. ABBAS:
2     Q.   My understanding is that persons on the
3 selectee list, even if they apply for redress
4 through DHS TRIP, are not told whether or not
5 they're on the selectee list; is that the FBI's
6 understanding as well?
7          MS. POWELL:  Objection; scope.
8          THE WITNESS:  Yes.
9 BY MR. ABBAS:
10     Q.   Why -- does the FBI agree that -- does
11 the FBI agree with DHS TRIP's policy of not
12 disclosing the status of persons on the selectee
13 list?
14          MS. POWELL:  Objection; vague.
15          You can answer.
16          THE WITNESS:  Yes.
17 BY MR. ABBAS:
18     Q.   Why does the FBI agree with DHS TRIP's
19 policy of not disclosing the status of individuals
20 on the selectee list?
21          MS. POWELL:  Objection as to scope and
22 vagueness and also a comprehensive answer would

Transcript of Matthew J. DeSarno, Designated Representative
Conducted on April 9, 2018

---

333

1 require disclosure of law enforcement sensitive
2 and SSI information.
3       To the extent you can give a general
4 answer, you may.
5       THE WITNESS:  So why does the FBI agree?
6 For the same reason I mentioned before that any
7 specific information about inclusion or not
8 inclusion on the TSDB watchlist could enable
9 adversaries to take countermeasures that could
10 endanger the United States national security.  And
11 I don't believe that people who are on the
12 selectee list know that they're on the selectee
13 list.
14 BY MR. ABBAS:
15   Q.   They do.  But --
16       MS. POWELL:  Objection, that's not a
17 question.
18       MR. ABBAS:  Fair enough.  I withdraw my
19 unsolicited commentary.  I apologize.
20 BY MR. ABBAS:
21   Q.   There was a period of time during which
22 persons on the no-fly list were not told that they

---

334

1 were on the no-fly list; correct?
2       MS. POWELL:  Objection.
3       I'm actually going to instruct the
4 witness not to answer any questions about the
5 no-fly list, that's explicitly covered by the
6 court's protective order.
7       MR. ABBAS:  It's not, it's about the
8 redress process.
9       MS. POWELL:  It's about the no-fly list
10 and it's explicitly covered by the court's
11 protective order.
12       I'm instructing the witness not to
13 answer.
14 BY MR. ABBAS:
15   Q.   Prior to 2014, was there any difference
16 in the watchlisting system's position on whether
17 individuals in the TSDB -- let me start all over.
18       Prior to 2014, were all individuals in
19 the TSDB who sought redress via DHS TRIP treated
20 the same way?
21       MS. POWELL:  Objection; vague, and
22 misleading, and outside the scope covered by both

---

335

1 the DHS TRIP and TSC depositions.  Also -- I think
2 I said vague and misleading.
3       I think you can answer, if you can.
4       THE WITNESS:  The question is prior to
5 2014 were people treated differently?
6 BY MR. ABBAS:
7   Q.   Were all people on the TSDB who applied
8 for redress via DHS TRIP treated the same way?
9       MS. POWELL:  Objection; scope and
10 misleading.  You're asking about information
11 uniquely within the purview of DHS TRIP.  I
12 realize you're getting at a different question
13 than you're asking, but --
14       THE WITNESS:  I don't know the details
15 of the pre-2014 redress process.
16 BY MR. ABBAS:
17   Q.   The FBI doesn't know the details of the
18 pre -- the prior iteration of the DHS TRIP redress
19 process?  The FBI doesn't know that?
20       MS. POWELL:  Objection as to scope.  To
21 the extent you're asking specifically about the
22 no-fly list process, he is not --

---

336

1       MR. ABBAS:  I'm not asking --
2       MS. POWELL:  -- prepared on that, that's
3 correct.
4       MR. ABBAS:  I'm not asking about the
5 no-fly list process.
6 BY MR. ABBAS:
7   Q.   There was a period of time in which no
8 person in the TSDB was informed by DHS TRIP of
9 their watchlist status; correct?
10       MS. POWELL:  Objection as to scope.  The
11 witness is not prepared to answer questions about
12 the differences between the no-fly and selectee
13 list because the court explicitly excluded that
14 topic from the deposition.
15       MR. ABBAS:  You can answer.
16       MS. POWELL:  If you can.
17       THE WITNESS:  I'm not prepared to answer
18 that question.
19 BY MR. ABBAS:
20   Q.   Do you not know the answer to that
21 question or you're just not answering the
22 question?

---

Transcript of Matthew J. DeSarno, Designated Representative
Conducted on April 9, 2018

337

1      A.   I don't know the answer to the question.
2   I didn't prepare for pre-2014 redress process.
3      Q.   Again, I'm not asking whether or not you
4   prepared.  I'm asking whether you know the answer.
5   If the answer is you don't know the answer, that
6   is a perfectly fine answer, I'll just move on.
7      A.   I don't know the answer.
8      Q.   Okay.  Let me just make sure that it's
9   clear.
10     Does the FBI know whether prior to the
11  2015 DHS TRIP revisions --
12     A.   Right.
13     Q.   -- all persons who applied for redress
14  via DHS TRIP were treated the same way?
15     MS. POWELL:  Objection; vague, and
16  misleading.  Not quite the same question you asked
17  before actually, but potentially asks for law
18  enforcement sensitive and SSI information and
19  outside the scope to the extent you're asking
20  specifically about changes to the no-fly process.
21     THE WITNESS:  I mean, you're making a
22  generalization about all people being treated the

338

1   same way.  I think each -- prior to 2015 -- and
2   you're intentionally avoiding the distinction
3   between no-fly and selectee or no-fly and other,
4   but the redress process -- I don't think the
5   redress process ever treated everyone the same
6   way.  I think the redress process individually
7   evaluates redress requests and then responds to
8   those requests.  And that's been the case prior to
9   and after 2015.
10  BY MR. ABBAS:
11     Q.   Subsequent to the DHS TRIP revisions in
12  2015 which required disclosure of watchlist status
13  to the subset of TSDB listees, has the FBI
14  assessed the damage done to national security
15  caused by the disclosure of the TSDB status of
16  some persons?
17     MS. POWELL:  I'm instructing the witness
18  not to answer on the grounds of scope as well as
19  the deliberative process privilege and potentially
20  others.  The court explicitly excluded the no-fly
21  list as a topic, that definitely includes this.
22     Q.   If people are able to determine -- if

339

1   people are told that they're on the selectee list,
2   why would that be damaging to national security?
3      MS. POWELL:  A comprehensive answer
4   would require disclosure of law enforcement
5   sensitive and SSI, potentially state secrets
6   information, but you can answer at a level of
7   generality I think.
8      THE WITNESS:  For the same reason that
9   if people are told that they're on the selectee
10  list, that could potentially provide information
11  to adversaries that could compromise national
12  security.
13  BY MR. ABBAS:
14     Q.   If people are able somehow to determine
15  they have been designated on to the TSDB, would
16  you agree that that would undermine the
17  effectiveness of the TSDB?
18     MS. POWELL:  Objection; vague and
19  misleading.
20     MR. ABBAS:  Go ahead.
21     THE WITNESS:  If people were able to
22  determine that they were on the TSDB, that

340

1   potentially could undermine it, but I'm not aware
2   of a way in which people could determine that
3   they're on the TSDB.
4   BY MR. ABBAS:
5      Q.   Has an FBI employee ever told a person
6   that is on the TSDB that they are on the TSDB?
7      MS. POWELL:  Objection; misleading.
8      You can answer to the extent you can.
9      THE WITNESS:  No, I'm not aware of that.
10  That would be outside of normal procedure, but I'm
11  not aware of it.
12  BY MR. ABBAS:
13     Q.   And I'm not asking you, I'm asking the
14  FBI.  Does the FBI have any information that any
15  FBI employee has told a TSDB listee of their TSDB
16  status?
17     MS. POWELL:  Same objections.
18     THE WITNESS:  I'm not aware of a
19  specific instance where that happened.
20  BY MR. ABBAS:
21     Q.   Does the FBI keep track of incidents
22  like that?

Transcript of Matthew J. DeSarno, Designated Representative
Conducted on April 9, 2018                                 86 (341 to 344)

341

1        MS. POWELL:  Objection; mischaracterizes
2  prior testimony and misleading.
3        MR. ABBAS:  I'm just asking.  Maybe the
4  FBI doesn't, but maybe the FBI does.
5  BY MR. ABBAS:
6     Q.  Does the FBI keep track of --
7     **A.  I told you that I didn't know of an**
8  **instance like that so I don't know of any tracking**
9  **of those instances.**
10    Q.  Either.  Okay.  That's fair.
11       Does the FBI have any quotas regarding
12 the nomination of persons to the TSDB?
13       MS. POWELL:  Objection; vague.
14       THE WITNESS:  No.
15 BY MR. ABBAS:
16    Q.  Does the FBI have any numerical goals
17 regarding nominations to the TSDB?
18       MS. POWELL:  Objection; vague.
19       THE WITNESS:  No.
20 BY MR. ABBAS:
21    Q.  Does the FBI -- never mind.
22       Does the FBI use TSDB information -- I'm

342

1  sorry.
2        Does the FBI screen prospective
3  employees against the TSDB?
4     **A.  The FBI screens prospective employees**
5  **against law enforcement and intelligence community**
6  **databases, which would include databases that**
7  **are -- that have probably larger sets of**
8  **information then what's in the TSDB.  So if**
9  **someone -- if someone was a prospective employee**
10 **and also in the TSDB, that would definitely come**
11 **up in a background investigation, yes.  Whether**
12 **that's hitting off of the TSDB itself or hitting**
13 **off some other database.**
14    Q.  But it's TSDB information somewhere in
15 some database that would come up in a prospective
16 employee's background check?
17    **A.  Yes.**
18    Q.  Would the FBI look upon a person's
19 inclusion in the TSDB who is a prospective
20 employee negatively?
21       MS. POWELL:  Objection; misleading.
22       I think you can answer.

343

1        THE WITNESS:  It's likely that the
2  person conducting that investigation would go to
3  the underlying derogatory information, review the
4  underlying derogatory information, make
5  assessments about that person's suitability as an
6  employee based on all of the information that they
7  could collect about that person.
8  BY MR. ABBAS:
9     Q.  Does the FBI allow TSDB listees to be
10 employed by the FBI?
11       MS. POWELL:  Objection; misleading.
12       THE WITNESS:  I'm not aware of any TSDB
13 listees that are employed by the FBI, but I don't
14 know that there's a specific probation against
15 that specific criteria.  It would be a totality of
16 circumstances review based on the suitability of
17 that employee -- that prospective employee.
18 BY MR. ABBAS:
19    Q.  But being in the TSDB is a negative for
20 a person applying for a job with the FBI; correct?
21       MS. POWELL:  Objection; mischaracterizes
22 prior testimony.

344

1        THE WITNESS:  It's the underlying
2  derogatory information that resulted in the TSDB
3  submission that would be the negative.
4  BY MR. ABBAS:
5     Q.  The FBI does -- the FBI works with USCIS
6  to conduct background checks; is that right?
7        MS. POWELL:  Objection, it potentially
8  calls for law enforcement sensitive information
9  and is certainly outside the scope to the extent
10 you're asking about USCIS investigations.
11       MR. ABBAS:  I'm going to back up to a
12 different question just to finish up.
13 BY MR. ABBAS:
14    Q.  Have people been terminated from the FBI
15 after being added to the TSDB?
16    **A.  I don't know the answer to that.  I'm**
17 **not aware of any instances where an FBI employee**
18 **was added to the TSDB and then terminated.**
19    Q.  Okay.  Are you familiar with the FBI
20 name check process?
21    **A.  Yes.**
22    Q.  What is the FBI name check process?

Transcript of Matthew J. DeSarno, Designated Representative
Conducted on April 9, 2018

345

1    MS. POWELL: Objection; scope.
2        You can answer.
3        THE WITNESS: The FBI name check process
4    is what I described before where other agencies
5    can query the FBI in the course of vetting
6    individuals to determine if the FBI or any
7    database that the FBI has access to has
8    negative -- derogatory information about a
9    specific person.
10   BY MR. ABBAS:
11   Q.   Does USCIS -- let's back up.
12       Can only federal government agencies
13   utilize this FBI name check process?
14       MS. POWELL: Objection; scope. We seem
15   to be going well beyond even TSDB status here.
16       MR. ABBAS: This is a use of TSDB
17   information.
18       MS. POWELL: Well, it's a use of all
19   sorts of information that goes --
20       MR. ABBAS: Including TSDB information.
21       MS. POWELL: -- well beyond TSDB
22   information. It is by definition way beyond TSDB

346

1    information.
2        MR. ABBAS: Go ahead.
3        MS. POWELL: He can answer if he knows,
4    but I don't really necessarily expect the witness
5    to know the answer to questions beyond TSDB
6    information.
7        MR. ABBAS: Yeah, that's fine. He can
8    answer just with regards to TSDB information.
9    BY MR. ABBAS:
10   Q.   But the FBI name check process includes
11   a querying of TSDB information; correct?
12       MS. POWELL: I'm actually going to
13   instruct the witness not to answer on the grounds
14   of the law enforcement privilege.
15   Q.   What is the law enforcement interest in
16   not sharing whether the FBI name check process
17   includes TSDB information?
18       MS. POWELL: Are you asking me?
19       MR. ABBAS: No, I'm asking him. Let me
20   rephrase the question.
21   BY MR. ABBAS:
22   Q.   What is the law enforcement interest in

347

1    not disclosing whether the FBI name check process
2    uses TSDB information?
3        MS. POWELL: I think he actually already
4    answered that.
5        THE WITNESS: Yeah.
6        MR. ABBAS: No, he didn't. What
7    is -- I'll ask it again.
8    BY MR. ABBAS:
9    Q.   What is the law enforcement interest in
10   not disclosing whether the FBI name check process
11   uses TSDB information?
12       MS. POWELL: Objection; mischaracterizes
13   prior testimony and the objection.
14       THE WITNESS: The FBI name check process
15   checks FBI holdings for derogatory information.
16   If it returns derogatory information, then it goes
17   back to the requester. Based on who the requester
18   is will determine what they get back.
19   BY MR. ABBAS:
20   Q.   Does the FBI name check process include
21   a review of TSDB information?
22       MS. POWELL: I think you can answer

348

1    that.
2        THE WITNESS: Only as much as it's a
3    review of FBI systems and the TSDB information
4    that is in FBI systems would create a hit, a
5    return.
6    BY MR. ABBAS:
7    Q.   Okay. So the FBI name check process
8    does include a review of TSDB information;
9    correct?
10       MS. POWELL: Objection; mischaracterizes
11   prior testimony.
12       MR. ABBAS: I know that's not what he
13   said. I'm asking if what I said is correct or
14   not.
15       THE WITNESS: No, that's not correct as
16   I know it.
17   BY MR. ABBAS:
18   Q.   Okay. Great.
19       What is not correct about the statement?
20   **A.   I don't know that the FBI name check
21   system goes against the entire TSDB database, the
22   entire list. I don't know that that happens.**

---

349

1 What I know that happens is it checks FBI systems
2 and if there is TSDB information or other
3 derogatory information in FBI systems, that will
4 create a record.
5    Q.  Great.  Okay.  That's fair.
6       What is the outcome of the FBI's name
7 check process?
8       MS. POWELL:  Objection; vague and beyond
9 the scope, and potentially misleading, maybe asked
10 and answered depending on what you mean.
11      THE WITNESS:  As it relates to the TSDB?
12 BY MR. ABBAS:
13   Q.  Just period.
14      MS. POWELL:  Objection; vague and scope.
15   Q.  You said that there's a name check
16 system?  Is there something called a name check
17 system?
18   A.  Yes.
19   Q.  Okay.  Does the FBI control the name
20 check system?
21      MS. POWELL:  Objection; vague,
22 misleading, mischaracterizes his prior testimony.

---

350

1    Q.  I don't know what it is, I'm just
2 asking.  What is the name check system?
3    A.  It's basically a service provided to
4 partners to vet people for employment or other
5 positions of trust or other -- it's basically a
6 background check of the FBI systems.
7    Q.  Okay.  So the FBI provides this service?
8    A.  It's a service, yes.
9    Q.  Okay.  Does the FBI provide this service
10 to other federal government agencies?
11      MS. POWELL:  Objection.  We're clearly
12 well beyond the scope here.  He actually testified
13 they check derogatory information and that's what
14 it's for.
15      MR. ABBAS:  That is TSDB information.
16      MS. POWELL:  No, it's not.
17      MR. ABBAS:  That includes TSDB
18 information.
19      MS. POWELL:  It's in their systems along
20 with derogatory information.  That's what it's
21 for.
22      MR. ABBAS:  Right.  The TSDB information

---

351

1 is within the systems that the FBI controls so
2 TSDB status is being communicated to other
3 agencies as a result of the name check process.
4       MS. POWELL:  That is misleading and
5 inaccurate.  You didn't say any of those things.
6       MR. ABBAS:  So if he wants to say that,
7 then that's -- he can say that, but the --
8       MS. POWELL:  He already told you what
9 the name check system is and you're
10 mischaracterizing it, that is the objection.
11      MR. ABBAS:  Okay.
12 BY MR. ABBAS:
13   Q.  What -- the name check system -- the
14 name check system is a service that the FBI
15 provides to other agencies; correct?
16   A.  Yes.
17   Q.  Okay.  What other agencies -- what --
18 let me -- what agencies does the FBI provide this
19 name check system service to?
20      MS. POWELL:  Objection as to scope and a
21 comprehensive answer would require disclosure of
22 law enforcement sensitive information at least.

---

352

1       Is there a general answer, no.  No, I'm
2 sorry, no further answer can be given I don't
3 think.
4       MR. ABBAS:  The identity of the agencies
5 that use the name check process is being withheld
6 on the basis of law enforcement privilege?
7       MS. POWELL:  I think that's right, yes.
8 BY MR. ABBAS:
9    Q.  Okay.  Well, what is the law
10 enforcement --
11      MS. POWELL:  It's also beyond the scope
12 to be clear.
13   Q.  What is the law enforcement interest in
14 not disclosing the names of the agencies that
15 utilize FBI's name check system?
16      MS. POWELL:  Objection; scope, vague,
17 potentially calls for law enforcement sensitive
18 information itself.
19      To the extent you can answer at a level
20 of generality, please do.
21      THE WITNESS:  I mean, again, any
22 information about -- specific information about

---

Transcript of Matthew J. DeSarno, Designated Representative
Conducted on April 9, 2018

353

1 who uses the name check system would provide
2 potential advantage to adversaries and allow them
3 to develop countermeasures to detection.
4 BY MR. ABBAS:
5    Q.   Have the names of agencies that utilize
6 the FBI's name check process been publicly
7 disclosed by the FBI?
8        MS. POWELL:  You can answer, if you
9 know.
10       THE WITNESS:  I don't know.
11       MS. POWELL:  And scope objection while
12 I'm at it.  I think we've well established this is
13 outside the scope of the use of TSDB information.
14 BY MR. ABBAS:
15    Q.   Aside from -- how does the FBI receive
16 requests to conduct name checks?
17       MS. POWELL:  Objection; scope for sure.
18       You can answer to the extent you know.
19       THE WITNESS:  The requests come from
20 other agencies who submit the requests for a name
21 check.
22

354

1 BY MR. ABBAS:
2    Q.   How do they submit the request, pigeon?
3    **A.   Yeah, pigeon.**
4    Q.   But like is there like a terminal
5 that -- is there a database that everybody has
6 access to?
7        MS. POWELL:  Objection; scope.  We're
8 way outside the delineated topics here.  I mean,
9 if he knows, he can answer as far as I'm
10 concerned.
11       THE WITNESS:  I mean, it's some
12 electronic request.  I don't know the system name
13 or the actual mechanics of how the request comes
14 in, but it's an electronic request.
15 BY MR. ABBAS:
16    Q.   But the FBI itself performs the name
17 check query, it's not other agencies that are
18 doing the querying themselves; correct?
19    **A.   Yes.**
20    Q.   So like -- okay.  Great.
21       Does the FBI participate in encounters
22 with TSDB listees at U.S. land borders and points

355

1 of entry?
2        MS. POWELL:  Objection; vague, and
3 misleading, but you can answer to the extent you
4 know.
5        THE WITNESS:  So the FBI will
6 participate in encounters at border crossings
7 pretty frequently.  The reasons for those
8 encounters could be a variety of reasons, one of
9 which -- one factor may be TSDB inclusion, but
10 there are a variety of reasons why the FBI would
11 be involved in a border encounter with a subject.
12 BY MR. ABBAS:
13    Q.   What are the variety of reasons why the
14 FBI would be involved in a border encounter with a
15 TSDB subject?
16       MS. POWELL:  Objection, a comprehensive
17 answer would certainly call for the disclosure of
18 law enforcement sensitive information and
19 potentially state secrets information.  I suspect
20 there's an answer that can be given at a level of
21 generality.
22       THE WITNESS:  Generally, if a CBP

356

1 officer is conducting an interview with someone at
2 a border crossing or is reviewing material on that
3 person at a border crossing pursuant to border
4 search authorities and they find something that's
5 related to terrorism, they would likely call an
6 FBI agent.  Or in many cases at ports of entry, at
7 international airports, FBI agents are on scene
8 all the time anyway.  So it's pretty standard for
9 them to contact an FBI agent if there's any
10 indication of terrorist activity by a subject
11 encountered at a border crossing.
12 BY MR. ABBAS:
13    Q.   Has the FBI ever made a
14 terrorism-related arrest of a TSDB listee during a
15 border encounter?
16       MS. POWELL:  Objection, the way the
17 question is phrased calls for law enforcement
18 privileged information.
19       I think I have to instruct the witness
20 not to answer as phrased.
21    Q.   Does the FBI know whether it has ever
22 terrorism-related arrest of a TSDB listee

Transcript of Matthew J. DeSarno, Designated Representative

90 (357 to 360)

Conducted on April 9, 2018

357

1 during a border encounter with a TSDB listee?

2 　　　MS. POWELL: I think you can answer

3 whether you know.

4 　　　THE WITNESS: Yes, I know.

5 BY MR. ABBAS:

6 　　Q.　But you're withholding the information

7 based on the law enforcement privilege; correct?

8 　　　MS. POWELL: I am instructing him not to

9 answer, correct.

10 　　　MR. ABBAS: On the basis of the law

11 enforcement privilege?

12 　　　MS. POWELL: Correct.

13 　　　MR. ABBAS: Is there any other

14 privilege?

15 　　　MS. POWELL: Potentially state secrets

16 depending on the context, but definitely the law

17 enforcement.

18 BY MR. ABBAS:

19 　　Q.　How many arrests has -- how many

20 terrorism-related arrests has the FBI undertaken

21 of TSDB listees during border encounters with TSDB

22 listees?

358

1 　　　MS. POWELL: I'm instructing the witness

2 not to answer on the grounds of the law

3 enforcement privilege and potentially state

4 secrets.

5 　　Q.　Has the FBI undertaken more than ten

6 terrorism-related arrests of TSDB listees at the

7 border?  That's it.

8 　　　MS. POWELL: I'm instructing the witness

9 not to answer on the grounds of the law

10 enforcement privilege and potentially state

11 secrets.

12 　　Q.　Has the FBI undertaken more than 10,000

13 terrorism-related arrests of TSDB listees at the

14 border during encounters with those TSDB listees?

15 　　　MS. POWELL: I'm instructing the witness

16 not to answer.

17 　　　MR. ABBAS: On the basis of?

18 　　　THE WITNESS: The law enforcement

19 privilege and potentially state secrets.

20 　　　The number of TSDB status people leading

21 to terrorism arrests is itself privileged to be

22 clear.

359

1 　　　MR. ABBAS: It's probably zero.

2 BY MR. ABBAS:

3 　　Q.　What is the FBI's role in the redress

4 process for persons listed in the TSDB?

5 　　**A.　So when the -- when a redress request is**

6 **made to DHS, if the FBI was a nominator, they will**

7 **receive a tasking to provide the underlying**

8 **information that led to the nomination.  They**

9 **also -- at that point, the nominator would confirm**

10 **that all the information in the record is accurate**

11 **and up to date and then pass that back to the DHS**

12 **TRIP.**

13 　　Q.　I'm just going to back up to the prior

14 topic.  Has the FBI ever publicly disclosed an

15 arrest it made of a TSDB listee at the border?

16 　　　MS. POWELL: I think you can answer

17 that.

18 　　　THE WITNESS: Yeah, the FBI publicly

19 discloses the terrorism-related arrests it makes,

20 but does not generally publicly disclose inclusion

21 on the TSDB watchlist.

22

360

1 BY MR. ABBAS:

2 　　Q.　But the FBI has publicly disclosed, for

3 instance -- what's that guy's name, the Times

4 Square bomber.  The FBI has publicly disclosed the

5 watchlist status of the Times Square bomber, for

6 instance; correct?

7 　　**A.　Of Rahimi, the Times Square bomber?**

8 　　Q.　The Times Square bomber.

9 　　**A.　You're talking about the Chelsea bomber.**

10 　　　MS. POWELL: The Christmas Day?

11 　　　MR. ABBAS: No, that's different.  Okay.

12 Can you Google the Times Square bomber and see

13 what his name is?  I think it's Faisal, yeah.

14 　　　THE WITNESS: It's not Faisal.

15 　　　MR. ABBAS: We'll see.  Google with tell

16 us.  Depositions tend to kind of wind down in this

17 way.

18 　　　MS. POWELL: Get a little punchy.  It

19 happens.

20 BY MR. ABBAS:

21 　　Q.　Are you familiar with Omar Mateen?

22 　　**A.　Yes.**

Transcript of Matthew J. DeSarno, Designated Representative
Conducted on April 9, 2018

91 (361 to 364)

361

1    Q.   Omar Mateen's watchlist status at the
2  time he committed his act of terrorism became
3  public; correct?
4    **A.   No.**
5         MS. POWELL:  Objection; misleading.
6         THE WITNESS:  I don't think that's the
7  case.
8  BY MR. ABBAS:
9    Q.   Faisal Shahzad --
10   **A.   Shahzad.**
11   Q.   -- was the Times Square boomer.
12        Faisal Shahzad's watchlist status was
13 disclosed by the FBI after his attempted act of
14 terrorism; correct?
15   **A.   I don't know that to be the case.**
16   Q.   The Boston bombers' watchlist status,
17 subsequent to their act of terrorism, their
18 watchlist status was disclosed publicly; correct?
19        MS. POWELL:  Objection; misleading.
20        THE WITNESS:  Yeah, I don't know that
21 the FBI was disclosing watchlist status in any of
22 those cases.  I think the FBI was discussing the

362

1  existence of an investigation, which reporters may
2  have translated to watchlist status, but I don't
3  know that we disclosed watchlist status in those
4  cases.  I'm not aware of it.
5  BY MR. ABBAS:
6    Q.   Are you familiar with the underwear
7  bomber?
8    **A.   Yes, Abdulmutallab.**
9    Q.   Yes, you got it.
10        The underwear bomber's watchlist status
11 was disclosed publicly after his attempted act of
12 terrorism; correct?
13        MS. POWELL:  Objection; misleading.
14        THE WITNESS:  Yeah, I don't know that
15 the FBI disclosed his watchlist status.
16 BY MR. ABBAS:
17   Q.   How does the FBI disseminate TSDB
18 information?
19   **A.   Didn't we start the deposition with this**
20 **question?**
21   Q.   No.
22   **A.   Right after we got done with the WAC?**

363

1         MS. POWELL:  Objection; vague.
2         I think you can answer to the extent you
3  can.
4         THE WITNESS:  The FBI primarily
5  disseminates TSDB information through NCIC.
6  BY MR. ABBAS:
7    Q.   There are other ways that the FBI
8  disseminates TSDB information other than the NCIC?
9    **A.   I don't know that there are other ways.**
10 **The FBI may share TSDB information with partners**
11 **in specific cases if there's a need for that**
12 **partner to know that, but generally it's through**
13 **NCIC.**
14   Q.   When a TSDB listee attempts to purchase
15 a gun, does the FBI learn of that attempted
16 purchase?
17        MS. POWELL:  Objection; vague and scope.
18        You can answer if you know.
19        THE WITNESS:  Gun purchases are specific
20 to -- there are a lot of ways guns can be
21 purchased and there are different state laws
22 governing gun purchases in different states.

364

1  BY MR. ABBAS:
2    Q.   Does the FBI maintain any practices
3  regarding situations in which a TSDB listee
4  attempts to buy a gun?
5         MS. POWELL:  Objection; vague.
6         THE WITNESS:  I don't really understand
7  the question.
8         MS. POWELL:  Internal FBI practices
9  might also be subject to the law enforcement
10 privilege.
11 BY MR. ABBAS:
12   Q.   Are there any internal FBI practices
13 regarding TSDB listees attempting to acquire
14 firearms?
15        MS. POWELL:  Objection; scope and
16 definitely calls for privileged information.
17        MR. ABBAS:  It's a yes-or-no question.
18        MS. POWELL:  Yeah, I'm instructing the
19 witness not to answer.
20 BY MR. ABBAS:
21   Q.   Does the FBI interfere with the ability
22 of TSDB listees to purchase firearms in any way?

365

1      MS. POWELL:  Argumentative, misleading,
2  and potentially calls for law enforcement
3  sensitive information.
4      THE WITNESS:  Yeah, I can't answer that
5  without law enforcement sensitive information.
6      MS. POWELL:  How are we doing on time?
7      MR. ABBAS:  Yes, let's go off the record
8  and take a break.
9      (Recess from the record.)
10     THE REPORTER:  This is the court
11 reporter and we have 32 minutes left.
12 BY MR. ABBAS:
13     Q.  Does the TSDB include persons who are
14 FBI informants?
15     MS. POWELL:  Objection.
16     I'm instructing the witness not to
17 answer on the grounds of the law enforcement
18 privilege.
19     Q.  Do FBI employees place people in the
20 TSDB for the purposes of assisting their efforts
21 to recruit those prospective listees as
22 informants?

366

1      MS. POWELL:  Objection; vague, and
2  misleading, a comprehensive answer could require
3  the disclosure of law enforcement information, but
4  I think you can answer at a level of generality.
5      THE WITNESS:  No, the FBI just places
6  people in the TSDB who meet this published
7  reasonable suspicion standard that we've discussed
8  at lengths multiple times.
9  BY MR. ABBAS:
10     Q.  Are there any persons that are included
11 in the TSDB that do not satisfy the TSDB's
12 inclusion standard?
13     MS. POWELL:  Objection; scope, vague,
14 and misleading.
15     You can answer to the extent you know
16 yes or no.
17     THE WITNESS:  No.
18 BY MR. ABBAS:
19     Q.  So every person in the TSDB satisfies
20 the TSDB's inclusion standard?
21     MS. POWELL:  Same objections, including
22 scope.

367

1      THE WITNESS:  The FBI, again, doesn't
2  make decisions about whether or not the submission
3  meets the standard.  So I don't know of an
4  instance where someone would be included that
5  doesn't meet that standard.
6  BY MR. ABBAS:
7      Q.  Does the FBI have the ability to
8  place -- does the FBI have the ability to
9  circumvent TSDB's inclusion standard to place
10 people who do not meet the inclusion standard on
11 the TSDB?
12     MS. POWELL:  Objection; vague,
13 misleading, scope, mischaracterizes --
14     THE WITNESS:  No.
15     MS. POWELL:  -- prior testimony and some
16 other things.
17     THE WITNESS:  The answer is no.
18 BY MR. ABBAS:
19     Q.  Okay.  Is the FBI aware of any instance
20 in which an FBI employee utilized a person's TSDB
21 status as a way of encouraging that person to
22 become an FBI informant?

368

1      MS. POWELL:  Objection; vague, and
2  misleading, a comprehensive answer would require
3  the disclosure of law enforcement sensitive
4  information, but you can answer to the extent you
5  can.
6      THE WITNESS:  Generally the recruitment
7  of sources involves identifying motivations on the
8  part of the person being recruited, those
9  motivations could be a variety of different things
10 and may include a motivation by that person
11 to -- maybe they think they are on the no-fly list
12 and they think they want to be removed from it.
13 So there may be discussions about that in a
14 recruitment process, but that's not to say that
15 the FBI is using that specifically as a
16 recruitment tool.
17 BY MR. ABBAS:
18     Q.  Has an FBI employee ever promised to
19 remove a person from the TSDB in exchange for that
20 person becoming an FBI informant?
21     MS. POWELL:  Objection; vague, and
22 misleading, a complete answer could require the

Transcript of Matthew J. DeSarno, Designated Representative
Conducted on April 9, 2018

93 (369 to 372)

369

1 disclosure of law enforcement sensitive
2 information, but you can answer.
3        THE WITNESS:  So that would not
4 be -- that would not be within policy to make a
5 promise like that.  What is more likely is that
6 during the course of an informant relationship
7 development, an agent may learn more information
8 about the subject, some of that information may be
9 exculpatory and that agent would have an
10 obligation to update the TSDB nomination with that
11 exculpatory information, which may result in a
12 change in status on the TSDB or potentially
13 removal from the TSDB.  That would require that
14 agent to start to collect from that individual
15 information and develop a more fulsome
16 understanding of that individual.
17 BY MR. ABBAS:
18    Q.  Are FBI employees required to include in
19 their TSDB nominations exculpatory information?
20        MS. POWELL:  Objection; misleading, and
21 a comprehensive explanation would require law
22 enforcement sensitive information, but I think you

370

1 can answer at a level of generality.
2        THE WITNESS:  Generally, it is the
3 obligation of nominating agencies to maintain
4 complete and accurate information regarding the
5 people that they nominate which would include
6 inculpatory and exculpatory information.
7 BY MR. ABBAS:
8    Q.  Has an FBI employee ever been
9 disciplined or reprimanded for not including
10 exculpatory information in that FBI employee's
11 nomination to the TSDB?
12        MS. POWELL:  Objection; vague, and
13 misleading, potentially calls for law enforcement
14 information, but answer if you can.
15        THE WITNESS:  I don't have any specific
16 awareness of that.
17 BY MR. ABBAS:
18    Q.  The FBI has no specific awareness of any
19 incident in which the FBI has identified an FBI
20 employee's nomination that did not, but should
21 have included exculpatory information?
22        MS. POWELL:  Same objections.

371

1        THE WITNESS:  That's a different
2 question.  Your first question was has a FBI
3 employee been disciplined or reprimanded for --
4 BY MR. ABBAS:
5    Q.  You're right, that is a totally
6 different question.  That's fair, it is a
7 different question.  So I'm asking if that's right
8 or not and if I'm wrong, tell me I'm wrong.
9    A.  I was focused on the differences.
10        Can you repeat the question?
11    Q.  I'll read it back.
12        Is it the FBI's testimony today that the
13 FBI has no specific awareness of any incident in
14 which the FBI has identified a FBI employee's
15 nomination to the TSDB that did not but should
16 have included exculpatory information?
17        MS. POWELL:  Objection; vague, and
18 misleading, potentially calls for law enforcement
19 information, but you can answer if you know.
20        THE WITNESS:  The answer to that
21 question is that is not my testimony.
22

372

1 BY MR. ABBAS:
2    Q.  Can TSDB status trigger a specific line
3 of questioning at ports of entry that regard
4 religion?
5        MS. POWELL:  Objection.
6        MR. ABBAS:  Like six plaintiffs were
7 questioned by the FBI about their religious
8 practices at ports of entry and borders so...
9        MS. POWELL:  I'm going to object as to
10 scope, especially if you're asking about CBP
11 questions and also as to the law enforcement
12 privilege.  I think that's probably it.  I don't
13 know if there's any additional answer that could
14 be given.  Do you think there's any additional
15 answer that could be given?
16        THE WITNESS:  I don't think so.
17        MS. POWELL:  I'm instructing witness not
18 to answer.
19        MR. ABBAS:  On the basis?
20        MS. POWELL:  Of law enforcement
21 privilege.
22

Transcript of Matthew J. DeSarno, Designated Representative
Conducted on April 9, 2018

94 (373 to 376)

373

1 BY MR. ABBAS:
2     Q.  We talked a little bit about land
3 borders, I just want to make sure that our use of
4 borders includes ports of entries so I'm going to
5 ask about ports of entry specifically.
6         Does FBI question TSDB listees at ports
7 of entry in addition to land border crossings?
8         MS. POWELL:  Objection; vague, and
9 misleading, potentially calls for law enforcement
10 privileged information.  Is there an answer that
11 could be given -- and SSI potentially.
12         Is there an answer that can be given?
13         THE WITNESS:  I mean, the FBI generally
14 conducts interviews at ports of entry when
15 required based on different factors, not specific
16 to TSDB's status.
17 BY MR. ABBAS:
18     Q.  TSDB listees -- the FBI is aware that
19 TSDB listees are routinely detained at ports of
20 entry per their TSDB status?
21         MS. POWELL:  Objection.
22         I'm instructing the witness not to

374

1 answer on the grounds of law enforcement
2 privilege, also objecting on the grounds of
3 vagueness and scope and misleading.
4         MR. ABBAS:  Go ahead.
5         MS. POWELL:  I just instructed the
6 witness not to answer.
7         MR. ABBAS:  I'm sorry.
8 BY MR. ABBAS:
9     Q.  Does the FBI know what happens to TSDB
10 listees as they go through ports of entry?
11         MS. POWELL:  Objection; vague.
12         You can answer to the extent you know
13 whether you know, if that makes sense.
14         THE WITNESS:  I mean, people -- people
15 have different experiences at ports of entry for a
16 variety of reasons, not necessarily specific to
17 TSDB -- to TSDB status.
18 BY MR. ABBAS:
19     Q.  What is the FBI's knowledge of what
20 happens to TSDB listees as they cross through
21 ports of entry?
22         MS. POWELL:  Objection; scope and a

375

1 comprehensive answer would require disclosure of
2 law enforcement privileged information and
3 information outside of FBI's purview in any case
4 couldn't bind some other agency.
5         THE WITNESS:  Any discussion of the way
6 TSDB listees are treated at ports of entry is
7 privileged law enforcement information.  It could
8 potentially disclose inclusion or lack thereof on
9 the TSDB list so it's not going to be discussed.
10 BY MR. ABBAS:
11     Q.  Does the FBI know that TSDB listees
12 receive boarding passes with four S's printed on
13 them?
14         MS. POWELL:  Objection, I'm sorry,
15 objection, vagueness and misleading, but you can
16 answer.
17         THE WITNESS:  So my last two
18 international trips traveling on a red official
19 passport in my official capacity as an FBI
20 executive on the U.S. bound flights from two
21 different ports, I received four S's on my
22 passport -- on my boarding pass.

376

1 BY MR. ABBAS:
2     Q.  That wasn't an answer to the question.
3         Does the FBI know that TSDB listees
4 receive boarding passes with four S's printed on
5 them?
6         MS. POWELL:  Objection; vagueness,
7 leading, and potentially calls for SSI
8 information.
9         THE WITNESS:  What the FBI knows is that
10 a subset of passengers on U.S. bound flights and
11 domestic U.S. flights receive secondary security
12 screening for a variety of reasons.  One of those
13 reasons is that the person is a selectee, other
14 reasons may be airline selection, random
15 selection, travel rules or ticketing
16 abnormalities are all reasons.
17         MS. POWELL:  And I'm instructing the
18 witness that he -- that a comprehensive answer
19 would require discussion of SSI.
20 BY MR. ABBAS:
21     Q.  When you say a person that is a
22 selectee, do you mean to refer to a person that is

Transcript of Matthew J. DeSarno, Designated Representative
Conducted on April 9, 2018

377

1  in the TSDB?
2     A.  Potentially.  There are a variety of
3  reasons why and there are a large number of people
4  who get the four S's.  So four S's are not
5  indicative of that.
6     Q.  Again, I understand that there are
7  multiple reasons why a person can see four S's on
8  their boarding pass and you've listed many of
9  them; correct?
10    A.  Correct.
11    Q.  Okay.  Do TSDB listees -- is it the
12 FBI's understanding that TSDB listees pursuant to
13 their status on the TSDB receive boarding passes
14 that have four S's stamped on them?
15    MS. POWELL:  Objection because you're
16 specifically asking the FBI, the deponent, about
17 TSA security procedures.  That's well --
18    MR. ABBAS:  I'm asking about --
19    MS. POWELL:  -- outside his purview.  A
20 comprehensive answer requires disclosure of SSI as
21 well as law enforcement sensitive information.
22 He's already given you his analysis of what that

378

1  SSSS might mean from FBI's perspective.
2     MR. ABBAS:  I'm asking about the FBI's
3  understanding of what happens to TSDB listees in
4  the context of air travel.
5     MS. POWELL:  And I'm making the same
6  objections.  He's already given you the FBI's
7  understanding.
8     MR. ABBAS:  Can you go back up to the
9  question, I've lost track of the question.
10 BY MR. ABBAS:
11    Q.  Is it the FBI's understanding that TSDB
12 listees pursuant to their status on the TSDB
13 receive boarding passes that have four S's stamped
14 on them?
15    MS. POWELL:  And I'm objecting for the
16 reasons stated before including SSI, law
17 enforcement privilege, scope, purview, vague, and
18 misleading, whatever else I said before as well as
19 asked and answered.
20    MR. ABBAS:  Lena has to take off.
21    MS. POWELL:  I don't know if there's any
22 additional answer you can give.  If so, please do.

379

1     MR. ABBAS:  Go ahead.
2     THE WITNESS:  There's no additional
3  answer I can give.
4  BY MR. ABBAS:
5     Q.  Are you withholding information on the
6  basis of the privileges that your attorney
7  asserted?
8     A.  Can I answer that?
9     MS. POWELL:  If you know the answer, but
10 it calls for -- yes, you can answer that.
11    THE WITNESS:  Yes, yes, on the basis of
12 privilege.
13 BY MR. ABBAS:
14    Q.  Okay.
15    MR. ABBAS:  So go back up to the
16 question.
17    Q.  The FBI has an understanding -- is it
18 correct that the FBI has an understanding of what
19 happens to TSDB listees pursuant to their status
20 on the TSDB as they receive boarding passes to
21 board commercial aviation to, from, or through the
22 United States?

380

1     MS. POWELL:  Objection; mischaracterizes
2  prior testimony in part because this question,
3  like the previous question, calls for information
4  outside the scope and outside the FBI's purview.
5  He already testified as to FBI's understanding of
6  those procedures.
7     MR. ABBAS:  Go ahead.
8     THE WITNESS:  I think I already answered
9  that.
10 BY MR. ABBAS:
11    Q.  The question was like a yes-or-no
12 question.
13    A.  Of which I already answered yes to.
14    Q.  Okay.  So that -- sometimes -- and I'm
15 not trying to be difficult, sometimes I don't know
16 because that's not my understanding of how you
17 answered the question.  So I'm asking in good
18 faith to get an answer.  And if I'm being
19 repetitive, I apologize, I'm not doing that
20 deliberately.
21    MR. ABBAS:  Can you go back to the
22 question.  We'll just do the question and then if

Transcript of Matthew J. DeSarno, Designated Representative

96 (381 to 384)

Conducted on April 9, 2018

381

1 the answer is, yes, the answer could be yes.
2     Q.  Is it correct that the FBI has an
3 understanding of what happens to TSDB listees
4 pursuant to their status on the TSDB as they
5 receive boarding passes to board commercial
6 aviation to, from, or through the United States?
7         MS. POWELL:  Same objection to the
8 scope, purview, vagueness, and misleading
9 particularly because this question requires the
10 FBI deponent to testify about TSA security
11 procedures, a comprehensive discussion of which
12 would be SSI as well as law enforcement privilege.
13 But you can answer yes or no to the extent you
14 think you can.
15         THE WITNESS:  Yes.
16 BY MR. ABBAS:
17     Q.  Okay.  Do TSDB listees -- is it the
18 FBI's understanding that each time a TSDB listee
19 gets a boarding pass to go to, from, or through
20 the U.S., that their boarding pass is stamped with
21 four S's?
22         MS. POWELL:  Objection; SSI and -- I'm

382

1 getting conflicting advice.  I'm just going to
2 object on my own that it's vague and misleading
3 and requires disclosure of SSI and law enforcement
4 information and also is outside the purview of
5 FBI.  You're asking for information about TSA
6 security procedures well outside this deponent's
7 purview.
8         THE WITNESS:  Yeah, no further answer.
9         MR. ABBAS:  Did you instruct him not to
10 answer?
11         MS. POWELL:  I was not sure whether
12 there was any answer that could be given that was
13 not privileged.  I think there's not.
14         Yeah, I'm instructing the witness not to
15 answer.
16         MR. ABBAS:  On the basis of?
17         MS. POWELL:  SSI, law enforcement
18 privilege, and on context potentially the state
19 secrets privilege.
20         MR. ABBAS:  Go back up to the question.
21 And Mr. DeSarno is right, it was yes.
22         Okay.  Do you want to take a break?  I

383

1 think we're done.
2         MS. POWELL:  Okay.
3         MR. ABBAS:  But I'll sign off that we're
4 done.  I think that we are and then --
5         MS. POWELL:  I'll have a few follow-up
6 questions.  I just want to touch base.
7         MR. ABBAS:  Thank you, Mr. DeSarno.
8         (Recess from the record.)
9         THE REPORTER:  This is the court
10 reporter and we have 13 minutes left.
11 EXAMINATION BY COUNSEL FOR THE DEFENDANTS (CONT'D)
12 BY MS. POWELL:
13     Q.  I have a few follow-up and clarification
14 questions.  The first is I previously over
15 asserted privilege in response to the question,
16 has the selectee list standard ever changed.  Can
17 you answer that question to some extent?
18     **A.  The answer is over a period of many**
19 **years, the standard has changed.**
20         MS. POWELL:  And we're going to assert
21 privilege over basically any details of those
22 changes, but if you want to ask any follow-up

384

1 questions?
2         MR. ABBAS:  Yes.
3 EXAMINATION BY COUNSEL FOR THE PLAINTIFFS (CONT'D)
4 BY MR. ABBAS:
5     Q.  When was the last time the selectee
6 inclusion standard was changed in any way?
7         MS. POWELL:  And I'm instructing the
8 witness not to answer on the grounds of law
9 enforcement and SSI privilege.
10     Q.  Why is -- who decides what the -- who
11 decides whether the selectee list standard changes
12 or stays the same?
13         MS. POWELL:  I think you can answer
14 that.
15         THE WITNESS:  The Watchlisting Advisory
16 Committee can make recommendations to the NSC to
17 change the standards of watchlisting in general so
18 that would include the selectee list.
19 BY MR. ABBAS:
20     Q.  And by the Watchlisting Advisory
21 Committee, are you referring to the WAC?
22     **A.  Yes, the Watchlisting Advisory, the WAC.**

Transcript of Matthew J. DeSarno, Designated Representative
Conducted on April 9, 2018

385

1    Q.   Okay.  Making sure.
2        So the WAC has made recommendations in
3  the past to alter the selectee list inclusion
4  standard; correct?
5        MS. POWELL:  Objection; mischaracterizes
6  prior testimony, and calls for SSI and law
7  enforcement privileged information.
8    Q.   Has the WAC ever made a recommendation
9  to change the selectee list inclusion standard?
10       MS. POWELL:  Objection; mischaracterizes
11 prior testimony, and calls for deliberative
12 process as well as SSI and law enforcement
13 privileged information.
14       I'm instructing the witness not to
15 answer.
16   Q.   Has the WAC issued a statement of
17 conclusion that regards the selectee list
18 inclusion standards?
19       MS. POWELL:  Objection; scope,
20 potentially calls for law enforcement or SSI
21 information.  I think you can answer, if you know.
22       THE WITNESS:  As discussed previously,

386

1  the WAC drafted the most current set of
2  watchlisting guidelines which includes criteria
3  for selectee designation.  So I would say that
4  that's the WAC defining -- defining that area.
5  BY MR. ABBAS:
6    Q.   And did the WAC at some point in time
7  propose to the NSC that the selectee list
8  inclusion standard should be changed?
9        MS. POWELL:  Objection.
10       I'm instructing the witness not to
11 answer on the grounds of the deliberative process
12 privilege as well as the law enforcement and SSI.
13       MR. ABBAS:  I'm confused.
14 BY MR. ABBAS:
15   Q.   So the selectee list standard has
16 changed at some point in the past; correct?
17   **A.   That's what I said, yes.**
18   Q.   Who decided that the watch -- I'm sorry.
19       Who decided that the selectee list
20 inclusion standards would change?
21       MS. POWELL:  Actually, I think you can
22 answer that at the level of generality without

387

1  disclosing privileged information.
2        THE WITNESS:  Although, I mean, specific
3  to the WAC would indicate the timing of a change
4  being since 2008.  The selectee list has been in
5  existence for many years prior to 2008.
6        MS. POWELL:  That's true.
7        THE WITNESS:  So the testimony was
8  that --
9        MS. POWELL:  I'm going to instruct the
10 witness not to answer as to the number then.  He's
11 right.
12       MR. ABBAS:  On what basis?
13       MS. POWELL:  The SSI law enforcement
14 privilege and potentially deliberative process
15 privilege depending on how it's framed.
16 BY MR. ABBAS:
17   Q.   What is the law enforcement interest in
18 not sharing when the selectee list inclusion
19 standards were changed?
20       MS. POWELL:  Objection; vague,
21 misleading, and potentially calls for disclosure
22 of SSI and law enforcement information itself.

388

1        To the extent you can answer at a level
2  of generality, I think you can describe the law
3  enforcement interest in the changes in the
4  selectee list standards.
5        THE WITNESS:  So specific timelines
6  regarding changes could inform adversaries as to
7  when they observe changes and could clearly
8  endanger national security.
9  BY MR. ABBAS:
10   Q.   Why?
11       MS. POWELL:  I'm instructing the witness
12 not to answer further on the grounds of law
13 enforcement privilege, SSI.
14   Q.   Are there any plans for a new
15 watchlisting guidance document coming out this
16 year in 2018?
17       MS. POWELL:  I'm instructing the witness
18 not to answer on grounds of deliberative process
19 privilege.
20   Q.   Is the FBI aware of any plans that the
21 WAC has to promulgate a new version of the
22 watchlisting guidance in the future?

Transcript of Matthew J. DeSarno, Designated Representative
Conducted on April 9, 2018

389

1        MS. POWELL:  Same objection.

2        I'm instructing the witness not to

3    answer on the grounds of deliberative process

4    privilege.

5        Q.  Does the FBI distribute a copy of the

6    currently operative watchlisting guidance to all

7    FBI employees who as part of their duties nominate

8    individuals to the TSDB?

9        MS. POWELL:  I think you can answer, if

10   you know.

11       THE WITNESS:  The watchlisting guidance

12   is available, I don't know that it's actively

13   distributed to all individuals who have a role in

14   watchlisting, but it is available.

15   BY MR. ABBAS:

16       Q.  Does the FBI know whether all FBI

17   employees who as per their FBI duties nominate

18   individuals to the TSDB, does the FBI know whether

19   all those individuals have read the watchlisting

20   guidance --

21       MS. POWELL:  Objection; vague.

22       Q.  -- that's currently operating?

390

1        MS. POWELL:  Objection, vague,

2    misleading, and asked and answered.

3        MR. ABBAS:  Go ahead.

4        THE WITNESS:  I don't expect that all of

5    those employees have read the entire watchlisting

6    guidance document, no.

7    BY MR. ABBAS:

8        Q.  So there are FBI employees who nominate

9    individuals to the watchlist who have not read the

10   watchlisting guidance?

11       MS. POWELL:  Objection; mischaracterizes

12   prior testimony.

13       THE WITNESS:  I don't believe that all

14   employees who have a role in watchlisting have

15   read the entire watchlisting guidance document.

16       MR. ABBAS:  Okay.  So I'm done with my

17   little piece.

18   EXAMINATION BY COUNSEL FOR THE DEFENDANTS (CONT'D)

19   BY MS. POWELL:

20       Q.  I'm not sure how some of those were

21   follow-ups, but that's okay.

22       Is TSDB's status alone a prohibiter for

391

1    purchasing a firearm to the best of your

2    understanding?

3        A.  No, it's not.

4        MS. POWELL:  Any follow-up questions?

5        (No verbal response.)

6    BY MS. POWELL:

7        Q.  I continue to think this question is

8    outside the scope of this deposition properly, but

9    has FBI disclosed the names of some of the

10   agencies that participate in the name check

11   service?

12       A.  Yes.

13       MS. POWELL:  Do you have any follow-up

14   questions?

15   EXAMINATION BY COUNSEL FOR THE PLAINTIFFS (CONT'D)

16   BY MR. ABBAS:

17       Q.  What are the names that the FBI has

18   disclosed that avail themselves of the FBI name

19   check service?

20       MS. POWELL:  And I continue to object as

21   to scope, but you can answer to the extent you

22   know.

392

1        THE WITNESS:  USCIS, OPM, there are

2    other federal agencies, other various federal

3    agencies.

4    BY MR. ABBAS:

5        Q.  Are there any others that you know of by

6    name besides OPM and USCIS?

7        MS. POWELL:  Same objection as to scope.

8        THE WITNESS:  There are others listed on

9    this website, but I don't know what they are.

10   BY MR. ABBAS:

11       Q.  You don't know the names of -- and it's

12   fine if you don't, I just want to make sure.

13       Do you know of any other agencies that

14   utilize FBI name check service other than OPM and

15   UCSIS?

16       A.  Yes.

17       Q.  What are the names of other agencies

18   aside from OPM and USCIS that use the FBI name

19   check system?

20       MS. POWELL:  Objection as to scope and

21   that a comprehensive answer to the question of all

22   of the agencies that use it is protected by the

Transcript of Matthew J. DeSarno, Designated Representative
Conducted on April 9, 2018

393

1   law enforcement privilege.
2          I've instructed the witness that he can
3   answer as to names of agencies previously
4   disclosed if he knows that they are public.
5          THE WITNESS:  Yeah, USCIS, OPM, U.S.
6   Secret Service, and a variety of others that I
7   can't recall right now.
8          MR. ABBAS:  Okay.
9   EXAMINATION BY COUNSEL FOR THE DEFENDANTS (CONT'D)
10  BY MS. POWELL:
11     Q.  You previously testified that the FBI
12  might engage in an interview at a land border if
13  there was suspicion of terrorist activity
14  involved; is that the only reason?
15     **A.  No.**
16         MS. POWELL:  Do you care to ask any
17  follow-up questions because that's all I got?
18  EXAMINATION BY COUNSEL FOR THE PLAINTIFFS (CONT'D)
19  BY MR. ABBAS:
20     Q.  What are the other reasons FBI agents
21  may engage in interviews at land borders other
22  than suspicion of terrorist activity?

394

1          MS. POWELL:  Objection that a
2   comprehensive answer would require disclosure of
3   law enforcement sensitive information, but you can
4   answer at a level of generality to the extent you
5   can.
6          THE WITNESS:  Specific criminal
7   activity, drug activity, other national security
8   reasons why FBI may have an encounter at a port of
9   entry.
10         MR. ABBAS:  Okay.
11  EXAMINATION BY COUNSEL FOR THE DEFENDANTS (CONT'D)
12  BY MS. POWELL:
13     Q.  And finally, to your knowledge and
14  understanding, are there exceptions to the
15  reasonable suspicion standard in the TSDB?
16     **A.  Yes, there are.**
17  EXAMINATION BY COUNSEL FOR THE PLAINTIFFS (CONT'D)
18  BY MR. ABBAS:
19     Q.  What are all the exceptions to the
20  reasonable suspicion standard at TSDB?
21         We've done this a few times.
22         MS. POWELL:  I'm instructing the witness

395

1   not to answer on the grounds of the law
2   enforcement privilege and potentially state
3   secrets.
4      Q.  How many -- I know the answer, but I
5   have to ask.
6          How many exceptions are there to the
7   TSDB's inclusion standard?
8          MS. POWELL:  I'm instructing the witness
9   not to answer on the grounds of the law
10  enforcement privilege.
11     Q.  Who created the exceptions to the TSDB
12  inclusion standard?
13         MS. POWELL:  Actually I think that a
14  comprehensive answer to that might require
15  disclosure of deliberative process or law
16  enforcement privileged information, but you can
17  answer at a level of generality.
18         THE WITNESS:  I believe they're agreed
19  upon by the WAC and approved by the NSC.
20         MR. ABBAS:  We might have one more.  Do
21  you have anything else?
22         MS. POWELL:  I don't think so.

396

1          MR. ABBAS:  Okay.
2          MS. POWELL:  I'm just checking to make
3   sure I didn't miss any notes.
4   BY MR. ABBAS:
5      Q.  Do the exceptions to the TSDB inclusion
6   standards apply only to non-U.S. persons?
7          MS. POWELL:  Objection.
8          I'm going to instruct the witness not to
9   answer on the grounds of the law enforcement
10  privilege.
11     Q.  Do the exceptions to the TSDB inclusion
12  standard apply only to U.S. persons?
13         MS. POWELL:  What?
14         MR. ABBAS:  It's the opposite of what I
15  asked.
16         MS. POWELL:  I'm instructing the witness
17  not to answer on the grounds of the law
18  enforcement privilege, yeah.
19  BY MR. ABBAS:
20     Q.  How many -- did I --
21         MS. POWELL:  You asked.  I objected.
22         MR. ABBAS:  Okay.  Thank you very much,

Case 1:16-cv-00375-AJT-JFA   Document 306-31   Filed 03/12/19   Page 102 of 102 PageID#
14633
Transcript of Matthew J. DeSarno, Designated Representative
Conducted on April 9, 2018

100 (397 to 400)

397

1  Mr. DeSarno.  I understand that you have a very
2  important job and I appreciate you taking the time
3  today to speak with us.  Thank you very much.
4        THE WITNESS:  Thank you.
5        MR. ABBAS:  Read and sign, electronic.
6        MS. POWELL:  Yeah, all that.
7        (Off the record at 6:59 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

399

1  DISTRICT OF COLUMBIA )
2
3        I, Matthew Goldstein, RPR, Notary Public
4  within and for the District of Columbia, do hereby
5  certify:
6
7        That I reported the proceedings in the
8  within entitled matter, and that the within
9  transcript is a true record of said proceedings.
10 Reading was requested.
11
12       I further certify that I am not related
13 to any of the parties to the action by blood or
14 marriage, and that I am in no way interested in
15 the outcome of this matter.
16
17       IN WITNESS WHEREOF, I have hereunto set
18 my hand this 15th day of April, 2018.
19
20       _____
21            Matthew Goldstein, RPR
22

398

1       A C K N O W L E D G E M E N T
2
3  DISTRICT OF COLUMBIA )
4
5        I, MATTHEW J. DESARNO, hereby
6  certify, I have read the transcript of my
7  testimony taken under oath in my deposition of
8  April 9, 2018; that the transcript is a true,
9  complete and correct record of what was asked,
10 answered and said during this deposition, and that
11 the answers on the record as given by me are true
12 and correct.
13
14       _____
15            MATTHEW J. DESARNO
16
17 Sworn and subscribed to before me
18 this _____ day of _____, 2018.
19
20 _____
21      Notary Public
22