# Elhady Plaintiffs
# MSJ Exhibit 29



# Transcript of Hao-y Tran Froemling, Designated Representative

**Date:** October 4, 2018
**Case:** El Hady, et al. -v- Kable, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

---

**Page 1**

```
1              UNITED STATES DISTRICT COURT
2              EASTERN DISTRICT OF VIRGINIA
3                  ALEXANDRIA DIVISION
4    - - - - - - - - - - - - x
5    ANAS ELHADY, et al.,      :
6            Plaintiffs,       :
7        v.                    :   Case No.
8    CHARLES H. KABLE,         :   16-cv-00375
9    Director of the           :
10   Terrorist Screening       :
11   Center; in his            :
12   official capacity, et     :
13   al.;                      :
14           Defendants.       :
15   - - - - - - - - - - - - x
16         Deposition of Hao-y Tran Froemling
17                  Washington, DC
18            Thursday, October 4, 2018
19                  10:40 a.m.
20   Job No.: 209464
21   Pages: 1 - 107
22   Reported By: Katy M. Zamora, CRR, RMR
```

---

**Page 2**

```
1        Deposition of Hao-y Tran Froemling held at the
2    offices of:
3
4
5              U.S. Department of Justice
6              Civil Division
7              1100 L Street, Northwest
8              Washington, DC 20005
9              (202) 514-2000
10
11
12
13
14       Pursuant to notice, before Katy M. Zamora, CRR,
15   RMR, Notary Public in and for the District of
16   Columbia.
17
18
19
20
21
22
```

---

**Page 3**

```
1        A P P E A R A N C E S
2    ON BEHALF OF PLAINTIFFS:
3        CAROLYN HOMER, ESQUIRE
4        GADEIR ABBAS, ESQUIRE
5        LENA F. MASRI, ESQUIRE (via telephone)
6        COUNCIL ON AMERICAN-ISLAMIC RELATIONS
7        453 New Jersey Avenue, Southeast
8        Washington, DC 20003
9        (202) 488-0833
10
11   ON BEHALF OF DEFENDANTS:
12       ANTONIA KONKOLY, ESQUIRE
13       CHRISTOPHER HEALY, ESQUIRE
14       UNITED STATES DEPARTMENT OF JUSTICE
15       1100 L Street, Northwest
16       Washington, DC 20005
17       (202) 514-2000
18
19
20
21
22
```

---

**Page 4**

```
1    A P P E A R A N C E S   C O N T I N U E D
2    ON BEHALF OF DEFENDANTS:
3        CONSTANTINA GLOVER, ESQUIRE
4        RACHEL MANN, ESQUIRE
5        U.S. CUSTOMS AND BORDER PROTECTION
6        U.S. DEPARTMENT OF HOMELAND SECURITY
7        1300 Pennsylvania Avenue, Northwest
8        Suite 4.4B
9        Washington, DC 20229
10       (202) 344-3694
11
12       JENNIFER GREENBAND, ESQUIRE
13       KEVIN HOULIHAN, ESQUIRE
14       KATHLEEN GANNON, ESQUIRE
15       U.S. DEPARTMENT OF HOMELAND SECURITY
16       TRANSPORTATION SECURITY ADMINISTRATION
17       601 South 12th Street
18       12th Floor, East Tower
19       Arlington, Virginia 20598
20       (571) 227-4294
21   ALSO PRESENT:
22       JOSEPH VELAZQUEZ, Videographer
```

---

**Page 5**

```
1          C O N T E N T S
2   EXAMINATION OF HAO-Y TRAN FROEMLING        PAGE
3     By Ms. Homer                             6
4
5
6          E X H I B I T S
7        (Attached to the transcript)
8   FROEMLING DEPOSITION EXHIBITS              PAGE
9     Exhibit 1 Notice of 30(B)(6) Deposition   8
10    Exhibit 2 Froemling Declaration          19
11    Exhibit 3 Quiet Skies Program Description 58
12    Exhibit 4 NPR Story                      101
13
14
15
16
17
18
19
20
21
22
```

**Page 7**

1    THE VIDEOGRAPHER:  Okay.  Would -- the court
2  reporter today is Katy Zamora representing Planet
3  Depos.  Would the reporter please swear in the
4  witness?
5  Whereupon,
6        HAO-Y TRAN FROEMLING,
7  being first duly sworn or affirmed to testify to the
8  truth, the whole truth, and nothing but the truth,
9  was examined and testified as follows:
10      EXAMINATION BY COUNSEL FOR PLAINTIFFS
11 BY MS. HOMER:
12   Q  Okay.  Ms. Froemling, I deposed you as a
13 representative of the TSA back in March, correct?
14   **A  Correct.**
15   Q  You remember that?
16   **A  Yes.**
17   Q  And so you remember generally how a
18 deposition works?
19   **A  Yes.**
20   Q  Okay.  You understand you're under oath?
21   **A  Yes.**
22   Q  Is there any medical or other reason

---

**Page 6**

1        P R O C E E D I N G S
2      THE VIDEOGRAPHER:  Here begins disc number
3  one in the videotaped deposition of Hao-y Tran
4  Froemling in the matter of Elhady, et al.,
5  v. Kable, et al., in the United States District
6  Court for the Eastern District of Virginia, case
7  number 16-cv-375.
8      Today's date is October 4, 2018.
9      The time on the video monitor is 10:40 a.m.
10     The videographer today is Joseph Velazquez
11 representing Planet Depos.
12     This video deposition is taking place at
13 1100 L Street, Northwest, Washington, D.C.
14     Would counsel please voice identify
15 themselves and state who they represent.
16     MS. HOMER:  This is Carolyn Homer with the
17 Council on American-Islamic Relations representing
18 plaintiffs; and joining me shortly will be Gadeir
19 Abbas, also for plaintiffs; and on the phone is Lena
20 Masri for plaintiffs.
21     MS. KONKOLY:  Antonia Konkoly for the U.S.
22 Department of Justice for the defendants.

**Page 8**

1  preventing you from providing truthful testimony
2  today?
3    **A  No.**
4    Q  Can you turn in your binder to what's marked
5  as tab one.
6        (Froemling Deposition Exhibit 1 was
7  marked for identification and attached to the
8  transcript.)
9    Q  Do you recognize this deposition notice?
10   **A  Yes.**
11   Q  Have you seen it before today?
12   **A  Yes.**
13   Q  Are you prepared to testify on behalf of the
14 TSA on the three topics listed on this notice?
15   **A  Yes.**
16   Q  Okay.  As an initial matter, Ms. Froemling,
17 the Federal Air Marshal Service is the subcomponent
18 of the TSA, correct?
19   **A  Correct.**
20   Q  Okay.  And the TSA has the authority to
21 direct the actions of the Federal Air Marshal
22 Service?

**9**

1      A  Correct.

2      Q  Okay.  Ms. Froemling, does the TSA engage in

3  intelligence collection on passengers in airports?

4      A  No.

5         MS. KONKOLY:  Can I get an objection?

6         MS. HOMER:  Yes.

7         MS. KONKOLY:  Objection insofar as the

8  complete answer would call for information protected

9  by SSI.  You can answer the best you can.

10     A  No.

11     Q  What is Federal Air Marshal special mission

12  coverage?

13     A  So --

14        MS. KONKOLY:  I'm sorry.  Objection insofar

15  as the complete answer would call for information

16  protected by SSI.  You can answer insofar as you

17  can.

18     A  So the Federal Air Marshals are charged with

19  the mission of securing the aircraft for aviation

20  security and protection of passengers and crew.  So

21  part of their -- their mission is to be on board

22  flights, and that includes special mission coverage

**10**

1  when they are assigned to flights to protect

2  aviation security.

3      Q  As part of special mission coverage, do

4  Federal Air Marshals observe the behavior of

5  specific passengers?

6         MS. KONKOLY:  Objection insofar as the

7  complete answer would call for any information

8  protected by SSI.  You can answer insofar as you

9  can.

10     A  As also referencing in my declaration that

11  the Federal Air Marshals are charged with, as part

12  of their security and law enforcement purposes,

13  observing passengers.

14     Q  Okay.  Do Federal Air Marshals prepare

15  reports on the observations they engage in of

16  passengers?

17        MS. KONKOLY:  Objection insofar as the

18  answer calls for any information protected by SSI.

19  Again, you can answer to the extent that you can.

20     A  So to the extent if they are noting any

21  suspicious activity, they do prepare reports related

22  to their mission and deployments.

**11**

1      Q  What is suspicious activity?

2         MS. KONKOLY:  Objection insofar as that

3  answer -- the complete answer would call for any

4  information protected by SSI.  You can answer to the

5  extent that you can.

6      A  So related to as -- our Federal Air Marshals

7  are law enforcement officers, and they are trained

8  to observe activities of passengers and securing the

9  cabin of the aircraft, as well as to secure the

10  aviation security.

11        They are looking for, as part of their law

12  enforcement activities, any activities that may

13  potentially cause harm or endanger the aircraft or

14  passengers and crew.  So their suspicious activity

15  would be actions that seem out of the ordinary or

16  anomalous behavior, something that could potentially

17  endanger.

18     Q  If a Federal Air Marshal observes suspicious

19  activity, do they document that in a report?

20        MS. KONKOLY:  Objection insofar as the

21  answer calls for any information protected by SSI.

22  You can answer to the extent that you can.

**12**

1      A  They do make notes if there is suspicious

2  activity.

3      Q  What are those reports called?

4         MS. KONKOLY:  Objection insofar as the

5  answer would call for any information protected by

6  SSI.  You can answer to the extent that you can.

7      A  I do not know the actual name of the report,

8  but it's primarily their FAMS mission reports.

9      Q  FAMS mission reports, okay.

10     A  High level.

11     Q  Are FAMS mission reports ever provided to

12  intelligence agencies?

13        MS. KONKOLY:  Objection insofar as the

14  answer would call for any information protected by

15  SSI.  You can answer to the extent that you can.

16     A  At a high level related to their law

17  enforcement duties as part of aviation security and

18  homeland security mission.  If there is information

19  that rises to the level, depending on what it is

20  that's identified requires further referral or

21  investigation, they will provide it if it's -- for

22  example, if it's related to terrorist-related

**13**

1  activities, it may be referred to other agencies.

2     Q  Why do FAMS mission reports provided to

3  other agencies, including intelligence agencies, not

4  constitute intelligence collection on passengers at

5  airports?

6        MS. KONKOLY:  Objection insofar as the

7  answer calls for any information protected by SSI.

8  You can answer to the extent that you can.

9     A  So the FAMS are performing -- their primary

10  objective is to secure and provide aviation security

11  and law enforcement -- provide the law enforcement

12  presence to secure the aircraft, protect passengers

13  and crew on flights.

14        Their primary purpose is to thwart any

15  potential harm that may come in that mission.

16  Should any activities occur, be it -- whether it's

17  law enforcement related or other -- if it rises to

18  terrorist activity or something that occurs, that is

19  the point at which it would be forwarded.

20        It is not intelligence collection.  Their

21  purpose is not to observe and perform intelligence

22  collection.  As stated in my prior testimony, we do

**14**

1  not perform intelligence collection.  The FAMS are

2  performing their law enforcement duties to observe

3  passengers and aircraft and monitor for potential

4  activities that may cause harm.  That is not

5  intelligence collection.  That is performing law

6  enforcement and aviation security mission.

7     Q  In the course of FAMS performing their law

8  enforcement mission, would it be fair to

9  characterize some of the information they obtained

10  during that mission as intelligence?

11        MS. KONKOLY:  Objection insofar as the

12  answer would call for any information protected by

13  SSI.  You can answer to the extent that you can.

14     A  In the broader scheme, as part of their law

15  enforcement mission, they are securing the aircraft.

16  If there's additional information that is later

17  determined to warrant further investigation or rises

18  to the level of providing additional information

19  related to terrorist activity or other capabilities

20  or operational activities that relate to adversarial

21  actions, that could be -- become then

22  intelligence -- provided for intelligence

**15**

1  information and further review.

2     Q  So in some circumstances, particularly

3  related to terrorism, FAMS do provide information to

4  intelligence agencies?

5        MS. KONKOLY:  Objection insofar as the

6  answer calls for any information protected by SSI.

7  Objection, mischaracterizes prior testimony.  You

8  can answer to the extent that you can.

9     A  Correct.  Information that is observed in

10  the course of performing their law enforcement and

11  aviation security mission, they will, if necessary,

12  be referred to the appropriate agency.  Same thing

13  if criminal activity is observed, it is forwarded to

14  the appropriate law enforcement agencies.  If there

15  is information that may rise and be related to

16  terrorist-related activities, it may be referred to

17  intelligence agencies, to answer your question.

18     Q  What are the intelligence agencies that the

19  Federal Air Marshal Service may supply information

20  to?

21        MS. KONKOLY:  Objection insofar as the

22  answer calls for any information protected by SSI.

**16**

1  You can answer to the extent that you can.

2     A  So broadly, it would depend on the

3  information.  When it rises to terrorist-related

4  activities, we do share that information with the

5  FBI and the National Counterterrorism Center, but it

6  would very much depend on the information on a

7  particular activity.

8     Q  Does the TSA maintain any list separate from

9  the terrorist screening database, which are designed

10  to identify high-risk passengers?

11        MS. KONKOLY:  Objection insofar as the

12  complete answer would call for any information

13  protected by SSI, and objection also as to the scope

14  of the deposition, but you can answer to the extent

15  that you can.

16     A  So related to my prior testimony, we had

17  discussed rules-based passengers where they are not

18  specific lists direct.  However, we do have

19  high-risk passengers where they may be derived based

20  on rules that then are utilized to identify

21  high-risk passengers.

22        And to your question of any other lists

17

1 outside of the TSDB, keeping within the scope, in my
2 prior testimony we had also discussed that there are
3 other watch lists, to include the CDC and "Do Not
4 Board" lists, that would be deemed higher risk.
5    Q  What is Quiet Skies?
6       MS. KONKOLY:  Objection insofar as the
7 answer would call for any information protected by
8 SSI.  You can answer to the extent that you can.
9    A  So per my declaration, the Quiet Skies is
10 one of TSA's high-risk, rules-based passenger
11 programs related to TSA's risk-based,
12 intelligence-driven rules to identify passengers
13 that may present an elevated risk.
14    Q  And is every passenger currently subject to
15 Quiet Skies rules compiled on a single list
16 somewhere?
17       MS. KONKOLY:  Objection insofar as the
18 answer calls for any information protected by SSI.
19 You can answer to the extent that you can.
20    A  So as discussed previously, it is not a list
21 direct similar to the watch list.  What we have is
22 we run a series of risk-based, intelligence-driven

18

1 rules that then derive -- are matched up against a
2 list of passengers.  So, in effect, in order to
3 execute it via our secure flight program, there is a
4 list in order to be able to effect Quiet Skies and
5 designate passengers for higher risk and enhanced
6 screening.
7    Q  In addition to Quiet Skies, does the TSA
8 have any other programs based off of the operation
9 of high-risk rules?
10       MS. KONKOLY:  Objection insofar as the
11 answer calls for any information protected by SSI.
12 You can answer to the extent that you can.
13    A  Yes.  So per my declaration, Quiet Skies is
14 one of our rules-based programs.  Yes, we do have --
15 Quiet Skies is one of our rules-based programs to
16 identify higher risk passengers.
17    Q  What are the names of the TSA's other
18 rules-based programs to identify high-risk
19 passengers?
20       MS. KONKOLY:  Objection insofar as an answer
21 calls for any information protected by SSI, but you
22 can answer to the extent that you can.

19

1    A  So as discussed in my declaration, we have
2 international-based and international-based subsets
3 for domestic screening operations, which is Quiet
4 Skies.  We also have -- the name for the
5 international-based rules is Silent Partner.
6    Q  I will just confess, I'm slightly confused.
7 You used the word "international" for both of those.
8 So what's the difference between Quiet Skies and
9 Silent Partner?
10       MS. KONKOLY:  Objection insofar as that the
11 answer calls for any information protected by SSI,
12 but you can answer to the extent that you can.
13    A  So may I refer to my declaration?
14    Q  Yeah.  Let's go ahead and just mark that.
15 So the -- it's tab two we will mark as Exhibit 2.
16       (Froemling Deposition Exhibit 2 was
17 marked for identification and attached to the
18 transcript.)
19    A  So on page 7 of 14, section 14, I discussed,
20 we have rules that designate passengers on
21 international flights for enhanced screening.  As I
22 just mentioned, that is our reference to Silent

20

1 Partner.  Quiet Skies international rules that apply
2 to domestic screening operations are Quiet Skies
3 rules.
4    Q  If a flight is inbound from an international
5 flight to the United States, is that governed by
6 Quiet Skies or Silent Partner?
7       MS. KONKOLY:  Objection insofar as the
8 answer could call for any information protected by
9 SSI, but you can answer to the extent that you can.
10    A  As discussed, as that relates to
11 international, that is Silent Partner.
12    Q  Okay.  And if a flight is leaving the United
13 States and flying to a foreign country, is that also
14 Silent Partner?
15       MS. KONKOLY:  Objection insofar as the
16 answer calls for any information protected by SSI.
17 You can answer to the extent that you can.
18    A  So that applies to our domestic screening
19 operations, so that is Quiet Skies.
20    Q  Okay.  And if a flight is simply between two
21 domestic airports, is that also Quiet Skies?
22       MS. KONKOLY:  Again, objection insofar as

21

1  the answer calls for anything protected by SSI, but
2  you can answer to the extent that you can.
3      **A  Quiet Skies refers to our domestic screening**
4  **operations, yes.**
5      Q  And for -- does TSA perform any rules-based
6  screening on international airport to international
7  airport flights?
8      MS. KONKOLY:  Objection insofar as the
9  answer would call for any information protected by
10 SSI.  You can answer to the extent that you can.
11     **A  So just to clarify your question, does TSA**
12 **perform rule-based prescreening or physical**
13 **screening?  I just want to clarify the question.**
14 **Sorry.**
15     Q  Yeah.  Does the TSA run any rules against
16 the itineraries of individuals on
17 international-to-international flights?
18     MS. KONKOLY:  And I'm going to object that
19 that question calls for information protected by SSI
20 and instruct the witness not to answer on that
21 basis.
22     Q  Does the TSA cooperate with foreign

22

1  governments in the operation of Silent Partner?
2      MS. KONKOLY:  Objection insofar as that
3  question calls for any information protected by SSI,
4  but you can answer to the extent that you can.
5      **A  So just to confirm the question, does the**
6  **TSA cooperate with other foreign governments?  TSA**
7  **operates Silent Partner.  Know that is primarily TSA**
8  **executing that.  It is not with foreign governments.**
9      Q  Does the TSA share the results of the
10 operation of the high-risk Silent Partner rules with
11 any foreign government agencies?
12     MS. KONKOLY:  And, again, objection insofar
13 as the answer calls for any information protected by
14 SSI.  You can answer to the extent that you can.
15     **A  So TSA by its policy and procedures, we do**
16 **not, as a norm, share any of the results of the**
17 **rules direct to the rules.  What we do is we operate**
18 **these rules-based programs to identify passengers**
19 **requiring enhanced screening.  So we're -- go ahead.**
20     Q  Does the TSA tell any foreign governments
21 that they should subject international passengers to
22 enhanced screening?  Objection insofar as that

23

1  question calls for any information protected by SSI,
2  also as to the scope of the designated topics for
3  this deposition, but you can answer if you can.
4      **A  So at a high level TSA does not perform the**
5  **screening abroad, so for international passengers**
6  **there is a cooperation where we have requirements on**
7  **carriers abroad to -- and airports' requirements to**
8  **perform screening prior to passengers boarding**
9  **aircraft.**
10     **So insofar as TSA -- and I also discussed in**
11 **my prior testimony -- provides the designation of**
12 **whether individuals should receive enhanced**
13 **screening, that information shared is not specific**
14 **to just the rules.  TSA provides back to the**
15 **carriers which passengers are required to undergo**
16 **enhanced screening.**
17     Q  So foreign governments conducting screening
18 of international passengers are made aware that the
19 TSA requires enhanced screening on those passengers?
20     MS. KONKOLY:  Objection insofar as the
21 answer calls for any information protected by SSI,
22 and, again, as to the scope of the designated topics

24

1  for the deposition, but you can answer if you can.
2      **A  Right.  So per my prior statement, to the**
3  **extent that they are made aware that there are**
4  **individuals that TSA has designated for enhanced**
5  **screening, they are aware and made aware via the**
6  **designation via TSA to the carrier of passengers**
7  **that have been designated to receive enhanced**
8  **screening.**
9      Q  Where did the name Silent Partner come from?
10     MS. KONKOLY:  Objection insofar as that
11 question calls for any information protected by SSI,
12 but you can answer if you can.
13     **A  I'm not sure I can answer other than as TSA**
14 **worked to implement the execution.  I was not there**
15 **when they were creating the name.**
16     Q  Yeah.  Who's the "partner" in Silent
17 Partner?
18     MS. KONKOLY:  Objection, vague.  Objection
19 insofar as the answer could call for any information
20 protected by SSI.  You can answer if you can.
21     **A  It is not intended to be -- there is no**
22 **direct partner.  The intent is that Silent Partner**

25

1    are those individuals on international-related
2    flights that have been identified via TSA's
3    high-risk rules that require enhanced screening.
4    There's no intended partner that I am aware of.
5        Q  Does partner --
6        MS. KONKOLY:  Can I just interject to say
7    that the whispering from counsel is somewhat
8    distracting, and we'd appreciate if you could pass
9    notes instead.
10       MR. ABBAS:  There's going to be some
11   whispering.
12       MS. KONKOLY:  Not during the witness'
13   testimony, please.
14       MR. ABBAS:  Go ahead.
15       Q  Why is Silent Partner called silent?
16       MS. KONKOLY:  Objection.  Asked -- I'm
17   sorry.  Objection, vague.  Objection insofar as the
18   answer calls for any information protected by SSI.
19   You can answer if you can.
20       A  I do not have the information regarding how
21   the name was decided.  I can answer to the construct
22   of they are high-risk rules.  They're designated to

26

1    identify and implemented to mitigate threats to
2    aviation security and to homeland security, identify
3    passengers that may present a higher risk.
4        Q  In addition to Quiet Skies and Silent
5    Partner, does the TSA have any other programs that
6    are based on the operation of high-risk rules?
7        MS. KONKOLY:  Objection insofar as the
8    question calls for any information protected by SSI.
9    You can answer to the extent that you can.
10       A  So per my declaration, we know we have
11   Silent Partner and Quiet Skies that are the
12   operations of our high-risk rules for identifying
13   high-risk passengers.
14       Q  So it's just those two?
15       MS. KONKOLY:  Same objections.
16       A  Yes.
17       Q  What is your understanding of who or what is
18   the partner in Silent Partner?
19       MS. KONKOLY:  Objection, asked and answered.
20   Objection, vague.  Objection insofar as the question
21   calls for any information protected by SSI, but you
22   can answer if you can.

27

1        A  As I've previously stated, I do not have the
2    background regarding the creation of the actual
3    name.  It is intended to and as part of my
4    declaration for international flights and travelers
5    we coordinate to identify rules that would identify
6    potential travel patterns or terrorist-related --
7    terrorist-related travel patterns or tradecraft and
8    identify rules that may designate passengers that
9    would have an elevated risk.  So --
10       Q  You just said we coordinate.  Who is the --
11       A  We, TSA.
12       MS. KONKOLY:  Objection insofar as the
13   question calls for any information protected by SSI.
14       Q  Let me kind of make the question more
15   precise for the record.  You just said we
16   coordinate.  Who is the "we" that is coordinating on
17   the rules?
18       MS. KONKOLY:  And let me put the objection
19   in, insofar as it calls for any information
20   protected by SSI, but you can answer if you can.
21       A  So TSA, the Office of Intelligence and
22   Analysis, reviews current intelligence purporting to

28

1    identify threats to aviation security and to
2    homeland security.  We identify potential rules that
3    would mitigate threats that have been identified,
4    and I derived the rules.  The coordination, as
5    discussed in my declaration, is we do work with CBP
6    to implement the rules.
7        So when I say coordinate, we use their
8    system, ATS, to implement our rules to identify
9    high-risk passengers on international flights and
10   then the subset is Quiet Skies for our domestic
11   operations, which is implemented by TSA.
12       Q  In addition to CBP, does the TSA coordinate
13   with any other federal foreign agencies --
14       MS. KONKOLY:  Objection --
15       Q  -- in the creation or implementation of
16   high-risk rules?
17       MS. KONKOLY:  Objection insofar as the
18   answer calls for information protected by SSI.  You
19   can answer -- and law enforcement privilege.  You
20   can answer to the extent that you can.
21       A  TSA derives the rules.  TSA does an
22   independent assessment of the intelligence and

Transcript of Hao-y Tran Froemling, Designated Representative

8 (29 to 32)

Conducted on October 4, 2018

---

29

1  creates the rules. We do not coordinate the
2  creation of the rules with any -- with other federal
3  agencies or foreign governments, to answer your
4  question.
5      Q  What sources of intelligence is TSA deriving
6  the rules from?
7      MS. KONKOLY:  Objection insofar as the
8  answer calls for anything protected by SSI,
9  potentially state secrets, and also the law
10  enforcement privilege. You can answer to the --
11      Q  Let me ask that question a better way. What
12  other agencies are communicating intelligence to the
13  TSA that forms the basis of high-risk rules?
14      MS. KONKOLY:  And I'm going to object
15  insofar as the answer calls for anything protected
16  by SSI or the law enforcement privilege, and I'm
17  going to instruct the witness not to answer.
18      Q  Is the FBI an agency that provides TSA with
19  information that informs the creation of high-risk
20  rules?
21      MS. KONKOLY:  I'm going to state the same
22  objections, SSI, law enforcement privilege; and I'm

---

30

1  going to again instruct the witness not to answer.
2      Q  Is the CIA an agency that provides
3  information to the TSA that informs the creation of
4  high-risk rules?
5      MS. KONKOLY:  Same objections, SSI, law
6  enforcement privilege; and I'm again instructing the
7  witness not to answer.
8      Q  Is the National Security Council an agency
9  that provides intelligence information to the TSA
10  that informs the creation of high-risk rules?
11      MS. KONKOLY:  Same objections, SSI, law
12  enforcement privilege; and I'm instructing the
13  witness not to answer.
14      Q  What is the relationship between the TSA's
15  high-risk rules and the terrorist screening
16  database?
17      MS. KONKOLY:  Objection insofar as the
18  answer calls for any information protected by SSI or
19  the law enforcement privilege. You can answer to
20  the extent that you can.
21      A  So as discussed in my declaration, I view
22  them as separate. The rules -- high-risk rules are

---

31

1  not -- they are not the same as our process for
2  watch list matching for passengers on the no-fly and
3  selectee list.
4      The high-risk rules are identification of
5  passengers that have an elevated risk. They are
6  derived from intelligence -- current intelligence
7  reporting to mitigate threats to aviation security
8  and homeland security.
9      The rules themselves or matching to the rule
10  are not -- those that match to the rule are not in
11  and of themselves -- they are separate. They are
12  not the -- we do not consider the high-risk rules
13  matches those as the same as the TSDB watch list
14  matching.
15      Q  Do the high-risk rules themselves cross
16  reference any TSDB information?
17      MS. KONKOLY:  Objection, that answer calls
18  for information protected by SSI, and I'm
19  instructing the witness not to answer, and the law
20  enforcement privilege.
21      Q  Does the operation of high-risk rules cross
22  reference any phone numbers associated with TSDB

---

32

1  listees?
2      MS. KONKOLY:  Objection, that question calls
3  for information protected by SSI, potentially the
4  state secrets privilege, the law enforcement
5  privilege. And I'm instructing the witness not to
6  answer.
7      Q  Does the operation of high-risk rules cross
8  reference any family members that may be associated
9  with TSDB listees?
10      MS. KONKOLY:  I'm going to again object on
11  the basis of SSI, the law enforcement privilege, and
12  I'm instructing the witness not to answer.
13      Q  Does the operation of high-risk rules cross
14  reference any email addresses associated with TSDB
15  listees?
16      MS. KONKOLY:  I am again objecting on the
17  basis of SSI, the law enforcement privilege, and
18  instructing the witness not to answer.
19      Q  Does the operation of high-risk rules ever
20  lead to the collection of information on the
21  passengers flagged by the rules that then leads to
22  that passenger's nomination to the TSDB?

---

33

1      MS. KONKOLY:  Objection, vague.  Objection
2  insofar as the answer calls for any information
3  protected by SSI and the law enforcement privilege.
4  You can answer to the extent that you can.
5      **A  So to date in our operation of high-risk**
6  **rules, we have not identified any reporting specific**
7  **to the rules that have been -- to make sure I'm**
8  **answering your question, can you confirm the last**
9  **part of your question just to make sure I'm**
10  **answering it?**
11      MS. HOMER:  Can you read it back?
12      (The Reporter read the record as
13  follows:  Does the operation of high-risk rules ever
14  lead to the collection of information on the
15  passengers flagged by the rules that then leads to
16  that passenger's nomination to the TSDB?)
17      MS. KONKOLY:  And same objections.
18      **A  So as stated previously, we do not perform**
19  **intelligence collection, and as I described, we are**
20  **performing law enforcement observations to secure**
21  **the crew.  The -- by virtue of being a match to a**
22  **rule does not lead automatically to a nomination to**

34

1  **the TSDB.  To date those observations as performed**
2  **have not led to nominations to the TSDB.**
3      Q  Has the TSA ever nominated a Quiet Skies
4  selectee to the TSDB?
5      MS. KONKOLY:  Objection insofar as the
6  answer calls for any information protected by SSI or
7  potential law enforcement privilege.  You can answer
8  to the extent that you can.
9      **A  To date, TSA, by virtue of being a Quiet**
10  **Skies rules-based passenger, has not nominated a**
11  **Quiet Skies rules-based passenger to the TSDB.**
12      Q  Has the TSA ever nominated a Quiet Skies
13  selectee who was subjected to Federal Air Marshal
14  scrutiny to the TSDB?
15      MS. KONKOLY:  Objection insofar as the
16  answer calls for any information protected by SSI or
17  the law enforcement privilege.  You can answer to
18  the extent that you can.
19      **A  I believe I just answered that, in that**
20  **Quiet Skies passengers' observations from our**
21  **Federal Air Marshals for being a Quiet Skies**
22  **rules-based passenger have not led to the**

35

1  passenger's nomination to the TSDB.
2      Q  TSA Administrator Pekoske testified to
3  Congress on September 5 that Quiet Skies had led to
4  nominations to the watch list; is that correct?
5      MS. KONKOLY:  I'm going to ask first that
6  the witness be provided a copy of the testimony
7  you're referencing.
8      Q  Are you familiar with that -- are you
9  familiar that Administrator David Pekoske testified
10  to Congress on September 5?
11      **A  Yes.**
12      Q  Did you attend that hearing?
13      **A  No.**
14      Q  Did you read the testimony from that
15  hearing?
16      **A  I've read portions of the testimony.**
17      Q  Did you review the video of that hearing?
18      **A  No.**
19      MS. HOMER:  Can we take a quick break?
20      MS. KONKOLY:  Sure.
21      THE VIDEOGRAPHER:  Please stand by.  We are
22  going off the record.  The time is 11:14 a.m.

36

1      (Off the record.)
2      THE VIDEOGRAPHER:  We are back on the
3  record.  The time is 10:32 a.m. (sic).
4      MS. KONKOLY:  And just a brief clarification
5  before we move onto the next question.  There was a
6  line of questioning in which I objected and
7  instructed the witness not to answer.  We understood
8  that line of questioning to be getting to the
9  content of the Quiet -- or the rules-based
10  targeting, and I just wanted to clarify that that is
11  the understanding that we had of those questions on
12  which we based those objections.
13  BY MS. HOMER:
14      Q  Okay.  One cleanup question from that, does
15  the TSA's rules-based programs rely on terrorist
16  screening database information in any capacity?
17      MS. KONKOLY:  Objection insofar as the
18  answer would call for information protected by SSI
19  and the law enforcement privilege.  And again, I
20  need to instruct the witness not to answer.
21      Q  Okay.  So before the break I referenced
22  testimony by Chairman Pekoske that he gave to

37

1 Congress, specifically the Senate, I believe,
2 Transportation Oversight Committee on September 5,
3 2018. Senator Markey in a portion of that
4 deposition was asking Administrator Pekoske about
5 the Quiet Skies program.
6        That testimony, it's about an hour and a
7 half long, and it is recorded by C-SPAN at
8 C-span.org/video/?451104-1/
9 TransportationSecurityAdministrationOversight.
10       MS. KONKOLY: Counsel, I'll just note what I
11 stated off the record which is that that's the URL
12 that is live today, but we would ask you to create a
13 permalink for that to preserve the testimony for the
14 record.
15       MS. HOMER: We are happy to do so. Starting
16 at the 1-hour, 8-minute, and 38-second portion,
17 there is a question from Senator Markey that Pekoske
18 answers that I am now going to play.
19       MR. ABBAS: Ask to confirm that that's
20 Pekoske.
21       MS. HOMER: Oh, yes.
22       MS. KONKOLY: I'm going to ask that one

38

1 counsel from plaintiff's side ask the questions.
2        MR. ABBAS: I did not ask a question of the
3 deponent.
4        Q All right. So first off, I want to show
5 this video of the URL or the picture. Is this TSA
6 Administrator Pekoske?
7        **A Yes.**
8        Q Okay. Now we're going to play this
9 question.
10       "MR. PEKOSKE: I don't have that information
11 off the top of my head.
12       SENATOR MARKEY: How many individuals
13 surveilled under the Quiet Skies program have been
14 arrested or prosecuted?
15       MR. PEKOSKE: I don't believe anybody has
16 been arrested or prosecuted. However, people that
17 are in the Quiet Skies program have eventually been
18 determined to be part of a larger selectee pool
19 based on what the Quiet Skies program --
20       SENATOR MARKEY: I appreciate that, but no
21 one has been arrested or --
22       MR. PEKOSKE: No, sir.

39

1        SENATOR MARKEY: -- prosecuted yet? And how
2 many threat --"
3        Q Did you hear that testimony?
4        **A I did.**
5        Q What is your understanding of what
6 chairman -- or Administrator Pekoske meant when he
7 said that individuals who are a part of the Quiet
8 Skies program had later been determined to be part
9 of a broader selectee pool?
10       MS. KONKOLY: Objection, calls for
11 speculation. Objection insofar as the answer would
12 call for any information protected by SSI or the law
13 enforcement privilege, but you can answer to the
14 extent that you can.
15       **A Okay. So my understanding, and in line with**
16 **my previous statement, TSA has not nominated any**
17 **individuals related to Quiet Skies for being Quiet**
18 **Skies passengers to the TSDB.**
19       **My understanding of his testimony is TSA --**
20 **it has been identified that past -- Quiet --**
21 **individuals that have matched to Quiet Skies rules**
22 **have subsequently been added to the TSDB as known or**

40

1 **suspected terrorists.**
2        Q Were those individuals who had matched to
3 Quiet Skies rules and who were subsequently added to
4 the TSDB as known or suspected terrorists on the
5 Quiet Skies list at the time of their nomination to
6 the TSDB?
7        MS. KONKOLY: Objection insofar as the
8 answer would call for any information protected by
9 SSI or the law enforcement privilege. You can
10 answer to the extent that you can.
11       **A I do not know for fact. I do know at a high**
12 **level the way we perform our passenger prescreening**
13 **and secure flight is we do conduct match it --**
14 **passenger matching to identify if there are any**
15 **individuals on the no-fly or selectee, expanded**
16 **selectee list as discussed in my prior deposition.**
17       **So we conduct that match. If they match to**
18 **that, they would be identified as such. Separate to**
19 **that we also have our high-risk rules, TSA's**
20 **high-risk rules passengers.**
21       **Our system, the way I understand it is, if**
22 **you match to the TSDB to those lists, you would**

Transcript of Hao-y Tran Froemling, Designated Representative
Conducted on October 4, 2018

11 (41 to 44)

41

1 be -- we would note it as such. If you're not on
2 those lists, we would also have our Quiet Skies
3 rules list matches.
4     And so, thus, if an individual has been
5 flagged for enhanced screening because of Quiet
6 Skies -- I do not know this for fact, but my
7 assumption is is they were not at the time on the
8 TSDB's no-fly selectee, expanded selectee. What we
9 have identified though, has been confirmed is that
10 individuals subsequent to being noted and matched to
11 Quiet Skies rules have been added to the TSDB.
12    Q Individuals are only flagged by Quiet Skies
13 for either 90 days or three encounters, correct?
14    MS. KONKOLY: Objection. That question
15 calls for information protected by SSI, and I'm
16 instructing the witness not to answer.
17    MS. GREENBAND: Oh, sorry.
18    MS. KONKOLY: That stands.
19    Q Has the TSA ever stopped flagging someone as
20 Quiet Skies selectees and then nominated that person
21 to the TSDB?
22    MS. KONKOLY: Objection, vague. Objection

42

1 insofar as the question calls for any information
2 protected by SSI, but you can answer that if you
3 can.
4     A So to make sure I understand the question,
5 as I stated previously, we have not nominated
6 individuals to the TSDB as a result or as part of
7 being Quiet Skies rules.
8     Q Does being flagged as a Quiet Skies designee
9 in any way support a nomination to the TSDB?
10    MS. KONKOLY: Objection, vague. Objection,
11 calls for speculation. Objection insofar as the
12 answer calls for any information protected by SSI.
13 You can answer to the extent that you can.
14    A So as stated, my declaration simply matching
15 our rules are established to identify passengers
16 that present an elevated risk and are higher risk.
17 Simply matching to the rule does not identify them
18 as being a known or suspicious terrorist. We have
19 not nominated -- we do not automatically nominate
20 anybody that matches to our high-risk rules to the
21 watch list.
22    Q Is the same information that triggers a

43

1 high-risk rule ever equivalent to derogatory
2 information that supports nomination to the TSDB?
3     MS. KONKOLY: Objection, vague. Objection
4 insofar as that question calls for any information
5 protected by SSI. And I need to instruct the
6 witness not to answer, and also on the basis of the
7 law enforcement privilege.
8     Q If an individual is flagged as a Quiet Skies
9 selectee on the basis of their travel patterns, can
10 the same travel pattern support information
11 nominating them to the TSDB?
12    MS. KONKOLY: Objection, that question calls
13 for information protected by SSI and the law
14 enforcement privilege, and I'm instructing the
15 witness not to answer.
16    Q Are the same facts that underlie application
17 of a Quiet Skies rule ever used to support a TSDB
18 nomination?
19    MS. KONKOLY: Same objections. That
20 question calls for information protected by SSI,
21 law enforcement privilege, and I'm instructing the
22 witness not to answer.

44

1     Q Is the fact that an individual has been
2 flagged as a Quiet Skies selectee ever used in the
3 totality of the circumstances to support a
4 nomination to the TSDB?
5     MS. KONKOLY: Objection insofar as the
6 question calls for any information protected by SSI
7 and the law enforcement privilege, but you can
8 answer that one to the extent that you can.
9     A I'm sorry. So repeat the question. Is the
10 fact that an individual is a match to the -- I'm
11 sorry.
12    MS. HOMER: Can you read it back for me,
13 please.
14    (Pending question read.)
15    MS. KONKOLY: And the same objections.
16    A So what I can state and I will reiterate is
17 to date TSA has not nominated any individuals
18 from -- that have been identified as a Quiet -- a
19 match to the Quiet Skies rules to the TSDB. By
20 virtue of being a match to the Quiet Skies rules
21 does not -- also does not automatically go to a
22 nomination to a TSDB.

45

1      Circumstances in the totality, as discussed
2  in prior testimony, is there's multiple pieces of
3  information and criteria that would need to be met
4  to be nominated to the TSDB.
5      So I'm trying to be responsive.  I'm not
6  sure if I could say -- the fact that they were a
7  Quiet Skies match was used as part of a nomination
8  to the TSDB.  I can say for -- definitively TSA has
9  not provided nor nominated anyone from the Quiet
10 Skies to the TSDB.  However -- I'll leave it at
11 that.
12    Q  To the TSA's knowledge, has any other agency
13 nominated an individual who happened to be a Quiet
14 Skies selectee to the TSDB?
15      MS. KONKOLY:  I'm going to object that the
16 witness is here to testify on behalf of the TSA
17 only, so that is outside of the scope of the
18 deposition for today.  I'll also object based on
19 insofar as the answer calls for any information
20 protected by SSI, but you can answer that if you
21 happen to know, to the extent that you can.
22      Let me also interject to the law enforcement

46

1  privilege as well.  Again, you can answer to the
2  extent that you can.
3    A  So as stated earlier and after -- and also
4  for clarification questions of what the
5  administrator stated, I can not speak for other
6  agencies.  However, it has been identified -- the
7  individuals that have matched to Quiet Skies rules
8  but independent of TSA matching those individuals to
9  Quiet Skies rules have been added to the TSDB.
10    Q  Is Quiet Skies information ever used in
11 support of TSDB nominations?
12      MS. KONKOLY:  Objection insofar as the
13 question calls for any information protected by SSI
14 and the law enforcement privilege, but you can
15 answer that one to the extent that you can.
16    A  I believe I've answered that.  TSA has not
17 nominated individuals for -- based -- that have
18 matched the Quiet Skies rules to the TSDB.
19    Q  The operation of either Quiet Skies or
20 Silent Partner high-risk rules do not depend on an
21 individual being under investigation for any crime,
22 correct?

47

1      MS. KONKOLY:  Objection insofar as that
2  question calls for anything protected by SSI, but
3  you can answer to the extent that you can.
4    A  Correct.  These are based on rules that we
5  have derived from current intelligence reporting and
6  present -- to identify passengers that present an
7  elevated risk.  This is not related to, as you
8  stated, criminal -- specific criminal reporting of
9  individuals to then put them in as a list.
10    Q  Okay.  Can we turn to paragraph nine of your
11 declaration, which was previously marked as
12 Exhibit 2.  In paragraph nine, the third full
13 sentence reads, "Risk-based security increases
14 operational efficiency and security effectiveness by
15 allowing TSA to focus less on lower-risk travelers
16 and more on higher-risk passengers or those about
17 whom it knows less."
18      And then it continues, "Quiet Skies is one
19 of TSA's risk-based security programs that
20 identifies and addresses potential threats from
21 individuals who may intend harm to aviation security
22 but who are not in the TSDB."

48

1      Did I read that correctly?
2    A  You did read that correctly.
3    Q  What constitutes an individual who may
4  intend harm to aviation security but who is not in
5  the TSDB?
6      MS. KONKOLY:  Objection insofar as that
7  question calls for any information protected by SSI
8  or the law enforcement privilege, but you can answer
9  that to the extent that you can.
10    A  So as you stated, from a risk-based security
11 perspective, TSA is reviewing current intelligence
12 reporting to identify threats to aviation security
13 or homeland security.  As I discussed earlier, TSA
14 does perform matches against individuals in the TSDB
15 for the no-fly selectee, expanded selectee lists.
16      But we also -- there is a component of
17 unknown -- so the TSDB are for those individuals
18 that have met the reasonable suspicion standards to
19 be a known or suspected terrorist.  TSA also reviews
20 current intelligence reporting to identify threats
21 to aviation security and homeland security.
22      There is enough information there to know

49

1 that there are threats and for that, but we do not
2 know the actual individuals, right, and that's why
3 this is separate from the TSDB related matching that
4 we perform. We derive a series of rules to try to
5 mitigate that threat and any potential harm that may
6 come about because of that threat reporting.
7 So this is to address -- those rules are to
8 try to identify passengers who may present a higher
9 risk for which TSA -- where we have established this
10 to identify for enhanced screening to -- again, to
11 try to mitigate the potential higher risk that
12 passengers may present in mitigation of the aviation
13 security and homeland security threats.
14 Q Okay. In paragraph ten of your declaration,
15 you use the phrase "unknown or partially known
16 terrorists," correct?
17 A Correct.
18 Q Is an unknown or partially known terrorist the
19 the same thing as an individual who may intend harm
20 to aviation security but who is not in the TSDB?
21 MS. KONKOLY: Objection insofar as the
22 answer calls for anything protected by SSI, but you

50

1 can answer that if you can.
2 A It's -- to an extent, yes. When we view the
3 current intelligence reporting and we identify a
4 threat we know that there is information out there
5 that are indications that present this threat but
6 it's not fully known, that's why they are not on the
7 TSDB for us to direct identify individuals.
8 We do have enough information based on the
9 threat reporting to then identify rules to identify
10 passengers that present a higher risk that may
11 intend to harm. So it's the risk related, so that's
12 the difference. It's unknown, partially known, so
13 we're trying to mitigate the threat by identifying
14 potentially higher risk.
15 Q Has the Quiet Skies program ever foiled a
16 terrorist plot?
17 MS. KONKOLY: Objection insofar as that
18 answer calls for information protected by SSI or the
19 law enforcement privilege. You can answer that to
20 the extent that you can.
21 A So it's very difficult to talk to if
22 something has been deterred. It's very difficult to

51

1 say what may have occurred had the enhanced
2 screening or the identification of higher risk
3 passengers for enhanced screening, what may have
4 occurred had they not been identified.
5 However, as it comes to directly known of a
6 direct plot that's been foiled by various -- any
7 specific passenger designated via Quiet Skies, no, I
8 do not -- have not identified any.
9 Q Has the Silent Partner program ever foiled
10 any terrorist threats?
11 MS. KONKOLY: Same objections insofar as the
12 answer calls for any information protected by SSI or
13 the law enforcement privilege, but you can again
14 answer to the extent that you can.
15 A So I would answer the same as I answered for
16 Quiet Skies. It's very difficult to identify those
17 that were deterred and did not occur and we did not
18 identify from a deterrence effect. I cannot -- it's
19 difficult to speculate on that. However, we have
20 not formally identified any foiled terrorist plots
21 based on Quiet Skies -- I'm sorry, Silent Partner.
22 Q Has either Quiet Skies or Silent Partner led

52

1 to the arrest or prosecution of an individual on
2 their list?
3 MS. KONKOLY: Again, objection insofar as
4 the answer calls for any information protected by
5 SSI or the law enforcement privilege. You can
6 answer to the extent that you can.
7 A No, not specific to by virtue of being the
8 match to Silent Partner or Quiet Skies.
9 Q What is the TSA's definition of an unknown
10 or partially known terrorist?
11 MS. KONKOLY: Objection insofar as the
12 complete answer calls for anything protected by SSI
13 or the law enforcement privilege. You can answer to
14 the extent you can.
15 A So as I discussed earlier, there is current
16 intelligence reporting out there that speaks to
17 threats to aviation security and homeland security
18 or threats at large. TSA is focusing on those that
19 are related to aviation security and homeland
20 security.
21 Those particular threats may not be as
22 granular down to being those that have been

53

1  identified and listed in the TSDB.  However, there
2  is information that relates to -- there are specific
3  activities that present a threat to aviation and
4  homeland security.
5      So we do not know all the details of, say,
6  the actual threat actors or there's only partially
7  known information which is why -- to mitigate that
8  threat, because they are not known or meeting
9  suspicion of known suspected terrorists, which is
10 part of the TSDB as discussed earlier.  These are
11 those that we know there's a threat but we do not
12 have the details down to individuals to say and that
13 is why they are unknown or only partially known.
14     Q  In paragraph ten -- I'm summarizing -- you
15 state that following the Christmas Day underwear
16 bomber TSA conducted a review of existing threats to
17 aviation security.  Is that generally correct?
18     A  That is correct.
19     Q  Where is that review memorialized?
20        MS. KONKOLY:  Objection insofar as the
21 answer would call for information protected by SSI
22 or the law enforcement privilege.  You can answer to

54

1  the extent that you can.  I'm also going to
2  interpose a scope objection.
3      A  I'd have to go back.  Generally speaking,
4  when we review current intelligence reports we --
5  and identify those that are aviation threats,
6  aviation security threats or homeland security
7  threats, we have intelligence reports, whether we
8  are providing it to our senior leadership or review
9  by our security operations or leadership.  I don't
10 know if we can follow up on that.
11     Q  Okay.  What are --
12     A  Sorry.
13     Q  What are the documents called where the TSA
14 creates and explains its high-risk rules?
15        MS. KONKOLY:  Objection insofar as the
16 answer calls for any information protected by SSI.
17 You can answer if you know.
18     A  What are the documents called where TSA
19 explains its --
20     Q  And creates the high-risk rules.
21     A  So we review reports.  We implement our
22 high-risk rules in the ATS system and then also

55

1  executed via secure flight.  We also have
2  documentation that memorializes what those rules are
3  that are also reviewed on a quarterly -- regular
4  basis with our DHS, oversight, civil rights and
5  liberties, privacy, our chief counsel.  They are
6  approved and regularly reviewed by our
7  administrator -- approved by our administrator or
8  deputy administrator.
9      Q  And what are the documents that memorialize
10 the high-risk rules called?
11        MS. KONKOLY:  Objection insofar as that
12 answer calls for any information protected by SSI,
13 but you can answer if you can.
14     A  I don't know the actual name of the
15 document.  It is memorialized in a memo, which is
16 approved by our administrator for the --
17     Q  What are the quarterly reports conducted by
18 the civil rights authorities called?
19        MS. KONKOLY:  And, again, objection insofar
20 as the answer calls for any information protected by
21 SSI, but you can answer to the extent that you can.
22     A  I don't know that the reports have a name.

56

1  It is -- we have a quarterly governance review of
2  current intelligence threats reporting and the rules
3  that have been established to mitigate those
4  threats.
5      Q  Has any portion of those quarterly
6  governance reviews been made public?
7      A  No.
8      Q  Has -- are those -- have any of those
9  quarterly governance reviews ever been provided to
10 Congress?
11        MS. KONKOLY:  Objection if there's anything
12 in that answer that calls for SSI, but you can
13 answer to the extent that you can.
14     A  I do not believe we provide the actual
15 quarterly governance reviews to Congress.  What we
16 do is we brief Congress regarding our processes,
17 regarding our establishment of rules.  We have been
18 doing this since the establishment of the program.
19 20 I do not believe we are actually -- the briefings
21 are not set up to be the same rated for audiences.
22     Q  When was Quiet Skies established?

57

1    MS. KONKOLY: Objection insofar as the
2 answer calls for any information protected by SSI,
3 but you can answer if you can.
4    **A TSA began Quiet Skies in 2011.**
5    Q When was Silent Partner established?
6    MS. KONKOLY: Same objection insofar as the
7 question calls for any information protected by SSI.
8 You can answer to the extent you can.
9    **A 2010.**
10   Q When did the TSA begin assigning Federal Air
11 Marshals to special mission coverage of Quiet Skies
12 selectees?
13   **A March of 2018.**
14   Q When did the TSA begin assigning Federal Air
15 Marshals to special mission coverage of Silent
16 Partner?
17   MS. KONKOLY: Objection. That question
18 calls for information protected by SSI, and I'm
19 going to instruct the witness not to answer on that
20 ground.
21   Q Does the TSA assign Federal Air Marshals to
22 special mission coverage of the Silent Partner

58

1 listees?
2    MS. KONKOLY: Again, I'm objecting on the
3 basis of SSI and instructing the witness not to
4 answer.
5    Q Has the TSA ever informed Congress about
6 whether or not it assigns Federal Air Marshals to
7 special mission coverage of Silent Partner
8 selectees?
9    MS. KONKOLY: I'm going to object on the
10 basis of SSI and instruct the witness not to answer.
11   Q I'd like to look at what's now tab three in
12 your binder, which is a March 13, 2018, TSA bulletin
13 or at least purports to be, and ask the court
14 reporter to mark it as Exhibit 3.
15   (Froemling Deposition Exhibit 3 was
16 marked for identification and attached to the
17 transcript.)
18   Q Ms. Froemling, have you seen this document
19 before?
20   MS. KONKOLY: I am going to object on the
21 basis of SSI, potentially law enforcement privilege,
22 and I'm instructing the witness not to answer any

59

1 questions regarding the document.
2    MS. HOMER: Any questions?
3    MS. GREENBAND: Can we take a 20-second
4 break?
5    MS. HOMER: Yes.
6    MR. ABBAS: Do you need us to leave the
7 room?
8    MS. KONKOLY: We can leave.
9    MS. HOMER: Okay, you'll leave. We'll stay
10 right here.
11   THE VIDEOGRAPHER: Please stand by. We are
12 going off the record. The time is 12:01 p.m.
13   (Off the record.)
14   THE VIDEOGRAPHER: We are back on the
15 record. The time is 12:03 p.m.
16   MS. KONKOLY: All right. Counsel, would you
17 mind clarifying the document at issue and where you
18 obtained it to include it among the materials that
19 you identified for questioning at this deposition?
20   MS. HOMER: Yes. So what has been marked as
21 Exhibit 3 is a document that was published by the
22 Boston Globe on July 28, 2018, and it was included

60

1 in plaintiff's motion to compel materials as Exhibit
2 B.
3    MS. KONKOLY: Okay. So to clarify, it was
4 among the materials that was identified by you in
5 preparation for this deposition?
6    MS. HOMER: Yes. I specifically identified
7 the Boston Globe July 28 article prior to this
8 deposition, and this is hyperlinked within that
9 article, and there's an image of it and it is quoted
10 extensively.
11   MS. KONKOLY: Okay. If you could ask the
12 question again or have it read back, either way.
13 BY MS. HOMER:
14   Q Okay. Ms. Froemling, have you ever seen
15 this document before?
16   THE WITNESS: I can answer?
17   MS. KONKOLY: Yeah. You can -- yes or no.
18   **A Yes.**
19   Q Did you see this document in connection with
20 the Boston Globe reporting just discussed?
21   MS. KONKOLY: I'm going to object insofar as
22 the full -- insofar as the answer calls for any

**61**

1    information protected by SSI, but you can answer yes
2    or no.
3        **A    Yes, as part of the exhibit provided for**
4    **this deposition.**
5        Q    Is this an official TSA document?
6        MS. KONKOLY:  And I'm going to object on the
7    basis of SSI, potentially law enforcement privilege,
8    and instruct the witness not to answer that
9    question.
10       Q    At the top left of the document, is that the
11   Federal Air Marshal Service seal?
12       MS. KONKOLY:  Objection on the basis of SSI.
13   I'm going to instruct the witness not to answer that
14   question.
15       Q    On the top right of the document, is that a
16   TSA seal?
17       MS. KONKOLY:  I'm going to again object on
18   the basis of SSI and instruct the witness not to
19   answer.
20       Q    Does the top of this document state that it
21   is a Transportation Security Administration
22   document?

**62**

1        MS. KONKOLY:  You're --
2        Q    Let me clarify that.  At the top of the
3    document do the words "Transportation Security
4    Administration Office of Law Enforcement/Federal Air
5    Marshal Service" appear?
6        **A    Yes.**
7        Q    Okay.  And do you understand that this
8    document purports to be titled, in this top gray bar
9    that's somewhat hard to read, "Information bulletin
10   Quiet Skies selectees"?
11       MS. KONKOLY:  I'm going to object that is
12   very difficult to read from this copy what is in
13   that bar.  If you can read it and --
14       **A    To the extent I can see that that matches**
15   **what you just stated, yes.**
16       Q    Okay.  And the first bold heading below that
17   gray bar says, "TSA's Quiet Skies Program," correct?
18       **A    It is listed there, yes.**
19       Q    Does the TSA have an internal bulletin
20   regarding the Quiet Skies program?
21       MS. KONKOLY:  Objection insofar as --
22   objection, the answer calls for information

**63**

1    protected by SSI, and I'm instructing the witness
2    not to answer.
3        Q    Does the TSA have any internal policy
4    documents about the Quiet Skies program?
5        MS. KONKOLY:  Objection insofar as the
6    complete answer would call for information protected
7    by SSI, but you can answer yes or no.
8        **A    Yes.**
9        Q    Is this one of those documents?
10       MS. KONKOLY:  Objection on the basis of SSI.
11   I'm instructing the witness not to answer that
12   question.
13       Q    All right.  You've previously testified that
14   the Federal Air Marshal special mission coverage for
15   Quiet Skies selectees began in March 2018, correct?
16       **A    Yes.**
17       Q    Did it begin specifically on March 13, 2018?
18       MS. KONKOLY:  I'm going to object to that
19   question as calling for SSI, and I'm going to
20   instruct the witness not to answer.
21       Q    Your declaration -- we were at paragraph ten
22   a minute ago -- stated that the TSA adopt rules to

**64**

1    mitigate the threat posed by -- and now I'm going to
2    quote -- "unknown or partially known terrorists
3    based on current intelligence on terrorist travel
4    and tradecraft."  Is that correct, your declaration
5    said that?
6        **A    Yes, my declaration says that we need to**
7    **mitigate the threat to commercial aviation posed by**
8    **unknown or partially known terrorists based on**
9    **analysis of current intelligence and terrorist**
10   **travel and tradecraft.**
11       Q    Okay.  And then turning back to Exhibit 3,
12   the first full, plain text paragraph, this exhibit
13   says that, quote, "The purpose of the Quiet Skies
14   program is to mitigate the threat to commercial
15   aviation posed by unknown or partially known
16   terrorists."  Did I read that correctly?
17       **A    You did.**
18       Q    Okay.  And then the sentence goes on and
19   says that this is, quote, based on analysis of
20   terrorist travel trends, comma, tradecraft and
21   associations.  Did I read that correctly?
22       **A    You did read it correctly.**

---

**65**

1    Q  Is an individual's associations a factor
2  considered by Quiet Skies selectees rules?
3      MS. KONKOLY:  Objection, that question calls
4  for information protected by SSI, and I'm going to
5  instruct the witness not to answer.
6    Q  Skipping down in Exhibit 3 to the third
7  bullet point, it states, "Quiet Skies rules target
8  specific travel patterns or affiliations."  Did I
9  read that correctly?
**10   A  Yes.**
11    Q  Are an individual's affiliations a factor
12  considered by Quiet Skies rules to designate them as
13  high-risk passengers?
14      MS. KONKOLY:  And I'm objecting on the basis
15  of SSI and instructing the witness not to answer
16  that question.  Let me also object on the basis of
17  law enforcement and provide the same instruction on
18  that basis as well.
19    Q  Skipping down to -- on Exhibit 3, beneath
20  where it says, "Special Mission Coverage," it
21  states, "Quiet Skies selectees are different from
22  traditional SMC subjects because they are not under

**66**

1  investigation by any agency and are not in the
2  terrorist screening database."  Did I read that
3  correctly?
**4   A  Yes.**
5    Q  What is a traditional special mission
6  coverage subject?
7      MS. KONKOLY:  Objection.  That question
8  calls for information protected by SSI, and I'm
9  going to instruct the witness not to answer.
10    Q  Do the Federal Air Marshals monitor every
11  individual on the TSDB who flies on a commercial
12  aircraft?
13      MS. KONKOLY:  I'm going to first object as
14  to scope, as that being outside of the scope of the
15  designated topics for this deposition, but I'm also
16  going to object on the basis of SSI, and I instruct
17  the witness not to answer based on that ground.
18    Q  Do traditional special mission coverage
19  subjects include individuals on the no-fly list?
20      MS. KONKOLY:  I'm going to again object as
21  to scope.  That would be outside of the designated
22  topics again.  And I'm again objecting on the basis

**67**

1  of SSI and instructing the witness not to answer
2  that question.
3    Q  Do traditional special mission coverage
4  subjects include individuals on the selectee list?
5      MS. KONKOLY:  I'm again objecting as to
6  scope and objecting as to SSI and instructing the
7  witness not to answer.
8    Q  Do traditional special mission coverage
9  subjects include individuals on the expanded
10  selectee list?
11      MS. KONKOLY:  Again, objection as to scope;
12  objection, SSI; and I'm instructing the witness not
13  to answer.
14    Q  What is the name of the policy manual that
15  TSA has that includes information on Quiet Skies?
16      MS. KONKOLY:  Objection, vague.  Objection
17  insofar as the answer calls for information
18  protected by SSI.  And I'm also going to object to
19  foundation.
20      MS. HOMER:  That's a fair objection.  Let me
21  start over, though I do think I asked that earlier.
22    Q  Does the TSA have any policy or procedure

**68**

1  manuals it provides to its employees regarding the
2  Quiet Skies program?
3      MS. KONKOLY:  Objection insofar as the
4  question calls for any information protected by SSI,
5  but you can answer that one to the extent you can.
**6   A  Yes.**
7    Q  What are the names of those manuals?
8      MS. KONKOLY:  Again, objection insofar as
9  the question calls for information protected by SSI.
10  You can answer that one to the extent you can.  I
11  will again interpose the question is vague.
**12   A  I do not actually know the name of given**
**13  manuals.  We do have policy documents regarding the**
**14  implementation of our Quiet Skies.  I don't know the**
**15  name.**
16    Q  What is the name of the policy document that
17  implements Quiet Skies?
18      MS. KONKOLY:  Same objections, also asked
19  and answered.
**20   A  I do not know the name of the document.**
21    Q  Does the TSA have policy documents regarding
22  the operation of the Silent Partner program?

Case 1:16-cv-00375-AJT-JFA   Document 306-32   Filed 03/12/19   Page 20 of 29 PageID#
14653
Transcript of Hao-y Tran Froemling, Designated Representative         18 (69 to 72)
Conducted on October 4, 2018

69

1      MS. KONKOLY: Again, objection insofar as

2   the answer calls for any information protected by

3   SSI; objection, vague; but you can answer to the

4   extent that you can.

**5      A  Yes.**

6      Q  What are the names of the policy documents

7   that TSA has regarding the implementation of the

8   Silent Partner program?

9      MS. KONKOLY: Same objections, vague, and

10  insofar as it calls for any information protected by

11  SSI, but you can answer if you can.

**12     A  I do not know the specific name of the**

**13  document.  I think the best I can say is --**

**14  referring back to my prior statement is that it's**

**15  primarily memorialized in the memo of our**

**16  implementation to these rules.  I do not know the**

**17  name of the document.**

18     Q  Does the TSA consider family members of TSDB

19  listees to be unknown or partially known terrorists?

20     MS. KONKOLY: Objection as to scope.

21  Objection, that question calls for information

22  protected by SSI, and also the law enforcement

70

1   privilege.  You can answer that one to the extent

2   that you can.

**3      A  I'm sorry, could you repeat the question?**

4      Q  Does the TSA consider family members of TSDB

5   listees to be unknown or partially known terrorists?

6      MS. KONKOLY: Same objections, but you can

7   answer to the extent that you can.

**8      A  So as I discussed on the unknown or**

**9   partially known, it is more related to whatever**

**10  particular threat is identified to aviation or**

**11  homeland security.  So to the extent, if it also so**

**12  happens that they -- individuals are designated as**

**13  higher risk and are designated for enhanced**

**14  screening, by virtue of that they may.  But TSA**

**15  directly does not just say, okay, these are our**

**16  unknown or partially known, therefore all family**

**17  members, to your question.**

18     Q  Does being a family member of a TSDB listee

19  trigger the application of any high-risk rules?

20     MS. KONKOLY: Objection on the basis of SSI,

21  the law enforcement privilege, and I'm instructing

22  the witness not to answer that question.

71

1      Q  Does being an individual listed in the

2   contact list of a TSDB individual's phone form a

3   basis to trigger any high-risk rules?

4      MS. KONKOLY: I'm, again, objecting on the

5   basis of the law enforcement privilege and SSI, and

6   I'm again instructing the witness not to answer that

7   question.

8      Q  In your declaration you referred to current

9   intelligence on terrorist travel and tradecraft.

10     MS. KONKOLY: Can you please identify the

11  paragraph?

12     Q  Yeah, so paragraph ten.  It was where we

13  were earlier, so Exhibit 2, paragraph ten.  So I'm

14  going to elide a bit of the sentence, but it says

15  TSA conducted its own review of the existing threats

16  to aviation security, ellipses, based on analysis of

17  current intelligence on terrorist travel and

18  tradecraft.

19     Do you see the portion I'm referring to?

**20     A  Yes.**

21     Q  Okay.

22     MS. KONKOLY: Could you actually read the

72

1   entire sentence for context?

2      Q  Sure.  "TSA conducted its own review of the

3   existing threats to aviation security and determined

4   that it needed to mitigate the threat to commercial

5   aviation posed by unknown or partially known

6   terrorists based on analysis of current intelligence

7   on terrorist travel and tradecraft."

8      Did I read that sentence correctly?

**9      A  Yes.**

10     Q  What is the definition of terrorist

11  tradecraft?

12     MS. KONKOLY: Objection insofar as that

13  answer calls for information protected by the law

14  enforcement privilege and SSI, and I'm instructing

15  the witness not to answer that question.

16     Q  Can you give me any examples even at a high

17  level of what constitutes terrorist tradecraft?

18     MS. KONKOLY:  I am going to again object on

19  the basis of SSI and the law enforcement privilege,

20  and I'm instructing the witness not to answer that

21  question.

22     Q  Turning back to Exhibit 3, does this

Transcript of Hao-y Tran Froemling, Designated Representative

Conducted on October 4, 2018

---

**73**

1 document reflect TSA policy -- that won't work.  Let
2 me start over.
3     Do the details about the Quiet Skies program
4 you disclosed in your declaration match the
5 information in Exhibit 3?
6     MS. KONKOLY:  I'm going to object on the
7 basis of SSI and the law enforcement privilege and
8 instruct the witness not to answer that question.
9    Q  What other Federal Government agencies are
10 involved in the creation of the TSA's risk-based,
11 intelligence-driven rules?
12     MS. KONKOLY:  Objection insofar as that
13 answer calls for information protected by the law
14 enforcement privilege and SSI, as well as the state
15 secrets privilege potentially, and I'm instructing
16 the witness not to answer that question.
17    Q  What other federal agencies provide
18 intelligence that inform TSA's creation of
19 risk-based rules?
20     MS. KONKOLY:  I'm going to again object
21 based on the law enforcement privilege, SSI,
22 potentially state secrets privilege, and I'm going

---

**74**

1 to again instruct the witness not to answer.
2    Q  What federal agencies assist with the
3 implementation of the TSA's high-risk rules?
4     MS. KONKOLY:  Objection insofar as that
5 calls for information protected by SSI or the law
6 enforcement privilege, but you can answer that one
7 to the extent that you can.
8    **A Sure.  As discussed previously, TSA does**
9 **coordinate with CBP to implement its -- TSA's**
10 **derived rules into CBP's system to identify**
11 **passengers that meet TSA's higher risk rules.**
12    Q  Aside from CBP, do any other federal
13 agencies assist with the implementation of TSA's
14 high-risk rules?
15     MS. KONKOLY:  I'm going to again object
16 based on SSI and the law enforcement privilege, but
17 you can answer that one to the extent that you can.
18    **A So for the actual creation of the rules,**
19 **it's TSA coordinating with CBP because we implement**
20 **our rules in CBP's system.  So, no, we do not work**
21 **with other agencies to create TSA's high-risk**
22 **passenger rules.**

---

**75**

1    Q  Does the TSA work with any foreign
2 government agencies to create or implement its
3 high-risk rules?
4     MS. KONKOLY:  I'm going to object on the
5 basis of SSI, law enforcement privilege.  You can
6 answer that one to the extent that you can.
7    **A So also as discussed previously, because you**
8 **said create and implement, I want to make sure the**
9 **way I'm interpreting it is TSA independently**
10 **assesses the current intelligence to identify**
11 **threats.  TSA independently creates the rules,**
12 **coordinates with CBP.**
13     **We do not coordinate with any, as stated**
14 **earlier, other federal agencies nor foreign**
15 **governments to create the rules.  When you state**
16 **implement, as I discussed previously, we identify**
17 **these rules, identify passengers that present a**
18 **higher risk and therefore require enhanced**
19 **screening.**
20     **So to the extent that passengers abroad**
21 **require enhanced screening, those foreign**
22 **governments may be involved in the -- if you want to**

---

**76**

1 **say implementation in the conducting the actual**
2 **screening activities, physical screening activities.**
3    Q  What federal agencies have the authority to
4 approve or disapprove specific risk-based rules?
5     MS. KONKOLY:  Objection insofar as that
6 question calls for any information protected by SSI,
7 but you can answer that one to the extent that you
8 can.
9    **A So TSA-specific, high-risk-based rules, it**
10 **is under our administrator's authority to -- sorry,**
11 **was the word "approve" or "implement"?**
12    Q  Approve or disapprove.
13    **A -- approve and disapprove the rules.**
14    Q  Can the Secretary of the Department of
15 Homeland Security override the TSA administrator's
16 determination?
17 **A So to the -- sorry.**
18     MS. KONKOLY:  Let me just object.  To the
19 extent that there is any information, the answer
20 calls for information protected by SSI, but you can
21 answer to the extent that you can.
22    **A Right.  So generally speaking, the TSA is a**

---

77

1  component of the Department of Homeland Security.
2  The Secretary for Homeland Security therefore has
3  the same authorities as our administrator, and our
4  administrator does report to the Secretary of
5  Homeland Security, so, she therefore, yes, does have
6  authority.
7      Q  Is there any individual outside of the
8  Department of Homeland Security who has authority to
9  approve or disapprove specific TSA risk-based rules?
10     MS. KONKOLY:  I'm going to object that this
11  line of questioning calls for a legal conclusion,
12  also insofar as the answer implicates any SSI.  You
13  can answer to the extent that you can.
14     A  So I'm trying to -- so no other federal
15  agency approves or disapproves TSA's high-risk
16  rules, to your question was, does any other
17  authority --
18     Q  Outside of DHS.
19     A  -- outside of DHS.
20     MS. KONKOLY:  Same objections.
21     A  Can I get like ten seconds just to clarify
22  if I state something, take a break, just to confirm?

---

78

1      MS. HOMER:  Yeah.  Can we go off the record?
2      THE VIDEOGRAPHER:  Stand by for a moment.
3      MS. KONKOLY:  Can we take just a five-minute
4  break actually?
5      MS. HOMER:  Yeah, that's fine.
6      THE VIDEOGRAPHER:  All right.  Well, then,
7  I'm going to change tapes, so please stand by.
8      MS. HOMER:  Okay.
9      THE VIDEOGRAPHER:  This marks the end of
10  disc number one in the videotaped deposition of
11  Hoa-y Tran Froemling.  We are going off the record
12  at 12:26 p.m.
13     (Off the record.)
14     THE VIDEOGRAPHER:  This marks the beginning
15  of disc number two.  We are back on the record at
16  12:48 p.m.
17     MS. HOMER:  Counsel, you said you had some
18  clarifications?  Or we should answer the --
19     MS. KONKOLY:  We had an open question so if
20  we could close that.
21     MS. HOMER:  Could you read back the question
22  before we left?

---

79

1      (The Reporter read the record as
2  follows:  Is there any individual outside of the
3  Department of Homeland Security who has authority to
4  approve or disapprove specific TSA risk-based
5  rules?)
6      MS. KONKOLY:  And I'm just going to again
7  object that that calls for a legal conclusion, but
8  you can answer to the extent that you can.
9      A  So I'm not the legal authority, but I
10  suppose in the broader scheme of just overall
11  authorities it could be the President that would
12  also have authorities to approve or disapprove.  But
13  I want to clarify that the administrator is the one
14  with the authority, TSA.
15     Q  What federal agencies provide input into the
16  creation of the TSA's high-risk rules?
17     MS. KONKOLY:  I'm going to object insofar as
18  that question calls for information protected by SSI
19  and also object on grounds of vagueness.  You can
20  answer to the extent that you can.
21     A  So it is -- to the extent that I can answer,
22  TSA conducts an independent assessment of current

---

80

1  intelligence threat reporting to derive its rules.
2  As far as input, this is more of back to the
3  discussion of oversight of we do review on a
4  quarterly basis with DHS, civil rights and
5  liberties, with privacy and our chief counsel,
6  general counsel with the department regarding TSA's
7  implementation of the rules.
8      Q  What other --
9      MS. KONKOLY:  Did you want to -- could we do
10  those clarifications?
11     MS. HOMER:  Oh, I'm sorry.  Please go ahead.
12     MS. KONKOLY:  Okay.  Before we lose track of
13  those.
14     Ms. Froemling, did you want to offer any
15  clarification regarding the testimony you provided
16  earlier this morning regarding the definition of --
17  or your statement regarding an unknown or partially
18  known terrorist --
19     THE WITNESS:  Yes.
20     MS. KONKOLY:  -- as you referenced that term
21  in your declaration?
22     THE WITNESS:  Yes.  So I believe the

Transcript of Hao-y Tran Froemling, Designated Representative
Conducted on October 4, 2018

21 (81 to 84)

81

1 question -- two parts to the question. For unknown
2 and partially known terrorists and terrorist
3 activities, TSA devises rules to identify passengers
4 that may present a high risk?
5     I want to be very clear that matching to one
6 of these rules does not mean that every individual
7 that matches to these rules are considered to be
8 unknown or partially known terrorists. These rules
9 are established to mitigate the threat from unknown
10 or partially known terrorists. That's part one.
11     And then the clarification to your question
12 of are family members on the TSDB considered to be
13 part of the unknown or partially known terrorist,
14 TSA -- no, TSA does not, again, automatically
15 consider family members of TSDB listees to be
16 unknown or partially known terrorists. So the two
17 tied together.
18     We establish rules to mitigate the threat
19 that's been identified to aviation, homeland
20 security, from unknown and partially known
21 terrorists, which may then identify passengers that
22 could present a higher level of risk. It is not one

82

1 for one equal.
2 BY MS. HOMER:
3   Q  Are there any individuals that the TSA has
4 labeled that individual as an unknown or partially
5 known terrorist?
6     MS. KONKOLY: I'll object insofar as that
7 question calls for any information protected by SSI,
8 and vagueness, but you can answer to the extent that
9 you can.
10   **A  So I think by definition, again, it's**
11 **unknown, partially known, so we do not know the**
12 **individuals. So all we could -- what we do is we**
13 **implement rules to identify passengers who may**
14 **present a higher risk to mitigate the threat from**
15 **unknown or partially known.**
16   Q  So would it be fair to say that the unknown
17 or partially known terrorist label, like encompasses
18 a broad group of high-risk characteristics but not
19 necessarily specific persons?
20     MS. KONKOLY: Objection insofar as the
21 answer calls for anything protected by SSI, but --
22 and law enforcement privilege, but you can answer it

83

1 to the extent you can.
2     **A  So it would depend on the particular threat,**
3 **so depending, because unknown can be -- unknown and**
4 **partially known is a broad term. Depending on the**
5 **threat it could be a broader -- so I think, yes, to**
6 **the extent of we do not know actual individuals**
7 **designated as unknown or partially known terrorists,**
8 **because at that point they would be known.**
9     **So to the extent that we identify a threat**
10 **we're establishing, that may encompass multiple**
11 **different areas and different things. I'm sorry.**
12 **It's a very broad question so to the extent I can,**
13 **I'm trying to answer it. It may depending on the**
14 **particular threat.**
15     MS. HOMER: Did you have another cleanup
16 question?
17     MS. KONKOLY: There were two more, if you
18 don't mind, quickly.
19     MS. HOMER: Okay.
20     MS. KONKOLY: Ms. Froemling, did you also
21 want to clarify your earlier testimony regarding the
22 potential existence of oversight reports related to

84

1 the quarterly reviews of the rules programs?
2     THE WITNESS: Right. We have a quarterly
3 review with our DHS oversight offices. There's no
4 actual report that I'm aware of that TSA creates as
5 a result of those quarterly governance reviews with
6 our DHS civil rights and civil liberties and then
7 privacy, general counsel, et cetera.
8     MS. KONKOLY: And did you also want to
9 clarify your testimony from earlier this morning
10 with respect to foreign government involvement with
11 implementation of the risk-based rules?
12     THE WITNESS: Right. I wanted to make sure
13 it's very, very clear. In the beginning, earlier
14 this morning, I discussed TSA as part of a secure
15 flight provides back to air carriers for overseas,
16 for international travel of those passengers that
17 require enhanced screening.
18     It could be for multiple reasons not just
19 whether they were matched to a rule or matches to
20 individuals on the -- a selectee. It could be
21 random, multiple reasons. Air carriers are aware of
22 passengers have been designated for enhanced

**85**

1 screening.  They don't know any other information.
2 They don't know the reason why.
3     So when it goes to the follow-on question of
4 are any foreign governments involved in the
5 implementation of rules I want to go back to they
6 are aware, if they are a part -- with the carriers
7 conducting any of the physical screening related to
8 enhanced screening, they are aware if passengers
9 have been designated for enhanced screening.  They
10 are not made aware that these individual passengers
11 have been matches to high-risk rules versus any
12 other reason.
13     Q  So foreign airlines or partners or
14 governments would not know that a specific
15 individual was a Quiet Skies or Silent Partner
16 selectee?
17     MS. KONKOLY:  Objection insofar as that
18 question calls for any information protected by SSI,
19 but you can answer to the extent you can.
**20     A  That is correct, when we are providing back**
**21 the indicator for enhanced screening that is all**
**22 that is provided to them.**

**86**

1     Q  What restrictions are there on foreign
2 governments sharing information about which
3 passengers have been identified as the U.S. as
4 higher risk and requiring enhanced screening?
5     MS. KONKOLY:  I'm going to object as to
6 scope.  I'm going to object on the basis of SSI and
7 the law enforcement privilege.  But you can answer
8 if you know and to the extent that you can.
**9     A  I'm not sure.  So the question is what**
**10 restrictions on foreign governments are -- I'm**
**11 sorry.**
12     Q  So let me break it down.  You just
13 testified, correct, that the foreign government is
14 aware that an individual requires enhanced
15 screening, correct?
**16     A  The foreign party.  If the government is**
**17 involved with the air carrier and performing**
**18 screening, then yes.**
19     Q  Okay.  What restrictions are there to
20 prevent the foreign party from sharing that
21 high-risk designation more broadly?
22     MS. KONKOLY:  I'm going to again object as

**87**

1 to scope of the designated topics for this
2 deposition.  I'm going to object on grounds of
3 vagueness, also SSI and the law enforcement
4 privilege.  You can answer if you know, to the
5 extent that you can.
**6     A  I do not believe I know other than the fact**
**7 that they -- a passenger, as we discussed in prior**
**8 testimony, the carrier would receive information and**
**9 ask to put on the boarding pass a designation for**
**10 enhanced screening, so to the extent that that**
**11 boarding pass is visible to the passenger and**
**12 others.  I don't know that I can answer regarding**
**13 foreign governments sharing that designation on a**
**14 boarding pass.**
15     Q  So going back to where we were earlier, do
16 members of the watch listing advisory council
17 provide recommendations for input to the TSA about
18 the creation of specific high-risk rules?
19     MS. KONKOLY:  I'm going to object insofar as
20 the answer calls for any information protected by
21 SSI or the law enforcement privilege, but you can
22 answer if you can.

**88**

**1     A  No.  As part of my declaration, just to**
**2 reiterate, the watch listing advisory council is not**
**3 involved in TSA or provide input into TSA's**
**4 determination of high-risk rules.**
5     Q  Do any members of the watch listing advisory
6 council discuss the specific criteria for TSA
7 high-risk rules with the TSA in any way?
8     MS. KONKOLY:  I'm going to object on the
9 basis of the deliberative process privilege insofar
10 as the information calls -- the question calls for
11 information protected by SSI or the law enforcement
12 privilege, but you can answer.
**13     A  Let me answer this -- in the sense of acting**
**14 as a member of the watch listing advisory**
**15 committee -- council, sorry, they do not discuss**
**16 regarding input or creation of the rules or have any**
**17 part in formulation and TSA's implementation of the**
**18 rules as to whether any member may have discussed it**
**19 or brought it up in its awareness if TSA has**
**20 implemented it.  It may have occurred but not in a**
**21 formal capacity of providing any advisory or other**
**22 capacity.**

Transcript of Hao-y Tran Froemling, Designated Representative
23 (89 to 92)
Conducted on October 4, 2018

89

1     Also CBP is also a partner, so to the extent
2  not as a watch listing advisory member but in its
3  component as CBP, TSA obviously does implement its
4  rules in CBP's systems for high-risk passengers.
5     Q  What federal agencies have access to or
6  knowledge of the specific criteria of specific
7  high-risk rules created by the TSA?
8        MS. KONKOLY:  Objection insofar as that
9  question calls for any information protected by SSI
10  or the law enforcement privilege.  You can answer if
11  you can.
12     A  I'm sorry, what members of any federal
13  agency -- I'm sorry.
14     Q  Yeah.  What federal agencies know what the
15  TSA's high-risk rules are?
16        MS. KONKOLY:  Same objections, and I'll add
17  that Ms. Froemling is here to testify on behalf of
18  TSA only as well today.
19     A  So I can speak in the capacity of CBP is
20  another federal agency.  TSA is obviously
21  implementing its rules in CBP's systems.  TSA also
22  reviews the rules with DHS, privacy, civil rights,

90

1  and liberties, general counsel bodies.  As to other
2  federal agencies, I do not --
3     Q  Does the terrorist --
4     A  -- know of the actual rules.
5     Q  Does the Terrorist Screening Center know
6  what the TSA's specific high-risk rules are?
7        MS. KONKOLY:  I'm going to again object
8  insofar as the answer implicates any SSI, object
9  vagueness, and, again, reiterate that Ms. Froemling
10  is here to testify on behalf of TSA only.  You can
11  answer if you know.  Let me also add law enforcement
12  to the potential grounds.
13     A  Generally speaking, no, in the sense of us
14  sharing or reviewing rules with TSC.  In the -- they
15  are aware of TSA's implementing high-risk passenger
16  rules overall and our process, but I do not believe
17  we review -- we do not review our rules with the
18  TSC.
19     Q  Okay.  So to clarify, the TSA does not give
20  details of the specific criteria for specific
21  high-risk rules to the Terrorist Screening Center?
22        MS. KONKOLY:  Objection insofar as there is

91

1  any information protected by SSI or law enforcement
2  implicated in that answer.  You can answer.
3     A  No, I do not believe TSA gives our rules to
4  the TSC.
5     Q  Does the TSA give its rules to the FBI?
6        MS. KONKOLY:  Objection insofar as the
7  answer calls for any information protected by SSI or
8  the law enforcement privilege, but you can answer if
9  you know.
10     A  No, I do not believe TSA gives its rules to
11  the FBI.
12     Q  Are Federal Air Marshals automatically
13  assigned to flights containing Quiet Skies
14  selectees?
15        MS. KONKOLY:  Objection.  That calls for
16  information protected by SSI.  And you can answer to
17  the extent -- you can answer to the extent that you
18  can without waiving the privilege.
19     A  Okay.  At a high level, depending on air
20  marshal availability, Federal Air Marshals are
21  assigned on flights that have Quiet Skies high-risk
22  passengers on them.

92

1     Q  Who determines the specific assignments for
2  specific air marshals to specific flights?
3        MS. KONKOLY:  Objection insofar as that
4  answer calls for information protected by SSI.  You
5  can answer to the extent you can without waiving.
6     A  At high level it's TSA and it's the Federal
7  Air Marshal's office.
8     Q  Are Federal Air Marshals automatically
9  assigned as soon as a Quiet Skies rule is triggered,
10  or is there a prioritization or discretionary
11  process regarding those assignments?
12        MS. KONKOLY:  Objection insofar as that
13  question calls for information protected by SSI.
14  You can answer to the extent that you can.
15     A  So at a high level there's multiple factors
16  that go into the assignment of Federal Air Marshals
17  on flights and prioritization, availability,
18  multiple factors, logistics, everything.
19        So there is a process that would go into
20  effectively the prioritization based on Federal Air
21  Marshal availability to deploy FAMS on our high
22  risk -- high security risk flights.

93

1    Q  Would you agree that human officials at the
2  TSA exercise discretion regarding the prioritization
3  of Federal Air Marshal assignments?
4       MS. KONKOLY:  Again, I'll object insofar as
5  the answer calls for any information protected by
6  SSI.  You can answer that one to the extent you can.
7    A  So at a high level there is human
8  involvement in the assignment of Federal Air
9  Marshals.  So to the extent as performing their
10  duties there's a review and steps involved that is
11  not 100 percent all system generated in order to be
12  able to assign Federal Air Marshals to flights.
13    Q  What prevents the TSA officials who are
14  making the final air marshal assignments from using
15  a race or religion as a factor in those assignments?
16       MS. KONKOLY:  Objection, vague.
17    A  So TSA does not use race or religion in its
18  rules to identify high-risk passengers.  So to the
19  same extent FAMS and scheduling as a part of that we
20  do not use race or religion in assignment of Federal
21  Air Marshals on flights.
22    Q  Has race or religion ever been a

94

1  consideration that a TSA employee or Federal Air
2  Marshal has used --
3       MS. KONKOLY:  Objection.
4    Q  -- regarding their assignment?
5       MS. KONKOLY:  Objection, vague.  Objection
6  as to the scope of the designated topics for this
7  deposition, but you can answer.  Let me also object
8  insofar as there's any SSI implicated in the answer,
9  but you can answer.
10    A  I can state that TSA at large does not use
11  race or religion in its identification of high-risk
12  passengers and assignments of flights.
13    Q  Has any TSA official ever used race or
14  religion in the course of carrying out their
15  assignment?
16       MS. KONKOLY:  I'm going to again object as
17  to the scope of the designated topics for the
18  deposition, object insofar as there is any SSI
19  implicated in the answer, calls for speculation at
20  some level.  But you can answer.
21    A  Not that I'm aware of by policy, by process,
22  policy operations, we do not use race or religion.

95

1  I cannot speculate on --
2    Q  Does the TSA evaluate the effectiveness of
3  Quiet Skies and Silent Partner?
4       MS. KONKOLY:  Objection insofar as the
5  answer implicates any SSI, but you can answer.
6    A  Yes, TSA is continually reviewing the
7  results of the rules, the high-risk passenger rules
8  that it implements.  It also compares it continually
9  evaluating the current intelligence threat.
10       And as stated earlier, we have set
11  independent of TSA identifying passengers as being
12  Quiet Skies or Silent Partner higher risk, it has
13  been identified -- confirmed that individuals have
14  been added to the TSDB.
15       TSA has evaluated from an effectiveness
16  perspective, has also identified that Quiet Skies
17  passengers independent of being identified as a
18  Quiet Skies rules-based passenger have been added to
19  the TSDB subsequent to that at a higher rate than
20  any other passengers.  So TSA -- yes, TSA does
21  evaluate the effectiveness of its high-risk rules.
22    Q  Can being flagged by a TSA high-risk rule

96

1  constitute derogatory information supporting a
2  nomination to the TSDB?
3       MS. KONKOLY:  I'm going to object insofar as
4  that question calls for any information protected by
5  SSI or the law enforcement privilege.  You can
6  answer to the extent that you can.
7    A  No.  To reiterate my statement in the
8  declaration, simply matching to rules to designate
9  high risk is not viewed as derogatory information to
10  be nominated into the TSDB.  These rules are to
11  identify passengers that may present an elevated
12  risk.
13       It goes back to my clarification again of
14  simply matching to the rule.  It does not constitute
15  that the individual is considered a terrorist or
16  considered the partially known terrorist direct.  It
17  is an indication that these passengers present an
18  elevated risk.
19    Q  How does an individual who is identified as
20  presenting an elevated risk end up on the TSDB?
21       MS. KONKOLY:  Objection as to scope.
22  Objection insofar as the answer calls for any

97

1  information protected by the law enforcement
2  privilege or SSI.  You can answer if you happen to
3  know, but -- to the extent you can.
4      **A  For those that have been -- so each**
5  **individual that has been subsequently added, I**
6  **cannot speak to how, but I can speak definitively**
7  **that by virtue of just simply matching to a Quiet**
8  **Skies rule has not been reason to be nominated to**
9  **the TSDB.**
10     **There's multiple criteria and factors just**
11 **overall, regardless of high risk -- of -- regardless**
12 **of whether you've matched to a high-risk rule.**
13 **There's multiple criteria that must be met in order**
14 **to be added to the TSDB.**
15     Q  Has a Quiet Skies or Silent Partner selectee
16 ever been nominated to the TSDB as a result of the
17 special mission coverage report about a specific
18 trip prepared by an air marshal?
19     MS. KONKOLY: I'm going to object.  I
20 believe this question has been asked and answered.
21 Objection insofar as the question calls for any SSI
22 or law enforcement privilege information.  You can

98

1  answer again to the extent you can.
2      **A  No.**
3      Q  How long does the TSA retain information on
4  passengers who have been flagged as a Quiet Skies or
5  Silent Partner selectee?
6      MS. KONKOLY: Objection insofar as the
7  question calls for any information protected by SSI.
8  You can answer that to the extent you can.
9      **A  So the details of -- the detailed**
10 **information of matches to Quiet Skies and Silent**
11 **Partner rules are reviewed in the Office of**
12 **Intelligence -- TSA's Office of Intelligence**
13 **Analysis for two years.**
14     **As -- broadly, as part of our secure flight**
15 **data retention information, those -- just matches,**
16 **not details regarding the rules, to high-risk**
17 **passenger rules are retained for seven years.**
18     Q  How long does the TSA retain any Federal Air
19 Marshal special mission coverage reports about Quiet
20 Skies or Silent Partner selectees?
21     MS. KONKOLY: I'll again object insofar as
22 the question calls for information protected by SSI,

99

1  but you can answer to the extent you can.
2      **A  So the Federal Air Marshals data retention**
3  **of their activities is five years.**
4      Q  Has the TSA prepared any reports on the
5  effectiveness of its risk-based rules?
6      MS. KONKOLY: Objection insofar as the
7  question calls for anything protected by SSI.  You
8  can answer if you can.
9      **A  There's, to my knowledge, no formal reports**
10 **of the effectiveness.  We do -- our analysts do**
11 **review the results of rules and how they match to**
12 **examine are they meeting the current intelligence.**
13 **I'm not aware of formal reports regarding**
14 **effectiveness.**
15     Q  How does the TSA determine that its rules
16 are effective?
17     MS. KONKOLY: Objection insofar as that
18 calls for any information protected by SSI, but you
19 can answer to the extent you can.
20     **A  So TSA has been conducting analysis, as I**
21 **stated earlier, where we have identified separately,**
22 **not as a result of being identified as a match to a**

100

1  **Quiet Skies or Silent Partner rule.  We have**
2  **identified that individuals that have matched have**
3  **independently been added to the TSDB, again, as a**
4  **part of its validation of effectiveness.  So**
5  **that's -- yeah.**
6      Q  Are Quiet Skies rules ever deactivated
7  because they have been proven ineffective?
8      MS. KONKOLY: Objection insofar as that
9  calls for information protected by SSI.  You can
10 answer to the extent that you can.
11     **A  So I'm going to rephrase.  I'm not going to**
12 **say they've been activated because they've been**
13 **proven ineffective.  We do, by virtue of**
14 **continuously reviewing current intelligence**
15 **reporting related to the threat, can and will and**
16 **have deactivated rules if the threat is no longer**
17 **present or is over, so not just as part of a**
18 **quarterly review.**
19     **We're continuously reviewing the threat when**
20 **we have identified whether -- if it's -- the threat**
21 **has evolved or is no longer present, we will**
22 **deactivate the rule.  But that is not because of**

101

1  ineffectiveness.

2      Q  I want you to turn to tab six of your

3  binder, which will now get marked as Exhibit 4.  And

4  this is a story from NPR that was published on

5  July 30, 2018.

6          (Froemling Deposition Exhibit 4 was

7  marked for identification and attached to the

8  transcript.)

9      Q  On the second page of this in the fifth full

10 paragraph, the NPR story reports, quote, After

11 analyzing travel patterns, the TSA pulls

12 intelligence from a number of sources, dash, state

13 and local law enforcement, federal agencies, and

14 international partners, and dash, before deciding to

15 assign an air marshal.  The program is designed to

16 ignore people clearly traveling for business or to

17 visit family and focus on potential threats, Bilello

18 said.  Who is the TSA official Bilello?

19     MS. KONKOLY:  Objection, scope.  You can

20 answer if you know.

21     **A  Michael Bilello is our assistant**

22 **administrator for strategic communications and**

102

1  **public affairs.**

2      Q  Okay.  Does this paragraph I just read

3  accurately reflect TSA policy?

4      MS. KONKOLY:  Objection insofar as the

5  question calls for any information protected by SSI,

6  but you can answer.

7      **A  Yes.  As I stated, it basically is**

8  **paraphrasing what I've stated previously in that TSA**

9  **reviews current intelligence to identify individuals**

10 **that present a higher risk and beginning in March**

11 **of 2018 have also been incorporated into the**

12 **assignment of Federal Air Marshals as part of their**

13 **risk-based security activities.**

14     Q  How does the TSA determine who people are

15 that are, quote, clearly traveling for business or

16 to visit family, closed quote?

17     MS. KONKOLY:  I'm going to object on the

18 basis of SSI and instruct the witness not to answer

19 that question.

20     Q  Does the TSA have a process for separating

21 out potential threats from individuals clearly

22 traveling for business or to visit family?

103

1      MS. KONKOLY:  I'm going to again object on

2  the basis of SSI.  You can answer that one to the

3  extent you can.

4      **A  Yes.  As stated in my declaration, TSA**

5  **doesn't have a process to maintain a list of those**

6  **passengers that have been identified as not being a**

7  **high risk or presenting a low risk.**

8      MS. HOMER:  Okay.  Can we go off the record

9  for a split second?

10     THE VIDEOGRAPHER:  Please stand by.  We are

11 going off the record.

12     (Off the record.)

13     THE VIDEOGRAPHER:  We are back on the

14 record.  The time is 1:20 p.m.

15 BY MS. HOMER:

16     Q  Are Federal Air Marshals ever assigned a

17 special mission coverage for individuals listed on

18 the TSDB?

19     MS. KONKOLY:  Objection as to scope.

20 Objection insofar as the question calls for

21 information protected by SSI.  You can answer that

22 to the extent that you can.

104

1      **A  I'm sorry.  Can we take a break real quick**

2  **just so -- sorry.**

3      MS. KONKOLY:  Well, if we'll break, we'll

4  come back and provide an answer.

5      THE WITNESS:  Yes.  Sorry.  Yeah.

6      THE VIDEOGRAPHER:  Please stand by.  We are

7  going off the record.  The time is 1:21 p.m.

8      (Off the record.)

9      THE VIDEOGRAPHER:  We are back on the

10 record.  The time is 1:27 p.m.

11     (The Reporter read the record as

12 follows:  Are Federal Air Marshals ever assigned a

13 special mission coverage for individuals listed on

14 the TSDB?)

15     MS. KONKOLY:  And I'm going to again object

16 as to scope and as to any SSI implicated in the

17 answer, but you can answer to the extent you can.

18     THE WITNESS:  They may be.

19     MS. HOMER:  Thank you.

20     MS. KONKOLY:  And then lastly,

21 Ms. Froemling, did you want to offer clarification

22 regarding your earlier testimony about the selection

Transcript of Hao-y Tran Froemling, Designated Representative
Conducted on October 4, 2018

105

1  of Quiet Skies or rules-based matches for FAMS
2  special mission coverage?
3       THE WITNESS:  Yes.  I believe the prior
4  question was are the FAMS automatically assigned to
5  all flights with Quiet Skies rules-based passengers.
6  What I want to clarify is as FAMS, Federal Air
7  Marshals are available they will be assigned for
8  flights with Quiet Skies rules passengers.
9       MS. HOMER:  Thank you.  Did counsel have any
10  other questions?
11       MS. KONKOLY:  That's it.
12       THE VIDEOGRAPHER:  All right.  Please stand
13  by.  This marks the end of the videotaped deposition
14  of Hao-y Tran Froemling.  We are off the record at
15  1:28 p.m.
16       THE COURT REPORTER:  Can I get your
17  transcript order for the record?
18       MS. MENSI:  Yes.  Can you process it normal
19  processing and then make it out to the CAIR Legal
20  Fund.
21       MS. KONKOLY:  Regular delivery.  Email it to
22  me.

106

1       (Off the record.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

107

1  CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
2       I, KATY M. ZAMORA, Registered Merit
3  Reporter, Certified Realtime Reporter, and Notary
4  Public, the officer before whom the foregoing
5  deposition was taken, do hereby certify that the
6  foregoing transcript is a true and correct record of
7  the testimony given; that said testimony was taken
8  by me stenographically and thereafter reduced to
9  typewriting under my supervision; that reading and
10  signing was not requested; and that I am neither
11  counsel for or related to, nor employed by any of
12  the parties to this case and have no interest,
13  financial or otherwise, in its outcome.
14       IN WITNESS WHEREOF, I have hereunto set my
15  hand and affixed my notarial seal this 16th day of
16  October 2018.
17  My commission expires April 30, 2019.
18
19
20  _____
21  NOTARY PUBLIC IN AND FOR
22  THE DISTRICT OF COLUMBIA