# Elhady Plaintiffs
# MSJ Exhibit 34

**United States Government Accountability Office**



Report to Congressional Requesters

September 2006

# TERRORIST WATCH LIST SCREENING

# Efforts to Help Reduce Adverse Effects on the Public



**GAO**

Accountability * Integrity * Reliability

September 2006

## G A O
**Accountability · Integrity · Reliability**

# Highlights

Highlights of GAO-06-1031, a report to congressional requesters

# TERRORIST WATCH LIST SCREENING

## Efforts to Help Reduce Adverse Effects on the Public

## Why GAO Did This Study

A consolidated watch list managed by the FBI's Terrorist Screening Center (TSC) contains the names of known or suspected terrorists, both international and domestic. Various agencies whose missions require screening for links to terrorism use watch list records. For example, U.S. Customs and Border Protection (CBP) screens travelers at ports of entry. Because screening is based on names, it can result in misidentifications when persons not on the list have a name that resembles one on the list. Also, some names may be mistakenly included on the watch list. In either case, individuals can be negatively affected and may express concerns or seek agency action, or redress, to prevent future occurrences. This report addresses: (1) the extent to which the numbers of misidentified persons are known and how they could be affected, (2) the major reasons misidentifications occur and the actions agencies are taking to reduce them or minimize their effects, and (3) the opportunities for redress available to individuals with watch list-related concerns. In conducting work at TSC and the principal federal agencies that use watch list data, GAO reviewed standard operating procedures and other relevant documentation and interviewed responsible officials.

GAO makes no recommendations at this time because the agencies have ongoing initiatives to improve data quality, reduce the number of misidentifications or mitigate their effects, and enhance redress efforts.

www.gao.gov/cgi-bin/getrpt?GAO-06-1031.

To view the full product, including the scope and methodology, click on the link above. For more information, contact Eileen Larence at (202) 512-8777 or larencee@gao.gov.

## What GAO Found

Annually, millions of individuals—from international travelers to visa applicants—are screened for terrorism links against the watch list. At times, a person is misidentified because of name similarities, although the exact number is unknown. In some cases, agencies can verify the person is not a match by comparing birth dates or other data with watch list records, but agencies do not track the number. In other cases, they ask TSC for help. From December 2003 (when TSC began operations) to January 2006, agencies sent tens of thousands of names to TSC, and about half were misidentifications, according to TSC. While the total number of people misidentified may be substantial, it likely represents a fraction of all people screened. Even so, misidentifications can lead to delays, intensive questioning and searches, missed flights, or denied entry at the border.

Misidentifications most commonly occur with names that are identical or similar to names on the watch list. To rapidly screen names against the watch list, agencies use computerized programs that account for differences due to misspellings and other variations. TSC has ongoing initiatives to improve computerized matching programs and the quality of watch list records. Also, CBP and the Transportation Security Administration (TSA) have established procedures designed to expedite frequently misidentified persons through screening, after confirming they are not on the watch list.

Because security measures regrettably may cause personal inconveniences, TSA and CBP, with the support of TSC, provide opportunities for people who have been misidentified or mistakenly included on the watch list to seek redress. Most of these are misidentified persons who are not on the watch list but have a similar name and, therefore, may be repeatedly misidentified. Thus, TSA, for example, provides redress that relies heavily on efforts to expedite frequently misidentified persons through screening by allowing them to submit personal information that helps airlines more quickly determine that they are not on the watch list. If TSA and CBP cannot resolve questions from the public, they ask TSC for help. For 2005, TSC reported that it processed to completion 112 redress referrals and removed the names of 31 mistakenly listed persons from the watch list. To ensure that opportunities for redress are formally documented across agencies and that responsibilities are clear, the Justice Department is leading an effort to develop an interagency memorandum of understanding and expects a final draft to be ready for approval by fall 2006. TSC and frontline-screening-agency officials recognize that, after the agreement is finalized, the public needs to clearly understand how to express concerns and seek relief if negatively affected by screening. So, these officials have committed to making updated information on redress publicly available.

GAO provided a draft copy of this report to the departments of Justice, Homeland Security, and State. They provided technical clarifications that GAO incorporated where appropriate.

# Contents

| **Letter** | | **1** |
|---|---|---|
| | Results in Brief | 4 |
| | Background | 6 |
| | Although Likely a Small Percentage of All People Screened, the Thousands of Persons Misidentified to the Terrorist Watch List Can Experience Additional Questioning, Delays, and Other Effects | 12 |
| | Most Misidentifications Occur Because of Similarities to Names on the Terrorist Watch List; Agencies Are Attempting to Reduce the Incidence of Misidentifications or Otherwise Facilitate Individuals through the Screening Process | 19 |
| | The Terrorist Screening Center and Frontline-Screening Agencies Are Addressing Concerns Related to Watch List Screening, and an Interagency Agreement Is Being Developed to Further Ensure an Effective Means for Seeking Redress | 27 |
| | Concluding Observations | 42 |
| | Agency Comments | 44 |
| **Appendix I** | **Objectives, Scope, and Methodology** | **47** |
| | Objectives | 47 |
| | Scope and Methodology | 47 |
| | Data Reliability | 54 |
| **Appendix II** | **Terrorist Screening Center Terrorist-Watch-List Redress Process** | **55** |
| **Appendix III** | **Transportation Security Administration Traveler Identity Verification Program** | **61** |
| | Exhibit A: "Our Traveler Identity Verification Program" | 61 |
| | Exhibit B: Traveler Identity Verification (TSA Form 2301, May 2006) | 64 |
| **Appendix IV** | **U.S. Customs and Border Protection Online Information** | **66** |
| | Background and Preliminary Observation | 66 |
| | Interagency Border Inspection System Fact Sheet | 66 |

**Appendix V**  **Comments from the Department of Homeland Security**  68

**Appendix VI**  **Comments from the State Department**  71

**Tables**

Table 1: Number and Disposition of Redress Queries Referred to the Terrorist Screening Center, Calendar Year 2005  32

Table 2: U.S. Customs and Border Protection Ports of Entry Visited by GAO  48

**Figures**

Figure 1: General Overview of the Name-Matching Process Used to Screen Individuals against the Terrorist Watch List  11

Figure 2: General Overview of the Terrorist Screening Center's Process for Handling Concerns Involving Watch-List-Related Screening  30

## Abbreviations

| | |
|---|---|
| CBP | U.S. Customs and Border Protection |
| FBI | Federal Bureau of Investigation |
| IAFIS | Integrated Automated Fingerprint Identification System |
| IDENT | Automated Biometrics Identification System |
| IBIS | Interagency Border Inspection System |
| RFID | radio frequency identification |
| SENTRI | Secure Electronic Network for Travelers Rapid Inspection |
| TSA | Transportation Security Administration |
| TSC | Terrorist Screening Center |
| US-VISIT | U.S. Visitor and Immigrant Status Indicator Technology |

This is a work of the U.S. government and is not subject to copyright protection in the United States. It may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.



**United States Government Accountability Office**
**Washington, DC 20548**

September 29, 2006

The Honorable F. James Sensenbrenner, Jr.
Chairman
Committee on the Judiciary
House of Representatives

The Honorable Bennie G. Thompson
Ranking Member
Committee on Homeland Security
House of Representatives

To identify individuals with known or potential links to terrorism, since the tragedies of September 11, 2001, agencies such as the departments of State, Justice, and Homeland Security have implemented enhanced procedures to screen international travelers, airline passengers, and visa applicants. One important homeland security tool used by these federal frontline-screening agencies is the terrorist-screening database, otherwise known as the consolidated watch list, containing the names of individuals with known and suspected links to terrorism. The database, which contains names of foreign and U.S. citizens, is maintained by the Terrorist Screening Center, an entity that has been operational since December 2003 under the administration of the Federal Bureau of Investigation (FBI). Based upon agency-specific policies and criteria, relevant portions of the Terrorist Screening Center's consolidated watch list can be used in a wide range of security-related screening procedures. For instance, the Transportation Security Administration's No Fly and Selectee lists—used by airlines to screen passengers prior to boarding—are portions of the Terrorist Screening Center's consolidated watch list.[1] Also, to help ensure that known or suspected terrorists do not enter the United States, applicable portions of the watch list are to be checked by Department of State consular officers before issuing U.S. visas and by U.S. Customs and

---

[1]According to the Transportation Security Administration, persons on the No Fly list should be precluded from boarding an aircraft bound for, or departing from, the United States. In contrast, being on the Selectee list does not mean that the individual will be precluded from boarding a plane or entering the United States. Instead, any person on the Selectee list is to receive additional screening, which may involve a physical inspection of the person and a hand-search of luggage.

Border Protection officers before admitting persons at air, land, and sea ports of entry.

Because terrorist watch list screening involves comparisons based on personal-identifying information such as names and dates of birth, there is potential to generate misidentifications—given that two or more persons, for example, may have the same or similar names.[2] As such, the screening inevitably can raise concerns from individuals who assert that they are being misidentified because of a name similarity to some other person whose name is on the watch list. Misidentifications can result in travel delays and other inconveniences for the respective individuals. Specific instances have been widely reported in newspapers and other media, including cases involving members of Congress and other high-profile individuals. Misidentifications highlight the importance of having a process—often referred to as redress—for affected persons to express their concerns, seek correction of any inaccurate data, and request other actions to reduce or eliminate future inconveniences.[3] Similarly, such a process would apply to other persons affected by the maintenance of watch list data, including persons whose names are actually on the watch list but should not be ("mistakenly listed persons") as well as persons who are properly listed.[4] Accordingly, in reference to terrorist watch list screening, this report addresses the following questions:

• To what extent are the numbers of terrorist watch list misidentifications known, and generally, how could misidentified persons be affected?

• What are the major reasons that misidentifications occur, and what actions are the Terrorist Screening Center and frontline-screening

---

[2] The term "misidentification" refers to a person initially matched by a screening agency to a name on the watch list, but upon closer examination, the person is found to not match any watch list record.

[3] As used in this report, the term "redress" generally refers to an agency's complaint-resolution process, whereby individuals may seek resolution of their concerns about an agency action. In the report, we describe elements of the opportunities for redress offered by several agencies, and we generally analyze their respective policies and procedures. However, we do not address the relation between agency redress and other possible remedies, such as judicial review.

[4] For purposes of this report, the term "mistakenly listed persons" includes two categories of individuals—(1) persons who never should have been included on the watch list but were due to some type of error and (2) persons who were appropriately included on the watch list at one time but no longer warrant inclusion on the terrorist watch list due to subsequent events.

agencies taking to reduce the number of misidentified persons or expedite them through the screening process?

- To address concerns from misidentified and mistakenly listed persons, what opportunities for redress have the Terrorist Screening Center and frontline-screening agencies established?

In answering these questions, we reviewed the Terrorist Screening Center's standard operating procedures, statistics on watch-list-related screening encounters that resulted in referrals to the center, and other relevant documentation; and we interviewed Terrorist Screening Center officials, including the director, principal deputy director, chief information officer, and privacy officer. Similarly, we interviewed officials at and reviewed documentation obtained from the principal frontline-screening agencies—Transportation Security Administration, U.S. Customs and Border Protection, and the Department of State—whose missions most frequently and directly involve interactions with travelers.[5] Regarding the screening of air passengers, in addition to contacting the Transportation Security Administration to broadly discuss the procedures of air carriers, we interviewed security officials at five major, domestic air carriers. Also, we visited various land and air ports of entry in four states—California, Michigan, New York, and Texas. Collectively, these states have ports of entry on both the northern and southern borders of the United States. Regarding statistical data we obtained from the Terrorist Screening Center—such as the number of misidentifications and the results of the redress process, particularly the number of mistakenly listed persons whose names have been removed from the watch list—we discussed the sources of the data with center officials, including the chief information officer, and we reviewed documentation regarding the compilation of the statistics. We determined that the statistics were sufficiently reliable for the purposes of presenting overall patterns and trends. We performed our work from April 2005 through August 2006 in accordance with generally accepted government auditing standards. Appendix I presents more details about our objectives, scope, and methodology.

---

[5]Although the terrorist watch list is used for a variety of screening purposes, such as conducting background checks of workers who have access to secure areas of the national transportation system, our work generally focused on the screening of travelers. At the Transportation Security Administration, we examined the screening of air passengers prior to their boarding a flight; at U.S. Customs and Border Protection, we examined the screening of travelers entering the United States through ports of entry; and at the Department of State, we examined the screening of nonimmigrant visa applicants.

## Results in Brief

Although the total number of misidentifications that have occurred as a result of watch-list-related screening conducted by all frontline-screening agencies and airlines is unknown, Terrorist Screening Center data indicate that about half of the tens of thousands of potential matches sent to the center between December 2003 and January 2006 for further research turned out to be misidentifications.[6] The frontline-screening agencies and, in the case of air travel, airlines are able use other identifying information to resolve some possible matches without Terrorist Screening Center involvement, but when the agencies are unable to do so, they are to refer the information to the center for clarification and resolution. Frontline-screening agencies and airlines generally do not have readily available statistics quantifying the number of potential matches they have been able to resolve without consulting the Terrorist Screening Center. Although the total number of misidentified persons may be substantial in absolute terms, it likely represents a small fraction of the hundreds of millions of individuals screened each year. For example, in fiscal year 2005, U.S. Customs and Border Protection alone reported that its officers managed about 431 million border crossings into the United States at land, air, and sea ports of entry. Nonetheless, misidentifications resulting from terrorist watch list screening can affect the respective individuals by, for example, delaying their travel, subjecting them to more intensive questioning and searches, and denying them conveniences such as self-serve check-in at airports. Also, in some cases, travelers have missed flights.

Misidentifications most commonly occur because the names of some persons being screened are similar to those on the terrorist watch list. The federal screening agencies we studied and most airlines use computer-driven algorithms to rapidly compare the names of individuals against the terrorist watch list.[7] Generally, these name-recognition technologies may be designed to balance minimizing the possibility of false negatives—that is, failing to identify an individual whose name is on the terrorist watch list—while not generating an unacceptable number of false positives (misidentifications). Thus, the computerized algorithms may be configured to return a broad set of possible matches based on the name input in order

---

[6]According to the FBI, the specific number of potential matches sent to the Terrorist Screening Center that turned out to be misidentifications is sensitive information; however, the total is substantially less than 100,000.

[7]An algorithm is a prescribed set of well-defined, unambiguous rules or processes for the solution of a problem in a finite number of steps. Pursuant to Transportation Security Administration security directives and implementing guidance, airlines are to prescreen passengers by matching their names against the No Fly and Selectee lists.

to account, for example, for differences in names due to misspellings or transcription errors. The Terrorist Screening Center has formed an interagency working group to improve the effectiveness of identity matching across agencies, and the group's efforts were ongoing the time of our review. The center also has ongoing quality-assurance initiatives to identify and correct incomplete or inaccurate records that contribute to misidentifications. Further, agencies are taking actions to expedite frequently misidentified persons through the screening process. For example, in February 2006, U.S. Customs and Border Protection began annotating its database to help ensure that travelers who have been inadvertently stopped in the past—because they have the same or similar name as a watch list record—are no longer subjected to intensive screening, unless warranted by new data. As a future enhancement, the Terrorist Screening Center is planning to have links to other agencies' biometric data, such as fingerprints. According to center officials, the capability to link biometric data to supplement name-based screening may be more relevant for confirming the identities of known terrorists than minimizing misidentifications or false positives.

The Terrorist Screening Center, the Transportation Security Administration, and U.S. Customs and Border Protection have processes in place to help resolve concerns or complaints submitted by persons adversely affected by terrorist watch list screening.[8] The processes are interdependent in that the frontline-screening agencies are to receive all redress queries, resolve those that, based on other identifying information, clearly involve misidentified persons, and refer the other queries to the Terrorist Screening Center—particularly queries submitted by persons whose names are actually contained on the watch list. For calendar year 2005, the center reported that it processed to completion 112 redress referrals and removed the names of 31mistakenly listed individuals from the watch list. In contrast, the frontline-screening agencies processed thousands of redress queries. Most redress queries are submitted by misidentified persons, and their names cannot be removed from the watch list because they are not the persons on the list. Instead, some frontline-screening agencies have undertaken initiatives to expedite the future

---

[8]Any such concern or complaint raised formally by an affected individual is what the Terrorist Screening Center calls a redress query. Specifically, the Terrorist Screening Center defines a "redress query" as communication from individuals or their representatives inquiring or complaining about an adverse experience during a terrorist watch-list-related-screening process conducted or sponsored by a federal agency, including congressional inquiries to federal agencies on behalf of their constituents.

processing of persons who are frequently misidentified. For example, under the Transportation Security Administration's process, affected individuals can voluntarily provide additional personal-identifying information as a basis for the agency to determine whether their names can be put on a cleared list. Airlines are to use the cleared list to more quickly distinguish these individuals from persons who are on the No Fly and the Selectee lists. This procedure is intended to reduce delays in obtaining airline-boarding passes. The Terrorist Screening Center, from its unique position as administrator of the consolidated terrorist watch list, has noted significant differences among agencies in providing watch-list-related redress. For instance, whereas the Transportation Security Administration has designated an official accountable specifically for redress, U.S. Customs and Border Protection does not and also has not followed consistent procedures in referring appropriate redress queries to the Terrorist Screening Center. Thus, at the Terrorist Screening Center's request, the Department of Justice is leading an effort to develop an interagency memorandum of understanding to ensure that opportunities for redress are formally documented and that agency responsibilities are clear, with designated officials specifically accountable for supporting the continued success of watch-list-related redress. This effort, according to the Terrorist Screening Center, has been ongoing since fall 2005, and a final draft of the memorandum of understanding is expected to be ready for interagency clearances by fall 2006. The Department of Justice and the Terrorist Screening Center have acknowledged that, upon finalization of an interagency agreement that documents the redress opportunities and designates agencies' responsibilities, it is important that appropriately updated information on redress and points of contact be made available to the public, including updates of Web-based guidance.

We are not making recommendations at this time because the agencies have ongoing efforts to improve data quality and otherwise either reduce the number of misidentifications or mitigate their effects and to provide more effective redress.

## Background

In April 2003, we reported that watch lists were maintained by numerous federal agencies and that the agencies did not have a consistent and uniform approach to sharing information on individuals with possible links to terrorism.[9] Our report recommended that the Department of Homeland

---

[9]GAO, *Information Technology: Terrorist Watch Lists Should Be Consolidated to Promote Better Integration and Sharing*, GAO-03-322 (Washington, D.C.: Apr. 15, 2003).

Security's Secretary, in collaboration with the heads of the departments and agencies that have and use watch lists, lead an effort to consolidate and standardize the federal government's watch list structures and policies. Subsequently, pursuant to Homeland Security Presidential Directive 6, dated September 16, 2003, the Terrorist Screening Center was established to consolidate the government's approach to terrorism screening and provide for the appropriate and lawful use of terrorist information in screening processes. The center began "24/7" operations on December 1, 2003, and, about 3 months later, on March 12, 2004, announced that watch list consolidation was completed with establishment of the terrorist-screening database. This consolidated database is the U.S. government's master repository for all known and suspected international and domestic terrorist records used for watch-list-related screening. Records for inclusion in the consolidated database are submitted to the Terrorist Screening Center from the following two sources:

- Identifying information on individuals with possible international terrorism ties is provided through the National Counterterrorism Center, which is managed by the Office of the Director of National Intelligence.

- Identifying information on individuals with ties to purely domestic terrorism, such as Ted Kaczynski (the "Unabomber"), is provided by the FBI.

In their terrorist-screening processes, the three federal frontline-screening agencies that we reviewed use records exported by the Terrorist Screening Center. That is, the applicable exported records are incorporated, respectively, into the Transportation Security Administration's No Fly and Selectee lists, U.S. Customs and Border Inspection's Interagency Border Inspection System, and the State Department's Consular Lookout and Support System. The following listing discusses the frontline-screening agencies' use of watch list records more specifically:

- **Transportation Security Administration's No Fly and Selectee Lists**: As needed, the Transportation Security Administration provides updated No Fly and Selectee lists to airlines for use in prescreening passengers. Through the issuance of security directives, the agency requires that airlines use these lists to screen passengers prior to boarding. The agency's Office of Intelligence (formerly called the Transportation

Security Intelligence Service) provides assistance to airlines in determining whether passengers are a match with persons on the lists.[10]

- **U.S. Customs and Border Protection's Interagency Border Inspection System**: U.S. Customs and Border Protection officers use the Interagency Border Inspection System to screen travelers entering the United States at ports of entry, which include land border crossings along the Canadian and Mexican borders, sea ports, and U.S. airports for international flight arrivals. This system includes not only the applicable records exported by the Terrorist Screening Center, but also additional information on people with prior criminal histories, immigration violations, or other activities of concern that U.S. Customs and Border Protection wants to identify and screen at ports of entry.

- **State Department's Consular Lookout and Support System**: This system is the primary sensitive but unclassified database used by consular officers abroad to screen the names of visa applicants to identify terrorists and other aliens who are potentially ineligible for visas based on criminal histories or other reasons specified by federal statute. According to the State Department, all visa-issuing posts have direct access to the system and must use it to check each applicant's name before issuing a visa.

Also, the Terrorist Screening Center makes applicable records in the consolidated database available to support the terrorist-screening activities of other federal agencies—such as U.S. Immigration and Customs Enforcement, which is the largest investigative component of the Department of Homeland Security—as well as state and local law enforcement agencies. For example, the FBI's National Crime Information Center has a file—the Violent Gang and Terrorist Organization File— which is accessible by federal, state, and local law enforcement officers for screening in conjunction with arrests, detentions, or other criminal

---

[10]The Transportation Security Administration is developing a new passenger prescreening program, known as Secure Flight. Under the Secure Flight program, the agency plans to take over, from commercial airlines, the responsibility to compare identifying information on airline passengers against information on known or suspected terrorists. The agency expects that Secure Flight will improve passenger prescreening as compared with the current airline-operated process. In June 2006, we reported that the Transportation Security Administration still faces significant challenges in developing and implementing the Secure Flight program. See, GAO, *Aviation Security: Management Challenges Remain for the Transportation Security Administration's Secure Flight Program*, GAO-06-864T (Washington, D.C.: June 14, 2006).

justice purposes.[11] A subset of this file consists of the Terrorist Screening Center's records to be used to screen for possible terrorist links.

Figure 1 presents a general overview of the name-matching process typically used by frontline-screening agencies and airlines to screen individuals against applicable records exported by the Terrorist Screening Center, which has an important role in verifying identities. When the computerized name-matching system of a frontline-screening agency or, in the case of air travel, an airline generates a "hit" (a potential name match) against a terrorist database record, the agency or airline is to review each potential name-match. Any obvious mismatches (misidentifications) are to be resolved by the frontline agency or airline.

Conversely, clearly positive or exact matches generally are to be referred to the applicable screening agency's intelligence center and to the Terrorist Screening Center to provide law enforcement an opportunity for a counterterrorism response.[12] Similarly, hits involving inconclusive matches—that is, uncertain and other hard-to-verify potential matches— typically are to be referred to the applicable screening agency's intelligence center. In turn, if the intelligence center cannot conclusively determine whether a hit is an exact match, the Terrorist Screening Center is to be contacted.[13] Referring inconclusive matches to the Terrorist Screening Center for resolution or confirmation is important because the possible consequences of not identifying a known or suspected terrorist could be worse than the inconveniences associated with

---

[11]Also, the FBI and designated state and local criminal justice agencies access the Violent Gang and Terrorist Organization File in conducting background checks on individuals seeking to purchase firearms or obtain permits to possess, acquire, or carry firearms. See GAO, *Gun Control and Terrorism: FBI Could Better Manage Firearm-Related Background Checks Involving Terrorist Watch List Records*, GAO-05-127 (Washington, D.C.: Jan. 19, 2005).

[12]Airlines are to contact the Transportation Security Administration, which may then contact the Terrorist Screening Center, as necessary.

[13]In commenting on a draft of this report, the State Department noted that the general overview presented in figure 1 is not fully reflective of the process for screening nonimmigrant visa applicants against the terrorist watch list. Specifically, the department emphasized that for any hit that clearly is not a mismatch, consular officers are required to obtain a security advisory opinion. That is, the consular post must ask Department of State headquarters to initiate a process of requesting that the Terrorist Screening Center and other relevant agencies check their respective databases or systems for the existence of any investigative or intelligence information regarding the individual and pass the results back to the department for use in recommending a course of action to the post.

misidentifications. In conducting its research, the Terrorist Screening Center has access to classified data systems that may contain additional information not available to the referring agency. Once the Terrorist Screening Center has confirmed the individual as either a positive match or a misidentification, the frontline-screening agency is to be informed.

**Figure 1: General Overview of the Name-Matching Process Used to Screen Individuals against the Terrorist Watch List**



**To, within, or from the United States**

Individual applies for a U.S. visa, makes an airline reservation, arrives at a U.S. port of entry (land/sea/air), or is stopped by state or local police in the interior of the United States

Frontline screening agency or airline conducts a name-match search of the individual against applicable terrorist watch list records

Exact matches and uncertain or difficult-to-verify matches are referred to intelligence centers for closer examination. State or local police contact the Terrorist Screening Center directly

YES

Potential match to terrorist watch list record

NO

Obvious mismatches of individuals to terrorist watch list records are resolved by the frontline screening agency or airline

Airline contacts the Transportation Security Administration's Office of Intelligence, State Department consular officer submits a request for a security advisory opinion on the visa applicant, or U.S. Customs and Border Protection contacts National Targeting Center

Exact matches and uncertain or difficult-to-verify matches are referred by intelligence centers to the Terrorist Screening Center

Terrorist Screening Center checks its database and other sources and confirms match or mismatch

Positive matches are referred for counterterrorism response

Misidentifications are referred back to the frontline screening agency or airline through the intelligence center

Source: GAO.

Homeland security-related screening processes entail some level of inconvenience for all travelers. Also, in an operational context, people can be and frequently are screened for reasons not related to the terrorist watch list but rather for reasons related to an agency's mission. For example, U.S. Customs and Border Protection screens travelers for any conditions that may make them inadmissible to the country, including past violations of immigration, drug, customs, or other laws. The agency also randomly selects certain individuals for more thorough screening. Similarly, prospective airline passengers may be randomly selected for additional screening, and others may be selected if they exhibit unusual behavior.[14] Generally, screening agencies and airlines are not to disclose the reason they select an individual for more thorough screening measures, so persons may mistakenly assume it is because they are on a terrorist watch list.

## Although Likely a Small Percentage of All People Screened, the Thousands of Persons Misidentified to the Terrorist Watch List Can Experience Additional Questioning, Delays, and Other Effects

Annually, hundreds of millions of individuals—international travelers, airline passengers, and visa applicants—are screened against relevant portions of the Terrorist Screening Center's consolidated watch list. The number of persons misidentified during terrorist watch list screening may be substantial in absolute terms but likely represents a small fraction of the total screenings. Nonetheless, misidentifications resulting from terrorist watch list screening can affect the respective individuals in various ways, with perhaps the most common situation involving delays and related inconveniences experienced by travelers.

---

[14]Since the late 1990s, airline passenger prescreening has been conducted using the Computer-Assisted Passenger Prescreening System (CAPPS I)—in which data related to a passenger's reservation and travel itinerary are compared against characteristics (known as CAPPS I rules) used to select passengers who require additional scrutiny—and through the matching of passenger names to terrorist watch lists. See, GAO, *Aviation Security: Secure Flight Development and Testing Under Way, but Risks Should Be Managed as System Is Further Developed*, GAO-05-356 (Washington, D.C.: Mar. 28, 2005), which reported that approximately 99 percent of all passengers on domestic flights are screened under the air carrier-operated, automated CAPPS I system, and the remaining 1 percent of passengers are screened by air carriers who do not have an automated system.

## Although a Substantial Number, Misidentified Persons Likely Constitute a Small Percentage of All People Screened

Although the full universe of persons misidentified by terrorist watch list screening may be substantial in absolute terms, the total number likely represents a small fraction of all persons who are screened. During the 26-month period we studied—from December 2003 (when the Terrorist Screening Center began operations) to January 2006—the center received tens of thousands of screening-encounter referrals from frontline-screening agencies and determined that approximately half involved misidentified persons with names the same as or similar to someone whose name was contained on the terrorist watch list. The number of referrals to the Terrorist Screening Center does not constitute the universe of all persons initially misidentified by terrorist watch list screening because the names of many persons initially misidentified are not forwarded to the Terrorist Screening Center. Rather, by comparing birth dates or other data, the frontline- screening agencies (e.g., U.S. Customs and Border Protection) are able to resolve many initial misidentifications without contacting the Terrorist Screening Center. Additionally, for air passengers, the airlines often are able to resolve initial misidentifications without contacting the Transportation Security Administration.[15] The screening agencies and airlines generally do not maintain readily available statistics on these resolutions.

Nonetheless, although the full universe of such misidentifications may be substantial in absolute terms, the total number likely represents a small fraction of all persons who are subject to terrorist watch list screening procedures, as in the following examples:

- U.S. Customs and Border Protection reported that its officers managed a total of 431 million border crossings into the United States at land, air, and sea ports of entry in fiscal year 2005.

- Domestic airline flights—flights within the United States—carried 658 million passengers during the 12 months ending January 2006, according to Department of Transportation statistics.[16]

---

[15]The Transportation Security Administration provides security directives and implementing guidance to foreign and domestic aircraft operators for use in ensuring that individuals who pose a threat to civil aviation are denied boarding passes or are subjected to additional screening, as appropriate.

[16]Also, terrorist-watch-list-screening procedures are applicable to international flights—of foreign and domestic air carriers—into or from the United States.

- The State Department reported that it processed about 7.4 million nonimmigrant visa applications in fiscal year 2005.[17]

In addition to these international travelers, domestic flight passengers, and visa applicants, any other person can be subject to terrorist watch list screening in conjunction with routine law enforcement activities. For instance, in stopping a motorist for a traffic violation, a state or local law enforcement officer can check the motorist's name against the National Crime Information Center's various files, which include terrorist watch list records exported by the Terrorist Screening Center. The National Crime Information Center, according to the FBI, is available to virtually every law enforcement agency nationwide, 24 hours a day, 365 days a year.

## Misidentified Individuals Can Experience Delays and Other Effects

People who are misidentified to the terrorist watch list can be affected in various ways, most commonly experiencing delays and related inconveniences, including being subjected to more intensive questioning and searches. Generally, the extent of the effects of terrorist watch-list-related misidentification can vary by individual circumstances and the operational nature of the screening agency's mission. For example, an individual with a name similar to someone who is on the Transportation Security Administration's No Fly list likely will be unable to utilize the convenience of Internet, curbside, and airport kiosk check-in options. This effect of misidentifications is reflected in a sample of 24 complaint letters to the Transportation Security Administration that we reviewed.[18] Many of the complainants described their frustrations with not being able to use alternative check-in options such as the Internet or airport kiosks. Similarly, in a survey conducted in June 2006 by the National Business Travel Association, many companies' travel managers responded that their

---

[17]A nonimmigrant is a person, not a citizen or national of the United States, seeking to enter the United States temporarily for a specific purpose, such as business or pleasure.

[18]As discussed in appendix I, the Transportation Security Administration provided us a selection of 24 terrorist watch-list-related complaint letters that the agency received from December 1, 2003 (when the Terrorist Screening Center became operational) to April 20, 2006. The agency attempted to select letters from different weeks throughout this time period; however, because a statistically projectable methodology was not used for the selections, the 24 letters are not representative of all complaints or inquiries (an unspecified total) that the Transportation Security Administration received during this time period.

employees have expressed frustration about repeatedly having to go to the airline ticket counter to obtain a boarding pass.[19]

Also, misidentifications can cause other effects, such as missed airline flights by either leisure travelers or business travelers, which could have economic and other consequences, although we found no readily available data on how frequently these effects occurred. However, according to Transportation Security Administration data, two international flights—one in December 2004 and another in May 2005—were diverted from landing at their scheduled destinations in the United States due to potential matches to the No Fly list. In each instance, following the diversions of the flights and further investigation after the airplanes landed, federal authorities determined that the respective passengers were misidentified and not true matches to the No Fly list. Nonetheless, the diversions resulted in delays and related inconveniences for all passengers on these flights.

The Transportation Security Administration has acknowledged that misidentifications can be embarrassing and time consuming for individuals and also potentially can erode the public's confidence in the agency's security efforts. Similarly, a recent Department of Homeland Security report recognized that "individuals who are mistakenly put on watch lists or who are misidentified as being on these lists can potentially face consequences ranging from inconvenience and delay to loss of liberty."[20]

Also, an individual can experience an immediate delay at a port of entry when U.S. Customs and Border Protection's automated search of the Interagency Border Inspection System database returns a potential match to a terrorist watch list record. For such potential matches, U.S. Customs

---

[19]According to its Web site (www.nbta.org), the National Business Travel Association represents over 2,500 corporate travel managers and travel service providers who collectively manage and direct more than $170 billion of expenditures within the business travel industry, primarily for Fortune 1,000 companies. In June 2006, the association conducted a survey of 1,316 corporate travel managers, and 444 responded to the survey. Of the responding travel managers, 107 reported that they have employees who repeatedly have had to go to the airline ticket counter to obtain a boarding pass. (Accessed August 2006.)

[20]Department of Homeland Security, *Report on Effects on Privacy & Civil Liberties—DHS Privacy Office Report Assessing the Impact of the Automatic Selectee and No Fly Lists on Privacy and Civil Liberties as Required under Section 4012(b) of the Intelligence Reform and Terrorism Prevention Act of 2004* (Washington, D.C.: Apr. 27, 2006).

and Border Protection's operating protocol is to escort the person to another screening area for further questioning and inspection (a process referred to as secondary screening). The length of time the person spends in secondary screening can be several hours, depending partly on the difficulty or ease of verifying whether the person is or is not the individual on the watch list. In the four states we visited—California, Michigan, New York, and Texas—U.S. Customs and Border Protection officers told us that given the importance of the homeland security mission, their practice is to err on the side of caution by conducting very thorough screenings.[21]

The effects of such misidentifications and the related secondary screenings can be emotional as well as physical, as reflected in complaint letters to U.S. Customs and Border Protection. A sample of 28 complaint letters to U.S. Customs and Border Protection that we reviewed alleged a range of effects, such as experiencing travel delays, which resulted in missing airline flights and incurring additional travel costs; being subjected to extensive questioning and searches, while not being allowed to contact family members, friends, or business associates to inform them about the delays; and feeling embarrassed and frustrated.[22]

The State Department's screening of nonimmigrant visa applicants against the terrorist watch list may not affect individuals in the same way as does screening by the Transportation Security Administration and U.S. Customs and Border Protection. Generally, the State Department's screening differs from other screening agencies because there is more time to search records and make decisions. According to State Department officials, the average time for processing a nonimmigrant visa application is about 2 days. However, additional processing time may be needed if initial screening of the applicant shows a possible link to terrorism—that is, the

---

[21]As discussed in appendix I, besides conducting work at U.S. Customs and Border Protection headquarters in Washington, D.C., we visited various land and air ports of entry in four states—California, Michigan, New York, and Texas. We judgmentally selected these four states because each has major land and air ports of entry, and the states collectively have ports of entry on both the northern and southern borders of the United States.

[22]As discussed in appendix I, U.S. Customs and Border Protection provided us a selection of complaint letters submitted by 28 individuals. The dates of the 28 complaint letters encompassed an 11-month period, ranging from June 2005 to April 2006. The 28 letters were not selected based on a statistically projectable methodology. Thus, the 28 letters are not representative of the approximately 220 complaints or inquiries—regarding watch-list-related secondary screening at ports of entry—that U.S. Customs and Border Protection's Customer Satisfaction Unit received during the 11-month time period and forwarded for research to the agency's National Targeting Center.

applicant's name possibly matches that of a person whose name is on the terrorist watch list. The officials explained that this additional processing time is needed because a decision on the visa applicant cannot be made until a security advisory opinion is obtained. That is, the consular post must ask the Department of State headquarters in Washington, D.C., to initiate a process of requesting that various agencies check their respective databases or systems for the existence of any investigative or intelligence information regarding the individual and pass the results back to a central point. This interagency review process includes the FBI, the Drug Enforcement Administration, the Central Intelligence Agency, and others. According to State Department officials, visa applicants are routinely told not to buy tickets or incur other travel-related expenses until the clearance process has been completed and the application approved.

In acknowledging that the interagency review process may extend the processing time for a visa decision, the State Department provided us (in June 2006) the following contextual perspectives:

- In the last 2 years, the department and its interagency partners have worked to decrease the processing time in order to reduce the impact on the traveling public.

- Nevertheless, the department's position is that the time it takes to screen a visa applicant is a necessary part of the application procedure and, therefore, is not an adverse governmental action. At times, additional processing must be done in order to determine whether a visa applicant is eligible for a visa under the law, including for national security reasons. The additional processing is the inconvenient consequence of the proper functioning of the visa screening system.

- Moreover, the extended processing time generally is a one-time occurrence. Once an alien is cleared through the process, the clearance is noted in the department's consular visa database. Thus, this person may not be subject to the same processing delay when applying for another visa in the future, unless additional investigative or intelligence information arises after issuance of the first visa.[23]

---

[23]The extended or additional processing time is not always a one-time occurrence. In processing visa applications, consular posts may request security advisory opinions for a variety of reasons. Thus, even though an individual previously has been the subject of a security advisory opinion, a new visa application may present facts and circumstances that lead the consular post to request another security advisory opinion.

Screening by state and local law enforcement also differs from screening by the Transportation Security Administration, U.S. Customs and Border Protection, and the State Department. Essentially, federal agencies (or air carriers, as applicable) initiate screening when individuals make an airline reservation, arrive at a port of entry, or apply for a visa. In contrast, a state or local law enforcement agency may initiate screening by, for example, pulling over a motorist for speeding. Generally, a routine procedure for the law enforcement officer is to query the motorist's name against records in the National Crime Information Center, which contains criminal history records as well as terrorist watch list records. According to congressional testimony presented in March 2004 by the Director of Public Security for the State of New York, it takes about 12 to 15 minutes, on average, for a New York patrol officer to contact the Terrorist Screening Center and resolve a potential name match.[24] More recently, in July 2006, the Director of the Terrorist Screening Center told us that the average time nationally is now down to about 5 minutes—that is, the time period beginning with the center's receipt of the call from a state or local law enforcement officer and ending with the response to the officer regarding the potential name match.[25]

---

[24]Testimony of Mr. James W. McMahon, Director, Office of Public Security, State of New York, at a hearing before the Subcommittee on Crime, Terrorism, and Homeland Security, Committee on the Judiciary, and the Subcommittee on Intelligence and Counterterrorism of the Select Committee on Homeland Security, House of Representatives (Mar. 25, 2004).

[25]The response to the state or local law enforcement officer may be provided by the Terrorist Screening Center or by the FBI's Counterterrorism Division (Terrorist Screening Operations Unit), as applicable.

# Most Misidentifications Occur Because of Similarities to Names on the Terrorist Watch List; Agencies Are Attempting to Reduce the Incidence of Misidentifications or Otherwise Facilitate Individuals through the Screening Process

The most common cause of misidentifications is similarity of the names of persons being checked to names on the Terrorist Screening Center's consolidated watch list, for which there is no complete remedy, but agencies are taking actions to minimize the effect on frequently misidentified persons. The Terrorist Screening Center has formed an interagency group to improve the effectiveness of identity matching across agencies and also has ongoing initiatives regarding data quality. As a future enhancement, the Terrorist Screening Center's strategy is to develop the capability to link name-based watch list searches to relevant biometric systems maintained by other agencies, although this capability may be more useful for confirming positive matches than for reducing the incidence of misidentifications.

## Misidentifications Result Because a Traveler's Name Is Similar to Someone with a Terrorist Watch List Record

Misidentifications occur most often because the names of some persons being screened are the same or similar to those in the consolidated terrorist watch list. To handle the large volumes of travelers and others who must be screened, federal agencies and most airlines use computer-driven algorithms to rapidly compare the names of individuals against the applicable terrorist watch list records. A primary factor in designing a computerized name-matching process is the need to minimize the possibility of generating false negatives—that is, failing to identify an individual whose name is on the terrorist watch list—without generating an unacceptable number of false positives (misidentifications). To help ensure that name-based screening does not miss detecting someone who is on the watch list, agencies and airlines may configure their algorithms in such a way that they return a broad set of possible matches for any given name input. For instance, the computerized algorithms may account for differences in names due to misspellings or transcription errors.

Operationally, for each name that is screened against the watch list, the computerized algorithm may return a list of possible matches. If applicable, screening agency or airline security personnel then review these results of possible matching records arrayed by probability scores to determine which, if any, is a positive match with the person being screened. To help ensure awareness of best practices among agencies, the Terrorist Screening Center has formed and chairs a working group—the

Federal Identity Match Search Engine Performance Standards Working Group—which met initially in December 2005.[26] An objective of the working group is to provide voluntary guidance for federal agencies that use identity-matching search engine technology. Essentially, the prospective guidance is intended to improve the effectiveness of identity matching across agencies by, among other means, assessing which algorithms or search engines are the most effective for screening specific types or categories of names. At the time of our review, a target date for completing the initiative to develop and provide voluntary guidance to screening agencies had not been set.

## Some Misidentifications Can Result from Inaccurate or Incomplete Data

Some misidentifications can result from inaccurate or incomplete data in the consolidated terrorist watch list. Generally, the FBI and intelligence agencies are the original collectors of the information used to determine whether a given individual should be added to the terrorist watch list. The Terrorist Screening Center, in turn, is responsible for ensuring that information received from the intelligence community is accurately maintained in the consolidated watch list. One of the Terrorist Screening Center's primary goals is to maintain accurate and complete information.

In June 2005, the Department of Justice's Office of the Inspector General reported that its review of the Terrorist Screening Center's consolidated watch list found several problems—such as inconsistent record counts and duplicate records, lack of data fields for some records, and unclear sources for some records.[27] Among other things, the Inspector General recommended that the Terrorist Screening Center develop procedures to regularly review and test the information contained in the consolidated terrorist watch list to ensure that the data are complete, accurate, and non-duplicative. The Terrorist Screening Center agreed and noted that it was taking steps to implement the recommendation. Also, the Terrorist Screening Center has quality-assurance initiatives ongoing to identify and correct troublesome records related to misidentifications.

---

[26]The working group's membership includes representatives from the departments of Homeland Security (including Transportation Security Administration and U.S. Customs and Border Protection), State, and Defense; FBI; and the intelligence community (including the National Counterterrorism Center, Central Intelligence Agency, National Security Agency, and Defense Intelligence Agency). Also, the National Institute of Standards and Technology acts as a special advisor to the working group.

[27]Department of Justice, Office of the Inspector General, *Review of the Terrorist Screening Center*, Audit Report 05-27 (June 2005).

Moreover, the Terrorist Screening Center's director and principal deputy director stressed to us that quality of data is a high priority for the center and also is a continuing challenge, particularly given that the database is dynamic, changing frequently with additions, deletions, and modifications. The officials noted the equal importance of ensuring that (1) the names of known and appropriately suspected terrorists are included in the watch list and (2) the names of any mistakenly listed individuals are removed. In this regard, the officials explained that the center's standard operating practices include at least two opportunities to review records. First, Terrorist Screening Center staff—including subject matter experts detailed to the center from other agencies—review each incoming record submitted (nominated) to the center for inclusion in the consolidated watch list. Also, every time there is a screening encounter—for example, a port-of-entry screening of an individual that generates an actual or a potential match with a watch list record—that record is reviewed again.

In addition to the Terrorist Screening Center's quality-assurance initiatives, screening agencies also have been looking at ways to reduce misidentifications. One way that holds promise, where applicable, is to use additional personal-identifying information to enhance name-based searching. For example, as part of its efforts to develop the Secure Flight program, the Transportation Security Administration conducted tests between November 2004 and April 2005 to determine what combinations of names and associated personal-identifying attributes were most effective in matching airline passenger data against terrorist watch list records. According to the Transportation Security Administration, the testing indicated that searches using additional personal-identifying attributes could potentially result in decreasing the number of misidentifications. However, the Transportation Security Administration concluded that more testing was needed to determine, among other things, the point of diminishing returns in using combinations of personal-identifying information to enhance name-based watch list searches.

## Agencies Are Taking a Number of Actions to Expedite Frequently Misidentified Persons through the Screening Process

In addition to initiatives aimed at reducing the number of misidentifications, screening agencies also are taking actions to expedite the screening of frequently misidentified persons.

**Transportation Security Administration Maintains a Cleared List of Individuals to Expedite Screening and Mitigate Negative Effects**

The Transportation Security Administration has instituted a process designed to help frequently misidentified air passengers obtain boarding passes more quickly and avoid prolonged delays. Under this process, an individual can voluntarily provide the Transportation Security Administration with additional personal-identifying information. Then, the Transportation Security Administration will use this information to decide whether the person's name should be put on a cleared list—that is, a list that contains the names and other personal-identifying information of individuals who have been checked and cleared as being persons not on the No Fly and Selectee lists. Airlines are to use the cleared list to more quickly determine that these passengers are not the persons whose names are on the No Fly and Selectee lists. As needed, the Transportation Security Administration provides the airlines with updates of the No Fly and Selectee lists and the cleared list. As discussed later in this report, the cleared list is integral to the Transportation Security Administration's redress process for watch-list-related complaints.

**U.S. Customs and Border Protection Is Annotating Its Database to Help Frequently Misidentified Travelers Avoid Additional Screening and Delays**

According to U.S. Customs and Border Protection officials, the agency has implemented procedures designed to help frequently misidentified travelers avoid additional screening and delays. Specifically, in February 2006, the agency began annotating its database regarding travelers who were inadvertently stopped because they have the same or similar name as a watch list record but are not the actual subject of the record. The officials explained that the agency uses the data routinely collected on a traveler during the initial inspection process, and no further action is necessary by the traveler. The officials noted that these travelers should no longer be stopped on subsequent visits because of the records in question. As of September 2006, according to U.S. Customs and Border Protection officials, the agency had annotated more than 10,300 such instances and had prevented more than 7,200 unnecessary inspections from occurring. [28]

**The Department of State Is Annotating Its Database to Avoid Future Delays for Visa Applicants**

As mentioned previously, the State Department's processing of a visa application takes additional time if initial screening shows a possible link to terrorism, because a decision on the visa applicant cannot be made until a security advisory opinion request is forwarded to Washington, D.C., and a response is received. However, the State Department has taken steps to

---

[28]Although a purpose is to expedite frequently misidentified persons through the screening process, the database-annotation initiative is not a "redress" process as defined in this report. Under the initiative, the agency is taking action proactively rather than responding to specific complaints or redress queries submitted by individuals.

help minimize visa-processing delays for any subsequent application filed by a previously screened person. Specifically, according to State Department officials, when a visa applicant is screened through the security advisory opinion process and is found to be a person who is not on the terrorist watch list, the State Department enters clarifying comments in its database or even on the visa itself. This information is available for review by consular officers in processing any subsequent visa applications filed by the individual. Thus, according to State Department officials, the individual's future applications should not incur any additional processing times, unless new information has been acquired in the interim period that would cast doubt on the applicant's eligibility for a visa.

## As a Future Enhancement, the Terrorist Screening Center Plans to Have Links to Biometric Data; Various Traveler-Screening Programs Already Use Biometric Data

Within the law enforcement community, fingerprint identification has been used and accepted for decades and is the de facto international standard for positively identifying individuals. Thus, as is widely recognized throughout government, the use of biometric technologies based on fingerprint recognition, facial recognition, or other physiological characteristics offer opportunities for enhancing the key homeland security objective of preventing known or suspected terrorists from entering the country.[29]

Conceptually, biometrics can be used to screen a traveler against a consolidated database, such as the terrorist watch list—a screening of one record against many records. However, the Terrorist Screening Center presently does not have this capability, although use of biometric information to supplement name-based screening is planned as a future enhancement. Specifically, the Terrorist Screening Center's strategy is not to replicate existing biometric data systems. Rather, the center's strategy, according to the director and principal deputy director, is to develop a "pointer" capability to facilitate the online linking of name-based searches to relevant biometric systems, such as the FBI's Integrated Automated Fingerprint Identification System (IAFIS)—a computerized system for storing, comparing, and exchanging fingerprint data in a digital format, which contains the largest criminal biometric database in the world. Center officials recognize that even biometric systems have screening

---

[29]In an earlier report, we assessed various biometric technologies. See, GAO, *Technology Assessment: Using Biometrics for Border Security*, GAO-03-174 (Washington, D.C.: Nov. 15, 2002).

limitations, such as relevant federal agencies may have no fingerprints or other biometrics to correlate with many of the biographical records in the center's consolidated database. For instance, watch list records may be based on intelligence gathered by electronic wire taps or other methods that involve no opportunity to obtain biometric data. Also, the availability of interoperable technology to facilitate online linking among agencies is a long-standing issue that presents challenges. Nonetheless, center officials anticipate that biometric information, if available, can be especially useful for confirming matches to watch list records when individuals use false identities or aliases.

On the other hand, the Terrorist Screening Center has no plans for trying to reduce the incidence of misidentifications by collecting or maintaining biometric information on persons who are not on the watch list. Center officials noted that collecting and using biometric information on innocent persons would raise significant privacy concerns, which would have to be thoroughly considered in interagency discussions and weighed against the possible benefits.

Presently, the Department of Homeland Security uses biometric data for operating various programs to screen travelers, one of which is a required-enrollment program for selected foreign nationals who travel to the United States and others are voluntary-enrollment or trusted-traveler programs. However, enrollment in these programs, whether required or voluntary, does not exempt individuals from being screened against the terrorist watch list. As mentioned previously, for instance, the watch list is dynamic, changing frequently with additions, deletions, and modifications.

The required-enrollment program that uses biometric data is the U.S. Visitor and Immigrant Status Indicator Technology (US-VISIT) program, which is an entry/exit tracking system designed to collect, maintain, and share information on selected foreign nationals who travel to the United States. The program uses a related system—the Automated Biometrics Identification System (IDENT), developed by the former Immigration and Naturalization Service—to collect two fingerprints (right and left index fingers) and a digital photograph to provide for the biometric identification of visitors.[30] Required enrollment in the US-VISIT program is conducted by the Department of State at visa-issuing consulates before the

---

[30]In July 2005, the Secretary of Homeland Security announced that US-VISIT would be enhanced to collect 10-finger scans.

visitors depart or by U.S. Customs and Border Protection at ports of entry when the visitors arrive. American citizens, permanent legal residents, Canadian nationals, and Mexican nationals with border-crossing cards are not required to submit to US-VISIT screening at ports of entry. In July 2006, the Department of Justice's Office of the Inspector General provided an update on progress toward achieving biometric interoperability between IDENT and IAFIS.[31] The Inspector General's progress report noted that the FBI and the Department of Homeland Security have formed a working group to make US-VISIT, IDENT, and IAFIS interoperable by December 2009.

Under the US-VISIT program, at each subsequent reentry into the United States, applicable individuals are biometrically screened against the fingerprints collected during the initial enrollment. Such biometric screening is for identity verification purposes—screening that involves a one-to-one matching of fingerprints to determine if the traveler is the person enrolled in the program. Enrollment in the U.S.-VISIT program does not exempt individuals from being screened against the terrorist watch list and generally may not reduce the possibility of the individuals being misidentified based on name similarities. As such, when there are potential matches to a name on the watch list, the individuals may still be subject to more extensive screening at ports of entry.

Another biometrics-based program—Registered Traveler—is being pilot tested by the Transportation Security Administration.[32] The program, commonly categorized as a trusted-traveler program, collects biographical information and biometric data from airline passengers who volunteer to undergo a security threat assessment. The pilot program is being tested in partnership with selected airlines and airports across the country. Under the program, prior to boarding at airports, participants are to be screened using the biometric data.

---

[31]U.S. Department of Justice, Office of the Inspector General, Evaluation and Inspection Division, *Follow-up Review of the FBI's Progress Toward Biometric Interoperability between IAFIS and IDENT* (Washington, D.C.: July 2006).

[32]The Transportation Security Administration is authorized to "establish requirements to implement trusted passenger programs and use available technologies to expedite security screening of passengers who participate in such programs, thereby allowing security screening personnel to focus on those passengers who should be subject to more extensive screening." See Pub. L. No. 107-71, § 109(a)(3), 115 Stat. 597, 613 (2001).

In addition, U.S. Customs and Border Protection operates various trusted-traveler programs, which are intended to provide expedited processing for pre-approved, low risk travelers who frequently cross U.S. borders. For instance, a commuter program on the southern border is known as Secure Electronic Network for Travelers Rapid Inspection (SENTRI) and on the northern border as "NEXUS." For these voluntary programs, the biometric component generally involves only the enrollment process, such as conducting fingerprint-based background checks using IDENT or IAFIS to ensure that applicants are eligible for expedited processing before allowing their participation.[33] Thereafter, cross-border commuting is facilitated by use of radio frequency identification (RFID) technology, whereby an embedded chip in each membership card transmits the person's arrival to a reader-antenna at the port of entry.[34]

While trusted-traveler programs are most commonly applicable to cross-border commuters, U.S. Customs and Border Protection officials told us that all persons who believe they are frequently misidentified with similar names on the terrorist watch list can apply and will be accepted if they are found to meet program requirements. Also, a benefit of these programs from a watch list perspective is that U.S. Customs and Border Protection has greater assurance of the identity of the enrollees and that these individuals are not persons on the watch list. Enrollment in a trusted-traveler program does not exempt individuals from being screened against the terrorist watch list; although, according to U.S. Customs and Border Protection officials, enrollment does mitigate the possibility of the individuals being misidentified and selected for more extensive screening at ports of entry. The officials also noted that the trusted-trusted traveler programs are not widely applicable to all ports of entry. Rather, the programs are helpful only to individuals eligible to use trusted-traveler lanes at the border, not at airports or seaports.

---

[33]In the SENTRI program, for example, applicants must volunteer for (1) a biographical background check against criminal, law enforcement, customs, immigration, and terrorist databases; (2) a 10-fingerprint law enforcement check; and (3) a personal interview with a U.S. Customs and Border Protection officer.

[34]RFID is a wireless technology that stores and retrieves data remotely from devices. For instance, the technology allows information to be written to tags, which can be scanned or read from a distance. See, GAO, *Information Security: Radio Frequency Identification Technology in the Federal Government*, GAO-05-551 (Washington, D.C.: May 27, 2005).

## The Terrorist Screening Center and Frontline-Screening Agencies Are Addressing Concerns Related to Watch List Screening, and an Interagency Agreement Is Being Developed to Further Ensure an Effective Means for Seeking Redress

It is important that individuals who are inadvertently and adversely affected by watch list screening be provided an opportunity to seek redress. The Terrorist Screening Center, the Transportation Security Administration, and U.S. Customs and Border Protection have processes in place to address individuals' concerns involving watch-list-related screening and have reported some successes, such as removing from the watch list the names of several mistakenly listed persons. Most watch-list-related redress concerns usually involve misidentified persons—individuals who are not on the watch list but have name similarities with known or suspected terrorists. To help ensure that opportunities for redress are formally documented and that agency responsibilities are clear, the Department of Justice is leading an effort to develop an interagency memorandum of understanding. A final draft of the memorandum of understanding is expected to be ready for interagency clearances by fall 2006, according to Terrorist Screening Center officials.

### The Terrorist Screening Center and the Federal Frontline-Screening Agencies Have a Role in Addressing the Concerns of Individuals Who are Adversely Affected by Watch List Screening

The Terrorist Screening Center, the Transportation Security Administration, and U.S. Customs and Border Protection have important responsibilities in providing individuals who are inadvertently and adversely affected by watch list screening with opportunities to seek redress. As mentioned previously, all aggrieved individuals may seek redress, including persons who express concerns or complaints that they are being misidentified and adversely affected because they have a name similar to someone whose name is on the terrorist watch list and persons who actually are on the terrorist watch list. Any such concern or complaint raised formally by an affected individual is what the Terrorist Screening Center calls a redress query. Specifically, the Terrorist Screening Center defines a "redress query" as communication from individuals or their representatives inquiring or complaining about an adverse experience during a terrorist watch-list-related-screening process conducted or sponsored by a federal agency, including congressional inquiries to federal agencies on behalf of constituents.

According to the Terrorist Screening Center's standard operating procedures for redress matters, frontline-screening agencies, such as the Transportation Security Administration and U.S. Customs and Border Protection, have a key role in handling redress queries. Significantly, for example, the frontline-screening agencies—and not the Terrorist

Screening Center—are to receive and initially handle redress queries from the public. The operating procedure of having frontline agencies receive redress queries serves at least two purposes, according to the Terrorist Screening Center. First, the applicable frontline-screening agency is better positioned to know the details of the screening encounters and to respond appropriately. Second, many screening encounters may be based on factors other than terrorism—factors such as narcotics trafficking or incomplete currency or customs declarations—which are not within the mission of the Terrorist Screening Center and must be resolved by the frontline agencies. Also, as a practical matter, the frontline agencies are the entities visible to complainants or inconvenienced persons.

Further, after a frontline-screening agency receives a complaint or concern from an individual, the agency is to begin its internal complaint-resolution or redress process. As part of this process, the agency is to determine whether the person's complaint is related to a potential match to a terrorist watch list record. If the determination is "no"—that is, the person is not actually on the watch list but was misidentified because of a name similarity to someone who is on the terrorist watch list—the frontline-screening agency is responsible for resolving the complaint and responding to the misidentified individual.

If the frontline-screening agency's determination is "yes"—which includes not only definite matches but also any potential or "maybe" matches that require additional research to confirm—the frontline agency is to refer the redress query to the Terrorist Screening Center. Then, the center is to check its database to determine whether the individual is indeed on the terrorist watch list or whether the person is misidentified with someone on the watch list. If the person is actually on the terrorist watch list, the Terrorist Screening Center is to consult with applicable intelligence community and law enforcement agencies to assess whether the person is appropriately listed and should remain on the watch list or is mistakenly listed and should be removed from the list. In either instance, the center is to inform the applicable frontline-screening agency, which is responsible for responding to the individual. If the complainant is a misidentified person, the Terrorist Screening Center is to send the redress query back to the applicable frontline-screening agency for that agency to resolve. Also, as part of its quality-assurance efforts, the center is to review the underlying watch list record that caused the person's adverse experience to determine, for example, the record's validity or whether a modification is needed, including possible removal of the record. Finally, any referrals received by the Terrorist Screening Center not related to its mission—that is, "other issues" with no nexus to terrorism such as complaints involving

employee misconduct or random screening—are to be sent back to the applicable frontline-screening agency, which is to provide a response to the individual.

In January 2005, the Terrorist Screening Center established its formal redress process. An overview of the redress process, including interaction between the center and the frontline-screening agencies, is illustrated in figure 2.

**Figure 2: General Overview of the Terrorist Screening Center's Process for Handling Concerns Involving Watch-List-Related Screening**

| | |
|---|---|
| Individual submits complaint or concern to frontline screening agency | Frontline screening agency initiates its internal complaint-resolution (redress) process |

Potential match to terrorist watch list record

**YES** → Issue is to be referred to the Terrorist Screening Center

**NO** → Frontline screening agency is responsible for resolving and responding to the individual

Terrorist Screening Center checks database and determines type of issue

**Positive match** — Positive matches are resolved in one of three ways: (a) the name of a mistakenly listed person is removed from the watch list; (b) no change to the watch list record is needed; or (c) the record is changed or updated, if appropriate, but is not removed from the watch list. The frontline screening agency is responsible for responding to the individual.

**Misidentification (false positive)** — Misidentifications (false positives) are returned by the Terrorist Screening Center to the frontline screening agency, which is responsible for responding to the individual and taking appropriate action, such as annotating the agency's database, that would assist the person in the future.

**Other** — Other issues usually should not have been referred to the Terrorist Screening Center because the issues have no nexus to terrorism and, thus, are sent back to the frontline screening agency, which is responsible for responding to the individual.

Source: GAO.

Note: As a general overview, the figure does not reflect all ways that complaints or concerns can be resolved. For instance, regarding clearance difficulties experienced by an individual at a port of entry, U.S. Customs and Border Protection may determine that the person was selected for intensive screening based on information provided by another federal law enforcement agency. If so, U.S. Customs and Border Protection may refer the complainant's query to the applicable agency—which, in turn, would reply directly to the individual.

The Terrorist Screening Center does not directly provide final disposition letters to individuals who have submitted redress queries. Rather, the center works with the frontline-screening agencies—and, as applicable, any relevant intelligence or law enforcement agencies—to develop a written response. In providing a final response to an individual who submits a redress query, the frontline-screening agencies use a response letter that neither confirms nor denies the existence of any terrorist watch list records relating to the individual. For example, one of the Transportation Security Administration's standardized response letters states, in part, "Where it has been determined that a correction to records is warranted, these records have been modified to address any delay or denial of boarding that you may have experienced as a result of the watch list screening process."

Generally, this type of language reflects the Terrorist Screening Center's policy of neither confirming nor denying whether an individual is on the consolidated terrorist watch list because this information is derived from classified and sensitive law enforcement and intelligence sources. The policy of nondisclosure to the public is intended to protect the operational counterterrorism and intelligence collection objectives of the government and the personal safety of those involved in counterterrorism investigations.

## The Terrorist Screening Center's Handling of Redress Referrals Has Resulted in Removing the Names of Several Mistakenly Listed Persons from the Terrorist Watch List

During calendar year 2005, the Terrorist Screening Center processed to completion 112 redress queries referred by frontline-screening agencies. Of this total, according to the Terrorist Screening Center, 31 were determined to be mistakenly listed individuals and their names were removed from the watch list (see table 1). The center reported that for another 54 queries the individuals were on the terrorist watch list and the center either did not change the watch list records (48) or made some updates (6).

**Table 1: Number and Disposition of Redress Queries Referred to the Terrorist Screening Center, Calendar Year 2005**

| Disposition of redress query | Number |
|---|---|
| Positive match: The name of the mistakenly listed person was removed from the watch list | 31[a] |
| Positive match: No change to the watch list record was needed | 48 |
| Positive match: The record was changed or updated but not removed from the watch list | 6 |
| Misidentification: The redress query was referred back to the frontline-screening agency to process and provide a response to the individual | 19 |
| Other: These queries involved issues not relevant to the terrorist watch list and should not have been referred to the Terrorist Screening Center | 8 |
| **Total** | **112** |

Source: Terrorist Screening Center data.

[a]According to Terrorist Screening Center officials, the center was already in the process of removing a few of these names before the center received the respective redress queries. The officials explained that although the names were properly included on the watch list initially, subsequent events warranted removing the names.

Also, as table 1 indicates, 19 of the 112 referrals in calendar year 2005 involved misidentified persons—that is, the Terrorist Screening Center determined that these individuals were not on the terrorist watch list but have names similar to someone who is a known or suspected terrorist. The center referred each of these queries back to the applicable frontline-screening agency for processing under the respective agency's redress procedures. These 19 misidentifications do not constitute the annual universe of all redress queries involving misidentifications. Rather, thousands of such queries from misidentified persons are handled by the frontline-screening agencies and are not referred to the Terrorist Screening Center.

To enhance public awareness of redress availability, the Web site of the FBI—the Terrorist Screening Center's administering agency—presents an overview of applicable policy and procedures, provides answers to frequently asked questions, and gives contact information for three frontline-screening agencies—the Transportation Security Administration, U.S. Customs and Border Protection, and the State Department. This information is also presented in appendix II of this report.

| | |
|---|---|
| **Most Redress Queries Involve Misidentified Persons and Are Handled by Frontline-Screening Agencies** | Most redress queries involve misidentified rather than mistakenly listed individuals. Therefore, inherently the disposition or resolution of a redress query involving a misidentification cannot be removal of the individual's name from a watch list because the individual is not the person on the list. Instead, an objective of the frontline-screening agencies is to address complaints of misidentified individuals by providing alternative relief—that is, by developing procedures and having sufficient information in screening databases to expedite the processing of frequently misidentified persons. |
| **Transportation Security Administration: For Individuals Who Are Frequently Misidentified Due to Name Similarities with Known or Suspected Terrorists, the Agency Has Compiled a Cleared List** | The Transportation Security Administration has a contact center that centrally receives nonmedia public inquiries and complaints. According to the agency, the contact center's customer service representatives and contact security specialists are trained to handle and analyze incoming calls, e-mails, correspondence, and facsimiles from the public, the Congress, and private industry. The functions of these representatives and specialists, as specified in the contact center's operating procedures, are to analyze letters and electronic messages, sort them by subject matter, and confer with appropriate offices throughout the agency (including field staff) to provide responses.

Generally, any inquiries and complaints regarding watch-list-related screening—that is, screening against the No Fly and Selectee lists—are to be handled by the agency's Office of Transportation Security Redress, which was established in November 2004.[35] As part of the redress process, an individual can voluntarily provide additional personal-identifying information to the Office of Transportation Security Redress. Specifically, the individual can submit a completed Traveler Identity Verification Form (reproduced in app. III), along with a copy of a U.S. passport or copies of three types of other identification documents, such as birth certificate, driver's license, military identification card, military discharge paper, voter registration card, and naturalization certificate or certificate of citizenship.[36] Then, the agency will use this information in deciding |

---

[35]Previously, the agency's Office of the Ombudsman handled all inquiries and complaints, including those regarding watch-list-related screening.

[36]The Traveler Identity Verification Form (May 2006) replaced an earlier form, the Passenger Identity Verification Form. Regarding the latter, the Transportation Security Administration's instructions required the submission of notarized copies of three identification documents. Instructions for the new form do not require that the submitted documents be notarized.

whether the person's name should be put on a cleared list—which airlines are to use for distinguishing the individual from persons who are in fact on the No Fly or Selectee lists.[37] Along with as-needed updates of the No Fly and Selectee lists, the Transportation Security Administration transmits updated cleared list information to the airlines for the purpose of enabling the airlines to more quickly determine that these passengers are not the persons who are on the No Fly and Selectee lists. The purpose of the cleared list is to mitigate or minimize delays or other inconveniences by facilitating the check-in process for passengers who have names similar to known or suspected terrorists. An individual on the cleared list may still have to obtain a boarding pass at the ticket counter rather than using Internet, curbside, or airport kiosk check-in options. Nonetheless, the intent of the cleared list is to reduce the delay or wait time for applicable air passengers in obtaining a boarding pass at the ticket counter.

According to the Director of the Office of Transportation Security Redress, over 30,000 individuals had submitted identify verification forms and supporting documentation to the agency, as of December 2005, and the names of the overwhelming majority of these individuals were added to the cleared list. The director explained that although the agency requires air carriers to use the cleared list, responsibility for utilizing the list rests with the air carriers, and all carriers do not operate in the same way or have equal capabilities. Further, according to the director, some customers (air passengers) call and complain about having problems even though they have taken the necessary steps to be placed on the cleared list. The director said that his office forwards information regarding these complaints to another component of the agency—the Office of Transportation Sector Network Management—which is responsible for contacting the respective air carriers to address relevant issues.

According to Transportation Security Administration officials, the Secure Flight program is a prospective solution to current issues regarding inconsistent use of the cleared list by air carriers—as well as any inconsistent use of the No Fly and Selectee lists. Under the Secure Flight program, the Transportation Security Administration plans to take over, from commercial airlines, the responsibility for comparing identifying information of airline passengers against information on known or

---

[37]The cleared list procedure began in May 2003 under the agency's Office of the Ombudsman.

suspected terrorists.[38] We note, however, that the Transportation Security Administration has been in the process of developing a passenger prescreening system, presently known as the Secure Flight program, for more than 3 years. We have reported and the Transportation Security Administration has acknowledged significant challenges in developing and implementing the Secure Flight program.[39] Earlier this year, the Transportation Security Administration suspended Secure Flight's development to reassess, or rebaseline, the program. The rebaselining effort includes reassessing the program goals to be achieved, the expected benefits and capabilities, and the estimated schedules and costs. As of July 2006, the Transportation Security Administration had not publicly announced any decisions regarding the future of the Secure Flight program, although the agency anticipates that the rebaselining effort will be completed by the end of September 2006.

**U.S. Customs and Border Protection Is Considering Realigning Its Watch-List-Related Redress Responsibilities and Is Updating Its Procedures**

U.S. Customs and Border Protection headquarters has a Customer Satisfaction Unit that functions as a centralized source for recording, tracking, and reviewing all complaint information related to U.S. Customs and Border Protection interactions with travelers, the general public, industry, and government entities. This unit is responsible for responding to customer complaints, irrespective of the subject matter—that is, the unit focuses on all complaint topics, not just complaints involving terrorist watch-list-related screening. For instance, U.S. Customs and Border Protection routinely uses a comment card that allows travelers to express any complaint regarding the port-of-entry processing experience. U.S. Customs and Border Protection policy is to provide a comment card to (1) all air and sea travelers who are subjected to a secondary examination and (2) all air, land, and sea travelers who undergo a personal search.

---

[38]In March 2003, the Transportation Security Administration began developing CAPPS II, a second-generation computer-assisted passenger prescreening program, to provide improvements over CAPPS I and to screen all passengers flying into, out of, and within the United States. CAPPS II was to perform different analyses and access more diverse data, including data from government and commercial databases, to classify passengers according to their level of risk (i.e., acceptable risk, unknown risk, or unacceptable risk), which would in turn be used to determine the level of security screening each passenger would receive. Because of a variety of challenges, the Department of Homeland Security cancelled the development of CAPPS II in August 2004 and announced that a new prescreening program, called Secure Flight, would be developed.

[39]GAO, *Aviation Security: Management Challenges Remain for the Transportation Security Administration's Secure Flight Program*, GAO-06-864T (Washington, D.C.: June 14, 2006).

In June 2006, U.S. Customs and Border Protection officials explained that the agency was actively considering ways to enhance the capability of the Customer Satisfaction Unit to support redress efforts regarding terrorist watch-list-related concerns or complaints. For instance, a realignment being considered is to move the responsibility for handling certain categories of complaints—those not involving terrorist watch list screening—from the Customer Satisfaction Unit to the Office of Public Affairs. Also, the officials further noted that the agency's Office of Regulations and Rulings was updating the Customer Satisfaction Unit's standard operating procedures, including redress procedures regarding terrorist watch-list-related concerns or complaints.

Further, in commenting on a draft of this report in September 2006, U.S. Customs and Border Protection officials said that the agency is working with the Terrorist Screening Center to ensure that its process aligns with the center's process. Also, another Department of Homeland Security component—U.S. Immigration and Customs Enforcement—commented that its Office of Intelligence serves as a point of contact and works closely with the Terrorist Screening Center's redress team to ensure the removal or modification of records, as appropriate, from the terrorist-screening database and the Treasury Enforcement Communications System/Interagency Border Inspection System. For instance, U.S. Immigration and Customs Enforcement noted that if the Terrorist Screening Center determines that an individual should no longer be listed in the terrorist-screening database, the Office of Intelligence coordinates with U.S. Customs and Border Protection to have the record expunged from the Treasury Enforcement Communications System/Interagency Border Inspection System.

As part of our study, we reviewed the Federal Bureau of Investigation's Web site for the Terrorist Screening Center to determine what overview information regarding watch-list-related redress was publicly available (see app. II). In turn, from the FBI's overview Web site, we followed up on any references or online links to the redress processes of key frontline-screening agencies—the Transportation Security Administration and U.S. Customs and Border Protection.

In contrast to the online link to the Transportation Security Administration's redress guidance (see app. III), we found limited usefulness in the online link to U.S. Customs and Border Protection's redress guidance. The FBI's overview Web site lists the Customer Satisfaction Unit as the redress-related contact point for U.S. Customs and Border Protection. Also, the overview Web site provides an online link to a

fact sheet describing the Interagency Border Inspection System—a system that provides U.S. Customs and Border Protection and other law enforcement entities with access to computer-based information. However, the fact sheet (reproduced in app. IV) has no specific guidance regarding terrorist-watch-list-related redress. Rather, the fact sheet answers basic questions regarding the Interagency Border Inspection System, such as who uses the system and what information is in the system. Moreover, the overview Web site provides no references or online links to U.S. Customs and Border Protection's trusted-traveler programs— such as SENTRI and NEXUS. As mentioned previously, agency officials told us that persons who believe they are frequently misidentified with the terrorist watch list or who continuously experience delays and other inconveniences during screening could apply to one of these programs and, if accepted, receive expedited processing at applicable ports of entry.

Based on our observations regarding the limited usefulness of the online links from the FBI's overview Web site, U.S. Customs and Border Protection officials acknowledged a need to coordinate with the FBI and the Terrorist Screening Center to provide more appropriate online links regarding redress guidance. The officials noted, for example, that U.S. Customs and Border Protection's Web site does provide information regarding the Customer Satisfaction Unit and how complaints are handled as well as information on trusted-traveler programs.

**Department of State: Applicants Who Are Denied a Visa Have No Legal Basis to Appeal, but an Agency-Initiated Process Is Used to Remove Erroneous or Outdated Entries from the Consular Lookout and Support System**

The term "redress," according to the State Department, is not applicable to complaints about visa denials, which are final decisions not subject to appeal or judicial review. However, the State Department has an agency-initiated process for removing erroneous or outdated entries from the Consular Lookout and Support System, which contains applicable terrorist watch list records. As mentioned previously, the system is used by consular officers abroad to screen the names of visa applicants to identify terrorists and other aliens who are potentially ineligible for visas based on criminal histories or other reasons specified by federal statute. All visa-issuing posts have direct access to the system and are required to use it to check each applicant's name before issuing a visa, according to the State Department.

The Immigration and Nationality Act of 1952, as amended, gives Department of State consular officers at overseas posts exclusive authority for adjudicating applications submitted by foreign citizens for

visas to enter the United States.[40] The process for determining who will be issued or refused a visa consists of several steps—including checking or cross-referencing each applicant's name against the Consular Lookout and Support System, which contains applicable names and biographical data exported from the Terrorist Screening Center's database. According to the State Department, no applicant is denied a visa simply because the person's name appears in the Consular Lookout and Support System, which is only a flag or tool to help the consular officer know if further screening may be required. Rather, visa denials are by law based either on statutory grounds of ineligibility, which are specifically set out in the Immigration and Nationality Act, as amended,[41] or on the applicant's failure to present evidence to establish eligibility for the type of visa requested. In addition to security and terrorism concerns, statutory grounds of ineligibility include, for example, criminal history reasons, previous violations of immigration law, and health-related grounds.

According to State Department instructions provided to consular offices worldwide, visa denials are to be reviewed by the consular officer's supervisor. If an error has been made or a question exists about interpreting immigration law in reference to the facts surrounding the applicant, the consular officer can request a legal advisory opinion. Also, if there are misunderstandings about the application process, individuals can correspond with the overseas consular section and the Public Inquiries Division of the Visa Office in Washington, D.C.

However, federal courts have consistently held that a consular officer's final decision to issue or deny a visa is not subject to a formal appeal or to judicial review.[42] That is, there is no way to directly appeal the visa denial,

---

[40]Pub. L. No. 82-414, 66 Stat. 182 (codified as amended at 8 U.S.C. § 1101, *et seq.*). However, obtaining a visa from an American consul does not guarantee an alien's entry into the United States. Rather, a visa authorizes the alien to arrive at a port of entry, at which point a U.S. Customs and Border Protection officer will independently examine the alien's eligibility for admission.

[41]See 8 U.S.C. § 1182(a).

[42]Courts have long held that a consular officer's decision to grant or deny a visa is not subject to judicial review. *See, e.g., Saavedra Bruno v. Albright,* 197 F.3d 1153 (D.C. Cir. 1999); *Centeno v. Schultz,* 817 F.2d 1212 (5th Cir. 1987); *Li Hing of Hong Kong, Inc. v. Levin,* 800 F.2d 970 (9th Cir. 1986); *Ventura-Escamilla v. I.N.S.,* 647 F.2d 28 (9th Cir. 1981); *Rivera de Gomez v. Kissinger,* 534 F.2d 518 (2d Cir. 1976); *U.S. ex rel. Ulrich v. Kellogg,* 30 F.2d 984 (D.C. Cir. 1929). See also, *Kleindienst v. Mandel,* 408 U.S. 753 (1972) (holding that courts may not look behind the exercise of an official's discretionary authority to deny admission to an alien).

nor is there a way to directly overturn the consular officer's denial decision because it is not subject to judicial review. Thus, in explaining why it would be incorrect and legally misleading to use the term "redress" in reference to any complaint about a visa denial, officials in the State Department's Bureau of Consular Affairs commented that a visa refusal (denial) is a final decision in which the consular officer makes a legal determination that the applicant is not eligible for a visa based on a statutory ground. The State Department officials reiterated that the consular officer's decision is a final governmental adjudication, for which there is no appeal or judicial review, and the only recourse for the person is to submit a new application with sufficient information to "overcome" the grounds for ineligibility.

Consular officers are required to provide each applicant an explanation of the legal basis for denying the visa.[43] However, if the basis for ineligibility is terrorism—under section 212(a)(3)(B) of the Immigration and Nationality Act, as amended[44]—the consular officer normally would not be able to explain the reasons behind the denial because of national security grounds.

According to Bureau of Consular Affairs officials, the State Department does have an agency-initiated process for removing erroneous or outdated information from the Consular Lookout and Support System. In explaining why the correction-of-records process is initiated by the agency and not the visa applicant, the officials commented substantially as follows:

- Visa applicants usually would not even know whether their names are on the terrorist watch list. If a visa application results in the overseas post's requesting a security advisory opinion and additional screening, the applicant might think that any processing delay is due to a record entry in the Consular Lookout and Support System. However, the additional screening could be due to reasons other than terrorism, such as a criminal record, a contagious disease, or simply an overstay on a previous visa.

- Thus, any deletion of entries from the Consular Lookout and Support System normally would be initiated by the consular officer in the field. That is, if the consular officer determines—based on evidence presented

---

[43]Secretary of State cable to all diplomatic and consular posts, *Subject: Reminder Regarding Visa Refusal Procedures* (June 12, 2001).

[44]See 8 U.S.C. § 1182(a)(3)(B).

during the course of a visa application—that an entry in the Consular Lookout and Support System is incorrect or has been overtaken by events, the officer is to initiate action to have the entry deleted from the system.

Also, the Bureau of Consular Affairs officials noted that there has been an occasional complaint that despite the issuance of a visa, the alien experienced difficulties at a U.S. port of entry because, for example, screening by U.S. Customs and Border Protection showed a potential match with a terrorist watch list record. Regarding these instances, the officials said that based on an interest in data integrity and customer service, the department works with the Terrorist Screening Center to review relevant records and determine an appropriate course of action, which could consist of a watch list message or annotation specifying that the alien is not a person on the watch list. In addition, as discussed previously, the State Department is taking steps to annotate its database when it screens individuals and finds that they are not on the watch list. Such annotations are intended to expedite visa processing in the future and limit the incidence of misidentifications.

## The Department of Justice Is Leading an Effort to Finalize an Interagency Agreement to Help Ensure That Effective Redress Is Available

The Terrorist Screening Center and the frontline-screening agencies have interdependent responsibilities in providing redress for individuals who are inadvertently and adversely affected by watch list screening. The availability of redress is important for all affected persons, including persons who are misidentified because of name similarities and to persons who contend that they are mistakenly included on the terrorist watch list. For any given watch-list-related complaint or redress query, providing relief can necessitate interaction among several governmental agencies. For instance, if the query involves a person who is mistakenly listed, relevant redress participants could include the Terrorist Screening Center and a frontline-screening agency as well as the agency that originally submitted or nominated the person's name for inclusion in the consolidated terrorist watch list. Nominating agencies include the FBI and various agencies within the intelligence community, such as the Central Intelligence Agency, the Defense Intelligence Agency, and the National Security Agency.

To help ensure that opportunities for terrorist-watch-list-related redress are implemented effectively, the Department of Justice is leading an effort—which has been ongoing since fall 2005—to develop and finalize an interagency memorandum of understanding. Key purposes of the final memorandum of understanding include ensuring that opportunities for redress are formally documented and that agency responsibilities are

clear, with designated officials accountable for supporting the continued success of the processes. The Department of Justice has a lead role in developing the memorandum of understanding because the Terrorist Screening Center has primary responsibility for the consolidated terrorist-screening database. Interagency partners in the effort to develop the memorandum of understanding include the Department of Homeland Security, the Department of State, and the National Counterterrorism Center.

Also, another entity involved in developing the memorandum of understanding is the Privacy and Civil Liberties Oversight Board, which is part of the Executive Office of the President and consists of five members appointed by the president.[45] According to the board's executive director, the terrorist watch list redress process is a top priority for the board. The executive director noted that since June 2006 board staff have attended all meetings of the interagency partners engaged in developing the memorandum of understanding. This official opined that the board's participation has helped reprioritize this matter among the constituent agencies and that the board is committed to continuing its involvement.

According to Department of Justice officials, a final draft of the memorandum of understanding is expected to be ready for interagency clearances by fall 2006. Terrorist Screening Center officials emphasized that the interagency memorandum of understanding was definitely needed, particularly as a mechanism for ensuring the accuracy of the watch list. The center officials noted, for instance, that there have been disagreements at times between agencies over nominations to the watch list. Thus, in handling watch-list-related complaints, the center officials explained that the interagency memorandum of understanding could help by clearly outlining a process for coordinating with the National Counterterrorism Center and nominating agencies to validate the accuracy and appropriateness of watch list records.

---

[45]The board was established by section 1061 of the Intelligence Reform and Terrorism Prevention Act of 2004. Pub. L. No. 108-458, 118 Stat. 3638, 3684-88. The board advises the president and other senior executive branch officials as to whether privacy and civil liberties protections are appropriately considered in the development and implementation of laws, regulations, and executive branch policies related to efforts to protect the nation against terrorism. The five board members were sworn in and had their first meeting on March 15, 2006. Additional information about the role of the board and its operations is available at www.privacyboard.gov.

Moreover, the Terrorist Screening Center officials explained that the interagency memorandum of understanding could help resolve significant watch-list-related redress differences among the frontline-screening agencies. Examples regarding Department of Homeland Security components are as follows:

- The Transportation Security Administration has an office specifically designated for redress issues, with an accountable official—the Director, Office of Transportation Security Redress. Also, the office has followed consistent procedures in referring appropriate watch-list-related complaints to the Terrorist Screening Center.

- In contrast, U.S. Customs and Border Protection does not have a clearly designated official accountable for redress, and the agency has not always followed consistent procedures in referring appropriate watch-list-related complaints to the Terrorist Screening Center.

Additionally, regarding the State Department, the Terrorist Screening Center officials stressed the importance of having clearly established procedures and responsibilities. The center officials noted that even though the State Department's operational context is somewhat different than that of other frontline-screening agencies, the department nonetheless has a substantial volume of interactions with the Terrorist Screening Center. State Department Bureau of Consular Affairs officials acknowledged to us the value of having an interagency memorandum of understanding that specifies standard operating procedures for redress and designates points of contact. In this regard, the State Department officials commented that they have been participating in meetings with the Terrorist Screening Center and other interagency partners to discuss the proposed memorandum of understanding. According to the officials, a benefit to the State Department expected from the interagency agreement would be clearly established and coordinated procedures for removing— from the department's Consular Lookout and Support System and the Terrorist Screening Center's consolidated watch list—any name that is mistakenly listed or has been overtaken by subsequent events.

# Concluding Observations

Homeland security measures affect all travelers to some extent. Thus, it may be argued that travel delays and other inconveniencies resulting from terrorist watch-list-related screening can be viewed as regrettable but inevitable consequences of enhanced security. However, name-based screening and its inherent limitations—even full names, in most cases, are hardly unique identifiers—may result in disproportionate impact on

individuals who repeatedly are singled out for additional screening for no other reason than the similarity of their names to someone on the watch list.

The Terrorist Screening Center and its interagency partners are undertaking a number of efforts, including data-quality initiatives, to reduce the occurrence and/or impact of watch list screening on U.S. citizens and visitors who do not necessarily merit additional scrutiny and the associated inconveniences. A continuing challenge for the center will be ensuring that the consolidated watch list contains accurate data, particularly given that the database is dynamic, changing frequently with additions, deletions, and modifications. The efforts of an interagency working group to improve the effectiveness of name-matching computer algorithms may offer some promise for reducing the number of people who experience unintended, adverse effects. However, any policy trade-off considerations regarding use of algorithms likely will favor ensuring homeland security over minimizing inconveniences to travelers. Regarding future operations, the Terrorist Screening Center is actively considering approaches for using biometric data to supplement name-based searches, although the availability of appropriate technology is an issue that has long confronted the interagency screening community.

In any event, despite the best efforts of the interagency community to maintain a fully accurate watch list and to conduct screening efficiently, there likely will be continuing unintended consequences. Thus, it is appropriate for the Terrorist Screening Center and its interagency partners to continue their efforts to provide effective redress for both mistakenly listed persons and misidentified persons. Indeed, redress queries have already resulted in the removal of several mistakenly listed names from the watch list. Comparatively, however, the issue of redress arises more commonly regarding the thousands of persons who are not on the watch list but are misidentified and adversely affected because of a name similarity. Whether appropriate relief is being afforded these individuals is still an open question, for several reasons. For example, although a core element of the redress provided by the Transportation Security Administration is the maintenance of a cleared list, there are some indications that the cleared list is not working as intended to reduce delays for air passengers in obtaining boarding passes. Prospectively, the Transportation Security Administration expects that development and implementation of the Secure Flight program will help ensure consistent and effective use of the cleared list among air carriers, although the agency has not publicly disclosed its future plans for the program.

Another frontline-screening agency's initiative, U.S. Customs and Border Protection's database-annotation initiative, may prove to be an even more efficient approach for assisting frequently misidentified individuals. Unlike the Transportation Security Administration's cleared list procedures, the U.S. Customs and Border Protection's initiative is based on records in the agency's database and does not necessitate any filing of forms and other documentation by travelers. At the time of our review, U.S. Customs and Border Protection was planning to develop a capability to monitor the effectiveness of the initiative. This planning effort is particularly important, given that the initiative may eventually prove to be a model for a proactive solution if it functions as intended.

Finally, an overarching factor regarding whether appropriate relief is being afforded to persons inadvertently and adversely affected by terrorist watch-list-related screening is the absence of an interagency agreement to help ensure that, among other matters, redress procedures and responsibilities are clearly documented and implemented effectively. The Terrorist Screening Center and its interagency partners are working to address this fundamental deficiency and have indicated their intent to provide the public with updated information on the availability of redress, after finalization of an agreement.

We are not making recommendations at this time because the agencies have ongoing efforts to improve data quality and otherwise either reduce the number of misidentifications or mitigate their effects and to provide more effective redress.

## Agency Comments

We provided a draft of this report for comments to the departments of Homeland Security, State, and Justice. We received written responses from each agency.

In its response, the Department of Homeland Security acknowledged that it currently is undertaking actions to enhance terrorist-screening and redress efforts. Also, the response noted that in January 2006, the departments of State and Homeland Security announced an initiative on "Secure Borders and Open Doors in the Information Age," otherwise known as the Rice-Chertoff Initiative. One purpose of the initiative is to establish a governmentwide redress process to address perceived problems in international and domestic traveler prescreening. According to the Department of Homeland Security, a goal is to establish a one-stop redress process for travelers by the end of calendar year 2006. The department explained that this initiative, which will supplement terrorist

watch-list-related redress, focuses on a larger set of travel-screening redress issues. The full text of the Department of Homeland Security's written comments is reprinted in appendix V. The department also provided technical comments, which we incorporated in this report where appropriate.

The Department of State commented that the report accurately describes the visa process and the department's position that the administrative processing time required to screen a visa applicant—including, if required, the processing of a security advisory opinion review—is a necessary part of the visa application procedure rather than an adverse governmental action. Also, the department noted that—in its use of the terrorist watch list as a screening tool for visa adjudication—a "misidentification" is not an adverse result for the visa applicant. Rather, according to the department, this type of response helps to determine that the visa applicant is not associated with terrorism. In its written response, the department also provided a technical comment regarding the security advisory opinion process, which we incorporated in this report where appropriate. The full text of the Department of State's written comments is reprinted in appendix VI.

The Department of Justice provided technical comments only, which we incorporated in this report where appropriate.

As arranged with your offices, unless you publicly announce the contents of this report earlier, we plan no further distribution until 30 days after the date of this report. At that time, we will send copies of this report to interested congressional committees and subcommittees. We will also make copies available to others on request. In addition, this report will be available at no charge on GAO's Web site at http://www.gao.gov.

If you or your staff have any questions about this report or wish to discuss the matter further, please contact me at (202) 512-8777 or larencee@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this report. Other key contributors to this report were Ronald J. Salo, Eric W. Clemons, R. Eric Erdman, Susan L. Conlon, Michele C. Fejfar, Kathryn E. Godfrey, Richard B. Hung, Thomas F. Lombardi, Jan B. Montgomery, and Danny R. Burton.

Eileen Larence
Director, Homeland Security and Justice Issues

# Appendix I: Objectives, Scope, and Methodology

## Objectives

In response to a request from the Chairman of the House Judiciary Committee and the Ranking Member of the House Committee on Homeland Security, we addressed the following questions:

- To what extent are the numbers of terrorist watch list misidentifications known, and generally, how could misidentified persons be affected?[1]

- What are the major reasons that misidentifications occur, and what actions are the Terrorist Screening Center and frontline-screening agencies taking to reduce the number of misidentified persons or expedite them through the screening process?

- To address concerns from misidentified and mistakenly listed persons, what opportunities for redress have the Terrorist Screening Center and frontline-screening agencies established?[2]

## Scope and Methodology

Our work generally focused on the screening of travelers, although the terrorist watch list is used for a variety of other screening purposes, such as conducting background checks of workers who have access to secure areas of the national transportation system. In performing our work, we focused on the Terrorist Screening Center and three frontline-screening agencies—the Transportation Security Administration, U.S. Customs and Border Protection, and the Department of State—whose missions most frequently and directly involve interactions with travelers. At the Terrorist Screening Center, we interviewed key officials—including the director, principal deputy director, chief information officer, and privacy officer—and reviewed standard operating procedures and other relevant documentation.

Regarding the screening of air passengers against the No Fly and Selectee lists prior to boarding, in addition to contacting the Transportation Security Administration to broadly discuss the procedures of air carriers,

---

[1] For purposes of this report, the term "misidentification" refers to a person initially matched by a screening agency to a name on the watch list, but upon closer examination, the person is found to not match any watch list record.

[2] As used in this report, the term "mistakenly listed persons" includes two categories of individuals—(1) persons who never should have been included on the watch list but were due to some type of error and (2) persons who were appropriately included on the watch list at one time but no longer warrant inclusion on the terrorist watch list due to subsequent events.

we interviewed security officials at five major, domestic air carriers. At their request, the air carriers are not identified in this report. Regarding U.S. Customs and Border Protection's screening of travelers entering the United States, besides conducting work at the agency's headquarters in Washington, D.C., we visited various land and air ports of entry in four states—California, Michigan, New York, and Texas (see table 2). We judgmentally selected these four states because each has major land and air ports of entry. Also, the four states are geographically dispersed and collectively have ports of entry on both the northern and southern borders of the United States.

**Table 2: U.S. Customs and Border Protection Ports of Entry Visited by GAO**

| State | Land ports of entry | Air ports of entry |
|-------|---------------------|--------------------|
| California | San Ysidro | Los Angeles International Airport |
| Michigan | Detroit Port Huron | Detroit Metropolitan Airport |
| New York | Niagara Falls | John F. Kennedy International Airport |
| Texas | Laredo | Dallas/Fort Worth International Airport |

Source: GAO.

Regarding the State Department, we focused on screening of applicants for nonimmigrant visas.[3] We performed our work at State Department headquarters in Washington, D.C, and did not visit consular offices abroad.

More details about the scope and methodology of our work regarding each of the objectives are presented in the following sections, respectively.

## Extent That the Numbers of Terrorist Watch List Misidentifications Are Known, and Generally, How Misidentified Persons Could Be Affected

From the Terrorist Screening Center, we obtained statistical information on misidentifications covering a 26-month time period—December 2003 (when the center began operations) to January 2006. These statistics are based on screening encounters that were referred for identity verification to the center by the frontline-screening agencies, particularly U.S. Customs and Border Protection, which conducts screening at ports of entry, and the Transportation Security Administration, which provides guidance to air

---

[3]A nonimmigrant is a person, not a citizen or national of the United States, seeking to enter the United States temporarily for a specific purpose, such as business or pleasure.

carriers, receives encounter inquiries from them, and makes applicable
referrals to the center. Frontline-screening agencies are able to resolve
some misidentifications on their own without having to refer them to the
center. Similarly, in following federal guidance, airlines may also resolve
some misidentifications without involving the Transportation Security
Administration or necessitating subsequent referrals to the Terrorist
Screening Center. However, the agencies and airlines generally do not
maintain readily available statistics on how often they do so. Thus, we
were unable to quantify the universe of terrorist watch-list-related
misidentifications. However, to provide a contextual perspective, we
obtained national statistics on the numbers of persons who were subject
to terrorist watch list screening procedures conducted, for example, in
fiscal year 2005 at ports of entry.

To determine how misidentified persons could be affected, we interviewed
officials at the principal frontline-screening agencies—the Transportation
Security Administration, U.S. Customs and Border Protection, and the
Department of State—whose missions most frequently and directly involve
interactions with travelers. Also, as indicated in table 2, we made on-site
observations of U.S. Customs and Border Protection screening operations
at various ports of entry in California, Michigan, New York, and Texas. Our
observations at these locations helped us better understand how the
name-match screening process can affect misidentified persons, but these
observations are not projectable to other locations.

To obtain additional information on ways that misidentified individuals
could be affected by terrorist-watch-list-related screening, we asked the
Transportation Security Administration and U.S. Customs and Border
Protection to provide us examples of actual complaint letters to review:

- The Transportation Security Administration provided us a selection of 24
  terrorist watch-list-related complaint letters that the agency received
  during December 1, 2003 (when the Terrorist Screening Center became
  operational) to April 20, 2006. The agency attempted to select letters from
  different weeks throughout this time period; however, because a
  statistically projectable methodology was not used for the selections, the
  24 letters are not representative of all complaints or inquiries (an
  unspecified total) that the Transportation Security Administration
  received during this time period.

- U.S. Customs and Border Protection's National Targeting Center provided
  us a selection of complaint letters submitted by 28 individuals. The dates
  of the 28 complaint letters encompassed an 11-month period, ranging from

June 2005 to April 2006. The 28 letters were not selected based on a statistically projectable methodology. Thus, the 28 letters are not representative of all complaints or inquiries—regarding watch-list-related secondary screening at ports of entry—that U.S. Customs and Border Protection's Customer Satisfaction Unit received during the 11-month time period and forwarded for research to the agency's National Targeting Center.[4]

The scope of our work did not include contacting or interviewing any of the individuals who submitted complaint letters to the Transportation Security Administration or U.S. Customs and Border Protection.

To further identify ways that misidentified persons could be affected by watch-list-related screening, we contacted various associations that represent air carriers, travel agencies, and business travelers. Specifically, we contacted (1) the Air Transport Association, a trade organization of the principal U.S. airlines; (2) the American Society of Travel Agents; and (3) the National Business Travel Association, which represents corporate travel management professionals and the travel industry.

Also, we reviewed the results of a survey that the National Business Travel Association conducted in June 2006. According to its Web site (www.nbta.org), the association represents over 2,500 corporate travel managers and travel service providers who collectively manage and direct more than $170 billion of expenditures within the business travel industry, primarily for Fortune 1,000 companies. In June 2006, the association conducted a survey of 1,316 corporate travel managers; the survey posed a range of questions that addressed how terrorist watch list screening by the Transportation Security Administration and air carriers affected travelers. A total of 444 corporate travel managers responded to the survey. The responses may not be representative of all of the association's corporate travel managers.

---

[4]According to Customer Satisfaction Unit managers, all complaints regarding the terrorist watch list are forwarded to the agency's National Targeting Center, which has access to classified information that may be needed to determine if the incidents cited by complainants involved individuals who either are on the watch list or were misidentified. National Targeting Center managers told us that if research indicates that the substance of the complaint does involve watch-list-related screening conducted by U.S. Customs and Border Protection, the National Targeting Center will draft a response letter, which is to be signed by the Customer Satisfaction Unit and mailed to the individual.

# Major Reasons That Misidentifications Occur, and Actions the Terrorist Screening Center and Frontline-Screening Agencies Are Taking to Reduce the Number of Misidentified Persons or Expedite Them through the Screening Process

## Major Reasons That Misidentifications Occur

Regarding why misidentifications occur, our work focused on interviewing officials at and reviewing documentation obtained from the Terrorist Screening Center and three frontline-screening agencies—the Transportation Security Administration, U.S. Customs and Border Protection, and the Department of State. We also interviewed security officers at five major domestic air carriers about their role in name-match screening against the No Fly and Selectee lists and obtained their views on the causes of misidentifications. Further, we reviewed the work of two groups regarding factors they have identified that contribute to misidentifications—the Terrorist Screening Center's Search Engine Standardization Working Group[5] and the Department of Homeland Security's Data Privacy and Integrity Advisory Committee.[6]

## Actions to Reduce the Number of Misidentified Persons or Expedite Them through the Screening Process

At the Terrorist Screening Center, we interviewed the director, principal deputy director, chief information officer, and other senior managers and staff regarding data-quality initiatives, including efforts to identify and correct troublesome records related to misidentifications. Additionally, we inquired about the status of the center's efforts to implement recommendations made by the Department of Justice's Office of the

---

[5]The working group's membership includes representatives from the departments of Homeland Security (including Transportation Security Administration and U.S. Customs and Border Protection), State, and Defense; FBI; and the intelligence community (e.g., the National Counterterrorism Center, Central Intelligence Agency, National Security Agency, and Defense Intelligence Agency). Also, the National Institute of Standards and Technology acts as a special advisor to the working group.

[6]The charter of the committee is to advise the Secretary of Homeland Security and the Department of Homeland Security's chief privacy officer on programmatic, policy, operational, administrative, and technological issues within the department's areas of responsibility that affect individual privacy, data integrity, data interoperability, and other privacy-related matters.

Inspector General in its June 2005 report.[7] Among other things, the Inspector General recommended that the Terrorist Screening Center develop procedures to regularly review and test the information contained in the consolidated terrorist watch list to ensure that the data are complete, accurate, and nonduplicative.

At the three frontline-screening agencies, we interviewed applicable program managers regarding initiatives being taken to expedite frequently misidentified persons through the screening process. We inquired particularly about any computer-based initiatives that use applicable databases to help ensure that travelers who have been frequently misidentified in the past are no longer subjected to intensive screening, unless warranted by new data.

In further reference to potential initiatives for minimizing misidentifications as well as better confirming the identities of terrorists, we reviewed the Terrorist Screening Center's strategic plan and discussed with center officials the outlook for using biometric data—such as fingerprints—to supplement name-based screening. Similarly, in our interviews with officials of the frontline-screening agencies, we discussed programs that currently use biometric data, such as the U.S. Visitor and Immigrant Status Indicator Technology (US-VISIT) program, which is an entry-exit tracking system designed to collect, maintain, and share information on selected foreign nationals who travel to the United States.

## Redress Opportunities Established by the Terrorist Screening Center and Frontline-Screening Agencies to Address Concerns from Misidentified and Mistakenly Listed Persons

As used in this report, the term "redress" generally refers to an agency's complaint-resolution process, whereby individuals may seek resolution of their concerns about an agency action. We identified elements of the opportunities for redress offered by the Terrorist Screening Center and the three frontline-screening agencies, and we generally analyzed their respective policies and procedures. However, we did not address the relation between agency redress and other possible remedies, such as judicial review, which involves invoking the legal system through a civil action. Rather, the scope of our work focused on means for redress made available by agencies for inconvenienced persons.

---

[7]Department of Justice, Office of the Inspector General, *Review of the Terrorist Screening Center*, Audit Report 05-27 (June 2005).

We reviewed the Terrorist Screening Center's standard operating
procedures for redress and interviewed the center official (privacy officer)
principally responsible for watch-list-related redress. Also, we obtained
and reviewed statistics and general disposition or outcome information
regarding redress queries that the center received and processed to
completion in calendar year 2005.[8]

Further, at the three frontline-screening agencies, we reviewed redress-
related documentation, including standard operating procedures and
training materials, and we interviewed the officials responsible for redress.
Specifically, we interviewed the Director of the Transportation Security
Administration's Office of Transportation Security Redress, the head of
U.S. Customs and Border Protection's Customer Satisfaction Unit, and
program managers at the State Department's Bureau of Consular Affairs
responsible for processing nonimmigrant visa applications.

Also, to generally determine what watch-list-related redress information
was publicly available, we reviewed the Federal Bureau of Investigation's
Web site for the Terrorist Screening Center. In turn, from that overview
Web site (see app. II), we followed up on any online links or references to
the redress processes of the Transportation Security Administration (see
app. III), U.S. Customs and Border Protection (see app. IV), and the State
Department.

In addition, we contacted the Department of Justice's Office of Legal
Policy, which has a lead role in ongoing efforts to develop an interagency
memorandum of understanding to help ensure that redress processes are
formally documented, with clearly established responsibilities for the
Terrorist Screening Center and all interagency partners. Also, we
contacted the executive director of the Privacy and Civil Liberties
Oversight Board to discuss its role in facilitating development of the

---

[8]The Terrorist Screening Center defines a "redress query" as communication from
individuals or their representatives inquiring or complaining about an adverse experience
during a terrorist watch-list-related-screening process conducted or sponsored by a federal
agency, including congressional inquiries to federal agencies on behalf of their
constituents.

interagency memorandum of understanding.[9] However, because the
memorandum of understanding was in draft form at the time of our study,
we have not had an opportunity to review it.

## Data Reliability

In addressing our objectives, we obtained the following statistics from the
Terrorist Screening Center:

- The number of watch-list-related screening encounters referred to the
  center by frontline-screening agencies during the period December
  2003 to January 2006.

- The number and general dispositions of redress queries that the center
  received and processed to completion in calendar year 2005.

We discussed the sources of the data with Terrorist Screening Center
officials, including the chief information officer, and we reviewed
documentation regarding the compilation of the statistics. We determined
that the statistics were sufficiently reliable for the purposes of presenting
overall patterns and trends.

---

[9]The five-member board, which is part of the Executive Office of the President, was
established by section 1061 of the Intelligence Reform and Terrorism Prevention Act of
2004. Pub. L. No. 108-458, 118 Stat. 3638, 3684-88. The board advises the president and other
senior executive branch officials as to whether privacy and civil liberties protections are
appropriately considered in the development and implementation of laws, regulations, and
executive branch policies related to efforts to protect the nation against terrorism. The five
board members were sworn in and had their first meeting on March 15, 2006. Additional
information about the role of the board and its operations is available at
www.privacyboard.gov.

# Appendix II: Terrorist Screening Center: Terrorist-Watch-List Redress Process

This appendix, which consists of two sections, presents publicly available information that we copied from the Web site of the Federal Bureau of Investigation:

- The first section of the appendix is an overview of the Terrorist Screening Center's watch-list-related redress process and also presents contact information for three frontline-screening agencies—the Transportation Security Administration, U.S. Customs and Border Protection, and the Department of State.

- The second section covers frequently asked questions.

**Overview and Contact Information**

[Copied from the FBI's Web site, www.fbi.gov. Accessed August 2006.]

"The Terrorist Screening Center cannot confirm or deny whether an individual is on the consolidated terrorist watch list, because this information is derived from classified and sensitive law enforcement and intelligence. The nondisclosure of the contents of the watch list protects the operational counterterrorism and intelligence collection objectives of the government, as well as the personal safety of those involved in counterterrorism investigations. The watch list remains an effective tool in the government's counterterrorism efforts because its contents are not disclosed.

"The Terrorist Screening Center works with other agencies on a daily basis to resolve complaints from individuals who are experiencing repeated delays or difficulties during a screening process that may be related to the terrorist watch list. Because individuals may experience problems during screening for any number of reasons, and not just because of the terrorist watch list, individuals should contact the agency that is conducting the screening process in question. The screening agency is in the best position to resolve issues.

"Contact information:

"The Terrorist Screening Center does not accept redress inquiries directly from the public. Members of the public should contact the relevant screening agency with complaints about a negative screening experience.

"Please direct the public to contact the following screening agencies to submit a complaint about a negative screening experience.

**For air passenger screening**:

Transportation Security Administration Ombudsman
Phone: (866) 289-9673
Email: tsa-contactcenter@dhs.gov
Online: TSA Traveler Identity Verification Program[1]

**For U.S. borders and ports of entry**:

Customs and Border Protection
Customer Satisfaction Unit[2]
1300 Pennsylvania Ave., NW, Room 5.5C
Washington, DC 20229
Phone: (202) 344-1968
Fax: (202) 344-2791
Online: Interagency Border Inspection System Fact Sheet[3]

**For visas**:

Director, Information Management Liaison (CA/VO/I)
Bureau of Consular Affairs, SA-1
U.S. Department of State
Washington, D.C. 20520
FAX: (202) 663-3535
Online: Bureau of Consular Affairs"

**"Frequently Asked Questions"**
[Copied from the FBI's Web site, www.fbi.gov. Accessed August 2006.]

---

[1]See appendix III.

[2]On September 12, 2006, in providing technical comments on a draft of this report, U.S. Customs and Border Protection officials noted that the contact information given on the FBI's Web site should be as follows: U.S. Customs and Border Protection, Freedom of Information Act/Privacy Act Branch. Also, the comments noted that the telephone number should be removed. We suggested to the U.S. Customs and Border Protection officials that they coordinate with the FBI to ensure that appropriate contact information is available to the public.

[3]See appendix IV for a copy of the fact sheet.

**"Why was the Terrorist Screening Database created?**

Prior to the creation of the terrorist-screening database, information about known or suspected terrorists was dispersed throughout the U.S. government and no one agency was charged with consolidating it and making it available for use in terrorist screening. Under Homeland Security Presidential Directive-6, the Terrorist Screening Center now provides "one-stop shopping" so that every government screener is using the same terrorist watch list—whether it is an airport screener, an embassy official issuing visas overseas, or a state or local law enforcement officer on the street. The Terrorist Screening Center allows government agencies to run name checks against the same comprehensive list with the most accurate, up-to-date information about known and suspected terrorists.

**Who gets included in the terrorist-screening database?**

Per Homeland Security Presidential Directive-6, only individuals who are known or appropriately suspected to be or have been engaged in conduct constituting, in preparation for, in aid of, or related to terrorism are included in the terrorist-screening database.

**Does the terrorist screening database contain information on domestic terrorists, like Timothy McVeigh?**

Yes. The terrorist-screening database contains information on both international and domestic terrorists.

**Does the terrorist-screening database contain information on people who have been convicted of a crime?**

The purpose of the terrorist-screening database is not to hold information on individuals who have been convicted of a crime; however, an individual appropriately included in the terrorist-screening database may also have a criminal history. None of the information pertaining to the criminal history is contained or referenced in the terrorist-screening database.

**Are there U.S. citizens in the terrorist-screening database?**

Yes, U.S. citizens are included in terrorist-screening database if they meet the Homeland Security Presidential Directive-6 terrorism nexus criteria.

**Can I find out if I am in the terrorism screening database?**

The Terrorist Screening Center cannot reveal whether a particular person is in the terrorist-screening database. The terrorist-screening database remains an effective tool in the government's counterterrorism efforts because its contents are not disclosed. If the Terrorist Screening Center revealed who was in the terrorist-screening database, terrorist organizations would be able to circumvent the purpose of the terrorist watch list by determining in advance which of their members are likely to be questioned or detained.

**I am having trouble when I try to fly or cross the border into the United States. Does this mean I am in the terrorist-screening database?**

No. At security checkpoints like our nation's borders, there are many law enforcement or security reasons that an individual may be singled out for additional screening. Most agencies have redress offices (e.g., Ombudsman) where individuals who are experiencing repeated problems can seek help. If an individual is experiencing these kinds of difficulties, he/she should cooperate with the agency screeners and explain the recurring problems. The screeners can supply instructions on how to raise concerns to the appropriate agency redress office.

**I have been told that I am on a terrorist watch list by an airline employee and I frequently have difficulty when I fly. Does this mean I am in the terrorist-screening database?**

No; however, an individual may be a "misidentified person." A misidentified person is someone who is experiencing a delay during screening because they have a similar name to a person in the terrorist-screening database. Misidentified persons are sometimes delayed while the government works to distinguish them from the terrorist in the terrorist-screening database. Because these delays are frustrating and inconvenient, there are several initiatives in progress to help streamline the clearance process for misidentified persons. If an individual believes he/she is having a misidentification problem, he/she should contact the screening agency's redress office for assistance.

### Are individuals removed from the terrorist-screening database?

Yes. The Terrorist Screening Center works with partner agencies through a formal process to remove individuals who no longer meet the Homeland Security Presidential Directive-6 terrorism criteria.

### How does the Terrorist Screening Center ensure that the terrorist-screening database is accurate?

The Terrorist Screening Center has a staff dedicated to redress and quality assurance that conducts comprehensive as well as case-specific reviews of terrorist-screening database records to ensure they are current, accurate, and thorough. The Terrorist Screening Center conducts research and coordinates with other federal agencies to ensure the terrorist record is as complete, accurate, and thorough as possible. The Terrorist Screening Center's redress and quality assurance process has resulted in the correction or removal of hundreds of records in the terrorist-screening database.

### What are the Terrorist Screening Center's redress procedures?

See the TSC Redress Procedures webpage for details. [GAO note: The procedures are copied in the first section of this appendix.]

### Does the Transportation Security Administration's Secure Flight program have anything to do with the terrorist-screening database?

Secure Flight is a congressionally mandated program that will check the names and dates of birth of passengers on domestic flights against the terrorist-screening database. As with all government programs that screen for terrorists, the Terrorist Screening Center provides this program support to ensure that terrorist identity matches are correct.

### What prevents the Terrorist Screening Center from violating the civil liberties of Americans?

The Terrorist Screening Center only receives information collected by other government entities with pre-existing authority to do so. Each agency that contributes data to the Terrorist Screening Center must comply with legislation, as well as its own policies and procedures to protect privacy rights and civil liberties. The handling and use of information, including information about U.S. citizens and legal immigrants, is governed by the same statutory, regulatory, and



**Appendix II: Terrorist Screening Center:**
**Terrorist-Watch-List Redress Process**

constitutional requirements as if the information was not to be included in a Terrorist Screening Center managed database."

# Appendix III: Transportation Security Administration: Traveler Identity Verification Program

This appendix presents an overview of the Transportation Security Administration's (TSA) traveler identify verification program for air passengers who are affected by terrorist watch list screening. An individual can voluntarily provide TSA with additional personal-identifying information, which the agency will use to decide whether the person's name should be put on a cleared list—that is, a list that contains the names and other personal-identifying information of individuals who have been checked and cleared as being persons not on the No Fly and Selectee lists. Airlines are to use the cleared list to more quickly determine that these passengers are not the persons whose names are on the No Fly and Selectee lists. As needed, TSA provides the airlines with updates of the No Fly and Selectee lists and the cleared list.

Specific information about TSA's traveler identity verification program is publicly available on the agency's Web site (www.tsa.gov). The following sections of this appendix reproduce—as exhibits A and B—relevant information from TSA's Web site (accessed August 2006):

- Exhibit A: Our Traveler Identity Verification Program.
- Exhibit B: Traveler Identity Verification (TSA Form 2301, May 2006). Generally, to participate in the program, an individual must complete a traveler identity verification form and return the form and copies of specified identity documents to TSA.

## Exhibit A: "Our Traveler Identity Verification Program"

"Told that you are on a Federal Government Watch List?

Problems printing your boarding pass at the kiosk or from home?

Experience other delays while checking-in for flights?

Our Office of Transportation Security Redress is here to help with our new Traveler Identity Verification Program.

**Why am I having these problems?**

TSA and the airlines are required to check and confirm that you are properly identified prior to your flight for safety and security. You may experience inconveniences when you present your identification during check-in due to mistaken identity or incorrect information. Our Traveler Identity Verification Program works with the relevant parties (including airlines) to resolve any inaccuracies or inconsistencies that may have resulted in misidentifications.

**Appendix III: Transportation Security
Administration: Traveler Identity Verification
Program**

## Am I on the No-Fly List?!

If you receive a boarding pass, you are not on the No-Fly List. Most commonly, passengers who are told that they are on the No-Fly List have, in fact, a similar name to an individual on the Watch Lists.

## What do I need to do?

You are invited to participate in the TSA Traveler Identity Verification Program by completing and returning the following information to TSA:

- Traveler Identity Verification Form (WORD 145 KB)
- A copy of your U.S. passport OR
- Copies of three of the following:
  - Driver's License
  - Birth Certificate
  - Voter Registration
  - Military ID Card
  - Visa
  - Naturalization Card
  - Government ID Card

## How does TSA review my information?

Your submission is reviewed to determine if the delays are caused by mistaken identity or incorrect information. TSA will respond to you in writing and provide air carriers with your identifying information to help properly identify you at check-in and expedite your future travel.

**I participated in the Traveler Identity Verification Program, but I'm still experiencing problems.**

**Airline check-in procedures must still be followed**. We currently distribute the Watch Lists to the airlines, who compare your reservation information to the Watch Lists prior to your flight. The airlines use varying procedures and technology to conduct this comparison, which could inadvertently lead to continued delays.

We are developing a program called Secure Flight to enhance the security of air travel in the U.S. while reducing security-related delays for the traveling public. It will allow the federal government, instead of individual airlines, to compare passenger data against the Watch Lists prior to check-in at the airport, while fully protecting privacy and civil liberties.

**Appendix III: Transportation Security
Administration: Traveler Identity Verification
Program**

**Our goal going forward is to ensure travelers' security with minimal disruptions.**

Please note that you will be subject to screening procedures at the checkpoint. Every passenger will still walk through a metal detector, their carry-on bags will still be X-rayed, and every checked bag will still be screened for explosives. Additionally, you may be randomly selected at the airline counter or upon arrival at the checkpoint for secondary screening.

We will continue to work with travelers to minimize any unnecessary delays. We will continue to look at process and technology improvements to ensure a safe and efficient travel experience."

Appendix III: Transportation Security
Administration: Traveler Identity Verification
Program

## Exhibit B: Traveler Identity Verification (TSA Form 2301, May 2006)

Transportation
Security
Administration

**Traveler Identity Verification**

**Instructions: Complete all fields and mail to the Office of Transportation Security Redress (address below)**

**Personal Information**

Full Name: _____
First          Middle          Last

Social Security No.: ___-___-___   Birth Date: __/__/__   Birthplace: _____
mm/dd/yy                         City or Town/Province/Country

Sex: ☐ Male  ☐ Female   Height: ____   Weight: ____   Hair Color: ____   Eye Color: ____

**I. Contact Information**

Current Address: _____
Street Number and Name                                        Apt. no.

_____
City or Town          State or Province          Zip Code

Home Telephone No.: ( ___ ) ___-___   Work Telephone No.: ( ___ ) ___-___

**II. Required Documentation and Information**
You must provide either a copy of a U.S. Passport (Passport No. must be clearly visible) or at least three (3) of the following documents in order for your request to be processed. Check the box next to the document(s) that you are submitting with this completed form and enter the requested information for each in the space provided.

| Documentation | Information |
|---|---|
| ☐ U.S. Passport | Registration No.: _____ <br> Place of issuance: _____ |
| | **OR** |
| ☐ Birth Certificate | Registration No.: _____ <br> Place of issuance: _____ |
| ☐ Certificate of Citizenship | Certificate No.: _____ <br> Place of issuance: _____ |
| ☐ Certificate of Release or Discharge from Active Duty (DD Form 214) | Discharge date: _____ <br> Check one: ☐ Air Force ☐ Army ☐ Marines ☐ Navy ☐ Coast Guard |
| ☐ Drivers License | License No.: _____ <br> State of issuance: _____ |
| ☐ Government Identification Card | Badge No.: _____ <br> Check one: ☐ Federal ☐ State ☐ Local |
| ☐ Immigrant/Nonimmigrant Visa | Control no.: _____ |
| ☐ Military Identification Card | Card No.: _____ <br> Check one: ☐ Air Force ☐ Army ☐ Marines ☐ Navy ☐ Coast Guard |
| ☐ Naturalization Certificate | Certificate No.: _____ <br> State of issuance: _____ <br> Country of issuance: _____ |
| ☐ Non U.S. Passport | Registration No.: _____ <br> Country of issuance: _____ |
| ☐ Voter Registration Card | Card No.: _____ <br> State of issuance: _____ |

1 of 2

TSA Form 2301, May 2006

Appendix III: Transportation Security
Administration: Traveler Identity Verification
Program



**Transportation Security Administration**

**Traveler Identity Verification**

**V. Acknowledgement**
The information I have provided on this form is true, complete, and correct to the best of my knowledge and is provided in good faith. I understand that knowingly and willfully making any materially false statement, or omission of a material fact, on this form can be punished by fine or imprisonment or both (see section 1001 of Title 18 United States Code).

I understand the above information and am voluntarily submitting this information to the Transportation Security Administration.

| Print or Type Name | Signature | Date |
| --- | --- | --- |

**PRIVACY ACT STATEMENT: Authority:** The authority for collecting this information is 49 U.S.C. § 114. **Principal Purpose(s):** This voluntary submission is provided to afford you the ability to confirm your identity as distinct from an individual on a Federal Watch List. Your Social Security Number (SSN) will be used to verify your identity. Furnishing this information, including your SSN, is voluntary; however, the Transportation Security Administration may not be able to confirm your identity without this information. **Routine Uses:** Routine uses of this information include disclosure to appropriate governmental agencies for law enforcement or security purposes, or to airports or air carriers to verify your identity for purposes of security screening.

**Mailing Instructions**
Please mail the completed form and copies of identity documents to:

Office of Transportation Security Redress
Transportation Security Administration
601 South 12th Street, TSA-901
Arlington, VA 22202

**Faxing Instructions**
Please fax the completed form and copies of identity documents to:

(866) 672-8640
or
(571) 227-1925

2 of 2

TSA Form 2301, May 2006

# Appendix IV: U.S. Customs and Border Protection: Online Information

## Background and Preliminary Observation

Appendix II provides an overview of the redress process used by the Terrorist Screening Center for addressing complaints or concerns resulting from the use of terrorist watch lists to screen individuals. As stated in appendix II, the Terrorist Screening Center is to work with frontline-screening agencies to resolve complaints from individuals who are experiencing repeated delays or difficulties during a screening process that may be related to a terrorist watch list. For instance, the Terrorist Screening Center's overview guidance notes that complainants experiencing such problems at U.S. borders and ports of entry should contact U.S. Customs and Border Protection. In further reference to the redress process for misidentifications of these individuals, the overview guidance provides an online link to the U.S. Customs and Border Protection's Interagency Border Inspection System Fact Sheet (reproduced below). The fact sheet does not specifically mention terrorist watch lists and the redress process.

However, U.S. Customs and Border Protection's Web site (www.cbp.gov), which can be directly accessed by the public, does provide information regarding the agency's Customer Satisfaction Unit and how complaints are handled as well as information on trusted-traveler programs.

## Interagency Border Inspection System Fact Sheet

GAO note: The fact sheet consists solely of the following six questions and answers, which we copied from the Web site of U.S. Customs and Border Protection (accessed August 2006).

### "What Is IBIS?"

"IBIS is the acronym for the Interagency Border Inspection System."

### "Who Uses IBIS?"

"In addition to U.S. Customs and Border Protection, law enforcement and regulatory personnel from 20 other federal agencies or bureaus use IBIS. Some of these agencies are the Federal Bureau of Investigation; U.S. National Central Bureau of the International Criminal Police Organization; the Drug Enforcement Administration; the Bureau of Alcohol, Tobacco, Firearms and Explosives; the Internal Revenue Service; the Coast Guard; the Federal Aviation Administration; the Secret Service; and the Animal and Plant Health Inspection Service, just to name a few. Also, information from IBIS is shared with the Department of State for use by Consular Officers at U.S. Embassies and Consulates."

**Appendix IV: U.S. Customs and Border
Protection: Online Information**

| | |
|---|---|
| "What Does IBIS Provide?" | "IBIS assists the majority of the traveling public with the expeditious clearance at ports of entry while allowing the border enforcement agencies to focus their limited resources on those potential non-compliant travelers. IBIS provides the law enforcement community with access to computer-based enforcement files of common interest. It also provides access to the FBI's National Crime Information Center and allows its users to interface with all fifty states via the National Law Enforcement Telecommunications Systems." |
| "Where Is IBIS?" | "IBIS resides on the Treasury Enforcement Communications System at the U.S. Customs and Border Protection's Data Center. Field level access is provided by an IBIS network with more than 24,000 computer terminals. These terminals are located at air, land, and sea ports of entry." |
| "What Information Is in IBIS?" | "IBIS keeps track of information on suspect individuals, businesses, vehicles, aircraft, and vessels. IBIS terminals can also be used to access National Crime Information Center records on wanted persons, stolen vehicles, vessels or firearms, license information, criminal histories, and previous Federal inspections. The information is used to assist law enforcement and regulatory personnel." |
| "Additional Questions?" | "Any concerns you may have as an international traveler or importer about the use or application of IBIS may be addressed to:<br><br>U.S. Customs and Border Protection<br>Freedom of Information Act/<br>Customer Satisfaction Unit<br>Room 5.5 C<br>1300 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20229" |

# Appendix V: Comments from the Department of Homeland Security

U.S. Department of Homeland Security
Washington, DC 20528



September 15, 2006

Ms. Eileen Larence
Director
Homeland Security and Justice Issues
U.S. Government Accountability Office
441 G Street, NW
Washington, DC 20548

Dear Ms. Larence:

Thank you for the opportunity to review and comment on the Government Accountability Office's (GAO's) draft report entitled, *TERRORIST WATCH LIST SCREENING: Efforts to Help Reduce Adverse Effects on the Public* (GAO-06-1031). Technical comments have been provided under separate cover.

The Department of Homeland Security appreciates your report and findings as well as your recognition of the many efforts we are currently undertaking to enhance terrorist screening and our redress efforts.

We do have one suggestion for an additional paragraph in your report, perhaps in your Results in Brief and Concluding Observations sections.

The Department of Homeland Security is working with the Departments of Justice, State and others on a larger set of travel screening redress issues, which the interagency memorandum of understanding, with its focus on redress related to the terrorist watch lists, will supplement. On January 17, 2006, the Departments of State and Homeland Security announced an initiative on "Secure Borders and Open Doors in the Information Age," otherwise known as the Rice-Chertoff Initiative. Part Three, "Smarter Screening," includes a "'One Stop' Redress for Travelers." The purpose is to establish a government-wide redress process to address perceived problems in international and domestic traveler prescreening. Secretary Chertoff made it a goal to establish this process by the end of the calendar year so that those with complaints or legitimate issues can resolve them with greater efficiency. US-VISIT and the Office for Civil Rights and Civil Liberties (CRCL) within DHS have been tasked with initiating from within the relevant DHS components and the Department of State a governance board and working group for this project. The new director of DHS's Screening Coordination Office now chairs the governance board with CRCL and US-VISIT as co-chairs. Representatives from State, the Terrorist Screening Center, and

www.dhs.gov

**Appendix V: Comments from the Department
of Homeland Security**

**Appendix V: Comments from the Department**
**of Homeland Security**

2

DHS's U.S. Customs and Border Protection, Transportation Security
Administration, U.S. Immigration and Customs Enforcement, US-VISIT, CRCL
and Office of Policy are all involved with the working group.

Thank you again for the opportunity to comment on this draft report and we look forward
to working with you on future homeland security issues.

Sincerely,

Steven J. Pecinovsky
Director
Departmental GAO/OIG Liaison Office

# Appendix VI: Comments from the State Department



**United States Department of State**

*Assistant Secretary for Resource Management
and Chief Financial Officer*

*Washington, D.C. 20520*

Ms. Jacquelyn Williams-Bridgers
Managing Director
International Affairs and Trade
Government Accountability Office
441 G Street, N.W.
Washington, D.C. 20548-0001

SEP 1 4 2006

Dear Ms. Williams-Bridgers:

We appreciate the opportunity to review your draft report,
"TERRORIST WATCH LIST SCREENING: Efforts to Help Reduce
Adverse Effects on the Public," GAO Job Code 440374.

The enclosed Department of State comments are provided for
incorporation with this letter as an appendix to the final report.

If you have any questions concerning this response, please contact
Timothy Smith, Chief, Coordination Division, Bureau of Consular Affairs at
(202) 663-1246.

Sincerely,

Bradford R. Higgins

cc:   GAO – Dan Burton
      CA – Maura Harty
      State/OIG – Mark Duda

Department of State Comments on GAO Draft Report

**Terrorist Watch List Screening: Efforts to Help Reduce
Adverse Effects on the Public
(GAO-06-1031, GAO Code 440374)**

Thank you for allowing the Department of State the opportunity to comment on the draft report *Terrorist Watch List Screening: Efforts to Help Reduce Adverse Effects on the Public.*

The report accurately describes the visa process and the Department of State's position that the administrative processing time required to screen a visa applicant, including, if required, the processing of a Security Advisory Opinion (SAO) review, is a necessary part of the visa application procedure rather than an adverse governmental action. The report also acknowledges the Department's interest in data integrity and taking steps to minimize the impact of the SAO process on the traveling public. (Note: the SAO process is the means through which Department of State Consular Officers screen visa applicants against the Terrorist Watch List.)

The Department has the following comments:

1. The GAO notes, first on the page immediately following the report cover sheet and several times throughout the document, that of the tens of thousands of names sent to the Terrorist Screening Center (TSC) by the frontline screening agencies, about half were "misidentifications." From the perspective of the State Department, which uses the Terrorist Watch List primarily as a screening tool for visa adjudication, a "misidentification" is not an adverse result for the visa applicant. Rather, a negative response would clear a visa applicant of an association with a terrorist identity (though subject to a second review upon seeking admission at a U.S. port of entry.)

2. The description of the Department's visa name check process in the body of the report is accurate. However, the general overview description and chart on pages 11-13 are not accurate as descriptions of the visa SAO process. The description and chart state that "inconclusive ... uncertain and other hard-to-verify potential matches..." are to be referred to the applicable screening agency. If that agency is unable to conclusively determine whether a hit is an exact match, then it contacts the Terrorist

2

Screening Center.  In describing visa operations, it is more accurate to
say (and depict on a chart) that consular officers are required to submit to
the Department for a Security Advisory Opinion *all hits that cannot
positively be labeled a mismatch*.  That SAO request is automatically
routed to the TSC and other screening agencies, and the Department will
not recommend a course of action to a post until the TSC and other
screening agencies have advised us that either the hit is a mismatch, or
that derogatory information exists and must be reviewed to determine
whether a legal basis for a visa denial exists.

| | |
|---|---|
| **GAO's Mission** | The Government Accountability Office, the audit, evaluation and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's Web site (www.gao.gov). Each weekday, GAO posts newly released reports, testimony, and correspondence on its Web site. To have GAO e-mail you a list of newly posted products every afternoon, go to www.gao.gov and select "Subscribe to Updates." |
| **Order by Mail or Phone** | The first copy of each printed report is free. Additional copies are $2 each. A check or money order should be made out to the Superintendent of Documents. GAO also accepts VISA and Mastercard. Orders for 100 or more copies mailed to a single address are discounted 25 percent. Orders should be sent to:<br><br>U.S. Government Accountability Office<br>441 G Street NW, Room LM<br>Washington, D.C. 20548<br><br>To order by Phone:  Voice:    (202) 512-6000<br>TDD:     (202) 512-2537<br>Fax:      (202) 512-6061 |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact:<br><br>Web site: www.gao.gov/fraudnet/fraudnet.htm<br>E-mail: fraudnet@gao.gov<br>Automated answering system: (800) 424-5454 or (202) 512-7470 |
| **Congressional Relations** | Gloria Jarmon, Managing Director, JarmonG@gao.gov (202) 512-4400<br>U.S. Government Accountability Office, 441 G Street NW, Room 7125<br>Washington, D.C. 20548 |
| **Public Affairs** | Paul Anderson, Managing Director, AndersonP1@gao.gov (202) 512-4800<br>U.S. Government Accountability Office, 441 G Street NW, Room 7149<br>Washington, D.C. 20548 |

PRINTED ON ♻ RECYCLED PAPER