# Elhady Plaintiffs
# MSJ Exhibit 36

# Homeland Security Presidential Directive-11

# An Updated Strategy for Comprehensive Terrorist-Related Screening Procedures



**FOR OFFICIAL USE ONLY**

**Elhady_FBITSC-PRIV004446**

DEPARTMENT OF HOMELAND SECURITY
FOR OFFICIAL USE ONLY

**This page is intentionally left blank.**

**Elhady_FBITSC-PRIV004447**

DEPARTMENT OF HOMELAND SECURITY
FOR OFFICIAL USE ONLY

## Table of Contents

1.   Introduction ...................................................................................................................... 4

2.   Screening Strategy Cornerstones ..................................................................................... 5

2.1. Risk-Based Screening                                                                                              5
 2.1.1.   HSPD-6 and the foundation for Risk-Based Screening ........................................... 6
 2.1.2.   Screening Categories ............................................................................................... 8

2.2. Civil Liberties and Privacy                                                                                      10

2.3. Governance                                                                                                            11

2.4. Information Sharing                                                                                                13
 2.4.1.   Information Sharing Environment .......................................................................... 14
 2.4.2.   The National Strategy for Information Sharing ...................................................... 14
 2.4.3.   Information Sharing amongst Screening Stakeholders ............................................ 15
 2.4.4.   International Exchange of Terrorist Screening Information ...................................... 17
 2.4.5.   Sharing within the Screening Community ............................................................... 17

3.   USG Approach – Screening Opportunities from Beyond our Borders to the Interior ............. 18

3.1. Visa and Passport Application Screening                                                                18

3.2. Screening Prior to Foreign Departure                                                                     19
 3.2.1.   Electronic Travel Authorization ............................................................................ 20
 3.2.2.   No Fly and Selectee Matching by Air Carriers ...................................................... 20
 3.2.3.   Screening with Advance Passenger Information ..................................................... 21
 3.2.4.   International Partnerships ....................................................................................... 21

3.3. Maritime En-Route and Pre-Arrival Screening                                                        22

3.4. Screening Travelers at the Border                                                                           22
 3.4.1.   Air and Sea Ports of Entry .................................................................................... 23
 3.4.2.   Land Border Screening and Supporting Initiatives ................................................ 23
 3.4.3.   Travel Document Validation ................................................................................. 24
 3.4.4.   Screening and Facilitation of Trusted Travelers .................................................... 25

3.5. Screening for Immigration and Other Benefits                                                        25

3.6. Iraqi Refugee Screening                                                                                         26

3.7. Interior Law Enforcement Encounters                                                                     27

3.8. Information-Based Screening for Domestic Air Travel                                             27

3.9. Transportation Systems and Occupational Screening                                              28
 3.9.1.   Airports ................................................................................................................ 28
 3.9.2.   Seaports ............................................................................................................... 30
 3.9.3.   Highways .............................................................................................................. 30

3.10. Private Sector Screening                                                                                      30

3.11   (G), (H)                                                                                                           31

3.12. Enhancing the Effectiveness of Screening                                                            31
 3.12.1.   Secure Identification ........................................................................................... 32
 3.12.2.   Biometrics Screening Opportunities ..................................................................... 32
 3.12.3.   Aligning Biographic and Biometric Screening ..................................................... 34

4.   Cargo Screening Approaches and Opportunities ............................................................ 35

Elhady_FBITSC-PRIV004448

DEPARTMENT OF HOMELAND SECURITY
FOR OFFICIAL USE ONLY

*4.1. International and Private Industry Partnerships in Support of Cargo Screening*   *35*

*4.2. Cargo Screening at the Border*   *36*

*4.3. Air Cargo Screening*   *36*

*4.4. Chemical, Biological, Radiological, Nuclear, and Explosives Detection Capabilities*   *37*

**5.   Redress**................................................................................................................................**39**

*5.1. Traveler Redress*   *39*

*5.2. Quality Assurance*   *40*

**6.   Planning the Way Forward – Harmonizing HSPD-11 with the NIP** ........................................**41**

**7.   Conclusion** ..........................................................................................................................**41**

**Appendix A:  Homeland Security Presidential Directive-11 Investments** ..........................................**42**

**Elhady_FBITSC-PRIV004449**

## 1. Introduction

On August 27, 2004, President Bush issued Homeland Security Presidential Directive-11 (HSPD-11) calling for "Comprehensive Terrorist-Related Screening Procedures" in support of homeland security, at home and abroad.  HSPD-11 establishes a U.S. policy to "enhance terrorist-related screening through comprehensive, coordinated procedures … in a manner that safeguards legal rights, including freedoms, civil liberties, and information privacy guaranteed by Federal law."  HSPD-11 defines "terrorist-related screening" as "the collection, analysis, dissemination, and use of information related to people, cargo, conveyances, and other entities and objects that pose a threat to homeland security.  Terrorist-related screening also includes risk assessment, inspection, and credentialing."

From September through November 2004, the Department of Homeland Security (DHS) led an interagency response effort to the challenges outlined in HSPD-11, and subsequently produced and submitted two reports to the Homeland Security Council (HSC).  The *Terrorist-Related Screening Procedures Strategy Report* (submitted on November 9, 2004) and the *Investment and Implementation Plan for Terrorist-Related Screening Procedures* (submitted on November 24, 2004) outlined the findings of the interagency endeavor and identified the following cornerstones for successfully implementing comprehensive screening procedures:

- <u>Risk-Based Screening</u>   Establish comprehensive, risk-based screening that includes standards for matching risk to screening methods and also provides for coordinated, comprehensive support for terrorist-related screening of people, cargo, and conveyances.
- <u>Civil Liberties and Privacy</u>   Ensure that safeguards for legal rights, including civil liberties and privacy, are built into all screening processes.
- <u>Governance</u>   Establish an office within DHS with the authority and responsibility to promulgate standards and ensure coordination across the Federal screening community to achieve consistency in terrorist-related screening processes.  Establish an interagency Governance Board to provide advice and counsel to this office.
- <u>Information Sharing</u>   Improve access to information across the Federal screening community, and other non-Federal partners as appropriate, while developing privacy and security standards for sharing personal information.

This report provides an update on the strategic cornerstones that were developed in 2004, together with an update on the implementation of U.S. Government screening programs.  The referenced cornerstones continue to require a coordinated, comprehensive, and effective risk-based management approach across the entire terrorist-related screening environment to ensure that resources and activities are appropriate and focused on the greatest threats.  Terrorist-related screening requires a risk management approach that is timely, supports critical resource allocation decisions, safeguards civil liberties and privacy, and facilitates the efficient movement of people, cargo, conveyances, and other potentially affected activities in commerce.

The Federal screening community includes the Federal departments and agencies that conduct terrorist-related information-based checks, physical checks, and risk-based assessments that support homeland security inside the U.S., at our borders, and abroad.  It also includes the agencies that are involved with screening activities by providing critical intelligence and law enforcement information.  These members include all agencies and departments identified in

Elhady_FBITSC-PRIV004450

HSPD-11, as well as many other departments across the Federal Government.  Each day, screeners throughout the community make countless decisions related to immigration, border security, law enforcement, intelligence, transportation security, credentialing, and critical infrastructure.

The challenge facing the Screening Community today is how to detect and interdict terrorists effectively and efficiently within the thousands of existing screening opportunities.  To meet this challenge, this report recommends a strategy that builds on a risk management framework to achieve the goal of quickly and cost effectively determining the known people, cargo, conveyances, and other entities and their relative risk so that more attention and resources can be focused on the unknowns.  Risk-based terrorist-related screening will result in coordinated management of all Federal terrorist-related screening activities.

The concept of risk considers the likelihood and consequences of a potential threat achieving its intended outcome.  Information, sound human judgment, and assessment are among the tools used to identify and manage risk.  Adoption of the four cornerstones presented in the following sections will enhance our nation's security by reducing vulnerabilities through an efficient use of resources while pushing out the borders, facilitating legitimate trade and travel, and maintaining the nation's commitment to civil liberties and privacy.

Additional efforts, such as the development of the National Implementation Plan for the War on Terror (NIP) unveiled in 2006, are intrinsically linked to the cornerstones that are required for the success of terrorist screening efforts.  The NIP serves as the U.S. Government's comprehensive strategic plan to implement policy for the War on Terror and is built upon four pillars, two of which are particularly relevant to screening are as follows:  1) Protect and Defend the Homeland and 2) Attack Terrorists and Their Capacity to Operate Effectively.  The strategic objectives for protecting and defending the homeland and attacking terrorists and their capacity to operate effectively, both domestically and overseas, are directly linked to the underlying objectives of HSPD-11.

The framework that was developed to support a coordinated response to the NIP provides a parallel infrastructure for building upon the comprehensive terrorist-related screening procedures and prioritized investment and implementation called for in HSPD-11.  The corresponding efforts ensure a congruent U.S. Government response to the goals and objectives of both the NIP and HSPD-11.

## 2.  Screening Strategy Cornerstones

### 2.1. Risk-Based Screening

Part of our challenge is to properly deploy limited resources to confront terrorist threats.  The process of adjusting screening operations must be based on the factors of likelihood and consequence.  To support risk assessment, the evolving knowledge of threats, vulnerabilities, and screening opportunities must be fully linked.  More comprehensive knowledge will allow agencies across the Screening Community to apply their best judgment to adjust screening at particular locations.

Elhady_FBITSC-PRIV004451

The wider application of risk assessment, to reduce what and who needs to be screened and at what level, is a more efficient way to improve the nation's homeland security and facilitate the movement of legitimate trade and travel by allowing a rational application of screening categories. This risk-based approach will rely on supporting analysis from the Intelligence Community and must be informed by situational awareness.

A risk-based approach to screening will:

- Establish basic criteria and procedures,
- Operate a coherent and cost-effective process with measurable outcomes,
- Provide timely and relevant information and analysis to screeners,
- Ensure operational feedback and analysis, and
- Enable screening at the farthest point possible from the U.S.

Simultaneously, the U.S. Government must continue to invest in technologies that will permit efficient, effective, and non-invasive screening of people, cargo, and conveyances at each appropriate screening opportunity. Continued investment and development of these technologies will enable the U.S. Government to approach 100 percent screening at the appropriate opportunities and venues, while reducing dependency on risk assessments alone, allowing greater flexibility in the allocation of resources. Continued investment also ensures the facilitation of legitimate travelers, cargo, and conveyances.

### 2.1.1.   HSPD-6 and the foundation for Risk-Based Screening

A key foundation for terrorist-related screening is the U.S. Government's terrorist watchlisting process managed by the National Counterterrorism Center (NCTC) and the Terrorist Screening Center (TSC). HSPD-6, "Integration and Use of Screening Information," dated September 16, 2003, provides that to protect against terrorism it is the policy of the U.S. to:

(1) develop, integrate, and maintain thorough, accurate, and current information about individuals known or appropriately suspected to be or have been engaged in conduct constituting, in preparation for, in aid of, or related to terrorism (Terrorist Information); and
(2) use that information as appropriate and to the full extent permitted by law to support:
(a) Federal, State, local, territorial, tribal, and foreign-government, private sector screening processes, and (b) diplomatic, military, intelligence, law enforcement, immigration, visa, and protective processes.

"To further strengthen the ability of the U.S. Government to protect the people, property, and territory of the U.S. against acts of terrorism, and to the full extent permitted by law, and consistent with the policy set forth above," HSPD-6 directed the "Attorney General to establish an organization to consolidate the Government's approach to terrorism screening and to provide for the appropriate and lawful use of Terrorist Information in screening processes." That organization, the TSC, became operational on December 1, 2003. The TSC is administered by the Federal Bureau of Investigation (FBI) with support from the Intelligence Community, the Department of Defense (DoD), DHS, the Department of Justice (DOJ), the Department of State (DOS), and the Department of the Treasury.

Elhady_FBITSC-PRIV004452

DEPARTMENT OF HOMELAND SECURITY
FOR OFFICIAL USE ONLY

Simultaneously with the issuance of HSPD-6, the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Director of Central Intelligence[1] executed the Memorandum of Understanding on the Integration and Use of Screening Information to Protect Against Terrorism (TSC MOU). The TSC has created and maintains the Terrorist Screening Database (TSDB) to serve as the U.S. Government's consolidated watchlist for terrorist screening information. The TSDB receives terrorist identifiers[2] from two sources. Information concerning known or suspected international terrorists comes to the TSC from the NCTC. Pursuant to section 1021 of the Intelligence Reform and Terrorism Prevention Act of 2004 (IRTPA), NCTC serves as the primary organization in the U.S. Government for analyzing and integrating all intelligence possessed or acquired by the U.S. Government pertaining to terrorism, excepting intelligence pertaining exclusively to domestic terrorists and domestic counterterrorism.[3] Consequently, members of the Intelligence Community ▓▓▓ (G), (H) ▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓, provide NCTC with nominations of known or suspected international terrorists for inclusion in NCTC's Terrorist Identities Datamart Environment (TIDE) database. These nominations are received and then select identifier data are exported in a Sensitive But Unclassified format to the TSC for inclusion in the TSDB. The TSC MOU represents their agreement on the implementation of HSPD-6. Pursuant to paragraph 13 of the TSC MOU, NCTC's TIDE database serves as the single source for TSC's TSDB (except for purely domestic terrorism information). The TSDB is a continuously updated, sensitive but unclassified subset of the terrorist information possessed by the NCTC, and the purely domestic terrorism information possessed by the FBI. The FBI's Terrorist Review and Examination Unit (TREX) also provides the identities of known or suspected domestic terrorists who have no link to international terrorism for inclusion in the TSDB.

The TSC operates a 24/7 Call Center to assist law enforcement, intelligence agencies, and other governmental authorities in determining whether individuals encountered during the screening process are positive or negative identity matches to the known or suspected terrorists watchlisted within the TSDB. All positive matches are passed to the Terrorist Screening Operations Unit (TSOU) in the FBI's Counterterrorism Division for follow-up action. ▓▓▓ (G), (H) ▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Additionally, the FBI's National Joint Terrorism Task Force Unit serves to enhance communications, coordination, and cooperation between Federal, State, and local government agencies representing the intelligence, law enforcement, defense diplomatic, public safety, and homeland security communities by providing a point of fusion for terrorism intelligence and by supporting the JTTFs throughout the U.S.

---

[1] ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (G), (H) ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
[2] ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (G), (H) ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓
[3] Section 1021 does further provide, however, that NCTC may receive intelligence pertaining to domestic counterterrorism from any Federal, State, or local government or any other source necessary to fulfill its responsibilities and retain and disseminate such intelligence.

Elhady_FBITSC-PRIV004453

DEPARTMENT OF HOMELAND SECURITY
FOR OFFICIAL USE ONLY

The current terrorist watchlisting process led by the TSC and the NCTC has supported the War on Terrorism by (1) consolidating the U.S. Government's terrorist watchlist; (2) providing screening and law enforcement agencies with information to help them respond appropriately during encounters; and, (3) helping screening, law enforcement, and intelligence agencies accurately identify individuals on the watchlist and subsequently collect information about them for use in assessing threats and conducting investigations. As we continue to enhance our screening capabilities, the U.S. Government is investigating the expanded use of biometrics in screening opportunities. The expanded inclusion of biometric information in watchlisting will improve the quality of watchlist records and further enhance terrorist screening programs.

### 2.1.2. Screening Categories

The overshadowing challenge faced by the Screening Community is the infeasibility for 100 percent screening of all people, cargo, and conveyances that would mitigate all potential risks. Screening programs must be applied to high-priority areas and must likewise be adaptive or sufficiently flexible to adjust to changing threats. This strategy recommends that the U.S. Government adopt the screening categories outlined below to serve as guidelines for the development and implementation of new screening programs, and the modification of existing programs as necessary and appropriate.



Elhady_FBITSC-PRIV004454

DEPARTMENT OF HOMELAND SECURITY
FOR OFFICIAL USE ONLY



When determining the appropriate screening category, the screening agency should consider risk and the capabilities at the screening location. Even though risk includes a variety of factors, it must be based on analysis conducted by the respective screening agency. The analysis may be supported by the Intelligence and Law Enforcement communities via interagency coordination through appropriate protocols. The analysis should be integrated with situational awareness (e.g., local conditions and situation). This integration will provide screening agencies with the ability to rationalize and categorize the objects of the screening strategy. Situational awareness will help identify which screening category is applicable to the screening opportunity. Intelligence may identify a higher level of risk that would necessitate a higher level of screening. However, circumstances surrounding screening opportunities may only allow for a lower level of

Elhady_FBITSC-PRIV004455

screening.  Ultimately, screening agencies must weigh the totality of circumstances when implementing risk-based screening categories.

When developing or modifying screening programs, screening entities should build capabilities for randomization and unpredictability into their respective screening programs, where appropriate, to increase the overall security of the programs.  Screening programs must also be flexible and adjustable to address new or evolving conditions when threat levels are elevated.  Randomization, unpredictability, flexibility, and adjustment capabilities for screening programs are agency and mission dependent.  Whether a program is based on information screening, physical screening, or a combination of both, the respective screening agencies must incorporate adaptability into their screening infrastructure (physical and information technology) and screening procedures to meet challenges of evolving threats as they develop.

## 2.2. Civil Liberties and Privacy

HSPD-11 directs that terrorist-related screening efforts be conducted "in a manner that safeguards legal rights, including freedoms, civil liberties, and information privacy guaranteed by Federal law."  Protections for civil rights, civil liberties, and information privacy will be built into screening processes as they are developed and as part of ongoing reviews.  To provide sound advice and oversight, the U.S. Government has established departmental officers for privacy and civil rights.  DHS, DoD, DOJ, the Director of National Intelligence (DNI), and the TSC have each designated civil liberties and privacy officers who play a strong role within the Screening Community and across the Federal Government.  As a result of the Implementing Recommendations of the 9/11 Commission Act of 2007 (9/11 Act), DHS and the other departments and agencies may conduct civil liberties impact assessments for new programs and initiatives, including those related to screening.  Additionally, in accordance with the E-Government Act of 2002 and the Privacy Act, DHS and the other departments and agencies in the Screening Community are committed to issuing Privacy Impact Assessments and System of Records Notices as required by law to inform the public about the personal information contained in government records and systems, how the information is used, and how the information is protected against unauthorized disclosure.

Recognizing the impact to the public of certain screening programs, DHS has been committed to incorporating redress processes into its screening programs.  On January 17, 2006, DHS and DOS announced the Rice-Chertoff Initiative with a vision of secure borders and open doors for travelers to the U.S.  Under the Rice-Chertoff Initiative, DHS and DOS initiated a "one stop redress" process for travelers, DHS Traveler Redress Inquiry Program (TRIP), to provide a simpler mechanism for addressing perceived watchlist misidentification issues and other individual complaints that arise from the traveler's screening experience.  The TSC also coordinated an interagency agreement on Terrorist Watchlist Redress Procedures to govern the watchlist redress process and inform the public of the protocols to respond to redress requests.

Without confirming or denying an individual's status on the watchlist, or otherwise compromising ongoing counterterrorism investigative efforts, the Screening Community will follow ten key principles when implementing the appropriate civil liberties and privacy safeguards:

Elhady_FBITSC-PRIV004456

- **Awareness.** Programs are instituted to ensure that screening personnel, other Federal Government employees, and people being screened are aware that terrorist-related screening procedures were developed with civil liberties and privacy safeguards in mind.
- **Monitoring and Compliance.** Oversight and measurement capabilities, including a civil liberties and privacy compliance audit process, are developed to check progress towards meeting civil liberties and privacy goals.
- **Responsibility and Accountability.** Terrorist screening personnel and other individuals with access to personal information are responsible and accountable for treating the information in accordance with policy.
- **Privacy/Civil Liberties Awareness and Training.** Terrorist screening personnel and other individuals with access to personal information receive education and training emphasizing respect for personal privacy and the proper treatment of personal information.
- **Identifying Purpose for Information Collection.** The purposes for which personal information is collected are disclosed by screening entities at or before the time of collection, in accordance with the Privacy Act and other applicable Federal laws, such as the E-Government and Paperwork Reduction Acts.
- **Informed Consent.** Individuals will be told why the information is needed and advised of the consequences that may result if they decline to provide the information.
- **Limited Collection, Use, Disclosure, and Retention.** The collection, use, disclosure, and retention of personal information are in accordance with the publicly stated purposes of why the information is required.
- **Strict Confidentiality.** Personal information is disclosed to authorized individuals with a legitimate need to know, and only for uses that are consistent with the stated purposes for which the information was collected.
- **Data Integrity.** Personal information will be accurate, complete, and updated as necessary for the stated purposes of the screening activity.
- **Security.** Personal information will be protected by administrative, technical, and physical safeguards appropriate to the sensitivity of the information.

To the extent that terrorist-related screening efforts involve information sharing, Federal departments and agencies have been directed to implement protections to safeguard the information privacy and other legal rights of Americans (the "Information Sharing Environment (ISE) Privacy Guidelines"). Theses guidelines require executive departments and agencies to take proactive and explicit actions to ensure the balance between information privacy and security is maintained, building on a set of core principles that reflect basic privacy protections and best practices.  Agencies must:

- Share protected information only to the extent it is terrorism information, homeland security information, or law enforcement information related to terrorism;
- Identify and review the protected information to be shared within the ISE;
- Enable ISE participants to determine the nature of the protected information to be shared and its legal restrictions (e.g., this record contains individually identifiable information about a U.S. citizen.);
- Assess, document, and comply with all applicable laws and policies;
- Establish data accuracy, quality, and retention procedures;

Elhady_FBITSC-PRIV004457

- Deploy adequate security measures to safeguard protected information;
- Implement adequate accountability, enforcement, and audit mechanisms to verify compliance;
- Establish a redress process consistent with legal authorities and mission requirements;
- Implement the guidelines through appropriate changes to business processes and systems, training, and technology; and
- Make the public aware of the agency's policies and procedures as appropriate;
- Ensure agencies disclose protected information to non-Federal entities - including State, local, tribal, and foreign governments - only if the non-Federal entities provide comparable protections.

The ISE Privacy Guidelines also establish an interagency governance structure to provide ongoing guidance and a forum for resolving issues to assist agencies in implementing necessary protections.

### 2.3. Governance

Prior to the issuance of HSPD-11, the U.S. Government departments and agencies that comprise the Screening Community were working to efficiently and effectively manage screening procedures to realize their homeland security missions. The issuance of HSPD-11, production of the corresponding reports, and associated interagency coordination efforts have enhanced collaboration within the Screening Community resulting in numerous successful programs and initiatives. Though the Screening Community has cooperated and coordinated effectively as screening missions and associated challenges continue to evolve, the U.S. Government's terrorist-related screening endeavors have benefited from supporting governance structures. The TSC has established a Governance Board to support the furtherance of its mission to assist law enforcement, intelligence, diplomatic, military, and regulatory agencies in protecting the U.S. against terrorist attacks. The role of the Governance Board is to provide TSC guidance concerning issues within TSC's mission and authority that are of interagency relevance and importance. The TSC Governance Board is chaired by the TSC Director and is composed of senior executive representatives from DOJ, DHS, DOS, NCTC, ODNI, FBI, DoD, CIA, and the Department of the Treasury.

As DHS represents the largest screening agency and is responsible for many of the screening activities that were legislated post September 11, DHS needed a mechanism for internal coordination. Such a coordinating mechanism was called for in HSPD-11 and the report issued by the National Commission on Terrorist Attacks Upon the United States (the 9/11 Commission). DHS established the Screening Coordination Office (SCO) in July 2006, with a primary mission to strengthen homeland security by enhancing screening processes and technologies, in order to facilitate legitimate travel and trade, ensure individual privacy and redress opportunities, and deter, detect, and deny access to and withhold benefits from those who pose a threat to the U.S. The SCO's primary goals include:

- Identifying opportunities to harmonize and enhance screening processes across DHS "people screening" programs.
- Rationalizing and prioritizing DHS investments in screening technologies and systems.
- Developing metrics for evaluating and improving DHS screening processes.

Elhady_FBITSC-PRIV004458

- Establishing standards for the use of biometrics within DHS screening programs.

Finally, the HSC, established by HSPD-1, provides a decision making body at the highest levels of government to resolve any issues and set policy.

The establishment of the TSC Governance Board, and the SCO for integrating DHS screening, together with oversight and guidance from the HSC has served to enhance communication and coordination within the Screening Community and has strengthened alliances with key elements from the Intelligence and Law Enforcement Communities which serve not only as partners to screening departments and agencies, but as extensions of the Screening Community itself. These established governance mechanisms provide for monitoring and analysis of watchlist screening efforts governmentwide; an ability to respond to issues that hinder effectiveness; and an ability to assess progress toward intended outcomes.

### 2.4. Information Sharing

Information sharing is critical to the success of the U.S. Government's terrorist-related screening programs. Today, the sharing of terrorism-related information takes place within multiple independent sharing environments that serve five communities    Intelligence, Law Enforcement, Defense, Homeland Security, and Foreign Affairs. Historically, each community developed its own policies, rules, standards, architectures, and systems to channel information to meet mission requirements. These environments were insulated from one another, which resulted in gaps and seams in the sharing of information across all levels of government.

Since the September 11 attacks, the U.S. Government has made extraordinary improvements in our capabilities to gather, analyze, and share the information needed to paint a more complete picture of the threat, and to provide a greater capacity for coordinated and integrated efforts to detect, prevent, disrupt, and respond to terrorist actions.

- NCTC was established to serve as a multi-agency center analyzing and integrating all intelligence pertaining to terrorism, including threats to U.S. interests at home and abroad.
- The TSC was created to consolidate terrorist watch lists and provide around-the-clock operational support for Federal, State, local, and tribal law enforcement personnel across the country.
- The Federal Government provided significant grant funding to support the establishment of fusion centers.
- The growth and maturation of the 101 Joint Terrorism Task Forces (JTTFs) in major cities throughout the U.S. has substantially contributed to improved information sharing and operational capabilities at the State and municipal levels.
- The U.S. Government has worked to remove barriers that once restricted sharing between the law enforcement and intelligence communities while also protecting our fundamental liberties.
- (G), (H)

Elhady_FBITSC-PRIV004459

DEPARTMENT OF HOMELAND SECURITY
FOR OFFICIAL USE ONLY

(G), (H)

### 2.4.1.   Information Sharing Environment

Recognizing information sharing challenges, IRTPA called for the creation of the ISE to enable trusted partnerships among all levels of government, the private sector, and our foreign partners, in order to more effectively detect, prevent, disrupt, preempt, and mitigate the effects of terrorism against the territory, people, and interests of the U.S.  This partnership enables the trusted, secure, and appropriate exchange of terrorism-related information across the Federal Government, to and from State, local, and tribal governments, foreign allies, and the private sector, and at all levels of security classifications.

Additionally, the Interagency Threat Assessment and Coordination Group (ITACG)  was recently established within NCTC to integrate, analyze and assist in the dissemination of federally coordinated information to state and local partners within the scope of the information sharing environment including homeland security information, terrorism information and weapons of mass destruction information, through appropriate channels identified by the ITACG Advisory Council.

### 2.4.2.   The National Strategy for Information Sharing

On October 31, 2007, President Bush issued the first National Strategy for Information Sharing to prioritize and unify the U.S. Government's efforts to advance the sharing of terrorism-related information.  The Strategy sets forth our plan to build upon the progress we have made in improving information sharing since the September 11 attacks and establish an integrated National information sharing capability.  It was developed using a collaborative process and based on significant input provided by members of the Federal Information Sharing Council, as well as State, local, tribal, and private sector officials from across the Nation.
The Strategy for Information Sharing will help ensure those responsible for combating terrorism and protecting our local communities have access to the timely and accurate information they need by:

- Providing a framework for enhanced information sharing among Federal, State, local, and tribal officials, the private sector, and foreign partners to aid their individual missions and to help secure the homeland.
- Describing the Federal Government's approach to support State and major urban area fusion centers, as well as National efforts to fight crime and make our local communities safer.
- Recognizing that as information sharing capabilities are enhanced, it is imperative that the legal rights of Americans continue to be protected, especially in the area of privacy and civil liberties.

Through the Strategy for Information Sharing and the ISE, the U.S. Government will:

Elhady_FBITSC-PRIV004460

DEPARTMENT OF HOMELAND SECURITY
FOR OFFICIAL USE ONLY

- Enable greater coordination at the Federal level, so that strategic and time-sensitive threat information gets into the hands of those who need it to protect our local communities and our Nation's interests at home and abroad;
- Facilitate the exchange of coordinated sets of requirements and information needs across the Federal and non-Federal domains to help guide the targeting, selection, and reporting of terrorism-related information;
- Make certain that intelligence products can be easily shared, as appropriate, with those outside the Intelligence Community;
- Enable State, local, and tribal government efforts to gather, process, analyze, and share information and intelligence;
- Establish a network of State and local information fusion centers operating in a manner that safeguards information privacy rights and other legal rights of Americans;
- Ensure our efforts to prevent future terrorist attacks are risk-based, information-driven, and supported by a greater understanding of our adversaries' motivations, intentions, and plans; and
- Change government culture to one in which information is regularly and responsibly shared and only withheld by exception.

The Strategy for Information Sharing recognizes partners must be assured their information will be protected from unauthorized disclosure; likewise, the American people must also be assured that their information privacy is being protected.  It is essential to continue protecting the information privacy and other legal rights of Americans as we fight the Global War on Terrorism.  Accordingly, our efforts will remain relentless on two fronts protecting our people, our communities, and our infrastructure from attack and zealously protecting the information privacy and other legal rights of Americans.

### 2.4.3.  Information Sharing Amongst Screening Stakeholders

(G), (H)

Elhady_FBITSC-PRIV004461

DEPARTMENT OF HOMELAND SECURITY
FOR OFFICIAL USE ONLY

The mission of the FBI's TSOU is to coordinate the operational encounter management for all terrorist watchlist referrals generated from the TSC.  The TSOU provides appropriate notifications and disseminates the necessary information to FBI operational entities and other Federal, state, and local law enforcement agencies.  The TSOU documents the actions taken to resolve each matte         (G), (H)

The TSC functions as the initial point of contact for receipt of inquiries from Federal, State, or local law enforcement agencies for possible terrorism related subjects.  When either a positive or inconclusive identification is made for the terrorist related subject(s), the TSC refers the matter to the TSOU for operational encounter management.  At the conclusion of the encounter, the final disposition and pertinent intelligence is reported back to TSOU.  The TSOU tracks and documents all terrorist encounters via electronic logs that are viewed in real time by the TSC.

(G), (H)

The FBI's TREX Unit receives requests from FBI agents to include individuals with known or suspected ties to terrorism on the watchlist.         (G), (H)

    In this role, TREX supports both the NCTC and the TSC, serving as a liaison between all parties and representing the FBI investigative perspective.  Additionally, TREX assisted in the development of policies and procedures in coordination with NCTC, TSC, and the White House in support of HSPD-6.  TREX further ensured the policies were implemented by the FBI and adhered to by all affected FBI entities.

(G), (H)

(G), (H)

Elhady_FBITSC-PRIV004462

DEPARTMENT OF HOMELAND SECURITY
FOR OFFICIAL USE ONLY

(G), (H)

(G), (H)

(G), (H)

### 2.4.4.   International Exchange of Terrorist Screening Information

To enhance the security of the U.S. and our allies in the War on Terror, DOS, in conjunction with the TSC, has expanded the exchange of terrorist screening information with a wider group of countries.  DOS and the TSC co-chair the HSPD-6 Interagency Working Group (IWG) to exchange terrorist screening information with our foreign partners.  (G), (H)

Efforts to exchange information are prioritized, focusing on countries that currently participate in the Visa Waiver Program (VWP).  DOS and the TSC have enhanced the sharing of terrorist screening information with two countries with which the U.S. Government already had established arrangements to exchange information.  A model MOU and country-specific arrangements are cleared through the HSPD-6 IWG prior to execution.  (G), (H)

Together, DOS and the TSC are examining longer-term prospects for enhanced information exchanges.

### 2.4.5.   Sharing within the Screening Community

The Screening Community has established policies and procedures for sharing information to facilitate the encounters of appropriately watchlisted known and suspected terrorists while simultaneously protecting civil liberties and privacy.  While legal and policy restrictions that have been established to prevent the disclosure of classified material preclude some members of the Screening Community from having access to underlying derogatory information, the NCTC and TSC in concert with the Screening Community have established mechanisms that safeguard classified and sensitive data while affording decision makers access to appropriate levels of

Elhady_FBITSC-PRIV004463

DEPARTMENT OF HOMELAND SECURITY
FOR OFFICIAL USE ONLY

information that enable them to carryout their homeland security missions.  Simultaneously, the Screening Community provides screening results back to the NCTC and the FBI through the TSC in support of terrorist-related investigations and appropriate watchlisting determinations.

(G), (H)

## 3.   USG Approach – Screening Opportunities from Beyond our Borders to the Interior

The frontline for screening opportunities extends far beyond our borders, originating in foreign countries where we employ programs to screen people, cargo, and conveyances destined for the U.S.  A key focal point for terrorist-related screening is the U.S. border, at and between our ports of entry.  The information-based and physical screening that takes place at our border represents the final stronghold in preventing terrorists and terrorist weapons from entering the U.S.  Once inside the U.S., terrorist-related screening opportunities increase, requiring the greatest application of discipline for risk-based screening measures to ensure that resources are focused accordingly, meeting the threats while simultaneously ensuring our civil liberties and privacy.

### 3.1. Visa and Passport Application Screening

The visa application process for foreign nationals provides the U.S. Government with one of the first opportunities to screen people before they arrive at our ports of entry.  DOS conduc (G), (H) checks on all visa applicants against the Consular Lookout and Support System (CLASS) database that includes information from other agencies including FBI and DHS. (G), (H)

A Security Advisory Opinion (SAO) is the mechanism used by the DOS to provide consular officers advice and background information to adjudicate visa applications abroad in the event the applicant(s) may be inadmissible under the security-related provisions of the INA, including for certain links to known or suspected terrorists or other security threats.

(G), (H)

Elhady_FBITSC-PRIV004464

DEPARTMENT OF HOMELAND SECURITY
FOR OFFICIAL USE ONLY

(G), (H)

DOS has incorporated biometric technology — specifically, facial recognition and fingerprint scans — into U.S. visa processes as well.  The U.S. BioVisa program is completely integrated with the DHS United States Visitor and Immigrant Status Indicator Technology (US-VISIT) program, so that anyone entering the U.S. on a nonimmigrant or immigrant visa can be identified through biometrics and imposters detected.

By October 2004, all DOS overseas posts were collecting two fingerprints, thus meeting the statutory deadline established by the Enhanced Border Security and Visa Entry Reform Act of 2002.  DOS currently collects fingerprints from each visa applicant (excluding diplomats and those under the age of 14 or over 79).  Prior to visa issuance, the fingerprints are checked against the DHS Automated Biometric Identification System (IDENT), which contains, among other information, fingerprints of known or suspected terrorists and of persons wanted by law enforcement.  DOS completed rolling out 10-Print technology to posts during calendar year 2007.  The 10-Print collection process allows for more complete checks against fingerprint records and greater ability for latent print processing.

In support of DOS visa screening programs, the Visa Security Program (VSP) within DHS Immigration and Customs Enforcement (ICE) partners law enforcement personnel with DOS consular officials in the visa issuance process in order to better identify threats before they reach the U.S.  Visa Security Officers work together with DOS performing proactive law enforcement vetting and investigation of visa applicants, working to uncover threats to homeland security.  The VSP is deployed at nine posts in eight countries.[4]  Discussions are underway to expand the program to additional posts.  ICE has also finalized the VSP Five-Year Expansion Plan, in response to a request from the HSC, to expand VSP to cover approximately 75 percent of the highest risk visa issuance activity globally.  Deployment would encompass approximately 6-7 new VSP locations annually between 2009 and 2013.

(G), (H)

### 3.2. Screening Prior to Foreign Departure

Not all travelers to the U.S. need a visa, including U.S. persons and those qualified for visa-free travel under the VWP or other bilateral agreement.  In order to ensure comprehensive terrorist

---

[4] Following its initial deployment to Saudi Arabia in 2003, VSP expanded to four locations in three countries in 2005.  Since January 2007, VSP has deployed to four additional locations, with plans to deploy to one additional location in November 2007.

Elhady_FBITSC-PRIV004465

screening, the U.S. Government screens all passengers departing from foreign countries en route to the U.S. via commercial air carriers.

The recently enacted 9/11 Act includes provisions to enhance security features of the VWP. Most notably, the bill requires counter-terrorism and information sharing by VWP countries, a biometric exit system for all VWP travelers, and an Electronic Travel Authorization (ETA) system.

### 3.2.1.   Electronic Travel Authorization

The ETA will require that prospective VWP travelers electronically provide biographic information before they travel to the U.S.  This information will be screened against law enforcement and national security databases.  The ETA, in conjunction with new security-related requirements that VWP participating countries must meet, will greatly enhance the overall security of the program while allowing for flexibility in admitting new member countries. Additionally, under the Secretary's new waiver authority, implementation of the ETA will allow DHS additional flexibility to admit member countries, on a pilot basis, that would not otherwise meet the criteria for participation in the program due to visa refusal rates.

Once established, the ETA will be a requirement for all VWP travelers (from new and existing participating countries) prior to travel, though it will not serve in lieu of a U.S. visa, if required, or the admissibility determination made by U.S. Customs and Border Protection (CBP) within DHS.  The ETA will require aliens traveling under the VWP to submit biographical information and other data (such as the data currently collected using the Arrival-Departure Record [Form I-94]) necessary to determine the aliens' eligibility to travel to the U.S.  DHS will use the data to screen against terrorist watchlist information, lost and stolen passports, and other database criteria to make a determination on each individual's eligibility to travel to the U.S. under the VWP.  Passengers who are not given an ETA will be referred to a U.S. consulate to apply for a visa.

### 3.2.2.   No Fly and Selectee Matching by Air Carriers

Since September 11, the U.S. Government has been requiring commercial air carriers flying into, out of, or within the U.S. to prescreen passengers against the DHS Transportation Security Administration (TSA) No Fly and Selectee lists.  Implementation Guidance for the No Fly and Selectee lists was revised in July 2006 to update and refine the criteria for including individuals on the lists and to provide the Screening Community with direction on appropriate nominations. Any nominating agency can recommend that a known or suspected terrorist be placed on the No Fly or Selectee list if the individual meets specific criteria for inclusion on either list.  TSC is ultimately responsible for placing individuals nominated on either the No Fly or Selectee lists, which are subsets of TSDB that must satisfy certain biographic and derogatory thresholds.

Currently, commercial air carriers receive the No Fly and Selectee lists and are responsible for conducting checks in advance of boarding pass issuance.  The carriers must notify TSA where there is a match to the No Fly list.  TSA coordinates with TSC to determine if the passenger is a positive match. ▓▓▓▓▓▓▓▓▓▓▓▓▓ (G), (H) ▓▓▓▓▓▓▓▓▓▓▓▓▓ The air carriers must also ensure that a match to the Selectee

Elhady_FBITSC-PRIV004466

list is subject to secondary screening prior to boarding an aircraft.  As outlined in the passenger screening sections below, the government is preparing to assume the responsibility for No Fly and Selectee screening in both the international and domestic air passenger processing venues.

### 3.2.3.   Screening with Advance Passenger Information

As a result of recommendations put forward by the 9/11 Commission, Congress mandated that CBP establish a requirement to receive advance information on international passengers traveling by air and sea, prior to their departure.  In August 2007, DHS published the Advance Electronic Transmission of Passenger and Crew Member Manifests for Commercial Aircraft and Vessels Final Rule requiring commercial air and vessel carriers to provide manifest information for flights to and from the U.S. prior to boarding and for vessels departing from the U.S. prior to departure.  CBP will then perform watchlist screening utilizing the Advance Passenger Information System (APIS) and return the results to the carriers.  (G), (H)

Prior to September 11, the U.S. Customs Service, now part of CBP, received advance passenger information from air and vessel carriers on a voluntary basis.  APIS requirements were first implemented under the Aviation and Transportation Security Act of 2001 and the Enhanced Border Security and Visa Reform Act of 2002, mandating the transmission of APIS data for commercial carriers arriving in or departing from the U.S.  Advance screening of APIS and Passenger Name Record (PNR) data has provided CBP the ability to identify potential threats and coordinate with carriers and foreign law enforcement to prevent the transportation of a person of interest.

Additionally, in September 2007, DHS issued a notice of proposed rulemaking, Advanced Information on Private Aircraft Arriving and Departing the U.S., that would expand existing regulations to require pilots of private aircraft to provide electronic manifest data relative to all persons traveling onboard to the U.S. Government one hour prior to departure to and from the U.S. by filing manifest data via CBP.  The proposed rule is in concert with the requirements established for commercial air carriers and is designed to better protect non-commercial flights through enhanced screening procedures.

### 3.2.4.   International Partnerships

In furtherance of comprehensive screening procedures beyond our borders, CBP has initiated additional layers of international air passenger screening that incorporates the private sector and our foreign partners.  The first of these is the Immigration Advisory Program (IAP).  Under this program, CBP officers are deployed overseas at high-volume, high-risk airports to work with carriers and law enforcement authorities from host countries to prevent passengers who pose a national security threat or are otherwise inadmissible from traveling to the U.S.  IAP officers utilize current targeting information and/or an assessment of the passenger's documentation to focus on high-risk persons.  (G), (H)

Elhady_FBITSC-PRIV004467

DEPARTMENT OF HOMELAND SECURITY
FOR OFFICIAL USE ONLY



### 3.3. Maritime En-Route and Pre-Arrival Screening

The U.S. Coast Guard assesses arriving commercial ships for security risk while they are in transit to the U.S., and coordinates interdiction of targeted ships away from the border.  The Coast Guard requires commercial ships en route to the U.S. to submit vessel information, itinerary data, crew/passenger manifests and cargo information four days in advance of arrival. Crew and passenger manifest data is transmitted via the APIS infrastructure for joint review by CBP.  (G), (H)

Coast Guard operational commanders apply this advance threat information to a uniform risk-based decision model.  Operational responses appropriate to mitigate the identified risk (such as at-sea boardings, escort into port, removal of individuals, or denial of entry to U.S. waters) are coordinated through Area Maritime Security Committees, and in nationally significant cases, the Maritime Operational Threat Response protocol of the National Maritime Security Strategy.

### 3.4. Screening Travelers at the Border

Terrorist-related screening procedures at the border are built upon a foundation of traditional risk-based programs, combining information-based and physical screening techniques.  In

Elhady_FBITSC-PRIV004468

DEPARTMENT OF HOMELAND SECURITY
FOR OFFICIAL USE ONLY

preventing terrorists and terrorist weapons from entering the U.S., CBP relies upon a combination of advance information, information technology-based decision support tools, and physical inspections. Collection of biometric information on most foreign nationals through US-VISIT has significantly enhanced our capabilities to identify and screen visitors to the U.S.

### 3.4.1. Air and Sea Ports of Entry

The availability of APIS and PNR data provides CBP with the ability to conduct information-based screening at the air and sea ports of entry prior to the arrival of passengers aboard international commercial carriers. All APIS data is screened by CBP against the TSDB, and other law enforcement databases used by CBP to identify possible violations of U.S. law.



(G), (H)

Travelers arriving and departing from the United States using private aircraft are also screened by CBP (G), (H)

On September 18, 2007, the CBP Private Aircraft Notice of Proposed Rule Making, requiring pilots of private aircraft to transmit complete APIS manifest data 60 minutes prior to departure was published in the Federal Register. This rule will enable CBP to conduct No Fly and Selectee watch list screening and provide landing rights for private aircraft through an automated system, adding an essential layer to our anti-terrorism security measures. The publication of this proposal as a final rule will greatly enhance border security efforts for private aircraft.

### 3.4.2. Land Border Screening and Supporting Initiatives

While CBP air-and-sea-ports of entry screening is significantly enhanced by the availability of APIS and PNR data, and will be further augmented by the ETA, screening at the land border is conducted almost exclusively without the benefit of advance information. At land border ports of entry, CBP primary officers perform the same initial screening function conducted for individuals traveling to the U.S. by air or sea, referring persons who require further examination to secondary. However, the vast majority of individuals entering at land border ports of entry are U.S., Canadian, or Mexican citizens. U.S. and Canadian citizens are currently not required to present passports. This vulnerability is well documented and is being closed through the Western Hemisphere Travel Initiative (WHTI), which will require documentary proof of identity and citizenship for all travelers. The document requirement, along with wider use of Radio Frequency Identification (RFID), will enhance CBP's ability to conduct terrorist watchlist and law enforcement checks, without disruption or delay in primary inspection.

On January 31, 2008, the land and sea requirements for WHTI will begin to be phased in, and DHS will discontinue the routine practice of allowing U.S. and Canadian citizens to prove their identity and citizenship through an oral declaration. Commencing on that date, U.S. and Canadian citizens will need to present either a WHTI-compliant document or a government-issued photo ID, such as a driver's license, plus government-issued proof of citizenship, such as a birth certificate. DOS is also developing a passport card in response to concerns of the border resident communities for a more portable and less expensive alternative to the traditional

Elhady_FBITSC-PRIV004469

DEPARTMENT OF HOMELAND SECURITY
FOR OFFICIAL USE ONLY

passport book.  The card, which will be available to the public in spring 2008, will be adjudicated to the same rigorous standards as the passport book.  The passport card will also use RFID technology to facilitate travel at CBP ports of entry.  The passport card was designed to meet operational requirements while also incorporating several safeguards to protect privacy.  Several factors will affect the timing of the full implementation of WHTI, including the availability of WHTI-compliant documents and the likely enactment of legislation affecting the final implementation date of WHTI.  Notwithstanding any delay, the Administration is committed to moving forward and closing this significant gap in border security.

### 3.4.3.  Travel Document Validation

Where WHTI will serve to close one document gap for CBP and the Screening Community through new documentary requirements, the U.S. Government has been working to develop a reliable means of screening for lost and stolen passports (LASPs).  Timely and accurate information sharing of LASP data significantly deters terrorist travel, identity theft, and transnational criminal activity.  DHS seeks to receive fast, accurate and actionable LASP data from all countries, particularly VWP participant countries which represent a top priority as a result of their exemption from visa screening for travels to the U.S. of up to 90 days.   (G), (H)

(G), (H)

(G), (H)

Elhady_FBITSC-PRIV004470

*Paragraph redacted, please refer to the Classified Addendum.*

CBP has also established the Fraudulent Document Analysis Unit (FDAU) and the Alien Smuggling Unit (ASI) to specifically look at travel patterns and fraudulent documents in order to identify human trafficking activity as well as those individuals attempting to enter the U.S. with fraudulent documents. Human trafficking and smuggling rings can avoid detection under the lost and stolen passport program by using travel documents that have been altered or illegally obtained. The FDAU/ASI counters this risk directly by creating system look-outs, special operations, and travel advisories to various entities where potential fraud is detected or suspected.

### 3.4.4.   Screening and Facilitation of Trusted Travelers

In support of enhanced screening and facilitation, CBP continues to expand enrollment in its trusted traveler programs. The trusted traveler framework is supported by a Global Enrollment System that provides for the harmonization of processing applicants across the various programs. Each applicant is subjected to an electronic, automated vetting proces    (G), (H)

Additionally, the Registered Traveler Interoperability Pilot (RTIP) is a voluntary program offered by the private industry and facilitated by TSA. The RTIP is offered to U.S. citizens and legal permanent residents and is a privilege program that, in a fully operational state, would offer a streamlined security experience for applicants who pay a fee and meet both TSA and the service provider's eligibility requirements. TSA conducts name-based checks on RTIP applicants utilizing the TSDB and other law enforcement databases. RTIP participants are subject to perpetual vetting.

### 3.5. Screening for Immigration and Other Benefits

U.S. Citizenship and Immigration Services (USCIS) within DHS supports national security by preventing individuals from fraudulently obtaining immigration benefits and by denying applications from individuals who pose national security or public safety threats. USCIS policy requires the completion of a background check on every alien who applies for or may benefit from an application or petition for an immigration benefit. The background checks include biographic queries against TSDB data. Additionally, criminal checks are required for every applicant, petitioner, and beneficiary seeking an immigration benefit; and FBI name checks and fingerprint checks are required to be conducted on all applicants for asylum, legal permanent resident status, and naturalization, as well as small populations of individuals applying for immigrant and nonimmigrant waivers of inadmissibility or legalization benefits. (G), (H)

Elhady_FBITSC-PRIV004471

DEPARTMENT OF HOMELAND SECURITY
FOR OFFICIAL USE ONLY

(G), (H)

USCIS is also embarking on an enterprise-wide ''Transformation Program'' that will transition the agency from a form-centric and paper-based operational environment to a person-centric, consolidated environment utilizing electronic adjudication.  The new operational environment will employ the types of online customer accounts used in the private sector.  This ''person-centric'' model will link information related to an individual in a single account in order to facilitate transactions, track activities, and reduce fraud.

The U.S. Agency for International Development (USAID) employs procedures to mitigate the risks that its partners are connected with terrorist organizations.  Steps to ensure USAID funds are not provided to individuals or entities associated with terrorism include: (1) requiring all solicitations, contracts, Annual Program Statements or Requests for Applications, grants or cooperative agreements, or other comparable documents contain language referencing the laws and Executive Orders prohibiting the provision of resources and support to individuals and organizations associated with terrorism; (2) requiring all Non-Government Organization (NGO) applicants to submit terrorist financing certifications; and (3) requiring checks of applicable terrorist listings be conducted to ensure potential contractors, grantees, sub-contractors and sub-grantees are not in these listings.  Additionally, USAID's mission for the organization's West Bank and Gaza program employs anti-terrorism vetting procedures for all awards it administers.

In July 2007, USAID published notices in the Federal Register of the intent to establish a new Partner Vetting System (PVS) of records.  If implemented as envisioned, the PVS will collect basic personal information on NGOs, contractors and other groups and individuals with potential access to USAID funds, and check this data against government databases to identify potential links to terrorist organizations and activities.  The PVS has the ability to vet individuals, officers or other officials of NGOs that apply for USAID contracts, grants, cooperative agreements or other funding, or who apply for registration with USAID as Private and Voluntary Organizations.  By conducting vetting, USAID will be taking an additional step towards ensuring that neither USAID funds nor USAID-funded activities inadvertently or otherwise provide support to entities or individuals associated with terrorism.  Should USAID decide to require vetting worldwide, the PVS can manage the entire vetting process in all locations in which USAID has or will have a program.

DOS uses available screening tools to vet, as appropriate, parties on munitions export license applications, U.S. Government-sponsored training program attendees, and those seeking employment with the Department to ensure that these individuals do not support terrorism or terrorist organizations.  DOS also ensures that recipients of DOS funds and other assistance are duly vetted.

### 3.6. Iraqi Refugee Screening

DHS in collaboration with other U.S. Government agencies has developed enhanced security screening procedures for Iraqi refugees applying for resettlement in the U.S. following the February 14, 2007, DOS announcement to accept more than 7,000 Iraqi refugee referrals from the United Nations High Commissioner for Refugees (UNHCR).  After an Iraqi referral is

Elhady_FBITSC-PRIV004472

received, DOS initiates the process of rigorous screening for all refugee applicants. SAOs are initiated for certain categories of Iraqis, ensuring name-checks are conducted against the TSDB and other appropriate databases.

Subsequently, USCIS electronically captures biometrics (minimum capture 10 fingerprints and photograph) of all Iraqi refugee applicants. This capture occurs while the applicant is still in the country of refuge (Turkey, Jordan, Syria, Lebanon, Egypt, or other location), and is done no later than at the time of the refugee interview by a USCIS officer.



### 3.7. Interior Law Enforcement Encounters

Interior law enforcement encounters of possible known or suspected terrorists present both screening and information sharing opportunities that support the furtherance of the terrorist-related investigation process. Federal, State, local, territorial, and tribal law enforcement personnel throughout the U.S. are involved in direct encounters of possible known or suspected terrorists on a regular basis. Terrorist-screening identity information can be accessed through the Violent Gang and Terrorist Organization File (VGTOF) in the National Crime Information Center (NCIC) database. VGTOF was established after the Oklahoma City bombing in 1995 and it provides identifying information about known or suspected international and domestic terrorists, as well as information about violent criminal gangs and gang members.



### 3.8. Information-Based Screening for Domestic Air Travel

Currently, domestic air passengers carried by commercial aircraft operators are screened against the No Fly and Selectee list components of the TSDB by the aircraft operators. The No Fly and Selectee list components of the TSDB are maintained by the TSC, transmitted to TSA, and subsequently distributed to the carriers for screening. In August 2007, DHS published the Secure Flight Notice of Proposed Rulemaking, which outlined DHS plans to assume watchlist

Elhady_FBITSC-PRIV004473

management responsibilities from air carriers for domestic flights and align domestic and international passenger pre-screening.  Secure Flight, as envisioned in the proposed rule, will make watchlist matching more effective, efficient, and consistent, offering improvements in both security and customer service for the traveling public.  DHS expects Secure Flight to add a vital layer of security to our nation's commercial air transportation system while maintaining the privacy of passenger information.

The most significant benefit to initiating the Secure Flight program is the government's ability to take over of the watchlist-matching responsibility from air carriers.  DHS will be able to more effectively and consistently perform the watchlist-matching function than air carriers for several reasons, including:

- DHS will utilize real-time watchlist information;
- Matching will be uniformly conducted by one process with consistent results applied across airlines;
- The system can be effectively and swiftly calibrated to meet the current threat    for example by increasing the number of potential matches that are generated for an intelligence analyst's review, based on an elevated threat level;
- Distribution of the watchlists themselves can be limited    protecting that sensitive information; and
- DHS will have identifying passenger information sooner and will be able to coordinate an appropriate law enforcement response to potential threats.

Secure Flight will establish a more consistent and uniform prescreening process, enhancing the ability of DHS to stop known or suspected terrorists before they get to the passenger screening checkpoints while simultaneously reducing potential misidentification issues.

### 3.9. Transportation Systems and Occupational Screening

The U.S. Government's multifaceted approach to terrorist-related screening incorporates the screening of Federal employees and other personnel in selected occupations that support our critical infrastructure.                              (G), (H)

### 3.9.1.  Airports

The skills and techniques utilized in the U.S. Government's approach to terrorist-related screening cross over the varying operations that comprise our transportation systems.  Behavioral observation techniques are critical to traditional law enforcement activities and investigations, and serve as a cornerstone in the foundation of screening conducted by CBP officers at the ports of entry.  Recognizing the significance of behavior observation techniques in the screening environment, TSA has incorporated them within their layered approach to screening.

Elhady_FBITSC-PRIV004474

DEPARTMENT OF HOMELAND SECURITY
FOR OFFICIAL USE ONLY

TSA trains Behavior Detection Officers for their Screening Passengers by Observation Techniques (SPOT) Program.  The program illustrates TSA's focus on pushing security measures to all areas of transportation systems and identifying people who may have harmful intent before they get to secure areas.  Initiated in June 2003, SPOT - which focuses on behavior and not physical characteristics - is expected to be deployed to dozens of the nation's busiest airports.  The DHS Office for Civil Rights and Civil Liberties provided guidance in the development of SPOT to ensure against concerns with regard to racial profiling.  To date, there have been thousands of referrals to law enforcement officials and for additional screening by TSA through SPOT.  More than 500 behavior detection officers are expected to be working in all modes of transportation by the end of 2008.  SPOT adds an element of unpredictability that will be easy for law-abiding passengers to navigate but difficult for terrorist to manipulate.

In addition to the behavioral analysis, information-based, and physical security screening for air passengers, all personnel working in a sensitive airport environment undergo extensive review before being allowed unescorted access.  Prior to being granted access to the Security Identification Display Area (SIDA) or the sterile area at our Nation's airports, employees that perform duties in those sensitive areas are subject to criminal history and terrorist watchlist screening.  Effective October 1, 2007, TSA increased the scope of Security Threat Assessments to include any individual who holds or is applying for airport-issued personnel identification.  The Security Threat Assessments of all identification medium holders will be conducted on a perpetual basis.

Generally, in order to access sterile or secured areas within the airport environment, anyone who has not been issued a SIDA badge for a particular airport, including airport and airline personnel, vendors and contractors, and even TSA employees, must pass through the TSA security screening checkpoint and submit to the same physical screening process that passengers must pass through before boarding an aircraft.  Although individuals with a SIDA badge are not required to pass through a screening checkpoint in order to access SIDA areas, TSA, for some time now, has been conducting physical screening of individuals and vehicles entering SIDA areas on a random basis at numerous airports

General Aviation (GA) is a vital component of the aviation sector and the national economy that accounts for approximately 77 percent of all flights in the U.S.  TSA conducts terrorist-related screening for several GA programs.  TSA requires operators of GA private charter aircraft over 12,500 lbs that are in scheduled or charter operations to conduct No Fly and Selectee matching for their passengers.  TSA also conducts targeted screening of GA flights seeking access to restricted airspace, particularly the National Capital Region.

Additionally, TSA is assuming responsibility for performing a security threat assessment of FAA airman certificate holders.  These checks include all pilots, mechanics, flight engineers, navigators, flight attendants, and others who are required to hold a certificate pursuant to FAA regulations.  Since 2003, TSA has also been conducting security threat assessments, including checks against the TSDB, on all aliens seeking flight instruction at FAA regulated schools in the U.S. and abroad.

Elhady_FBITSC-PRIV004475

### 3.9.2.  Seaports

In furtherance of securing our seaports, the Transportation Worker Identification Credential (TWIC) is a DHS screening initiative with joint participation from the TSA and the U.S. Coast Guard.  The TWIC program will provide a tamper-resistant biometric credential to maritime workers requiring unescorted access to secure areas of port facilities and vessels regulated under the Maritime Transportation Security Act of 2002.  To obtain a TWIC, an individual must provide biographic and biometric information such as fingerprints, sit for a digital photograph, and successfully pass a security threat assessment conducted by TSA.

As an interim measure, TSA, in collaboration with the TSC, screened approximately 800,000 port workers against the TSDB, prior to TWIC implementation.  The TWIC program began enrollment and issuance to maritime workers at the Port of Wilmington, Delaware on October 16, 2007, and nationwide enrollment is expected to be completed within 15 months of first enrollment.  National deployment of the TWIC program will enhance security of ports by requiring credentialed merchant mariners and workers with unescorted access to secure areas of vessels and facilities to undergo a security threat assessment and receive a TWIC.

Port facility and vessel owners and operators will be required to integrate TWIC into their existing access control systems and operations.  The second phase of the program will implement card reader requirements through rulemaking to verify the identity of workers entering secure areas by matching their biometric to the biometric on their TWIC.  Before implementing these requirements, DHS will conduct pilot tests in accordance with the Security and Accountability For Every Port Act of 2006 (SAFE Port Act), and the public will be afforded ample opportunity to comment on that aspect of the TWIC program through the rulemaking process.

### 3.9.3.  Highways

The U.S. Government has worked to address the vulnerability posed by the movement of hazardous materials on our roads and highways.  TSA conducts security threat assessments on commercial drivers who are authorized to transport placarded hazardous materials in commerce. States may not issue hazardous materials endorsements (HME) to commercial drivers unless TSA has first determined that the driver does not pose a security threat.  The threat assessment includes a check against the TSDB, criminal history, and immigration status.  TSA has completed threat assessments for approximately 700,000 commercial drivers.  In addition, TSA has conducted initial TSDB checks and is now conducting perpetual TSDB checks on the entire population of drivers who currently hold a HME  2.7 million drivers.  Expanding the scope of this screening opportunity, TSA is also preparing to conduct security threat assessments on all commercial drivers, a population of approximately 11 million.

### 3.10. Private Sector Screening

Though the private sector serves as a significant partner to the Screening Community in support of a variety of screening related opportunities beyond, at, and within our borders, perhaps the broadest frontier left for expanded screening opportunities is the private sector itself.  Because of the vast array of screening opportunities within the private sector, it is within this area that it is most important for risks to be balanced against available resources and applicable authorities.  In

Elhady_FBITSC-PRIV004476

prioritizing screening for the private sector, screening resources must be focused upon critical infrastructure, meaning systems and assets, whether physical or virtual, so vital to the U.S. that the incapacity or destruction of such systems and assets would have a debilitating impact on the U.S. national security, economic security, national public health or safety, or any combination of these.

Pursuant to HSPD-6 and the TSC MOU, DHS is developing guidelines by which private sector entities that have a substantial bearing on homeland security could submit voluntary requests for terrorist screening. These guidelines will provide for ensuring the appropriate law enforcement response or other appropriate governmental action in response to positive matches to the TSDB. These individuals could include new hires, employees, contractors, and vendors requiring unescorted access to sensitive security areas within the private sector entity. Under the guidelines, screening priority will be focused on persons with access and the ability to cause harm within critical infrastructure entities. For these purposes, critical infrastructure is defined as systems and assets, whether physical or virtual, so vital to the United States that the incapacity or destruction of such systems and assets would have a debilitating impact on security, national economic security, national public health or safety, or any combination of those matters. In addition to the draft guidelines, DHS will publish an associated Privacy Impact Assessment and Systems of Records Notice.

**3.11**     (G), (H)

(G), (H)

(G), (H)

## 3.12. Enhancing the Effectiveness of Screening

(G), (H)

(G), (H)

Elhady_FBITSC-PRIV004477

(G), (H)

*Paragraphs redacted, please refer to the Classified Addendum.*

### 3.12.1. Secure Identification

Identification documents often provide the baseline information for conducting screening. Therefore, continued enhancements to such proof of identity are critical to the overall effectiveness of screening activities. In addition to WHTI, DHS is pursuing efforts to increase the security of identification documents as part of screening opportunities. Most notably, DHS, working with the States, established minimum standards for driver's licenses as required under the REAL ID Act of 2005, including information and security features that must be incorporated into each card; application information that must be provided to establish the identity and immigration status of an applicant before a card can be issued; and physical security standards for locations where licenses and applicable identification cards are produced. Under the REAL ID Act, beginning May 11, 2008, Federal agencies may only accept State-issued driver's licenses and identification cards issued by REAL ID compliant States when such cards are presented as identification for official purposes. This includes boarding commercial aircraft and accessing Federal and nuclear facilities.

The TWIC program requires all applicants to provide legitimate identity verification documents and utilizes fraudulent document detection software in the enrollment process. When issued, the credential includes the applicant's fingerprint template, and thus, will provide positive proof of the identification of the holder.

### 3.12.2. Biometrics Screening Opportunities

The collection and sharing of biometric data plays a significant role in the U.S. Government's terrorist-related screening programs as it uniquely links a record to an individual and is difficult to counterfeit or alter. (G), (H)

The use of biometric information helps prevent document fraud and identity theft, which threatens the integrity of the immigration process.

To move toward increased biometrics, DHS and DOS have both begun to transition to the collection of ten fingerprints. DOS began collecting two fingerprints from nearly all visa applicants in 2003 and completed the transition to collecting all ten prints during calendar year 2007. DHS has initiated a transition to collect 10 fingerprints from travelers enrolling in the US-VISIT program upon arrival at the ports of entry (which includes those traveling under the Visa

Elhady_FBITSC-PRIV004478

Waiver Program).                              (G), (H)

Other Departments and Agencies are pursuing and executing additional biometric capability. DOS has been actively capturing and digitizing photographs from all visa applicants, establishing a database for facial recognition purposes and conducting facial recognition on those visa applicants from whom prints were not collected since 2003.          (G), (H)

(G), (H)

Successful use of biometric can be seen in certain U.S. Government initiatives.  The US-VISIT program enables the use of biometric identifiers, specifically digital fingerprints and photographs, for the Screening Community.  The use of biometrics within this program has made travel safer and more secure by allowing DHS and DOS to identify persons attempting to enter the U.S. using fraudulent identities and screen individuals to determine whether they constitute a risk to national security.  Additionally, CBP Border Patrol Agents have integrated the use of biometrics in their interdiction efforts between the ports of entry, collecting and screening fingerprints of individuals illegally present in the U.S. against IDENT and IAFIS.  (G), (H)

Elhady_FBITSC-PRIV004479

DEPARTMENT OF HOMELAND SECURITY
FOR OFFICIAL USE ONLY

### 3.12.3. Aligning Biographic and Biometric Screening

(G), (H)

(G), (H)

(G), (H)

(G), (H)

(G), (H)

**Elhady_FBITSC-PRIV004480**

DEPARTMENT OF HOMELAND SECURITY
FOR OFFICIAL USE ONLY

(G), (H)

## 4.  Cargo Screening Approaches and Opportunities

The methodologies for cargo screening are closely aligned with those that underpin the screening of people.  Initial cargo screening opportunities present themselves outside of our borders, and the U.S. Government works closely with both our international counterparts and the private sector community to anchor a coordinated and layered approach.

### 4.1. International and Private Industry Partnerships in Support of Cargo Screening

Customs-Trade Partnership Against Terrorism (C-TPAT) is a CBP alliance with the trade community that serves to better secure goods moving through the international supply chain. C-TPAT has enabled CBP to leverage supply chain security throughout international locations where CBP has no regulatory reach.  In conducting member validations and revalidations, CBP has continued to expand and strengthen the C-TPAT program and ensure that certified member companies are fulfilling their commitment to the program by securing their goods moving across the international supply chain to the U.S.  CBP has strengthened the C-TPAT program by clearly defining the minimum-security requirements for all categories of participants wishing to participate in the program and thereby gain trade facilitation benefits.

The next layer in the U.S. Government's approach to cargo screening is represented in the partnership established with the international community through the CBP Container Security Initiative (CSI).  Almost 32,000 seagoing containers arrive and are off-loaded at U.S. seaports each day.  Because of the sheer volume of sea container traffic and the opportunities it presents for terrorists, containerized shipping is uniquely vulnerable to terrorist exploitation.  Working together with host governments, the CSI program enables the identification and inspection of potential high-risk cargo containers at foreign ports before they are shipped to our seaports, where they may pose a threat to the U.S. and to global trade.  During 2007, the CSI program has continued to expand and is now active in more than 58 overseas ports, which account for 85 percent of container traffic bound for the U.S.  Further deployment under the CSI program will be considered after evaluation of the Secure Freight Initiative, as discussed below.

In support of evaluating potential terrorist risk from containerized maritime cargo, CBP requires that all carriers provide proper cargo descriptions, valid consignee addresses, and other information through the Sea Automated Manifest System 24 hours before cargo is laden aboard a vessel at a foreign port for shipment to the U.S.  CBP uses this data to conduct information-based screening for 100% of U.S. bound containerized cargo.  Cargo that is determined to pose a potential high-risk may undergo additional screening either at a foreign port through CSI partnerships or upon arrival at a port of entry in the U.S.  Under certain circumstances, including a failure to provide data in accordance with the "24-hour Rule", CBP may issue a "Do Not Load"

Elhady_FBITSC-PRIV004481

message which denies the loading of potentially high-risk cargo on board a U.S. bound vessel. The "24-hour rule" supports the security of the supply chain and is a key component of CBP cargo screening programs.

Cargo screening has been further reinforced through the cooperative efforts of DHS, DOS, the Department of Energy, our international partners, and the maritime indust       (G), (H)

(G), (H)

(G), (H)

### 4.2. Cargo Screening at the Border

CBP also incorporates technology into the screening of cargo at our Nation's sea, air, and land border ports of entry including large-scale X-ray and gamma-imaging systems as well as a variety of portable and hand-held equipmen       (G), (H)       . These capabilities represent force multipliers that enable us to screen or examine a larger portion of the stream of commercial traffic while facilitating the flow of legitimate trade, cargo, and passengers.

(G), (H)

### 4.3. Air Cargo Screening

*Section redacted, please refer to the SSI Addendum.*

Elhady_FBITSC-PRIV004482

DEPARTMENT OF HOMELAND SECURITY
FOR OFFICIAL USE ONLY

### 4.4. Chemical, Biological, Radiological, Nuclear, and Explosives Detection Capabilities

Under the Public Health Security and Bioterrorism Preparedness and Response Act of 2002, all personnel who are provided access to dangerous biological organisms and toxins that have been designated as "select agents" must submit application for registration to the Centers for Disease Control and Prevention (CDC) of the U.S. Department of Health and Human Services (HHS) or the U.S. Department of Agriculture (USDA), as appropriate.  The Act provides that the Secretaries of HHS and USDA, after consulting with the Attorney General, may limit or deny access to persons whom the Attorney General reasonably suspects of being a foreign agent or of being involved with terrorism or intentional crimes of violence.   (G), (H)

(G), (H)

(G), (H)

(G), (H)

(G), (H)

(G), (H)

FOR OFFICIAL USE ONLY

Elhady_FBITSC-PRIV004483

DEPARTMENT OF HOMELAND SECURITY
FOR OFFICIAL USE ONLY



Elhady_FBITSC-PRIV004484

DEPARTMENT OF HOMELAND SECURITY
FOR OFFICIAL USE ONLY

## 5. Redress

### 5.1. Traveler Redress

Recognizing the impact of screening on the public, particularly where only name-based checks are conducted, agencies have incorporated redress into their screening programs. DHS TRIP provides a central gateway for travelers to obtain information about screening and redress as well as a central contact to DHS regarding their adverse screening experiences. Travelers can submit inquiries via website, email, fax or postal mail. DHS TRIP ensures that the cases are resolved, to the extent possible, and that travelers receive an official response from the screening agency. DHS TRIP assigns redress requests to the appropriate DHS agencies, ensures coordination of responses, and institutes performance metrics to track progress, giving leadership visibility into the types of complaints DHS receives and the status of response.

If an individual is cleared as a result of a redress request associated with No Fly and Selectee matching, the cleared individual is added to the TSA Cleared List and provided to air carriers. The Cleared List is currently used by the airlines to distinguish false matches from actual matches as they perform No Fly and Selectee list matching.


(G), (H)

When DHS TRIP is unable to determine whether an individual is a positive or false match, the redress request is referred to the TSC pursuant to the formal watchlist redress process established in January 2005. The process allows Screening Community agencies that use TSDB data during a terrorism screening process to refer individuals' complaints to the TSC when it appears those complaints are watchlist related. The goal of TSC's redress process is to provide for timely and fair review of individuals' complaints, and to identify and correct any data errors, including errors in the terrorist watchlist itself.

TSC's redress process consists of a procedure to receive, track, and research watchlist-related complaints and to correct, where appropriate, erroneous watchlist or other data that may have caused an individual difficulty during a screening process. During the redress process, TSC works closely with screening agencies on referral of and response to public redress complaints. TSC also works with the FBI's Redress coordinators from its TREX Unit, as well as the Intelligence Community and other Federal law enforcement agencies that nominate individuals to the watchlist in order to review the redress complaint of any individual on the terrorist watchlist, evaluate whether that person was properly watchlisted and that the associated information was correct, and make any corrections that were appropriate, including removal from the watchlist where warranted.

Elhady_FBITSC-PRIV004485

TSC sponsored the drafting of an interagency MOU to secure a commitment from the Screening Community agencies to participate in and support the watchlist redress process. Among other things, the MOU establishes obligations for all parties to secure personal information, update and correct their own record systems, and share information to ensure redress complaints are resolved appropriately. Each participating agency also committed to providing appropriate staff and other resources to ensure the redress process functions in a timely and efficient manner. Finally, to ensure accountability, each agency is responsible for designating a senior official to ensure the agency's full participation in the redress process and overall compliance with the MOU. The signatories to the MOU are the Attorney General, the Secretaries of Homeland Security, State, Defense, and Treasury, the Director of National Intelligence, the Directors of the Terrorist Screening Center, Federal Bureau of Investigation, Central Intelligence Agency and the National Counterterrorism Center. The MOU was executed on September 19, 2007, and was released to the public to provide greater transparency and thereby enhance the public's trust concerning the terrorist watchlist redress process.

## 5.2. Quality Assurance

The TSC, FBI's TREX Unit, and NCTC are leading efforts to continually improve the quality of watchlist information contained in the TSDB. Each collector providing potential terrorist screening nominations to NCTC is responsible for the accuracy of its information. NCTC ensures that the data it receives are properly entered into TIDE and that the information is reviewed for its appropriateness as a potential nomination for terrorist screening before it is passed to the TSC. Any nominations that do not meet the criteria for watchlisting are rejected by TSC. TSC also reviews watchlist records for quality assurance purposes each time there is an encounter or potential encounter with a watchlisted person. Also, as explained above, TSC does an in depth review of relevant watchlist records when a redress complaint is referred by DHS TRIP.

In addition to the efforts described above, TSC analysts also conduct various proactive quality assurance projects. For example, TSC recently completed a review of all records on the No Fly List and is near completion of a record-by-record review of the Selectee List. Quality assurance projects like the No Fly and Selectee reviews ensure that the most current, accurate, and thorough watchlist information is made available to DHS and other screening agencies, and that records are updated in a timely fashion. Such regular updates both improve the quality of the screening being conducted and decrease the instances of screening misidentifications.

Significant efforts are underway to address both the ability of travelers to seek redress and the watchlisting process itself. DHS is making progress, though more needs to be done. It may be of interest to note that the Government Accountability Office (GAO) has recognized these efforts. In September 2006, GAO issued a report (GAO-06-1031) describing the U.S. Government's initiatives to minimize adverse effects to the traveling public of the use of terrorist watchlists. The report notes that although the total number of misidentifications is significant, they represent a tiny fraction of the total screening transactions that are conducted on the hundreds of millions of travelers DHS encounters each year. The report also recognizes the interagency efforts that are underway to improve the quality of the data maintained by the TSC, as well as the initiatives that have been put in place to improve the ability of people to seek

Elhady_FBITSC-PRIV004486

redress if they believe they have been misidentified.  The GAO had favorable reviews of these efforts and issued no additional recommendations in its report.

TSA has also instituted robust redress processes for transportation workers who are required to undergo security threat assessments.  The redress procedures were developed through the rulemaking process and currently apply to HME, TWIC, air cargo, and certain aviation applicants.  As new populations are required to complete security threat assessments, these redress procedures will also apply.  Applicants who TSA initially determines pose a security threat may request the records on which the determination is based, appeal the determination, or seek a waiver of the qualification standards.  If TSA does not grant a waiver request, applicants may seek review by an Administrative Law Judge (ALJ).  In addition, applicants who are denied an appeal of a disqualification based on national security, may seek ALJ review.

## 6.  Planning the Way Forward – Harmonizing HSPD-11 with the NIP

*Section redacted, please refer to the Classified Addendum.*

## 7.  Conclusion

Terrorist-related screening is driven by information, is dynamic, and is ever-evolving.  The risks posed by terrorism are far reaching and the screening approach to counter these risks must be balanced through the appropriate distribution of resources at the critical touch points for screening opportunities.

The U.S. Government has been working in responding to the evolving challenges and demands of establishing and maintaining screening programs that are commensurate with terrorist threats.  In addressing screening opportunities, the Screening Community is adhering to the cornerstones of HSPD-11: Risk-Based Screening; Civil Liberties and Privacy; Governance; and Information Sharing.  This approach enhances homeland security by enabling the Screening Community to be flexible in its ability to quickly scale the intensity of screening to new and emergent terrorist threats.

The U.S. Government's progress in meeting the objectives outlined in HSPD-11 is reflected in ongoing and planned efforts.  These endeavors will continue to be carried forth in the partnerships that have been established at all levels of government and together with the international community and the private sector.

Elhady_FBITSC-PRIV004487

## Appendix A

**Homeland Security Presidential Directive-11 Investments**
(G), (H)

Elhady_FBITSC-PRIV004488

# Elhady Plaintiffs
# MSJ Exhibit 36