# Elhady Plaintiffs
# MSJ Exhibit 53

SENSITIVE SECURITY INFORMATION

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
## ALEXANDRIA DIVISION

|   |   |   |
|---|---|---|
| GULET MOHAMED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:11-CV-0050 |
| | ) | |
| LORETTA LYNCH, in her official capacity as | ) | |
| Attorney General of the United States, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF RODERICK ALLISON

I, Roderick Allison, declare as follows pursuant to the provisions of 29 U.S.C. § 1746:

1. I am the Acting Deputy Administrator of the Transportation Security

Administration (TSA), a component agency of the U.S. Department of Homeland

Security (DHS). I have been acting in this position since November 2015. My position

of record is the Assistant Administrator for the Office of Law Enforcement and Director

of the Federal Air Marshal Service (FAMS).

2. In my current position, I am delegated full power and authority to act for

the TSA Administrator, who is responsible for protecting U.S. transportation systems and

the traveling public and assesses intelligence and threats related to transportation security.

I also exercise authorities related to transportation security as the Administrator considers

appropriate, to the extent authorized by law.

3. I understand the Plaintiff in this action has challenged the constitutionality

of the No Fly List as applied to U.S. citizens who have not been charged with crimes. I

*WARNING:* This record contains Sensitive Security Information that is controlled under 49 CFR parts 15 and 1520. No part of this record may be disclosed to persons without a "need to know", as defined in 49 CFR parts 15 and 1520, except with the written permission of the Administrator of the Transportation Security Administration or the Secretary of Transportation. Unauthorized release may result in civil penalty or other action. For U.S. government agencies, public disclosure is governed by 5 U.S.C. 552 and 49 CFR parts 15 and 1520.

Elhady-DHS-000756

SENSITIVE SECURITY INFORMATION

make this Declaration in support of the defendants' motion for summary judgment. The statements herein are based on my personal knowledge and information made available to me in my official capacity. As further explained below, TSA's continued ability to utilize the No Fly List to prevent passengers who meet specified criteria from accessing the sterile area of airports and boarding an aircraft is essential to defeating on-going threats to aviation and national security. This Nation's aviation system faces the most complex and diverse set of threats that we have seen in recent years. While TSA uses many countermeasures beyond matching passenger names against watch lists to prevent or defeat threats, no single countermeasure is perfect or invulnerable to exploitation by a terrorist, making the No Fly List an essential component of TSA's countermeasures.[1]

4.     As set forth below, I first describe TSA's mandate and highlight the security measures used by TSA to secure aviation. Next, I describe the current threat to aviation, including recent attempts to commit terrorist attacks. I then describe various aviation security measures designed to mitigate the threat and attendant limitations and vulnerabilities that terrorists could exploit.

## TSA's Mandate and Security Measures

5.     As a result of the terrorist attacks of September 11, 2001, Congress passed the Aviation and Transportation Security Act of 2001 (ATSA),[2] which created TSA. ATSA charged TSA with responsibility "for security in all modes of transportation" and created a federal workforce to screen passengers and cargo at commercial airports.[3]

---

[1] This declaration is limited to sensitive security information and unclassified information and thus necessarily omits certain supporting detail regarding the challenges that security screening must address.
[2] Pub. L. No. 107-71, 115 Stat. 597 (2001).
[3] ATSA § 101, 49 U.S.C. § 114(d); ATSA § 111, amending 49 U.S.C. § 44935.

WARNING: This record contains Sensitive Security Information that is controlled under 49 CFR parts 15 and 1520. No part of this record may be disclosed to persons without a "need to know", as defined in 49 CFR parts 15 and 1520, except with the written permission of the Administrator of the Transportation Security Administration or the Secretary of Transportation. Unauthorized release may result in civil penalty or other action. For U.S. government agencies, public disclosure is governed by 5 U.S.C. 552 and 49 CFR parts 15 and 1520.

Elhady-DHS-000757

SENSITIVE SECURITY INFORMATION

ATSA also granted TSA broad authority to "assess threats to transportation,"[4] to

"develop policies, strategies, and plans for dealing with threats to transportation

security,"[5] to "enforce security-related regulations and requirements,"[6] and to "oversee

the implementation, and ensure the adequacy, of security measures at airports."[7] ATSA

also specifically directed TSA to prevent passengers who may be a threat to civil aviation

or national security from boarding an aircraft.[8]

6.    TSA executes its mandate in part through the Secure Flight program,

which pre-screens aviation passengers flying into, out of, and within the U.S. against

Government watch lists, including the No Fly and Selectee Lists. Individuals on the

Selectee List receive enhanced screening, while individuals on the No Fly List are

deemed to be of sufficient threat to civil aviation or national security that they are barred

from entering a sterile area of an airport and boarding an aircraft altogether. Secure

Flight identifies and prevents known or suspected terrorists or other individuals from

gaining access to airports and airplanes where they may jeopardize the lives of

passengers and others.

7.    Inclusion on the No Fly List requires heightened suspicion above the

general criterion for inclusion in the Terrorist Screening Database (TSDB), the U.S.

Government's consolidated watch list of known or suspected terrorists. Specifically, in

addition to meeting the standard for inclusion in the TSDB, an individual on the No Fly

---

[4] 49 U.S.C. § 114(f)(2).
[5] 49 U.S.C. § 114(f)(3).
[6] 49 U.S.C. § 114(f)(7).
[7] 49 U.S.C. § 114(f)(11).
[8] *See* ATSA § 101, 49 U.S.C. §§ 114(f), 114(h)(3); *see also* 49 U.S.C. § 44903(j)(2)(C)(ii) (providing that the TSA Administrator or his designee "shall begin to assume the performance of the passenger pre-screening function of comparing passenger information to the automatic selectee and no fly lists and utilize all appropriate records in the consolidated and integrated terrorist watchlist maintained by the Federal Government in performing that function").

WARNING: This record contains Sensitive Security Information that is controlled under 49 CFR parts 15 and 1520. No part of this record may be disclosed to persons without a "need to know," as defined in 49 CFR parts 15 and 1520, except with the written permission of the Administrator of the Transportation Security Administration or the Secretary of Transportation. Unauthorized release may result in civil penalty or other action. For U.S. government agencies, public disclosure is governed by 5 U.S.C. 552 and 49 CFR parts 15 and 1520.

Elhady-DHS-000758

SENSITIVE SECURITY INFORMATION

List must also represent: (1) a threat of committing an act of international terrorism[9] (as defined in 18 U.S.C. § 2331(1)) or an act of domestic terrorism (as defined in 18 U.S.C. § 2331(5)) with respect to an aircraft (including a threat of air piracy, or threat to an airline, passenger, or civil aviation security); (2) a threat of committing an act of domestic terrorism (as defined in 18 U.S.C. § 2331(5)) with respect to the homeland; (3) a threat of committing an act of international terrorism (as defined in 18 U.S.C. § 2331(1)) against any U.S. Government facility abroad and associated or supporting personnel, including U.S. embassies, consulates and missions, military installations (as defined by 10 U.S.C. § 2801(c)(4)), U.S. ships, U.S. aircraft, or other auxiliary craft owned or leased by the U.S. Government; or (4) a threat of engaging in or conducting a violent act of terrorism and who is operationally capable of doing so.

8.       U.S. persons (U.S. citizens and lawful permanent residents) make up only a very small percentage of individuals placed on the No Fly List; the vast majority of individuals on the No Fly List are non-resident aliens. Currently, of the ████ individuals currently placed on the No Fly List, ████ or approximately ████ are U.S. persons.

## The Current Threat

9.       Today the United States faces terrorist threats that are more dangerous than at any time in the recent past. The current threat environment is complex and diverse, with multiple terrorist groups intent on attacking the Nation's civil aviation

---

[9] Terrorism and/or terrorist activities (a) involve violent acts or acts dangerous to human life, property, or infrastructure that may be a violation of U.S. law, or may have been, if those acts were committed in the United States; and, (b) appear intended to intimidate or coerce a civilian population, influence the policy of a government by intimidation or coercion, or affect the conduct of government by mass destruction, assassination, kidnapping, or hostage-taking.

WARNING: This record contains Sensitive Security Information that is controlled under 49 CFR parts 15 and 1520. No part of this record may be disclosed to persons without a "need to know", as defined in 49 CFR parts 15 and 1520, except with the written permission of the Administrator of the Transportation Security Administration or the Secretary of Transportation. Unauthorized release may result in civil penalty or other action. For U.S. government agencies, public disclosure is governed by 5 U.S.C. 552 and 49 CFR parts 15 and 1520.

Elhady-DHS-000759

SENSITIVE SECURITY INFORMATION

system and willing to use any means at their disposal to incite terror. Terrorist groups are competing with each other for influence and control and they remain focused on aviation. They have new and more sophisticated tools at their disposal, including social media, to inspire, direct and facilitate attacks, and have become more adept at concealing their planning from the intelligence agencies that TSA relies on to identify potential threats. These new tools have enabled terrorist groups to empower so-called "lone actor" attackers – individuals who have become radicalized by information available on the Internet and who are inspired by foreign terrorist groups to carry out an attack in the homeland.

10.  The U.S. Intelligence Community also warns that terrorist groups like the Islamic State (ISIS) also may be working to build the capability to carry out mass casualty attacks, such as plots on this Nation's commercial aviation system, rather than simply encouraging lone actor attacks. A mass casualty attack has become more likely in part because of a fierce competition with other terrorist networks. Demonstrating an ability to kill opponents on a large scale would allow terrorist groups such as ISIS to make a powerful showing and would facilitate recruitment.

11.  Terrorist groups have proven adaptive in the face of new security measures, as demonstrated by their development of non-metallic explosive devices designed to evade metal detectors and other aviation security measures. These devices remain some of the most serious threats to aviation. The threat is compounded by the fact that terrorist groups have published instruction manuals online and invited their aspirants to use the information.

*WARNING:* This record contains Sensitive Security Information that is controlled under 49 CFR parts 15 and 1520. No part of this record may be disclosed to persons without a "need to know", as defined in 49 CFR parts 15 and 1520, except with the written permission of the Administrator of the Transportation Security Administration or the Secretary of Transportation. Unauthorized release may result in civil penalty or other action. For U.S. government agencies, public disclosure is governed by 5 U.S.C. 552 and 49 CFR parts 15 and 1520.

Elhady-DHS-000760

SENSITIVE SECURITY INFORMATION

12.     One such example is the 13th edition of Inspire, Al-Qaeda in the Arabian Peninsula's (AQAP) English language magazine. Published in December 2014, Inspire 13 focuses on lone actor attacks and presents step-by-step, illustrated instructions for constructing a home-made, easily portable bomb inside a 17 centimeter plastic water bottle. The instructions go on to suggest that the bomb be used against U.S. commercial airliners over U.S. soil and also provide advice on the best location on the plane and altitude to detonate the bomb.

13.     Inspire 13 claims that this bomb can be hidden in a part of the body not included in airport pat-downs and is undetectable by canines, odor-detecting machines, or metal detectors, but is detectable by imaging/screening machines. The publication notes, however, that imaging and screening machines are not found in all airports and "this large loophole" allows individuals to pass through many American airports undetected.

14.     Two recent attacks on commercial aircraft in Somalia and Egypt demonstrate the ongoing intent to attack aviation and the danger posed by terrorist groups intent on exploiting vulnerabilities in aviation security measures.

15.     In February 2016, a bomb detonated onboard Daallo Airlines Flight D3-159 from Mogadishu. The bomber was reportedly blown out of the aircraft. Al-Qaeda linked terrorist group al-Shabaab claimed responsibility. Per media reports, Somalia's government spokesperson has noted that security video footage taken at Mogadishu airport shows the suspected suicide bomber being handed what appears to be a laptop computer after he passed through the security checkpoint. The media reports also allege that the laptop computer was handed to the bomber by an individual dressed as an airport

*WARNING:* This record contains Sensitive Security Information that is controlled under 49 CFR parts 15 and 1520. No part of this record may be disclosed to persons without a "need to know", as defined in 49 CFR parts 15 and 1520, except with the written permission of the Administrator of the Transportation Security Administration or the Secretary of Transportation. Unauthorized release may result in civil penalty or other action. For U.S. government agencies, public disclosure is governed by 5 U.S.C. 552 and 49 CFR parts 15 and 1520.

Elhady-DHS-000761

SENSITIVE SECURITY INFORMATION

worker. The reports call this a clear example of terrorists mastering the technique of getting simple bombs on planes via corrupt airport personnel.

16.     In October 2015, Metrojet Flight 9268 was scheduled to fly from Sharm el-Sheikh International Airport, Sinai Peninsula, Egypt to St. Petersburg, Russia, but suffered a catastrophic explosive event after departing, killing all 224 passengers. ISIS claimed responsibility. Following an investigation, several countries, including the United States, concluded that the plane was brought down by an explosive device. A matter of significant concern about the bombing was the possibility of an airport worker with insider access facilitating the smuggling of the bomb onto the plane.

17.     In the wake of the Metrojet attack, ISIS published a new edition of their English language magazine Dabiq, which celebrated the downing of the aircraft and displayed a photo of the improvised explosive device (IED) purportedly used to bring down the aircraft. The photo reveals a soda can filled with a substance–possibly an explosive–a commercial detonator, and a probable firing circuit that could include a timer and power source.

18.     Terrorists have demonstrated an interest in going through extreme measures to evade airport security measures. Ibrahim al-Asiri, a leader of al-Qaeda in the Arabian Peninsula (AQAP), dubbed by Time magazine as "the world's most dangerous man" due to his expertise in devising innovative IEDs to defeat existing security measures and his repeated efforts to devise attacks by AQAP against aviation targets, has developed body bombs, which are surgically implanted into a bomber in an effort to beat Advanced Imaging Technology (AIT) and evade pat-downs and canines.

WARNING: This record contains Sensitive Security Information that is controlled under 49 CFR parts 15 and 1520. No part of this record may be disclosed to persons without a "need to know", as defined in 49 CFR parts 15 and 1520, except with the written permission of the Administrator of the Transportation Security Administration or the Secretary of Transportation. Unauthorized release may result in civil penalty or other action. For U.S. government agencies, public disclosure is governed by 5 U.S.C. 552 and 49 CFR parts 15 and 1520.

Elhady-DHS-000762

SENSITIVE SECURITY INFORMATION

19.     Although the significance of a bombing onboard an aircraft resulting in the death of some or all passengers cannot be overstated, the greatest potential consequence of a terrorist attack on a commercial aircraft is the use of the aircraft itself as a weapon of mass destruction. There are hardened cockpit doors in place to prevent a hijacking, but a trained adversary (or worse, a team of adversaries) could exploit crewmember transition periods, such as when a pilot exits the flight deck to use the restroom, to gain access to and control of the cockpit. No weapon or other prohibited item would be required for the adversary to accomplish this task.

20.     Terrorists also continue to show intent to use edged weapons and other items to perpetrate hijackings. In the April 2014 hijacking of Lufthansa Airlines 1676, a man being deported from Germany threatened the air crew with a broken razor blade and demanded to be returned to Germany. And in the June 2012 hijacking of Tianjin Airlines 7554, six men attempted to break into the cockpit using a crutch to hijack the aircraft. On-board security officers and passengers subdued the hijackers.

21.     In sum, terrorist groups continue to target civil aviation for their attacks. These groups are actively empowering and encouraging individuals to plan lone actor attacks, and recent events indicate that they are able to make use of insiders to execute attacks on aviation. Individuals may be included in the TSDB in part due to membership in such terrorist organizations. Individuals in the TSDB who are on the No Fly List, including U.S. citizens who have not been charged with crimes, are so listed because the Government has a reasonable suspicion that they pose a heightened threat of carrying out a terrorist attack. These are the individuals that U.S. law enforcement and intelligence agencies believe are both most willing and most capable of conducting the types of

*WARNING:* This record contains Sensitive Security Information that is controlled under 49 CFR parts 15 and 1520. No part of this record may be disclosed to persons without a "need to know", as defined in 49 CFR parts 15 and 1520, except with the written permission of the Administrator of the Transportation Security Administration or the Secretary of Transportation. Unauthorized release may result in civil penalty or other action. For U.S. government agencies, public disclosure is governed by 5 U.S.C. 552 and 49 CFR parts 15 and 1520.

Elhady-DHS-000763

attacks described above. Using the No Fly List to prohibit these high-threat individuals from entering the sterile area and boarding an aircraft is an essential countermeasure to prevent such sophisticated attacks against civil aviation and the Nation.

Security Measures to Mitigate the Threat and Attendant Vulnerabilities

22.     The threat posed by U.S. citizens on the No Fly List cannot adequately be counteracted through security measures such as pre-screening prior to airport arrival, enhanced screening at airport security checkpoints, and the deployment of FAMs on flights transporting individuals who meet the criteria for placement on the No Fly List. As further explained below, a persistent and ever-changing terrorist threat, coupled with the limitations associated with available security measures make the No Fly List essential to aviation security. Because of the possibility of technological and human error in passenger checkpoint screening and the limitations of other threat mitigation procedures, and because implementation of each security measure requires a commitment of limited resources, abandoning the use of the No Fly List as a basis for making sterile area access and boarding decisions would risk significant harm to aviation security.

*Pre-Screening and Watch List Matching*

23.     Pursuant to section 4012(a) of the Intelligence Reform and Terrorism Prevention Act of 2004 (IRPTA), TSA implemented the Secure Flight program. Under this program, aircraft operators must transmit certain passenger information to TSA approximately 72 hours prior to scheduled flight departure times. For reservations created within 72 hours of flight departure, covered aircraft operators must submit Secure Flight passenger information as soon as it becomes available.

*WARNING:* This record contains Sensitive Security Information that is controlled under 49 CFR parts 15 and 1520. No part of this record may be disclosed to persons without a "need to know", as defined in 49 CFR parts 15 and 1520, except with the written permission of the Administrator of the Transportation Security Administration or the Secretary of Transportation. Unauthorized release may result in civil penalty or other action. For U.S. government agencies, public disclosure is governed by 5 U.S.C. 552 and 49 CFR parts 15 and 1520.

Elhady-DHS-000764

SENSITIVE SECURITY INFORMATION

24.     Upon receipt of the passenger information, TSA compares it to Government watch lists including the No Fly and Selectee List. After Secure Flight completes the comparison of passenger information, TSA returns to aircraft operators a boarding pass printing result, which may identify the individual for enhanced screening at a security checkpoint, or deny the individual transport or authorization to enter a U.S. airport's sterile area. In the 72-hour window, TSA reviews anticipated encounters with individuals in the TSDB to analyze potential threats and general trends. TSA then distributes the information within the agency to drive risk-based operational responses and allocation of airport screening resources.

25.     Secure Flight pre-screening is one of the Nation's front-lines of defense against terrorism targeting aviation. The Secure Flight program is an essential tool that enables TSA to effectively rely on intelligence information to prevent known and suspected terrorists from using the transportation system to harm or gain entry to the United States. For example, the No Fly List includes individuals who have been associated with foreign fighter activities. Foreign fighters include U.S. citizens affiliated with terrorist groups like ISIS who have joined the fight in Iraq and Syria and have likely received training in combat tactics as well as the handling of firearms and explosives. As demonstrated by the November 2015 attacks in Paris, returning foreign fighters with firsthand battlefield experience pose a dangerous operational threat.

26.     TSA also relies on terrorist databases to vet aviation workers. For example, there are approximately 1.6 million workers with access to Security Identification Display Areas, 1.4 million workers with access to Sterile Areas, and 1.2

WARNING: This record contains Sensitive Security Information that is controlled under 49 CFR parts 15 and 1520. No part of this record may be disclosed to persons without a "need to know", as defined in 49 CFR parts 15 and 1520, except with the written permission of the Administrator of the Transportation Security Administration or the Secretary of Transportation. Unauthorized release may result in civil penalty or other action. For U.S. government agencies, public disclosure is governed by 5 U.S.C. 552 and 49 CFR parts 15 and 1520.

Elhady-DHS-000765

SENSITIVE SECURITY INFORMATION

million workers with access to Air Operations Areas at U.S. airports.[10]  These

individuals are automatically vetted against terrorist databases on a daily basis, which

ensures individuals who are added to the No Fly List are unable to access sterile areas of

airports and that TSA is made aware of individuals with insider access to airports who

may have connections to terrorism.

*Checkpoint Screening*

27.     Passengers who are found eligible to enter the sterile area and board an

aircraft after pre-screening through the Secure Flight program must first undergo

screening at an airport security checkpoint, which may include screening utilizing AIT,

walk-through metal detectors, pat-downs, explosive detection canines, and other

technology.  TSA also utilizes in-flight security measures, such as Federal Air Marshals

(FAMs), to mitigate in-flight risks.

28.     TSA continues to adapt its checkpoint security screening measures to

better address the threat to our Nation's aviation security.  But, as illustrated by the

examples below, no screening measure is 100 percent effective and, as a result, the

current checkpoint security system is not equipped to detect all known threats.

29.     In December 2001, Richard Reid attempted to detonate explosives packed

into the shoes he was wearing while on an American Airlines flight from Paris to Miami.

Reid was subdued by passengers on the plane, which then landed at Logan International

---

[10] The Security Identification Display Area (SIDA) refers to portions of an airport, specified in the airport security program, in which security measures required by regulation must be carried out. This area includes the security area and may include other areas of the airport. The Sterile Area refers to portions of an airport defined in the airport security program that provides passengers access to boarding aircraft and to which the access generally is controlled by TSA, an aircraft operator, or a foreign air carrier.  The Air Operations Area includes aircraft movement areas, aircraft parking areas, loading ramps, and safety areas, for use by aircraft regulated under 49 C.F.R. part 1544 or 1546, and any adjacent areas (such as general aviation areas) that are not separated by adequate security systems, measures, or procedures.

*WARNING:* This record contains Sensitive Security Information that is controlled under 49 CFR parts 15 and 1520. No part of this record may be disclosed to persons without a "need to know", as defined in 49 CFR parts 15 and 1520, except with the written permission of the Administrator of the Transportation Security Administration or the Secretary of Transportation. Unauthorized release may result in civil penalty or other action. For U.S. government agencies, public disclosure is governed by 5 U.S.C. 552 and 49 CFR parts 15 and 1520.

Elhady-DHS-000766

SENSITIVE SECURITY INFORMATION

Airport in Boston, Massachusetts. Reid claimed to be "with Al-Qaeda." Following this terrorist attempt, airport screening procedures were revised by enhancing the screening of footwear.

30.     In 2004, terrorists mounted a successful attack on two domestic Russian passenger planes using explosives that were concealed on the torsos of female passengers. TSA responded to this demonstrated security vulnerability by revising pat-down protocols.

31.     In 2006, terrorists in the United Kingdom plotted to board aircraft with liquid explosives that would be used to construct and detonate a bomb while in flight. Following this threat, TSA again adjusted its security procedures by limiting the amount of liquids that could be brought on board aircraft and enhancing the screening of liquids, aerosols, and gels. TSA also deployed technology to improve detection of liquid explosives.

32.     On December 25, 2009, Umar Farouk Abdulmutallab attempted to detonate an explosive device concealed in his underwear on a Northwest flight from Amsterdam to Detroit. The explosive device set off a "fireworks effect" and injured only Abdulmutallab. AQAP claimed responsibility. After this attack, TSA modified its screening procedures to improve its ability to detect explosives hidden in an area of the body that previously was not thoroughly searched.

33.     TSA's current security measures at airport security screening checkpoints include AIT and walk-through metal detectors to screen passengers and to prevent them from bringing prohibited items onboard an aircraft. AIT, which is designed to identify both metallic and non-metallic potential threat items that may be concealed on an

*WARNING:* This record contains Sensitive Security Information that is controlled under 49 CFR parts 15 and 1520. No part of this record may be disclosed to persons without a "need to know", as defined in 49 CFR parts 15 and 1520, except with the written permission of the Administrator of the Transportation Security Administration or the Secretary of Transportation. Unauthorized release may result in civil penalty or other action. For U.S. government agencies, public disclosure is governed by 5 U.S.C. 552 and 49 CFR parts 15 and 1520.

SENSITIVE SECURITY INFORMATION

individual, is not available at every airport screening checkpoint, and the configurations of some airports do not allow for the deployment of AIT at certain checkpoint locations. While AIT provides the best available tool to detect both metallic and non-metallic objects and facilitates TSA's ability to respond to evolving threats, the system is not impervious.

34.     The DHS Inspector General (IG) recently conducted covert testing of passenger screening checkpoints with a focus on AIT. While the details of the IG's testing methods, findings, and reasons for each failure are classified, the failure rate underscored that the technology cannot be counted on as a silver-bullet for detecting potential security threats.

35.     The IG conducted multiple tests at eight airports of different sizes. The weaknesses identified by the IG's efforts were found across airports and were variously attributed to limitations in the technology itself, deficiencies in screening procedures, and weaknesses in the performance of those procedures. TSA immediately recognized the necessity of correcting the deficiencies identified by the IG, including those which could have catastrophic consequences.

36.     While AIT remains the Government's best tool for efficiently and effectively screening for non-metallic explosive devices on individuals seeking access to the secure area of airports, terrorist groups continue to develop explosives designed to avoid detection by this and other technologies, and TSA must anticipate and respond to those efforts.

37.     Assuming TSA's screening technology functions optimally in identifying potential threat items on a passenger during a checkpoint screening, successful

*WARNING:* This record contains Sensitive Security Information that is controlled under 49 CFR parts 15 and 1520. No part of this record may be disclosed to persons without a "need to know", as defined in 49 CFR parts 15 and 1520, except with the written permission of the Administrator of the Transportation Security Administration or the Secretary of Transportation. Unauthorized release may result in civil penalty or other action. For U.S. government agencies, public disclosure is governed by 5 U.S.C. 552 and 49 CFR parts 15 and 1520.

Elhady-DHS-000768

SENSITIVE SECURITY INFORMATION

completion of screening for the passenger that alarms still requires a physical pat-down, which in turn introduces the possibility for human error. If a passenger alarms while going through an AIT machine or walk-through metal detector, a Transportation Security Officer (TSO) has to resolve that alarm using pat-down procedures. If the TSO does not detect a threat item and determines that the alarm was false, the passenger is allowed to proceed to the gate.

38.     The IG identified deficiencies ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ with various root causes, all of which are endemic to having human beings search for and resolve alarms. To address these issues, TSA has adjusted the Standard Operating Procedures ▓▓▓▓▓▓▓ and implemented new TSO training requirements. Follow-up assessments ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ after these measures were put into place, but no system with a human element can be 100 percent effective.[11] That is, despite the new procedures and training, some passengers who alarmed while going through AIT or a walk-through metal detector were allowed to enter the sterile area with a prohibited item ▓▓▓▓▓▓▓▓▓▓▓.

39.     In addition to AIT, walk-through metal detectors, and pat-downs, where available TSA uses other technology to screen passengers and their property at the checkpoint, including bottle liquid scanners, explosive trace detectors, and advanced technology x-rays. Results of testing in the IG report prompted re-evaluations of this equipment to ensure it performs as expected. These tests are underway, but not all have been completed. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

---

[11] The actual pass/fail rate is classified.

WARNING: This record contains Sensitive Security Information that is controlled under 49 CFR parts 15 and 1520. No part of this record may be disclosed to persons without a "need to know", as defined in 49 CFR parts 15 and 1520, except with the written permission of the Administrator of the Transportation Security Administration or the Secretary of Transportation. Unauthorized release may result in civil penalty or other action. For U.S. government agencies, public disclosure is governed by 5 U.S.C. 552 and 49 CFR parts 15 and 1520.

Elhady-DHS-000769

SENSITIVE SECURITY INFORMATION

40.　TSA also uses canine explosive detection teams for passenger screening at airport security checkpoints. These Passenger Screening Canine (PSC) teams are specifically trained to detect explosives odor on passengers in the checkpoint environment and have proven to be one of the most effective means of detecting explosive substances. Because there is a limited supply of certified trained PSC teams, TSA must allocate its canine teams to specific airports utilizing risk based criteria that take into account multiple factors, including passenger throughput and threats to transportation security in the immediate geographical area of a transportation domain. Over 700 certified TSA canine teams are deployed at airports across the country, but there are not enough canine teams to ensure a PSC team continuously operating at every U.S. airport, much less every security checkpoint. Further, Inspire 13 references AQAP's belief that while "dogs have a great capability of scenting materials they are trained on," "covering the explosives with non-porous material" would prevent canines from detecting an explosive device.

41.　All of these checkpoint screening technologies and processes have vulnerabilities, thus necessitating the continual use of passenger pre-screening against the No Fly List to effectively counter the threat to aviation security.

42.　Further, even if a passenger who is a known or suspected terrorist is thoroughly and successfully screened, that passenger may nevertheless be capable of terrorist activity on board a plane if he or she is assisted by an unidentified co-traveler ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Assessments show that TSOs are ▮▮▮▮▮▮ more likely to detect prohibited items during checkpoint screening when they are aware that the passenger poses a heightened security risk. While

WARNING: This record contains Sensitive Security Information that is controlled under 49 CFR parts 15 and 1520. No part of this record may be disclosed to persons without a "need to know," as defined in 49 CFR parts 15 and 1520, except with the written permission of the Administrator of the Transportation Security Administration or the Secretary of Transportation. Unauthorized release may result in civil penalty or other action. For U.S. government agencies, public disclosure is governed by 5 U.S.C. 552 and 49 CFR parts 15 and 1520.

Elhady-DHS-000770

SENSITIVE SECURITY INFORMATION

this increased detection rate is encouraging in the context of screening known or suspected terrorists, ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

43.     Because checkpoint security screening measures are not always effective and have vulnerabilities that may be exploited, TSA must rely on denying boarding to individuals whom the Government has reasonable suspicion to believe meet the heightened criteria for placement on the No Fly List.

*Insider Threats*

44.     Even if airport security checkpoint screening measures could detect and prevent all passenger threats 100 percent of the time, the No Fly List would still be essential because of the potential for a passenger who is a known or suspected terrorist committing an attack with the help of an insider.

45.     An insider is an "individual with access and/or insider knowledge that allows them to exploit vulnerabilities of the Nation's transportation systems with intent to do harm."[12] Insiders extend beyond TSA's workforce and include non-TSA personnel employed at airports and by airlines who enjoy privileged access to aircraft and secure areas of airports. As noted above, TSA estimates that there are approximately 1.6 million workers with access to Security Identification Display Areas, 1.4 million workers with access to the Sterile Areas, and 1.2 million workers with access to Air Operations Areas at U.S. airports.

---

[12] Department of Homeland Security Transportation Sector Security Risk Assessment (TSSRA) Fiscal Year 2015 Report to Congress, dated July 2, 2015.

*WARNING:* This record contains Sensitive Security Information that is controlled under 49 CFR parts 15 and 1520. No part of this record may be disclosed to persons without a "need to know", as defined in 49 CFR parts 15 and 1520, except with the written permission of the Administrator of the Transportation Security Administration or the Secretary of Transportation. Unauthorized release may result in civil penalty or other action. For U.S. government agencies, public disclosure is governed by 5 U.S.C. 552 and 49 CFR parts 15 and 1520.

Elhady-DHS-000771

SENSITIVE SECURITY INFORMATION

46.     An insider acting as co-conspirator with an airline passenger who is capable of carrying out terrorist activity presents a significant threat to aviation security. Most directly, insiders with security responsibilities positioned at airport security screening checkpoints (e.g., a TSO) could allow a passenger to pass through checkpoint screening with a prohibited item. Beyond this most direct example, a passenger who had been thoroughly screened without error at an airport security checkpoint could nonetheless become lethally dangerous with the help of an insider who covertly provides the passenger with a prohibited item once he enters the sterile area of the airport. As noted above, the bomb used on Daallo Flight D3-159 was reportedly packed into a laptop computer and handed to the bomber by an individual dressed as an airport worker just before boarding the plane. Furthermore, there is a potential threat associated with an insider with access to an airplane (e.g., an airline or catering employee) planting a prohibited item in the cabin for use by the passenger in-flight. An insider with cargo access could similarly plant a prohibited device in the cargo area of an airplane ▨▨▨

▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

47.     TSA has made progress in addressing vulnerabilities associated with insiders. Individuals undergo a Security Threat Assessment for potential ties to terrorism before being granted privileged access to U.S. airports and are continuously vetted against terrorist watch lists. Prior to access, individuals also undergo a criminal history records check to ensure they have not committed a disqualifying criminal offense within the preceding 10 years. However, this vetting process is not foolproof.

48.     In the domestic cargo system alone, TSA has identified over 700 individuals whose Security Threat Assessments were obtained with fraudulent

WARNING: This record contains Sensitive Security Information that is controlled under 49 CFR parts 15 and 1520. No part of this record may be disclosed to persons without a "need to know", as defined in 49 CFR parts 15 and 1520, except with the written permission of the Administrator of the Transportation Security Administration or the Secretary of Transportation. Unauthorized release may result in civil penalty or other action. For U.S. government agencies, public disclosure is governed by 5 U.S.C. 552 and 49 CFR parts 15 and 1520.

Elhady-DHS-000772

documentation. And an automated recurrent criminal record vetting solution for airport and airline employee badge holders is not yet available. Instead, TSA requires airports and airlines to conduct fingerprint-based Criminal History Records Checks every two years.

49.     TSA also lacks automated access to some additional intelligence-related data on U.S. citizens that is available to other federal government agencies and that would help to further inform TSA's vetting decisions. TSA is currently working with other agencies to address this deficiency, but complete access is not expected for several months. And as demonstrated by the examples of the Christmas Day bomber and the individual who masterminded and carried out the Boston Marathon bombing,[13] not all individuals who pose a threat are identified as such, and as a result, not all threats are included on terrorist watch lists.

50.     Recent events also demonstrate that Security Threat Assessments cannot identify every individual with malicious intent. As reported in public source material, an airplane cleaning contractor who at one time had airport access at Minneapolis-St. Paul International Airport was identified as a foreign fighter for ISIS following his death in Syria in August 2014.

51.     Although not terrorism related, a gun smuggling operation run by airline employees out of Hartsfield-Jackson Atlanta International Airport that was exposed by law enforcement in December 2014 is further evidence that vetting is not always

---

[13] The 2013 Boston Marathon bombing was masterminded and carried out by Tamerlan Tsarnaev, an individual who was not within any active U.S. Government databases. Further, the Christmas Day 2009 bomber was known to certain elements of the intelligence community but was not placed in the TSDB, on the Selectee List, or on the No Fly List.

WARNING: This record contains Sensitive Security Information that is controlled under 49 CFR parts 15 and 1520. No part of this record may be disclosed to persons without a "need to know", as defined in 49 CFR parts 15 and 1520, except with the written permission of the Administrator of the Transportation Security Administration or the Secretary of Transportation. Unauthorized release may result in civil penalty or other action. For U.S. government agencies, public disclosure is governed by 5 U.S.C. 552 and 49 CFR parts 15 and 1520.

Elhady-DHS-000773

SENSITIVE SECURITY INFORMATION

adequate to identify insiders with a propensity to bring prohibited items into secure areas and on to airplanes.

52.     TSA has pursued other options to minimize the insider threat by exercising its regulatory authority to issue information circulars and security directives to airport and aircraft operators directed at implementation of increased security measures.[14] However, in 2015 TSA found regulatory compliance violations in ▓▓▓▓▓▓ of the inspections it performed at ▓▓▓▓▓▓▓▓▓▓▓▓ the primary noncompliance was a failure to ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Similarly, TSA implemented measures to increase randomized screening inspections for aviation employees at U.S. airports. To date, not all airports are in compliance with the requirements for increased inspections. Even full compliance would result in more frequent random screenings, but not 100 percent inspection of all aviation employees every day.

53.     In sum, insiders present a demonstrated threat to aviation security. There are significant challenges associated with identifying insiders at airports and preventing them from helping others to commit terrorist attacks. Given the threat presented by an insider facilitating an attack by a previously screened individual, and that No Fly subjects represent the U.S. intelligence community's best identification of individuals as known or suspected terrorists who further represent a heightened threat, the No Fly List is critical to ensuring aviation and national security.

---

[14] Information circulars notify certified cargo screening facilities of security concerns, but do not impose mandatory requirements. TSA issues a Security Directive setting forth mandatory measures when TSA determines that additional security measures are necessary to respond to a threat assessment, or to a specific threat against civil aviation.

*WARNING:* This record contains Sensitive Security Information that is controlled under 49 CFR parts 15 and 1520. No part of this record may be disclosed to persons without a "need to know", as defined in 49 CFR parts 15 and 1520, except with the written permission of the Administrator of the Transportation Security Administration or the Secretary of Transportation. Unauthorized release may result in civil penalty or other action. For U.S. government agencies, public disclosure is governed by 5 U.S.C. 552 and 49 CFR parts 15 and 1520.

Elhady-DHS-000774

SENSITIVE SECURITY INFORMATION

*In-Flight Measures*

54. TSA employs in-flight measures to ensure aviation security that include FAMs, armed Federal Flight Deck Officers (FFDOs), and hardened cockpit doors. These countermeasures are particularly important because of the potential for hijackings and the use of the aircraft as a weapon of mass destruction.

55. As explained below, however, each of these in-flight countermeasures has limitations that could be exploited by a terrorist, and thus they do not serve to supplant the need for a No Fly List. Despite these in-flight measures, the No Fly List remains a vital additional measure to prevent the risk of terrorism on flights to, from, or over the United States.

56. FAMs are trained and equipped to detect, deter, and defeat criminal and terrorist activities onboard aircraft. FAMs face challenges associated with a unique operating environment at 30,000 feet in tight quarters. Security measures (including FAM tactics) must be balanced against the safety of passengers and the integrity of the aircraft. FAMs are trained to be vigilant and to react to a wide spectrum of events, but they may not be able to prevent any and all terrorist activity.

57. FAMs are deployed on flight missions using risk-based analysis, and as such, flight missions are responsive to current intelligence, threats, and vulnerabilities. FAMS' mission coverage goals are adjusted continually in response to emerging and evolving threats and incorporate randomness and unpredictability as a further mitigation measure. But FAMs are limited to flights on U.S.-flagged aircraft and do not operate on foreign air carrier flights into, out of, or over the United States. FAMs also do not

*WARNING:* This record contains Sensitive Security Information that is controlled under 49 CFR parts 15 and 1520. No part of this record may be disclosed to persons without a "need-to-know", as defined in 49 CFR parts 15 and 1520, except with the written permission of the Administrator of the Transportation Security Administration or the Secretary of Transportation. Unauthorized release may result in civil penalty or other action. For U.S. government agencies, public disclosure is governed by 5 U.S.C. 552 and 49 CFR parts 15 and 1520.

Elhady-DHS-000775

operate on flights between certain foreign countries and the United States where no agreement has been reached with the foreign country.

58.     Decisions to deploy FAMs are based upon many factors including requests or requirements for coverage on a specific flight. This type of deployment is known as Special Mission Coverage (SMC). SMC is generally deployed on flights where ▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

SMC requires ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ coordination by TSA.

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇

59.     ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

60.     There are extraordinary circumstances in which TSA, in coordination with TSC and other interagency partners, will facilitate the air travel of an individual on the No Fly List. For example, the Government has instituted a policy to permit a U.S. person

*WARNING:* This record contains Sensitive Security Information that is controlled under 49 CFR parts 15 and 1520. No part of this record may be disclosed to persons without a "need to know", as defined in 49 CFR parts 15 and 1520, except with the written permission of the Administrator of the Transportation Security Administration or the Secretary of Transportation. Unauthorized release may result in civil penalty or other action. For U.S. government agencies, public disclosure is governed by 5 U.S.C. 552 and 49 CFR parts 15 and 1520.

SENSITIVE SECURITY INFORMATION

on the No Fly List to travel under controlled conditions on a commercial flight from a

foreign airport bound for the United States. ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮

61.      ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮

62.      Although FAMS coverage provides additional security ▮▮▮▮

▮▮▮▮▮▮ limitations to FAMS' capabilities that could be exploited if U.S.

citizens who would otherwise meet the criteria for the No Fly List were regularly

permitted to fly.

63.      For example, ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮

WARNING: This record contains Sensitive Security Information that is controlled under 49 CFR parts 15 and 1520. No part of this record may be disclosed to persons without a "need to know", as defined in 49 CFR parts 15 and 1520, except with the written permission of the Administrator of the Transportation Security Administration or the Secretary of Transportation. Unauthorized release may result in civil penalty or other action. For U.S. government agencies, public disclosure is governed by 5 U.S.C. 552 and 49 CFR parts 15 and 1520.

Elhady-DHS-000777

SENSITIVE SECURITY INFORMATION



64.    In addition, No Fly subjects could also exclusively fly on foreign-flagged air carriers or to and from foreign countries that FAMs do not fly, thus altogether removing this mitigation effort. As noted above, FAMs do not operate on flights between certain foreign countries and the United States due to lack of an agreement with the foreign country and only operate on U.S.-flagged carriers.

65.    More broadly, it is essential to prevent individuals who represent known risks from flying so resources can be focused on threats posed by unknown subjects. In 2015, there were more than 7,584,700 domestic commercial flights. FAMs were on ██████████████, or approximately ████████ Without a No Fly List, the FAMS would

██████████████████████████████████████████████████████

████████████████████ thereby decreasing the number of covered flights carrying passengers who may present unknown risks. As demonstrated by the Boston Marathon bomber and the Christmas Day Underwear bomber examples, not all individuals who seek to do grave harm to the United States are on terrorist watch lists, making FAMs' coverage of flights without known or suspected terrorists on board essential to protecting national security.

66.    In addition to FAMS coverage, an additional line of defense against in-flight attacks is the FFDO program, by which TSA deputizes qualified pilots employed by air carriers to defend the flight deck against acts of criminal violence or air piracy. FFDOs are trained and authorized to transport and carry a firearm and to use force,

*WARNING:* This record contains Sensitive Security Information that is controlled under 49 CFR parts 15 and 1520. No part of this record may be disclosed to persons without a "need to know", as defined in 49 CFR parts 15 and 1520, except with the written permission of the Administrator of the Transportation Security Administration or the Secretary of Transportation. Unauthorized release may result in civil penalty or other action. For U.S. government agencies, public disclosure is governed by 5 U.S.C. 552 and 49 CFR parts 15 and 1520.

SENSITIVE SECURITY INFORMATION

including deadly force in defense of the flight deck. FFDOs are a valuable component of TSA's in-flight security measures.

67.     But – like FAMs – FFDOs are only authorized on U.S.-flagged air carriers, and because the program is voluntary and pilots are not compensated by the United States, not every flight has an FFDO on board. An important distinction between FFDOs and FAMs, however, is that FFDOs are not authorized to exercise their law enforcement authority outside of the flight deck. They are prohibited from using their firearm outside of the cockpit, including in the event of a disturbance in the passenger cabin of the aircraft. Thus, while FFDOs may help to defend the flight deck, they do not effectively mitigate threats to other areas of the aircraft.

68.     One reason why FFDOs are an important part of TSA's security scheme is that, despite progress made to fortify the flight deck since the 9/11 attacks, hijacking remains an in-flight threat to aviation security, as evidenced by the Lufthansa Airlines and Tianjin Airlines hijacking attempts described above. Indeed, there have been at least 10 hijacking attempts around the world since 2007.

69.     Following 9/11, the Federal Aviation Administration (FAA) issued guidance regarding the minimum requirements, installation, and testing of hardened flight deck doors. Improvements made to cockpit doors resist forced entry for a period of time, but do not eliminate the possibility of breaking into the flight deck. Out of necessity, cockpit doors are regularly opened for periods of time in order to facilitate rest periods, lavatory breaks, and food and beverage service to the crew. Publicly available videos suggest that it takes less than two seconds to breach a cockpit door, leaving very little time for FAMs or crew to react should such an attack occur. Cockpit doors are regularly

*WARNING:* This record contains Sensitive Security Information that is controlled under 49 CFR parts 15 and 1520. No part of this record may be disclosed to persons without a "need to know", as defined in 49 CFR parts 15 and 1520, except with the written permission of the Administrator of the Transportation Security Administration or the Secretary of Transportation. Unauthorized release may result in civil penalty or other action. For U.S. government agencies, public disclosure is governed by 5 U.S.C. 552 and 49 CFR parts 15 and 1520.

Elhady-DHS-000779

open for periods of time exceeding the two-second window of opportunity depicted. Further, should an attacker gain access to the flight deck, the hardened cockpit door becomes an additional vulnerability, enabling the hijacker to remain protected in the cockpit.

70.     The overall vulnerability of the flight deck coupled with allowing a known or suspected terrorist on board a flight who may be capable of flying a plane and may be assisted in an attack by unidentified co-travelers presents an unacceptable risk to aviation and national security. The No Fly List is the last line of defense to counteract the high-level threat that such a scenario presents.

71.     In sum, despite the in-flight measures described above, a properly trained or sufficiently motivated individual may be able to succeed in a terrorist plot targeting an aircraft even with FAMs on board, particularly if that individual is willing to die, is assisted by insiders or unidentified co-travelers, or has access to information and technology that enable an attack that does not give the FAMs and flight crew time to react before a catastrophic event occurs. Moreover, even if the FAMs and others on board are able to defeat the individual, there may be a high cost in terms of injury or death to innocent passengers. Given existing in-flight security vulnerabilities, the No Fly List is essential to prevent known or suspected terrorists who meet the heightened No Fly criteria from exploiting these in-flight vulnerabilities to the detriment of the lives of innocent passengers and potential targets on the ground.

*WARNING:* This record contains Sensitive Security Information that is controlled under 49 CFR parts 15 and 1520. No part of this record may be disclosed to persons without a "need to know", as defined in 49 CFR parts 15 and 1520, except with the written permission of the Administrator of the Transportation Security Administration or the Secretary of Transportation. Unauthorized release may result in civil penalty or other action. For U.S. government agencies, public disclosure is governed by 5 U.S.C. 552 and 49 CFR parts 15 and 1520.

SENSITIVE SECURITY INFORMATION

*Last Point of Departure Airports*

72. In addition to the considerations set forth above, many foreign airports that serve as Last Points of Departure (LPDs) for flights to the United States present unique challenges to securing the Nation's aviation system. As explained below, TSA lacks operational control over LPDs and these facilities are not required to meet TSA's aviation security requirements, which generally far exceed the baseline measures required at foreign airports. In addition, TSA is unable to vet foreign aviation workers who have insider access to LPDs. For this reason as well, security measures at airports cannot and do not supplant the need for the critical additional protective measure provided by the No Fly List.

73. TSA does not have operational control over LPDs. Foreign countries are held to the aviation security standards required by the International Civil Aviation Organization (ICAO). ICAO promulgates international civil aviation regulations, which include legally binding standards and non-legally binding recommendations (SARPs) for its 192 member states. ICAO security SARPs are minimum baseline requirements and do not include many of the enhanced measures described above that TSA has implemented following incidents of terrorism or specific known threats. TSA's aviation security requirements generally far exceed the level of security provided by ICAO SARPs, but TSA is limited in its ability to impose those requirements in other sovereign countries.

74. TSA may require regulated air carriers operating service to the United States to implement additional security requirements at LPDs, provided that these requirements do not otherwise conflict with the foreign sovereign's laws and regulations. But these additional requirements are only applicable to air carrier operations and do not

*WARNING:* This record contains Sensitive Security Information that is controlled under 49 CFR parts 15 and 1520. No part of this record may be disclosed to persons without a "need to know", as defined in 49 CFR parts 15 and 1520, except with the written permission of the Administrator of the Transportation Security Administration or the Secretary of Transportation. Unauthorized release may result in civil penalty or other action. For U.S. government agencies, public disclosure is governed by 5 U.S.C. 552 and 49 CFR parts 15 and 1520.

SENSITIVE SECURITY INFORMATION

extend to other airport operations that may occur at LPDs. For example, TSA conducts vetting for air carrier crew members who fly on flights to the United States from LPDs, but TSA is not able to vet LPD airport personnel. Thus, TSA's regulatory requirements at LPDs only partially mitigate the potential for insider threats at foreign airports. As noted above, the recent international events involving Metrojet Flight 9268 and Daallo Airlines Flight D3-159 highlight the dangers posed at foreign airports, specifically in light of potential insider threats.

75. Just as vetting standards at LPDs may differ from TSA domestic requirements, there are discrepancies between the screening standards at domestic airports and many LPDs. For instance, while TSA deploys AIT at domestic airports to combat the threat of non-metallic IEDs hidden on passengers, ICAO SARPs do not require screening technology such as AIT, nor is it widely deployed at LPDs around the world. As a result, TSA must rely on other mitigation factors to reduce the risk of an explosive entering the sterile area at LPDs and ultimately ending up on a plane bound for the United States. One vital way to reduce this risk is passenger pre-screening, including through the No Fly List. Every passenger and crew member on every flight bound for or overflying the United States is required to be vetted against the TSDB. Secure Flight pre-screening at LPDs ensures that known or suspected terrorists who meet the heightened No Fly List criteria are not able to enter U.S. airspace. The No Fly List thus remains an essential security tool at LPDs given that foreign airports may have lower levels of checkpoint screening than that required in the U.S.

*WARNING:* This record contains Sensitive Security Information that is controlled under 49 CFR parts 15 and 1520. No part of this record may be disclosed to persons without a "need to know", as defined in 49 CFR parts 15 and 1520, except with the written permission of the Administrator of the Transportation Security Administration or the Secretary of Transportation. Unauthorized release may result in civil penalty or other action. For U.S. government agencies, public disclosure is governed by 5 U.S.C. 552 and 49 CFR parts 15 and 1520.

SENSITIVE SECURITY INFORMATION

## Conclusion

76. TSA operates in a high-threat environment in which terrorists look for security gaps and vulnerabilities to exploit. Although TSA has implemented a robust, multifaceted security regime, no one security measure is perfect or can completely mitigate the risks posed by current threats or those that will emerge in the future as the nature of terrorist threats evolve. The No Fly List allows TSA to effectively counter the threat posed by individuals, including U.S. citizens, who have been identified by the intelligence community as known or suspected terrorists who pose a heightened threat. As explained above, the No Fly List allows TSA to deny boarding entirely to a person who meets the heightened criteria, serving numerous invaluable purposes. The No Fly List allows TSA to counter the threat posed by terrorists who would conspire with insider airport employees to introduce a prohibited item beyond the security screening checkpoint. The No Fly List prevents terrorists who would attempt to avoid the most effective checkpoint security technologies by targeting security screening checkpoints that do not have all security countermeasures at their disposal. It also enables TSA to mitigate in-flight security threats and security screening limitations at LPDs. It is my assessment that the No Fly List, including its application to U.S. citizens, is one of this Nation's critical defenses against the threat posed by individuals who seek to damage commercial aviation or national security. It serves as an essential tool to prevent terrorist attacks that could result in a catastrophic loss of life and cause substantial damage to the economic health of the nation. Without the No Fly List, this Nation's vulnerability to a terrorist attack against aviation would be substantially heightened.

*WARNING:* This record contains Sensitive Security Information that is controlled under 49 CFR parts 15 and 1520. No part of this record may be disclosed to persons without a "need to know", as defined in 49 CFR parts 15 and 1520, except with the written permission of the Administrator of the Transportation Security Administration or the Secretary of Transportation. Unauthorized release may result in civil penalty or other action. For U.S. government agencies, public disclosure is governed by 5 U.S.C. 552 and 49 CFR parts 15 and 1520.

SENSITIVE SECURITY INFORMATION

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 2, 2016

By: _____

Roderick Allison
Acting Deputy Administrator
Transportation Security Administration
U.S. Department of Homeland Security
601 South 12th Street
Arlington, VA 20598

WARNING: This record contains Sensitive Security Information that is controlled under 49 CFR parts 15 and 1520. No part of this record may be disclosed to persons without a "need to know", as defined in 49 CFR parts 15 and 1520, except with the written permission of the Administrator of the Transportation Security Administration or the Secretary of Transportation. Unauthorized release may result in civil penalty or other action. For U.S. government agencies, public disclosure is governed by 5 U.S.C. 552 and 49 CFR parts 15 and 1520.

Elhady-DHS-000784