**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| Anas ELHADY, et al.,       ) | |
|                 ) | |
|     Plaintiffs,        ) | |
|                 ) | |
| v.                  ) | Case No. 1:16-cv-375 (AJT/JFA) |
|                 ) | |
| CHARLES H. KABLE, et al.,   ) | |
|                 ) | |
|     Defendants.       ) | |

## MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

G. ZACHARY TERWILLIGER
United States Attorney

JOSEPH H. HUNT
Assistant Attorney General
Civil Division

ANTHONY J. COPPOLINO
Deputy Director, Federal Programs Branch

AMY POWELL
DENA M. ROTH
ANTONIA KONKOLY
CHRISTOPHER HEALY
Trial Attorneys, Federal Programs Branch
United States Department of Justice
Civil Division, Federal Programs Branch

LAUREN A. WETZLER
Chief, Civil Division
Assistant United States Attorney
2100 Jamieson Ave.,
Alexandria, VA. 22314
Tel: (703) 299-3752
Fax: (703) 299-3983
Lauren.Wetzler@usdoj.gov

*Attorneys for Defendants*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ..................................................................................................................1

    RESPONSE TO PLAINTIFFS' STATEMENT OF UNDISPUTED

    MATERIAL FACTS ....................................................................................1

ARGUMENT........................................................................................................................19

    I.     Plaintiffs Have Not Established the Deprivation of a Liberty Interest.......................19

          a.    Watchlisting Does Not Deprive Plaintiffs of a Liberty Interest
               in International Travel. .....................................................................20

          b.    The Watchlist Does Not Deprive Plaintiffs of a Liberty Interest
               in Domestic Travel. ........................................................................26

          c.    Plaintiffs Have Not Been Deprived of Any Reputational Liberty
               Interest under the Stigma-Plus Test. ................................................29

          d.    The Risk of Erroneous Deprivation is Low .......................................38

          e.    The Government's Interest in Maintaining an Effective
               Watchlisting System Outweighs Plaintiffs' Interests in
               Additional Process. .........................................................................40

    II.    DHS TRIP Provides all the Process that is Due .........................................44

CONCLUSION.....................................................................................................................45

## INTRODUCTION

Plaintiffs' Motion for Summary Judgment asks the Court to conclude, as a matter of law, that individuals required to undergo enhanced screening at airports or inspection at the border are entitled to know whether or not they are in the Terrorist Screening Database ("TSDB"), and if so, the basis for their placement. Plaintiffs request this relief on the basis of very little evidence, and in the face of compelling Government declarations showing that such additional procedures could not be implemented without considerable risk to national security.

As a result of hard-earned lessons regarding the prevention of terrorist attacks, Defendants generally share identifying information about an individual reasonably suspected of terrorist activity with law enforcement, homeland security, intelligence entities, foreign governments, and a limited number of additional entities in furtherance of national security. Plaintiffs have put forward no evidence supporting a conclusion that individuals in the TSDB are generally deprived of a liberty interest within the meaning of the Due Process Clause, and have put forward no evidence that they personally have been deprived of a liberty interest. Given the limited Plaintiffs' interests at stake, the rigorous quality review and dynamism of the TSDB, and the extraordinary public interest at stake, the current redress process is sufficient to protect Plaintiffs' interests.

## RESPONSE TO PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS[1]

Pursuant to Local Civil Rule 56(B), Defendants address below Plaintiffs' material statements of fact that are in dispute. However, Plaintiffs have also set forth many statements of fact that are not material, but that nonetheless require correction or clarification. Thus, by addressing statements of fact below, Defendants do not necessarily concede that any specific fact is material.

**3.** Defendants clarify that the Watchlisting Advisory Council ("WLAC") does not "set" watchlisting policy; rather, it is an informal, inter-agency advisory body, comprised of representatives from the

---

[1] The numbers preceding each paragraph below correspond with those in Plaintiffs' Statement of Undisputed Material Facts. For the sake of efficiency, Defendants have omitted those paragraphs that are either not in dispute or that do not otherwise warrant correction or clarification.

federal agencies that participate in the U.S. terrorism watchlisting enterprise. It is convened

voluntarily, by the mutual agreement of its members, and does not itself have any statutory or legal

authority. Plaintiffs' Exhibit ("PEX") 69 (Groh Decl. II) ¶¶ 40-45. Additionally, the WLG is updated

on a periodic basis. It is drafted and approved by all affected agencies, and ultimately goes into effect

only after consideration by the Deputies Committee of the National Security Council ("NSC").

Defendants' Exhibit ("DEX") 3 ("Groh MSJ Decl.") ¶ 15 n. 6. The current, operative version of the

WLG ("2018 WLG") went into effect on March 19, 2019. DEX59 (Mar. 22, 2019 Groh Decl.) ¶ 6.

**4.** Plaintiffs mischaracterize HSPD-6, which announces policy, and contains different instructions

for the Attorney General and the Secretary of Homeland Security. PEX30.

**5.** Defendants clarify that, after a person is removed from the TSDB, records of the person's

previous placement are available only as an "audit history," to which only a small number of

authorized TSC employees have access. Such records are not exported, and do not result in "hits"

under standard TSDB searches. PEX25 ("Groh Tr.") 300-01.

**8.** Defendants clarify that foreign partners may submit identities to be considered for nomination to

the TSDB by the NCTC or TSC. Groh MSJ Decl. ¶ 18; *see also* Defendants' Statement of

Undisputed Material Facts ("Defs' SMF") ¶ 16.

**9.** Defendants clarify that the numbers provided in PEX74 were estimates, not precise figures.

**10.** Defendants again clarify that foreign partners may submit identities to be considered for

nomination to the TSDB by the NCTC or TSC. Groh MSJ Decl. ¶ 18; *supra* ¶ 8.

**12.** A current, more complete description of the reasonable suspicion standard is set forth in Groh

MSJ Decl. ¶ 22.

**16.** Defendants clarify that there are certain limited exceptions to the reasonable suspicion standard

for inclusion in the TSDB; Defendants further note they asserted—and this Court upheld—the law

enforcement privilege with respect to detailed information about these exceptions. PEX68 (Groh

Decl. I) ¶ 11; Dkt. No. 258 (Order of January 4, 2019, upholding this assertion). Defendants

respectfully refer the Court to Groh Tr. 64-65, 76-77; PEX26 ("Froemling Tr.") 83; and PEX27

("Howe Tr.") 123-25; for a more complete and accurate description of the publically available
information.

**18-19.** Defendants clarify that none of the factors identified in these paragraphs suffice to meet the
standard for TSDB inclusion. Groh MSJ Decl. ¶ 25; *see* Defs' SMF ¶ 13.[2]

**20.** Defendants clarify that while the reasonable suspicion standard is not tied to language in a
specific criminal statute, "[i]nclusion in the TSDB is based on an assessment of the threat of terrorist
activity posed by a particular individual." DEX2 ("Orlando MSJ Decl.") ¶ 8.

**21.** Defendants clarify that "foreign government[s]," as used by Plaintiffs, would only include foreign
partners with which the TSC has entered into arrangements that limit the use and dissemination of
the shared information. Groh MSJ Decl. ¶¶ 31, 33. There is no information in the record to support
Plaintiffs' description of these governments' uses, and Defendants asserted privilege over the
contents of most of the arrangements. *See* Dkt. No. 178-19 (Sessions Decl.).

**23.** Defendants clarify that the subsets of the TSDB, *see* Groh MSJ Decl. ¶ 26, are not
"annotations." Plaintiffs' use of the term "annotate" or "annotation" in the context of the TSDB is
their own invented nomenclature, and has no basis in Governmental practices or terminology.

**24.** Defendants clarify that the majority of passengers designated for enhanced airport screening are
so designated for reasons other than TSDB status. DEX1 ("Froemling MSJ Decl.") ¶¶ 10-11, 60.
Likewise, CBP may refer people for additional scrutiny for many reasons unrelated to TSDB status,
including randomized referral. DEX51 ("Howe MSJ Decl.") ¶ 14. Accordingly, selection for
enhanced screening and/or secondary inspection—even on multiple occasions—does not allow an
individual to infer that he or she is on the TSDB.

**27.** Defendants clarify that admissibility determinations are made on a case by case basis based on
the totality of the circumstances. Howe Tr. 58-59, 62-63. A foreign national's TSDB status may

---

[2] Defendants additionally clarify that Plaintiffs' reference to the "study of Arabic" comes from a
deposition question posed by Plaintiffs' counsel, and it does not suggest that the study of the Arabic
language is the only language that might be considered. Groh Tr. 340-41.

signal that further investigation is needed to make to a final determination of admissibility. *Id.* 59, 63.

**28.** Defendants clarify that CBP does not deny boarding to individuals on international flights. CBP may make a recommendation to an air carrier not to board a passenger if CBP believes that passenger will be inadmissible upon arrival in the U.S. *Id.* 34-35, 58. CBP does *not* deny U.S. citizens reentry based on TSDB status (or any of its subset lists). *Id.* 59-61.

**29.** Defendants clarify that CBP Officers who begin a border inspection, sometimes known as "primary" inspection, are alerted to an individual's TSDB status. CBP Officers have discretion in referring a traveler for additional scrutiny, sometimes referred to as secondary inspection. An alert in TECS that notifies the CBP officer that the traveler is a confirmed or suspected match to a TSDB identity or has a prior conviction or offense, may indicate additional scrutiny is warranted. Howe MSJ Decl. ¶ 14, Howe Tr. 69-70.[3]

**30.** Defendants clarify that CBP does not have policies that require its officials to draw a weapon or use handcuffs whenever they encounter a traveler who is a potential or confirmed match to a TSDB identity. CBP also does not have a policy which dictates that all individuals who are potential or confirmed matches to a TSDB identity be designated as "armed and dangerous." Any determination of the propriety of a CBP Officer's use of such actions during the inspection of any person, including but not limited to a person who is a potential or confirmed match to a TSDB identity, is based upon the totality of the circumstances of each individual encounter. Howe MSJ Decl. ¶ 18, *see also* DEX 60 ("April 27, 2018 Howe Decl.") ¶ 12.

**31.** Defendants clarify that CBP conducts personal searches in accordance with its publicly available Personal Search Handbook and conducts border searches of electronic devices in accordance with CBP Directive No. 3340-049A, Border Search of Electronic Devices (January 4, 2018) ("BSED Directive") (PEX64). Howe MSJ Decl. ¶ 17. If CBP determines that it would benefit from the

---

[3] Four of the Plaintiffs currently have criminal convictions. DEX63, 64 (Al Halabi); PEX21 ("Doe 2 Tr.") 144-46, 152-55; DEX65, 66 (El-Shwehdi); DEX67(Elhuzayel).

assistance of another agency during secondary inspection, it may invite those agents to witness a secondary inspection, but generally, a CBP Officer completes the inspection. Howe Tr. 310-311.

**32.** Defendants clarify that CBP's BSED Directive allows, but does not require, an advanced search of an electronic device in instances in which there is a national security concern, an example of which could be the presence of the individual on a government-operated and government-vetted terrorist watch list. *Id.* at 311-13; PEX64 § 5.1.4. The subject of the search will be notified of the purpose and authority for such search, how the individual may obtain more information on reporting concerns about their search, and how to seek redress from the agency if aggrieved by a search. *Id.* § 5.4.1.3. Notification may be withheld if CBP determines that disclosure of the search would impair national security, law enforcement, officer safety, or other operational interests. *Id.*

**33.** Defendants clarify that CBP records reflect *all* individuals crossing the border, which would include "traveling companions" of an international traveler. CBP decides what actions to take and what to document at the border based on law enforcement need. Howe Tr. 270. CBP Officers inspecting travelers have discretion, subject to legal and policy requirements and in accordance with their training and experience. Howe MSJ Decl. ¶ 14.

**34.** Defendants clarify that CBP documents all of its secondary inspections in TECS. Howe Tr. 79. A primary inspection officer does not have access to inactive records or to narrative descriptions of prior inspections. *Id.* 82.

**35-37.** Defendants clarify that the cited testimony regarding Elhady's subjective experiences and impressions does not establish those subjective impressions as objective fact. Further, according to Elhady's testimony, when he requested medical assistance, CBP called an ambulance. PEX1 ("Elhady Tr.") 187-88.[4]

**38-40.** Defendants clarify that the cited testimony regarding Kadura's subjective experiences and impressions does not establish those subjective impressions as objective fact. Defendants clarify that

---

[4] Elhady has a pending lawsuit in the Eastern District of Michigan regarding his treatment by CBP; although CBP maintains that the suit should not have been maintained. *See Elhady v. Unidentified CBP Agents*, 2:17-cv-12969 (E.D. Mich).

the BSED Directive provides that a border search of an electronic device is to be completed as expeditiously as possible, and "[u]nless extenuating circumstances exist, the detention of devices ordinarily should not exceed five (5) days." PEX64 § 5.4.1. *See also id.* § 5.4.1.1.

**41.** Defendants clarify that the cited testimony regarding Al Halabi's subjective experiences and impressions does not establish those subjective impressions as objective fact. Defendants further refer the Court to Defs' SMF ¶ 41 ("beginning in 2016, he 'started seeing less and less interrogation and . . . invasive searching,' including on two trips to Canada"). Al Halabi further testified that he was discharged from the Air Force for bad conduct, in connection with a court martial during which he plead guilty to a number of charges, PEX5 ("Al Halabi Tr.") 172-76, and that he has not pursued jobs requiring security clearance because of the circumstances of this discharge, *id.* 154-55.

**42.** Defendants clarify that the cited testimony regarding Shibly's subjective experiences and impressions does not establish those subjective impressions as objective fact. Defendants refer the Court to Defs' SMF ¶ 102 ("As of the time of his deposition, Shibly does not recall experiencing any travel problems since 2016, and he continued to travel."). *See also* ¶ 30, *supra*.

**43.** Defendants clarify that Shibly's cited testimony regarding his subjective experiences and impressions does not establish those subjective impressions as objective fact. His testimony regarding the experiences of non-parties to this lawsuit is inadmissible hearsay.

**44-47.** Defendants clarify that the cited testimony regarding certain plaintiffs' subjective experiences and impressions does not establish those subjective impressions as objective fact. *See also* ¶ 30, *supra*.

**47.** Defendants refer the Court to Defs' SMF ¶ 61 (Coleman); ¶ 96 (Khan); ¶ 53 (Shahir Anwar).

**48-53.** Defendants clarify that CBP conducts border searches of electronic devices in accordance with CBP's BSED Directive. This Directive provides that a border search of an electronic device is to be completed as expeditiously as possible, and "[u]nless extenuating circumstances exist, the detention of devices ordinarily should not exceed five (5) days." PEX64 § 5.4.1. Passcodes or other means of access may be requested and retained as needed to facilitate the examination of an electronic device or information contained on an electronic device. *Id.* § 5.3.1. "If an Officer is

unable to complete an inspection of an electronic device because it is protected by a passcode or encryption, the Officer may … detain the device pending a determination as to its admissibility, exclusion, or other disposition." *Id.* § 5.3.3.

**48.** Defendants respectfully refer the Court to Defendants' response to Plaintiffs' paragraph 38.

**49.** Defendants clarify that Elhady testified that on two occasions, his cell phone was detained beyond his inspection, and that each time it was returned to him approximately two months later. Elhady Tr. 134, 177; *cf. id.* 94, 177 (testifying that on two other occasions his phone was returned to him prior to his release from the POE). Additionally, Elhady's testimony regarding his subjective recollection of the FBI agent's statement does not establish this memory as objective fact.

**50.** Defendants clarify that El-Shwehdi's cited testimony regarding his subjective experiences and impressions does not establish those subjective impressions as objective fact. Defendants clarify that as of the time of his deposition, Shaout did not own a cell phone, PEX4 ("Shaout Tr.") 192, and there is no evidence that the Government put any software on his devices. *See* PEX64 § 5.1.2.

**51.** Defendants clarify that Al Halabi testified that his phone was not returned upon release, not that it was never returned. Al Halabi Tr. 75-81.

**52.** Defendants clarify that there is no evidence in the record that border searches of El-Shwehdi's phone caused him to miss flights. Further, Ali testified that on a single occasion his personal and work phones were detained overnight and he was able to pick them up the next morning. PEX15 ("Ali Tr.") 53. Defendants clarify that Dr. Khan's cited testimony regarding his cell phone being "seized at least twice at airports" involved inspections after returning to the U.S. from abroad. PEX18 ("Khan Tr.") 32, 55. Defendants clarify that the cited testimony regarding plaintiffs' subjective experiences and impressions—such as feeling "pressured" to provide passcodes does not establish those subjective impressions as objective fact. *See also* PEX64 § 5.3.1.

**53.** Defendants clarify that the cited testimony regarding Plaintiffs' subjective experiences and impressions—such as feeling "pressured" to provide passcodes or the experiences of traveling companions who are not parties to the case (which is inadmissible hearsay)—does not establish

those subjective impressions as objective fact. Defendants further refer the Court to PEX64 § 5.3.1. Defendants clarify that the cited testimony regarding Doe 3's and Baby Doe's parents' cell phones being "seized" at an airport involved inspections after returning to the U.S. from abroad. PEX22 ("Doe 3 Tr.") 147, 208; PEX2 ("Baby Doe Tr.") 46. Baby Doe's parents are not parties.

**54.** Defendants clarify that the cited evidence does not support that TSA involves CBP in screening air travelers against the TSDB. *See* Froemling MSJ Decl. ¶¶ 8, 31.

**55-59.** Defendants clarify that the TSC does not "annotate" the TSDB. *See supra* ¶ 23. Additionally, "Expanded Selectee" is a TSA designation. PEX51 at 26.

**59.** Defendants clarify that only individuals who meet the reasonable suspicion standard and for whom minimal identifying information is available are designated, by TSA, as Expanded Selectees. Froemling MSJ Decl. ¶ 10 & n. 15; PEX51 ("Terrorist Screening Ctr.: Redress Program Standard Operating Procedure" ("TSC SOP")) at 26.

**60.** Defendants clarify that the Government Accountability Office ("GAO") is not part of the Executive Branch, *see* https://www.gao.gov/about/, and its cited report does not bind Defendants. In any event, the adverse experiences described in the cited GAO report relate to individuals who were misidentified, not potential TSDB listees. PEX34 at 14-15. With respect to the cited TSC Redress MOU, PEX38, Defendants acknowledge that persons listed on the TSDB may experience inconvenience or delay, and clarify that any traveler may be selected for enhanced screening or secondary inspection on a randomized basis, or for other reasons.

**61.** Defendants clarify that there are no "annotations" in the TSDB. *See supra* ¶ 23. Some passengers designated for enhanced screening may be required to check-in at the ticket counter. An airline representative may ask for identification and may place a call to TSA for identity resolution. The average time for such calls is 12.5 minutes. Froemling MSJ Decl. ¶ 31 n. 21.

**62.** Defendants respectfully refer the Court to Froemling MSJ Decl. ¶ 39, for a complete and accurate description of enhanced screening.

**63.** Defendants clarify that, to the extent any passenger on a covered flight abroad requires enhanced screening, which can occur for a variety of reasons unrelated to TSDB status, foreign governments may be involved in implementing the screening. If a foreign government is performing screening, it would know which passengers require enhanced screening. PEX29 ("Froemling Supp. Tr.") 75-76, 86; Froemling MSJ Decl. ¶ 10.

**64.** Defendants clarify that CBP's deponent testified only that, generally speaking, associations may be "a contributing factor" to a designation as high-risk based on information in ATS. Howe Tr. 90-91. Plaintiffs' further assertions in this paragraph are not supported by the cited evidence, but further clarification would implicate SSI. *See* DEX61 (Aug. 15, 2018 Froemling Declaration).

**66.** Defendants clarify that Federal Air Marshals ("FAMs") may (1) make notes of suspicious activity; Froemling Supp. Tr. 11-12; (2) refer any information they observe that may be related to terrorist-related activities to the appropriate federal agency, *id.* 15; and (3) be assigned to Special Mission Coverage for individuals listed on the TSDB, *id.* 104. Plaintiffs' further assertions in this paragraph are not supported by the cited evidence, but further clarification would implicate SSI. *See* DEX61.

**67.** Defendants clarify that PEX34 at 15, supports only that international flights have been diverted from landing in the U.S. due to potential matches to the No Fly list being on board.

**68-70.**[5] Shibly's cited testimony regarding his subjective experiences and impressions does not establish those subjective impressions as objective fact. His testimony regarding the alleged Israeli detention of a non-party is inadmissible hearsay. PEX8 ("Shibly Tr.") 176. There is no evidence that the Government has prohibited Shibly from visiting Jerusalem, nor any other destination; nor does the record contain any evidence that he has ever been prohibited from flying. In addition, Shibly has

---

[5] Pls' SMF ¶¶ 68-86 are collectively titled, "Plaintiffs' Adverse Air Travel Experiences," and Defendants clarify that not every experience described in these paragraphs involves TSA airport screening, rather they also involve CBP border inspection.

not experienced *any* travel problems in the past two and a half years, and prior to that experienced enhanced screening or inspection only intermittently. *Id.* 141-45, 188-89, 209, 190; Defs' SMF ¶ 102.

**71.** Amri's description mischaracterizes the cited evidence. After submitting a DHS TRIP inquiry, he received a letter stating that "[a]t this time the U.S. Government knows of no reason, related to your inquiry, that you should be unable to fly." DEX4 ("Moore MSJ Decl.") ¶ 27. There is no evidence that Amri was "removed" from the No Fly List, and any such prior status is protected from disclosure. Froemling MSJ Decl., Ex. A.

**72-73.** Defendants respectfully refer the Court to PEX70 (TSA Joseph Decl.) for a complete accounting of the TSA screening Amri underwent on the trip in question, which amounted to two additional pat-downs—one was necessitated by Amri's positive result on the explosive test, and the second was the result of a mistake by TSA in allowing a trainee to conduct the initial post-explosives test pat-down.[6] Further, Amri's cited testimony regarding his subjective experiences and impressions does not establish those subjective impressions as objective fact.

**74.** Hakmeh's descriptions mischaracterize the cited evidence. His cited testimony regarding his subjective experiences and impressions—including that he is "forced to" book international flights out of Chicago—does not establish those subjective impressions as objective fact. Additionally, the record does not support the contention that he consistently encounters delay; to the contrary, Hakmeh has traveled round-trip entirely without issue eight times, five internationally and three domestically. PEX7 ("Hakmeh Tr.") 234; 223-229; 196-202; 113-117; 104-109; 89-103; 76-80; 68-76. Finally, the record also reflects that Hakmeh arrives at the airport two to three (not four) hours prior to his flights. *Id.* 70-71.

---

[6] This Court previously denied Plaintiffs' motion to conduct additional discovery into these events. Dkt. Nos. 175, 206. The Court accepted TSA's explanation for the events of that day, including that an honest mistake was made regarding the trainee pat-down, and specifically found that there was insufficient evidence to support Plaintiffs' arguments that the screening was punitive or retaliatory. Dkt. No. 211 (May 4, 2018 Hearing Tr.) at 9.

**75-77.** The cited testimony regarding certain plaintiffs' subjective experiences and impressions does not establish those subjective impressions as objective fact.

**78-79.** Defendants refer the Court to Coleman's deposition testimony at 63-64 for clarification. His cited testimony regarding his subjective experiences and impressions does not establish those subjective impressions as objective fact. Additionally, it is undisputed that Coleman did not experience any travel difficulties traveling more than five times by air domestically, and twice internationally, between September 2017 and February 2018, and he does not believe that he is currently on any watchlist. PEX6 ("Colemand Tr.") 118, 119, 154.

**80.** Regarding Fares' canceled 2016 trip to Jordan, no one told him he could not make this trip. PEX19 ("Fares Tr.") 103. In 2017, Fares thrice flew roundtrip between the U.S. and Jordan without incident, except for one instance of CBP questioning for approximately one hour upon arrival in the U.S. *Id.* 123, 129, 139; Defs' SMF ¶¶ 79-81.

**81.** Khan's cited testimony regarding his subjective experiences and impressions does not establish those subjective impressions as objective fact.

**82.** Shahir Anwar's descriptions mischaracterize the record. The only time he was referred for secondary inspection was in 2006. *See* Defs' SMF ¶ 53.

**83.** Defendants clarify that Kadura has, since January 2016, experienced "zero" travel issues. DEX41 at 10-11; PEX3 ("Kadura Tr.") 242-45, 251-52. The cited evidence does not support Kadura's assertion related to TSA's treatment of him. Tr. 259.

**85-86.** Defendants clarify that there are no "annotations" in the TSDB. *See supra* ¶ 23. Additionally, the TSA Administrator has final authority over implementation of the No Fly and Selectee Lists. Groh MSJ Decl. ¶ 26.

**87-89.** Defendants dispute Plaintiffs' characterizations of these incidents as "interrogations about . . . religious beliefs and practices." *See also* Howe Tr. 288-92 (CBP testimony re: religious questioning).

**91.** Defendants clarify that the cited evidence establishes only that the State Department—which is not a party to this suit—uses TSDB information to determine visa eligibility. The cited evidence

does not support the contention that a consular officer will deny a visa application or determine an alien to be ineligible based solely on TSDB status. *Id.* 340.

**92.** Defendants clarify that the cited evidence establishes only that CBP—not the State Department, which is not a party to this suit—has, in some instances in the past, revoked permission for a foreign national to participate in the visa waiver program. *Id.* 340-42.[7]

**93.** Defendants clarify that the DHS document cited by Plaintiffs does not speak for or bind the State Department, which is not a party to this case. In any event, the cited document states only that the State Department "uses available screening tools to vet, as appropriate … those seeking employment with the Department to ensure that these individuals do not support terrorism or terrorist organizations." PEX36.

**94.** Plaintiffs mischaracterize the cited evidence, which establishes only that the U.S. Citizenship & Immigration Services ("USCIS")—which is not a party to this suit—"requires the completion of a background check on every alien who applies for or may benefit from an application or petition for an immigration benefit," and that such background checks "include biographic queries against TSDB data." PEX36 § 3.5.

**95-96.** Defendants clarify that the length of adjudication for a given application for an immigration benefit does not necessarily evidence "delay." All applications referenced here were from or on behalf of third parties who are not before this Court.

**97.** Defendants clarify that TSA, not DHS or CBP, makes TSA Pre✓® determinations. Further, with respect to TSA Pre✓®, the cited testimony supports the more limited assertion that Secure Flight matching ensures that if an individual has been determined to be higher risk and requires enhanced screening, that individual would not receive low-risk screening.

---

[7] Plaintiffs appear to refer to the Electronic System for Travel Authorization ("ESTA"), an automated system that constitutes the method by which CBP informs travelers whether they are able to travel under the Visa Waiver Program ("VWP"). The VWP allows some individuals who are citizens of particular countries to travel as visitors without a visa. However, a determination that an individual is unable to obtain an ESTA authorization and travel under the VWP is not a determination of the individual's ultimate admissibility or visa eligibility. 8 U.S.C. § 1187(h)(3)(C)(iii).

**97-98, 100-103, 105-106.** Defendants clarify that TSA uses governmental databases and available information, including the TSDB, as part of its security threat assessment process, Froemling MSJ Decl. ¶ 16, and that an individual's inclusion in one or more government databases is not determinative of TSA's eligibility determination and merely serves as a factor indicating that an individual requires further scrutiny, *id.* ¶ 50. Defendants further clarify that TSA conducts security threat assessments on a range of individuals with privileged access to the transportation sector, including those with access to Security Identification Display Areas, sterile areas, and Air Operations Areas at U.S. airports. *Id.* ¶ 49. Further, Plaintiffs' assertion that any other component of DHS is involved in TSA's security threat assessment processes is not supported by any of Plaintiffs' cited evidence in these paragraphs.

**98.** Defendants clarify that, although some employees of the identified contractors have access to TSDB information in their capacity as TSA or TSC staff, the companies do not otherwise have access to TSDB information. PEX79; Froemling Tr. 252-55.

**99.** With respect to "employment," the record evidence only supports the contention that CBP uses the TSDB in its vetting for CBP employees. Howe Tr. at 341-42. Further, CBP's use of TSDB status in its vetting process for the issuance of customs seals is not dispositive, but rather is one of many factors considered in making a determination to grant, revoke, or suspend a customs seal. Howe MSJ Decl. ¶ 24; *see* Defs' SMF ¶ 36 (and citations therein).

**100.** Defendants clarify that TSA authorities are more accurately described *supra* ¶ 97-98, 100-103, 105-106. CBP also does not vet workers with "access to the international portion" of airports, but rather workers with unescorted access to the customs security area. *See generally* 19 C.F.R. §§ 122.181-89.

**103.** Defendants further clarify that with respect to flight schools, TSA conducts security threat assessments only on non-U.S. Citizen candidates seeking training at flight schools regulated by the Federal Aviation Administration. *See* 49 U.S.C. § 44939(a); *see also* 49 C.F.R. § 1552.3(a)(4), (e); *Olivares v. TSA*, 819 F.3d 454, 458 (D.C. Cir. 2016).

13

**104.** Ahmed's recitation of facts in this paragraph is expressly excluded pursuant to Court Order. At a discovery hearing on January 19, 2018, Magistrate Judge Anderson held that Plaintiffs "will be limited to those instances of disruption, or impeding their liberty, or whatever they claim is a result of the watchlist to those that have been identified as of today either through answers to interrogatories or through the depositions that have been taken [through] today." Dkt. No. 94 at 25-26. Ahmed did not disclose the alleged issue with his customs seal until his February 20, 2018 deposition; accordingly, this alleged fact is excluded from the evidentiary record.[8]

**105-106.** Defendants clarify that TSA provides a subset of TSDB information to regulated U.S. aircraft operators for the purpose of vetting airline employees who may have access to SSI (and for whom TSA does not conduct watchlist matching). Froemling MSJ Decl. ¶ 61. The airlines are required to ensure that employees with access to that sensitive information do not match the TSDB. Froemling Tr. 259. Insofar as these paragraphs refer to screening of employees of private entities receiving Overseas Private Investment Corporation ("OPIC") loans and U.S. Agency for International Development ("USAID") benefits or grants, such screening is conducted at TSC, not DHS. PEX80. The evidence cited does not support the contention that "TSDB Listees who are applicants to or employees of these agencies are ineligible for employment and/or specific job responsibilities with access to sensitive information or physical areas"; rather, the record reflects only that TSDB hits "*may* result" in such ineligibility. *Id.*

Insofar as these paragraphs refer to the activities of other components of DHS, the only other screening of private sector employees with either "transportation [or] infrastructure functions" that any subcomponent of DHS conducts is pursuant to the Protecting and Securing Chemical Facilities from Terrorist Attacks Act of 2014 ("CFATS"), Pub. L. 113-254, 128 Stat. 2989 (Dec. 18,

---

[8] Further, and in any event, the record does not establish that the revocation of the customs seal "interfered" with Ahmed's ability to perform his job. Ahmed continued working in his position at the airport following the revocation of the customs seal. He was eventually fired for reasons he concedes were wholly independent. PEX4 ("Ahmed Tr.") 65-69.

2014); *see also* 6 C.F.R. Part 27.[9] Nothing in this statute, implementing regulations, or any of the evidence cited by Plaintiffs supports their contention that "TSDB Listees who are applicants to or employees of" entities regulated under this program "are ineligible for employment and/or specific job responsibilities with access to sensitive information or physical areas."

**107-08.**  Defendants clarify that TSC exports only a subset of the TSDB (the KST File) to the NCIC. DEX52 ("Rago MSJ Decl.") ¶¶ 2, 6. Information in an NCIC file can only be accessed pursuant to a properly formed query on a specific individual. DEX62 (Feb. 20 Rago Decl.) ¶ 7.

**109.** Defendants clarify that entities that possess the ability to query the NCIC do not have access to all TSDB information. *See supra* ¶¶ 107-08. Defendants respectfully refer the Court to PEX82 (March 1, 2019 CJIS supplemental response) at 8 for a description of the types of private entities that may have access to the NCIC, and in what circumstances they qualify for such access. *See also* Rago MSJ Decl. ¶¶ 9-12. The employees at qualified private entities that have access to the NCIC use any information they obtain from an NCIC query the same way a law enforcement entity would—for law enforcement purposes. PEX82 at 3.[10]

**110.** Defendants clarify that entities that possess the ability to query the NCIC do not have access to or use all "TSDB information." *See supra* ¶¶ 107-08. Additionally, the cited testimony responded to a request for a definition of encounters, and the witness does not purport to describe authorized uses of NCIC; it also referred to "a call to a house," not a "house visit." PEX28 ("DeSarno Tr.") 136. Finally, NCIC may only be queried for criminal justice purposes, 28 C.F.R.§§ 20.3(b), 20.33(a),

---

[9] Additional information on CFATS is available at, *inter alia*, https://www.dhs.gov/cisa/chemical-security, and https://www.dhs.gov/publication/dhs-nppd-pia-018a-chemical-facilities-anti-terrorism-standards-personnel-surety (Privacy Impact Assessments for the CFATS Personnel Surety Program, which includes a discussion of applicable redress procedures).

[10] With respect to animal welfare organizations, Defendants clarify that some such organizations have law enforcement divisions that have agreements to assist law enforcement by conducting animal cruelty investigations, and have police powers derived from state law. These divisions are subject to the same requirements of any other entity receiving NCIC access pursuant to 28 C.F.R. § 20.33(a)(7). PEX82 at 4. Finally, Defendants note that they are unclear about the entity to which "fingerprint database" is meant to refer, and accordingly cannot respond.

20.20(a). Accordingly, the uses listed by Plaintiffs would not be authorized uses unless they were specifically related to criminal justice (and not, for example, mere civil permits). *See also* PEX71.

**111, 113-115.** PEX56, which appears to be a Baltimore Police Department document, is unauthenticated and in any event cannot bind any of the federal Defendants, and does not establish the proposition for which it is cited.

**111.** Defendants clarify that the TSC does not "annotate" the TSDB. *See supra* ¶ 23. Further, Defendants asserted—and this Court upheld—the law enforcement privilege with respect to any FBI "handling codes" associated with matches to the KST file in NCIC. Groh Decl. I ¶ 42; Dkt. No. 258.

**112.** The exhibits cited by Plaintiffs in this paragraph are unauthenticated and dated, and do not establish the facts for which they have been cited.

**113.** PEX83 concerns the VGTOF, not the KST File, and does not and cannot support the stated proposition. DeSarno Tr. 87. Instructions for responding to KST hits from NCIC queries are consistent among all criminal justice, law enforcement, and private entities. Recipients of TSDB information in NCIC are notified that it is provided only for intelligence and lead purposes. PEX71. Further information regarding responding to a KST hit is protected by the law enforcement privilege. Groh Decl. I ¶ 42; Dkt. No. 258.

**117.** Defendants clarify that there is no specific prohibition against a TSDB listee working for the FBI; "[i]t would be a totality of circumstances review based on the suitability of … that prospective employee." DeSarno Tr. 343.

**118.** Plaintiffs' assertion that "TSDB status may be used to deny purchase of a firearm altogether" —while immaterial because no Plaintiff has alleged any inability to purchase a firearm due to purported TSDB status, *see* Defs' SMF ¶ 38—is incorrect.[11] Although NCIC is queried, a match to the KST File is not a basis for denial of a firearm purchase, and also does not result in a "mandatory

---

[11] While it is not entirely clear what evidence Plaintiffs intended to cite to in this paragraph, all three citations appear to be to GAO Reports, which do not bind Defendants.

3-day waiting period." The 3-day waiting period is a statutory maximum and where any issue is resolved prior to the expiration of this period, the firearms dealer will receive authorization to proceed with the sale. DEX53 ("Stark-Nutter MSJ Decl.") ¶¶ 10-13.

**119.** The cited evidence states only that the Department of Defense—which is not a party to this suit—uses the TSDB for base access screening. PEX57, 62.

**120.** The assertions in this paragraph relate to the Financial Crimes Enforcement Network, a division of the U.S. Department of the Treasury ("Treasury"). Treasury is not a party to this suit, and any statements in the unauthenticated exhibit cited in this paragraph do not bind Defendants. Regardless, the assertions in this paragraph are not supported by the cited evidence, and none of the Plaintiffs have alleged any injury connected to any action by Treasury.

**121.** Defendants clarify that pursuant to TSC's HSPD-6 mandate to exchange terrorism screening information with select foreign partners, the U.S. Government shares TSDB information with foreign partners pursuant to written arrangements, all of which include representations to the effect that the foreign partner will use TSDB information only for terrorist screening, will safeguard TSDB information from unauthorized disclosure, and will not, without express permission, disclose TSDB information publicly or to any private entity, private individual, other government or international organization. Groh Decl. I ¶ 52. None of the Plaintiffs have alleged that they have ever been subjected to any restriction by a foreign government as a result of their alleged TSDB status.

**122.** Defendants clarify that not all Plaintiffs have fully availed themselves of the DHS TRIP redress process. Moore MSJ Decl. ¶ 22-24. Those Plaintiffs who have done had the ability to provide any comments or additional information that they deemed relevant to their redress inquiries. *See id.* ¶ 7.

**123.** Defendants clarify that Plaintiffs have the opportunity to provide comments, including exculpatory information, in the DHS TRIP form. *See id.*; *see also* Groh MSJ Decl. ¶ 52-59. *See* Moore MSJ Decl. ¶ 17 for a complete list of requirements to learn of No Fly List status.

**124.** The cited evidence does not support the factual assertions in this paragraph. *See id.* (describing the process applicable to U.S. Persons who make redress inquiries after a denial of boarding).

**125.** Defendants clarify that DHS TRIP is not limited to providing redress for travelers screened by DHS. Moore MSJ Decl. ¶ 5; *see also* Groh MSJ Decl. ¶ 54.

**127.** Defendants clarify that DHS TRIP may note that someone is involved in ongoing litigation. PEX24 ("Moore Tr.") 211-12.

**128.** The cited evidence establishes only that where a traveler has a DHS TRIP redress number but does not provide it to CBP, this would not affect how the CBP may evaluate that traveler. *See* Howe Tr. 319-320.

**129.** Defendants clarify that the record reflects only that approximately 98 percent of DHS TRIP inquiries have no connection with any identity in the TSDB. *See* Moore Decl. ¶ 11.

**130.** Defendants clarify that TSC has discretion in opening redress cases referred to it by Congress. *See* TSC SOP §§ 4.2-4.3.

**131.** Defendants clarify that a more accurate description of the DHS TRIP redress process for individuals on the TSDB can be found in the Moore MSJ Decl. ¶¶ 9-13 and Groh MSJ Decl. ¶¶ 52-63. Defendants further clarify that nominating agencies participate in part to ensure that any new exculpatory information that they may have is considered as part of the redress review. PEX62 at 8.

**132.** Defendants clarify that the TSC is responsible for determining if the underlying information meets the criteria for inclusion, but the TSA Administrator has final authority over implementation of the No Fly and Selectee Lists and makes final determinations concerning inclusion on the No Fly List for U.S. persons seeking redress through DHS TRIP. Groh MSJ Decl. ¶ 26.

**133.** Defendants clarify that to qualify for additional procedures, the individual must meet the requirements set forth in the Moore Declaration. *See* Moore MSJ Decl. ¶ 17.

**134.** Defendants clarify that the Government does not "choose" whether to maintain or remove a No Fly "annotation," but rather determines whether the No Fly List placement continues to be supported. Groh MSJ Decl. ¶ 26. The TSA Administrator makes final determinations concerning inclusion on the No Fly List for U.S. persons seeking redress through DHS TRIP. *Id.*

**135.** Defendants clarify that this broad assertion is not supported by the cited testimony from December 2017.

**136.** Defendants clarify the incident referred to in this paragraph was a sole, isolated incident that did not involve any of the Plaintiffs to this action, and corrective action was taken. Groh Tr. 214-15.

**137-138.** Defendants clarify that the TSDB is subjected to rigorous and ongoing quality control measures to ensure nominations continue to satisfy the criteria for inclusion, and that the information supporting a nomination is reliable and up-to-date. Groh MSJ Decl. ¶¶ 41-46; *see* Defs' SMF ¶¶ 19-21. Statements in GAO reports do not bind Defendants. Further, no Plaintiff has alleged that he experienced any "adverse experience or outcome" as the result of being misidentified as a TSDB Listee or a near match to a TSDB Listee.

**140.** Defendants clarify that TSA uses two sets of risk-based rules to designate passengers for enhanced security screening, referred to as Silent Partner and Quiet Skies, Froemling MSJ Decl. ¶ 10 n. 13, and that the cited testimony refers to those risk-based rules.

**141.** Defendants clarify that the cited testimony states that the FBI has not publicly identified a perpetrator of a U.S. act of terrorism as a TSDB listee. DeSarno Tr. 177-78. The FBI does not confirm or deny TSDB status for the reasons set forth in the Orlando MSJ Decl. ¶¶ 19-31.

## ARGUMENT

### I.      Plaintiffs Have Not Established the Deprivation of a Liberty Interest.

To merit summary judgment, each of the 23 Plaintiffs must demonstrate—with all evidence of Defendants to be credited, and all justifiable inferences drawn in Defendants' favor—that there is no genuine dispute as to any material fact, and that they are entitled to judgment as a matter of law, on their claim that the procedures for placement on the TSDB do not comport with due process requirements. The framework for evaluating this claim requires the Court to balance: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the

19

fiscal and administrative burdens that the additional or substitute procedural requirements would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). Plaintiffs' claims falter, initially, at the first step of this analysis, as they have not established that they have been deprived of any protected liberty interest in domestic or international travel, or in their reputations.

### a. Watchlisting Does Not Deprive Plaintiffs of a Liberty Interest in International Travel.

As discussed in greater depth in Defendants' Motion for Summary Judgment, the Constitution protects a right to travel, but does not protect against delays and inconveniences. Defs' MSJ at 40-41, 45-48. Any liberty interest that Plaintiffs have in international travel is weak because it is subject to reasonable regulation by the Government, is subordinate to national security concerns, and thus may constitutionally be restricted.

The Supreme Court has held that "the 'right' of international travel [is] no more than an aspect of the 'liberty' protected by the Due Process Clause of the Fifth Amendment," and "the freedom to travel abroad … is subordinate to national security and foreign policy considerations … [and] is subject to reasonable governmental regulation." *Haig v. Agee*, 453 U.S. 280, 306-07 (1981). For this reason, "the *freedom* to travel outside the United States must be distinguished from the *right* to travel within the United States," *Id.*. at 306, and therefore governmental action "which is said to infringe the freedom to travel abroad is not to be judged by the same standard applied to laws that penalize the right of interstate travel," *Califano v. Aznavorian*, 439 U.S. 170, 176-77 (1978); *Hutchins v. Dist. of Columbia*, 188 F.3d 531, 537 (D.C. Cir. 1999). As the Supreme Court held in *U.S. v. Flores-Montano*, 541 U.S. 149, 153 (2004), "[i]t is axiomatic that the United States, as sovereign, has the inherent authority to protect, and a paramount interest in protecting, its territorial integrity."

The only case law cited by Plaintiffs is this Court's opinion in *Mohamed*, in which the Court held that placement on the No Fly List triggered the requirements of procedural due process, and ultimately held that the revised redress process for U.S. citizens could satisfy due process. *See generally Mohamed v. Holder*, No. 1:11-cv-50, 2015 WL 4394958 (E.D. Va. July 16, 2015). The No Fly List is, of

course, not at issue in this case, and a complete prohibition on air travel is a greater burden on international travel than merely being subject to screening and inspection. Indeed, all travelers are obligated to present themselves for inspection at the border and *any* traveler may be experience additional scrutiny at the border, even repeatedly, for a wide variety of reasons unrelated to the TSDB. *See* Howe MSJ Decl. ¶¶ 13-19. Plaintiffs cite no caselaw for the proposition that the subjective fear of border searches is sufficient to constitute a deprivation of the liberty interest in travel. No level of suspicion is required to refer a traveler for additional scrutiny, often known as secondary inspection, which is merely a continuation of the border search initiated on primary.[12]

At summary judgment, each Plaintiff must establish that his placement on the TSDB effectively deprived him of the ability to travel internationally. Instead, most of the Plaintiffs cannot even allege that they are routinely subject to heightened scrutiny at the border. *See* Defs' SMF ¶¶ 38-106; Pls' MSJ at 40-41. The following Plaintiffs are not mentioned in Plaintiffs' description of their international travel difficulties: Ahmed, Ali, Samir Anwar, Awad, Baby Doe, John Doe 2, Hakmeh, Khan, and Shaout. Amri is mentioned, but he specifically disclaimed any claims based on international travel. DEX55 (Stipulation). Elhuzayel, Thomas, and John Doe 4 are only mentioned in the context of their denial of boarding, but the Court has already held that none of the Plaintiffs claim to be on the No Fly List and no such claims survive. *Elhady*, 303 F. Supp. 3d at 458 n.2. Thus, none of these 13 Plaintiffs has even attempted to establish that they have been deprived of a liberty interest in international travel. That leaves only ten who have attempted to make a claim based on international travel: Al Halabi, Shahir Anwar, Coleman, Elhady, El-Shwehdi, Fares, Frljuckic, Doe 3, Kadura, and Shibly, and only six of them claimed to have been deterred from travel. None of these ten Plaintiffs are prohibited from any form of travel, and none have established that the adverse

---

[12] If Plaintiffs' theory of the law was accepted, it might require an entire new administrative and judicial regime for reviewing secondary inspections at the border, whether they result from questions about travel documentation, random selection, criminal history, discovery of prohibited agricultural items, concern regarding merchandise or duties paid, or information related to customs violation, or any of the myriad factors an officer could take into account in determining whether to refer a particular traveler for additional scrutiny.

experiences described are the necessary consequence of TSDB status or that their fear of travel deprives them of the freedom to travel.

With respect to allegations directed at CBP, an alert in TECS notifies the CBP Officer that an individual is a potential match to an identity in the TSDB, which may prompt additional scrutiny. The specific actions taken during a border inspection, however, are generally within the discretion of the officer, taking into account the totality of the circumstances. Howe MSJ Decl. ¶¶ 12-19. There is no policy that would require TSDB hits to be confronted with drawn weapons or to be handcuffed or to be designated "armed and dangerous" in each instance. *Id.*[13]  Nor is there any set requirement for how long a secondary inspection must take, which will necessarily depend on the traveler's individual circumstances and the conditions at the particular port of entry. *Id.* Accordingly, Plaintiffs cannot establish that their purported TSDB status is the cause of any of their experiences; rather such actions would have been based on the CBP officer's assessment of the individual and the conditions at the port of entry.[14]

Of the ten Plaintiffs claiming problems with international travel, none have established that purported placement on the TSDB deprived them of the ability to travel internationally.[15] Al Halabi claims he was handcuffed in front of his family, but the use of restraints is an action taken in light of the totality of the circumstances, and there is no policy requiring handcuffing of individuals in the TSDB. Moreover, Al Halabi admitted that beginning in 2016, he "started seeing less and less interrogation and . . . invasive searching," including on two trips to Canada. Al Halabi Tr. 107-08.

---

[13] *See also* DEX68 (CBP National Standards on Transport, Escort, Detention, and Search).

[14] Defendants maintain that each and every exercise of the border officers' discretion as described in these papers was reasonable and lawful, but for the purposes of the instant motions, Defendants need not prove this point. Whether dealing with TSDB listees or others, CBP is bound by the Constitution's limits on its actions, and the only question presented here is whether the TSDB requires some violation of Constitutional rights. It does not. If there were violations of other constitutional rights in some individual instance, that is not a due process claim; rather it is a claim that an agency violated the Fourth Amendment or some other restriction on government action.

[15] As further explained in Defendants' Motion for Summary Judgment, mere deterrence does not constitute a deprivation of the right to travel. *See* Defs' MSJ at 47.

So, he plainly has not been deterred from travel. And he speculated that his problems may have been due to the circumstances surrounding his bad conduct discharge from the Air Force.[16]

Shahir Anwar purportedly missed a funeral. But the only secondary inspection he ever encountered at the border was a single incident in 2006, when he was returning from Afghanistan, and was delayed for 2-3 hours for a search of his luggage. PEX16 ("Shahir Anwar Tr."), 43-51, 65-66; DEX15 at 6. The Supreme Court has held that "delays of one to two hours at international borders are to be expected," *Flores-Montano*, 541 U.S. at 155 n.3, and other courts of appeal have found detentions at the border of four to six hours to be constitutional, *Tabbaa v. Chertoff*, 509 F.3d 89, 100-01 (2d Cir. 2007).

Plaintiffs claim that Coleman is deterred from travel, but his testimony does not support that; he does not even believe that he is on a watchlist. Coleman Tr. 56-57, 154. His only claims about CBP involve two secondary inspections, the longest of which may have lasted two hours, and he has since travelled internationally without incident. Defs' SMF ¶¶ 59-62. Plainly, he is not deterred from travel. Likewise, Doe 3 claims to have "exiled himself to Germany" based on a single land border crossing in 2016 at which he was handcuffed and allegedly detained and questioned for five and a half hours. No policy requires handcuffing for TSDB hits. Moreover, he claims to have first encountered secondary screening in 2002 and continued travelling internationally for some time thereafter, his description of most of his border entries is entirely unremarkable, and he continues to travel extensively abroad. DEX25, at 6-10; Defs' SMF ¶¶ 65-67. Accordingly, he has not established that his freedom to travel is burdened by the TSDB.

In addition to several shorter secondary inspections, Elhady details one lengthier detention by CBP for secondary inspection at a land port of entry in 2015 in which he was handcuffed and fell ill. His description of the timeframe of that detention varies from 6-12 hours, and includes the time

---

[16] Al Halabi was court martialed on multiple charges, including violation of the Espionage Act. He pleaded guilty to lesser offenses, including, *inter alia*, violating orders related to the mishandling of classified information, and making false statements to an investigator. *See* DEX63, 64.

during which he also received medical care at a hospital. Defs' SMF ¶¶ 71-74. Although he claims to be deterred from travel as a result, he continued travelling internationally after his issues began, has travelled internationally as recently as a 2017 trip to Yemen, Elhady Tr. 111-24, and his domestic air travel has been without incident, Defs' MSJ ¶¶ 71-74. On his most recent reentry to the U.S. upon returning from Yemen, he recalls being questioned for 30 minutes about his activities overseas. Elhady Tr. 121-24. Accordingly, he cannot plausibly claim to be deterred from international travel.

El-Shwehdi claims to have missed specific trips due to his fear of travelling internationally. On three of his four returns to the U.S. (from Libya) since he began experiencing problems, he claims to have experienced delays at the border of about two hours, and on the fourth, he estimates that his inspection took 5 to 6 hours. Defs' SMF ¶¶ 77-78. Delays during international travel are to be expected, and it is worth noting here that the delays he alleges follow travel to Libya, El-Shwehdi Tr. 26-28, 60-61, 173, 203 (describing the ongoing war, including unwillingness to travel or live there), and his criminal conviction. *Id.* 240-43, 265-69.[17] He moreover admitted that his reaction to authority figures was colored by experiences in Libya. *Id.* 108-10. His idiosyncratic decisions to skip particular family trips are not a basis for finding a deprivation of a liberty interest.

Fares describes a single incident in which he was removed from a domestic flight for additional screening and rebooked on a subsequent flight. *See* Defs' SMF ¶¶ 79-82. He claims he was too frightened to take the connecting international flight after being questioned and screened, but he was never told he could not fly. *Id.* Additionally, TSA later informed him that the reason for being taken off the flight was that he had been selected for enhanced screening but that the TSA agent had failed to properly perform the screening the first time. *Id.* The incident does not appear to have otherwise affected his willingness to travel; in 2017, Fares flew from the U.S. to Jordan three times without incident, with the sole exception that on one occasion he was questioned by CBP for

---

[17] El-Shwehdi pleaded guilty to, *inter alia*, making false statements to the IRS, in connection with his failure to report his charity's violations of sanctions on Iraq. DEX65, 66.

approximately one hour upon arrival in the U.S. *Id.* An isolated and subjective decision to cancel a single trip is not a basis for finding deprivation of a liberty interest.

Frljuckic claims that he stopped travelling internationally so that his family would not see him handcuffed again. But there is no policy requiring handcuffing of individuals in the TSDB. And he continued travelling for a considerable time after beginning to experience secondary inspection at the border—at least 5 separate trips by car. *See id.* ¶¶ 83-86. Frljuckic estimates that these five secondary inspections lasted approximately 3.5 to four hours; on one occasion, the inspection lasted six hours. *Id.* Although he has not travelled internationally since 2016, his individual decision not to travel internationally is not a basis for finding that he has been deprived of a right to travel. *Id.*

Kadura claims to have skipped several events in Libya as a result of his travel experiences. He claims to have first encountered travel difficulty in February 2011, upon return to the U.S. from Libya, when he recalls being questioned by CBP for about an hour. *See id.* ¶¶ 89-93. He continued travelling internationally thereafter, including at least 5 separate land border crossings, two of which did not involve a secondary inspection. *Id.* He cannot plausibly claim to be deterred from international travel, especially because he has ceased having any difficulty in domestic air travel. *Id.*; Kadura Tr. 242-45, 251-52 (acknowledging "zero" issues on at least four trips since 2016).

Finally, Shibly simply claims that he was handcuffed at a border crossing on one occasion ten years ago. And since that occasion, he has travelled extensively internationally and domestically and cannot plausibly claim to be deterred from travel. *See id.* ¶¶ 101-03.

Even if the Court were to credit one or more of the claims that a Plaintiff was individually deterred from travel by purported placement on a watchlist, that Plaintiff's individual decision not to travel, based on border inspections, is not a basis for finding a deprivation of a liberty interest. Plaintiffs would not be entitled to a hearing because they made a subjective decision that they dislike border security so much that they would not travel. *See* Defs' MSJ at 45-48. Moreover, the due process analysis looks to the "generality of cases," beyond the particular application of the process to the individual at bar. *Mathews*, 424 U.S. at 344 ("[P]rocedural due process rules are shaped by the

risk of error inherent in the truthfinding process as applied to the generality of cases, not the rare exceptions."); *Veterans for Common Sense v. Shinseki*, 678 F.3d 1013, 1034 (9th Cir. 2012) (en banc) (same). Plaintiffs' recitation of the border experiences that they found unpleasant is not a basis for finding a deprivation of a liberty interest anytime someone believes they are on a watchlist.

b. **The Watchlist Does Not Deprive Plaintiffs of a Liberty Interest in Domestic Travel.**

Similarly, Plaintiffs argue that "the Watchlisting System deprives Plaintiffs of their right to interstate travel by deterring its exercise." Pls MSJ at 42. Defendants do not dispute that there is a right to interstate travel, but it does not extend to a right to delay-free travel by air, and Defendants dispute that Plaintiffs have been deterred from travel. Plaintiffs cannot establish that the TSDB deprives them of the ability to travel between states.

As explained in greater depth in Defendants' Motion for Summary Judgment, burdens on a single form of transportation have generally been found not to be an impediment to interstate travel, and every court to directly address the issue has held that delays occasioned by enhanced screening are not a deprivation of a liberty interest. *See* Defs' MSJ at 41-45; *Beydoun v. Sessions*, 871 F.3d 459 (6th Cir. 2017); *Abdi v. Wray*, No. 2:17-CV-622-DB, 2018 WL 1940411, at *3 (D. Utah Apr. 23, 2018), *appeal pending*; *Kovac v. Wray*, No. 3:18-CV-0110-L, 2019 WL 1057935, at *18 (N.D. Tex. Mar. 5, 2019); *Kadura v. Lynch*, No. 14-13128, 2017 WL 914249, at *5-6 (E.D. Mich. Mar. 8, 2017); *Scherfen v. DHS*, No. 3:CV-08-1554, 2010 WL 456784, at *7 (M.D. Pa. Feb. 2, 2010); *Green v. TSA*, 351 F. Supp. 2d 1119, 1130 (W.D. Wash. 2005); *see also Gilmore v. Gonzales*, 435 F.3d 1125, 1137 (9th Cir. 2006).[18]

It is undisputed that persons listed in the TSDB as known or suspected terrorists are subject to enhanced security screening at airports security checkpoints, which typically takes 10-15 minutes.

[18] In *Mohamed*, this Court distinguished between the No Fly List and other cases in which a single form of transportation was burdened, reasoning that "[t]o the extent courts have discussed the lack of rights with respect to the 'the most convenient mode' of transportation, they have done so, not within the context of a total ban, but with respect to reasonable regulations that still facilitated access and use." *Mohamed*, 2015 WL 4394958, at *6. Watchlisting "still facilitates access and use" and is not subject to the same reasoning.

Defs' SMF ¶¶ 7-8 (citing Froemling MSJ Decl.). This is not plausibly construed as the deprivation of a liberty interest, particularly because it is not unique to passengers who are in the TSDB. Rather, passengers can be selected for enhanced screening for many reasons, including random selection, and even repeated enhanced screening is not a reliable indicator that someone is in the TSDB. *Id; see also Scherfen*, 2010 WL 456784, at *7. To constitute a deprivation of a liberty interest, the plaintiff must be deprived of something to which he or she is *entitled*, and no one is entitled to travel without enhanced screening.

The record confirms that Plaintiffs are not prohibited from travel and are not deterred from travel. In fact, almost all of the Plaintiffs currently and regularly travel by air without enhanced screening. *See* Defs' MSJ at 43-44. Those that do claim to regularly experience enhanced screening describe their experiences consistently with the Froemling Declaration—minor delays or inconveniences that they personally may happen to find embarrassing or unpleasant, but which are not impediments to travel. Plaintiffs' motion includes testimony related to "deterrence" for only six of the 23 plaintiffs. These few Plaintiffs who claim (implausibly) to have been deterred from domestic travel, readily admit that they routinely travel by other means. These complaints are the types of minor burdens that courts have found not to implicate due process. *See* Defs' MSJ at 41-45.

None of the examples of "substantial fear of interstate travel" in Plaintiffs' motion support a conclusion to the contrary. For example, Amri describes a single trip in which he was searched multiple times. Most of his description is consistent with TSA's description of enhanced screening potentially applied to every passenger. Defs' SMF ¶¶ 47-48. TSA has further explained that a swab taken from Amri's hands tested positive on an explosive trace detection test; he was thereafter required to undergo two additional pat-downs because a trainee had erroneously been assigned to conduct the first pat-down, requiring that it be re-done. *Id.* The only tangible consequence was that Amri missed his connecting flight and was rebooked on a later flight. *Id.* He has taken two roundtrip flights since he was denied boarding in 2016, and other than the minor delay occasioned by the

27

single 2018 flight in one direction, he reported only minor delays, largely consistent with the description of enhanced screening in the Froemling Declaration. *Id.*

El-Shwehdi claims that he was observed at the airport on one occasion by someone he suspected was an officer, and that he sometimes drives instead of flying when travelling. Pls' MSJ at 42. Even if one assumed El-Shwehdi's speculation about the "officer" is correct, being observed in a public place is not even arguably a deprivation of a liberty interest. And despite his testimony that he sometimes drives instead of flying, he also specifically noted that he would still fly for long trips. PEX20 ("El-Shwehdi Tr.") 179, 210, 253. His travel history bears that out, as he has flown more than 20 times since first encountering enhanced screening in 2011. Defs' SMF ¶¶ 77-78. Objectively, his ability to fly is not impaired, and his ability to travel certainly is not impaired.

Hakmeh similarly claims that he sometimes drives to avoid flight connections and delays. Pls' MSJ at 42. But Hakmeh routinely travels domestically and internationally without incident, including his most recent flights (which did not involve enhanced screening), Defs' MSJ at SMF ¶¶ 87-88, and reports that screening on domestic flights has sometimes taken 5-10 minutes or less. Hakmeh Tr. 44-46, 148. Unsurprisingly, he continues to travel, domestically and internationally, Defs' SMF ¶¶ 87-88, and cannot establish a deprivation of his right to travel.

Khan describes that he fears travelling by plane and sometimes drives instead. Khan did describe the experience of being required to undergo enhanced screening as "traumatic" and "humiliating," but his subjective experience is not a basis for finding that minor delay deprives someone of a liberty interest. And notwithstanding that he sometimes prefers to drive rather than go through security, Khan Tr. 75-77, he also testified that he has flown domestically "quite a few times," including at least two roundtrips that were without incident, *id.* 155-57. In any event, it is undisputed that he is not prohibited from air travel and has in fact continued to fly.

Plaintiffs cite Shaout's testimony that in in June 2011, he was asked to deplane after boarding a domestic flight. Pls' MSJ at 42. As he admits, the flight was held for him and his trip was not otherwise delayed. Defs' SMF ¶¶ 98-100. Plaintiffs claim that Shaout interpreted the other

passengers clapping for him as "humiliating" rather than supportive, but he testified that the other passengers thought that he "was speaking on their behalf" and "did something good." Shaout Tr. 72. Under neither interpretation does the slight delay mean he was deprived of a right to travel. And the record confirms that continues to travel frequently and extensively, and has not encountered enhanced screening or secondary inspection since 2017. Defs' SMF ¶¶ 98-100.

Finally, Plaintiffs cite the testimony of Shibly that he urges his wife and children to travel separately to spare them "trauma" of seeing him screened. Pls' MSJ at 42. Even if Shibly's conclusion that he was "targeted" was supported by the evidence, his occasional decision to travel separately from his family is not a deprivation of the right to travel. But as described above, he has travelled extensively internationally and domestically and cannot plausibly claim to be deterred from travel. *See* Defs' SMF ¶¶ 101-03. As of the time of his deposition, Shibly did not recall experiencing any travel problems since 2016, and he continued to travel. *Id.*

As with the border search allegations, Plaintiffs have not established that they are prevented from travel. And even if the Court were to credit one or more of the bare claims that a Plaintiff was individually deterred from travel by purported placement on a watchlist, that individual decision not to travel, based on enhanced screening, is not a basis for finding a deprivation of a liberty interest. *See* Defs' MSJ at 41-48.

### c. Plaintiffs Have Not Been Deprived of Any Reputational Liberty Interest under the Stigma-Plus Test.

To support their purported reputational liberty deprivation, Plaintiffs argue that the TSDB's purportedly widespread dissemination amounts to a constitutional publication of their TSDB status, and that purported multifarious, far-reaching consequences amount to a "plus" factor sufficient for stigma-plus purposes. *See* Pls' MSJ at 43-52. This sensational framing is not sufficiently supported by the record or by case law, and Plaintiffs' theory has been rejected by multiple courts. *See* Defs' MSJ at 48-55; *Beydoun,* 871 F.3d at 469; *Abdi,* 2018 WL 1940411, at *3; *Kovac,* 2019 WL 1057935, at *20; *Scherfen,* 2010 WL 456784, at *7; *Bazzi,* 2016 WL 4525240, at *7; *Green,* 351 F. Supp. 2d at 1130.

Plaintiffs argue that their TSDB status has been "published" to a long list of entities that no Plaintiff has even alleged (let alone proven) caused Plaintiffs any harm, or is even aware of any Plaintiff's status. Without referencing the NCIC by name, Plaintiffs begin by listing entities that receive access to query the KST file in NCIC as if these entities receive unfettered access to Plaintiffs' purported TSDB status.[19] As the record reflects, however, this is simply not the case—the NCIC is populated by 21 different files (including warrants, protection orders, missing persons, stolen property, etc.), one of which is the KST File, that is, a subset of the TSDB's "known or suspected terrorists," which may only be accessed by law enforcement entities (including a limited number of private entities who use the NCIC for covered law enforcement purposes and have signed an agreement and the CJIS security agreement). *See* Rago MSJ Decl. ¶ 6. Even then, the KST file may only be queried with both a name and a piece of identifying information such as a date of birth or social security number, and it may only be queried for criminal justice purposes. *Id.* Users are directed that the information can only be used for intelligence and lead purposes. Through these measures, and through regular audits, NCIC information is carefully protected from misuse—it does not constitute widespread "publication" of Plaintiffs' purported TSDB status. *See id.*

Even if these protections were not in place, Plaintiffs provide no reason to believe that any of the entities they list have ever used NCIC to query Plaintiffs' names, even assuming they were in NCIC. No Plaintiff in this action alleges that he has been harmed by dissemination of TSDB information by any private entity with NCIC access. Without any such allegations—let alone undisputed material facts—NCIC information-sharing cannot support Plaintiffs' argument that their purported TSDB status has been published.

Similarly, Plaintiffs also mention DHS screening functions in their attempt to show that their purported status on the TSDB was widely published. But again, no plaintiff alleges that they have

---

[19] Plaintiffs include "animal shelters" in their list of NCIC entities even though the record clearly indicates that animal shelters do not receive NCIC access. Instead, certain law enforcement divisions of some animal welfare organizations with police powers under state law have NCIC access. *See* PEX82 at 4.

been or will be adversely screened for employment with an airline, port authority, nuclear facility, or chemical facility, nor that they were ever denied a HAZMAT license, OPIC political risk insurance, or a USAID grant. *See* Pls' SMF ¶ 105; Defs' SMF ¶ 38. The one Plaintiff (Ahmed) who initially alleged he was unable to secure employment at an airport due to his purported TSDB status, *see* Am. Compl. ¶ 211, testified in his deposition that he was in fact able to apply, and was accepted for employment there mere weeks afterward, Ahmed Tr. 57-58. He worked there for more than two years and admits that the termination of his employment had nothing to do with his TSDB status. *Id.* 67. Other Plaintiffs also worked at airports without difficulty. *See* Shibly Tr. 22-23, Ali Tr. 18, 112, Al Halabi Tr. 150-152. Even if Plaintiffs' conclusions about the consequences of such screening were correct—and they are not—it is not a publication of Plaintiffs' status.

Plaintiffs also argue that their TSDB status has been published "global[ly]" via information-sharing arrangements with foreign governments. Pls' MSJ at 44. Again, these arrangements cannot support Plaintiffs' stigma claim, both because the use of such information is carefully guarded, and because sharing with foreign governments forms no part of Plaintiffs' alleged injuries. The U.S. Government shares TSDB information with foreign partners pursuant to agreements under the HSPD-6 mandate to exchange terrorism screening information with select foreign partners, and which contain provisions regarding the restricted use and protection of TSDB information. DEX68 ¶ 52. Where, as here, no Plaintiff has alleged or shown that any such arrangement caused them harm at all, they certainly cannot claim that such arrangements stigmatize them.

Plaintiffs also argue that Plaintiffs' purported TSDB status is publicly disseminated whenever Plaintiffs' family, friends, and coworkers "might draw an adverse inference" if they become aware of Plaintiffs' purported TSDB status. *See* Pls' MSJ at 45-47 (citing *Mohamed*, 2015 WL 4394958). *Mohamed* found that No Fly status might become known by those who witnessed exclusion from boarding, or among those who required Plaintiffs to fly for employment, family, or social reasons. 2015 WL 4394958, at *6. Even so, this Court also recognized that "a person's listing on the No Fly List, in itself, does not infringe any protected liberty interest," and expressed doubt that

"dissemination of the No Fly List within or among government agencies or to airlines, standing alone, would satisfy the public disclosure prong of a stigma-plus claim." *Id.* Unlike *Mohamed*, Plaintiffs here do not allege an inability to fly. Travelers may be selected for heightened screening for a variety of reasons unrelated to TSDB status, with identical enhanced screening protocols. *See* Froemling MSJ Decl. ¶¶ 10, 12. Contrary to Plaintiffs' contentions, enhanced screening does not run the risk of becoming known in the same way this Court suggested No Fly List status might.

Nor can the specific experiences (reported by only five Plaintiffs) assist Plaintiffs' argument. *See* Pls' MSJ at 46-47. A few plaintiffs testified as to their belief that their families, acquaintances, or bystanders became aware of their status due to their screening experiences. *See id.* These beliefs are not based on knowledge of Plaintiffs' status, any actual Government publication, or reasonable inference. As the *Scherfen* court found, and as detailed further in the Froemling Declaration, "[h]eightened screening at airports and border-crossing points does not necessarily signify inclusion in the TSDB. Travelers may be pulled out of line, searched, and questioned for a variety of reasons, unrelated to watch lists." *Scherfen*, 2010 WL 456784, at *7; *see also* Froemling MSJ Decl. ¶¶ 10, 12. If these instances alone could constitute publication, then it would seem that nearly any adverse or uncomfortable interaction with law enforcement or security could entitle individuals to claim that they have been stigmatized. It is for this reason that numerous other courts examining such claims have refused to find that such interactions constitute stigma. *See* Defs' MSJ at 51-52 (listing cases).

Ultimately, the Government does not actually disseminate TSDB status in a way that would reach the community at large or Plaintiffs' employers, nor does it disseminate outside the proper chain of command—these are the two potential tests for stigmatizing dissemination recognized by this Court in its Opinion on Defendants' Motion to Dismiss. *See Elhady*, 303 F. Supp. 3d at 464. The record here reflects that neither test is met: TSDB information is closely guarded, and is shared only with those who need it, through critical law enforcement and anti-terrorism information sharing practices. *See* Defs' MSJ at 49-51.

Even if Plaintiffs had shown that their TSDB status had been widely publicized such that it constitutes stigma, there is no plus factor that would suffice to transform Plaintiffs' claim into a reputational deprivation of liberty or property. Plaintiffs aver that the "plus" "need not be a standalone constitutional violation," and that "the bare existence of government conduct distinct from the imposition of a stigma is sufficient" to constitute a plus factor. In so arguing, they rely heavily on a reversed Second Circuit decision that held that a plaintiff must simply identify "some material indicium of government[] [*sic*] involvement beyond the mere presence of a state Defendant" to prevail on a stigma-plus claim. *See* Pls' MSJ at 48 (citing *Doe v. Dep't of Pub. Safety ex rel Lee*, 271 F.3d 38, 54 (2d Cir. 2001), *rev'd sub nom Conn. Dep't of Pub. Safety v. Doe*, 538 U.S. 1 (2003)).

This conclusion of law is directly contrary to *Paul v. Davis*, 424 U.S. 693, 709 (1976), which expressly that "defamation, standing alone" does not deprive a Plaintiff of "any 'liberty' protected by the procedural guarantees of the Fourteenth Amendment." Such liberty is only deprived where there is a concomitant deprivation of some "tangible interests," that are "defined by existing rules or understandings that stem from an independent source such as state law rules or understandings." *Id.* (citing to *Bd. of Regents v. Roth,* 408 U.S. 564, 577 (1972)). These interests "attain this constitutional status by virtue of the fact that they have been initially recognized and protected" by law. The procedural guarantees of Due Process apply "whenever the [Government] seeks to *remove or significantly alter* that protected status," that is, such rights must be "*distinctly* altered or extinguished" in order to amount to a reputational liberty deprivation. *Id.* at 711 (emphasis added). Ultimately, Plaintiffs' preferred "material indicium" test—vacated by the Supreme Court, and not cited anywhere outside the Second Circuit—is not the law. *See* Pls' MSJ at 48 (citing *Doe*, 271 F.3d at 54). If "some material indicium of government involvement" were sufficient to constitute a "plus" factor, the "plus" factor would be meaningless, and nearly any plaintiff with a defamation claim against the Government would have a cause of action under Procedural Due Process. Such a regime

would transform the stigma-plus doctrine into the "font of tort law" that that the *Paul* Court was seeking to avoid. *Paul*, 424 U.S. at 701.[20] This court should decline to adopt such a test.

Plaintiffs contend that this Court, as an alternative, may simply ignore the Supreme Court in *Paul* altogether. *Compare* Pls' MSJ at 49 ("the plus need not even alter or extinguish a right,"), *with Paul* 424 U.S. 693, 710-11 (plus rights are those "distinctly altered or extinguished"). They suggest that a "legal requirement that entities consult the TSDB" before conferring rights or benefits is sufficient, citing to the Ninth Circuit in *Humphries*. *See* Pls' MSJ at 49. In that case, the Court found that California's Child Abuse Central Index ("CACI") did not satisfy due process where there were no procedures *whatsoever* to remedy incorrect placement on the list. *See Humphries v. County of Los Angeles*, 554 F.3d 1170, 1179 (9th Cir. 2009), reversed in part on other grounds, 562 U.S. 29 (2010). The Court noted that Plaintiffs' legal rights had been distinctly altered by the fact that California agencies conducted searches of the CACI prior to granting rights and benefits including obtaining child care licenses, volunteering in a crisis nursery, and receiving custody of a relative's child, among other benefits. *See id.* at 1187-88. To the extent this is even a correct conclusion of law, these "plus" factors had a direct nexus with Plaintiffs claims: the *Humphries* plaintiffs had alleged that they desired to volunteer and teach at a child care center, renew teaching credentials, and enroll in a California child care program, each of which would entail a CACI check. *See id.* at 1183.

Plaintiffs here contend that the TSDB "works in the exact same way" because 20,000 entities "reflexively" search the TSDB for plaintiffs' status. *See* Pls' MSJ at 50. But they offer no facts to suggest that they have been, or will imminently be, denied any benefits based on such searches, if

---

[20] Plaintiffs further interpret *Siegert* to have "identified the single key inquiry" to determine when a "plus" factor is involved: whether consequences flow from the injury to reputation, "or from other government conduct." *See* Pls' MSJ at 49. This latter quoted phrase, not found in *Siegert*, twists the holding of that case. *See Siegert v. Gilley*, 500 U.S. 226 (1991). Nowhere does the case suggest that any governmental actions with consequences beyond those that flow from the injury to reputation itself constitute a "plus" factor. Instead, the Court held only that "special damage and out-of-pocket loss which flows from . . . injury . . . to a plaintiff's reputation" was not recoverable in a *Bivens* action, reaffirming *Paul. Id.* at 234-5. Plaintiff's interest in future employment with the Government, not enshrined in law, unsurprisingly did not constitute a plus factor. *Id.* at 233 (citing the *Paul* Court's discussion of *Roth*).

those searches were even to occur. Instead, they offer a laundry list of purported benefits and privileges, most of which have no connection whatsoever to Plaintiffs allegations in the record: They contend that listees are "all subject to a 3-day waiting period for gun purchases"—this is incorrect,[21] but regardless, no Plaintiff claims he was subject to any wait before purchasing a gun. They contend that Defendants will not grant Plaintiffs TSA PreCheck or Global Entry—but nothing in the record indicates that any Plaintiff has been or would be denied on the basis of a TSDB search.[22] They contend that listees cannot enter military bases—no Plaintiff alleges any attempt to enter a military base, not to mention that there assuredly is no cognizable liberty interest in entering military bases.[23] They contend that they may not be employed by the FBI—but the record does not support that allegation, ¶ 117, *supra*, and no Plaintiff alleges that he aspires to work at the FBI. They contend that DHS denies airport identification to TSDB listees who are employed at airports—but this is false, and noted *infra*, several plaintiffs testified to having worked at airports; the TSDB is only a reference point in such security threat assessments and cannot form the basis for denial. Moreover, the only Plaintiff who gave testimony regarding such credentials was never denied DHS airport entry credentials. *See* Ahmed Tr. at 67.[24]  Likewise, they also contend that the

---

[21] Only positively-identified KSTs are subject to a maximum of a 3-day wait period, and it does not disqualify them from gun ownership. *See* Stark-Nutter MSJ Decl. ¶ 11.

[22] Enrollment in these trusted traveler programs simply means travelers are eligible for, but not guaranteed to receive, expedited treatment. Given that neither standard nor enhanced screening impinges upon a protected liberty interest, and neither does inspection at the border, there is clearly no cognizable liberty interest in being eligible for expedited screening or inspection.

[23] *See Fields v. Blake*, 349 F. Supp. 2d 910, 920-21 (E.D. Pa. 2004) (citing *Greer v. Spock*, 424 U.S. 828 (1976)) ("[c]ivilians have no constitutional right to enter a military base."); *Berry v. Bean,* 796 F.2d 713, 717 (4th Cir. 1986) (similar).

[24] Plaintiffs also mention Ahmed's customs seal, an allegation which is not properly in evidence because it was excluded by the Court's January 19th Order. *See* supra ¶ 104. Regardless, the record does not establish that the revocation of the customs seal "interfered" with Ahmed's ability to perform his job, let alone rose to the level of a liberty deprivation. *See* Pls' MSJ at 51. A customs seal is required to work in the customs security area of an international airport, and is governed by a separate administrative scheme from airport ID badges. *See generally* 19 C.F.R. §§ 122.181-89. Ahmed continued working in his position at the airport following the revocation of the customs seal, and was eventually fired from this position for reasons he concedes were wholly independent. Ahmed Tr. 65-69. This single extra-record allegation is not the plus factor Plaintiffs seek.

Watchlisting System "renders commercial aviation, as an industry, effectively off limits"—but this conclusion is not supported by the record, and no Plaintiff has alleged they have ever been denied the ability to work for an airline.

The only item on Plaintiffs' list that theoretically relates to facts in this case are that three plaintiffs (Al Halabi, Hakmeh, and Baby Doe) experienced delays when family members were sponsored for immigration. This is not a plus factor because the delay did not deny Plaintiffs anything to which they were entitled, *see Kerry v. Din*, 135 S. Ct. 2128, 2133-38 (2015) (plurality opinion finding no liberty interest in family visa), and nothing in the record suggests that this putative "plus" factor had anything to do with the TSDB. For example, Al Halabi's wife's visa was more likely delayed by the fact that he was charged with espionage, court martialed, and received a bad conduct discharge, not as a result of the TSDB. *See* Al Halabi Tr. at 163-172; DEX63, 64. Hakmeh has provided no reason to believe that a 5-year wait for his wife's petition was due to placement in the TSDB, and it is not clear that a 5-year wait is even particularly unusual. The same holds true for Baby Doe's mother, whose wait for her U.S. citizenship was only two years, and whose petition was sponsored by Father Doe, who is not even a Plaintiff in this action. Moreover, any remedy for these harms would issue to USCIS or to the State Department, which are not Defendants in this action. In any event, none of these Plaintiffs are currently deprived of any arguable liberty interest because they already received the benefit that they sought. Other Plaintiffs sponsored people for immigration without difficulty. *See, e.g.,* Shaout Tr. 178-179.

Finally, Plaintiffs suggest that searches and seizures of several Plaintiffs' electronic devices and questioning concerning Islamic religious beliefs at border crossings count as a plus factor. *See* Pls' MSJ at 51-52. Plaintiffs cannot by implication shoehorn a Fourth Amendment or Equal Protection allegation where no such claims are operative in this case. Plaintiffs' Equal Protection claim has already been dismissed, *Elhady*, 303 F. Supp. 3d at 467; with respect to the Fourth Amendment, if Plaintiffs believed they had a basis to challenge these border search practices, they

could have attempted to do so. Moreover, Plaintiffs provide no reason to believe that TSDB status was at issue in any of their questioning or in their device searches.

Even if such allegations were appropriately considered here in the context of stigma-plus, however, there is no indication that CBP electronic device search practices constitute the alteration or extinguishing of any legal status, because they do not violate the law. At the border, "[i]t is axiomatic that the United States, as sovereign, has the inherent authority to protect, and a paramount interest in protecting, its territorial integrity." *Flores-Montano*, 541 U.S. at 153; *see also, e.g.*, *U.S. v. Oriakhi*, 57 F.3d 1290, 1296 (4th Cir. 1995) (noting that "inherent in national sovereignty are the overarching rights of a nation to defend itself from outside threats, to act in relation to other nations, and to secure its territory and assets."). "[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness,'" *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006), and "[r]outine searches of the persons and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant." *U.S. v. Molina-Gomez*, 781 F.3d 13, 19 (1st Cir. 2015) (quoting *Montoya de Hernández*, 473 U.S. at 538) (emphasis added). Rather, these searches "are reasonable simply by virtue of the fact they occur at the border." *Flores–Montano*, 541 U.S. at 152-53; *accord US. v. Touset*, 890 F.3d 1227, 1232 (observing that border searches are, in a word, "different.").

CBP's device search practices are clearly reasonable, and comport with the Fourth Amendment. Information on electronic devices is not exempt from border search authority. *See U.S. v. Ickes*, 393 F.3d 501 (4th Cir. 2005). The Fourth Circuit has found that advanced forensic searches of electronic devices require "some level of particularized suspicion," *U.S. v. Kolsuz*, 890 F.3d 133, 144 (4th Cir. 2018)[25], but left undisturbed the well-established proposition that "[a]t the border, the highest standard for a search is reasonable suspicion." *U.S. v. Vergara*, 884 F.3d 1309, 1313 (11th Cir. 2018), *cert denied*, 139 S. Ct. 70 (Oct. 1, 2018). The Fourth Circuit recognized that the overwhelming

---

[25] *But see Touset*, 890 F.3d at 1233 ("We see no reason why the Fourth Amendment would require suspicion for a forensic search of an electronic device when it imposes no such requirement for a search of other personal property.").

weight of case law rejects the proposition "that … more [than reasonable suspicion] would be necessary—for a forensic search of a phone at the border or, indeed, for any border search, no matter how nonroutine or invasive." *Kolsuz*, 890 F.3d at 147, and "there are no cases requiring more than reasonable suspicion for forensic cell phone searches at the border." *See id.* [26]  And at least one other circuit has held that information within the TECS database, even if unsubstantiated by other information, can establish reasonable suspicion. *See Bryan v. U.S.*, 913 F.3d 356, 361-62 (3d Cir. 2019) (citing *U.S. v. Whitted*, 541 F.3d 480, 490 (3d Cir. 2008).[27]

Ultimately, Plaintiffs can neither show that they have been stigmatized, nor that there was a plus factor sufficient to constitute a deprivation of some reputational liberty interest.

### d.  The Risk of Erroneous Deprivation is Low.

As the evidence shows, the current procedures surrounding the TSDB—including the abundant safeguards built into the nomination and review process, quality assurances, and DHS TRIP redress procedures—provide ample assurance that U.S. Persons will not be erroneously placed or maintained on TSDB. Because Plaintiffs cannot meet their burden of demonstrating otherwise, this factor of the *Mathews* analysis weighs strongly in Defendants' favor.

Current procedures minimize the risk of erroneous placement. Before an individual is added to the TSDB, the nomination undergoes a careful and precise multi-step review process. Groh MSJ Decl. ¶ 20. At all levels of this review process, the watchlisting system relies on informed judgments

---

[26] Moreover, the same analysis that applies to searching devices also applies to the detention of electronic devices, as is necessary in some circumstances "to perform a thorough border search." PEX64 § 5.4.1. *Kolsuz*  cited with clear approval the district court's holding that "'an off-site forensic search of an electronic device over a long period of time is nonetheless a border search.'" 890 F.3d at 142. Thus, "the border exception is not rendered inapplicable because a search initiated at a border ultimately is conducted at some physical or temporal remove." *Id.* (collecting cases).

[27] The Fourth Circuit has already noted with approval that CBP's 2018 Directive requires that advanced searches "may be conducted only with reasonable suspicion of activity that violates the customs laws or in cases raising national security concerns." *Kolsuz*, 890 F.3d at 146; *see also* Howe Tr. at 311-13; PEX64 § 5.1.4; Pls' SMF ¶ 32, *supra*. Inclusion in the TSDB is reasonable suspicion sufficient for Fourth Amendment purposes. Particularly where there is no Fourth Amendment claim in this case, border searches of electronic devices cannot constitute a plus factor sufficient to constitute a deprivation of their reputational liberty.

by experienced analysts and agents who evaluate watchlist nominations based on individual circumstances, taking into account the particular intelligence that distinguishes the individual under review.[28] Agents and analysts are also guided in their decision-making by detailed analytical standards that structure their discretion and promote scrutiny and professionalism in their work—as well as subject matter experts throughout the Intelligence Community. Such intelligence expertise can fill knowledge gaps and identify certain patterns of behaviors or overarching trends that can help analysts and agents gauge the credibility and seriousness of a threat. Orlando MSJ Decl. ¶¶ 11, 14.

After placement, all of the entities involved in the original placement of an individual list— *i.e.*, (1) nominating agency, (2) NCTC or FBI, as appropriate, and (3) TSC—conduct regular reviews and audits, including at each encounter. Groh MSJ Decl. ¶¶ 42-44 (describing all post-placement quality control measures). Available, relevant information, including any exculpatory information, is carefully reviewed to evaluate whether the record still meets the standard for inclusion. *Id.* Further, any time that a U.S. government agency participating in the watchlisting enterprise (whether or not it was the nominator for the individual in question) identifies new or updated information about a watchlist record, it is expected to make a request to NCTC or TSC, as appropriate, to modify or remove that record. *Id.* ¶ 45. And any time it is determined during the quality assurance reviews that a change should be made to a record in the TSDB, the TSC, coordinating with the nominating agency and any other relevant agencies, takes steps to clarify the record. *Id.* ¶ 48 (listing examples of situations where TSDB record may be removed).

---

[28] Citing a case involving a state assuming emergency custody of a child from a parent, Plaintiffs assert that any governmental determination that is "fact specific" "presents a grave risk of erroneous deprivation." Pls' MSJ at 52 (quoting *Weller v. Dep't of Soc. Servs.*, 901 F.2d 387, 395 (4th Cir. 1990). Setting aside the obvious distinctions between determinations involving parental fitness and the instant case, this assertion does not withstand scrutiny, and indeed defies logic. That the watchlisting system relies on highly individualized assessments, as opposed to some type of mechanistic sorting, necessarily *reduces* the risk of error by ensuring that each nomination receives careful, particularized consideration of the "totality of the circumstances" it presents. Groh MSJ Decl. ¶ 22; *cf. U.S. v. Smedley*, 611 F. Supp. 2d 971, 975 (E.D. Mo. 2009) ("Absent any individualized determination, there is simply no way of knowing whether the deprivation of liberty is warranted or wholly erroneous.").

Finally, DHS TRIP redress procedures provide a final, important measure of assurance that an individual will not be erroneously maintained in the TSDB. Any travelers who experiences a screening-related travel difficulty—including, as relevant here, those who believe that they experienced such problems because they were wrongly identified as a threat—may submit a Traveler Inquiry Form to DHS TRIP. Moore MSJ Decl. ¶ 7. In the small fraction of cases in which DHS TRIP determines that a traveler is an exact or possible match to an identity in the TSDB, DHS TRIP refers the matter to the TSC Redress Office; when the traveler is further confirmed to be a match to the TSDB, TSC reviews the available derogatory and exculpatory information about the traveler, including any information provided by the traveler as a part of the inquiry, to make a *de novo* determination as to whether the individual continues to satisfy the standard for inclusion in the TSDB and its subsets. *Id.* ¶¶ 11-12. The Redress Office consults with other agencies, as appropriate, and, when warranted, the DHS TRIP redress process will result in the removal of the traveler from the TSDB and/or one of its subsets. *Id.* ¶ 12. These robust, multi-layered quality control measures ensure that any risk of erroneous deprivation is appropriately low.

### e. The Government's Interest in Maintaining an Effective Watchlisting System Outweighs Plaintiffs' Interests in Additional Process.

Plaintiffs argue that the Government's interest is low because—according to Plaintiffs—the TSDB has prevented no acts of terrorism. But Plaintiffs' reasoning is deeply flawed, for a host of reasons—in particular that the purpose of the system is to identify and monitor potential threats given the catastrophic risks at stake. Put in its simplest terms, the TSDB and the information-sharing system it supports have allowed the Government to track potential terrorist plots by coordinating derogatory information from the intelligence community with encounter information from local law enforcement and other screening partners. Defs' SMF ¶ 3. Failure to share information contributed to the failure to prevent the 9/11 terrorist attacks, and the common operating picture afforded by the TSDB is absolutely critical to preventing such terrorist plots from coming to fruition in the future. *Id.* With appropriate information sharing, the Government can track, investigate, counter,

disrupt and deter plots before an attack occurs. DeSarno Tr. 78, 89, 120-21. Indeed, neutralizing threats so as to avoid actual terrorist activity is the primary purpose of the TSDB, and if an individual does not go on to commit a terrorist act, that may reflect the success of the listing determination and other counterterrorism tools.

Disclosure of TSDB status in contravention of the Government's policy would imperil the very purpose that the TSDB serves, first and foremost, by giving terrorists information that they could use to attempt to evade enhanced security screening and other security measures to gain access to the commercial aviation system to perpetrate an attack. Froemling MSJ Decl. ¶¶ 49-59. Further, disclosure of status would signal to terrorists whether the Government has an investigative interest in a particular individual, as well as expose the investigative procedures and techniques associated with that individual's status. Orlando MSJ Decl. ¶¶ 21-23; *see also* Groh MSJ Decl. ¶¶ 64-67; Howe MSJ Decl. ¶ 20. The Government's policy of not disclosing status does not mean that the TSDB has not prevented or reduced the risk of acts of terrorism.

Plaintiffs also mischaracterize the TSDB inclusion standard as an "administrative innovation—without precedent or analogue" that is overly permissive. Pls' MSJ at 55. That is simply not the case. In developing the TSDB inclusion standard, the Government did precisely what Congress and the President directed it to do: to identify individuals who are "known to pose, or suspected of posing, a risk of … terrorism," 49 U.S.C. § 114(h)(2), and to "develop, integrate, and maintain thorough, accurate, and current information about individuals known or appropriately suspected to be or have been engaged in . . . terrorism" and use that information to support screening and other processes. HSPD-6. *Cf. Steadman v. SEC*, 450 U.S. 91, 95 (1981) (explaining that where Congress has prescribed the governing standard of proof, its choice controls absent countervailing constitutional constraints).

The TSDB inclusion standard sets forth clear and substantive criteria for determining whether someone is "known or appropriately suspected to be or have been" engaged in terrorist activities. *Id.* The standard requires "articulable intelligence or information" and rational inferences

drawn therefrom that "creates a reasonable suspicion" that the individual has, is, or will engage in terrorism. Groh MSJ Decl. ¶ 22. Guesses, "hunches," and reporting of suspicious activity are not sufficient to meet the inclusion standard. *Id.* at ¶ 24. Rather, as explained in the Orlando Declaration, "[a]nalytical judgments about potential threats are the stock-in-trade of the intelligence community," and nominators draw on particular expertise, tools, training, and professional standards, in assessing the threats posed by the activities of a particular individual. Orlando MSJ Decl. ¶¶ 10-14. Moreover, a nomination must be approved by several layers of reviewing experts, as discussed *supra*. There is no evidence to support Plaintiffs' claim that reviewing agencies "rubber stamp" nominations, or that the number of listed individuals reflects the permissiveness of the standard.[29]

Finally, Plaintiffs argue that the TSDB inclusion standard should be decided by the Judiciary, rather than the Executive Branch (acting based on both the President's constitutional authority in national security matters and an explicit statutory authorization from Congress). Pls' MSJ at 55-56. First, as discussed supra, Congress has already determined the appropriate standard. The additional explanation provided by the watchlisting standards ensures that Congress's authorization is further meaningfully limited. Second, the Executive Branch has the necessary expertise in this area. As discussed supra, an assessment that someone poses a threat of committing an act of terrorism emerges from specific intelligence about that individual and his or her circumstances that point to known or possible terrorist activity, and those analytical, intelligence-based judgments are the province of the intelligence community. The Government's predictive judgments are entitled to substantial deference in this national security context, involving substantive assessments based on

---

[29] The fact that the TSDB population grew by approximately 130,000 records between June 2016 and June 2017 (with the approximate percentage of U.S. persons growing by only 0.1%), *see* PEX74 at ¶ 4, does not demonstrate that the standard is too inclusive. First, the Government sets no quota or numerical goals with respect to the size of the TSDB. PEX62 at 2. Second, Plaintiffs, without any basis, wrongly presume that agency personnel nominate with something less than a good faith recommendation based upon the intelligence and law enforcement information available to them at the time. A more likely explanation for the increase in records from year to year is increasing resources to counterterrorism efforts in order to counter the increased recruitment and better understanding of the activities of particular terrorist organizations.

limited intelligence. *See, e.g., Al Haramain Islamic Found. Inc. v. Dep't of Treasury*, 686 F.3d 965, 979 (9th

Cir. 2012) (acknowledging "extremely deferential" review in the national security and intelligence

area). As the Supreme Court recognized, "national security and foreign policy concerns arise in

connection with efforts to confront evolving threats in an area where information can be difficult to

obtain and the impact of certain conduct difficult to assess." *Holder v. Humanitarian Law Project*, 561

U.S. 1, 34 (2010). The Court concluded that although such concerns "do not warrant abdication of

the judicial role," when "it comes to collecting evidence and drawing factual inferences in this area,

the lack of competence on the part of the courts is marked, and respect for the Government's

conclusions is appropriate." *Id.* (internal quotation marks and citation omitted).

Finally, the reasonable suspicion standard is not only consistent with these congressional

mandates and the Executive Branch's expertise, but also appropriate given the purpose to be

achieved—the prevention of terrorist attacks. *See* Orlando MSJ Decl. ¶¶ 6-8; Groh MSJ Decl. ¶ 6; *see*

*Rahman v. Chertoff*, 530 F.3d 622, 627 (7th Cir. 2008); *see also Terry v. Ohio*, 392 U.S. 1, 22, 24 (1968)

(recognizing the public's interest in "effective crime prevention" and explaining that "we cannot

blind ourselves to the need for law enforcement officers to protect themselves and other

prospective victims of violence in situations where they may lack probable cause for an arrest").

Plaintiffs appear to try to impose a judicial standard of review, borrowed from other non-analogous

contexts, on an administrative determination. There is no basis for doing so. *See Cubaexport v.*

*Treasury*, 606 F. Supp. 2d 59, 72 (D.D.C. 2009), *aff'd on other grounds*, 638 F.3d 794, 803 (D.C. Cir.

2011) (observing that an agency determination "does not have to meet the same rigorous

requirements as proceedings in court. If it did, the administrative decision making process would

come to a grinding halt." Thus, the agency must instead "consider[] the relevant factors and

articulate[] a rational connection between the facts found and the choice made." *Id.* at 68.) (citing

*Jifry v. FAA*, 370 F.3d 1174, 1180 (D.C. Cir. 2004)).[30]  There is no basis for requiring a higher

---

[30] None of the cases relied on by Plaintiffs here involve national security, but do involve deprivations
far beyond those alleged to occur in the watchlisting context. *See Woodby v. Immigration &*
*Naturalization Serv.,* 385 U.S. 276, 284 (1966) (deciding what degree of proof is required in

administrative inclusion standard for this intelligence-driven determination, especially given the extremely limited Plaintiffs' interest at stake.

## II.      DHS TRIP Provides all the Process that is Due.

Plaintiffs argue that the current DHS TRIP process is insufficient because they are not afforded notice of either the deprivation, or the Selectee List inclusion standard. Pls' MSJ at 54. The record does not support that Plaintiffs have experienced any deprivation requiring notice. *See infra* and Defs' MSJ at 41-48. With respect to the Selectee List inclusion standard, Plaintiffs also fail to address at least two critical considerations. First, Plaintiffs do know the TSDB inclusion standard, as well as the fact that the Selectee List requires "additional distinct criteria, in addition to meeting the reasonable suspicion standard for inclusion in the TSDB as a known or suspected terrorist." Groh MSJ Decl. ¶ 26.[31] In other words, Plaintiffs do have notice of the minimum criteria for placement and that some additional criteria is required for placement on the Selectee List. Moreover, Plaintiffs have not identified any harm stemming from their alleged placement on the Selectee List, as opposed to their alleged placement on the TSDB generally. *See* Defs' SMF ¶ 14. The "deprivations" that Plaintiffs claim to have experienced as a result of being on the TSDB (such as additional screening at the airport, or additional inspection at the border) are triggered by inclusion on the TSDB as known or suspected terrorists, irrespective of Selectee List status. *Id.*

---

deportation proceedings); *Santosky v. Kramer*, 455 U.S. 745, 748, (1982) (deciding due process requires clear and convincing evidence before a state may "completely and irrevocably" sever "the rights of parents in their natural child"); *Cooper v. Oklahoma*, 517 U.S. 348, 350 (1996) (deciding that a state's clear and convincing evidence standard for a criminal defendant to prove he is incompetent to stand trial violates due process). The contention that a person who is otherwise completely at liberty, but gets screened at airports and the border, is comparably curtailed, is plainly wrong.

[31] In ruling on the Motion to Dismiss in *Mohamed,* the Court expressed concern that a previous drafting of the "reasonable suspicion" standard could theoretically be interpreted to permit the agencies to find a "reasonable suspicion" of a "reasonable suspicion." *See Mohamed v. Holder*, 995 F. Supp. 2d 520, 531 (E.D. Va. 2014). The current definition of the reasonable suspicion standard has eliminated the possibility of that interpretation. Groh MSJ Decl. ¶ 22. *See also Mohamed*, 2015 WL 4394958, at *3 ("The defendants have alternatively phrased this standard as 'known or appropriately suspected to be or to have engaged in conduct constituting, in preparation for, in aid of, or related to terrorism.'").

Likewise, Plaintiffs also do not articulate a compelling need for the Selectee List criteria, which constitutes SSI and are not public because disclosure would give known or suspected terrorists information that may assist in developing strategies to circumvent security screening. Groh MSJ Decl. ¶ 27. *See also* Ex. A. to August 15, 2018 Froemling Decl. Indeed, Plaintiffs offer no evidence to create a genuine dispute over the magnitude of the governmental interest at stake or the harm that would flow from providing the additional process Plaintiffs request. *See Jifry,* 370 F.3d at 1183 ("In light of the governmental interests at stake and the sensitive security information, substitute procedural safeguards may be impracticable[.]"). In recognizing the crucial role that watchlisting plays in securing our nation, courts have upheld the government's ability to withhold watchlist information. *Bassiouni v. CIA*, 392 F.3d 244, 245-46 (7th Cir. 2004); *Tooley v. Bush*, No. 06-306, 2006 WL 3783142, at *20 (D.D.C. Dec. 21, 2006), *aff'd sub nom., Tooley v. Napolitano*, 586 F.3d 1006 (D.C. Cir. 2009) (upholding government's position that confirming or denying records indicating plaintiff's presence on watch lists would reveal [sensitive security information]). *See also Kalu v. IRS*, 159 F. Supp. 3d 16, 22 (D.D.C. 2016) (upholding FBI's "Glomar" response to "Plaintiff's presence or non-presence on any FBI watch list"). Due process does not require disclosure of the Selectee List criteria under such circumstances.

To the extent Plaintiffs also demand notice of the specific derogatory evidence underlying someone's placement on a watchlist, the record establishes that such notice would have a devastating effect on the usefulness of the TSDB and imperil the effectiveness of critical law enforcement tools used to protect national security. Defs' MSJ at 55-58. As set forth in Defendants' opening brief, the current DHS TRIP process provides travelers who experience enhanced screening all the process that is constitutionally required. *Id.* at 58-59.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for summary judgment.


Dated:  March 25, 2019                         Respectfully submitted,

G. ZACHARY TERWILLIGER
United States Attorney

JOSEPH H. HUNT
Assistant Attorney General
Civil Division

ANTHONY J. COPPOLINO
Deputy Director, Federal Programs Branch

AMY POWELL
DENA M. ROTH
ANTONIA KONKOLY
CHRISTOPHER HEALY
Trial Attorneys, Federal Programs Branch
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue NW, Room 7324
Washington, DC 20530
Tel: (202) 514-2395
amy.powell@usdoj.gov
dena.m.roth@usdoj.gov
antonia.konkoly@usdoj.gov
christopher.healy@usdoj.gov


/s/ Lauren A. Wetzler
LAUREN A. WETZLER
Chief, Civil Division
Assistant United States Attorney
2100 Jamieson Ave.,
Alexandria, VA. 22314
Tel: (703) 299-3752
Fax: (703) 299-3983
Lauren.Wetzler@usdoj.gov

Attorneys for Defendants