# EXHIBIT 60

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

ANAS ELHADY, et al.,

    Plaintiffs,

v.

CHARLES H. KABLE, et al.,

    Defendants.

Case No. 1:16-cv-375 (AJT/JFA)

## DECLARATION OF RANDY HOWE

I, Randy Howe, hereby state as follows:

1. I am the Executive Director for Operations, Office of Field Operations (OFO), U.S. Customs and Border Protection (CBP), Department of Homeland Security (DHS). I have been employed in this role since October 2017. I began my career in 1988 with the U.S. Immigration and Naturalization Service. During my 30 years of federal service, I have held various leadership positions, including Area Port Director Buffalo; Assistant Director for Border Security; and Border Security Coordinator. Immediately prior to assuming my current role, I served as Director of Field Operations for the Preclearance Field Office.

2. In my role as the Executive Director for Operations, I am responsible for executing the missions of CBP and, in particular, OFO. The CBP mission includes the enforcement of the customs, immigration, and agriculture laws of the United States and hundreds of other laws at the border on behalf of numerous federal agencies. OFO is the primary law enforcement agency responsible for securing the U.S. border at ports of entry (POEs) and Preclearance locations outside of the U.S., while facilitating lawful international trade and travel.

1

Among other things, OFO is responsible for coordinating the enforcement activities of CBP at POEs to deter and prevent terrorists and terrorist weapons from entering the United States. *See* 6 U.S.C. § 211(g). In my position, I oversee more than 23,000 employees, with operations at 20 major field offices, 328 POEs, and 16 Preclearance locations. On an average day in Fiscal Year 2017, OFO processed 1,088,300 travelers; of which 340,444 were incoming international air passengers and crew; 55,709 were passengers and crew arriving by vessel; 691,549 were incoming land travelers; as well as 283,664 incoming privately owned vehicles; and 78,137 truck, rail, and sea containers.

3. As Executive Director for Operations, I am familiar with CBP's administration and enforcement of legal requirements at the border, including the enforcement and administration of immigration laws and the inspection, processing, and admission of persons who seek to enter or depart the United States. To accomplish its mission, CBP officers conduct searches and inspections at the border and POEs. This requires using a variety of investigative and law enforcement techniques. It also entails the exercise of border search authority, which authorizes CBP officers to detain and search persons and property at the border without suspicion or a warrant.

4. I was deposed in this action on March 22, 2018 and provided testimony on behalf of CBP regarding CBP's policies and procedures in conducting searches and inspections at the border, among other topics.

5. It is my understanding that subsequent to my deposition, Plaintiffs in this action moved to compel additional information regarding CBP's policies and procedures, including policies and procedures relating to the border inspection of individuals who are potential or confirmed matches to the United States Government's Terrorist Screening Database (TSDB).

6. I am making this Declaration for the purpose of providing additional information which CBP has determined can be disclosed and/or to clarify my deposition testimony, as discussed in more detail below.

7. In addition, I am making this Declaration for the purpose of asserting the law enforcement privilege with respect to certain other CBP information that was either withheld during my deposition or which Plaintiffs are now seeking for the first time. For the reasons set forth below, I have determined that the disclosure of certain information that Plaintiffs seek in their motion to compel would reveal CBP's confidential law enforcement techniques, methods and procedures, and thus harm CBP's law enforcement mission.

8. As further discussed below, the effectiveness of CBP's mission is dependent to a large extent on the use of sensitive investigative techniques and methods that are not known to the general public. The disclosure of these techniques and methods would seriously compromise CBP's ability to perform its law enforcement mission to safeguard the borders of the United States.

9. This declaration is based on my personal knowledge, my personal review and appraisal of the claims of law enforcement privilege hereby asserted, the factual background of the case, and other information conveyed to me by my staff and other knowledgeable CBP personnel in the course of my official duties and responsibilities.

**CBP Encounters with Individuals who are Potential or Confirmed Matches to the TSDB**

10. I understand that Plaintiffs seek to compel additional information regarding the specific techniques and procedures that are employed by CBP officials when inspecting individuals who are potential or confirmed matches to the TSDB.

11. CBP officials are trained to handle all encounters with travelers in compliance with agency policies and procedures, as applied on a case-by-case basis.

12. CBP does not have any policies that require its officials to draw a weapon or use handcuffs when encountering a traveler who is a potential or confirmed match to the TSDB. CBP also does not have a policy which dictates that all individuals who are potential or confirmed matches to the TSDB be designated as "armed and dangerous." Any determination of the propriety of a CBP official's use of such actions during the inspection of any person, including but not limited to one who is a potential or confirmed match to the TSDB, is based upon the totality of the circumstances of each individual encounter.

13. Further, if CBP discovers information on a traveler attempting to enter or depart the United States, including a traveler that is a potential or confirmed match to the TSDB, relevant a possible violation of the laws enforced by CBP, CBP may make a copy of the information.

14. The disclosure of further information – beyond the information stated above, at my March 22, 2018 deposition and/or otherwise previously made publically available – regarding specific techniques and procedures that are employed by CBP officials when inspecting individuals who are potential or confirmed matches to the TSDB would increase the risk of circumvention of laws and regulations, impede effectiveness of law enforcement activities, endanger agency investigative practices and techniques, and present a risk to officer safety. Specifically, disclosure of this information would allow known or suspected terrorists to deduce potential vulnerabilities in CBP's inspection efforts, reverse-engineer effective countermeasures to facilitate undetected movement and activity, and thwart CBP inspection efforts. Accordingly, the additional information sought by Plaintiffs regarding specific techniques and procedures that are employed by CBP officials when inspecting individuals who

4

are potential or confirmed matches to the TSDB is properly protected by the law enforcement privilege.

15. Likewise, disclosure of information regarding CBP's potential recruitment of informants could also compromise ongoing counterterrorism efforts by publicizing CBP's law enforcement practices and techniques. Knowledge of such information could cause terrorists to change their behavior around known associates, and thus result in the loss of valuable counterterrorism information and resources. Accordingly, the information sought by Plaintiffs regarding CBP's potential recruitment of informants is also protected by the law enforcement privilege.

**Sharing of Information with Law Enforcement Partners**

16. I understand that Plaintiffs seek to compel additional information regarding CBP's practices and procedures for information sharing with other law enforcement partners.

17. CBP Directive No. 3340-049A, Border Search of Electronic Devices (January 4, 2018) (Directive) provides guidance and standard operating procedures for searching, reviewing, retaining, and sharing information contained in electronic devices subject to inbound and outbound border searches by CBP. Among other things, the Directive, which is publicly available,[1] establishes guidance and standard operating procedures for the retention and sharing of information found in electronic devices during border searches. CBP follows the guidance and standard operating procedures set forth in the Directive, which defines the circumstances in which CBP may share information found in border searches of electronic devices with other federal agencies, including the Federal Bureau of Investigation (FBI). For border searches of electronic devices initiated prior to January 4, 2018, CBP officials applied the guidance and

---

[1] https://www.cbp.gov/document/directives/cbp-directive-no-3340-049a-border-search-electronic-devices

5

standard operating procedures identified in CBP Directive No. 3340-049, Border Search of Electronic Devices Containing Information (August 20, 2009), which is also publicly available.[2]

18. I testified during my March 22, 2018 deposition that if CBP determines that it needs the assistance of another law enforcement agency, such as the FBI, the Drug Enforcement Agency (DEA), or the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), to complete the secondary inspection of a traveler, that other agency may be present during the secondary inspection. I further testified that while the secondary inspection is completed by CBP, a person from the agency providing assistance to CBP may ask the traveler a question.

19. The disclosure of further information regarding potential information sharing between CBP and FBI – beyond the information stated above, at my March 22, 2018 deposition and/or otherwise previously made publically available – would impair open communication across agencies and cohesive law enforcement and national security efforts. Disclosure of such information—including but not limited to whether the FBI shares National Crime Information Center (NCIC) handling codes with CBP and whether CBP may share with FBI copies of records it acquires from travelers who are potential or confirmed matches to the TSDB during an inspection—could have far-reaching effects, impairing other agencies' law enforcement operations or their ability to effectively carry out their respective missions. Public knowledge of this information would increase the risk of circumvention of laws and regulations, impede effectiveness of law enforcement activities, and endanger agency investigative practices and techniques. Specifically, terrorists could use information regarding the use and sharing of information between agencies to identify potential gaps in that information sharing, and thus to tailor their strategies and methods to more ably avoid detection by law enforcement.

---

[2] https://www.dhs.gov/xlibrary/assets/cbp_directive_3340-049.pdf

6

Accordingly, this category of information is also properly protected by the law enforcement privilege.

### CBP's Nominations to the TSDB

20. I understand that Plaintiffs seek to compel additional information regarding CBP's nominations to the TSDB and CBP's Automated Targeting System (ATS).

21. CBP decisions to nominate an individual to the TSDB or to suggest removing someone from the same are made by CBP officials who, taking into account all available information, assess whether the applicable standard for inclusion in the TSDB has been met. The Terrorist Screening Center makes the ultimate decision regarding an individual's inclusion in or removal from the TSDB.

22. CBP's ATS compares traveler, cargo, and conveyance information against law enforcement, intelligence, and other enforcement data to assist CBP officers in identifying travelers and cargo that may need additional inspection. CBP has published a Privacy Impact Assessment on ATS that is publically available.[3]

23. During inspections resulting from CBP's use of ATS, CBP officials may identify information that may be considered by CBP in assessing whether to nominate an individual for inclusion in the TSDB.

24. However, the identification by ATS of someone for additional inspection does not in and of itself suffice to constitute an adequate basis for a nomination to the TSDB.

25. To the extent Plaintiffs are seeking more information about ATS – beyond the information stated above, at my March 22, 2018 deposition and/or otherwise previously made publically available – disclosure of such information could undermine the effectiveness of law

---

[3] https://www.dhs.gov/publication/automated-targeting-system-ats-update

7

enforcement techniques and procedures by revealing the information CBP considers in conducting law enforcement activities, as well as CBP's priorities when conducting these activities. Such information, if unprotected, could enable individuals to thwart CBP's efforts to secure the border and enforce various laws, including customs and immigration laws. Disclosure of this information could allow terrorists to deduce law enforcement priorities—and conversely, areas where investigative resources may not be focused—and exploit that information to develop and employ more effective counter-measures to diminish the effectiveness of inspection efforts. Accordingly, such information is protected by the law enforcement privilege.

**CBP Statistics**

26. During my deposition, I testified that, according to Executive Order 13780: *Protecting the Nation From Foreign Terrorist Entry Into the United States* Initial Section 11 Report, CBP encountered 2,554 individuals on the TSDB attempting to enter the United States in 2017. 2,554 encounters in a year is approximately 7 encounters per day.

27. I understand that Plaintiffs have also requested information regarding the number of individuals listed in the TSDB who were arrested by CBP in 2017, as well as cumulatively over the last 10 years; the number of those arrestees who were U.S. citizens; and the number of those arrests that were terrorism related. CBP does not track this information requested by Plaintiffs. To assemble this information would require a manual record-by-record analysis of each arrest made by CBP over a ten-year period, and a comparison of whether the individual was listed in the TSDB at that specific point in time, which would require coordination with other agencies. Such an endeavor would be enormously burdensome and would divert significant CBP resources away from the agency's performance of its critical law enforcement mission.

**CBP Use of "Exceptions" to the Reasonable Suspicion Standard for Inclusion in the TSDB**

8

28. During my deposition I also testified regarding the existence of certain limited records contained within the TSDB for foreign nationals (i.e., aliens) who do not otherwise meet the reasonable suspicion standard for inclusion in the TSDB. Specifically, I stated that these records are shared with CBP and the Department of State for their use in administering and enforcing the Immigration and Nationality Act (INA). In order to maintain its effectiveness, CBP's use of these records, along with all available information to assess whether ineligibilities exist for admission to the United States, is law enforcement sensitive. For example, details regarding the type of information that is needed to justify the inclusion of an individual in the TSDB pursuant to an "exception" to the reasonable suspicion standard, and the method(s) by which individuals are identified for an applicable "exception," must not be disclosed and are properly categorized as law enforcement sensitive procedures and techniques. If this information became public, it could cause persons seeking to avoid detection by the U.S. government to change their behavior or take other precautions to minimize their chances of being identified as having a terrorism nexus. In addition, the effectiveness of CBP's ability to enforce the INA is dependent on its ability to receive all information regarding an alien that is relevant to determining admissibility to the United States. CBP's use of sensitive information for these purposes is effective in part because the sources of such information and the processes by which such information is obtained are not known to the general public. The disclosure of the information provided to CBP by other agencies would chill the free exchange of information between elements of the federal government. Consequently, the disclosure of these techniques and methods would harm CBP's ability to obtain this information and would therefore seriously compromise CBP's ability to prevent those with a terrorism nexus from entering the United States. Accordingly, additional information regarding CBP's use of these records and the

persons who are in the TSDB pursuant to an "exception" to the reasonable suspicion standard, is properly protected by the law enforcement privilege.

### Conclusion

29. In my judgment, the disclosure of additional information regarding CBP's policies and procedures would allow potential violators to discover or circumvent CBP investigative techniques, and endanger CBP operations and personnel at POEs. Specifically, the disclosure of these techniques would enable potential violators to evade CBP inspection processes and law enforcement activities, and place CBP officers and the public in harm's way. The disclosure of the withheld information would also jeopardize the overall effectiveness of CBP and third-party law enforcement activities and investigations.

30. Accordingly, in my opinion, the disclosure of additional information would impede law enforcement and impair CBP's ability to apprehend violators or persons who may seek to violate the many laws enforced by CBP.

31. Therefore, I respectfully assert the law enforcement privilege with respect to the information sought, for the reasons set forth above.

I declare, under penalty of perjury, that the foregoing is true and correct to the best of my information, knowledge and belief.

Executed on the 27 day of April, 2018.

Randy Howe
Executive Director, Operations
Office of Field Operations
U.S. Customs and Border Protection