# EXHIBIT 61

**SUBMITTED IN CAMERA, EX PARTE**
**SENSITIVE SECURITY INFORMATION**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| Anas ELHADY, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. 1:16-cv-375 (AJT/JFA) |
| ) | |
| CHARLES H. KABLE, et al., ) | |
| ) | |
| Defendants. ) | |

## DECLARATION OF HAO-Y TRAN FROEMLING

I, Hao-y Tran Froemling, declare as follows pursuant to the provisions of 29 U.S.C. § 1746:

1. I am the Executive Director for Vetting, Office of Intelligence and Analysis, for the Transportation Security Administration (TSA), a component agency of the U.S. Department of Homeland Security (DHS). I have held this position since January 2018.

2. I understand the Plaintiffs in this action have challenged the constitutionality of the procedures afforded to U.S. citizens who seek to challenge their purported placement in the Terrorist Screening Database (TSDB). I make this Declaration in support of the Defendants' opposition to Plaintiffs' Fourth Motion to Compel. The statements herein are based on my personal knowledge and information made available to me in my official capacity.

3. As set forth below, I first describe TSA's mandate and highlight the security measures used by TSA to secure aviation. Next, I describe TSA's risk-based rules. Finally, I

*WARNING:* This record contains Sensitive Security Information that is controlled under 49 CFR parts 15 and 1520. No part of this record may be disclosed to persons without a "need to know", as defined in 49 CFR parts 15 and 1520, except with the written permission of the Administrator of the Transportation Security Administration or the Secretary of Transportation. Unauthorized release may result in civil penalty or other action. For U.S. government agencies, public disclosure is governed by 5 U.S.C. 552 and 49 CFR parts 15 and 1520.

SUBMITTED IN CAMERA, EX PARTE
SENSITIVE SECURITY INFORMATION

describe how TSA's risk-based rules inform mission coverage of the Federal Air Marshal Service (FAMS).

### TSA's Mandate and Security Measures

4. As a result of the terrorist attacks of September 11, 2001, Congress passed the Aviation and Transportation Security Act of 2001 (ATSA), which created TSA. ATSA charged TSA with responsibility "for security in all modes of transportation" and created a federal workforce to screen passengers and cargo at commercial airports. ATSA also granted TSA broad authority to "assess threats to transportation," to "develop policies, strategies, and plans for dealing with threats to transportation security," to "enforce security-related regulations and requirements," and to "oversee the implementation, and ensure the adequacy, of security measures at airports." ATSA also specifically directed TSA to take appropriate action with respect to individuals who may be a threat to civil aviation or national security. The Intelligence Reform and Terrorism Prevention Act of 2004 (IRPTA) directed TSA to implement a pre-flight passenger pre-screening program comparing passenger information to the No Fly and Selectee Lists and to utilize all appropriate records in the Terrorist Screening Database (TSDB). As recommended in the final report of the National Commission on Terrorist Attacks Upon the United States (9/11 Commission), TSA may also use the "larger set of watch lists maintained by the federal government." 49 C.F.R. § 1560.3. ATSA further directed TSA to deploy Federal Air Marshals (FAMs) on every flight determined to "present high security risks." In determining which flights present "high security risks," ATSA states that "nonstop, long distance flights, such as those targeted on September 11, 2001, should be a priority."

WARNING: This record contains Sensitive Security Information that is controlled under 49 CFR parts 15 and 1520. No part of this record may be disclosed to persons without a "need to know", as defined in 49 CFR parts 15 and 1520, except with the written permission of the Administrator of the Transportation Security Administration or the Secretary of Transportation. Unauthorized release may result in civil penalty or other action. For U.S. government agencies, public disclosure is governed by 5 U.S.C. 552 and 49 CFR parts 15 and 1520.

SUBMITTED IN CAMERA, EX PARTE
SENSITIVE SECURITY INFORMATION

Further, TSA may deploy FAMs on passenger flights of air carriers engaged in air transportation, including flights by aircraft between two places within the United States, and flights between a place in the United States and a place outside the United States.[1] The TSA Administrator is also specifically authorized to exercise oversight and responsibility for the functions, duties, and personnel of the FAMS. FAMs are designated by the Administrator as federal law enforcement officers, and as such, carry the authorities of federal law enforcement officers. From the moment all external doors of an aircraft are closed following the boarding of passengers until the doors are opened to allow passengers to leave, the TSA Administrator has the exclusive responsibility to direct law enforcement activity related to the safety of passengers on an aircraft involved in an incident of air piracy.

5. TSA executes its mandate in part through the Secure Flight program, which pre-screens aviation passengers flying into, out of, within, and over the U.S. against various Government watch lists. All aviation passengers must undergo security screening prior to entering the sterile area of an airport and boarding an aircraft. Secure Flight may designate an individual for enhanced, standard, or expedited screening at airport security checkpoints.

6. Through Secure Flight, TSA may designate aviation passengers for enhanced screening based on a variety of criteria, including random selection, matching to a risk-based,

---

[1] FAMs are limited to flights on U.S.-flagged aircraft and do not operate on foreign air carrier flights into, out of, or over the United States.

WARNING: This record contains Sensitive Security Information that is controlled under 49 CFR parts 15 and 1520. No part of this record may be disclosed to persons without a "need to know", as defined in 49 CFR parts 15 and 1520, except with the written permission of the Administrator of the Transportation Security Administration or the Secretary of Transportation. Unauthorized release may result in civil penalty or other action. For U.S. government agencies, public disclosure is governed by 5 U.S.C. 552 and 49 CFR parts 15 and 1520.

intelligence-driven rule, or otherwise posing a threat to civil aviation or national security sufficient to warrant enhanced screening prior to boarding an aircraft.

7. TSA applies the same checkpoint screening procedures to individuals designated for enhanced screening, regardless of whether the individual is designated due to TSDB status or is designated randomly or for other reasons. In addition, passengers TSA designates for expedited or standard screening are not guaranteed to receive that type of screening and may be required to undergo additional screening as a result of unpredictable and random screening measures at the checkpoint, to resolve a walk-through metal detector alarm or an Advanced Imaging Technology (AIT) alarm, or for other reasons.

8. TSA recommends that all travelers arrive at the airport two to three hours in advance of the scheduled flight time. TSA's intent is to clear passengers for entry to the sterile area and to board an aircraft after applying the appropriate security measures. Although passengers may be delayed as a result of TSA's security measures, the purpose is to ensure aviation security and the freedom of movement for people and commerce.

### TSA's Risk-Based Rules

9. TSA has evolved over time in its approach to aviation security, moving to more risk-based, intelligence-driven security operations. Under this passenger-centric approach, TSA conducts pre-screening to segment passengers by risk. Risk-based security increases operational efficiency and security effectiveness by allowing TSA to focus less on lower risk travelers and more on higher risk passengers or those about whom it knows less. Quiet Skies is one of TSA's risk-based security programs that identifies and

WARNING: This record contains Sensitive Security Information that is controlled under 49 CFR parts 15 and 1520. No part of this record may be disclosed to persons without a "need to know", as defined in 49 CFR parts 15 and 1520, except with the written permission of the Administrator of the Transportation Security Administration or the Secretary of Transportation. Unauthorized release may result in civil penalty or other action. For U.S. government agencies, public disclosure is governed by 5 U.S.C. 552 and 49 CFR parts 15 and 1520.

addresses potential threats from individuals who may intend harm to aviation security but who are not in the TSDB maintained by the Terrorist Screening Center (TSC).

10. On December 25, 2009, Umar Farouk Abdulmutallab made a failed attempt to detonate an explosive device while onboard flight 253 from Amsterdam to Detroit. Mr. Abdulmutallab was not in the TSDB. Following this attack, the President of the United States initiated a review of the facts that permitted Abdulmutallab to board that flight. In his January 7, 2010 memorandum, the President concluded that immediate actions must be taken to enhance the security of the American people. TSA conducted its own review of the existing threats to aviation security and determined that it needed to mitigate the threat to commercial aviation posed by unknown or partially known terrorists based on analysis of current intelligence on terrorist travel and tradecraft. In order to do so, TSA partnered with U.S. Customs and Border Protection (CBP) to use the Automated Targeting System (ATS) to assist in designating individuals for enhanced screening during international air travel.

11. ATS is an enforcement and decision support tool that uses risk-based targeting to identify travelers, cargo and conveyances that may need additional scrutiny by CBP at the U.S. border. ATS receives advance information about passengers and crew attempting to fly to or from the United States. Information from both the Advanced Passenger Information System (APIS), which includes biographical information such as full name, date of birth, gender, flight number, date of arrival and departure, citizenship, and passport/alien registration card number, among others, and the Passenger Name Record (PNR), which refers to reservation information contained in an air carrier's electronic reservation

*WARNING:* This record contains Sensitive Security Information that is controlled under 49 CFR parts 15 and 1520. No part of this record may be disclosed to persons without a "need to know", as defined in 49 CFR parts 15 and 1520, except with the written permission of the Administrator of the Transportation Security Administration or the Secretary of Transportation. Unauthorized release may result in civil penalty or other action. For U.S. government agencies, public disclosure is governed by 5 U.S.C. 552 and 49 CFR parts 15 and 1520.

Case 1:16-cv-00375-AJT-JFA Document 239-4 Filed 03/25/19 Page 7 of 14 PageID# 6292
Case 1:16-cv-00375-AJT-JFA Document 239-1 Filed 03/25/19 Page 7 of 14 PageID# 6292

SUBMITTED IN CAMERA, EX PARTE
SENSITIVE SECURITY INFORMATION

system and/or departure control system that sets forth the identity and travel plans of each traveler or group of travelers included under the same reservation record, are utilized in the vetting of individuals attempting to travel to the United States.

12. ATS compares traveler information to travel patterns requiring additional scrutiny. The patterns are based on CBP officer experience, analysis of trends of suspicious activity and raw intelligence corroborating those trends. For example, ATS can compare information on travelers against criteria in a targeting rule developed by CBP that indicates a particular travel pattern is used by drug smugglers. CBP officials can then refer a person who meets such criteria who is attempting to enter or depart the United States for additional scrutiny, often known as a secondary inspection.

13. TSA creates two sets of rules that leverage ATS to designate passengers for enhanced screening. TSA's rules rely on an analysis of current intelligence reporting to identify a small portion of the traveling population into higher risk categories to determine whether individuals should receive enhanced screening. The rules developed by TSA exclusively address threats to aviation security or to the homeland. ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ TSA exclusively determines the rules that are used to designate airline passengers for enhanced screening and neither the Terrorist Screening Center nor the Watchlisting Advisory Council are involved in determining the rules. The rules constitute TSA final orders exclusively reviewable in a U.S. Court of Appeals pursuant to 49 U.S.C. § 46110.

14. ▮▮▮▮▮▮ rules designates passengers on international flights for enhanced screening. ▮▮▮▮▮▮▮▮▮▮ international rules that apply to domestic

WARNING: This record contains Sensitive Security Information that is controlled under 49 CFR parts 15 and 1520. No part of this record may be disclosed to persons without a "need to know", as defined in 49 CFR parts 15 and 1520, except with the written permission of the Administrator of the Transportation Security Administration or the Secretary of Transportation. Unauthorized release may result in civil penalty or other action. For U.S. government agencies, public disclosure is governed by 5 U.S.C. 552 and 49 CFR parts 15 and 1520.

screening operations ("Quiet Skies rules"). TSA identifies such rules to address unknown threats to aviation security. These rules are applied to a limited set of travelers who matched to an international rule and received enhanced security screening on an international flight as a result. Individuals matching to such rules receive enhanced screening for a limited period of time.

15. TSA currently utilizes ▇ Quiet Skies rules. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Out of the two million passengers TSA screens each day, the current Quiet Skies rules result in TSA designating approximately ▇ passengers for enhanced screening.

16. TSA does not confirm or deny whether an individual received enhanced screening as a result of matching to a rule. Whether or not an individual received enhanced screening as a result of matching to a rule, as well as the rules themselves and certain details about their implementation, constitute Sensitive Security Information ("SSI") pursuant to 49 U.S.C. § 114(r) and 49 C.F.R. §§ 1520.5(b)(9)(i) and (ii).

17. TSA's risk-based rules are only used by Secure Flight and are not used by any other TSA vetting programs. Federal agencies are required to provide "terrorist information" in their possession to the National Counterterrorism Center (NCTC) for integration into a terrorism identities database. "Terrorist information" is defined as "information about individuals known or reasonably suspected to be or to have been engaged in conduct constituting, in preparation for, in aid of, or related to terrorism or terrorist activities." This requirement excludes individuals who merely match a Quiet Skies rule, as such

WARNING: This record contains Sensitive Security Information that is controlled under 49 CFR parts 15 and 1520. No part of this record may be disclosed to persons without a "need to know", as defined in 49 CFR parts 15 and 1520, except with the written permission of the Administrator of the Transportation Security Administration or the Secretary of Transportation. Unauthorized release may result in civil penalty or other action. For U.S. government agencies, public disclosure is governed by 5 U.S.C. 552 and 49 CFR parts 15 and 1520.

individuals have only triggered a TSA rule that is an indication that there may be elevated risk that merits enhanced screening. Simply matching to a rule does not constitute derogatory information that the individual has or is suspected to have been engaged in conduct constituting, in preparation of, in aid of, or related to terrorism or terrorist activities. As a result, TSA does not submit information about individuals who match to a rule to TSC, NCTC, or the FBI for further screening or investigation by those agencies based solely on the match to the rule.[2]

18. Individuals who matched to a Quiet Skies rule will continue to receive enhanced screening ▆▆▆▆ or for a period of ▆▆▆▆ In order to minimize impacts on travelers, TSA maintains a cleared list to ensure an individual will not continue to receive enhanced screening from matching to a rule indefinitely, and to enhance privacy, civil rights and civil liberties protections. After ▆▆▆▆ or the requisite time period, individuals will not receive enhanced screening as a result of the prior match to a Quiet Skies rule.

19. TSA adds individuals to this cleared list for a period of ▆▆▆▆ During this time period, an individual would not be referred for enhanced screening due to ▆▆▆▆ ▆▆▆▆ After that ▆▆▆▆ period, travelers who match ▆▆▆▆

WARNING: This record contains Sensitive Security Information that is controlled under 49 CFR parts 15 and 1520. No part of this record may be disclosed to persons without a "need to know", as defined in 49 CFR parts 15 and 1520, except with the written permission of the Administrator of the Transportation Security Administration or the Secretary of Transportation. Unauthorized release may result in civil penalty or other action. For U.S. government agencies, public disclosure is governed by 5 U.S.C. 552 and 49 CFR parts 15 and 1520.

SUBMITTED IN CAMERA, EX PARTE
SENSITIVE SECURITY INFORMATION

▓▓▓ required to undergo enhanced security screening, and will again become eligible for this cleared list as described above.[3]

20. TSA rule sets for ATS are developed by the TSA Office of Intelligence & Analysis based on current threat information. The Office of Intelligence and Analysis continually evaluates the performance of the rules and the intelligence supporting them. If a rule is determined to no longer be necessary to address a particular threat, the rule will be deactivated and individuals identified for enhanced screening using the deactivated rule will no longer receive enhanced screening on account of that rule. Further, the rules are reviewed on a quarterly basis by the DHS Office for Civil Rights and Civil Liberties, the DHS Privacy Office, and the DHS Office of the General Counsel. The purpose of this review is to ensure that rules are based on current intelligence identifying specific potential threats; are deactivated when no longer necessary to address those threats; are appropriately tailored to minimize any impact upon bona fide travelers' civil rights, civil liberties, and privacy; and are in compliance with relevant legal authorities, regulations, and DHS policies.

### FAMS Intelligence-Based Deployments

21. FAMs are an integral part of risk-based security where they serve within a matrix of security layers, and often as a last line of defense. FAMs serve as a deterrent to those with intent to do harm, and their presence helps to sustain the confidence of the traveling public. The FAMS is unique in its flexibility and ability to re-deploy thousands of law

---

[3] Individuals may no longer be required to undergo enhanced screening at an earlier time as a result of TSA's threat assessment of the individual, multiple screenings, deactivation of the particular Quiet Skies rule, or a shorter period of time for receiving enhanced screening for certain rules.

WARNING: This record contains Sensitive Security Information that is controlled under 49 CFR parts 15 and 1520. No part of this record may be disclosed to persons without a "need to know", as defined in 49 CFR parts 15 and 1520, except with the written permission of the Administrator of the Transportation Security Administration or the Secretary of Transportation. Unauthorized release may result in civil penalty or other action. For U.S. government agencies, public disclosure is governed by 5 U.S.C. 552 and 49 CFR parts 15 and 1520.

**SUBMITTED IN CAMERA, EX PARTE**
SENSITIVE SECURITY INFORMATION

enforcement officers rapidly in response to specific threats or incidents in the transportation domain. As a risk-based organization, FAMS is responsive to current intelligence, threats and vulnerabilities and continually reviews its operations to further improve and mature the risk-based mission deployment methodology.

22. Information concerning the deployments, numbers, and operations of FAMs constitutes SSI pursuant to 49 U.S.C. § 114(r) and 49 C.F.R. §§ 1520.5(b)(8)(ii) ("details of aviation . . . security measures, both operational and technical, whether applied directly by the Federal government or another person," to include information "concerning the deployments, numbers, and operations of" FAMs constitutes SSI).

23. In March 2018, the FAMS began coverage of flights with individuals who matched to a Quiet Skies rule while continuing to prioritize flights ▮▮▮▮▮▮▮▮▮▮▮▮. As explained above, TSA formulates risk-based screening rules based on ▮▮▮▮▮▮▮▮▮▮ to identify higher risk travelers who are not on the TSDB.

24. TSA's Office of Intelligence and Analysis (I&A) provides the identities of individuals who matched to a Quiet Skies rule to FAMS up to 72 hours in advance of the individual's scheduled flight. The FAMS analyzes each flight ▮▮▮▮▮▮▮▮▮▮▮▮.

25. If a FAM team will cover the flight, they will receive information about the passenger in advance, including the individual's name, flight number, the rule(s) the passenger matched, and other available information relevant to the team's coverage.

*WARNING:* This record contains Sensitive Security Information that is controlled under 49 CFR parts 15 and 1520. No part of this record may be disclosed to persons without a "need to know", as defined in 49 CFR parts 15 and 1520, except with the written permission of the Administrator of the Transportation Security Administration or the Secretary of Transportation. Unauthorized release may result in civil penalty or other action. For U.S. government agencies, public disclosure is governed by 5 U.S.C. 552 and 49 CFR parts 15 and 1520.

**SUBMITTED IN CAMERA, EX PARTE**
SENSITIVE SECURITY INFORMATION

26. All FAM teams have multiple priorities during a flight, including ▓▓▓▓▓ ▓▓▓▓▓ monitoring other passengers in the cabin. The FAM team has the same priorities on flights with a Quiet Skies passenger (or any other higher-risk passenger) onboard, to include ▓▓▓▓▓ monitoring passengers in the cabin, although the FAM team will be sure to observe the higher-risk passenger in case he or she exhibits any suspicious activity. Unless suspicious activity is observed, the FAM team's coverage of the Quiet Skies passenger is limited to in-flight observations and observations at ▓▓▓▓▓ the airport. FAM teams merely observe what any passenger could observe while in the airport or passenger cabin.

27. After the flight, the FAM team will complete a report on which they will indicate whether or not they observed the passenger engage in suspicious activity. If there is no suspicious activity observed, the FAMS will make no report of any observations of the individual.[4] FAMs may also recommend, based on their observations, that an individual no longer receive enhanced screening as a result of the prior match to a rule. This recommendation is then shared with I&A for an assessment as to whether the individual should receive enhanced screening for ▓▓▓▓▓.

28. If the FAMs observe suspicious activity,[5] they will describe that activity on the report. The report is then shared with FAMS and I&A personnel, who will independently assess

---

[4] This would not permanently remove the possibility of the individual receiving enhanced screening, as the individual could match t▓▓▓▓▓ ▓▓▓▓▓ or be randomly designated for enhanced screening, among other reasons.
[5] Suspicious activity includes, but is not limited to, ▓▓▓▓▓ ▓▓▓▓▓

WARNING: This record contains Sensitive Security Information that is controlled under 49 CFR parts 15 and 1520. No part of this record may be disclosed to persons without a "need to know", as defined in 49 CFR parts 15 and 1520, except with the written permission of the Administrator of the Transportation Security Administration or the Secretary of Transportation. Unauthorized release may result in civil penalty or other action. For U.S. government agencies, public disclosure is governed by 5 U.S.C. 552 and 49 CFR parts 15 and 1520.

SUBMITTED IN CAMERA, EX PARTE
SENSITIVE SECURITY INFORMATION

the information to determine whether further sharing is warranted, such as with TSA's insider threat division.[6] If the suspicious activity rises to the level of suspected terrorist activity, TSA will share the information with other appropriate government agencies, including NCTC and the FBI. Absent such suspicious activity, no information is shared.

29. By leveraging risk-based rules through Secure Flight, the FAMS is able to use intelligence driven information as an element in identifying the highest risk domestic and international mission deployments. FAMS provides an adaptive layer of security with the ability to change deployment capability – literally overnight – in response to risk identified by current intelligence.

---

[6] "Insiders" are, or present themselves to be, current or former transportation sector workers (including both TSA and private sector personnel) and individuals employed or otherwise engaged in providing services requiring authorized access to transportation facilities, assets, or infrastructure. "Insider Threats" are "insiders" with the intent to cause harm to the transportation domain.

WARNING: This record contains Sensitive Security Information that is controlled under 49 CFR parts 15 and 1520. No part of this record may be disclosed to persons without a "need to know", as defined in 49 CFR parts 15 and 1520, except with the written permission of the Administrator of the Transportation Security Administration or the Secretary of Transportation. Unauthorized release may result in civil penalty or other action. For U.S. government agencies, public disclosure is governed by 5 U.S.C. 552 and 49 CFR parts 15 and 1520.

SUBMITTED IN CAMERA, EX PARTE
SENSITIVE SECURITY INFORMATION

DATED:   August 15, 2018
         Arlington, VA

*[signature]*

HAO-Y TRAN FROEMLING
Executive Director for Vetting
Office of Intelligence and Analysis
Transportation Security Administration

*WARNING:* This record contains Sensitive Security Information that is controlled under 49 CFR parts 15 and 1520. No part of this record may be disclosed to persons without a "need to know", as defined in 49 CFR parts 15 and 1520, except with the written permission of the Administrator of the Transportation Security Administration or the Secretary of Transportation. Unauthorized release may result in civil penalty or other action. For U.S. government agencies, public disclosure is governed by 5 U.S.C. 552 and 49 CFR parts 15 and 1520.