# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

**ANAS ELHADY,** *et al.*,        )
                                  )        **Case No. 16-cv-00375**
        Plaintiffs,               )        Hon. Anthony J. Trenga
                                  )        Mag. Hon. John F. Anderson
        v.                        )
                                  )        **[CORRECTED]**
**CHARLES H. KABLE,** Director of the   )   **PLAINTIFFS' MEMORANDUM**
Terrorist Screening Center; in his official   )   **IN OPPOSITION TO DEFENDANTS'**
capacity, *et al.;*               )        **MOTION FOR SUMMARY**
                                  )        **JUDGMENT**
        Defendants.               )

---

**CAIR LEGAL DEFENSE FUND**
Lena F. Masri (DC # 100019) ±
Gadeir I. Abbas (VA # 81161) *
Carolyn M. Homer (DC # 1049145) ±
453 New Jersey Ave SE
Washington, DC 20003
Tel: (202) 516-4724
Fax: (202) 379-3317
gabbas@cair.com


± Admitted *pro hac vice*

*Mr. Abbas licensed in VA, not in D.C.*
*Practice limited to federal matters*
*Admitted to practice in this Court*

**AKEEL AND VALENTINE, PLC**
SHEREEF H. AKEEL (MI # P54345) ±
888 W. Big Beaver Rd., Ste. 910
Troy, MI 48084
Phone: (248) 269-9595
shereef@akeelvalentine.com


*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS...................................................................................................I

TABLE OF SUPPLEMENTAL EXHIBITS IN OPPOSITION ......................................III

INTRODUCTION ............................................................................................................1

STATEMENT OF DISPUTED FACTS............................................................................1

    A.    Disputed Facts Regarding Government Operation of the TSDB...................1

    B.    Disputed Facts Regarding Plaintiffs' Experiences .......................................4

        1.    Dispute of Government's Summary Paragraph ...............................4

        2.    Osama Ahmed's Watchlist Experiences .........................................6

        3.    Ahmad Al Halabi's Watchlist Experiences .....................................7

        4.    Saleem Ali's Watchlist Experiences ...............................................9

        5.    Mark Amri's Watchlist Experiences .............................................11

        6.    Samir Anwar's Watchlist Experiences ..........................................11

        7.    Shahir Anwar's Watchlist Experiences .........................................12

        8.    Ibrahim Awad's Watchlist Experiences ........................................13

        9.    Michael Coleman's Watchlist Experiences....................................15

        10.    Baby Doe's Watchlist Experiences................................................16

        11.    John Doe 2's Watchlist Experiences ..............................................17

        12.    John Doe 3's Watchlist Experiences ..............................................17

        13.    John Doe 4's Watchlist Experiences ..............................................18

        14.    Anas Elhady's Watchlist Experiences ...........................................19

        15.    Ausama Elhuzayel's Watchlist Experiences ..................................21

        16.    Zuhair El-Shwehdi's Watchlist Experiences .................................22

        17.    Hassan Fares's Watchlist Experiences ..........................................23

        18.    Murat Frljuckic's Watchlist Experiences ......................................24

        19.    Wael Hakmeh's Watchlist Experiences ........................................26

        20.    Yasseen Kadura's Watchlist Experiences ......................................27

        21.    Muhammad Khan's Watchlist Experiences ....................................28

        22.    Adnan Khalil Shaout's Watchlist Experiences ..............................29

        23.    Hassan Shibly's Watchlist Experiences ........................................31

        24.    Donald Thomas's Watchlist Experiences ......................................33

OPPOSITION ARGUMENT ..........................................................................................34

I.   PLAINTIFFS HAVE STANDING TO CHALLENGE THE WATCHLIST ............................34

    A.   The Watchlisting System Injures Plaintiffs in the Present and the Future......................35

    B.   The Government's Watchlisting System Has Deterred Plaintiffs from Travel.................37

    C.   The Court Should Follow the Ninth Circuit's Decision in *Fikre v. FBI* to Resolve Any Standing or Mootness Concerns .....................................................................................39

II.  DHS TRIP IS A SHAM, AND COMPLETING IT IS NOT A PREREQUISITE FOR JUDICIAL INTERVENTION............................................................................................40

III. DHS TRIP PROVIDES FACIALLY INADEQUATE PROCESS FOR PLAINTIFFS .........42

IV.  THE WATCHLISTING SYSTEM DEPRIVES PLAINTIFFS' OF THEIR MOVEMENT-BASED RIGHTS AND RIGHT TO BE FREE FROM GOVERNMENT-IMPOSED STIGMA........................................................................................43

    A.   Experiencing Handcuffing at Gunpoint at the Border, among other Horrors, is a Deterrent to International and Domestic Travel ...........................................................43

    B.   TSDB Listings and Dissemination Deprive Plaintiffs of their Stigma-Plus Liberty Interests......................................................................................................................44

CONCLUSION.........................................................................................................................46

**TABLE OF SUPPLEMENTAL EXHIBITS IN OPPOSITION**

| # | Exhibit Title | Date |
|---|---|---|
| 84 | Government Privilege Logs in *Elhady v. Kable* | November 2017 – March 2019 |
| 85 | 2013 Watchlisting Guidance | March 2013 |
| 86 | Declaration of Scott A. Rago Federal Bureau of Investigation | March 25, 2019 |
| 87 | Information Bulletin - Quiet Skies Selectees | March 13, 2018 |
| 88 | Critical Infrastructure Protection | February 2017 |
| 89 | Plaintiff Saleem Ali's Second Amended Responses To Defendants' First Set of Discovery Requests to Plaintiffs | February 2018 |
| 90 | Plaintiff Anas Elhady TECS Record | April 11, 2015 |
| 91 | Plaintiff Kadura DHS TRIP Letter | September 4, 2015 |
| 92 | Plaintiff Coleman DHS TRIP Letter | September 15, 2015 |
| 93 | JD3 DHS TRIP Inquiry | July 2014 – January 2015 |

## INTRODUCTION

"[T]hey handcuffed me in front of my four-year-old kid.  He was crying so much.  That was the hardest part."
Plaintiffs' MSJ Ex. 11, Frljuckic Dep at 47.

Any fair-minded reading of Plaintiffs' testimony establishes that the Watchlisting System terrorizes people.  It stigmatizes them.  It stops them from traveling across borders or by plane.  It inflicts all of these harms and more.

This case is not about Plaintiffs' mere convenience.  It is about the ability of the Government to place innocent Americans—people who have never been arrested, charged, let alone convicted of a terrorism-related offense—on a secret list, administered with no notice.  There is no notice of the deprivation, of the evidence, nor even of the inclusion standard.  It is all secret.  Just last week, in fact, Defendants adopted a new secretive governing document for its list – the 2018 Watchlisting Guidance.  No one but Defendants knows anything about the contents.

Given the startling extent of Plaintiffs' deprivations, on one hand, and the sham redress process on the other, this Court should issue an injunction prohibiting Defendants from placing innocent Americans—those who have not been arrested, charged, or convicted of a terrorism-related offense—on Defendants' lists.

## STATEMENT OF DISPUTED FACTS

### A.    Disputed Facts Regarding Government Operation of the TSDB

1.    Plaintiffs dispute Government Facts ¶¶ 1-3 insofar as the Government has invoked privileges to block Plaintiffs' inquiries into the global terrorism threat environment pursuant to the law enforcement privilege. *See, e.g.,* Plaintiffs MSJ Ex. 25, TSC Dep. at 283:19-284:4; Plaintiffs MSJ Ex. 28, FBI Dep. at 84:17-85:1, 90:13-20, 91:16-22, 104:16-105:1, 124:15-20, 126:11-17, 164:5-11; Plaintiffs MSJ Ex. 26 TSA Dep. at 211:22-212:16, Plaintiffs MSJ Ex. 29, TSA Supp. Dep. at 72:16-21; Plaintiffs' MSJ Opp. Ex. 84, Gov't Privilege Logs.

2.    Plaintiffs further dispute Government Facts ¶¶ 1-3 because use of the TSDB has not been shown to identify any perpetrator of terrorism or prevent any act of terrorism.  *See* Plaintiffs' MSJ Facts ¶¶ 139-141.

3.      Plaintiffs further dispute Government Facts ¶¶ 1-3 because robust statistical analysis of watchlist records could demonstrate that placement on the TSDB operates no better than random selection in identifying perpetrators of terrorism or preventing acts of terrorism.  *See* Declaration of Fairley and Huber Re: Statistical Documents, Dkt. 253-1 ¶¶ 5, 7, 11.

4.      Plaintiffs dispute Government Fact ¶ 11 to the extent it implies that CBP secondary inspection of TSDB Listees is not mandatory.  *See* Plaintiffs' MSJ Fact ¶ 29; Plaintiffs' MSJ Opp. Ex. 85, 2013 Watchlisting Guidance at 59-60, 65, 79 (describing CBP encounter processes, including preparing Secondary Exam Reports as terrorism information).

5.      Plaintiffs dispute Government Fact ¶ 12 in part. Plaintiffs do not deny that "the TSDB is constantly changing as it is continuously reviewed and updated."  However, as presented by the Government, this fact omits the detail that since 2006 the TSDB has retained copies of all prior versions of a person's watchlist record, and that CBP's TECS system includes all prior encounter information with TSDB Listees. *See* Plaintiffs' MSJ Facts, ¶¶ 5, 34.

6.      Plaintiffs dispute Government Fact ¶ 17 to the extent it implies that the "informed judgments by experienced analysts and agents" regarding watchlisting are reliable or error-free.  *See* Plaintiffs' Facts ¶¶ 136-139; *Ibrahim v. Dep't of Homeland Security*, 912 F.3d 1147 (9th Cir. 2019) (en banc) (detailing history of erroneous inclusion of Stanford graduate student on the watchlist). Plaintiffs note that for the last decade, TSC has accepted 99% or more of the hundreds of thousands of watchlist nominations it receives each year.  *See* Plaintiffs' MSJ Ex. 66 at 22.  Plaintiffs further note that only 35 people within TSC are tasked with reviewing and accepting nominations. Plaintiffs' MSJ Ex. 25, TSC Dep. at 374:5-21.  This means each individual TSC employee is tasked with reviewing approximately 13,750 nominations per year, or 50 per workday.

7.      Plaintiffs further dispute Government Fact ¶ 12 to the extent the Government has utilized privileges to block Plaintiffs' inquiry into specific "policy-based criteria," "intelligence-gathering tools," and "detailed analytical standards" such that they have not been subjected to cross-examination or adversarial testing.  *See generally* Plaintiffs' MSJ Opp. Ex. 84, Gov't Privilege Logs. *See also, e.g.,* Plaintiffs MSJ Ex. 25, TSC Dep. at 283:19-284:4; Plaintiffs MSJ Ex. 28, FBI Dep. at 84:17-

2

85:1, 90:13-20, 91:16-22, 104:16-105:1, 124:15-20, 126:11-17, 164:5-11; Plaintiffs' MSJ Ex. 27, CBP Dep. at 131:22-132:6; Plaintiffs MSJ Ex. 26 TSA Dep. at 211:22-212:16; Plaintiffs MSJ Ex. 29, TSA Supp. Dep. at 72:16-21.

8.     Plaintiffs dispute Government Facts ¶¶ 28-29 to the extent that internal Government assessments regarding terrorism threats and DHS TRIP processes have not been made available to the Plaintiffs for adversarial testing.  *See generally* Plaintiffs' MSJ Opp. Ex. 84, Gov't Privilege Logs.

9.     Plaintiffs further dispute Government Facts ¶¶ 28-29 to the extent the Government made identical arguments regarding the dangers of providing notice to U.S. Persons of their No Fly List status prior to 2015, but the Government has since identified no actual harm has resulted from the implementation of revised redress procedures.  *See* Plaintiffs' MSJ Ex. 40, FBI North *Ibrahim* Decl. ¶¶ 13-21; Plaintiffs' MSJ Ex. 42, FBI Giuliano *Latif* Decl. ¶¶ 13-20.

10.     Plaintiffs dispute Government Fact ¶ 31 to the extent it omits that HSPD-6 expressly contemplates the sharing of TSDB information to assist in private-sector screenings.  *See* Plaintiffs' MSJ Facts ¶ 4.

11.     Plaintiffs dispute Government Fact ¶¶ 35-36 to the extent that any administrative redress process regarding the denial of federal employment or credentials still does not entail notice of TSDB status, its factual basis, or the opportunity to contest that TSDB status.

12.     Plaintiffs dispute Government Fact ¶ 35 that "An individual's inclusion in one or more government databases is not determinative of TSA's eligibility determinations" for credentials. Rather, at least six employment credentials related to access to critical infrastructure screen against the TSDB.  Plaintiffs' MSJ Opp. Ex. 88, Critical Infrastructure Protection at 8.  Presence on the TSDB is a basis for denial of the credential.  *See id.* at 9. *See also* Plaintiffs' Facts ¶¶ 99-106.

13.     Plaintiffs dispute Government Facts ¶¶ 37 to the extent it omits that during the brief period of time Plaintiffs' counsel reviewed the NCIC private entity list, Plaintiffs identified one private high school which did not meet the Government's own criteria to possess an ORI.  Last week CJIS revoked that high school's access to the NCIC.  *See* Plaintiffs' MSJ Opp. Ex. 86, March 25, 2019 FBI Declaration.

14. Plaintiffs generally dispute that Government Facts ¶¶ 1-37 regarding operation of the TSDB are sufficient to adjudicate whether the TSDB comports with procedural due process. Plaintiffs contend the Government's presentation includes material omissions about the TSDB, and therefore incorporate and cross-reference the entirety of Plaintiffs' Statement of Facts in support of Plaintiffs' MSJ. (Dkt. 304). Plaintiffs further dispute that the Government's descriptions of the TSDB and watchlisting policy is complete to the extent the Government does not reference binding watchlisting policy documents and information which the Government has withheld as privileged. *See generally* Plaintiffs' MSJ Opp. Ex. 84, Gov't Privilege Logs.

15. Plaintiffs specifically dispute Government Facts ¶¶ 1-37 to the extent they entirely omit the fact that the Government labels individuals as "high-risk," labels individuals as known, suspected, or potential terrorists, and singles them out for heightened scrutiny and the denial of benefits, based on TSDB Listee associational information. *See* Plaintiffs' Facts ¶ 19, 33, 64, 66, 120; Plaintiffs' MSJ Opp. Ex. 85, 2013 Watchlisting Guidance at 5, 22-23, 32, 38-39, 42-43, 66-69, 75; Plaintiffs' MSJ Opp. Ex. 87, Quiet Skies Bulletin.

**B. Disputed Facts Regarding Plaintiffs' Experiences**

**1. Dispute of Government's Summary Paragraph**

16. Plaintiffs dispute Government Fact ¶ 38 as an accurate summary of Plaintiffs' adverse experiences. Plaintiffs generally refer the Court to Plaintiffs' MSJ Ex. 3 at 190-193, 202-204,240-245, 3B; Ex. 4 at 27, 65-70; Ex. 8 at 77-78, 287-288; Ex. 5 at 80-81; Ex. 9 at 125-131, 281-282, 9C; Ex. 10 at 46-59, 66-67, 93-94, 138-143; Ex. 10H; Ex. 13 at 40-45, 47-49; Ex. 19 at 95-104; Ex. 23 at 30-32, 176-178; Gov't MSJ Ex. 4, Moore Decl. ¶ 27, ¶ 35, ¶ 37, ¶ 42, ¶ 46; *Kadura v. Lynch*, No. 4:14-cv-13128, Dkt. No. 28 (E.D. Mich. Nov. 13, 2015); Plaintiffs' Opp. Ex. 91.

17. Plaintiffs deny that only four Plaintiffs were denied boarding, that none were prohibited from travel, and that none believe they are currently on the No Fly List. Five Plaintiffs – Elhuzayel, Thomas, Amri, Kadura and John Doe 4 – were denied boarding and therefore prohibited from travel. Moreover, subsequent to being denied boarding, John Doe 4 was told by an FBI agent that he was given a one-time pass to fly on one international trip so that he can get married.

Plaintiffs' MSJ Ex. 9, Elhuzayel Dep. at 125-131, 136-137, 160; Plaintiffs' MSJ Ex. 10  Thomas Dep. at 44-59, 93, 106; Plaintiffs' MSJ Ex. 3, Kadura Dep. at 190-193; Plaintiffs' MSJ Ex. 23, JD4 Dep. at 30-33; Plaintiffs' MSJ Ex. 23, JD4 Dep. at 71-73, 85-86, and 176-178.

18.     Shortly after joining lawsuits challenging their No Fly List status, Elhuzayel and Kadura received letters from DHS TRIP stating "[t]he U.S. Government knows of no reason" why they "should be unable to fly." Further, after being added to the No Fly List, Thomas was also permitted to board his flight he took shortly after joining this lawsuit – although he never submitted a DHS TRIP inquiry after being denied boarding.  Plaintiffs' MSJ Ex. 3B, Kadura Redress; Gov't MSJ Ex. 4, Moore Decl. ¶¶ 37, 42, 46; Plaintiffs' MSJ Ex. 10 at 164, 171.

19.     Plaintiffs further deny that none have been informed by government officials whether they are on a watchlist that would require enhanced screening.  Elhuzayel was informed that he could not board his flight by an armed agent who escorted him out of an airport as other agents "[h]ad their guns ready to go." Plaintiffs' MSJ Ex. 9, Elhuzayel Dep. at 125-131, 136-137, 160. Thomas and his friend were both contacted by an FBI agent who informed them separately that Thomas would not be allowed to fly unless he returned the agent's call. Plaintiffs' MSJ Ex. 10 at 142, 159-160. Kadura was contacted by an HSI Special Agent and asked to meet at a hotel room to discuss how he can "help America" to achieve "democracy in Libya," in exchange for his phone and to "fix [his] travel issues."   Ahmed was informed by the FBI that he was on the No Fly List and would be removed if he acted as an informant. Plaintiffs' MSJ Ex. 3, Kadura Dep. at 138-141, 148-149, 169, 202-204. Dr. Fares was told by TSA agents that he was required to undergo additional screening and questioning due to a designation given to him before they removed him from a plane after boarding, causing him to miss his flight. Plaintiffs' MSJ Ex. 19, Fares Dep. at 95-105. Al Halabi was informed by an FBI agent at his brother's home that being handcuffed and detained at the border until clearance is obtained is "a process that needs to take place." Plaintiffs' MSJ Ex. 5 Halabi Dep. at 80-81. Frljuckic was told by a CBP officer during one of five border crossings where he was handcuffed at gunpoint, detained and interrogated for more than 4.5 hours each time that if he were to do a U-turn and cross the border again, he would have to be subjected to the same treatment.

Plaintiffs' MSJ Ex. 11, Frljuckic Dep. at 46-51, 66-69, 81-85, 93-94, 101-103. Shibly was told by a Customs officer at a border crossing that he would be stopped by armed officers and handcuffed again the next time he reenters the U.S. He was also told by a Customs officer at an airport that he was being subjected to heightened scrutiny because "[w]e have to protect against bombs and terrorism." Plaintiffs' MSJ Ex. 8 at 73-75, 77-78, 95, 107, 110-111, 218-220, 310, 312-313.

20.    Plaintiffs admit that none have been denied the ability to purchase a gun; however, Defendants neglect to mention that Shibly's application for a concealed weapon permit was subjected to a delay. Plaintiffs' MSJ Ex. 8 at 288. Plaintiffs further state that Defendants' assertion that no Plaintiffs have been denied a job at an airport is misleading. Defendants neglect to mention that Ahmed was employed as a supervisor at Detroit Metro Airport prior to being added to the No Fly List. After being added to the No Fly List, FBI agents told him that his job at the airport could be impacted by his status on the watchlist and that if he acted as their informant, they could remove him from the list. His Customs seal was ultimately revoked without notice or explanation, which interfered with his ability to perform his job. Plaintiffs' MSJ Ex. 4 at 27, 65-70.

21.    Plaintiffs admit that they are all U.S. citizens and that none have been denied the ability to board a ship or a boat.

### 2.    Osama Ahmed's Watchlist Experiences

22.    Plaintiffs dispute Government Facts ¶¶ 39-40 in part. Plaintiffs generally refer to Plaintiffs' MSJ Ex. 4, Ahmed Dep. at 17-32, 36-39, 42-45, 72-73 for clarification. Ahmed admits that he traveled approximately twice a month from 2003 to 2009 across the border to visit family, and that 90% of those trips resulted in secondary inspections. More than twenty of those inspections lasted more than five hours. He stopped crossing the border in 2009 to visit his family in Canada. Ahmed further admits that he has thrice traveled by air to Yemen since 2010 and that he was subjected to enhanced screening during his last two international trips. Plaintiffs' MSJ Ex. 4, Ahmed Dep. at 17-46.

23.    However, Defendants neglect to mention that Ahmed was also subjected to enhanced screening during his 2010 international trip. In 2010, he was screened three times before

he was permitted to board his outbound flight, including once at the gate, causing him to almost miss his flight.  After returning from his trip, he was pulled aside for secondary screening and interrogated about "what sect of Islam I followed, what imams I followed, what mosques I went to…They asked if I was affiliated to different organizations."  Ahmed admits that his USB drive was confiscated; however, he adds that it was returned approximately two months later during a visit by FBI agents who pressured him at his home and at a restaurant to become an informant.  Ahmed refused to work with them, so the FBI agents did not remove him from the list.   Plaintiffs' MSJ Ex. 4, Ahmed Dep. at 20-32.

24.    Defendants neglect to mention that in 2014 and 2016, he was screened by multiple officers before being permitted to board his outgoing flights, including connections.  After returning from his 2014 trip, he was again pulled aside for screening and interrogated for approximately an hour about "where I pray and who I follow."  Plaintiffs' MSJ Ex. 4, Ahmed Dep. at 32-41.

25.    In 2016, Ahmed was not permitted to board his outgoing flight with his laptop, so he was forced to arrange for a friend to pick it up.  For his return trip in 2016, he admits that he missed his flight in Qatar due to enhanced screening; however, Defendants omit that he almost missed his rebooked flight due to enhanced screening as well.  Ahmed admits that afterwards, upon arriving at his connection, he missed his connecting flight due to secondary screening and boarded a rebooked flight one or two hours later. Defendants omit that during this secondary screening, he was interrogated about his religious views, among other things, for three hours.  Plaintiffs' MSJ Ex. 4, Ahmed Dep. at 38, 42-46.

26.    Ahmed admits that he had no issues traveling to his deposition in February 2018; however, he adds that absence "was very weird."  Ahmed also admits that he completed a DHS TRIP traveler inquiry form on April 20, 2011 and that DHS TRIP issued a final determination letter in response to that inquiry on or about October 4, 2011. Plaintiffs' MSJ Ex. 4, Ahmed Dep. at 72-73; Gov't MSJ Ex. 4, Moore Decl. ¶ 24.

3.    **Ahmad Al Halabi's Watchlist Experiences**

27.    Plaintiffs dispute Government Facts ¶¶ 41-42 in part.  Plaintiffs generally refer for

clarification to Plaintiffs' MSJ Ex. 5, Al Halabi Dep. at 9, 27-29, 32, 34, 37-51, 57, 63-67, 72-80, 82-83, 88, 92, 94, 103, 107-108, 135-137, 150-152. Al Halabi admits that in 2005, he entered the U.S. by land near San Diego, and was questioned, searched and detained for approximately four and a half hours. However, Defendants omit that he was detained in a cold, concrete cell. Plaintiffs' MSJ Ex. 5, Al Halabi Dep. at 26-29.

28.     Al Halabi also admits that from 2005-2016, he lived in Dubai. However, Defendants ignore the reason he lived in Dubai. He was forced to uproot his life, sell everything he owned and move to Dubai so that he could live with his wife because the immigration petition he filed for her was delayed by Defendants for more than 10 years because of his status on the watchlist. Plaintiffs' MSJ Ex. 5, Al Halabi Dep. at 9, 31-32, 34.

29.     Al Halabi further admits that he took approximately seven international trips and three domestic trips between 2012 and 2017, that he was routinely interrogated by someone from the U.S. Embassy and subjected to enhanced screening during those trips, and that he missed two connecting flights as a result of enhanced screening. Defendants omit, however, that after each international trip by air upon arriving in the U.S., government agents check the passports of all passengers until he is identified and escorted for secondary inspection and interrogation. After an international trip in 2012, both he and his daughter were interrogated and left in a room for four and a half hours before clearance to board his connecting flight was given from "Washington," and all their belongings were taken out of their luggage and searched, causing them to miss their connecting flight and spend the night. In 2014, after his wife's visa was finally processed, Al Halabi took his wife and children on an international flight to the U.S. The entire family was detained in a holding cell for an hour, then they were taken to a secondary inspection area where all their luggage and carry-ons were opened and searched, and afterwards he was taken to a back room to be interrogated, causing them to miss their connecting flight. Plaintiffs' MSJ Ex. 5, Al Halabi Dep. at 36-52, 63-67.

30.     Al Halabi admits that in 2014, he and his entire family were detained at the border for approximately five hours after entering the U.S. by land from Canada. However, Defendants omit that his entire family was detained although they drove in three separate cars, including his

brother who drove to the border to check on his family.  Moreover, he was handcuffed in front of his family, detained (without ever being interrogated) in a freezing cold holding cell with bright lights without his shoes – his feet were frozen.  This experience caused him to have "flashbacks of the time [he worked] in Guantanamo… that's how prisoners were in that holding cell."  Plaintiffs' MSJ Ex. 5, Al Halabi Dep. at 71-80.

31.     Al Halabi admits that since 2016, "with the complaint, I started seeing less and less interrogation and, you know, invasive searching," including one international flight, two land border crossings and his flight for his deposition.  However, Defendants fail to mention that, as he noted during his deposition, all of these trips occurred after Al Halabi joined this lawsuit.  "It was quite a scene to me.  It was amazing."  Plaintiffs' MSJ Ex. 5, Al Halabi Dep. at 103, 107.

32.     Al Halabi admits that as part of his employment with a contractor, he acquired a security badge giving him full access to the Detroit airport's facilities.  However, Defendants omit that whereas obtaining security clearance would normally take three to four days, his was delayed three weeks.  Moreover, he applied for the job and security badge after filing this lawsuit. Plaintiffs' MSJ Ex. 5, Al Halabi Dep. at 150-52.

33.     Al Halabi further admits that he submitted three DHS TRIP inquiries and was issued a final determination letter each time.  Gov't MSJ Ex. 4, Moore Decl.  ¶ 25.

### 4.      Saleem Ali's Watchlist Experiences

34.     Plaintiffs dispute Government Facts ¶¶ 43-46 in part.  Plaintiffs generally refer for clarification to Plaintiffs' MSJ Ex. 15, Ali Dep. at 36, 40-42, 45, 49-53, 69-72, 83-88, 90-92.  Ali admits traveling by air on more than 15 flights between 2011 and 2017.[1]  Ali admits being interrogated upon reentry in 2011 for approximately three hours; however, Defendants omit that he was interrogated about "who was my Imam, they asked what masses I prayed at," and about the

---

[1] Defendants' interrogatories only asked for international travel to and from the United States.  Ali took two international trips from Canada to Indonesia during this time period, both of which were not responsive to Defendants' interrogatories.  Ali did disclose driving across the border to make those flights.  Plaintiffs' MSJ Ex. 15, Ali Dep. at 43, 45; Plaintiffs' Opp. Ex. 89 at Rog 43.

religious books he was carrying.  Plaintiffs' MSJ Ex. 15, Ali Dep. at 29-45.

35.     Ali also admits that on an outgoing flight in 2014, he experienced enhanced screening at the TSA checkpoint, and that he was told it was a random selection.  However, Defendants ignore that he was the only one in his entire family – a group of eight – that was unable to obtain his boarding pass until an airline representative received clearance to print it.  In fact, he has been unable to obtain his boarding pass until an airline representative received clearance for every single flight since 2011.  Ali also admits that upon reentry from a March 2017 trip from Indonesia, he was interrogated by CBP for approximately 45 minutes and that he was again told he was randomly selected.  However, Defendants fail to mention that when he was taken to secondary inspection to be interrogated, the only other people there that were selected for secondary inspection were three other Muslims.  Plaintiffs' MSJ Ex. 15, Ali Dep. at 40-41, 68-72, 83-88.

36.     Ali admits that between 2014 to 2016, he frequently exited and reentered the U.S. by land.[2]  In fact, he recalled at least four incidents returning to the U.S. across the border during that time period and being selected for secondary inspection and detained each time.  Ali admits that in November (not October) 2015, he was detained for approximately six hours, had his phone confiscated and was told to return the next day to retrieve his phone.  However, Defendants omit that because he was traveling with a friend, they were both detained and interrogated for six hours, and they both had their phones confiscated. Plaintiffs' MSJ Ex. 15, Ali Dep. at 47-56.

37.     Ali admits that between September and December 2017, he made 11 (not 12) trips into Canada as part of his employment as a truck driver, and that after each trip, he returned to the U.S. by air.  He also admits that he was unable to obtain a boarding pass for any of these flights unless an airline representative obtained clearance and printed them for him.  Ali admits that he did not encounter additional screening on these flights; however, he notes that all of these flights were taken after joining this lawsuit. Plaintiffs' MSJ Ex. 15, Ali Dep. at 74-92.

38.     Ali admits that he submitted a DHS TRIP inquiry on March 15, 2011 and that DHS

---

[2] Ali has had problems crossing the border since well before 2011.  Plaintiffs' MSJ Ex. 15, Ali Dep. at 31-32.

TRIP issued a final determination letter in response to that inquiry on or about March 30, 2011. Gov't MSJ Ex. 4, Moore Decl. ¶ 26.

### 5.   Mark Amri's Watchlist Experiences

39.     Plaintiffs dispute Government Facts ¶¶ 47-48 in part.  Plaintiffs generally refer for clarification to Plaintiffs' MSJ Ex. 13, Amri Dep. at 39-40, 42-45, 64-83, 86.  Amri admits he never had travel issues by land or by air prior to January 2016.  Plaintiffs' MSJ Ex. 13, Amri Dep. at 39-41.

40.     Amri admits that he was unable to obtain a boarding pass when he attempted to fly to Las Vegas for business purposes in January 2016.  However, Defendants neglect to mention that he was delayed an hour and a half to two hours before he was informed by an airline representative that the government will not allow him to fly.  Plaintiffs' MSJ Ex. 13, Amri Dep. at 41-45.

41.     Amri further admits that he has flown domestically twice since, in August 2016 and March 2018, and that he was subjected to enhanced screening both times.  However, he denies the remainder of ¶ 48 as false and misleading.  In March 2018, Amri was subjected to six searches and chemically tested four times before he was finally cleared to board his rebooked connecting flight (after missing the first one due to enhanced screening) from Dallas to Washington, DC, to testify for his deposition in this case.  Plaintiffs' MSJ Ex. 13, Amri Dep. at 57-83.

42.     Amri admits that he filed a DHS TRIP inquiry on March 4, 2016.  Amri further admits that DHS TRIP issued a final determination letter in response to that inquiry on or about September 1, 2016, that stated, "At this time the U.S. Government knows of no reason, related to your inquiry, that you should be unable to fly."  Gov't MSJ Ex. 4, Moore Decl. ¶ 27.

### 6.   Samir Anwar's Watchlist Experiences

43.     Plaintiffs dispute Government Facts ¶¶ 49-51 in part.  Plaintiffs generally refer for clarification to Plaintiffs' MSJ Ex. 17, Samir Dep. at 31-35, 60-61, 64-72, 82-90, 92-93. Samir Anwar admits that prior to 2014, he has crossed the border for approximately 15 trips without incident. Anwar further admits that he crossed the border into the U.S. in May 2014 and February 2015 and he was detained and interrogated both times for approximately three and a half hours.  However, Defendants fail to mention that in May 2014, his wife was detained with him, and in February 2015,

his father was detained with him.  Additionally, Defendants also do not mention that in May 2014, Anwar was pressured to provide the password to his phone because a CBP officer threatened to confiscate it and never return it. Plaintiffs' MSJ Ex. 17, Samir Dep. at 64-73, 82-91.

44.     Anwar further admits that in June 2014, he was subjected to enhanced screening in connection with a domestic flight, however denies that he was only delayed 15 minutes.  In fact, in both legs of the trip he was unable to print his boarding pass until the airline representative obtained clearance.  Moreover, he – in addition to his wife and daughter – were all subjected to enhanced screening, and then subsequently detained while eating at a restaurant despite having cleared security before TSA agents obtained clearance a second time before they could board their return flight. Plaintiffs' MSJ Ex. 17, Samir Dep. at 30-36.

45.     Anwar admits that he did not travel to Canada – to a family engagement party – due to the enhanced screening he is subjected to when he crosses the border.  However, Defendants omit that he also did not cross the border to attend multiple family events for the same reason. Plaintiffs' MSJ Ex. 17, Samir Dep. at 92-93.

46.     Anwar admits that he has had no travel issues in connection with a border crossing in September 2017, two domestic flights he took in August 2017, and a domestic flight he took in January 2018 for his deposition in this case, but states that all those flights occurred after joining this lawsuit.  Defendants fail to mention that he testified that travel has been smoother since he joined this lawsuit.  Plaintiffs' MSJ Ex. 17, Samir Dep. at 60-61.

47.     Anwar admits that he completed a DHS TRIP inquiry form on July 9, 2014 and DHS TRIP issued a final determination letter in response to that inquiry on or about August 7, 2014.  Plaintiffs' MSJ Ex. 17, Samir Dep. at 113-118; Gov't MSJ Ex. 4, Moore Decl. ¶ 28.

7.     **Shahir Anwar's Watchlist Experiences**

48.     Plaintiffs dispute Government Facts ¶¶ 52-54 in part.  Plaintiffs generally refer for clarification to Plaintiffs' MSJ Ex. 16, Shahir Dep. at 47-56, 58-60, 65-66.  Shahir Anwar admits that he estimated that he traveled by land to Canada and back once or twice per year.  Shahir Anwar specifically recollected six to seven trips by land since 2005.  Anwar admits that in 2006, he was

detained at the border for two to three hours, along with his family, and all their luggage was searched.  Plaintiffs' MSJ Ex. 16, Shahir Dep. at 43, 46-48 (just last sentence).

49.     Anwar admits that he was not subjected to enhanced screening for an international trip he took in 2010; however, Defendants omit that his itinerary was booked by a travel agency as part of a larger group trip.  Plaintiffs' MSJ Ex. 16, Shahir Dep. at 48-50.

50.     Anwar further admits that in 2013 and 2014 he was unable to print his boarding pass and security searched through all his items in connection with two domestic flights he took in those years.  However, Defendants do not mention that for each leg of each of those flights, he was delayed a half hour before an airline representative boarding pass obtained clearance to print his boarding pass, and another hour and half for enhanced screening.  Moreover, all his boarding passes were stamped "SSSS" during those trips.  Defendants also fail to mention that in 2014, he was traveling with 10-15 coworkers that witnessed the same delays and enhanced screening he was being subjected to.  Plaintiffs' MSJ Ex. 16, Shahir Dep. at 51-56, 58-60.

51.     Defendants neglect to mention that due to his own experiences traveling in addition to knowledge of the treatment his brother, Samir Anwar, has been subjected to at the border, Shahir Anwar stopped crossing the border entirely.  Plaintiffs' MSJ Ex. 16, Shahir Dep. at 66.

52.     Anwar further admits he did not encounter any difficulties flying in connection with the last three domestic trips he took or his last border crossing.  However, Defendants fail to mention he testified "when the lawsuit was filed, it seemed like everything just kind of went away." Each of these trips were taken after joining this lawsuit. MSJ Ex. 16, Shahir Dep. at 65-66.

53.     Anwar admits that he completed a DHS TRIP inquiry form on November 3, 2014 and that DHS TRIP issued a final determination letter in response to that inquiry on or about March 23, 2015.  Gov't MSJ Ex. 4, Moore Decl. ¶ 29.

8.      **Ibrahim Awad's Watchlist Experiences**

54.     Plaintiffs dispute Government Facts ¶¶ 55-58 in part.  Plaintiffs generally refer for clarification to Plaintiffs' MSJ Ex. 12, Awad Dep. at 38, 57-60, 73-82, 89, 93-96, 97-99, 102-103, 106-108, 111-116.  Awad admits that since becoming an adult, he has not been subjected to

enhanced screening in connection with domestic flights.  However, Defendants neglect to mention that he was subjected to enhanced screening in connection with the two domestic flights he recalls taking as a minor.  He was subjected to enhanced screening as a nine or ten year old, while his mother waited for him.  He was again subjected to enhanced screening while traveling with his father as a 13 year old, which ultimately caused them both to miss their flight.  Plaintiffs' MSJ Ex. 12, Awad Dep. at 101-108.

55.     Awad admits that in 2013, on a connecting flight from the U.S. to Turkey, he was subjected to pat downs and interrogations by Netherlands security.  However, Defendants neglect to mention that he was delayed approximately 45 minutes before an airline representative obtained clearance to print his boarding passes in the U.S.  Plaintiffs' MSJ Ex. 12, Awad Dep. at 36-38.

56.     Awad also admits that in 2014, he was interrogated by NYPD officers upon returning to the U.S. from an international trip for approximately 15 minutes.  However, Defendants neglect to mention that a man in a suit identified Award before he reached passport control and escorted him to secondary inspection for interrogation.  Plaintiffs' MSJ Ex. 12, Awad Dep. at 57-60.

57.     Awad also admits that in 2017, he flew from Saudi Arabia to the U.S.  However, Defendants neglect to mention that at the gate at his connection in Jordan, Jordanian officials created two lines – one for those passengers that had "SSSS" on their boarding pass and one for those passengers that did not – and directed both Awad and his friend to the line designated for "SSSS" passengers, even though his friend's boarding pass did not contain the "SSSS" designation. An officer wrote both their names down under an "SSSS" column in his notebook.  When the friend asked why, the officer explained that his name was added because he was traveling with Awad.  Awad denies that they experienced no delay at this time.  In fact, both were subjected to enhanced screening and managed to make their flight only because it was held for them.  These three international trips are the only international trips Awad has taken since 2001.  Plaintiffs' MSJ Ex. 12, Awad Dep. at 73-84.

58.     Awad admits that the last three times he crossed the border prior to joining this lawsuit, he was subjected to enhanced screening.  In December 2013, he was interrogated for 40

minutes.  In April 2014, he and six coworkers were told to leave their cell phones in the car with their SIM cards out, and all were taken to secondary inspection for 45 minutes to an hour.  After joining this lawsuit, he crossed the border once without incident. Plaintiffs' MSJ Ex. 12, Awad Dep. at 85-89 and 95.

59.     Awad admits that subpoenaed records reflect that in 2016, Awad was subjected to a delay before he could test drive or lease a truck, and that subpoenaed records reflect that a reason for the delay was that his name was a near match to a name on the Specifically Designated National ("SDN") list maintained by the Office of Foreign Asset Control ("OFAC").  *See* Gov't Fact ¶ 57. Awad denies that this listing excludes the possibility that his TSDB watch list status may also have been a reason for the delay.

60.     Awad can neither admit nor deny whether or not he filed a DHS TRIP, as he does not recall whether he submitted one. Plaintiffs' MSJ Ex. 12, Awad Dep. at 180.

### 9.     **Michael Coleman's Watchlist Experiences**

61.     Plaintiffs dispute Government Facts ¶¶ 59-62 in part. Plaintiffs refer for clarification to Plaintiffs' MSJ Ex. 6, Coleman Dep. at 50-57, 63-92, 96-97, 101, 103-104, 110-115, 117-119.

62.     Coleman admits that he was detained during his last border crossing in March 2015 for approximately two hours.  However, Defendants neglect to mention that his wife and children who were traveling with him were detained with him.  Moreover, Defendants omit that he was interrogated about the details of a religious talk he gave in Windsor, "about theological disagreements among Muslim groups and that leading to radicalization of some young people," and about his missionary activities.  Coleman also admits that prior to this incident, he crossed the border multiple times without incident.  However, Defendants neglect to mention that as a result of this experience, Coleman stopped crossing the border, despite having family and colleagues that he would have visited frequently.  Plaintiffs' MSJ Ex. 6, Coleman Dep. at 50-54, 56.

63.     Coleman admits that he has taken between seven and twelve domestic trips and

seven international trips since 2015[3], and that he was required to undergo enhanced screening. However, Defendants neglect to mention that he was required go through the clearance process to print his boarding pass at every leg of his trips, which causes him significant delays.   Moreover, Defendants do not mention that in May 2015, after having been invited as a guest by the Office of the Prime Minister of Malaysia, Malay authorities witnessed him having to obtain clearance from the U.S. to board the first leg of his flight, which could cause the government of Malaysia to reconsider inviting him again in the future.   Additionally, Defendants do not mention that his missed flight due to enhanced screening was despite a three and a half hour connection. Plaintiffs' MSJ Ex. 6, Coleman Dep. at 63-115, 117-119.

64.    Coleman denies that he was twice referred to secondary inspection by CBP upon returning to the U.S.   In fact, he was referred to secondary inspection after returning from five international trips.    Additionally, Defendants omit that he was interrogated about his religious activities during one of those inspections.   They also omit that his name was called on a loudspeaker before he was escorted off a plane and taken to one of those secondary inspections.   They also omit that two students traveling with him on a field trip were also subjected to secondary inspections because they were traveling with him.   Plaintiffs' MSJ Ex. 6, Coleman Dep. at 63-115.

65.    Coleman admits that he did not experience travel difficulties in connection with his last two international trips and five domestic trips, all of which he took after joining this lawsuit.

66.    Coleman denies that he did not submit the requisite documentation in connection with his DHS TRIP inquiry; and in fact, states that he never received a response to his inquiry that was properly submitted on September 15, 2015.  Plaintiffs' MSJ Opp. Ex. 92, Coleman Redress.

10.    **Baby Doe's Watchlist Experiences**

67.    Plaintiffs dispute Government Fact ¶ 63 in part. Baby Doe admits he was not even a year old when his boarding pass was first stamped "SSSS," and he was subjected to a four-hour secondary inspection upon arrival in the U.S. after an international trip although he was burning up

---

[3] Defendants incorrectly state that Coleman has taken at least five domestic trips and four international trips since 2015.  Gov't MSJ, Dkt. 299 at 23.

and had a fever.  He was traveling with both of his parents; however, only he and his father received the designation.  All their bags were opened, searched and swabbed for explosives.  Baby Doe admits he traveled on one trip afterwards and did not experience any issues; however, he also notes that he took that trip after joining this lawsuit.  Baby Doe admits he did not submit a DHS TRIP inquiry. Plaintiffs' MSJ Ex. 2, Baby Dep. at 37-60; Plaintiffs' MSJ Ex. 2A, Baby Boarding Pass.

### 11.    **John Doe 2's Watchlist Experiences**

68.    Plaintiffs dispute Government Fact ¶ 64 in part.  Plaintiffs generally refer for clarification to Plaintiffs' MSJ Ex. 21, JD2 Dep. at 65-74, 76-77, 81-83, 90-93, 103-106, 143-145. JD2 admits that he was not subjected to enhanced screening for his domestic flights; however, he was subjected to enhanced screening after every international flight he took since 2005.  He was detained for up to three hours each time, where he was pressured to provide his password to his electronic devices to be searched, including his camera, laptop, phone and iPad, and CBP officers searched his checked-in luggage, sometimes in public view.  Defendants omit that he was interrogated in detail at three of the inspections about the mosque he attends and whether he knows if anyone is affiliated with terrorist organizations.  Moreover, during a secondary inspection in 2010, he was pressured to become an informant inside his mosque.  Defendants also omit that he missed a connecting flight as a result of secondary inspection in 2015.  JD2 admits that he intends to travel internationally in 2019, and he is concerned about the enhanced screening that he, and potentially his wife, would be subjected to.  Plaintiffs' MSJ Ex. 21, JD2 Dep. at 65-74, 76-77, 81-83, 90-93, 103-106, 143-145.

69.    JD2 further admits that he submitted a DHS TRIP inquiry on December 21, 2015 and that DHS TRIP issued a final determination letter in response to that inquiry on or about January 21, 2016. Gov't MSJ Ex. 4, Moore Decl. ¶ 33.

### 12.    **John Doe 3's Watchlist Experiences**

70.    Plaintiffs dispute Government Facts ¶¶ 65-68 in part. Plaintiffs generally refer for clarification to Plaintiffs' MSJ Ex. 22, JD3 Dep. at 26, 34-37, 44-79, 100-119, 125-129, 137-138, 146-153, 160, 187, 193-194, 210.

71.    JD3 admits that he is subjected to enhanced screening before every flight, whether

domestic, international or connecting.  He was twice removed from the secure area of the airport to be searched again after having already cleared security.  Whenever he returns from an international flight, he's taken to secondary inspection – where he is detained for hours and interrogated, his electronics are searched, his luggage is searched, and he is treated like a criminal and a terrorist. Defendants omit that in one instance, he saw a government agent following him around the airport everywhere he went.  Plaintiffs' MSJ Ex. 22, JD3 Dep. at 44-79, 100-119, 125-129, 137-138, 146-153, 160, 187, 193-194, 210.

72.     Defendants omit the reason why JD3 moved to Germany.  In 2016, upon crossing the border back into the U.S., JD3, his wife and his 14-year old son were all handcuffed at gun point, before they were all detained for five and a half hours and all their electronics searched.  JD3 said the officers – whom he described as nervous and acting as if they were losing control – aimed their guns at them and frantically gave conflicting orders.  He overheard them describe him as "armed and dangerous."  JD3 and his family knew they could have been killed, so the family collectively decided JD3 should separate from the family and move out of the country.  "It was devastating to me and my family because I've been married for 31 years, we never have marital problem, we have beautiful family, and this incident was the cause for this forced separation."  Plaintiffs' MSJ Ex. 22, JD3 Dep. at 26, 34-37, 45.

73.     JD3 admits he took trips to Morocco, Saudi Arabia, Turkey and Canada; however, none of these trips were over U.S. airspace.  He flew to Canada for the purposes of his deposition in this case, because he did not want return to the U.S.  Plaintiffs' MSJ Ex. 22, JD3 Dep. at 30-32.

74.     JD3 denies that DHS TRIP has no record of receiving an inquiry from him.  In fact, he submitted an inquiry on August 5, 2014 and followed up twice after having received no response. On January 27, 2015, DHS TRIP responded to the same email thread that he submitted his inquiry and claimed they "do not have a record of you applying for redress." Plaintiffs MSJ Opp. Ex. 93.

### 13.     **John Doe 4's Watchlist Experiences**

75.     Plaintiffs dispute Government Facts ¶¶ 69-70 in part.  Plaintiffs generally refer for clarification to Plaintiffs' MSJ Ex. 23, JD4 Dep. at 30-33, 44-45, 71-73, 85-86. JD4 admits that prior

to being denied boarding on August 1, 2016, he never encountered any problems traveling. That day, he was planning on flying to Morocco to get engaged to his then-fiancée and meet her family for the first time. It was not until he arrived at the airport when he was first informed that he was on the No Fly List by the ticketing agent. Plaintiffs' MSJ Ex. 23, JD4 Dep. at 30-33.

76.     Defendants omit that JD4 was later told by an FBI agent that he was given a one-time pass to fly on one international trip so that he can get married – which he took on September 1, 2016. That day, he was subjected to a second screening at the gate after having cleared security. JD4 admits that he has flown domestically twice after joining this lawsuit and did not encounter any difficulties. Plaintiffs' MSJ Ex. 23, JD4 Dep. at 71-73, 85-86, and 176-178.

77.     JD4 further admits that on or about September 21, 2016, he received a letter in response to his DHS TRIP inquiry stating, "At this time the U.S. Government knows of no reason, related to your inquiry, that you should be unable to fly." Gov't MSJ Ex. 4, Moore Decl. ¶ 70.

14.     **Anas Elhady's Watchlist Experiences**

78.     Plaintiffs dispute Government Facts ¶¶ 71-74 in part. Plaintiffs generally refer for clarification to Plaintiffs' MSJ Ex. 1, Elhady Dep. at 56, 70-72, 76, 84-85, 89, 91, 94-95, 99-105, 123-124,133-135, 139-143, 147-149, 156-161, 164-169, 176-177, 180, 185. Elhady admits that between 2012 and 2018, he took approximately seven one-way international flights with a departure or arrival point in the U.S. However, he denies that his departures on these trips were without incident. Every international flight that arrived in the U.S. resulted in enhanced screening, secondary inspection, a search of his electronics and aggressive interrogations, one of which was video recorded. He admits that he was detained once for more than two hours, once for four hours, once for six hours and once for thirty minutes to an hour. Defendants omit that during a trip in 2013 that he took with his brother, both subjected to secondary inspection, searched and interrogated. Plaintiffs' MSJ Ex. 1, Elhady Dep. at 54-56, 66-72, 76, 84-89, 93-95, 123-124.

79.     Elhady admits that he traveled by land from the U.S. to Canada between 2014-2015 at least eight times. Elhady further admits that he was taken to secondary inspection every time he returned to the U.S., where he was searched and interrogated. However, contrary to the times

Defendants provided, he was detained once for four hours, three times for five to seven hours, once for more than six hours, once for seven hours and twice for eight hours.  Defendants omit that he was handcuffed three times and detained in a holding cell three times.  Plaintiffs' MSJ Ex. 1, Elhady Dep. at 132-136, 139-161, 163-170, 175-177, 180-185.

80.     Elhady admits that his phone was seized during two secondary inspections at the border.  However, Defendants omit that his phone was also seized a third time at an airport.  After his phone was seized upon returning from an international flight in 2013, FBI agents went to the home where he was staying in addition to the homes of two his uncles looking for him.  An FBI agent later showed up at his school to return his phone.  During a call with that FBI agent, he was informed that his phone was being tapped.  Similarly, after his phone was seized during his August 2014 border crossing, FBI agents refused to ship his phone to him and showed up at his work instead.  His phone was seized a third time in September 2014 at a border crossing.  Plaintiffs' MSJ Ex. 1, Elhady Dep. at 98-105.

81.     Defendants also omit that in August 2014, the taxi driver that was driving him across the border was also detained for 30 minutes.  Additionally, Defendants omit that his closest friend (a Canadian citizen) was detained, searched and interrogated for over six hours because he was crossing the border with Elhady.  The following week, when his friend attempted to enter the U.S., Customs officers informed him that he was no longer permitted to enter the U.S. because of his association with Elhady.  Elhady lost him as a friend as a result.  Plaintiffs' MSJ Ex. 1, Elhady Dep. at 133-136, 156-159.

82.     Defendants omit that Elhady was also detained by Canadian authorities twice for approximately three hours – both times, he was asked to provide an exact time that he anticipated returning to the U.S. and given an instruction to call if his plans changed.  Defendants do not mention that his April 2015[4] border crossing where he was detained in a freezing cold cell with bright lights, without his jacket and shoes, occurred after he gave the exact time to Canadian

---

[4] Defendants' TECS records indicate that the April 2015 inspection was approximately 8 hours.  *See* Plaintiffs' MSJ Opp. Ex. 90, Elhady TECS Record.

authorities that he would be crossing back into the U.S. Defendants also omit that Elhady received emergency medical care during his April 2015 secondary due to his confinement conditions. Plaintiffs' MSJ Ex. 1, Elhady Dep. at 94, 163-168.

83. Elhady admits that he had no issues related to domestic flights.

84. Elhady admits that he submitted a DHS TRIP inquiry on January 27, 2015 and DHS TRIP issued a letter in response to that inquiry on May 11, 2015. Plaintiffs' MSJ Ex. 1B, Elhady Redress; Gov't MSJ Ex. 4, Moore Decl. ¶ 36.

15. **Ausama Elhuzayel's Watchlist Experiences**

85. Plaintiffs dispute Government Facts ¶¶ 75-76 in part. Plaintiffs generally refer for clarification to Plaintiffs' MSJ Ex. 9, Elhuzayel Dep. at 56-73, 75-84, 86-94, 96-98, 100, 125, 128-131, 136-137, 160. Elhuzayel admits that prior to 2016, he never encountered issues traveling by air. He also admits that on April 23, 2016 he was denied boarding on a flight to San Juan. Defendants omit that he was told by a government agent at the airport that he was not going anywhere. He was escorted by an agent out of the airport as armed agents were "ready to go." Plaintiffs' MSJ Ex. 9, Elhuzayel Dep. at 125-131, 136-137, 160.

86. He further admits that he submitted a DHS TRIP inquiry on April 24, 2016 and that DHS TRIP issued a letter in response to that inquiry on December 6, 2016, which stated, "At this time the U.S. Government knows of no reason, related to your inquiry, that you should be unable to fly." Elhuzayel notes that he received this letter after he joined this lawsuit. Gov't MSJ Ex. 4, Moore Decl. ¶ 37.

87. Elhuzayel further admits that he was subjected to enhanced screening on both trips that he took after he was denied boarding in 2016. Defendants omit that he was subjected to a very invasive pat-down at every leg of every flight both at the TSA checkpoint and at the gate – including a pat-down "all over [his] private body parts." He was subjected to enhanced screening twice at connections as well – first he is escorted back to the TSA checkpoint where he undergoes enhanced screening, then he is screened again at the gate. Elhuzayel admits that multiple flights had to be re-booked due to enhanced screening. Elhuzayel further admits that one of these missed flights was

the result of a three-hour interrogation after returning from an international flight.  Plaintiffs' MSJ Ex. 9, Elhuzayel Dep. at 56-80, 96-98, 100.

88.     Defendants omit that he was interrogated by Dominican authorities when he arrived there on an international flight.  Defendants also omit that flight attendants removed two passengers who were assigned seats next to him and replaced them with two men who later followed him all over the airport where he landed.  Defendants also omit that one of the DHS agents that searched him at a gate for one of his flights went to his gym for a year prior and tried to entice him to say something about ISIS that would get him into trouble.  Elhuzayel never saw that DHS agent at the gym again after that gate search.  Plaintiffs' MSJ Ex. 9, Elhuzayel Dep. at 64-65, 81-94, 122-125.

### 16.     Zuhair El-Shwehdi's Watchlist Experiences

89.     Plaintiffs dispute Government Facts ¶¶ 77-78 in part.  Plaintiffs generally refer for clarification to Plaintiffs' MSJ Ex. 20, El-Shwehdi Dep. at 33, 43-44, 53, 57-58, 66-67, 75, 95, 102-110, 113, 116, 120, 124, 126-129, 133-134, 137, 141-143, 157-159, 162, 176-177, 179, 180-182, 190-191, 193-196, 204. El-Shwehdi admits that he has flown more than 20 times since 2011, including 17 domestic flights.  He further admits that he is subjected to enhanced screening before every flight, including connections; however, the clearance process at check-in for domestic flights frequently takes forty minutes to an hour, and the enhanced screening process at the checkpoint typically takes 20-30 minutes.  On other hand, Defendants do not mention that the clearance process for international flights takes longer.  Defendants also neglect to mention that he is frequently subjected to additional enhanced screening again at the gate before being permitted to board a flight, adding further delay.  Plaintiffs' MSJ Ex. 20, Elhuzayel Dep. at 38-44, 53, 57-58, 66-67, 75, 102-110, 113-116, 119-121, 123-129, 133-34, 137, 141-143, 162, 176-177.

90.     El-Shwehdi also admits that upon returning from every international flight, he was taken to secondary inspection, interrogated and searched – a process that can take up to six hours.  However, Defendants omit that upon deplaning, he is escorted by two to four officers to secondary inspection.  Plaintiffs' MSJ Ex. 20, Elhuzayel Dep. at 157-159.

91.     He further admits that he has missed at least three flights due to enhanced screening,

which resulted in him staying overnight before continuing to his final destination. Defendants omit that one of the missed flights was because he was escorted off a plane prior to takeoff by CBP officers and Turkish personnel only to be searched and interrogated again, resulting in a missed flight. Defendants also omit he has missed flights due to his phone being searched. Plaintiffs' MSJ Ex. 20, Elhuzayel Dep. at 157-159, 180-182, 189-191, 193-196.

92.    Defendants do not mention that he has been followed by CBP officers in airports, on at least two trips, to the point that they waited outside the bathroom when he used it. Plaintiffs' MSJ Ex. 20, Elhuzayel Dep. at 91-95.

93.    He admits he avoids travel due to the enhanced screening he is subjected to – in fact, he did not travel to Libya for the funerals of his brother and his sister's husband. He also drives 500-miles two to three times a year, although he is disabled and experiences problems in his hips as a result of two hip replacements. Plaintiffs' MSJ Ex. 20, Elhuzayel Dep. at 33, 43, 67, 203-204.

94.    El-Shwehdi admits that he submitted a DHS TRIP inquiry on August 18, 2016 and that he received a letter in response to that inquiry on or about November 21, 2016. Gov't MSJ Ex. 4, Moore Decl. ¶ 38.

17.    **Hassan Fares's Watchlist Experiences**

95.    Plaintiffs dispute Government Facts ¶¶ 79-82 in part. Plaintiffs generally refer for clarification to Plaintiffs' MSJ Ex. 19, Fares Dep. at 29-32, 43-45, 55, 78-81, 95-106, 123, 134-135. Dr. Fares admits that between 2005 and some point between 2010 and 2014, the only problems he had traveling were that he could not print his boarding pass at a kiosk and that an airline representative needed to print it for him. Defendants omit that he was told by an airline representative during this time that the reason he could not print his boarding pass at a kiosk was because he was on a list. Dr. Fares admits that since some time between 2010 and 2014, he has been able to print his boarding pass at kiosks. Plaintiffs' MSJ Ex. 19, Fares Dep. at 29-32, 43-45, 55, 106.

96.    Dr. Fares further admits that in May 2015, he and his wife were interrogated by a Customs officer at the gate for approximately ten minutes prior to boarding a flight to Jordan. Plaintiffs' MSJ Ex. 19, Fares Dep. at 76-81.

97.     Dr. Fares also admits that on August 2, 2016, TSA officers removed him from a plane after boarding to undergo additional security, causing him to miss his flight to Jordan. However, Defendants neglect to mention that he was told by the TSA agents that he was required to undergo additional screening and questioning due to a designation given to him.  Dr. Fares admits that he was rebooked on another flight; however, Defendants omit that his rebooked flight arrived after his flight to Jordan had already departed.  Moreover, Defendants ignore the reason that Dr. Fares decided to forego his trip to Jordan, which was for business purposes.  Dr. Fares was traumatized after what he had just experienced and scared that he would not be allowed to reenter the country if he left on an international flight.  Plaintiffs' MSJ Ex. 19, Fares Dep. at 95-105.

98.     Dr. Fares also admits that he made "numerous" land border crossings from Detroit to Canada and back between 2005 and 2014.  While it is true that the actual questioning he was subjected to was typically 10-15 minutes, Defendants neglect to mention that he was taken to secondary inspection and detained during most of these border crossings for a minimum of a half hour to approximately 1.5 to 2 hours.  Plaintiffs' MSJ Ex. 19, Fares Dep. at 63-71.

99.     Dr. Fares denies that in 2017, he flew from the U.S. to Jordan three times without incident, with the sole exception being one interrogation upon his return by CBP.  Dr. Fares admits that he was interrogated for approximately an hour and fifteen minutes by CBP after arriving from one of these three trips.  However, for all three trips, his boarding pass for his return flight from Jordan was stamped "SSSS," and he was subjected to enhanced screening at the gate along with several other passengers who also had their boarding passes stamped "SSSS."    Plaintiffs' MSJ Ex. 19, Fares Dep. at 123, 134-35.

100.    Dr. Fares admits that he did not file a DHS TRIP inquiry.

### 18.    **Murat Frljuckic's Watchlist Experiences**

101.    Plaintiffs dispute Government Facts ¶¶ 83-86 in part.  Plaintiffs generally refer for clarification to Plaintiffs' MSJ Ex. 11, Frljuckic Dep. at 46-51, 60, 63-64, 66-69, 74-75, 81-85, 93-94, 101-103. Frljuckic admits that the last five times he crossed the border to return to the U.S. from Canada (between October 2012 and May 2016), he was handcuffed at gunpoint before he was taken

to secondary inspection for 3.5 to four hours, and in one instance six hours.  However, Defendants neglect to mention that his car was surrounded each time with four to five officers aiming their guns in his direction.  In one of those instances, his 70-year-old mother and 4-year-old son were in the car.  In another instance, his wife and eight children were in the car.  In another instance, a CBP officer told him that if he did a U-turn and crossed the border again, he would be subjected to the same treatment.  The last instance, the officers "were shouting, screaming" and "got so nervous, upset, and they started screaming more" as they were pointing their guns at him.  He thought they were "going to shoot this time."  Frljuckic admits that as a result of these crossings, Frljuckic no longer crosses the border or travels by air.  Plaintiffs' MSJ Ex. 11, Frljuckic Dep. at 44, 46-51, 66-69, 81-85, 93-94, 101-103.

102.     Defendants also fail to mention that in multiple secondary inspections, Frljuckic was interrogated about his religious beliefs – "so much" actually – including questions about what mosque he attends, where he prays, what scholars he listens to, and who he associates with.  Plaintiffs' MSJ Ex. 11, Frljuckic Dep. at 81-85.

103.     Frljuckic admits that in June 2014, he missed his international flight to Vienna because he was unable to print his boarding pass.  However, Defendants neglect to mention that it took the airline representative four to 4.5 hours to obtain clearance to print his boarding pass, and by then his flight had already departed.  As a result, his wife and eight children also missed their flight and they were forced to spend the night in the airport.  Frljuckic also admits that between December 2012 and April 2013, he traveled by air between Detroit and New York monthly, and that for all of these trips he was subjected to enhanced screening – including having to go through the clearance process and being subjected to invasive searches by TSA at the checkpoint and again at the gate.  Frljuckic admits that prior to December 2012, he did not experience any problems flying.  Plaintiffs' MSJ Ex. 11, Frljuckic Dep. at 60-65, 74-75.

104.     Frljuckic admits that he submitted a DHS TRIP inquiry on November 7, 2012 and that DHS TRIP issued a letter in response to that inquiry on or about January 4, 2013.  He also admits that he submitted a second inquiry on August 18, 2014 and DHS TRIP issued a letter in

response to that inquiry on or about October 31, 2014.  Gov't MSJ Ex. 4, Moore Decl. ¶40.

> **19.    Wael Hakmeh's Watchlist Experiences**

105.    Plaintiffs dispute Government Facts ¶¶ 87-88 in part.  Plaintiffs generally refer for clarification to Plaintiffs' MSJ Ex. 7, Hakmeh Dep. at 41, 51, 53-63, 68-70, 73, 94-95, 132, 137, 140, 146-147, 156-157, 166-174, 212-215, 220.  While Dr. Hakmeh admits that he specifically recollected the secondary inspections he was referred to after returning from two of his ten international trips in March 2017 and July 2017, Dr. Hakmeh testified repeatedly that he is consistently subjected to heightened scrutiny whenever he flies since 2014.   Dr. Hakmeh travels regularly to Turkey in connection with medical missions to provide critical care training courses and life-saving emergency care to victims of the Syria conflict.   His boarding pass is routinely designated "SSSS" upon returning from his medical missions in Turkey, and he is always taken to secondary inspection upon returning from international flights.  Plaintiffs' MSJ Ex. 7, Hakmeh Dep. at 41-44, 53-63, 73, 132, 135-137, 166-174, 212-215, 220.

106.    Dr. Hakmeh admits that he missed a flight after being escorted to secondary inspection upon deplaning by two TSA agents and interrogated for more than one to two hours, causing him to miss his connecting flight.  Since this missed flight, Dr. Hakmeh admits that for the last four years he has booked all his international flights to leave from Chicago – he recounted approximately ten – "so that [his] ability to come back and work as an emergency physician isn't jeopardized," Dr. Hakmeh has been "forced to" book all of his international trips to fly directly out of and back to Chicago, and he drives to and from Chicago (a five-hour drive) instead of flying to ensure he does not miss a connecting flight.  Defendants omit, however, that in addition to driving to avoid connections, Dr. Hakmeh also always arrives at airports at least four hours before each flight to account for secondary screening.  Plaintiffs' MSJ Ex. 7, Hakmeh Dep. at 66-70, 94-95.

107.    Defendants also omit that he missed an international trip back to the U.S. from Turkey due to enhanced screening and was forced to spend the night.  Plaintiffs' MSJ Ex. 7, Hakmeh Dep. at 135-137, 146-147.

108.    Dr. Hakmeh recalls submitting a DHS TRIP inquiry and has not received a response.

Plaintiffs' MSJ Ex. 7, Hakmeh Dep. at 140.

20.     **Yasseen Kadura's Watchlist Experiences**

109.    Plaintiffs dispute Government Facts ¶¶ 89-93 in part.  Plaintiffs generally refer for clarification to Plaintiffs' MSJ Ex. 3, Kadura Dep. at 104, 113-116, 138-141, 163-167, 169, 190-193, 202-204, 235-239, 260-263. Kadura admits that in 2011 and 2012, he crossed back into the United States at least five times, and that three of those crossings resulted in four to eight hour secondary inspection and interrogation.  Kadura admits that during one of those inspections, CBP officers drew their weapons while he exited his car.  However, Defendants neglect to mention that CBP officers stopped traffic at all inspection booths, before they handcuffed him and detained him, shoeless, in a freezing cold room without any windows or any place to sit for 7.5 to eight hours.  At least one passenger filmed the incident on her phone.  Defendants also neglect to mention that the next time he crossed the border returning from Mexico, he was again handcuffed – this time to a seat – as soon as his passport was swiped, for about seven to eight hours during which he was interrogated about, among other things, what his religion is and what mosque he goes to. Defendants also neglect to mention that the third instance resulted in his father being subjected to an invasive search, including of his crotch area, and treated like a criminal just because he was traveling with him.  Plaintiffs' MSJ Ex. 3, Kadura Dep. at 103-104, 113-116, 137-141, 163-167, 190-193, 235-239.

110.    Kadura admits that his phone was detained during one of these secondary inspections at the border.  However, Defendants omit that he has had his phone confiscated twice at border crossings and not returned to him upon release.  Moreover, the phones of his father and 17-year old brother, in addition to his father's laptop, were also seized because they were crossing the border with him.  Defendants also omit that the second time his phone was confiscated, an ICE agent contacted him and asked him to meet him at a hotel room without his attorney to discuss how he can "help America" to achieve "democracy in Libya," in exchange for his phone and to "fix [his] travel issues."  Kadura stopped taking his phone with him when he crosses the border and ships it home instead.  Plaintiffs' MSJ Ex. 3, Kadura Dep. at 138-141, 148-149, 169, 202-204.

111.     Kadura admits that upon reentry into the U.S. in August 2011 by air, he was subjected to secondary inspection, searched and interrogated between one and two hours.   He further admits that on October 22, 2012, he was denied boarding a flight to Libya to visit his mother on a religious holiday.  Plaintiffs' MSJ Ex. 3, Kadura Dep. at 190-193.

112.     Kadura admits that he submitted a DHS TRIP inquiry form on November 21, 2012 and that DHS TRIP issued a form letter in response to that inquiry on or about May 8, 2013.  Then, after filing a lawsuit challenging his denial of boarding on August 14, 2014, Kadura admits that DHS TRIP issued a "superseding final determination letter" that stated "[t]he U.S. Government knows of no reason" why they "should be unable to fly."  Thus, Kadura admits that since receiving this letter, he has been able to fly on five domestic flights, one of which he was subjected to enhanced screening. Plaintiffs' MSJ Ex. 3B, Kadura Redress; Plaintiffs' MSJ Opp. Ex. 91, Kadura Redress; Gov't MSJ Ex. 4, Moore Decl. ¶ 42.

113.     Kadura admits that he has declined to travel on a number of occasions due to his watchlist status.  In fact, he missed a lot of weddings and funerals of family members in Libya, avoids domestic travel when possible, and chose to attend a lower-ranked and more expensive masters degree program to remain closer to his parents so he would not have to fly to visit them. Plaintiffs' MSJ Ex. 3, Kadura Dep. at 260-263.

21.     **Muhammad Khan's Watchlist Experiences**

114.     Plaintiffs dispute Government Facts ¶¶ 94-97 in part.  Plaintiffs generally refer for clarification to Plaintiffs' MSJ Ex. 18, Khan Dep. at 29-36, 39, 41-42, 45-60, 63-71, 74-84, 93-99, 131-133, 150-155, 157-158, 161-164, 166. Khan admits that in 2012, he was referred to secondary inspection upon entering the U.S. by land in Michigan.  However, Defendants omit that he was traveling with his family and as a result, all their cell phones were taken, and they were detained with him.  Plaintiffs' MSJ Ex. 18, Khan Dep. at 94-96.

115.     Khan admits that in 2016 and 2017, he took three international trips and that he was subjected to enhanced screening prior to each leg of each flight.  In one instance he was delayed two to three hours in Jordan to obtain his boarding pass, and then subjected to a three to four hour

28

secondary inspection upon arriving to the U.S., causing him to miss work.  In another instance, he was delayed three to four hours in Saudi Arabia to obtain his boarding pass, causing him to miss his connecting flight.  He rebooked the next available flight, which did not leave until three days later.  Khan admits he was delayed another 30-40 minutes upon arriving in Jordan to obtain his boarding pass for his rebooked flight; however, upon arriving to the U.S. he was subjected to a secondary inspection that lasted three and a half hours.  In the third instance, he almost missed his connecting flight in Istanbul due to delays in obtaining his boarding pass, and was again subjected to a three to four hour secondary inspection upon arriving in the U.S.  Plaintiffs' MSJ Ex. 18, Khan Dep. at 33, 78, 84, 154.

116.    Khan admits that he was also subjected to enhanced screening at each leg of a domestic trip he took in 2016.  Plaintiffs' MSJ Ex. 18, Khan Dep. at 140-141.

117.    Khan admits that he drives to avoid flying when he can; however, Defendants omit the reason is because Khan experiences psychological trauma and cannot sleep the day before he goes to the airport.  Defendants also omit that Khan has not crossed the border since the 2012 incident, including to attend at least one wedding in Canada, to avoid the treatment he was subjected to at the border.  Plaintiffs' MSJ Ex. 18, Khan Dep. at 74, 96-97.

118.    Khan admits that he submitted a DHS TRIP inquiry on January 7, 2014 and a second inquiry on or about February 26, 2014.  He further admits that DHS TRIP issued a letter in response to the second inquiry on or about July 14, 2015.  Plaintiffs' MSJ Ex. 18, Khan Dep. at 205-207, 218; Gov't MSJ Ex. 4, Moore Decl. ¶ 43.

22.    **Adnan Khalil Shaout's Watchlist Experiences**

119.    Plaintiffs dispute Government Facts ¶¶ 98-100 in part.  Plaintiffs generally refer for clarification to Plaintiffs' MSJ Ex. 14, Shaout Dep. at 5-17, 34-35, 37-39, 41-48, 71-72, 74-75, 77-78, 86-87, 90-91, 137, 143, 170, 192.  Shaout admits that he has experienced enhanced screening before every leg of every flight he has taken since December 2004 – which are approximately 36 international flights and at least ten domestic flights.  The clearance process alone prior to every leg takes approximately an hour and a half to two hours every time, 45 minutes if he's lucky.  He is

subjected to secondary inspection upon every return from an international flight.  He admits that he has missed at least one connecting flight due to enhanced screening, despite a two-hour connection, causing him to spend the night.    Plaintiffs' MSJ Ex. 14, Shaout Dep. at 34-48, 71-75, 77-78, 86-87, 89-91, 143-145, 170.

120.    Dr. Shaout admits that he was escorted off a flight in public view at least once in June 2011 only to be subjected to enhanced screening and interrogated, although he had already cleared security.  He admits that he ultimately boarded that flight; however, that was only because the entire flight was delayed.  Dr. Shaout also admits that he was subjected to enhanced screening at the gate prior to departure at least once after having already cleared security.  Plaintiffs' MSJ Ex. 14, Shaout Dep. at 86-87.

121.    Defendants omit that since 2004, Dr. Shaout arrives at the airport at least three hours in advance of all domestic flights and four hours in advance of all international flights to account for enhanced screening he is always subjected to. Plaintiffs' MSJ Ex. 14, Shaout Dep. at 41.

122.    Defendants also omit that Dr. Shaout has stopped traveling with cell phones due to the searching and copying of all his documents in his possession and his electronic devices at every secondary inspection – a process that has caused significant delays such that sometimes he sleeps on a chair as he waits.  As a computer engineer, he has been able to determine that software was added to his phone during secondary inspections.  Dr. Shaout denies that he testified secondary inspections take a half hour to three hours.  Rather, he testified that the searching and copying of his documents and electronic devices alone during secondary inspections takes between a half hour to three hours. Plaintiffs' MSJ Ex. 14, Shaout Dep. at 46-48, 169-170, 192-197.

123.    Defendants also omit that Dr. Shaout is regularly interrogated the same religious questions "over and over and over" – including questions about where he prays, which mosque he goes to and what organizations he donates to. Plaintiffs' MSJ Ex. 14, Shaout Dep. at 47, 146-149.

124.    Dr. Shaout admits that he has not had problems related to travel since May 2017; however, he notes that these trips were all taken after joined this lawsuit.  Plaintiffs' MSJ Ex. 14, Shaout Dep. at 137-138.

125.    Dr. Shaout admits he submitted three DHS TRIP inquiries between 2011 and 2015 and that he received a letter in response to those inquiries.  Gov't MSJ Ex. 4, Moore Decl. ¶ 44.

23.    **Hassan Shibly's Watchlist Experiences**

126.    Plaintiffs dispute Government Facts ¶¶ 101-103 in part.  Plaintiffs generally refer for clarification to Plaintiffs' MSJ Ex. 8, Shibly Dep. at 52, 59-60, 66-68, 71-83, 85-100, 102, 112-113, 115, 121-122, 123-137, 163-172, 180-181, 182-186, 206-210, 216-227.  Shibly admits that he has entered the U.S. by land at the U.S. Canada border at least 12-13 times between 2004 and 2017, and that between 2004 and 2016 he was referred to secondary inspection and interrogated every time. Contrary to Defendants' assertion, Shibly recollected only one inspection where he was detained between 15-30 minutes.  Rather, for the rest, he estimated the secondary inspections typically lasted up to an hour or two, with two hours being the norm.  Shibly further admits one of the secondary inspections lasted approximately six hours; however, Defendants neglect to mention that his mother and three siblings were detained with him because they were crossing with him.  Plaintiffs' MSJ Ex. 8, Shibly Dep. at 47-48, 52, 55, 73, 108, 112,-113, 126, 137, 143, 231, 307.

127.    Additionally, Defendants neglect to mention that Shibly was stopped by armed officers and handcuffed several times, including once in front of his grandmother – who fainted at the sight and was taken by ambulance and hospitalized as a result.  Defendants also omit that during this inspection, a CBP officer informed Shibly that he would be subjected to the same treatment the next time he reenters the U.S.  Defendants also do not mention that many of Shibly's friends that were detained with him because they were crossing with him – along with his wife, children, mother and sister – began experiencing the same treatment as Shibly even when they cross the border without him.  Plaintiffs' MSJ Ex. 8, Shibly Dep. at 73-75, 77-78, 107, 110-111, 310.

128.    Shibly admits that he took at least ten international trips between 2006 and 2016 and more than 80 domestic flights since 2015.  Shibly further admits that since approximately 2010, he has almost always been subjected to enhanced screening while flying.  Shibly denies that he would wait 15-20 minutes for his boarding pass with the longest time taking 45 minutes.  Rather, he typically waited between 40-45 minutes before almost every flight to go through the clearance

process.  Shibly also admits that having to go through the clearance process meant that he would be subjected to enhanced screening by TSA for those flights.  Defendants omit that Shibly was told by a Customs officer that he was being subjected to heightened scrutiny because "[w]e have to protect against bombs and terrorism."  Defendants also omit that he was also subjected to enhanced screening after a cruise.  Plaintiffs' MSJ Ex. 8, Shibly Dep. at 95, 218-220, 312-313.

129.    Shibly admits that he recollected the specifics of two missed flights due to enhanced screening. Defendants neglect to mention that Mr. Shibly testified that he urged his wife on more than one occasion, after being detained for an interrogation prior to boarding with his family, to take the children and board the flight without him because he wanted to save them from the "long-term traumatic impact" of having to "see their parents consistently being targeted by their own government."  Defendants also neglect to mention that for one of the missed flights, he was traveling to meet with "senior White House leadership" to discuss the targeting of Muslims, including himself, by Customs and the FBI when they travel.  During that meeting, he shook President Barack Obama's hand and was not subjected to any enhanced screening beforehand.  In fact, former DHS Director of Operations even felt safe enough to invite Mr. Shibly to his home while Mr. Shibly was continuing to be subjected to enhanced screening.  Plaintiffs' MSJ Ex. 8, Shibly Dep. at 88, 114, 120, 123, 183-184, 208.

130.    Defendants neglect to mention that Shibly was subjected to heightened scrutiny while he was employed by Regional Elite and given unrestricted access to sterile areas of their airport and airplanes, and despite relationships he established through his career with senior level government officials, including former Commissioner of CBP Gil Kerlikowske and former Senior Advisor to President Barack Obama Valerie Jarrett.  Plaintiffs' MSJ Ex. 8, Shibly Dep. at 22, 86-88, 121, 125, 184-186.

131.    Defendants omit that the enhanced screening he has been subjected to has caused him humiliation in front of family members, business leaders, executives and friends that have traveled with him. Plaintiffs' MSJ Ex. 8, Shibly Dep. at 194.

132.    Defendants also neglect to mention that Shibly has been consistently interrogated

about his religious beliefs and practices – such that it has been "a consistent theme throughout each and every time" he was detained at airports and at the border.  Among the questions he was asked were, "Do you recruit people for Islam?" "Do you visit any Islamic extremist website?  Are you part of any Islamic tribes?"  "Have you ever been to a madrassah?"  "Have you ever studied Islam full-time?"; whether he attends a particular mosque, which Muslim scholars he listens to, and how many gods and prophets he believes in.  An officer told him he was asking these questions because "we have to protect against terrorism."  Mr. Shibly was also interrogated about his father's charitable work for Syrian children.  Plaintiffs' MSJ Ex. 8, Shibly Dep. at 59, 92-94, 108, 172.

133.    Shibly admits that he submitted a DHS TRIP inquiry on November 30, 2009 and August 26, 2013 and that he received letters in response to those inquiries on or about March 8, 2011 and November 15, 2013 respectively. Plaintiffs' MSJ Ex. 8, Shibly Dep. at 233-244; Gov't MSJ Ex. 4, Moore Decl. ¶ 45.

### 24.    Donald Thomas's Watchlist Experiences

134.    Plaintiffs dispute Government Facts ¶¶ 104-106 in part.  Plaintiffs generally refer for clarification to Plaintiffs' MSJ Ex. 8, Thomas Dep. at 44-59, 66-76, 78-87, 93-94, 98-100, 112-119, 138-143, 154, 161-163.  Thomas admits that in October 2015 and January 2016, he was subjected to enhanced screening on two flights resulting in one to two hour delays; however, Defendants omit that several of his friends were subjected to enhanced screening as well because they were traveling with him in both instances.

135.    Thomas admits that in February 2016, he traveled by land to Canada; however, Defendants omit that he and his friends traveling with him were all detained by Canadian authorities for an hour.  Thomas further admits that he and his friends were detained and subjected to secondary inspection and interrogations for eight hours upon reentry.  Defendants again neglect to mention that his friends crossing with him were also detained for eight hours, and that he was escorted to secondary inspection by seven government agents holding their guns.

136.    Thomas admits that he was denied boarding an international flight to Malaysia in April 2016 after arriving at the airport with his wife and children and luggage containing everything

they owned, and after leaving his job, to permanently move to Malaysia.  That day, he was told by an airline representative for the first time that he was on the No Fly List.

137.    Thomas further admits that he filed a DHS TRIP inquiry shortly *before* his denial of boarding; however, Defendants omit the reason he filed shortly before his trip.

138.    Thomas was met by an FBI agent shortly prior to his planned trip to Malaysia and interrogated about his Islamic beliefs, asked questions including "What does jihad mean?  When does Islam allow violence?  Why are you going to Malaysia?  Do you know there's a lot of extremist people in Malaysia?... When did you become Muslim?"  Thomas had agreed to meet with the FBI agent because he and his friend were told separately by the FBI agent that Thomas would not be allowed to fly to Malaysia unless he spoke with the agent.  This interrogation prompted Thomas to file a DHS TRIP inquiry prior to his flight.  Thomas further admits that on September 1, 2016 he received a final determination letter in response to that inquiry.

139.    Thomas also admits that he did not submit a DHS TRIP inquiry after he was denied boarding, nor did he receive a letter from DHS TRIP stating "[t]he U.S. Government knows of no reason" why they "should be unable to fly."  Nonetheless, after he joined this lawsuit, Thomas admits he has been able to fly, although he has been subjected to enhanced screening and has missed at least one flight as a result.

140.    Thomas admits that prior to 2015, he was never subjected to enhanced screening.

## OPPOSITION ARGUMENT

## I.     <u>PLAINTIFFS HAVE STANDING TO CHALLENGE THE WATCHLIST</u>

Plaintiffs have long been assigned TSDB statuses.  Indeed, the Government has repeatedly screened Plaintiffs in accordance with their TSDB statuses and various annotations, and disseminated their statuses to tens of thousands of entities around the world.  These 23 innocent people the Government has stigmatized as "known or suspected terrorists" have standing to challenge the due process ramifications of the TSDB statuses that continue to impact their lives.[5]

---

[5] Plaintiffs' Administrative Procedures Act claim is co-extensive with their Procedural Due Process claim.

Subsequent to placing Plaintiffs on the watchlist, and mostly after the filing of this case, the Government appears to have made secret changes to the annotations that accompany some of the Plaintiffs' TSDB statuses, without providing any notice of the changes.  Despite these changes, Plaintiffs' lives as TSDB Listees endure.

In order for a plaintiff to establish standing, they must first have suffered "an injury in fact," namely a harm that is both "concrete and particularized" and "actual or imminent." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal citations omitted). The plaintiff must then show a causal connection between the injury and conduct complained of that is fairly traceable to the challenged action of the defendant and not the result of an independent action of a third party not before the court. *Id.* (citing *Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 41-42 (1976)). Finally, it must be "likely," as opposed to "speculative," that the injury can be redressed by a favorable decision. *Lujan*, 504 U.S. at 560 (citing *Simon*, 426 U.S. at 38, 43). Because the Government's motion only objects to the "injury in fact" aspect of Plaintiffs' standing, the analysis that follows is limited to that inquiry.

## A.      The Watchlisting System Injures Plaintiffs in the Present and the Future

Defendants injury-in-fact argument focuses on only "a threat of future harm."  Gov't MSJ, Dkt. 299 at 36.  But Plaintiffs' claims rest equally on present injuries.  Those present injuries include a disfavored "known or suspected terrorist" label that, at this very moment, courses through the Watchlisting System's arteries to tens of thousands of recipient entities.  In addition, the present injuries include various travel-related deprivations, electronics searches, associational harms, and the Government's retention of past data.  Regardless of the particular harm imposed, all of Plaintiffs' injuries have the same source: status as a TSDB Listee.  These ongoing harms constitute standing.

While the facts vary from Plaintiff to Plaintiff, for purposes of demonstrating standing, it is enough for this Court to conclude that at least one Plaintiff has standing.  *Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir. 2014).  Here, the facts show that Government agents explicitly disclosed TSDB status to at least seven plaintiffs—which conclusively satisfies any possible permutation of the

standing analysis this Court chooses to conduct.

Defendants' agents told Mr. Ahmed that he was on the No Fly List.  *See* Plaintiffs MSJ Ex. 4, Ahmed Dep. at 27 ("[FBI agents] told me I was on a No Fly List.").  Mr. Kadura was told by a DHS agent that, in exchange for becoming an informant, the agent would "fix [his] travel issues," which made clear to Mr. Kadura that he was on the Government's watchlist.  *See* Plaintiffs' Disputed Facts ¶¶ 19, 110.   TSA agents told Dr. Fares—on a crowded plane within earshot of all the passengers seated in the cabin—that he "had been given this designation" and that the designation meant he "needed to be subjected to additional questioning and screening."  Plaintiffs MSJ Ex. 19, Fares Dep. at 99.  CBP agents told Mr. Frljuckic that the nature of his horrifying experiences at the border was predetermined, explaining to Mr. Frljuckic, for example, that were he to "just make a u-turn, come back [through the US-Canada land border]," he would again be handcuffed at gun point in front of his children and wife.  Plaintiffs MSJ Ex. 11, Frljuckic Dep. at 82-84.  The agents thus made clear that the Government had assigned Mr. Frljuckic a disfavored status that automatically dictates what happens when he tries to cross the border.  *See id.*  Mr. Shibly was likely told that his repeated treatment was to prevent terrorism.  *See* Plaintiffs' Disputed Facts ¶ 132.

Simply put, the facts demonstrate that at least Mr. Ahmed, Mr. Kadura, Dr. Fares, Mr. Frljuckic and Mr. Shibly received confirmation of their TSDB status from Government agents themselves.  Defendants do not dispute these facts with facts of their own.  Because of this, those Plaintiffs with a defendant-confirmed TSDB status have standing to challenge that status, the various annotations to it, the retention of data related to it, and the myriad ways that TSDB Listee status continues to affect their lives.  The Court need not assess the standing of the other 16 plaintiffs.  *Bostic*, 760 F.3d at 370.

Beyond instances of Government-confirmed TSDB status, the facts detailing Plaintiffs' harrowing border and airport screenings independently establishes Plaintiffs' TSDB designations and thus their standing.  Here, Defendants concede that five plaintiffs "currently, regularly experience enhanced screening."  Gov't MSJ, Dkt. 299 at 39.  Though Defendants argue that consistent and extreme responses during border and airport screenings do not reveal a person's

watchlist status (Gov't MSJ, Dkt. 299 at 39), the facts leave no other plausible explanation for treatment that is conspicuously consistent with known watchlist policies regarding treatment based on watchlist status alone. The Defendants know, just as the Plaintiffs do, that the Watchlisting System targets these people. The Court should not hesitate to take the Government up on its offer to disclose Plaintiffs' current watchlist status *in camera* – and the Court should extend its request to a summary of all Plaintiffs' historical watchlist statuses. *See* Gov't MSJ, Dkt. 299 at 37-38 n. 19.

Defendants continue to gloss over how their Watchlisting System actually works. While what Defendants call "enhanced screening" occurs for a variety of reasons, the screening a person's TSDB status triggers is distinct from the screening a person receives randomly or for reasons unrelated to TSDB status. When Mr. Frljuckic, for example, crossed the border by land with his children and wife, CBP officers "started running towards me … [and they] handcuffed me, guns all over, surrounded the car, take me inside." Plaintiffs MSJ Ex. 11, Frljuckic Dep. at 82. When Mr. Kadura gave a CBP agent his passport and saw "that red screen pop up," just as it had on a previous trip, he was ordered to "walk out into the middle of the road" with his hands in the air, surrounded by police officers surrounding him—including two mirrored officer formations covering Mr. Kadura's flanks. Plaintiffs MSJ Ex. 3, Kadura Dep. at 162-165. The spectacle was so great "a girl ha[d] her camera phone open and is like videotaping" Mr. Kadura. *Id.* at 164. This is not what random "enhanced screening" looks like at land borders. This is TSDB-triggered "enhanced screening" which onlookers recognize as something notable and distinct. The Government knows it.

## B.     The Government's Watchlisting System Has Deterred Plaintiffs from Travel

Several plaintiffs, as a result of their TSDB status, have not exercised their right to travel domestically and internationally. Indeed, Mr. Kadura picked a graduate school near his home rather than far away, planning his life to minimize travel. MSJ SOF 83. Collectively, Plaintiffs have missed weddings, funerals, and business opportunities, among other occasions that necessitate travel. They missed those things not for litigation purposes but because the Watchlisting System actually deters travel.

And the fact that Mr. Kadura, like other plaintiffs, have "curtail[ed] his" international and domestic travel as a result of Defendants' "continuous and pervasive" Watchlisting System is "enough for injury in fact." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs, Inc.*, 528 U.S. 167, 184–85 (2000). In *Laidlaw*, the defendant had discharged mercury into a river that caused environmental damage to an outdoor area which individuals had previously used to canoe, hike, and fish. Id. 182. The plaintiffs ceased using the polluted outdoor area "because of [their] concerns" regarding the defendants polluting actions. *Id.* The Supreme Court held that, because the residents' decision "refraining from [their previous] use" of the outdoor area was "entirely reasonable," the residents had standing to challenge that which caused their cessation. *Id.* at 184.

Similar to the individuals in *Laidlaw*, many plaintiffs are "refraining from use" of their rights to cross the border by land or otherwise travel, because Defendants did and will again subject them to a humiliating and terrifying process. *Id.* at 184. Plaintiffs pled, and through discovery, have now demonstrated that they have TSDB status. Not wanting to be handcuffed at gunpoint at the land border like some many Plaintiffs are nor treated like a dangerous terrorist in front of their families at airports, Plaintiffs exercise their movement-based rights much less. And just like in *Laidlaw*, in avoiding international and domestic travel, Plaintiffs are being "entirely reasonable." *Laidlaw*, 528 U.S. at 184–85.

Here, it is "entirely reasonable" for Mr. Kadura, for example, to avoid international travel. *Id.* Once, when he crossed the border with his family, as a result of his TSDB status which is effectively contagious[6], his whole family was aggressively searched. "I saw them put my dad up against the wall, pat him down, feel up his junk just like they felt up mine, just like they felt up my brother's," Mr. Kadura testified. Kadura Dep. at 138. "It's one of the worst memories of my life is seeing my dad have to go through that because of me, you know?" *Id.* at 149.

In the Fourth Circuit, the avoidance of unconstitutional conduct is an exceptional manner of

---

[6] In a uniquely un-American way, TDSB status acts as a virus, causing a Listee's individual's friends and family to be nominated, labeled high-risk or a terrorist, and scrutinized as well. *See* Plaintiffs' Disputed Facts ¶ 15.

demonstrating standing. In *Suhre v. Haywood County*, the Fourth Circuit held that persons who avoid an unconstitutional religious display have made an "extraordinary showing of injury" which is "sufficient [but] not necessary to support" standing. 131 F.3d 1083, 1088 (4th Cir. 1997). This logic is equally applicable here as the only reason that Plaintiffs have refrained from exercising their movement-based rights is because of Defendants' Watchlisting System. *See also Hernandez v. Cremer*, 913 F.2d 230, 234 (5th Cir. Tex. 1990) (finding standing for a challenge that regarded the wrongful exclusion of a citizen from the US based on testimony that the plaintiff "would like to return to Mexico, but did not want to run the risk of [the illegal conduct] happening again."); *Cherri v. Mueller*, Case No. 12-11656, 2013 U.S. Dist. LEXIS 81679 at *22 (E.D. Mich. June 11, 2013) (finding standing based on avoidance where "Plaintiffs' decision to stop traveling across the border is based on a reasonable fear that they would [again] be questioned about their religious practices and beliefs").

### C. The Court Should Follow the Ninth Circuit's Decision in *Fikre v. FBI* to Resolve Any Standing or Mootness Concerns

The agency defendants leading the Watchlisting System have defended their actions, at times, in a manner that is less than scrupulous. One defining feature of this approach is Defendants' time-honored Watchlisting System tradition to remove persons from the TSDB or otherwise alter their status once those persons file a lawsuit, in an effort to obfuscate standing and render claims moot. Indeed, the federal government acknowledges that it annotates which DHS TRIP complainants have filed lawsuits. P's SOF ¶ 127. Plaintiffs assert that this is done to facilitate the standing and mootness arguments Defendants now make.

Regardless of Defendants' arguments which mistakenly blur together matters of standing and mootness, Defendants' fundamental error is to have "placed the burden of proof on the wrong party." *Adarand Constructors v. Slater*, 528 U.S. 216, 222 (2000). To the extent that Defendants assert that Plaintiffs no longer have TSDB status, it is their burden to prove it. *Id.* It is also their burden to prove that it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *United States v. Concentrated Phosphate Export Assn., Inc.*, 393 U.S. 199, 203 (1968).

As the Ninth Circuit emphasized, this is a burden that the nature of the Watchlisting System precludes Defendants from satisfying.

In *Fikre v. FBI,* 904 F.3d 1033, 1040 (9th Cir. 2018), the Ninth Circuit confronted a protracted No Fly List case that continued even after the federal government filed a notice that the plaintiff had been "removed from the No Fly List."  In allowing the case to continue, the court observed that the removal decision was "untethered to any explanation or change in policy, much less an abiding change in policy." *Id.*  The decision emphasizes that TSDB status could be reinstated "for the same reasons that prompted the government to add him to the list in the first place." *Id.*

But beyond the traditional analysis regarding mootness exceptions, the Ninth Circuit went further to describe an injury that persists even after a notice-free TSDB status alteration undertaken for secret reasons.  It noted that removal from the No Fly List, a part of the TSDB, "does not completely and irrevocably eradicate the effects" of the placement decision.  *Id.*  Indeed, the nature of the stigma-based injury means that an unexplained alteration of TSDB status does not address the actual injury.  As *Fikre* explained: "Absent an acknowledgment by the government that its investigation revealed [that the listee] did not belong on the list, and that he will not be returned to the list based on the currently available evidence, [the listee] remains, in his own words, stigmatiz[ed]."  Defendants have told no Plaintiffs they have been removed from the TSDB, and to the extent that the Court accepts Defendants' invitation to provide the "current status of Plaintiffs *ex parte* and *in camera*," this Court should adopt *Fikre's* approach in handling any mootness issues.

## II.   DHS TRIP IS A SHAM, AND COMPLETING IT IS NOT A PREREQUISITE FOR JUDICIAL INTERVENTION

Defendants assert an administrative exhaustion requirement but omit the Supreme Court case that squarely dictates this issue's outcome.  Simply put, *Darby v. Cisneros*, 509 U.S. 137 (1993), means that Plaintiffs' APA claim, which is coextensive with the constitutional claims, can be brought without first exhausting DHS TRIP.

In *Darby*, the Supreme Court held that, with respect to a court's ability to require exhaustion, "judicial discretion" applies only "in cases not governed by the APA." 509 U.S. at 153. Where claims

are based on the APA, any final agency action is subject to immediate judicial review unless two conditions are met. *Id.* at 145-47. The first condition for an exhaustion requirement to be proper is if it is expressly mandated by a statute or an agency rule. *Id.*; *Fort Sumter Tours, Inc. v. Babbitt*, 66 F.3d 1324, 1334 (4th Cir. 1995). Even if an agency rule purports to require exhaustion, that requirement will not be given judicial effect unless the agency decision is "meanwhile inoperative" during the pendency of the appeal. *Darby*, 509 U.S. at 148; *Idaho Watersheds Project v. Hahn*, 307 F.3d 815, 827–28 (9th Cir. 2002); 5 U.S.C. § 704. So long as there is "final agency action" subject to APA challenge, the APA exhaustion factors govern. *Id.* at 144.

There is no explicit statute or rule that requires persons Defendant designate to exhaust any agency process. And specifically, there is no explicit statute or rule that requires DHS TRIP to be exhausted. The statute authorizing DHS to establish TRIP makes it clear that it is a voluntary process.  *See* 49 U.S.C. §44926(a).  DHS TRIP rules state the same, describing DHS TRIP as a "voluntary program through which individuals may request redress." 49 C.F.R § 1560.3.

 But even if an exhaustion requirement was permitted under *Darby v. Cisneros*, it would still be excused here because that avenue for relief is actually futile.  *Mohamed v. Holder*, 995 F. Supp. 2d 520, 533 (E.D. Va. 2014) (describing Fourth Circuit law) (citations omitted).  To begin with, DHS TRIP does not address the stigma-plus injury at all.   As the Ninth Circuit in *Fikre* explained, "[b]ecause acquaintances, business associates, and perhaps even family members are likely to persist in shunning or avoiding [the listee] despite his [altered TSDB status]," the remedy he needs is "vindication in this action."  *Fikre*, 904 F.3d at 1040.  It is not enough that the conditions during border crossings and at airports change; the plaintiffs need "an acknowledgment that its investigation revealed [that they] did not belong on the list." *Id.*

Here, the TSA Administrator has not issued a final order on a No Fly List matter since 2015, despite the fact that TSC recommendations regarding such DHS TRIP complaints have awaited his review for years.  P'S SOF ¶ 135.  The process that the Government claims is mandatory is just a dead end even when that process is required by judicial intervention.  Additionally, with regards to persons with a Selectee List annotation, the letters are just like the pre-*Latif* letters all listees used to

receive: "any letter provided by the TSA at the conclusion of a DHS TRIP review is non-substantive, does not reveal whether an alteration in status has been accomplished, and has no substantive relationship to the TSC's review of a complaint by a listee." *Mohamed v. Holder*, No. 1:11-cv-50 (AJT/TRJ), 2011 U.S. Dist. LEXIS 96751, at *30 n.6 (E.D. Va. Aug. 26, 2011).

There are two further reasons why DHS TRIP exhaustion is not a barrier for standing. First, DHS TRIP is not an available remedy unless one has suffered a travel-related problem. SOF ¶¶ 125. But, as the broad facts establish above, individuals suffer from being on the watchlist even without a travel-related problem. *See* SOF ¶¶ 90-121. Second, even if individuals correctly guess they are on the TSDB database and make a compelling case to DHS TRIP, DHS TRIP's judgment will not bind the TSC Redress Office. SOF ¶¶ 129. Either way, the DHS TRIP program cannot be required when it is not available to serve as an effective remedy for Defendants' unlawful conduct. *U.S. ex rel. Rahman v. Oncology Assocs., P.C.*, 198 F.3d 502, 515 (4th Cir. 1999).

Because (1) the DHS TRIP does not contain an exhaustion requirement; (2) even if it did it would fail the "meanwhile inoperative" rule; and (3) it would be futile in light of Defendants' failure to actually process TSDB-related requests for relief, there is no exhaustion requirement.

## III.    DHS TRIP PROVIDES FACIALLY INADEQUATE PROCESS FOR PLAINTIFFS

Defendants claim that DHS TRIP is "appropriate and adequate" in light of the "multiple levels of review." Def. MSJ at 58. At no point in the administrative process are complainants given notice of the deprivation, notice of the standard used to deprive them, notice of the evidence used against them, or an opportunity to challenge that evidence. It is inadequate.

In the Fourth Circuit, without notice and a meaningful opportunity to be heard, the Court need not balance the *Matthews* factors. *See D.B. v. Cardall*, 826 F.3d 721, 743 (4th Cir. 2016) (explaining that "notice and an opportunity to be heard" are "basic requirements" of procedural due process and that the *Matthews* factors exist to establish "the need for procedural safeguards" that go "beyond those requirements."). The DHS TRIP process therefore does not provide sufficient due process.

IV.   **THE WATCHLISTING SYSTEM DEPRIVES PLAINTIFFS' OF THEIR MOVEMENT-BASED RIGHTS AND RIGHT TO BE FREE FROM GOVERNMENT-IMPOSED STIGMA**

Defendants' arguments against Plaintiffs' movement and reputation-based interests are rebutted by Plaintiffs' Motion for Summary judgment, which is incorporated by reference here rather than repeated.  Plaintiffs also note that their standing arguments above are applicable to the deprivation inquiry discussed below.  *See Mohamed v. Holder*, No. 1:11-cv-50 (AJT/TRJ), 2011 U.S. Dist. LEXIS 96751, at *17 n.1 (E.D. Va. Aug. 26, 2011). The deprivations are real and they are extensive.

A.   **Experiencing Handcuffing at Gunpoint at the Border, among other Horrors, is a Deterrent to International and Domestic Travel**

Despite Defendants' offensive gloss, the undisputed facts show that Plaintiffs have experienced much more than "modest delays while traveling."  Def. MSJ at 41.  For Mr. Frljuckic, the worst part of a border crossing was not the delay. It was, instead, the manner in which he was screened, ordered by CBP agents[7] at the land border to "slowly come out [of his car], [and] walk back" towards his trunk.  Frljuckic Dep at 47.  "He was holding the gun on me constantly, and then they handcuffed me in front of my four-year-old kid…[H]e was crying so much," Mr. Frljuckic testified.  *Id.*  "That was the hardest part for me to see."  *Id.*  His child crying was the "hardest part" in a border crossing where, because of the belligerence of the CBP agents, Mr. Frljuckic "actually thought they were going to shoot me."  *Id.*  102.

As this Court previously explained, if Plaintiffs can demonstrated that they have "been deterred from traveling as a result of actual detentions," that is sufficient to demonstrate a movement-based deprivation.  *Elhady v. Piehota*, 303 F. Supp. 3d 453, 464 (E.D. Va. 2017).  Plaintiffs have proven that and much more.  Placement on the TSDB comes with extraordinary detention and screening for any individual who attempts to either enter the U.S. at a port of entry or board an

---

[7] "They were shouting, screaming.  They were very, very loud in the way they were talking to me. They were giving me orders to proceed, but because I got so nervous, I guess I didn't – I turn around or something, and they got so nervous, upset, and they started screaming more, pointing guns on me."  Frljuckic Dep at 102.

airplane.  *See* Plaintiffs' Facts ¶¶ 25-47, 54-86.

JD3 separated from his family and emigrated from the U.S. to Germany after he, along with his wife and 14-year-old son, were handcuffed at gun point at the border.  P's MSJ Ex. 22, JD3 Dep. at 26, 34, 37, 44-45, 47-51, 59-61, 215.  Ahmed stopped crossing the border in 2009 after being detained at the border more than twenty times for more than five hours.  Khan no longer crosses the border since 2012 after being subjected to secondary inspection upon reentering the U.S.  Plaintiff's Facts ¶ 47.  Samir Anwar has not crossed the border to attend multiple family events, including a family engagement party, in Canada.  Due to his own experiences traveling in addition to knowledge of the treatment his brother, Samir Anwar, is subjected to at the border, Shahir Anwar has stopped crossing the border entirely.  Coleman stopped crossing the border, despite having family and colleagues that he would have visited frequently in Canada. Plaintiff's Facts ¶ 47.  Elhady stopped crossing the border altogether and from flying for more than a year after being detained in a freezing cold cell with bright lights without his jacket and shoes for eight hours before he was rushed to the hospital in an ambulance due to his confinement conditions.  Ex. 1 at 187-192, 194.

El-Shwehdi avoids flying, and in fact, he did not travel to Libya for the funerals of his brother or his sister's husband.  Plaintiff's Facts ¶ 77.  He also drives a 500-mile drive two to three times a year, although he is disabled and experiences problems in his hips as a result of two hip replacements.  *Id.* Kadura missed a lot of weddings and funerals of family members in Libya, avoids domestic travel when possible, and chose to attend a lower-ranked and more expensive masters' degree program to remain closer to his parents so he would not have to fly to visit them.  Plaintiffs' Facts ¶ 83.  And this list is illustrative, not exhaustive.

**B.      TSDB Listings and Dissemination Deprive Plaintiffs of their Stigma-Plus Liberty Interests**

TSDB information, says the federal government, is "closely guarded" and "only disseminated to those who absolutely need to receive it."  Def. MSJ at 49.  The record contradicts the Defendants' claims.  TSDB information is made available to animal shelters—among a

hodgepodge of more than 500 private entities. Almost 20,000 other entities receive access to TSDB information, including every law enforcement officer in the country. Earlier today, for the first time, the federal government indicated that they had given "the police department of a private high school" access to TSDB information, apparently on accident. *See* Rago Decl. at 2. The facts outlined in Plaintiffs' own motion for summary judgment, incorporated by reference here, show that the Watchlisting System disseminates TSDB information so pervasively that the extent of the dissemination independently satisfies the stigma prong of the stigma plus doctrine.

Plaintiffs also note that those who travel with someone who is pulled out of their car at gunpoint, searched in an onerous manner, asked questions about their religious beliefs and practices, or are themselves treated as a TSDB Listee due to their joint travel with one of the Plaintiffs—these people witness the outward manifestations of Defendants' decision to impose a TSDB status on Plaintiffs. *See* Plaintiffs' MSJ at 45-47.

The plus prong is also satisfied in multiple ways, including all those articulated in Plaintiffs' own motion. One consequences, though, warrants some elaboration. TSDB status subjects Listees to seizure and search of electronic devices and information whenever they cross the border. Plaintiffs' Facts ¶¶ 32, 48-53. And there is evidence the Government installs malware or monitoring software on at least some watchlisted individual's devices. Plaintiffs' Facts ¶ 50 and Plaintiffs' MSJ Ex. 14 at 7, 46-48, 192. These searches are also done for TSDB Listee's travelling companions. Plaintiffs' Facts ¶¶ 33, 53. The information seized includes the complete contents of cell phone contact lists and social media accounts. Plaintiffs' MSJ Opp. Ex. 85, 2013 Watchlisting Guidance at 68-69. These searches give the Government a "collection of bank-account numbers, copies of electronic devices, cell-phone contact lists, laptop images, GPS data, [and] photos." *Tarhuni v. Sessions*, No. 3:13-CV-00001, 2018 WL 3614192, at *11 (D. Or. July 27, 2018). The Government retains this collection permanently, even if an individual is later removed from the TSDB. Plaintiffs' Facts ¶ 34. The result of this privacy intrusion "constitute[s] such a significant intrusion into a traveler's privacy that the Court concludes it is a sufficient deprivation of Plaintiff's liberty interest in travel to warrant procedural due-process protection." *Tarhuni*, 2018 WL 3614192, at *11.

45

## CONCLUSION

The Court should **DENY** Defendants' Motion for Summary Judgment and

**GRANT** Plaintiffs' Motion for Summary Judgment.

Dated:  March 25, 2018

Respectfully submitted,

**CAIR LEGAL DEFENSE FUND**

/s/ Gadeir I. Abbas
Lena F. Masri (D.C # 1000019) ±
    lmasri@cair.com
Gadeir I. Abbas (VA # 81161) *
    gabbas@cair.com
Carolyn M. Homer (D.C. # 1049145) ±
    chomer@cair.com
    453 New Jersey Ave., SE
    Washington, DC 20003
    Phone: (202) 742-6420
    Fax:     (202) 488-0833


± Admitted pro hac vice

* Licensed in VA, not in D.C.
Practice limited to federal matters

**AKEEL AND VALENTINE, PLC**
SHEREEF H. AKEEL (MI # P54345) ±
888 W. Big Beaver Rd., Ste. 910
Troy, MI 48084
Phone: (248) 269-9595
shereef@akeelvalentine.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 26, 2019, I filed the foregoing document via the Court's CM/ECF system.  I further certify that counsel for Defendants will automatically receive service of this filing via electronic mail.

/s/ *Gadeir I. Abbas*
Gadeir I. Abbas