**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**
Alexandria Division

| | |
|---|---|
| Anas ELHADY, et al.,  ) | |
|  ) | |
| Plaintiffs,  ) | |
|  ) | |
| v.  ) | Case No. 1:16-cv-375 (AJT/JFA) |
|  ) | |
| CHARLES H. KABLE, et al.,  ) | |
|  ) | |
| Defendants.  ) | |

**REPLY MEMORANDUM IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

G. ZACHARY TERWILLIGER
United States Attorney

JOSEPH H. HUNT
Assistant Attorney General
Civil Division

ANTHONY J. COPPOLINO
Deputy Director, Federal Programs Branch

AMY POWELL
DENA M. ROTH
ANTONIA KONKOLY
CHRISTOPHER HEALY
Trial Attorneys, Federal Programs Branch
United States Department of Justice
Civil Division, Federal Programs Branch

LAUREN A. WETZLER
Chief, Civil Division
Assistant United States Attorney
2100 Jamieson Ave.,
Alexandria, VA. 22314
Tel: (703) 299-3752
Fax: (703) 299-3983
Lauren.Wetzler@usdoj.gov

*Attorneys for Defendants*

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

PLAINTIFFS' FACTUAL DISPUTES.................................................................................2

    A.    The Threat, Defendants, and the TSDB ..............................................................2

    B.    Plaintiff-Specific Facts ......................................................................................8

ARGUMENT.......................................................................................................................18

    I.    Plaintiffs Lack Standing to Pursue Their Due Process Claims .....................18

        A.    Plaintiffs Have Not Demonstrated Certainly Impending
            Injury.......................................................................................................18

        B.    The Ninth Circuit Decision in Fikre Does Not Help
            Plaintiffs Demonstrate Standing.............................................................24

    II.    Plaintiffs Who Did Not Complete DHS TRIP Should Be Dismissed .......................27

    III.    Plaintiffs Have Not Established the Deprivation of a Liberty Interest.......................28

        A.    Watchlisting Does Not Deprive Plaintiffs of a Liberty Interest
            in Travel...................................................................................................28

        B.    Plaintiffs Have Not Been Deprived of Any Reputational
            Liberty Interest under the Stigma-Plus Test ..........................................33

    IV.    The Government's Interest in Maintaining an Effective Watchlisting
        System Outweighs Plaintiffs' Interests in Additional Process ......................36

CONCLUSION....................................................................................................................38

**INTRODUCTION**

The 9/11 Commission identified information-sharing as a key failure in the months leading up to the catastrophic terrorist attacks and recommended sweeping changes to how the Government handles terrorism information. The President directed the establishment of the Terrorist Screening Center, and authorized the consolidation of existing watchlists into the Terrorist Screening Database, and Congress has specifically required the screening of air passengers against the watchlist. The judgment of the Executive Branch, consistent with the mandate of Congress, is that the watchlisting system is appropriately calibrated to detect, track, deter, and disrupt terrorist activities, while protecting civil liberties. The TSDB is constantly under review and revision to make sure that the list includes timely and accurate information responsive to current threats. And the TSDB is consistent with the protection of civil liberties; an individual's presence on the watchlist does not deprive him of any rights or entitlements; rather his information is available only to those who can take appropriate safety, investigative, homeland security, and law enforcement steps that are otherwise authorized by law.

Plaintiffs admit in their opposition that their goal is to undo all of this—to prohibit the use of the watchlist altogether, at least as applied to U.S. citizens. *See* Plaintiffs' Opposition ("Pls' Opp."), Dkt. No. 3131, at 1. The extraordinary—potentially devastating—consequences of such a move cannot be overstated. *See* Defendants' Statement of Material Facts ("Defs' SMF") ¶¶ 1-3 (describing the current terrorist threat and the importance of the watchlist). But even their original request for additional process is inconsistent with an effective watchlist, and Defendants have put forward undisputed evidence that such compelled disclosures would cause harm to national security and law enforcement efforts and be detrimental to transportation security. Plaintiffs' widely varying, and mostly long-past, experiences with airport security or border inspections do not show that they

have been deprived of a liberty interest by placement on a watchlist, and the Defendants are entitled to summary judgment on all remaining claims.

## PLAINTIFFS' FACTUAL DISPUTES

### A.     The Threat, Defendants, and the TSDB, Defs' SMF ¶¶ 1-37.

With few exceptions, Plaintiffs do not dispute the Defendants' description of the TSDB and how it is used, and have no competent evidence contradicting Defendants' sworn testimony. One point merits global correction. First, throughout the brief, Plaintiffs frequently confuse the respective actions of TSA and CBP. As set forth in Defs' SMF ¶¶ 6-11, TSA conducts screening at airports, on travelers departing on all domestic and international flights, and CBP conducts inspections at the border (which includes inspections at airports of travelers arriving to the United States on an international flight). Although both agencies use TSDB information as part of these processes, they do so in different ways. TSA uses the Expanded Selectee List, among many other tools, to designate passengers for enhanced screening, which results in specific security protocols at checkpoints, which all passengers may experience whether or not they are on the TSDB. DEX1 ("Froemling MSJ Decl.") ¶¶ 10-12.[1] CBP Officers, on the other hand, have discretion in referring a traveler for additional scrutiny, sometimes referred to as secondary inspection. An alert that notifies the CBP officer that the traveler is a confirmed or suspected match to a TSDB identity or has a prior conviction or offense, may indicate additional scrutiny is warranted. DEX51 ("Howe MSJ Decl.") ¶¶ 14-16. Secondary inspection does not entail specific mandatory steps for matches to the TSDB; rather, "the specific actions taken during the secondary border inspection vary depending on the officer's evaluation of each traveler's situation" and "the totality of the circumstances." *Id.* ¶¶ 17-18.

---

[1] Generally, TSA screeners are not required to question individuals during the administrative search for any purpose other than facilitating and completing the search. Froemling MSJ Decl. ¶ 40; *see also id.* n. 29.

Plaintiffs' statement of disputed facts requires further specific clarification as well. Because Plaintiffs' numbered paragraphs in their opposition do not track the paragraphs numbers in Defendants' Statement of Material Facts ("SMF"), Defendants will respond to Plaintiffs' numbered paragraphs for Plaintiffs' paragraphs 1-21.

**Pls' Opp. ¶¶ 1, 7, 8, 14.** Plaintiffs contest Defendants' SMF paragraphs ¶¶ 1-3, ¶ 12, and ¶¶28-29 because the Government has invoked privileges over certain information, and further contests the entirety of paragraphs ¶¶1-37 on this basis. These responses do not comport with the Local Rule 56(b), which requires Plaintiffs to identify specific facts in dispute. *See Shapiro v. Lanteigne*, No. 2:09CV339, 2010 WL 8961357, at *1 (E.D. Va. Jan. 21, 2010), aff'd, 389 F. App'x 304 (4th Cir. 2010). Moreover, this Court has upheld Defendants' invocation of these privileges. Because the facts contested by Plaintiffs are still properly in evidence notwithstanding the invocation of privilege, Plaintiffs' objections are without merit.

**Pls' Opp. ¶ 2.** This purported fact has already been rebutted in Defendants' Opposition ("Defs' Opp."), Dkt. No. 311; the cited testimony does not contradict the Defendants' statements. *See* Defs' Opp. at 40-41 ¶¶ 140-41.

**Pls' Opp. ¶ 3.** Plaintiffs' objection in ¶ 3 constitutes speculation. This Court denied Plaintiffs' motions for additional statistical records. Dkt. Nos. 213, 258. And statistical modeling could not demonstrate inefficacy. DEX2 ("Orlando MSJ Decl.") ¶¶ 11-14 (explaining that TSDB nominations are not based on statistical models but instead on intelligence analysis and policy-based criteria); PEX50 (2015 Giacalone Decl) ¶¶ 7-23 (explaining, in the No Fly List context, why such statistical modeling is not helpful and why No Fly determinations are nonetheless effective and reliable).

**Pls' Opp. ¶ 4.** Plaintiffs' assertion that "CBP secondary inspection of TSDB Listees" is "mandatory" was rebutted in Defendant's prior briefing. Defs' Opp. at 4. In addition, Plaintiffs may

3

not rely on an unauthenticated and unverified purportedly leaked copy of the 2013 Watchlisting Guidance, which is not properly in evidence. The actual 2013 Watchlisting Guidance has been protected by this Court as privileged. *See* January 4, 2019 Order, Dkt. No. 258.

**Pls' Opp. ¶ 5.** This purported fact has already been rebutted in Defendants' prior filing. *See* Defs' Opp. ¶ 5.

**Pls' Opp. ¶ 6.** Defendants have already responded to Plaintiffs' fact paragraphs ¶¶ 136-39 in their prior briefing. This court should not rely on the *Ibrahim* decision Plaintiffs cite, which contains errors of fact and law, including overturning or ignoring factual findings of the District Court which were not appealed. Although the Ninth Circuit recently denied the Government's motion for reconsideration, *see Ibrahim v. Dep't of Homeland Sec.*, No 14-16161, Dkt. No. 105 (Defendants' Motion for Reconsideration, attached hereto as DEX69), the time for seeking certiorari has not yet run. In any event, the error at issue in the *Ibrahim* case occurred 15 years ago and was corrected the next day, and is not material to evaluating the current TSDB.[2]  The percentage of nominations accepted and number of employees tasked with review of nominations does not reflect anything about the accuracy of the TSDB. Moreover, Plaintiffs' assertion that only 35 people within TSC are tasked with reviewing and accepting nominations is not reflected in the evidence—the deposition testimony Plaintiffs cite states that, although 35 individuals have authority for final review of certain TSDB nominations (such as "Adds"), there may be multiple levels of review depending upon the type of nomination. PEX25 ("Groh Tr.") 374-75. As a result, there are more than 35 individuals at TSC that review nominations. Plaintiffs' attempt to estimate the number of nominations per final reviewer per

---

[2] For example, Secure Flight was implemented and DHS TRIP was designated to perform statutory redress, all subsequent to the denial of boarding in that case. *See* TSA Secure Flight Program, September 18, 2014 written statement of Steve Sadler, TSA Assistant Administrator, available at https://www.tsa.gov/news/testimony/2014/09/18/tsa-secure-flight-program (explaining that since November 2010, Secure Flight has conducted watchlist matching of passenger information against the TSDB for covered flights and that DHS TRIP was established in 2007).

workday is inaccurate. Additionally, certain final reviews are less time-consuming than others. Thus, Plaintiffs' math is misleading to the point of being meaningless.

**Pls' Opp. ¶ 9.** The fact that the government has not publicly identified harm related to implementation of the revised DHS TRIP policy does not undermine the applicability of such arguments here. Moreover, the harms described apply with even greater force in the context of individuals who are on the TSDB but are not on the No Fly List, because such individuals are allowed into sensitive areas of airports. *See* Froemling MSJ Decl. ¶ 55.

**Pls' Opp. ¶ 11.** Defendants clarify that the referenced TSA and CBP administrative redress processes do not disclose classified information or information protected from disclosure under law, including TSDB status or the reasons for such status, which, in any event, are not determinative to such TSA or CBP determinations.

**Pls' Opp. ¶ 12.** Plaintiffs' assertions in the first sentence are not inconsistent with the fact they purport to dispute; none of the cited evidence supports the conclusion that TSDB status is a basis for denial of the credentials. TWIC, HME and SIDA applications are adjudicated through the TSA Security Threat Assessment process described in the Froemling Declaration; TSDB status is not determinative of TSA's eligibility determination and merely serves as a factor indicating that an individual merits further scrutiny. Froemling MSJ Decl. ¶¶ 49-51; *see also Seraji v. Gowadia*, No. 816CV01637JLSJCG, 2017 WL 2628545, at *7 (C.D. Cal. Apr. 28, 2017) (challenge to purported use of TSDB to deny a TWIC should be reviewed in the Court of Appeals under 49 U.S.C. § 46110). Each of these three credentialing processes has its own redress process (not challenged by the Plaintiffs here), that can result in judicial review. *See, e.g., id.;* 49 C.F.R. Part 1515. The other three programs listed on the cited page are administered by non-Defendant agencies, Plaintiffs have reported no interaction with these programs, and there is no competent information in the record regarding their screening or use of the TSDB. No plaintiff has had difficulty obtaining sought after

employment and many have obtained credentials for employment at airports or elsewhere. *See* PEX8 ("Shibly Tr.") 22-23; PEX15 ("Ali Tr.") 18, 112; PEX5 ("Al Halabi Tr.") 150-152 (Plaintiffs who worked at airports without difficulty); *see also* Ali. Tr. 113-114 (successfully obtained Hazmat license). The cited pages of the GAO report do not support the contentions asserted, and Defendants are not bound by the conclusions of the GAO. Plaintiffs' facts ¶¶ 99-106 have been disputed or clarified in Defendants' Opposition.

**Pls' Opp. ¶ 13.** Defendants clarify that the ORI to which Plaintiffs refer was held by the police department of a private high school, which had demonstrated to the FBI that it would perform the administration of criminal justice, have arrest powers pursuant to a state statute, and allocate more than 50% of its annual budget to the administration of criminal justice as defined by CJIS regulations. *See* PEX86 ("March 25, 2019 Rago Decl.") ¶ 4. Defendants further clarify that that police department had never used its ORI to submit any NCIC queries. *See id.*

**Pls' Opp. ¶ 14.** Plaintiffs cannot dispute paragraphs ¶¶ 1-37 in full by cross-referencing the entirety of their statement of facts. This response does not comport with Local Rule 56(B), which requires Plaintiffs to identify specific facts in dispute and cite to specific evidence.

**Pls' Opp. ¶ 15.** This paragraph also fails to comport with Local Rule 56(B), and Plaintiffs' citations do not support the contentions in this paragraph. Each of Plaintiffs paragraphs 19, 33, 34, 64, 66, and 120 were disputed or clarified in Defendant's prior briefing. Plaintiffs may not rely on an unauthenticated and unverified purportedly leaked copy of the 2013 Watchlisting Guidance, nor of the purported Quiet Skies Bulletin, because both documents are not properly in evidence. These documents are purportedly leaked copies which have not been properly authenticated. The actual 2013 Watchlisting Guidance, and documents related to the Quiet Skies program, have both been protected as privileged. *See* Orders Dkt. Nos. 245, 258.

**Pls' Opp. ¶ 16.** Plaintiffs cannot dispute Defendants' ¶ 38 in full by generally referring the Court to a long string cite of deposition testimony without further explanation or identification of the fact being disputed. This response does not comport with the Local Rule 56(b), which requires Plaintiffs to identify specific facts in dispute and cite to specific evidence; Plaintiffs may not rely on wholesale denials such as this without explanation.

**Pls' Opp. ¶ 17.** Plaintiffs deny that "only four Plaintiffs were denied boarding, that none were prohibited from travel, and that none believe they are currently on the No Fly List." *See* Pls' Opp. ¶ 17. Plaintiffs' correction only applies as to the first of these three phrases: Defendants revise their SMF ¶ 38 to convey that five Plaintiffs were denied boarding, not four. None of the information Plaintiffs cite supports Plaintiffs' denial of the latter two phrases, *i.e.* none of the Plaintiffs have been prohibited from travel, nor do any Plaintiffs believe they are currently on the No Fly List. With respect to Doe 4, he testified that someone he believes was an FBI agent told him "you can fly right now if wanted to," and that he subjectively interpreted that statement to mean that the agent had given him "a pass, like a one-time deal because I said I wanted to get married." DEX23 ("Doe 4 Tr.") 177-78. The record does not support the conclusion that Doe 4 was in fact given a "waiver," nor even that he was ever so informed by any governmental official.

**Pls' Opp. ¶ 18.** It is unclear what, if any, facts Plaintiffs are disputing because this paragraph contains no reference to Defendants' SMF, but Plaintiffs' citation to the deposition of Donald Thomas does not support the assertion that he was permitted to board after being placed on the No Fly List. Thomas did submit a DHS TRIP inquiry prior to his alleged denial of boarding. *See* DEX4 ("Moore MSJ Decl.") ¶ 46. The response he received was thus consistent with the redress processes described in the Moore Declaration.

**Pls' Opp. ¶ 19.** This paragraph generally describes Plaintiffs' subjective characterizations and impressions and does not establish those impressions as objective fact. Almost none of the

quoted or summarized statements actually involves government officials telling them they are in the TSDB. For example, Fares was allegedly told that he had been selected for enhanced screening, but one can be selected for enhanced screening for many reasons unrelated to TSDB status. Froemling MSJ Decl. ¶¶ 10-12, 31. Plaintiffs' description of Plaintiff Thomas' testimony is not reflected in the testimony they cite. Thomas testified that he was contacted by someone from the FBI who told him he would like to speak in person, but did not leave a call back number. *See* PEX10 ("Thomas Tr.") at 142-43. Although Thomas alleges that his friend was told that Thomas could not fly, his friend's recollection is inadmissible hearsay. When he did meet with the agent, the agent declined to confirm or deny his status. *Id.* 141-43. Al-Halabi's cited deposition testimony only reflects that the FBI agent purportedly stated that the search of Al-Halabi's phone was "a process that needs to take place." *See* Al-Halabi Tr. 81. Ahmed's testimony is addressed in further detail below. *See infra* at 9-10.

**Pls' Opp. ¶ 20.** Shibly's deposition testimony states only that he was asked to come back in and redo his fingerprints for his concealed weapon permit, not that there was otherwise any undue delay. *See* Shibly Tr. 288. Shibly received the permit and stated that he did not have information to determine if being asked to redo his fingerprints had anything to do with his allegations in this suit. *See id.* Plaintiffs assert that Ahmed was on the No Fly List, although his testimony reflects that he was never denied boarding on a plane. *See* PEX4 ("Ahmed Tr.") at 74.  Ahmed's deposition testimony nowhere suggests that he was removed from his position as a supervisor at the Detroit Airport during his tenure there. *See* Defs' Opp. at 31.

**B.    Plaintiff-Specific Facts. Defs' SMF ¶¶ 38-106.**

With few exceptions, Plaintiffs largely do not dispute the Defendants' recitation of facts describing each Plaintiff's individual travel experiences, but instead put forward additional subjective descriptions of their individualized experiences. These subjective experiences, virtually none of which can be specifically tied to TSDB status, do not contradict or undermine the general evidence

about how the TSDB works or how TSDB information is used. Accordingly, Defendants do not respond to each individual recitation of deposition testimony, and do not concede that these characterizations are correct or material. Two global factual issues merit clarification. First, there is no evidence, nor reasonable inference, that Defendants systematically delisted people who filed lawsuits or as a result of lawsuits. Several plaintiffs have testified to having traveled without experiencing additional screening well before this action was filed. *See, e.g.,* Al-Halabi Tr. 107; DEX70 (exhibits documenting the travel described in deposition); PEX17 ("Samir Anwar Tr.") 31-41; Doe 2 Tr. 26-54, 120-22 (never experienced enhanced screening on domestic travel); Elhady Tr. 46-50, 127-28 (no problems with domestic screening); Shibly Tr. 141-145. And a few Plaintiffs claim to continue experiencing enhanced screening or border inspections. Defs' MSJ 43-45. No reasonable inferences can be drawn from the facts that some Plaintiffs stopped experiencing problems prior to the lawsuit, some stopped experiencing problems after the lawsuit was filed, and others continue to experience problems. Second, several Plaintiffs allege that CBP asked questions about their religious beliefs, but Defendants do not concede their characterizations of the questions or the agents' motivations. *See also* PEX27 ("Howe Tr.") 288-92 (CBP testimony regarding religious questioning).

**Ahmed. Defs' SMF ¶¶ 38-39.** Ahmed's cited testimony does not support the contention in Plaintiffs' paragraph 22 that 90% of his trips to Canada while a minor resulted in secondary inspection, only that he recalls inspections of around 15 minutes 70% of the time, and delays of multiple hours 20% of the time. *See* Ahmed Tr. 20. The cited deposition testimony does not support the proposition that Ahmed stopped visiting his family in Canada in 2009 due to his purported watchlist status, and he continued flying internationally after 2009. *See* DEX5 ("Ahmed Interrog. Resp.") at 6-9. The cited testimony also does not support the contention in paragraph 23 that he was screened three times before boarding an outbound international flight in 2010; the cited testimony indicates that he was screened three times in Frankfurt, Germany on his way back from Yemen.

Ahmed Tr. 22-24. With respect to his 2016 travel issue, Defendants clarify that Plaintiffs' testimony indicates that he had to arrange for a friend to pick up his laptop because it was out of batteries. *See id.* 38; *see also* Froemling MSJ Decl. ¶ 39, n. 27 (TSA, as a screening measure, may require electronic devices to be powered on). Plaintiffs mistakenly state that Ahmed's testimony indicated that he missed his flight in Qatar in 2016 due to enhanced screening—his testimony indicates that there were no screening issues traveling from Yemen to Qatar, only that he missed his flight in Qatar for some unrelated reason, and was rebooked. *See* Ahmed Tr. 42.

**Al Halabi. Defs' SMF ¶¶ 41-42.** Plaintiffs have not established that Al Halabi moved to Dubai because his wife's immigration petition was delayed for more than 10 years "because of his status on the watchlist." Rather, Al Halabi's wife's visa was more likely delayed by the fact that he was charged with espionage, court martialed, and received a bad conduct discharge, not as a result of the TSDB. *See* Al Halabi Tr. 163-172; DEX63, 64. Further, Al Halabi's claim in Plaintiff's paragraph 31 that he stopped experiencing travel difficulties "after Al Halabi joined this lawsuit" is contradicted by his own testimony. Al Halabi testified that he traveled without difficulty on two separate international round trips in January and March 2016, both before the filing of the complaint in this litigation. Al Halabi Tr. 107-08; DEX70.

**Ali. Defs' SMF ¶¶ 43-46.** The cited testimony does not support Ali's subjective characterization that his enhanced screening and secondary inspection on two occasions in 2014 and 2017, respectively, was not the result of random selection. With respect to the 2014 flight, the fact that Ali stated that he was the only one in his family randomly selected for enhanced screening is consistent with random selection. With respect to the March 2017 trip from Indonesia, Ali stated that only he and "three other Muslims" were selected for secondary inspection, without consideration for the likelihood that there were other Muslim passengers on the flight who were not selected for secondary inspection.

**Amri. Defs' SMF ¶¶ 47-48**. Defendants again respectfully refer the Court to Defendants' Opposition, at 10 n.6, explaining that the Court previously denied Plaintiffs' Motion to Conduct Additional Discovery, Dkt. No. No. 175, into these events. *See* May 4, 2018 Order, Dkt. No. 206. The Court accepted TSA's explanation for the events of that day, including that an honest mistake was made regarding the trainee pat-down, and specifically found that there was insufficient evidence to support Plaintiffs' arguments that the screening was punitive or retaliatory. May 4, 2018 Hearing Tr. (Dkt. No. 211) at 9.

**Samir Anwar. Defs' SMF ¶¶ 49-51**. Samir Anwar's father, wife, and daughter are not parties to this suit and any allegations regarding their experiences are wholly irrelevant to Anwar's claim. Regarding the June 2014 trip, Anwar testified that although he could not print his boarding pass at a kiosk, there was "not much" delay in obtaining the pass at the counter, Samir Anwar Tr. 33; he further testified that at the security checkpoint, he was "just inspected I guess a little further," and that he was told he had been randomly selected for the screening, *id.* at 33-34. Regarding the return leg of this trip, he testified that he was approached by TSA agents waiting for his flight at a restaurant inside the sterile area, and that they re-checked his boarding pass and identification. *Id.* at 38-39. This testimony does not support the assertion that he was "detained." Regarding foregone travel, Anwar testified that he once decided not to attend an engagement party, but that he could not "recall specifically" any other incidents of foregone travel. *Id.* at 92-93. Finally, the record also does not support any conclusion or inference that the cessation of Anwar's travel issues had any connection with this lawsuit or any other lawsuit.

**Shahir Anwar. Defs' SMF ¶¶ 52-54.** Plaintiff Shahir Anwar's interrogatory response indicates that he made multiple other crossings the U.S.-Canada border that he does not specifically recall. DEX15 ("Shahir Anwar Interrog. Resp.") at 6 ¶ 9. Plaintiffs incorrectly assert that Plaintiff Shahir Anwar "stopped crossing the border entirely" after his and his brother's travel issues began—

his deposition testimony only indicates that he "didn't go to Canada for a little bit." PEX16 ("Shahir

Anwar Tr.") at 66. Defendants further clarify that Anwar testified that he was delayed from between

15 and 30 minutes in obtaining his boarding passes at the check-in counter. *Id.* at 52-53, 56, 59.

**Awad. Defs' SMF ¶¶ 55-58.** Plaintiffs have not established that, as a minor, Awad

experienced "enhanced screening" as TSA uses that terminology; nor have they established any

connection to his purported TSDB status. *Compare* PEX12 ("Awad Tr.") at 101-08 (admitting that

he does not recall details of the screening but describing agents looking more closely at his carry-on

belongings); with Froemling MSJ Decl. ¶¶ 10, 39 (describing what constitutes "enhanced screening"

and that most passengers designated for enhanced screening are not on the TSDB). Moreover,

Plaintiffs' paragraph 55 misidentifies the flights at issue. The Netherlands security issue was on a

flight from the Netherlands to the U.S., Awad Tr. 37-42; the boarding pass issue was on a flight

from Detroit to Amsterdam, and Awad admitted that he had no idea why issuance of the boarding

pass was delayed, *id.* 39. Plaintiffs' paragraphs 57-58 misstate the testimony, which does not show

only three international trips, nor that he was referred to secondary inspection each time he crossed

the border.

**Coleman. Defs' SMF ¶¶ 59-62.** Defendants admit that their SMF ¶ 60 incorrectly stated

that Coleman "was twice referred for secondary inspection by CBP upon returning to the U.S."

Defendants correct that error and clarify that twice Coleman was met by CBP officers who escorted

him to customs inspection upon returning to the U.S. PEX6 ("Coleman Tr.") 96, 105. Defendants

clarify that Coleman testified that he does not recall whether he provided his agent with the required

identity documents to be submitted with his DHS TRIP inquiry. *Id.* 134-135. Defendants further

admit that Coleman's representative submitted the required documentation in 2015, and that DHS

TRIP did not substantively respond. DEX71, Supplemental Declaration of Deborah Moore ("Supp.

Moore Decl.") ¶¶ 3-5.

**Doe 2. Defs' SMF ¶ 64.** The cited testimony does not support Plaintiffs' subjective characterizations that Doe 2 was "pressured to become an informant" or that he was each time "interrogated . . . about the mosque he attends." With respect to the missed flight, Doe 2 further admitted that the missed flight was in part the result of mechanical issues. PEX21 ("Doe 2 Tr.") 105-06.

**John Doe 3. Defs' SMF ¶¶ 65-68.** Defendants add that DHS TRIP has reviewed Plaintiff's MSJ Exhibit 93 and has no record of receiving the submission email, dated August 5, 2014. It is possible that it bounced back due to file size limitation. DHS TRIP is unable to receive inquiries via email that exceed 10 megabytes (MB). Supp. Moore Decl. ¶ 6.

**Doe 4. Defs' SMF ¶¶ 69-70.** With respect to Plaintiffs' paragraph 76, Doe 4 testified that someone he believes was an FBI agent told him "you can fly right now if wanted to," and that he subjectively interpreted that statement to mean that the agent had given him "a pass, like a one-time deal because I said I wanted to get married." Doe 4 Tr. 177-78. The record does not support the conclusion that Doe 4 was in fact given a "waiver," nor even that he was ever so informed by any governmental official. The record also does not support any conclusion or inference that the cessation of Doe 4's travel issues had any connection with this lawsuit. Doe 4 flew successfully to Morocco on September 16, 2016 (not September 1, 2016, as stated in Plaintiffs' paragraph 76), and joined this lawsuit a week later, on September 23, 2016. *Id.* at 41; DEX27 ("Doe 4 Interrog. Resp.") at 6-7; Am. Compl., Dkt. No. 22.

**Elhady. Defs' SMF ¶¶ 71-74.** Elhady's brother, friend, and one-time taxi driver are not parties to this suit and any hearsay allegations regarding their experiences are wholly irrelevant to Elhady's claim and inadmissible. The Canadian government is also not a party to this suit, and any allegations about the actions of Canadian authorities are likewise irrelevant. With respect to Plaintiffs' paragraph 78, the sole issue that Elhady identified regarding any of his departures for the

travel described in this paragraph was a "system issue" that delayed his check-in by about one hour in June 2017. PEX1 ("Elhady Tr.") 111-14. With respect to his allegation that his international inbound flights "resulted in enhanced screening," Defendants clarify that all passengers arriving in the United States must submit to a CBP inspection and generally will only undergo TSA security screening if the passenger has a connecting flight. *See* Howe MSJ Decl. ¶13; Froemling MSJ Decl. ¶¶ 9, 34. Further, Elhady stated in his sworn interrogatory responses that the times of the secondary inspections he received from CBP upon his return to the U.S. from international air travel were—as Defendants stated in ¶ 71 of their SMF—two hours, one hour, four hours, and thirty minutes, respectively. DEX29 ("Elhady Interrog. Resp.") at 6-7 ¶¶ 3-6. That Elhady later contradicted himself by providing enlarged time estimates for some of these events at his deposition does not establish a fact issue for trial: "it is well established that a genuine issue of fact is not created where the only issue of fact is to determine which of the two conflicting versions of a party's testimony is correct." *Erwin v. United States,* 591 F.3d 313, 325 n.7 (4th Cir. 2010) (internal citation omitted).

With respect to Plaintiffs' paragraph 80, Elhady testified that on two occasions, his cell phone was detained beyond his inspection, and that each time it was returned to him approximately two months later. Elhady Tr. 134, 144. He further testified that on two other occasions—including during the CBP inspection following his August 2013 reentry to the U.S. referenced in this paragraph—his phone was returned to him prior to his release from the port of entry. *Id.* 94; Elhady Interrog. Resp. at 6-7 ¶ 5; *see also* Elhady Tr. 177. Thus, the record does not support Plaintiffs' assertion that Elhady's phone was "seized" three times, or during his August 2013 reentry. Additionally, Elhady's testimony regarding his subjective recollection of the FBI agent's statement does not establish this memory as objective fact.

Finally, the record does not establish that the medical care Elhady received in April 2015 was "due to his confinement conditions" during a CBP detention.

14

**Elhuzayel. Defs' SMF ¶¶ 75-76.** With respect to Plaintiffs' paragraph 87, Defendants clarify that the cited testimony regarding the alleged "three hour interrogation" related to a border inspection, not to enhanced screening at the airport. Moreover, the description of the cited testimony is unclear, but the cited testimony (which is admittedly unclear itself) does not support the claim that he was screened twice with respect to each leg of each flight. With respect to Plaintiffs' paragraph 88, the cited testimony does not support the proposition that questions were asked "to get him into trouble."

**El-Shwehdi. Defs' SMF ¶¶ 77-78.** With respect to the estimated delays, El-Shwehdi admitted that he generally did not recall specific times but was "guessing." PEX20 ("El-Shwehdi Tr.") at 58. The cited testimony does not support the proposition that airport screening sometimes takes longer for international flights (only that CBP inspections sometimes take longer upon reentry); rather he repeatedly stated that it was the same or substantially similar for all flights. With respect to the escort, the cited testimony only supports the proposition that he was sometimes escorted to customs. With respect to the allegation about "CBP officers and Turkish personnel," it is unclear which flight Plaintiffs refer to, but the cited testimony does not support this sentence.

**Fares. Defs' SMF ¶¶ 79-82.** Defendants clarify that with respect to the three trips Fares took to Jordan in 2017, Fares testified that Jordanian screeners in Amman—not TSA or CBP— separated the passengers into two lines, "regular line and SSS," and the Jordanian screeners subjected him and "many of the passengers" (approximately ten to fifteen) to additional screening, and Fares did not feel he was being singled out. PEX19 ("Fares Tr.") 134-138. Fares further testified that he did not receive additional screening upon arrival in the United States on two of these three trips. *Id.* 139.

**Frljuckic. Defs' SMF ¶¶ 83-86.** Plaintiff incorrectly states that in June 2014, Frljuckic and his family were "forced to spend the night in the airport" as a result of missing their flight from

Toronto to Vienna while waiting for clearance for Frljuckic to print his boarding pass. Pls' Opp. ¶ 103. Frljuckic testified that "I called my brother because he lives …not too far from there. He picked us up and we went over to his house to sleep over." PEX11 ("Frljuckic Tr.") at 78.

**Hakmeh. Defs' SMF ¶¶ 87-88.** With respect to Plaintiff's paragraph 106, the cited testimony does not support the conclusion that "secondary inspection" or interrogation were conducted by TSA, which does not conduct secondary inspections, nor that it lasted two hours. PEX7 ("Hakmeh Tr.") 53-70 (describing questioning by CBP for about an hour); *id.* 94-96 (describing "security personnel" who he speculated were CBP questioning him for 20 minutes). With respect to Plaintiff's paragraph 107, Hakmeh's deposition testimony indicates that he missed this flight in Turkey not due to any watch list screening but because he needed to recheck a box of tables he bought in Jordan that had to be delivered to "some bulk area," which it turned out was closed. Hakmeh Tr. 136. He therefore spent the night. *Id.* 146. Defendants further clarify that the record reflects that Hakmeh arrives at the airport two to three (not four) hours prior to his flights. *Id.* 70-71. Finally, Plaintiffs assert that Hakmeh recalls submitting a DHS TRIP inquiry, but in response to a question at his deposition, he states that he does not believe he submitted a DHS TRIP inquiry form. *See id.* 278 ("Q: But you don't believe that you ever submitted a DHS TRIP inquiry form? A: Not to my knowledge.").

**Kadura. Defs' SMF ¶¶ 89-93.** Kadura's father and brother are not parties to this suit and any allegations regarding their experiences are wholly irrelevant to Kadura's claim. The record also does not support any conclusion or inference that the cessation of Kadura's travel issues had any connection with this lawsuit or any other lawsuit. Kadura filed a federal lawsuit related to his alleged TSDB status on August 14, 2014. *Kadura v. Holder*, 14-cv-13128 (E.D. Mich.), Dkt. No. 1. Kadura testified that he was detained for seven hours following a border crossing at Laredo in August 2015, and that he received enhanced screening from TSA in January 2016. PEX3 ("Kadura Tr.") at 235-

39, 242-45, 251-52. Since then, he has traveled on multiple occasions and experienced "zero" travel issues. *Id.* 253-56. Finally, his voluntary attendance at a "lower-ranked" degree program is not material to this suit.

**Khan. Defs' SMF ¶¶ 94-97.** Khan's family members are not parties to this suit and any allegations regarding their experiences are wholly irrelevant to Khan's claim. Additionally, regarding the last sentence in Plaintiffs' paragraph 115, Khan stated in his sworn interrogatory response that the secondary inspection he received on this occasion (a February 2016 return trip the U.S. from Pakistan, through Istanbul) lasted "approximately forty-five minutes," not "three to four hours" as stated in Plaintiffs' filing. DEX43 ("Khan Interrog. Resp.") at 7 ¶ 6. Additionally, contrary to Plaintiffs' assertion, the record does not contain any evidence or testimony that Khan ever forewent attending any wedding to which he was invited in Canada.

**Shaout. Defs' SMF ¶¶ 98-100.** The cited testimony does not support the contention that Shaout has "experienced enhanced screening before every leg of every flight he has taken since December 2004." *See, e.g.,* PEX14 ("Shaout Tr.") 43, 72 (no issues since May 2017). Defendants further clarify that the connecting flight Shaout missed followed an international flight, for which he was required to clear customs prior to proceeding to any further domestic travel. *Id.* 34-35. Further, Shaout's testimony that software was added to his electronic devices during secondary inspection is based on pure speculation, and the record establishes that CBP's BSED Directive prohibits "tak[ing] actions that would make any changes to the contents of the device." PEX64 § 5.1.2.

**Shibly. Defs' SMF ¶¶ 101-103.** Defendants clarify that Shibly testified to being placed in handcuffs on only one occasion, in November 2009. Shibly Tr. 73-77. Further, Defendants do not concede that Shibly's testimony that his travel to meet with "senior White House leadership," or his testimony that he "was subjected to scrutiny while he was employed at Regional Elite" in 2010-2011, is material to the litigation.

17

**Thomas. Defs' SMF ¶¶ 104-06.** With respect to Plaintiffs' paragraphs 134-35, the cited testimony does not support the proposition that Thomas's friends were searched or detained because they were travelling with him. Thomas Tr. 72. Thomas's friends are also not parties to this suit and any allegations regarding their experiences are wholly irrelevant to Thomas's claim. And Defendants clarify that no guns were drawn during the encounter with agents. With respect to Plaintiffs' paragraph 138, the cited testimony does not support his characterization of the conversation with the FBI agent. *Id.*. 141-43 (explaining that Thomas asked if he would be able to fly and the FBI agent was noncommittal). With respect to Plaintiffs' paragraph 139, Defendants clarify that Thomas missed his flight because he arrived only 45 minutes prior to departure; he estimates that the screening at issue took 30 minutes or less. *Id.* 77-88. Additionally, with respect to Thomas's DHS TRIP inquiry, *see supra*, Defendants' response to Plaintiffs' paragraph 18.

## ARGUMENT

### I.     Plaintiffs Lack Standing to Pursue Their Due Process Claims.

### A.     Plaintiffs Have Not Demonstrated Certainly Impending Injury.

The Constitution "confers limited authority on each branch of the Federal Government," and Article III limits the judicial power to "Cases" and "Controversies." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1546-47 (2016), *as revised* (May 24, 2016). "The doctrine of standing gives meaning to these constitutional limits by 'identify[ing] those disputes which are appropriately resolved through the judicial process.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). Because standing "serves to prevent the judicial process from being used to usurp the powers of the political branches," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013), courts are "especially rigorous" in examining standing when, as here, a suit asks the court to decide "whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Raines v. Byrd*, 521 U.S. 811, 819-20 (1997). Plaintiffs are the

party invoking jurisdiction and bear the burden of satisfying this especially rigorous inquiry. *Spokeo*, 136 S. Ct. at 1547. They cannot do so on the record before the Court, and their arguments to the contrary are unavailing, for numerous reasons.

Initially, Plaintiffs do not even attempt to make any case for the standing of a substantial majority of the Plaintiffs to this suit, but instead argue that because five Plaintiffs—Ahmed, Kadura, Fares, Frljuckic, and Shibly—each allege that they were told, in the past, that they were on the TSDB by various government officials, "[t]he Court need not assess the standing of the other 16 [sic] plaintiffs." Pls' Opp. at 36.[3]  This argument suffers from three independent flaws. First, as a factual matter, it does not appear that any of the listed Plaintiffs, except possibly Ahmed, were actually told they were on the TSDB—and although Ahmed claims he was told he was on the No Fly List, he was never actually denied boarding, and currently flies freely. Second, "'the standing inquiry requires careful judicial examination of ... whether the *particular plaintiff* is entitled to an adjudication of the *particular claims* asserted,'" *Knight First Amendment Inst. at Columbia Univ. v. Trump*, 302 F. Supp. 3d 541, 556 (S.D.N.Y. 2018) (quoting *Allen v. Wright*, 468 U.S. 737, 752 (1984) (emphasis in original). The Supreme Court has repeatedly held that "standing is not dispensed in gross" and that "a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (quoting *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008)). A plaintiff may not invoke injury resulting from one transaction to justify pursuing relief as to separate transactions. *See Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996). "If the right to complain of *one* administrative deficiency automatically conferred the right to complaint of *all* administrative deficiencies, any citizen aggrieved in one respect could bring the whole structure of state administration before the courts for review. That is of course not the

---

[3] There are 23 Plaintiff remaining in this suit. Thus, there are 18 Plaintiffs in addition to Ahmed, Kadura, Fares, Frljuckic, and Shibly.

law." *Id.*; *see also, e.g., Pagan v. Calderon*, 448 F.3d 16, 26 (1st Cir. 2006) ("The standing inquiry is both plaintiff-specific and claim-specific. Thus, a reviewing court must determine whether each particular plaintiff is entitled to have a federal court adjudicate each particular claim that he asserts.").[4]

Third, even assuming *arguendo* that one Plaintiff could maintain standing to vindicate the claims of twenty-two others who concededly lacked Article III standing to pursue any claim on their own—and further that Ahmed, Kadura, Fares, Frljuckic, and Shibly's allegations regarding "confirmation" of prior TSDB status are established—Plaintiffs' argument fundamentally misunderstands the standard for pursuing injunctive relief. As "the [Supreme] Court has reiterated" "[t]ime and again … '[p]ast exposure to [purportedly] illegal conduct does not in itself show a present case or controversy regarding injunctive relief,'" absent any continuing, present adverse effects. *Lebron v. Rumsfeld*, 670 F.3d 540, 561 (4th Cir. 2012) (quoting *City of Los Angeles v. Lyons,* 461 U.S. 95, 102 (1983)). Thus, the mere "fact of past injury … does nothing to establish a real and immediate threat that [a plaintiff] would again suffer similar injury in the future," which is a necessary requirement for "standing to seek forward-looking relief." *Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 210-11 (1995) (citation omitted). Rather, in order to establish standing to seek injunctive or declaratory relief, a plaintiff must demonstrate the existence of a future "'threatened injury [that is] *certainly impending*,'" *Clapper*, 568 U.S. at 401 (emphasis added) (citing *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990))—meaning "that [he or] she is in danger of being injured by the opposing party's conduct and that the danger is both 'real' and 'immediate' and neither 'conjectural' nor 'hypothetical,'" *Carrero v. Farrelly*, 310 F. Supp. 3d 542, 546 (D. Md. 2018) (quoting *Lyons*, 461

---

[4] In *Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir. 2014), the plaintiffs sought a declaration that a prohibition on same sex marriage was unconstitutional. Thus, the relief sought (and the reasoning therefore) was identical as to all plaintiffs, even if only one of them had standing, and the appellate court could adjudicate the bare legal question pending before it. The same is not true here, where Plaintiffs have widely varying claims regarding how they may have been deprived of a liberty interest and seek relief that would vary by Plaintiff in the Amended Complaint, including notice of the basis for alleged placement in the TSDB, and removal from the TSDB. *See* Am. Compl., Prayer for Relief.

U.S. at 102), *appeal filed* Jan. 15, 2019. Thus, where Ahmed, Kadura, Fares, and Shibly have each traveled, in many cases repeatedly, without any relevant issue in the recent past—and thus cannot establish any "credible threat of future injury" on any future trips, *Winsness v. Yocom*, 433 F.3d 727, 735 (10th Cir. 2006)—their allegations about more distant events cannot satisfy their burden to establish standing.[5]

Further, although Frljuckic was among five Plaintiffs who Defendants acknowledge—construing the record favorably—have provided testimony that they have received enhanced screening on a regular basis on their most recent flights, neither Frljuckic nor any of these others (Amri, John Doe 3, Elhuzayel, El-Shwehdi) have satisfied their burden of demonstrating more than a speculative harm of any future injury. Plaintiffs do not and cannot dispute that TSA applies the same checkpoint screening procedures to individuals Secure Flight designates for enhanced screening, regardless of whether the individual is designated due to TSDB status, randomly, or for other reasons, Defs' SMF ¶ 8 (citing Froemling MSJ Decl. ¶ 11). Nor do Plaintiffs dispute that the majority of passengers designated for enhanced security screening are so designated for reasons other than TSDB status, *id.* (citing Froemling MSJ Decl. ¶ 10)—nor still that persons who are not in the TSDB may be designated for enhanced screening on multiple consecutive flights, thus diminishing the ability of any individual to infer TSDB status from even repeated designations for enhanced screening. Froemling MSJ Decl. ¶ 11. In these circumstances, not even those Plaintiffs whose testimony, construed generously, attests to relatively recent, regular enhanced screening can

---

[5] *See* Kadura Tr. 253-56 (testimony establishing that since January 2016, Kadura has taken at least four round-trip domestic trips, on which he has experienced "zero" travel issues); Shibly Tr. 141-45, 188-89, 209, 190 (testimony establishing that Shibly has not experienced *any* travel problems in the past two and a half years, and prior to that experienced enhanced screening or inspection only intermittently); Fares Tr. 123, 129, 139 (testimony establishing that in 2017, Fares flew from the U.S. to Jordan three times without incident, with the sole exception that on one occasion he was questioned by CBP for approximately one hour upon arrival in the U.S.); Ahmed Tr. 72-73 (testimony establishing that Ahmed did not have any issues flying to Washington, DC for his deposition in February 2018).

demonstrate the requisite threat of a future injury that is "certainly impending," *Clapper*, 568 U.S. at 401. And an identical result applies regarding secondary inspections at the border, where CBP possesses undisputed, significant authorities to search *all* persons and goods entering the country, as well as discretion in implementing those authorities by selecting goods and travelers for secondary inspection. *See* Defs' SMF ¶ 9; Howe MSJ Decl. ¶¶ 12-20.

Moreover, Plaintiffs' contention that they may alternatively establish standing by "avoiding international and domestic travel," Pls' Opp. at 38, is likewise unavailing. Although this Court previously held that, in theory, government actions that "actually deter[]" travel might create such an unreasonable burden as to deprive someone of their liberty interest in travel. *Elhady v. Piehota*, 303 F. Supp. 3d 453, 463 (E.D. Va. 2017) (citation omitted), for the reasons set forth in detail in Defendants' prior briefing, no Plaintiff has entirely refrained from travel as a result of his purported TSDB status, nor has any Plaintiff in fact established that he has been deterred from travel at a level sufficient to establish a deprivation of any constitutionally protected liFberty interest.[6] *See* Defs' MSJ at 46-48; Defs' Opp. at 22-29. Moreover, in *Clapper*, the Supreme Court rejected a claim of injury based on the alleged chilling of Plaintiffs' speech rights by Government surveillance activity, because the subjective chilling effect of Government activity was insufficient to establish a certainly impending future injury. *Clapper*, 568 U.S. at 401. Plaintiffs' claim that they are subjectively deterred by unpleasant experiences at the border or at airports suffers from the same defect. Accordingly, no

---

[6] Plaintiffs cite *Suhre v. Haywood Cty.*, 131 F.3d 1083, 1088 (4th Cir. 1997), for the proposition that "[i]n the Fourth Circuit, the avoidance of unconstitutional conduct is an exceptional manner of demonstrating standing," *i.e.*, one that exceeds Article III minimums—apparently, in Plaintiffs' view, in all contexts. However, *Suhre* was an Establishment Clause case, which itself noted that because "the standing inquiry in Establishment Clause cases has been tailored to reflect the kind of injuries Establishment Clause plaintiffs are likely to suffer," the "rules of standing recognize that noneconomic or intangible injury may suffice to make an Establishment Clause claim justiciable." *Id.* at 1086. Plaintiffs cite no authority or rationale to support the extension of such rules, unique to Establishment Clause considerations and claims, to their claims here.

Plaintiff has established the requisite "injury in fact" sufficient to establish standing on a "deterrence" theory.

Finally, it bears noting here that Plaintiffs, for the first time in their opposition to Defendants motion, seek a broad, preposterous "injunction prohibiting Defendants from placing innocent Americans—those who have not been arrested, charged, or convicted of a terrorism-related offense—on Defendants' lists." This new demand does not appear in the Amended Complaint, or the Plaintiffs' Motion for Summary Judgment, *see* Pls' MSJ at 57 (seeking supplemental briefing on remedy). And no Plaintiff has standing to seek such relief for the alleged procedural due process violation, because the requested injunction seeks relief far beyond "the inadequacy that produced the injury in fact" that the Plaintiff has attempted to establish. *See Lewis*, 518 U.S. at 357; *see also Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018) ("A plaintiff's remedy must be tailored to redress the plaintiff's particular injury."); *Trump* v. *Hawaii*, 138 S. Ct. 2392, 2429 (2018) (Thomas, J., concurring) ("[U]niversal injunctions are legally and historically dubious.")  And the requested relief is inconsistent with ordinary equitable principles as well. *See also, e.g., Madsen v. Women's Health Ctr., Inc.,* 512 U.S. 753, 765 (1994) ("injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs."); *Hawaii*, 138 S. Ct. at 2425 (Thomas, J., concurring) (explaining that universal injunctions "take a toll on the federal court system—preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch."). Rather, the remedy for procedural violations is ordinarily additional procedures, and the Plaintiffs have not established standing for this new, extraordinary remedy.[7]

---

[7] The new relief sought is also extraordinarily dangerous, given the undisputed testimony about the importance of the TSDB in thwarting terrorist attacks. Defs' SMF ¶¶ 1-3.

**B.**     **The Ninth Circuit Decision in *Fikre* Does Not Help Plaintiffs Demonstrate Standing.**

Plaintiffs make the wholly unsupported claim that Defendants remove persons from the TSDB or otherwise alter their status once those persons file a lawsuit, "in an effort to obfuscate standing and render claims moot." Pls' Opp. at 39. Plaintiffs' contention is based on no evidence in the record,[8] and Defendants categorically deny Plaintiffs' assertion to the contrary.  Whether an individual satisfies the TSDB inclusion criteria (or that of one of its subsets) is the only consideration that authorized Government officials take into account to decide whether a record should be included, changed, or removed. As a result of the dynamic intelligence environment, decisions to nominate or change an individual's TSDB status undergo continuous assessment as to whether an individual satisfies the criteria for inclusion on the TSDB or one of its subsets. PEX62 at 2. *See also* DEX3 ("Groh MSJ Decl.") ¶¶ 12, 17-25; Orlando MSJ Decl. ¶¶ 10-14. Moreover, Defendants' acknowledgment that DHS TRIP may note that someone is involved in ongoing litigation is not evidence to the contrary. Rather, as DHS TRIP testified, DHS TRIP's notation is not specific as to whether the litigation is connected to the traveler's alleged watchlist status, and the purpose of the notation is so that DHS TRIP analysts seek appropriate internal legal advice before issuing communications to travelers who may be represented by legal counsel. PEX24 ("Moore Tr.") 212.

Plaintiffs' reliance on the Ninth Circuit's decision in *Fikre v. FBI,* 904 F.3d 1033, 1040 (9th Cir. 2018) for the proposition that watchlisting inherently prevents a finding of mootness is also misplaced. In *Fikre*, the Ninth Circuit panel reversed the district court's dismissal of plaintiff's due process challenge to his placement on the No Fly List following plaintiff's removal from the No Fly

---

[8] As discussed on page 9, *supra*, no reasonable inferences can be drawn from the facts that some Plaintiffs stopped experiencing problems prior to the lawsuit, some stopped experiencing problems after the lawsuit was filed, and others continue to experience problems. None of them have certainly impending future injuries.

List. The Ninth Circuit panel held that the voluntary cessation doctrine precluded a finding of mootness because, even though the plaintiff was no longer on the No Fly List, removing the plaintiff from the No Fly List was "individualized" and "untethered to any explanation or change in policy," did not assure plaintiff that he will not be re-added to the No Fly List based on currently available evidence, or else renounce its decision to place him on the No Fly List to begin with. 904 F.3d at 1039-1040. The panel indicated, however, that a declaration stating that the plaintiff would not be placed back on the No Fly List absent new evidence or information might satisfy the government's burden. *Id.* at 1040. (citing *Mokdad v. Sessions*, 876 F.3d 167 (6th Cir. 2017)).

Assuming the analysis in *Fikre* is correct, the *Fikre* panel's out-of-circuit decision in a case involving a single plaintiff who was denied boarding, was notified that he was placed on the No Fly List and then removed from the No Fly List, has no bearing on this case. The No Fly List is not at issue in this case, and the Government has not confirmed any of the Plaintiffs' alleged current TSDB status, *see supra* at p.19-20. None of the Plaintiffs here allege that they are on the No Fly List, and none of the Plaintiffs allege that the Government has previously confirmed their alleged current TSDB status. Rather, Plaintiffs here seek an injunction that would require Defendants "to provide individuals designated on the [TSDB] with a legal mechanism that affords them notice of the reasons and bases for their placement on the [TSDB] and a meaningful opportunity to contest their continued inclusion on the [TSDB]." Am. Compl. Prayer for Relief ¶ 3.b. In other words, in sharp contrast to the No Fly List claim presented in *Fikre,* Plaintiffs here have not demonstrated that they have experienced the deprivation of any liberty interest such that they are entitled to the requested due process relief, let alone established that they are vulnerable to being nominated (for the first time or again) to the TSDB based on improper or insufficient reasons. Nothing about screening at airports or inspection at the border permits Plaintiffs to conclude that they have past injuries, much less one that is current and certainly impending. Accordingly, the question is not one of mootness as

to a prior confirmed deprivation; it is one of standing to obtain prospective relief based on the sufficiency of the evidence in this case.

Further, even if it were applicable here in some way, the Government respectfully disagrees with the Ninth Circuit panel's analysis of how the mootness doctrine should apply to the watchlisting process to require the disclosure of information about a person. The *Fikre* court suggested that the mootness doctrine requires "an acknowledgment by the government that its investigation revealed that [the listee] did not belong on the list." 904 F.3d at 1040.[9] But this approach manifestly cannot apply to watchlisting for both legal and practical reasons. Unlike prosecutorial decisions to file or not file criminal charges for past conduct, *see McCormack v. Herzog*, 788 F.3d 1017, 1025 (9th Cir. 2015), watchlisting decisions are based on current assessments of the risks posed by particular individuals. They are the result of assessments made by trained agents and analysts as to whether an individual meets the defined watchlisting criteria at any given time. The available information underlying a nomination is constantly reexamined, and evaluations change as the available information changes. In other words, watchlisting decisions are, by design, neither "entrenched" nor "permanent." *Id.* at 1038 (quoting *McCormack*, 788 F.3d at 1025). The individualized nature of the assessment also means that changes in status are less likely to be attributable to "a change in agency policy," *id.* at 1040, than to a change in the available information about a particular person. Moreover, due to reliance on classified and law enforcement sensitive information in the watchlisting process, the Government cannot reveal the reasons for a prior placement or changed status without causing harm to national security.[10] *See also* Groh MSJ Decl. ¶¶

---

[9] In addition, the Ninth Circuit panel in *Fikre* appeared to assume that the plaintiff's original placement on the No Fly List was in error, which was nowhere indicated let alone conceded in the record of that case.

[10] Other cases cited by the Ninth Circuit panel also involve government decision-making processes that are distinguishable from the watchlisting enterprise. *See, e.g, Native Vill. Of Noatak v. Blatchford*, 38 F.3d 1505 (9th Cir. 1994) (case mooted when statute giving rise to the challenged action was repealed); *Olagues v. Russoniello*, 770 F.2d 791 (9th Cir. 1985) (case not mooted when prosecutors

12, 17-25 (attesting that information in the TSDB is commonly updated more than one thousand times per day); Orlando MSJ Decl. ¶¶ 10-14 (attesting that watchlisting determinations are not categorical judgments, rather they combine intelligence analysis with policy-based criteria). Thus, the fact a person was removed from a watchlist does not mean that the original placement was in error or unlawful.  Watchlisting is intended to detect and prevent the risk of terrorism, and the Government must act when it judges that placement criteria are satisfied, even if changed circumstances or additional information later result in a modification of the original placement. And where national security information is typically at issue in a placement decision, the Government may not be able to state or disclose the reasons for a change in placement in order to demonstrate mootness or to address other claims.

## II.   Plaintiffs Who Did Not Complete DHS TRIP Should Be Dismissed.

Defendants previously explained that Plaintiffs are required to complete DHS TRIP for two separate and independent reasons: both the ripeness doctrine and due process analysis require Plaintiffs to avail themselves of the procedures they are challenging. Defendants withdraw the argument with respect to Coleman but not with respect to Doe 3. *See supra* p. 12. With respect to the ripeness analysis, as noted in Defendants' opening brief, this Court previously rejected a similar exhaustion analysis in *Mohamed*, and in their opposition, Plaintiffs largely recite the same analysis relied upon in that case. *See Mohamed v. Holder*, 995 F. Supp. 2d 520, 533 (E.D. Va. 2014). Defendants respectfully disagree that *Darby* prohibits the constitutional ripeness analysis applied to constitutional claims brought here, or that completion of DHS TRIP would be futile, and have preserved the

---

terminated investigation into the citizenship status of certain recently-registered, foreign-born voters who requested bilingual ballots); *Forest Guardians v. Johanns*, 450 F.3d 455 (9th Cir. 2006) (case not mooted because federal agency must engage in challenged concurrence-seeking process every year for a ten-year term); *White v. Lee*, 227 F.3d 1214 (9th Cir. 2000) (case mooted when federal agency made permanent policy change that by its terms was "broad in scope and unequivocal in tone," and acknowledged that the litigation was catalyst for the policy change).

issue.[11] Although DHS TRIP does not generally disclose TSDB status, DHS TRIP can and does result in relief from the actual travel-related difficulties, including removal from the TSDB, and removal from subsets of the TSDB, and DHS TRIP further provides travelers with a redress number that can help prevent future problems. *See* Moore MSJ Decl. ¶ 8.[12] Ultimately, whether or not it created a record available to the Plaintiffs, it would create a record of the agency's actions.

### III.   Plaintiffs Have Not Established the Deprivation of a Liberty Interest.

### A.   Watchlisting Does Not Deprive Plaintiffs of a Liberty Interest in Travel.

With respect to the right to travel, Plaintiffs' opposition makes almost no allegations or arguments regarding interstate travel, and they do not attempt to distinguish the increasingly copious and consistent case law on this topic. Defs' Opp. at 26 (collecting cases). The consequences of TSDB status for domestic travel are the airport security measures described in the Froemling Declaration, which only affect air travel and cause, at most, minor delays that are potentially applicable to every traveler. *See* Froemling MSJ Decl. ¶¶ 10-12. As set forth there, and in

---

[11] *Darby* stands for the proposition that courts cannot require exhaustion as a purely prudential matter, as a prerequisite to bringing an APA claim, because the APA does not itself require exhaustion. *Darby v. Cisneros*, 509 U.S. 137 (1993). Ripeness analysis requires exhaustion as a constitutional, not a prudential matter. Moreover, neither this Court's previous exhaustion opinion nor the Plaintiffs' opposition addresses the second, independent legal holding requiring Plaintiffs to complete DHS TRIP. As a matter of due process law, Plaintiffs have not been deprived of due process of law if they have rejected the procedures available to them. *Cf. Mora v. City of Gaithersburg*, 519 F.3d 216, 224 (2008) (reject due process claim in 1983 case where plaintiff claimed state procedures were unconstitutional); *Tri Cty. Paving, Inc. v. Ashe Cty.*, 281 F.3d 430, 438 (4th Cir. 2002) (similar).

[12] Plaintiffs further assert that engagement with DHS TRIP is "actually futile" because, as of December 2017, the TSA Administrator had not issued any final orders in two years in No Fly cases. Pls' Opp. at 41. As a preliminary matter, this assertion is immaterial, where no Plaintiff believes that he is currently on the No Fly List (and thus, none could receive an order from the Administrator maintaining or removing them from the No Fly List). Further, Plaintiffs' assertion regarding the purported futility of the available process is belied by the fact that the vast majority of the Plaintiffs availed themselves of the process, including several Plaintiffs who submitted more than one inquiry—and that none challenge or complain about the timeframes in which DHS TRIP processed their individual inquiries.

Defendants' previous filings, those measures may potentially delay a traveler for less than an hour. Defs' MSJ at 42-43; *see, e.g.*, PEX9 ("Elhuzayel Tr.") 62-63, 86, 140, 142-44 (estimating 20-30 minutes for check-in and 15-30 minutes for screening). And every traveler is potentially required to undergo enhanced screening and gate screening, Froemling MSJ Decl. ¶¶ 9, 10, 46; in fact, most people selected for enhanced screening are not on the TSDB, *id.* ¶10. Plaintiffs cite no case law supporting the contention that such minor delays—which can and do occur to every traveler— constitute a deprivation of a protected liberty interest. Plaintiffs are not entitled to avoid airport security.

With respect to the freedom to travel internationally, Plaintiffs have not established that the TSDB, as a general matter, entails specific security measures at the border, or that their border experiences constitute a deprivation of a liberty interest protected by the Due Process clause. It bears repeating that Government action that infringes on international travel will be upheld unless it is "wholly irrational." *Califano v. Aznavorian*, 439 U.S. 170, 177 (1978). And, while several courts have held that watchlist status in general does not deprive one of a freedom to travel, at least one court has also specifically rejected repeated CBP encounters as a deprivation of a liberty interest. *Bibicheff v. Holder*, 55 F. Supp. 3d 254, 264–65 (E.D.N.Y. 2014) (rejecting argument that repeated CBP inspections curtailed freedom to travel). Accordingly, although total prohibitions on travel are subject to some procedural protections, s*ee generally Haig v. Agee*, 453 U.S. 280 (passport revocation); *Weinstein v. Albright*, 261 F.3d 127, 137 (2d Cir. 2001) (upholding passport revocation based on child support arears, even without any federal redress), the government may, and routinely does, engage in acts that might "burden" international travel, even severely, without triggering the requirements of due process. The United States can conduct lengthy and intrusive searches and inspections of anyone entering the country, *see U.S. v. Flores-Montano*, 541 U.S. 149, 152-53 (2004); *Rahman v. Chertoff*, 530 F.3d 622, 624 (7th Cir. 2008); impose quarantines, *see, e.g.,* 42 U.S.C. § 264; *U. S. ex rel.*

*Siegel v. Shinnick*, 219 F. Supp. 789, 791 (E.D.N.Y. 1963); and completely prohibit travel to certain

countries, *Regan v. Wald*, 468 U.S. 222, 242 (1984) (regulations restricting travel to Cuba justified by

foreign policy concerns).

The Howe Declaration, addressing border screening by CBP, explains that all persons

entering the country must present themselves and their belonging for inspection. Howe MSJ Decl.

¶¶ 13, 16. CBP officers have discretion in conducting their inspections, including in referring a

traveler for additional scrutiny. *Id.* ¶ 14. TSDB status is one factor that that may be considered in

referring an individual to secondary inspection. *Id.* And, of course, anyone may be referred to

secondary inspection for myriad reasons unrelated to the TSDB. *Id.* The specific actions taken

during a secondary inspection will vary depending on the officer's evaluation of the traveler's

circumstances. CBP does not have policies that require officers to draw a weapon or use handcuffs

whenever they encounter a traveler who is a potential or confirmed march to a TSDB identity. *Id.* ¶

18. Accordingly, while TSDB status is a factor that might make a border inspection take longer or

require more care, it is one factor among many that affects the officers' exercise of discretion. And

the officers remain bound by various CBP policies, and legal requirements, including the Fourth

Amendment.

Plaintiffs' Opposition summarizes testimony of eight of the 23 plaintiffs regarding

experiences at border crossings, but does not attempt to explain how these experiences (each of

which was very different) relates to the due process analysis. Plaintiffs' theory of the case appears to

be that if TSDB status makes a referral to secondary inspection and a potentially more intrusive

border inspection or officer safety measures more likely, they are entitled to notice and an

opportunity to be heard before such a border inspection. But Plaintiffs point to no case law even

suggesting that conclusion. And such a theory would seem to lack a limiting principle, in that *any*

reason that would increase the likelihood of secondary inspection and which could consequently

make someone reluctant to travel would require such notice and opportunity to be heard, since

travelers are often unaware of the reasons for secondary inspection or the specific steps taken in

such inspections. Accordingly, Plaintiffs' theory of the case seems to necessitate a whole new legal

regime for border searches, which are generally authorized without suspicion or a warrant. Such a

regime is dangerously impractical, and inconsistent with long-standing case law on border

inspections. *See U.S. v. Flores-Montano*, 541 U.S. 149, 152-53 (2004); *Rahman v. Chertoff*, 530 F.3d 622,

624 (7th Cir. 2008). As the Seventh Circuit has explained, issues like the amount of time spent at the

border and safety measures used are at least in significant part policy issues, requiring resolution by

"political actors":

> Delays depend not only on technology (do passports include biometric data, and, if
> so, subject to what safeguards?) and other political choices (which entrants require
> passports?) but also on the size of the staff assigned to screen travelers. Only
> Congress can authorize the hiring of additional agents in order to reduce waiting
> time or provide extra backup. One plaintiff says that a nervous border agent drew a
> gun unnecessarily and embarrassed him before his family; a larger staff would leave
> fewer agents fearful for their own security-but at any given staff size an injunction
> telling agents to be calm and patient would be a waste of paper.

*Rahman*, 530 F.3d at 627.

All of the allegations in this section concerning Plaintiffs' travel are addressed in greater

detail in Defendants' Opposition, Defs' Opp. at 23-29, but a few merit further explanation. Frljuckic

and Doe 3 each claim that they were temporarily handcuffed during a border stop.[13] For example,

---

[13] Doe 3 similarly testified that the cuffs were removed after the stop and initial questioning, and he
rejoined his family. PEX22 ("Doe 3 Tr.") 53. In Plaintiffs' opening brief, three other Plaintiffs
claimed that they were handcuffed temporarily during a border stop on at least one occasion. *See*
Defs' Opp. at 22-25. At summary judgment, almost none of the Plaintiffs have claimed that they
were subjected to prolonged handcuffing. In the opening motion, Kadura claimed he was
handcuffed for hours during a 2015 land border crossing, but even with respect to that allegation,
Plaintiffs have not established that such restraint would be necessarily related to the TSDB, or that it
is a deprivation of a liberty interest during a border inspection. CBP use of restraints is guided by
policy and legal requirements and motivated by concern for officer safety. The use of restraints on
detainees during detention must be in a manner that is safe, secure, humane, and professional, and
officers are required to regularly test the restraints. *See, e.g.*, DEX68.

during the search cited in Plaintiffs' opposition, Frljuckic estimates that he was kept in restraints for about 30 minutes while he was patted down and searched, and he recalls the border officers telling him it was for their safety, and that he was then permitted to wait with his family while the border inspection of his belongings and questioning was completed. Frljuckic Tr. 46-49.[14]  Accordingly, even assuming his testimony is accurate, he has not established that the border officers acted unreasonably in applying temporary restraints while checking for weapons. *See, e.g., Rahman v. Chertoff*, No. 05 C 3761, 2010 WL 1335434, at *1 (N.D. Ill. Mar. 31, 2010) (holding that even prolonged handcuffing was reasonable under the circumstances); *see also United States v. Yang*, 286 F.3d 940, 950 (7th Cir. 2002) (finding that safety concerns made the brief use of handcuffs reasonable); *United States v. Nava*, 363 F.3d 942, 946 (9th Cir. 2004) (similar); *United States v. Esieke*, 940 F.2d 29, 36 (2d Cir. 1991) (use of handcuffs and leg irons during day and half border detention of suspected alimentary canal smuggler was reasonable).[15]

Plaintiffs' allegations that Shahir Anwar and Coleman stopped crossing the border altogether are demonstrably incorrect, based on Plaintiffs' own testimony that they continued travelling internationally. *See* Defs' SMF ¶¶ 52-54, 59-61. Similarly, Ahmed claims that he stopped crossing the border in 2009 but Ahmed's testimony does not support the contention that he stopped crossing the border because of border inspections; rather he continued crossing the border once or twice a month for many years and did not state a reason for stopping. Ahmed Tr. 18. And Ahmed did continue crossing international borders after 2009, but not on these regular trips to Canada. *See* DEX5 at 6-9. Kadura's claims that he chose to live closer to his parents to avoid flying was based on

---

[14] It is unclear from his description how the patdown and personal search described could have taken 30 minutes, but Defendants will not dispute the testimony for the purposes of this motion

[15] Particularly in the context of land border crossings, where CBP may not have advance information regarding individuals seeking to cross the border, such measures may be more reasonable due to the heightened risks faced by CBP officers in such settings. *See* Howe MSJ Decl. ¶ 15.

his previous alleged status on the No Fly List, not on his subsequent travel experiences, and he admits that the decision was also based on his desire to be closer to his parents. Kadura Tr. 262-64.

In short, although a few Plaintiffs claim that they travel less frequently or extensively as a result of experiences with border inspections, none of them have established an infringement of the right to travel, and they certainly have not established, as a general matter, that placement on the TSDB deprives all Plaintiffs of a right to travel, let alone that the TSDB deprives everyone on it of the right to travel.

### B.   Plaintiffs Have Not Been Deprived of Any Reputational Liberty Interest under the Stigma-Plus Test.

For all of the reasons explained in Defendants' prior briefing, Plaintiffs have not established the deprivation of a liberty interest in their reputations:  they have not shown they have been stigmatized, and they have not shown that there was a deprivation of some "plus" factor. *See* Defs' MSJ at 48-58. Plaintiffs' opposition largely presents a threadbare repetition of their prior briefing. They again argue that TSDB information is made available to animal shelters, a contention that is flatly incorrect, *see* Defs' Opp. at 15 n.10; and that it is shared to what they call a "hodgepodge" of private entities, although Defendants have described in detail exactly what kinds of entities have access to NCIC, for what purpose, and how that access is protected, *see* DEX52 ("Rago MSJ Decl.") ¶¶ 10-24 (corrected version filed at Dkt. No. 309-1). Even if TSDB information were available exactly as widely as Plaintiffs describe, Plaintiffs have provided no reason to believe that any of these entities *even once* queried Plaintiffs' purported TSDB status.

They also again assert that the plus prong is established through the seizure and search of electronic devices, this time with new questionable facts and equally spurious reasoning. They claim that TSDB Listees experience search and seizure of electronic devices and information "whenever they cross the border." *See* Pls' Opp. at 45. It bears repeating that everyone traveling through the border must submit their belongings for inspection, including electronic devices, and that border

33

searches of electronic devices may occur for numerous reasons entirely unrelated to the TSDB. *See,*
*e.g.,* CBP's BSED Directive § 1 (in addition to terrorism and other national security matters, border
searches of electronic devices may be used to detect evidence relating to human and bulk cash
smuggling, contraband, child pornography, and financial and commercial crimes, such as copyright,
trademark and export control violations); *see also Tabbaa v. Chertoff*, 509 F.3d 89, 97 (2d Cir. 2007) ("It
is well established that the government has broad powers to conduct searches at the border even
where, as here, there is no reasonable suspicion that the prospective entrant has committed a
crime."); *see also United States v. Brignoni–Ponce*, 422 U.S. 873, 884–85 (1975) ("Any number of factors
may be taken into account . . . In all situations the officer is entitled to assess the facts in light of his
experience in detecting illegal entry and smuggling"). Plaintiffs' unsupported claim that all TSDB
Listees have their devices seized is flatly contradicted by CBP testimony and by the CBP BSED
Directive, both of which clearly indicate that such searches are not mandatory. Howe Tr. 311-13;
BSED § 5.1.4. Moreover, numerous Plaintiffs that claim to be on the TSDB have not experienced
such searches or seizures at all. *See* Pls' MSJ ¶¶ 48-53 (describing testimony of only 12 of 23
plaintiffs). None of the Plaintiffs have attempted to establish that there was an "advanced" search of
their devices, and few, if any, could plausibly make such a claim. *See id.* Most of the cited testimony
simply involves CBP looking at the devices and asking for passwords.[16] *See, e.g.,* Pls' MSJ ¶¶ 52, 53;
El-Shwehdi Tr. 81 (officer told him he needed to "check" the phone), Doe 2 Tr. 69-75 (officers
asked him questions about photographs on his camera and computer, and asked for passwords),
Samir Anwar Tr. 86-87 (officers asked for passwords and then questions about some addresses on

---

[16] Entrants may not avoid inspection by refusing to actually present their belongings for inspection, such as by refusing to provide a password. Just as entrants cannot present locked luggage and avoid inspection, they cannot present locked devices and avoid having CBP inspect them. *See U.S. v. Ramsey*, 431 U.S. 606, 618 (1977) ("[A] port of entry is not a traveler's home. His right to be let alone neither prevents the search of his luggage nor the seizure of unprotected, but illegal, materials when his possession of them is discovered during such a search.") (quoting *United States v. Thirty-seven Photographs*, 402 U.S. 363, 376 (1971)).

34

the phone), PEX18 ("Khan Tr.") 57-58 (officers took the phone for a while and returned it), Shibly

Tr. 81-2 (stating only that his electronics were searched), and Thomas Tr. 71-73 (stating only that

phones were taken and passwords sought). To the extent any Plaintiffs have shown that there was

an "advanced" search of their devices on some occasion, they have not shown that it was the sort of

search requiring heightened suspicion in this Circuit, Defs' Opp. at 37-38, or that any search would

constitute a plus factor with respect to their reputational interests.[17]

Plaintiffs also include other baseless assertions. They again contend that "malware" or

"monitoring software" is installed in their devices. As mentioned in Defendants' previous briefing,

the only evidence they have for such contention (in the face of the fact that the CBP BSED

Directive prohibits "actions that would make any changes to the contents of the device." BSED

5.1.2, *see* PEX64) is the fact that one Plaintiff indicated that he believes his devices run slower after a

search of the devices. This may happen for numerous benign reasons. Plaintiffs also claim that the

information seized includes the "complete contents of cell phone contact lists and social media

accounts," but the only support for this proposition is a citation to the purported 2013 Watchlisting

Guidance, which is an unverified, unauthenticated document not properly in evidence, and in any

event does not remotely support the proposition for which it is cited. *See supra* p. 3-4. Puzzlingly,

Plaintiffs also attempt to bolster this claim with a quote from the *Tarhuni* court, but that quote is

simply a reference, in the context of a motion to dismiss, to the contents of the Plaintiffs' complaint

in that case; the *Tarhuni* court did not conclude anything about what kinds of information is actually

collected in electronic searches. *See Tarhuni v. Sessions*, No. 3:13-cv-00001, 2018 WL 3614192, at *11

(D. Or. July 27, 2018). Lastly, they claim that the Government "retains this collection permanently,"

---

[17] Several of the Plaintiffs use the word "confiscate" or "seize." Defendants clarify that the vast majority of their electronic devices were returned prior to Plaintiffs' respective releases from the port of entry; others were returned to them later. *See* Defs' Response to Pls' SMF ¶¶ 48-53 (Defs' Opp. at p. 6-8).

but CBP retains data in accordance with the applicable Systems of Records Notice in which such information is retained. *See* Privacy Impact Assessment Update for CBP Border Searches of Electronic Devices (Jan. 4, 2018) at 10, *available at* https://www.dhs.gov/publication/border-searches-electronic-devices. The cited evidence only reflects that all secondary inspections are documented in TECS, not that all information is stored there.

None of Plaintiffs' points on opposition provide any further heft or substance to their stigma-plus arguments. Plaintiffs cannot show that there was dissemination of a stigmatic injury, nor that there has been a "plus" deprivation. For the reasons described here and in Defendants' prior briefing, this claim must fail.

## IV.   The Government's Interest in Maintaining an Effective Watchlisting System Outweighs Plaintiffs' Interests in Additional Process.

Plaintiffs do not, and cannot, meaningfully dispute the compelling public interest at stake in maintaining the terrorism watchlist. And they nowhere dispute that the requested procedures would seriously impair the Government's ability to track and prevent terrorist plots. And they cannot seriously maintain that the TSDB is not subject to constant, thorough, and careful review to assure that placement determinations are made on the basis of accurate and timely information, and pursuant to a familiar, well-understood legal standard.[18]   Plaintiffs instead argue that balancing is wholly unnecessary because DHS TRIP is "facially inadequate."[19]   As explained in the prior briefs,

---

[18] "The 'reasonable suspicion' standard has been applied in a number of contexts and effects a needed balance between private and public interests when law enforcement officials must make a limited intrusion on less than probable cause." *United States v. Montoya de Hernandez*, 473 U.S. 531, 541 (1985) (approving border detention based on reasonable suspicion of alimentary canal smuggling).

[19] Plaintiffs' citation to *D.B. v. Cardall* is unavailing. In that case, the mother had no procedures available to contest the removal and detention of her child on the grounds that she was an unfit mother. 826 F.3d 721 (4th Cir. 2016). The court recites the black letter elements of due process; it does not hold that any particular form of notice or hearing is always required under that standard, and in fact the Fourth Circuit remanded to the district court to conduct the balancing in the first instance to determine what was required in that case. *Id.* at 743 (explaining that the "three-factor Mathews framework is 'flexible' and highly 'fact-specific'").

DHS TRIP provides aggrieved travelers the opportunity to submit their complaints and request a review of relevant records. They do not always receive, as a result, their actual status with respect to any watchlist, but they can and do receive relief. Given the national security issues at play and the potentially catastrophic consequences of further process, this abbreviated process is both appropriate and necessary. Defs' MSJ at 55-59; Defs' Opp. at 42-45; *see also Bibicheff*, 55 F. Supp. 3d at 265 ("[W]hatever weight might be given to Plaintiff's articulated private interests or any risk of procedural error during the DHS TRIP review process is significantly outweighed by the government's substantial interest in protecting its borders and ensuring national security"). The overwhelming weight of the case law is in accord: enhanced screening and border inspections do not give rise to a due process claim. *See* Defs' Opp at 26, 29 (collecting cases).

That analysis is consistent with the hefty weight given to national security considerations in other contexts. In *Jifry v. FAA*, the D.C. Circuit held that a process whereby the FAA designated pilots as a national security threat but gave them no other underlying information was sufficient to comport with due process, given the extraordinary interests at stake. 370 F.3d 1174, 1183 (D.C. Cir. 2004) ("The pilots' interests at stake here—their interest in possessing FAA airman certificates to fly foreign aircraft outside of the United States—pales in significance to the government's security interests in preventing pilots from using civil aircraft as instruments of terror."). *Cf. Mora*, 519 F.3d at 224-25 ("As the likelihood, urgency, and magnitude of a threat increase, so does the justification for and scope of police preventive action. In circumstances that suggest a grave threat and true emergency, law enforcement is entitled to take whatever preventive action is needed to defuse it."). In *Jifry,* the plaintiffs' livelihoods were potentially at stake, but the abbreviated procedures were appropriate given the enormity of the threat. The same is true here. Plaintiffs are able to fly and to cross borders and in fact generally do so, although a few of them experience some delays.  Those

delays weigh against the warning that the process demanded would seriously undermine counterterrorism measures and pose a risk to national security.

In *Rahman v. Chertoff*, a group of U.S. citizens attempted to bring a class action based on their treatment at the border and their purported TSDB status. *See* 530 F.3d 622. The Seventh Circuit rejected the attempt to certify a class, and warned against tipping the scales too far to avoid incorrect watchlist placement:

> . . . Congress and the President worry at least as much about false negatives–
> that is, people who should be on a watch list but aren't–as about false positives
> (people who are on the list but shouldn't be, and people who aren't on the list
> but are mistaken for someone who is). Judges are good at dealing with false
> positives, because the victims come to court and narrate their grievances, but
> bad at dealing with false negatives, which are invisible. Any change that
> reduces the number of false positives on a terrorist watch list may well increase
> the number of false negatives. Political rather than judicial actors should
> determine the terms of trade between false positives and false negatives.

*Id.* at 627. Although the Seventh Circuit was examining a Fourth Amendment claim, the same warning applies here – Plaintiffs' demand to tip the scales by either expanding additional disclosures during the redress process (or, in their latest brief, to abolish the watchlist altogether) would significantly undermine, if not entirely negate, the Government's compelling needs in protecting national security from terrorist threats.

This Court should follow the overwhelming majority of the courts to address this issue. Given the limited Plaintiffs' interests at stake, and the extraordinary public interest in watchlisting, DHS TRIP is more than sufficient to accommodate Plaintiffs' interests.

## **CONCLUSION**

For the foregoing reasons, the Court should grant Defendants' motion for summary judgment.


Dated: April 1, 2019                                Respectfully submitted,

G. ZACHARY TERWILLIGER
United States Attorney

JOSEPH H. HUNT
Assistant Attorney General
Civil Division

ANTHONY J. COPPOLINO
Deputy Director, Federal Programs Branch

AMY POWELL
DENA M. ROTH
ANTONIA KONKOLY
CHRISTOPHER HEALY
Trial Attorneys, Federal Programs Branch
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue NW, Room 7324
Washington, DC 20530
Tel: (202) 514-2395
amy.powell@usdoj.gov
dena.m.roth@usdoj.gov
antonia.konkoly@usdoj.gov
christopher.healy@usdoj.gov


*/s/ Lauren A. Wetzler*
LAUREN A. WETZLER
Chief, Civil Division
Assistant United States Attorney
2100 Jamieson Ave.,
Alexandria, VA. 22314
Tel: (703) 299-3752
Fax: (703) 299-3983
Lauren.Wetzler@usdoj.gov

*Attorneys for Defendants*