## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
## ALEXANDRIA DIVISION

| | | |
|---|---|---|
| **ANAS ELHADY,** *et al.,* | ) | |
| | ) | **Case No. 16-cv-00375** |
| Plaintiffs, | ) | Hon. Anthony J. Trenga |
| | ) | Mag. Hon. John F. Anderson |
| v. | ) | |
| | ) | |
| **CHARLES H. KABLE,** Director of the | ) | **PLAINTIFFS' MEMORANDUM** |
| Terrorist Screening Center; in his official | ) | **IN OPPOSITION TO DEFENDANTS'** |
| capacity, *et al.;* | ) | **MOTION FOR SUMMARY** |
| | ) | **JUDGMENT** |
| Defendants. | ) | |

---

**CAIR LEGAL DEFENSE FUND**
Lena F. Masri (DC # 100019) ±
Gadeir I. Abbas (VA # 81161) *
Carolyn M. Homer (DC # 1049145) ±
453 New Jersey Ave SE
Washington, DC 20003
Tel: (202) 516-4724
Fax: (202) 379-3317
gabbas@cair.com

**AKEEL AND VALENTINE, PLC**
SHEREEF H. AKEEL (MI # P54345) ±
888 W. Big Beaver Rd., Ste. 910
Troy, MI 48084
Phone: (248) 269-9595
shereef@akeelvalentine.com

*Attorneys for Plaintiffs*

± Admitted *pro hac vice*

*\*Mr. Abbas licensed in VA, not in D.C.*
*Practice limited to federal matters*
*Admitted to practice in this Court*

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS...................................................................................................... I

TABLE OF AUTHORITIES............................................**ERROR! BOOKMARK NOT DEFINED.**

INTRODUCTION .................................................................................................................1

SUMMARY OF FACTS ......................................................................................................1

REPLY ARGUMENT ..........................................................................................................4

I.      PLAINTIFFS HAVE STANDING TO CHALLENGE THE WATCHLIST .........................4

        A.      Plaintiffs Have Shown Travel-Related Deprivations of Constitutionally Protected
                Liberty Interests ..............................................................................................4

                1.      The Evidence Supports Plaintiffs' Standing for Travel-Related Deprivations
                        Due to the TSDB....................................................................................5

                1.      The Government's Arguments Regarding Standing Are Not Applicable ........7

        B.      Plaintiffs Have Shown Deprivations of Other Constitutionally-Protected Liberty and
                Property Interests ...........................................................................................9

II.     THE TSDB VIOLATES THE FIFTH AMENDMENT UNDER *MATHEWS* ...............11

        A.      Plaintiffs' Interests Affected by Lack of Process is High.............................11

        B.      The Risk of Erroneous Deprivation is High .................................................16

                1.      The Standard for Inclusion Creates an Impermissibly High Risk of
                        Erroneous Error ...................................................................................16

                2.      The Government's Supposed Procedural Safeguards for Implementing the
                        Inclusion Standard Are Inadequate .....................................................21

                        a.      The Nomination and Review Processes Are Inadequate ...................21

                        b.      The DHS TRIP Redress Process Is Inadequate Process ...................24

        C.      The Government's Interest in Stopping Terrorism Cannot Justify Actions that Are
                not Reasonably Calculated to Meet that Interest ...........................................26

CONCLUSION....................................................................................................................27

## INTRODUCTION

This case is about real injuries—life-altering injuries—Defendants impose on innocent people like the citizens who have brought this challenge.  And despite the federal government's best efforts to diminish the plight that accompanies TSDB status, the tears of children, grandmothers, spouses, and siblings who have witnessed the terror the Watchlisting System has wrought make the gravity of what Defendants are doing to more than one million listees impossible to deny.

The Plaintiffs have been detained, they have been handcuffed, they have had guns pointed at them—repeatedly.  Many have stopped their travel as a result.  They have also suffered invasions of their privacy, negative effects on their job and relationships, loss of certain rights, and major delays on their immigration cases and those of their family.  And they have no reasonable way challenge the Government's infliction of this harm, to see the evidence the Government has marshalled against them, or to even know the inclusion standard used to measure the sufficiency of the evidence.

This is wrong.  The Watchlisting System is a historic injustice that this Court must remedy—for the Plaintiffs and the more than one million other innocent people listed.  The Defendants do not have it in them to make the changes needed, and congressional intervention is not coming.  It is left to the judiciary and its special responsibilities to secure the rights of the plaintiffs, particularly here where the chances are fleeting that this unpopular minority—Muslims who the government has labeled as "known or suspected terrorists"—could ever muster the political will to right the Defendants' wrong legislatively.

After all, it is difficult to imagine a group in greater need of this Court's careful scrutiny.  These plaintiffs are, in the eyes of the agency Defendants, "suspected terrorists," and they are Muslim.  This group's marginalized place in American society is beyond dispute and warrants a robust interrogation of the agency Defendants' specious claims.

For the reasons below, Summary Judgment is warranted.

## SUMMARY OF FACTS

The Government's various quibbles (Dkt. 311, MSJ Opp. at 1-19) with Plaintiffs' Statement of Undisputed Facts (in its Motion for Summary Judgment, Dkt. 304) do not undermine or even

question their accuracy. The Statement of Facts chronicles how serious deficiencies with the TSDB have caused tragic harm to Plaintiffs without any justification, legal or otherwise. The Government nitpicks some of these facts and clarifies others around the margins, but Plaintiffs' account of widespread deprivations due to Government watchlist policies remains materially uncontested. Yet Plaintiffs have received no notice of their historical or present watchlist status, no notice of the facts underlying their statuses, no notice of what sorts of facts even inform inclusion on the watchlist, and no opportunity to contest their inclusion.

The Government does not substantially dispute that TSDB placement may depend on a nominee's race, ethnicity, religious affiliation, or First Amendment beliefs and associations. Plaintiffs' Facts (Dkt. 304) ¶ 19. Nor does the Government substantially deny that the TSDB includes misidentifications and erroneous information. Plaintiffs' Facts ¶¶ 137-138. The Government does not contest that the TSC has to regularly correct quality assurances problem with its data. Plaintiffs' Facts ¶ 137. And the Government does not refute that it has essentially stopped processing DHS TRIP requests to adjust No Fly List status. Plaintiffs' Facts ¶ 135.

The Government does not substantially counter Plaintiffs' showing that TSDB placement— as a matter of law and policy—creates significant harm upon those who are on the list. It does not substantially contest that TSDB placement leads to listed individuals being detained at the border, complete with arrest (often at gunpoint), being handcuffed, being placed in a concrete cell without shoes for anywhere from four to ten hours, being subjected to intrusive religious questioning, and having their electronic devices searched and seized. Plaintiffs' Facts ¶¶ 25-27, 29, 31-53, 87-89. It does little to dispute that TSDB placement leads to hours-long enhanced screening at airports as well, leading to missed flights, humiliation and harassment. Plaintiffs' Facts ¶¶ 54-84. The Government does not deny that TSDB Listee status is often broadcast to border officials and law enforcement as "armed and dangerous." Plaintiffs' Facts ¶¶ 13-15, 30, 45. The Government likewise does not substantially disagree that TSDB placement makes it more difficult, if not impossible, to get approval for a wide range of employment, credentials, and other privileges, including HAZMAT licenses, TWIC credentials, Customs Seals, approval for TSA PreCheck or Global Entry, military base and airport

access, enrollment in flight school, and the ability to buy a gun. Plaintiffs' Facts ¶¶ 97-106, 117-119. Nor does the Government significantly rebut the fact that TDSB data can lead to major delays and even outright denials of visas, visa waivers, and immigration benefits for not only those on the watchlist but also their family members. Plaintiffs' Facts ¶¶ 90-96. And the Government does not refute that TSDB information is shared with tens of thousands of law enforcement agencies and hundreds of private entities. Plaintiffs' Facts ¶¶ 108-109.

The Government also does not substantially contest the facts of the various individual incidents where symptoms of being on the watchlist have affected the Plaintiffs in traumatic ways. Just by ways of example, the Government does not raise any doubt that Elhady's arrest and border detention caused a serious medical problem, listed as likely dehydration, shock and hypothermia, requiring life-saving medical treatment at a nearby hospital. Plaintiffs' Facts ¶¶ 35-36. The Government does not dispute that Kadura, al Halabi, Shibley, Frljuckic, and John Doe 3, among others, have also been forcibly arrested (often at gunpoint) and detained for long hours in front of their family. Plaintiffs' Facts ¶¶ 37-47 (also noting similar experiences by El-Shwehdi, Coleman, Jhan, and Samir and Shair Anwar). Nor does it deny that Elhady, Dr. Shaout, El-Shwehdi, John Doe 2, Samir Anwar, Ali, and Baby Doe had their electronics and those of family members searched, seized, and copied. Plaintiffs' Facts ¶¶ 48-53. The Government does not substantially contest the fact that Shibley, Amri, Dr. Hakmeh, Dr. Shaout, El-Schwehdi, Dr. Fares, Coleman, Thomas, Dr. Khan, Shahir Anwar, Baby Doe, and Kadura have regularly and repeatedly had their travel disrupted by long and invasive secondary inspections, causing them to regularly miss connecting flights and sometimes avoid travel altogether. Plaintiffs' Facts ¶¶ 68-84. And the Government does not disclaim that some Plaintiffs have been denied the ability to even board flights, including Ahmed, John Doe 4, Elhyuzayel, Thomas, Amri, and Kadura. Plaintiffs' Facts ¶¶ 85-86.

Instead of disputing these material facts, the Government merely tries to minimize their impact. But the Government's attempts to downplay the record cannot avoid the force of Plaintiffs' Motion for Summary Judgment. The TSDB causes real and cognizable constitutional harm on individuals, who suffer extraordinarily due to their placement. Nominations to the list do not even

purport to require evidence that nominees pose any danger. Considering the absence of any opportunity for adversarial testing, coupled with the arithmetic surrounding the Watchlisting System's operation, the nomination and maintenance process cannot possibly entail the supposedly-thorough, individualized determinations and rigorous quality controls the Government claims avoid any potential error. The Plaintiffs, none of whom pose a security threat and many of whom appear to have had their status downwardly-adjusted since filing suit, are themselves proof that the Watchlisting System's chief product is error.

## REPLY ARGUMENT

## I.    PLAINTIFFS HAVE STANDING TO CHALLENGE THE WATCHLIST

To show constitutional standing under the Procedural Due Process clause, a plaintiff "must first show that he has a constitutionally protected 'liberty' or 'property' interest, and that he has been 'deprived' of that protected interest by some form of 'state action'." *Johnson v. Morris*, 903 F.2d 996, 999 (4th Cir. 1990) (quoting *Stone v. University of Maryland System Corp.*, 855 F.2d 167, 172 (4th Cir. 1988)).

Here, as also explained in Plaintiffs' Opposition to the Government's Motion for Summary Judgment (Dkt. 313 at 34-39), Plaintiffs have standing because of the pernicious effects TSDB placement has on Plaintiffs' travel-related and non-travel-related liberty interests.

### A.    Plaintiffs Have Shown Travel-Related Deprivations of Constitutionally Protected Liberty Interests

The Government asserts that Defendants have not showed that they have deprived of a liberty interest. *See* 311 at 19.  But the facts show, repetitively and overwhelmingly, that the opposite is true.

As this court previously explained, "Plaintiffs' movement-related liberty interests involve the right to travel by airplane or reenter the United States without being detained for additional screening." *Elhady v. Piehota*, 303 F. Supp. 3d 453, 463 (E.D. Va. 2017). Whatever the precise standard for determining when a movement-related deprivation is sufficient to require due process, that standard is met by "invasive additional screening and other liberty-constraining activities when they fly or reenter the country at a land border or port," including being "detained for hours," and the result "has

4

caused them to avoid travel." *Id.* at 464; *see also Mohamed v. Holder*, 266 F. Supp. 3d 868, 875 (E.D. Va. 2017) ("Plaintiff's decision not to engage in international travel because of the difficulties he reasonably expects to encounter upon return to the United States is sufficient to demonstrate standing.") (string cite omitted).

> 1.    **The Evidence Supports Plaintiffs' Standing for Travel-Related Deprivations Due to the TSDB**

As explained in its Opposition to the Government's Motion for Summary Judgment, Plaintiffs' proffered evidence establishes standing. Dkt. 313 at 34-39. The Government suggests the Defendants have not met this standard because they have only suffered "delays and inconveniences." Dkt. 311 at 20. This characterization, however, ignores the agonizing facts.

Plaintiffs who have attempted to cross a border at a port of entry have endured humiliation and fear neither they nor their family who witnessed their treatment will never forget. Plaintiffs' Facts ¶¶ 35-47. They have been handcuffed—publicly, and often at gunpoint—and detained for lengthy periods of time. *Id.* During most of that time many would be placed in a cold cell, without shoes, and handcuffed to a chair. *Id.* This would be done in front of crying, hysterical family members—toddlers and grandparents, fathers and sisters. See MSJ Ex. 5, Al Halabi Dep. at 51 & 75 (Mr. Al Halabi's daughter "started screaming" and his sister "started crying"); MSJ Ex. 10, Frljuckic Dep. at 47 (Frljuckic's 4-year-old son crying "so much"); MSJ Ex. 20, El-Shwehdi Dep. at 26 (El-Shwehdi's wife and kids crying); MSJ Ex. 14, Shaout Dep. at 47 (Dr. Shaout's wife and kids afraid something happened to him). Shibly's grandmother fainted and required hospitalization, and now Shibly urges "his wife to take the children and board the flight without him because he wanted to save them from the 'long-term traumatic impact' of having to 'see their parents consistently being targeted by their own government'," MSJ Ex. 8, Shibly Dep. at 41, 47, 87, 123-124, 153-154. And Plaintiffs' family members sometimes have to go through similar treatment. *See* Plaintiffs' Facts ¶ 46 and MSJ Ex. 3, Kadura Dep. at 138-149 (Kadura: "it's one of the worst memories of my life is seeing my dad have to go through that because of me"); MSJ Ex. 20, El-Shwehdi Dep. at 201 ("they book me five, six hours, they will hassle [my family] with me").

The detention takes place in cold, bright rooms, with no comfortable place to sit. See, e.g., Plaintiffs' Facts ¶¶ 35 and 38. Plaintiffs are often handcuffed to a chair. Plaintiffs' Facts ¶¶ 36 and 39. This is true even when the Government declines to interrogate these individuals at all. The detention often lasts up to eight, and sometimes up to ten, hours. Plaintiffs' Facts ¶¶ 35, 37, 38, and 47. During this extended time, Plaintiffs are sometimes not even questioned. Plaintiffs' Facts ¶ 38.

These things do not occur by happenstance to Plaintiffs, but as a natural consequence of agency rules for dealing with listees. See, e.g., Plaintiffs' Facts ¶¶ 25-34; Plaintiffs' Opp. Facts ¶ 4. The process is dangerous, humiliating, scary, painful, and even bewildering. Plaintiffs' Facts ¶ 50, MSJ Ex. 14, Shaout Dep. at 48, MSJ Ex. 3, Kadura Dep. at 169, MSJ Ex. 7, MSJ Ex. 20, El-Shwehdi Dep. at 33, Hakmeh Dep. at 58, 81, 70, MSJ Ex. 18 Khan Dep. at 74, MSJ Ex. 8 Shibley Dep. at 88, (Dr. Shaout: "you feel like dirt, basically"); (Kadura: "I'm freaking out"); (El-Shwehdi "really they humiliate me in front of my kids"); (Dr. Hakmeh: "humiliating"); (Mr. Khan: "humiliation again, and again and again"); (Shibley: "I can go meet the president, I can go meet Valerie Jarrett, and the top President advisors and get into the White House complex without any extra screening, but I can't get on [a] flight to get there"); see also Plaintiffs' Facts ¶ 78 (Coleman humiliated); MSJ Ex. 11, Frljuckic Dep. at 47, 67, 82-83 and Plaintiffs' Facts ¶ 44 (Frljuckic's humiliated and terrified).

And some have suffered even more substantial hardships. During one TSDB-triggered border crossing fiasco, Elhady requested an ambulance and was denied. Plaintiffs' Facts ¶¶ 35-36. Thirty minutes later, he passed out, likely from hypothermia, and was rushed to the hospital, where doctors administered basic life support. Plaintiffs' Facts ¶¶ 35-36. At the hospital, aware of his mistreatment, CBP officers then interfered with his medical care by trying to prevent the doctor from asking Elhady questions about what CBP did to him. *Id.*

Flight, particularly international flight, is not much better. Plaintiffs suffer invasive and lengthy secondary screening when they fly to or from the United States. Plaintiffs' Facts ¶ 61. The process can be harrowing, humiliating, and dangerous. See. e.g., MSJ Ex. 7, Hakmeh Dep. at 174 (after Dr. Hakmeh was threatened by San Diego police, his wife was "praying that she doesn't have a miscarriage from four police officers showing up, staring me down, threatening to send me to jail"). Due to the

6

inevitable screening, Plaintiffs must arrive hours earlier than recommended for most travelers in order to catch their flights. Plaintiffs' Facts ¶¶ 74-75 (Dr. Hakmeh and Dr. Shaout arrive at airports at least four hours before flights in consideration of secondary screening every time they fly internationally). And they still regularly miss flights and connections due to lengthy detention and secondary screening. Plaintiffs' Facts ¶¶ 69, 73, 74, 77, 79. Some Plaintiffs have even been physically removed from airplanes after boarding, in front of the other passengers. Plaintiffs' Facts ¶¶ 75, 76, 80 (Shaout, El-Shwehdi, Dr. Fares). Others have been denied boarding altogether. Plaintiffs' Facts ¶ 85-86; Plaintiffs' Opp. Facts ¶ 17 (Ahmed, John Doe 4, Elhuzayel, Thomas, Amri, Kadura).

As a result of this cumulative interference with their rights, multiple Plaintiffs have refrained from exercising their movement-based rights. Plaintiffs' Facts ¶¶ 36, 44,-47, 68, 74, 77, 78, 80-81, 82-86. (Elhady, Frljuckic, John Doe 3, El-Shwehdi, Coleman, Dr. Khan, Shahir Anwar, Amri, Hakmeh, Dr. Fares, Kadura, Baby Doe 2, John Doe 4, Elhuzayel, Thomas). This constitutes a deprivation of a constitutionally protected right under this Court's prior decision and provides Plaintiffs with standing.

### 1. The Government's Arguments Regarding Standing Are Not Applicable

The Government (Dkt. 311 at 22-25), citing *U.S. v. Flores-Montano*, 541 U.S. 149 (2004), and *Tabbaa v. Chertoff,* 509 F.3d 89 (2d Cir. 2007), claims that the consequences outlined above are mere inconveniences that do not infringe on any constitutionally-protected movement-based rights. While Plaintiffs have suffered longer delays than the ones at issue in *Flores-Montano* and *Tabbaa*, it is the decidedly non-routine nature of TSDB-triggered screening, and not just the delay itself, that distinguishes this case.

Both cases focus on the length of the delay as a way of concluding that the search was routine. *Flores-Montano* held that a delay of "one to two hours" at a land border is a routine search that does not require probable cause. 541 U.S. at 155 n.3. *Tabbaa*, whose extension of *Flores-Montano* has never been adopted by any court in this Circuit, allowed a four-to-six hour delay at a land border. 509 F.3d at 100.

But the delay was only permitted in *Tabbaa* because it was the time necessary to perform vehicle searches, basic questioning, and identity verification. *Id.* at 100; *see also id.* at 101 n.3. The Court

specifically disclaimed that its approval would extend to situations where the form of search was "non-routine," *id.* at 100-101. And, like in *Flores-Montano*, there was no detention involved. So the delay was only permitted to the extent it was occasioned only by elements of a routine border search. *Id.* at 92. *Tabbaa* has thus been distinguished in cases where individuals have been handcuffed or otherwise treated in a manner akin to a formal arrest. *E.g.*, *Mireles v. United States*, No. CV B: 13-197, 2016 WL 4992026, at *9 (S.D. Tex. July 29, 2016), *report and recommendation adopted*, No. B-13-197, 2016 WL 5080448 (S.D. Tex. Sept. 15, 2016; *see also Arjmand v. Dep't of Homeland Sec.*, No.14-cv-07960, 2018 WL 1755428, at *6 (C.D. Cal. Feb. 9, 2018) ("most of these searches were permitted under the well-established border search doctrine because none was sufficiently destructive, particularly offensive, or overly intrusive").

 The border screenings approved in *Flores-Montano* and *Tabbaa* would be a marked improvement for almost all of the plaintiffs.  As discussed in detail in Section 1 above, Plaintiffs crossing land borders were detained, handcuffed, often at gunpoint, on a regular and repeated basis. They are then placed in a holding cell, often still handcuffed and often in cold, dangerous conditions, without their shoes. The process is humiliating. The delay Plaintiffs suffered alone was above the outlier *Tabbaa* case.

 And, while it is not the delay itself that distinguishes *Flores-Montano* and *Tabbaa*, the amount of delay Plaintiffs confront is, indeed, greater. For the plaintiffs, a four-to-six hour delay at the border is not just an unusual length of time that happened to be necessary in a certain instance to complete routine border searches, but a general, rule-based minimum. Some detentions would take longer, including detentions of up to eight or even ten hours. Some of these detentions went on for many hours even though they were unaccompanied by questioning at all. Meanwhile, other delays occurred at airports, where as a result flights were missed, causing Plaintiffs to be stranded overnight.  In every way, the Watchlisting System is unprecedented.

 The Government separately claims that Plaintiffs do not have standing because at least some of them have travelled at some point after their movement-related deprivations manifested, which supposedly undermines the argument that Defendants have deterred them from travel. Dkt. 311 at

22-25. Yet the travel-related-deprivation test does not require an individual to cease all travel to have suffered a constitutionally-recognizable travel-related deprivation. Rather, any significant amount of deterrence from travelling is enough. *Elhady*, 303 F. Supp. 3d at 463-64; *Mohamed*, 266 F. Supp. 3d at 875. And the facts establish that Plaintiffs have been deterred by the Government's conduct.

Finally, the Government suggests that Plaintiffs do not have standing because, after the filing of this lawsuit, the Government has altered, secretly and without notice, the TSDB status of approximately half of the Plaintiffs. Dkt. 311 at 22-25; *see also* Plaintiffs' Opp. Facts ¶ 18, 31, 37, 46, 52, 58, 65, 76, 124, 139 (Elhyuzayel, Kadura, Al Halabi, Ali, Samir and Shahir Anwar, Awad, Coleman, John Doe 4, Dr. Shaout, Thomas). But as the Ninth Circuit explained in *Fikre v. FBI*, 904 F.3d 1033 (9th Cir. 2018), the Government cannot moot a case with voluntary post-filing action to alter a plaintiffs' TSDB status or annotate it in a manner that makes travel easier and more routine. Instead, under the voluntary cessation exception to mootness, the capability of the Government to return the Plaintiffs to their previous TSDB status after the termination of this case means their claims may continue. *Id.* at 1040.

## B.    Plaintiffs Have Shown Deprivations of Other Constitutionally-Protected Liberty and Property Interests

"[U]nder the liberty interest test announced in [*Paul v. Davis*, 424 U.S. 693, 701 (1976)], which has become known as the 'stigma-plus' test, a plaintiff asserting a reputational liberty interest protected by the Fourteenth Amendment must show both (i) the infliction by state officials of a 'stigma' to plaintiff's reputation and (ii) the deprivation of a legal right or status." *Doe v. George Mason Univ.*, 132 F. Supp. 3d 712, 722 (E.D. Va. 2015) (other citations and emphasis omitted). For the second prong to be met, all Plaintiffs must show is "some tangible change of status." *Doe v. DOJ*, 753 F.2d 1092, 1108 (D.C. Cir. 1985). This includes any "deprivation of" an "opportunity" which is "caused by a statutory impediment." *Valmonte v. Bane*, 18 F.3d 992, 1001 (2d Cir. 1994).

For example, courts have held that "statutory impediments to buying alcohol, opening or maintaining bank accounts, or receiving material support from other people," qualify. *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 204 (D.C. Cir. 2001). Also qualifying is a "loss of tax

exemption." *Paul*, 424 U.S. at 705. Likewise, the right to be considered for government contracts qualifies. *Doe*, 753 F.2d at 1109 (citing *Conset Corporation v. CSA*, 655 F.2d 1291 (D.C. Cir.1981)); *see also Shirvinski v. U.S. Coast Guard,* 673 F.3d 308, 316 (4th Cir. 2012).

The record here includes a number of examples of various instances of stigma-related harms caused by the Government that give rise to constitutional standing. As a matter of policy, all TSDB Listees are subjected to higher scrutiny for and often outright denied employment, credentials, and immigration benefits. Al Halabi filed an immigration petition for his wife that was delayed for 10 years, so he left the country and moved to Dubai. Plaintiffs' Facts ¶ 95. Dr. Hakmeh's immigration petition he filed for his wife was delayed five years, and Baby Doe's mother's citizenship application was delayed for more than two years. Plaintiffs' Facts ¶ 96. Elhady's currently-pending immigration petition for his wife will likely be similarly delayed. *Id.* Ahmed's custom seal was revoked, interfering with his ability to perform his job. Plaintiffs' Opp. Facts ¶ 20. Shibly's application for a concealed weapon permit was also subjected to a delay. Plaintiffs' Opp. Facts ¶ 20. And as a matter of policy, TSDB Listees are subjected to "advanced" electronics searches. A number of Plaintiffs were subjected to search and seizure of their electronic devices, based on the "reasonable suspicion" caused by being on the watchlist. *See* Plaintiffs' Facts at ¶¶ 32 and 48-53; *see also* Section II(A), below. And at least one Plaintiff, Dr. Shaout, has had malware placed on his phone as a result of his TSDB placement. MSJ Ex. 14 at 7, 46-48, 192.

Aside from the significant effects on Plaintiffs' public status and rights, the stigma from being on the list has caused serious harms to their private lives. Their travel-related arrests occur in public. *See* Plaintiffs' Facts ¶ 30. Plaintiffs' names have been announced on loudspeakers at the airport. *See* Plaintiffs' Facts ¶ 79. They have been physically removed from airplanes in front of the public. Plaintiffs' Facts ¶¶ 75-76, 79-80 (Dr. Shaout, El-Shwehdi, Coleman, Dr. Fares).

So aside from Plaintiffs being humiliated in front of their family, *see* Section A(1), above, their reputations are also damaged among their communities at large. Some of Mr. Shibley's friends, sadly but understandably, now refuse to travel with him. Plaintiffs' Facts ¶ 43. And he has been treated like a terrorist in front of not only his friends but also business leaders, fellow religious leaders and

congregants, at great cost to his reputation. Plaintiffs' Facts ¶ 69. Kadura had his arrest at the border recorded on a phone by a stranger. Plaintiffs' Facts ¶ 109.  These policies and experiences each constitute the "plus" sufficient for standing under the stigma-plus doctrine.

Meanwhile, while some Plaintiffs may have had their TSDB status altered, the Government has done nothing to disclaim Plaintiffs' stigmatizing "known or suspected terrorist" label.  In *Ibrahim v. DHS*, 912 F.3d 1147 (9th Cir. 2019) (discussed in more detail below in Section II(B)(2)(a)), the Government conceded Ibrahim should never have been placed on the No Fly List. 912 F.3d at 1153. In *Tarhuni*, the Government provided sworn declarations that Tarhuni would not be re-added to the watchlist based on available information. *Tarhuni v. Holder*, 3:13-cv-1, Dkt. No. 99 (D. Or. July 6, 2015) (Grigg Declaration). But here, Plaintiffs and their families still live in an amorphous and uncertain world, where all have been labeled as "known or suspected" terrorists in the past, many have had their label annotated or otherwise modified in some way, and all may at any time be subject to even more onerous watchlist-related consequences in the future—all without notice or an opportunity to contest that placement.

## II.     THE TSDB VIOLATES THE FIFTH AMENDMENT UNDER *MATHEWS*

### A.     Plaintiffs' Interests Affected by Lack of Process is High

The first part of the *Mathews* balancing test looks at the "private interest that will be affected by the official action." *Mathews v. Eldridge*, 424 U.S. 319, 335, (1976). The private interest is heavy, as TSDB placement causes a significant injury in "potentially far-reaching" ways. *Latif v. Holder*, 969 F. Supp. 2d 1293, 1304 (D. Or. 2013). Placement on the list comes with extraordinary detention and screening for any individual who attempts to either enter the U.S. at a port of entry, *see* Plaintiffs' Facts ¶¶ 25-47, or board an airplane, Plaintiffs' Facts ¶¶ 54-86. It creates hindrances for TSDB listees and their families applying for visas, visa waivers, and immigration benefits. Plaintiffs' Facts ¶¶ 90-96. Placement limits access to certain types of government and even private employment, HAZMAT licenses, PreCheck and Global Entry, custom seals, military base and airport access, Transportation Worker Identification Credentials, flight school, and the ability to buy a gun. Plaintiffs' Facts ¶¶ 97-

106, 117-119; Plaintiffs' Opp. Facts ¶¶ 20. It delays security clearances, concealed carry permits, and even the ability to test drive a truck. Plaintiffs' Opp. Facts ¶¶ 20, 32, and 59. It subjects them to search and seizure of plaintiff's personal information that are collected by the Government every they cross a border. Plaintiffs' Facts at ¶¶ 32 and 48-53 (also discussed in more detail below). Placement also makes their engagement with local law enforcement, Plaintiffs' Facts ¶¶ 107-115, and foreign governments, Plaintiffs' Facts ¶ 121; *see also Latif*, 969 F. Supp. 2d at 1304, immensely more dangerous. And, in a way contrary to core aspects of our legal traditions, placement on the TSDB watchlist acts as a virus, causing a placed individual's friends and family to be placed as well. *See* Plaintiffs' Facts ¶¶ 43 and 120.

Sections I(A)(1) and I(B), above, as well as the cited statements of facts in those sections from Plaintiffs' Motion for Summary Judgment and Opposition to the Government's Motion for Summary Judgment, provide illustrative and telling examples of the travel-related and stigma-related harms they have faced, even without a No Fly List annotation. Again, these harms are illustrative, as *Mathews* is concerned with the potential harm caused by the watchlist generally and not any particular harm already inflicted on a specific plaintiff. But they show in the most tangible way how strong the private interests at stake are.

A No Fly annotation exacerbates the harm imposed by the Government. Those with a No Fly annotation are prohibited from boarding any aircraft that even traverses U.S. airspace. Plaintiffs' Facts ¶ 57. The costs of this in light of "the numerous reasons an individual may have for wanting or needing to travel overseas quickly such as for the birth of a child, the death of a loved one, a business opportunity, or a religious obligation," are severe. *Latif*, 969 F. Supp.2d at 1303; *see also Ibrahim v. Dep't of Homeland Sec.*, No. C 06-00545 WHA, 2012 WL 6652362, at *7 (N.D. Cal. Dec. 20, 2012) ("for international travel, air transport in these modern times is practically the only form of transportation") (emphasis omitted). Plaintiffs' own experiences are illustrative. Some Plaintiffs—United States citizens—have been denied the ability to travel by airplane. SOF ¶¶ 85-86. (Ahmed, Elhuzayel, Thomas, Amri, Kadura, and John Doe 4). As a result of being denied the right to board an airplane, one plaintiff was denied the ability to meet his fiancée's family (John Doe 4), others could not go on

vacation (Elhuzayel, Kadura), engage in business (Amri), or even, perhaps ironically, move out of the country entirely (Thomas). *Id.* at ¶ 86.

And, the private interest at stake includes the legally-protected privacy rights against the seizure of Plaintiffs' electronic data upon crossing the border. Plaintiffs' Facts at ¶¶ 32 and 48-51. CBP Directive 3340-04A Section 5.1.4 expressly states that for people on the watchlist, an Officer at its discretion may perform an "advanced search" which allows the Officer to "connect[] external equipment, through a wired or wireless connection, to an electronic device not merely to gain access to the device, but to review, copy, and/or analyze its contents." Being on the watchlist itself supposedly establishes the "reasonable suspicion" the Government believes is sufficient to undertake even the most intrusive border searches. *Id.*; *see* Dkt. 311 at 37-38; Government's Memorandum in Support of Motion to Dismiss, *El Ali v. Barr*, Case No. 8:18-cv-2415, Dkt. No. 37-1, at 54-55 (Dec. 14, 2018) (defending off-site border searches as permissible with reasonable suspicion). For people on the watchlist, this is done in secret. CBP Directive at 5.4.2.5. These searches are also done for all travelling companions. Plaintiffs' Facts ¶¶ 33 and 53.

These searches give the Government a "collection of bank-account numbers, copies of electronic devices, cell-phone contact lists, laptop images, GPS data, or photos." *Tarhuni v. Sessions*, No. 3:13-CV-00001-BR, 2018 WL 3614192, at *11 (D. Or. July 27, 2018). The Government retains this collection permanently, even if an individual is later removed from the TSDB. Plaintiffs' Facts at ¶ 34. The result of this privacy intrusion should "constitute such a significant intrusion into a traveler's privacy that the Court concludes it is a sufficient deprivation of Plaintiff's liberty interest in travel to warrant procedural due-process protection." *Tarhuni*, 2018 WL 3614192, at *11.

On top of these privacy intrusions, the Government sometimes will not return phones upon the end of the individual's border-related detention. Plaintiffs' Facts ¶¶ 38 and 48-53. Individuals have had to wait up until four weeks to get them back. *See* MSJ Ex. 3, Kadura Dep. At 181-183. And the Government has installed malware on at least some watchlisted individual's devices; it is unclear what that malware does. Plaintiffs' Facts ¶ 50 and P's MSJ Ex. 14 at 7, 46-48, 192.

Overall, the resulting cost of being on the watchlist is tremendous.

The Government attempts to downplay the harms caused to individuals placed on the watchlist. In their attempt, it employs three significant but inappropriate tactics.

First, the Government focuses on the facts of particular plaintiffs, conflating standing with *Matthews*. *See, e.g.* Gov't Opp. at 21 (incorrectly suggesting as part of *Mathews* test that "each Plaintiff must establish that his placement on the TSDB effectively deprived him of the ability to travel internationally"). *Mathews* is not concerned merely with a deprivation that a particular plaintiff has suffered, but the "degree of potential deprivation that may be created by a particular decision." 424 U.S. at 341 (citations omitted); *see also Delaware Riverkeeper Network v. Fed. Energy Regulatory Comm'n*, 243 F. Supp. 3d 141, 152 (D.D.C. 2017) (admonishing a party not to conflate standing with the *Mathews* test itself, and noting the former, unlike the latter, requires "demonstrat[ion of] deprivation of a protected liberty or property interest"), *aff'd*, 895 F.3d 102 (D.C. Cir. 2018).

Second, for each type of deprivation it attempts to dismiss, the Government cherry-picks plaintiffs who have suffered the least in some aspect, ignoring other plaintiffs or other incidents. By way of example, the Government is eager to emphasize (Dkt. 311 at 24) Elhady's relatively fewer problems at airports since litigation began, while ignoring that his problems are still significant with respect to international flights, *see* Plaintiffs' Opp. Facts ¶ 78. But the Governor avoids discussing the ongoing airport-related problems of Shibly, Amri, Hakmeh, Shaout, El-Shwehdi, Coleman, Dr. Fares, Dr. Khan, and others, whose problems were severe. See, Plaintiffs' Facts ¶¶ 68-87; *e.g.*, *id.* at ¶ 72 (Amri was subjected to six searches and chemically tested four times on the way to his deposition, missing his flight); *id.* at ¶ 74 (Dr. Hakmeh has missed so many flights returning from humanitarian missions that he must drive five hours to Chicago, to avoid the need for a connecting flight); *id.* at ¶¶ 76 and 79 (Coleman El-Shehdi personally escorted off a plane for additional screening); The Government also barely mentions Elhady's life-threating experience (it passively states that he "fell ill") from detention-related-hypothermia during one border encounter. Dkt. 311 at 23; *see* Plaintiffs' Facts ¶¶ 35-37. Likewise, the Government claims (Dkt. 311 at 23) that most of John Doe 3's border experiences were "unremarkable," without any discussion of the time John Doe 3 was detained by "nervous" government agents at the border at gunpoint along with his entire family, held for five and

a half hours, and had his electronics both searched and seized, Plaintiffs Facts ¶¶ 45 and 53.

Third, the Government disclaims responsibility for conduct that repeatedly occurs to Plaintiffs and other listees. By way of example, the Government merely suggests that "there is no policy *requiring* handcuffing of individuals in the TSDB." Dkt. 311 at 25 (emphasis added); *see also id.* at 22 (no policy requiring CBP officers to draw weapons at watchlisted individuals). Plaintiffs lack information to demonstrate any such requirement because core watchlist policies have been withheld from their review. There is, however, Government testimony and documentary evidence that at least some TSDB individuals are annotated as "armed and dangerous." As a result, the Government affords officers the discretion to call in law enforcement reinforcements, to call in explosive-sniffing canines, to draw their firearms, and to handcuff the watchlisted individuals. Plaintiffs' Facts ¶ 30; *see also* Dkt. 311 at 4 (Government arguing it is up to the CBP officer's discretion). It does not take much imagination to anticipate CBP officer action when he is (incorrectly) alerted that an individual is a known or suspected terrorist who is armed and dangerous. As one CBP officer explained to Frljuckic: "when I swipe your passport, then all the officers run, rush to the car, and that's what they always do." MSJ Ex. 11, Frljuckic Dep. at 82. And so Frljuckic had guns pointed in his face five times in a row when crossing the border. Plaintiffs' Opp. Facts ¶ 101. This despite the fact that Frljuckic has never owned a gun or even tried to purchase one. MSJ Ex. 11, Frljuckic Dep. at 111.[1]

John Doe 3 was also listed as armed and dangerous, and likewise had guns pointed in his face to the point where he felt so threatened for his life that he moved out of the country. Plaintiffs Facts ¶ 45. Like Frljuckic, John Doe 3 has also never owned a gun. MSJ Ex. 22, JD3 Dep. at 235-36. Another CBP officer told Shibly that he would be stopped by armed officers and handcuffed again the next time he crosses the border. Plaintiffs' Opp. Facts ¶ 19; *see also id.* at ¶ 127. And other Plaintiffs

---

[1] Along with Frljuckic, the majority of Plaintiffs have never owned a gun. MSJ Ex. 3, Kadura Dep. at 277; MSJ Ex. 4, Ahmed Dep. at 55; Ex. 5, Al Halabi Dep. at 155; Ex. 9, Elhuzayel Dep. at 262-63; Ex. 10, Thomas Dep. at 149; Ex. 12, Awad Dep. at 173; Ex. 13, Amri Dep. at 179; Ex. 14, Shaout Dep. at 179; Ex. 16, Shahir Anwar Dep. at 75; Ex. 17, Samir Anwar Dep. at 100-01; Ex. 19, Hassan Dep. at 159; Ex. 21, John Doe 2 Dep. at 131; *but see* U.S. CONST., Amend. II (guaranteeing right to gun ownership).

likewise are regularly handcuffed. *See, e.g.,* Plaintiffs' Opp. Facts ¶ 79, 109 (Elhady, Kadura).

The Government shrugs its shoulders about other things as well. *See* Dkt. 311 at 5 (claiming electronic search and seizure not *required* but admitting that "advanced search" CBP policy for individuals on terrorist watchlists exists); 22 (no minimal time for detention required). From the Government's viewpoint, these harrowing experiences keep happening to Plaintiffs because they have terrible luck which cannot possibly be attributable to a secret watchlist with proscribed consequences. Plaintiffs emphasize, however, that their collective experiences—almost entirely undisputed— establishes that the Watchlisting System doles out consequences based on the bare fact of TSDB status.

## B.     The Risk of Erroneous Deprivation is High

The second *Mathews* factor looks to "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards." 424 U.S. at 335. Here, the risk is unacceptably high. This is not only because of TSDB Listees' lack of an effective right to a hearing to challenge their inclusion, but also because the standard for inclusion is neither legally ascertainable nor properly applied in practice.

### 1.     The Standard for Inclusion Creates an Impermissibly High Risk of Erroneous Error

The reason for the impermissibly high risk of erroneous application starts with the standard for inclusion. An individual may be added to the TSDB "upon articulable intelligence or information which, based on the totality of the circumstances and, taken together with rational inferences from those facts, creates a reasonable suspicion that the individual is engaged, has been engaged, or intends to engage, in conduct constituting in preparation for, in aid or in furtherance of, or related to, terrorism and/or terrorist activities." Plaintiffs' Facts ¶ 15. The Government's test takes the traditional reasonable suspicion standard and expands it by merely requiring a "reasonable suspicion" that an individual be "related to" terrorism. What "related to terrorism" means is so vague and open-ended as to render the standard meaningless. As explained by this Court in *Mohamed v. Holder,* 995 F. Supp. 2d 520, 531 (E.D. Va. 2014), conduct that can constitute being "related to" or "in aid" of terrorism

sufficient to place an individual on the watchlist "is not necessarily related to any unlawful conduct."

"This absence of any ascertainable standard for inclusion and exclusion is precisely what offends the Due Process Clause." *Smith v. Goguen*, 415 U.S. 566, 578 (1974). A standardless test for inclusion is no more permissible for determining whether an individual should be deprived a liberty right by administrative action by as it is for determining is guilty of a crime. *K.W. v. Armstrong*, 180 F. Supp. 3d 703, 714 (D. Idaho 2016) (applying *Smith* in context of a *Mathews* challenge to agency action).

Nor do the clarifying regulations provide any meaningful restriction sufficient to tease out a workable, meaningful standard. Instead, the Government's clarifications on its policies simply provide itself with even more uncabined discretion, often in constitutionally-problematic ways. The Government, in determining whether "reasonable cause" exists, may consider an individual's "race, ethnicity, or religious affiliation" as well as their "beliefs and activities protected by the First Amendment, such as freedom of speech, free exercise of religion, freedom of the press, freedom of peaceful assembly, and the freedom to petition the government for redress of grievances." Plaintiffs' Facts ¶ 18. The Government may also "consider an individual's travel history, associates, business associations, international associations, financial transactions, and study of Arabic as information supporting a nomination to the TSDB." Plaintiffs' Facts ¶ 19. This Court in *Mohamed* asked if "it enough to be a member of a lawfully operating social or religious organization whose membership may include other persons suspected of terrorism" or if "studying Arabic abroad" was enough. *Mohamed,* 995 F. Supp. 2d at 532. The facts now show that it is. The lack of any meaningful restraint on what constitutes grounds for placement should be fatal to the TSDB's viability.

The Government uses a declaration to assert that it does not and will not do many of the things the plain language of its regulations and deposition responses indicate that it does now and will do again in the future. So the Government claims it will not place an individual on the watchlist based on race, ethnicity, religious affiliation, exercise of First amendment rights, travel history, associates, business associations, financial transactions, and study of Arabic alone. *Compare* Plaintiffs' Facts ¶¶ 18-19 with Dkt. 311 at 3. The Government uses the same declaration to assert (Dkt. 311 at 42) that "[g]uesses, 'hunches,' and reporting of suspicious activity are not sufficient to meet the inclusion standard." And

the Government claims that inclusion standard require "additional distinct criteria, in addition to meeting the reasonable suspicion standard for inclusion the TSDB." Dkt. 311 at 44

But the Government's bald assertions are contrary to the plain text of their regulations and have no binding effect on the Government, *see also Kisor v. Wilkie*, No. 18-5 (U.S.) (currently pending before the Supreme Court on question of whether the Government is entitled to any deference as to the interpretation of its own regulations). Likewise, they are refuted by the Government's own clarifying regulations and deposition testimony. *See* Plaintiffs' Facts ¶¶ 18-19 and supporting material. They should be ignored. *See Nat'l Enters., Inc. v. Barnes*, 201 F.3d 331, 335 (4th Cir.2000) (self-serving affidavit insufficient to survive summary judgment); *see also Simard v. Unify, Inc.*, No. 1:15-cv-1649, 2016 U.S. Dist. LEXIS 92321, at *14, 2016 WL 3854451, at *5 (E.D. Va. July 15, 2016) ("Where assertions made by affidavits or declarations prepared for the motion for summary judgment are conclusory or conflict with prior statements or deposition testimony, the affidavit or declaration is insufficient to create a genuine issue of material fact."). In any event, the Government's failure to provide any adversarial process means that if its nominators *did* rely on guesses, hunches, or improper criteria, Plaintiffs and other TSDB Listees would never have an opportunity to contest them.

The Government also argues (Dkt. 311 at 37-38) that its reasonable-suspicion-of-related-to-terrorism is no different from other "reasonable suspicion" standards approved by courts. But it is not, either in theory or in practice. As explained above, the Government applies its reasonable suspicion standard to allow infringement of rights on not only lawful but perfectly ordinary behavior, such as race, religion, association, language, and national origin, without any additional individualized information indicating potential criminal concern. This is improper. *United States v. Sigmond-Ballesteros*, 285 F.3d 1117, 1121 (9th Cir. 2002) (reasonable suspicion cannot be met "based on broad profiles which cast suspicion on entire categories of people without any individualized suspicion of the particular person to be stopped") (citations omitted). And, although "lawful conduct may give rise to a reasonable suspicion *if the circumstances as a whole indicate that criminal activity is afoot*," *United States v. Singleton*, 360 F. App'x 444, 445 (4th Cir. 2010) (emphasis added and citation omitted) (unpublished opinion), "reasonable suspicion" of wholly legal activity may not justify a deprivation of rights. Rather,

it must be "reasonable suspicion" of "criminal activity." *United States v. Cortez*, 449 U.S. 411, 417 (1981). The Government admitted in depositions that watchlist nominations and inclusion can be based on entirely lawful activities with no relationship to criminal activity, *see* Plaintiffs' Facts ¶ 20, because the watchlist's goal is to predict a potential possibility of behavior which might be suspected of being related to future terrorist activity. *See also* Plaintiffs' Facts ¶¶ 18-19.

Even if the Government was applying a real *Terry*-style "reasonable suspicion" standard, that standard is inadequate here. The "reasonable suspicion" standard developed under *Terry* "effects a needed balance between private and public interests when law enforcement officials must make a limited intrusion on less than probable cause." *United States v. Montoya de Hernandez*, 473 U.S. 531, 541 (1985) (discussing *Terry*). But, as the Plaintiffs have established, TSDB placement does not create a "limited intrusion" but has far-reaching and substantial effects. In *Montoya de Hernandez*, the Supreme Court recognized that a more invasive search than *Terry* would otherwise permit may be permitted at the border depending on the facts and circumstances of an individual case. *Id.* at 544 ("detention was long, uncomfortable, indeed, humiliating; but both its length and its discomfort resulted solely from the method by which she chose to smuggle illicit drugs into this country"). But here the results of being placed on the TSDB watchlist do not create harms that are reasonably related to individual circumstances, whether at the border or elsewhere. Instead, the detention and other deprivations of liberty are systematic based on the particular TSDB annotation. Plaintiffs' Facts ¶¶ 29 and 69.

The significant and often fundamental restrictions on liberty caused TSDB placement further makes the high risk of erroneous deprivation improper. Plaintiffs are not losing mere money, but their freedom to travel, avoid detention, maintain the privacy of their associations and electronic data, exercise constitutional rights, and even stay physically healthy and safe. *See* Sections I(A)(1) and (B), above. "[D]ue process places a heightened burden of proof on the State in civil proceedings in which the "individual interests at stake ... are both 'particularly important' and 'more substantial than mere loss of money.'" *Cooper v. Oklahoma*, 517 U.S. 348, 363 ((1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 756 (1982)). "[T]he risk of erroneous deprivation of a fundamental right may not be placed on the individual." *Tijani v. Willis*, 430 F.3d 1241, 1245 (9th Cir. 2005). As explained in *Addington v. Texas*,

441 U.S. 418, 423-24 (1979), due process is satisfied in purely monetary cases by a preponderance standard, is "protected by standards of proof designed to exclude as nearly as possible the likelihood of an erroneous judgment" in criminal cases, and is satisfied by an "intermediate standard" such as "clear and convincing" is appropriate to safeguard those rights that fall in between.

The Government claims (Dkt. 311 at 37) that "reasonable suspicion" is the "highest standard" permitted at the border. But this only applies to searches. The Government's infringement of rights here goes well beyond a mere search. And, in any event, the Government is simply wrong: one recent federal court rejected this claim as specifically applied to watchlist-based border searches and seizures of electronic data like the ones suffered by Plaintiffs here. *Alasaad v. Nielsen*, Memorandum and Order, Dlt. 34, Case 1:17-cv-11730-DJC, at slip op. 28-47 (D. Mass. May 9, 2018); *see also id.* at slip op. at 44-45 (specifically rejecting the Government's reasonable-suspicion-is-a-ceiling-at-the-border argument).

And further, because of the increased deprivation the "reasonable suspicion" test as applied to border detentions requires a "particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417 (1981), *quoted in part by Montoya de Hernandez*, 473 U.S. at 541. The Government's TSDB nominations clause does not require that, rather, it requires some amalgamation of reasonable suspicion that "engaged in conduct constituting, in preparation for, in and of or related to terrorism and terrorist activities." Being engaged in conduct "related to terrorism" goes far beyond criminal conduct. So as a matter of law it cannot be justified, even at the border, by *Cortez* and *Montoya de Hernandez*. And, in practice, the facts show there is neither a "particularized" showing of that suspicion for individuals nor an appropriate tailoring of the intrusion to the individual situation of each defendant.

The Government's reasonable-suspicion-of-related-to-terrorism test impermissibly places the burden of erroneous deprivation of important and fundamental rights on Plaintiffs. The standard falls well below a preponderance standard. It has no enforceable limits and is, at its essence, no standard at all. The Government's purported standard for TSDB placement thus constitutes an impermissibly high risk of erroneous deprivation regardless of the level of notice and hearing an individual receives in order to challenge the Government's determination. The Government cannot simply bypass the

constitutional requirements for significant deprivations of liberty interests in secret, wholesale, based on the magic words "national security" and "reasonable suspicion." *See R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 190 (D.D.C. 2015) ("Incantation of the magic words 'national security' without further substantiation is simply not enough to justify significant deprivations of liberty.").

### 2. The Government's Supposed Procedural Safeguards for Implementing the Inclusion Standard Are Inadequate

#### a. The Nomination and Review Processes Are Inadequate

The Government claims (Dkt. 311 at 41-42) the nomination and review process creates sufficient safeguards to quell any risk of erroneous deprivation. But these supposed safeguards are inadequate.

The Government claims (Dkt. 311 at 19)—again in a self-serving manner without elaboration or evidence, *see National Enterprises*, 201 F.3d at 335—that "the TSDB is subjected to rigorous and ongoing quality control measures to ensure nominations continue to satisfy the criteria for inclusion, and that the information supporting a nomination is reliable and up-to-date." The Government similarly alleges (Dkt. 311 at 39) that "experienced analysts and agents who evaluate watchlist nominations based on individual circumstances, taking into account the particular intelligence that distinguishes the individual under review," and are "guided in their decision-making by detailed analytical standards that structure their discretion and promote scrutiny and professionalism in their work—as well as subject matter experts throughout the Intelligence Community." And the Government alleges (Dkt. 311 at 39 n.28)—yet again without support—that "the watchlisting system relies on highly individualized assessments."

Yet no matter how rigorous the Government's approach may be, or how smart and well-trained their agents are, the Government has a staff of 35 individuals with the ability to handle a nomination, with a slightly larger number of individuals—90—having the authority to process a removal (the latter of which, but not the former, requires two individuals to sign off). Plaintiffs' Opposition Facts ¶ 35 and TSC Dep. at 374:5-21 The 35 individuals processing nominations handle approximately 481,000 nominations per year (including status changes and duplicates), adding

approximately 167,000 new nominees while rejecting 5,000. Plaintiffs' MSJ Ex. 66 at 22. That is approximately 13,500 "individual circumstances" analyzed per agent per year, with about 4,800 new additions per agent and 142 rejections. Generously assuming 2000 hours of adjudication per year for each of the 35 agents (so assuming all 35 agents work full time on nominations and have no other duties or training to distract them), that would still be nearly 7 "highly individualized assessments" per hour per agent.

Indeed, the Government's tale of a well-safeguarded and accurate nomination and review policy flies in the face of the facts described in *Ibrahim*, 912 F.3d 1147. There, an FBI agent accidentally nominated a Stanford graduate student who indisputably was not a security risk for a No Fly List annotation the agent did not purport to claim was supportable under the No Fly List standard. *Id.* at 1157-58. The Government's safeguards did not catch the mistake; instead the Government defended it in federal litigation for a decade. When Dr. Ibrahim prompted a review of her status, *id.* at 1155, the review agent denied her revocation, along with all other requests for removal from the watchlist being processed at the time, even though the reviewing agent contemporaneously emailed that the records being reviewed "contain virtually no derogatory information." *Id.* at 1158. Sometime later, Dr. Ibrahim was then taken off the list, but then a year after that, for reasons the Government was unable to explain, she was then placed back on the list, before being removed again. *Id.* at 1159-60. A few years later, for a reason the Government was unwilling to explain, Dr. Ibrahim was then placed on the list a third time. *Id.* at 1160. She remained on the list, and unable to return to the United States, despite the Government conceding "Dr. Ibrahim was not a threat to the national security of the United States and that she never has been." *Id.* at 1160. Then, at trial, Dr. Ibrahim's American daughter was unable to return to the United States to testify because, it seems, the Government accidentally placed the daughter on the No Fly List as well. *Id.* at 1164; *see also Latif v. Holder,* 28 F. Supp. 3d 1134, 1155-56 (D. Or. 2014) (describing it as an error). The Government's evidence-free assurances about the safeguards in their system are simply inconsistent with the facts in *Ibrahim.*

Nor does it appear the Government's rigorous process includess any effective way of incorporating new information to revise its nomination determinations. The evidence instead shows

that *every time* one of the Plaintiffs triggered detention, interrogation, or secondary inspection, the failure to find any of the Plaintiffs a threat to national security in any way had no subsequent effect on their watchlist status. The very next time they crossed a border or tried to board an airplane, the Government subjected them to the exact same conduct. *See* Plaintiffs' Facts ¶¶ 42, 69, 74, 82, 87; Plaintiff's Opp. Facts ¶ 22, 29, 48-49, 58, 63, 68, 71, 79, 87, 89, 98, 101, 105, 109, 115-116, 119, 126 (all showing that the Plaintiffs' experiences were repeated and regular rather than one off). To illustrate the problem with an example, by the *fifth* time in a row Frljuckic was arrested *at gunpoint* while crossing a border, Plaintiffs' Opp. Facts ¶ 101, the Government's failure to modify its behavior on the basis of what it learned in his previous four detentions was overkill. Yet instead of attempting to correct the problem each time it occurred, the Government told Frljuckic he could make a "u-turn" and expect to receive the exact same treatment yet again. Plaintiffs' Facts ¶ 44.

Indeed, it appears there is only one effective way to force the Government to significantly review an individual's TSDB Listee's placement, and that is to sue. When Plaintiffs (like others around the country) joined this lawsuit, many of their travel-related problems lessened or vanished. But filing constitutional challenges to the TSDB should not be required for the Government to alter an innocent person's TSDB status. *See Fikre*, 904 F.3d at 1040 (removal from No Fly List after filing suit does not moot challenge constitutional challenge to TSDB system).

The quantitative data that is available about that process confirms that it is irredeemably riddled with errors. Either despite or because of the minimal levels of resources put into the nomination and review process, the default position of the government is simply to accept all nominations. *Cf. Ibrahim*, 912 F.3d at 1158 (Government refused to modify individuals' placement despite lack of derogatory information). As a result, for the last decade, TSC has accepted 99% or more of the hundreds of thousands of watchlist nominations it receives each year. Plaintiffs' Opp. Facts ¶ 6. A 99% approval rate shows there is an essentially non-rebuttable presumption of placement that does not constitute review adequate required by due process. *O'Donnell v. Harris Cty.*, 251 F. Supp. 3d 1052, 1104 (S.D. Tex. 2017) (99 percent rejection of bail adjustment claims show process is unconstitutionally "futile"); *cf. Ford v. Quarantillo*, 142 F. Supp. 2d 585, 587 (D.N.J. 2001) ("Due process

cannot be satisfied by 'rubber stamp' denials"); *Minney v. OPM*, 130 F. Supp. 3d 225, 234 (D.D.C. 2015) ("predetermined outcome" does not constitute due process).

The Government is outraged Plaintiffs would suggest that this process is anything other than fair and balanced. "There is no evidence to support Plaintiffs' claim that reviewing agencies 'rubber stamp' nominations," the Government decries (Dkt. 311 at 42). Yet, completing that very sentence, the Government denies "that the number of listed individuals reflects the permissiveness of the standard." But the 99% approval rate is evidence, *see O'Donnell*, 251 F. Supp. 3d at 1104. And despite the Government's protestations, Plaintiffs' ability to fully assess the Government's nomination and review process is significantly hampered by the fact that the Government will not disclose that process, or even some of the inclusion standards. *See* Plaintiffs' Opp. Facts ¶ 7-8. Plaintiffs have put forth plenty of other evidence showing that the Government's watchlist processes are at best highly inaccurate and more likely a ministerial formality. The Government counterbalances Plaintiffs' showing with only self-serving declarations and righteous indignation.

### b.      The DHS TRIP Redress Process Is Inadequate Process

The Government argues that DHS TRIP process provides all the due process required by the Constitution. It does not. Many of the Plaintiffs in this case have filed DHS TRIP redress complaints. That process is, at best, a black box; and few of Plaintiffs' complaints resulted in meaningful changes to their treatment. What instead appears to have been successful is the Plaintiffs filing suit. Plaintiffs' Opp. Facts ¶ 18, 31, 37, 46, 52, 58, 65, 76, 124, 139. After that, as the Government itself asserts, many of the Plaintiffs' TSDB-related travel problems went away. Government's Facts ¶¶ 38, 41, 45, 49, 53, 56, 61, 70, 99, 105.[2]

---

[2] Nor is this cause and effect unique to the plaintiffs in this case. In *Tarhuni v. Sessions*, No. 3:13-CV-00001-BR, 2018 WL 3614192, at *4 (D. Or. July 27, 2018), the plaintiff filed suit and issued interrogatories requesting the reasons for his placement on the No Fly List. *Id.* at *4. In response, the Government took Tarhuri off the list, "based on the totality of available information, including your submissions to DHS TRIP." *Id.* This was true even though the Government had, prior to Tarhuni filing suit, responded to his DHS TRIP submission by declaring it had "conducted a review of any applicable records in consultation with other federal agencies, as appropriate" and it "has been determined that no changes or conditions are warranted at this time." *Id.* at *3.

As explained in prior briefings, the DHS TRIP is inadequate as applied to non-No Fly List plaintiffs because they are not told, even after filing, that they are on the TSDB watchlist, and because they are also not told the factual basis for their inclusion. *See* Plaintiffs' MSJ at 56-57 and Plaintiffs' Facts ¶ 124; *see also Latif v. Holder,* 28 F. Supp. 3d 1134, 1154-61 (D. Or. 2014) (explaining why DHS TRIP process fails constitutional muster as applied to No Fly List annotation). However, the DHS TRIP process does not save the TSDB's constitutionality for at least five additional reasons:

**First**, the standard for inclusion is itself a violation of due process, and simply providing additional process related to that standard will not cure the violation. *See* above at Section 1.

**Second**, the error rate for inclusion in the TSDB takes Plaintiffs' situations out of the range of cases for which a pre-deprivation hearing can be dispensed with. Although the Court in *Mohamed v. Holder*, Civil Action No. 1:11-cv-50, 2015 U.S. Dist. LEXIS 92997, at *23 (E.D. Va. July 16, 2015), determined pre-deprivation notice was inappropriate for the No Fly List and was not ready to decide whether requiring a pre-deprivation *ex parte* hearing was appropriate, a different result is warranted here. This is because general TSDB placement, including the Selectee List annotation, entails far more amorphous criteria increases the risk of error over the No Fly List. The Government's interest in general TSDB placement is also weaker, because the very fact that the individual is *not* on the No Fly List establishes that the Government does not have any reason to believe the individual poses an imminent security threat.

**Third**, an individual cannot invoke the DHS TRIP process until he has suffered a travel-related harm. Plaintiffs' Facts ¶ 125. But as described throughout Plaintiffs' briefing, TSDB Listee status imposes a wide range of deprivations, including employment, credentialing, immigration, gun ownership, associational, and electronic property-based harms. Plaintiffs' Facts ¶¶ 90-96, 97-106-121; *see generally* Section I(B), above. None of those deprivations are even arguably addressed by DHS TRIP.

**Fourth**, the DHS TRIP process does not give individuals a meaningful hearing in front of a neutral arbiter. While TSDB Listees with a No Fly List annotation which is not removed by the TSC

might receive a summary of facts regarding their placement and *ex parte* review of their status by the TSA Administrator, no such process exists for anyone else on the TSDB. Plaintiffs' Facts ¶ 123. Relatedly, the TSA Administrator has not even processed a single No Fly List determination arising out of DHS Trip since six months after *Latif* was instituted. Plaintiffs' Facts ¶ 135.

**Fifth**, the DHS TRIP process does not require the Government to consider exculpatory information in its possession.

Again, exactly what is necessary to remedy the violation of constitutional rights inherent in the TSDB watchlist as currently constructed should be determined in subsequent briefing. For purposes of summary judgment, it is enough to declare that the current incarnation of the TSDB system violates due process, and the current DHS TRIP redress system does not save it from being unconstitutional.

### C.   The Government's Interest in Stopping Terrorism Cannot Justify Actions that Are not Reasonably Calculated to Meet that Interest

The Government finally argues that it should be given unwavering deference to infringe Plaintiffs' rights because of its important interest in stopping terrorism. Plaintiffs do not dispute that stopping terrorism is an important Government interest. Plaintiffs hotly dispute, however, that the watchlist, the Government's processes for nominating and removing individuals from the watchlist, the Government's policies for imposing adverse consequences on TSDB Listees, and the utter lack of redress including notice or hearings regarding TSDB status are not reasonably calculated to meet any anti-terrorism goal. The Government does not dispute that it cannot point to any evidence that the watchlist has stopped a terrorist attack or was otherwise effective at combating terrorism. Plaintiffs' Facts at ¶¶ 139-141. As the FBI admits, it has never "publicly identified a perpetrator of a U.S. act of terrorism as having been listed on the TSDB at the time of the act."  MSJ Ex. 28, FBI Dep. at 177:10-14.  And as noted, Plaintiffs have long contended (although as of yet they have not been permitted to access the necessary statistical information to demonstrate) that placement on the TSDB operates no better than random selection in identifying perpetrators of terrorism or preventing acts of terrorism. *See* Plaintiffs' Opp. Facts ¶ 3.

Any interest the Government would have in using a watchlist to negatively impact potential

terrorists is undermined by the high risk of erroneous deprivations. *Humphries v. Cty. of Los Angeles*, 554 F.3d 1170, 1194 (9th Cir. 2009), *as amended* (Jan. 30, 2009), *rev'd in part on other grounds*, 562 U.S. 29 (2010) (although government may have a compelling interest in general, it cannot have a compelling interest in a process for furthering that goal when the process constitutes a high risk of error).

## CONCLUSION

For the reasons in Plaintiffs' Motion for Summary Judgment (Dkt. 304), Opposition to the Government's Motion for Summary Judgment (Dkt. 313), and this Reply, the Court should grant Plaintiffs' Motion for Summary Judgment, deny the Government's Motion for Summary Judgment, declare the current incarnation of the TSDB system unconstitutional, and schedule briefing on the appropriate remedy.

Dated:  April 1, 2019

Respectfully submitted,

**CAIR LEGAL DEFENSE FUND**

*/s/ Gadeir I. Abbas*
Lena F. Masri (D.C # 1000019) ±
    lmasri@cair.com
Gadeir I. Abbas (VA # 81161) *
    gabbas@cair.com
Carolyn M. Homer (D.C. # 1049145) ±
    chomer@cair.com
    453 New Jersey Ave., SE
    Washington, DC 20003
    Phone: (202) 742-6420
    Fax:    (202) 488-0833

± Admitted *pro hac vice*

* *Licensed in VA, not in D.C.*
*Practice limited to federal matters*

**AKEEL AND VALENTINE, PLC**
SHEREEF H. AKEEL (MI # P54345) ±
888 W. Big Beaver Rd., Ste. 910
Troy, MI 48084
Phone: (248) 269-9595
shereef@akeelvalentine.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 1, 2019, I filed the foregoing document via the Court's CM/ECF system.  I further certify that counsel for Defendants will automatically receive service of this filing via electronic mail.

/s/ *Gadeir I. Abbas*
Gadeir I. Abbas