IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| ANAS ELHADY, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| CHARLES H. KABLE, *et al.*, | ) | Civil Action No. 1:16-cv-375 (AJT/JFA) |
| *Director of the Terrorist Screening Center,* | ) | |
| *in his official capacity* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs are twenty-three United States citizens[1] who claim that because of their inclusion in the federal government's Terrorist Screening Database ("TSDB"), referred to colloquially as "the Watchlist," they have suffered a range of adverse consequences without a constitutionally adequate remedy.[2]

In *Mohamed v. Holder*, 2015 WL 4394958 (E.D. Va. July 16, 2015), the Court concluded that the Department of Homeland Security Traveler Redress Inquiry Program ("DHS TRIP"), as that process existed at the time, did not provide a constitutionally adequate remedy for a United States citizen who had been listed on the No Fly List, which is a subset of persons included in the TSDB who are prohibited from boarding a commercial aircraft that traverses U.S. airspace, and

---

[1] These Plaintiffs are: (1) Anas Elhady; (2) Baby Doe 2, by his next friend, Father Doe 2; (3) Yaseen Kadura; (4) Osama Hussein Ahmed; (5) Ahmed Ibrahim Al Halabi; (6) Michael Edmund Coleman; (7) Wael Hakmeh; (8) Hassan Shibley; (9) Ausama Elhuzayel; (10) Donald Thomas; (11) Murat Frljuckic; (12) Ibrahim Awad; (13) Mark Amri; (14) Adnan Khalil Shaout; (15) Saleem Ali; (16) Shahir Anwar; (17) Samir Answar; (18) Muhammad Yahya Khan; (19) Hassan Fares; (20) Zuhair El-Shwehdi; (21) John Doe 2; (22) John Doe 3; and (23) John Doe 4.
[2] Plaintiffs bring their claims against the following Defendants in their official capacities based on their involvement in the administration of the TSDB: (1) the Director, Principal Deputy Director, and Deputy Director for Operations of the Terrorist Screening Center; (2) the Director of the Department of Homeland Security Traveler Redress Inquiry Program; (3) the Director of the National Counterterrorism Center; (4) the Administrator of the Transportation Security Administration; (5) the Director of the Federal Bureau of Investigation; and (6) the Acting Commissioner of United States Customs and Border Protection.

outlined what it considered to be the relevant considerations in assessing whether the subsequently revised DHS TRIP, which the Court concluded was not constitutionally deficient on its face, provided that constitutionally adequate remedy in its application to any particular case. *See id.* at *8-9, 12-13.

An individual's listing in the TSDB, without more, does not prevent them from boarding flights, but that listing is disseminated to and used by federal, state, and foreign government agencies and officials to support various diplomatic and security functions and does trigger a variety of other consequences, including restrictions on an individual's ability to travel. In this action, the Court now considers whether DHS TRIP, as it currently applies to a listing in the TSDB, provides to these United States citizen Plaintiffs a constitutionally adequate opportunity to challenge their presumed inclusion in the TSDB. As the Court acknowledged in *Mohamed*, this constitutional inquiry presents unsettled issues whose resolution is complicated by the criteria used to compile the TSDB, and "the classified information that, of necessity, is used to determine whether a person satisfies that criteria." *Id.* at *1.

Presently pending are the parties' cross-motions for summary judgment [Doc. Nos. 298 and 303] as to Plaintiffs' remaining claims: Count I of the Amended Complaint [Doc. No. 22], a Fifth Amendment procedural due process claim; and Count III, an Administrative Procedure Act ("APA") claim.[3] Underlying both of these claims is Plaintiffs' contention that they were denied a meaningful opportunity to challenge their presumed placement on the TSDB. Specifically, Plaintiffs claim that they were not provided notice of their placement on the Watchlist, or a meaningful opportunity to refute any derogatory information that was used to place them on the

---

[3] The Court previously dismissed Plaintiffs' claims based on substantive due process (Count II), the Equal Protection Clause (Count IV), and the non-delegation doctrine (Count V). *Elhady v. Piehota*, 303 F. Supp. 3d 453, 468 (E.D. Va. 2017).

Watchlist, and that as a result of these constitutional violations, they have been denied their liberty interests in (1) international travel, (2) interstate travel; and (3) being free from false governmental stigmatization as a terrorist. *See generally*, [Doc. No. 304]. Defendants contend that Plaintiffs cannot establish with sufficient certainty an impending future injury sufficient to support standing. They further contend that even if Plaintiffs can establish standing, their claimed injuries resulting from placement on the TSDB do not constitute a deprivation of a liberty interest protected by the Due Process Clause, and that in any event, DHS TRIP, the review process by which an individual may request a review of their presumed placement on the TSDB, is constitutionally adequate to protect any limited liberty interests Plaintiffs may have, particularly given the Government's interest in combatting terrorism. *See generally,* [Doc. No. 299].

For the reasons stated herein, Plaintiff's Motion for Summary Judgment is GRANTED and Defendants' Motion for Summary Judgment is DENIED. Briefly summarized, the Court concludes that (1) Plaintiffs have established that they have standing to raise their constitutional challenges; (2) Plaintiffs have constitutionally protected liberty interests that are implicated by their inclusion in the TSDB; and (3) the DHS TRIP process through which Plaintiffs may challenge their inclusion in the TSDB is not constitutionally adequate to protect those liberty interests.

## I. Background

Unless otherwise noted, the following facts are undisputed:

## A. The TSDB

The Terrorism Screening Center ("TSC") is an interagency operation within the Federal Bureau of Investigation ("FBI") that also involves the Department of Homeland Security

("DHS"), the National Counterterrorism Center ("NCTC"), the Transportation Security Administration ("TSA"), and United States Customs and Border Protection ("CBP"). *See* Pls.' Statement of Material Facts ¶¶ 1-2, 4; *see also* Defs.' Statement of Material Facts ¶¶ 3-7. The TSDB is a centralized collection of information about listed individuals, including biographic and biometric data, that is compiled and maintained by the TSC. The information contained in the TSDB, which is unclassified, is "updated continuously and disseminated around the country and world in real-time." Pls.' Statement of Material Facts ¶¶ 5, 7; Defs.' Statement of Material Facts ¶ 12. As of June 2017, approximately 1.2 million individuals, including approximately 4,600 United States citizens or lawful permanent residents, were included in the TSDB. Pls.' Statement of Material Facts ¶ 9; Pls.' MSJ Ex. 74 at ¶ 4.

An individual may be "nominated" to the TSDB by a federal government agency or foreign government. Pls.' Statement of Material Facts ¶ 8; Defs.' Statement of Material Facts ¶ 16. Nominated individuals are added to the TSDB if their nomination is based "upon articulable intelligence or information which, based on the totality of the circumstances and, taken together with rational inferences from those facts, creates a reasonable suspicion that the individual is engaged, has been engaged, or intends to engage, in conduct constituting, in preparation for, in aid or in furtherance of, or related to, terrorism and/or terrorist activities." Pls.' Statement of Material Facts ¶ 15; Defs.' Statement of Material Facts ¶ 13; Pls.' MSJ Ex. 62 at 4.

All nominations to the TSDB are reviewed by the TSC, which, in assessing whether an individual should be placed on the TSDB, must determine whether the United States Government has a "reasonable suspicion that the individual is a known or suspected terrorist." Pls.' Statement of Material Facts ¶ 12; Defs.' Statement of Material Facts ¶ 18; *see also* Pls.' MSJ Ex. 66 at 46-47. A "known terrorist" is defined as "an individual who has been (1) arrested,

charged by information, or indicted for, or convicted of, a crime related to terrorism and/or

terrorist activities by the United States Government or foreign government authorities; or (2)

identified as a terrorist or member of a terrorist organization pursuant to statute, Executive Order

or international legal obligations pursuant to a United Nations Security Council Resolution."

Pls.' Statement of Material Facts ¶ 13. A "suspected terrorist" is "an individual who is

reasonably suspected to be engaging in, has engaged in, or intends to engage in conduct

constituting, in preparation for, in aid of, or related to terrorism and/or terrorist activities." *Id.* ¶

14.

In determining whether to accept, reject, or modify a nomination, the TSC may consider,

but may not solely base its decision on, an individual's race, ethnicity, religious affiliation, or

"beliefs and activities protected by the First Amendment, such as freedom of speech, free

exercise of religion, freedom of the press, freedom of peaceful assembly, and the freedom to

petition the government for redress of stress of grievances." Pls.' Statement of Material Facts ¶¶

17-18; Defs.' Statement of Material Facts ¶ 13; *see also* Pls.' MSJ Ex. 62 at 4. The TSC may

also consider an individual's travel history, associates, business associations, international

associations, financial transactions, and study of Arabic as information supporting a nomination

to the TSDB. Pls.' Statement of Material Facts ¶ 19; *see also* Pls.' MSJ Ex. 40 at ¶ 20; Pls.' MSJ

Ex. 50 at ¶ 9; Pls.' MSJ Ex. 25 at 340:17-341:13, 343:21-344:14. An individual's placement into

the TSDB does not require any evidence that the person engaged in criminal activity, committed

a crime, or will commit a crime in the future; and individuals who have been acquitted of a

terrorism-related crime may still be listed in the TSDB. Pls.' Statement of Material Facts ¶ 20;

*see also* Pls.' MSJ Ex. 25 at 323:6-9; Pls.' MSJ Ex. 28 at 254:5-255:8, 261:9-21, 276:13-18. The

underlying information that supports an individual's inclusion in the TSDB is not included in the database. Pls.' Statement of Material Facts ¶ 7.

The TSC shares the TSDB with various "partners," including federal, state, and foreign government agencies and officials, who then use that information to support their screening, vetting, credentialing, diplomatic, military, intelligence, law enforcement, visa, immigration, and other security functions. Pls.' Statement of Material Facts ¶ 21; Pls.' MSJ Ex. 62 at 1-2, 5-6. These partners include CBP, which screens all individual travelers against the TSDB when they seek to enter the United States, *id.* ¶ 25; the Coast Guard, which, along with CBP, uses the TSDB to screen passenger and crew manifests for ships traveling through U.S. waters and seaports, *id.* ¶ 26; TSA, which screens air travelers against the TSDB and designates anyone on the list as "high-risk status," subjecting them to additional pre-boarding security screening,[4] *id.* ¶¶ 54, 59-63; the State Department, which uses the TSDB to screen individuals for visa waiver, visa, and passport eligibility, *id.* ¶ 90; United States Citizenship and Immigration Services ("USCIS"), which checks the TSDB status of individuals who apply for or may benefit from immigration, asylum, and naturalization benefits, *id.* ¶ 94; DHS, which, in conjunction with other agencies, uses the TSDB to screen TSC, TSA, and CBP employees and contractors,[5] private sector employees with transportation and infrastructure functions,[6] individuals with any form of airport

---

[4] This advanced pre-boarding security screening typically includes screening of the person using Advanced Imaging Technology (a walk-through metal detector) and a pat-down, and screening of accessible property through a scanner, an explosives trace detection search, and physical search of the interior of the passenger's accessible property, electronics, and footwear. Defs.' Statement of Material Facts ¶ 8; Defs.' MSJ Ex. 1 ¶ 39. Travelers may also be subject to this additional screening for a variety of reasons other than their inclusion in the TSDB. Defs.' Statement of Material Facts ¶ 8.

[5] Some TSC and TSA contractors, including IBM, InfoZen, Stopso, and Sotera, are given TSDB access for this purpose. Pls.' Statement of Material Facts ¶ 98.

[6] This includes private sector employees in the airlines, airports, general aviation, port authorities, nuclear facilities, chemical facilities, and hazardous material transportation industries, as well as employees of private entities receiving Overseas Private Investment Corporation ("OPIC") loans and U.S. Agency for International Development ("U.S. AID") benefits and grants. Pls.' Statement of Material Facts ¶ 105. These private entities are required to block TSDB listees from accessing sensitive information or physical areas, potentially rendering TSDB listees ineligible for certain job responsibilities. *Id.* ¶ 106.

identification, and those applying for or maintaining Transportation Worker Identification

Credentials, Federal Aviation Administration airman certificates, and hazardous material

transportation licenses, *id.* ¶¶ 97-103, 105; and the Department of Defense ("DOD"), which uses

the TSDB to screen individuals accessing military bases, *id.* ¶ 119.

    The FBI, which administers the TSC, also uses the TSDB to conduct and facilitate law

enforcement screening and investigations, and, for that purpose, shares TSDB information with

more than 18,000 state, local, county, city, university and college, tribal, and federal law

enforcement agencies and approximately 533 private entities[7] through its National Crime

Information Center ("NCIC") system, which these law enforcement agencies and private entities

then use to screen individuals they encounter in traffic stops, field interviews, house visits, and

municipal permit processes. *Id.* ¶¶ 107-110. The FBI also uses the TSDB to screen its own

applicants and employees, and to conduct background checks on individuals seeking to purchase

firearms or obtain firearm licenses. *Id.* ¶¶ 117-118. TSDB data is also shared with more than

sixty foreign governments with which the TSC has entered into foreign partner arrangements,

which, subject to their domestic laws and the restrictions in the agreements, use the information

for terrorist screening purposes. *Id.* ¶ 121; Defs.' Statement of Material Facts ¶ 32.

    Individuals who are included in the TSDB, or who are misidentified as or near matches to

TSDB listees, may experience "delay, inconvenience, or other difficulties at a point of screening

where TSDB data is used to screen for terrorists," including being denied boarding on

international flights, being subject to secondary inspection, having their electronic devices and

those of their travel companions subject to an advanced search, and, if they are a foreign

---

[7] These private entities include the police and security forces of private railroads, colleges, universities, hospitals, and prisons, as well as animal welfare organizations; information technology, fingerprint databases, and forensic analysis providers; and private probation and pretrial services. Pls.' Statement of Material Facts ¶ 109.

national, being denied admission to the United States. Pls.' Statement of Material Facts ¶¶ 24, 28-29, 32-33, 138. Individuals who experience travel-related difficulties that they attribute to their wrongful inclusion in the TSDB may seek redress by submitting a Traveler Inquiry Form to DHS TRIP. Defs.' Statement of Material Facts ¶¶ 15, 23. This submission triggers a review by DHS TRIP of the information submitted by the traveler, which, in 98% of cases, results in a determination that the claimed travel difficulties had no connection to an individual's inclusion in the TSDB. *Id.* ¶ 24; Pls.' Statement of Material Facts ¶ 129. In cases where the individual is a match to an identity in the TSDB, DHS TRIP refers the matter to the TSC Redress Office, which then conducts a review of the underlying information supporting the individual's inclusion in the TSDB, including by consulting with the nominating agency or foreign government, to determine whether they should be removed.[8] Pls.' Statement of Material Facts ¶ 131; Defs.' Statement of Material Facts ¶ 26. After this inquiry is concluded, DHS TRIP sends the traveler a determination letter with the results of their redress inquiry, but does not disclose whether the traveler was, or is, included in the TSDB.[9] Defs.' Statement of Material Facts ¶ 27.

---

[8] The TSC Redress Office does not accept or respond to direct inquiries from individuals but does accept inquiries received from Congress through the FBI Office of Congressional Affairs as to the "adverse screening experience of a constituent." Pls.' Statement of Material Facts ¶¶ 129-130.

[9] This process differs from the separate redress process that has been put in place for U.S. persons who are on the No Fly List, a subset of the TSDB. A DHS TRIP complaint filed by a U.S. person on the No Fly List triggers a requirement that DHS TRIP, after referral to and consultation with TSC, must inform the individual if they are currently on the No Fly List, following which the individual may request additional information, including TSC's unclassified summary of the information supporting their inclusion on the No Fly List, and submit additional information they consider potentially relevant to their No Fly List designation. Pls.' Statement of Material Facts ¶ 133. Upon receipt of this information, TSC and the TSA Administrator make a final written determination as to whether the individual should remain on the No Fly List, and if an individual remains on the List, a final order is issued which is subject to judicial review. *Id.* ¶ 134. This process for those on the No Fly List was put in place pursuant to a court order in *Latif v. Holder*, 28 F. Supp. 3d 1134, 1161-62 (D. Or. 2014) requiring the Government to "fashion new procedures that provide Plaintiffs with the requisite due process . . . without jeopardizing national security."

**B. The Individual Plaintiffs**

The Plaintiffs are twenty-three U.S. citizens, none of whom have been formally notified by the Government that they are included in the TSDB.[10] Though some of the Plaintiffs were previously denied boarding on flights, none of them believe they are currently on the No Fly List. *Id.* ¶ 38. Rather, Plaintiffs are routinely subjected to additional screening when they fly on a commercial airplane and when they enter the United States at a land border or port, though the frequency and invasiveness of that secondary screening varies; and they contend that their inclusion in the TSDB can be inferred from a range of adverse consequences they have suffered, including, but not limited to, adverse land border crossing experiences, *see* Pls.' Statement of Material Facts ¶¶ 35-47, adverse experiences with electronic searches at the border, *id.* at ¶¶ 48-53, adverse air travel experiences, *id.* at ¶¶ 68-86, and adverse immigration experiences, *id.* at ¶¶ 95-96. For example:

(1) When attempting to return to the United States by car after a brief trip to Canada in April 2015, Plaintiff Anas Elhady ("Elhady") was surrounded by CBP officers, handcuffed, and then escorted to a room where he was held for more than ten hours and repeatedly interrogated about his family members and other associates. *Id.* ¶ 35; *see* Pls.' MSJ Ex. 1 at 181-92. During this time, Elhady required emergency medical attention and was transported to a hospital, where he was administered Basic Life Support. Pls.' Statement of Material Facts ¶ 36. Elhady was transported to and from the hospital in handcuffs. *Id.* On at least two prior occasions, Elhady was detained for approximately seven to eight hours when attempting to cross the border into the United States, and was handcuffed, stripped him of his belongings, kept in a cell, and prohibited

---

[10] It is not the Government's practice to inform an individual of their inclusion in the TSDB either in the first instance or in connection with the resolution of a DHS TRIP complaint. *See* Pls.' Statement of Material Facts ¶¶ 122-24; Defs.' Statement of Material Facts ¶ 27.

from contacting his attorney. *Id.* ¶ 37. Elhady has also had his phone confiscated multiple times at the U.S. border, been pressured to reveal its password to border agents, been questioned about its contents, and been told by an FBI agent that his cell phone conversations were being monitored. *Id.* ¶ 49. When Elhady attempted border-crossings, CBP officers told him, "Are you serious? Someone like you should have stopped crossing the border by now." *Id.*; Pls.' MSJ Ex. 1 at 152. As a result of these experiences, Elhady stopped crossing the border altogether and stopped flying for more than a year. *Id.* ¶ 35; Pls.' MSJ Ex. 1 at 186-92, 194. Elhady submitted a DHS TRIP inquiry on January 27, 2015, and DHS TRIP issued a final determination letter in response to that inquiry on May 11, 2015. Defs.' Statement of Material Facts ¶ 74; Defs.' MSJ Ex. 4 ¶ 36.

(2) Like Elhady, Plaintiffs Kadura, al Halabi, Shibley, Frljuckic, and John Doe 3, among others, have been forcibly arrested (often at gunpoint) and detained for long hours in front of their family. Pls.' Statement of Material Facts ¶¶ 37-47 (also noting similar experiences by El-Shwehdi, Coleman, Jhan, and Samir and Shair Anwar).

(3) In addition to Elhady, Plaintiffs Shaout, El-Shwehdi, John Doe 2, Samir Anwar, Ali, and Baby Doe have had their electronics and those of family members searched, seized, and copied. *Id.* ¶¶ 48-53.

(4) Some Plaintiffs, including Shibley, Amri, Hakmeh, Shaout, El-Schwehdi, Fares, Coleman, Thomas, Khan, Shahir Anwar, Baby Doe, and Kadura, have regularly and repeatedly had their travel disrupted by long and invasive secondary inspections, causing them to, on some occasions, miss connecting flights, and sometimes to avoid travel altogether. *Id.* ¶¶ 68-84. And on a few occasions, some Plaintiffs, including Ahmed, John Doe 4, Elhyuzayel, Thomas, Amri, and Kadura, have been denied the ability to even board flights. *Id.* ¶¶ 85-86.

Based on their experiences, most of the Plaintiffs have submitted an inquiry with DHS

TRIP as to their Watchlist status.[11] Some of these Plaintiffs have received in response letters

informing them that there is no reason they should not be able to fly, but containing no

information concerning whether they remain listed within the TSDB. *See* Pls.' MSJ Exs. 3A, 9C.

Others have received acknowledgement letters neither confirming nor denying their status on the

Watch List. *See* Pls.' MSJ Exs. 1B, 5B, 8B, 11A, 14B, 16A, 17B, 18B.

**C. Procedural History**

Plaintiffs brought this action on April 5, 2016 [Doc. No. 1] and filed an Amended

Complaint [Doc. No. 22] on September 23, 2016, in which they allege that their presumed

inclusion in the TSDB violates (1) procedural due process (Count I); (2) substantive due process

(Count II); (3) the APA (Count III); (4) the Equal Protection Clause (Count IV); and (5) the non-

delegation doctrine (Count V). Plaintiffs seek a declaratory judgment that Defendants'

challenged policies violate their constitutional rights and an injunction requiring the Defendants

to remedy the alleged constitutional violations, including by providing "individuals designated

on the [TSDB] with a legal mechanism that affords them notice of the reasons and bases for their

placement on the [Watchlist] and a meaningful opportunity to contest their continued inclusion."

[Doc. No. 22 at 91-92].

Defendants moved to dismiss the Amended Complaint on November 4, 2016 on the

grounds that Plaintiffs' claims were not justiciable, and to the extent they were, Plaintiffs had

failed to plead sufficient facts to make any of their claims plausible. [Doc. No. 28] (the "Motion

to Dismiss"). By Memorandum Order dated September 5, 2017 [Doc. No. 47], the Court first

concluded that Plaintiffs' claims were justiciable, as Plaintiffs had adequately alleged a

---

[11] The only Plaintiffs who have not sought redress through DHS TRIP are Awad, Baby Doe 2, Doe 3, Fares, and Hakmeh. Pls.' MSJ Ex. 4 ¶ 22.

constitutional injury in fact sufficient for standing as to all of their claims. *Elhady v. Piehota*, 303 F. Supp. 3d 453, 462 (E.D. Va. 2017). The Court then concluded that Plaintiffs had not alleged facts sufficient to make plausible their claims based on substantive due process (Count II), the Equal Protection Clause (Count IV), and the non-delegation doctrine (Count V), but had alleged sufficient facts to allow their procedural due process (Count I) and APA (Count III) claims to proceed. *Id.* at 468.

Following an extensive period of discovery, during which the Court considered a variety of issues as to what information pertaining to the TSDB was protected by the law enforcement or state secrets privileges and was thus not required to be disclosed in discovery, *see e.g.*, [Doc. Nos. 258, 294], the parties filed the pending cross-motions for summary judgment as to the remaining procedural due process and APA claims on March 11, 2019. [Doc. Nos. 298 and 303]. The Court held a hearing on the Motions on April 4, 2019, at the conclusion of which it took the Motions under advisement.

## II. Legal Standard

Summary judgment is appropriate only if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *Evans v. Techs. Apps. & Serv. Co.*, 80 F.3d 954, 958–59 (4th Cir.1996). "When cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56. . . ." *Desmond v. PNGI Charles Town Gaming, LLC*, 630 F.3d 351, 354 (4th Cir. 2011).

With regard to each motion, the party seeking summary judgment has the initial burden to show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317,

325 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 (1986). To defeat a properly supported motion for summary judgment, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 247–48. Whether a fact is considered "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248. On a motion for summary judgment, the facts shall be viewed, and all reasonable inferences drawn, in the light most favorable to the non-moving party. *Zenith,* 475 U.S. at 255; *see also Lettieri v. Equant Inc.,* 478 F.3d 640, 642 (4th Cir. 2007).

### III. Analysis

As this Court has previously held, Plaintiffs' Administrative Procedure Act ("APA") claim asserted in Count III "essentially conflate[s]" with Count I's procedural due process claim, *Elhady,* 303 F. Supp. 3d at 467, and the same analysis therefore governs as to both claims. Defendants argue that (1) Plaintiffs' claims are not justiciable; (2) Plaintiffs' injuries attributable to their placement on the TSDB do not constitute a deprivation of a liberty interest protected by the Due Process Clause; and (3) DHS TRIP provides constitutionally adequate protection of any limited liberty interests Plaintiffs may have, particularly given the Government's interest in combatting terrorism.

## A. Justiciability

As a threshold matter, Defendants argue that Plaintiffs' claims should be dismissed pursuant to Fed. R. Civ. P. 12(b) because they lack standing to bring their claims, notwithstanding the Court's earlier rulings at the motion to dismiss stage that Plaintiffs' due process and APA claims were justiciable, and that they had the requisite standing to pursue them. Defendants argue that based on the record before the Court at this stage, Plaintiffs cannot satisfy the injury in fact requirement for standing because they have failed to establish with sufficient certainty any impending future injury. *See* [Doc. No. 299 at 38]. Separately, Defendants argue that the claims of the individual Plaintiffs who have failed to exhaust their administrative remedies by completing the DHS TRIP process should be dismissed as unripe. *Id.* at 40-41.

As a general proposition, in order for a plaintiff to have standing, (1) they must have "suffered an injury in fact . . . which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) "there must be a causal connection between the injury and the conduct complained of"; and (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal citations and quotation marks omitted). As the party invoking jurisdiction, the plaintiff bears the burden of establishing these elements. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). While the plaintiff "must demonstrate standing for each claim . . . and for each form of relief that is sought," *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (internal quotation marks and citation omitted), they are not required to demonstrate standing for each individual plaintiff, and a claim is justiciable if even a single plaintiff has standing to raise it, *Bostic v. Schaefer*, 760 F.3d 352, 370-71 (4th Cir. 2014).

At issue here is the first element of the standing inquiry, the existence of an "injury in fact." Where, as here, a plaintiff seeks relief in the form of a forward-looking injunction, satisfying the injury in fact element requires them to demonstrate that they are "immediately in danger of sustaining some direct injury as the result of the challenged official conduct and the injury or threat of injury [is] both real and immediate, not conjectural or hypothetical." *Lebron v. Rumsfeld*, 670 F.3d 540, 560 (4th Cir. 2012) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)). "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief." *Id.* (internal quotation marks and citation omitted). What a plaintiff seeking forward-looking injunctive relief must demonstrate is the existence of a future "threatened injury [that is] certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013) (internal quotation marks and citation omitted).

In *Mohamed v. Holder*, 995 F. Supp. 2d 520, 535 (E.D. Va. 2014), the Court concluded that the plaintiff's inclusion in the No Fly List was sufficient to establish a future threatened injury that was "actual, concrete and particularized, and traceable to the defendants." Here, while none of the Plaintiffs claims to currently be on the No Fly List, they have all either been informed of their inclusion in the broader TSDB or reasonably inferred it as a result of various experiences.[12] While the consequences of an individual's inclusion in the TSDB are less straightforward and sometimes less transparent than the consequences of their inclusion in the

---

[12] Plaintiff Ahmed was actually informed that he was on the No Fly List, though he is not on it at this time. *See* Pls.' MSJ Ex. 4 at 27. Kadura was told by a DHS agent that, in exchange for becoming an informant, the agent would "fix [his] travel issues," which he reasonably took to mean that he was on the Watchlist. Pls.' Statement of Material Facts ¶ 48. Fares was informed by TSA agents that he "had been given this designation," which meant he "needed to be subjected to additional questioning and screening." Pls.' MSJ Ex. 19 at 99. Frljukic was told by CBP agents that the nature of his border-crossing experiences was pre-determined, from which he reasonably inferred that he had disfavored Watchlist status. Pls.' MSJ Ex. 11 at 82-84. Shibly was told that his repeated questioning regarding his Islamic faith was because "we have to protect against terrorism." Pls.' Statement of Material Facts ¶ 87. The Government does not disclose an individual's inclusion in the TSDB, and it is only through statements like these and the Plaintiffs' actual air travel and border crossing experiences that they could become aware of their Watchlist status.

No Fly List, Defendants concede that there is uncontradicted testimony that at least five of the Plaintiffs in this action – Amri, John Doe 3, Elhuzayel, El-Shwehdi, and Frljuckic – are regularly subjected to enhanced screening that they attribute to their inclusion in the TSDB. [Doc. No. 299 at 39, 45].

Plaintiffs have adequately established with sufficient certainty impending future injury that is "actual, concrete and particularized, and traceable to the defendants," who administer the TSDB and use it in determining whether an individual is detained for additional screening. In that regard, because of the enhanced screening and other travel-related difficulties they have encountered, multiple Plaintiffs have refrained from exercising their movement-based rights, including their right to international travel. *See* Pls.' Statement of Material Facts ¶¶ 36 (Elhady), 44 (Frljuckic), 45 (John Doe 3), 46, 77 (El-Shwehdi), 47 (Coleman, Khan, and Anwar), 83 (Kadura), 84 (Baby Doe 2). As the Court recognized in *Mohamed v. Holder*, 266 F. Supp. 3d 868, 875 (E.D. Va. 2017), these Plaintiffs' "decision not to engage in international travel because of the difficulties [they] reasonably expect to encounter upon return to the United States is sufficient to demonstrate standing."

Defendants argue that the claims of Plaintiffs Awad, Baby Doe 2, Doe 3, Fares, and Hakmeh should be dismissed as unripe for adjudication because they have failed to exhaust their administrative remedies by completing the DHS TRIP process. [Doc. No. 299 at 40-41]. The "basic rationale" of the ripeness doctrine is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Ostergren v. Cuccinelli*, 615 F.3d 263, 288 (4th Cir. 2010) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967)). The court assesses ripeness by "balanc[ing] the fitness of the issues for judicial decision with the hardship to the parties of withholding court consideration." *Id.* (quoting *Miller*

*v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006)). A case is not ripe when "problems such as the inadequacy of the record . . . or ambiguity in the record . . . will make [the] case unfit for adjudication on the merits." *Ostergren*, 615 F.3d at 288; *Reg'l Mgmt. Corp. v. Legal Servs. Corp.*, 186 F.3d 457, 465 (4th Cir. 1999).

In *Mohamed*, 995 F. Supp. at 535, the Court concluded that the plaintiff's challenge to his inclusion in the No Fly List was ripe despite his failure to exhaust DHS TRIP's administrative requirements because "there is nothing 'hypothetical' about [Plaintiff's] claims, which attack the constitutionality of the No Fly List." The Court further observed that "[t]he DHS TRIP process is already established, and [Plaintiff's] participation in the process would not provide the Court with more information about how the process works than the Court already possesses or could be presented at trial." *Id.* at 535-36. For substantially the same reasons, the claims brought by the Plaintiffs who have not exhausted their DHS TRIP remedies in this action are nevertheless ripe for adjudication. Plaintiffs' claims are therefore justiciable.

**B.  The Procedural Due Process Claim**

Whenever a person is deprived of "liberty or property interests within the meaning of the Due Process Clause," procedural due process mandates "constraints on governmental decisions." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). The strength and scope of those constraints vary "as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). Nevertheless, there are "basic requirements" that procedural due process, in each instance, demands, including notice and a meaningful opportunity to be heard. *D.B. v. Cardall*, 826 F.3d 721, 743 (4th Cir. 2016). In *Mathews*, 424 U.S. at 335, the Supreme Court outlined the applicable analysis for procedural due process claims as follows:

> [I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action;

second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*See also Hamdi v. Rumsfeld,* 542 U.S. 507, 529 (2004) ("The *Mathews* calculus [] contemplates a judicious balancing of these concerns, through an analysis of the risk of an erroneous deprivation of the private interest if the process were reduced and the probable value, if any, of additional or substitute procedural safeguards.") (internal citations omitted).

For the purposes of the *Mathews* constitutional analysis, the Court concludes based on undisputed facts that Plaintiffs' liberty interests implicated by their inclusion in the TSDB, though weaker than those implicated by placement on the No Fly List, are nevertheless strong; and the Government's interest in securing the United States borders and aviation system from terrorist threats is compelling. The Court also concludes that the administrative process used to place a person on the TSDB has an inherent, substantial risk of erroneous deprivation; and that additional procedures, similar to those made available to individuals on the No Fly List following *Latif v. Holder,* 28 F. Supp. 3d 1134 (D. Or. 2014), would reduce the risk of erroneous inclusion in the TSDB and all the resulting consequences.

### 1. Plaintiff's Movement-Related Interests

Central to the *Mathews* analysis is the parties' characterization of the nature of the movement-related liberty interests at stake. Plaintiffs characterize their movement-related liberty interest as the right to international travel, which this Court recognized as a protected liberty interest in *Mohamed v. Holder*, 2015 WL 4394958 at *6. Plaintiffs assert that their inclusion in the TSDB has had the practical effect of preventing them from exercising their right to travel internationally, in some instances by denying them boarding on international flights, and in

others by imposing consequences so severe that Plaintiffs have stopped exercising the right. [Doc. No. 304 at 51]. Relying on the Court's prior ruling that government actions that "actually deter" travel can create an unreasonable burden that deprives someone of their liberty interest in travel, Plaintiffs contend that their liberty interest in international travel is sufficient to trigger due process requirements. *See Elhady*, 303 F. Supp. 3d at 463.

Defendants, on the other hand, characterize Plaintiffs' claimed liberty interest as the "right to travel through airports or across borders without screening or delay," which they assert is insufficient to trigger due process requirements. [Doc. No. 299 at 43]. While Defendants concede that "there is some procedurally protected interest in travel and that outright bans on all means of travel would trigger due process requirements," they assert that inclusion in the TSDB does not constitute such an outright ban on all means of travel. *Id.* Instead, Defendants characterize inclusion in the TSDB as merely subjecting Plaintiffs to "[i]nconvenience, inspections, or delay" when they travel, and point to various cases where courts have recognized that a traveler does not have a constitutional right to travel without encountering such burdens. *Id.* at 43, 45-47; *see, e.g., Beydoun v. Sessions*, 871 F.3d 459, 468 (6th Cir. 2017) (added security burdens imposed by placement on the Selectee List did not constitute a constitutional violation because plaintiffs "were not prohibited from flying altogether or from traveling by means other than an airplane"); *Gilmore v. Gonzalez*, 435 F.3d 1125, 1137 (9th Cir. 2006) (plaintiff "does not possess a fundamental right to travel by airplane even though it is the most convenient mode of travel for him"); *Cramer v. Skinner*, 931 F.2d 1020, 1031 (5th Cir. 1991) ("Minor restrictions on travel simply do not amount to the denial of a fundamental right that can be upheld only if the Government has a compelling justification.").

The general right of free movement is a long recognized, fundamental liberty. *See Kent v. Dulles,* 357 U.S. 116, 125 (1958) ("The right to travel is a part of the 'liberty' of which the citizen cannot be deprived without the due process of law under the Fifth Amendment."); *Zemel v. Rusk,* 381 U.S. 1, 15 (1965); *see also Kerry v. Din,* 135 S. Ct. 2128, 2133 (2015) (plurality opinion, Scalia, J.) (referencing Blackstone's recognition that "the "personal liberty of individuals" protected under the Magna Carta "consist[ed] in the power of locomotion, of changing situation, or removing one's person to whatsoever place one's own inclination may direct; without imprisonment or restraint."). Courts have also recognized a protected liberty interest in traveling internationally. *See Kent,* 357 U.S. at 126 ("Travel abroad, like travel within the country, may be necessary for a livelihood. It may be as close to the heart of the individual as the choice of what he eats, or wears, or reads. Freedom of movement is basic to our scheme of values."). As this Court stated in *Mohamed,* "[i]t must be recognized that a meaningful right of travel in today's world cannot be understood as cleanly divided between interstate and international travel or a right without any correlative rights with respect to the usual and available means in a modern society." 2015 WL 4394958 at *6.

While inclusion in the TSDB does not constitute a total ban on international travel in the same way that inclusion on the No Fly List does, the wide-ranging consequences of an individual's Watchlist status render it more closely analogous to the No Fly List than to the types of regulations that courts have found to be reasonable regulations that still facilitated access and use of means of travel. *See, e.g. Gilmore,* 435 F.3d at 1137. This Court previously held that government actions that "actually deter" travel can create such an unreasonable burden that they constitute, in practical terms, a ban. *See Elhady,* 303 F. Supp. 3d at 463. Here, several Plaintiffs refrain from exercising their right of international travel because of the treatment they have been

subjected to due to their Watchlist status when attempting to fly internationally or cross the border into the United States. For example, Plaintiff Elhady, who was handcuffed in public view while attempting to cross the U.S.-Canada border on three separate occasions and once had to be rushed to the hospital and administered emergency Basic Life Support after being detained for hours at the border, now refrains from exercising his right of international travel to avoid similar experiences. *See* Pls.' MSJ Ex. 1 at 150, 156, 165-177, 186-190, 194, 269; Pls.' MSJ Ex. 1A at 4. Other Plaintiffs, including Frljuckic, Pls.' MSJ Ex. 11 at 84, El-Shwehdi, Pls.' MSJ Ex. 20 at 200, 204, 206, Coleman, Pls.' MSJ Ex. 6 at 57, Khan, Pls.' MSJ Ex. 18 at 93, Shahir Anwar, Pls.' MSJ Ex. 16 at 66, Amri, Pls.' MSJ Ex. 16 at 126, and Fares, Pls.' Ex. 19 at 104, have all avoided international travel to varying degrees due to negative experiences with border crossings and air travel that they attribute to their inclusion in the TSDB.

Inclusion in the TSDB also burdens an individual's right to interstate travel, which, as this Court observed in *Mohamed*, 266 F. Supp. 3d at 877, is well established as a fundamental right. The right accords all persons the freedom to travel domestically "uninhibited by statutes, rules, or regulations which unreasonably burden or restrict this movement." *Shapiro v. Thompson*, 394 U.S. 618, 629 (1969). Here, several Plaintiffs have chosen not to exercise their right to travel domestically due to negative experiences while flying domestically that they attribute to their Watchlist status. These Plaintiffs include Khan, who avoids flying domestically and drives instead as a result of experiences that have contributed to "psychological trauma" associated with air travel. Pls.' MSJ Ex. 18 at 74-84, 148-49, 158-66. Plaintiffs El-Shwehdi and Hakmeh have also chosen on various occasions to avoid domestic flights as a result of their domestic air travel experiences. Pls.' MSJ Ex. 20 at 33, 43-44, 67 (El-Shwehdi); Pls.' MSJ Ex. 7 at 68-69 (Hakmeh). Inclusion in the TSDB accordingly imposes a substantial burden on

Plaintiffs' exercise of their rights to international travel and domestic air travel, thus constituting

a deprivation of Plaintiffs' liberty interests that requires some measure of due process.

### 2. Plaintiff's Reputational Interests

Coupled with Plaintiffs' movement-related rights are their reputational interests and

claims of reputational harm resulting from their placement on the TSDB. A person has certain

rights with respect to governmental defamation that alters or extinguishes a right or status

previously recognized by state law, known as a "stigma-plus." *Paul v. Davis,* 424 U.S. 693, 711

(1976). "[A] plaintiff bringing a stigma-plus claim under *Paul* must allege both a stigmatic

statement and a state action that distinctly altered or extinguished his legal status." *Evans v.*

*Chalmers*, 703 F.3d 636, 654 (4th Cir. 2012) (internal quotation marks omitted). The "plus"

factor can be any "other government action adversely affecting the plaintiff's interests." *Doe v.*

*Dep't of Pub. Safety ex rel. Lee*, 271 F.3d 38, 55 (2d Cir. 2001) *rev'd on other grounds*,

*Connecticut Dep't of Pub. Safety v. Doe*, 538 U.S. 1 (2003). The stigmatic statement is any

statement that "might seriously damage [the plaintiff's] standing and associations in his

community." *Bd. of Regents v. Roth*, 408 U.S. 564, 573 (1972). Because the defamatory

statement must affect one's standing in the community, some type of dissemination or

publication of the statement must be shown.

In *Mohamed*, 995 F. Supp. 2d at 529, the Court discussed "the broad range of

consequences that might be visited upon [a person on the No Fly List] if that stigmatizing

designation were known by the general public." The Court concluded that a person's listing on

the No Fly List, in and of itself, does not infringe on any protected liberty interest, but left open

the question of whether the broader dissemination of the No Fly List would satisfy the public

disclosure prong of a stigma-plus claim. *See id.* at 528. Subsequently, in the context of a motion

for summary judgment as to the plaintiff's procedural due process claim in *Mohamed*, the Court

acknowledged that:

> "[A] person's placement on the No Fly List would likely become known over
> time to persons beyond government agencies or the airlines, with accompanying
> adverse consequences visited upon a restricted person. For example, any member
> of the general public who would actually witness a person being excluded from
> boarding might draw an adverse inference concerning that person's reputation.
> More likely to inflict reputational harm are other scenarios not hard to imagine
> where a person's inability to fly would become known to those outside of
> government and have adverse consequences, such as to a person's actual or
> prospective employer who would call upon that person to travel by air, or to
> extended family members whom a person might not be able to visit except
> through air travel, or to members of religious, professional or social organizations
> in which participation might require air travel.

2015 WL 4394958 at *6. Accordingly, the Court concluded that while Mohamed's

constitutionally protected reputational interests implicated by his No Fly List status were "not as

strong as his travel related interests, . . . they underscore[d] the need overall for strong procedural

protections for Mohamed's travel related rights." *Id.*

Here, Plaintiffs' reputational interests implicated by their inclusion in the TSDB are

substantial because of the extent to which TSDB information is disseminated, both in terms of

the numbers of entities who have access to it and the wide range of purposes for which those

entities use the information, including purposes far removed from border security or the

screening of air travelers. For example, TSDB information is used in the screening of

government employees and contractors, for which purpose access to the TSDB is provided to

certain large private contractors to screen certain employees, as well as private sector employees

with transportation and infrastructure functions. Pls.' Statement of Material Facts ¶¶ 97-103,

105-06.

Additionally, and significantly, the FBI shares an individual's TSDB status with over

18,000 state, local, county, city, university and college, tribal, and federal law enforcement

agencies and approximately 533 private entities for law enforcement purposes. *Id.* ¶¶ 107-110.

These private entities include the police and security forces of private railroads, colleges,

universities, hospitals, and prisons, as well as animal welfare organizations; information

technology, fingerprint databases, and forensic analysis providers; and private probation and

pretrial services. *Id.* ¶ 108. The dissemination of an individual's TSDB status to these entities

would reasonably be expected to affect any interaction an individual on the Watchlist has with

law enforcement agencies and private entities that use TSDB information to screen individuals

they encounter in traffic stops, field interviews, house visits, municipal permit processes, firearm

purchases, certain licensing applications, and other scenarios. For example, Plaintiffs might

experience in other interactions with law enforcement agencies or affiliated private entities the

same kinds of encounters they complain about at the border – being surrounded by police,

handcuffed in front of their families, and detained for many hours. In short, placement on the

TSDB triggers an understandable response by law enforcement in even the most routine

encounters with someone on the Watchlist that substantially increases the risk faced by that

individual from the encounter. Based on these reputational harms, the Court concludes, as it did

in *Mohamed*, 2015 WL 4394958 at *6, that while Plaintiffs' constitutionally protected

reputational interests implicated by their TSDB status are not as strong as their travel related

interests, they "underscore the need overall for strong procedural protections for Mohamed's

travel related rights." *Id.*

### 3. Risk of Erroneous Deprivation

The second *Mathews* factor looks to "the risk of an erroneous deprivation of [the liberty]

interest through the procedures used, and the probable value, if any, of additional or substitute

procedural safeguards." 424 U.S. at 335. Here, Plaintiffs argue that the nature of the Defendants'

procedures give rise to a high likelihood of mistaken determinations and erroneous placements on the TSDB and that additional procedures would reduce that risk, without impairing legitimate governmental interests, even where there are national security concerns, reflecting the sentiments expressed in *Mohamed*, 2015 WL 4394958 at \*7, as well as such cases as *Hamdi v. Rumsfeld*, 542 U.S. at 528 (holding unconstitutional the government procedures used to determine whether an American citizen may be detained as an "enemy combatant" since they did not sufficiently provide notice of the facts for that classification and an opportunity to rebut those factual assertions before a neutral decision maker).

*Matthews* establishes that the "nature of the relevant inquiry" is, ultimately, "central to the evaluation of any administrative process" aimed at determining that scheme's risk of erroneous deprivation. 424 U.S. at 343. An administrative inquiry that is "sharply focused and easily documented" will have a lower risk of erroneous deprivation than an inquiry that involves a "wide variety of information" and raises issues of "witness credibility and veracity." *Id.* at 343-44. Determinations that, by their nature, are "fact-specific" present a "grave risk of erroneous deprivation." *Weller v. Dep't of Soc. Servs. for City of Baltimore*, 901 F.2d 387, 395 (4th Cir. 1990).

The nature of Defendants' inquiry, as reflected in the TSDB inclusion standard they adopted, presents such a "grave risk of erroneous deprivation." *Id.* There is no evidence, or contention, that any of these plaintiffs satisfy the definition of a "known terrorist." None have been convicted, charged or indicted for any criminal offense related to terrorism, or otherwise. Rather, Plaintiffs are included in the TSDB because they have been labeled as "suspected terrorists," a determination that this Court has found "to be based to a large extent on subjective judgments." *Mohamed*, 995 F. Supp. 2d at 531. This inclusion standard is satisfied by

demonstrating a reasonable suspicion that an individual is "engaging in, has engaged in, or intends to engage in conduct constituting, in preparation for, in aid of, or related to terrorism and/or terrorist activities." Pls.' Statement of Material Facts ¶ 12. But as this Court observed in *Mohamed*, this inclusion standard makes it easy to imagine "completely innocent conduct serving as the starting point for a string of subjective, speculative inferences that result in a person's inclusion." 995 F. Supp. 2d at 532. This situation is compounded by the fact that, as in *Mohamed*, "the Court has little, if any, ability to articulate what information is viewed by the TSC as sufficiently 'derogatory' beyond the labels it has provided the Court." *Id.* Moreover, under the TSDB's inclusion standard, the TSC may consider a wide range of factors in determining whether an individual belongs on the Watchlist, including an individual's "race, ethnicity, or religious affiliation," beliefs and activities protected by the First Amendment, travel history, personal and professional associations, and financial transactions. Pls.' Statement of Material Facts ¶¶ 18-19. The vagueness of the standard for inclusion in the TSDB, coupled with the lack of any meaningful restraint on what constitutes grounds for placement on the Watchlist, constitutes, in essence, the "absence of any ascertainable standard for inclusion and exclusion," which "is precisely what offends the Due Process Clause." *See Smith v. Goguen*, 415 U.S. 566, 578 (1974).

The Defendants contend that there are sufficient safeguards to protect against the risk of erroneous deprivation since two agencies – the nominating agency and TSC – must review the nomination to ensure that there is sufficient supporting information, and the supporting information requires concrete criteria to be met. They further contend that the risk of erroneous deprivation is low because Plaintiffs may seek redress for their erroneous inclusion in the TSDB through DHS TRIP. But it is undisputed that there is no independent review of a person's

26

placement on the TSDB by a neutral decisionmaker, and when coupled with the limited

disclosures and opportunity to respond by a person who requests that his status be reviewed,

there exists a substantial risk of erroneous deprivation, regardless of the internal procedures used

to determine whether a nomination to the TSDB is accepted.[13]

Nor is DHS TRIP, as it currently exists, a sufficient safeguard because, in the context of

individuals challenging their placement on the TSDB rather than on the No Fly List, it is a black

box – individuals are not told, even after filing, whether or not they were or remain on the TSDB

watchlist and are also not told the factual basis for their inclusion. *See* Pls.' Statement of Material

Facts ¶ 124; *see also Latif*, 28 F. Supp. 3d at 1154-61 (explaining why DHS TRIP process failed

constitutional muster as applied to individuals on the No Fly List, and mandating changes to that

process that have subsequently been made). Accordingly, the Court concludes that the risk of

erroneous deprivation of Plaintiff's travel-related and reputational liberty interests is high, and

the currently existing procedural safeguards are not sufficient to address that risk.

### 4. The Government's Interest

The third prong of the *Mathews* inquiry looks to "the Government's interest, including the

function involved and the fiscal and administrative burdens that [any] additional or substitute

procedural requirement would entail." 424 U.S. at 335. Here, there can be no doubt that there is a

profound, fundamental, and compelling Government interest in preventing terrorist attacks,

including by maintaining and protecting information necessary to prevent such attacks. *See Haig

v. Agee*, 453 U.S. 280, 307 (1981) ("[N]o governmental interest is more compelling than the

security of the Nation."); *Wayte v. United States*, 470 U.S. 598, 612 (1985) ("Unless a society

has the capability and will to defend itself from the aggressions of others, constitutional

---

[13] As the Court previously observed in in *Mohamed*, the Court has been presented with little information as to the internal procedures used to determine whether a nomination to the TSDB is accepted. *See* 995 F. Supp. 2d at 532.

27

protections of any sort have little meaning."); *Mohamed*, 2015 WL 4394958, at *5 ("[T]he government's interest in protecting the safety of commercial aircraft is compelling[.]"). The question, then, is what kind of remedy can be fashioned to adequately protect a citizen's constitutional rights while not unduly compromising public safety or national security.

Here, Plaintiffs seek additional procedural requirements in the form of notice of their placement on the TSDB and the reasons for it, and a meaningful opportunity to challenge their inclusion. In the context of a due process claim, so long as the deprivation of a right at issue is greater than a "de minimis" deprivation, "some form of notice and hearing . . . is required." *Fuentes v. Shevin*, 407 U.S. 67, 90 n.21 (1972); *Cardall*, 826 F.3d at 743 (4th Cir. 2016) (finding that the basic requirements of procedural due process are (1) "notice of the reasons for the deprivation," (2) some information regarding the "evidence against" the person injured, and (3) "an opportunity to present [the deprived person's] side of the story."). "[A]ssessing the adequacy of a particular form of notice requires balancing the interest of the State against the individual interest sought to be protected." *Jones v. Flowers*, 547 U.S. 220, 229 (2006) (internal quotation marks and citation omitted).

Given the effects that pre-deprivation notice of an individual's inclusion in the TSDB would have on the Government's compelling interest in combating terrorism, a balancing of the respective interests does not weigh in favor of pre-deprivation notice. *See GRF v. O'Neill*, 315 F.3d 748, 754 (7th Cir. 2002) ("Risks of error rise when hearings are deferred, but these risks must be balanced against the potential for loss of life if assets should be put to violent use."). Pre-deprivation notice and hearing could alert an individual, and through him or her, others, whom the Government suspects of terrorist activity, and thereby compromise ongoing investigations and endanger those persons involved in those investigations. *See Ibrahim v. DHS*,

28

62 F. Supp. 2d 909, 930 (N.D. Cal. 2014) ("[T]he Executive Branch must be free to maintain its watchlists in secret, just as federal agents must be able to maintain in secret its investigations into organized crime, drug trafficking organizations, prostitution, child-pornography rings, and so forth. To publicize such investigative details would ruin them."). For these reasons, the Court concludes that so long as post-deprivation notice and hearing are sufficiently robust, pre-deprivation notice and hearing are not constitutionally required. *See Gilbert v. Homar*, 520 U.S. 924, 930 (1997) ("[O]n many occasions, [] where a State must act quickly, or where it would be impractical to provide pre-deprivation process, post-deprivation process satisfies the requirements of the Due Process Clause."); *see also Holy Land Found. For Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57 (D.D.C. 2002), *aff'd*, 333 F.3d 156, 163-64 (D.C. Cir. 2003) (holding that pre-deprivation process is not constitutionally required within the context of immediate asset blocking to prevent financial assistance to terrorism); *but cf. Haramain Islamic Found. v. Dep't of Treasury*, 686 F.3d 965 (9th Cir. 2011) (where there are no national security concerns, OFAC must provide a Specially Designated Global Terrorist designee a "timely" statement of reasons for the investigation); *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192 (D.C. Cir. 2001) (absent adequate showing to the court that earlier notification would impinge on security and foreign policy goals, target organizations for Foreign Terrorist Organization designation must receive pre-deprivation notice that they are under consideration for designation, the unclassified portions of the administrative record relied on in making the determination and an opportunity to rebut the administrative record). The Government has taken the position that the DHS TRIP process as it currently applies to challenges to inclusion in the TSDB is sufficiently robust and adequate, and that the DHS TRIP process applicable to challenges to the No Fly List should not be extended to challenges to inclusion in the TSDB

because the disclosure of an individual's TSDB status and/or the reasons for their placement on the Watchlist would impair the Government's "strong interest in protecting sensitive and classified information related to terrorism," as well as its "interest in preventing acts of terrorism through the maintenance of an effective watchlisting system." *See* [Doc. No. 299 at 58-60].[14]

DHS TRIP, in its current form, provides no notice concerning whether a person has been included or remains in the TSDB, what criteria was applied in making that determination, or the evidence used to determine a person's TSDB status. Nor does the DHS TRIP process provide the Plaintiffs with an opportunity to rebut the evidence relied upon to assign them TSDB status. Given the consequences that issue out of a person's inclusion in the TSDB, the Court concludes that DHS TRIP, as it currently applies to an inquiry or challenge concerning inclusion in the TSDB, does not provide to a United States citizen a constitutionally adequate remedy under the Due Process Clause.

---

[14] This Court has previously found that the DHS TRIP process did not provide sufficient post deprivation notice and process to U.S. citizens on the No Fly List. *See Mohamed*, 2015 WL 4394958 at *5 (adopting analysis in *Latif*, 28 F. Supp. 3d at 1161-62, as to inadequacy of DHS TRIP process). Pursuant to a court order in *Latif*, a case involving a similar challenge to the No Fly List, the DHS TRIP process has since been modified with regard to only U.S. citizens on the No Fly List. The court in *Latif* directed the Government to "fashion new procedures that provide Plaintiffs with the requisite due process described herein without jeopardizing national security" which must include "notice . . .to permit each Plaintiff to submit evidence relevant to the reasons for their respective inclusions on the No-Fly List" and "any responsive evidence that Plaintiffs submit in the record to be considered at both the administrative and judicial stages of review," which may involve providing the plaintiffs "with unclassified summaries of the reasons for their respective placement on the No-Fly List or disclose the classified reasons to properly-cleared counsel." 28 F. Supp. 3d at 1161-62. The Government revised its DHS TRIP procedures so that U.S. citizens on the No Fly List can seek redress through DHS TRIP by filing a complaint that triggers a requirement that DHS TRIP, after referral to and consultation with the TSC, inform the individual if they are currently on the No Fly List, following which the individual may request additional information, including TSC's unclassified summary of the information supporting their inclusion on the No Fly List, and submit additional information they consider potentially relevant to their No Fly List designation. Pls.' Statement of Material Facts ¶ 133. Upon receipt of this information, TSC and the TSA Administrator make a final written determination as to whether the individual should remain on the No Fly List, and if an individual remains on the List, a final order is issued which is subject to judicial review. *Id.* ¶ 134. In *Mohamed*, the Court reviewed that revised procedure and concluded that it was not facially unconstitutional. 2015 WL 4394958 at *13. Rather, the Court recognized that the constitutional adequacy of that process would need to be assessed based on its application in any particular case and outlined the relevant considerations in making that assessment. *See id.*

## C. Plaintiffs' Remedy[15]

Before ruling further as to the appropriate relief in this case, the Court directs the parties to file supplemental briefing as to what they contend is the appropriate remedy, including whether the post-*Latif* changes to DHS TRIP should apply, including those procedures the Court has outlined for assessing the adequacy of that revised DHS TRIP process in a particular case; and if not, why not. The Court also directs the parties to address in their supplemental briefing whether Plaintiffs are entitled to any other remedies with regard to their APA claim, which the parties have represented is coextensive with the procedural due process claim.

### IV. Conclusion

For the above reasons, the Court concludes that the TSDB fails to provide constitutionally sufficient procedural due process, and thereby also violates the Administrative Procedures Act. Plaintiffs are therefore entitled to judgment as a matter of law on Counts I and III of their Amended Complaint, and it is hereby

ORDERED that Plaintiffs' Motion for Summary Judgment [Doc. No. 303] be, and the same hereby is, GRANTED to the extent that the Court concludes that the DHS TRIP process currently applicable to any inquiries concerning the TSDB does not satisfy the Due Process Clause; and Defendants' Motion for Summary Judgment [Doc. No. 298] be, and the same hereby is, DENIED; and it is further

---

[15] Plaintiffs seek as a remedy for these constitutional violations a declaratory judgment in their favor, as well as injunctive relief that

> (a) requires Defendants to remedy the constitutional and statutory violations identified above, including the removal of Plaintiffs from any watch list or database that burdens or prevents them from flying or entering the United States across the border; and, (b) requires Defendants to provide individuals designated on the federal terror watch list with a legal mechanism that affords them notice of the reasons and bases for their placement on the federal terror watch list and a meaningful opportunity to contest their continued inclusion on the federal terror watch list.

[Doc. No. 22 at 92].

ORDERED that the parties are to submit any additional briefing as to the outstanding issues to be resolved in this matter within 30 days of the date of this Order, with replies to each other's positions filed within 14 days thereafter.

The Clerk is directed to forward copies of this Order to all counsel of record.

_____ /s/
Anthony J. Trenga
United States District Judge

Alexandria, Virginia
September 4, 2019