UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

**ANAS ELHADY;**
**YASEEN KADURA;**
**OSAMA HUSSEIN AHMED;**
**DONALD THOMAS;**
**MURAT FRLJUCKIC;**
**IBRAHIM AWAD;**                          **Case No. 16-cv-00375**
**ADNAN KHALIL SHAOUT;**                   **Hon. Anthony J. Trenga**
**SALEEM ALI;**
**SAMIR ANWAR;**                           **SECOND AMENDED COMPLAINT**
**MUHAMMAD YAHYA KHAN;**                   **FOR INJUNCTIVE RELIEF AND**
**HASSAN FARES; and**                      **DECLARATORY RELIEF**
**JOHN DOE NO. 3.**                        **AND JURY DEMAND**

      Plaintiffs,

v.

**CHRIS MAGNUS,** Commissioner, U.S.
Customs and Border Protection; in his official
capacity, only;

      Defendant.

_____/

## <u>SECOND AMENDED COMPLAINT FOR INJUNCTIVE</u><br><u>AND DECLARATORY RELIEF</u>

      Plaintiffs Anas Elhady, Yaseen Kadura, Osama Hussein Ahmed, Ahmad Ibrahim Al

Halabi, Donald Thomas, Murat Frljuckic, Ibrahim Awad, Adnan Khalil Shaout, Saleem Ali,

Samir Anwar, Muhammad Yahya Khan, John Doe No. 3 for themselves and on behalf of all

others similarly situated, through their attorneys, CAIR Legal Defense Fund ("CAIR-LDF")

and Akeel and Valentine, PLC, state as follows:

### <u>Parties</u>

      1.    Plaintiff Anas Elhady is a United States Citizen and a Muslim residing in

Wayne County, Michigan.  Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district which is where the TSDB and CBP and TSA watch lists are compiled.  Upon information and belief, Defendant nominated Plaintiff Elhady in the TSDB and designated him as "Armed and Dangerous" in CBP's TECS system.

2.      Plaintiff Yaseen Kadura is a United States Citizen and a Muslim residing in Cook County, Illinois. Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district which is where the federal terror watch list is compiled.  Upon information and belief, Defendant nominated Plaintiff Kadura in the TSDB and designated him as "Armed and Dangerous" in CBP's TECS system.

3.      Plaintiff Osama Hussein Ahmed is a United States Citizen and a Muslim residing in Wayne County, Michigan. Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district which is where the federal terror watch list is compiled. Upon information and belief, Defendant nominated Plaintiff Ahmed in the TSDB and designated him as "Armed and Dangerous" in CBP's TECS system.

4.      Plaintiff Ahmad Ibrahim Al Halabi is a United States Citizen and a Muslim residing in Wayne County, Michigan. Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district which is where the federal terror watch list is compiled.  Upon information and belief, Defendant nominated Plaintiff Al Halabi in the TSDB and designated him as "Armed and Dangerous" in CBP's TECS system.

5.      Plaintiff Donald Thomas is a United States Citizen and a Muslim residing in Sacramento County, California. Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district which is where the federal terror watch list is compiled.  Upon information and belief, Defendant nominated Plaintiff Thomas

in the TSDB and designated him as "Armed and Dangerous" in CBP's TECS system.

6.      Plaintiff Murat Frljuckic is a United States Citizen and a Muslim residing in Oakland County, Michigan. Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district which is where the federal terror watch list is compiled.  Upon information and belief, Defendant nominated Plaintiff Frljuckic in the TSDB and designated him as "Armed and Dangerous" in CBP's TECS system.

7.      Plaintiff Ibrahim Awad is a United States Citizen and a Muslim residing in Oakland County, Michigan. Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district which is where the federal terror watch list is compiled.  Upon information and belief, Defendant nominated Plaintiff Awad in the TSDB and designated him as "Armed and Dangerous" in CBP's TECS system.

8.      Plaintiff Adnan Khalil Shaout is a United States Citizen and a Muslim residing in Jordan. Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district which is where the federal terror watch list is compiled. Upon information and belief, Defendant nominated Plaintiff Shaout in the TSDB and designated him as "Armed and Dangerous" in CBP's TECS system.

9.      Plaintiff Saleem Ali is a United States Citizen and a Muslim residing in Wayne County, Michigan. Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district which is where the federal terror watch list is compiled.  Upon information and belief, Defendant nominated Plaintiff Ali in the TSDB and designated him as "Armed and Dangerous" in CBP's TECS system.

10.     Plaintiff Samir Anwar is a United States Citizen and a Muslim residing in Macomb County, Michigan. Venue is proper because a substantial part of the events or

omissions giving rise to his claims occurred within this district which is where the federal terror watch list is compiled.  Upon information and belief, Defendant nominated Plaintiff Samir Anwar in the TSDB and designated him as "Armed and Dangerous" in CBP's TECS system.

11.     Plaintiff Muhammad Yahya Khan is a United States Citizen and a Muslim residing in Oakland County, Michigan. Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district which is where the federal terror watch list is compiled.  Upon information and belief, Defendant nominated Plaintiff Khan in the TSDB and designated him as "Armed and Dangerous" in CBP's TECS system.

12.     Plaintiff John Doe No. 3 is a United States Citizen and a Muslim residing in Washtenaw County, Michigan. Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district which is where the federal terror watch list is compiled.  Upon information and belief, Defendant nominated Plaintiff John Doe No. 3 in the TSDB and designated him as "Armed and Dangerous" in CBP's TECS system.

13.     Defendant McAleenan is Commissioner of the United States Customs and Border Protection ("CBP") of the DHS.  CBP is a regular agency attendee of the Watchlisting Advisory Council ("WAC")[1], a government agency that promulgates decisions regarding all policies, procedures, practices and instructions pertaining to the federal terrorist watchlist, including, but not limited to: (1) watchlist nomination and removal procedures; (2) specific criteria used to nominate persons to the Terrorist Screening Database ("TSDB"); (3) redress procedures; and (4) vetting of information used to nominate persons to the TSDB.[2]  CBP

---

[1] *See* DeSarno Dep. at 8, 11.  Plaintiffs provide citations to the record developed in this case for the sole purpose of showing that no additional discovery will be necessary for the allegations. Plaintiffs make no attempt to incorporate any part of the discovery record into this Second Amended Complaint.
[2] *See* DeSarno Dep. at 11.

4

represents DHS at WAC meetings.[3]  Because the WAC operates by consensus, CBP has both

decision-making authority and veto power over all decisions made by the WAC.  Upon

information and belief, CBP acts as a front-line agency that utilizes the TSDB to screen

individuals against the TSDB, including the Plaintiffs and other similarly situated Americans,

to seize and search Plaintiffs' electronic devices and the electronic devices of similarly

situated Americans.  Moreover, upon information and belief, CBP nominated some or all of

the Plaintiffs, and continues to nominate other similarly situated American citizens,

permanent residents, and foreign nationals to the federal terrorist watchlist and designated

them as "Armed and Dangerous" in CBP's TECS system.[4]  Defendant Magnus is being sued

in his official capacity, only.

### Jurisdiction and Venue

14.     Under U.S. Const. Art. III § 2, this Court has jurisdiction because the rights

sought to be protected herein are secured by the United States Constitution.

15.     Jurisdiction is proper pursuant to 28 U.S.C. § 1331, 5 U.S.C. § 702, 5 U.S.C. §

706, the United States Constitution, and federal common law.

16.     This Court has authority to grant the declaratory relief requested herein

pursuant to the Declaratory Judgment Act, 28 U.S.C. § § 2201-02, because the action

presents an actual case or controversy within the Court's jurisdiction, and pursuant to the

general, legal, and equitable powers of this Court.

17.     Nothing in 49 U.S. § 46110 eliminates that jurisdiction.  See, e.g., *Mohamed v.*

*Holder*, No. 11-1924, 2013 U.S. App. LEXIS 26340, at *5-6 (4th Cir. May 28, 2013); *Ege v.*

---

[3] *See* DeSarno Dep. at 12.
[4] *See* Howe Dep. at 109.

*United States Dep't of Homeland Sec.*, 784 F.3d 791, 796 (D.C. Cir. 2015); *Latif v. Holder*, 686 F.3d 1122, 1128-29 (9th Cir. 2012); *Wilwal v. Nielsen*, 346 F. Supp. 3d 1290, 1304 (D. Minn. 2018).

18.     A substantial part of the unlawful acts alleged herein were committed within the jurisdiction of the United States District Court for the Eastern District of Virginia.

19.     Venue is proper under 42 U.S.C. § 1391(e)(1) because at least one of the Plaintiffs resides in this district; because Defendant are officers or employees of agencies of the United States sued in their official capacities; because Defendant regularly conduct business in the State of Virginia; because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred within this district; and because the action involves no real property.

## Factual Background

### The Federal Government's Expansive TSDB Inclusion Standards Capture Broad Categories of Innocent Travelers

20.     In September 2003, Attorney General John Ashcroft established the Terrorist Screening Center ("TSC") to consolidate the government's approach to terrorism screening. The TSC develops and maintains the federal government's consolidated Terrorism Screening Database ("TSDB" or "federal terrorist watchlist").  TSC's consolidated watchlist is the federal government's master repository for suspected international and domestic terrorist records and is used for watchlist related screening.

21.     Two government entities are primarily responsible for "nominating" individuals for inclusion in the terrorist watchlist—NCTC and FBI.  The NCTC, which is managed by the Office of the Director of National Intelligence, relies on information from other federal departments and agencies when including alleged known or suspected international terrorists

in its Terrorist Identities Datamart Environment ("TIDE") database.  The NCTC reviews TIDE entries and recommends specific entries to the TSC for inclusion in the watchlist.  The FBI, in turn, nominates to the watchlist individuals with what it characterizes as suspected ties to domestic terrorism.

22.     CBP also nominates individuals for inclusion in the terrorist watchlist.[5]

23.     CBP employs risk-based targeting rules to single out travelers at ports of entry for secondary inspection, detention, investigation and deportation.  Upon information and belief, CBP utilizes the results of high-risk targeting rules and resulting inspections and investigation as a factual predicate for nominating individuals to the TSDB.

24.     All nominations to the TSDB must be approved and implemented by the TSC. The TSC makes the final decision on whether a nominated individual meets the minimum requirements for inclusion into the watchlist as a known or suspected terrorist.  TSC also decides which screening systems will receive information about that individual.

25.     The federal government publicly states that to be included in the TSDB, an individual must be reasonably suspected of being a known or suspected terrorist.  More specifically, a government nominator, including CBP, "must rely upon articulable intelligence or information which, based on the totality of the circumstances and taken together with rational inferences from those facts, creates a reasonable suspicion that the individual is engaged, has been engaged, or intends to engage, in conduct constituting in preparation for, in aid or in furtherance of, or related to, terrorism and/or terrorist activities."  *See* January 2018 Overview of the U.S. Government's Watchlisting Process and Procedures (Exhibit 5).

---

[5] *See* Howe Dep. at 109.

26.     The "totality of the circumstances" analysis for TSDB inclusion may include assessment of an individual's race, ethnicity, country of origin, religion, religious practices, languages spoken, family, associations, travel history, social media history, and other activities protected by the First Amendment, Fifth Amendment, Fourteenth Amendment, and U.S. Constitution.[6]

27.     Former Director of the Terrorism Screening Center Timothy Healy testified that in evaluating whether an individual meets the criteria for inclusion on the consolidated watchlist, the TSC determines whether the nominated individual is "reasonably suspected" of having possible links to terrorism.  According to the TSC, "reasonable suspicion requires articulable facts which, taken together with rational inferences, reasonably warrant the determination that an individual is known or suspected to be or has been engaged in conduct constituting, in preparation for, in and of or related to terrorism and terrorist activities."

28.     The federal government has provided only limited information about and otherwise not stated publicly what standards or criteria are applied to determine whether an American citizen will be nominated placed on the TSDB or any other terrorist watchlist that is distributed to CBP and other screening agencies.

29.     The standards for watchlist inclusion do not evince even internal logic.  The Watchlisting Guidance defines a "suspected terrorist" as an "individual who is reasonably suspected to be, or have been, engaged in conduct constituting, in preparation for, in aid of, or related to terrorism and terrorist activities based on articulable and reasonable suspicion."

---

[6] The TSA conducts a similar assessment of the family relationships, associations, and travel patterns of individuals in order to flag them as "unknown or partially known terrorists" and place them on the "Quiet Skies (or Silent Partner) Selectee List" which operates in parallel to the TSDB.  Quiet Skies and Silent Partner may, however, cross-reference TSDB information and serve as a stepping stone the process of identifying and investigating individuals which leads to TSDB nomination.

30.     In other words, pursuant to official federal government policy, Americans and other individuals are placed on the federal terrorist watchlist based upon a "reasonable suspicion" that they are "reasonably suspected" of nefarious activities.  These standards fall far below the established "reasonable suspicion" and "probable cause" standards required for criminal investigation.

31.     Individuals may also be added to the TSDB based on guilt-by-association as a basis for watchlist inclusion.  For example, immediate relatives of listed persons can become TSDB listees without any derogatory information—other than the bonds of family.  Likewise, they can be subjected to CBP rules-based 'terrorist' monitoring on the basis of family affiliation alone.  Such annotations signals to screening agencies, officers, employers, and others that the immediate relative is a violent threat engaged in nefarious activities.

32.     Individuals may be added to the TSDB for being a known associate—a friend, colleague, fellow community member, etc.—of a TSDB listed individual.

33.     Even if an American citizen is acquitted of terrorism charges or those charges are otherwise dismissed, they can and routinely are added to the watchlist.[7]

34.     American citizens can be and are routinely added even if they are not the subject of a federal investigation.

35.     Individuals can be added to the federal terrorist watchlist without any information regarding whether or not an intended target exists, and without any information about whether an individual poses a threat to commercial aviation or to a U.S. land border.[8]

36.     Individuals can be added to the federal terrorist watchlist without ever having been charged or convicted of any crime.

---

[7] *See* DeSarno Dep. at 255.
[8] *See* DeSarno Dep. at 240, 276.

37.     The FBI has conceded that because the federal terrorist watchlist "only includes identifiers of known or suspected terrorists, by itself [the FBI] is not aware of any instance where that identifying information alone prevented an act of terrorism."[9]

38.     CBP has also conceded that it has never publicly identified an act of terrorism that its use of TSDB information prevented.[10]

39.     In fact, the FBI does not even consider TSDB inclusion in and of itself to be a source of reliable information to form sufficient basis to deny an prospective employee employment with the FBI.  Rather, to determine the "suitability of that [prospective] employee," the FBI would need to review the "totality of the circumstances" that formed the basis of the TSDB placement.[11]

40.     Because of these loose standards and practices, the federal terrorist watchlist's rate of growth has dramatically increased.  In fiscal 2009, there were 58,999 new additions to the watchlist.  Over 1.1 million new names have been added to the watchlist since 2009.  In fiscal 2016, there were 176,014 new additions.  These additions include thousands of U.S. citizens and lawful permanent residents.

41.     More than 98% of the names nominated to the TSDB are accepted.  In 2013, TSC accepted 98.96 percent of all nominations made.  A 2007 GAO report found that TSC rejects only approximately one percent of all nominations to the watchlist.[12]

---

[9] *See* DeSarno Dep. at 85.
[10] *See* Howe Dep. at 333.
[11] *See* DeSarno Dep. at 343.
[12] *See* United States Government Accountability Office Report to Congressional Requesters entitled *Terrorist Watchlist Screening:  Opportunities Exist to Enhance Management Oversight, Reduce Vulnerabilities in Agency Screening Processes, and Expand Use of the List*, GAO-08-110, October 2007, at 22.

42.     Upon information and belief, in 2001, there were 16 people who the federal government systematically prevented from flying.  By 2009, the number grew to approximately 3,400.  By 2016, that number increased to approximately 81,000.

43.     At a March 10, 2010, Senate Homeland Security Committee hearing, Russel E. Travers, Deputy Director of the National Counterterrorism Center, stated that "[t]he entire federal government is leaning very far forward on putting people on list," and that the watchlist is "getting bigger, and it will get even bigger."

44.     The federal terrorist watchlist's and rules-based terror lists' inclusion standards are so permissive, pliable, and laden with discriminatory assessments of race, ethnicity, national origin, and religion, that they bear at best a fleetingly marginal connection to actual terrorist activities.

45.     Based on the University of Maryland's Global Terrorism Database, a project funded in part by the Department of Homeland Security, there have been less than 250 terrorist acts inside the United States over the last decade.  These terrorist acts were perpetrated by less than 250 persons.

46.     Only one of these perpetrators was designated on the federal terrorist watchlist by the federal government prior to their criminal conduct.  This single person designated on the federal terrorist watchlist, however, was removed from the federal terrorist watchlist prior to perpetrating the terrorist attack.

47.     Upon information and belief, in order to designate a person on the federal terrorist watchlist, the federal government must first have information about that person. Because the federal government does not possess information on every person in the world, existing law enforcement and intelligence practices produce a subset of persons who the

federal government can then screen against the federal terrorist watchlist's inclusion standards.

48.     The precise size of this subset is unknown; however, a survey of law enforcement and intelligence practices indicates that the size of this subset is greater than 50 million people.

49.     Upon information and belief, the practices that produce this subset exclude some persons who do pose a threat of terrorism and include innocent persons who do not pose a threat of terrorism.

50.     Upon further information and belief, the federal government does not screen the entire subset of people known to it.  Moreover, federal government does not make individual determinations as to whether each person about whom they have information should be placed on the federal terrorist watchlist.

51.     Additionally, the federal government utilizes automated algorithms and risk-based targeting rules to select individuals for scrutiny, investigation, and nomination to one or more terrorist watchlists.

52.     In order to designate a person on the federal terrorist watchlist, a federal government official, including a CBP officer, must make a nomination in accordance with the established nomination policies and procedures described above, and a TSC official must accept the nomination.   TSC officials accept nominations at a rate above 98 percent.

53.     Based on the facts alleged in this Complaint and the publicly known processes of the federal terrorist watchlist, a quantitative analysis can be constructed to measure and describe the performance and efficacy of the federal terrorist watchlist.

54.     A quantitative analysis requires that, in order to accomplish the federal terrorist watchlist's stated objectives, Defendant must have at least some greater-than-random abilities

to identify future terrorists.  This is due to the nature of the processes the federal government utilizes to place persons on the federal terrorist watchlist and the size of the population Defendant can—if they so choose—screen against the federal terrorist watchlist's inclusion standards.

55.    A quantitative analysis demonstrates that the federal government's watchlisting system would perform similarly if inclusion on the watchlist was done via random selection instead of the existing inclusion standards it utilizes.

56.    A quantitative analysis indicates that the federal government has no ability to watchlist persons whose placement on the watchlist would further the federal government's—or CBP's—stated objectives.

### CBP Policies Violate the Constitutional Rights of TSDB Listees

57.    Anyone listed in the TSDB is subjected to varying forms of heightened scrutiny and adverse repercussions by CBP.

58.    The "information in [the] TSDB [contains] merely the identifying information of the person entered into the TSDB, and does not include the "derogatory information," or "totality of the circumstances," that is the basis of a nomination by the FBI."[13]

59.    As such, TSDB information shared with CBP also contains merely the identifying information of TSDB listee and does not include the "derogatory information," or "totality of the circumstances," that formed the basis of a nomination by the FBI.

60.    Although CBP has access to TSDB information provided by the TSC, it is the TSC that maintains and controls the TSDB database.

---

[13] *See* DeSarno Dep. at 202, 229, 163.

61.     CBP automatically designates TSDB listees as "Armed and Dangerous," refers them to secondary inspection, and otherwise automatically flags them as potential terrorists in automated alerts sent to officers.

62.     All travelers, including Plaintiffs and similarly situated American citizens, permanent residents, and foreign nationals, that present themselves at a port of entry, whether at a land border crossing or an airport, interact with officers from CBP for entry into the United States and are queried by CBP against TECS, a CBP system that includes TSDB information shared by the Terrorist Screening Center "seamlessly and in realtime."[14]

63.     Airlines are required to provide a complete passenger manifest to CBP before a flight can depart or enter the United States and CBP queries the identities of all passengers on those manifests against the Advance Passenger Information System ("APIS"), an automated targeting system that feeds biographical information of passengers into TECS.[15]

64.     CBP can also conduct additional screening and questioning of individual airline passengers prior to departing the United States if a passenger matches TSDB information in TECS.[16]

65.     As a matter of policy and practice, CBP primary inspection officers are alerted that TSDB listees are a "potential match" to TSDB in TECS and refer them to secondary inspection for questioning to determine if the traveler is in fact a "potential match."[17]

66.     CBP officers do not have access to the underlying derogatory information that formed the basis for a traveler being listed in the TSDB.[18]

---

[14] *See* Howe Dep. at 29, 46-48.
[15] *See* Howe Dep. at 33, 52.
[16] *See* Howe Dep. at 43-44, 46-47, 50-53.
[17] *See* Howe Dep. at 31, 33, 35, 67.
[18] *See* Howe Dep. at 83-84.

67.     CBP Officers conducting the secondary inspection are directed to contact the National Targeting Center ("NTC"), a division within CBP Field Operations that works with the TSC, which ultimately makes a final determination on whether the traveler is a match to the TSDB.[19]

68.     CBP records in TECS a summary of the secondary inspection that includes whether a determination was made by NTC as to whether the traveler was confirmed to be a match.[20]

69.     Despite having gone through this TSDB matching process during secondary inspection, each time a traveler who was previously confirmed as a match to the TSDB presents themselves for inspection at a port of entry, CBP primary inspection officers receive the same alert that the traveler is a "potential match" because they do not have access to or knowledge of previous inspections, and accordingly the TSDB listee is referred back to secondary inspection to go through the TSDB match process all over again.[21]

70.     Even if CBP determines a traveler is not a match to the TSDB and records that information in TECS, unless the TSC updates the TSDB, the next time that traveler presents themselves at a port of entry for inspection, the CBP primary inspection officer will receive the same alert that the traveler is a "potential match" to the TSDB and will refer that traveler to secondary inspection to undergo the TSDB match process all over again.[22]

---

[19] *See* Howe Dep. at 70-76.
[20] *See* Howe Dep. at 79-81, 87-88.
[21] *See* Howe Dep. at 82-83.
[22] *See* Howe Dep. at 91-94, 103-104.

71.     Pursuant to official CBP policy, CBP officers refer TSDB listees to secondary inspection and the TSDB listees are compelled as a matter of process to provide biometric fingerprints to determine whether they are a match to the TSDB.[23]

72.     Pursuant to official CBP policy, CBP officers may handcuff TSDB listees before referring them to secondary inspection.[24]

73.     Pursuant to official CBP policy issued in 2018, CBP officers are directed to conduct an advanced forensic search of any electronics carried by TSDB listees:

> An advanced search is any search in which an officer connects external equipment through a wired or wireless connection to an electronic device not merely to gain access to the device, but to review, copy, and analyze its contents.[25]

74.     "The presence of an individual on a government operated and government vetted terrorist watch list," alone constitutes grounds for the CBP to search, copy, store, and analyze the contents of laptops, tablets, and smartphones, etc. without requesting or obtaining consent.[26] (Hereinafter the "CBP electronic devices policy").

75.     Pursuant to the CBP electronic devices policy, CBP officers are directed to disregard factors for and against a search and seizure of electronic devices in the possession of TSDB listees and to conduct a nonroutine forensic search and seizure of all electronics despite not having access to the underlying derogatory information that formed the basis of the TSDB listees' nomination to the TSDB.

---

[23] *See* Howe Dep. at 260-261, 308-309.
[24] *See* Howe Dep. at 256.
[25] *See* CBP Directive No. 3340-049A (January 2018).
[26] *See* id. *See also* Howe Dep. at 302-04, 312-315.

76.     CBP officers seize, search, download, copy, analyze, and conduct a forensic search of the contents of the electronic devices, including those of each of the Plaintiffs and similarly situated American citizens, permanent residents, and foreign nationals.

77.     The prior version of the CBP electronic devices policy adopted in 2008 similarly directed CBP officers to copy data off of the electronic devices of TSDB listees, and it was and continues to be standard practice to do so and outside the view of the TSDB listee.[27]

78.     Watchlist policies, including all the watchlist policies described in this Complaint, and all guidance and rules as to how all individual watchlist-based determinations are made, are managed and controlled by the WAC, whose actions are in turn decided by the Defendant who, as described above, advises the WAC.

**Anas Elhady**

79.     In April 2012, Anas Elhady was detained in Detroit Metro Airport for approximately two hours after returning from an international trip to Saudi Arabia.[28]

80.     In another trip in 2012, Elhady was detained in Detroit Metro Airport after returning from Yemen.  He was detained for approximately six hours.  His phone was seized and searched, and he was interrogated while being recorded on camera.[29]

81.     On or around October 6, 2012, Elhady returned to the United States from Yemen.[30]  Upon arrival in Detroit, Elhady provided his passport to CBP officers at the booth. The officers asked Elhady to follow them.[31]  The officers took Elhady to a room and

---

[27] *See also* Howe Dep. at 307, 314-315.
[28] Elhady Dep. at 70:10-72:14.
[29] Elhady Dep. at 81:12-85:12.
[30] Elhady Dep. at 83.
[31] *Id.* at 84.

questioned him.[32] They searched Elhady's luggage and confiscated his cell phone.[33]  CBP officers recorded the interaction with a camera.[34] Elhady's detention lasted approximately six hours.[35]

82.     On or around August 27, 2013, Elhady and his brother were detained in Detroit Metro Airport after arriving from Dubai after the CBP officer inspecting his passport radioed for CBP officers to come to the booth to escort for secondary inspection.[36] CBP officers asked Elhady whether he was traveling with anyone and then escorted Elhady to retrieve his luggage. They then escorted Elhady and his brother to a private room where officers unpacked Elhady's luggage, searched through each item, and questioned Elhady about each item.[37]

83.     CBP officers confiscated Elhady's cell phone, asked him to open it and type in the password, and then took the cell phone to a different room for approximately one to two hours.[38] CBP officers further questioned Elhady about his sim cards, pictures on his cell phone, and his phone contacts.[39]

84.     On August 21, 2014, Elhady was detained at the Detroit-Windsor port of entry for approximately four or five hours.  His phone was seized and searched and was not returned until approximately two months later by an FBI agent.[40]

---

[32] *Id.*
[33] *Id.* at 85.
[34] *Id.* at 85.
[35] *Id.* at 85.
[36] *Id.* at 91:11-95:12.
[37] *Id.* at 93:11-94:12.
[38] *Id.* at 94.
[39] *Id.* at 95.
[40] *Id.* at 131:14-134:14, 142:16-21.

85.     Elhady was detained a second time at the Detroit-Windsor port of entry for more than five hours shortly after his August 21, 2014 trip.  His phone was seized and searched and was not returned until two months when it was shipped to him by mail.[41]

86.     Elhady was detained three times in September, 2014—each time at least four hours or longer and each time his phone was seized and searched.[42]

87.     In October 2014, he was detained for approximately seven to eight hours and subjected to the same treatment again at Detroit-Windsor port of entry; however, this time the carpet in his car was stripped during a search of the car.[43]

88.     In November or December 2014, Elhady's vehicle was surrounded by four to six armed Customs officers when he presented himself for inspection at the Detroit-Windsor port of entry who told him to get out of his car, handcuffed him, seized and searched his phone, and detained him and questioned him for approximately seven or eight hours.[44]

89.     Also in November or December 2014, Elhady's vehicle was again surrounded by several armed Customs officers when he presented himself for inspection at the Detroit-Windsor port of entry who told him to get out of his car, handcuffed him, seized and searched his phone, and detained him and questioned him for approximately seven or eight hours.[45]

90.     On or around April 11, 2015, Elhady was handcuffed and detained at the Detroit-Canada land border crossing where CBP officers questioned him.[46]  When Elhady arrived at the booth, he provided his ID and DHS TRIP form. CBP asked Elhady to exit his

---

[41] *Id.* at 142:14-143:14.
[42] *Id.* at 146:21-150:10.
[43] *Id.* at 151:10-152:5, 156:1-4.
[44] *Id.* at 167:7-170:6, 177:7-12.
[45] *Id.* at 176:9-177:12.
[46] *Id.* at 24:16-25:2, 183:19-192:4, 195.

vehicle and leave everything in the car.[47] CBP officers handcuffed Elhady and escorted him into the building and into a bright and cold cell with a metal seat. CBP confiscated Elhady's shoes, jacket, watch, his phone, his belt, and any other item on Elhady's person.[48]

91.     Elhady was detained in a freezing cold cell with excessively bright lights without his shoes for at least four hours, before he passed out and taken to a hospital by ambulance. Elhady began to call for help and ask for an ambulance after feeling drowsy, feeling a headache, and beginning to shake.[49] CBP officers finally called for an ambulance after Elhady became unconscious, and Elhady was transferred to a hospital in handcuffs.[50]  He was handcuffed to the stretcher inside the ambulance on his way to the hospital and handcuffed again to a chair in the waiting area at the hospital.  Following the ordeal, Elhady was transported back to the border via bus where he was handcuffed to the floor until he arrived at the bridge and CBP officers returned his belongings and allowed him to leave.[51]  This entire incident lasted more than 10 hours.[52]

92.     On or around August 23, 2017, Elhady entered the United States by plane via Chicago.[53] When Elhady arrived at the front of the Customs line, CBP officers escorted him to a separate line. Elhady was delayed for approximately 30 minutes to one hour while CBP officers screened him and searched his luggage.[54]

**Yaseen Kadura**

---

[47] *Id.* at 184.
[48] *Id.* at 185.
[49] Elhady v. Bradley, 438 F. Supp. 3d 797 (E.D. Mich. 2020)
[50] Elhady Dep. at 187.
[51] *Id.* at 192.
[52] *Id*. at 183:19-192:4.
[53] *Id.* at 120.
[54] *Id.* at 123.

93.     In August 2011, Mr. Kadura was detained in a room by himself at Dulles airport after a flight from London.[55] He was also interrogated and all his belongings searched for around half an hour.[56]

94.     In December 2011, Mr. Kadura was detained at the Ambassador Bridge for six-and-a-half hours attempting to return to the U.S. after a trip to Canada.[57] CBP agents separated, searched, aggressively patted down, and interrogated Mr. Kadura, his father, and his 17-year-old brother.[58] Agents refused to allow either adult to accompany the brother despite his being a minor.[59] When Mr. Kadura's father asked agents to allow him to accompany his son, they "roughed [him] up" and forced "his hands up on the wall" to "feel up his crotch … his whole body … like trying to look for something on him like he's a criminal."[60]

95.     During this detention, CBP confiscated the complete contents of their vehicle, along with their cell phones, laptops, and wallets, photocopying all contents.[61] Mr. Kadura saw agents take one of the phones into a back room and plug it into a computer.[62]

96.     On or around September 22, 2012, Mr. Kadura was again detained at the Port Huron land crossing for eight hours attempting to return to the U.S. after a trip to Canada.[63] He was commanded to exit his vehicle, hands in the air, surrounded by officers with hands on their weapons, before he was patted down and handcuffed in front of a line of cars waiting to

---

[55] Kadura Dep. at 109:22-114:23.
[56] *Id.* at 115:6-116:9.
[57] *Id.* at 132:22-140:17.
[58] *Id.* at 136:21-138:9.
[59] *Id.* at 137:4-13.
[60] *Id.* at 141:4-11.
[61] *Id.* at 138:10-139:1.
[62] *Id.* at 138:12-14.
[63] *Id.*at 162:3-169:25.

cross the border while a girl filming the whole encounter on her cell phone.[64] Agents told him he was handcuffed for his protection, "so we don't shoot you."[65]

97.     CBP agents aggressively placed Mr. Kardura in a freezing back room, handcuffed, sitting on the ground with no shoes for hours while fingerprinting and photographing him, photocopying the contents of his vehicle, and demanding that he unlock his cell phone for inspection.[66] He asked what would happen if he refused, and agents said "you have to."[67] Mr. Kardura watched them plug his phone into a computer.[68]

98.     Upon release, CBP agents informed Mr. Kardura that he could get his phone back in 24 hours by calling a number they provided him. After getting lost on the way home to Indiana from Michigan with no GPS, he found the number CBP provided was ineffective.[69] His phone was not returned, but instead was handed over to ICE who refused to give it back unless he agreed to come in and be interrogated.[70] The phone was eventually shipped back to him a few months later.[71]

99.     In or around November 2012, Mr. Kardura was again detained for at least seven hours at the Port Huron crossing into the U.S.[72]

100.    In or around August 2015, Mr. Kardura was again detained for seven hours, this time at the pedestrian crossing into Laredo, Texas, after a vacation in Mexico.[73] Agents

---

[64] *Id.* at 163:15-164:20.
[65] *Id.* at 164:21-165:2.
[66] *Id.* at 165:3-166:15.
[67] *Id.* at 166:14-18.
[68] *Id.* at 166: 17-18.
[69] *Id*. at 168:23-172:16.
[70] *Id.* at 167:12-172:16.
[71] *Id.* at 181:23-183:4.
[72] *Id.* at 211:2-19.
[73] *Id.* at 231:15-239:8.

handcuffed him to a bench for five hours while they searched and interrogated him, mimicking a bomb explosion sound when he threw trash away.[74]

### Osama Ahmed

101.    From 2003 to 2009, Osama Ahmed traveled frequently to Canada—usually twice a month although sometimes less—by land to visit family.[75]

102.    Every time he returned to the United States he would be stopped, interrogated, and his vehicle searched. Although this often would only take about 15 minutes, about 20% of the time these detentions would take four to five hours.[76]

103.    In 2009, he stopped travelling to Canada by land.[77]

104.    In 2010, he travelled to Yemen by air. On return to the United States, Mr. Ahmed was detained by CBP agents for 6-7 hours, and interrogated about various topics including his politics, his religious views, and what mosque he attended.[78] Mr. Ahmed missed his connecting flight.[79] CBP agents insisted he was involved with nefarious organizations and implored him to "help us find the big fish."[80]

105.    Mr. Ahmed's electronics were confiscated, and his USB card was not returned until a later date.[81] When a federal agent came to return his USB card later, the federal agent attempted to recruit him to become an informant.[82]

---

[74] *Id.* at 236:12-21.
[75] Ahmad Dep. at 16:1-20:20.
[76] *Id.*
[77] *Id.*
[78] *Id.* at 22:1-25:7; 44:8-21.
[79] *Id.*
[80] *Id.*
[81] *Id.* at Dep. 25:16-26:4.
[82] *Id.*

106.    In 2014, after another return from Yemen by air, Mr. Ahmed was again detained and questioned about his religious beliefs, his family, and his political opinions on Yemen.[83]

### Ahmad Ibrahim Al Halabi

107.    In or around August 2005, Ahmad Al Halabi was held in a cell at the San Diego border crossing while attempting to return from a day trip to Tijuana, Mexico.[84] When detaining him, CBP agents confiscated and searched his camera and all electronics, including his watch.[85]

108.    CBP subjected him to prolonged detention and questioning for approximately four and a half hours.[86] FBI agents also questioned him during this time.[87]

109.    In 2005, Mr. Halabi relocated to Dubai.

110.    On April 30, 2012, Mr. Halabi was stopped briefly by a representative of "the embassy of the United States" in Doha, Qatar, before being detained and questioned for five hours upon arrival in Houston, Texas, on a trip from Dubai to Michigan with his six-year-old daughter.[88] When being detained, two CBP agents escorted him and his daughter from the aircraft door, through the airport to the security office, and confiscated their belongings.[89]

---

[83] *Id.* at 36:10-21.
[84] Halabi Dep. 26:18-28:7, 31:8-10, 18.
[85] *Id.* at 29:15-17.
[86] *Id.* at 29:13-14.
[87] *Id.* at 30:6-10.
[88] *Id.* at 37:5-40:15.
[89] *Id.* at 38:19-39:12.

111.    On August 23, 2013, Mr. Halabi was again questioned for some time in Amsterdam, The Netherlands, by a representative of "the embassy" before boarding his connecting flight from Dubai to Los Angeles, California.[90] The representative also searched his luggage during the course of the detention.[91]

112.    Again, upon arrival in Los Angeles, two CBP agents escorted him from the aircraft door, through the airport, to the security area where he was held, questioned, and searched for hours.[92]

113.    On June 5, 2014, Mr. Halabi was again detained, searched, and questioned for over three hours upon landing in Atlanta, Georgia, by CBP and two agents who identified themselves as DHS, while his pregnant wife and three children waited in a secondary holding area with no access to their belongings.[93]

114.    On June 25, 2014, Mr. Halabi was again detained when attempting to return to Michigan from a three-day trip to Niagara Falls, Canada.[94] This time, he was forced to exit the vehicle and handcuffed in front of his pregnant wife, small children, sister, and 80-year-old father.[95]

---

[90] *Id.* at 48:4-5, 21-49:19.
[91] *Id.* at 49:13-14.
[92] *Id.* at 50:17-51:14.
[93] *Id.* at 63:13-14, 64:4-67:2.
[94] *Id.* at 74:5-12.
[95] *Id.* at 74:13-75:13.

115.    Before detaining him in a cold, concrete holding cell, CBP confiscated his cellphone, watch, wallet, and even his shoes.[96] A CBP supervisor demanded his cellphone security code, and he gave it.[97]

116.    CBP detained Mr. Halabi and his entire family for more than five hours and kept his iPhone when they finally let them return to their disheveled vehicle. Dep. 79:11-16. The device was returned two days later. Dep. 81:7-11.

117.    Two FBI agents came to his brother's house, where he was staying, a day or two after the incident and questioned Mr. Halabi for three hours. Dep. 80:6-81:6.

118.    On April 27, 2015, Mr. Halabi was again escorted from the aircraft door to secondary search for over three hours of detention, search, and interrogation, with his wife and now four children upon landing in Detroit, Michigan. Dep. 87:1-3, 88:7-89:15.

119.    In July 2015, Mr. Halabi was again detained and interrogated by the FBI for more than four hours upon arriving in Los Angeles on a domestic flight from Detroit. Dep. 94:5-95:3.

120.    In April 2016, Mr. Halabi returned to Detroit, Michigan from a trip to Dubai and was detained and interrogated for 20 minutes by an FBI agent. Dep. 90:15-92:20.

121.    Around the time the complaint in this case was filed, detentions, interrogations, searches, and SSSS/boarding pass issues stopped. Dep. 107:18-108:4.

**Donald Thomas**

---

[96] *Id.* at 75:19-76:1.
[97] *Id.* at 76:13-16.

122.     Donald Thomas and his traveling companions were detained at the U.S./Canadian border for eight hours in February 2016.[98] He and his fellow travelers were told they "have no rights."[99] Their phones were confiscated, and agents demanded they give over their passwords.[100] Mr. Thomas and his friends felt they had no choice but to comply.[101]

123.     During the search, seizure, and interrogation, agents conducted a K-9 search of Mr. Thomas's car and contents, as evidenced by paw prints, fur, and lingering odor remaining in the vehicle upon release.[102]

**Murat Frljuckic**

124.     On or about October, 2012, Mr. Murat Frljuckic was referred to secondary inspection, handcuffed and detained by CBP at the border stop at the Blue Water Bridge Port of Entry in Port Huron, Michigan, when he attempted to re-enter the United States after a brief vacation in Canada.[103] When detaining him, CBP agents drew their guns and pointed at him in front of his 4-year-old child and 70-year-old mother until he was handcuffed.[104]

125.     CBP officers patted Mr. Frljuckic down, removing some of his clothing, and subjected him to a prolonged detention and interrogation for approximately four to five hours.[105] CBP officers also fingerprinted Mr. Frljuckic during the detention.[106]

---

[98] Thomas Dep. at 68:14-20.
[99] *Id.* at 73:13.
[100] *Id.* at 73:2-21.
[101] *Id.* at 73:7-9.
[102] *Id.* at 74:1-75:10.
[103]  Frljuckic Dep. at 46:5-50:17.
[104] *Id.* at 47:4-20.
[105] *Id.* at 48:2-50:4.
[106] *Id.* at 48:10-13.

126.   Mr. Frljuckic was again detained returning from Canada by car sometime around January 2013, again at gunpoint, this time for approximately three-and-a-half hours with his wife and eight children.[107] He was again subjected to pat down, pocket search, fingerprinting, handcuffing, and extensive interrogation during this detention.[108]

127.   Mr. Frljuckic again was detained at gunpoint at the United States-Canada land border at Port Huron/Sarnia in the summer of 2014 (as he was returning from a flight from Montenegro, where he flew from Toronto), this time for approximately six hours, with his wife and eight children.[109] Again he was subjected to handcuffing, pat down, fingerprinting, and extended, intense interrogation.[110] During his interrogation, CBP agents asked him "religious stuff and where do I go, who do I hang out with, from which scholar do I listen, like on the YouTube or whatever, things like that."[111]

128.   Mr. Frljuckic was again detained at the U.S.-Canada border in May 2015, for at least three and a half to four hours.[112] Agents handcuffed, patted down, fingerprinted, and interrogated him.[113]

129.   Mr. Frljuckic returned to the United States on the Canada border a fifth time in May 2016 and was again detained at gunpoint with agents aggressively shouting and pointing weapons to the point that he "actually thought they were going to shoot this time."[114] Agents

---

[107] *Id.* at 66:11-69:13.
[108] *Id.* at 67:18-68:2.
[109] *Id.* at 70:15-84:12.
[110] *Id.* at 82:11-19.
[111] *Id.* at 83:10-19.
[112] *Id.* at 93:1-94:4.
[113] *Id.* at 94:7-22.
[114] *Id.* at 101:18-102:11.

called Mr. Frljuckic a "terrorist" and handcuffed, patted down, fingerprinted, aggressively interrogated, and detained him for at least three and a half hours.[115]

130.    Mr. Frljuckic has never owned or attempted to purchase a gun or firearm.[116]

131.    Moreover, every time Mr. Frljuckic travels by air, since approximately March or April, 2012, his boarding pass is stamped with the "SSSS" designation, indicating that he has been designated as a "known or suspected terrorist."[117]

### Adnan Shaout

132.    Mr. Shaout was detained for over two hours returning to the United States by air from Algeria in 2004.  This caused him to miss his connecting flight in the United States.[118]

133.    Since then, until 2017 (after he brought this lawsuit), Mr. Shaout is detained every time he returns to the United States by air in similar fashion.[119]  Mr. Shaout flies internationally frequently, so these detentions have happened well over a dozen times.[120]

134.    Each time, his electronics are taken and searched, with his data copied.[121]  Mr. Shaout learned from his extensive travel over time that the less information he brings with him, the shorter the detention.[122]

135.    Some of the times he is detained he is asked religious questions.[123]

---

[115] *Id.* at 101:2-103:11.
[116] *Id.* at 111:10-15.
[117] *Id.* at 106:3-19.
[118] Shaout Dep. at 34:10-35:14, 45:4-11.
[119] *Id.* at 41:8-43:10, *see also id.* at 76:9-14.
[120] Plaintiffs' First Responses to Defendants' First Set of Discovery Responses at 52-55.
[121] Shaout Dep. at 46:9-19.
[122] *Id.*
[123] *Id.* at 39:4-7.

136.    Knowing what the experiences of others who are on the watchlist are, Mr. Shaout has avoided crossing the border by land since 2004.[124]

**Saleem Ali**

137.    Returning to the United States at San Francisco International Airport on a flight from Jakarta through Taipei in the Spring of 2011, Saleem Ali was detained by CBP for approximately three hours.[125] Agents searched Mr. Ali's belongings including his luggage, interrogated him about his religious practices, family and acquaintances in Indonesia, and demanded names, addresses and phone numbers of contacts, as well as Facebook login information.[126]

138.    In or around June 2015, Mr. Ali was again detained and interrogated for at least 45 minutes while attempting to cross the Port Huron Blue Water Bridge crossing from Canada to the U.S.[127]

139.    In or around October 2015, Mr. Ali was again detained at the tunnel crossing from Windsor, Canada, to Detroit, Michigan, for approximately six hours.[128] During this detention, agents searched Mr. Ali's vehicle, confiscated his phones and other property, conducted an iris scan, swiped the bottoms of his feet, fingerprinted, and interrogated him, and demanded passwords to his personal and work cell phones.[129]

140.    CBP agents kept Mr. Ali's phones overnight and called him the following day to pick them up.[130]

---

[124] *Id.* at 173:4-9.
[125] Ali Dep. 32:2-34:15.
[126] *Id.* at 36:7-12.
[127] *Id.* at 44:19-45:6.
[128] *Id.* at 48:3-20.
[129] *Id.* at 50:13-52:19.
[130] *Id.* at 53:7-11

141.    Mr. Ali separately was detained at least two more times returning to the United States from Canada by land for periods ranging from 30 to 45 minutes.[131]

142.    In March 2017, the night before an international flight, FBI agents came to Mr. Ali's house and interrogated him for over 30 minutes regarding his Facebook posts about Colin Kaepernick, saying they "don't think … you're a terrorist or involved in terrorism" but that they "just had to make contact."[132] The FBI agents then asked him to become an informant and call them if he saw or heard anything while in Indonesia.[133] They suggested he go to the U.S. embassy to call them to avoid "get[ting] into any trouble" while out of the country.[134]

143.    On his return to the United States, he was told he was randomly selected for secondary selection and interviewed for another 45 minutes.[135]

144.    In September 2017, Mr. Ali filed the instant lawsuit.

145.    At some point after, at least some of Mr. Ali's travel issues subsided.[136] But Mr. Ali has never been informed about his watchlist status or been told that he was taken off the watchlist.

**Samir Anwar**

146.    In May 2104, at the Ambassador Bridge Port of Entry, Samir Anwar was detained for 3 and half hours.[137]

---

[131] *Id.* at 39:18-22, 43:19-44:1, 47:21-49:5.
[132] *Id.* at 63:2-66:8.
[133] *Id.* at 65:13-17.
[134] *Id.* at 65:18-66:3.
[135] *Id.* at 71:6-72:5.
[136] *Id.* at 74:15-75:20; *see also* Ali's Amended and Supplemental Responses to Defendants' First Set of Discovery Requests, #43 (showing no border crossings between March 2017 and the filing of this lawsuit).
[137] Samir Anwar Dep. at 66:17-72:18.

31

147.    The next time he travelled by land to Canada, in February 2015, he was detained on return at the Port Huron Port of Entry for three and a half to four hours.[138]  This time when they took his electronic devices, they demanded his password.[139]  A CBP agent told him his phone would not be returned unless he gave his passport.[140] Mr. Samir Anwar then obliged.[141]

### Muhammad Yahya Khan

148.    Mr. Khan has stopped crossing the U.S.-Canada border "because it takes seven to eight hours to just be sitting there and clear yourself and coming into the states.[142]

149.    In 2012, Khan "entered the United States by land at the United States by land at the Bluewater Bridge Heron Port of Entry."[143] His cell phone was confiscated during this time, and he was detained for around one hour.[144]

150.    In April 2015, he was detained for several hours, his cell phone confiscated, and luggage searched, when entering the country through Boston Logan International airport.[145]

151.    Similarly, in January 2017, Mr. Khan was detained by CBP at Detroit Metropolitan Airport upon arrival from an international flight for three to four hours while he was interrogated, and his luggage and belongings searched.[146] His cell phone was confiscated during this time.[147]

---

[138] *Id.* at 83:1-88:8.
[139] *Id.* at 86:17-87:2.
[140] *Id.*
[141] *Id.*
[142] Khan Dep. 93:5-10.
[143] *Id.* at 94:14-20.
[144] *Id.* at 95:6-17.
[145] *Id.* at 30:11-33:11.
[146] *Id.* at 47:11-59:19.
[147] *Id.* at 57:8-58:6.

152.    Mr. Khan was similarly detained at Detroit Metropolitan Airport upon arrival from an international flight in December 2017, for approximately three and a half hours while being interrogated and having his belongings and luggage searched and his phone confiscated.[148]

## John Doe No. 3

153.    In July 2016, John Doe 3 was detained at the Sault Ste. Marie border point of entry, at gunpoint, for five and a half hours.[149]  This was the only time John Doe had crossed the border by land in the sixteen years preceding his interrogatory responses in this case.[150]

154.    CBP agents seized his and his family's phones and other electronic devices and demanded their passports.[151]  The agents told them "we will keep you detained until you give us" the passwords.[152]

155.    During the interrogation, which ranged in topics from what John Doe 3 was doing in Canada to his use of two credit cards, to whether he worked or the FBI.[153]

156.    At some point, CBP agents told John Doe 3 ""We will never release you if you don't answer our questions."[154]

157.    In 2014, coming back to the United States in Washington DC by air from Saudi Arabia, John Doe 3 was also stopped then and had his electronics seized.[155]

---

[148] *Id.* at 80:11-84:14.
[149] John Doe No. 3 Dep. at 63:8-10 & Ex. 2 at 100-102.
[150] Ex. 2 at 100-102.
[151] *Id.* at 65:18-67:13.
[152] *Id.*
[153] *Id.* at 71:15-18.
[154] *Id.* at 77:14-15.
[155] *Id.* at 206:1-209:15

## COUNT I

## VIOLATION OF THE FOURTH AMENDMENT
## TO THE UNITED STATES CONSTITUTION
## (Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702)

### Electronic Search and Seizure

1.     The foregoing allegations are realleged and incorporated herein.

2.     Plaintiffs and similarly situated Americans have the right "to be secure in their…

papers… against unreasonable searches and seizures." Const. amend. IV.

3.     As a matter of official policy and practice, Defendant refers TSDB listees to

secondary inspection where they are compelled as a matter of process to provide biometric

fingerprints to determine whether the TSDB listee is a match to the TSDB.

4.     As a matter of official policy and practice, Defendant seize, search, download,

copy, analyze, and conduct a forensic search of the contents of the electronic devices of

individuals on the TSDB when presenting themselves at the border or at the airport, including

Plaintiffs and similarly situated American citizens, permanent residents, and foreign nationals.

Defendants routinely do not return the electronic devices to the watchlisted individuals for

weeks or months, if not longer. See CBP Directive No. 3340-049A.

5.     As a matter of official policy and practice, and particularly at the border,

Defendants download and copy the contents of watchlisted individuals' electronic devices,

including those of Plaintiffs, onto Defendants' computers and upload those contents to

Defendants' watchlisting and intelligence databases. Defendants then review that material in a

manner which constitutes a search for Fourth Amendment and other purposes.

6.     As a matter of official policy and practice, Defendants utilize the contents of

watchlisted individuals' electronic devices, including those of Plaintiffs, as a source of

intelligence. Defendants also utilize the contents and contacts of watchlisted individuals'

electronic devices, including those of Plaintiffs, to launch investigations into and nominate associates of the watchlisted individual for rules-based terrorist monitoring and inclusion in the federal terrorist watchlist.

7.      Defendants, after seizing Plaintiffs' electronic devices, have forced them to open those devices, including by providing passwords and by using biometric means such as facial recognition or fingerprints.

8.      Defendants' demands were not mere requests and given the circumstance of the demand (including the ongoing seizure of Plaintiffs) and the consequences often expressed by CBP officers regarding noncompliance (lengthy and indefinite detention and potentially permanent confiscation of the device), no reasonable person in Plaintiffs' position would take Defendants' demands to be a mere request.

9.      Even if demands for passwords and biometric data are permissible under the Fifth Amendment, they result in an intrusion of privacy that is the equivalent of a forensic search under the Fourth Amendment.

10.     CBP policy permits and generally performs searches (including forensic searches) and seizures of electronics solely on the basis of watchlist placement.

11.     Watchlist placement does not satisfy any probable cause standard.

12.     Watchlist status does not satisfy a reasonable suspicion of a border-related crime or inadmissibility because (1) it is not an actual reasonable suspicion standard, (2) it does not require reasonable suspicion of any crime, (3) it does not require reasonable suspicion of any border related crime, (4) it does not require reasonable suspicion that there is anything in Plaintiffs' electronic devices that is related to any border-related issue, and (5) it does not require reasonable suspicion there is any contraband in Plaintiffs' electronic devices.

13.     Defendant confiscated Plaintiffs' electronic devices, copied the devices'

contents, and searched and utilized those contents for intelligence and investigations that are not related to any border-related crime, and generally are not related to any particular crime at all.

14.     Defendant engaged in these seizures and searches solely because Plaintiffs and similarly situated American citizens, permanent residents, and foreign nationals are listed on the federal terrorist watchlist.

15.     Defendant violated the rights of Plaintiffs and similarly situated American citizens, permanent residents, and foreign nationals listed on the federal terrorist watchlist to be free from unreasonable search and seizure under the Fourth Amendment to the United States Constitution and their reasonable expectations of privacy when they confiscated Plaintiffs' electronic devices, copied the devices' contents, and searched and utilized those contents for intelligence and investigations that are not related to any border-related crime.

16.     Defendant's forensic searches of Plaintiffs' electronic devices and the electronic devices of similarly-situated American citizens, permanent residents, and foreign nationals are nonroutine border searches that required and were not based on individualized suspicion in violation of their Fourth Amendment rights.  *U.S. v. Montoya de Hernandez*, 473 U.S. 531, 538, 540-41 & n.4 (1985); *United States v. Kolsuz*, 890 F.3d 133, 144 (4th Cir. 2018), as amended (May 18, 2018); *U.S. v. Cotterman*, 709 F.3d 952, 963–68 (holding that forensic examination of computer is nonroutine border search requiring reasonable suspicion); *U.S. v. Saboonchi*, *United States v. Saboonchi*, 990 F. Supp. 2d 536, 548 (D. Md. 2014) (same as to smartphones and flash drives).

17.     Defendant's forensic searches of Plaintiffs' electronic devices and the electronic devices of similarly-situated American citizens, permanent residents, and foreign nationals are not subject to the border search exception because there is no direct link between the search of

Plaintiffs' electronic devices and the electronic devices of similarly situated Americans and any government interest that justified the searches on any account of a nexus requirement in violation of their Fourth Amendment rights. *United States v. Kolsuz*, 890 F.3d 133, 143 (4th Cir. 2018), as amended (May 18, 2018).

18.     Defendant CBP's policy that the presence of an individual on a government operated and government vetted terrorist watch list" alone constitutes grounds for CBP officers to search, copy, store and analyze the contents of laptops, tablets, and smartphones, without any individualized suspicion of the particular Plaintiff or similarly situated American citizens, permanent residents, and foreign nationals being stopped is a violation of their Fourth Amendment rights.

19.     Defendant's policies requiring CBP officers and TSA agents to disregard "all the facts surrounding the traveler and [their] trip" and "factors for and against reasonable suspicion," and to conduct a nonroutine forensic search of Plaintiffs' electronic devices and the electronic devices of similarly situated American citizens, permanent residents, and foreign nationals based upon the mere presence of identifying information without derogatory information that formed the basis of the TSDB nomination violates their rights under Fourth Amendment. *United States v. Montoya de Hernandez*, 473 U.S. 531, 541 (1985); *Manzo–Jurado*, 457 F.3d 928 (9th Cir. at 938) (the reasonable suspicion determination must "take[ ] into account both factors weighing for and against reasonable suspicion.")

20.     Because the TSDB includes tens of thousands of innocent travelers and is "based on broad profiles which cast suspicion on entire categories of people without any individualized suspicion of the particular person to be stopped," Defendant violated the Fourth Amendment rights of Plaintiffs and similarly situated American citizens, permanent residents, and foreign nationals when they confiscated their electronic devices, copied the devices'

contents, and searched and utilized those contents for intelligence and investigations that are not related to any border-related crime. See *Reid v. Georgia*, 448 U.S. 438, 441 (1980); *United States v. Sigmond–Ballesteros*, 285 F.3d 1117, 1121 (9th Cir.2001) (internal quotations and citations omitted).

21.     Defendant lacked consent, reasonable suspicion, probable cause, or a warrant for the seizures and searches of Plaintiffs' electronic devices and the electronic devices of similarly situated American citizens, permanent residents, and foreign nationals when they confiscated their electronic devices, copied the devices' contents, and searched and utilized those contents for intelligence and investigations that are not related to any border-related crime. *See United States v. Kolsuz*, 185 F. Supp. 3d 843, 853 (E.D. Va. 2016), *aff'd*, 890 F.3d 133 (4th Cir. 2018), *as amended* (May 18, 2018).

22.     Defendant knew at the time that they confiscated the electronic devices of Plaintiffs and the electronic devices of similarly situated American citizens, permanent residents, and foreign nationals, copied the devices' contents, and searched and utilized those contents for intelligence and investigations that are not related to any border-related crime Plaintiffs' electronic devices and the electronic devices of similarly situated Americans when they presented themselves at the border and at the airport that they were violating their reasonable expectations of privacy and their rights to be free from unreasonable search and seizure under the Fourth Amendment to the United States Constitution.

23.     By placing Plaintiffs and similarly situated American citizens, permanent residents, and foreign nationals on the federal terrorist watchlist, Defendant have caused them an actual, imminent, and irreparable injury that cannot be undone through monetary remedies.

WHEREFORE, Plaintiffs request this Honorable Court grant declaratory and injunctive relief in the form described in the Prayer for Relief below, plus all such other relief

this Court deems just and proper including costs and attorneys' fees incurred in this action.

## COUNT II

### VIOLATION OF THE FIFTH AMENDMENT
### TO THE UNITED STATES CONSTITUTION
### (Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702)

### Self-Incrimination

24.     The foregoing allegations are realleged and incorporated herein.

25.     The Fifth Amendment protects the fundamental individual right against self-incrimination.  U.S. Const. amend. V

26.     The Fifth Amendment protects every person from incrimination by the use of evidence obtained through search or seizure made in violation of his or her rights under the Fourth Amendment.  *Agnello v. United States*, 269 U.S. 20, 33–34 (1925).

27.     As a matter of official policy and practice, Defendant refers TSDB listees to secondary inspection where they are compelled as a matter of process to provide biometric fingerprints to determine whether the TSDB listee is a match to the TSDB.

28.     Defendants, after seizing Plaintiffs' electronic devices, have forced them to open those devices, including by providing passwords and by using biometric means such as facial recognition or fingerprints.

29.     Defendants' demands were not mere requests and given the circumstance of the demand (including the ongoing seizure of Plaintiffs) and the consequences often expressed by CBP officers regarding noncompliance (lengthy and indefinite detention and potentially permanent confiscation of the device), no reasonable person in Plaintiffs' position would take Defendants' demands to be a mere request.

30.     Even if the Government had the right to seize and search a device, that does not allow the Government to infringe upon an individual's other rights.

31.     Requiring the providing of passwords or the use of biometric means such as facial recognition or fingerprints violates the Fifth Amendment.

WHEREFORE, Plaintiffs requests this Honorable Court grant declaratory and injunctive relief in the form described in the Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

**COUNT III**

**VIOLATION OF THE FOURTH AMENDMENT
TO THE UNITED STATES CONSTITUTION
(Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702)**

**Seizure of Person (Border Ports of Entry)**

32.     The foregoing allegations are realleged and incorporated herein.

33.     The Fourth Amendment protects against unreasonable search and seizure of persons.

34.     Nonroutine searches and seizures of persons at the border are impermissible absent reasonable suspicion that a person is inadmissible, is carrying inadmissible contraband, or is guilty of border-related crime.

35.     Plaintiffs are detained at land borders for up to six to twelve hours, which based on consistent experience appears to be the time necessary for a terrorist specialist to be available at the port of entry, for search and seizure of Plaintiffs' devices, and for interrogation of Plaintiffs.

36.     Plaintiffs at airport ports of entry are detained for a somewhat shorter period of time, primarily because CBP agents have advanced notice of Plaintiffs' arrival.

37.     Detaining an individual—generally in a holding cell, sometimes at gunpoint—in order to search and seize Plaintiffs' electronic devices and perform a nonroutine

interrogation led by a specialist is a nonroutine search and seizure of Plaintiffs. This is true for both land border and airport port of entry detentions of Plaintiffs.

38.     Watchlist status does not satisfy a reasonable suspicion of a border-related crime or inadmissibility because (1) it is not an actual reasonable suspicion standard, (2) it does not require reasonable suspicion of any crime, (3) it does not require reasonable suspicion of any border related crime, (4) it does not require reasonable suspicion that there is anything in Plaintiffs' electronic devices that is related to any border-related issue, (5) it does not require reasonable suspicion there is any contraband in Plaintiffs' electronic devices, and (6) Plaintiffs are all US citizens and permanent residents with a constitutional right of admission into the United States.

39.     Even if watchlist status permitted some nonroutine search and seizure of Plaintiffs' person, the length of the search and seizure sis unreasonable in relation to any legitimate purpose or reasonable suspicion for them.

40.     Defendants have confiscated Plaintiffs' electronic devices, copied the devices' contents, searched and utilized those contents, and interrogated Plaintiffs for intelligence and investigations that are not related to any border-related crime, and generally are not related to any particular crime at all. Defendants have seized and unreasonably detained Plaintiffs and similarly situated American citizens, permanent residents, and foreign nationals are listed on the federal terrorist watchlist.

WHEREFORE, Plaintiffs requests this Honorable Court grant declaratory and injunctive relief in the form described in the Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

## COUNT IV

**VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT**

**(Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702)**

41. The foregoing allegations are realleged and incorporated herein.

42. For the reasons explained in Counts I-III, Defendants' policies of searching and seizing Plaintiffs and other United States citizens and permanent residents on the federal watchlist, as well as searching and seizing their cell phones, are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and contrary to constitutional rights, power, privilege, or immunity, and should be set aside as unlawful pursuant to 5 U.S.C. § 706.

43. Even if constitutional, Defendants' policies of permitting seizure forensic searches of watchlisted individuals solely based on watchlist status are arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law, and should be set aside as unlawful pursuant to 5 U.S.C. § 706.

44. Even if constitutional, Defendants' policies of seizing individuals and their devices at the border and ordering them to provide passwords and biometric data, including by suggesting that failure would lead to prolonged detention, confiscation or seizure of the person or the electronic device, are arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law, and should be set aside as unlawful pursuant to 5 U.S.C. § 706.

45. Even if constitutional, Defendants' policies of seizing and detaining watchlisted individuals for hours in order to perform a non-border-related interrogation of those individuals are arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law, and should be set aside as unlawful pursuant to 5 U.S.C. § 706.

46. Even if constitutional, Defendants' policies of treating certain individuals on the watchlist as armed and dangerous, and as a result generally seizing those individuals at land borders at gunpoint, are arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law, and should be set aside as unlawful pursuant to 5 U.S.C. § 706.

WHEREFORE, Plaintiffs requests this Honorable Court grant declaratory and injunctive relief in the form described in the Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

### **Prayer for Relief**

WHEREFORE, Plaintiffs respectfully request:

1.     A declaratory judgment that Defendant's policies, practices, and customs violate the Fourth and Fifth Amendment to the United States Constitution and the Administrative Procedure Act.

2.     A declaratory judgment that Defendants require reasonable suspicion of a border related crime, contraband, or inadmissibility, apart from watchlist status, before performing a nonroutine search or seizure of persons on the watchlist or forensic searches of their electronic devices.

3.     An injunction that:

    a.     Prohibits Defendants from applying CBP Policy that permits a forensic search of the electronic devices of US citizens or permanent residents solely because of watchlist status.

    b.     Prohibits Defendants from applying CBP Policy that permits nonroutine detention and interrogation of US citizens or permanent residents solely because of watchlist status.

    c.     Prohibits Defendants from ordering individuals at the border provide passwords or biometric means to access electronic devices, including by asserting or suggesting consequences (such as prolonged detention, confiscation or seizure of the person or the electronic device) for failure to

provide passwords or biometric means of access.

4.      An award of attorneys' fees, costs, and expenses of all litigation, pursuant to 28

U.S.C. § 2412; and,

5.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

NOW COME Plaintiffs, by and through their undersigned counsel, and hereby demand

trial by jury of the above-referenced causes of action.

Respectfully submitted,

CAIR LEGAL DEFENSE FUND
BY: /s/ Lena F. Masri
Lena F. Masri (VA 93291
     lmasri@cair.com
Gadeir I. Abbas (VA 81161)*
     gabbas@cair.com
Justin M. Sadowsky (VA 73382)
     jsadowsky@cair.com
453 New Jersey Ave., S.E.
Washington, DC 20003
Phone: (202) 742-6420
Fax: (202) 488-0833

*Mr. Abbas licensed in VA, not in D.C.
Practice limited to federal matters

AKEEL AND VALENTINE, PLC
SHEREEF H. AKEEL (MI # P54345) ±
888 W. Big Beaver Rd., Ste. 910
Troy, MI 48084
Phone: (248) 269-9595
shereef@akeelvalentine.com

Attorneys for Plaintiffs

Dated: March 7, 2022